# U.S. District Court
# DISTRICT OF KANSAS (Kansas City)
# CRIMINAL DOCKET FOR CASE #: <u>2:19–cr–20044–JAR</u> All Defendants

Case title: USA v. Hay

Date Filed: 07/16/2019

Date Terminated: 12/13/2022

Assigned to: Chief District Judge
Julie A. Robinson

Appeals court case number:
22–3276 10CCA

**<u>Defendant (1)</u>**

**Bruce L. Hay**
*29719–031*
*Release*
***TERMINATED: 12/13/2022***

represented by **Chekasha Ramsey**
Office of Federal Public Defender – KCKS
500 State Avenue, Suite 201
Kansas City, KS 66101–2400
913–551–6712
Fax: 913–551–6562
Alternative Phone:
Cell Phone:
Email: che_ramsey@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community*
*Defender Appointment*
*Bar Number: 78476*
*Bar Status: Active*

**David M. Magariel**
Office of Federal Public Defender – KCKS
500 State Avenue, Suite 201
Kansas City, KS 66101–2400
913–825–6922
Alternative Phone:
Cell Phone:
Email: david_magariel@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community*
*Defender Appointment*
*Bar Number: 21748*
*Bar Status: Active*

**Paige A. Nichols**
Office of Federal Public Defender – Topeka

117 SW 6th Avenue, Suite 200
Topeka, KS 66603
785–232–9828
Alternative Phone:
Cell Phone:
Email: paige_nichols@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*
*Bar Number: 16400*
*Bar Status: Active*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1343 and 2 – Wire Fraud. (SUPERSEDING INDICTMENT FILED 6/14/2022) (1s–6s) | The defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 37 months for Counts 1–16 to run concurrently. Upon release from imprisonment, defendant will be on supervised release for a term of 3 years on Counts 1–16 to run concurrently. Special Assessment: $1600. Restitution: $537,915.87 |
| 18:641 and 2 – Theft of Government Funds. (SUPERSEDING INDICTMENT FILED 6/14/2022) (7s–16s) | The defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 37 months for Counts 1–16 to run concurrently. Upon release from imprisonment, defendant will be on supervised release for a term of 3 years on Counts 1–16 to run concurrently. Special Assessment: $1600. Restitution: $537,915.87 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:641 – Theft of Public Money. (INDICTMENT FILED 7/16/19). Forfeiture Allegation. (1–4) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

**USA**                                                    represented by   **Donald Christopher Oakley**
                                                                          Office of United States Attorney – KCKS
                                                                          500 State Avenue, Suite 360
                                                                          Kansas City, KS 66101
                                                                          913–551–6730 ext 6604
                                                                          Alternative Phone:
                                                                          Cell Phone:
                                                                          Email: chris.oakley@usdoj.gov
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*
                                                                          *Designation: Retained*
                                                                          *Bar Number: 19248*
                                                                          *Bar Status: Active*

                                                                          **Ryan Huschka**
                                                                          Office of United States Attorney – KCKS
                                                                          500 State Avenue, Suite 360
                                                                          Kansas City, KS 66101
                                                                          913–551–6526
                                                                          Alternative Phone:
                                                                          Cell Phone:
                                                                          Email: ryan.huschka@usdoj.gov
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*
                                                                          *Designation: Retained*
                                                                          *Bar Number: 23840*
                                                                          *Bar Status: Active*

                                                                          **Tristram W. Hunt**
                                                                          Office of United States Attorney – KCKS
                                                                          500 State Avenue, Suite 360
                                                                          Kansas City, KS 66101
                                                                          913–551–6730
                                                                          Fax: 913–551–6541
                                                                          Alternative Phone:
                                                                          Cell Phone:
                                                                          Email: tris.hunt@usdoj.gov
                                                                          *TERMINATED: 03/08/2022*
                                                                          *Designation: Retained*
                                                                          *Bar Number: 18196*
                                                                          *Bar Status: Terminated*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 07/16/2019 | 1 | INDICTMENT as to Bruce L. Hay (1) counts 1–4. (hw) (Entered: 07/16/2019) |
| 07/19/2019 |   | ARREST of Bruce L. Hay. (hw) (Entered: 07/19/2019) |

| 07/19/2019 | 2 | ARREST WARRANT returned executed on 7/19/19 as to Bruce L. Hay. (hw) (Entered: 07/19/2019) |
|---|---|---|
| 07/19/2019 | 3 | MINUTE ENTRY for proceedings held before Magistrate Judge James P. O'Hara: INITIAL APPEARANCE and ARRAIGNMENT as to Bruce L. Hay (1) Count 1–4 held on 7/19/2019. Counsel appointed. Status Conference set for 9/13/2019 at 9:30 a.m. before Judge Murguia. Defendant to be released. Order setting conditions to of release to follow. (Tape #1:33 FTR/JPO.) (heo) (Entered: 07/19/2019) |
| 07/19/2019 | 4 | CJA 23 FINANCIAL AFFIDAVIT by Bruce L. Hay. (heo) (Entered: 07/19/2019) |
| 07/19/2019 | 5 | ORDER SETTING CONDITIONS OF RELEASE as to Bruce L. Hay (1). Signed by Magistrate Judge James P. O'Hara on 7/19/2019. (heo) (Entered: 07/19/2019) |
| 07/19/2019 | 6 | ENTRY OF APPEARANCE by attorney Chekasha Ramsey appearing for Bruce L. Hay. (Ramsey, Chekasha) (Entered: 07/19/2019) |
| 07/19/2019 | 7 | PRETRIAL AND CRIMINAL CASE MANAGEMENT ORDER ENTERED as to Bruce L. Hay. Status Conference set for 9/3/2019 at 09:30 AM in KC Courtroom 463 (CM) before District Judge Carlos Murguia. Signed by Magistrate Judge James P. O'Hara on 7/19/2019. (heo) (Entered: 07/19/2019) |
| 07/26/2019 | 8 | **(NOTE: Access to document is restricted pursuant to the courts privacy policy.)**<br><br>NOTICE & RECEIPT OF SURRENDERED PASSPORT as to Bruce L. Hay. Passport Number 440082965 issued by USA. (hw) (Entered: 07/26/2019) |
| 08/14/2019 | 9 | NOTICE of Discovery by USA as to Bruce L. Hay. (Hunt, Tristram) (Entered: 08/14/2019) |
| 08/30/2019 | 10 | Unopposed MOTION to Continue Status Conference by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 08/30/2019) |
| 08/30/2019 | 11 | ORDER granting 10 Motion to Continue; Time excluded from 8/30/2019 until 11/4/2019 as to Bruce L. Hay (1). Status Conference set for 11/4/2019 at 09:30 AM in KC Courtroom 463 (CM) before District Judge Carlos Murguia. Signed by District Judge Carlos Murguia on 8/30/2019. (heo) (Entered: 08/30/2019) |
| 10/22/2019 | 12 | Unopposed MOTION to Continue Status Conference and Declare Time Excludable from Speedy Trial Act Deadline by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 10/22/2019) |
| 10/23/2019 | 13 | ORDER granting 12 Motion to Continue; Time excluded from 10/23/2019 until 1/27/2020 as to Bruce L. Hay (1). Status Conference set for 1/27/2020 at 09:30 AM in KC Courtroom 463 (CM) before District Judge Carlos Murguia. Signed by District Judge Carlos Murguia on 10/23/2019. (heo) (Entered: 10/23/2019) |
| 12/09/2019 | 14 | Unopposed MOTION to Continue Status Conference by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 12/09/2019) |
| 12/13/2019 | 15 | ORDER granting 14 Motion to Continue; Time excluded from 12/9/2019 until 2/3/2020 as to Bruce L. Hay (1). Status Conference set for 2/3/2020 at 09:30 AM in KC Courtroom 463 (CM) before District Judge Carlos Murguia. Signed by District Judge Carlos Murguia on 12/13/2019. (heo) (Entered: 12/13/2019) |
| 01/30/2020 | 16 | Unopposed MOTION to Continue Status Conference by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 01/30/2020) |

| | | |
|---|---|---|
| 01/30/2020 | 17 | ORDER granting 16 Motion to Continue. Time excluded from 1/30/2020 until 4/13/2020 as to Bruce L. Hay (1). Status Conference set for 4/13/2020 at 09:30 AM in KC Courtroom 463 (CM) before District Judge Carlos Murguia. Signed by District Judge Carlos Murguia on 1/30/2020. (hw) (Entered: 01/30/2020) |
| 02/20/2020 | 18 | MINUTE ORDER REASSIGNING CASE: Case reassigned to Chief District Judge Julie A. Robinson as to Bruce L. Hay for all further proceedings. District Judge Carlos Murguia no longer assigned to case. Signed by deputy clerk on 2/20/20. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kao) (Entered: 02/20/2020) |
| 02/24/2020 | 19 | NOTICE OF HEARING as to Defendant Bruce L. Hay.  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. This case was reassigned to Judge Julie A. Robinson on 2/20/2020. The Status Conference is reset for 4/20/2020 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 02/24/2020) |
| 04/10/2020 | 20 | Unopposed MOTION to Continue Status Conference by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 04/10/2020) |
| 04/10/2020 | 21 | ORDER granting 20 Motion to Continue Status Conference. Time excluded from 4/20/2020 until 6/15/2020 as to Bruce L. Hay (1). Status Conference set for 6/15/2020 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Signed by Chief District Judge Julie A. Robinson on 4/10/2020. (hw) (Entered: 04/10/2020) |
| 06/08/2020 | 22 | ORDER TO CONTINUE as to Bruce L. Hay. Pursuant to Administrative Order No. 2020−3, all nonemergency hearings or trials before this court should be postponed pending further order of the court. Status Conference set for 8/17/2020 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Time excluded from 6/15/2020 until 8/17/2020. Signed by Chief District Judge Julie A. Robinson on 6/8/2020. (heo) (Entered: 06/08/2020) |
| 08/14/2020 | 23 | NOTICE OF HEARING as to Defendant Bruce L. Hay.  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Status Conference set for 8/17/2020 at 09:00 AM will be conducted y Telephone before Chief District Judge Julie A. Robinson. The parties shall join the conference by dialing into the CONFERENCE LINE 1−888−363−4749 and entering the ACCESS CODE 4697748#. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 08/14/2020) |
| 08/17/2020 | 24 | MINUTE ENTRY for proceedings held before Chief District Judge Julie A. Robinson: STATUS CONFERENCE as to Bruce L. Hay held on 8/17/2020. Motions due by 12/7/2020. Response deadline 12/14/2020. In Limine Conference set for 12/21/2020 at 01:30 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Jury Trial set for 1/4/2021 at 09:00 AM in KC Courtroom 643 before Chief District Judge Julie A. Robinson. Excludable started as to Bruce L. Hay: Time excluded from 8/17/2020 until 1/4/2021. (Court Reporter Kelli Stewart) (bw) (Entered: 08/17/2020) |
| 08/17/2020 | 25 | SCHEDULING ORDER: estimated trial time 8−9 days as to Bruce L. Hay. Motions due by 12/7/2020. Response deadline 12/14/2020 Motion Hearing/limine conference set for 12/21/2020 at 01:30 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Jury Trial set for 1/4/2021 at 09:00 AM in KC Courtroom |

| | | |
|---|---|---|
| | | 643 before Chief District Judge Julie A. Robinson. Signed by Chief District Judge Julie A. Robinson on 8/17/2020. (bw) (Entered: 08/17/2020) |
| 11/10/2020 | 26 | Unopposed MOTION to Continue Jury Trial by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 11/10/2020) |
| 11/17/2020 | 27 | ORDER granting 26 Motion to Continue; Time excluded from 1/4/2021 until 7/12/2021 as to Bruce L. Hay (1). Jury Trial continued to 7/12/2021 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Signed by Chief District Judge Julie A. Robinson on 11/17/2020. (heo) (Entered: 11/17/2020) |
| 11/20/2020 | 28 | ORDER as to Bruce L. Hay re 26 Unopposed MOTION to Continue Jury Trial (and pretrial deadlines) filed by Bruce L. Hay. Motions due by 6/1/2021. Response deadline 6/15/2021 Motion Hearing set for 6/22/2021 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson.) Signed by Chief District Judge Julie A. Robinson on 11/20/2020. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 11/20/2020) |
| 05/13/2021 | 33 | ENTRY OF APPEARANCE by attorney David M. Magariel appearing for Bruce L. Hay. (Magariel, David) (Entered: 05/13/2021) |
| 06/01/2021 | 34 | Joint MOTION to Continue Pretrial Motions Deadline and Jury Trial by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 06/01/2021) |
| 06/02/2021 | 35 | ORDER granting 34 Joint Motion for Continuance of Trial and Pretrial Motions Deadlines. Pretrial motions due by 7/1/2021. Response deadline 7/12/2021. Motion Hearing set for 7/21/2021 at 10:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Jury Trial set for 9/14/2021 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Time excluded from 7/12/2021 until 9/14/2021 as to Bruce L. Hay (1). Signed by Chief District Judge Julie A. Robinson on 6/2/2021. (kas) (Entered: 06/02/2021) |
| 06/17/2021 | 36 | MOTION for Bill of Particulars by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 06/17/2021) |
| 06/23/2021 | 37 | Unopposed MOTION to Continue Trial and Pretrial Motions Deadlines by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 06/23/2021) |
| 06/24/2021 | 38 | ORDER granting 37 Unopposed MOTION to Continue Trial and Pretrial Motions. Time excluded from 9/14/2021 until 3/21/2022 as to Bruce L. Hay (1). The government's response to defendant's Motion for Bill of Particulars is due 10/15/2021. Pretrial Motions due by 11/8/2021. Response to Pretrial Motions deadline 11/29/2021. Witness and Exhibit lists are due 1/17/2022. Motions in Limine are due 2/27/2022. Motion In Limine Hearing set for 3/2/2022 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Pretrial Motions Hearing set for 12/21/2021 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Jury Trial set for 3/21/2022 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Signed by Chief District Judge Julie A. Robinson on 6/23/2021. (kas) (Entered: 06/24/2021) |
| 06/24/2021 | | **Per 38 Order – Set Deadlines as to Bruce L. Hay: Motions in Limine due by 2/27/2022. Set Deadlines re 36 MOTION for Bill of Particulars, Response deadline 10/15/2021. (kas)** (Entered: 06/24/2021) |
| 07/01/2021 | 39 | ORDER AND NOTICE OF HEARING ON MOTION as to Bruce L. Hay. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING re 36 Motion for Bill of Particulars: |

| | | |
|---|---|---|
| | | At the parties request, the Court resets the government's response to Motion for Bill of Particulars to 9/23/2021, and sets a Motion Hearing for 10/12/2021 at 01:30 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. Signed by Chief District Judge Julie A. Robinson on 7/1/2021. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (bw) (Entered: 07/01/2021) |
| 08/19/2021 | 40 | ENTRY OF APPEARANCE on behalf of USA by Ryan Huschka. (Huschka, Ryan) (Entered: 08/19/2021) |
| 09/23/2021 | 41 | MOTION for Extension of Time to File Response as to 36 Motion for Bill of Particulars by USA as to Bruce L. Hay. (Hunt, Tristram) (Entered: 09/23/2021) |
| 09/23/2021 | 42 | ORDER granting 41 Motion for Extension of Time to File Response as to Bruce L. Hay (1). Response deadline 10/8/2021. A hearing on defendant's Bill of Particulars is set for October 19, 2021 at 2:30 p.m. Signed by Chief District Judge Julie A. Robinson on 9/23/2021. (hw) (Additional attachment(s) added on 9/23/2021: # 1 Main document) (hw). (Entered: 09/23/2021) |
| 09/23/2021 | | NOTICE OF DOCKET TEXT MODIFICATION by Deputy Clerk regarding Motion Hearing, time of hearing changed from 1:30 pm to 2:30 pm. (hw) (Entered: 09/23/2021) |
| 09/23/2021 | 43 | DOCKET ANNOTATION: A corrected version of 42 Order has been added to the entry and this annotation for noticing purposes only. (hw) (Entered: 09/23/2021) |
| 10/08/2021 | 44 | RESPONSE TO MOTION by USA as to Bruce L. Hay re 36 Motion for Bill of Particulars. (Hunt, Tristram) (Entered: 10/08/2021) |
| 10/14/2021 | 45 | AMENDED NOTICE OF HEARING ON MOTION as to Bruce L. Hay. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING re 36 Motion for Bill of Particulars: Due to a conflict with the Court's schedule, the Motion Hearing is reset for 10/19/2021 at 10:30 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (bw) (Entered: 10/14/2021) |
| 10/14/2021 | 46 | MEMORANDUM IN SUPPORT of 36 Motion for Bill of Particulars by Bruce L. Hay as to Bruce L. Hay. (Ramsey, Chekasha) (Entered: 10/14/2021) |
| 10/19/2021 | 47 | MINUTE ENTRY for proceedings held before Chief District Judge Julie A. Robinson: MOTION HEARING as to Bruce L. Hay held on 10/19/2021 DENYING 36 MOTION for Bill of Particulars filed by Bruce L. Hay. (Court Reporter Nancy Wiss) (bw) (Entered: 10/19/2021) |
| 10/25/2021 | 48 | TRANSCRIPT of Motion for Bill of Particulars Hearing held 10/19/2021 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913−735−2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Che Ramsey. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/24/2022. (nw) (Entered: 10/25/2021) |
| 11/08/2021 | 49 | MOTION to Suppress by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 11/08/2021) |
| 11/22/2021 | | **The Court's Order 38 directed the parties to file motions in limine by 2/27/2022. However, since this date falls on a Sunday, the Court resets the motion in limine deadline to 2/28/2022. (bw)** (Entered: 11/22/2021) |
| 11/29/2021 | 50 | RESPONSE TO MOTION by USA as to Bruce L. Hay re 49 Motion to Suppress. (Huschka, Ryan) (Entered: 11/29/2021) |
| 12/21/2021 | 52 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: MOTION HEARING as to Bruce L. Hay held on 12/21/2021. The Court takes under advisement the defendant's 49 Motion to Suppress. Jury Trial continued to 8/1/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Excludable started as to Bruce L. Hay: Time excluded from 12/21/2021 until 8/1/2022. (Court Reporter Dani Murray) (bw) (Entered: 12/21/2021) |
| 01/07/2022 | 54 | TRIAL ORDER: estimated trial time 10 days as to Bruce L. Hay. In Limine Conference set for 7/20/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/1/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. See Order for additional deadlines. Signed by District Judge Julie A. Robinson on 1/7/2022. (kas) (Entered: 01/07/2022) |
| 03/08/2022 | 59 | WITHDRAWAL OF COUNSEL by Tristram W. Hunt and ENTRY OF APPEARANCE OF SUBSTITUTED COUNSEL by Donald Christopher Oakley on behalf of USA. (Oakley, Donald) (Entered: 03/08/2022) |
| 04/20/2022 | 60 | RULE 404(b) NOTICE by USA as to Bruce L. Hay. (Huschka, Ryan) (Entered: 04/20/2022) |
| 05/04/2022 | 61 | ORDER as to Bruce L. Hay. This case is scheduled for jury trial beginning on 8/1/2022. The parties jointly request an extension of the deadline for filing their witness and exhibit lists. The Court grants said request and extends deadline for filing their witness and exhibit lists to **6/27/2022**. Signed by District Judge Julie A. Robinson on 5/4/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 05/04/2022) |
| 05/05/2022 | 62 | MEMORANDUM AND ORDER denying 49 Motion to Suppress as to Bruce L. Hay (1). Signed by District Judge Julie A. Robinson on 5/5/2022. (mam) (Entered: 05/05/2022) |
| 05/18/2022 | | **NOTICE: The Court sets deadline of 5/31/2022 for the defendant Bruce L. Hay, to file response to the 60 404(b) Notice filed by the government. (bw)** (Entered: 05/18/2022) |
| 05/31/2022 | 65 | RESPONSE re 60 Notice of Rule 404b, and Motion to Strike USA's 60 Rule 404(b) Notice by Bruce L. Hay. (Ramsey, Chekasha) Modified on 6/2/2022 to add Motion to Strike. (kao) (Entered: 05/31/2022) |
| 06/02/2022 | 66 | DOCKET ANNOTATION: Docket Entry 65 was filed as a Response however it contains a MOTION to Strike. The entry has been modified to show as a pending |

| | | |
|---|---|---|
| | | motion. (kao) (Entered: 06/02/2022) |
| 06/14/2022 | 67 | ORDER AND NOTICE OF HEARING as to Defendant Bruce L. Hay THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Due to a scheduling conflict with the Court's calendar, the In Limine Conference is rescheduled for 7/26/2022 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Signed by District Judge Julie A. Robinson on 6/14/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 06/14/2022) |
| 06/14/2022 | 68 | SUPERSEDING INDICTMENT as to Bruce L. Hay (1) counts 1s−6s, 7s−16s. (ca) (Entered: 06/14/2022) |
| 06/16/2022 | 69 | NOTICE OF HEARING as to Defendant Bruce L. Hay. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Arraignment set for 6/22/2022 at 01:30 PM in KC Courtroom 223 (ADM) before Magistrate Judge Angel D. Mitchell (ht) (Entered: 06/16/2022) |
| 06/22/2022 | | ORDER as to Bruce L. Hay – Pursuant to the Due Process Protections Act, the government is reminded of its obligations pursuant to Brady v. Maryland and its progeny to disclose material that is favorable to the defendant and material to defendants guilt or punishment. The failure to do so in a timely manner may include dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, or any other remedy that is just under the circumstances. Signed by Magistrate Judge Angel D. Mitchell on 6/22/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ht) (Entered: 06/22/2022) |
| 06/22/2022 | 70 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: ARRAIGNMENT as to Bruce L. Hay (1) Count 1s−6s,7s−16s held on 6/22/2022. Defendant appears in person and with counsel and advised of Due Process Protections Act. Continued on present conditions of release. (Tape #FTR/JAR Network @ 1:30 pm) (ca) (Entered: 06/22/2022) |
| 06/24/2022 | 71 | NOTICE OF HEARING as to Defendant Bruce L. Hay. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Status Conference set for 7/5/2022 at 09:00 AM via Telephone JAR – CONFERENCE LINE 1−888−363−4749 ACCESS CODE 4697748 before District Judge Julie A. Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 06/24/2022) |
| 06/27/2022 | 72 | WITNESS LIST by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 06/27/2022) |
| 06/27/2022 | 73 | EXHIBIT LIST by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 06/27/2022) |
| 06/27/2022 | 74 | EXHIBIT LIST by USA as to Bruce L. Hay. (Attachments: # 1 Exhibit List Ex. A)(Huschka, Ryan) (Entered: 06/27/2022) |
| 06/27/2022 | 75 | WITNESS LIST by USA as to Bruce L. Hay. (Huschka, Ryan) (Entered: 06/27/2022) |
| 06/29/2022 | 76 | RULE 404(b) NOTICE by USA as to Bruce L. Hay. (Huschka, Ryan) (Entered: 06/29/2022) |
| 07/01/2022 | 77 | MOTION pursuant to Rule 17(b) by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 07/01/2022) |
| 07/05/2022 | 78 | |

| | | |
|---|---|---|
| | | Order for Production of Witness(es) Fed. R. Crim. P. 17(b)and granting <u>77</u> Motion Pursuant to Rule 17b as to Bruce L. Hay (1). Signed by District Judge Julie A. Robinson on 7/1/2022. (ca) (Entered: 07/05/2022) |
| 07/05/2022 | <u>79</u> | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: finding as moot <u>65</u> Motion to Strike as to Bruce L. Hay (1); STATUS CONFERENCE as to Bruce L. Hay held on 7/5/2022. (Court Reporter Dani Murray) (bw) (Entered: 07/05/2022) |
| 07/11/2022 | <u>80</u> | MOTION in Limine by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 07/11/2022) |
| 07/18/2022 | <u>81</u> | RESPONSE TO MOTION by USA as to Bruce L. Hay re <u>80</u> Motion in Limine. (Attachments: # <u>1</u> Exhibit A)(Huschka, Ryan) (Entered: 07/18/2022) |
| 07/22/2022 | <u>82</u> | MOTION to Exclude *Expert Opinon Testimony* by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 07/22/2022) |
| 07/23/2022 | <u>83</u> | STIPULATION by USA as to Bruce L. Hay. (Huschka, Ryan) (Entered: 07/23/2022) |
| 07/25/2022 | <u>84</u> | PROPOSED JURY INSTRUCTIONS by USA as to Bruce L. Hay. (Oakley, Donald) (Entered: 07/25/2022) |
| 07/25/2022 | <u>85</u> | PROPOSED JURY INSTRUCTIONS by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 07/25/2022) |
| 07/26/2022 | <u>86</u> | AMENDED WITNESS LIST by Bruce L. Hay. (Ramsey, Chekasha) (Modified on 7/28/2022 to add amended. (heo) (Entered: 07/26/2022) |
| 07/26/2022 | <u>87</u> | MINUTE ENTRY for IN LIMINE CONFERENCE as to Bruce L. Hay held on 7/26/2022 held before District Judge Julie A. Robinson: re <u>80</u> Motion in Limine as to Bruce L. Hay (1); and <u>82</u> Motion to Exclude as to Bruce L. Hay (1). See minute sheet for rulings. (Court Reporter Dani Murray) (bw) (Entered: 07/26/2022) |
| 07/28/2022 | <u>88</u> | REDACTED TRANSCRIPT of Motion Hearing held July 26, 2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Mr. Christopher Oakley.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/26/2022. (dm) (Entered: 07/28/2022) |
| 07/28/2022 | <u>89</u> | SEALED TRANSCRIPT as to Bruce L. Hay. (dm) (Entered: 07/28/2022) |
| 07/29/2022 | <u>91</u> | EXHIBIT LIST by Bruce L. Hay. (Attachments: # <u>1</u> Exhibit List) (Ramsey, Chekasha) (Entered: 07/29/2022) |
| 07/29/2022 | <u>92</u> | |

| | | |
|---|---|---|
| | | EXHIBIT LIST by USA as to Bruce L. Hay. (Attachments: # 1 Ex. A)(Huschka, Ryan) (Entered: 07/29/2022) |
| 07/29/2022 | 94 | WITNESS LIST by USA as to Bruce L. Hay. (Huschka, Ryan) (Entered: 07/29/2022) |
| 08/01/2022 | | **Set Additional Jury Trial Days as to Bruce L. Hay: Jury Trial set for 8/2/2022 at 09:30 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/3/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/4/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/5/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/8/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/9/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/10/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/11/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Jury Trial set for 8/12/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw)** (Entered: 08/01/2022) |
| 08/01/2022 | 95 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY SELECTION and JURY TRIAL as to Bruce L. Hay begins on 8/1/2022. Jury selected. Opening Statements. Evidence begins. Court adjourns at 4:53 p.m. Trial will resume on 8/2/2022 at 9:30 a.m. (Court Reporter Dani Murray) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/01/2022) |
| 08/02/2022 | 96 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/2/2022. The government continues with presentation of evidence. Court adjourns at 4:44 p.m. Trial will resume on 8/3/2022 at 9:00 a.m. (Court Reporter Dani Murray) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/03/2022) |
| 08/03/2022 | 97 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/3/2022. The government continues with presentation of evidence. Court adjourns at 5:08 p.m. Trial will resume on 8/4/2022 at 9:00 a.m. (Court Reporter Dani Murray) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/04/2022) |
| 08/04/2022 | 98 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/4/2022. The government continues with presentation of evidence. Court adjourns at 4:26 p.m. Trial will resume on 8/5/2022 at 9:00 a.m. (Court Reporter Dani Murray) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/04/2022) |
| 08/05/2022 | 99 | MOTION for Acquittal by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 08/05/2022) |
| 08/05/2022 | 102 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/5/2022. The government continues with presentation of evidence. The government rests. Court adjourns at 3:58 p.m. Trial will resume on 8/8/2022 at 9:00 a.m. (Court Reporter Dani Murray) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/08/2022) |
| 08/06/2022 | 100 | |

| | | |
|---|---|---|
| | | RESPONSE TO MOTION by USA as to Bruce L. Hay re <u>99</u> Motion for Acquittal. (Huschka, Ryan) (Entered: 08/06/2022) |
| 08/07/2022 | <u>101</u> | MOTION to Exclude by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 08/07/2022) |
| 08/08/2022 | <u>103</u> | TRANSCRIPT of Jury Trial Excerpt (Testimony of Dr. Danielle Becker) held August 8, 2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Mr. Christopher Oakley.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 11/7/2022. (dm) (Entered: 08/08/2022) |
| 08/08/2022 | 105 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/8/2022. The defendant begins presentation of evidence. Court adjourns at 12:01 p.m. Trial will resume at 9:30 a.m. (Court Reporter Nancy Wiss) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/10/2022) |
| 08/09/2022 | 104 | ORDER. For the reasons stated on the record, Defendant Bruce L. Hay's <u>101</u> Motion to Exclude is granted in part and denied in part. Signed by District Judge Julie A. Robinson on 8/9/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jm) (Entered: 08/09/2022) |
| 08/09/2022 | 106 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/9/2022. The defense continues with presentation of evidence. Court adjourns at 3:16 p.m. Trial to resume on 8/10/2022 at 8:30 a.m. (Court Reporter Nancy Wiss) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/10/2022) |
| 08/10/2022 | 107 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/10/2022. Defense continues with presentation of evidence. Defense rests. Jury released to begin deliberations. Jury to return for deliberations on 8/11/2022 at 8:30 a.m. (Court Reporter Nancy Wiss) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/11/2022) |
| 08/11/2022 | <u>108</u> | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: JURY TRIAL as to Bruce L. Hay held on 8/11/2022. (Court Reporters Nancy Wiss and Dani Murray) (Attachments: # <u>1</u> Gov't Exhibit List, # <u>2</u> Defendant's Exhibit List, # <u>3</u> Witness List) (bw) (Entered: 08/11/2022) |
| 08/11/2022 | <u>109</u> | JURY INSTRUCTIONS as to Bruce L. Hay (bw) (Entered: 08/11/2022) |
| 08/11/2022 | <u>110</u> | |

| | | |
|---|---|---|
| | | JURY VERDICT as to Bruce L. Hay (1) Guilty on Counts 1s−6s,7s−16s. (bw) (Additional attachment(s) added on 8/11/2022: # 1 Unredacted Jury Verdict) (bw). (Entered: 08/11/2022) |
| 08/15/2022 | | **Per 108 Minute Sheet: Sentencing Memorandum Deadline set for 10/13/2022. Sentencing set for 10/27/2022 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (kao)** (Entered: 08/15/2022) |
| 08/18/2022 | 111 | MOTION for order Preserving JERS File of Admitted Trial Exhibits by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 08/18/2022) |
| 08/18/2022 | 112 | ORDER denying 111 Motion for Order Preserving JERS File of Admitted Trial Exhibits as to Bruce L. Hay. See D. Kan. Rule 79.3. Signed by District Judge Julie A. Robinson on 8/18/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jm) (Entered: 08/18/2022) |
| 09/20/2022 | 113 | NOTICE OF HEARING TIME (TIME CHANGE ONLY) as to Defendant Bruce L. Hay. <span style="color:red">THIS IS AN OFFICIAL NOTICE FOR THIS HEARING.</span> Sentencing reset for 10/27/2022 at 09:30 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 09/20/2022) |
| 10/03/2022 | 114 | Unopposed MOTION to Continue PSR Objection Deadline and Sentencing Hearing by Bruce L. Hay. (Ramsey, Chekasha) (Entered: 10/03/2022) |
| 10/05/2022 | 115 | ORDER granting 114 Motion to Continue as to Bruce L. Hay (1). Objections to PSR due by 10/18/2022. PSR Response deadline 10/24/2022. Sentencing Memorandum Deadline is 11/29/2022. Sentencing set for 12/13/2022 at 10:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Signed by District Judge Julie A. Robinson on 10/5/2022. (ca) (Entered: 10/05/2022) |
| 11/08/2022 | 116 | PRESENTENCE INVESTIGATION REPORT as to Bruce L. Hay.<br><br>**<span style="color:red">(NOTE: Access to this document is restricted to the USA and this defendant.)</span>**<br><br>(USPO) (Entered: 11/08/2022) |
| 11/29/2022 | 117 | SEALED MOTION for Leave to File Under Seal by Bruce L. Hay. (Attachments: # 1 Proposed Sealed Document Sentencing Memorandum, # 2 Proposed Sealed Document Exhibit A, # 3 Proposed Sealed Document Exhibit B, # 4 Proposed Sealed Document Exhibit C, # 5 Proposed Sealed Document Exhibit D, # 6 Proposed Sealed Document Exhibit E, # 7 Proposed Sealed Document Exhibit F)(Ramsey, Chekasha) (Entered: 11/29/2022) |
| 11/29/2022 | 118 | ORDER sustaining 117 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested documents with an event from the SEALED DOCUMENTS category as to Bruce L. Hay (1). Signed by District Judge Julie A. Robinson on 11/29/2022. (ca) (Entered: 11/29/2022) |
| 11/29/2022 | 119 | SEALED SENTENCING MEMORANDUM by Bruce L. Hay. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Ramsey, Chekasha) (Entered: 11/29/2022) |
| 12/02/2022 | 120 | MEMORANDUM AND ORDER denying 99 MOTION for Acquittal as to Bruce L. Hay (1). Signed by District Judge Julie A. Robinson on 12/2/2022. (kas) (Entered: 12/02/2022) |

| 12/06/2022 | 121 | RESPONSE TO Sentencing Memorandum by USA as to Bruce L. Hay. (Oakley, Donald) (Entered: 12/06/2022) |
|---|---|---|
| 12/13/2022 | 122 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: SENTENCING HEARING held on 12/13/2022 as to defendant Bruce L. Hay. (Court Reporter Dani Murray) (ss) (Entered: 12/13/2022) |
| 12/13/2022 | 123 | JUDGMENT as to Bruce L. Hay (1) – Counts 1s–6s, 7s–16s, The defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 37 months for Counts 1–16 to run concurrently. Upon release from imprisonment, defendant will be on supervised release for a term of 3 years on Counts 1–16 to run concurrently. Special Assessment: $1600. Restitution: $537,915.87. Counts 1–4, Dismissed. Signed by District Judge Julie A. Robinson on 12/13/2022. (ca) (Entered: 12/13/2022) |
| 12/13/2022 | 124 | STATEMENT OF REASONS as to Bruce L. Hay re 123 Judgment.<br><br>**(NOTE: Access to this document is restricted to the USA and this defendant.)**<br><br>(ca) (Entered: 12/13/2022) |
| 12/15/2022 | 125 | NOTICE OF APPEAL TO 10CCA as to defendant Bruce L. Hay re 123 Judgment. (Ramsey, Chekasha) (Entered: 12/15/2022) |
| 12/16/2022 | | APPEAL FEE STATUS: Filing fee not paid re 125 Notice of Appeal on behalf of Defendant Bruce L. Hay. CJA 23 filed on 7/19/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mam) (Entered: 12/16/2022) |
| 12/16/2022 | 126 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA as to Bruce L. Hay re 125 Notice of Appeal. (Attachments: # 1 Preliminary Record) (mam) (Entered: 12/16/2022) |
| 12/16/2022 | 127 | APPEAL DOCKETED in 10CCA on 12/16/2022 and assigned Appeal No. 22–3276 re 125 Notice of Appeal filed by Bruce L. Hay. (mam) (Entered: 12/16/2022) |
| 12/28/2022 | 128 | ENTRY OF APPEARANCE by attorney Paige A. Nichols appearing for Bruce L. Hay. (Nichols, Paige) (Entered: 12/28/2022) |
| 12/28/2022 | 129 | DESIGNATION OF RECORD ON APPEAL by Bruce L. Hay re 125 Notice of Appeal – Final Judgment. (Appeal No. 22–3276) (Nichols, Paige) (Entered: 12/28/2022) |
| 12/28/2022 | 130 | TRANSCRIPT ORDER FORM: Transcript Requested motion to suppress hearing held 12/21/21; status conference held 7/5/22; sentencing hearing held 12/13/22; jury trial held 8/1/22–8/5/22 and 8/11/22 re 125 Notice of Appeal – Final Judgment filed by Bruce L. Hay. (Nichols, Paige) (Entered: 12/28/2022) |
| 12/28/2022 | 131 | TRANSCRIPT ORDER FORM: Transcript Requested jury trial held 8/8/22–8/11/22 re 125 Notice of Appeal – Final Judgment filed by Bruce L. Hay. (Nichols, Paige) (Entered: 12/28/2022) |
| 12/28/2022 | 132 | ORDER of 10CCA as to Bruce L. Hay. Pursuant to 18 U.S.C. §3006A, the Federal Public Defender for the District of Kansas is appointed as counsel of record to represent the appellant Bruce L. Hay. This appointment is effective nunc pro tunc to the date the notice of appeal was filed in this matter. (Appeal No. 22–3276) (mam) |

| | | |
|---|---|---|
| | | (Entered: 12/28/2022) |
| 01/11/2023 | 133 | TRANSCRIPT ORDER FORM by Court Reporter Nancy Wiss ordering transcripts of Jury Trial – Days 8/8/22–8/11/22 re 125 Notice of Appeal – Final Judgment filed by Bruce L. Hay. (Appeal No. 22–3276) Transcript due by 2/11/2023. (nw) (Entered: 01/11/2023) |
| 01/11/2023 | 134 | TRANSCRIPT ORDER FORM by Court Reporter Dani Murray ordering transcripts of motion to suppress hearing held 12/21/21, status conference held 7/5/22, jury trial held 8/1–5/22, and sentencing held 12/13/22 (Note: Nancy Wiss was the only court reporter assigned on 8/11/22) re 125 Notice of Appeal – Final Judgment filed by Bruce L. Hay. (Appeal No. 22–3276) Transcript due by 2/11/2023. (dm) (Entered: 01/11/2023) |
| 02/10/2023 | 135 | (PLEASE DISREGARD THIS ENTRY AS THE INCORRECT PLEADING WAS ATTACHED AT TIME OF FILING. SEE DE 148 FOR CORRECT FILING) TRANSCRIPT of Jury Trial Volume – Day Six held 8/8/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Six.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (nw) Modified text on 2/14/2023 (msb). (Entered: 02/10/2023) |
| 02/10/2023 | 136 | TRANSCRIPT of Jury Trial Volume – Day Seven held 8/9/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Seven.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (nw) (Entered: 02/10/2023) |
| 02/10/2023 | 137 | TRANSCRIPT of Jury Trial Volume – Day Eight held 8/10/2022 as to Bruce L. Hay |

| | | |
|---|---|---|
| | | before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Eight. |
| | | **<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.</span>** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (nw) (Entered: 02/10/2023) |
| 02/10/2023 | <u>138</u> | TRANSCRIPT of Jury Trial Volume – Day Nine held 8/11/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Nine. |
| | | **<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.</span>** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (nw) (Entered: 02/10/2023) |
| 02/10/2023 | <u>139</u> | TRANSCRIPT of Motion Hearing held 12/21/2021 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. |
| | | **<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.</span>** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | <u>140</u> | |

| | | |
|---|---|---|
| | | TRANSCRIPT of Telephone Conference held 7/5/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | <u>141</u> | TRANSCRIPT of Jury Trial Day 1 held 8/1/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 1.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | <u>142</u> | TRANSCRIPT of Jury Trial Day 2 held 8/2/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 2.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |

| 02/10/2023 | <u>143</u> | TRANSCRIPT of Jury Trial Day 3 held 8/3/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 3. |
| --- | --- | --- |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | <u>144</u> | TRANSCRIPT of Jury Trial Day 4 held 8/4/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 4. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | <u>145</u> | TRANSCRIPT of Jury Trial Day 5 held 8/5/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 5. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for |

| | | |
|---|---|---|
| | | 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | <u>146</u> | TRANSCRIPT of Sentencing Hearing held 12/13/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/11/2023 | <u>147</u> | TRANSCRIPT of Jury Trial Voir Dire held 8/1/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Voir Dire.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/12/2023. (dm) (Entered: 02/11/2023) |
| 02/14/2023 | <u>148</u> | TRANSCRIPT of Jury Trial Volume Day Six held 8/8/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Day Six.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for |

| | | 5/15/2023. (nw) (Entered: 02/14/2023) |
|---|---|---|

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### (KANSAS CITY DOCKET)

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | | |
| | ) | | |
| **Plaintiff,** | ) | | |
| | ) | | |
| **v.** | ) | **No.** | 19-20044-CM/JPO |
| | ) | | |
| **BRUCE L. HAY,** | ) | | |
| | ) | | |
| **Defendant.** | ) | | |

## INDICTMENT

The Grand Jury charges:

At all times relevant to this indictment:

1.     The U.S. Department of Veterans Affairs (VA) Compensation and Benefits program compensated veterans with verified disabilities.   Specifically, disability compensation is a benefit paid to a veteran because of injuries or diseases sustained while on active duty, or made worse by active military service, or sustained from VA healthcare.   The benefits are not taxable.

2.     Eligible veterans who are patients in a nursing home or hospital, or who are housebound, may be entitled to higher income limitations and an additional benefit known as Aid & Attendance (A&A).   A&A is an additional VA payment,

supplementing the VA pension, which provides care for veterans requiring a higher level of regular care by another person or facility. Some examples of higher level of care include the inability of a veteran to dress or undress, frequent need for the adjustment of any special prosthetic or orthopedic appliances, or inability to attend to the wants of nature. In essence, the need for A&A means helplessness or being so nearly helpless as to require the regular "aid and attendance" of another person. The VA requires a physician's certification for the veteran to qualify for A&A. The 2008 A&A benefit was $622 per month, above and beyond the VA pension benefit.

3.     The VA Survivors' and Dependents' Educational Assistance program provides education and training opportunities to eligible dependents and survivors of certain veterans. Eligible individuals are veterans' and service members' dependents, spouses, and surviving spouses found eligible by the Regional Processing Office (RPO) because the veteran was rated for total and permanent service-connected disability. Participants include a dependent child between the ages of 14 and 31, a spouse, or surviving spouse. The services provide education and career counseling, special assistance, special restorative training, and specialized vocational training to the participants.

4.     The defendant served in the United States Army from June 21, 1987 to June 11, 1991; August 26, 1996 to October 9, 1998; and January 21, 2003 to

February 28, 2006.

5.    The allegations contained in paragraphs 1-4 are realleged and incorporated as if fully set forth in this paragraph.

## COUNT 1

6.    On or about September 30, 2016, in the District of Kansas, the defendant,

**BRUCE L. HAY**,

willfully and knowingly stole and converted to his own use money of the United States, in the amount of $3,843.31, which he received as disability payments from the Department of Veterans Affairs Compensation and Pension Benefits program, to which he was not entitled, after falsely claiming to have conversion disorder with major depressive disorder, generalized choreiform movement disorder, weakness in left lower leg associated with conversion disorder, weakness in right lower leg associated with conversion disorder, and falsely claiming that he was entitled to receive special monthly compensation based on aid and attendance and Dependents' Educational Assistance under Title 38, United States Code, Chapter 35.

This was all in violation of Title 18, United State Code, Section 641.

7.    The allegations contained in paragraphs 1-6 are realleged and incorporated as if fully set forth in this paragraph.

## COUNT 2

8.     On or about November 1, 2016, in the District of Kansas, the defendant,

**BRUCE L. HAY,**

willfully and knowingly stole and converted to his own use money of the United States, in the amount of $3,843.31, which he received as disability payments from the Department of Veterans Affairs Compensation and Pension Benefits program, to which he was not entitled, after falsely claiming to have conversion disorder with major depressive disorder, generalized choreiform movement disorder, weakness in left lower leg associated with conversion disorder, weakness in right lower leg associated with conversion disorder, and falsely claiming that he was entitled to receive special monthly compensation based on A&A and Dependents' Educational Assistance under Title 38, United States Code, Chapter 35.

This was all in violation of Title 18, United State Code, Section 641.

9.     The allegations contained in paragraphs 1-8 are realleged and incorporated as if fully set forth in this paragraph.

## COUNT 3

10.    On or about March 31, 2017, in the District of Kansas, the defendant,

**BRUCE L. HAY,**

willfully and knowingly stole and converted to his own use money of the United

States, in the amount of $3,990.24, which he received as disability payments from the Department of Veterans Affairs Compensation and Pension Benefits program, to which he was not entitled, after falsely claiming to have conversion disorder with major depressive disorder, generalized choreiform movement disorder, weakness in left lower leg associated with conversion disorder, weakness in right lower leg associated with conversion disorder, and falsely claiming that he was entitled to receive special monthly compensation based on A&A and Dependents' Educational Assistance under Title 38, United States Code, Chapter 35.

This was all in violation of Title 18, United State Code, Section 641.

11.    The allegations contained in paragraphs 1-10 are realleged and incorporated as if fully set forth in this paragraph.

## COUNT 4

12.    On or about May 1, 2017, in the District of Kansas, the defendant,

**BRUCE L. HAY**,

willfully and knowingly stole and converted to his own use money of the United States, in the amount of $3,990.24, which he received as disability payments from the Department of Veterans Affairs Compensation and Pension Benefits program, to which he was not entitled, after falsely claiming to have conversion disorder with major depressive disorder, generalized choreiform movement disorder, weakness in

left lower leg associated with conversion disorder, weakness in right lower leg associated with conversion disorder, and falsely claiming that he was entitled to receive special monthly compensation based on A&A and Dependents' Educational Assistance under Title 38, United States Code, Chapter 35.

This was all in violation of Title 18, United State Code, Section 641.

## **<u>FORFEITURE NOTICE</u>**

13.    The allegations contained in paragraphs 1-12 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title United States Code, Section 2461.

14.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 641 as set forth in Counts 1-4 of this Indictment, the defendant,

## **BRUCE L. HAY**,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title United States Code, Section 2461.

any property constituting or derived from proceeds obtained, directly or indirectly, as a result of such violations.   The property to be forfeited includes, but is not limited to, the following:

A.    A forfeiture money judgment in an amount equal to the amount

of proceeds that the defendant obtained from the commission of Counts 1-4

15.     If any of the property described above, as a result of any act or
        omission of the defendant:

        A.      cannot be located upon the exercise of due diligence;

        B.      has been transferred or sold to, or deposited with, a third party;

        C.      has been placed beyond the jurisdiction of the court;

        D.      has been substantially diminished in value; or

        E.      has been commingled with other property which cannot be
                divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

18, United States Code, Section 982(b)(1) and Title 28, United States Code,

Section 2461(c)

                                                A TRUE BILL.


Dated: July 16, 2019

                                                s/*Foreperson*
                                                FOREPERSON



s/*Tristram W. Hunt*, KS Bar No. 18196    for:

STEPHEN R. MCALLISTER
United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
stephen.mcallister@usdoj.gov
(913) 551-6730
(913) 551-6541 (fax)
Ks. S. Ct. No. 15845

(It is requested that trial of the above captioned case be held in Kansas City, Kansas.

## **PENALTIES**

**Counts 1 – 4**          **Theft of Public Money-18 U.S.C. § 641**

- If aggregate loss from crime of conviction >$1,000, then: Imprisonment of NMT 10 years;
- Fine of NMT $250,000.00;
- Supervised Release of NMT 3 years; and
- Special Assessment of $100.00 for each count of conviction.

**In the United States District Court
for the District of Kansas**

United States of America,

    Plaintiff,

v.

    Case No. 19-20044-01-JAR

Bruce L. Hay,

    Defendant.

## MOTION FOR BILL OF PARTICULARS

Defendant Bruce Hay through counsel, Chekasha Ramsey, moves the Court for a Bill of Particulars pursuant to Rules 7(f) and 12(b) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendments to the United States Constitution.

Rule 7(f) of the Federal Rules of Criminal Procedure allows a court to issue a bill of particulars at its discretion. The purpose of a bill of particulars is to address deficiencies in an indictment and inform the defendant of the charge against him with sufficient precision so as to allow him to prepare his defense, minimize surprise at trial, and to enable the defendant to plead double jeopardy in the event of a later prosecution for the same offense. *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) (citation omitted). Although Mr. Hay recognizes that he "is not entitled to know all the *evidence* the government intends to produce, but only the *theory* of the government's case[,]" review of the indictment, in conjunction with discovery provided to this point, leaves Mr. Hay unable to determine the government's theory to commit the offenses charged.

The government alleges that Mr. Hay stole and converted money from the Department of Veterans Affairs Compensation and Pension Benefits program. The money the government alleges he stole were veterans' benefits that were approved for and then paid to him. The dates in the

indictment are dates only reflecting when the funds were dispensed to him. In claiming the money was stolen, the government alleges the benefits were improperly paid to Mr. Hay because of a false claim made by Mr. Hay. But the indictment does not allege when the claims were made, or what false claims it is relying on to support the charges in the indictment. As explained below, this lack of specificity prejudices Mr. Hay. Thus, he respectfully asks the Court to grant a bill of particulars to more precisely and completely enable him to prepare a defense, avoid surprise at trial, and to bar the risk of double jeopardy.

**I.     The Court has discretion to order the government to supply a bill of particulars.**

A bill of particulars serves to "amplif[y] the indictment by providing additional information." *Dunn*, 841 F.2d at 1029 (quoting *United States v. Johnson*, 575 F.2d 1347, 1356 (5th Cir. 1978)). Its purpose is threefold:

(1) informing the defendant of the charges against him with enough precision that he can prepare a defense;

(2) minimizing any surprise at trial; and

(3) enabling the defendant to plead double jeopardy in a later prosecution.

*Dunn*, 841 F.2d at 1029 (quoting *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985)). The Tenth Circuit has vested trial courts with "broad discretion" in deciding whether to grant a bill of particulars. *Dunn*, 841 F.2d at 1029. Here, the Court should exercise that discretion and grant Mr. Hay a bill of particulars so that he may adequately mount a defense, minimize any surprise at trial, and allow him to plead double jeopardy in any later prosecutions.

## II. A bill of particulars would sufficiently and precisely inform Mr. Hay of the charges against him, thus allowing him to defend himself at trial.

"An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Gama-Bastidas*, 222 F.3d 779, 785 (10th Cir. 2000) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)). An indictment's sufficiency is determined by practical, not technical, considerations. *Dunn*, 841 F.2d at 1029. When a defendant is unable to prepare a defense, avoid surprise at trial, or plead double jeopardy, then the indictment is not sufficiently complete or precise. *United States v. Barbieri*, 614 F.2d 715, 719 (10th Cir. 1980).

For the reasons discussed below, the indictment is inadequate because it fails to provide Mr. Hay of adequate notice of the particular acts against which he must defend himself at trial. Moreover, the lack of specificity of any date or duration of any false claim alleged in the indictment, coupled with the discovery, prevents the defendant from responding to the government's case.

### A. The indictment fails to provide Mr. Hay of adequate notice of the particular acts against which he must defend himself at trial.

Mr. Hay is charged with four violations of 18 U.S.C. § 641. The allegations revolve around Mr. Hay's receipt of veterans disability payments from the Department of Veterans Affairs Compensation and Pension Benefits program. In summary, counts 1-4 of the indictment charge:

> On or about the dates of September 30, 2016, November 1, 2016, March 31, 2017 and May 1, 2017, in the District of Kansas, the defendant, willfully and knowingly stole and converted to his own use money of the United States, in (a designated amount),[1] which he received as disability payments from the Department of Veterans Affairs Compensation and Pension Benefits program, to which he was not entitled, *after* falsely claiming to have conversion disorder with major depressive disorder, generalized choreiform movement disorder, weakness in left lower leg associated with conversion disorder, weakness in right lower leg associated with conversion disorder, and falsely claiming he was entitled to receive monthly compensation based on

---

[1] Count 1=$3,843.31, Count 2=$3,843.31, Count 3=3,990.24, Count 4=$3,990.24

aid and attendance and Dependents' Educational Assistance under Title 38, United States Code, Chapter 35.

This was all in violation of Title 18, United States Code, Section 641.

(emphasis added).

The dates in the indictment, which refer only to dates the money was dispensed, are not enough to put Mr. Hay on notice. The indictment charges both stealing and conversion, the concepts of which are mutually exclusive. But 18 U.S.C. § 641 is a "specific intent" crime. Intent, while not explicitly mentioned in the statute, is an element of any crime under § 641. *Morissette v. United States*, 72 S. Ct. 240 (1952). Here, it is unclear when exactly the government alleges that Mr. Hay formed the specific intent to steal the benefits because the indictment does not allege when these false claims were made. Moreover, the indictment seems to allege acts—acts of "falsely claiming"—, but without knowing precisely when the government contends these acts occurred, Mr. Hay cannot defend himself at trial. This failure to identify any specific date, act, or "false claim" only creates speculation and, therefore, the indictment fails to provide adequate notice of the particular acts against which Mr. Hay must defend himself at trial and prevents him from forming specific defenses.

## B. The lack of specificity in the indictment prevents Mr. Hay from forming a potential statute of limitations defense.

The lack of specificity of any date or duration in the indictment, coupled with the discovery, leads to speculation and leaves the defendant in the dark regarding any specific acts which the government might attempt to rely on. Without a more specific charging document, it is unclear whether the "false claim" or action of "falsely claiming" alleged by the government occurred within the statute of limitations. Here, Mr. Hay is unable to determine when the alleged criminal conduct occurred and is forced to speculate, undermining his ability to raise a potential statute of limitations defense based against the charges.

The Supreme Court examined the statute of limitations defense in *Toussie v. United States*, <u>397 U.S. 112</u> (1970). Specifically, the Court was determining whether the offense of failing to register for the draft is a continuing offense that would extend the statute of limitations time period.

> "In deciding when the statute of limitations begins to run in a given case several considerations guide our decision. The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity."

<u>397 U.S. at 114</u>–15. In denying the continuing offense exception to the statute of limitations, the *Toussie* Court reaffirmed "that '(s)tatutes of limitations normally begin to run when the crime is complete.'" *Pendergast v. United States*, <u>317 U.S. 412, 418</u> (1943); *see United States v. Irvine*, <u>98 U.S. 450, 452</u> (1878).

Consider *United States v. Payne*, <u>978 F.2d 1177, 1180</u>–81 (10th Cir. 1992), which held that the general five-year statute of limitations prevented prosecution alleging false representation of a social security number because the representation was more than five years before the indictment. Despite the government's contention that the purported violation of § 408(a)(7)(B) is a continuing offense that is not completed until defendant corrects the false numbers, and that defendant committed new acts of false representation when he reaffirmed the social security numbers, the Tenth Circuit held the continuing offense doctrine did not extend the statute of limitations. *See also United States v. Jaynes*, <u>75 F.3d 1493, 1597</u> (10th Cir. 1996) (citing *United States v. Beard*, <u>713 F. Supp. 285, 291</u>–92 (S.D. Ind. 1989) (requiring a bill of particulars to determine whether any of several offenses alleged in one count of an indictment occurred within the statutory period and thus could properly be brought in that count)).

Because Mr. Hay could raise a potential statute of limitations defense and the dates of specific acts would be vital to this defense, he asks the Court to order a bill of particulars and require government to supply the specific dates concerning any acts the government might attempt to rely upon in its prosecution of Mr. Hay.

**C. The indictment contains inconsistent legal theories and, because it lacks precision, the indictment forces Mr. Hay to guess which elements the government will have to prove beyond a reasonable doubt at trial.**

Congress did not intend the offenses of § 641 to be interchangeable. *United States v. Hill*, 835 F.3d 759, 763 (10th Cir. 1987). "[T]he elements of embezzlement, stealing, and conversion were preserved in section 641 as alternate means of committing the statutory offense therein defined[,]" and "[i]nterchangeability would eliminate the reason for separately enumerating the different and distinguishable means by which the crime can be accomplished." *Id.* Stealing and conversion, thus, are not interchangeable offenses. *Id.* at 765. "There is no way in which both offenses can be committed by the same person involving the same property at the same time for the simple reason that one cannot wrongfully take property and still come into possession of it in a lawful manner." *Id.*

Although the government may charge the two offenses in the conjunctive, here it is unclear whether the government has alleged both crimes by the same means. Stealing and conversion are different and distinguishable, and, as such, inconsistent with each other, but the government has included both in each count. Thus, Mr. Hay is unsure which theory he must defend against. The alleged multiple, distinct, and, ultimately, inconsistent methods of stealing and conversion impede Mr. Hay's preparations and increases the potential for surprise at trial.[2]

---

[2] *United States v. Cantrell*, 612 F.2d 509 (10th Cir. 1980) ( "[W]hen a defendant is charged with apparently inconsistent counts in a single indictment and the government removes the inconsistency only at trial, if at all, we cannot say that the defendant "could . . . have anticipated what the evidence would be at trial.").

Without knowing the particular method the government contends that Mr. Hay used to steal and convert, he cannot prepare an adequate defense. He does not know what elements the United States will have to prove beyond a reasonable doubt at trial and, accordingly, is unable to offer competing evidence in advance of trial. A criminal defendant should not be forced to guess at the elements of his alleged crime at the eve of trial. A bill of particulars, however, which requires the United States to specify which theft-of-property and which conversion-of-property theory it intends to pursue at trial, would remedy the insufficiencies in the Indictment and allow Mr. Hay the ability to mount a trial defense.

III.     **A bill of particulars would minimize surprise at trial and not bar any future double jeopardy pleas.**

A bill of particulars remedies an insufficient indictment by providing additional information so as to precisely inform the defendant of the charges against him so he can prepare a defense, to minimize any surprise at trial, and to enable the defendant to plead jeopardy in any later prosecutions. *Dunn*, 841 F.2d at 1029. For the reasons stated above, a bill of particulars will minimize any surprise at trial and allow Mr. Hay to plead double jeopardy in the event of future prosecutions. Currently, the indictment is imprecise and creates only speculation. The indictment does not provide specific dates or durations for the alleged acts the government intends to rely on. The indictment also contains two inconsistent legal theories with different legal elements—stealing veterans benefits by false claims and then converting the same benefits. Without a bill of particulars, Mr. Hay will remain in the dark until trial, when the government will likely specify its contentions and make clear its legal theory and, as a result, create prejudicial surprise at trial. The lack of timeline in the indictment also leaves open the possibility that the government could re-prosecute Mr. Hay, who became eligible for veterans benefits once he left the United States Army, by alleging that *other* claims he made were false. A bill of particulars, however, would easily resolve these concerns, and Mr. Hay respectfully asks the Court to use its broad discretion to order the government to provide one.

## Conclusion

The United States has charged with Mr. Hay with serious offenses. He should not have to hypothesize and speculate about the allegations against him or the elements he will have to rebut. In order for Mr. Hay to have adequate notice of the charges, to file pretrial motions, limine motions and objections, the government should be ordered to file a bill of particulars that will provide notice of when the false claim, claims, or related acts occurred.

The Court should exercise the broad discretion entrusted to it and order the United States to issue a bill of particulars that specifies:

(1) the dates on which the false claims were made; and

(2) the method and theory of theft and conversion it intends to prove at trial in each Count.

Defense counsel does not know if a statute of limitations or other motions to dismiss are proper without receiving a bill of particulars. Therefore, defense counsel files this motion prior to the pretrial motions deadline on July 1st.

Respectfully submitted,

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I certify that on June 17, 2021 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>　　　　　Plaintiff, )<br>　　　　　　　　　　　　　)<br>　v.　　　　　　　　　　　)<br>　　　　　　　　　　　　　)<br>BRUCE L. HAY, )<br>　　　　　Defendant. )<br>　　　　　　　　　　　　　) | CASE NUMBER: 19-CR-20044-JAR |

## **GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S REQUEST FOR A BILL OF PARTICULARS**

The United States of America, by and through Duston J. Slinkard, Acting United States Attorney for the District of Kansas, and Tristram W. Hunt, Assistant United States Attorney, respectfully requests that the Court deny defendant's Motion for a Bill of Particulars. (Doc. 36.)

## **Background**

*A.  Summary of the investigation*

Disability compensation is a benefit paid to a veteran because of injuries or diseases that happened while on active duty or that were made worse by active military service. It is also paid to certain veterans disabled from Veterans Administration ("VA") healthcare. The benefits are tax free.

1

The VA Education Benefits program, Title 38 of the United States Code, Chapter 30, provides monthly financial payments to qualified veterans for attending VA-approved courses. For approved programs in college and vocational or technical schools, basic payments are monthly and the rates are based on the amount of training time that the eligible beneficiary is receiving. The desired program must be VA approved. The beneficiary receiving benefits must meet the school's standards of attendance, conduct and progress in order to continue to receive VA benefits. Once a beneficiary is enrolled and the program has started, he/she must notify the VA at the appropriate VA Regional Office (VARO) that he/she is attending classes as required. The certification of attendance is done on a monthly basis.

In 2012, the Veterans Administration-Office of the Inspector General (VA-OIG) and Social Security Administration-Office of the Inspector General (SSA-OIG) began a joint investigation of Hay. Hay was drawing Social Security Administration (SSA) disability payments and Veterans Office disability payments. These payments were based on common disabilities Hay claimed that he had.

2

A claim file review of veteran Hay revealed the following information:

- Hay served in the United States Army from June 21, 1987 to June 11, 1991; August 26, 1996 to October 9, 1998; and January 21, 2003 to February 28, 2006.

- Hay was involved in a motor vehicle accident on February 25, 2005, in Miami County, Kansas. After the accident, Hay complained of tremors and problems walking. Hay received a medical discharge from the Army.

- Hay submitted a claim for compensation to the VA February 28, 2006, claiming the following disabilities: wrist fusion, conversion disorder post head injury with tremors, PTSD, chronic uticaria, hearing loss, hypothyroidism, irritable bowel syndrome and shortness of breath.

- On March 8, 2007, the VA made a decision on Hay's claim, rating him 100% disabled for conversion disorder and 100% disabled for psychomotor abnormal tremors or body movements, as well as various lesser ratings for the other claimed conditions, all effective March 1, 2006.

The Kansas City VA-OIG office received a complaint from the VA-OIG Hotline Division in which an anonymous source claimed that Hay performed physical labor, including lifting hay bales over 100 pounds and construction work on his family farm without the use of a cane or walker, and that Hay frequently drove tractors and trucks. The hotline complaint further detailed that Hay's rating decision dated September 12, 2007, described Hay as rated 100% disabled, unable

3

to drive, and that he requires the use of a cane, walking with a gait similar to someone with cerebral palsy.

A review of Hay's claim file revealed numerous claims by Hay of tremors, seizure-like episodes, falls, muscle spasms and occasional inability to speak. Hay requested that the VA pay to install an elevator in his home, as they were considering adding a second story. Hay claimed he needed a walker or a cane to move around and struggled to keep his balance. During various doctor's appointments, Hay reported to VA medical personnel he had problems with standing, maintaining balance, frequent falls, coordination, walking, grabbing items and displayed involuntary movements of his head, neck and arms. During the doctor's appointments, Hay's wife also made statements attesting to Hay's inability to walk. Doctors initially attributed Hay's apparent gait and spasms as secondary to "conversion disorder."[1] A nurse's note from April 26, 2005, from Irwin Army Community Hospital states: "While Sgt. Hay was leaving the room he lifted his walker up above the head in both has (sic) gripped holding the walker." In a treatment record dated May 17, 2005, Dr. Robert Beck, a neurologist at Walter

---

[1] The Mayo Clinic defines conversion disorder as a "condition in which you show psychological stress in physical ways" and described "a health problem that starts as a mental or emotional crisis – a scary or stressful incident or some kind – and converts to a physical problem."

Reed Hospital, noted that "his apparent spastic gait takes place in the absence of physical findings to support spasticity" and that he was unable to fully comment on etiology due to lack of supporting evidence. A May 19, 2005, letter from Kansas City Clinical Neurological Associates bears a statement from Dr. Kathryn Hedges, "It is very unusual that he would be able to do finger-to-nose, rapid alternating movement and heel-to-shin normally and still has this marked choreiform activity."

On October 23, 2012, a VA-OIG agent interviewed Dr. Emmett McWoods, Hay's attending VA physician at the VA Community Based Outpatient Center in Paola, Kansas. Dr. McWoods expressed frustration with Hay, in that there is a lack of physical evidence to explain his symptoms. Dr. McWoods referred Hay to a neurologist, but Hay refused to make an appointment. Each time Hay came to the VA clinic, he used a walker and displayed a significant choreiform gait (involuntary spasmodic movements with irregular jerking) and claimed to walk in that fashion all of the time. The agent directed Dr. McWoods' attention to a letter he wrote, dated March 12, 2012, supporting Hay's claim for permanent and total disability. Dr. McWoods stated he would not have written that letter if he knew Hay to be capable of performing the physical tasks described in the hotline complaint.

5

On October 29, 2012, an agent conducted surveillance on Hay in the Miami County, Kansas area. He observed Hay exit his residence in Osawatomie carrying a cane, work on his vehicle and walk without apparent difficulty. Hay's wife, Laurie, drove the pickup while Hay entered the passenger side. The agent observed Hay walking rapidly down a sidewalk to a business in Paola, Kansas, carrying a cane and walking without difficulty. When Hay arrived at the VA Community Based Outpatient Clinic ("CBOC") in Paola, Kansas, he walked into the clinic more slowly, leaning on his cane with a noticeable limp, displaying jerking movements with his head. Hay then proceeded to the Miami County Administration Building in Paola, Kansas. Hay walked to and from the building with a pronounced limp and bobbing of his head. Hay returned to his residence, and soon after, entered the pickup's driver side without his cane and drove to his family farm property in rural Paola, Kansas. As then agent's vehicle neared the farm, he observed Hay's truck in a field. The agent observed Hay throw a large bale of hay into the bed of the truck and jump into the bed of the truck. Hay then stood in the truck bed as the vehicle pulled out of the field on unpaved grass and onto the road. The agents then observed the truck in a pasture nearby. Hay was

6

next to the vehicle throwing hay to cattle. The agent obtained video footage of this surveillance activity.

The same day, the agent interviewed Dr. McWoods at the CBOC immediately following the termination of surveillance on Hay. After viewing the video footage obtained of Hay's activities that day, Dr. McWoods stated, "I think he's running a scam," and that the way Hay was walking and the activities he was performing were in direct contradiction to the symptoms Hay has claimed to him as well as to other doctors and therapists in the past.

On November 19, 2012, agents from VA-OIG and SSA-OIG conducted surveillance of Hay as he was scheduled for a medical appointment in Olathe, Kansas. Hay was again being driven by his wife Laurie. Hay was observed walking into and out of a QuikTrip en route without difficulty. When Hay walked into the doctor's office, he was walking unsteadily and shaking, assisted greatly by his wife. When Hay left the office, he was walking so unsteadily, he nearly fell down. Approximately 5 minutes later, the agent observed Hay walk into a pawn shop nearby without assistance or difficulty. Hay was later seen walking around his residence and his father's residence carrying his cane without difficulty.

On November 28, 2012, two agents from VA-OIG and SSA-OIG went to Hay's residence where they met with him and asked him if he had any information related to deer poaching in the area. Hay did not display any difficulty or movement or head bobbing during this contact that lasted approximately one hour. During the conversation, Hay was pointing out an area on the side of the yard where he had seen deer carcasses dumped. Hay was navigating the unpaved road's shoulders and peering over the stone embankment without difficulty. Hay also admitted he hunted from elevated tree stands, which he accessed by using climbing steps screwed into the trunk of the tree.[2] Hay discussed a stand hunt within the last two years in which a "retired pastor friend" hunted with him, and Hay had to assist his overweight friend up to the deer stand. Hay additionally discussed routinely completing tasks such as chores related to ranching cattle and repairing fencing around the expansive property.

On January 9, 2014, an agent contacted the United States Department of Agriculture OIG (USDA-OIG) regarding any farm subsidies or related records for Hay's agricultural activities. USDA-OIG related that Hay is the listed operator and

---

[2] This process involves manually hand-screwing L-shaped metal steps into a tree trunk, typically spaced two feet apart on opposite sides of the trunk. The hunter then climbs with hands and feet up the tree utilizing the steps to get up to the deer stand, which must be hauled up on the climber's back or via rope

8

his father is listed as the owner for the rural property in Paola, Kansas. The VA-OIG agent also obtained other USDA documents from 2009 bearing Hay's signature claiming that he provided 100% of the active personal labor in operating the farm. He claimed to hire no outside labor or management.

B. *Stage II of the investigation*

From the end of 2014 through approximately March 2016, the investigation remained inactive. In March 2016, VA-OIG agent met with Osawatomie Police Department Deputy Chief David Ellis. Chief Ellis knew that Hay was supposed to be disabled but recalled an incident within the past year or two in which Hay's family was hosting a yard sale. When an unexpected rain shower started, Hay dropped his cane and picked up one end of a sofa while someone else lifted the other end and moved it into the house quickly and without impairment.

On October 4, 2016, agents installed covert surveillance equipment near Hay's residence. The equipment was set to cover and record the front of Hay's residence to include his driveway. From October 6, 2016 through November 29, 2016, Hay was observed leaving his house nearly daily without any symptoms of choreiform movement disorder. He carried his cane regularly but did not appear to use it. Hay drove nearly every day.

9

On November 4, 2016, Hay backed his two trucks together and moved two large boxes from one truck bed to the other without assistance. He climbed into and out of the truck beds.

On November 27, 2016, Hay carried a large black box to a silver car in the driveway. He then worked on the car and walked around the driveway and yard without a cane and without impairment.

On November 29, 2016, Hay carried several boxes from his house to a white SUV in his driveway. When he finished, his wife brought a baby out to him and he carried and played with the baby in the yard where he was clearly squatting down repeatedly. He kicked leaves onto the baby repeatedly and did all without impairment or assistance.

Using the previously installed covert surveillance equipment, agents reinitiated the recording of the front of Hay's residence to cover the period of March 24, 2017 through March 30, 2017. During this timeframe, Hay again moved without assistance or visible impairment. He drove nearly daily.

VA-OIG agents recorded a covert surveillance operation of Hay and his wife at a dental appointment at the VA Medical Center ("VAMC"), located at 4801 E. Linwood Boulevard, Kansas City, Missouri. Throughout the operation, Hay

10

carried a cane but did not appear to place any weight on the cane. He walked without any choreiform movement disorder symptomology and Laurie Hay provided no assistance to Hay. The two returned to a black car where Hay entered the passenger side and his wife drove.

On March 27, 2017, a VA-OIG agent interviewed Dr. Ellen Berry regarding Hay's March 24, 2017 dental appointment. Dr. Berry had been Hay's dentist for approximately two years and had seen Hay approximately ten times. She stated that Hay carried a cane and walks slowly but he had never required any assistance or special accommodations. She had never observed Hay display any muscle spasms, rigidity, or involuntary movements during any exams. Dr. Berry was not made aware of any such preexisting conditions.

On March 30, 2017, VA-OIG agents and a SSA-OIG Task Force Officer recorded a covert surveillance operation of Hay and his wife at a Paola CBOC primary care appointment. Hay carried a cane but did not appear to use it for support. He walked to and from the facility without visible impairment. Upon return to their car, Hay stopped to pick up loose change from the ground that had been placed there by SSA-OIG Task Force Officer. Hay squatted and bent without limitation and used his cane to retrieve money from under the car.

Using the previously installed covert surveillance equipment, agents reinitiated the recording of the front of Hay's residence to cover the period between May 2, 2017 to May 8, 2017. During that timeframe, Hay once again moved without assistance or visible impairment. He carried large items, and on May 7, 2017, was observed chasing a baby across the yard, then lifting the baby over his shoulder. He drove nearly daily. In contrast, the morning of Hay's CP exams, Hay left his house carrying what appeared to be the walker he used to ambulate through VAMC, Kansas City approximately 90 minutes later.

On May 3, 2017, VA-OIG agents and a SSA-OIG Task Force Officer recorded a covert surveillance operation of Hay and his wife at CP examination appointments at the VA Medical Center in Kansas City, Missouri. The VA requested the exams to assist the investigation and to address Hay's recent request for additional benefits in the form of Aid and Attendance. Hay was recorded in the hospital lobby barely able to move and relying heavily on a wheeled walker. The exams were also recorded with the consent of each provider. Once in the exam rooms, Laurie Hay assisted Hay in sitting and removing his jacket as he was allegedly unable to do these tasks without her assistance.

Hay did admit to the providers that he is able to drive short distances, which contradicts his previous statements in support of his VA benefits. Hay departed the hospital in much the same manner as his arrival, relying heavily on the walker and moving very slowly and deliberately and with apparent great difficulty.

Later that same day, the Hays were recorded at the SSA office located at 2021 Independence Avenue, Kansas City, Missouri, where again Hay struggled to ambulate and relied heavily on the walker to make it to and from the facility. Upon returning to his truck, Hay and his wife bent down to pick up loose change placed outside the truck by a SSA-OIG Task Force Officer before entering the truck and leaving SSA.

After leaving SSA, Hay was followed to Sam's Club located at 12200 W. 95th Street, Lenexa, Kansas, where he and his wife went into the store and shopped for approximately 30 minutes. Hay required no walker and no assistance at that time. He carried a cane but was never seen using it for support. Hay loaded the purchased items into the extended cab of the truck without assistance.

Later that afternoon, Hay was recorded carrying bags from the truck to the house without any assistive device and without any physical assistance. Later the

same afternoon, Hay left his house again without a cane and worked under the hood of his red truck, clearly bending at the waist without impairment.

On May 16, 2017, an agent interviewed Dr. Carolyn Karr who was a Staff Psychologist at VAMC, Kansas City regarding her CP psychological examination of Hay on May 3, 2017. The agent allowed Dr. Karr to view the footage of Hay carrying his walker to his truck the morning of the appointment.

Dr. Karr recalled that Hay and his wife's statements at his exam were consistent with his past diagnosis of conversion disorder, but added that Hay's reported symptoms inconsistent with his recorded mobility from the surveillance footage. Dr. Karr thought it was fishy that Hay did not desire to have neurological testing to attempt to determine the cause of his symptoms, which Dr. Karr referred to as pseudo seizures.

The agent then interviewed Dolly Cherian who was a Nurse Practitioner at VAMC, Kansas City regarding her CP physical examination of Hay on May 3, 2017. After being allowed to review surveillance footage of Hay, Cherian stated that Hay's daily mobility was not consistent with the symptoms he presented at his CP exam. She observed no gait disorder symptoms in the footage and no need for assistive devices or for physical assistance. Cherian observed no involuntary

14

movements, spasms or seizure-like movements at any time during the exam. She also noted Hay's extraordinary musculature which is not consistent with this type of debilitating disorder.

As a direct consequence of this investigation, the VA terminated all but of one of Hay's disability payments. He is currently receiving payments stemming from injury to his hand while in the U.S. Army.

In preparation for trial, an agent interviewed several of Hay's family members. They stated they had sometimes seen Hay have seizures. Additionally, Dr. McWoods was re-interviewed. He noted he had seen Hay have what appeared to be a seizure.

## Argument

Hay claims he is unable to determine the government's theory to commit the offenses charged. He claims "the indictment is inadequate because it fails to provide Mr. Hay of adequate notice of the particular acts against which he must defend himself at trial. Moreover, the lack of specificity of any date or duration of any false claim alleged in the indictment, coupled with the discovery, prevents the defendant from responding to the government's case." (Doc. 36 at 3).

15

Hay is simply not entitled to a detailed preview of the Government's case, of the kind requested here. Hay is entitled to sufficient information to understand the charges against him, prepare a defense, and protect against double jeopardy. The extensive discovery and other voluntary disclosures that have been made by the government do just that. His motion should be denied.

A.  *Applicable Law*

A motion for a bill of particulars should be granted only where necessary (1) to inform the accused of the charge against him with sufficient precision to enable him to prepare his defense and avoid surprise; and (2) to enable the accused to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *See Wong Tai* v. *United States*, 273 U.S. 77, 82 (1927); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Kilpatrick*, 821 F.2d 1456, 1464 (10th Cir. 1987) (allegations of means and methods, as well as overt acts may be considered when judging the sufficiency of counts).

An indictment is "generally sufficient if it sets forth the offense in the words of the statute so long as the statute adequately states the elements of the offense." *United States v. Salazar*, 720 F.2d 1482, 1486 (10th Cir. 1985). Sufficiency is determined by practical rather than technical considerations. *See United States v.*

16

*Crim*, <u>529 F.2d 287</u> (10th Cir. 1976); *United States v. Dunn*, <u>841 F.2d 1026, 1029</u>

(10th Cir. 1988). "An indictment need not go further and allege in detail the factual

proof that will be relied upon to support the charges." *United States v. Crippen*,

<u>579 F.2d 340, 342</u> (5th Cir. 1979) (citations omitted).

<u>Federal Rule of Criminal Procedure 7</u> allows for the Court to direct the filing

of a bill of particulars in the following appropriate circumstances.

> The court may direct the government to file a bill of particulars. The
> defendant may move for a bill of particulars before or within 14 days
> after arraignment or at a later time if the court permits. The
> government may amend a bill of particulars subject to such conditions
> as justice requires.

<u>Fed. R. Crim. P. 7(f)</u>.

The purpose of a bill of particulars is to supplement an incomplete

indictment to more fully disclose the nature of charges against a defendant. *See*

*United States v. Wilks*, <u>629 F.2d 669, 672</u> (10th Cir. 1980) (amendment to bill of

particulars filed three days before trial to clarify the superseding indictment). The

bill of particulars is to supplement the allegations in the indictment when necessary

to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the

defendant at trial, and (3) preclude a second prosecution for the same offense.

*United States v. Gabriel*, <u>715 F.2d 1447, 1449</u> (10th Cir. 1983).

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare a defense." *United States v. Levine*, 983 F.2d 165, 166-67 (10th Cir. 1992) (citations and internal quotation marks omitted). However, the bill of particulars "is not necessary if the indictment sets forth the elements of the offense charged and sufficiently apprised the defendant of the charges to enable him to prepare for trial." *Id*. at 167 (citations and internal quotation marks omitted). An indictment that is sufficiently detailed to inform the defendant of the essential facts or elements of the crimes with which he is charged is all that he needs to be apprised of the charges and prepare a defense, thereby obviating the need for a bill of particulars. *See United States v. Drietzler*, 577 F.2d 539, 553 (9th Cir. 1979).

The purpose of a bill of particulars is not to obtain discovery, evidentiary detail of the government's case, or information regarding the government's legal theories. *See Gabriel*, 715 F.2d at 1449; *United States v. Kunzman*, 54 F.3d 1522, 1526 (10th Cir. 1995) (an indictment describing charges in detail, including dates, places, and persons makes a bill of particulars unnecessary). In fact, an indictment need not explain the government's theory of a case. *See United States v. Shareef*, 190 F.3d 71, 75-76 (2d Cir. 1999) (indictment not required to identify precise

18

nature of effect upon interstate commerce that government intended to prove at trial); *United States v. Schmidt*, 947 F.2d 362, 369-70 (9th Cir. 1991) (indictment that did set out the government's theory of the case was not required).

In order to prevail on a motion for a bill of particulars, a defendant must show that without the bill, his case would be prejudiced, and must identify the specific prejudice flowing from the lack of particulars. *United States v. Swiatek*, 632 F. Supp. 985, 987 (N.D. Ill. 1986). The prejudice must be based, for instance, upon potential surprise at trial, which would prejudice the defendant's substantial rights. *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996). "A generalized and conclusory statement of prejudice in support of a motion for a bill of particulars is, in itself, a basis for denying the motion." *Id.* (citation omitted).

Although the defendant has a constitutional right to be apprised of the offenses with which he is charged, he has no right to know how the government will prove those crimes at trial. *See Swiatek*, 632 F. Supp. at 988. The defendant is not entitled to "attempt to compel the Government to synthesize and correlate the information in a comprehensible format." *United States v. Deerfield Specialty Papers, Inc.*, 501 F. Supp. 796, 810 (E.D. Pa. 1980).

Applying these principles, courts routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed, and the denial or granting of such a motion rests within the discretion of the Court. *See United States v. Jenkins*, 313 F.3d 549, 558 (10th Cir. 2002) (no abuse of discretion with denial of motion for bill of particulars because the disclosure was sufficient and there was no showing of unfair surprise by the defendant); *see also United States v. Urban*, 404 F.3d 754, 772 (3d Cir. 2005) (no abuse of discretion with denial of motion for bill of particulars because the defendant had access to extensive discovery); *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003) (no abuse of discretion with denial of motion for bill of particulars because the information sought by the defendant was available through discovery).

## B. Discussion

Hay's motion seems to be an effort to obtain evidentiary detail of the government's case and information regarding the government's legal theories— neither of which is a proper purpose of a bill of particulars. *See Gabriel*, 715 F.2d at 1449 (disclosure of all documentary and physical evidence to be presented at trial makes bill of particulars unnecessary).

20

The defendant claims he will be unable to prepare for trial absent the bill of particulars and thereby prejudiced, (doc. 36 at 3), yet the indictment alleges the necessary elements of the charged crimes. For example, Count One charges:

On or about September 30, 2016, in the District of Kansas, the defendant,

**BRUCE L. HAY**,

willfully and knowingly stole and converted to his own use money of the United States, in the amount of $3,843.31, which he received as disability payments from the Department of Veterans Affairs Compensation and Pension Benefits program, to which he was not entitled, after falsely claiming to have conversion disorder with major depressive disorder, generalized choreiform movement disorder, weakness in left lower leg associated with conversion disorder, weakness in right lower leg associated with conversion disorder, and falsely claiming he was that he was entitled to receive special monthly compensation based on aid and attendance and Dependents' Educational Assistance under Title 38, United States Code, Chapter 35. This was all in violation of Title 18, United State Code, Section 641.

(doc. 1.)

As stated by the Tenth Circuit, the elements of Title 18, United States Code, Section 641 are:

This law makes it a crime to [steal] [embezzle] [convert] government property. The defendant is accused of [stealing] [embezzling] [converting] [name property].

21

To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: the [name property] belonged to the United States government [if lack of knowledge is asserted, add: It does not matter whether the defendant knew that the [name property] belonged to the United States government, only that he knew it did not belong to him.];

Second: the defendant [stole] [embezzled] [converted] the [name property] intending to put it [to his own use or gain] [to the use or gain of another] or the defendant took the [name property] knowing it was not his and intending to deprive the owner of the use or benefit of the [name property]; and

Third: the value of the [name property] was more than $1000. "Value" means the face, or market value, or cost price, either wholesale or retail, whichever is greater.

Tenth Circuit Pattern Inst., 2.31 (2011-Update 2018).

The government has also provided Hay discovery (which he has had for more than a year) containing sufficient information to allow him to prepare his defense, including information beyond what is required by Rule 16, such as reports of interviews for the government's witnesses. There can be no dispute that through the detailed indictment and extensive discovery the government has provided

the tools necessary to anticipate and forestall any surprise that might have resulted from the indictment. Once the government provided these tools, it was [the defendants'] responsibility to use them in

22

preparing their defense, regardless of whether the discovery was copious and the preparation of the defense was difficult. Because they had these tools available to them, and because they have done nothing more than make conclusory assertions of prejudice, we conclude neither [of the defendants] have sustained their burden of showing they suffered "actual surprise."

*Ivy*, 83 F.3d at 1282.

Indeed, since this case was filed, the government has provided Hay 70 gigabytes of discovery dating back to 2005. The discovery includes material relevant to the SSA investigation too. A review of this copious discovery, in the government's opinion, should put Hay on notice of what the government intends to prove at trial. Hay's medical records, going back to 2005, contain representations to the VA in medical examinations which are false and which support the Section 641 charges in the indictment.

Hay's suggestion that more information is somehow necessary to potentially raise a statute of limitations defense is without merit. The 2019 indictment charges Hay with stealing and converting disability payments from the VA on four dates in 2016, all within the 5-year statute limitations. (Doc. 1). Hay's acts and representations that allowed him to steal and convert those disability payments are all relevant evidence to the four counts charged, but in any event have no bearing on whether those charges are time barred.

Finally, in *United States v. Hill*, <u>835 F.2d 759, 764</u>, the Tenth Circuit

explained the difference between stealing and conversion, two different means of

violation § 641:

> The distinction between stealing and conversion turns on
> how possession is obtained. One who gains possession of
> property by wrongfully taking it from another steals.
> *Morissette*, <u>342 U.S. at 271</u>, <u>72 S.Ct. at 254</u>. One who
> comes into possession of property by lawful means, but
> afterwards wrongfully exercises dominion over that
> property against the rights of the true owner, commits
> conversion. *Morissette*, <u>342 U.S. at 272</u>, <u>72 S.Ct. at 254</u>;
> *United States v. May*, <u>625 F.2d 186, 192</u> (8th Cir.1980)
> (quoting Restatement (Second) of Torts § 228). There is
> no way in which both offenses can be committed by the
> same person involving the same property at the same
> time for the simple reason that one cannot wrongfully
> take property and still come into possession of it in a
> lawful manner. Yet, that is the essence of the
> government's argument.
>
> The government could have charged the § 641 offense in
> the conjunctive, *see Turner v. United States*, <u>396 U.S.
> 398</u>, <u>90 S.Ct. 642</u>, <u>24 L.Ed.2d 610</u> (1970), but it did not
> do so.
>
> Having formed the charge in a limited way, the
> government cannot now complain that the charge must
> be dismissed because the evidence demonstrates the
> wrong choice was made.

(*Id.*)

24

Here, the indictment has properly charged stealing and conversion in the conjunctive. At trial, after the evidence is in, the government may have to elect between stealing and conversion. Hay's motion is a premature effort to limit that election. *See United States v. Shareef*, 190 F.3d 71, 75-76 (2d Cir. 1999) (indictment not required to identify precise nature of effect upon interstate commerce that government intended to prove at trial); *United States v. Schmidt*, 947 F.2d 362, 369-70 (9th Cir. 1991) (indictment that did set out the government's theory of the case was not required).

WHEREFORE, Hay's Motion for Bill of Particulars should be denied.

Respectfully Submitted,

DUSTON J. SLINKARD
Acting United States Attorney
District of Kansas

*s/Tristram W. Hunt*
TRISTRAM W. HUNT, #18196
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)
E-mail: tris.hunt@usdoj.gov
ELECTRONICALLY FILED
Attorneys for Plaintiff

25

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of October 2021, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Chekasha Ramsey
Office of Federal Public Defender - KCKS
500 State Avenue, Suite 201
Kansas City, KS 66101-2400
Counsel for Defendant

I further certify that on this date the foregoing document and the notice of electronic filing were mailed by first-class mail to the following non-CM/ECF participants:

None.

*s/Tristram W. Hunt*
TRISTRAM W. HUNT, #18196
Assistant United States Attorney

**In the United States District Court
for the District of Kansas**

---

**United States of America,**

Plaintiff,

v.

Case No. 19-20044-01-JAR

**Bruce L. Hay,**

Defendant.

---

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR BILL OF
PARTICULARS**

---

Bruce Hay through counsel, Chekasha Ramsey, submits this Memorandum in Support of the Motion for a Bill of Particulars. D.E. 36[1]. The fifteen-page government response describes the investigation in this case, but fails to identify the specific criminal unlawful act, the alleged false claims, and when Mr. Hay allegedly made the false claims. Each count in the Indictment states that the stealing and conversion of Veterans Administration (hereinafter VA) benefits occurred because Mr. Hay received the benefits: "after falsely claiming to have conversion disorder with major depressive disorder, generalized choreiform movement disorder, weakness in left lower leg associated with conversion disorder, weakness in right lower leg associated with conversion disorder, and falsely claiming that he was entitled to receive monthly compensation based on aid and attendance and Dependent's Educational Assistance…" Nothing in the government's response informs Mr. Hay of the specific unlawful false claim or claims, or dates the government is relying on to support the charges in the indictment.

### I.    The lack of specificity in the Indictment prevents Mr. Hay from forming a defense.

---

[1] Defense counsel recognizes that a hearing on defense Motion for Bill of Particulars is schedule on October 19, 2021. On October 14, 20201 defense counsel consulted with attorney for the government, Tris Hunt. Mr. Hunt has no objection to this filing.

The government's response states: "Hay's medical records, going back to 2005, contain representations to the VA in medical examinations which are false, and which support the Section 641 charges in the indictment." D.E. 44 p.16. The government's response refers to "representations" as false which could include statements or behavior over the last 12 years.

It appears the government's theory is that any statement or behavior spanning 12 years, from 2005 until May 1, 2017, the last date in the Indictment, could be the alleged the false claim. This does not provide Mr. Hay with sufficient notice. The government is correct that discovery includes 70 gigabytes which consist of approximately 1,294 pages of medical records. The medical records alone include an almost countless number of statements made in medical examinations, questionnaires, request for treatment, physical medical tests, and other documentation. The issue is not a lack of discovery; the issue is that the government believes 70 gigabytes of sprawling discovery is sufficient notice of how, what, and when Mr. Hay's alleged false claim occurred to support the charges against him.

The failure to identify any specific false claim or claims, or the date they were made, only creates speculation. The Indictment fails to provide adequate notice of the particular acts against which Mr. Hay must defend himself at trial and prevents him from forming specific defenses. The government has charged that Mr. Hay received VA benefits due to the agency's reliance on his false claims. But a violation of 18 U.S.C. section 641 is a "specific intent" offense. *Morissette v. United States*, 342 U.S. 246 (1952). As such, the government must prove that Mr. Hay's specific intent to steal the benefits was formed when the false claims were made.

In this case, the government's theory is formed on the element of surprise. The government has tasked the defendant with determining what false claims over 12 years, through 70 gigabytes of discovery, were false and unlawful. Mr. Hay is completely unable to prepare a defense and avoid surprise at trial. When a defendant is unable to prepare a defense, avoid surprise at trial, or plead

double jeopardy, then the indictment is not sufficiently complete or precise. *United States v. Barbieri*, 614 F.2d 715 (10th Cir. 1980). By failing to identify any false claim or claims, or even a specific range of dates, the government has ensured that Mr. Hay will be unable to form specific defenses and avoid surprise at trial.

## II. Failure to provide the dates and false claim denies Mr. Hay the right to present a defense regarding the materiality of the statement.

The only date range of the alleged false claims that defense counsel is able to determine from the government's response is any claim spanning the time of his medical records from 2005 to May 1, 2017, the last date in the Indictment. The language contained in Counts 1-4 of the Indictment are misleading. The language in Counts 1-4 of the Indictment represents medical diagnoses made by doctors. Since the government alleges that Mr. Hay made false claims which the VA relied upon to grant him benefits, the alleged unlawful act was not just the taking of government funds, but that the VA's reliance on those alleged false representation or claims made the taking possible. The government's is essentially adding an element to the alleged violations of section 641. The government must, therefore, prove that the false claim, claims, or representations were material to the VA's grant of benefits to Mr. Hay specifically charged in Counts 1-4 of the Indictment. The first step to this is identifying how, when, and what are the claims.

Without providing some clarity of the substance or dates of the false claims, Mr. Hay cannot defend against whether they were material to the amount of VA benefits specifically alleged in Counts 1-4. *See United States v. Gaudin,* 515 U.S. 506 (1995) (The due process clause and Sixth Amendment right to jury trial required trial judge to submit to jury question of materiality of defendant's allegedly false statements in matter within jurisdiction of federal agency.).

### III. Without a Bill of Particulars, the Government is able to shift the burden to Mr. Hay to prove his innocence.

Without a Bill of Particulars, Mr. Hay will remain in the dark until trial. Without being advised of the false claims, documents, or behavior, Mr. Hay cannot adequately prepare for trial. The government's strategy shifts the burden to Mr. Hay to prove that any alleged false claim, statement, or behavior over the last 12 years put before the jury was not false. In *United States v. Bortnovsky*, 820 F. 2d 572 (2d Cir. 1985), the defendants were indicted for engaging in a scheme to defraud the Federal Emergency Management Administration and the New York Property Insurance Underwriting Association through the submission of false and inflated insurance claims. *Id.* at 573. On appeal, the defendants argued that the district court's failure to grant a Bill of Particulars was prejudicial. *Id.* Finding that the district court erred by failing to grant a Bill of Particulars, which was vital to appellants' understanding of the charges pending and to the preparation of a defense, the Second Circuit noted: "Nowhere in the indictment, however, does the Government specify the dates of the staged burglaries or enumerate which of numerous documents were falsified." *Id.* at 574. The Second Circuit concluded:

> "[A]ppellants were hindered in preparing their defense by the district court's failure to compel the Government to reveal crucial information: the dates of the fake burglaries and the identity of the three fraudulent documents. Appellants were forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending. In effect, the burden of proof impermissibly was shifted to appellants." *Id.* at 574.

As in this case, it is not enough that the government has turned over "mountains of documents" when it leaves defense counsel "unguided as to which documents would be proven falsified." *Id.*; *see also United States v. Patterson*, No. 16-10091-JTM-01, 02, 2017 WL 1361727 (D. Kan. 2017) (defendants charged with wire fraud, granting a Bill of Particulars in part, requiring the government to identify bates number of each fax that contains material representations, which will

contain dates); *United States v. Tilga*, No. 09-CR-865 JEC, 2009 WL 10706690 (D.N.M 2009) (ordering the government to file a Bill of Particulars setting forth each affirmative act by the defendant, the approximate date of that action, and to identify the false statement). Without a Bill of Particulars compelling the government to reveal the false claims, statements, documents, behavior or the dates, the burden of proof is unlawfully shifted to Mr. Hay.

**Conclusion**

The government contends that defendant's request for a Bill of Particulars is an effort to obtain evidentiary detail of the government's case and information regarding the government's legal theories. This is incorrect. Mr. Hay simply seeks to know when the alleged crime of making a false claim or claims occurred and what claim or claims were allegedly false.

The United States has charged with Mr. Hay with serious offenses. He should not have to hypothesize and speculate about the allegations against him or the elements he will have to rebut. In order for Mr. Hay to have adequate notice, the government should be ordered to file a Bill of Particulars that will provide notice of which claims (that were material to the VA disbursing benefits) the government believes are false, and the dates they occurred.

Respectfully submitted,

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I certify that on October 14, 2021 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

## CLERK'S COURTROOM MOTIONS/MISCELLANEOUS MINUTE SHEET

UNITED STATES OF AMERICA,                    AUSA:  Tris Hunt
                        Plaintiff

      v.                                                CASE NO. 19-20044-01-JAR

BRUCE L. HAY                                        Deft Atty:  Che Ramsey

             Defendant

| JUDGE: | Julie A. Robinson | DATE: | 10/19/2021 |
|---|---|---|---|
| DEPUTY CLERK: | Bonnie Wiest | REPORTER: | Nancy Wiss |
| INTERPRETER: | | PRETRIAL/PROBATION: | |

## MOTION HEARING

This case comes before the Court for a motion hearing.  The government appears by its counsel, Tris Hunt.  Defendant appears in person and with his counsel Che Ramsey.

The Court hears argument from counsel.  For the reasons stated more specifically on the record, the Court **DENIES** defendant's Motion for Bill of Particulars (Doc. 36).

The Court discusses the pretrial deadlines and trial date previously set.  The parties advise they are on track and will be ready to go forth with the trial on March 21, 2021.  Defense Counsel will confirm this date again with Mr. Hay and will advise the Court within the next week if they will need a continuance.

Defendant remains on release.

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2
     UNITED STATES OF AMERICA,          Docket No. 19-20044-JAR
3
          Plaintiff,                    Kansas City, Kansas
4                                       Date: 10/19/2021
           v.
5
     BRUCE HAY,
6
          Defendant.
7    ...................

8                         TRANSCRIPT OF
                  MOTION FOR BILL OF PARTICULARS
9          BEFORE THE HONORABLE JULIA A ROBINSON,
            UNITED STATES DISTRICT CHIEF JUDGE.
10
     APPEARANCES:
11
     For the Plaintiff:       Tris Hunt
12                            Asst US Attorney
                              360 US Courthouse
13                            500 State Avenue
                              Kansas City, KS  66101
14
     For the Defendant:       Che Ramsey
15                            Asst Federal Public Defender
                              201 US Courthouse
16                            500 State Avenue
                              Kansas City, KS  66101
17
     Court Reporter:          Nancy Moroney Wiss, CSR, RMR, FCRR
18                            Official Court Reporter
                              558 US Courthouse
19                            500 State Avenue
                              Kansas City, KS  66101
20
     Proceedings recorded by machine shorthand, transcript
21   produced by computer-aided transcription.

22

23

24

25

1          THE COURT:  All right.  We're here in United States

2    versus Bruce Hay, 19-20044.  Your appearances please.

3          MR. HUNT:  May it please the court, Tris Hunt

4    appearing on behalf of the United States.

5          MS. RAMSEY:  Che Ramsey on behalf of Bruce Hay who

6    appears in person with counsel.

7          THE COURT:  All right.  We are here for Mr. Hay's

8    motion for a bill of particulars.  Mr. Hay's filed a motion and

9    a memorandum in response, the government has filed a memorandum

10   in response.  Miss Ramsey.

11         MS. RAMSEY:  Your Honor, umm, I -- I think I asked for

12   this hearing in anticipation of two things.  One, if the court

13   may possibly have some questions regarding either the bill of

14   particulars or the memorandum.  But two, to provide the court

15   some additional information, I think, in consideration of our

16   motion.  I do not have any witnesses at this -- at this time.

17   Regarding the motion for bill of particulars, I think we

18   outlined, obviously, the standard for what we're looking for

19   and why, which is that it is to prevent surprise at trial and

20   allow Mr. Hay to conduct an adequate defense, in addition to

21   preventing double jeopardy issues.  As some background,

22   however, this case is interesting in some manners as it is

23   charged.  Ultimately, the way the indictment is written and

24   alleges and states, what it does is it states that two

25   theories, two inconsistent theories.  We'd like to address that

1    first.  Specifically, the indictment charges in the language

2    that there was theft and conversion of the veteran's benefits

3    as outlined in Counts 1 through 4 of the indictment.  And

4    although this may be a motion for a later date, the

5    government's theory seems to encompass stealing by fraud, and

6    we -- in looking at the Supreme Court's distinguishing stealing

7    and conversion, stealing means to take away from what is lawful

8    possession without right with the intention to keep wrongfully,

9    while conversion, however, may be consummated without any

10   intent to keep, and without any wrongful taking where the

11   initial conversion possession by the converter was entirely

12   lawful.  The reason we're asking the court to order the

13   government to issue a bill of particulars is on its face, the

14   indictment apparently alleges stealing and conversion by the

15   same means.  Without a bill of particulars requiring the

16   government to tell us the means by which the allegation is that

17   Mr. Hay stole and/or thereby converted, he is unable to mount a

18   defense, at least upon the government's theory.  If in fact the

19   government, by charging stealing by fraud, what the government

20   is alleging -- or by false claims and by fraud, what the

21   government alleges is basically that the indictment charges

22   that the stealing itself was the false claim, and then the

23   false claim led to a stealing gaining consent which is

24   unlawful, which cannot also be conversion.  And at this point,

25   Mr. Hay is left to speculate as to what theory the government

1   is pursuing regarding theft and conversion.  I think it's

2   important for the court to understand a bit about why we're

3   seeking the specific information of the actual dates, and what

4   the false claim was regarding how the VA benefits and decisions

5   work.  A veteran making a claim for benefits doesn't just walk

6   into the VA and claim to have a disorder, or claim to have a

7   disability, and they write and send 'em a check.  The VA

8   Benefits Services has a whole entity of compensation of

9   benefits.  There are people called veteran services

10  representatives, and those veteran services representatives are

11  responsible for promulgating a rating decision, and then the

12  benefit's based on the rating decision.  They are governed by a

13  whole title and host of regulations in Title 38 of the Code of

14  Federal Regulations that has to do with disability ratings,

15  rating codes, evidentiary standards for adjudication of

16  evidence, and so the rater gets information, and that

17  information can come from a whole host of -- of -- of services

18  or documents; so medical evidence from service records,

19  statements of others, private physician records, VA medical

20  examination records, clinical summaries from VA medical

21  centers, all these things where treatment has been provided,

22  and then the rater who's not a doctor must then evaluate all

23  that evidence and determine whether the disabling condition is

24  rateable ongoing, and then whether or not to grant benefits.

25  And then there's a whole host of a software that then they

 1    input this information in.  I give the court this background

 2    information, because part of our memorandum in response

 3    requests that the court consider as part of the reason that the

 4    bill of particulars is needed to prevent surprise at trial is

 5    because at this point, the information that the way the VA

 6    services benefits works, we are unable to determine out of all

 7    the information that the government apparently in their

 8    response is saying has been submitted to the VA for the claim

 9    from 2005 to 2017 is a whole host of either statements or

10    documents, or documents which, you know, enlist or list the

11    behavior noticed by doctors, of which of those statements in

12    which the government is relying on to prove either that is

13    false and when that statement was made, and that is important,

14    because based on the government's theory, and the language in

15    the indictment, that false claim has to have some materiality

16    to the granting of those benefits, ultimately, that I believe

17    the government is charging that he stole or converted.  And

18    without knowing what the false claim is, when it was made, Mr.

19    Hay is completely hindered from preventing a defense, and the

20    government thereby is able to, at trial, at any point in time,

21    make any statement or behavior or anything in front of the jury

22    a claim to be false without notice to Mr. -- with Mr. Hay.  In

23    line with that, Your Honor, we, in our motion and our response,

24    indicate to the court that we believe that this presents double

25    jeopardy issues.  It is anticipated that at the trial, it's

1    unknown which claims that the government is going to present to

2    the jury.  It is clearly possible that at any later date, the

3    government can come back and re-prosecute Mr. Hay on these

4    claims.  Effectively, what the government is alleging in the

5    indictment is when they believe a part of the offense,

6    whichever one it is, the theory is, stealing or conversion, may

7    have ended and the dates contained in the indictment, but when

8    did it begin, when are they alleging the actual unlawful

9    conduct occurred, and in this case, because they are claiming

10   that the unlawful conduct was the false claim, cannot defend

11   against that without knowing.  So those are our arguments in

12   support of the motion for bill of particulars, in addition to

13   the memorandum.  If the court has any questions, I can answer

14   them.

15        THE COURT:  Umm, I don't have any questions.  Thank

16   you.

17        MR. HUNT:  Your Honor, I think the government has

18   filed a relatively comprehensive response, and I would hazard

19   to guess that the court in reviewing the government's response

20   and reviewing the factual section of that response, probably

21   has no question about what this case is, and what the

22   government is alleging.  The government's alleging that the

23   defendant has falsely claimed these various illnesses.  He has

24   done so consistently, and he has done so from the get-go, and

25   that this case is tremendously consistent.  Now, as a threshold

1 matter, in reviewing the motion for the bill of particulars,

2 obviously, in contemplating the government's response and

3 looking at the motion that was then subsequently filed,

4 defendant complains based upon the alternative methods that

5 could violate 641, conversion versus theft. I've determined

6 that, in thinking about this case a lot, that the government

7 believes and will assert that this is a theft case, not a

8 conversion case. The government's position ultimately is that

9 the defendant was never lawfully in possession of these funds.

10 These funds were stolen. So I think that that is something

11 that is now a non-issue. It is not an issue for the court to

12 make a determination on the relief sought on this motion for

13 the bill of particulars. The statements, the conduct that give

14 rise to the charged counts in this case go over many years, and

15 they involve many different aspects. So for example, as in --

16 detailed in the facts in the government's response, the

17 defendant had contact with VA medical personnel. I think the

18 evidence will show at trial that statements are made. The

19 evidence is going to show that this defendant, when he has

20 contact with the VA, generally speaking, puts on I think what

21 the evidence will show is a show, it's an act, and then he goes

22 back to his normal life when he doesn't think that the

23 government or the VA is looking. That is part of essentially

24 his scheme, and this is essentially -- these instances are part

25 of the evidence that the government is going to present that

1    verifies the way that this case is charged.  There's nothing

2    that this defendant has done, the government does not believe

3    that the ultimate diagnosis -- and I think what the court will

4    see, and the jury will see, is that these particular diseases

5    or conditions rely on self-reporting, and a lot of the

6    diagnoses basically stem back to that position.  The jury will

7    be entitled to make an ultimate determination whether, in fact,

8    the claims that -- the statements that have basically been made

9    by this defendant over the period of time relevant to the

10   indictment are in fact true, were made, is the scheme; did he

11   have the intent to essentially steal the benefits?  In this

12   instance, the government could have charged other monthly

13   payments, but the government doesn't have to charge somebody

14   every time they steal.  I think the court can take a look at

15   the indictment, and see that the document -- that the payments

16   are spaced out, and again, that shows the consistency with

17   respect to what the defendant is doing, and that it hasn't

18   changed.  But the ultimate genesis of this case is the claim

19   which the government alleges false, maintained false, and not

20   changed, false.  Now, the defendant does have one legitimate

21   claim, and that was for, I believe, a hand injury when he was

22   on active duty.  That is valid.  I would note that defendant,

23   during one of the exams I believe in 2017, told to one of the

24   individuals examining him that he -- he could drive.  Now, in

25   prior paperwork, I understand -- and you know, it's a lot of

1  discovery, but I believe he had claimed he could not drive.

2  But with respect to everything else, the government's evidence

3  bit by bit, observation by observation, builds up to the

4  appropriateness of the charges in this particular case, and so

5  the defendant should be able to assert a statute of limitations

6  defense.  He knows when he was charged, he knows when the

7  statute is, and if he wants to argue that evidence is beyond

8  the statute of limitations, there are going to be probably

9  motions filed, or litigation on potential 404 B, all whether

10  the conduct -- so for example, in what I referred to as a

11  social security case, whether that is properly admitted or

12  excluded in this particular trial, because the defendant has

13  been charged with stealing VA benefits, not social security.  I

14  think the discovery shows he's doing exactly the same thing,

15  but to social security as well, and that's why we had the joint

16  investigation with the VA OIG as well as the SSA OIG.  So I

17  think that's -- unless the court has questions for the

18  government, I think that the pleadings on both sides, I think,

19  frame the issues.  So if the court has any questions, be happy

20  to -- to answer them.

21       THE COURT:  All right.  So the indictment charges,

22  what, three, four counts -- four counts of -- four counts under

23  18 USC Section 641.  The government is placing defendant on

24  notice today that they're not -- you're not pursuing a

25  conversion theory.  You're pursuing a theft or stealing theory

 1    under that statute.  The indictment charges in the conjunctive,

 2    but it's one law I think that -- and certainly, in the Tenth

 3    Circuit, that the indictment may properly charge in the

 4    conjunctive, but the government must prove in the disjunctive,

 5    but in this case, you're placing defendant on notice that the

 6    theory is not conversion, it's stealing.

 7              MR. HUNT:  Yes, Judge.

 8              THE COURT:  All right.  And then these are four

 9    discrete payments that are being charged; the government says

10    there were more, but it was four -- are these monthly payments?

11              MR. HUNT:  Yes, Judge.

12              THE COURT:  So September 30, 2016, November 1, 2016,

13    March 31, 2017, and May 1, 2017, are the four thefts under the

14    government's theory?

15              MR. HUNT:  Yes, Judge.

16              THE COURT:  In the form of VA compensation and pension

17    benefits.  Umm, I take it from the government's response

18    that -- and from the indictment itself that the indictment says

19    that Mr. Hay gives his dates of military service, but then it

20    also says that he was -- well, it was in 2008 that he was

21    certified -- 2008, he was certified to qualify for Aid &

22    Attendance payments, A & A payments of $622 per month, but

23    these that are charged are payments under the compensation and

24    pension benefits program?

25              MR. HUNT:  Yes, Judge.

1        THE COURT:  And I don't know that the indictment says

2   this, but your response indicates -- I'm trying to find when he

3   first started receiving payments from the VA, when he was

4   certified.  So March 8, 2017, he was given 100 percent

5   disability rating by the VA.

6        MR. HUNT:  Yes, Judge.

7        THE COURT:  And payments began back then?

8        MR. HUNT:  Yes.

9        THE COURT:  And it sounds like from your response, the

10  evidence that at least has been turned over to Mr. Hay dates

11  perhaps as early as -- medical records -- perhaps as early as

12  2005, because you reference nurse's notes and treatment records

13  in 2005 going forward?

14        MR. HUNT:  Yes, Judge.  And I think that part of the

15  reason I did that is because I wanted Mr. Hay to have all

16  discovery relative to his dealings with the VA, even though

17  there was investigation involving social security benefits

18  payments which I think he was not entitled to for those same

19  reasons he's not entitled to them that are alleged in this

20  case.  I think that would give the defendant the ability to

21  argue that that evidence could -- should be excluded, that it

22  was not relevant to this particular case, but that's why we've

23  provided the records going all the way back to '03.

24        THE COURT:  So government's evidence as presented is

25  -- I guess frames the government's theory that Mr. Hay was

1   never entitled to 100 percent disability, that even back in

2   2017, when the VA made its disability rating, it was based on

3   his false -- the false history, false self-report as you would

4   call 'em to the medical practitioners at the VA.

5           MR. HUNT:  Yes, Judge.

6           THE COURT:  And that all of the either statements or

7   history or complaints that he's given to the VA practitioners

8   since that time have been false as well for the same reasons.

9           MR. HUNT:  A sham to continue to receive the benefits.

10          THE COURT:  All right.  Thank you.  Miss Ramsey,

11  anything more from you?

12          MS. RAMSEY:  Yes, Your Honor.  I think that is -- is

13  the problem as the court -- court didn't note it as a problem,

14  but that it is every statement that he has made to any medical

15  provider going all the way back to 2017 is a statement

16  apparently that the government's alleging is false.  The --

17  the -- the problem with not telling us the date and/or which

18  statement within that time-frame, and I think I quote the

19  medical documents alone with possible statements, is I think

20  1,296, does not put Mr. Hay on notice about what the claim was

21  or what was false about the claim, and the government's theory

22  is -- as I understand it is not that in the indictment, again,

23  that Mr. Hay made false claims of conversion disorder in the

24  specific language of the indictment, but that statements that

25  he made to medical providers since 2005 which then led those

1  medical providers to make diagnosis, which then led the medical

2  providers to submit those diagnoses to the Veteran's

3  Administration -- excuse me -- Administration Compensation

4  Benefits, and then for a rater to take those particular medical

5  diagnoses and records that may contain statements from Mr. Hay,

6  and then determine what rating he was, and what disability, and

7  what benefits he qualified for.  That is an impossible fete to

8  ask Mr. Hay to mount a defense against, particularly where the

9  way that they've claimed the stealing has occurred is that the

10  false claim was made, and that false claim has to be material

11  throughout this process for the benefit as indicated in

12  Counts 1 through 4 of the indictment.

13       THE COURT:  But isn't it fair to say that the medical

14  records, at least some of them, evidence not so much that,

15  maybe they evidence that Mr. Hay gave certain oral history to

16  the medical practitioners, but throughout the -- the treatment

17  records, the doctors are recording their observations of Mr.

18  Hay's behavior, such as he appears on a walker, and he has

19  tremors, and he says he can't do this, and he can't do that,

20  and he can't stand up, etcetera, etcetera?  I mean, those --

21  that's -- I think it's pretty clear that that's what the

22  government is relying on, and -- and not that Mr. Hay went into

23  the medical practitioner and told 'em this is my diagnosis.

24  They recorded a diagnosis based on, you know -- in part, based

25  on their observations of him, whatever history he gave them,

1   what his medical complaints as orally told to them during that

2   particular visit.

3          MS. RAMSEY:  I'd agree, and I think the court makes a

4   good point.  It's not just the observations.  It may be oral

5   statements, it may be statements by him, or it could be their

6   observations, but the problem is, is for instance, if -- if --

7   for example, if in fact, you know, there was a claim that, you

8   know, he could not walk, or a statement made by Mr. Hay on a

9   questionnaire that, you know, he could not walk, or could not

10  walk long distances, if in fact, that statement was false, and

11  then the medical provider -- then must be imputed to the

12  medical provider to then make a diagnosis of that, and then

13  that diagnosis must be imputed to the VA raters to make a

14  decision on that.  It is very difficult to know with all of

15  this information which one that Mr. Hay has to defend against

16  which was false, because the -- the way the VA rating process

17  works is, there are compensation and pension exams which are

18  ordered by the VA.  Oftentimes, when someone makes a claim for

19  benefits, and those compensation -- pen examinations, the

20  veteran will then go into a -- typically a VA or private

21  physician contracted with the VA, and the compensation and

22  pension exam will then be for a specific exam about a specific

23  disability, and that specific disability has what's called a

24  DBQ, a disability questionnaire, and the doctor is tasked with

25  filling out and getting that information for the DBQ.  And so

1    while the doctor may be getting observations, they're also
2    getting that statement and information.  Now, this is the first
3    time -- and the indictment does not allege, at least, by any
4    language that I can see, a scheme to defraud.  Now, the
5    government is claiming that there was a scheme since 2005 to
6    defraud for these payments, but again, while I understand the
7    court's statement that these could be observations by the
8    doctors, it is clear that the government is alleging not just
9    that, but there were false claims made by Mr. Hay that led to
10   the process of these doctors making this hospital diagnosis,
11   and without knowing that, how do we defend against what is
12   false or not, and how do we defend against whether or not --
13   knowing the process, these particular false claims was material
14   to the benefits as they have been received in Counts 1 through
15   4 of the indictment?
16          THE COURT:  All right.  Umm, I have a few more
17   questions for you, Mr. Hunt.
18          MR. HUNT:  Yes, Judge.
19          THE COURT:  And you know, obviously, I haven't seen
20   the government's evidence or the discovery, but -- so just if
21   you could walk me through in general terms how you intend to
22   prove these charges.  I mean, so there was this disability
23   rating of 100 percent disability based on identified diagnoses
24   back in 2017.  There's, I assume, a whole slew of treatment
25   records at the VA, perhaps at private doctors, too, I don't

1  know, since then, that you know, probably build on the doctor's

2  recording this -- this defendant's oral history and oral

3  complaints when he comes in, their observations.  Perhaps

4  they're taking -- they're doing some sort of tests as well.  I

5  mean, the typical things you see in treatment records.  Umm, in

6  the -- typically, in medical records themselves, it

7  distinguishes between what the patient says versus what the

8  doctor's observations are, conclusions are, if you will.  But I

9  guess my question is, are you planning to put any medical

10  expert on, or any medical evidence on as to -- so the

11  indictment says conversion disorder, generalized choreiform

12  movement disorder, I mean, what that is and what the legitimate

13  symptoms of that would be, etcetera.

14       MR. HUNT:  Yes, Judge, and counsel and I have worked

15  together.  They have all ready noticed up an expert witness.  I

16  think that that also is telling, because it basically evidences

17  an understanding of what they will need to defend against.  I

18  think that the government will have to explain to a jury what

19  that is, and it's not something that is I think, for lack of a

20  better term, cut and dried, and I think that that's going to

21  take some time, but you know, getting to the court's -- I think

22  where the court's going with this, you've got statements that

23  Mr. Hay made, but you've got a non-verbal statement.  When Mr.

24  Hay is walking, sham, with a walker he doesn't need, based on

25  the government's evidence, based on our agent's observations,

1    he's representing to the VA, to -- if you want to, call doctors

2    who are examining them agents of the VA, certain things that

3    basically support his claim, or false claim of this particular

4    condition, and as the years progress, defendant, the

5    government's evidence would be, realizes he has to keep up the

6    act in order to basically remain eligible for these particular

7    benefits.  So there are incidents where a whole host of things

8    could be representations; seeing a nurse, you know, having Mr.

9    Hay come into an examination room when he's pretending like he

10   is having this -- you know, some kind of medical condition,

11   that could be a representation, collectively.  So there's other

12   analogies you could draw about what the defendant is doing.

13   It's not just talking to the doctor.  The jury's entitled to

14   hear the entire -- and I'm not charging a scheme from -- I'm

15   not using the term scheme in a legal sense.  This was a scheme,

16   government's evidence would be, that this defendant came up and

17   he stuck with it, and he believed he needed to engage in

18   certain actions, whether they were verbal or non-verbal, in

19   order to remain eligible for benefits he knew he was not

20   entitled to, because this was a scheme from the get-go.

21            THE COURT:  All right.  I understand.  So the motion

22   for bill of particulars should -- you can be seated.

23            MR. HUNT:  Thank you.

24            THE COURT:  A motion for bill of particulars -- did

25   you have something else?

```
 1              MS. RAMSEY:  I did, Your Honor.
 2              THE COURT:  Go ahead.
 3              MS. RAMSEY:  Your Honor, the -- the -- I think it's
 4    clear from what the government states that their evidence will
 5    be that again, their false claim is relying on thousands of
 6    medical records, whether that's statements or representations,
 7    but the problem I think that -- or what may be missing, again,
 8    is that what the government now calls -- is calling agents of
 9    the VA, medical providers, some of them private physicians,
10    umm, are actually the ones that make the diagnosis, and then
11    that diagnosis is, my understanding, as alleged by the
12    government, the VA raters rely on that diagnosis.  So the
13    problem, without knowing what the false claim is or
14    representation that Mr. Hay made that led to that particular
15    diagnosis, prevents Mr. Hay from forming a defense as to the
16    materiality of whatever that was that led to the diagnosis.  So
17    I wanted to make that issue with the court, give that
18    information to the court.  The second thing is, is that the --
19    you know, in -- in researching this -- this issue over a long
20    period of time this case has been pending, you know, there's
21    very few cases that charge fraud, or false claims or fraud,
22    fraudulent stealing under 18 USC 641 such as this.  And when
23    I've seen the issue presented in cases, it is, you know, where
24    let's say, a veteran makes a claim to the veteran's benefits
25    compensation entity or program that they have served in a war,
```

1    and then it's clear that they have not served in the war, and

2    that the benefits thereby were connected and given to that

3    individual on the basis of that statement, making the benefits

4    service connected and given to them, or that a particular

5    veteran's injury, they have submitted a claim for, occurred in

6    combat or during the war, and then it was very easy to prove

7    that that individual never was in combat or that injury

8    occurred somewhere else.  Here, that is not the case.  And in

9    those cases, the materiality, I think, is -- is being able to

10   be made a direct link, but where we cannot defend against the

11   possibility that any particular statement or representation

12   made over the last 12 years was material to those benefits,

13   without knowing at least a date that it was made, because

14   that's the language that the indictment is that his false claim

15   was the medical diagnosis, and I will say up until this point

16   that I have not received any of that information in discovery,

17   and I did e-mail Mr. Hunt a question about a specific --

18   specific notation in his response asking for a claim that is

19   stated as a claim in the indictment.  The other problem is, is

20   the word claim is being kind of used in two manners.  Claim

21   being one, a statement made by someone or individual or

22   allegedly made by Mr. Hay, but then there's the claim in the

23   sense that veteran's benefits are based on someone filing a

24   claim or a written request.  It doesn't even have to be the

25   veteran.  In fact -- in fact, it could be, you know, someone

1  else, a veteran's representative or the Army filing a -- a

2  claim on behalf of the veteran.  And so I think -- I just want

3  to make clear that that is part of our -- part of our problem

4  in not knowing anything about whether or not the government is

5  making, is at this point charging what the false claim, the

6  substance of it, when it was made and whether or not it was an

7  actual statement, representation, or a filing of a claim, which

8  in fact, would be some form of statement maybe on behalf of Mr.

9  Hay, or allegedly by Mr. Hay.  We just don't know.

10          THE COURT:  Umm, in Paragraph Number 2 of the

11  indictment, it speaks to the Aid & Attendance benefits.  It

12  gives some -- it gives some examples.  People -- inability of a

13  veteran to dress or undress, frequent need for the adjustment

14  of any special prosthetic or orthopedic appliances, or

15  inability to attend to the wants of nature.  Is this -- is this

16  case only about A & A benefits, or are there other kinds of

17  benefits that are -- I mean, what the payments that are

18  charged, are those A & A monthly benefits?

19          MR. HUNT:  Judge, they are payments for benefits for

20  his disability for those injuries, and then also the Aid & -- A

21  & A benefits, yes.

22          THE COURT:  All right.  So the motion for bill of

23  particulars should be granted when necessary to inform the

24  accused of the charge against him with sufficient precision to

25  enable him to prepare his defense and avoid surprise.  In this

1   case, the indictment gives Mr. Hay notice that on four
2   occasions, at least those are the four that the government is
3   charging, September 30, 2016, November 1, 2016, March 31, 2017
4   and May 1, 2017, he received as -- as noticed in each count
5   certain amount of disability payments from the Department of
6   Veteran's Affairs Compensation and Benefits Program to which he
7   was not entitled after falsely claiming -- and then it lists
8   these diagnoses, some of which involved conversion disorder,
9   weakness in right lower leg, etcetera.  So he's placed on
10  notice that he -- the government is -- is charging that he
11  committed theft when he received these four payments on those
12  specific days, because he wasn't entitled to them, because it
13  was false that he had conversion disorder, and the things that
14  are listed in the particular indictment.  The government has
15  given the defendant discovery that the government will use to
16  attempt to prove that the medical records that dated back to
17  2005 when he was given the disability classification were false
18  at that time, and have been false ever since, based on
19  statements of Mr. Hay that are both oral statements and
20  non-verbal statements in terms of how he presented with respect
21  to what his mobility issues were, his disability issues, both
22  oral and non-verbal.  I think that places the defendant on
23  sufficient notice, given that there's significant medical
24  records, given that just based on government's -- and of
25  course, needless to say, this goes on for a long period of

1    time, but he's on notice that he's only charged with these four

2    distributions, but also it's evident to me from the

3    government's response that the government has evidence about

4    medical appointments before or after generally in the same

5    time-frame as these four payments, and/or has evidence about

6    surveillance of Mr. Hay around the time of these payments that

7    would suggest he did not have weakness in his right lower leg

8    associated with conversion disorder, did not have weakness in

9    his left lower leg associated with conversion disorder, and did

10   not qualify for Aid & Attendance benefits.  So I think there --

11   it sounds to me based on the government's response that there's

12   a lot of evidence, there's a lot of medical evidence that

13   includes both statements attributable to Mr. Hay and

14   observations of the doctors of Mr. Hay's non-verbal behavior

15   that is itself a representation of what's going on with him,

16   and it's clear in treatment records what the difference is.

17   It's also clear in treatment records what the doctor's

18   diagnoses are, or conclusions are, versus their observations,

19   versus oral statements or oral history taken from Mr. Hay,

20   etcetera.  So I think he's on sufficient notice.  A bill of

21   particulars is not intended to be a discovery device, but it

22   sounds like there has been substantial discovery here.  There's

23   not really a risk of double jeopardy because the indictment is

24   clear as to which specific payments he's being charged on, so

25   -- and it doesn't charge as ongoing offense or scheme in the

1   legal sense.  So I don't see that there's any problem with this
2   indictment not enabling Mr. Hay to impose a plea of double
3   jeopardy if he were prosecuted a second time for any of these
4   same four offenses.  So I'm going to deny the bill of
5   particulars.  I do find the government has elected its
6   alternative means under this statute, so that is moot.  The
7   defendant's concerns about that are moot as well.  So I'm go
8   going to deny the motion for bill of particulars.  I think that
9   between the indictment and the discovery provided, Mr. Hay is
10  fully on notice.  Now, let's -- we're not -- Bonnie, these
11  deadlines, have we all ready given them these deadlines, or are
12  these the ones you propose?
13          MS. WIEST:  They all ready have that.
14          THE COURT:  Okay.  So we have a trial date of
15  March 21st, and we have a pretrial motions deadline of
16  November 8th, responses in any 404 B notices November 29th.
17  The pretrial motions hearing is going to be on December 21st at
18  9 AM.  Witness and exhibit lists are due January 17th.  Motions
19  in limine are due February 27th, which is actually a Sunday, so
20  let's call it February 28th, and then we have scheduled a
21  limine conference for March 2nd at 9:00 AM, and then the jury
22  trial March 21st.  Does the government still estimate a
23  two-week block of time necessary for trial?
24          MR. HUNT:  Judge, on the outside, at the outside.  I
25  would hope it could be done before then, but --

          THE COURT:  Have the parties -- have the parties --
have the parties been engaged in plea negotiations, or do you
anticipate plea negotiations at all going forward?

          MS. RAMSEY:  No, I do not anticipate plea
negotiations, Your Honor, and I think, you know, that was one
of the issues, I think with the bill of particulars.  This is
going to be an extremely complex, I think, case, especially
since we -- Mr. Hay is required to go back to 2005 to defend
this case.  So I do anticipate at this point, it will last two
weeks.

          THE COURT:  Okay.  Umm, are you all solid on the
March 21st deadline -- date for trial?  And the reason I ask
is, I've got a big backlog.  I have got some cases that would
love to have that time block, so I'm not wanting to grant a
continuance to you all.  If you think there's any possibility
you need more time, I'd rather have you tell me now, and I'll
find you a good block of time, and I can let somebody else have
that two weeks.

          MR. HUNT:  Judge, I think --

          THE COURT:  I won't consider favorably a motion for
continuance, because I can tell you, this is prime real estate
you're sitting on on my calendar right now, and if this is --
if you all can commit to me March 21st, that's great, we'll go
forward, but if you think there's any possibility you won't be
ready, I'd like to talk about it now.

1          MR. HUNT:  Judge, Miss Ramsey and I have, I think,

2     worked well together with respect to scheduling this case, and

3     I think that this schedule is thought out.  Obviously, you

4     can't tell what's going to happen and whether something's going

5     to happen that may impact this, but I think from the

6     government's perspective, this is the final schedule.

7          THE COURT:  Okay.  You agree, Miss Ramsey?

8          MS. RAMSEY:  Your Honor, umm, my client, Mr. Hay, has

9     made some comments that I possibly need to discuss with him

10     regarding that trial setting date.  It is a deadline that

11     myself and Mr. Hunt, along with the other deadlines that the

12     court announced, did work out to try and get this on track for

13     that -- for that date and time.  So at this moment, I'm not

14     asking the court for any continuance.  However, as we are in

15     open court, Mr. Hay would like to have some discussions with me

16     about that.  I would notify the court as soon as possible if --

17     if I -- if there's any indication that a continuance would be

18     requested, but I believe we've got it on track to go on those

19     dates.

20          THE COURT:  Okay.  And so when you say as soon as

21     possible, are you talking about like within the next week or

22     so?

23          MS. RAMSEY:  Yes, Your Honor.

24          THE COURT:  Okay.  'Cause we really do need to know.

25     We've got some big scheduling issues here, so --

1          MS. RAMSEY:  Understood.

2          THE COURT:  All right.  We will be in recess, and I

3    guess we will see you back December 2nd.  Is that the limine

4    hearing?  No.  No, the motions hearing is set for

5    December 21st, should there be any motions filed.  We'll have a

6    status conference on that date if there are no motions filed.

7          MS. RAMSEY:  Your Honor, and I do just -- just for

8    notice for the court, I do anticipate there will be pretrial

9    motions filed, and so we will need that time on that date, so

10   just as a -- try to give some confirmation about the dates and

11   the timing that's going to go on, I do want to let the court

12   know that motions will be filed and certain hearings will need

13   to be held.

14         THE COURT:  All right.  Thank you so much.  We will be

15   in recess.

16         (Whereupon, court recessed proceedings.)

17

18

19

20

21

22

23

24

25

1

2                         C E R T I F I C A T E

3

4

5       I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official reporter

7    of the United States District Court for the District of Kansas,

8    do hereby certify that as such official reporter, I was present

9    at and reported in machine shorthand the above and foregoing

10   proceedings.

11      I further certify that the foregoing transcript, consisting

12   of 27 typewritten pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15      SIGNED October 25, 2021.

16

17                    S/_____

18                    Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No. 19-20044-JAR |
| | } | |
| BRUCE L. HAY, | } | |
| Defendant. | } | |

## MOTION TO SUPPRESS POLE CAMERA FOOTAGE

Mr. Bruce Hay respectfully moves this Court for an order suppressing all evidence obtained through the warrantless use of a pole camera which observed the front of Mr. Hay's residence and driveway at least 15 hours a day, 7 days a week, from October 6, 2016, to November 29, 2016, and then again from March 24, 2017, to March 30, 2017, and May 2, 2017, to May 8, 2017. For 68 days, agents from the Department of Veteran's Affairs, Office of the Inspector General Criminal Investigations Division (VA-OIG) were able to surveil Mr. Hay at their discretion by using a pole camera installed without a warrant near his residence.

VA-OIG's long-term surveillance of Mr. Hay via pole camera constituted a search. VA-OIG's actions intruded on Mr. Hay's reasonable expectation of privacy in his physical movements over time—an expectation that society accepts as reasonable. The pole camera search was warrantless and, thus, the fruits of this illegal search must be excluded.

### Statement of Facts

On or about October 4, 2016, covert electronic surveillance equipment was installed by VA-OIG agents near Mr. Hay's residence. The VA-OIG was investigating a criminal referral suspecting that Mr. Hay, a veteran, falsely claimed he was disabled. This covert attempt to record Mr. Hay engaging in conduct that was incongruent with his claimed disability was part of the agents' investigative strategy, in addition to previous surveillance conducted by the agents.

Specifically, VA-OIG agents installed the covert surveillance equipment to the outside of Osawatomie High School, which is located across the street from Mr. Hay's residence, 1211 Parker Avenue, Osawatomie, Kansas. Parker Avenue is a two-lane road. The covert surveillance equipment included a mounted camera directed to face the front of Mr. Hay's residence, including the porch, front yard, and driveway. Mr. Hay's residence is less than 200 feet from the high school.

The covert electronic surveillance equipment was in place and recording continuously for almost eight weeks, from October 6, 2016, to November 29, 2016. The agents were able to turn the surveillance equipment on and off, and they took advantage of that feature by turning the surveillance equipment on to record Mr. Hay's residence twice during 2017. From March 24, 2017, until March 30, 2017, and from May 5, 2017, until May 8, 2017, the covert surveillance equipment again recorded Mr. Hay's residence.

The camera was motion-activated, and could also be remotely controlled to zoom, pan, and tilt. If a VA-OIG agent wished to zoom in on a license plate, for example, the investigating agent could call a tech agent who would then, working remotely, zoom the camera at the other agent's request. The recording was stored, and agents had the ability to download and create shorter clips of the continuous recording.

The VA-OIG agents did not obtain prior judicial approval via a search warrant to install the pole camera. Yet, the agents had time to speak with the Osawatomie supervisor of city utilities, the police department deputy chief, and potentially Osawatomie High School administrators about the possibility of installing covert surveillance equipment.

**Argument and Authorities**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Its basic purpose "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018). "A district court may not suppress evidence unless the defendant has met his burden of proving that he had a personal Fourth Amendment interest that was implicated by the search." *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989).

1. **Law enforcement's use of the pole camera was a search for Fourth Amendment purposes.**

 To establish a Fourth Amendment violation, the defendant must prove a legitimate expectation of privacy in the place searched or the item seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). "Determining whether a legitimate ... expectation of privacy exists ... involves two inquiries. First, the defendant must show a subjective expectation of privacy in the area searched, and second, that expectation must be one that society is prepared to recognize as reasonable." *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002) (internal citation omitted); *see also Katz v. United States*, 389 U.S. 347 (1967). "The ultimate question is whether one's claim to privacy from the government intrusion is reasonable in light of all the surrounding circumstances." *Id.*

Here, Mr. Hay had a reasonable expectation of privacy in his movements over time, and VA-OIG agents intruded on this reasonable expectation of privacy when they installed a pole camera across from Mr. Hay's residence and watched and recorded his movements over a cumulative period of 68 days.

**A. Mr. Hay held a subjective expectation of privacy in his movements over time.**

In *Carpenter*, the Supreme Court recognized, in the context of cell-site location information, an individual's legitimate expectation of privacy in the record of his physical movements. *Carpenter*, 138 S. Ct. at 2217. As such, the Court held that the government's acquisition of cell-site location records was a search within the meaning of the Fourth Amendment. *Id.* at 2220. Consequently, "accessing seven days of [cell-site location information (CSLI)] constitut[ed] a Fourth Amendment search" and necessitated a warrant. *Id.* at 2217, n.3. The Court noted, additionally, that the cell-site location information the government could, in combination with other information, could "deduce a detailed log of Carpenter's movements[.]" *Id.* at 2218. By accessing the cell-site location information from the wireless carriers, the government "invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Id.* at 2219.

*Carpenter* compels the reconsideration of the propriety of warrantless, intentional, and prolonged law enforcement video surveillance of private property. Although Mr. Hay could expect being seen when he left his home, he could not expect that law enforcement would surveil and record him for weeks, zooming in and rewinding each and every step he took. Mr. Hay had a legitimate expectation of privacy, and when VA-OIG agents conducted nearly 68 days of surveillance on him—55 continuously, and the rest at their leisure—and maintained a record of his physical movements, the agents invaded that reasonable expectation of privacy.

**B. Society accepts as reasonable Mr. Hay's expectation of privacy in his movements over time.**

In *United States v. Jones*, the Court expressed its still-growing concern of warrantless, intentional, and prolonged government surveillance. 565 U.S. 400 (2012). *Jones* involved a GPS tracking device warrantlessly installed by the FBI on the undercarriage of a Jeep operated by the defendant. *Id.* at 403. The device tracked the movement of the Jeep for 28 days. *Id.* The device established the vehicle's location within 50 to 100 feet, and remotely relayed more than 2,000 pages of data over the

4–week period. *Id.* The majority opinion, authored by Justice Scalia, held that the installation of the device constituted a trespass and, therefore, violated the Fourth Amendment. *Id.* at 404-05. However, Justices Sotomayor and Alito authored concurring opinions analyzing the issue by application of the expectation of privacy test. *Id.* at 415 (opinion of Sotomayor, J., agreeing with the application of the trespass test and reaching the same conclusion via the expectation of privacy test); *Id.* at 430 (opinion of Alito, J., rejecting the trespass test, but reaching the same conclusion via the expectation of privacy test).

Although *Jones* involved a physical trespass, the concurrences of Justices Sotomayor and Alito inform the Court's analysis of whether society is prepared to accept Mr. Hay's expectation of privacy as reasonable. First, as Justice Sotomayor points out in *Jones*, "[a]wareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse." *Jones*, 565 U.S. at 416. Then, as Justice Alito reasons, "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer-term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.* at 430.

All of the concerns articulated by Justices Sotomayor and Alito in *Jones* are present here. The use of a small, unnoticeable mounted pole camera aimed at a house that runs dusk until dawn, 7 days a week, and can be turned on and off at-will, is clearly an "electronic or other novel mode of surveillance that does not depend upon a physical intrusion of property." *Jones*, 565 U.S. at 415. Further, the government can start collecting this intimate information at their leisure. Covertly, via pole cam, the government tracked movements to and from a private home. The government tracked relationships and associations. The government tracked whether the Hay family entered and left

their property at times common to political or religious events or whether the family conducted those events alone or with others on their property.

The government tracked these intimate, personal details, from start to finish, and created a catalogue that can be stored and mined for information years into the future. Perhaps as passerby law enforcement need not shield their eyes, but no passerby could do, as freely and unfettered, as the VA-OIG agents did. The agents bypassed the ordinary checks of police power and surreptitiously aggregated information for eight weeks, and that is the sort of behavior that chills associational and expressive freedoms.

### C. Prior Tenth Circuit cases relying on public view are no longer controlling.

Although the Tenth Circuit has previously rejected the argument that individuals have a reasonable expectation of privacy on their own property over time as recorded by pole cameras, *see United States v. Cantu*, 684 Fed. App'x 703 (10th Cir. 2017) (unpublished); *United States v. Jackson*, 213 F.3d 1269 (10th Cir. 2000), *vacated on other grounds by Jackson v. United States*, 531 U.S. 1033 (2000), these cases are not controlling here in light of *Carpenter*. In both *Jackson* and *Cantu*, the Tenth Circuit emphasized that a person has no reasonable expectation of privacy in "activity a person knowingly exposes to the public." *Cantu*, 684 Fed. App'x at 705; *Jackson* 213 F.3d at 1281. Yet, these cases still recognize the fundamental question that must be asked when covert surveillance is at issue: "whether society is willing to recognize [the defendant]'s expectation of privacy as reasonable." *Cantu*, 684 Fed. App'x at 705.

The rationale of *Cantu* and *Jackson*—that knowingly exposing activity to another always defeats a person's reasonable expectation of privacy—has been upended by *Carpenter*,[1] at least when the

---

[1] The Supreme Court's decision in *Carpenter* has had a far-reaching impact outside the Tenth Circuit. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th Cir. 2021) (applying *Carpenter* and determining that the community advocate plaintiffs were likely to succeed on the merits of their claim that city police

activity recorded is a chronicle of the person's physical movements over time. In *Carpenter*, the Court rejected the third-party doctrine—the idea of voluntary exposure—, finding that Carpenter's claim to Fourth Amendment protection remained even though the Government acquired the cell-site records from wireless carriers. *Carpenter*, 138 S. Ct. at 2219-20. Third-party doctrine is analogous to the Tenth Circuit's rationale in *Cantu* and *Jackson* and is superseded by *Carpenter*. This Court is not bound by Tenth Circuit decisions that have been superseded by a contrary Supreme Court decision. *Brand v. Mazda Motor Corp.*, 978 F. Supp. 1382, 1392 (D. Kan. 1997).

**2. The pole camera search was warrantless, and the government will be unable to establish an exception to the warrant requirement.**

When a search and seizure is challenged as violative of the Fourth Amendment, the government bears the burden to prove its validity. *United States v. Ibarra*, 955 F.2d 1405, 1408 (10th Cir. 1992). "[W]arrantless searches are typically unreasonable where 'a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing.'" *Carpenter*, 138 S. Ct. at 2221 (citation omitted). Thus, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* (citation omitted).

Here, the government cannot establish an exception to the warrant requirement.

department's aerial surveillance program invaded individual's reasonable expectation of privacy in their movements and, therefore, violated the Fourth Amendment). Additionally, the First Circuit has granted en banc review to consider the use of surveillance technologies, including pole camera, in light of *Carpenter*. *See United States v. Moore-Bush*, 963 F.3d 29 (1st Cir. 2020), *vacated, reh'g en banc granted*, 982 F.3d 50 (10th Cir. 2020) (argued Mar. 23, 2021) (considering whether the placement of a pole camera violated the Fourth Amendment in light of *Carpenter*); *but see United States v. Tuggle*, F4th 505 (7th Cir. 2021), *petition for cert. filed*, 2021 WL 4790611 (Oct. 8, 2021) (No. 21-541) (although distinguishing *Carpenter* from the prolonged use of pole camera surveillance in a drug trafficking investigation, the Seventh Circuit expressed caution about the trajectory of Fourth Amendment jurisprudence alongside society's evolving expectations of privacy).

### 3. The evidence must be excluded from trial.

Evidence taken in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure. *United States v. Calandra*, 414 U.S. 338, 347 (1974). "A district court cannot suppress evidence unless the movant proves that a search implicates *personal* Fourth Amendment interests." *United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995) (emphasis in original). If a search or seizure violates the Fourth Amendment, the exclusionary rule prohibits the admission of the fruits of illegally seized evidence, such as any information, object, or testimony uncovered or obtained directly or indirectly as a result of the illegally seized evidence or any leads obtained therefrom. *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

Here, because the warrantless, prolonged, and intentional law enforcement video surveillance recorded the private home of Mr. Hay, it was unlawful search and must be suppressed.

### Conclusion

Mr. Hay had a reasonable expectation of privacy in his movements over time. The ordinary remedy for violation of the Fourth Amendment is suppression of any evidence obtained as a result of the illegal police conduct. Here, all evidence law enforcement obtained was as a result of the warrantless search of Mr. Hay's property. Accordingly, Mr. Hay requests this evidence be excluded from trial.

Respectfully submitted,

s/Chekasha Ramsey

CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

## **CERTIFICATE OF SERVICE**

      I certify that on November 8, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,  )
         Plaintiff,  )
               )
    v.              )       CASE NUMBER: 19-CR-20044-JAR
               )
BRUCE L. HAY,         )
         Defendant.  )
               )

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by and through Duston J. Slinkard, Acting United States Attorney for the District of Kansas, and Tristram W. Hunt and Ryan J. Huschka, Assistant United States Attorneys, respectfully requests that the Court deny defendant's Motion to Suppress. (Doc. 49). His only proffered basis for suppression—that a camera attached to a public high school constituted a search under the Fourth Amendment—is foreclosed by Tenth Circuit precedent, and even if it were not the good-faith exception to the exclusionary rule applies.

**I.**     **The use of a pole camera on public property did not constitute a "search" subject to the Fourth Amendment.**

The defendant argues that a warrantless installation and use of a pole camera to record all activities in the front of the defendant's home for 15 hours per day for

1

approximately eight weeks starting in October 2016, one week in March 2017, and one week in May 2017 was a "search" (or a series of searches) and thus unreasonable.[1] His motion lacks merit and should be denied.

The Fourth Amendment provides, in part, that the people have a right to be "secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. The ultimate touchstone of the Fourth Amendment is "reasonableness." *Riley v. California*, 134 S. Ct. 2473, 2482 (2012). The Fourth Amendment protects people, not places, so violations may occur even if the government does not physically intrude on a constitutionally protected area. *Katz v. United States*, 389 U.S. 347, 361 (1967).

A party alleging an unconstitutional search under the Fourth Amendment must establish both a subjective and objectively reasonable expectation of privacy to prevail. *Id.* The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that "the privacy expectation be one that society is prepared to recognize as reasonable." *Id.* The

---

[1] For purposes of this response, the United States does not dispute any of the facts in the defendant's motion, because even assuming that all of his factual representations are accurate he is not entitled to relief.

2

defendant bears the burden of proving a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

Moreover, "what a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *United States v. Katz*, 389 U.S. 347, 351 (1967). It follows and courts have therefore routinely held that the use of pole cameras to view outdoor areas surrounding a home and easily observable by people passing by does not violate the Fourth Amendment. *See United States v. Cantu*, 684 F. App'x 703, 705-06 (10th Cir. 2017) (holding that video camera installed on utility pole and used for as much as "a few months" was not a search and thus no warrant required); *United States v. Jackson*, 213 F.3d 1269, 1281 (10th Cir. 2000) (holding no Fourth Amendment violation because "the video cameras installed on the telephone poles were capable of observing only what any passerby would easily have been able to observe"), *vacated on other grounds*, 531 U.S. 1033 (2000); *see also, e.g.*, *United States v. Tuggle*, 4 F.4th 505, 521-22 (7th Cir. 2021) (noting that "sister circuits have almost uniformly declined to find Fourth Amendment searches" in the context of pole camera video surveillance and at a minimum "no federal circuit court has found a Fourth Amendment search based on long-term use of pole cameras on public

3

property to view plainly visible areas of a person's home"); *United States v. Houston*, <u>813 F.3d 282, 289</u> (6th Cir. 2016) (10 weeks of warrantless pole camera footage constitutional); *United States v. Bucci*, <u>582 F.3d 108, 116-17</u> (1st Cir. 2009) (approving 8 months of warrantless pole camera surveillance); *United States v. Mazzara*, <u>2017 WL 4862793</u>, at *12 (S.D.N.Y. Oct. 27, 2017) (concluding that 21 months of pole camera surveillance outside of the defendant's home did not violate Fourth Amendment); *United States v. Moore*, <u>2014 WL 4639419</u>, at *4 (S.D. Fla. Sept. 15, 2014) (rejecting argument that 9 months of pole camera footage was unconstitutional).

The defendant acknowledges that the Tenth Circuit has previously rejected his argument on two occasions, but he argues those cases are not controlling after the United States Supreme Court's decision  in *Carpenter v. United States*, <u>138 S. Ct. 2206</u> (2018).  (<u>Doc. 49 at 6</u>).  The defendant's reliance on *Carpenter* is misplaced.

The technology addressed in *Carpenter* was cell-site location information, which involved "a new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals." *Id.* at 2216.  By contrast, the pole camera used in this case was a traditional video camera.  Indeed, the Supreme Court—when extending Fourth Amendment protections to cell-site

4

location information—expressly stated that its decision should not "call into question conventional surveillance techniques and tools, *such as security cameras*." *Id.* at 2220 (emphasis added).

The defendant also discusses the Supreme Court's decision in *United States v. Jones*, 565 U.S. 400 (2012), (doc. 49 at 4-5), but that case involved the warrantless installation of a tracking device on a personal vehicle, which could then monitor vehicle movements. A substantial basis for the Supreme Court's decision was that law enforcement physically trespassed on private property (the vehicle). *Jones*, 565 U.S. at 407-08. By contrast, the defendant does not suggest that law enforcement installed the pole camera in a location where he could claim a privacy interest. And in any event, GPS tracker data is nothing like a pole camera used to surveil property across the street from a public high school, which was limited to a fixed location and only captured activities within the limited scope of the camera.

Most recently, the Seventh Circuit rejected an argument that *Carpenter* and/or *Jones* applied to warrantless pole camera footage obtained by the government, noting:

> Of course, the stationary cameras placed around Tuggle's house captured an important sliver of Tuggle's life, but they did not paint the type of exhaustive picture of his every movement that the Supreme Court has frowned upon. If the

5

facts and concurrences of *Jones* and *Carpenter* set the benchmarks, then the surveillance in this case pales in comparison.

*Tuggle*, 4 F.4th at 524.

In summary, the VA-OIG did not conduct a "search" subject to the Fourth Amendment by using a pole camera. The camera was placed on public property, and, from its fixed location, captured only what would have been visible to any member of the public. The defendant's motion to suppress should be denied.

## II. The good-faith exception to the exclusionary rule would prevent suppression.

Even assuming that the VA-OIG's conduct amounted to a search, suppressing evidence would not be warranted. At the time of the challenged conduct, binding Tenth Circuit precedent supported the lawfulness of that conduct. Because the sole purpose of the exclusionary rule is to deter misconduct, later decisions modifying that precedent do not justify suppression.

Suppressing evidence is a remedy of "last resort." *Davis v. United States*, 564 U.S. 229, 237 (2011). The exclusionary rule—a prudential doctrine—is "'not a personal right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* at 236 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Its "sole purpose" is "to deter future Fourth Amendment violations." *Id.*

6

at 236-37.  Thus, when "suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly unwarranted.'"  *Id.* at 237 (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)) (alteration omitted).

Moreover, deterrence is not a sufficient reason to apply the exclusionary rule. *Davis*, 564 U.S. at 237.  The decision whether to exclude evidence "must also account for the 'substantial social costs' generated by the rule," as exclusion "exacts a heavy toll on both the judicial system and society at large." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)).  Only when "the deterrence benefits of suppression . . . outweigh its heavy costs" may courts exclude evidence. *Id.*  The deterrent benefits will only do so when law enforcement's conduct is particularly culpable: "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (quotations omitted); *see also Leon*, 468 U.S. at 908-09.

The Supreme Court applied those principles to the context of an intervening change in law in *Davis*, 564 U.S. 229.  There, officers had searched the passenger compartment of a car after arresting and securing the occupants in the back of patrol cars.  *Id.* at 235.  The circuit in which the search occurred had expressly

7

approved of such a search, reading the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454 (1981), to categorically permit vehicle searches incident to arrest. *Davis*, 564 U.S. at 235. The Supreme court later clarified, however, that *Belton*'s rule applies only when the arrestee is unsecured and within reaching distance of the car at the time of the search. *Id.* at 234; *Arizona v. Gant*, 556 U.S. 332 (2009). Under that rule, the officers' search was unlawful. *Davis*, 564 U.S. at 236.

Despite the unlawful search, the Supreme Court held that suppression was not warranted. *Id.* at 241. Because appellate precedent permitted the officers' conduct when it occurred, the officers did not act culpably in conducting the search, even though in hindsight it was improper. *Id.* at 239-41. Suppressing evidence would thus create little deterrent value but would still impose social costs. *Id.* The Court therefore held that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Id.* at 249-50.

Suppressing evidence would offer no deterrent value here, as binding Tenth Circuit precedent at the time of the challenged conduct—intermittently from October 2016 to May 2017—would have reasonably justified a belief that the use

8

of pole cameras did not violate the Fourth Amendment.  *See Jackson*, 213 F.3d at 1281; *see also Cantu*, 684 F. App'x at 706.  Moreover, the Supreme Court clearly stated in *Jones*: "This Court has to date not deviated from the understanding that mere visual observation does not constitute a search."  565 U.S. at 412.  These binding precedents from the Tenth Circuit and the Supreme Court would have given the VA-OIG an objectively reasonable basis to conclude—as multiple other federal circuit courts have concluded—that the use of pole cameras was lawful.

The defendant relies extensively on *Carpenter* as a basis for suppression, claiming that it "upended" the rationale of Tenth Circuit precedent regarding pole cameras.  (Doc. 49 at 6-7).  For the reasons discussed above the defendant's argument is baseless, but regardless *Carpenter* was decided more than a year after the VA-OIG obtained the pole camera footage the defendant seeks to suppress.  Accordingly, the exclusionary rule would not apply even if this Court were to conclude that the use of pole cameras constituted a search.

9

## III. Conclusion

For the foregoing reasons, this Court should deny the defendant's motion to suppress.

Respectfully Submitted,

DUSTON J. SLINKARD
Acting United States Attorney
District of Kansas


*s/Tristram W. Hunt*
TRISTRAM W. HUNT, #18196
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)
E-mail: tris.hunt@usdoj.gov

*s/Ryan J. Huschka*
RYAN J. HUSCHKA, #23840
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)
E-mail: ryan.huschka@usdoj.gov

ELECTRONICALLY FILED
Attorneys for Plaintiff

10

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of November 2021, the foregoing was

electronically filed with the clerk of the court by using the CM/ECF system which

will send a notice of electronic filing to the following:

> Chekasha Ramsey
> Office of Federal Public Defender - KCKS
> 500 State Avenue, Suite 201
> Kansas City, KS 66101-2400
> Counsel for Defendant

I further certify that on this date the foregoing document and the notice of

electronic filing were mailed by first-class mail to the following non-CM/ECF

participants:

> None.

> */s/ Ryan J. Huschka*
> Ryan J. Huschka
> Assistant United States Attorney

11

## CLERK'S COURTROOM MOTIONS/MISCELLANEOUS MINUTE SHEET

UNITED STATES OF AMERICA,                AUSA:  Ryan Huschka
                        Plaintiff

        v.                                CASE NO. 19-20044-01-JAR

BRUCE L. HAY                              Deft Atty:  Che Ramsey

                Defendant

| JUDGE: | Julie A. Robinson | DATE: | 12/21/2021 |
|--------|-------------------|-------|------------|
| DEPUTY CLERK: | Bonnie Wiest | REPORTER: | Dani Murray |
| INTERPRETER: | | PRETRIAL/PROBATION: | |

## MOTION HEARING

This case comes before the Court for a motion hearing.  The government appears by its counsel, Ryan Huschka.  Defendant appears in person and with his counsel, Che Ramsey.

After hearing argument from counsel, the Court takes Defendant's Motion to Suppress (Doc. 49) **under advisement** and issue a written decision.

Earlier, it was necessary for the Court to move Mr. Hay's jury trial from March 21, 2022 to April 18, 2022.  Defendant's expert witness is not available at that time and counsel requests a later trial date.  The government does not oppose.  The Court grants said request and continues the jury trial to **August 1, 2022 beginning at 9:00 a.m.**

Counsel will discuss and agree on new pretrial deadlines and provide the Court with a proposed order.

Pursuant to the specific findings set forth on the record, the Court finds that the ends of justice served by allowing the defendant the additional time requested outweigh the best interest of the public and the defendant in a speedy trial and that the continuance shall be granted. The period of delay resulting from the additional time granted pursuant to the court's order, **December 21, 2021 through August 1, 2022**, shall be deemed excludable time as provided for in 18 U.S.C. § 3161(h)(7)(A), in that the ends of justice served by the granting of an extension outweigh the best interest of the public and the defendant in a speedy trial.

Defendant remains on release.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,    )
        Plaintiff,    )
                    )
    v.               )
                    )     CASE NUMBER: 19-CR-20044-JAR
BRUCE L. HAY,        )
        Defendant.    )
                    )

## UNITED STATES' INITIAL NOTICE UNDER FEDERAL RULE OF EVIDENCE 404(b)

The United States of America, by and through Duston J. Slinkard, United

States Attorney for the District of Kansas, and Ryan J. Huschka and D.

Christopher Oakley, Assistant United States Attorneys, files this Initial Notice

with the Court under Federal Rule of Evidence 404(b).  Although these

allegations are inextricably intertwined with the charged conduct and constitute

direct evidence, in an abundance of caution, the United States files this Notice

under Federal Rule of Evidence 404(b) to notify the Court and Defendant that it

may seek to tender evidence during trial concerning the following:

In January 2021, the Defendant filed a Mechanics Lien on his mother's

property in Miami County, Kansas District Court.  The lien was claimed for labor

1

the Defendant furnished as a "Farm Manager" on his mother's property from January 1, 1985 to December 31, 2020.  Among the labor the Defendant represented that he provided during those years included the following: "equipment repair, livestock management, property upkeep (fence repair, water gaps, etc.), crop planting and harvesting and hay harvesting."  The Defendant claimed he was owed $62,400 per year for those 35 years based on the work performed.  An accompanying employment agreement dated May 15, 2015 and signed by the Defendant and his mother stated that the Defendant had been employed as a "Farm Manager" since January 1, 1985 and that he accepted and agreed to continue such employment for an annual salary of $62,400.  The agreement provided that the Defendant's mother would retain his earned wages and execute a note and mortgage to secure the amount owed.


Respectfully Submitted,

DUSTON J. SLINKARD
United States Attorney
District of Kansas


*/s/  Ryan J. Huschka*
RYAN J. HUSCHKA, #23840
Assistant United States Attorney

2

500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)
E-mail: ryan.huschka@usdoj.gov

*/s/ D. Christopher Oakley*
D. CHRISTOPER OAKLEY, #19248
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)
E-mail: chris.oakley@usdoj.gov

ELECTRONICALLY FILED
Attorneys for Plaintiff

3

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of April, 2022, the foregoing was

electronically filed with the clerk of the court by using the CM/ECF system

which will send a notice of electronic filing to the following:

Chekasha Ramsey
Office of Federal Public Defender - KCKS
500 State Avenue, Suite 201
Kansas City, KS 66101-2400
Counsel for Defendant


*/s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney

4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

BRUCE L. HAY,

      Defendant.

Case No. 19-20044-JAR

## MEMORANDUM AND ORDER

Suspecting that Defendant Bruce Hay had falsely claimed he was disabled to receive disability payments, federal agents surveilled him without a warrant to obtain evidence of his physical capabilities. The agents installed a pole camera on public property across the street from his residence and recorded nearly ten weeks' worth of footage. Before the Court is Hay's Motion to Suppress Pole Camera Footage (Doc. 49). He contends that the use of a pole camera to monitor the front of his residence constituted a warrantless search in violation of the Fourth Amendment to the U.S. Constitution, Tenth Circuit precedent to the contrary notwithstanding. The motion is fully briefed,[1] and the Court heard oral argument on December 21, 2021. For the following reasons, the Court denies Hay's motion.

## I. Background

Hay is charged with four counts of theft of public money, in violation of 18 U.S.C. § 641. The charges stem from an investigation by the U.S. Department of Veterans Affairs, Office of Inspector General ("VA OIG"), Criminal Investigations Division, into allegations that Hay, a

---

[1] Hay did not file a reply brief.

veteran receiving disability payments, falsely claimed disability. The following facts, drawn primarily from Hay's motion to suppress, are undisputed for purposes of the motion.[2]

As part of the investigation, VA OIG agents surveilled Hay to determine whether he engaged in activities that belied his claims of disability. In October 2016, agents installed a hidden surveillance camera outside a public high school across from Hay's residence on Parker Avenue in Osawatomie, Kansas. The camera faced the front of Hay's residence, including his porch, front yard, and driveway. Hay lives less than 200 feet from the high school.

Once installed, the pole camera monitored Hay's residence continuously for almost eight weeks, from October 6 to November 29, 2016. The agents then turned the camera off, but did not remove it. Then, in 2017, the agents turned the camera back on twice, though for shorter periods: from March 24 to March 30, 2017, and from May 2 to May 8, 2017. The camera was motion-activated, and agents could remotely control its zoom, pan, and tilt features. "If a VA-OIG agent wished to zoom in on a license plate, for example, the investigating agent could call a tech agent who would then, working remotely, zoom the camera at the other agent's request."[3] Despite these features, the camera did not record audio or allow agents to see inside Hay's residence. All the camera's footage was stored, and agents could later download and replay it. The agents did not seek a warrant before installing the pole camera.

Hay now moves to suppress evidence obtained from the pole camera, arguing that the warrantless pole camera surveillance, which lasted "a cumulative period of 68 days," was a search that violated the Fourth Amendment.[4]

---

[2] Neither party asked this Court to conduct an evidentiary hearing.

[3] Doc. 49 at 2.

[4] *Id.* at 3.

## II.    Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[5]  Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."[6]

The Supreme Court has articulated two tests to determine when a search occurs within the meaning of the Fourth Amendment.  The first, the common-law trespassory test, identifies a search when the government "obtains information by physically intruding on a constitutionally protected area."[7]  The second, the reasonable-expectation-of-privacy test derived from Justice Harlan's concurrence in *Katz v. United States*, recognizes that a search can take place "even in the absence of a trespass."[8]  Under this test, a search occurs when the government violates a person's "reasonable expectation of privacy."[9]  Courts employ a "two-part inquiry" to assess the legitimacy of a privacy expectation: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?"[10]

Because there was no physical intrusion, Hay challenges the pole camera surveillance under the reasonable-expectation-of-privacy test.  As Hay recognizes, however, the Tenth Circuit has already conducted that analysis in a case with similar facts, *United States v. Jackson*, and it

---

[5] U.S. Const. amend. IV.

[6] *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

[7] *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012); *see also United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment).

[8] *Jones*, 565 U.S. at 414 (Sotomayor, J., concurring).

[9] *Katz*, 389 U.S. at 360 (Harlan, J., concurring); *see also Kyllo v. United States*, 533 U.S. 27, 33 (2001); *Smith v. Maryland*, 442 U.S. 735, 740–41 (1979).

[10] *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

found no Fourth Amendment search.[11]  There, the Tenth Circuit confronted a Fourth Amendment

challenge to the use of pole cameras installed without a warrant to monitor residences.  Law

enforcement in *Jackson* had affixed "video cameras on the tops of telephone poles overlooking

the residences of" suspected leaders of drug organizations.[12]  "[B]oth of these cameras could be

adjusted by officers at the police station, and could zoom in close enough to read a license plate,

[but] neither had the capacity to record sound, and neither could view inside of the houses."[13]

In assessing whether the pole camera surveillance constituted a Fourth Amendment

search, the Tenth Circuit asked "whether [the defendant] had a reasonable expectation of privacy

in the area viewed by the cameras."[14]  Relying on longstanding Supreme Court precedent, the

Tenth Circuit stated: "The use of video equipment and cameras to record activity visible to the

naked eye does not ordinarily violate the Fourth Amendment.  In addition, activity a person

knowingly exposes to the public is not a subject of Fourth Amendment protection, and thus, is

not constitutionally protected from observation."[15]  Because the pole cameras in *Jackson* "were

incapable of viewing inside the houses, and were capable of observing only what a passerby

would easily have been able to observe," the Tenth Circuit concluded that the government did

not invade any reasonable expectation of privacy.[16]  Almost two decades later, the Tenth Circuit

in *United States v. Cantu*, a case with "quite similar" facts, affirmed a district court's reliance on

---

[11] 213 F.3d 1269 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033 (2000).

[12] *Id.* at 1276.

[13] *Id.*

[14] *Id.* at 1280.

[15] *Id.* at 1280–81 (first citing *Dow Chem. Co. v. United States*, 476 U.S. 227 (1986); then citing *California Ciraolo*, 476 U.S. 207, 213 (1986); and then citing *Katz v. United States*, 389 U.S. 347, 351 (1967)).

[16] *Id.* at 1281.

4

*Jackson*'s holding in denying a motion to suppress evidence obtained from the warrantless use of a pole camera.[17]

Here, just like in *Jackson* (and *Cantu*), the pole camera could not view inside Hay's house; the camera could only capture the front of his residence, an area plainly visible to the public. Under *Jackson*, then, Hay lacked a reasonable expectation of privacy in the area viewed by the camera, so the pole camera surveillance was not a search under the Fourth Amendment.

Hay does not attempt to distinguish *Jackson*. Instead, he contends *Jackson* does not control the outcome of this case after *Carpenter v. United States*, where the Supreme Court found an expectation of privacy in historical cell-site location records,[18] because *Carpenter* "upended" *Jackson*'s reasoning.[19] Hay argues that, under *Carpenter* and the concurring opinions in *United States v. Jones*,[20] he has a "reasonable expectation of privacy in his movements over time."[21] And he urges this Court to find that the prolonged pole camera surveillance here invaded that privacy expectation. While Hay does not expressly use the term, his argument is premised on a "mosaic theory" of the Fourth Amendment, under which law enforcement activities that are not searches in isolation may nevertheless become a search when viewed in the aggregate.[22]

For the reasons explained below, the Court is not persuaded by Hay's argument that it may disregard *Jackson*'s no-search ruling in light of *Carpenter*. *Jackson* remains binding precedent in the Tenth Circuit, and it forecloses Hay's argument that the pole camera

---

[17] 684 F. App'x 703, 703 (10th Cir. 2017) (unpublished).

[18] –U.S.–, 138 S. Ct. 2206, 2220 (2018).

[19] Doc. 49 at 6.

[20] 565 U.S. 400 (2012).

[21] Doc. 49 at 3.

[22] *See* Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 Mich. L. Rev. 311, 320 (2012).

surveillance invaded a reasonable expectation of privacy. But even if the Tenth Circuit were to accept the mosaic theory, *Carpenter* and the *Jones* concurrences do not support finding a Fourth Amendment search here.

### A.    The Mosaic Theory of the Fourth Amendment

The Court begins by discussing the decisions on the mosaic theory in *Jones* and *Carpenter*, the two cases on which Hay relies. Broadly speaking, the mosaic theory "holds that, when it comes to people's reasonable expectation of privacy, the whole is greater than the sum of its parts."[23] "More precisely, it suggests that the government can learn more from a given slice of information if it can put that information in the context of a broader pattern, a mosaic."[24] Thus, under the mosaic theory, courts "apply the Fourth Amendment search doctrine to government conduct as a collective whole rather than in isolated steps," and consider "whether a set of nonsearches aggregated together amount to a search because their collection and subsequent analysis creates a revealing mosaic."[25]

The mosaic theory first appeared in Fourth Amendment jurisprudence in *United States v. Maynard*, the D.C. Circuit opinion later reviewed by the Supreme Court under a different name, *United States v. Jones*.[26] In *Maynard*, the D.C. Circuit held that the government's use of a GPS device to monitor a car's location for twenty-eight days was a Fourth Amendment search under

---

[23] *United States v. Tuggle*, 4 F.4th 505, 517 (7th Cir. 2021) (quoting Matthew B. Kugler & Lior Jacob Strahilevitz, *Actual Expectations of Privacy, Fourth Amendment Doctrine, and the Mosaic Theory*, 2015 Sup. Ct. Rev. 205, 205 (2015)), *cert. denied*, 142 S. Ct. 1107 (2022).

[24] Kugler & Strahilevitz, *supra* note 23, at 205.

[25] Kerr, *supra* note 22, at 320.

[26] *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *aff'd sub nom. United States v. Jones*, 565 U.S. 400 (2012).

the reasonable-expectation-of-privacy test.[27]  The D.C. Circuit relied on the mosaic theory to explain why the month-long GPS monitoring of the car constituted a Fourth Amendment search:

> [W]e hold the whole of a person's movements over the course of a month is not actually exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil.  It is one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work.  It is another thing entirely for that stranger to pick up the scent again the next day and the day after that, week in and week out, dogging his prey until he has identified all the places, people, amusements, and chores that make up that person's hitherto private routine.[28]

"The whole of one's movements over the course of a month is not constructively exposed to the public either," the D.C. Circuit explained, because the whole reveals more than the sum of its parts:

> Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble.  These types of information can each reveal more about a person than does any individual trip viewed in isolation.  Repeated visits to a church, a gym, a bar, or a bookie tell a story not told by any single visit, as does one's not visiting any of these places over the course of a month.  The sequence of a person's movements can reveal still more; a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story.  A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups—and not just one such fact about a person, but all such facts.[29]

---

[27] *Id.* at 568.

[28] *Id.* at 560.

[29] *Id.* at 561–62.

The D.C. Circuit held that, considered in the aggregate, the prolonged GPS monitoring amounted to a Fourth Amendment search because it "reveal[ed] an intimate picture of the subject's life that he expects no one to have—short perhaps of his spouse."[30]

The Supreme Court in *Jones* unanimously agreed that a Fourth Amendment search took place but split on why.[31] Writing for the majority, Justice Scalia affirmed on a narrow trespass-based theory, holding that the GPS monitoring was a search because installing the device on the car constituted a common-law trespass.[32] Although the *Jones* majority did not endorse the mosaic theory, five justices—across two concurring opinions penned by Justices Alito and Sotomayor—embraced the D.C. Circuit's mosaic approach.[33]

Concurring in the judgment, Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, criticized Justice Scalia's reliance on what he described as an "18th-century tort law" approach to resolve questions of 21st-century surveillance.[34] Justice Alito would have applied the reasonable-expectation-of-privacy test and asked whether the GPS monitoring "involved a degree of intrusion that a reasonable person would not have anticipated":

> Under this approach, relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period. . . .[35]

---

[30] *Id.* at 563.

[31] *See United States v. Jones*, 565 U.S. 400 (2012).

[32] *Id.* at 404–411.

[33] Kerr, *supra* note 22, at 326–28.

[34] *Jones*, 565 U.S. at 418 (Alito, J., concurring in the judgment).

[35] *Id.* at 430.

Where is the line?  Justice Alito did not say: "We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark."[36]  This section of Justice Alito's concurrence cites no authority, but "scholars have read his opinion to 'echo[] the D.C. Circuit's mosaic approach in *Maynard*.'"[37]

Concurring separately, Justice Sotomayor explained that she joined the majority because she agreed that a search occurs, "at a minimum," when the government physically intrudes on a constitutionally protected area to obtain information.[38]  But she also agreed with Justice Alito that the GPS monitoring was a search independent of the physical intrusion.  Justice Sotomayor focused on the "unique attributes of GPS surveillance" that she found troubling, including its precision, efficiency, and inexpensiveness.[39]  She emphasized that "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."[40]  In Justice Sotomayor's view, these unique attributes implicate privacy interests:

> I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements.  I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on. . . .[41]

---

[36] *Id.*

[37] *United States v. Tuggle*, 4 F.4th 505, 518 (7th Cir. 2021) (alteration in original) (quoting Kerr, *supra* note 22, at 327), *cert. denied*, 142 S. Ct. 1107 (2022).

[38] *Jones*, 565 U.S. at 413 (Sotomayor, J., concurring).

[39] *Id.* at 415–16.

[40] *Id.* at 415.

[41] *Id.* at 416.

Like Justice Alito's concurrence, scholars recognize that "[t]his passage clearly echoes the mosaic theory."[42]

In 2018, the Supreme Court decided *Carpenter*, which concerned the government's acquisition of historical cell-site location information ("CSLI")—the time-stamped records a phone generates each time it connects to a cell site.[43] The Supreme Court held that "accessing seven days of CSLI constitute[d] a Fourth Amendment search" because it invaded the defendant's reasonable expectation of privacy "in the record of his physical movements as captured through CSLI."[44] In reaching this conclusion, the Court focused on the revealing nature of CSLI: when there is enough of it, CSLI "provides an all-encompassing record of the holder's whereabouts," opening "an intimate window into a person's life" that reveals "not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"[45] The *Carpenter* Court also pointed out that "a majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements," citing the *Jones* concurrences.[46] "Scholars describe the *Carpenter* majority as effectively 'endors[ing] the mosaic theory of privacy.'"[47]

As the Seventh Circuit recently stated in *United States v. Tuggle*, however, the Supreme Court's "passing endorsement" of the mosaic theory in *Carpenter* was not a "full and affirmative adoption."[48] The Seventh Circuit explained:

---

[42] *Tuggle*, <u>4 F.4th at 519</u> (alteration in original) (quoting Kerr, *supra* note 22, at 328).

[43] *Carpenter v. United States*, –U.S.–, <u>138 S. Ct. 2206, 2211</u> (2018).

[44] *Id.* at 2217 & n.3.

[45] *Id.* at 2217 (quoting *Jones*, <u>565 U.S. at 415</u> (Sotomayor, J., concurring)).

[46] *Id.*

[47] *Tuggle*, <u>4 F.4th at 519</u> (alteration in original) (quoting Paul Ohm, *The Many Revolutions of* Carpenter, 32 Harv. J.L. & Tech. 357, 373 (2019)).

[48] *Id.*

At a minimum, the Supreme Court has not yet required lower courts to apply it. Moreover, many courts that have considered the theory have expressed disapproval, although not without exception. Additionally, the mainstream academic view has urged courts to reject the theory. Accordingly, whether or not the theory has merit from a theoretical or policy standpoint, Tuggle has not presented us with binding caselaw indicating that we *must* apply the mosaic theory.[49]

Hay has not pointed to any such binding precedent, either.

    **B.**     ***United States v. Jackson* remains binding precedent in the Tenth Circuit and precludes finding the pole camera surveillance was a Fourth Amendment search**

The Court now turns to Hay's argument that *Jackson*'s no-search ruling no longer binds this Court because of *Carpenter*. Hay concedes that *Jackson* is on point, but he argues that its reasoning—that "activity a person knowingly exposes to the public is not a subject of Fourth Amendment protection"[50]—was "upended by *Carpenter*."[51] The Court disagrees.

The basic Fourth Amendment principle relied on by the Tenth Circuit in *Jackson* comes from *Katz*, which stated: "The Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."[52] Relatedly, the Tenth Circuit cited the portion of *California v. Ciraolo* that, itself citing *Katz*, explained "[t]he Fourth Amendment protection of the home has never extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."[53]

---

[49] *Id.* (footnotes omitted).

[50] 213 F.3d 1269, 1281 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033 (2000).

[51] Doc. 48 at 6.

[52] *Katz v. United States*, 389 U.S. 347, 351 (1967)).

[53] 476 U.S. 207, 213 (1986).

Hay argues that *Carpenter* "upended" these principles, but *Katz* and *Ciraolo* remain good law.  As the First Circuit explained in *United States v. Moore-Bush*, which reversed a district court decision that departed from circuit precedent holding that eight months of pole camera surveillance did not constitute a search, *Carpenter* "leaves intact" these two cases.[54]  The First Circuit continued, "[n]owhere in the *Carpenter* opinion does the Court suggest that [these] cases, or any part of the Court's existing Fourth Amendment framework involving the lack of Fourth Amendment protection for places a defendant knowingly exposes to public view, has been overruled or modified."[55]  The *Carpenter* Court also emphasized that its ruling was "a narrow one," limited to the specific question presented in that case, and it did not "call into question conventional surveillance techniques and tools, such as security cameras."[56]  This Court therefore cannot read *Jackson* as relying on reasoning that *Carpenter* has upended.

Still, Hay urges that "*Carpenter* compels the reconsideration" of the constitutionality of warrantless pole camera surveillance of private property when, as here, it is prolonged.[57]  Hay argues that although he could expect to be seen when he left his home, the same cannot be said of his public movements over time in the aggregate.  In other words, Hay thinks this Court should apply the mosaic theory and treat long-term pole camera surveillance differently than short-term surveillance when considering the existence of a reasonable expectation of privacy— something *Jackson* (and *Cantu*) did not do.

Hay may well be right that the Tenth Circuit should, in light of *Carpenter*, reconsider *Jackson* and broaden the application of *Carpenter*'s mosaic reasoning to pole camera

---

[54] 963 F.3d 29, 41 (1st Cir.), *reh'g en banc granted, opinion vacated*, 982 F.3d 50 (1st Cir. 2020) (mem.) (granting en banc review to consider whether to overrule *United States v. Bucci*, 582 F.3d 108 (1st Cir. 2009)).

[55] *Id.*

[56] *Carpenter v. United States*, –U.S.–, 138 S. Ct. 2206, 2220 (2018).

[57] Doc. 49 at 4.

surveillance.  But this Court's role is to apply Tenth Circuit precedent, not to reconsider it.  In the absence of clear Supreme Court precedent overruling *Jackson*, this Court will "follow the case which directly controls, leaving to the [Tenth Circuit] the prerogative of overruling its own decisions."[58]  Thus, the Court concludes that *Jackson*'s no-search ruling remains binding on district courts in the Tenth Circuit and compels this Court to find that the warrantless pole camera surveillance here did not constitute a Fourth Amendment search.

> **C.**     **The pole camera surveillance was not a Fourth Amendment search under the mosaic theory either**

Even if the Court were to apply the mosaic theory, it would not help Hay.  In *Jones* and *Carpenter*, the justices were concerned about the government's use of surveillance tools that could "generate[] a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."[59]  Because the GPS and CSLI technologies at issue in those cases could reveal the whole of a person's movements, the *Jones* concurrences and *Carpenter* majority found the Fourth Amendment implicated.  Relying on those two cases, Hay argues that VA OIG agents violated his reasonable expectation of privacy in the record of his movements because, for weeks, the pole camera recorded "each and every step he took," which in turn revealed "intimate, personal details" about his relationships and associations.[60]

But that is not what happened here.  The pole camera was fixed in place, so it could view only what happened in front of it.  While it is true that the camera could record every movement Hay made within its view, the camera could not track his movements anywhere else.  Unlike the

---

[58] *Agostini v. Felton*, 521 U.S. 203, 207 (1997).

[59] *United States v. Jones*, 565 U.S. 415 (2012). (Sotomayor, J., concurring); *Carpenter* 138 S. Ct. at 2217.

[60] Doc. 49 at 4, 6.

GPS and CSLI technologies in *Jones* and *Carpenter*, the camera "exposed no details about where [Hay] traveled, what businesses he frequented, with whom he interacted in public, or whose homes he visited, among many other intimate details of his life."[61] Far from revealing the "whole of his physical movements,"[62] the pole camera surveillance revealed just a small part of that much larger whole, even if an important one.

Hay raises legitimate concerns about the duration of the pole camera surveillance. But the pole camera surveillance in this case does not present the same privacy concerns that animated the majority in *Carpenter* and the concurrences in *Jones*. Thus, even applying the mosaic theory, the prolonged pole camera surveillance did not invade any reasonable expectation of privacy.

For these reasons, the Court concludes that no Fourth Amendment search took place here. The Court therefore need not consider the government's alternative argument that, even if the pole camera surveillance amounted to a search, the good-faith exception to the exclusionary rule would prevent suppression. Hay's motion to suppress is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Bruce Hay's Motion to Suppress (Doc. 49) is **denied**.

**IT IS SO ORDERED.**

Dated: May 5, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[61] *United States v. Tuggle*, 4 F.4th 505, 524 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1107 (2022).

[62] *Carpenter*, 138 S. Ct. at 2219.

# In the United States District Court
## for the District of Kansas

---

**United States of America**,
             Plaintiff,

v.

                                   Case No. 19-20044-01-JAR

**Bruce L. Hay**,
             Defendant.

---

## RESPONSE TO GOVERNMENT'S 404(B) NOTICE

---

Bruce Hay, through counsel Chekasha Ramsey, moves the Court to strike the government's Initial Notice under Federal Rule of Evidence 404(b), D.E. 60, because it is deficient and thus fails to comply with Rule 404(b), or in the alternative to order the government to file a supplemental notice. The Notice, although stating the evidence the government seeks to introduce, fails to articulate any permitted purpose or reasoning in support of the offered evidence. As a result, Mr. Hay is denied a fair opportunity to respond or object in a substantive matter to the offered evidence at this time.

Rule 404(b) limits evidence of 'other' crimes, wrongs, or acts—those extrinsic to the charged crime. *United States v. Parker*, <u>553 F.3d 1309, 1314</u> (10th Cir. 2009). A court must "make a threshold determination that the offered

evidence is "'probative of a material issue other than character'" before admitting evidence under Rule 404(b)." *United States v. Martinez*, 890 F.2d 1088, 1093 (10th Cir. 1989) (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)). In order to aid the Court's determination of whether evidence is offered to prove an issue other than character, "the government must precisely articulate the purpose of the proffered evidence." *United States v. Commanche*, 577 F.3d 1261, 1266 (10th Cir. 2009). "[A] broad statement merely invoking or restating Rule 404(b) will not suffice." *United States v. Birch*, 39 F.3d 1089, 1093 (10th Cir. 1994) (quoting *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985)). Moreover, in 2020, Rule 404(b) was amended to impose additional notice requirements on the government in a criminal case. The 2020 Advisory Committee Notes dictate that the government must not only articulate a non-propensity reason for which the evidence is offered, but also the basis for concluding that the evidence is relevant in light of this purpose.

The demands of Rule 404(b) are clear. The government's Notice fails to identify the non-propensity reason for its offered evidence and fails to articulate the basis for concluding the evidence is relevant in light of that non-propensity purpose. Thus, Mr. Hay and the Court are required to speculate, and the Court is unable to fulfil its gatekeeping function. The Tenth Circuit has applied a four-part process to determine whether evidence is admissible under Rule 404(b). To determine whether Rule 404(b) evidence is admissible the Court considers: (1) whether the evidence is offered for a proper purpose; (2) the evidence must be

relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted. *See United States v. Herndon*, 982 F.2d 1411, 1414 (10th Cir. 1992) (citing *Huddleston v. United States*, 485 U.S. at 691-92 (1988)). Without the proper notice, both Mr. Hay and the Court are stymied. Mr. Hay cannot substantively respond to the government's Notice and the Court cannot conduct the balancing test pursuant to Rule 403.

While invoking Rule 404(b), the government also suggests that "these allegations are inextricably intertwined with the charged conduct and constitute direct evidence[.]" Intrinsic evidence is "evidence essential to the context of the crime," and does not fall under the framework of Rule 404(b). *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011). Intrinsic evidence, nevertheless, must still meet the demands of Rules 401 and 403. In its Notice, the government does not explain, at all, how the offered evidence is intrinsic, or even relevant.

The government's Notice is deficient. It only describes the evidence the government seeks to admit under Rule 404(b), without articulating a non-propensity purpose or reasoning for the evidence. Nor does the government articulate how the evidence is intrinsically intertwined. The government cannot have it both ways. Because the Notice is deficient and Mr. Hay is unable to

respond to substantially respond, Mr. Hay requests an order striking the government's 404(b) Notice or, in the alternative, to an order requiring the government to file a supplemental notice.

Respectfully submitted,

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I certify that on May 31, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

# UNITED STATES DISTRICT COURT

## District of Kansas

(Kansas City Docket)

UNITED STATES OF AMERICA,

      **Plaintiff,**

    v.                       **CASE NO. 2:19-cr-20044-JAR**

BRUCE L. HAY,

      **Defendant.**

---

# SUPERSEDING INDICTMENT

---

### THE GRAND JURY CHARGES:

### <u>COUNTS 1-6</u>

**WIRE FRAUD**
**[18 U.S.C. § 1343]**

1.  Beginning on a date unknown, but no later than in or about January 2011, and continuing through in or about August 2018, in the District of Kansas and elsewhere, the defendant,

**BRUCE L. HAY,**

with intent to defraud, knowingly devised a scheme and artifice to defraud the Department of Veterans Affairs, and to obtain money and property by means of

materially false and fraudulent pretenses, representations and omissions of material facts,

well knowing and having reason to know that said pretenses and representations were and

would be false and fraudulent when made and caused to be made and that said omissions

would be material.

## **Background**

At times relevant to this Superseding Indictment:

2. The U.S. Department of Veterans Affairs (VA) was an agency of the United

States. Within the VA, the compensation and pension benefits program compensates

veterans with verified disabilities and is managed by the Veterans Benefits

Administration. Specifically, disability compensation is a tax-free benefit paid to a

veteran because of, among other things, injuries or diseases sustained while on active

duty.

3. VA disability compensation varied with the degree of disability and the number of

dependents and was paid monthly. A veteran's injury or illness was determined by a VA

Rating Specialist who reviewed medical records, the results of compensation and pension

examinations, the veteran's application for benefits, and other applicable evidence. The

VA rated the level of service-connected disability of veterans on a scale of 0% to 100%.

The amount of disability compensation a veteran received was commensurate with their

service-connected disability rating.

4. The VA also administered the Special Monthly Compensation (SMC) program,

which paid a higher rate of disability compensation to qualifying veterans due to special

circumstances such as the need of aid and attendance (A&A) by another person. In

essence, this means being so helpless—inability to dress or undress, inability to eat, or inability to use the restroom without assistance—as to require the regular "aid and attendance" of another person.

5.  The defendant, BRUCE L. HAY, served in the United States Army from June 21, 1987 to June 11, 1991; August 26, 1996 to October 9, 1998; and January 21, 2003 to February 28, 2006.

6.  On or about February 25, 2005, while on active duty, HAY was involved in a vehicle accident.  In the days following the vehicle accident, HAY began to report to medical professionals that he suffered from weakness and shaking of the lower extremities as well as head and upper extremity tremors.  Because neurological evaluations were normal and medical professionals were not otherwise able to identify a physical explanation for HAY's claimed symptoms, HAY was diagnosed with conversion disorder.

7.  On or about February 28, 2006, HAY applied for disability benefits from the VA based upon his claim of, among other things, a diagnosis of conversion disorder and "head injury w/ tremors," which HAY claimed began in February 2005.  During a compensation and benefits examination on September 15, 2006, HAY reported that he could only move with a walker, had continuous abnormal movement of his hands, neck, head, and body, could not drive a vehicle, and could not work.  In a March 8, 2007 rating decision, the VA determined that HAY had a 100% service-connected disability rating for conversion disorder and psychomotor abnormal tremors or body movement and was entitled to special monthly compensation based on A&A criteria being met.

8.  In a September 12, 2007 rating decision, the VA determined HAY had 100%

service-connected disability ratings for conversion disorder and generalized choreiform

movement disorder (previously evaluated as psychomotor abnormal tremors or body

movements).  This was based on HAY reporting that he had frequent problems with falls,

dropping objects, inability to grasp items, and difficulty with upper body movements; that

he required a cane or walker to walk; that he was unable to drive; that he could not tie his

shoes or put on his socks; and that he had constant tremors and shakes.  During an August

2007 examination, HAY presented himself as having a gait similar to someone with

cerebral palsy and had constant movement of the head, neck, back, arms, trunk, and legs.

The VA determined there was a likelihood for improvement and did not consider the

disability permanent, making it subject to future examination.

## Manner and Means

9.  By a date unknown, but at least by approximately January 2011, HAY was able to

engage in a full range of physical activities, including work on his family farm, deer

hunting, driving regularly, and walking without assistance from a cane or walker.

10. The object of HAY's scheme to defraud was to fraudulently obtain disability

benefits from the VA to which he would not have otherwise been entitled had he

provided true and accurate representations regarding his physical condition and

capabilities.

11.  As part of the scheme to defraud, HAY made fraudulent representations regarding

his claimed disabilities, faked or exaggerated symptoms, and failed to disclose his true

physical condition, capabilities, and daily activity. HAY's failure to provide true and accurate information concealed his ineligibility for benefits and accommodations, allowed him to maintain a 100% disability rating and obtain a permanent designation, and otherwise prevented the VA from learning of his purported disabilities and reducing his benefits accordingly.

12. On April 10, 2012, HAY requested that his rating be changed to a 100% permanent and total disability rating for "conversion disorder and seizure disorder." In his application, HAY represented that "these conditions will never improve."

13. Both HAY and L.H. falsely described his physical abilities during various compensation and pension examinations conducted by the VA and during appointments with VA medical providers. For example, during a compensation and pension examination on March 18, 2013 on HAY's request for a 100% permanent and total disability rating, HAY and L.H. represented that HAY was unable to engage in most activities of daily living, including needing help with bathing, shaving, toileting, and putting on clothing, and that he could not do any household chores other than sorting laundry.

14. On April 20, 2013, based on HAY's fraudulent representations and omissions, the VA found that HAY was 100% disabled for conversion disorder and choreiform movement disorder and changed the rating from temporary to permanent. This also made HAY eligible for additional compensation in the form of Dependents' Educational Assistance ("DEA"), which provides education and training opportunities to eligible

dependents and survivors of certain veterans who have a total and permanent service-connected disability.

15. During another compensation and pension examination on May 3, 2017, HAY and L.H. fraudulently represented that HAY had muscle spasms, had been using a walker for approximately two years, used a cane for "tight spaces" where the walker would not fit, and did not drive on a regular basis.

16. To further and conceal the scheme, HAY feigned or exaggerated physical symptoms during appointments with VA doctors or examiners.  For instance, when he was moving in and around VA facilities, HAY exaggerated his physical symptoms—displaying a significant limp, muscle spasms, head bobs, and jerking movements—and used a walker that he did not normally use outside of VA facilities.

17. To further and conceal the scheme to defraud the VA, HAY made similar fraudulent representations to and omitted material facts from the Social Security Administration regarding his physical condition and capabilities, which helped prevent the VA and the United States from discovering HAY's ineligibility for certain disability benefits.

## Execution of the Scheme

18. On or about the dates set forth in the chart below, each date constituting a separate count, in the District of Kansas and elsewhere, the defendant,

### BRUCE L. HAY,

for the purpose of devising and intending to devise the aforementioned scheme and artifice to defraud, and to obtain money and property by means of materially false and

fraudulent pretenses and representations, and by omission of material facts, did transmit and cause to be transmitted by means of wire communication in interstate commerce the writings, signs, signals, pictures, and sounds described below, each Automated Clearing House (ACH) transaction constituting a separate count:

| COUNT | DATE | AMOUNT | DESCRIPTION |
|---|---|---|---|
| 1 | 6/30/2017 | $3,990.24 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 2 | 8/1/2017 | $3,990.24 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 3 | 9/1/2017 | $3,990.24 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 4 | 3/1/2018 | $4,070.05 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 5 | 5/1/2018 | $4,070.05 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 6 | 8/1/2018 | $4,070.05 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 7-16

**THEFT OF GOVERNMENT FUNDS**
**[18 U.S.C. § 641]**

19. Paragraphs 2 through 17 are incorporated here.

20. On or about the dates set forth in the separate counts below, in the District of Kansas and elsewhere, the defendant,

**BRUCE L. HAY,**

willfully and knowingly did embezzle, steal, purloin, and convert to his own use goods and property of the United States, of a value exceeding $1,000, that is, disability and other monetary compensation paid by the VA, to which he was not entitled, in the amounts listed below:

| Count | Date | Amount |
|-------|------|--------|
| 7 | 9/30/2016 | $2,827.18 |
| 8 | 11/1/2016 | $2,827.18 |
| 9 | 3/31/2017 | $2,971.60 |
| 10 | 5/1/2017 | $2,971.60 |
| 11 | 6/30/2017 | $2,971.60 |
| 12 | 8/1/2017 | $2,971.60 |
| 13 | 9/1/2017 | $2,971.60 |
| 14 | 3/1/2018 | $3,030.64 |
| 15 | 5/1/2018 | $3,030.64 |
| 16 | 8/1/2018 | $3,030.64 |

In violation of Title 18, United States Code, Sections 641 and 2.

# **FORFEITURE NOTICE**

21. The allegations related to Counts 1-16 of this Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

22. Upon conviction of one or more of the offenses set forth in Counts 1-16 of this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

   a. A forfeiture money judgment against the defendant in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 1-16.

23. If any of the property described above, as a result of any act or omission of the defendant:

   b. cannot be located upon the exercise of due diligence;

   c. has been transferred or sold to, or deposited with, a third party;

   d. has been placed beyond the jurisdiction of the court;

   e. has been substantially diminished in value; or

   f. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant

to Title 21, United States Code, Section 853(p).


A TRUE BILL.


June 14, 2022                              s/Foreperson
DATE                                        FOREPERSON OF THE GRAND JURY


DUSTON J. SLINKARD
UNITED STATES ATTORNEY

By: *Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: Ryan.Huschka@usdoj.gov
Ks. S. Ct. No. 23840


By: *D. Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: Chris.Oakley@usdoj.gov
Ks. S. Ct. No. 19248


IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

# **PENALTIES**

## Counts 1-6: Wire Fraud, 18 U.S.C. § 1343

- Punishable by a term of imprisonment of not more than twenty (20) years. 18 U.S.C. § 1341.

- A term of supervised release of not more than three (3) years. 18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000. 18 U.S.C. § 3571(b)(3). In the alternative, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571(d).

- A mandatory special assessment of $100.00. 18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## Counts 7-16: Theft of Government Funds, 18 U.S.C. § 641

- Punishable by a term of imprisonment of not more than ten (10) years. 18 U.S.C. § 641.

- A term of supervised release of not more than three (3) years. 18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000. 18 U.S.C. § 3571(b)(3). In the alternative, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571(d).

- A mandatory special assessment of $100.00. 18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19-20044-JAR |
| | ) | |
| BRUCE L. HAY, | ) | |
| Defendant | ) | |
| | ) | |

**UNITED STATES' SUPPLEMENTAL NOTICE UNDER FEDERAL RULE OF EVIDENCE 404(b)**

The United States of America, by and through the undersigned counsel, files this supplemental notice under Federal Rule of Evidence Rule 404(b). This notice supplements the prior notice provided by the United States (Doc. 60).

**RELEVANT LAW**

Rule 404(b) states that evidence of any uncharged crime, wrong, or act is inadmissible to prove "a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the evidence may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Independent of Rule 404(b), evidence of uncharged conduct may also be admissible as *res gestae* – such as where the uncharged conduct is so inextricably intertwined with the charges that a witness's testimony would have been confusing without mention of the prior act (*See United States v. Ford*, 613 F. 1263, 1267 (10th Cir. 2010) or where the evidence of other crimes is part and parcel of the proof of the offense charged in the indictment. (*See United States v. Kimball*, 73 F. 3d 269, 272 (10th Cir. 1995).

As for Rule 404(b) evidence, the Tenth Circuit considers a four-factor test in determining admissibility. *United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011). First, the evidence must be offered for a proper purpose. *Id*. Second, the evidence must be relevant. *Id*. Third, the trial court must make a determination under Rule 403 as to whether the probative value of the evidence is outweighed by any prejudicial effect. *Id*. Finally, the trial court must give a limiting instruction if requested by the defense. *Id*.

In order to admit "other acts" evidence the Government need not meet a preponderance of evidence standard to prove the other act, but must merely prove there is sufficient evidence to support a finding by the jury that the defendant committed the similar act. *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Additionally, as the Tenth Circuit has held, "the standard for satisfying Rule 404(b) admissibility is permissive: If the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403." *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (quotation omitted).

**PROPSED EVIDENCE**

### A. Mortgage/Employment Agreement and Mechanic's Lien

As stated in the Government's initial notice, in January 2021, Defendant Hay filed a Mechanic's Lien on his mother's property in Miami County, Kansas District Court. In the lien, Defendant Hay stated he furnished labor as a "Farm Manager" on his mother's property from January 1, 1985 to December 31, 2020. Defendant Hay claimed that he provided various labor during those years, including "equipment repair, livestock management, property upkeep (fence repair, water gaps, etc.), crop planting and harvesting and hay harvesting." According to an affidavit, in or about March 2015, Defendant Hay told attorney Gary Thompson that in exchange

for past work that Defendant Hay had done the family farm, his mother would give him a note for the value of the work and a mortgage on the farm to secure the note. On May 15, 2015, Defendant Hay and his mother met with Thompson and executed a mortgage and employment agreement as described in the Government's initial 404(b) notice.

Defendant Hay is charged with six counts of wire fraud and ten counts of theft of government funds in the Superseding Indictment (SI). The wire fraud counts allege that from around January 2011 until around August 2018, Defendant Hay engaged in a scheme to defraud the Department of Veterans Affairs (VA) by obtaining VA disability benefits that he would not have been entitled to receive had he provided true and accurate representations concerning his physical condition and capabilities. The SI alleges that Defendant Hay was "able to engage in a full range of physical activities, including work on his family farm, deer hunting, driving regularly, and walking without assistance from a cane or walker." (SI, doc. 68 at 4). The SI alleges Defendant Hay made false representations about his claimed disabilities, faked or exaggerated symptoms, and failed to disclose his true physical condition, capabilities, and daily activity. *Id.* at 4-5. The theft of government funds counts all relate to allegations that Defendant Hay stole disability and other monetary compensation from the VA that he was not entitled to receive.

Evidence concerning the filed Mechanic's Lien is not covered under Rule 404(b), because it is not evidence of another crime, civil wrong or "other act." In fact, it is merely the Defendant's statement related to a highly relevant subject – his ability to perform manual labor. The evidence is admissible as a statement of a party opponent. It is a direct admission that he performed farm related work such as mending fences, harvesting, and equipment repair. The statement is intrinsic to the crimes charged in the SI.

However, should the Court find the evidence qualifies as "other act" evidence under Rule 404(b), it is admissible to prove knowledge, intent, and absence of mistake or accident. The evidence is admissible to show Defendant Hay's knowledge of his physical abilities, which is directly relevant to the charged offense. The SI claims Defendant Hay lied to the VA about his physical abilities. Defendant Hay's admissions in the Mechanics Lien, employment agreement, and mortgage state that he performed the farm work from 1985 until the end of 2020, a period of time which covers all the allegations in the SI. It is also admissible to show the Defendant's intent and lack of mistake or accident in failing to provide accurate information regarding his physical abilities to the VA, as he cited the farm work when it benefited him in this other context.

There is no undue prejudicial effect –performing physical farm labor is itself neither illegal nor a civil wrong and there can be no concern that the jury would convict Defendant Hay based upon any prejudicial inference based on the farm work. Therefore, this evidence is admissible under Rule 404(b) and not precluded by Rule 403.

**B. The Social Security Fraud**

In addition to obtaining VA benefits through fraud, Defendant Hay obtained Social Security Administration (SSA) disability benefits[1] by claiming that, among other ailments, he suffered from conversion disorder and tremors/abnormal muscle spasms, beginning in 2007, around the same time Defendant Hay began to receive VA disability benefits.

In March 2011, the SSA was looking into Defendant Hay's disability benefits based upon his posted self-employment earnings (i.e., tax filings) that reflected profits from farming for 2005-2006 and 2009-2010. The SSA sent Defendant Hay a letter asking him to explain the earnings. In one Work Activity Report, the Defendant represented that "since the accident," his

---

[1] Although awarded in 2007, the benefits were calculated backwards from February 25, 2005.

father agreed to share farm profits with him if he helped pay for expenses. He characterized the 2009-2010 earnings as "investment income." In another Work Activity Report, Defendant Hay said it was his father's farming operation and that his father makes all the decisions. Defendant Hay told the SSA he did not "live or work on the farm" and is "unable to do any of the labor."

In November 2011, the SSA-OIG started a joint investigation with VA-OIG regarding Defendant's Hay's potential disability fraud. On November 19, 2012, the SSA conducted a mental status examination of Defendant Hay. During the examination, Defendant Hay reported that he needed to use a cane for balance and that he had frequent seizures since his 2005 automobile accident. Law enforcement officers conducted surveillance of Defendant Hay on his way to and from the examination and video recorded Defendant Hay conducting physical activities before and after the examination and displaying markedly different physical attributes while at the SSA appointment than he did both before and after the appointment.

In addition to the mental status examination, Defendant Hay and his spouse made other claims to the SSA in September and October 2012, including that Defendant had a limited ability to dress, bathe, prepare meals, do chores, and other physical tasks.

The SSA ultimately decided to terminate Defendant Hay's disability benefits in 2013, finding that he obtained the benefits through fraud.

As an initial matter, the Defendant's false statements and concealment of his physical abilities to SSA is an intrinsic part of Defendant's scheme to defraud the VA. The SI specifically alleges that Defendant Hay "made similar fraudulent representations to and omitted material facts from the Social Security Administration regarding his physical condition and capabilities, which helped prevent the VA and the United States from discovering HAY's ineligibility for certain disability benefits." SI at 6.

However, should the Court find the evidence is not intrinsic to the charged offenses, it is nevertheless admissible under Rule 404(b). The evidence shows Defendant Hay's intent to defraud, his plan, his knowledge, and lack of mistake or accident. His false statements to SSA about his physical abilities, such as an inability to dress himself, perform work, or attend to his own physical needs shows his intent to defraud VA by making similar false allegations. Although evidence under Rule 404(b) may relate to conduct either before or after the charged offense the Tenth Circuit has "consistently recognized the probative value of uncharged acts to show motive, intent, and knowledge whether the acts involved previous conduct or conduct subsequent to the charged offense, as long as the uncharged acts are similar to the charged crime and the Tenth Circuit has "consistently recognized the probative value of uncharged acts to show motive, intent, and knowledge whether the acts involved previous conduct or conduct subsequent to the charged offense, as long as the uncharged acts are similar to the charged crime and sufficiently close in time." *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011) (quotation omitted). Here, the SSA fraud occurred during the time of the Defendant's scheme to defraud the VA and the uncharged SSA fraud is similar, if not identical, to the charged VA fraud.

**CONCLUSION**

Evidence of Defendant Hay's submission of the Mechanic's Lien, employment agreement, and mortgage is admissible independent of Rule 404(b) because they include statements and not other crimes, civil wrongs, or "other acts" evidence; is relevant; and not otherwise excludable. His false statements to SSA are intrinsic to his scheme to defraud VA and likewise not covered by the Rule. However, should the Court find either to be covered under Rule 404(b), the Mechanic's Lien evidence is admissible to show Defendant Hay's knowledge, intent, and absence of mistake or accident. And the evidence of Defendant Hay's false

statements to SSA are admissible to show his knowledge, but also his intent, his plan, and a lack of mistake or accident.

Respectfully submitted,

*/s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Ryan.Huschka@usdoj.gov
KS Bar No. 23840


*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Chris.Oakley@usdoj.gov
KS Bar No. 19248

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2022, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*/s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

**<u>CLERK'S COURTROOM MOTIONS/MISCELLANEOUS MINUTE SHEET</u>**

UNITED STATES OF AMERICA,　　　　　AUSA:  Ryan Huschka

　　　　　　　　Plaintiff

　v.　　　　　　　　　　　　　　　　CASE NO:  19-20044-01-JAR

BRUCE L. HAY,　　　　　　　　　　Def Atty:  Che Ramsey

　　　　　Defendant

| JUDGE: | Julie A. Robinson | DATE: | 7/5/2022 |
|---|---|---|---|
| DEPUTY CLERK: | Bonnie Wiest | REPORTER: | Dani Murray |
| INTERPRETER: | | PROBATION: | |

# STATUS CONFERENCE
### *(Parties appear by telephone pursuant to Administrative Order 2022-02)*

This case comes before the Court for a telephone status conference. The government appears by its attorney, Ryan Huschka.  The defendant appears by telephone and by his counsel, Che Ramsey who also appears by telephone.  Defendant consents to having this status conference by telephone.

The Court set this case for a status conference to discuss the current trial date, the Superseding Indictment filed on 6/14/2022 (Doc. 68), the government's Rule 404(b) Notice filed on 4/20/2022 (Doc. 60), the defendant's response and motion to strike filed on 5/31/2022 (Doc. 65), and the government's supplemental Rule 404(b) Notice filed on 6/29/2022 (Doc. 76).  Based on the government's supplemental notice, the Court finds that defendant's motion to strike is moot.

The parties expect the trial to take two weeks.  Some housekeeping matters were discussed.

The defendant remains on release.

## In the United States District Court
## for the District of Kansas

**United States of America**,
      Plaintiff,

v.                          Case No. 19-20044-01-JAR

**Bruce L. Hay**,
      Defendant.

## Motion in Limine

Defendant, Bruce Hay, by and through counsel, Chekasha Ramsey, and seeks to exclude the following:

**Item 1: Anonymous call, complainant, or hearsay information provided by the anonymous complainant.**

The government seeks to admit testimony, through investigators information obtained by an anonymous source, that Mr. Hay was engaging in activities that the government alleges were inconsistent with his diagnosed disorder. The investigation underlying the Indictment began after the Veterans Administration Office of Inspector General (hereinafter VA-OIG) received an anonymous call in January 2011. The anonymous complainant alleged that Mr. Hay was falsely claiming or exaggerating his claims of injury in order to gain Veteran benefits. The caller reported that Bruce Hay performs physical labor, including lifting hay bales over 100 pounds, and construction work on his family farm without the use of a cane or walker and frequently drives. The government has not endorsed the anonymous source as a

witness to be used in their case in chief. It appears from the government's witness list, they have endorsed the VA-OIG employee that received the anonymous call, Michelle Swagler. Mr. Hay moves the Court to rule inadmissible any reference by government witnesses regarding an anonymous call or complainant in describing how the officers began to investigate Mr. Hay in this case. Mr. Hay also moves the Court to rule inadmissible any statements made by the anonymous complainant. Unless the complainant testifies, testimony about information the complainant allegedly provided to the VA-OIG officers is inadmissible hearsay under Federal Rules of Evidence 801(c) and Rule 802. More importantly, this testimony would deprive Mr. Hay of his Sixth Amendment right to confrontation.

In this case, the anonymous caller is the same as a confidential source. Allowing government witnesses to testify to out-of-court statements made by a confidential source violates Mr. Hay's Sixth Amendment rights and are barred under the Confrontation Clause pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004). If an out-of-court statement is testimonial, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness. *Bullcoming v. New Mexico*, 564 U.S. 647, 657 (2011). A confidential informant's statements to a law enforcement officer are clearly testimonial. *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 310–11 (2009). An out-of-court statement by an informant is admissible, and not hearsay, when offered for the limited purpose of explaining why a government investigation

was undertaken. However, this does not defeat Mr. Hay's Sixth Amendment right to confront witnesses against him.

Even if the government is introducing out-of-court statements by the confidential source offered to explain the background of an investigation, like all evidence, these statements must be evaluated under the criteria in Rules 401 and 403 for relevance and to prevent confusion or prejudice on the part of the jury. *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir. 1987). In this case, the probative value is outweighed by the prejudicial effect. Allowing the government to provide information to the jury that the investigation began as a result of an anonymous call or complaint, allows an improper bolstering of the government's case. "Bolstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999) (citing *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997). Mr. Hay cannot confront the complainant, nor is he able to test the credibility of the anonymous complaint, leaving only the presumption that the underlying information provided by the caller is true. "Courts and commentators have recognized that out-of-court statements should not be admitted to explain why a law enforcement agency began an investigation if the statements present too great a danger of prejudice." *United States v. Cass*, 127 F.3d. 1218, 1222 (10th Cir.1997) (citing *Garrett v. United States,* 78 F.3d 1296, 1302-03 (8th Cir.), *cert. denied,* 519 U.S. 956 (1996)). The

statements given by the anonymous complainant go directly to guilt and, therefore, there is no limiting instruction that could be given to the jury in this case.[1]

Ultimately, despite any rule of evidence to the contrary, Mr. Hay retains his right to confront witnesses against him under the Sixth Amendment and any government argument made to the contrary fails. "The Confrontation Clause, providing that the accused has right to confront and cross-examine witnesses against him, applies not only to in-court testimony, but also to out-of-court statements introduced at trial, regardless of admissibility of statements under law of evidence." *Crawford,* 541 U.S. at 50–51 (2004); Fed. R. Evid. 402. Mr. Hay request this court sustain this limine request and exclude any testimony or evidence regarding an anonymous call or anonymous complainant in this case.

**Item 2: Testimony by Dr. Emmett McWoods on Mr. Hay's mental state, specifically any statement that "I think he is running a scam."**

On October 29, 2021, VA-OIG agents interviewed Mr. Hay's treating physician, Dr. Emmett McWoods, and showed Dr. McWoods two surveillance videos of Mr. Hay. After reviewing the videos, Dr. McWoods stated that "I think he is running a scam." The word scam means to deceive or to defraud. This testimony improperly allows Dr. McWoods to testify to an ultimate issue—Mr. Hay's knowledge and specific intent to falsify his symptoms to steal veterans' benefits. This testimony usurps the jury's role

---

[1] *Cass,* 127 F.3d. at 1223, 1224; *see United States v. Evans,* 950 F.2d 187, 191 (5th Cir.1991) (evidence otherwise admissible as background "becomes inadmissible hearsay if it also points directly at the defendant and his guilt in the crime charged"); *United States v. Brown,* 767 F.2d 1078, 1084 (4th Cir.1985) (error to admit out-of-court statements as "background" where statements implicated defendant in charged crime and "effect of the evidence could only have been a substantial bolstering of the government's case by inadmissible hearsay").

as factfinder. Federal Rule of Evidence 701 allows a lay witness to testify to an ultimate issue, but only if the witness is not testifying as an expert witness and the opinion is one that is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. The 2000 amendment clarifies that. "Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Here, this is what the government seeks to do. This is improper opinion testimony and prohibited by Fed. R. Evid. 701 and 704.

Mr. Hay request this Court exclude any opinion testimony by Dr. McWoods whether he did have the mental state or condition that constitutes an element of the offense, including any statement that Mr. Hay was running a scam.

**Item 3: Any testimony by government investigative agents or VA-OIG agents that Mr. Hay's behavior is inconsistent with his symptoms of choreiform and conversion disorder.**

Defense counsel anticipates the government will solicit testimony from VA-OIG agents that, in their opinion, they observed Mr. Hay engaged in behavior inconsistent with symptoms of his conversion disorder. Any testimony is hearsay not subject to any exception. The agent's testimony is based on prior statements made by Mr. Hay to treatment providers. The agents' knowledge of the symptoms is based on the treatment providers written reports and are statements made to those treatment providers. The agents lack any personal knowledge as required by Fed. R. Evid. 602 and, as such, any statements regarding Mr. Hay's symptoms of conversion disorder are hearsay and must be excluded. This Court should exclude this evidence. It also

should be excluded because it is telling the jury what result to reach. This specific testimony is simply disguised opinion evidence on the ultimate issue, whether Mr. Hay's statements or representations were false or fraudulent. This evidence is prohibited by Fed. R. Evid. 701, because it is not helpful and is a meaningless assertion which amounts to little more than choosing up sides. *See* Fed. R. Evid. 701 Advisory Committee Notes, 1972.

**Item 4: Any evidence or testimony by government witnesses that Mr. Hay was falsifying or faking his symptoms of conversion disorder, generalized choreiform movement disorder, weakness in left and right lower legs, and major depression.**

Defense counsel anticipates the government will present multiple witnesses in order to solicit testimony that Mr. Hay was faking or falsifying his symptoms of conversion disorder. This is opinion testimony prohibited by Fed. R. Evid. 701. Rule 701 requires that lay opinion testimony be rationally based on the witness's perception, helpful to clearly understanding the witness's testimony or determining a fact in issue; and not based on scientific, technical, or specialized knowledge within the scope of Rule 702. This opinion testimony is not helpful to clearly understanding the witness's testimony or determining a fact in issue. While these witnesses may be able to testify to their personal observations, the conclusion is one that can, and only should be, drawn by the jury. This makes the opinion testimony superfluous. While Federal Rule of Evidence 704 states that an opinion is not automatically objectionable because it embraces and ultimate issue, it is balanced by Rule 701. Fed. R. Evid. 704, Advisory Committee Notes, 1972 proposed Rules state: "The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions." Under Rules 701 and

702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion

of evidence which wastes time. These provisions afford ample assurances against the

admission of opinions which would merely tell the jury what result to reach,

somewhat in the manner of the oath-helpers of an earlier day." Here any testimony

by any witness that Mr. Hay is falsifying or faking his symptoms is superfluous

because it is not helpful to determining a fact in issue that the jury can draw for itself

and should be excluded. It also should be excluded because it is telling the jury what

result to reach.

**Item 5: Testimony or evidence that the Veteran Administration and the Social Security Administration terminated Mr. Hay's benefits as a result of the investigation or based on a finding that he engaged in fraud by falsifying his symptoms of conversion disorder, which is also contained in government exhibits 210-211 and 213-214.**

As a result of the investigation by VA-OIG and SSA agents, both the

Veterans Administration (hereinafter VA) and Social Security Administration

(hereinafter SSA) terminated Mr. Hay's benefits for conversion disorder.

Despite Mr. Hay's appeal of the decision, the VA and SSA terminated his

benefits. Defense counsel anticipates the government will introduce evidence

that, after a review of his case, ex parte proceedings were held and the SSA

and VA determined that Mr. Hay engaged in fraud by falsifying his

symptoms. An independent determination by a government agency that Mr.

Hay fraudulently claimed the benefits at issue goes directly to guilt. This

evidence is extremely prejudicial. It will invade the jury's independent

determination based on the evidence. Any probative value is outweighed by

the unfair prejudice and will mislead the jury to presume guilt on an improper basis in violation of Rule of Evidence 403. It also lessens the government's burden and improperly shifts burden of proof. The government has the burden of proving the defendant guilty beyond a reasonable doubt. Allowing the government to provide evidence that a prior federal agency terminated Mr. Hay's benefits as a result of the same evidence the jury in this case will hear lessens the government's burden. Allowing this evidence will essentially tell the jury what result to reach in violation of <u>Fed. R. Evid. 701</u>. The SSA and VA's decision to terminate Mr. Hay's benefits were based on a different level of standards, without due process of law. Thus, this evidence shifts the burden requiring the defendant, Mr. Hay, to prove his innocence contrary to the presumption of innocence. Here the evidence is highly prejudicial, will confuse the issues and mislead the jury. Judges are allowed to exclude evidence when the probative value of the evidence is "substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. *United States v. Montoya*, <u>527 Fed. Appx 716</u> (10th Cir. 2013) (unpublished) "Evidence is unfairly prejudicial when it has the capacity "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Id. at 723, citing, *Old Chief v. United States*, <u>519 U.S. 172</u> (1997)

This evidence is highly prejudicial because it might invite the jury to infer that the Mr. Hay has already been deemed to have committed fraud in contradiction to the government's burden in this case.

In addition, any admission of documents representing the VA or SSA findings, and termination of benefits is hearsay and would violate Mr. Hay's rights under the Confrontation Clause. Defense counsel anticipates that the government will attempt to admit these documents under a hearsay exception. However, "[e]ven if "evidence [is] sufficiently reliable to qualify for admission under a recognized exception to the hearsay rule," it cannot be admitted if it "offend[s] confrontation values."[2] Here these documents clearly offend confrontation values. This Court should exclude this evidence.

## Item 6: Mr. Hay's receipt of subsidies from his farm and government exhibit 325.

Defense counsel anticipates that the government will present evidence and testimony that Mr. Hay was receiving subsidies from his farm. This evidence is irrelevant under Rule 401. Defense counsel anticipates that the government may use this evidence to suggest that Mr. Hay was working on his family farm. The government has not alleged in the Superseding Indictment (SI) that employment by Mr. Hay was a part of his scheme to defraud. The fact that Mr. Hay received subsidies from the farm is not relevant to whether he was performing any physical labor. It merely highlights money received from the farm. Therefore, it does not have any

---

[2] *United States v. Noria*, 945 F. 3d 847 (5th Cir. 2019) (quoting *United States v. Sarmiento-Perez*, 633 F.2d 1092, 1099 (5th Cir. Unit A Jan. 1981); see also *Idaho v. Wright*, 497 U.S. 805, 814 (1990).

tendency to make a fact more or less probable than it would be without the evidence and is not a fact of consequence in determining the action. This Court should exclude this evidence.

**Item 7: Civil dispute between Linda Hay and Bruce Hay.**

Defense counsel anticipates that the government will introduce evidence that Bruce Hay is involved in a civil dispute with his mother, Linda Hay. Counsel anticipates this evidence will be submitted through testimony by witnesses, and documents in Miami County case 2020-06497 which includes a Mortgage/Security Interest Agreement, Employment Agreement and Mechanics Lien (government exhibits 326-329). This evidence is irrelevant and does not have any tendency to make a fact more or less probable than it would be without the evidence and is not a fact of consequence in determining the action.

**Item 8: Allegations of child abuse.**

Defense counsel requests this Court exclude any testimony or evidence that will introduce that Mr. Hay was investigated for child abuse. This evidence is irrelevant and does not have any tendency to make a fact more or less probable than it would be without the evidence and is not a fact of consequence in determining the action. It is therefore barred under Fed. R. Evid. 401. If the Court finds this evidence to be relevant, the Court should still exclude the evidence because its probative value is outweighed by the danger of unfair prejudice. Further, this is also evidence of other wrongs or acts not submitted for any proper purpose and is, therefore, prohibited by Fed. R. Evid. 404(b).

**Item 9: Evidence that Mr. Hay's children were improperly restrained during the 2005 car accident.**

Defense counsel requests this Court exclude any testimony or evidence that will introduce that Mr. Hay's children were improperly restrained or buckled during the February 2005 car accident. This evidence is irrelevant and does not have any tendency to make a fact more or less probable than it would be without the evidence and is not a fact of consequence in determining the action. If the Court finds this evidence to be relevant, the Court should still exclude the evidence because its probative value is outweighed by the danger of unfair prejudice. Further, this is also evidence of other wrongs or acts not submitted for any proper purpose and is, therefore, prohibited by Fed. R. Evid. 404(b).

**Item 10: Mr. Hay's attending anger management classes.**

Defense counsel anticipates that the government will introduce that Mr. Hay has attended anger management classes. This evidence is irrelevant and does not have any tendency to make a fact more or less probable than it would be without the evidence and is not a fact of consequence in determining the action. It is therefore barred under Fed. R. Evid. 401. Even if relevant, it would mislead the jury to make a finding based on an improper and emotional reason. Any probative value is substantially outweighed by the danger of unfair prejudice and is, therefore, barred under Fed. R. Evid. 403.

**Item 11: Mr. Hay going through parenting classes, kicking his 10-year-old child, and SRS mandated parenting classes contained in government exhibit 202.**

This evidence is irrelevant and does not have any tendency to make a fact more or less probable than it would be without the evidence and is not a fact of consequence in determining the action. It is therefore barred under Fed. R. Evid. 401. This is also evidence of other wrongs or acts not submitted for any proper purpose and is, therefore, prohibited by Fed. R. Evid. 404(b).

**Item 12: Total Estimation of Loss.**

Defense counsel anticipates that the government will introduce evidence of their total estimation of loss to the VA. The government has charged a total of 16 counts. The government alleges that the total amount of loss to the VA is $422,527.66. The government has alleged a specific amount of either wire fraud or theft in each Count of the SI. Each count requires the government to individually prove a separate amount of money. The total estimation of loss is irrelevant and does not have any tendency to make a fact more or less probable than it would be without the evidence and is not a fact of consequence in determining the action. It is, therefore, barred under Fed. R. Evid. 401.

More importantly this evidence, even if relevant, implicates Fed. R. Evid. 403. The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury. Here, allowing the government to introduce evidence of the total estimation of loss, would confuse the jury and will make unclear whether the jury is finding Mr. Hay innocent or guilty of the individual counts contained in the Superseding Indictment or simply overall. This evidence should be excluded.

## Item 13: Government Exhibit 71

Mr. Hay objects to government exhibit 71, titled "Video of Bruce Hay shooting target practice with friends," and requests the Court exclude it. This evidence is irrelevant under Rule 401 and should be excluded on that basis. If the Court, however, finds that this evidence has relevance, the exhibit should be excluded under Rule 403. The title of the exhibit is misleading and unfairly prejudicial because it implies that Mr. Hay is participating in target practice. This is not factually true and is misleading.

Further, the video itself appears to be a recording of a recording. The requirements of Federal Rule of Evidence 1002 are clear: the rule demands that courts exclude secondary evidence of an original's contents unless the original is in evidence. *United States v. Chavez*, 976 F.3d 1178, 1195 (10th Cir. 2020). Although a duplicate may be admitted under certain circumstances, *see* Fed. R. Evid. 1003 and 1004, the question remains whether the rerecording satisfies Rule 1001(e)'s requirement that the "counterpart" accurately reproduce the original. This requires the government to show that the purported duplicate recording "accurately reproduce[s] the scenes that took place, [and is] . . . accurate, authentic and trustworthy." *United States v. Condry*, No. 21-CR-0322-CVE, 2021 WL 5756385, at *2 (N.D. Okla. Dec. 3, 2021).

## Item 14: Government Exhibit 101

Mr. Hay objects to government exhibit 101, titled "Summary exhibit regarding pole camera footage," and requests the Court exclude it because it includes levels of hearsay and violates his rights under the Sixth Amendment Confrontation Clause.

The document is an out-of-court testimonial statement that is barred by the Sixth Amendment.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with witnesses against him," and the Confrontation Clause bars the admission of out-of-court testimonial statements unless the declarant witness is unavailable, and the defendant had a prior opportunity to cross-examine. *Crawford*, 541 U.S. at 59. Statements "which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" are part of a "core class" of testimonial statements. *Id.* at 51-52; *United States v. Yeley-Davis*, 632 F.3d 673, 679 (10th Cir. 2011) ("[a] testimonial statement is a statement that a reasonable person in the position of the declarant would objectively foresee might be used in the investigation or prosecution of a crime.").

Here, exhibit 101 is testimonial. It was created for the purpose of trial and should be excluded. Further, it is unclear who created this exhibit. Although defense counsel could speculate about the exhibit's author, it remains that the exhibit includes levels of hearsay and the potential to cause unfair prejudice, confusion, and to mislead the jury.

Defense counsel was provided a copy of the government's exhibit. The exhibit contains opinion testimony from the author regarding whether the government's video shows Mr. Hay, with or without impairments. The exhibit is essentially a summary of the government's opinion of the evidence. It is improper for the

government to be able to submit a summary of their evidence accompanied by their opinion to the jury and it should be excluded.

**Item 15: Government Exhibit 134**

Mr. Hay objects to government exhibit 134 titled "Kansas Farmers Union, Kansas Kontact Publication, Sept./Oct 2012" is an online newspaper article. Defense counsel at this time is unclear of the purported author and therefore the news article is hearsay and prohibited by Fed, R. Evid. 801 (c). It also violates Mr. Hay's right to confrontation under the Sixth Amendment. This Court should exclude government exhibit 134.

WHEREFORE, Mr. Hay respectfully objects to the government's evidence contained above and requests this Court grant the Motion in Limine and exclude the evidence.

Respectfully submitted,

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I certify that on July 11, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19-20044-JAR |
| | ) | |
| BRUCE L. HAY, | ) | |
| Defendant | ) | |
| | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT BRUCE HAY'S MOTION IN
LIMINE**

The United States of America, by and through the undersigned counsel, responds to

Defendant Bruce Hay's Motion in Limine (doc. 80).  Defendant Hay seeks to exclude fifteen

categories of evidence.

### Item 1:  Anonymous call, complainant, or hearsay information provided by the anonymous complainant

Defendant Hay seeks to preclude the government from introducing evidence of an

anonymous call to the Veteran's Administration Office of Inspector General (VA-OIG) made in

January 2011 regarding the Defendant's VA benefits.  Defendant argues such evidence is

hearsay and violates his rights under the Confrontation Clause of the Constitution.

The government intends to introduce the fact that an anonymous complaint was received

by a VA-OIG hotline and that the nature of that complaint related to potential disability benefits

fraud.  The government intends to introduce the anonymous tip to explain why the VA-OIG

opened its investigation, and to explain the investigative steps that VA-OIG took, including

conducting video surveillance before and after appointments, obtaining medical records and

other information regarding the Defendant's physical abilities, and the installation of a pole

camera.

1

The Defendant's reliance on *United States v. Cass*, 127 F.3d. 1218 (10th Cir.1997), is misplaced. In *Cass*, the government introduced numerous out-of-court statements of individuals under the theory that the statements were admissible to explain law enforcement's actions. *Id*. at 1222. However, during both opening and closing statements, the government relied upon the truth of the matters asserted in the hearsay statements in support of proving specific elements of its case. *Id*. at 1224. In this case, the government may introduce the anonymous tip to explain why VA-OIG began its investigation of the Defendant and the investigative steps that it took. Without such evidence, the jury is left to speculate as to why agents surveilled the Defendant, obtained records concerning his supposed disabilities, and installed a pole camera outside the Defendant's residence. The government does not intend to rely upon the tip to prove any of the elements of the charged offenses.

Introduction of an anonymous tip for such purposes is admissible. *See United States v. Freeman*, 816 F.2d 558, 563 (10th Cir. 1987) (U.S. Secret Service agent's testimony of information received from information and local police department was admissible to explain preparations and steps in investigation and not offered for truth of matter); *see also United States v. Reynolds*, 684 Fed. App'x 510, 514-15 (6th Cir. 2017) (Detective testified that he began investigating defendant based on information he received suggesting that defendant was involved in the sale of drugs, but Detective never described the source of information); *United States v. Hoffpauir*, 209 Fed. App'x 969, 971 (11th Cir. 2006) (Anonymous letter received by police reporting methamphetamine lab at defendant's residence was not hearsay because it was not offered for the truth-of-the-matter, but to explain why police obtained search warrant for residence).

2

Defendant claims that admission of the anonymous tip would also violate his Confrontation Clause rights under *Crawford v. Washington*, <u>541 U.S. 36</u> (2004), because the out-of-court statement is testimonial in nature. However, where the anonymous tip is introduced to explain the action of law enforcement, and not for the truth of the matter, the Confrontation Clause is not violated. *Williams v. Illinois*, <u>567 US. 50, 57</u> (2012); *see also Crawford*, <u>541 U.S.</u> <u>at 59</u> n.9 ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted (citing *Tennessee v. Street*, <u>471 U.S. 409, 414</u> (1985)); *Ahmed v. Wolfenbarger*, <u>2008 WL 5188268</u>, at *4 (E.D. Mich. Dec. 9, 2008); *Rayner v. Overmyer*, <u>2021 WL 6596867</u>, at *14 (E.D. Penn. Sep. 1, 2021); *Davis v. Jackson*, <u>2020 WL 2235722</u>, at *4 (W.D. Mich. Apr. 18, 2020).

**Item 2: Testimony by Dr. Emmett McWoods on Mr. Hay's mental state, specifically any statement that "I think he is running a scam."**

Defendant Hay seeks to preclude the government from introducing a statement from Dr. McWoods, who was the Defendant's treating physician, related to the Defendant's mental state. Defendant Hay specifically identifies a statement that Dr. McWoods made to a VA-OIG agent. Dr. McWoods said, "I think he is running a scam," after the agent showed Dr. McWoods surveillance video of Defendant performing physical activities.

The government does not intend to ask Dr. McWoods' opinion as to whether Defendant Hay was "running a scam" or a scheme to defraud VA. Dr. McWoods' opinion on Defendant's criminal intent is irrelevant. However, as the Defendant's treating physician, whether Dr. Woods would have treated the Defendant differently if he had known of Defendant's true physical capabilities is highly relevant. So is the difference between the way Defendant presented himself to Dr. McWoods and what McWoods observed on the video. Therefore, the government does intend to ask Dr. McWoods about his observations of the Defendant during office visits,

3

statements made by the Defendant about his physical condition and whether Dr. McWoods based his medical diagnoses of Defendant based, in part, upon those statements. The government will ask Dr. McWoods whether, had he known Defendant was capable of the physical activities he observed in the surveillance video, would he have diagnosed Defendant differently or wrote a letter supporting the Defendant's application for a permanent and total disability designation from the VA, which the Defendant requested from Dr. McWoods.

None of this proposed line of questioning in impermissible. Dr. McWoods' physical observations of Defendant during office visits is not opinion testimony. Statements made by the Defendant during office visits are statements of a party-opponent and is not hearsay under Fed. R. of Evid. Rule 801(d)(2)(A). Whether Dr. McWoods would have treated the Defendant differently had he known of Defendant's physical capabilities is not impermissible expert opinion testimony.

Opinion testimony from a non-expert witness is admissible if the opinion is (1) rationally based on the witnesses' perception; helpful to clearly understanding the witnesses' testimony, and not based upon scientific, technical, or other specialized knowledge. Fed. R. Evid. Rule 701. Although a medical doctor, the government does not intend to call Dr. McWoods as an expert. The opinion in question – whether Dr. McWoods would have diagnosed Defendant differently had he known of Defendant's physical capabilities observed on the surveillance video, is not based on scientific evidence.

Further, whether Dr. McWoods would have treated the Defendant differently had he been aware of the Defendant's physical capabilities that were captured on video is highly relevant. The Eighth Circuit, in remarkably similar circumstances, affirmed a district court's admission of equivalent testimony. In *United States v. Lemons*, <u>792 F.3d 941</u> (8th Cir. 2015), Lemons was

4

charged with making a false statement and theft of government funds related to Social Security disability benefits she received related to a medical diagnosis of a damaged spinal cord. Lemons claimed this caused her to be unable to work. Lemons' treating physician was interviewed by investigators after Lemons sought to appeal an administrative decision revoking her benefits. During the interview, agents showed the physician surveillance video of Lemons engaging in physical activities. After seeing the video, the physician revised her opinion that Lemons was disabled and concluded that Lemons could perform some type of work. *Id*. at 945. At trial, the prosecution admitted a statement of Lemons' treating physician that Lemons was unable to work. On appeal, Lemons argued the trial court erred in admitting the statement. The Eighth Circuit affirmed. "Based on Lemons's statements, [the treating physician] first concluded that Lemons could not work. When [the treating physician] saw the videotape of Lemons performing physical activity, she revised her assessment. Whether Lemons was eligible for disability benefits turned largely on whether she was able to work. [The treating physician's] letter therefore assisted the jury in understanding the importance of Lemon's false statements to her receipt of government benefits." *Id*. at 949.

**Item 3: Any testimony by government investigative agents or VA-OIG agents that Mr. Hay's behavior is inconsistent with his symptoms of choreiform and conversion disorder.**

Defendant Hay objects to any testimony of agents related to their observation of the Defendant engaged in activities inconsistent with a diagnosis of conversion disorder. The Defendant claims such testimony would be hearsay, because their knowledge of his symptoms "is based on the treatment providers['] written reports and are statements made to those treatment providers." (Doc. 80 at 5).

The Defendant's statements to medical treatment providers are admissible as a statement of a party opponent under Rule 801(d)(2)(A). Observations of agents who witnessed the Defendant performing physical activity inconsistent with Defendant's statements to medical providers is not hearsay. Such testimony would describe things the agents personally observed either through physical surveillance or surveillance obtained from a pole camera, as compared to statements and how the Defendant presented himself to medical providers. A particular agent's physical observation satisfies Rule 602's requirement that a witness have personal knowledge of the matter. Investigating agents will not be asked to diagnose the Defendant with a medical disorder (or lack thereof). They will be asked to testify concerning their personal observations, which is clearly admissible.

**Item 4: Any evidence or testimony by government witnesses that Mr. Hay was falsifying or faking his symptoms of conversion disorder, generalized choreiform movement disorder, weakness in left and right lower legs, and major depression.**

As discussed above, the government's witnesses will testify as to their physical observations in contrast to the Defendant's statements about his physical symptoms and the differences in the observations when the Defendant was at VA or SSA appointments versus when he was engaged in other activities.

These witnesses are allowed to describe in their own words what they personally observed when watching the Defendant and a blanket prohibition on commonly used and understood terms is not appropriate. Fed. R. Evid. 602 states that the "witness has personal knowledge of the matter" and that evidence of knowledge can come from the witness's own testimony. *See United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014) (stating Fed. R. Evid. 602 "does not require that the witness' knowledge be positive or rise to the level of absolute certainty"); *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir. 1997). To

6

say the Defendant "appeared to be faking or feigning" symptoms after, for example, observing him carry and load a walker into his truck without assistance and then use that same walker and present himself as barely able to walk inside the VA medical building, would be based on the witness's rational perception.

By contrast, Dr. Danielle Becker, the government's expert witness, will testify regarding conversion disorder/functional neurological disorder (FND), which involves functional defects that may appear to be voluntary, but are thought to be produced subconsciously. In addition to explaining FND, she will contrast FND with malingering, which is where a patient's symptoms are consciously feigned or grossly exaggerated for external incentives. As an expert witness, Dr. Becker is entitled to give her opinion if it is based on a reliable scientific foundation and will assist the trier of fact in determining a relevant issue. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993).

> **Item 5: Testimony or evidence that the Veteran Administration and the Social Security Administration terminated Mr. Hay's benefits as a result of the investigation or based on a finding that he engaged in fraud by falsifying his symptoms of conversion disorder, which is also contained in government exhibits 210-211 and 213-214.**

An element of the wire fraud charges requires the government to prove Defendant made materially false statements or withheld material information as part of his scheme to defraud. *United States v. Welch*, 327 F.3d 1081, 1108 (10th Cir. 2003). The fact that VA and SSA terminated the Defendant's benefits when it learned that he had mischaracterized his physical abilities shows that the Defendant's lies and omissions about his physical ability were material. Moreover, during the Defendant's appeal of the VA's decision to sever his benefits, the Defendant made statements that may be used as evidence at trial. And during the appeal

proceedings, the Defendant submitted written statements to the VA from a number of individuals who he has included as potential witnesses in this criminal trial.

Similarly, in January 2013, after his social security benefits were terminated, the Defendant submitted a request for reconsideration claiming that "[s]ince February 2005 I have needed assistance with many ADLs (Activities of Daily Living. I believe that the information you received to make your determination did not give you an accurate account," but contemporary surveillance and other evidence undermines this representation. In March 2013, the Defendant faxed SSA the VA's March 8, 2007 rating decision in an effort to get his SSA benefits reinstated, and he filed a request for a hearing by an ALJ in July 2013, representing: "Disability has been full and permanent since 2005. VA confirms no improvement or expected improvement. ADL assistance is required – completely unable to work. 100% disability for mental/physical . . . ." The Defendant cited the VA's rating decision in support. On May 3, 2017, after the Defendant went to the VA for a compensation and pension benefits examinations, he went to the SSA office and used the same walker he used inside the VA to ambulate slowly into the SSA building and his wife helped him sit down. While inside, he asked for a copy of his disability folder because he was interested in refiling. When he returned to the vehicle, he packed up the walker and loaded into his truck and went to Sam's Club where he walked around and shopped without the use of a walker and without needing assistance from his wife. All of this is relevant evidence, and it would be confusing for the jury without the context that the Defendant's SSA and VA benefits were terminated and he was taking steps (and making inculpatory statements) to reinstate them.

8

**Items 6 and 7: Mr. Hay's receipt of subsidies from his farm and government exhibit 325, and Civil dispute between Linda Hay and Bruce Hay.**

The Defendant's physical activities and his ability to perform physical activities are a central issue in this case. Farming activities are physical labor that is inconsistent with Defendant's claim that he has a full and permanent disability and his representations to the VA. The fact that the Defendant received farm subsidies is evidence that Defendant farmed, which is evidence that he performed physical labor.

Likewise, in the civil dispute in Miami County District Court, the Defendant claimed that he furnished labor as a "Farm Manager" on his mother's property from January 1, 1985 to December 31, 2020. The Defendant claimed he provided various labor during those years, including "equipment repair, livestock management, property upkeep (fence repair, water gaps, etc.), crop planting and harvesting and hay harvesting." The Defendant's statements are not hearsay under Rule 801(d)(2)(A), are relevant under Rule 401, and are not unduly prejudicial under Rule 403. The Defendant does not seriously contend otherwise. Therefore, the Court should not exclude evidence of the Defendant's receipt of farm subsidies and his statements concerning his farm labor.

**Item 8: Allegations of child abuse**

The government does not intend to introduce evidence of allegations of child abuse.[1] However, the government reserves the right to seek to introduce such evidence as rebuttal evidence should Defendant open the door. For instance, should the Defendant seek to admit character evidence regarding his attributes as a father, the government should be allowed to rebut such evidence.

---

[1] The government has asked the Defendant to identify any such statements in Items 8, 10, and 11, so that they can be redacted from any otherwise admissible documents.

9

**Item 9: Evidence that Mr. Hay's children were improperly restrained during the 2005 car accident.**

During its case-in-chief, the government does not intend to introduce evidence that the children were not properly restrained. The extent of the children's injuries resulting from the 2005 car accident is not relevant. Although his injuries from the accident may be relevant, Defendant Hay should not be allowed to introduce evidence of the children's injuries, including that they were life-flighted to a hospital. If the Defendant introduces evidence of the children's injuries, then the fact they were not properly restrained becomes relevant to show that the injuries may have been caused by improper restraint as opposed to the severity of the car accident. Absent such evidence or argument, the children's injuries and involvement in the accident is not relevant.

**Items 10 and 11: Mr. Hay's attending anger management classes and Mr. Hay going through parenting classes, kicking his 10-year-old child, and SRS mandated parenting classes containing in government exhibit 202.**

The government does not intend to introduce evidence of the Defendant's participation in anger management classes, parenting classes, or allegations of child abuse unless the defense opens the door to such testimony in some manner.

**Item 12: Total Estimation of Loss**

The loss caused by the Defendant's scheme to defraud is clearly admissible and the Defendant does not cite any authority to the contrary. The wire fraud counts charged the Defendant with a continuing scheme to defraud and obtain money or property. In order to prove the Defendant obtained money as a result of the scheme to defraud, the government should be allowed to prove the total amount of loss caused by the Defendant.

10

### Item 13: Government Exhibit 71

The Defendant objects to Ex. 71, which is a video of Defendant and others preparing for target shooting with firearms. He claims the evidence is not relevant and is prejudicial. The Defendant is observed using no cane or walker, and he does not appear to need any assistance. The video is relevant for this reason alone. But it is also relevant because the Defendant claimed to the VA that he is unable to be around fireworks, because the noise is distressing. Target shooting, or being around others who are target shooting, is relevant given the Defendant's statements to the VA and medical providers.

The Defendant additionally claims that, because the video is a video recording of the original (an agent used a device to record the video as it played on a computer), it is not admissible under Rule 1001(e). That rule requires a duplicate to be a "counterpart produced by a mechanical, photograph, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." The government intends to introduce evidence from the agent who produced the video. The agent will testify that he accurately recorded the original by an electronic means. Therefore, the video in question meets Rule 1001(e)'s definition of "duplicate." Rule 1003 allows admission of a duplicate, "to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."

### Item 14: Government Exhibit 101

The Defendant objects to Ex. 101, which is a summary exhibit of the many hours of pole camera video obtained from the Defendant's residence, which cannot practically be shown to a jury in its entirety. Rule 1006 allows a summary "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court" provided the proponent makes the originals available to the other side. The government has provided the originals to the Defense.

11

To the extent the Defendant objects to the language contained in the summary, the Government has offered to confer with the Defense to make agreed-upon adjustments to any language that the Defendant considers to be unduly prejudicial. Ultimately, however, any dispute would go to weight, not admissibility. The Defendant is free to offer his own summary exhibit or cross-examine government witness(es) regarding the basis for the statements in the summary exhibit.

**Item 15: Government Exhibit 134**

Defendant Hay's objection to the admission of the "Kansas Kontact," a periodical publication of the Kansas Farmers Union, should be overruled because it is self-authenticating under Rule 902(6).

The publication, attached as Exhibit A, is the Sept/Oct 2012 issue of Kansas Kontact, a publication of the Kansas Farmers Union. There are two relevant articles. One is entitled "Aspiring farmers learn at specialty crop farm tours." It contains a byline of Lauren Clary. The article discussed a July 31, 2012 farm tour of five farms around Lawrence and Edgerton. It includes two photographs. The first is a photograph of several individuals, including Defendant Hay, listening to an individual who is speaking in front of a hoop house. The second photograph is several individuals, including the Defendant, looking at plants in a field.

The second relevant article in the publication is entitled "Get to know some of Kansas' Farmer-Veterans." It contains a by-line of Andrew Roberts. It includes a photograph of five individuals, including Defendant Hay. The article is an interview of the five veterans. Defendant Hay is interviewed as part of the article and is directly quoted. He says, "I own 80 acres and help my dad on his conventional farm." When asked why he attended the tour, Defendant Hay said, "I'm looking to consolidate some of our growing. We're thinking about breaking off 20 or 30 acres to do this (growing vegetables) and maybe a small orchard."

The Defendant's quotes in the second article are clearly admissible. They are statements of a party-opponent and are not hearsay. Any argument related to the authenticity of the articles is

12

covered by Rule 902, which includes "[p]rinted material purporting to be a newspaper or periodical" among the classes of evidence that is self-authenticating, requiring no extrinsic of authenticity in order to be admitted. Fed. R. Evid. Rule 902(6).

The first article, which discusses the farm tour, is admissible as non-hearsay. It provides context to the photos of the Defendant's visit to the farms insomuch as it states that 30 people attended a tour of five area farms. It identifies a grant that funded the tour. Additionally, it identifies the specific farms that were toured, what is grown on the farm, marketing and farming practices of the farm, and some other information about the farm, none of which is offered for the truth of any matter, but merely to provide context. There is no information in any article about physical activities of the Defendant, except those that come from him personally.

The Defendant's quotes in the periodical are relevant as statements that identify his farming practices, which is relevant to the charged offenses. The photos show the Defendant engaged in a physical activity. The caption and other articles in the periodical are not offered to prove the truth of the matters asserted, but to provide context to the photographs. There is nothing unduly prejudicial in the periodical – the only potential prejudice comes from the Defendant's statements about his farming activities which are clearly not impermissibly prejudicial.

Respectfully submitted,

*/s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Ryan.Huschka@usdoj.gov
KS Bar No. 23840

13

/s/ Christopher Oakley
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Chris.Oakley@usdoj.gov
KS Bar No. 19248

# CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2022, I caused the foregoing pleading to be filed with the

Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

/s/ Ryan J. Huschka
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

14

GOVERNMENT EXHIBIT

134

19-20044-JAR

PENGAD 800-631-6989

# Kansas Farmers Union

UNITED TO GROW FAMILY AGRICULTURE

# KANSAS KONTACT

*A publication of Kansas Farmers Union*
McPherson, Kansas

**Sept/Oct 2012**

# Aspiring farmers learn at specialty crop farm tours

**By Lauren Clary**

On July 31 Kansas Farmers Union hosted tours of five farms around Lawrence and Edgerton.

About 30 people attended the tour, including five veterans. We spent so much time gathering a wealth of information from every farm, that we missed the Lawrence Farmers Market and toured The Merc, a grocery co-op, instead.

Pictures can be found on flickr.com/ksfarmersunion.

These tours were made possible by a grant Kansas Farmers Union and Center for Rural Affairs received through USDA Risk Management to help our nation's military veterans have the opportunity to be involved in agriculture. Kansas AgrAbility has also been involved in implementing the program. Although, we also encouraged the public to attend in order to spread awareness of local foods and help others who are interested in farming.

**Descriptions of each farm can be found on page 2, 11 and 12.**



Frank Gieringer, far right, talks about growing tomatoes in hoop houses. Gieringers' Orchard has five hoop houses: three with tomatoes, one with ymmy peppers and one with cherry tomatoes.

# KFU to hold workshop, tour in NW Kansas

**By Lauren Clary**

Kansas Farmers Union is hosting two free events in September in northwest Kansas (Atwood/St Francis) for beginning farmers and anyone interested in food cooperatives.

The first event, Beginning Farmer Networking Workshop, will be on Wednesday, **September 19** at the Atwood American Legion from 10 a.m. to 4 p.m. The Workshop will feature five speakers and a panel of producer members of the High Plains Food Co-op (HPFC).

"We see a large number of farmers that are considering retirement and the next generation is going to have to step up and take the lead. We know they're out there, its just a matter of finding them and



helping them find the resources that they need to become the next generation of family farmers," Nick Levendofsky, KFU Special Projects Coordinator, said.

Workshop speakers include Donn Teske, KFU president, to talk about the financial aspect of farm transition; Calvin Adams will discuss the Kansas Ranch and Range Management Internship Program; Dr. Scott Mickelsen with the Ne-

**Continued on Page 3**

**MORE KFU EVENTS ON PAGE 6**

# 2012 Farm Bill: held up in Congress

**By Lauren Clary**

As reported in the July/August Kontact, the Senate passed their Farm Bill on June 21 and the House Agriculture Committee approved their Farm Bill, titled FARRM (Federal Agriculture Reform and Risk Management Act), on July 12.

Since then agriculture leaders have been urging the US House of Representatives leadership to bring the bill to the floor for debate.

"House leadership needs to stop playing political games and show it values rural America, and pass a farm bill now," NFU President Roger Johnson said. "Our farmers and ranchers are facing a rough harvest and barren pastures; further delays will have a huge impact on the U.S. agriculture industry."

On Aug. 22 National Farmers Union joined with 38 other organizations to form a Farm Bill Now Coalition.

In the Coalition's first statement, they said: "While Congress waits to finish the farm bill, we are united in asking all Americans to encourage legislators—home for summer town hall meetings and speeches—to finish this vital legislation before the current farm and food law expires in September. After all, it's your bill too."

At the end of July, the US House proposed legislation to extend the 2008 Farm Bill for one year and then withdrew the measure.

**Continued on Page 4**

## SPECIALITY CROP FARMS
### CONTINUED FROM PAGE 1



Frank Gieringer, far right, talks about the blackberry bushes they recently planted. Gieringers' Orchard sells blackberries through a U-Pick program, where they allow their customers to come and harvest their own fruit.

### Gieringers' Orchard

**Owners**: Frank and Melanie Gieringer

**Crops grown**: peaches, blackberries, tomatoes, cherry tomatoes, yummy peppers, sweet corn

**Marketing**: on farm store, u-pick option on farm, Olathe Farmers Market, Overland Park Farmers Market, and Lawrence Farmers Market (when they have extra to sell).

**Farming practices**: conventional, hoop houses (tomatoes and yummy peppers)

**Other**: When Frank and Melanie moved out to the country, they decided they wanted to have lots of trees and started planting peach trees in 2001. Their customers were coming to their farm to buy peaches, they came with $20 and only spent $10. Frank wanted to find a way for his customers to spend their whole $20 with his family. So, he decided to grow tomatoes and sweet corn, and added more crops as time went on.

# Get to know some of Kansas' Farmer-Veterans

### Andrew Roberts
### Chanute, KS

**Military Branch**: Air Force. Based in Minot, ND

**Are you currently farming or own land?**: No. "I hope to convince a friend to let me grow on a few of his acres in Harvey County. I want to start with a high tunnel and grow organically for the Wichita and Newton markets."

**Why did you decide to attend the tours?**: "I think these tours are tremendous for us novices and KFU is doing a great service to us veterans. I've attended almost every event put on and I'm always anxious to rub shoulders with farmers and veterans alike to share learning experiences!"

### Mike O'Bea
### Leavenworth, KS

**Military Branch**: Army. Served in Saudi Arabia, Turkey and Korea

**Are you currently farming or own land?**: Yes. "I started with 25 acres, then the neighbor sold me 100 acres next to me. Right now I'm leasing out 50 acres for soybeans and 80 acres for cattle."

**Why did you decide to attend the tours?**: "I'm hoping to do some high tunnels. I'm



Veterans who attended the tour. Left to Right: Andrew Roberts of Chanute, Mike O'Bea of Leavenworth, Bruce Hay of Osawatomie, Tom Shepard of Burlingame, and Hugh Talley of Lansing.

just weighing my options. But I want to do something that's not too labor intensive. My interests line up with what Gierengers' and Pendleton's are doing."

### Bruce Hay
### Osawatomie, KS

**Military Branch**: Army for 19 years. Served in Germany and Iraq. He has also served or is serving in the National Guard and Army Reserve.

**Are you currently farming or own land?**: Yes. "I own 80 acres and help my dad on his conventional farm."

**Why did you decide to attend the tours?**: "I'm looking to consolidate some of our growing. We're thinking about breaking off 20 or 30 acres to do this (growing vegetables) and maybe a small orchard."

### Tom Shepard
### Burlingame, KS

**Military Branch**: He has served in the Army since 1984. Served in Bagdad, Desert Storm, and several other countries.

**Are you currently farming or own land?**: Yes. "I own 13 acres where I'm raising chick-

ens, geese and turkeys and have a small vegetable garden that I would like to expand."

**Why did you decide to attend the tours?**: "I came to the tours to see how others are farming and learn new methods."

### Hugh Talley
### Lansing, KS

**Military Branch**: Army for 27 years. Served in Desert Storm and several other countries.

**Are you currently farming or own land?**: No. "I want to get into farming."

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1 Page 191

KANSAS KONTACT.pdf                                          ROA_HAY_000355

## Sept Tours
## from Page 1

braska College of Technical Agriculture will talk about the college's 100 Cow Program and others NCTA offers; Cynthia Dixson, Rawlins County Extension Agent, will discuss a Website she is working on that will link beginning farmers to retiring farmers, along with Chris Sramek and Greg Laudenslager, both with HPFC, will also talk about greenhouse production and youth internships.

After the Workshop on Wednesday at 5 p.m., KFU Board Member Chris Schmidt will show everyone around Atwood, including the Ben-Lee Processing Plant.

Supper will be at 6:30 p.m. at the American Legion in Atwood and will feature food produced by HPFC members. A KFU Board of Directors meeting will convene after supper.

On Thursday, **September 20** a tour of the High Plains Food Cooperative (HPFC) will be held in the St. Francis area.

The group will depart from Atwood for St. Francis at 7 a.m.

at Hwy 25 and 36 intersection. Carpooling will be available. Breakfast will not be provided.

Once in St. Francis, the tour will start at Becky's Bierocks (306 S College), where the HPFC producers gather every third Thursday to transport their products to Denver. Here, tour attendees will have the opportunity to witness the co-op in action.

The rest of the morning will be filled with HPFC farm tours, starting at Becky's Bierocks. Other tour stops include Prairie House Herbs, Rattlesnake Ridge Ranch and RJ Klie Organics. A list of all the HPFC producers and their stories can be found at highplainsfood.org/shop/prdcr_list.php.

Becky Roberson, owner of Becky's Bierocks, and nine employees make fresh bierocks daily, which they sale in several markets, including Dillon's.

Prairie House Herbs, owned and operated by sisters Jo Hagney and Laura Reeser, purchased a farm in 2000 where they now grow herbs and vegetables, raise goat meat and chickens for eggs, and make spices and sauces.

Rattlesnake Ridge Ranch,

owned and operated by Chris and Heather Leibbrandt along with their children, "offers a full range of premium pork products and are beginning to offer a wide range of grass fed, home raised beef."

RJ Klie Organics, owned and operated by Robert and JoAnn Klie, raise beef "on pasture, organic hay feed and are finished on organic oats." They also raise "all natural" pork, which is raised conventionally but fed organic corn and never any GMO grains. They also grow organic wheat and triticale.

The tour will conclude with lunch in Atwood and time to network and socialize.

### HPFC Background Info

Five years ago a group of producers in the Atwood/St Francis area, including KFU board member Chris Schmidt, started up the High Plains Food Co-op.

"The High Plains Food Cooperative is committed to developing a self-reliant, self-empowering community, by offering a retail exchange to the Front Range of Colorado for goods and services which are grown, produced, traded, and distributed locally, in a sustainable, equitable, and re-

sponsible manner," part of the co-op's vision statement says on highplainsfood.org.

The High Plains Food Co-op acts as a venue for producers and consumers to buy and sell food. The Co-op has 160 members and about 60 to 80 orders each month.

Consumer members, who live in the Denver area, get online during the first of each month and order from each producer's list of products. The most popular item is usually eggs, Sramek said.

The Online Food Market is intended to "bring fresh, healthy, locally grown and produced food to you, the buyer, in a cost-effective and easy manner," highplainsfood.org says.

After the orders close, producers bring the filled orders on the third Thursday of every month to one of the drop points (Kansas producers meet in Atwood or St Francis) and one member takes the orders to Denver, stopping along the way to pick up more orders in Colorado.

Once in Denver, all the food is organized and each members' order is sent to one of 10 pick up points in the Denver area.

**RSVP: 785-527-0941**



## got photo ID?

If you're a registered voter, all you need to vote is your Driver's License, Military ID, Kansas College ID or other qualifying ID card.

The new Kansas Voting Law - it's easy.

On November 6, TAKE IT TO THE POLLS.

For a list of accepted identification and additional information go to gotVoterID.com or call 800-262-VOTE

### Kansas Kontact

**STAFF:** Lauren Clary, communications specialist (kfu.lauren@gmail.com) and editor; Callie Kramer, membership secretary and bookkeeping (kfum@nfuic.kscoxmail.com); Mary Howell, membership specialist (kfu.mary@gmail.com). Nick Levendofsky, special projects coordinator (kfu.nick@gmail.com).

**OFFICERS:** Donn Teske, Wheaton (dteske@bluevalley.net), President; Lavern Potuzak, Agenda, Vice President.

#### Board of Directors

| | |
|---|---|
| President | Donn Teske, Wheaton |
| Vice President | Lavern Potuzak, Agenda |
| North District | Gerard Steinlage, Seneca |
| | David Heins, Abilene |
| | Chris Schmidt, Oberlin |
| South District | Linda Hessman, Dodge City |
| | Herb Bartel, Hillsboro |
| | Jason Schmidt, Newton |

Volume 40 - Number 5

# 2012 Farm Bill Timeline

**June 21**
Ag Reform, Food, Jobs Act
passes in Senate, 64-35

**August 2**
House passes Ag Disaster
Assistance Act, 223-197

**September 30**
2008 Farm Bill expires

**April 26**
Senate Ag Committee
approves the Ag Re-
form, Food, Jobs Act

**July 12**
House Ag Committee approves
the Federal Ag Reform and Risk
Management (FARRM) Act

**September 10**
House and Senate
reconvenes after
the August recess

## Farm Bill
## from Page 1

Then House Ag Committee Chairman Frank Lucas introduced the Agricultural Disaster Assistance Act of 2012 and the House passed it on Aug. 2, 223-197. According to gop.gov, "the legislation would reauthorize expired emergency disaster programs for livestock ranchers, as well as fish, tree, honey bee and nursery plant producers for fiscal year 2012."

"This ill-considered action only holds farmers hostage with uncertainty, and does nothing to address specialty crops, dairy, commodities and other non-insured produce," NFU President Roger Johnson said.

In a letter written by a coalition of agriculture organizations, including National Farmers Union and American Farm Bureau, the US House was urged to pass a comprehensive, long-term farm bill before the 2008 Farm Bill expires on Sept. 30.

"This letter highlights the sense of urgency the House should have in passing a comprehensive, five-year farm bill before time runs out. While NFU fully supports providing disaster assistance to farmers and ranchers, we are extremely concerned with the limited disaster package that is being offered," NFU President Johnson said.

According to "Roll Call," the US "Senate has refused to take up the measure, with Agriculture Chairwoman Debbie Stabenow calling on the House to instead bring the full farm bill to the floor."

Members of the US House and Senate will reconvene in our nation's Capitol on Sept. 10. Farmers Union members from across the country will also be there for the NFU Fall Fly-in, Sept 9-12, to push for the Farm Bill to be pass before Sept. 30. On Sept. 12 a "Farm Bill Now" rally will be held on the US Capitol grounds that will include participants from all the major farm and commodity organizations.

**Find your representative's phone number in the box above, call them and urge them to pass the Farm Bill before the legislative session is over.**

A one-page handout that is meant to be distributed and discussed is available at kansasfarmersunion.org/2012f armbill or call 620-241-6630 and KFU staff will mail you copies.

You can also find more information at farmbillnow.com.

### Comparing the Senate and House Farm Bills

According to the Congressional Research Service, "both farm bills would reshape the structure of farm commodity support, expand crop insurance coverage, consolidate conservation programs, revise the Supplemental Nutrition Assistance Program (SNAP, formerly food stamps), and extend authority to appropriate funds for many U.S. Department of Agriculture (USDA) discretionary programs through FY2017.

"Among the major differences in the two farm bills is how each would restructure the farm safety net. Both farm bills borrow conceptually from current programs, by revising (and renaming) them to enhance price or revenue protection for producers.

"The House farm bill is similar to the current mix of farm programs in that it retains producer choice between a counter-cyclical price program and a revenue enhancement program, while the Senate farm bill provides for a revised revenue program with a slightly higher guarantee than in the House farm bill.

# Farm Bill Now!

**It's imperative to America's family farms that a comprehensive, long-term farm bill be passed before Sept 30**

## CALL YOUR REPRESENTATIVE TODAY

| | |
|---|---|
| **1st District: Congressman Huelskamp** | **785-309-0572** |
| **2nd District: Congresswoman Jenkins** | **785-234-5966** |
| **3rd District: Congressman Yoder** | **913-621-0832** |
| **4th District: Congressman Pompeo** | **316-262-8992** |

### STAY UP-TO-DATE WITH THE FARM BILL
BY VISITING KANSASFARMERUNION.ORG /2012FARMBILL AND FOLLOW KFU ON FACEBOOK

"The Congressional Budget Office (CBO) projects that the programs of the 2008 farm bill, if they were to continue, would cost nearly $1 trillion over the next 10 years. Compared to this "baseline," the Senate-passed farm bill would reduce spending by $23.1 billion and the House Agriculture Committee-approved farm bill would reduce it by $35.1 billion, both over the same 10-year horizon."

KANSAS KONTACT.pdf                                                                    HAY_000357

# KFU member finds success in niche markets

**By Lauren Clary**

NEWTON—Norm Oeding, farm manager at Janzen Family Farms south of Peabody, has been raising certified organic wheat for the past 10 years.

He decided to go organic not only to get a premium for the product, but he realized how much unhealthy "stuff" was being added during food processing.

"Our customers know it's a more pure product and they agree with the concept of taking care of the environment better," Norm said. "They get some face time with the people that produce it and they enjoy that. A few of them come out to the farm and bring their kids, they like that part."

> **There are some niche markets out there, its a matter of going after them. Getting out there, doing some research and finding out what the customers are buying in the community.**
>
> **-Norm Oeding**



Norm started grinding wheat and selling it as fresh, stone-milled, certified organic whole wheat flour eight years ago on his parents farm in Kingman County. A year after he began to sell flour, he found that people want a ready to eat product and began selling bread. Norm started grinding flour at Janzen Family Farms five years ago.

"It's a lot easier to sell a loaf of bread than for them to consider grinding their own flour. And that was a surprise when I got into grinding flour," Norm said. "They want a fresh product. I just figured, sure they'll buy flour, but it is a little tougher than that. They'd rather buy the bread."

"We take a very basic, common product, just about anybody in this part of the world grows wheat, and run it through a grinder, we add value, and we keep adding value as needed. We generate a lot more revenue and most of that revenue is earned. There's a little bit of profit in it and it works," Norm said.

Under the Little Red Hen Bakery brand, Norm sells whole wheat bread loaves, whole wheat burger buns, whole wheat hoagie buns, whole wheat dinner rolls and cracked wheat loaves. Once a week Norm takes fresh milled flour to a bakery in Wichita and picks up bread to distribute to six grocery stores in Wichita (Food for Thought, 3 Whole Foods, Green Acres and Natural Grocers).

"I certainly recommend to anybody that wanted to be in the value added food businesses, that you buy from the people you sell to, it really works," Norm said. "One hand washes the other. Everybody depends on the next person. The working together, the teamwork process."



Above: Norm Oeding, farm manager of Janzen Family Farms, checks cattle.
Left: Norm sells these 3.5 pound bags of organic flour at farmers markets in Newton and Wichita. He also sells flour and wheat berries in a 40 pound bag.
Below: Norm explains how his wheat grinder works. It has an automatic button that allows him to walk away from it and not worry about it overflowing. It makes 50 pounds of flour an hour.



Janzen Family Farms also raises grass fed beef, which is directly marketed to consumers. Norm said they meet most of their beef customers through farmers markets (Newton and Wichita) and those who have found them online.

"Since we've started selling our grass fed beef, we can sell two pounds of hamburger and also provide them an eight pack of burger buns. All off the same farm and that gets their attention. It's kind of an add on. I know a lot of customers really appreciate that," Norm said.

Consumers can find Janzen Family Farms online at janzenfamilyfarms.com and Norm at normsflour.com. Norm said they do a "little bit" of business online. The main thing the website does is allows their customers to find out more about the farm.

"Almost all of our beef goes to individuals. They're familiar with our bread product. They go searching online, they email us, they call us. All of the above. They're quite a variety of individuals," Norm said. "Last winter we were basically sold out of every steer. So we believe we're doing ok. We get a lot of repeat customers. and it works."

KANSAS KONTACT.pdf

ROA_B_HAY_000358

# KFU to host renewable energy tour, policy drafting

**By Nick Levendofsky**

Kansas Farmers Union will host a renewable energy tour on October 5 at 9 a.m., followed by policy drafting on October 6 at 9 a.m. in the Scandia and Concordia areas.

KFU members and the public are invited to tour **Nesika Energy, LLC**, an ethanol plant located west of Scandia on U.S. Highway 36. Nesika Energy has the capacity to produce 10 million gallons of ethanol a year from 3.6 million bushels of grain, and the wet distiller's grain is used for livestock feed at the nearby Premium Feeders, Inc. feedlot.

Following the ethanol plant tour, we will cross the road and visit **Premium Feeders, Inc.**, a 22,000 head capacity feedlot started in 1962. Premium Feeders is located in the midst of the primary grain producing areas of the Great Plains, surrounded by irrigated farmland, and has access to major packer markets.

We will enjoy a noon lunch at TAG's Grill and Bar in downtown Scandia (dutch treat), and then head south of Concordia to tour **Meridian Way Wind Farm**, located along U.S. Highway 81. Meridian Way Wind Farm was constructed in 2008 and is made up of 67 turbines spread out over some 20,000 acres of farmland. The Meridian Way Wind Farm generates 201 megawatts of electricity. Some

of that power is purchased by local utility provider Westar Energy and powers some 60,000 homes. During the tour, we will view a slide show of the construction process and then get an up-close look at one of the turbines in action.

On Friday evening, we'll enjoy dinner (dutch treat) at one of Concordia's many dining establishments, and you're welcome to stay the night at the Super 8, Holiday Inn Express or Rodeway Inn, especially if you plan to attend policy drafting the next day.

Kansas Farmers Union members are invited to participate in **drafting our organization's policies** on Saturday morning. We will meet at 9

a.m. in Room 257 at Cloud County Community College. Please park in Lot #3 or 4, stair and elevator access will be available.

Following policy drafting, there will be time to tour many historic locations like the Cloud County Historical Museum, National Orphan Train Museum, Brown Grand Theatre, and Sisters of St. Joseph Nazareth Motherhouse. Kansas Farmers Union will coordinate these tour stops, and more information can be found as it becomes available at www.kansasfarmersunion.org.

Please join us October 5-6 for this great opportunity to observe renewable energy and draft KFU policies.

## CALENDAR OF EVENTS

**September 5**
Kansas Farmers Union/Farmland Industries history presentation at 4 pm at Manhattan Library. See pg 8

**September 10-11**
Fall Forage Tour and Livestock Watering Workshop in Republic County. 785-562-8726

**September 19-20**
Beginning Farmer Workshop and High Plains Food Co-op Tour in Northwest Kansas. See Page 1 for info.

**September 21**
Strategic Marketing Workshop and Farm Tour for Livestock Producers at the American Legion in Concordia from 9am-5pm. 785-764-3481.

**October 5**
Renewable Energy Tour. 785-527-0941

**October 6**
Policy Drafting at 9 a.m. at Cloud Community College

**November 30-December 1**
Kansas Farmers Union Convention in Topeka.

*For more information on all of these events, visit kansasfarmersunion.org or call 620-241-6630*

# Fall Forage and Livestock Watering Tour

**Fall Forage Tour**: Dale Strickler Farm - September 10 at 1 p.m. Meet 1 mile south of Courtland. Dale is grazing 1 cow/calf pair on 1.3 acres, year round, with very little hay.

The tour will discuss: What carrying capacity and weaning weights can be achieved with optimum management? Is it possible to graze 12 months a year and eliminate feeding hay? Is it possible to have more production and profit from grazing crops w/animals than harvesting the grain?

Tour includes Dale's Cow/Calf Operation and many forage and grass varieties providing much information. Sponsored by Star Seed. For questions call Dale Strickler 785-614-2031.

**Electric Fence/Livestock Water Workshop, Sept. 11**, held at Jamestown Log Cabin Retreat and Dale Strickler Farm. Registration is free and

starts at 8:30 a.m. at The Lodge, 250 Xavier Road, Jamestown. 9 a.m. to 4 p.m. Indoor Workshop and Outdoor Classroom
PLEASE RSVP FOR HANDOUTS AND LUNCH TO: Mary at 785-562-8726 or kfu.mary@gmail.com

Mark Green, Missouri NRCS Grazing Specialist, will be discussing and demonstrating the latest in electric fence products, the pros and cons to various types of materials used in electric fence construction and installation techniques. Various livestock watering systems will be discussed. Pros and cons to permanent water vs portable water. Alternatives to getting water out to pastures.

This workshop is sponsored by USDA RMA, Kansas Graziers, KRC, Kansas SARE, Kansas Center for Sustainable Agriculture and Alternative Crops, and KFU. Lunch provided by Star Seed.

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1 p. 195

# PRESIDENT'S REPORT By DONN TESKE

In this report I should be talking to you about the need for a farm bill to be passed right away, anyone in ag can see that **our best chance for the best farm bill we can hope for is now and not later** when more cuts to the national budget will surely be coming at us.

And in this light I should be talking about the multi-organizational farm rally to be held in DC on Sept 12 pushing for a farm bill now. However to you all reading this I'm preaching to the choir.

What I really want to visit with you all about is Les Olsen.

Les passed on last week and we saw him off on Friday. Les was a dear, dear friend and a mentor.

If you grew up in ag in Kansas, Les had an influence on you whether you knew him personally or not. In his quiet humble manner, usually working in the background, he was extremely influential in the direction ag education evolved here in Kansas. He spent many years in the state education department and served as the state advisor to Kansas FFA.

Huge numbers of Kansans in ag knew Les and I'll bet most liked him, respected him, and considered him a friend. He was just that kind of a man. Unlike me, he could make things happen and influence change without creating controversy.

Always he conducted himself with dignity.

I remember Les from my high school days when he was an ag advisor from another school but when I really became close to him was during our time together in the NYFEA. The National Young Farmers Educational Association was a bunch of grown up FFA'ers.

Les started the Kansas chapter (KYFEA; Kansas Young Farmers Educational Assn.) and my chapter, Onaga, was one of the strongest in the state, mostly as a result of the stewardship of Barb Rezac.

Now the Onaga chapter has evolved into an FFA alumni association as I assume most of the others have too. In 1988 the national organization numbered over 70,000 and is still active in other states to this day. I think the KYFEA was one of Les's pet projects.

Local chapters would host a state Young Farmer tour each summer and we would often have about 400 in attendance. It was a great learning experience and a great bonding time for us all as was our annual convention. Onaga hosted two summer tours over the years and Kathy and I were the chairmen of one of them in 1986.

(Worthless trivia, it seems many NFYEA'ers ended up migrating to Farmers Union. At one point there were five of us former state presidents of Young Farmers serving on the NFU board together, Kent Peppler, Rocky Mountain FU; Arthur Douglas, Utah FU; Russ Kremer, Missouri FU; Joe Logan, Ohio FU; and myself)

I often reflect on these times and I think it still has a great influence on what I do as KFU president. During my terms with the Kansas Farmers Union I have tried to expand our experiences and focus beyond legislation to include a stronger facet of adult education.

I often bring in speakers to our state convention that might be considered socially inappropriate for our membership but I want to broaden our thought process and give an opportunity for one to think for themselves. I think that is a direct result of Les's influence on me.

In 1988 both Les and I were selected to serve on the national board of the NYFEA. During this service Les was the person who took me on my very first airplane trip in 88. (I was 33 at the time, man how things have changed, it seems like I'm flying all the time now)

Les showed me how to use satellite parking at the KC airport, how to travel efficiently, how to travel and function in DC, and also how to function in DC politics. Quite a mentor!

It seemed over the years Les and I grew always closer. He asked me to come and speak to his chapter of the Lions club in Holton a few years back, and I was extremely honored when I was invited to join his family at Les and Corrine's' 50th wedding anniversary.

A couple of years back the KYFEA held a reunion in Jewel, Kansas. Les wanted to go badly and asked if I would ride over with him. A blizzard was on the horizon and roads were questionable but Les was adamant that we go anyhow. When we met up to head over I wanted to drive (I'm not a good passenger in the best of conditions) but Les insisted. He drove like a madman and I was gripping the armrest and praying to get home safely but the trip turned out uneventful and the reunion was special.

The status of our relationship concerned me early on, as I evolved into my current role in an alternative position in ag and rural Kansas advocacy, that our friendship might wane with me taking a path much different than most FFA'ers in Kansas have done. But that was not the case and it seemed to just strengthen our friendship.

How appropriate that on his

**Continued on Page 8**

---

## CONVENTION CALL

Pursuant to the By-Laws of the organization, notice is hereby given that the annual convention of the Farmers Education and Cooperative Union of America, Kansas Division (Kansas Farmers Union) will convene in the Ramada Inn in Topeka, Kansas on November 30, 2012 at 1 p.m. and will continue through Saturday, December 1, 2012, or until all business has been transacted.

The basis of representation in the Kansas Farmers Union convention, as provided by the By-Laws, shall be one delegate from each chartered county union per 20 dues paying members, or a majority fraction thereof, plus one delegate vote.

Credentials blanks will be mailed in October to county secretaries and county presidents and these should be returned to the state office not later than November 16, 2012. If they are not submitted in advance, they must be brought to the convention by the proper county officials and submitted at the time of registration.

Donn Teske, President                    Callie Kramer, Secretary

KANSAS KONTACT.pdf

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1 p. 196
KANSAS KONTACT_HAY_000360

## President
### from Page 7

memory table they placed the FFA figure of the advisor, the owl, known for it's wisdom.

Not only does this honor Les' many years as state FFA advisor but I look at it as also honoring him for his wisdom mentoring all of us out here beyond FFA who he has advised in his normal humble way over his many years of service, both on the job, and off.

Rest in peace Les, I will miss you. And good job!

**Larry Mitchell** was recently named the head of the USDA Grain Inspection, Packer and Stockyard Administration. (GIPSA)

Larry will do a great job. His Texas farming background has his feet firmly planted in the land, (maybe other stuff too), and he knows agriculture in and out. He started out his tenure in D.C. with the American Agriculture Movement (AAM), and then he was National Farmers Union's big dog lobbyist, which is when I first met him. During the Clinton Administration he was in the USDA in D.C. Larry's kind of done it all.

I think Larry's history in D.C. will make him as effective a GIPSA administrator as one can hope for. He knows where a lot of the skeletons are buried in D.C. and he knows how to groom who to make things happen.

He has big shoes to fill replacing J Dudley Butler.

Larry is pushing up-hill against pretty formidable odds but I can't think of a better person right now to be doing the pushing than Larry.

Good luck D.C. Plowboy.

Ever wonder how **Farmland Industries** evolved into the giant Co-op it became? Wonder what happened to Far-Mar-Co? How is Kansas Farmers Union involved in the roots of Farmland?

Syndee Adams, a K-State senior, has done a summer intern project for the Ogallala Commons and the Kansas Farmers Union. She has spent the summer deep in the bowels of Hale Library on the K-State campus in the Special Collections department scrounging through 106 boxes of documents and photo's donated to the library by Farmland Industries. She has scanned gobs of stuff that she is compiling into a database that we hope to make available on the KFU website in the future.

On Wednesday, Sept 5 at 4 P.M. at the Manhattan Public Library (2nd floor) Syndee will be offering an open to the public presentation on what she has found out in her research.

There will be fascinating information and lots of really neat photos and history of Kansas agriculture as it evolved since 1917.

A teaser: In the first box we found the original minutes of the first meeting when 37 members of Kansas Farmers Union formed the "Kansas Farmers Union Jobbing Association."

---

# Communications Report By Lauren Clary

This summer I have been going through old issues of the Kontact, scanning them and creating digital files of each newsletter. We have a room with rolled up newsletters, dating back to 1977.

Even though I'm new to the organization, I'm having a lot of fun going through Kansas Farmers Union's rich history.

So, for my report, I'm going to show you some of the interesting things I've found.

**August 1980**: John Stencel, President of Rocky Mountain Farmers Union, said "Agriculture is a key to correcting our present economic ills and better prices will keep us on the land and put people back to work. When will we (farmers) ever learn to unite, organize and get those commitments to family agriculture?"

**August 1980**: Dale Lyon, President of Kansas Farmers Union, said "In Kansas, only

Farmers Union stands out as an institution and a philosophy dedicated to the family farm and its future."

"Farming must be profitable and farmers must control the land. Such is the very definition of family farm agriculture."

**Sept 1977**: KFU President Dale Lyon on the 1977 Farm Bill: "Last time it took 17 years from the time Roosevelt and the Congress committed themselves to farm income before the farmer got a law requiring 90% of parity for farm commodities. Charlie Brannan was Harry Turman's Secretary of Agriculture when he had the 90% parity law. Farm income was highest for the longest period of time during those years than any other time in history.

"It was not the "free market" but a sound farm program that brought good prices for farmers. That is reality. It still

is. The 1977 Farm Bill is a beinning. Seventeen years is too long a time to wait for fair prices, however."

**Sept 1981**: Ivan Wyatt, KFU President on the 1981 Farm Bill: "Farmers need an immediate rollback of inter-est rates and an increase in support proces or there will be a devastating loss of family farmers this year. And that loss will send ripples throughout the American economy and not just the farm sector."



McPherson County FU President Daryl Larson talks to a reporter from a German newspaper about how the drought that is affecting this corn field and his other crops and livestock. During August, Kansas Farmers Union received several phone calls from US and international reporters who wanted to know how the drought and heat is affecting Kansas farmers and ranchers.

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1 p. 197

HAY_000361

# Projects Report by Nick Levendofsky

Last March, philanthropist Howard Buffett told National Farmers Union members that 1.5 million families in the U.S. live in poverty.

"We should be ashamed of that," he told the opening session of the 110th annual National Farmers Union convention in La Vista, Neb. "That's challenging our country's soul. We tell people we feed the world, but we're not feeding our own country."

Buffett, son of Omaha billionaire Warren Buffett, is a farmer by trade, with a 1,240-acre family farm in Illinois, a 400-acre farm in eastern Nebraska that his son is now farming, and two foundation-operated research farms in Illinois and South Africa. He spends much of his time now managing the philanthropic Howard G. Buffett Foundation, dealing with hunger issues around the world.

Early last year, the NFU board backed a drive to raise funds for Feeding America, which aims to feed America's hungry through a nationwide network of member food banks.

Buffett pledged to match the drive up to $50,000, and generous NFU members topped his donation with $55,000. By the end of the night, Buffett put his money where his mouth is, and added another $50,000 beyond his match for this year's drive.

He also gave attendees a heads up on a new program called "Invest an Acre," in which farmers will be asked to give the proceeds of 1 acre of crops to an anti-hunger program, such as a food bank or meals on wheels. More information can be found at www.investanacre.org.

"Who better than the U.S. farmer to step up?" he said to

the opening banquet crowd. "We can lead by example. This group can do it and is doing it."

What can Farmers Union members do to help solve the hunger problem? It's as easy as making a donation through our partnership with Feeding America, and thanks to Buffett's $50,000 challenge match from the Howard G Buffett Foundation, your gift will have twice the impact.

I urge you to accept the Howard G. Buffett Foundation challenge and help families struggling with hunger in your community and across America. For more information, and to donate, visit kansasfarmerunion.org or call 620-241-6630 and we will mail the donation forms to you. The campaign concludes on Dec. 15, 2012.

One thing you can do on a local level is to volunteer at your local food bank or you can

contribute to the food bank directly. Republic County Farmers Union recently formed a partnership with a local grain elevator and started a locally driven anti-hunger program called "Grains for Groceries." During harvest, farmers are invited to donate at least one bushel of grain to a special account set up for the Republic County Food Bank. The Republic County Ministerial Alliance, the governing body of the food bank, can then sell the grain whenever they choose, and they can use the funds to purchase necessary items for the food bank.

Working together, we can help solve the problem of hunger in our communities. As anthropologist Margaret Mead once said, "Never doubt that a small group of thoughtful, committed citizens can change the world; indeed, it's the only thing that ever has."

# Membership Report By Mary Howell

For years I have been fortunate to be a part of, as well as organize, many farm tours. I have yet to go to someone's farm or business and not learn something that I could apply to my own situation.

The other thing I have discovered is the value of those producers sharing with their guests the secrets of what makes their farm successful, valuable information that they have picked up over the years, and answers to the questions that producers may ask them.

They allow us to look at the good, the bad and sometimes even the ugly of their operations. I don't think that I have met a farmer yet that hasn't made a mistake of some kind that he would never do again. Most of the tour hosts will very openly share the information the inquiring minds on the tour want to know.

Over the years I have come to appreciate the fact there is not enough time or money for each of us to learn the hard way and make all the mistakes ourselves. By sharing what all of us know with our fellow farming and ranching friends we can become very successful. The other thing that I find very interesting is that this same group of agricultural producers; be they livestock, gardening or specialty crops are not afraid to share their knowledge, fearing that the guests doing the asking will take the success and profit they are making away from them.

Having said all of this, if you were not on any of the tours that we have offered this summer, you have missed some golden opportunities. The on farm tours to the Emporia, Lawrence and Edgerton areas and the Grazing Workshops in

Topeka and Hays were full of very worthwhile and useable knowledge that could be taken home and put straight to use.

To all of the gracious farm tour hosts, I sincerely thank you and appreciate you agreeing to let us come visit your farm and sharing your passion for your farming venture with us. We could tell that you love what you do. Many, many THANKS!

To our beginning farmers, I hope that you find the time spent with us was very helpful and you will allow us to continue to be your farming friends and let me know how I can be of further assistance as you join the ranks of the American Family Farmers who so diligently work to put food on tables and produce all of the other products that consumers rely on us to provide.

There is still time to join in

the last tour this summer and farm transitioning workshop in Atwood Sept 19-20, or the Fall Forage Tour and Fencing and Water Development Workshop at the Jamestown Marsh Area south of Courtland, Sept 10-11. There is no registration fee for any of these tours.

Finally......rain at last; the comforting sounds of much needed precipitation, as the rain drops fall upon the parched earth. I almost forgot how wonderful it is to listen to. Windows open....Fresh air. I hope the forecast for most of the state to get measurable amounts of nurturing rain came to your farm.

### Jim Gerrish Workshops

There is no way to condense all of the information that we learned during the two day

**Continued on Page 10**

KANSAS KONTACT.pdf

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 11 p. 198
KH_HAY_000362

## Membership
## from Page 9

workshops with Jim Gerrish. This was the second Kansas Tour for Jim. In 2011 Jim presented five one-day workshops around the state and this year the workshops were two days each in Hays and Topeka.

This year allowed for more information on grazing education, livestock management and the business aspects of ranch management. In addition to teaching the grazing terminology, how to set up and manage grazing systems for success, Jim included very valuable ranch management information. He stressed the fact that ranch managers should know that their job is to manage the ranch and the grazing animal so that the animal does its job. Information and suggestions for coping with and surviving the continuing drought situation were included in each topic as it was discussed.

The following three brief overviews based on my interpretation of major discussion could be applied to any ranching operation for increased production and profitability.

1) Better management of forage resources with rest and recovery for the plant will create increased plant health and production on grazing acres. Jim explained the effects of stress to the plant health of the good, desired forage species due to the grazing animal continually biting off the re-growth; before the roots get recharged (fed) from the photosynthesis the leaves provide for plant vigor. The good plants that the cows like, get weaker and may eventually die; allowing the less desirable forages and forbs to increase.

2) Every ranch has cows that rank in the best 1/3 of the producing females, a bottom 1/3 of the poorest performing cows and the middle third. The

ranch manager should always be keeping track of the bottom third and work to eliminate those animals that are not fulfilling their job description as mothers, whatever the reason. Especially in times of drought those cows could go to town and the resources they consume be allocated to the better performing 2/3's of the herd. This type of critical culling results in continual improvement of the herd; especially if replacement heifers come from the ranch genetics.

3) It is always easier to keep the body condition on the cow rather than to try to feed her extra to put the pounds back on her after weaning her calf. Cows that go into fall and winter thin, most likely will stay at a lower nutritional state, calve thinner and often do not rebreed for the following season. The cows that are experiencing drought condition grazing will benefit from early weaning. The pressure from producing milk will be lessened and the cow will remain in better shape. It is much cheaper to feed the calf than to feed the cow extra to meet her nutritional needs.

Thanks to Jim for his educational trip to Kansas. We wish him continued healing as he recovers from a rather severe ATV mishap while building electric fence on his Idaho ranch. We all need to take the time to practice farm safety as we go about our daily work.

---

## Patronize Your Local Farmers Union Agent

A portion of the gross income sales in Kansas comes back to Kansas Farmers Union to support your policies without any influence on what those policies should be.

| Agent | County Represented | Telephone |
|---|---|---|
| Stacey Addison | Hamilton, Grant, Morton, Stanton, Wichita, Kearny | 620-384-5402 |
| Art Alcala | Leavenworth, Wyandotte, Douglass, Jefferson, Shawnee | 785-266-2708 |
| Matthew Anderson | Mitchell, Lincoln, Ottawa | 785-738-5701 |
| Fred Behrens | Marshall | 785-562-3789 |
| Roger Blaken | Clay, Washington | 785-632-3306 |
| Richard Boxum | Osborne | 785-454-3870 |
| Ron Buddenhagen | Labette, Montgomery, Cherokee, Crawford | 620-421-4360 |
| Jerry and Jeff Cady | Marion, Chase, Lyon | 620-382-3282 |
| Phillip Chaney and | Neosho, Allen, Wilson, Labette, Woodson, | 620-431-6290 |
| Roy McCoy | Crawford | 620-431-4234 |
| Ron Clark | Logan, Gove, Trego, Thomas, Cheyenne, Rawlins, Sherman, Wallace | 785-672-3231 |
| Tom Clark | Republic | 785-374-4446 |
| Tim Dycus | West District Manager | 785-201-2202 |
| Nicole Faulconer | Finney | 620-275-6741 |
| Greg Frank | Smith | 785-282-6658 |
| John Geier | Ford | 620-225-0999 |
| Jim Gierhan | Clay, Dickinson, Washington | 785-632-3264 |
| Hanna Glantz | Pottawatomie, Riley, Geary, Wabaunsee, Morris, Jackson | 785-456-9077 |
| Jeff Kindel | Cloud, Republic, Ottawa | 785-243-1571 |
| Trent Lebahn | Eastern District Manager | 785-825-2941 |
| Katie Limon | Haskell, Morton, Seward | 620-649-2840 |
| Rick Lindblom | Saline, Dickinson, Ottawa | 785-827-1011 |
| Mario Lopez | Finney | 620-271-0844 |
| Randy Mader | Ellis, Ness, Trego, Russell | 785-628-6134 |
| Jerry Nolte | Nemaha, Brown, Atchinson, Doniphan | 785-336-2040 |
| Jason Ortman | Jewell | 785-378-3212 |
| Thomas Rice | Norton, Phillips, Rooks | 785-543-3103 |
| Ty Racette | Pawnee, Barton, Edwards, Rush, Stafford, Ford | 620-804-6131 |
| Nicole Schaller | Comanche, Clark, Edwards, Hodgeman, Kiowa, Meade | 620-659-2011 |
| David Snyder | Pawnee, Pratt, Stafford | 620-285-6867 |
| Todd and Evan Whitehilll | McPherson, Reno, Rice | 620-241-1918 |
| Steve Yearout | Sumner, Harper, Cowley | 620-326-2021 |
| Stan Brown | General Manager Midwest Agency | 402-483-1045 |

KANSAS KONTACT.pdf

RDHB_HAY_000363

## SPECIALITY CROP FARMS
### CONTINUED FROM PAGE 2



Jack Wilson stands in front of his harvested lavender bushes and explains the best way he and his wife, Kathy, have found to grow lavender. He said the most important thing is to make sure it has lots of air circulation, because lavender is susceptible to mildew and rot.

### Washington Creek Lavender

**Owners**: Jack and Kathy Wilson
**Crops grown**: lavender for decoration, air fresheners, dryer sheets and cooking
**Marketing**: online, Lawrence Farmers Market and area grocery stores
**Farming practices**: certified organic

**Other**: The Wilsons gave up their big city careers, moved to Kansas and started growing lavender in 2008. Jack said to be a farmer, you "have to have another job or lots of money, have great friends and people that know farming, and have to have passion."

They are in the process of building a hoop house and plan to build a store on their farm.



Lee Quaintance checks to see if his chickens have layed any organic eggs. Lee produces all of the organic grain he feeds to his chickens and markets it to other chicken producers.

### Soaring Eagle Organic Farm

**Owners**: Lee and Cindy Quaintance
**Crops grown**: spelt, wheat, corn, clover seed, soybeans, barley, sorghum, buckwheat
**Animals**: chickens for meat and eggs, cattle

**Marketing**: online and word of mouth. Lee said his organic grains are very popular with farms raising organic chickens and meat animals.
**Farming practices**: certified organic
**Other**: Lee Quaintance said he gave up chemicals on his 400 acres in 1993 and became certified organic in 1996.

### Pendleton's Country Market

**Owners**: John and Karen Pendleton
**Crops grown**: flowers, asparagus, eggplant, spinach, rhubarb, tomatoes, sunflowers, green beans, lettuce, kale, peppers, sweet corn, herbs (basil, dill, rosemary, etc), pumpkins
**Marketing**: CSA (Community Support Agriculture), on farm store and Lawrence Farmers Market
**Farming practices**: conventional, hydroponic, hoop houses
**Other**: The Pendleton's started growing produce, with a half acre of asparagus, in 1980 during the farm crisis in order to diversify their farming operation. They sold at Farmers Markets and were open from April 15-Memorial Day, which left time to manage the traditional/conventional side of the operation (raising corn, soybeans, etc.). Starting in 2006, they rented out the conventional acres and focused on the Country Market. The Market now sits where John's father use to run a cattle feedlot.

Pendleton's also does some Agritourism on their farm. They use to have corn mazes, although stopped several years ago because it wasn't making enough money to justify the work involved. Now they have a Butterfly Bio Villa, where they fill a hoop house with 12 native butterfly species. John admitted it doesn't make a huge profit, but he has a lot of fun with it.

One major aspect of Pendleton's is flowers. They grow perennials for customers to take home and plant, sell to area flower shops and supply arrangements for weddings and other area events. John said in the peak wedding season (June-Oct) they supply flowers for 2-4 events each weekend.

Pendleton's CSA offers the traditional pick up at the farm option, but also has other places and times to pick up shares. The most unique option is punch cards, where members get a $15 punch card to buy whatever products they want at the farm or Farmers Market. John said, "I hated the thought of saying come pick up your share on Tuesday from 4 to 6, let alone making them pay ahead."



John Pendleton names off the different varities of flowers that Pendleton's grows, markets to area flower shops and uses to make arrangements for summer weddings. In August they will collect butterflies off this field for their Butterfly Bio-Villa.

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 11 p. 200

KANSAS KONTACT.pdf

RD_US_HAY_000364



# Kansas Farmers Union

Kansas Farmers Union
P.O. Box 1064
McPherson, KS 67460
(620) 241-6630
www.kansasfarmersunion.org

**Return Service Requested**

NonProfit Org
U.S. Postage PAID
Permit # 346
McPherson, KS 67460





Jessica Pierson shows tour attendees where she keeps their Boer Goats. She and her partner Jen raise the goats for meat.

## By the Numbers: 2012 Drought

**Kansas' corn crop is in its' worst condition ever recorded at 44% "very poor."**

**67% of Range and Pasture conditions are rated at "very poor."**

**63% of Subsoil Moisture rated as "very short."**

**Average max temperature in July in Wichita is 92.4. This year: 102.2.**

**Average Summer (June-Aug) Percipitation in Wichita: 12.22 inches. This year: 6.19 inches.**

*Courtesy Ntl Weather Service/Kansas Ag Statistics, as of Aug. 27*

### The Red Tractor Farm

**Owners**: Jessica Pierson and Jen Humphrey
**Crops grown**: tomatoes, potatoes, squash, cabbage and other vegetables
**Animals**: meat goats and chickens for eggs
**Marketing**: Lawrence Farmers Markets and Lawrence restaurants

**Farming practices**: conventional, but in the process of becoming organic. hoop houses
**Other**: Jessica Pierson gave us a tour of the farm and also joined us at her neighbor's, Washington Creek Lavender. She moved out to the farm in 2008 with her father, later that year he passed away and she was thrown into agriculture without much experience. She decided to raise goats and expanded from there.

KANSAS KONTACT.pdf

**In the United States District Court**
**For the District of Kansas**

---

**United States of America,**
     Plaintiff,


v.                              **Case No. 2:19-cr-20044-JAR-1**


**Bruce L. Hay,**
     Defendant.

---

**Defendant's Motion to Exclude Expert Opinion Testimony**

---

Pursuant to Rule 704(b) of the Federal Rules of Evidence, defendant Bruce L. Hay moves the Court to preclude the government's expert witness from offering an opinion about Mr. Hay's state of mind. The following explains.

**Argument and Authorities**

Opinion testimony generally isn't "objectionable just because it embraces an ultimate issue."[1] But there's an exception to this general rule. In a criminal case like this one, "an expert witness must not state" that the defendant had (or didn't have) a particular mental state if that mental state "constitutes an element of the crime charged."[2]

---

[1] Fed. R. Evid. 704(a).

[2] Fed. R. Evid. 704(b).

One of the crimes charged here is wire fraud.[3] One of the elements of that crime is a particular state of mind: namely, an intent to defraud.[4] The phrase "to defraud," in turn, means to deprive another of money or property "through deceit or misrepresentation."[5] In order to commit wire fraud, a defendant must therefore harbor an intent to deprive another of money or property through such means. Consequently, allowing the government's expert witness to testify that Mr. Hay acted with the intent to deprive the government of money or property through deceit or misrepresentation would be "substantively indistinguishable from" allowing her to testify that Mr. Hay harbored the requisite intent to defraud.[6]

Yet it appears that this is precisely the type of opinion testimony that the government's expert witness intends to offer at trial. As a part of the government's expert disclosure, counsel received a written letter for government's expert, Danielle A. Becker. In her July 15, 2022 letter to the government, for instance, Danielle A. Becker, MD, MS, opines that Mr. Hay was "malingering"—a term that Dr. Becker uses to describe not just a general "feigning of symptoms," but "the feigning of symptoms *for a specific purpose*."[7] Likewise, Dr. Becker opines not only that Mr.

---

[3] Doc. 68 at 1.

[4] *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003); *see* 18 U.S.C. § 1343.

[5] *Welch*, 327 F.3d at 1106.

[6] *United States v. Wood*, 207 F.3d 1222, 1236 (10th Cir. 2000) (holding that a Rule 704(b) violation occurred where, although the expert's opinion testimony was "not cast in precisely the same terminology as the statute, case law, or instruction," that testimony was nevertheless "substantively indistinguishable from" the definition of the requisite mens rea); *see, e.g.*, *United States v. Esch*, 832 F.2d 531, 535 (10th Cir. 1987) (affirming the district court's decision to exclude expert testimony under Rule 704(b) where that testimony "essentially" went to the defendant's intent).

[7] (emphasis added).

Hay "*deliberately* misrepresented" his condition, but that he do so in order to obtain "benefits" and "other compensation" from the government.[8]

In other words, Dr. Becker's ultimate opinion is that Mr. Hay purposefully feigned his symptoms with the intent to deprive the government of money through deceit or misrepresentation. But the intent to deprive the government of money through such deceit or misrepresentation is, by definition, the intent to defraud.[9] And the intent to defraud is "an element of the crime charged."[10] "If believed," Dr. Becker's opinion testimony would therefore "necessarily dictate[] the final conclusion" that Mr. Hay "possessed the requisite mens rea" to commit the charged crime.[11]

Unsurprisingly, courts routinely exclude such opinion testimony—whether offered by the government or the defense—under Rule 704(b). In *United States v. Cunningham*, for instance, the Sixth Circuit held that the district court properly barred the defendants' expert witness from testifying that the defendants "lacked the requisite criminal intent to defraud."[12] Conversely, in *United States v. Cooper*,

---

[8] (emphasis added)).

[9] *Welch*, 327 F.3d at 1104.

[10] Fed. R. Evid. 704(b); *see Welch*, 327 F.3d at 1104.

[11] *Wood*, 207 F.3d at 1236; *see, e.g.*, *United States v. Reyez*, 183 F. App'x 755, 759 (10th Cir. 2006) (holding that the district court abused its discretion by allowing an expert witness to testify that the defendant's behavior "'led [the witness] to believe that [the defendant] had knowledge' of the presence of methamphetamine"; explaining that because this testimony "expressly stat[ed] the final conclusion or inference as to a defendant's actual mental state," it "clearly r[an] afoul of Rule 704(b)" (citations omitted)).

[12] 679 F.3d 355, 380–81 (6th Cir. 2012); *see also United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998) (affirming the district court's decision to exclude expert testimony under Rule 704(b) where the expert would have testified, e.g., that it was "unlikely" the defendant would have "knowingly and willfully submit[ted] false statements to the I.R.S" (citation omitted)).

the district court precluded the government's witnesses from testifying that any particular activity was "'fraud' or 'fraudulent.'"[13] As the district court in *Cooper* aptly put it, "when an expert witness opines that a defendant's activity is fraudulent, the witness expressly draws the conclusion or inference that the defendant acted with the intent to defraud."[14]

In short, allowing Dr. Becker to testify that Mr. Hay "malinger[ed]," "consciously feigned" his symptoms, or "deliberately misrepresented" his condition—let alone that he did so for the "specific purpose" of, or "in . . . pursuit for" obtaining, "benefits" or "other compensation" from the government—would constitute precisely the sort of "intrusion into the province of the jury" that "Rule 704(b) is designed to prevent."[15] The Court should therefore preclude Dr. Becker from offering this (or any other "substantively indistinguishable") opinion testimony about Mr. Hay's state of mind.[16]

## Conclusion

For the reasons discussed above, Mr. Hay asks the Court to preclude Dr. Becker from offering any testimony about his state of mind under Rule 704(b).

---

[13] 286 F. Supp. 2d 1283, 1295 (D. Kan. 2003).

[14] *Id.*; *cf. Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir. 1995) ("The word 'fraud' implies a requirement of intent to deceive . . . .").

[15] *Wood*, 207 F.3d at 1236; *see* Fed. R. Evid. 704(b) ("Those matters are for the trier of fact alone.").

[16] *Wood*, 207 F.3d at 1236; *cf., e.g.*, *United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993) (characterizing the defendant's Rule 704(b) argument as "semantic camouflage"; explaining that even if the defendant's expert witness didn't plan to expressly testify that the defendant lacked the requisite mens rea, Rule 704(b) nevertheless precludes expert witnesses from "stating the bottom-line inference, and leaving it to the jury merely to murmur, 'Amen'").

Respectfully submitted,

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I certify that on July 22, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 19-20044-JAR |
| | ) | |
| BRUCE L. HAY, | ) | |
| Defendant | ) | |
| | ) | |

**JOINT STIPULATION #1**

The parties hereby stipulate and agree to the following with respect to each count

identified below:

**Count 1:** The June 30, 2017 ACH payment transaction identified in Count 1 traveled in,
affected, and flowed in interstate commerce by being transmitted from Illinois to Kansas.

**Count 2:** The August 1, 2017 ACH payment transaction identified in Count 2 traveled in,
affected, and flowed in interstate commerce by being transmitted from Illinois to Kansas.

**Count 3:** The September 1, 2017 ACH payment transaction identified in Count 3
traveled in, affected, and flowed in interstate commerce by being transmitted from
Illinois to Kansas.

**Count 4:** The March 1, 2018 ACH payment transaction identified in Count 4 traveled in,
affected, and flowed in interstate commerce by being transmitted from Illinois to Kansas.

**Count 5:** The May 1, 2018 ACH payment transaction identified in Count 5 traveled in,
affected, and flowed in interstate commerce by being transmitted from Illinois to Kansas.

**Count 6:** The August 1, 2018 ACH payment transaction identified in Count 6 traveled in,
affected, and flowed in interstate commerce by being transmitted from Illinois to Kansas.

The parties therefore stipulate and agree that the United States has satisfied its burden of

proof beyond a reasonable doubt for the required element concerning Interstate Commerce for

each of Counts 1 through 6.  The Defense reserves the right to raise any challenges and

arguments concerning other elements and burdens that are not contained within this stipulation.

1

Dated: July 23, 2022                    Respectfully submitted,

*/s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
Ryan.Huschka@usdoj.gov
KS Bar No. 23840

*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
Chris.Oakley@usdoj.gov
KS Bar No. 19248

United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754

*Counsel for United States*

Dated: July 23, 2022                    Respectfully submitted,

*/s/ Chekasha Ramsey*
Chekasha Ramsey
Federal Public Defender
500 State Ave., Suite 201
Kansas City, KS 66101-2400
(913) 551-6911
Che_ramsey@fd.org
KS Bar No. 78476

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2022, I caused the foregoing pleading to be filed with the

Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

> */s/ Ryan J. Huschka*
> Ryan J. Huschka
> Assistant United States Attorney
> United States Attorney's Office for the
> District of Kansas

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA    )
          Plaintiff,         )
                       )
                       )
       v.                  )        Case No. 19-20044-JAR
                       )
BRUCE L. HAY,             )
          Defendant      )
                       )

## GOVERNMENT'S PROPOSED JURY INSTRUCTIONS

The United States of America, by and through undersigned counsel, submits the attached

proposed jury instructions for the Court's consideration. The parties have consulted and the

Government provided the Defense with the proposed jury instructions, pursuant to the Court's

instructions, and D. Kan. R. 51.1. However, the parties have been unable to agree upon any

proposed instruction. The government will submit is objections to Defendant's proposed jury

instructions separately.

Respectfully submitted,

*/s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Ryan.Huschka@usdoj.gov
KS Bar No. 23840

*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Chris.Oakley@usdoj.gov
KS Bar No. 19248

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2022, I caused the foregoing pleading to be filed with the

Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

## <u>INSTRUCTION NO.</u> ____[1]

The defendant is charged in counts One through Six with violations of 18 U.S.C. § 1343.

This law makes it a crime to use interstate wire communication facilities in carrying out a scheme to defraud. A scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises is a specific type of a scheme to defraud.

To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:    the defendant devised or intended to devise a scheme to defraud, as alleged in the indictment;

*Second*:    the defendant acted with specific intent to defraud;

*Third*:    the defendant used interstate or foreign wire communications facilities or caused another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

*Fourth*:    the scheme employed false or fraudulent pretenses, representations, or promises that were material.

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension.

A "scheme to defraud" includes a scheme to deprive another of money or property.

An "intent to defraud" means an intent to deceive or cheat someone. **Intent to defraud can be inferred from circumstantial evidence considered in its totality.**[2]

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity.

A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

---

[1] Pattern Crim. Jury Instr. 10th Cir. 2.57 (2021) (Wire Fraud). The Government has bolded any proposed modifications to the pattern instructions.

[2] *United States v. Kalu*, 791 F.3d 1194, 1205 (10th Cir. 2015) ("[F]raudulent intent is difficult to prove with direct evidence" and, thus, "it may be inferred from circumstantial evidence considered in its totality."); *United States v. Simpson*, 950 F.2d 1519, 1523-24 (10th Cir. 1991) (approving of similar intent instruction: "Intent may not ordinarily be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind.").

A false statement or omission is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.

**Each separate transmission by wire communication in interstate or foreign commerce for the purpose of carrying out the scheme is a separate violation of the wire fraud statute.[3] An interstate wire transmission is considered to be "for the purpose of carrying out the scheme" so long as the transmission is incident to the accomplishment of an essential part of a scheme.[4] An interstate or foreign wire communication need not itself be false or deceptive, nor necessary or even helpful for the success of the scheme.[5]**

To "cause" interstate wire communications facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course.

---

[3] Pattern Crim. Jury Instr. 11th Cir. OI O51 (2020) ("Each separate use of the interstate [wire] [radio] [television] communications as part of the scheme to defraud is a separate crime."); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir.1995) ("The statute clearly contemplates a separate mail fraud count each time the mail is used to help execute the fraudulent scheme-not each time a misrepresentation is made."); *United States v. Wolf*, 561 F.2d 1376 (10th Cir. 1977) ("Each use of the mails is a separate and distinct offense.").

[4] *United States v. Redcorn*, 528 F.3d 727, 738-39 (10th Cir. 2008) ("The defendant need not have made the transmission personally, merely caused it to be made. It need not be at the heart of a scheme, nor necessary or even helpful for its success; it need not itself be false or deceptive. Rather, as we have said, a transmission is considered to be for the purpose of furthering a scheme to defraud so long as the transmission is incident to the accomplishment of an essential part of a scheme.") (internal quotation marks omitted).

[5] Pattern Crim. Jury Instr. 5th Cir. 2.57 (2019) ("It is also not necessary that the government prove that the material transmitted by wire [radio] [television] communications was itself false or fraudulent, or that the use of the interstate [foreign] wire communications facilities was intended as the specific or exclusive means of accomplishing the alleged fraud."); Pattern Crim. Jury Instr. 11th Cir. OI O51 (2020) ("It also doesn't have to prove that the material transmitted by interstate [wire] [radio] [television] was itself false or fraudulent; or that using the [wire] [radio] [television] was intended as the specific or exclusive means of carrying out the alleged fraud; or that the Defendant personally made the transmission over the [wire] [radio] [television].");
*Redcorn*, 528 F.3d at 738-39.

**INSTRUCTION NO. _____ <sup>6</sup>**

The defendant is charged in counts seven through sixteen with violations of 18 U.S.C. section 641.

This law makes it a crime to steal, embezzle, or convert government property. The defendant is accused of stealing, embezzling, or converting disability or other monetary compensation paid by the United States Department of Veterans Affairs.

To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*: the disability or other monetary compensation belonged to the United States government, namely, the United States Department of Veterans Affairs;

*Second*: the defendant stole, embezzled, or converted the disability or other monetary compensation intending to put it to his own use or gain; and

*Third*: the value of the disability or other monetary compensation was more than $1,000.

"Value" means the face, or market value, or cost price, either wholesale or retail, whichever is greater.

---

[6] Pattern Crim. Jury Instr. 10th Cir. 2.31 (2021)

**INSTRUCTION NO. ____**[7]

Each count of the indictment also charges a violation of 18 U.S.C. section 2, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime. To find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First:*     Every element of the charged crime as outlined in Instructions [] and [] was committed by someone other than the defendant, and

*Second:*     the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

[7] Pattern Crim. Jury Instr. 10th Cir. 2.06 (2021)

# INSTRUCTION NO. _____ [8]

     You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crime charged. The defendant is not on trial for any act, conduct, or crime not charged in the indictment.

     It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person *also* may be guilty is no defense to a criminal charge.

     The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crime charged.

---

[8] Pattern Crim. Jury Instr. 10th Cir. 1.19 (2021)

**INSTRUCTION NO. \_\_\_\_** [9]

In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training, or education, may testify, and state an opinion concerning such matters.

You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

---

[9] Pattern Crim. Jury Instr. 10th Cir. 1.17 (2021)

## INSTRUCTION NO. ____ [10]

      You have heard evidence of other crimes, acts, or wrongs engaged in by the defendant. You may consider that evidence only as it bears on the defendant's intent, plan, knowledge, or absence of mistake or accident and for no other purpose. Of course, the fact that the defendant may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case.

---

[10] Pattern Crim. Jury Instr. 10th Cir. 1.30 (2021)

# In the United States District Court
## for the District of Kansas

**United States of America**,
        Plaintiff,

v.

                                  Case No. 19-20044-01-JAR

**Bruce L. Hay**,
        Defendant.

## DEFENDANT'S REQUESTED JURY INSTRUCTIONS

Pursuant to Federal Rule of Criminal Procedure 30(a), and the deadlines set by this Court, the Defendant, Bruce Hay, by and through counsel, respectfully submits the following proposed jury instructions.

        Respectfully submitted,

        s/Chekasha Ramsey
        CHEKASHA RAMSEY, #78476
        Assistant Federal Public Defender
        500 State Avenue, Suite 201
        Kansas City, Kansas 66101
        Telephone: (913) 551-6712
        Fax: (913) 551-6562
        Email: che_ramsey@fd.org
        Attorney for Defendant

## CERTIFICATE OF SERVICE

I certify that on July 25, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

## PROPOSED DEFENSE JURY INSTRUCTION NO. 1
### Preliminary Instructions Before Trial

Members of the Jury:

At the end of the trial, I will give you detailed guidance on the law and on how you will go about reaching your decision. But now I simply want to generally explain how the trial will proceed.

This criminal case has been brought by the United States government. I will sometimes refer to the government as the prosecution. The government is represented by Assistant United States Attorneys, Ryan Huschka and Chris Oakley. The defendant, Bruce Hay, is represented by his lawyers, Chekasha Ramsey and David Magariel from the Federal Public Defender's Office for the District of Kansas.

The superseding indictment charges Mr. Hay with six counts of wire fraud and ten counts of theft of government funds. The indictment is simply the description of the charge made by the government against the defendant; it is not evidence of guilt or anything else. Mr. Hay pleaded not guilty and is presumed to be innocent of the charge. **This presumption of innocence (1) remains with Mr. Hay throughout every stage of the trial, including, most importantly, during your deliberations, and (2) is extinguished only if all twelve of you unanimously find that the government has proved Mr. Hay's guilt beyond a reasonable doubt. He may not be found guilty by you unless all twelve of you**

**unanimously find that the government has proved his guilt beyond a reasonable doubt.**[1]

The first step in the trial will be the opening statements. The government in its opening statement will tell you about the evidence which it intends to put before you. Just as the indictment is not evidence, neither is the opening statement. Its purpose is only to help you understand what the evidence will be. It is a road map to show you what is ahead.

After the government's opening statement, Mr. Hay's attorney will then make an opening statement.

After opening statements, evidence will be presented from which you will have to listen and determine the facts. The evidence will consist of the testimony of the witnesses, documents and other things received into the record as exhibits, and any facts about which the lawyers agree or to which they stipulate.

The government will offer its evidence. After the government's evidence, Mr. Hay's lawyers may present evidence, but they are not required to do so. I remind you that Mr. Hay is presumed innocent, and it is the government that must prove Mr. Hay's guilt beyond a reasonable doubt. If defense counsel submits evidence, the government may introduce rebuttal evidence.

[1] Sources: Criminal Pattern Jury Instruction for the Tenth Circuit, modified by *Mahorney v. Wallman*, 917 F.2d 469, 471 n.2 (10th Cir. 1990); *United States v. Medlin*, 408 Fed. A'ppx. 203, 206 n.2 (10th Cir. 2011) (unpublished); *see also United States v. Starks*, 34 F.4th 1142, 1159 (10th Cir. 2022). This proposed preliminary instruction was adopted by Judge Daniel Crabtree in a recent District of Kansas case, *United States v. Shiferaw*, No. 2:19-cr-20025-DDC-1. *See* Doc. 215 at 9-10.

At times during the trial, a lawyer may make an objection to a question asked by another lawyer, or to an answer by a witness. This simply means that the lawyer is requesting that I make a decision on a particular rule of law or evidence. Do not draw any inferences or conclusions from any objections or from my rulings on the objections. If I sustain an objection to a question, the witness may not answer it. Do not attempt to guess what answer might have been given if I had allowed the answer. If I overrule the objection, treat the answer as any other. If I tell you not to consider a particular statement, you may not refer to that statement in your later deliberations. Similarly, if I tell you to consider a particular piece of evidence for a specific purpose, you may consider it only for that purpose.

During the course of the trial, I may have to interrupt the proceedings to confer with the attorneys about the rules of law that should apply. Sometimes we will talk briefly at the bench. But some of these conferences may take more time, so I will excuse you from the courtroom. I will try to avoid such interruptions whenever possible, but please be patient even if the trial seems to be moving slowly because conferences often will save time in the end.

You are to consider all evidence received in this trial. It will be up to you to decide what evidence to believe and how much of any witness's testimony to accept or reject.

After you have heard all the evidence on both sides, the government and the defense will be given time for their final arguments.

During the course of the trial, I may ask a question of a witness. If I do, that does not indicate I have any opinion about the facts in the case but am only trying to bring out facts that you may consider.

[Insert Instruction 1.02 here if material on note-taking by jurors is desired.]

[Insert discussion of the elements of the offense here if they are to be set out for the jury in the preliminary instruction.]

During the course of the trial, you should not talk with any witness, or with Mr. Hay, or with any of the lawyers at all. In addition, during the course of the trial you should not talk about the trial with anyone else. Do not discuss the case with anyone or provide any information about the trial to anyone outside the courtroom until the verdict is received. Do not use the internet or any other form of electronic communication to provide any information. Simply put, do not communicate with anyone about the trial until your verdict is received. Also, you should not discuss this case among yourselves until I have instructed you on the law and you have gone to the jury room to make your decision at the end of the trial. It is important that you wait until all the evidence is received and you have heard my instructions on the controlling rules of law before you deliberate among yourselves. Let me add that during the course of the trial you will receive all the evidence you properly may consider to decide the case. Because of this, you should not attempt to gather any information or do any research on your own. Do not attempt to visit any places mentioned in the case, either actually or on the internet, and do not in any other way try to learn about the case outside the courtroom.

The court reporter is making stenographic notes of everything that is said. However, a typewritten copy of the testimony will not be available for your use during deliberations. On the other hand, any exhibits that are admitted into evidence will be available to you during your deliberations.

Now that the trial has begun you must not hear or read about it in the media. The reason for this is that your decision in this case must be made solely on the evidence presented at the trial.

With that introduction, [AUSA] you may present the opening statement for the government.

Source: See ft. n. 1

**PROPOSED DEFENSE JURY INSTRUCTION NO. 2**
**Introduction to Final Instructions**

Members of the Jury:

In any jury trial there are, in effect, two judges. I am one of the judges, you are the other. I am the judge of the law. You, as jurors, are the judges of the facts. I presided over the trial and decided what evidence was proper for your consideration. It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

In explaining the rules of law that you must follow, first, I will give you some general instructions which apply in every criminal case—for example, instructions about burden of proof and insights that may help you to judge the believability of witnesses. Then I will give you some specific rules of law that apply to this particular case and, finally, I will explain the procedures you should follow in your deliberations, and the possible verdicts you may return. These instructions will be given to you for use in the jury room, so you need not take notes.

Source: Tenth Circuit, Pattern § 1.03.

**PROPOSED DEFENSE JURY INSTRUCTION NO. 3**
**Duty to Follow Instructions**

You, as jurors, are the judges of the facts. But in determining what actually happened—that is, in reaching your decision as to the facts—it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However, you should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took.

Source: Tenth Circuit Pattern § 1.04.

## PROPOSED DEFENSE JURY INSTRUCTION NO. 4

## Presumption of Innocence – Burden of Proof – Reasonable Doubt

**As you enter into your deliberations, you must continue to presume Mr. Hay innocent. As I instructed you at the beginning of this trial, the presumption of innocence (1) remains with Mr. Hay throughout every stage of the trial, including, most importantly, during your deliberations, and (2) is extinguished only if all twelve of you unanimously find that the government has proved his guilt beyond a reasonable doubt.[2]**

The government has the burden of proving Mr. Hay guilty beyond a reasonable doubt. The law does not require Mr. Hay to prove his innocence or produce any evidence at all. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if the government fails to do so, you must find Mr. Hay not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the Mr. Hay's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A reasonable doubt is a doubt

[2] Sources: Criminal Pattern Jury Instruction for the Tenth Circuit, modified by *Mahorney v. Wallman*, 917 F.2d 469, 471 n.2 (10th Cir. 1990); *United States v. Medlin*, 408 F. A'ppx. 203, 206 n.2 (10th Cir. 2011) (unpublished); *see also United States v. Starks*, 34 F.4th 1142, 1159 (10th Cir. 2022). This proposed preliminary instruction was adopted by Judge Daniel Crabtree in a recent District of Kansas case, *United States v. Shiferaw*, No. 2:19-cr-20025-DDC-1. *See* Doc. 215 at 9-10.

based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence and the law, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you think there is a real possibility that Mr. Hay is not guilty, you must give him the benefit of the doubt and find him not guilty.

Source: See ft. n. 2

## PROPOSED DEFENSE JURY INSTRUCTION NO. 5
### Evidence - Defined

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed (if any).

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

[if required] During the trial, I did not let you hear the answers to some of the questions that the lawyers asked. I also ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Source: Tenth Circuit Pattern § 1.06.

## PROPOSED DEFENSE JURY INSTRUCTION NO. 6
### Credibility of Witnesses

I remind you that it is your job to decide whether the government has proved the guilt of Mr. Hay beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judge of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses. You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions:

Did the witness impress you as honest?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome in this case?

Did the witness have any relationship with either the government or the defense?

Did the witness seem to have a good memory?

Did the witness clearly see or hear the things about which he/she testified?

Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?

Did the witness's testimony differ from the testimony of other witnesses?

When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

[The testimony of Mr. Hay should be weighed and his credibility evaluated in the same way as that of any other witness.]

[Mr. Hay did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. I want you to clearly understand, please, that the Constitution of the United States grants to a defendant the right to remain silent. That means the right not to testify or call any witnesses. That is a constitutional right in this country, it is very carefully guarded, and you should understand that no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant does not take the witness stand and testify or call any witnesses.]

In reaching a conclusion on particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.

Source: Tenth Circuit, Pattern § 1.08.

## PROPOSED DEFENSE JURY INSTRUCTION NO. 7

## Caution – Consider Only Crime Charged

You are here to decide whether the government has proved beyond a reasonable doubt that Mr. Hay is guilty of the crimes charged. Mr. Hay is not on trial for any act, conduct, or crime not charged in the indictment.

Source: Tenth Circuit, Pattern § 1.19.

**PROPOSED DEFENSE JURY INSTRUCTION NO. 8**

**Elements at Issue**

Mr. Hay entered a plea of "Not Guilty" to the counts contained within the indictment. His plea puts at issue every element of the crime charged, and therefore it is the burden and responsibility of the government to prove beyond a reasonable doubt every element of the crime charged.

Source: *United States v. Allen, et. al.*, 16-cr-10141-EFM, Doc. 384 at 6.

## PROPOSED DEFENSE JURY INSTRUCTION NO. 9

## Wire Fraud

## 18 U.S.C. § 1343

Mr. Hay is charged in counts 1-6 of the indictment with wire fraud, in violation of 18 U.S.C. section 1343.

This law makes it a crime to use interstate wire communication facilities in carrying out a scheme to defraud. A scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises is a specific type of scheme to defraud.

To find Mr. Hay guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*: Mr. Hay devised or intended to devise a scheme to defraud, as alleged in the indictment;

*Second*: Mr. Hay acted with specific intent to defraud;

*Third*: Mr. Hay used interstate or foreign wire communications facilities or caused another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme;

*Fourth*: the scheme employed false or fraudulent pretenses, representations, or promises that were material.

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension.

A "scheme to defraud" includes a scheme to deprive another of money, property, or the intangible right of honest services.

An "intent to defraud" means an intent to deceive or cheat someone.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity.

A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or decision making body to which it was addressed.

To "cause" interstate wire communications facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business.

Sources: Tenth Circuit, Pattern § 2.57; *United States v. Williams*, 865 F.3d 1302, 1310 (10th Cir. 2017).

## PROPOSED DEFENSE JURY INSTRUCTION NO. 10

## Theft of Government Property

## 18 U.S.C. § 641

Mr. Hay is charged in counts 7-16 with violations of 18 U.S.C. section 641.

This law makes it a crime to steal government property. Mr. Hay is accused of stealing disability compensation.

To find Mr. Hay guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*: the disability compensation belonged to the United States government, namely the United States Department of veteran Affairs.

*Second*: Mr. Hay took the disability compensation knowing that it was not his and intending to deprive the owner of the use or benefit of the disability compensation; and

*Third*: the value of the disability compensation was more than $1,000.

Source: Tenth Circuit, Pattern § 2.31

**PROPOSED DEFENSE JURY INSTRUCTION NO. 11**

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crime charged. The defendant is not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crime charged.

Source: Tenth Circuit, Pattern § 1.19. (*modified*)

<u>**CLERK'S COURTROOM MOTIONS/MISCELLANEOUS MINUTE SHEET**</u>

UNITED STATES OF AMERICA,                    AUSA: Chris Oakley/Ryan Huschka

                  Plaintiff

     v.                                                          CASE NO: 19-20044-01-JAR

BRUCE L. HAY,                                          Def Atty: Che Ramsey/David Magariel

              Defendant

| JUDGE: | Julie A. Robinson | DATE: | 7/26/2022 |
|---|---|---|---|
| DEPUTY CLERK: | Bonnie Wiest | REPORTER: | Dani Murray |
| INTERPRETER: | | PROBATION: | |

# IN LIMINE CONFERENCE

This case comes before the Court for an In Limine Conference. The government appears by its attorneys, Chris Oakley and Ryan Huschka. The defendant appears in person and by his counsel, Che Ramsey and David Magariel.

After hearing argument of counsel, and for reasons set forth in full on the record, the Court rules on the following motions:

1. Motion in Limine filed by Defendant (<u>Doc. 80</u>):
   - Item 1: Anonymous call, complainant, or hearsay information provided by the anonymous complaint – **GRANTED.**
   - Item 2: Testimony of Dr. Emmett McWoods on Mr. Hay's mental state, specifically any statement that "I think he is running a scam." – **DENIED AS MOOT.**
   - Item 3: Any testimony by government investigative agents or VA OIG against that Mr. Hay's behavior is inconsistent with his symptoms of choreiform and conversion disorder: **GRANTED.**
   - Item 4: Any evidence or testimony by government witnesses that Mr. Hay was falsifying or faking his symptoms of conversion disorder, generalized choreiform movement disorder, weakness in left and right lower legs, and major depression: **GRANTED.**
   - Item 5: Testimony or evidence that the VA and the Social Security Administration terminated Mr. Hay's benefits as a result of the investigation or based on a finding that he engaged in fraud by falsify8ing his symptoms of conversion disorder, which is also contained in government exhibits 210-211 and 213-214: **GRANTED.**

- Item 6:  Mr. Hay's receipt of subsidies from his farm and gov. exhibit 325: **DENIED WITHOUT PREJUDICE.**
- Item 7:  Civil dispute between Linda Hay and Bruce Hay:  **DEFERRED RULING.**
- Item 8:  Allegations of child abuse:  **GRANTED AS UNOPPOSED.**
- Item 9:  Evidence that Mr. Hay's children were improperly restrained during the 2005 car accident – **GRANTED AS UNOPPOSED.**
- Item 10 and 11:  Mr. Hay's attending anger management classes; and Mr. Hay going through parenting classes, kicking his 10-year-0ld child, and SRS mandated parenting classes containing in government exhibit 202 – **GRANTED AS UNOPPOSED.**
- Item 12:  Total Estimation of Loss:  **GRANTED IN PART AND DENIED IN PART.**
- Item 13:  Government Exhibit 71:  **DENIED AS MOOT IN PART AND DEFERRED RULING IN PART.**
- Item 14:  Government Exhibit 101:  **GRANTED to the extent the motion seeks to remove the agent's opinions for the summary.**
- Item 15:  Government Exhibit 134:  **GRANTED IN PART AND DENIED IN PART.**

2. Motion to Exclude Expert Opinion Testimony filed by Defendant (Doc. 82): **GRANTED.**
3. Government Exhibit 74:  **DEFERRED RULING**


The Court takes up housekeeping matters.  Rule invoked.  Jury trial set to begin on August 1, 2022, at 9:00 a.m.  Estimated time of trial is 10 days.  Lafler-Frye query.

Court recesses - The defendant remains on release.

1              UNITED STATES DISTRICT COURT
                    DISTRICT OF KANSAS
2

UNITED STATES OF AMERICA,        )
3                                )
          Plaintiff,             )
4                                )
vs.                              ) Case No. 19-CR-20044-JAR
5                                )
BRUCE L. HAY,                    )
6                                ) Kansas City, Kansas
          Defendant.             ) Date:  26 July, 2022
7    ...........................

8                        REDACTED
          TRANSCRIPT OF MOTIONS IN LIMINE HEARING
9          BEFORE THE HONORABLE JULIE A. ROBINSON
          SENIOR UNITED STATES DISTRICT COURT JUDGE
10

11                A P P E A R A N C E S

12   FOR THE PLAINTIFF:

13          Mr. Ryan Huschka
            Mr. Christopher Oakley
14          OFFICE OF THE UNITED STATES ATTORNEY
            500 State Avenue
15          Kansas City, Kansas 66101

16   FOR THE DEFENDANT:

17          Ms. Chekasha Ramsey
            Mr. David M. Magariel
18          OFFICE OF THE FEDERAL PUBLIC DEFENDER
            500 State Avenue
19          Suite 201
            Kansas City, Kansas 66101
20

21

22

23

24   _____
          Proceedings recorded by machine shorthand,
25    transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2           THE COURT:  We're here in United States versus Bruce

 3   Hay.  The case number is 19-20044.

 4           Your appearances, please.

 5           MR. HUSCHKA:  Ryan Huschka on behalf of the United

 6   States, Your Honor.

 7           MR. OAKLEY:  Chris Oakley on behalf of the United

 8   States, Your Honor.

 9           MS. RAMSEY:  Che Ramsey and David Magariel on behalf

10   of Bruce Hay who appears with counsel.

11           THE COURT:  All right.  So of course we are scheduled

12   to start trial next Monday in this case.  So some matters to

13   take up today ahead of that, first I'll acknowledge that I've

14   received the joint stipulation, Document 83, that you all filed

15   on July 23rd stipulating on Counts 1 through 6 that the

16   payments flowed through interstate commerce.  So that's part of

17   the record and that's something that will be in the jury

18   instructions.  If you would -- the final jury instructions.

19   And of course I assume you're going to want to read that during

20   trial too, and I'll leave that up to you all to decide when to

21   do that, Mr. Huschka.

22           All right.  The main thing, we're going to do some

23   talking about just the trial logistics of the trial and all of

24   that as well, but let's start with the defendant's motion *in*

25   *limine*, which is Document 80.  There's a response from the
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.242

1    government that is Document 81.  Defendant has also filed a

2    motion to exclude expert opinion testimony, which is

3    Document 82.

4         So I'd like to just run through these and tell you my

5    ruling, although there are some of these that I want to ask

6    additional questions.  You may have come prepared, though, to

7    offer oral argument, so if you want to start some oral

8    argument, that's fine too, Ms. Ramsey.

9         MS. RAMSEY:  Your Honor, I don't.  I anticipate -- I

10   tried to lay them out as items so that we can have some order

11   to take them up.  I don't know if possibly after the court's

12   ruling I may have some oral argument.  I don't know where to

13   start unless the court has questions about --

14        THE COURT:  Why don't I run through the items and

15   that's -- I'm glad you organized them that way.  I'll tell you

16   my thoughts.  I've read, you know, the motion and the response,

17   and with respect to those things that I want to hear further

18   from you, I'll let you know.

19        So the first item is the anonymous call.  This

20   investigation was started by the VA Office of Inspector General

21   when it received an anonymous call in 2011.  Defendant is

22   concerned about the jury hearing the statements of the person

23   that gave the anonymous complaint.

24        I think that concern is well taken because those are

25   out-of-court statements.  There's a confrontation clause issue.

DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.243

1   I do think the best way to handle this is to allow someone from

2   the government to testify that this investigation was begun by

3   that particular organization based on an anonymous call and

4   leave it at that, not the substance of the call, just the fact

5   that it started on the basis of an anonymous call.  I think

6   it's fair for the jury to at least hear that.

7        So I grant the motion and limit what the government

8   can say to just the fact that there was an anonymous complaint

9   and then that they opened the investigation based on

10  information received.

11       The second item concerns testimony by Dr. Emmett

12  McWoods on Mr. Hay's mental state.  There's really no

13  objection.  I can deny this as moot or grant it as unopposed.

14  I'll consider it moot because the government represents that it

15  does not intend to ask Dr. McWoods about -- and is not going to

16  elicit testimony from Dr. McWoods that he thought Mr. Hay was

17  running a scam.

18       Dr. McWoods apparently had made that statement to

19  agents, but the government understands that would be improper.

20  It does go to the ultimate issue or one of the ultimate issues

21  of Mr. Hay's state of mind, his intent, and obviously that's

22  for the jury to decide.

23       The government does in its response set out what it

24  does intend to ask Mr. McWoods about.  The defendant has not

25  moved to exclude any of that.  I guess if there are objections,

DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.244

1    those will be taken up extemporaneously, but my understanding,

2    Dr. McWoods will be called to testify about his observations of

3    Mr. Hay during office visits, statements Mr. Hay made about his

4    physical condition, whether Dr. McWoods based his medical

5    diagnoses in part on Mr. Hay's statements, whether he would

6    have diagnosed Mr. Hay differently or whether or not he would

7    have wrote a letter supporting Mr. Hay's application for

8    disability had he known -- had he known Mr. Hay was capable of

9    the physical activities he observed in a surveillance video.

10           So I take it by that the government is going to play

11   the surveillance video in trial; is that correct?

12           MR. OAKLEY:  Yes, Your Honor.

13           THE COURT:  All right.  Item No. 3 concerns any

14   testimony by government agents that Mr. Hay's behavior is

15   inconsistent with symptoms of choreiform or conversion

16   disorder.  I grant that motion.  Lay witnesses should not be

17   rendering an opinion on whether or not -- I guess that would be

18   a medical opinion actually, wouldn't be properly a lay opinion

19   about whether his -- whether his behavior is consistent with

20   that.

21           I will allow these agents or anyone else who had

22   personal observations of Mr. Hay's behavior.  I think that's

23   generally admissible, but they shouldn't be opining on what

24   that means concerning his diagnoses.

25           Item No. 4 seeks to exclude any evidence or testimony

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                   USA v. Bruce L. Hay
                                   ROA - Volume 1, p.245

1  by government witnesses that Mr. Hay was falsifying or faking

2  his symptoms of conversion disorder, generalized choreiform

3  movement disorder, weakness in left and right lower legs, and

4  major depression.

5           Again, I'm going to allow lay witnesses as well as

6  experts I suppose to describe their personal observations of

7  Mr. Hay, but I'm not going to allow anyone to testify that

8  Mr. Hay was faking or falsifying his symptoms.  That again is

9  one of the ultimate issues and something for the jury to

10  decide.

11          Now, there is an expert witness, Dr. Danielle Becker,

12  that the government is going to call to offer testimony

13  explaining the diagnoses of conversion disorder and functional

14  neurological disorder and to talk about I suppose the symptoms

15  and the diagnoses and clinical observations or whatever that

16  underlies what she says about that.  But defendant seeks to

17  exclude anyone, including Dr. Becker, from testifying that he

18  was malingering.

19          And the DSM definition of "malingering" is where a

20  patient's symptoms are consciously feigned or grossly

21  exaggerated for external incentives.  Given that definition of

22  malingering, I do think it would be improper to ask a witness

23  whether he was malingering.  I think this is something for the

24  jury to decide.  Again, it goes to the heart of this case

25  whether he was engaged in a scheme to defraud and obtain

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 1, p.246

1    benefits by falsifying, faking, malingering, all of those sorts

2    of things, but I won't let anyone testify using those words

3    because that's something the jury needs to ultimately decide.

4         Item No. 5, Mr. Hay seeks to exclude testimony or

5    evidence that the VA and Social Security Administration

6    terminated his benefits as a result of the investigation or

7    based on a finding he's engaged in fraud by falsifying his

8    symptoms, et cetera.

9         So I may want to hear more thought from you on this,

10   but here's what I'm thinking.  So there was this administrative

11   process and as there always is in termination of VA benefits,

12   disability benefits, and that process I guess originally

13   resulted or some process originally resulted in Mr. Hay

14   receiving benefits, but then there was I think an investigation

15   and another process in which the government terminated his

16   benefits.  Mr. Hay appealed that decision to sever his benefits

17   and made statements that the government may be intending to use

18   as I guess statements of a party-opponent at trial.

19        So my thought is first it would be improper for the

20   jury to hear what the findings were, what the -- you know, what

21   the basis for the findings were, what the determination was at

22   least substantively at the VA.  That's a different process.

23   The jury is here to decide somewhat similar issues, although

24   not identical because this is a very different type of

25   proceeding.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.247

1          Under the 403 analysis my concern always with an

2     administrative decision or some related determination by

3     another entity or body or adjudicator, the jury's verdict is

4     going to be directed or, you know, at least influenced by that,

5     so the fact that the Social Security Administration, the VA at

6     some given point decided to terminate Mr. Hay's disability

7     benefits I think is admissible that fact, but I would want to

8     give a limiting instruction cautioning the jury that that

9     doesn't determine any of the issues in this case.

10          My understanding is if -- there would be relevance in

11    that simply to explain that there was a termination decision

12    and that after that Mr. Hay made certain statements in an

13    attempt to get that decision reconsidered.

14          But the process itself, the finding, the

15    determination, all of that would not be admissible.  And I'd

16    ask the parties to get together and draft a limiting

17    instruction if you can agree to one.  Similarly, any documents

18    related to the adjudication would not be admissible.

19          The one question I have is I don't know what the form

20    of the statements were from Mr. Hay.  I don't know if those

21    were in writing, it was an affidavit, he testified.

22          Mr. Huschka.

23          MR. HUSCHKA:  Yes, Your Honor.  It's just one written

24    statement that was submitted with his signature.

25          THE COURT:  And that's what you seek to introduce?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 1, p.248

1        MR. HUSCHKA:  We may introduce the statements in

2   there, yes.

3        THE COURT:  All right.  So is there anything in the

4   context of that statement that would cross the line I've drawn

5   that I don't really want the jury to know about, the

6   adjudication process and what that entailed, what the findings

7   were, et cetera?

8        MR. HUSCHKA:  I don't believe so, Your Honor.  It's

9   actually -- it was submitted to the VA in 2015, but it's

10  actually dated sometime in 2013 or 2014 at least on the bottom

11  right and then it's submitted to the VA in 2018.  It's largely

12  factual.  It's sort of his case for why they should be

13  reinstated.  I don't think it sort of discusses the proceedings

14  or response to any, you know, allegations or anything like that

15  on the part of the VA.

16       THE COURT:  Okay.  Ms. Ramsey, what's your position on

17  that particular document?

18       MS. RAMSEY:  Your Honor, we received the

19  government's -- I want to say exhibits today.  My recollection

20  is that it may not refer to any of the particular proceedings.

21  I think what I'd like to do is, not having it in front of me,

22  go back and take a look and see if maybe there's something in

23  there the parties can agree to the portion being redacted if in

24  fact there is I think -- my memory is I don't think there's

25  anything about the proceedings, but the letter may itself start

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.249

1   an introduction about them, but I don't have an exact memory.

2   I'm willing to go back and take a look and meet with the

3   government about possibly redacting those portions.

4        THE COURT:  That sounds good.  I'll defer ruling on

5   that document then obviously, and you all understand the limits

6   I think of what you can say about the fact that there was a

7   termination.

8        MR. HUSCHKA:  And, Your Honor, just one more point on

9   that, I want to make sure we address it on the front end.  So

10  we described this in some detail in our response to the motion

11  *in limine*, but with respect to the social security's

12  termination, that was more contemporaneous with some of the

13  other issues in the case in 2013, and we have for instance --

14  and we describe it in our response -- but a request for

15  reconsideration on his part.

16        So it doesn't say anything about -- it is an SSA form

17  document that is handwritten and it has the defendant's

18  statements, says "request for reconsideration," so in our view

19  it doesn't go beyond just the fact that they're terminated and

20  then it's his statement in response.  So I think that would be

21  within the spirit of your ruling, but I wanted the court to be

22  aware of the types of documents that we're talking about.

23        THE COURT:  So there was one relating to

24  reconsideration of the VA decision and one relating to

25  reconsideration of the SSA?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.250

1          MR. HUSCHKA:  Yes.  And they're a little bit distinct.

2   In the SSA form it says at the top, you know, "request for

3   reconsideration" and then there's boxes that can be filled in

4   by the individual.  The VA form is -- just looks like a printed

5   out letter just on a piece of paper that was submitted

6   electronically to the VA.

7          THE COURT:  Okay.

8          MR. HUSCHKA:  And that was in 2018.

9          THE COURT:  Okay.  All right.  So I think you all know

10  where I'm coming from on that, and then, you know, to the

11  extent there are issues with either one of those documents, you

12  can bring that to my attention later or contemporaneously at

13  trial.

14         Okay.  So the next item is Mr. Hay moves to exclude

15  evidence and testimony that he received subsidies from his farm

16  arguing it is irrelevant because he says that this does not

17  show that he performed any physical labor; all it shows is that

18  he received money.

19         I think -- I think this is relevant in the sense that

20  it might tend to show that he was involved in farm labor.  On

21  the other hand, it may only show that he had some property

22  interest, nominal interest, title interest, I'm not really

23  sure.  Mr. Hay is free to cross-examine the government's

24  witnesses on this point and introduce evidence or testimony to

25  the contrary should he choose to, but if all this says is that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 1, p.251

1    he -- if all this is shows he receives subsidies from the

2    government, it's true, it doesn't necessarily show that he

3    performed any physical labor, but it is relevant to show he had

4    some interest in the farm to whatever extent that is relevant.

5         Ms. Ramsey, is there anything more you'd like to argue

6    about that?

7         MS. RAMSEY:  Your Honor, I think it is important for

8    the court -- and my understanding is that the government is

9    seeking to use this sort of evidence to raise an inference that

10   Mr. Hay was capable of doing things which in fact he either did

11   not disclose or disclosed falsely to providers with the

12   Veterans Administration.  I think the reason we're asking to

13   limine-exclude this is because it raises an inference about

14   separate income and motive of Mr. Hay that I don't think is

15   necessarily relevant to this case, and so that was our concern.

16        I will take a look at Government Exhibit No. 325 and

17   so I'm fine with the court's ruling today.  I'll take a look at

18   it and see if in fact I find that it overcomes the type of

19   prejudice I think entering it is going to have which is that

20   it's going to reflect on possibly -- what's the word I'm

21   looking for?  It will have an impact on things that are

22   irrelevant.

23        So the problem I'm having is I think that I cannot

24   make an argument that it's not relevant, but it may still be

25   prejudicial.  I'll take another look and make a contemporaneous

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.252

1   objection if I still feel that way, Your Honor.

2        THE COURT:  I'll defer this for a contemporaneous

3   objection.  I am mindful that, based on what I've read in the

4   pleadings, the government says it has evidence that -- well,

5   we're going to get to that, but a lien on the property that's

6   supposed to be based on physical labor and perhaps surveillance

7   or video of physical farm labor.

8        If that's the case, then, you know, I don't know what

9   the prejudicial effect of this would necessarily be, so it's

10  probably better that I just hear the evidence and take this

11  contemporaneously as an objection.

12       So the next item, similarly it's a civil dispute

13  between Linda and Bruce Hay in Miami County District Court,

14  Linda Hay being Mr. Hay's mother.  I'm not sure I'm

15  understanding what it is exactly the government would be

16  offering.  Apparently there's a lawsuit.  Apparently Mr. Hay

17  claims he was a farm manager on his mother's property from 1985

18  to the end of 2020 and claimed he performed labor.

19       So in what context -- in what form are these

20  statements in the lawsuit?

21       MR. OAKLEY:  Your Honor, the government doesn't intend

22  to get into the facts, the underlying facts of that civil state

23  court lawsuit.  What we're interested in is as a part of that

24  Mr. Hay filed a mechanic's lien, and in that mechanic's lien he

25  made certain assertions.  I think we quoted some of it in our

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.253

1  response, and those assertions directly relate to his work on

2  the farm, that he was a farm manager, that he provided labor.

3  So that's what we're interested in.

4         We don't intend to make whatever that civil dispute is

5  about part of this, but we do intend to introduce and we think

6  it's relevant and admissible the defendant's statements about

7  his work on the farm.

8         THE COURT:  Okay.  So it has a court caption, the

9  lawsuit caption, and then -- it's just been a while since I've

10 seen a mechanic's lien, but it's entitled "mechanic's lien" and

11 I don't know if it's a form or just a narrative statement, but

12 it's signed by Mr. Hay; is that correct?  Or is it signed by

13 his counsel?

14         MR. OAKLEY:  It's not signed by counsel.  I believe

15 there's an employment contract that was included as part --

16 that is signed by Mr. Hay, but otherwise it's -- it's more in

17 the form of a pleading in which he makes certain -- asserts

18 certain statements related to his work.

19         THE COURT:  Is it a pleading that's signed by counsel

20 and then there's an attached employment contract signed by

21 Mr. Hay?  Or did he sign the pleading?  I guess what I'm trying

22 to say, is it a mechanic's lien lodged or is it -- what is it?

23         MR. HUSCHKA:  Yeah, so a mechanic's lien is lodged,

24 and in connection with that mechanic's lien and as support for

25 the mechanic's lien an employment agreement -- the mechanic's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.254

1   lien references the work, and this mechanic's -- sorry, the

2   employment agreement that is the basis for the mechanic's lien

3   is signed by Mr. Hay and appears to be entered into and

4   executed in 2015, sort of within the heart of the allegations

5   in this case.  And it describes what the labor he provides to

6   earn a certain wage and all of the work that he does, and the

7   mechanic's lien sort of references that same information.

8        And so this -- there is a freestanding mechanic's lien

9   that is filed in Miami County state court that is unrelated and

10  not filed by -- it may have been filed by but not signed by

11  counsel in the sense of a traditional pleading with one of our

12  signatures at the bottom.

13       THE COURT:  Well, it's definitely relevant.  I'll

14  entertain any contemporaneous objections on other bases on

15  admissibility, but it's definitely relevant to the issues at

16  hand.

17       MS. RAMSEY:  Your Honor, may I be heard on that before

18  you move on?

19       THE COURT:  Yes.

20       MS. RAMSEY:  I think that it is relevant, the

21  mechanic's lien and possibly employment agreement.  The concern

22  I have is on the government's exhibit list they also have a

23  motion to set aside the judgment, answer to plaintiff's reply

24  to motion to set aside judgment.  There's additional documents

25  that the government seems to have on their list that they

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.255

1   intend to use or admit in some kind of way that I don't see the

2   relevance for, and I think when you're going to get that far

3   into the weeds, this case will be taken over by trying to

4   explain what is going on in the civil dispute.

5          So to the extent that what they're submitting is the

6   mortgage, the employment agreement and the mechanic's lien that

7   references that, I don't know that we have such a relevancy or

8   argument for that.  But the additional documents that have to

9   do with the civil dispute, I don't see why they're relevant and

10  then not overly prejudicial especially if the government tries

11  to get into them and will cause confusion for the jury.

12         THE COURT:  I will say, that's why I was honing in on

13  these statements of Mr. Hay, did he sign them, did he adopt

14  them, then they would be admissible as statements of a

15  party-opponent if he did.

16         Pleadings are different.  They're signed by a lawyer.

17  Sort of like answering interrogatories, they're signed by the

18  lawyer and not signed by the person, not necessarily adopting

19  as to that, so there is a distinction there.

20         Mr. Huschka, do you intend to offer these other

21  documents she's talking about?

22         MR. HUSCHKA:  Yeah.  I mean, we marked a few exhibits

23  I think, you know, not being sure exactly what we may be able

24  ultimately to get into.  I think the mechanic's lien is at the

25  heart of what we're interested in getting into, so we have a

DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.256

1    freestanding exhibit I believe marked that is the mechanic's

2    lien and the employment agreement that is incorporated into it.

3         I think that there may well be -- so the -- some of

4    the other pleadings that we have marked at least in some

5    respects are *pro se* pleadings by Mr. Hay where he makes

6    statements on his own initiative that's not adopted or drafted

7    by counsel, it appears.  So I do think even if we were to not

8    get into those in our case in chief, we may well want to get

9    into some of that either through cross-examining defense

10   witnesses or rebuttal because there are, just sort of looking

11   at some of this, yeah, it's respectfully submitted by Bruce Hay

12   and there are statements that are made that could very well

13   relate to some of the issues at trial.

14        THE COURT:  I'll defer ruling on all of that.  That

15   will be subject to contemporaneous objections.

16        Okay.  There are several items that I can grant as

17   unopposed:  Allegations of child abuse, evidence that Mr. Hay's

18   children were improperly restrained during the 2005 car

19   accident, evidence that Mr. Hay attended anger management

20   classes, parenting classes, kicked his ten-year old,

21   SRS-mandated parenting class.  The government agrees that none

22   of that is properly admitted, so I will grant all of those

23   items as unopposed.

24        The next item is total estimation of loss.  Defendant

25   moves to exclude the VA's total estimation of loss on relevance

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.257

1  and Rule 403 grounds.  The government responds that it's

2  required to show -- to prove that the defendant obtained money

3  or property or at least had a scheme to obtain money or

4  property.

5          So when we're talking about loss here, what we're

6  talking about are checks which are actually the subject of

7  certain wire fraud counts, but then there's other money as well

8  over a certain time period, correct?

9          MR. HUSCHKA:  Yeah.

10         THE COURT:  All right.  Well, I think I deny the

11  motion *in limine*.  I think the government can obviously prove

12  the amount of the checks that are the subject of the counts,

13  but also I think it's proper to say, you know, these were the

14  time periods that he received checks and this was the amount of

15  the checks.

16         Whether it needs to be calculated as a total loss or

17  called a total loss, I don't think it should be called a total

18  loss, but I think it is relevant that it was more than just

19  the -- more than just the checks that are set out in the

20  indictment.

21         Ms. Ramsey.

22         MS. RAMSEY:  Right.  I wanted to make clear -- I think

23  you may have just made the finding.  We're not objecting to the

24  government obviously putting forth evidence of the particular

25  amount and benefits for each count they have to prove, right;

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 1, p.258

1    that's an element of their offense.

2         I think what we're saying is prejudicial is what the

3    overall total amount of loss that they are attributing his

4    scheme to defraud.  They've alleged in the indictment that the

5    scheme began possibly earlier than but at minimum in 2011 up

6    until 2018, and so my understanding is the government is going

7    to try to allege that this loss occurred from possibly 2005 to

8    2018.

9         And so that was our argument, that there's a portion

10    of that that's not relevant to proving their elements, and I

11    think it has, you know, the tendency to kind of inflame the

12    jury on the wrong points that, you know, overstates what the

13    elements that they're supposed to prove.

14         So we just think it's just not relevant to the

15    elements and then it can inflame the jury to make a judgment on

16    the wrong basis that has nothing to do with the government's

17    proof of the amount of loss on each count.

18         THE COURT:  You're saying the government -- so the

19    indictment alleges a scheme to defraud that -- the superseding

20    indictment, from January 2011 until on or about August 2018,

21    and you're objecting to the government presenting evidence

22    outside of that time period, is that what you're saying,

23    predating January 2011?

24         MS. RAMSEY:  No, Your Honor.

25         Your Honor, we're just objecting to the fact that the

1  jury will consider such a large amount of money in the wrong

2  sense rather than holding the government to their burden of

3  proving each particular element of the offense.  And so

4  while -- and we believe that that total estimation of loss is

5  going to be, although may be relevant at another time or

6  proceeding in this case, it's just not relevant now.

7          THE COURT:  Mr. Huschka.

8          MR. HUSCHKA:  Your Honor, the indictment -- it alleges

9  beginning on a date unknown but at least by on or about that

10  date.  And I think that the amount of money that Mr. Hay got as

11  a result of these purported disorders is -- I mean, it goes to

12  the scope, it goes to motive, it goes to his intent, it goes to

13  willfulness.  And there's no authority cited for excluding the

14  amount of potential loss or money received in a fraud case.

15          And I mean, I think you could analogize it in a way to

16  excluding the amount of money stolen in a bank robbery.  A bank

17  robbery happened, money was stolen, but the amount of that

18  money is still an issue in the case.

19          THE COURT:  Here's one question I have.  So the

20  indictment alleges that in 2005, that's when the vehicle

21  accident was.  And in 2006 Mr. Hay applied for disability

22  benefits, got a rating decision, 100 percent service-connected.

23  And then so -- and then so -- it doesn't say this, but

24  presumably starting in 2007 Mr. Hay started receiving benefits?

25          MR. HUSCHKA:  He did receive benefits starting in

DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.260

1    approximately 2007.  He received a lump sum, though, that dated

2    back to his -- either to his initial application or to the

3    vehicle accident, one or the other.

4           THE COURT:  Okay.  So then the indictment picks up by

5    a date unknown but at least by January 2011 on through 2018 he

6    was able to -- he wasn't disabled essentially.

7           So is the government planning to present evidence

8    about what was going on back when he got the disability rating,

9    2005-2007, what was going on between 2007 and 2011, or does

10   your evidence sort of pick up around 2011 as to what his

11   physical capabilities were?

12          MR. HUSCHKA:  I will tell the court the January 2011

13   date that's listed, that is the date of the hotline complaint,

14   so that's why that date is listed in the indictment.  We expect

15   that there may well be testimony and some videos that predate

16   that 2011 of covert videos of the defendant engaged in various

17   activities.

18          But statements that he made in compensation and

19   pension benefits exams in 2006 and 2007 we will present

20   evidence of that because the statements he makes in those are

21   relevant because he later comes in 2012 and '13 and says that

22   he has not improved at all.  So as compared to what got him the

23   benefits in '06 and '07, he comes in and says this is

24   permanent, I don't think I'm going to improve, attaches a

25   letter from his physician.

DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.261

1        So we think the prior timeframes are relevant because

2    that's how he received the benefits at issue.  They were just

3    not permanent and total at that time.  He comes later to try to

4    get a permanent and total designation that would mean he would

5    not be subject to any future examinations after that time.

6        THE COURT:  Okay.  So was there potentially a period

7    of time between 2007 and 2011 where Mr. Hay was disabled and

8    actually entitled to receive these disability benefits?  Or is

9    the government's theory he never was disabled?

10        MR. HUSCHKA:  Just a moment, Your Honor.

11        THE COURT:  Because I agree with you it is relevant to

12    go back and show the timeline, but the reason I'm asking that

13    is if there's some evidence that suggests that he -- the

14    alleged fraud was not so much that he got it at the beginning

15    but that he kept representing that he was still that bad off so

16    the fraud started sometime later, then I am concerned about you

17    calculating loss going all the way back to 2005.  That's all

18    I'm saying.

19        MR. HUSCHKA:  I understand, Your Honor.  I think the

20    vast majority of the evidence will be to the later time period

21    because that's when the agents learned about it and so that's

22    the evidence that we have.

23        We do think there may be evidence that a jury could

24    reasonably infer that this -- that he was not disabled at least

25    to the extent he claimed from the outset including he was

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 1, p.262

1   involved in a vehicle accident where he's driving in 2005

2   shortly after the initial car accident when he is telling all

3   the medical providers that he cannot drive and he can't really

4   engage in any physical activities.

5          So I do think there's evidence that we'll call into

6   question, but the majority of the evidence in trial will relate

7   to the later time periods because that's just frankly the

8   evidence that we have for the most part.

9          THE COURT:  Okay.  So here's the distinction I'm going

10   to draw:  I think what you're telling me, I mean, it is

11   relevant, the timeline from 2005 forward and what happened and,

12   you know, whatever you're going to present.

13          But this particular motion *in limine* goes to

14   calculation of loss, and I do think on a 403 balancing to

15   calculate loss before 2011 when there was an active

16   investigation and there was an active determination of whether

17   or not he was disabled, I think that that doesn't survive the

18   balancing test pre-2011 because in my mind there's, you know --

19   you're not really going to present much evidence it sounds

20   like, if any, about disability in those earlier years, although

21   obviously you're going present some.

22          I'm just concerned that on balance, you haven't

23   charged any of those years, and it would be more prejudicial

24   than probative to talk about how much his checks were during

25   those years.  But certainly from 2011 on, you know, that's the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.263

1   time period in which this wire fraud occurred according to the

2   indictment and I think it would be fine to on a 403 analysis

3   for you to address the amounts of money he received during that

4   time period forward.

5         So that's where I'm going to draw the line, kind of

6   where the indictment draws the line.  Okay.  And that's just

7   with respect to loss.  I'm not saying you can't present other

8   evidence of what was going on before that and other evidence

9   that might have shown or that the jury could infer he was in

10   fact not disabled before 2011 either.

11         Okay.  So let's see what else.  Government Exhibit 71,

12   defendant moves to exclude this.  It's a video that the

13   government has entitled "video of Bruce Hay shooting target

14   practice with friends."  Defendant asserts this is not relevant

15   and argues that the title should be excluded under Rule 403.

16   Also says this is a recording of a recording, contravening the

17   best evidence rule.

18         Government responds the video is relevant because

19   Mr. Hay is seen without a cane or walker, appears to need no

20   assistance, and also target practice would involve presumably

21   loud sounds and at this time period Mr. Hay was claiming to the

22   VA he could not be around fireworks.  Also the agent recorded

23   the video as the original played on a computer and will testify

24   that he accurately recorded the original by electronic means.

25         All right.  So, you know, as far as the legal standard

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.264

1  for admissibility of duplicatus, there is a best evidence rule,

2  but the real question under Federal Rule of Evidence 1002 is

3  whether it's an authentic copy.  So I'll hear from the agent

4  and make a contemporaneous ruling at that time on that.

5       I do think it's relevant if the video depicts what the

6  government says it depicts.  Tell me, though, what time period

7  this relates to.

8       MR. HUSCHKA:  Your Honor, we don't have an exact time

9  period at this time.  We think we're probably going to get some

10  more information on that, but we believe it to be around 2010.

11       And I will just note we changed the name on the

12  exhibit list to just "video of target practice," and we also

13  have now received and produced the actual copy, not the one

14  that was recorded on a cell phone.

15       THE COURT:  Okay.  So that takes those concerns off

16  the table.

17       Ms. Ramsey, are you okay with that title of the video?

18  I understand you have other objections.

19       MS. RAMSEY:  Yes, I'm okay with the title.  I think

20  I'm fine with the full video that they've produced, so those

21  objections are moot.

22       I would be interested in whether or not -- whenever

23  the timeframe is, because we don't know when the timeframe is,

24  to a relevancy objection, but not knowing that now, I can't

25  make it.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.265

1    THE COURT:  Okay.  I'm not going to rule definitively

2  on the relevance objection until I hear the testimony about the

3  time period or whatever else would resolve whether it's

4  relevant.

5    Okay.  Let's see.  Government Exhibit 101, defendant

6  objects to this.  This is a summary exhibit regarding pole

7  camera footage.  Neither party attached that to your pleadings,

8  so I'm not really not -- I'm really not prepared to rule on

9  this motion at this point.  I need to see the summary.

10    MR. OAKLEY:  Your Honor, and I apologize, I did print

11  off one for the court today, if I may approach.

12    THE COURT:  Okay.

13    So I assume, Ms. Ramsey, you're objecting to comments

14  like "no observable impairment" as testimonial.  I tend to

15  agree.

16    MS. RAMSEY:  Yeah, that's our general objection.  And

17  I don't know if -- I guess from the government's point of view,

18  especially if you're moving to admit this, I think any time

19  they're making -- giving their opinion or statement obviously

20  on what they're viewing invades the province of the jury.

21    And they're going to have -- they're going to have a

22  copy of -- and see a copy of the video for themselves.  Our

23  objection is generally to that specific language.

24    THE COURT:  I mean, if it's summarizing something

25  that's readily observable like "leaves alone in red truck," I

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.266

1   don't think that's necessarily testimonial if that's what

2   happens.  But then "no observable impairment" I think becomes

3   testimonial.  "Carries item in each hand from inside of house

4   onto front porch" and "no cane," if that's readily observable

5   from anyone watching that, that's probably a fair way to

6   summarize that.  Is it readily observable?  I don't know.

7         Ms. Ramsey, have you compared this with the actual

8   video?

9         MS. RAMSEY:  Your Honor, I cannot say that I have

10  taken each one of these and compared to the actual video.  What

11  I can tell the court is that this was a pole camera set up

12  outside the high school across the street that was

13  motion-activated, and I believe this particular log is a

14  summary of multiple agents watching these videos and putting

15  down their descriptions I think.

16        So I think just to be clear, my objection is to the

17  language contained where they're giving an opinion about

18  whether or not there's impairment or not.

19        THE COURT:  Yeah, that's my main concern.  "No

20  observable impairment," "no visible impairment," I think that's

21  testimonial, should come out.

22        If it's just describing what's readily depictable,

23  that he's leaving alone in a red truck, that he has something

24  in his hands, that he's walking on the porch, that I think is a

25  proper way to summarize the content of the video.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.267

1            So you understand the distinction?

2            MR. OAKLEY:  Yes, Your Honor.  And I guess to clarify,

3    the spreadsheet was initially put together by multiple agents.

4    We expect to have one agent who has viewed all of the video and

5    has gone through to make sure that he agrees with the

6    descriptions testify, and I guess the issue, the difficulty

7    that we have in, for instance, the "no observable impairment"

8    is in describing what he sees when he doesn't see I guess an

9    impairment.

10           You know, obviously the purpose of this summary is so

11   the jury is not forced to sit and watch hours upon hours upon

12   hours of the same type of video, so if we would expect the

13   agent to testify and he could even explain what he means by "no

14   observable impairment," or --

15           THE COURT:  Okay.  So I don't know how -- this is a

16   multiple page summary; double-sided; many, many video segments.

17   You're not going to play all of this for the jury?

18           MR. OAKLEY:  No, Your Honor.

19           THE COURT:  You're going to play some of them for the

20   jury, and obviously it's admitted into evidence; if the jury

21   wanted to see all of it, they could.

22           You're going to have one agent watch all of this so

23   that he or she can testify this is an accurate summary of

24   everything I watched?

25           MR. OAKLEY:  Yes, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 1, p.268

1        THE COURT:  So you want this agent to testify "no

2   observable impairment," what does that mean?

3        MR. OAKLEY:  Correct.

4        THE COURT:  I mean, what does that mean?

5        MR. OAKLEY:  When I put on that form, for instance,

6   "no observable impairment," I did not see the types of body

7   movement that -- we expect also during that same agent's

8   testimony that the jury will see video, for instance, of the

9   defendant at the VA where he shows a very significant and

10  obvious body movement, and so we intended to ask the agent,

11  when you're watching the pole camera video, when you say "no

12  observable impairment," what do you mean?  And anticipate that

13  he would say, I mean I saw no, you know, upper body movement or

14  however he chooses to describe what the jury will also see in

15  the VA video, for instance.

16       THE COURT:  And I think that's proper for testimony.

17  The question is since the -- this is a summary, which

18  presumably the jury is going to use as evidence in lieu of

19  watching all of those, whether it would be proper for this

20  language "no observable impairment" to be on this piece of

21  evidence.

22       I mean, most of this seems rather objective to me as a

23  summary of what's on the thing.  My only concern is about the

24  "no observable impairment."

25       What you're saying is that there's going to be video

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 1, p.269

1   that the jury -- played at trial that the jury is going to see

2   that there's going to be observable impairment, a palsy,

3   shaking, head movements, motor movements?

4           MR. OAKLEY:  Yes, Your Honor.

5           THE COURT:  And this same agent is going to testify

6   about observing that or at least he's going to be on the stand

7   when the jury is able to see what he's talking about?

8           MR. OAKLEY:  Yes.

9           THE COURT:  Then he's also going to offer this summary

10  in which he's going to say there was a number of instances in

11  the summary where I didn't observe that same thing?

12          MR. OAKLEY:  Yes, Your Honor.

13          THE COURT:  Is there any gradation or degree observed

14  a little bit?  I mean, I don't know.  I'm asking because I

15  don't know.

16          MR. OAKLEY:  And if the -- if the concern is with the

17  phrase "no observable impairment," obviously we can remove that

18  from the exhibit and -- and then ask the agent, did you see

19  any -- while you reviewed this poll cam video, did you see --

20          THE COURT:  I think that's the better way to go, to

21  remove that language because otherwise I think it opens into

22  question -- I think it opens it to question because it could be

23  a matter of degree of degradation too.  Reasonable minds could

24  differ on whether there's something observable or not.  I'm

25  just a little concerned about that.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.270

1        But I think if you leave it off, the jury can look at

2   any of these they want to, not only the ones you play in court.

3   I just think that -- I think that's cleaner and I think that's

4   better, so I'll sustain to that extent, take off the sort of

5   "no observable impairment" because that's a little bit open to

6   question.

7        The other things seem so factual to me I don't think

8   they're open to question.  You observed a cane or you don't

9   observe a cane, front porch, in the car, out of the car,

10  whatever.  I think that's fine.

11       Can I keep this copy?

12       MR. OAKLEY:  Yes, Your Honor.

13       THE COURT:  All right.  Government Exhibit 134, Kansas

14  Farmers Union *Kansas Kontact* publication from 2012.  It's a

15  newspaper periodical.  I think the photographs themselves are

16  admissible.  I think the captions are not because it's an

17  out-of-court statement by whoever wrote the captions.

18       And then also the quotations from Mr. Hay are not

19  admissible out-of-court statement, and it's not really -- it's

20  not a statement of Mr. Hay; it's a statement Mr. Hay made to

21  the author of the article, so unless you're going to bring the

22  author of the article in to testify about a statement of

23  party-opponent, I don't think it would be admissible because of

24  confrontation clause problems.

25       So just the photographs at this point unless you're

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.271

1   going to call this newspaper reporter in to talk about what

2   Mr. Hay told him.

3         Okay.  And then I think the final thing as far as

4   motion *in limine* is defendant has filed a motion to exclude

5   expert opinion testimony of Dr. Danielle Becker.  I think we've

6   already covered this.  This whole malingering, using the word

7   "malingering," I said no to that, but I think the rest of

8   her -- the rest of her --

9         MR. HUSCHKA:  Your Honor --

10        THE COURT:  -- testimony is fine unless I hear

11   something contemporaneously that's problematic.

12        MR. HUSCHKA:  I just want to clarify so we can make

13   sure we instruct our expert.  She -- and we've talked about

14   this a fair amount since the defendant filed their motion, and

15   maybe if I could just give the court a really quick kind of

16   summary of what we anticipate that she'll testify about.

17   Obviously she has a much more lengthy report.

18        But just broadly, she would testify and explain

19   functional neurological disorder.  She would explain

20   malingering and just what it is, just generally, not opining on

21   it, not talking about it, but explaining what it is.  It

22   involves the presence of external gain, the interplay between

23   functional neurological disorder and malingering, what you look

24   for to distinguish between the two, what sorts of evidence you

25   look at.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 1, p.272

1          But she would not say that it's her opinion he's

2    malingering.  She would not even say the evidence provides

3    support for malingering, but simply explain to the jury these

4    different concepts.  Let them -- her ultimate conclusion would

5    be that he does not suffer from functional neurological

6    disorder to the extent that he claims, but does not get

7    anywhere to his state of mind, and we even sent the defendant a

8    revised expert report to remove that language that they cited

9    deliberately misrepresenting because we agree.

10         THE COURT:  Okay.  So here I'm a little concerned

11   about using the word "malingering" because in the DSM it

12   defines it as somebody doing something because they have

13   external motivations, you know.  I mean, that's part of the

14   definition.

15         But I think it would be proper for her to testify

16   here's what this disorder is, here's what the symptoms are, the

17   characteristics, here's what we look for, here are things that

18   may be presented that aren't consistent with that, and here's

19   what we saw in Mr. Hay or what we didn't see in Mr. Hay,

20   therefore I conclude "X," without using the word "malingering."

21         Is she going to testify, for example, like -- I don't

22   know how to give an example.  So here's the presentation; if

23   someone has this, here is their motor -- the things you can

24   observe in their movement; but we also saw in Mr. Hay "X" and

25   that's not consistent with that; and that's a presentation or

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 1, p.273

1    something that may be relevant to us because it may mean that

2    the person is, I don't know, malingering I guess, that the

3    person is presenting or exaggerating their symptoms.

4         I mean, is that the kind of thing she's going to

5    testify about?

6         MR. HUSCHKA:  Yeah, she would testify that, you know,

7    especially with respect to functional neurological disorder,

8    which is not -- for instance, like blindness, it's not

9    something you can go look up on an EEG, so it -- inherently the

10   disease itself makes this potentially more of an issue.  And

11   she would just explain the significance of the interplay

12   between -- I'll use the term "malingering" now, but just the

13   presence of external gain when you're trying to determine

14   whether somebody is feigning or exaggerating symptoms because

15   -- and I think she would testify that the best evidence of that

16   in the clinical setting when you come in to your doctor, you

17   may -- that's not an issue necessarily, but when there is the

18   presence of external gain, then you have to look at certain

19   things, and the most objective evidence you can look at is

20   video surveillance, for instance, the difference between

21   reported functioning and actual functioning or a difference

22   between your actions in the clinical context versus the

23   nonclinical context.  And she would explain the significance of

24   that and that it doesn't just sort of come and go to the point

25   that you don't have it, you know, before you exit the car and

DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.274

1    you start walking in and it doesn't just stop right after the

2    exam is done.

3          THE COURT:  Okay.  So I think she can testify here's

4    what we would expect to see.  We can compare -- I guess you're

5    going to show her videos, and she can testify this isn't

6    consistent with, you know, whatever.  I don't have a problem

7    with that.

8          I guess where I'm drawing the line is, for her to then

9    say, this is significant because, you know, what the person's

10   motivation is is significant to our medical diagnoses because

11   that to me is sort of encroaching on the whole ultimate issue

12   here, intent, state of mind.

13         I understand VA and disability doctors care about this

14   because that's what they're called upon to do, but I'm just

15   concerned about her saying that to the jury because to me it

16   sort of sounds like she's basically testifying about we're

17   trying to figure out, you know, what his intent is, whether

18   he -- what his motivation is.  I mean, I think that's where the

19   line is crossed.

20         But the line is not crossed with respect to, you know,

21   he tells us this, we observed this in the clinic, and then in a

22   nonclinical setting I'm seeing this video and, you know, that's

23   inconsistent with the diagnosis I gave based on my clinical

24   observations.  I mean, I think that's proper.

25         So I'm convinced the use of the word "malingering"

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.275

1    would be problematic and also any sort of testimony around his

2    state of mind or his motivation, understanding that that's what

3    -- they're considering that.  I understand they consider that

4    when they're trying to do a disability determination, but I

5    just think we have to be really careful in a criminal trial to

6    not have the jury be influenced by a doctor's opinion about

7    what the defendant's state of mind is.

8            Does that give you enough guidance on that, do you

9    think?

10           MR. HUSCHKA:  Yes, Your Honor.  I think we have a good

11   understanding where we can sort of have a discussion with her

12   about the scope of her testimony.

13           Just so the court is aware, this is not a VA doctor,

14   so she has not observed or, you know, diagnosed him.  She's an

15   expert just in neurology who's opining as an expert.  She won't

16   be a fact witness.

17           THE COURT:  Okay.  But you are going to show her

18   medical records from what the fact -- the treating docs saw or

19   observed and wrote down, and then you're going to show her

20   video and ask her to opine about whether -- what he's

21   presenting in the video outside of a clinical setting is

22   consistent with this diagnosis, right?

23           MR. HUSCHKA:  Yes, Your Honor.

24           THE COURT:  I think that's fine.  That's fine.

25           MR. HUSCHKA:  Thank you, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 1, p.276

1        THE COURT:  Okay.  All right.  Anything more on

2   motions *in limine* before we just talk about the trial itself,

3   logistics?

4        MS. RAMSEY:  Yes, Your Honor.  Your Honor, we -- there

5   was an exhibit -- we received the government's exhibits today,

6   and there's an Exhibit No. 74, and I don't know if the court

7   wants to take that up now or if maybe we need to do it shortly

8   before trial.

9        But I anticipate it is a video -- it appears to be

10  by the date that the video is named of a video taken of my

11  client in 2021 allegedly doing things that I think the

12  government may use to present that are inconsistent with his

13  stated disability or representations, and we would just argue

14  that -- the relevancy of that.

15       There is no relevancy because we're talking about way

16  after the charging period, and I think it's overly prejudicial

17  and has no impact on the jury's decision about whether or not

18  he committed fraud within the limited time period in the

19  superseding indictment.

20       I only know this because Mr. Huschka told me that

21  that's the period of time that the video was in, and I saw it

22  today so I wanted to bring it up to the court.  I don't know if

23  the government is prepared to discuss it.

24       MR. HUSCHKA:  I mean, I don't know that we're prepared

25  to argue it at this time.  Our view is that it is relevant.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.277

1   His physical ability out on a rooftop, I mean, if anything, it

2   just goes to weight, and he can -- you know, the witness can be

3   cross-examined about it.

4           Other than that, I don't think -- we haven't done

5   research on it, but I think it definitely is in our view

6   relevant.

7           Right, and he has claimed that this wouldn't get

8   better and hasn't gotten better and is permanent.  Clearly he's

9   standing on a roof with nobody around to assist him and no

10  support, I think really goes to the heart of the issues here.

11          THE COURT:  Okay.  Well, I will decide that later.

12  When you all are ready to -- it's Exhibit No. 74?

13          MS. RAMSEY:  Yes, at least what we got, but I also

14  think the government is still kind of revising their exhibit

15  list, so that may change.  But it is a video I think in 2021

16  allegedly of Mr. Hay on a roof, doing some things on a roof.

17          So that would be our objection as to relevancy,

18  outside the scope of the investigation, the charging documents.

19  But if the court would like to wait to resolve that once we see

20  a copy, I'm fine with that.

21          THE COURT:  All right.  Well, I'll decide it later.

22          I will say that obviously Mr. Hay has no obligation as

23  a defendant to present any evidence, present a defense,

24  testify, anything like that.  It's the government's burden.

25          But at the same time, Mr. Hay is presenting in the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 1, p.278

1   courtroom as if he has some sort of palsy.  I mean, it's

2   readily observable to the court, and the government says that

3   he has taken the position or has stated to the VA that his

4   disability is permanent.  So there may be some relevance for

5   more current evidence about, you know, how he's doing now,

6   particularly in light of the way he's presenting in court and

7   presumably will at trial.

8          But I'll wait and see.  I may want to hear more detail

9   about the video and that sort of thing.

10         Okay.  So let's turn to just run through some matters

11  about the trial itself.  You all have estimated a ten-day

12  trial, so we've set this to begin next Monday.  So I've set

13  aside the first two weeks of August, August 1st through

14  August 12th.  Fortunately, I have no other -- well, except --

15  do we still have that sentencing on the 9th?

16         COURTROOM DEPUTY:  Yes.

17         THE COURT:  So with the exception of a sentencing at

18  9:00 on Tuesday, the 9th, the rest of those days I have

19  absolutely nothing, so we will have full days, and even that

20  sentencing will probably be done by 9:30, so we'll get a little

21  bit of a late start.

22         But I'd like to start at 9:00 every day and finish up

23  around 5:00.  If we have a witness on the stand, we can go past

24  5:00 if we can finish that person in a reasonable time and

25  assuming the jury can stay a little late.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.279

1        Those will be our trial days, basically 9:00 to 5:00

2   and an hour or so for lunch and a 15-minute break in the

3   morning, another in the afternoon.

4        Ms. Ramsey, remind me, does Mr. Hay -- I think we

5   talked about this, did we not?  Does he need more frequent

6   breaks?

7        MS. RAMSEY:  Yes, Your Honor.  I think we talked

8   about -- I thought the court said it was customary to have a

9   break once an hour --

10       THE COURT:  No, about every two hours.  If we need it

11  more frequently, we certainly can.

12       MS. RAMSEY:  Give me one second, Your Honor.  Thank

13  you.

14       I think a break every two hours will be fine, Your

15  Honor.  If that changes, we'll let you know as soon as we can.

16       THE COURT:  If at any given point anyone for that

17  matter needs to break, just signal to me.  Or if I'm going past

18  two hours for some reason and I'm forgetting, please let me

19  know.  Okay.

20       I intend to have the trial in this courtroom.  We've

21  been having trials upstairs in the larger courtroom, but that

22  courtroom is not as well equipped for video and electronic

23  evidence, so I intend to have it here.  Hopefully we can make

24  that work.

25       I intend to seat a jury of 12 and 3 alternates given

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 1, p.280

1  the length of the trial and given that the virus is still among

2  us.  I will tell the jury that they are free to wear a mask or

3  not wear a mask.  We've still got some COVID protocols in

4  place.  We're still going to have this Plexiglass up for the

5  witness stand.

6          Bonnie, don't we have a side panel too?

7          COURTROOM DEPUTY:  They took it down, but I can

8  probably get it back up.

9          THE COURT:  I use the struck method as you know for

10  jury selection, so we'll call up 35 people so that the

11  government gets six strikes, the defendant gets ten strikes,

12  and then you each get strikes for the alternates.  So we'll go

13  from 35 down to 15, 12 plus 3 alternates.

14          Any questions about jury selection?

15          MR. HUSCHKA:  No, Your Honor.

16          MS. RAMSEY:  No, Your Honor.

17          THE COURT:  I was thinking 20-minute opening per side,

18  but given the length of the case, do you think you need longer

19  than 20 minutes?  If so, that's fine.

20          MR. OAKLEY:  Twenty is fine for the government, Your

21  Honor.

22          MS. RAMSEY:  Twenty is fine, Your Honor.

23          THE COURT:  We'll talk about length of closings later.

24          Let's see.  Remind you of the national privacy and

25  redaction policy that applies to both exhibits and testimony,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 1, p.281

1    to keep out of the public domain certain identifiers.  So I

2    imagine there's probably social security numbers on some of

3    these medical records or, I don't know, some sort of military

4    ID number.  To the extent there are ID numbers, redact all but

5    the last four digits.  So that applies to social security, tax

6    ID, financial account numbers, bank account numbers.

7            It also applies to dates of birth, the names of minor

8    children, and the street addresses of witnesses, victims,

9    parties, jurors.  Those need to be redacted and not testified

10   to.

11           We'll -- does anyone want to invoke the rule

12   sequestering witnesses?

13           MR. HUSCHKA:  Yes, Your Honor.

14           THE COURT:  Okay.  The rule will be invoked.  I leave

15   it to each party to police their own witnesses, to explain the

16   rule to them and that they are not to address their testimony

17   with any other witness.  And obviously can't be in the

18   courtroom.

19           The government will be able to have its case agent of

20   course.

21           Do you have one case agent, VA?  Or do you have VA and

22   Social Security?

23           MR. HUSCHKA:  We have two VA case agents who are in

24   the courtroom here.  We do have one Social Security agent who

25   may be here for a portion of the trial, probably not much.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.282

1          THE COURT:  Okay.  Well, the two VA case agents can

2    sit at counsel table if that's your intention.

3          Okay.  And then obviously the parties can be here and

4    should be here and must be here.

5          I will instruct before closing arguments, so we will

6    probably want to have a jury instruction conference around the

7    10th or 11th of August.  You know, obviously I want you to

8    submit proposed jury instructions, although these charges are

9    pretty standard, so we've got some standard instructions for

10   those.  But any special instructions you think of, we

11   definitely want you to submit those.

12         We'll have an informal instruction conference with you

13   and the law clerk just to iron out what are the final

14   objections, and then we'll take up a formal instruction

15   conference so that you'll have the instructions and be able to

16   use them during closing arguments.

17         *Lafler-Frye* inquiry.  Ms. Ramsey, has Mr. Hay received

18   any and all of the government's plea offers in this case?

19         MS. RAMSEY:  Yes, Your Honor.  Mr. Hay has received --

20   the offer of diversion was made to Mr. Hay.  I will notify the

21   court that I reviewed that.  He received that offer, and that

22   is the information I have for the court.

23         THE COURT:  An offer of diversion --

24         MS. RAMSEY:  Yeah.

25         THE COURT:  -- was received by Mr. Hay?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 1, p.283

1          MS. RAMSEY:  Yes.

2          THE COURT:  Has Mr. Hay had a full opportunity to

3    discuss what that means, what a diversion is, and how if he

4    successfully completes it, he won't have a conviction?

5          MS. RAMSEY:  I would -- I'd ask to sidebar *ex parte*

6    with the court regarding that particular issue and have me and

7    Mr. Hay make a record with the court.

8          THE COURT:  I think we should.  Come on forward.

9        (The following proceedings were had at the bench with

10   counsel for the defendant and the defendant present).

11       (The following portion of the record is sealed).

12   ███████████████████████████████████████████████████

13   ███████████████████████████████████████████████

14   ██████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████

18   █████████████████

19   █████████████████████████████████████

20   ██████████████████████████████████████████████

21   ███████████████████████████████████████

22   ███████████████████████████████████████

23   ██████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.284



DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.285





23    (End of sealed portion.)

24    (Thereupon, the proceedings continued in open court.)

25         THE COURT:  Is there anything else we need to talk

DANIELLE R. MURRAY, RMR, CRR
U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 1, p.287

1   about at this time?

2            MR. HUSCHKA:  One clarification, Your Honor, or --

3   Items 8 through 11, I just wanted to note that Item 8 and Item

4   10 both sort of just refer to information generally.  We've

5   asked defense counsel and had a discussion of asking them to

6   identify anything that they think is covered under those

7   instructions so we could make sure that we redact it.  We just

8   don't want to miss something that they claim falls under those

9   categories of information --

10           THE COURT:  Item 8 and item what?

11           MR. HUSCHKA:  Items 8 and 10.

12           THE COURT:  This is about allegations of child abuse,

13  anger management classes, et cetera?

14           MR. HUSCHKA:  Yes.

15           THE COURT:  I understand you all need to confer about

16  that.

17           MR. HUSCHKA:  And we'll make our redactions.

18           THE COURT:  And Mr. Hay may or may not want to confer

19  with you further about the diversion offer too, but I leave

20  that all to you to decide whether he wants to confer and

21  whether you want to confer.  That's up to all of you.

22           Unless I hear otherwise, I'll plan on seeing you all

23  at 9:00 on Monday morning.  If for some reason you all are able

24  to work something out, I encourage you to do that before we

25  start calling jurors in because that's pretty expensive

1   obviously.

2           We'll be in recess.

3           MS. RAMSEY:  Your Honor, I apologize, one further

4   thing, and this is just to try to give the court some notice.

5   I know that I have possibly five witnesses that are coming in

6   from out of town including an expert.  I have tried to do my

7   best to schedule those witnesses in a way that we don't have

8   breaks, but I just wanted to let the court know that I

9   anticipate -- I will do my best to keep them lined up and keep

10  the trial going, but with witnesses coming in from out of town,

11  we've had to, you know, make flights and hotel arrangements and

12  things for days that we think they're going to testify.

13          THE COURT:  When do you have them here?  When did you

14  have them coming in?

15          MS. RAMSEY:  I did not bring that list, but I believe

16  on the 9th and the 10th.  And the reason is I think -- I know

17  the government said they're going to use the full week for

18  their case and possibly that Monday, so we do actually have

19  some lined up that could be local for that Monday.  So I've

20  tried to give them that starting at least after the 8th.

21          THE COURT:  Okay.  Not to worry.  I mean, if we end up

22  having a gap, I'll explain to the jury that there's witnesses

23  that are coming in from out of town and we're dependent on

24  flights, and we all know what's going on in the airline

25  industry.  It's hard to be flexible.

1          So, you know, usually juries don't mind.  As long as

2     you tell them the case is not going to be delayed and they're

3     going to be done by the end of that week, they're fine with

4     taking a Monday afternoon off or whatever.  It will be fine.

5          Thank you.  We'll be in recess.

6      (The proceedings were adjourned at 2:46 p.m.)

7                    C E R T I F I C A T E

8      I, Danielle R. Murray, a Certified Court Reporter and the

9     regularly appointed, qualified, and acting official reporter of

10    the United States District Court for the District of Kansas, do

11    hereby certify that the foregoing is a true and correct

12    transcript from the stenographically reported proceedings in

13    the above-entitled matter.

14     SIGNED 27th of July, 2022

15

16                    /s/Danielle R. Murray
                     DANIELLE R. MURRAY, RMR, CRR
17                    United States Court Reporter

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 1, p.290

# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**UNITED STATES OF AMERICA**

    v.                                    **Case No. 2:19-cr-20044-JAR**

**BRUCE L. HAY,**

                    Defendant.

---

## DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

---

Mr. Bruce Hay, by and through counsel, respectfully moves this Court to grant a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. Mr. Hay is charged with 6 counts of wire fraud, in violation of 18 U.S.C. § 1343, and 10 counts of theft of government funds, in violation of 18 U.S.C. § 641.[1] The government failed to establish every element of these offenses beyond a reasonable doubt. Thus, Mr. Hay is entitled to acquittal on all counts.[2]

---

[1] D.E. 68.

[2] Below, Mr. Hay also raises a more specific insufficiency argument. By doing so, he does not abandon, forfeit, or waive his argument that the government's evidence is generally insufficient to allow the jury to convict him on any count.

I.      **As a general matter, the government failed to prove the elements of each crime beyond a reasonable doubt.**

In determining whether to grant a motion for judgment of acquittal under Rule 29(a), the Court asks only whether, taking the evidence in the record in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.[3] That is, the Court must "determine whether the evidence, if believed, would establish each element of the crime."[4] "The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt."[5] Here, the government generally failed to prove the elements of each crime beyond a reasonable doubt. Mr. Hay moves this Court for a general judgment of acquittal on all grounds.

II.     **In order to convict Mr. Hay of Counts 7-16, the government was specifically required to prove that he violated every element of 18 U.S.C. § 641 beyond a reasonable doubt.**

In order to convict Mr. Hay of theft of government funds, the government must prove beyond a reasonable doubt the following elements: (1) that the disability compensation belonged to the United States government, namely the United States Department of Veteran Affairs; (2) that Mr. Hay took the disability compensation knowing it was not his and intending to deprive the owner of the use or benefit of the

---

[3] *United States v. McKissick*, 204 F.3d 1282, 1289 (10th Cir. 2000); *United States v. Isaac-Sigala*, 448 F.3d 1206, 1210 (10th Cir. 2006); *see United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (The district court's role is to "determine 'whether [the] evidence, if believed, would establish each element of the crime.'" (citation omitted)).

[4] *United States v. Vallo*, 238 F.3d 1242, 1246-47 (10th Cir. 2001).

[5] *McKissick*, 204 F.3d at 1289.

disability compensation; and (3) the value of the disability compensation was more than $1,000. In order to convict Mr. Hay, the government must prove each and every element beyond a reasonable doubt.[6]

Mr. Hay maintains that, as a general matter, the government failed to prove any of the elements beyond a reasonable doubt. He also specifically argues that the government cannot satisfy the second element because, as discussed below, § 641 does not encompass (1) fraud or (2) stealing by means of fraud, false claim, or fraudulent representations or omissions.

## III.     The plain language of § 641 does not encompass fraud, false claims, or stealing by fraud.

In pertinent part, 18 U.S.C. § 641 states:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate . . . does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

"Interpretation of a statute must begin with the statute's language."[7] "It is a fundamental canon of statutory construction that the words of a statute must be read

---

[6] *In re Winship*, 397 U.S. 358, 364 (1970) (The Due Process Clause requires the government to prove each and every element of a charged offense beyond a reasonable doubt.); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (The government "must [also] persuade the factfinder beyond a reasonable doubt of the facts necessary to establish each of those elements.").

[7] *Mallard v. U.S. Dist. Court for S.D. of Iowa*, 490 U.S. 296, 300 (1989) (internal citations omitted); *see Hasan v. Chase Bank*, 880 F.3d 1217, 1218 (10th Cir. 2018) ("Statutory interpretation begins with the words in the statute.").

in their context and with a view to their place in the overall statutory scheme."[8] Where a statute's language is plain, "the sole function of the courts is to enforce it according to its terms."[9] "[T]he meaning of statutory language, plain or not, depends on context."[10]

In promulgating § 641, Congress plainly delineated separate means by which the offense could be committed: embezzlement, stealing, purloining, and conversion.[11] The terms *fraud* and *false claim* are absent from the text. Further, the plain language of § 641 does not include conversion or stealing by fraud or false claim as a means by which the statute could be violated. The plain language of § 641 does not encompass fraud, and the Court should not read fraud into the statute. Moreover, as discussed below, Congress did not intend to include the concept of fraud into the statute. Had Congress intended § 641 to encompass fraud, Congress would have included fraud, or fraudulent conduct, as a means to violate the statute.

---

[8] *Home Depot v. Jackson*, 139 S. Ct. 1743, 1748 (2019).

[9] *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 240-41 (1989).

[10] *Hamer v. City of Trinidad*, 924 F.3d 1093, 1103 (10th Cir. 2019) (citation omitted).

[11] 18 U.S.C. § 641 (2004); *Morissette v. United States*, 342 U.S. 246, 271-72 (1952).

### i. Congress did not intend to include the concept of fraud in 18 U.S.C. § 641.

When searching for statutory meaning, the Court examines the context and structure of the statutory scheme in which a word is used, looking at the statute as a whole.[12] Congress is capable of promulgating a statute that penalizes fraud. Congress has made clear in other statutes when a criminal offense encompasses fraud.[13] Courts presume that "Congress is knowledgeable about existing law pertinent to the legislation it enacts."[14] So, when Congress "use[s] one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."[15]

---

[12] *Wichita Ctr. for Graduate Med. Educ., Inc. v. United States*, 917 F.3d 1221, 1225 (10th Cir. 2019) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988)).

[13] *See Univ. Health Servs. v. United States*, 579 U.S. 176 (2016) (explaining the history of the False Claims Act, which imposes civil liability for false claims against the government, was "aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War").

[14] *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988).

[15] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170, 252 (noting that related statutes "are to be interpreted together, as though they were one law").

### ii. Congress is capable of promulgating laws that penalize theft and fraud.

Theft and fraud are distinct concepts.[16] With a theft offense, "property has been obtained from its owner 'without consent[.]'"[17] "[I]n a fraud scheme, the owner has voluntarily 'surrendered' his property, because of an 'intentional perversion of truth,' or otherwise 'act[ed] upon' a false representation to his injury."[18] Consent is the controlling distinction between fraud and theft.[19]

Because theft and fraud are distinct, it is telling when Congress omits the concept of fraud in one statute and explicitly includes it in another statute. In Chapter 31 of Title 18, captioned "Embezzlement and Theft," the same chapter in which § 641 is found, Congress repeatedly demonstrated that it recognizes the difference between stealing and defrauding, taking care to unambiguously identify those offenses that apply to both types of taking.[20] Moreover, the existence of Chapter

---

[16] *Soliman v. Gonzalez*, <u>419 F.3d 276, 282</u> (4th Cir. 2005).

[17] *Id.* (citation omitted).

[18] *Id.* (citation omitted).

[19] *Id.*

[20] *See, e.g.*, <u>18 U.S.C. § 659</u> (whoever "embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception " obtains goods or chattels commits a criminal offense); <u>18 U.S.C. § 665</u> (whoever "embezzles, willfully misapplies, steals, or obtains by fraud" property commits a criminal offense); <u>18 U.S.C. § 666(a)(1)(A)</u> (whoever "embezzles, steals, obtains by fraud, or . . . converts" property commits a criminal offense); <u>18 U.S.C. § 668(b)(1)</u> (whoever "steals or obtains by fraud" an object of cultural heritage commits a criminal offense); <u>18 U.S.C. § 668(b)(2)</u> (whoever receives an object of cultural heritage knowing that it "has been stolen or obtained by fraud" commits a criminal offense); <u>18 U.S.C. § 670(a)(1)</u> (whoever "embezzles, steals, or by fraud or deception" obtains a pre-retail medical product commits a criminal offense).

47 of Title 18, titled "Fraud and False Statements," signifies Congress's ability to recognize and penalize forms of fraud.

### iii.  If Congress intended to penalize fraud in § 641, Congress would have written the statute to encompass fraud.

Section 641 was enacted in 1948, as a consolidation of four former sections of Title 18, as adopted in 1940.[21] That same year, Congress enacted 18 U.S.C. § 659, in which Congress sought to protect and promote the flow of goods in interstate commerce.[22] The relevant portion of Section 659 provides:

> Whoever embezzles, *steals*, or unlawfully takes, carries away, or conceal, or *by fraud or deception obtains* from any pipeline system, railroad car, wagon, motortruck, trailer, or other vehicle . . .

18 U.S.C. § 659 (1948 ed.) (emphases added).

Both § 641 and § 659 use the term *steal*. Where the two statutes depart, however, is § 659's use of a materially different term—*by fraud or deception obtains*. By using *by fraud or deception obtains*, it shows that Congress's belief was the term *steal* did not encompass fraud. Otherwise, it would be redundant to include both terms if *steal* already encompassed obtaining through fraud. Fraud and stealing are distinct, and Congress is able to promulgate a theft statute encompassing fraud. That Congress excluded the concept of fraud in § 641 is significant and shows that Congress did not intend for § 641 to include fraud, false claims, or stealing by fraud.

---

[21] *Morissette*, 342 U.S. at 265.

[22] *United States v. Berger*, 338 F.2d 485, 487 (2d Cir. 1964).

Reading fraud into § 641 would impermissibly add elements to the offense, thus expanding the reach of the statute.

## IV. Section 641 is unambiguous and so the Court should not read fraud into its text.

Courts are often unwilling to "read an absent word into [a] statute." An "absent provision cannot be supplied by the courts." As a matter of statutory interpretation, "[t]o supply omissions transcends the judicial function." Section 641 is an unambiguous statute. To read fraud into the statute—where Congress intentionally excluded the concept—would be impermissible.

Reading fraud into § 641 requires the Court to impermissibly add the element of materiality, and an "absent provision cannot be supplied by the courts."[23] The government argued that Mr. Hay received VA disability payments because of fraudulent representations or omissions or false claim—in short, because of a "scheme to defraud." As discussed above, § 641 does not encompass fraud or fraudulent conduct in any form. Criminal statutes that do proscribe a scheme to defraud or to obtain money or property "by means of false or fraudulent pretenses, representations, or promises," however, require the government to meet an element of materiality.[24] Adding this new element will alter the range of conduct the statute

---

[23] Scalia & Garner, *supra*, at 94, 93-100 (discussing the omitted-case canon).

[24] *See Neder v. United States*, <u>527 U.S. 1, 24</u> (1999).

punishes. It would impermissibly substantively change and expand the criminal conduct covered by § 641.[25]

The government's case is that the theft of government funds occurred because of Mr. Hay's alleged fraudulent representations and omissions and false claims to the VA regarding his disabilities—in short, because of his "scheme to defraud." Section 641, however, does not encompass fraud. Fraud, or fraudulent conduct, is not a means by which the statute may be violated. To read "fraud" into the statute now and use it to impose criminal liability would be unconstitutional and violate Mr. Hay's right to due process.[26]

## V.      The government failed to prove, beyond a reasonable doubt, that Mr. Hay is guilty of theft of government property.

The government failed to prove, beyond a reasonable doubt, that Mr. Hay stole, embezzled, or converted VA disability benefits knowing they were not his and intending to deprive the owner of the use or benefit of the disability benefits. Because the government has failed to prove all elements of the offense beyond a reasonable doubt, Mr. Hay should be granted judgment of acquittal.

---

[25] *See Schriro v. Summerlin*, <u>542 U.S. 348, 354</u> (2004) ("A decision that modifies the elements of an offense is normally substantive rather than procedural. New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa.").

[26] *Bouie v. City of Columbia*, <u>378 U.S. 347</u> (1964) ("The crime for which these petitioners stand convicted was 'not enumerated in the statute' at the time of their conduct. It follows that they have been deprived of liberty and property without due process of law in contravention of the Fourteenth Amendment." (citation omitted)).

## Conclusion

The government failed to establish every element of the charged offenses beyond a reasonable doubt. Thus, Mr. Hay is entitled to acquittal on all counts.

Respectfully submitted,

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on August 5, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA      )
        Plaintiff,         )
                      )
                      )
        v.              )        Case No. 19-20044-JAR
                      )
BRUCE L. HAY,              )
        Defendant      )
                      )

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The United States of America, by and through the undersigned counsel, responds to Defendant Bruce Hay's Motion for Judgment of Acquittal (doc. 99).

The Defendant's argument in support of his motion is based on the remarkable proposition that the theft of government funds statute (18 U.S.C. § 641) does not encompass receipt of government funds based on false and fraudulent pretenses. It has no basis in law and should be denied.

"Stealing" includes any acquisition of the property of another by false pretenses. Black's Law Dictionary defines "steal" in the following way: "1. To take (personal property) illegally with the intent to keep it unlawfully. 2. To take (something) by larceny, embezzlement *or false pretenses*." Black's Law Dictionary 1425 (11th ed. 2019) (emphasis added).

The defendant's attempt to draw a distinction between "fraud" and "stealing" is unavailing. At its very basic level, "stealing" encompasses "any dishonest transaction whereby one person obtains that which rightfully belongs to another." *Crabb v. Zerbst*, 99 F.2d 562, 565 (5th Cir. 1938. The Defendant cites, without meaningful discussion, the Supreme Court's decision in *United States v. Morissette*, 342 U.S. 246 (1952). (Doc. 99 at 4, 7). But *Morissette*

1

addressed the specific intent element of § 641, and its general discussion of § 641 contradicts the

Defendant's position. Significantly, the Court remarked: "The history of § 641 demonstrates that

it was to apply to acts which constituted larceny or embezzlement at common law and also acts

which shade into those crimes but which, most strictly considered, might not be found to fit their

fixed definitions." *Id.* at 266 n.28. It also explained that "[s]tealing, having no common law

definition to restrict its meaning as an offense, is commonly used to denote any dishonest

transaction whereby one person obtains that which rightfully belongs to another." *Id.*

      Not surprisingly, Circuit Courts of Appeal have routinely affirmed convictions for theft

of government funds when those funds were obtained by fraud. *See United States v. Dowl*, 619

F.3d 494, 501-02 (5th Cir. 2010) (collecting cases indicating that a fraudulent scheme would fall

within the scope of § 641); *United States v. Herrera-Martinez*, 525 F.3d 60, 61 (1st Cir. 2008)

(holding that § 641 applied to defendant charged with making false claims for federal benefits);

*United States v. Aguilar*, 967 F.2d 111, 114 (5th Cir. 1992) (noted the breadth of the term "steal"

and holding that Congress intended for § 641 to include offenses like passing bad checks);

*United States v. Crutchley*, 502 F.2d 1195, 1201 (3d Cir. 1974) (finding that § 641 applies to

"larceny by trick") (citations omitted); *see also* Model Crim. Jury Instr. 8th Cir. 6.18.641 cmt.

(2021) ("In this statute, steal or stealing has been given broader meaning than larceny at common

law. The statute applies to any taking whereby a person dishonestly obtains anything of value

belonging to another with the intent to deprive the owner of the rights and benefits of

ownership."); 1 Modern Federal Jury Instructions-Criminal P23A.01 cmt ("Stealing includes

obtaining property by misrepresentation.").

In this case, the Defendant's acquisition of money from the VA through false pretenses and deceit is exactly what Congress intended to address with the enactment of § 641. His motion should be denied.[1]

Respectfully submitted,

/s/ Ryan J. Huschka
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Ryan.Huschka@usdoj.gov
KS Bar No. 23840


/s/ Christopher Oakley
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-6754
Chris.Oakley@usdoj.gov
KS Bar No. 19248

---

[1] The Defendant's general motion judgment for acquittal (doc. 99 at 2), for which he offers no support, should also be denied. The overwhelming evidence established that the Defendant could engage in all manner of intense, physical labor at the same time he falsely represented to the VA that he had constant tremors and jerking movements, could not walk, drive, or even engage in the most basic activities of daily living. In 2012, he falsely claimed that his condition was permanent and would never improve, which is directly contradicted by witness testimony, video footage, and other documents that were introduced at trial. All of the elements of wire fraud (18 U.S.C. § 1343) and theft of government funds (18 U.S.C. § 641) were established at trial.

3

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2022, I caused the foregoing pleading to be filed with the

Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*/s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA**,
*Plaintiff,*

vs.                                              **CASE NO. 2:19-cr-20044-JAR**

**BRUCE HAY**,
*Defendant.*

---

## MOTION TO EXCLUDE SUPERSEDING INDICTMENT TO THE JURY

---

### *Introduction*

A Superseding Indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. <u>Fed. R. Crim. P. 7(c)(1)</u>. In this case, the Superseding Indictment includes language that invades the province of the jury and is unfairly prejudicial to Mr. Bruce Hay.[1] Defendant Bruce Hay ask the Court to refrain from:

(1) reading the Superseding Indictment to the jury; and

(2) providing the jury with a written copy of the Superseding Indictment.

### *Argument*

The Superseding Indictment in this case is particularly argumentative and contains many more conclusory statements than contemplated by federal

---

[1] D.E. 136

rules. It is essentially the government's closing argument. It presents, in writing the prosecution's theory–and only the prosecution's theory–of the case. Because of this, the Superseding Indictment should not be read or provided to the jury during deliberations.

Rule 7 of the Federal Rules of Criminal Procedure states that a federal Superseding Indictment should contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."[2] The Superseding Indictment in this case goes well beyond a concise statement of the essential facts constituting the offenses charged. It explains the prosecution's theory of the case and draws conclusions that invade the province of the jury.

In *United States v. Esso*, the U.S. Court of Appeals for the Second Circuit discussed the practice of sending the Indictment into the jury room:

> Indeed, while it is permissible, as we have noted above, to send the indictment into the jury room, the practice is hardly mandatory, and not all trial judges follow it, particularly when the indictment does not merely state the statutory charges against the defendant, but additionally contains a running narrative of the government's version of the facts of the case, including detailed allegations of facts not necessary for the jury to find in order to address the elements of the charged offenses. In most cases, the judge's instructions regarding the issues to be addressed by the jury and the elements of the offenses charged, which may include a reading of the legally effective portions of the indictment, will more than suffice to apprise the jury of the charges before them.[3]

[2] Fed. R. Crim. P. 7(c)(1).
[3] 684 F.3d 347, 352 n.5 (2d Cir. 2012).

Mr. Hay asks this Court to follow the logic of the Second Circuit in *Esso*.

Here, the Superseding Indictment sets forth the government's opinion on two ultimate issues of fact that are for the jury to decide: (1) the state of mind of the defendant and (2) whether any statements, representations or omissions were material. For example, the Superseding Indictment includes the following language:

> "In a September 12, 2007 rating decision, the VA determined HAY had 100% service-connected disability ratings for conversion disorder and generalized choreiform movement disorder (previously evaluated as psychomotor abnormal tremors or body movements). This was based on HAY reporting that he had frequent problems with falls, dropping objects, inability to grasp items, and difficulty with upper body movements; that he required a cane or walker to walk; that he was unable to drive; that he could not tie his shoes or put on his socks; and that he had constant tremors and shakes.[4]"

> "As part of the scheme to defraud, HAY made fraudulent representations regarding his claimed disabilities, faked or exaggerated symptoms, and failed to disclose his true physical condition, capabilities, and daily activity. HAY's failure to provide true and accurate information concealed his ineligibility for benefits and accommodations, allowed him to maintain a 100% disability rating and obtain a permanent designation, and otherwise prevented the VA from learning of his purported disabilities and reducing his benefits accordingly."[5]

---

[4] D.E. 68 ¶8.
[5] D.E. 68 ¶11.

"To further and conceal the scheme, HAY feigned or exaggerated physical symptoms during appointments with VA doctors or examiners. For instance, when he was moving in and around VA facilities, HAY exaggerated his physical symptoms—displaying a significant limp, muscle spasms, head bobs, and jerking movements—and used a walker that he did not normally use outside of VA facilities."[6]

These conclusory statements reach far beyond a plain and concise statement of the essential facts. This language tells the jury that Mr. Hay intended to defraud the VA, and that his alleged statements, representations, and omissions were false and material to the VA's rating decision. These are only three examples; the Superseding Indictment is replete with statements by the government that improperly invade the province of the jury.

Whether Mr. Hay acted with specific intent to defraud, whether he made false or misleading statements, representations, or omissions, and whether any of those statements, representations, or omissions were material is for the jury to decide. Mr. Hay's subjective state of mind, in particular, is a question of fact within the exclusive province of the jury. Here, the government seeks to make an argument in the Superseding Indictment that should be left to closing argument.

[6] D.E. 68 ¶16.

Because the Superseding Indictment contains well more than contemplated by Federal Rule of Criminal Procedure 7(c)(1), the prosecution's "speaking Superseding Indictment" should not be read to the jury or allowed to serve as a refresher on the prosecution's theories and allegations after the case is submitted to the jury.

This request is not without precedent in this district. In *United States v. Reulet et al.*, one of the defendants argued that the Indictment went well beyond a concise statement of the essential facts by explaining the prosecution's theory of the case and by including additional alleged facts that were wholly unnecessary to the elements of the offense charged.[7] The Honorable Judge Daniel Crabtree agreed, explaining that because the indictment was "particularly argumentative, . . . the jury should not have it in the jury room," and Judge Crabtree would "not read the Indictment in its entirety to the jury."[8] The Court went on to direct the parties to remove any cross-references to the Indictment when preparing proposed jury instructions.[9] The Superseding Indictment in this case suffers from the same problems.

---

[7] *See* D.E. 539, Case No. 14-40005-DDC (D. Kan. Nov. 20, 2015).
[8] *United States v. Reulet*, 2016 WL 126355, at *7 (D. Kan. Jan. 11, 2016).
[9] *Id.*

In addition, the Superseding Indictment contains only a partial definition of a crucial regulation. It is a violation of Mr. Hay's right to due process if the jury is allowed to only consider this partial definition. The Superseding Indictment includes the following language:

> "The VA also administered the Special Monthly Compensation (SMC) program, which paid a higher rate of disability compensation to qualifying veterans due to special circumstances such as the need of aid and attendance (A&A) by another person. In essence, this means being so helpless—inability to dress or undress, inability to eat, or inability to use the restroom without assistance—as to require the regular "aid and attendance" of another person."[10]

The full definition of "aid and attendance" is found in 38 C.F.R. § 3.352. And that full definition clarifies that the veteran must only be so helpless as to need regular aid and attendance, "*not that there* [*must*] *be a constant need*."[11]

By omitting this italicized language, the Superseding Indictment elides a critical qualifier: the fact that a veteran may *sometimes* be able to function without such aid and attendance does not—contrary to the Superseding Indictment—mean that the veteran is not, as a matter of law, entitled to "a higher rate of disability compensation"[12] The partial definition contained in

---

[10] D.E. 68 ¶4.
[11] 38 C.F.R. § 3.352
[12] D.E. 68 ¶4.

the Superseding Indictment therefore creates unfair prejudice and misleads the jury on an ultimate issue.

## Conclusion

For these reasons, this Court should prohibit the Superseding Indictment from being read in its entirety to the jury and prohibit it from being provided to the jury during deliberations.

Respectfully submitted,

s/ Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone (913) 551-6712
Fax: (913) 551-6562
Email: Che_Ramsey@fd.org
Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 7, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Ryan Huschka
Assistant United States Attorney
Ryan.Huschka@usdoj.gov

Chris Oakley
Assistant United States Attorney
Chris.oakley@usdoj.gov

s/ Chekasha Ramsey
CHEKASHA RAMSEY, #78476

CLERK'S COURTROOM MINUTE SHEET

Case No: 19-20044-01-JAR

APPEARANCES:

UNITED STATES OF AMERICA                Chris Oakley and Ryan Huschka

                  Plaintiff,

BRUCE L. HAY

                  Defendant.          Che Ramsey and David Magariel

| Judge: Julie Robinson Clerk: Bonnie Wiest Reporter: Dani Murray | DATE: T/B: T/E: | 8/1/2022 8:55 a.m. 4:53 p.m. | 8/2/2022 9:26 a.m. 4:44 p.m. | 8/3/2022 8:54 a.m. 5:08 p.m. | 8/4/2022 9:02 a.m. 4:26 p.m. |
|---|---|---|---|---|---|
| 8/5/2022 8:58 a.m. 3:58 p.m. | 8/8/2022 9:02 a.m. 12:01 p.m. | | 8/9/2022 9:30 a.m. 3:16 p.m. | 8/10/2022 8:37 a.m. 4:24 p.m. | 8/11/2022 9:49 9:52 |

PROCEEDINGS

JURY IMPANELED & SWORN:    8/1/2022 at 1:18 p.m.        Kansas City, Kansas

| | (BACK ROW) | | (FRONT ROW) |
|---|---|---|---|
| 1 | 101175904 01-0048 | 8. | 101183601 01-0023 |
| 2 | 101158180 01-0002 | 9. | 101190198 01-0123 |
| 3 | 101178185 01-0003 | 10. | 101169330 01-0028 |
| 4 | 101156827 01-0142 | 11. | 101172443 01-0044 |
| 5. | 101181053 01-0036 | 12. | 101205587 01-0065 |
| 6. | 101200200 01-0057 | Alt 1 | 101195149 01-0100 |
| 7. | 101198694 01-0121 | Alt 2 | 101174064 01-0026 |
| | | Alt 3 | 101157046 01-0053 |

# JURY TRIAL PROCEEDINGS MINUTES
## 19-20044-JAR (USA VS. BRUCE L. HAY)

**AUGUST 1, 2022**
Court Reporter: Dani Murray
- Court convenes at 8:55 a.m.
- Preliminary matters discussed outside the presence of the jury panel.
- Entire Jury panel is sworn in.
- Voir dire and jury selection begin.
- Jury is impaneled and sworn at 1:18 p.m.
- The Court recesses for lunch break (1:18 p.m. to 2:28 p.m.)
- Preliminary jury instructions read to jury.
- Government's opening statement.
- Defendant's opening statement.
- Government begins presentation of evidence.
- Testimony of Special Agent Daniel White.
- Jury admonition.  Jury excused.  Court adjourns at 4:53 p.m.  Trial to resume on August 2, 2022, beginning at 9:30 a.m.


**AUGUST 2, 2022**
Court Reporter: Dani Murray
- Court convenes at 9:26 a.m.
- The government continues with presentation of evidence.
- Continue with testimony of Special Agent Daniel White.
- Testimony of Aimee Rogers.
- The Court recesses for lunch break (12:22 p.m. to 1:20 p.m.)
- Record made outside the presence of the jury.
- Continue with testimony of Aimee Rogers.
- Testimony of Dr. Emmett McWoods.
- Testimony of Dr. Robert Beck.
- Jury admonition.  Jury excused.  Court adjourns at 4:44 p.m.  Trial to resume on August 3, 2022, at 9:00 a.m.

**AUGUST 3, 2022**
Court Reporter: Dani Murray
- Court convenes at 8:54 a.m.
- Record made outside presence of the jury.
- The government continues with presentation of evidence.
- Testimony of Dr. Kathryn Hedges.
- Testimony of Agent Kerry Baker.
- Jury excused for lunch.
- Record made outside presence of the jury.
- The Court recesses for lunch break (12:18 p.m. to 1:18 p.m.)
- Continue with testimony of Agent Kerry Baker.
- Testimony of Dr. Carolyn Karr.

# JURY TRIAL PROCEEDINGS MINUTES
## 19-20044-JAR (USA VS. BRUCE L. HAY)

- Jury admonition.  Jury excused.
- Court adjourns at 5:08 p.m.  Trial to resume on August 4, 2022, at 9:00 a.m.

**AUGUST 4, 2022**
Court Reporter:  Dani Murray
- Court convenes at 9:02 a.m.
- The government continues with presentation of evidence.
- Continue with testimony of Dr. Karr.
- Testimony of Dolly Cherian.
- Testimony of Special Agent Shane Osterhaus.
- Testimony of Special Agent Tim Mugrage.
- The Court recesses for lunch break (12:05 p.m. to 1:15 p.m.)
- Testimony of Lauren Clary.
- Testimony of Myron Stroup.
- Testimony of Rhonda Snyder.
- Testimony of Bert Snyder.
- Testimony of Stacy Macom.
- Testimony of Joe Hughes.
- Testimony of David Ellis.
- Testimony of Nathen Howard.
- Testimony of Yessika Zarazua.
- Jury admonition.  Jury excused.
- Court adjourns at 4:26 p.m.  Trial to resume on August 5, 2022, at 9:00 a.m.

**AUGUST 5, 2022**
Court Reporter:  Dani Murray
- Court convenes at 8:58 a.m.
- Record made outside the presence of the jury.
- Government continues with presentation of evidence.
- Continue with testimony of Yessika Zarazua.
- Testimony of Ellen Berry.
- Testimony of Suzy Tousey.
- Joint Stipulation of the parties read into the record.
- Testimony of Paul Kalmar.
- Record made outside the presence of the jury.
- Testimony of Wesley Ungeheuer.
- The Court recesses for lunch break (11:05 a.m. to 1:01 p.m.)
- Testimony of Dr. Danielle Becker.
- Testimony of James Carmack.
- Jury admonition.  Jury excused at 3:55 p.m.
- Defendant orally moves for judgment of acquittal.  The Court takes under advisement.

# JURY TRIAL PROCEEDINGS MINUTES
## 19-20044-JAR (USA VS. BRUCE L. HAY)

- Court adjourns at 3:58 p.m. Trial to resume on August 8, 2022, at 9:00 a.m.

**AUGUST 8, 2022**
Court Reporter: Nancy Wiss
- Court convenes at 9:02 1 a.m.
- Defendant begins presentation of evidence.
- Testimony of Alan Acker.
- Testimony of Dr. Harry Wilkins.
- Testimony of Dr. Daryl Callahan.
- Testimony of Dr. Luis Giron, Jr.
- Testimony of Rebekah Branson.
- Jury admonition. Jury excused at 12:00 p.m.
- Court adjourns at 12:01 p.m. Trial to resume on August 9, 2022, at 9:30 a.m.

**AUGUST 9, 2022**
Court Reporter: Nancy Wiss
- Court convenes at 9:30 a.m.
- Defense continues with presentation of evidence.
- Testimony of Dr. Vikas Singh.
- Testimony of Dr. Brian Lewis.
- Testimony of Jessica Klinge.
- Court recesses for lunch break (11:05 a.m. to 1:01 p.m.)
- Testimony of Barbara Brown.
- Testimony of Leon Zook.
- Testimony Pastor Joseph Bell.
- Jury admonition. Jury excused at 2.13 p.m.
- Final instruction conference is held outside the presence of the jury.
- Court adjourns at 3:16 p.m. Trial will resume on August 10, 2022, at 8:30 a.m.

**AUGUST 10, 2022**
Court Reporter: Nancy Wiss
- Court convenes at 8:37 a.m. Record made outside the presence of the jury.
- Trial resumes and jury brought in at 9:02 a.m.
- Defense continues with presentation of evidence.
- Testimony of George Feebeck.
- Testimony of Dr. Mary O'Neal.
- Record made outside the presence of the jury. Defendant confirms he will not be testifying.
- Defendant orally moves for judgment of acquittal. The Court takes under advisement.
- Defense rests.

- Court recesses for lunch break (11:27 a.m. to 1:02 p.m.)
- Record made outside the presence of the jury.
- The Court instructs the jury.
- Government's closing argument.
- Record made outside the presence of the jury. Defendant moves for mistrial for reasons stated on the record. The Court denies motion.
- Defendant's closing argument.
- Final instructions read to jury. No objections to the reading of the instructions.
- Bailiffs were duly sworn.
- Jury released to begin deliberations.
- Jury admonition. Jury excused.
- Court adjourns at 5:39 p.m. Deliberations will resume on August 11, 2022, at 8:30 a.m.


**AUGUST 11, 2022**
Court Reporter: Nancy Wiss
- Jury begins deliberations at 8:30 a.m.

  Jury reaches a verdict. The verdict is read in open court at 9:49 a.m.
    - On the offense of wire fraud charged in Count 1, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of wire fraud charged in Count 2, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of wire fraud charged in Count 3, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of wire fraud charged in Count 4, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of wire fraud charged in Count 5, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of wire fraud charged in Count 6, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of theft of government funds charged in Count 7, we find the defendant Mr. Bruce Hay: GUILTY
    - On the offense of theft of government funds charged in Count 8, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of theft of government funds charged in Count 9, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of theft of government funds charged in Count 10, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of theft of government funds charged in Count 11, we find the defendant, Mr. Bruce Hay: GUILTY
    - On the offense of theft of government funds charged in Count 12, we find the defendant, Mr. Bruce Hay: GUILTY

- o On the offense of theft of government funds charged in Count 13, we find the defendant, Mr. Bruce Hay:  GUILTY
- o On the offense of theft of government funds charged in Count 14, we find the defendant, Mr. Bruce Hay:  Guilty
- o On the offense of theft of government funds charged in Count 15, we find the defendant, Mr. Bruce Hay:  GUILTY
- o On the offense of theft of government funds charged in Count 16, we find the defendant, Mr. Bruce Hay:  GUILTY

- July polled.
- Jury released.
- The Court schedules sentencing for October 27, 2022, at 9:00 a.m.  Sentencing Memoranda due October 13, 2022.  Responses due October 27, 2022.
- The Court adjourns at 9:55 a.m.

Exhibits returned to the parties following trial.

Defendant remains on release.

| No. | Description | I.D. | Off. | Adm. | Witness |
|-----|-------------|------|------|------|---------|
| **Video Evidence (1-99)** | | | | | |
| 1 | 10/29/12 - Prior to CBOC appointment – working on truck | x | x | x | White |
| 2 | 10/29/12 - Prior to CBOC appointment – title company | x | x | x | White |
| 3 | 10/29/12 - Arriving at CBOC appointment | x | x | x | White |
| 4 | 10/29/12 - Leaving CBOC appointment | x | x | x | White |
| 5 | 10/29/12 - Leaving Miami County Admin building | x | x | x | White |
| 6 | 10/29/12 - Video in truck bed with hay bale | x | x | x | White |
| 7 | 11/19/12 - Prior to SSA evaluation | x | x | x | Carmack |
| 8 | 11/19/12 -Arriving at SSA evaluation | x | x | x | White |
| 9 | 11/19/12 -Leaving SSA evaluation | x | x | x | White |
| 10 | 11/19/12 -Leaving SSA evaluation angle 2 | x | x | x | White |
| 11 | 11/19/12 - Pawn shop after SSA evaluation | x | x | x | White |
| 12 | 11/19/12 - Leaving pawn shop after SSA evaluation | x | x | x | White |
| 13 | 11/19/12 -At business after SSA evaluation | x | x | x | White |
| 14 | 11/19/12 - Home after SSA evaluation | x | x | x | White |
| 15 | 11/19/12 - Driving after SSA evaluation | x | x | x | White |
| 16 | 11/19/12 - Leaving neighbor's house after SSA evaluation | x | x | x | White |
| 17 | 11/28/12 – Surveillance – Gesturing | x | x | x | White |
| 18 | 11/28/12 - Surveillance – Standing, bending, shaking hands | x | x | x | White |
| 19 | 11/28/12 - Surveillance – Standing, gesturing | x | x | x | White |
| 20 | 11/28/12 - Surveillance – Standing, walking, gesturing close-up | x | x | x | White |

1

**Government's Trial Exhibit List**

| No. | Description | I.D. | Off. | Adm. | Witness |
|-----|-------------|------|------|------|---------|
| 21 | 11/28/12 – Surveillance - Standing, walking | x | x | x | White |
| 22 | 11/29/12 - Surveillance at Hay farm | x | x | x | White |
| 23 | 11/29/12 - Surveillance at around Hay farm | x | x | x | White |
| 24 | 3/24/17 - VAMC dental appointment | x | x | x | Baker |
| 25 | INTENTIONALLY BLANK | | | | |
| 26 | 3/24/17 - VAMC dental appointment – lobby 1 | x | x | x | Howard |
| 27 | 3/24/17 - VAMC dental appointment lobby 2 | x | x | x | Howard |
| 28 | 3/24/17 - VAMC dental appointment – lobby 3 | x | x | x | Howard |
| 29 | INTENTIONALLY BLANK | | | | |
| 30 | INTENTIONALLY BLANK | | | | |
| 31 | 3/24/17 - VAMC dental appointment – walking | x | x | x | Mugrage |
| 32 | INTENTIONALLY BLANK | | | | |
| 33 | INTENTIONALLY BLANK | | | | |
| 34 | INTENTIONALLY BLANK | | | | |
| 35 | INTENTIONALLY BLANK | | | | |
| 36 | 3/24/17 - VAMC dental appointment – walking elevator | x | x | x | Mugrage |
| 37 | INTENTIONALLY BLANK | | | | |
| 38 | INTENTIONALLY BLANK | | | | |
| 39 | INTENTIONALLY BLANK | | | | |
| 40 | INTENTIONALLY BLANK | | | | |
| 41 | INTENTIONALLY BLANK | | | | |

2

| No. | Description | I.D. | Off. | Adm. | Witness |
|-----|-------------|------|------|------|---------|
| 42 | 3/30/17 Leaving CBOC appointment | x | x | x | Baker |
| 43 | 3/30/17 Leaving CBOC appointment angle 2 | x | x | x | Baker |
| 44 | 3/30/17 Walking downtown Paola | x | x | x | Carmack |
| 45 | INTENTIONALLY BLANK | | | | |
| 46 | 5/3/17 - C&P arrival | x | x | x | Mugrage |
| 47 | INTENTIONALLY BLANK | | | | |
| 48 | 5/3/17 - C&P physical examination | x | x | x | Baker |
| 49 | 5/3/17 - C&P mental examination | x | x | x | Baker |
| 50 | 5/3/17 - Departure from C&P examination | x | x | x | Osterhaus |
| 51 | 5/3/17 - Departure from C&P examination loading walker in truck | x | x | x | Carmack |
| 52 | 5/3/17 - Departure from C&P examination parking lot | x | x | x | Mugrage |
| 53 | 5/3/17 - SSA arrival | x | x | x | Osterhaus |
| 54 | 5/3/17 - SSA departure pick up change | x | x | x | Osterhaus |
| 55 | 5/3/17 - Arriving at Sam's Club after C&P examination | x | x | x | Osterhaus |
| 56 | 5/3/17 – Sam's Club battery aisle | x | x | x | Carmack |
| 57 | 5/3/17 – Sam's Club check out | x | x | x | Carmack |
| 58 | 5/3/17 – Sam's Club end of paper aisle | x | x | x | Carmack |
| 59 | 5/3/17 – Sam's Club after C&P examination | x | x | x | Carmack |
| 60 | 5/3/17 – Sam's Club meat aisle | x | x | x | Carmack |
| 61 | 5/3/17 – Sam's Club samples | x | x | x | Carmack |
| 62 | 5/3/17 – Sam's Club paper aisle | x | x | x | Carmack |

3

| No. | Description | I.D. | Off. | Adm. | Witness |
|-----|-------------|------|------|------|---------|
| 63 | 5/3/17 – Sam's Club checkout | x | x | x | Carmack |
| 64 | 5/3/17 – Sam's Club load truck at exit | x | x | x | Carmack |
| 65 | 5/3/17 – Sam's Club loading items into truck | x | x | x | Osterhaus |
| 66 | INTENTIONALLY BLANK | | | | |
| 67 | 6/2/17 – Surveillance truck towing | x | x | x | Carmack |
| 68 | 6/2/17 – Surveillance carrying toddler | x | x | x | Carmack |
| 69 | 6/2/17 – Surveillance carrying toddler into house | x | x | x | Carmack |
| 70 | 6/2/17 – Surveillance at car dealer | x | x | x | Carmack |
| 71 | Video of target practice | x | x | x | R. Snyder |
| 72 | Video of Bruce Hay throwing hay bales on trailer | x | x | x | R. Snyder |
| 73 | 10/29/12 surveillance driving truck | | | | |
| 74 | 9/7/21 Hay on his roof | x | x | x | Macon |
| 75 | Video of Bruce Hay loading hay bales | x | x | x | B. Snyder |
| 76 | 1-12-21 Deer cam at Linda Hay's | | | | |
| 77 | Hay walking on farm | x | x | x | B. Snyder |
| 78 | 5/3/17 Sam's Club entrance camera | x | x | x | Mugrage |
| 79 | 5/3/17 Sam's Club overhead camera | x | x | x | Mugrage |
| 80 | 5/3/17 Sam's Club roof camera | x | x | x | Mugrage |
| 81 | 5/3/17 Sam's Club exit camera | x | x | x | Mugrage |
| 82 | Video running toward road | | | | |
| 83 | 7-11-22 Wes Recycling Surveillance | x | x | x | Ungerheuer |

4

| | | | | | |
|---|---|---|---|---|---|
| 84 | 7-11-22 Wes Recycling Surveillance 2 | x | x | x | Ungerheuer |
| 85 | 7-25-22 Wes Recycling Surveillance | x | x | x | Ungeheuer |
| 86 | Highland Games Video 1 | | | | |
| 87 | Highland Games Video 2 | | | | |
| 88 | Highland Games Video 3 | | | | |
| 89 | Highland Games Video 4 | | | | |
| 90 | Highland Games Video 5 | | | | |
| 91 | Highland Games Video 6 | x | x | x | Baker |
| 92 | Highland Games Video 7 | x | x | x | Baker |
| **Pole Camera Surveillance (100-109)** | | | | | |
| 100 | Pole Camera Footage, Oct. 2016, Mar. 2017, May 2017 | x | x | x | Baker |
| 100-A | 10/8/16 Pole Camera Footage - Buckets from truck bed | x | x | x | Baker |
| 100-AA | 5/3/17 Pole Camera Footage - carrying baby | x | x | x | Baker |
| 100-B | 10/8/16 Pole Camera Footage - Carrying items into house | x | x | x | Baker |
| 100-BB | 5/3/17 Pole Camera Footage - work on truck and leaves | x | x | x | Baker |
| 100-C | 10/13/16 Pole Camera Footage - Walking | x | x | x | Baker |
| 100-CC | 5/3/17 Pole Camera Footage - returns | x | x | x | Baker |
| 100-D | 10/14/16 Pole Camera Footage – Carrying objects | x | x | x | Baker |
| 100-E | 10/15/16 Pole Camera Footage - carrying items back and forth | x | x | x | Baker |
| 100-F | 10/28/16 Pole Camera Footage - Carrying baby carrier and bag back and forth | x | x | x | Baker |
| 100-G | 10/28/16 Pole Camera Footage - Walking around, carrying child, carrying objects | x | x | x | Baker |

5

| 100-H | 10/29/16 Pole Camera Footage – Walking back and forth | x | x | x | Baker |
|---|---|---|---|---|---|
| 100-I | 10/30/16 Pole Camera Footage – Driving, moving gas cans | x | x | x | Baker |
| 100-J | 11/1/16 Pole Camera Footage - carries baby carrier, moves gas cans from truck | x | x | x | Baker |
| 100-K | 11/1/16 Pole Camera Footage - walking, throwing item | x | x | x | Baker |
| 100-L | 11/3/16 Pole Camera Footage - scraping mud off boots | x | x | x | Baker |
| 100-M | 11/4/16 Pole Camera Footage – moving boxes, truck bed bouncing | x | x | x | Baker |
| 100-N | 11/4/16 Pole Camera Footage - more box moving | x | x | x | Baker |
| 100-O | 11/17/16 Pole Camera Footage - driving truck, jumps in and out of truck bed | x | x | x | Baker |
| 100-P | 11/24/16 Pole Camera Footage - working on trailer, carrying boxes | x | x | x | Baker |
| 100-Q | 11/27/16 Pole Camera Footage - carrying bag into house | x | x | x | Baker |
| 100-R | 11/27/16 Pole Camera Footage - carrying heavy box, working on car | x | x | x | Baker |
| 100-S | 11/29/16 Pole Camera Footage - jogs into house, carrying toddler, carrying boxes in both hands | x | x | x | Baker |
| 100-T | 3/30/17 Pole Camera Footage - carrying baby, carrying multiple trash bags | x | x | x | Baker |
| 100-U | 3/30/17 Pole Camera Footage - walking with baby carrier | x | x | x | Baker |
| 100-V | 3/30/17 Pole Camera Footage - drives up in red truck, walks in with items | x | x | x | Baker |
| 100-W | 3/30/17 Pole Camera Footage - walking to truck, running, and back | x | x | x | Baker |
| 100-X | 5/2/17 Pole Camera Footage - walking, moving door and large items between trucks, drives away | x | x | x | Baker |
| 100-Y | 5/3/17 Pole Camera Footage - carrying walker briskly to truck | x | x | x | Baker |
| 100-Z | 5/3/17 Pole Camera Footage - return from Sam's Club | x | x | x | Baker |
| 101 | Summary of pole camera surveillance of Hay residence | x | x | x | Baker |
| **Photographs (110-199)** | | | | | |

6

| 110 | 3/9/12 Veteran Farming Workshop RD13_HAY_000001 | x | x | x | Clary |
|-----|--------------------------------------------------|---|---|---|-------|
| 111 | 3/9/12 Veteran Farming Workshop RD13_HAY_000004 | x | x | x | Clary |
| 112 | 3/9/12 Veteran Farming Workshop RD13_HAY_000008 | x | x | x | Clary |
| 113 | 3/9/12 Veteran Farming Workshop RD13_HAY_000011 | x | x | x | Clary |
| 114 | 3/9/12 Veteran Farming Workshop RD13_HAY_000013 | x | x | x | Clary |
| 115 | 3/9/12 Veteran Farming Workshop RD13_HAY_000018 | x | x | x | Clary |
| 116 | 6/20/12 Emporia Farming Tour RD13_HAY_000019 | x | x | x | Clary |
| 117 | 6/20/12 Emporia Farming Tour RD13_HAY_000020 | x | x | x | Clary |
| 118 | 6/20/12 Emporia Farming Tour RD13_HAY_000021 | x | x | x | Clary |
| 119 | 6/20/12 Emporia Farming Tour RD13_HAY_000022 | x | x | x | Clary |
| 120 | 6/20/12 Emporia Farming Tour RD13_HAY_000023 | x | x | x | Clary |
| 121 | 6/20/12 Emporia Farming Tour RD13_HAY_000024 | x | x | x | Clary |
| 122 | 6/20/12 Emporia Farming Tour RD13_HAY_000025 | x | x | x | Clary |
| 123 | 6/20/12 Emporia Farming Tour RD13_HAY_000026 | x | x | x | Clary |
| 124 | 6/20/12 Emporia Farming Tour RD13_HAY_000027 | x | x | x | Clary |
| 125 | 6/20/12 Emporia Farming Tour RD13_HAY_000028 | x | x | x | Clary |
| 126 | 6/20/12 Emporia Farming Tour RD13_HAY_000029 | x | x | x | Clary |
| 127 | 6/20/12 Emporia Farming Tour RD13_HAY_000030 | x | x | x | Clary |
| 128 | 6/20/12 Emporia Farming Tour RD13_HAY_000031 | x | x | x | Clary |
| 129 | 6/20/12 Emporia Farming Tour RD13_HAY_000032 | x | x | x | Clary |
| 130 | 6/20/12 Emporia Farming Tour RD13_HAY_000033 | x | x | x | Clary |

7

| 131 | 6/20/12 Emporia Farming Tour RD13_HAY_000034 | x | x | x | Clary |
|-----|-----------------------------------------------|---|---|---|-------|
| 132 | 6/20/12 Emporia Farming Tour RD13_HAY_000035 | x | x | x | Clary |
| 133 | 6/20/12 Emporia Farming Tour RD13_HAY_000036 | x | x | x | Clary |
| 134 | Kansas Farmers Union, Kansas Kontact publication, Sept./Oct. 2012 | x | x | x | Clary |
| 135 | 7/31/12 Lawrence Farming Tour RD13_HAY_000037 | x | x | x | Clary |
| 136 | 7/31/12 Lawrence Farming Tour RD13_HAY_000038 | x | x | x | Clary |
| 137 | 7/31/12 Lawrence Farming Tour RD13_HAY_000039 | x | x | x | Clary |
| 138 | 7/31/12 Lawrence Farming Tour RD13_HAY_000040 | x | x | x | Clary |
| 139 | 7/31/12 Lawrence Farming Tour RD13_HAY_000041 | x | x | x | Clary |
| 140 | 7/31/12 Lawrence Farming Tour RD13_HAY_000042 | x | x | x | Clary |
| 141 | 7/31/12 Lawrence Farming Tour RD13_HAY_000043 | x | x | x | Clary |
| 142 | 7/31/12 Lawrence Farming Tour RD13_HAY_000044 | x | x | x | Clary |
| 143 | 7/31/12 Lawrence Farming Tour RD13_HAY_000045 | x | x | x | Clary |
| 144 | 7/31/12 Lawrence Farming Tour RD13_HAY_000046 | x | x | x | Clary |
| 145 | 7/31/12 Lawrence Farming Tour RD13_HAY_000047 | x | x | x | Clary |
| 146 | 7/31/12 Lawrence Farming Tour RD13_HAY_000048 | x | x | x | Clary |
| 147 | 7/31/12 Lawrence Farming Tour RD13_HAY_000049 | x | x | x | Clary |
| 148 | 7/31/12 Lawrence Farming Tour RD13_HAY_000050 | x | x | x | Clary |
| 149 | 7/31/12 Lawrence Farming Tour RD13_HAY_000051 | x | x | x | Clary |
| 150 | 7/31/12 Lawrence Farming Tour RD13_HAY_000052 | x | x | x | Clary |
| 151 | 7/31/12 Lawrence Farming Tour RD13_HAY_000053 | x | x | x | Clary |

| 152 | 7/31/12 Lawrence Farming Tour RD13_HAY_000054 | x | x | x | Clary |
|---|---|---|---|---|---|
| 153 | 7/31/12 Lawrence Farming Tour RD13_HAY_000055 | x | x | x | Clary |
| 154 | 7/31/12 Lawrence Farming Tour RD13_HAY_000056 | x | x | x | Clary |
| 155 | 7/31/12 Lawrence Farming Tour RD13_HAY_000057 | x | x | x | Clary |
| 156 | 7/31/12 Lawrence Farming Tour RD13_HAY_000058 | x | x | x | Clary |
| 157 | 7/31/12 Lawrence Farming Tour RD13_HAY_000059 | x | x | x | Clary |
| 158 | 7/31/12 Lawrence Farming Tour RD13_HAY_000060 | x | x | x | Clary |
| 159 | 7/31/12 Lawrence Farming Tour RD13_HAY_000061 | x | x | x | Clary |
| 160 | 7/31/12 Lawrence Farming Tour RD13_HAY_000062 | x | x | x | Clary |
| 161 | 7/31/12 Lawrence Farming Tour RD13_HAY_000063 | x | x | x | Clary |
| 162 | 7/31/12 Lawrence Farming Tour RD13_HAY_000064 | x | x | x | Clary |
| 163 | 6/12/21 Scrap Yard  RD13_HAY_000324 | | | | |
| 164 | 6/12/21 Scrap Yard  RD13_HAY_000325 | | | | |
| 165 | 6/12/21 Scrap Yard RD13_HAY_000326 | | | | |
| 166 | 6/12/21 Workshop RD13_HAY_000328 | x | x | x | Baker |
| 167 | 6/12/21 Workshop RD13_HAY_000329 | x | x | x | Baker |
| 168 | Residential construction labor | x | x | x | Kalmar |
| 169 | Residential construction labor | x | x | x | Kalmar |
| 170 | Residential construction labor | x | x | x | Kalmar |

9

| 171 | Residential construction labor | x | x | x | Kalmar |
|---|---|---|---|---|---|
| 172 | Residential construction labor | x | x | x | Kalmar |
| 173 | Residential construction labor | x | x | x | Kalmar |
| 174 | Residential construction labor | x | x | x | Kalmar |
| 175 | Residential construction labor | x | x | x | Kalmar |
| 176 | Residential construction labor | x | x | x | Kalmar |
| 177 | Residential construction labor | x | x | x | Kalmar |
| 178 | Residential construction labor | x | x | x | Kalmar |
| 179 | Residential construction labor | x | x | x | Kalmar |
| 180 | Residential construction labor | x | x | x | Kalmar |
| 181 | Residential construction labor | x | x | x | Kalmar |
| **VA C&P records (200-224)** | | | | | |
| 200 | 3/9/06 application for VA compensation and pension benefits | x | x | x | Rogers |
| 201 | 9/8/06 C&P examination | x | x | x | Rogers |
| 202 | 9/15/06 C&P examination | x | x | x | Rogers |
| 203 | 3/8/07 VA rating decision | x | x | x | Rogers |

10

| | | | | | |
|---|---|---|---|---|---|
| 204 | 8/16/07 C&P examination | x | x | x | Rogers |
| 205 | 8/24/07 C&P examination | x | x | x | Rogers |
| 206 | 9/12/07 VA rating decision | x | x | x | Rogers |
| 207 | 4/3/12 Hay statement in support of permanent and total disability, attaching 3/12/12 letter McWoods to VA | x | x | x | Rogers |
| 208-A | 3/18/13 C&P mental examination | x | x | x | Rogers |
| 208-B | 3/18/13 C&P neurological examination | x | x | x | Rogers |
| 209 | 4/20/13 rating decision | x | x | x | Rogers |
| 210-A | 5/3/17 C&P mental examination | x | x | x | Karr |
| 210-B | 5/3/17 C&P physical examination | x | x | x | Cherian |
| 211 | 4/17/17 letter VA to Hay | | | | |
| 212 | 3/14/18 Hay personal statement | | | | |
| 213 | INTENTIONALLY BLANK | | | | |
| 214 | INTENTIONALLY BLANK | | | | |
| 215 | VA disability payment history | x | x | x | Rogers |
| 216 | Breakdown of monthly VA benefits | x | x | x | Rogers |
| 217 | VA overpayment calculation (2011-2018) | x | x | x | Rogers |
| **Medical records (225-249)** | | | | | |
| 225 | Photograph of 2/25/05 vehicle accident | | | | |
| 226 | 5/5/05 MEB evaluation | | | | |
| 227 | 4/21/10 Primary Care Note | x | x | x | McWoods |
| 228 | 1/20/11 Primary Care Note | | | | |

11

| | | | | | |
|---|---|---|---|---|---|
| 229 | 5/12/12 Primary Care Note | x | x | x | McWoods |
| 230 | 2/6/12 Nursing Triage Note | | | | |
| 231 | 2/6/12 Physician ER Note | | | | |
| 232 | 2/7/12 ER Addendum | | | | |
| 233 | 2/7/12 ER Addendum | | | | |
| 234 | 2/21/12 Orthopedic Consult | | | | |
| 235 | 2005-05-17 Beck appointment notes re Hay | x | x | x | Beck |
| 236 | 2005-05-19 Hedges letter re Hay conversion disorder | x | x | x | Hedges |
| 237 | 2005-5-31 Neurology Letter | x | x | x | Hedges |
| 238 | 2005-08-31 letter Hedges to Wilkins | x | x | x | Hedges |
| 239 | 2005 Hedges docs | x | x | x | Hedges |
| **Bank records (250-299)** | | | | | |
| 250 | Citizens State Bank bank records | | | | |
| 251 | Interstate nexus joint stipulation | x | x | x | |
| **SSA records (300-324)** | | | | | |
| 300 | 9/18/12 Continuing Disability Review Report | x | x | x | Zarazua |
| 301 | 10/15/12 SSA Function Report | x | x | x | Zarazua |
| 302 | 10/15/12 SSA Third Party Function Report | x | x | x | Zarazua |
| 303 | 11/19/12 SSA evaluation | | | | |
| 304 | Request for Reconsideration - Mar 2013 RD13_HAY_000403 | x | x | x | Zarazua |
| 305 | Work Activity Report - March 22, 2011 RD13_HAY_000409 | | | | |

12

| | | | | | |
|---|---|---|---|---|---|
| 306 | Work Activity Report - May 3, 2011 (2005-2006) RD13_HAY_000416 | | | | |
| 307 | Work Activity Report - May 3, 2011 (2009_2010)  RD13_HAY_000428 | | | | |
| 308 | 03/07/13 Fax Hay to SSA | x | x | x | Zarazua |
| 309 | 07/25/2013 Request for hearing before ALJ | x | x | x | Zarazua |
| **Other (325-349)** | | | | | |
| 325 | 7/17/2009 letter USDA to Hay re farm operating plan and worksheet for payment eligibility | x | x | x | Stroup |
| 326 | 5/15/15 mortgage and employment agreement for past and future work on farm | | | | |
| 327 | 1/26/21 Mechanics Lien for work Hay did on farm 1985-2020 | x | x | x | Baker |
| 328 | INTENTIONALLY BLANK | | | | |
| 329 | 5/26/12 Hay Answer to Plaintiff's Reply to Motion to Set Aside Judgment, Miami County District Court | | | | |
| 330 | USDA subsidy information | | | | |
| 331 | Wes Recycling, Inc. customer records for Bruce Hay | x | x | x | Ungeheuer |
| 332 | Google Map Osawatomie to Westside Church Nazarene | x | x | x | Bell |

13

# EXHIBIT SHEET

*United States v. Bruce Hay*, Case No. 19-20044-JAR        Defendant Exhibits

| No. | Description | I.D. | Off. | Adm. | Deposition or Witness |
|-----|-------------|------|------|------|------------------------|
| 801 | Photo of Red Pickup Truck 1 | x | x | x | |
| 802 | Photo of Red Pickup Truck 2 | x | x | x | |
| 803 | Photo of Red Pickup Truck 3 | x | x | x | |
| 804 | Photo of Red Pickup Truck 4 | x | x | x | |
| 805 | Photo of Red Pickup Truck 5 | x | x | x | |
| 806 | Certificate of Records; Miami County Sheriff Department | | | | |
| 807 | Photo of Bruce Hay | x | x | x | Acker |
| 808 | Map from Parker Avenue to VAMC | x | x | x | Baker |
| 809 | 2005-05-17 Record of Medical Care | | | | |
| 810 | 2005-03-25 Attending Physician Letter | x | x | x | Wilkins |
| 811 | 2005-05-04 Chronological Record of Medical Care | | | | |
| 812 | 2005-08-31 Neurology Letter | x | x | x | Hedges |
| 813 | 2005-05-19 Neurology Exam Report | x | x | x | Hedges |
| 814 | 2005-05-31 Neurology Letter | x | x | x | Hedges |
| 815 | 2007-08-16 Kindling C&P Exam Report | | | | |
| 816 | 2005-11-14 Chronological Record | x | x | x | Lewis |
| 817 | 2005-11-28 Medical Evaluation Board | x | x | x | Lewis |
| 818 | 2005-12-20 Chronological Record | x | x | x | Lewis |
| 819 | 2006-01-10 Chronological Record | x | x | x | Lewis |
| 820 | 2006-09-15 C&P PTSD Exam | | | | |
| 821 | 2017-11-19 EEG Neurology Consult Report | x | x | x | Singh |
| 822 | 2012-08-20 KC EEG Consult Report | x | x | x | Giron |
| 823 | Map Osawatomie Paola Lane Olathe | x | x | x | White |

| No. | Description | I.D. | Off. | Adm. | Deposition or Witness |
|-----|-------------|------|------|------|----------------------|
| 824 | Map Quik Trip to 511 North Mur Len | x | x | x | White |
| 825 | Video Hay Arrest | x | x | x | Baker |
| 826 | 2011-06-07 Primary Care Note Paola CBOC | x | x | x | McWoods |
| 827 | Highland Games Video 1 | x | x | x | Baker |
| 828 | Highland Games Video 2 | x | x | x | Baker |
| 829 | Video Agents Entering Hay Residence | x | x | x | Baker |
| 830 | Karr Email | | | | |
| 831 | Map for Witness Tousey | x | x | x | Tousey |
| 832 | 2005-03-25 Bruce Hay Office Consultation | x | x | x | Wilkins |
| 833 | 2005-06-24 Letter to Miami County Medical Center | x | x | x | Wilkins |
| 834 | 2016-07-28 KC Occupational Therapy Consult | x | x | x | Klinge |
| 835 | 2005-05-04 Army PCP Routine Exam | x | x | x | Callahan |
| 836 | 2005-06-03 Order Request | x | x | x | Callahan |

*(Revised 5/93)*

# CLERK'S COURTROOM MINUTE SHEET - WITNESS LIST
## USA vs. Bruce L. Hay
## CASE NO: 19-20044-01-JAR

**WITNESSES FOR    Government**

| Date | Name | Sworn |
|---|---|---|
| **8/1/2022** | Daniel White special agent VA-OIG | ( x ) |
| **8/2/2022** | Daniel White (cont'd) | (x ) |
| | Aimee Rogers, VA | (x ) |
| | Dr. Emmett McWoods | (x ) |
| | Dr. Robert Beck | (x ) |
| **8/3/2022** | Dr. Kathryn Hedges | (x ) |
| | Special Agent Kerry Baker VA-OIG | (x ) |
| | Dr. Carolyn Karr | (x ) |
| **8/4/2022** | Dr. Carolyn Karr (cont'd) | (x ) |
| | Dolly Cherian | (x ) |
| | Special Agent Shane Osterhuas VA-OIG | (x ) |
| | Special Agent Tim Mugrage, VA-OIG | (x ) |
| | Lauren Clary | (x ) |
| | Myron Stroup | (x ) |
| | Rhonda Snyder | (x ) |
| | Bert Snyder | (x ) |
| | Stacy Macom | (x ) |
| | Joe Hughes | (x) |
| | David Ellis | (x) |

**WITNESSES FOR    Defendant**

| Date | Name | Sworn |
|---|---|---|
| **8/8/2022** | Alan Acker | (x ) |
| | Dr. Harry Wilkins | (x ) |
| | Dr. Daryl Callahan | (x ) |
| | Dr. Luis Giron, Jr. | (x ) |
| | Rebekah Branson | ( x ) |
| **8/9/2022** | Dr. Vikas Singh | (x ) |
| | Dr. Brian Lewis | (x ) |
| | Jessica Klinge | (x ) |
| | Scott Jackson | (x ) |
| | Barbara Brown | (x ) |
| | Leon Zook | (x ) |
| | Pastor Joseph Bell | (x ) |
| **8/10/2022** | George Feebeck | (x ) |
| | Dr. Mary O'Neal | (x ) |
| | | (   ) |
| | | (   ) |
| | | (   ) |
| | | (   ) |

**GOVERNMENT WITNESSES (Cont'd)**

Special Agent Nathen Howard VA-OIG          (x)

Yessika Zarazua, SSA                                    (x)

**8/5/2022** Yessika Zarazua, SSA (cont'd)       (x)

Dr. Ellen Berry                                               (x)

Suzy Tousey                                                   (x)

Paul Kalmar                                                   (x)

Wesley Ungeheuer                                        (x)

Dr. Danielle Becker                                        (x)

James Carmack, SSA OIG                             (x)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

BRUCE L. HAY,

      Defendant.

Case No. 19-20044-JAR

## <u>JURY INSTRUCTIONS</u>

# INSTRUCTION NO. 1

Members of the Jury:

Now that you have heard all of the evidence, it becomes my duty to instruct you on the law applicable to this case. In the interest of clarity, I will read the instructions to you, and each of you will have a copy of the instructions in the jury room.

In any jury trial there are, in effect, two judges. I am one of the judges; the other is the jury. It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration. It is your duty, as judges of the facts, to follow and apply that law to the facts as you find them from the evidence in the case. You are not to single out one instruction alone as stating the law, but you must consider the instructions as a whole. Neither are you to be concerned with the wisdom of any rule of law stated by me. That is, you must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I give it to you, regardless of the consequences.

## INSTRUCTION NO. 2

The Indictment in this case charges substantially as follows:

1. Beginning on a date unknown, but no later than in or about January 2011, and continuing through in or about August 2018, in the District of Kansas and elsewhere, the defendant,

### BRUCE L. HAY,

with intent to defraud, knowingly devised a scheme and artifice to defraud the Department of Veterans Affairs, and to obtain money and property by means of materially false and fraudulent pretenses, representations and omissions of material facts, well knowing and having reason to know that said pretenses and representations were and would be false and fraudulent when made and caused to be made and that said omissions would be material.

### Background

At times relevant to this Indictment:

2. The U.S. Department of Veterans Affairs (VA) was an agency of the United States. Within the VA, the compensation and pension benefits program compensates veterans with verified disabilities and is managed by the Veterans Benefits Administration. Specifically, disability compensation is a tax-free benefit paid to a veteran because of, among other things, injuries or diseases sustained while on active duty.

3. VA disability compensation varied with the degree of disability and the number of dependents and was paid monthly. A veteran's injury or illness was determined by a VA Rating Specialist who reviewed medical records, the results of compensation and pension examinations, the veteran's application for benefits, and other applicable evidence. The VA rated the level of service-connected disability of veterans on a scale of 0% to 100%. The amount of disability compensation a veteran received was commensurate with their service-connected disability

rating.

4. The VA also administered the Special Monthly Compensation (SMC) program, which paid a higher rate of disability compensation to qualifying veterans due to special circumstances such as the need of aid and attendance (A&A) by another person.

5. The defendant, BRUCE L. HAY, served in the United States Army from June 21, 1987 to June 11, 1991; August 26, 1996 to October 9, 1998; and January 21, 2003 to February 28, 2006.

6. On or about February 25, 2005, while on active duty, HAY was involved in a vehicle accident. In the days following the vehicle accident, HAY began to report to medical professionals that he suffered from weakness and shaking of the lower extremities as well as head and upper extremity tremors. Because neurological evaluations were normal and medical professionals were not otherwise able to identify a physical explanation for HAY's claimed symptoms, HAY was diagnosed with conversion disorder.

7. On or about February 28, 2006, HAY applied for disability benefits from the VA based upon his claim of, among other things, a diagnosis of conversion disorder and "head injury w/ tremors." In a March 8, 2007 rating decision, the VA determined that HAY had a 100% service-connected disability rating for conversion disorder and psychomotor abnormal tremors or body movement and was entitled to special monthly compensation based on A&A criteria being met.

8. In a September 12, 2007 rating decision, the VA determined HAY had 100% service-connected disability ratings for conversion disorder and generalized choreiform movement disorder (previously evaluated as psychomotor abnormal tremors or body movements). The VA determined there was a likelihood for improvement and did not consider the disability permanent, making it subject to future examination.

**Manner and Means**

9.  The government alleges that, by a date unknown, but at least by approximately January 2011, HAY was able to engage in a full range of physical activities, including work on his family farm, deer hunting, driving regularly, and walking without assistance from a cane or walker.

10. The object of HAY's scheme to defraud was to fraudulently obtain disability benefits from the VA to which he would not have otherwise been entitled.

11. The government alleges that, as part of the scheme to defraud, HAY made fraudulent representations regarding his claimed disabilities and symptoms, and failed to disclose his true physical condition, capabilities, and daily activity.

12. On April 10, 2012, HAY requested that his rating be changed to a 100% permanent and total disability rating for "conversion disorder and seizure disorder." In his application, HAY represented that "these conditions will never improve."

13. The government alleges that both HAY and L.H. falsely described his physical abilities during various compensation and pension examinations conducted by the VA and during appointments with VA medical providers. For example, during a compensation and pension examination on March 18, 2013 on HAY's request for a 100% permanent and total disability rating, HAY and L.H. represented that HAY was unable to engage in most activities of daily living, including needing help with bathing, shaving, toileting, and putting on clothing, and that he could not do any household chores other than sorting laundry.

14. On April 20, 2013, the VA found that HAY was 100% disabled for conversion disorder and choreiform movement disorder and changed the rating from temporary to permanent. This also made HAY eligible for additional compensation in the form of Dependents' Educational Assistance ("DEA"), which provides education and training opportunities to eligible

dependents and survivors of certain veterans who have a total and permanent service-connected disability.

15. The government alleges that, during another compensation and pension examination on May 3, 2017, HAY and L.H. fraudulently represented that HAY had muscle spasms, had been using a walker for approximately two years, used a cane for "tight spaces" where the walker would not fit, and did not drive on a regular basis.

16. The government alleges that, to further and conceal the scheme, HAY feigned or exaggerated physical symptoms during appointments with VA doctors or examiners.

17. The government alleges that, to further and conceal the scheme to defraud the VA, HAY made similar fraudulent representations to and omitted material facts from the Social Security Administration regarding his physical condition and capabilities.

### Execution of the Scheme

18. On or about the dates set forth in the chart below, each date constituting a separate count, in the District of Kansas and elsewhere, the defendant,

### BRUCE L. HAY,

for the purpose of devising and intending to devise the aforementioned scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses and representations, and by omission of material facts, did transmit and cause to be transmitted by means of wire communication in interstate commerce the writings, signs, signals, pictures, and sounds described below, each Automated Clearing House (ACH) transaction constituting a separate count:

| COUNT | DATE | AMOUNT | DESCRIPTION |
|---|---|---|---|
| 1 | 6/30/2017 | $3,990.24 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 2 | 8/1/2017 | $3,990.24 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 3 | 9/1/2017 | $3,990.24 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 4 | 3/1/2018 | $4,070.05 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 5 | 5/1/2018 | $4,070.05 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |
| 6 | 8/1/2018 | $4,070.05 | Wire communications related to the ACH payment initiated by the VA in Hines, Illinois to HAY's bank account ending in 8701 at Security Bank of Kansas City in Kansas City, Kansas. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 7-16

## THEFT OF GOVERNMENT FUNDS
### [18 U.S.C. § 641]

19. Paragraphs 2 through 17 are incorporated here.

20. On or about the dates set forth in the separate counts below, in the District of Kansas and elsewhere, the defendant,

### BRUCE L. HAY,

willfully and knowingly did steal goods and property of the United States, of a value exceeding $1,000, that is, disability and other monetary compensation paid by the VA, to which he was not entitled, in the amounts listed below:

| Count | Date | Amount |
|-------|------|--------|
| 7 | 9/30/2016 | $2,827.18 |
| 8 | 11/1/2016 | $2,827.18 |
| 9 | 3/31/2017 | $2,971.60 |
| 10 | 5/1/2017 | $2,971.60 |
| 11 | 6/30/2017 | $2,971.60 |
| 12 | 8/1/2017 | $2,971.60 |
| 13 | 9/1/2017 | $2,971.60 |
| 14 | 3/1/2018 | $3,030.64 |
| 15 | 5/1/2018 | $3,030.64 |
| 16 | 8/1/2018 | $3,030.64 |

In violation of Title 18, United States Code, Sections 641 and 2.

INSTRUCTION NO. 3

An indictment is but a formal method of accusing a defendant of a crime. It is not evidence of any kind against a defendant, and does not create any presumption or permit any inference of guilt. It is a mere charge or accusation—nothing more and nothing less.

INSTRUCTION NO. 4

The Indictment charges that the crime was committed "on or about" a certain date. It is not necessary that the proof establish with certainty the exact date of the alleged crime. It is sufficient if the evidence shows beyond a reasonable doubt that the crime was committed on a date reasonably near the date alleged.

## INSTRUCTION NO. 5

Whenever the word "he" is used in these instructions, you may consider it as applying equally to a woman. In like manner, the use of the singular of a word may be taken equally to mean the plural.

INSTRUCTION NO. 6

The Indictment charges the defendant with committing an offense in several ways, using the conjunctive language "and." However, the law is worded in the disjunctive, that is, the various modes or methods of violating the statute are separated by the word "or." It is sufficient if the government proves the offense in the disjunctive, that is, proof beyond a reasonable doubt that any one method or way of violating the law occurred.

INSTRUCTION NO. 7

To the charges contained in the Indictment, the defendant has entered pleas of "not guilty." These pleas put in issue every element of the crimes charged and make it incumbent upon the government to prove beyond a reasonable doubt every element of the crimes charged.

## INSTRUCTION NO. 8

The law presumes a defendant to be innocent of crime. This presumption remains with him throughout the trial. Thus, a defendant, although accused, begins the trial with a "clean slate," with no evidence against him and the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against a defendant. The presumption of innocence alone is sufficient to acquit the defendant now on trial, unless the jurors are satisfied of the defendant's guilt beyond a reasonable doubt, from all the evidence in the case.

# INSTRUCTION NO. 9

As you start your deliberations, you must continue to presume Mr. Hay innocent. As I instructed you at the beginning of this trial, the presumption of innocence (1) remains with Mr. Hay throughout every stage of the trial, including your deliberations, and (2) is extinguished only if all twelve of you unanimously find that the government has proved his guilt beyond a reasonable doubt.

The government has the burden of proving the defendant guilty beyond a reasonable doubt. The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

INSTRUCTION NO. 10

Burden of proof means burden of persuasion. The burden is always upon the government to prove beyond a reasonable doubt every essential element of the crimes charged. In determining whether or not it has met this burden, you must consider all the evidence.

INSTRUCTION NO. 11

A separate crime is charged in each count of the Indictment. Each count and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other crimes charged. Your verdict with respect to each count of the Indictment must be unanimous.

INSTRUCTION NO. 12

Wire Fraud (18 U.S.C. § 1343)

Mr. Hay is charged in Counts 1 through 6 with violations of 18 U.S.C. section 1343.

This law makes it a crime to use interstate wire communication facilities in carrying out a scheme to defraud. A scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises is a specific type of a scheme to defraud.

To find Mr. Hay guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:  Mr. Hay devised or intended to devise a scheme to defraud, as alleged in the indictment;

*Second*:  Mr. Hay acted with specific intent to defraud;

*Third*:  Mr. Hay used interstate or foreign wire communications facilities or caused another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

*Fourth*:  the scheme employed false or fraudulent pretenses, representations, or promises that were material.

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension.

A "scheme to defraud" means a scheme to deprive another of money or property.

An "intent to defraud" means an intent to deceive or cheat someone.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity.

A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

A false statement or omission is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.

To "cause" interstate wire communications facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business.

An interstate wire transmission is considered to be "for the purpose of carrying out the scheme" so long as the transmission is incident to the accomplishment of an essential part of a scheme. An interstate or foreign wire communication need not itself be false or deceptive.

Each separate transmission by wire communication in interstate or foreign commerce for the purpose of carrying out the scheme is a separate violation of the wire fraud statute.

## INSTRUCTION NO. 13

## Theft of Government Funds (18 U.S.C. § 641)

Mr. Hay is charged in counts 7 through 16 with violations of 18 U.S.C. section 641.

This law makes it a crime to steal government property. Mr. Hay is accused of stealing disability or other monetary compensation paid by the United States Department of Veterans Affairs.

To find Mr. Hay guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:      the disability or other monetary compensation belonged to the United States government, namely, the United States Department of Veterans Affairs;

*Second*:      Mr. Hay stole the disability or other monetary compensation intending to put it to his own use or gain; and

*Third*:      the value of the disability or other monetary compensation was more than $1,000.

"Value" means the face, or market value, or cost price, either wholesale or retail, whichever is greater.

INSTRUCTION NO. 14

Aid and Abet (18 U.S.C. § 2)

Each count of the indictment also charges a violation of 18 U.S.C. section 2, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime. To find Mr. Hay guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:      Every element of the charged crime as outlined in Instructions 12 and 13 was committed by someone other than Mr. Hay, and

*Second*:      Mr. Hay intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the government must prove that Mr. Hay consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

Mr. Hay need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

## INSTRUCTION NO. 15

In every crime there must exist a union or joint operation of act and intent.

The burden is always upon the government to prove both act and intent beyond a reasonable doubt.

INSTRUCTION NO. 16

The question of intent is a matter for you to determine.

Intent is a state of mind. Since it is not possible to look into a person's mind to see what went on, the only way you have of arriving at the intent of the defendant is for you to take into consideration all of the facts and circumstances shown by the evidence, including the exhibits, and determine from all such facts and circumstances what the intent of the defendant was at the time in question.

INSTRUCTION NO. 17

There are two types of evidence from which a jury may properly find a defendant guilty of crime. One is direct evidence, such as the testimony of an eyewitness. The other is circumstantial evidence, the proof of a chain of circumstances pointing to the commission of the offense.

The law makes no distinction between direct and circumstantial evidence but requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case.

INSTRUCTION NO. 18

You have heard evidence indicating that the Department of Veterans Affairs (the VA) and the Social Security Administration (the SSA) previously terminated Mr. Hay's benefits.

Neither the fact that the VA and SSA previously terminated Mr. Hay's benefits nor their reasons for doing so have any bearing on the issue of Mr. Hay's guilt. In deciding whether the government has proved every element of the crimes charged beyond a reasonable doubt, you may not consider the fact that the VA and SSA previously decided to terminate Mr. Hay's benefits. You may not speculate as to why they did so. And you may not otherwise rely on the VA's or SSA's decisions, in any way, as evidence of Mr. Hay's guilt.

INSTRUCTION NO. 19

During the trial, I informed you that the government and defendant had agreed or

stipulated to certain facts. That stipulation was then read to you. As I also indicated to you at

that time, these instructions contain a written copy of those stipulations agreed upon by the

parties. The parties stipulate that:

> The June 30, 2017 ACH payment transaction identified in Count 1
> traveled in, affected, and flowed in interstate commerce by being transmitted from
> Illinois to Kansas.

> The August 1, 2017 ACH payment transaction identified in Count 2
> traveled in, affected, and flowed in interstate commerce by being transmitted from
> Illinois to Kansas.

> The September 1, 2017 ACH payment transaction identified in Count 3
> traveled in, affected, and flowed in interstate commerce by being transmitted from
> Illinois to Kansas.

> The March 1, 2018 ACH payment transaction identified in Count 4
> traveled in, affected, and flowed in interstate commerce by being transmitted from
> Illinois to Kansas.

> The May 1, 2018 ACH payment transaction identified in Count 5 traveled
> in, affected, and flowed in interstate commerce by being transmitted from Illinois
> to Kansas.

> The August 1, 2018 ACH payment transaction identified in Count 6
> traveled in, affected, and flowed in interstate commerce by being transmitted from
> Illinois to Kansas.

> The parties therefore stipulate and agree that the United States has
> satisfied its burden of proof beyond a reasonable doubt for the required element
> concerning Interstate Commerce for each of Counts 1 through 6. The Defense
> reserves the right to raise any challenges and arguments concerning other
> elements and burdens that are not contained within this stipulation

A stipulation simply means that both the government and the defendant accept these facts

as true. There was no disagreement over these facts, so there was no need for evidence on either

side of these facts. You may accept these facts as true, but you are not required to do so, because

you are the sole judge of the facts.

INSTRUCTION NO. 20

The weight to be given the evidence is determined not by the number of witnesses or the amount of testimony produced by either side, but by the credibility of the witnesses and the nature and quality of their testimony. The evidence of one witness who is entitled to full credit is sufficient for the proof of any fact in this case, and you would be justified in returning a verdict in accordance with such testimony even though a number of witnesses gave conflicting testimony, if from the consideration of the whole case and the reliability and credibility of the various witnesses you believe the one witness as opposed to the greater number of witnesses.

Always keep in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

# INSTRUCTION NO. 21

Although you must consider all of the evidence, you are not required to accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness you should consider the witness's relationship to the government or to the defendant; any interest the witness may have in the outcome of the case; the witness's manner while testifying; the opportunity and ability to observe or acquire knowledge concerning the facts about which the witness testified; the witness's candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

When weighing conflicting testimony you should consider whether the discrepancy has to do with a material fact or with an unimportant detail, and should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

In addition, while you must consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in the case.

## INSTRUCTION NO. 22

In considering the evidence in this case, you are expected to use your good sense; consider the evidence for only those purposes for which it has been admitted, and give it a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

You are to perform your duty without bias as to any party or person. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. That was the promise you made and the oath you took before being accepted by the parties as jurors and they have the right to expect nothing less.

Keep constantly in mind that it would be a violation of your sworn duty to base a verdict upon anything but the evidence in, and the law applicable to, this case.

INSTRUCTION NO. 23

The defendant is on trial only for the acts alleged in the Indictment. He is not on trial for any other acts or conduct. In determining whether the defendant is guilty or not guilty, you are therefore to consider only whether the defendant has or has not committed the acts charged in this Indictment. Even if you are of the opinion that he is guilty of some offense not charged in the Indictment, you must find the defendant not guilty if the evidence does not show beyond a reasonable doubt that the defendant committed the specific acts charged in the Indictment.

INSTRUCTION NO. 24

Evidence has been received regarding law enforcement methods and equipment used in the investigation of this case. Likewise, evidence has been received concerning enforcement methods and equipment which were not used in relation to the investigation.

You may consider this evidence for the purpose of evaluating the weight of the evidence produced by the government and the credibility of law enforcement personnel involved in the investigation. However, there is no legal requirement that the government, through its enforcement agents, must use all known or available crime detection methods or any particular type of equipment in its investigations.

INSTRUCTION NO. 25

You have heard tape recordings of conversations made by witnesses for the government. These tape recordings were legally recorded and are a proper form of evidence. You may consider the tape recordings just like any other form of evidence. It is for you as the trier of fact to determine what was said in the taped conversations, by whom, and the weight and credit, if any, to be given such recorded evidence.

INSTRUCTION NO. 26

You are instructed that the testimony offered by agents, officers or employees of the government shall not be given any greater weight or credibility by the fact alone of their office, but that such testimony should be weighed and considered as to the credibility on the same ground and for the same reason that the testimony of all other witnesses is weighed and judged.

## INSTRUCTION NO. 27

The rules of evidence provide that if scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify and state his or her opinion concerning such matters.

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

INSTRUCTION NO. 28

A witness may be discredited or "impeached" by contradictory evidence, by a showing that he or she testified falsely concerning a material matter, or by evidence that at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness's present testimony.

If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

INSTRUCTION NO. 29

In criminal investigations, the government may utilize informants, and may employ various undercover strategies involving artifice and trickery in order to gain the confidence of a suspect and to ferret out criminal activity.

INSTRUCTION NO. 30

Certain charts and summaries have been shown to you to help explain the evidence in this case. Their only purpose is to help explain the evidence. These charts and summaries are not evidence or proof of any facts.

INSTRUCTION NO. 31

The law does not compel a defendant to testify. The fact that the defendant did not take the witness stand and testify in his own behalf does not create any presumption against him. You must not permit that fact to weigh in the slightest degree against the defendant, nor should it enter into your discussions or deliberations in any manner.

INSTRUCTION NO. 32

Mr. Hay's defense to the counts charged in the Indictment is as follows:

Mr. Hay accurately reported the symptoms of his disabilities to VA representatives when questioned about them. Mr. Hay accurately answered the questions he was asked by representatives of the VA. Mr. Hay accurately represented his symptoms to the VA.

Mr. Hay did not steal money from the VA. Mr. Hay specifically did not intend to defraud the VA and did not devise a scheme to defraud the VA of benefits.

The foregoing is a statement of the defendant's defense; it is not evidence.

INSTRUCTION NO. 33

Statements, questions and arguments of counsel are not evidence.  The evidence consists of the sworn testimony of the witnesses and all exhibits received in evidence.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded.  Anything you may have seen or heard outside the courtroom is not evidence, and must be entirely disregarded.

INSTRUCTION NO. 34

During the trial I may have questioned witnesses and passed upon objections to the admission of certain testimony or exhibits into evidence. Questions relating to the admissibility of evidence are solely questions of law for the court, and you must not concern yourselves with the reasons for my rulings. In your consideration of the case, you must draw no inference from these rulings and you must consider only the evidence which I admitted.

Neither in any question I have asked, nor in these instructions, nor in any ruling, action or remark that I have made during the course of this trial, have I intended to interpose any opinion or suggestion as to how I would resolve any of the issues of this case. If I have made any remark that you believe indicates how I would decide this case, I instruct you to disregard such remark.

## INSTRUCTION NO. 35

The punishment provided by law for the crimes charged is a matter exclusively within the province of the court and may not be considered by the jury in any way in deciding whether the defendant is guilty or not guilty of the crimes charged.

# INSTRUCTION NO. 36

During your deliberations, that is when all of you are together in the jury room, you are released from the admonition regarding discussion of the case. The admonition regarding discussion remains in effect at any time when all of you are not in the jury room, or when you are away from the courthouse.

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals or other entities involved in the case. This means you may not use any electronic device or media (such as a phone, computer, or tablet), the internet, any text or instant messaging service, or any social media apps (such as Twitter, Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat) to research or communicate about what you've seen and heard in this courtroom.

These restrictions continue during deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and law presented in this courtroom. Information you find on the internet or through social media might be incomplete, misleading, or inaccurate. And, as I noted in my instructions at the start of the trial, even using your smartphones, tablets, and computers—and the news and social media apps on those devices —may inadvertently expose you to certain notices, such as pop-ups or advertisements, that could influence your consideration of the matters you've heard about in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial,

without undue influence by anything or anyone outside of the courtroom. For this reason, I expect you to inform me at the earliest opportunity, should you learn about or share any information about this case outside of this courtroom or the jury room, or learn that another juror has done so.

The alternate jurors will not be allowed to participate in deliberations but they remain bound by all aspects of the admonition. The clerk's office will notify the alternate jurors of the verdict and, if appropriate, when they will need to return.

## INSTRUCTION NO. 37

During your deliberations, you may refer, if you wish, to any notes you took during the trial. Remember, however, that your notes are not evidence and remember, also, that it is your memories regarding the evidence, and not your notes, which control.

# INSTRUCTION NO. 38

Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous, and it must be unanimous as to each count.

It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

INSTRUCTION NO. 39

Upon retiring to the jury room, you should first select one of your number to act as your foreperson, who will preside over your deliberations and will be your spokesperson here in court. A form of verdict has been prepared for your convenience.

You will take the verdict form to the jury room, and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill it in, date and sign it, and then return to the courtroom.

If, during your deliberations, you should desire to communicate with the court, please reduce your message or question to writing, signed by the foreperson and pass the note to my law clerk, who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you return to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should never state or specify your numerical division at the time.

# INSTRUCTION NO. 40

A final suggestion by the court—not technically an instruction upon the law—may assist your deliberations. The attitude of jurors at the outset of and during their deliberations is important. It is seldom productive for a juror, immediately upon entering the jury room, to make an emphatic expression of his or her opinion upon the case or to announce a determination to stand for a certain verdict. The reason is obvious: we are all human and it is difficult to recede from a position once definitely stated, even though later convinced it is unsound.

Jurors are selected for the purpose of doing justice. This presupposes and requires deliberation—counseling together in an effort to agree. Have in mind at all times, therefore, that you are a deliberative body, selected to function as judges of the facts in a controversy involving the substantial rights of the parties. You will make a definite contribution to efficient administration of justice when and if you arrive at a just and proper verdict under the evidence which has been adduced. No one can ask more and you will not be satisfied to do less.

8/10/22
_____
Date

Julie A. Robinson
_____
Julie A. Robinson
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 19-20044-JAR |
| BRUCE L. HAY, | |
| Defendant. | |

## VERDICT FORM

We, the jury, duly impaneled and sworn, upon our oaths, make the following unanimous findings:

### COUNT 1

On the offense of wire fraud charged in Count 1, we find the defendant, Mr. Bruce Hay:

\_\_\_\_\_ Not Guilty

_X_ Guilty

### COUNT 2

On the offense of wire fraud charged in Count 2, we find the defendant, Dr. Bruce Hay:

\_\_\_\_\_ Not Guilty

_X_ Guilty

## COUNT 3

On the offense of wire fraud charged in Count 3, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty


## COUNT 4

On the offense of wire fraud charged in Count 4, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty


## COUNT 5

On the offense of wire fraud charged in Count 5, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty


## COUNT 6

On the offense of wire fraud charged in Count 6, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

## COUNT 7

On the offense of theft of government funds charged in Count 7, we find the defendant,
Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty


## COUNT 8

On the offense of theft of government funds charged in Count 8, we find the defendant,
Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty


## COUNT 9

On the offense of theft of government funds charged in Count 9, we find the defendant,
Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty


## COUNT 10

On the offense of theft of government funds charged in Count 10, we find the defendant,
Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

## COUNT 11

On the offense of theft of government funds charged in Count 11, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

## COUNT 12

On the offense of theft of government funds charged in Count 12, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

## COUNT 13

On the offense of theft of government funds charged in Count 13, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

## COUNT 14

On the offense of theft of government funds charged in Count 14, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

## COUNT 15

On the offense of theft of government funds charged in Count 15, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

## COUNT 16

On the offense of theft of government funds charged in Count 16, we find the defendant, Mr. Bruce Hay:

_____ Not Guilty

__X__ Guilty

_8 / 11 / 2022_
Date

▉▉▉▉▉▉▉▉▉▉▉▉▉▉
Foreperson

5

# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**
      Plaintiff,

    v.                                   **Case No. 2:19-cr-20044-JAR**

**BRUCE L. HAY,**
      Defendant.

---

## Motion to Preserve JERS File of Admitted Trial Exhibits

---

Mr. Bruce L. Hay, by and through counsel, moves this Court to either (1) provide counsel with a copy of the JERS file containing all admitted trial exhibits, or (2) docket the JERS file to ECF, with access limited to the parties. This motion is brought to fulfill the defendant's obligation, should an appeal or other review be necessary, to provide the Tenth Circuit with a record on appeal "that is sufficient for considering and deciding the appellate issues."[1]

Preserving the JERS file either by providing copies to counsel or by docketing it to ECF will save judicial resources down the road. While counsel may have exchanged exhibits before trial, the final exhibits admitted may not exactly match those provided before trial if, for instance, an exhibit number is changed, a witness marks an exhibit, or an exhibit is subject to redaction before submission. If the exhibits are not adequately preserved *in the condition in which they were submitted*

---

[1] 10th Cir. R. 10.4(A); *see also* Fed. R. App. P. 10; *United States v. Stoner,* 98 F.3d 527, 530 (10th Cir. 1996) ("The appellant is responsible for insuring that all materials on which he seeks to rely are part of the record on appeal.").

*to the jury*, the parties and the district court may later need to reconstruct the record.[2] This can be a difficult and time-consuming task, and an inability to reconstruct the record may lead to reversal on appeal.[3]

At worst, exhibits may be lost or destroyed, or trial counsel may retire or otherwise become unavailable, and the exhibits may be irretrievable.[4] The *Novaton* case from the Eleventh Circuit offers a useful cautionary lesson in this regard. In *Novaton*, when direct-appeal counsel attempted to locate approximately 100 tape recordings and transcripts that had been admitted at trial, counsel discovered that "neither the district court clerk's office, nor [the Eleventh Circuit] clerk's office, knew where the missing trial exhibits were."[5] The district court clerk advised the Eleventh Circuit that "the voluminous trial exhibits had been returned to the United States Attorney's Office at some time after the conclusion of trial, and that the district court clerk's office had not maintained copies of the exhibits nor had it included any of the exhibits in the record on appeal."[6] But all of the trial prosecutors had since left the United States Attorney's Office, and the government was unable to find the exhibits.[7]

---

[2] Fed. R. App. P. 10(c)-(e).

[3] *See Roberts v. Ferman*, 826 F.3d 117, 125-26 (3d Cir. 2016) (noting "avenues for appellants to seek appropriate relief if they can show that they were prejudiced by the loss of part or all of the record below"); *United States v. Stacy*, 337 Fed. Appx. 837, 838-39 (11th Cir. 2009) (discussing standard for reversal "in the absence of a substantial and significant portion of the record" and granting new trial for defendant who met standard) (unpublished); *United States v. Johnson*, 231 F.3d 43, 45 (D.C. Cir. 2000) (remanding for resentencing where transcript was lost and sentencing judge was too ill to reconstruct record).

[4] *See, e.g., United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001).

[5] *Id.* at 991.

[6] *Id.*

[7] *Id.* at 992.

The government was also, at least initially, unable or unwilling to stipulate to a reconstructed transcript of any of the exhibits.[8] After the Eleventh Circuit "urged the parties to do more to solve the problem of the missing exhibits," the government and defense counsel "made some progress but were not entirely successful."[9] Ultimately, the Eleventh Circuit had to remand the case for further record-reconstruction proceedings.[10]

With the lesson of *Novaton* in mind, we respectfully propose that this Court either (1) provide counsel with a copy of the JERS file containing all admitted trial exhibits, or (2) docket the JERS file to ECF, with access limited to the parties. This will ensure that the parties' exhibits—as admitted to the jury—are readily available to appellate counsel and the Tenth Circuit.

Respectfully submitted,

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Telephone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
Attorney for Defendant

---

[8] *Id.*

[9] *Id.*

[10] *Id.* at 993.

## CERTIFICATE OF SERVICE

I certify that on August 18, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Chekasha Ramsey
CHEKASHA RAMSEY, #78476

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 19-20044-JAR** |
| **BRUCE L. HAY,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Before the Court is Defendant Bruce Hay's Motion for Judgment of Acquittal (Doc. 99), filed at the close of the Government's evidence. The Government filed a Response,[1] and Hay orally renewed his motion at the close of all the evidence. In his motion, Defendant Hay generally argues that the Government failed to present sufficient evidence to support convictions for wire fraud or theft of government funds. Hay also argues that the theft-of-government-funds statute, 18 U.S.C. § 641, does not encompass conversion or stealing by fraud. The Court took the motions under advisement, and on August 11, 2022, the jury rendered its verdict, finding Hay guilty of all sixteen counts of the Superseding Indictment.[2] As described more fully below, the Court denies Defendant's motion for judgment of acquittal.

## I.      Evidentiary Background

Viewing the evidence in the light most favorable to the Government, as the Court must, a rational jury could find that the evidence and stipulations presented at trial proved the following beyond a reasonable doubt.

---

[1] Doc. 100.

[2] Doc. 110.

Defendant Bruce Hay is a veteran of the United States Army, serving three stints, from 1987 to 1991, 1996 to 1998, and 2003 to 2006. In 2006, Hay received a medical discharge following a 2005 car accident which he complained caused him tremors and difficulty walking. In 2005, Hay was evaluated by neurologists for complaints of muscle spasms, tremors, involuntary seizure-like episodes, and his claimed inability to drive or work. After evaluating MRIs and EEGs, these neurologists, and later other treatment providers, determined that Hay was suffering from conversion disorder. Conversion disorder's genesis is a psychological problem that manifests in some other way, often with neurological symptoms. It presents with one or more motor and sensory symptoms that are not consistent with a neurological or medical condition but that nonetheless severely impair one's occupational or social functioning. There are no diagnostic tests for conversion disorder; it is a diagnosis of exclusion. Some people with conversion disorder cannot work. Some cannot drive, given that the symptoms may include seizure-like episodes, spasms, shaking, tremors, and involuntary body movements that are unplanned and unpredictable. Nonetheless, Dr. Kathryn Hodges, a neurologist who treated Hay in 2006, expected that he would improve. She ordered him to continue with physical therapy, but Hay stopped physical therapy after two months. And Hay did not return to this neurologist for any follow-up visits.

On February 28, 2006, Hay submitted a claim for compensation to the Veterans Administration ("VA"), reporting the following disabilities: wrist fusion, conversion disorder post head injury with tremors, post-traumatic stress disorder ("PTSD"), chronic urticaria, hearing loss, hypothyroidism, irritable bowel syndrome, and shortness of breath. As part of the claims process, the VA conducted Compensation and Pension ("C&P") benefits examinations of Hay in September 2006, and periodic C&P examinations thereafter. At these C&P examinations, Hay

reported that he had full-body tremors on a daily basis and that he could only ambulate with the assistance of a walker. He reported that he could not work, drive, or even engage in leisure activities. And at these examinations he presented as someone unable to walk without a walker; he displayed a spastic gait, tremors, and impaired balance. Hay also told C&P examiners that he was unable to perform some activities of daily living ("ADLs") such as dressing and toileting without assistance from his wife and family.

On March 8, 2007, the VA issued a rating decision that Hay had 100% service-connected disabilities for conversion disorder and psychomotor abnormal tremors or body movements, effective March 1, 2006.[3] The VA also determined that Hay was entitled to additional Aid and Attendance benefits to pay for someone to assist him with ADLs. Because the VA did not determine that Hay's disabilities were total and permanent, he was required to undergo periodic C&P examinations by the VA. During this time period Hay also successfully submitted a claim to the Social Security Administration ("SSA") and received disability benefits.

In August 2007, the VA required Hay to undergo an updated C&P examination. At this examination, Hay reported that he was experiencing frequent falls, an inability to grasp, constant involuntary upper body movements, that he was unable to drive, needed a cane or walker to ambulate, needed help dressing, and that it took him a long time to eat because of his constant tremors.

From 2008 to 2012, Dr. Emmett McWoods, a VA physician, treated Hay, seeing him once or twice a year. Hay consistently reported to Dr. McWoods that his symptoms and impairments continued. And Hay consistently presented as someone who had difficulty walking without the assistance of a cane or walker.

---

[3] The VA determined he had various ratings less than 100% for other conditions not at issue in this case.

On April 3, 2012, Hay submitted a claim to the VA for total and permanent disability. Based on his clinical observations of Hay since 2008, and largely relying on Hay's reports of his symptoms and impairments Dr. McWoods authored a letter at Hay's request supporting Hay's claim for total and permanent disability benefits from the VA. Dr. McWoods' letter stated that Hay's condition would never improve. After conducting additional C&P examinations, on April 20, 2013, the VA granted Hay's application for total and permanent disability for conversion disorder and choreiform movement disorder. This meant that Hay did not have to undergo any further periodic C&P examinations. And it also made Hay eligible for additional benefits, including educational benefits for his spouse and dependent children.

In 2011, the Inspector General offices of the VA and SSA had received anonymous complaints that Hay was able to perform physical labor inconsistent with his claims of disability. These anonymous complainants reported that Hay was lifting heavy hay bales, doing construction work on his family farm and frequently driving tractors and trucks.

The VA and SSA initiated an investigation in 2012. At that point their investigation focused on surveilling Hay as he arrived at and departed from medical and C&P examination appointments at the VA. On at least one occasion, agents began their surveillance by watching Hay depart from his house. On November 28, 2012, agents had an hour-long interaction with Hay, under the guise that they were investigating deer poaching. They talked to Hay and surreptitiously video-recorded Hay's movements and demeanor during that interaction. What they observed and recorded belied Hay's claims of disability. Hay displayed no tremors, no difficulty walking as he stepped down into a ditch and walked on unpaved ground, and, though he had a walking stick, he did not use it to ambulate, but occasionally gestured or pointed with it. Hay told the agents that he was an avid deer hunter. He described his deer stand as one that he

pulled up into the tree after he climbed steps that he screwed into the tree trunk. He even described pulling his obese hunting partner up into the deer stand. Hay presented as someone with well-formed musculature as well.

For various reasons, the investigation stalled until 2016. In 2016, agents installed a pole camera on a public building across the street from Hay's house. For an eight-week period in November and December 2016, a one-week period in March 2017, and a one-week period in May 2017, the pole camera video recorded Hay's activities on his front porch, front yard, and driveway.

A rational jury could find that Dr. McWoods and other medical and claims professionals at the VA were fooled by Hay's verbal reports and non-verbal displays of his symptoms and impairments during appointments from 2008–2017. Agents testified to their surveillance and showed video-recordings of some of their surveillance of Hay arriving at and departing from the VA Medical Center and Dr. McWoods' office. They also showed videos recorded inside the VA halls and lobby in which Hay used a walker and displayed spastic head and body movements. There were audio and video recordings of two C&P examinations in May 2017, which allowed the jury to see how Hay presented and hear what Hay reported to the C&P examiners. And Dr. McWoods and the many medical professionals who testified described similar reports by Hay of symptoms and impairments and described similar clinical observations of Hay's displays of such.

But these medical and claims professionals were not privy to the extensive surveillance, video-recordings, testimony of percipient witnesses, and other evidence collected by agents and admitted for the jury's consideration at trial. When shown the video-recordings of Hay's activities and movements outside of his house and at other locations, Dr. McWoods testified that

he would never have supported Hay's disability claim had he been privy to these recordings, which depicted that Hay could easily ambulate without assistance and with movements that were fluid, not spastic.

The evidence included the pole camera footage and the agents' video-recordings and testimony about their observations of Hay in front of his house, at the VA, at commercial establishments, and in other places in the community. The jury also heard testimony from Hay's sister and neighbors, who, unbeknownst to law enforcement, were also video-recording Hay's activities. The jury heard testimony from other people in the community who interacted with Hay and had personal knowledge that his activities belied his claims of disability. And Hay made written and oral statements to other people and other government agencies that were inconsistent with his claimed symptoms and impairments. This evidence allowed the jury to compare what Hay was representing to the VA with Hay's behavior in other places and contexts, as further detailed below.

In February 2006, Hay applied for disability compensation from the VA and in September 2006, Hay underwent C&P examinations, claiming he could not walk, work, drive, or engage in ADLs without assistance. But the jury heard testimony and saw photographs of Hay constructing a 4,000 square-foot, two-story house in the spring and summer of 2006. The photographs depicted Hay standing on high ladders, installing the main water line, putting up roof trusses, using power tools, lifting heavy windows and balancing himself on scaffolding on the second story of the house. At a C&P examination in August 2007, Hay continued to claim that he was unable to even attend to his ADLs without assistance. Yet in 2006 and 2007, Hay applied for and received Kansas Unemployment Compensation benefits, attesting that he was

ready, willing and able to work.  Hay's sister, Stacy Macomb, testified that Hay put up heavy bales of hay on the family farm every year from 2005 to 2015.

Rhonda and Bert Snyder were neighbors of the Hay family farm.  They testified that they saw Hay continually do physical labor on the farm.  They had never seen him with a walker, but noticed that he usually carried a cane in public places and that if he saw a car approaching the farm, he would grab his cane before the car arrived.  The Snyders testified that in 2010 they observed Hay single-handedly loading, stacking and hauling 50- to 70-pound bales of hay, hauling junk to the farm and leaving with an empty trailer (evidencing he had unloaded the junk), and building a 50-yard-long fence.   The Snyders surreptitiously video-recorded Hay's activities on two occasions.  On the first occasion, Hay stood on the bed of a moving hay truck and threw bales of hay.  On the second occasion, Hay appeared to be assisting a group that had come to the farm to hunt or shoot; Hay was laying out the guns, bending, squatting and not using a cane.  Hay's proximity to shooting was inconsistent with his telling VA personnel that he avoided loud noises because it triggered his PTSD and conversion disorder symptoms.

During this time period that the Snyders were video recording and photographing Hay's activities on the farm, Hay continued to tell Dr. McWoods and others that his symptoms and impairments continued.  Yet in 2009 and 2010, Hay was receiving farm subsidy payments after he represented to the United States Department of Agriculture that he was the sole operator of the Hay family farm and that he performed 100% of the farm labor.

Notably, in 2015, Hay and his mother entered into an employment agreement that stated the Hay family farm owed Hay $62,000 a year for his labor on the farm.  Hay attached this employment agreement to a mechanic's lien he filed in 2021, claiming that he was owed $62,000 a year from January 1, 1985 to December 31, 2020 for labor he had performed as the "Farm

Manager," which included equipment repair, livestock management, fence repair and other property upkeep, crop planting and harvesting, and hay harvesting.

In March 2012, a trade publication article quoted Hay and depicted him as he attended a farm workshop for his stated purpose of improving his farming operation. The photographs evidence that Hay toured the farmland on foot without the need of a walker and while carrying but not using his cane. In 2012, Hay told a Miami County deputy sheriff who was investigating a cow-motorcycle collision that Hay had fixed or replaced about three miles of fence on his property. Yet one month later, in April 2012, Hay convinced Dr. McWoods to support his claim for total and permanent disability.

In the fall of 2012, the VA required Hay to undergo updated C&P examinations in connection with his claim for total and permanent disability. Hay reported and displayed for these examiners that his symptoms and impairments continued without improvement. Agents video-recorded Hay as he arrived and departed these VA appointments. For example, on October 29, 2012, agents surveilled Hay working on his truck in front of his house and walking without any apparent difficulty or use of an assistive device until he arrived at the VA facility that day for his appointment with Dr. McWoods. Then Hay displayed the difficulty walking and other symptoms he typically demonstrated when he had an appointment with Dr. McWoods. After Hay and his wife drove home that day, Hay drove himself to his family farm where he was seen throwing a large bale of hay into the bed of a truck, jumping onto the bed of the truck and standing on the bed of the moving truck as it traveled through a pasture off-road.

And on November 19, 2012, Hay displayed great difficulty walking and unsteadiness on his feet, almost falling in the parking lot outside of the doctor's office. But minutes after the appointment Hay's wife drove them to a pawn shop, where Hay went inside unassisted and

without any difficulty. After a short time in the pawn shop, and a short visit to another business, Hay's wife drove them home. Later that day, Hay left their home, driving alone. Nine days later, on November 28, 2012, agents had the aforementioned hour-long conversation with Hay about deer poaching. And while his claim for total and permanent disability was pending, on March 18, 2013, Hay had another C&P examination, again displaying difficulty walking, spasms, head movements, hyper extension of his arms and hands; and reporting that he needed help with toileting, bathing, and dressing.

Hay had a dentist appointment at the VA in March 2017. His dentist testified that at times she had seen him have an unusual, unsteady gait, walking with a cane, but never a walker. His dentist further testified that she began treating him in December 2014 and he never warned her that he might have tremors, head jerking, or involuntary movements. She testified that this would have been important information for her to know before working in his mouth, particularly before a two-hour dental procedure she performed. In the dentist's waiting room during that March 2017 visit, Hay told an undercover officer that he worked with his brother-in-law doing remodeling, and offered to help him get a job there.

In May 2017, the VA required Hay to undergo updated C&P examinations despite its earlier determination that his disability was total and permanent. Pole camera footage showed that the day before his two C&P examinations that month, Hay moved heavy tent canopies onto his truck and worked on his truck's engine, alone and without assistance. But the next day, Hay arrived at the VA for the two C&P examinations, using a walker that he had been seen loading into the truck at home earlier that day. Hay displayed great difficulty walking, with marked head bobbing. The C&P examinations were audio- and video-recorded. Hay mumbled and displayed difficulty answering the examiners' questions. Hay reported that he had not worked since 2006

and that someone else did the labor on his family farm.  He reported that weekly he had whole body tremors and seizure-like symptoms, with severe episodes once or twice a month that lasted for two or more hours.  Hay's wife added that the episodes were random with no prior warning.  The Hays described the episodes as causing all of his muscles to contract and that he was unable to move except for shaking.[4]  During the two C&P examinations, Hay displayed head shaking, groaning, tremors, and arm stiffness.  He reported that his wife sometimes had to help him with bathing, dressing, and toileting.  He reported that he was unable to shop; he would sit on a bench and wait for his wife while she shopped.  Shortly after leaving that appointment, Hay's activities belied his statements.

Immediately after these two C&P examinations, Hay again displayed difficulty walking with his walker in the VA parking lot; yet he easily bent down to pick up coins that agents had left on the ground near Hay's truck.  He also loaded the walker into the truck by himself.  Hay's wife then drove them to Sam's Club, 20–25 minutes away, where agents surveilled and store video footage evidenced Hay shopping.  He walked around the large store without the walker and without assistance or difficulty, loading boxes of groceries into the truck and quickly grabbing a runaway shopping cart.  Though Hay had the cane with him, he did not rely on it.  Rather he was seen swinging the cane, dragging it on the ground and at times he kept the cane inside the grocery cart.  The Hays then drove home.

The pole camera footage of Hay's activities in front of his house in late 2016, March 2017, and May 2017, allowed the jury to see Hay's movements and conduct to which the VA personnel were not privy.  The pole camera showed Hay in front of his house almost daily.  At

---

[4] He also told the psychologist examiner that he could not get along with people, that he isolated and that he hated everyone.  But the jury heard from multiple witnesses that during this period Hay led a committee at church and engaged in other social activities.

various times he moved, lifted, and stacked large boxes and obviously heavy items. At times he appeared to be working on his truck engine. Once he was seen attaching a trailer to his truck. He was seen hopping up and down the front porch steps and running or jogging across the yard or driveway. He was never seen with a walker, except when he carried and loaded the walker into his truck on the way to a VA appointment. At times he was seen with the cane, but never using it for assistance with ambulating. On several occasions he carried a baby in a baby carrier despite his wife being present; they were both apparently unconcerned about Hay potentially injuring the baby should he have a sudden tremor, involuntary movement, or loss of balance. On one occasion Hay was seen kicking the door of his truck closed; once he stood and balanced on one foot to clean the sole of his boot, with no difficulty.

Others testified about their observations of Hay's activities in 2016 and 2017. In 2016, agents surveilled Hay at a festival; for three hours he displayed none of the claimed symptoms and impairments. Osawatomie Deputy Chief of Police testified that he saw Hay moving a loveseat during a yard sale in 2016.

In September 2021, Hay was still engaging in physical labor inconsistent with his claims of disability. Macomb testified about photographs she took that month of Hay standing on a roof, throwing planks of wood and debris from a house fire onto the ground. And Wes Ungeheuer, a scrap metal dealer, testified that Hay had been hauling and selling scrap to him for over fifteen years. Ungeheuer presented a spreadsheet of his transactions with Hay from 2017 to 2022 evidencing that he had paid Hay over $162,000 for over one million pounds of scrap Hay hauled to his yard during those five years. Ungeheuer testified he had seen Hay with a cane occasionally but never with a walker and that Hay had told him Hay obtained some scrap by collecting it from curbside.

In August 2018, the VA terminated Hay's disability benefits for choreiform movement disorder and conversion disorder.[5]

## II. Discussion

Fed. R. Crim. P. 29 allows a defendant to move for a judgment of acquittal at the close of the Government's evidence.[6] The Court may reserve decision on the defendant's motion and proceed with trial, submit the case to the jury, and then decide the motion for acquittal before the jury reaches a verdict or after the jury returns a guilty verdict.[7] Rule 29(c) provides that a defendant may also move for a judgment of acquittal or renew a previous motion for acquittal within fourteen days after the jury returns a guilty verdict or is discharged.[8]

The Court must consider the sufficiency of the evidence in the light most favorable to the Government and determine "whether any rational trier of fact could have found, from the direct and circumstantial evidence presented to it, together with the reasonable inferences therefrom, the essential elements of the crime beyond a reasonable doubt."[9]

### A. Wire Fraud

Hay was charged in Counts 1–6 of the Superseding Indictment with wire fraud under 18 U.S.C. §§ 1343 and 2 for devising a scheme to defraud the VA of disability payments that were paid electronically, through ACH payments initiated by the VA in Illinois and transmitted to Hay's bank account in Kansas as follows: Count 1 for a $3,990.24 payment on June 30, 2017;

---

[5] The Presentence Investigation Report (Doc. 116) includes the Government's calculation of losses to the VA as: $422,572.66 for disability benefits from 2013 to 2017 to which Hay was not entitled, $69,704.95 in caregiver benefits paid to his wife, and $115,343.21 in dependent educational benefits paid to his children, for a total of $607,620.82 in VA benefits to which Hay was not entitled. The Government calculates that the total loss to SSA and VA was $760,741.82. *Id.* at 10–12.

[6] Fed. R. Crim. P. 29(a).

[7] Fed. R. Crim. P. 29(b).

[8] Fed. R. Crim. P. 29(c)(1).

[9] *United States v. McIntosh*, 124 F.3d 1330, 1334 (10th Cir. 1997) (citations omitted).

Count 2 for a $3,990.24 payment on August 1, 2017; Count 3 for a $3,990.24 payment on September 1, 2017; Count 4 for a $4,070.05 payment on March 1, 2018; Count 5 for a $4,070.05 payment on May 1, 2018; and Count 6 for a $4,070.05 payment on August 1, 2018.[10]  Hay was convicted of all six wire fraud counts.

To convict Hay of wire fraud, the Government must prove the following elements beyond a reasonable doubt: (1) that Hay devised or intended to devise a scheme to defraud, as alleged in the Superseding Indictment; (2) that Hay acted with specific intent to defraud; (3) that Hay used interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and (4) the scheme employed false or fraudulent pretenses, representations or promises that were material.[11]  Hay generally argues that the Government failed to prove each element beyond a reasonable doubt.

The parties filed a Joint Stipulation that these payment transactions flowed in interstate commerce, such that the third element of wire fraud was not disputed.[12]  And, when viewing the evidence in the light most favorable to the Government, a rational jury could find that the Government proved the other three elements of wire fraud beyond a reasonable doubt.  The evidence proved that Hay devised a scheme to obtain disability and disability-related benefits from the VA by repeatedly falsely representing to the VA that he was unable to work and often unable to drive or engage in ADLs.  Hay made false representations, both verbal and non-verbal, to VA medical and claims personnel about the nature, extent, and duration of his symptoms, impairments, and resulting disability.  These false verbal representations and nonverbal pretenses were material to the VA.  Dr. McWoods relied upon Hay's false representations and pretenses in

---

[10] Doc. 68 at 7.

[11] *See, e.g.*, *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) (citations omitted).

[12] Doc. 83.

supporting Hay's application for total and permanent disability benefits. Other VA personnel relied upon Hay's false representations and pretenses in awarding and continuing to award him benefits, including Aid and Attendance, and total and permanent disability.

A rational jury could find from circumstantial evidence and reasonable inferences, that Hay specifically intended to defraud the VA, through false verbal representations and false non-verbal pretenses. Hay's movements and behavior was surveilled and at times recorded in various locations by agents, neighbors and Hay's sister. The jury heard evidence suggesting that at the VA or medical appointments, Hay put on a display of severe spastic movements and difficulty ambulating. Minutes after the appointments, in other locations, Hay was seen ambulating fluidly and without assistance. In other public settings Hay also ambulated well and displayed no impairments or symptoms. At Sam's Club, at the scrapyard, at the family farm, or in interacting with local law enforcement or agents who claimed to be investigating deer poaching, Hay displayed no difficulty ambulating, nor any other symptoms. While Hay usually carried his cane in public, the cane appeared to be used as a prop, not as an assistive device. Hay frequently drove without assistance despite his claims of sudden, unwarned, seizure-like episodes.

And in front of his home and on his family farm, where a jury could infer Hay believed he was out of the public eye, Hay engaged in heavy farm labor, scrap hauling, truck mechanics, moving and loading heavy objects. Hay displayed none of the symptoms or impairments he consistently reported to the VA from 2006 to 2018.

## B. Theft of Government Property

Hay was charged in Counts 7–16 of the Superseding Indictment with theft of government funds exceeding $1,000, in the form of disability and other monetary compensation paid by the VA to which he was not entitled, in violation of 18 U.S.C. §§ 641 and 2, as follows: Count 7 for

a $2,827.18 payment on September 30, 2016; Count 8 for a $2,827.18 payment on November 1, 2016; Count 9 for a $2,971.60 payment on March 31, 2017; Count 10 for a $2,971.60 payment on May 1, 2017; Count 11 for a $2,971.60 payment on June 30, 2017; Count 12 for a $2,971.60 payment on August 1, 2017; Count 13 for a $2,971.60 payment on September 1, 2017; Count 14 for a $3,030.64 payment on March 1, 2018, Count 15 for a $3,030.64 payment on May 1, 2018; and Count 16 for a $3030.64 payment on August 1, 2018.[13] Hay was convicted on all ten counts.

To convict Hay of theft of government property under 18 U.S.C. § 641, the Government must prove the following three elements beyond a reasonable doubt: (1) that the disability or other monetary compensation belonged to the United States government, namely the VA; (2) that he stole, embezzled, or converted the disability or other monetary compensation intending to put it to his own use or gain, or that he took the property knowing it was not his and intending to deprive the owner of the use or benefit of the property; and (3) that the value of the disability or other monetary compensation was more than $1,000.[14] Hay generally argues that the Government failed to prove each element beyond a reasonable doubt, and specifically argues that the Government failed to prove that he violated 18 U.S.C. § 641 because fraud is not actionable under § 641.

First, with respect to Hay's general factual challenge to his convictions under § 641, the Court easily concludes that a rational jury could find that Hay received disability or other monetary compensation belonging to the VA and that its value was more than $1,000. The Court easily concludes that a rational jury could find that Hay received this money intending to deprive the VA of the funds, for his own gain. Hay did this in the same manner and means that the Court

---

[13] Doc. 68 at 8.

[14] See 18 U.S.C. § 641; United States v. McPhilomy, 270 F.3d 1302, 1307–08 (10th Cir. 2001).

described on the wire fraud convictions, through false and fraudulent representations and pretenses, through verbal statements and non-verbal representations to VA personnel.

Hay argues more specifically that fraud is not actionable under § 641 and thus the Government failed to prove he violated that statute.[15]  Hay argues that § 641 expressly states the means by which the offense may be committed: embezzlement, stealing, purloining, and conversion but the plain language does not include conversion or stealing by fraud.

Hay further argues that this reading of the statute is consistent with congressional intent, as demonstrated by Congress omitting the word "fraud" in § 641, but including the words "steal" and "fraud" in other statutes found in Chapter 31 of Title 18, titled "Embezzlement and Theft."[16] For instance, 18 U.S.C. § 659 provides: "Whoever embezzles, *steals*, or unlawfully takes, carries away, or conceals, or *by fraud or deception* obtains from any pipeline system, railroad car, wagon, motortruck, trailer, or other vehicle" commits a criminal offense.  Hay urges that Congress's use of the terms "steal" and "by fraud or deception" in § 659 shows that Congress did not intend the word "steal" to encompass fraud, or the language "by fraud or deception" would

_____

[15] Section 641 provides in relevant part:

> Whoever *embezzles*, *steals*, *purloins*, or *knowingly converts* to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both. . . .

18 U.S.C. § 641 (emphasis added).

[16] *See, e.g.*, 18 U.S.C. § 659 ("embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains" certain goods or chattels); *id.* § 665(a) ("embezzles, willfully misapplies, steals, or obtains by fraud" certain property); *id.* § 666(a)(1)(A) ("embezzles, steals, obtains by fraud, or . . . converts" certain property); *id.* § 668(b)(1) ("steals or obtains by fraud from . . . a museum any object of cultural heritage"); *id.* § 668(b)(2) (prohibiting receiving an object of cultural heritage knowing that it "has been stolen or obtained by fraud"); *id.* § 670(a)(1) ("embezzles, steals, or by fraud or deception obtains, or knowingly and unlawfully takes, carries away, or conceals a pre-retail medical product").

16

be redundant. Hay also argues that reading fraud into § 641 would require the Court to supply the element of materiality, and an absent element cannot be supplied by the courts and would violate his right to due process.

But, as the Government posits, the word "stealing" includes any acquisition of the property of another by false pretenses. The definition of "steal" in *Black's Law Dictionary* supports this proposition: "1. To take (personal property) illegally with the intent to keep it unlawfully. 2. To take (something) by larceny, embezzlement, *or false pretenses*."[17] Indeed, since before § 641's enactment, the word "steal" has been defined as denoting the taking of personal property by "larceny, embezzlement, or *false pretenses*."[18] Unlike larceny, stealing has "no common law definition to restrict its meaning as an offense [and] is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another."[19]

Given this common-law background, in *United States v. Morissette*, the Supreme Court recognized the breadth of § 641, noting that the statute was drafted "to collect from scattered sources crimes so kindred as to belong in one category": those that prohibit unlawful taking from the government.[20] In describing the history of § 641, the Supreme Court concluded that the statute applied "to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their

---

[17] Black's Law Dictionary 1425 (11th ed. 2019) (emphasis added).

[18] *United States v. Turley*, 352 U.S. 407, 412 (1957) (emphasis added) (quoting Black's Law Dictionary (4th ed. 1951)); *see also Boone v. United States*, 235 F.2d 939, 940 (4th Cir. 1956) ("Black's Law Dictionary, 3d ed., gives 'steal' as denotive of a taking by false pretenses or by embezzlement or by larceny.").

[19] *Crabb v. Zerbst*, 99 F.2d 562, 565 (5th Cir. 1938).

[20] 342 U.S. 246, 266–67 (1952).

fixed definitions."[21]  And, unsurprisingly, circuit courts routinely affirm convictions for theft of government funds when those funds were obtained by fraud.[22]

This Court thus concludes that the scope of § 641 includes obtaining government funds by fraud, false representations, and false pretenses. And, a rational jury could find that the Government proved every element of § 641 beyond a reasonable doubt, as Hay obtained VA disability benefits by false pretenses, false representations, and by means of dishonest transactions.

## III.  Conclusion

Viewing the evidence in the light most favorable to the Government, a reasonable jury could find that the evidence proved beyond a reasonable doubt that Defendant Hay committed the crimes charged in Counts 1–16 of the Superseding Indictment.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Judgment of Acquittal (Doc. 99) is **denied**.

---

[21] *Id.* at 266 n.28.

[22] *See, e.g.*, *United States v. Dowl*, 619 F.3d 494, 501–02 (5th Cir. 2010) (concluding that a fraudulent scheme falls within the scope of § 641); *United States v. Herrera-Martinez*, 525 F.3d 60, 61–65 (1st Cir. 2008) (holding that § 641 applied to defendant charged with obtaining federal benefits under false pretenses); *United States v. Aguilar*, 967 F.2d 111, 114 (5th Cir. 1992) (noting the breadth of the term "steal" and holding that Congress intended for § 641 to include offenses like passing bad checks); *United States v. Crutchley*, 502 F.2d 1195, 1201 (3d Cir. 1974) (finding that § 641 applies to "larceny by trick"); *United States v. Dominguez*, 735 F. App'x 591, 594 (11th Cir. 2018) (finding a reasonable jury could convict the defendant for violating § 641 where she "made a knowing misrepresentation in an effort to receive workers' compensation benefits to which she was not entitled"); *see also* Model Crim. Jury Instr. 8th Cir. 6.18.641 cmt. (2021) ("In this statute, steal or stealing has been given broader meaning than larceny at common law. The statute applies to any taking whereby a person dishonestly obtains anything of value belonging to another with the intent to deprive the owner of the rights and benefits of ownership."); 1 Modern Fed. Jury Instr.—Crim. P23A.01 cmt ("Stealing includes obtaining property by misrepresentation.").

**IT IS SO ORDERED.**

Dated: December 2, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA

          **Plaintiff,**

    **v.**                           **Case No. 19-20044-JAR**

BRUCE HAY,

          **Defendant.**

## GOVERNMENT'S RESPONSE TO DEFENDANT BRUCE HAY'S SENTENCING MEMORANDUM

Defendant Bruce Hay committed fraud against the United States taxpayers for more than fifteen years. He lied to the Veteran's Administration and to the Social Security Administration. Moreover, his scheme to defraud and his deceitful conduct continued throughout the investigation and trial in this matter. Throughout his fraudulent scheme, Defendant stole more than $760,000. The appropriate punishment Defendant's conduct is an advisory Guidelines recommended sentence of 37 months imprisonment, 2 years of supervised release, and restitution in the amount of $537,915.87.

### RELEVANT FACTS

A. **The Indictment**

The Superseding Indictment charged Defendant with six counts of wire fraud in violation of 18 U.S.C. § 1341, and ten counts of theft of government funds in violation of 18 U.S.C. § 641. The wire fraud counts each carry a maximum sentence of twenty years imprisonment, and the theft of government funds have a maximum sentence of ten years each.

The wire fraud scheme and the theft of government funds charges each rely upon similar conduct. Defendant obtained VA and Social Security benefits based upon false statements and

assertions related to his physical condition. The theft counts each related to individual VA benefits, each of which exceeded $1,000.

The SSI alleged that Defendant Hay was involved in an automobile accident in February 2005, while he was on active duty. About a year after the accident, Defendant applied for VA benefits, and was determined to be 100% service-connected disabled. However, the SSI alleges that, by a date unknown but by at least January 2011, Defendant was "able to engage in a full range of physical activities, including work on his family farm, deer hunting, driving regularly, and walking without assistance from a cane or walker." (*SSI*, doc 68, filed 6/14/22 at 4).

B. **Evidence at Trial**

Although the Indictment alleged that Defendant's scheme to defraud began no later than January 2011, the evidence at trial conclusively proved that Defendant began the scheme as early as August 2005, when he began working on the construction of his Paul Kalmar's house, despite telling VA that he was unable to work.







During much of the relevant time period, Defendant's primary care physician was Dr. Emmett McWoods. Defendant presented himself to Dr. McWoods as requiring the assistance of a cane or walker in order to walk.

As part of the benefits process, VA conducted Compensation and Pension (C&P) examinations of Defendant Hay. During the various C&P exams, Defendant reported that he could not work or drive and was unable to perform some activities of daily living. In April 2012 Defendant submitted a claim to VA seeking a declaration that he was totally and permanently disabled. Dr. McWoods submitted a letter on behalf of Defendant in support of the request, based upon McWoods' observations of Defendant and Defendant's assertions to Dr. McWoods. Dr. McWoods testified that, had he known of Defendant's true physical abilities, he would not have submitted the letter.

In 2011, VA-Office of Inspector General (VA-OIG) received an anonymous complaint regarding Defendant and began investigating him. As part of the investigation, agents conducted physical surveillance of Defendant and installed a pole camera that captured video of the front of Defendant's house and yard. The camera recorded video of Defendant coming and going from his house. Defendant was never observed using a walker or a cane. He was observed carrying a walker to put into his truck prior to a C&P exam; was observed moving heaving items from his truck into another truck; and jogging from the truck into his house.

In May 2017, Defendant was required to go to VA for another C&P examination. VA-OIG recorded the examination rooms and the waiting rooms, in addition to the pole camera, that captured video of Defendant before and after the examination. The pole camera recorded video of Defendant carrying a walker to his truck, then using the walker while on VA property. During the C&P interviews, Defendant described his impairments and stated he was unable to work. Following the appointment Defendant went to a Sam's Club where he walked without impairment, shopped, and loaded items into his truck.

The government presented evidence of Defendant's physical activities in the community. A former deputy police chief testified that he had observed Defendant lift and move a couch. Wes

Ungeheuer, who owns Wes' Recycling, a scrap-metal company, testified that Defendant had been selling scrap metal to him for more than fifteen years. From 20017 to 2022 Defendant sold Wes' Recycling more than one million pounds of scrap metal. Defendant's sister testified that she observed and video-recorded Defendant working on a roof. The sister and others observed Defendant loading haybales onto a flat-bed trailer and moving scrap metal.

The government introduced evidence of an employment agreement between Defendant and his mother. The agreement stated that Defendant had performed as farm manager on the family farm and was owed $62,000 a year for his labor. The agreement included a mechanic's lien which stated Defendant had performed work such as equipment repair, livestock management, and fence repair on the farm.

After a two-week trial, the jury convicted Defendant Hay as charged in the SSI -- six counts of wire fraud and ten counts of theft of government funds. The Court ordered a Presentence Investigation Report (PSR). The PSR calculates the applicable loss as more than $550,000, but less than $1.5 million and Defendant's criminal history category as I, resulting in an applicable advisory Guidelines range of 37 to 46 months.

## C. Defendant's Conduct during Court hearings

Defendant presented himself during trial and in pretrial hearings as having constant involuntary shaking. Despite video surveillance that showed little to no involuntary movements outside of VA or SSA property, Defendant's shaking and movements appeared constant while in court. At the *Limine* hearing on July 26, 2022, Defendant's shaking was prevalent enough that the Court remarked on it:

> THE COURT: All right. Well, I'll decide it later.
> I will say that obviously Mr. Hay has no obligation as a defendant to present any evidence, present a defense, testify, anything like that. It's the government's burden.

But at the same time, Mr. Hay is presenting in the courtroom as if he has some sort of palsy. I mean, it's readily observable to the court, and the government say that he has taken the position or has stated to the VA that his disability is permanent. So there may be some relevance for more current evidence about, you know, how he's doing now, particularly in light of the way he's presenting in court and presumably will at trial.

*Limine Transcript*, Doc. 88, filed 7/28/22 at 39.

Despite the way the Defendant presented himself to the Court on July 26, the day before the *Limine* hearing, Defendant sold more than 1300 pounds of scrap metal to Wes' Recycling.



(Ex. 85, screenshot)



| 222146 | 7/25/2022 | #2 Clean cop | 7.0 | LB | $2.1000 | LB | $14.70 |
| 222146 | 7/25/2022 | AC Core Rad | 38.0 | LB | $1.0000 | LB | $38.00 |
| 222146 | 7/25/2022 | Sealed Units | 133.0 | LB | $0.1400 | LB | $18.62 |
| 222145 | 7/25/2022 | Shred | 1,280.0 | LB | $100.0000 | NT | $64.00 |
| **Bruce Hay 1/13/2017 to 7/25/2022** | | **Total Weight 1,057,540 lbs.** | | | | **TOTAL PAID:** | **$162,353.81** |

(Portion taken from Gov. Ex. 331)

### D. The Sentencing Guidelines

Although the United States Sentencing Guidelines (USSG or Guidelines) are advisory, both Congress and precedent requires the Court to consider the Guidelines in imposing an appropriate sentence. Indeed, the Supreme Court has clarified that the Guidelines are entitled to considerable deference. "The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). Additionally, § 3553(a)(6) requires the Court to impose a sentence that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The PSR in this case calculates loss as $760,741.82, which includes VA benefits of $422,572.66, $69,704.95 in caregiver payments to Defendant's wife, $115,343.21 in dependent educational benefits to Defendant's children and $153,121 in fraudulently obtained SSA payments. PSR, doc. 116, filed 11/08/22 at 11. Because the loss is more than $550,000, and because wire fraud carries a maximum sentence of more than 10 years, this results in a base offense level of 21 under U.S.S.G. § 2B1.1. Defendant has no scoreable criminal history, and therefore his criminal

history category is I under the Guidelines.  This results in an advisory Sentencing Guidelines range of 37 to 46 months.

## ARGUMENT AND AUTHORITIES

### A.  The **18 U.S.C. § 3553** factors support a sentence of imprisonment

The factors set forth at § 3553(a) support a sentence of imprisonment.

### 1.  *The nature and circumstances of the offense and the history and characteristics of the defendant*

Defrauding the government of more than three-quarters of a million dollars is a serious offense, particularly when considering the length and prevalence of Defendant's lies and deception.  This is not an isolated crime committed during a moment of weakness.  It is a fifteen year fraud perpetrated each time Defendant collected his monthly payments, or appeared in front of VA employees and chose to lie, mislead, and deceive.

As the trial evidence showed, VA's mission is to service veteran's needs as quickly and efficiently as possible.  Detecting fraud is not a primary function of VA, it is left to VA's Office of Inspector General.  However, common sense and good governance dictate that the more prevalent fraud becomes, the more circumspect that VA must become.  This would likely lead to delays in benefits and services to legitimately disabled veterans.  Moreover, a primary reason Defendant Hay's fraud went undetected for so long is that his claimed disability was a neurological disorder not visibly apparent to even trained medical professionals.  Although Defendant's claimed disability was a fraud, many other veterans suffer from disabilities that are not apparent, such as post-traumatic stress disorder.  In times past, those disabilities were often not recognized in the general public or even the medical field,  because they are often not physically apparent, and were often not treated or under-treated. Fraudsters such as Defendant, who take advantage of the difficulty in diagnosing such disabilities potentially causes the public to call into question the true

disability of other veterans.  Make no mistake, Defendant Hay's decades long criminal activity was greater than "just" stealing more than three-quarters of a million dollars from the taxpayers.

The defendant's lies and deception began in 2005 and continue through today.  His fraudulent behavior has spanned two decades.  He has caused $760,741.82 in loss to the United States taxpayer.   His crimes warrant a sentence of imprisonment.

       *2. The need for the sentence imposed to (a) reflect the seriousness of the offense, promote respect for the law, and to provide just punishment*

Defendant Hay seeks a sentence of probation.  As discussed above, Defendant's crimes spanned more than a decade and resulted in substantial loss.  A sentence of probation would neither promote respect for the law, nor provide just punishment for the crimes Defendant chose to commit.

       *3.  The need for the sentence imposed to afford adequate deterrence to criminal conduct*

Defendant's criminal behavior was able to succeed for more than a decade because of the nature of his claimed disability.  Other veterans who might be included to concoct a similar scheme would likely be deterred if they knew a sentence of imprisonment is the consequence of such acts.  Defendant's Sentencing Memorandum, which seeks a sentence of probation, discusses deterrence as it applies to Defendant.  However, it fails to recognize the general deterrence to others.

       *4.  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

Defendant's physical ailments are set forth in the presentence investigation report (PSR).  Until 2017 his medical treatment was provided by the VA.  The Bureau of Prisons will be able to attend to his medical needs should the Court impose a sentence of imprisonment.

His mental health is more difficult to discern, given Defendant's lies and deceptions to VA, his primary mental health provider since 2005.  It is further unclear what mental health treatment,

if any, Defendant sought since the charges in this case were first brought. However, any legitimate mental health needs of the Defendant will be able to be adequately provided during the relatively short period of incarceration, if the Court imposes the government's recommended sentence.

Defendant does not appear to need vocational or other correctional treatment.

**CONCLUSION**

Defendant's crimes are serious and spanned many years. A sentence of 37 months, which is the low-end of the advisory Sentencing Guidelines, takes into account the § 3553 factors and the Sentencing Guidelines, and is sufficient, but not greater than necessary, to provide an appropriate sentence to Defendant and the community.

RESPECTFULLY SUBMITTED,


*/s/ D. Christopher Oakey*
D. Christopher Oakley
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax. 913-551-6541
Chris.Oakley@usdoj.gov
Ks. Bar No. 19248

**CERTIFICATEOF SERVICE**

I hereby certify that on the 6th day of December, 2022, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*/s/ D. Christopher Oakley*
D. Christopher Oakley

# CLERK'S COURTROOM MINUTE SHEET – CRIMINAL

## SENTENCING

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Case No:   19-20044-01-JAR

BRUCE L. HAY,

        Defendant.

**Atty for Govt: Chris Oakley**
**Atty for Deft: Che Ramsey**

| JUDGE: | Julie A. Robinson | DATE: | 12/13/2022 |
|---|---|---|---|
| CLERK: | Sarah Spegal | COURT REPORTER: | Dani Murray |
| INTERPRETER: | | PRETRIAL/PROBATION: | Ruth Yorke |

☒ For Details of Sentence See Judgment and Commitment Order

☒ Restitution Ordered under 18:3663     $ 537,915.87   on counts 1-16
                                   $ _____  on count(s)

☒ **Total Restitution:**        $ 537,915.87

☐ Defendant Fined                $ _____  on count(s) _____
                                   $ _____  on count(s)

☐ **Total Fine:**             $ 0.00

☒ Defendant Assessed under 18:3013    $ 100.00 on each count, counts 1-16
                                   $         on count(s)

☒ **Total Assessment:**        $**1600.00**

☐ Count(s) _____ dismissed by the court on the motion of the United States.
☒ Government ☒ Defendant    - Advised of right to appeal
☒ Defendant to voluntarily surrender:
☐ Defendant remanded to custody
☐ Stay of Execution   ☐ Granted   ☐ Denied
☒ Notes:  The court recommends placement at Springfield Medical Center.

# United States District Court
## District of Kansas

UNITED STATES OF AMERICA

v.

Bruce L. Hay

**JUDGMENT IN A CRIMINAL CASE**

Case Number:  2:19CR20044 - 001

USM Number:  29719-031

Defendant's Attorney:  Chekasha Ramsey

## THE DEFENDANT:

☐     pleaded guilty to count(s): ___.

☐     pleaded nolo contendere to count(s) ___ which was accepted by the court.

☒     was found guilty on count(s) <u>1-16 of the Superseding Indictment</u> after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| <u>18 U.S.C. § 1343</u> | Wire Fraud, a Class C Felony | 08/01/2018 | 1-6 |
| <u>18 U.S.C. § 641</u> | Theft of Government Funds, a Class C Felony | 08/01/2018 | 7-16 |

The defendant is sentenced as provided in pages 1 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐     The defendant has been found not guilty on count(s) ___.

☒     All original charging documents are dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of material changes in economic circumstances.

12/13/2022
_____
Date of Imposition of Judgment

s/ Julie A. Robinson
_____
Signature of Judge

Honorable Julie A. Robinson, Senior U.S. District Judge
_____
Name & Title of Judge

12/13/22
_____
Date

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of <u>37 months</u> for Counts 1-16 to run concurrently.

☒ The Court makes the following recommendations to the Bureau of Prisons: to be designated to MCFP Springfield to address medical issues.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district.

    ☐ at ___ on ___.

    ☐ as notified by the United States Marshal.

☒ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before ___ on ___.

    ☒ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Officer.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
Deputy U.S.  Marshal

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of <u>3 years</u> on Counts 1-16 to run concurrently.

# MANDATORY CONDITIONS

1.  You must not commit another federal, state, or local crime.

2.  You must not unlawfully possess a controlled substance.

3.  You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed eight (8) drug tests per month.

    ☐  The above drug testing condition is suspended based on the court's determination that you pose a low risk of future substance abuse.  *(Check if applicable.)*

4.  ☒  You must make restitution in accordance with <u>18 U.S.C. §§ 3663</u> and <u>3663A</u> or any other statute authorizing a sentence of restitution. *(Check if applicable.)*

5.  ☒  You must cooperate in the collection of DNA as directed by the probation officer. *(Check if applicable.)*

6.  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (<u>34 U.S.C. § 20901</u>, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(Check if applicable.)*

7.  ☐  You must participate in an approved program for domestic violence. *(Check if applicable.)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by your probation officer.

5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or Tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining court approval, require you to notify the person about the risk and you must comply with that instruction.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand additional information regarding these conditions is available at the www.uscourts.gov.

Defendant's Signature _____     Date _____

# SPECIAL CONDITIONS OF SUPERVISION

1.    You must participate as directed in a cognitive behavioral program and follow the rules and regulations of that program which may include MRT, as approved by the United States Probation and Pretrial Services Office. You must contribute toward the cost, to the extent you are financially able to do so, as directed by the U.S. Probation Officer.

2.    You must not incur new credit charges or open, or attempt to open, additional lines of credit, without the prior approval of the U.S. Probation Officer. You must also execute any release of information forms necessary for the probation officer to monitor your compliance with the credit restrictions.

3.    You must immediately provide the U.S. Probation Officer with access to any and all requested financial information, to include executing any release of information forms necessary for the probation office to obtain and/or verify said financial information.

4.    You must participate in an approved program for mental health treatment, and follow the rules and regulations of that program, which may include psychological counseling. You must contribute toward the cost, to the extent you are financially able to do so.


ACKNOWLEDGMENT OF CONDITIONS:
I have read or have had read to me the conditions of supervision set forth in this judgment; and I fully understand them. I have been provided a copy of them. I understand upon finding of a violation of probation or supervised release, the Court may (1) revoke supervision, (2) extend the term of supervision and/or (3) modify the conditions of supervision.


Defendant's Signature _____    Date _____

USPO Signature _____    Date _____

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments set forth in this Judgment.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $1600 | $537,915.87 | Waived | Not applicable | Not applicable |

☐      The determination of restitution is deferred until **___**. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒      The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

       If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| The Veterans Administration | | $537,915.87 | |
| | | | |
| **TOTALS** | **$** | **$ 537,915.87** | |

☐      Restitution amount ordered pursuant to plea agreement $ ___ .

☐      The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options set forth in this Judgment may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒      The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

     ☒ the interest requirement is waived for the ☐ fine and/or ☒ restitution.

     ☐ the interest requirement for the ☐ fine and/or ☐ restitution is modified as follows:

# SCHEDULE OF PAYMENTS

Criminal monetary penalties are due immediately. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows, but this schedule in no way abrogates or modifies the government's ability to use any lawful means at any time to satisfy any remaining criminal monetary penalty balance, even if the defendant is in full compliance with the payment schedule:

A    ☐    Lump sum payment of $___ due immediately, balance due
           ☐ not later than ___, or
           ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B    ☒    Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☒ F below); or

C    ☐    Payment in monthly installments of not less than 5% of the defendant's monthly gross household income over a period of ___ years to commence ___ days after the date of this judgment; or

D    ☒    Payment of not less than 10% of the funds deposited each month into the inmate's trust fund account and monthly installments of not less than 5% of the defendant's monthly gross household income over a period of 3 years, to commence 30 days after release from imprisonment to a term of supervision; or

E    ☐    Payment during the term of supervised release will commence within ____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☒    Special instructions regarding the payment of criminal monetary penalties:

If restitution is ordered, the Clerk, U.S. District Court, may hold and accumulate restitution payments, without distribution, until the amount accumulated is such that the minimum distribution to any restitution victim will not be less than $25.

Payments should be made to Clerk, U.S. District Court, U.S. Courthouse - Room 204, 401 N. Market, Wichita, Kansas 67202, or may be paid electronically via Pay.Gov.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount and corresponding payee, if appropriate.

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States. Payments against any money judgment ordered as part of a forfeiture order should be made payable to the United States of America, c/o United States Attorney, Attn: Asset Forfeiture Unit, 1200 Epic Center, 301 N. Main, Wichita, Kansas 67202.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>vs.<br><br>BRUCE L. HAY,<br>     Defendant. | }<br>}<br>}<br>}<br>}<br>}<br>}<br>}<br>} | Case No. 2:19-cr-20044-JAR<br><br>Hon. Julie A. Robinson<br>United States District Judge,<br>Presiding |

## NOTICE OF APPEAL

Notice is hereby given that the Defendant, Bruce L. Hay, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Judgment and Commitment Order this Court entered in the above captioned case on December 13, 2022.

Date: December 15, 2022

Respectfully submitted,

s/Che Ramsey
CHEKASHA RAMSEY, #78476
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas 66101
Phone: (913) 551-6712
Fax: (913) 551-6562
Email: che_ramsey@fd.org
COUNSEL FOR DEFENDANT

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 15, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/Che Ramsey
CHEKASHA RAMSEY, #78476

# CLERK'S CERTIFICATE

    I, SKYLER B. O'HARA, Clerk of the United States District Court for the District of Kansas, do hereby certify that the foregoing pages are copies of original pleadings, orders, papers and transcripts of the court reporter, in a case lately pending in this court, wherein

| | | |
|---|---|---|
| USA | ) | |
| | ) | |
| Appellee | ) | |
| | ) | |
| | ) | |
| | ) | USDC No. 2:19-cr-20044-JAR |
| | ) | |
| vs. | ) | |
| | ) | USCA No. 22-3276 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Bruce L. Hay | ) | |
| | ) | |
| Appellant | ) | |

    IN TESTIMONY to the above, I do hereunto sign my name and affix the seal of the Court at ___Wichita___ , Kansas this __22__ day of ___February___ , _2023_ .

SKYLER B. O'HARA, CLERK



By: _____s/ M. McGivern_____
       Deputy Clerk