# U.S. District Court
# DISTRICT OF KANSAS (Kansas City)
# CRIMINAL DOCKET FOR CASE #: 2:19–cr–20044–JAR–1

Case title: USA v. Hay

Date Filed: 07/16/2019

Date Terminated: 12/13/2022

Assigned to: Chief District Judge
Julie A. Robinson

Appeals court case number:
22–3276 10CCA

**Defendant (1)**

**Bruce L. Hay**
*29719–031*
*Release*
*TERMINATED: 12/13/2022*

represented by **Chekasha Ramsey**
Office of Federal Public Defender – KCKS
500 State Avenue, Suite 201
Kansas City, KS 66101–2400
913–551–6712
Fax: 913–551–6562
Alternative Phone:
Cell Phone:
Email: che_ramsey@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*
*Bar Number: 78476*
*Bar Status: Active*

**David M. Magariel**
Office of Federal Public Defender – KCKS
500 State Avenue, Suite 201
Kansas City, KS 66101–2400
913–825–6922
Alternative Phone:
Cell Phone:
Email: david_magariel@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*
*Bar Number: 21748*
*Bar Status: Active*

**Paige A. Nichols**
Office of Federal Public Defender – Topeka

117 SW 6th Avenue, Suite 200
Topeka, KS 66603
785–232–9828
Alternative Phone:
Cell Phone:
Email: paige_nichols@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community*
*Defender Appointment*
*Bar Number: 16400*
*Bar Status: Active*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1343 and 2 – Wire Fraud. (SUPERSEDING INDICTMENT FILED 6/14/2022) (1s–6s) | The defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 37 months for Counts 1–16 to run concurrently. Upon release from imprisonment, defendant will be on supervised release for a term of 3 years on Counts 1–16 to run concurrently. Special Assessment: $1600. Restitution: $537,915.87 |
| 18:641 and 2 – Theft of Government Funds. (SUPERSEDING INDICTMENT FILED 6/14/2022) (7s–16s) | The defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 37 months for Counts 1–16 to run concurrently. Upon release from imprisonment, defendant will be on supervised release for a term of 3 years on Counts 1–16 to run concurrently. Special Assessment: $1600. Restitution: $537,915.87 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:641 – Theft of Public Money. (INDICTMENT FILED 7/16/19). Forfeiture Allegation. (1–4) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

**USA**                                          represented by  **Donald Christopher Oakley**
                                                                Office of United States Attorney – KCKS
                                                                500 State Avenue, Suite 360
                                                                Kansas City, KS 66101
                                                                913–551–6730 ext 6604
                                                                Alternative Phone:
                                                                Cell Phone:
                                                                Email: chris.oakley@usdoj.gov
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Designation: Retained*
                                                                *Bar Number: 19248*
                                                                *Bar Status: Active*

                                                                **Ryan Huschka**
                                                                Office of United States Attorney – KCKS
                                                                500 State Avenue, Suite 360
                                                                Kansas City, KS 66101
                                                                913–551–6526
                                                                Alternative Phone:
                                                                Cell Phone:
                                                                Email: ryan.huschka@usdoj.gov
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Designation: Retained*
                                                                *Bar Number: 23840*
                                                                *Bar Status: Active*

                                                                **Tristram W. Hunt**
                                                                Office of United States Attorney – KCKS
                                                                500 State Avenue, Suite 360
                                                                Kansas City, KS 66101
                                                                913–551–6730
                                                                Fax: 913–551–6541
                                                                Alternative Phone:
                                                                Cell Phone:
                                                                Email: tris.hunt@usdoj.gov
                                                                *TERMINATED: 03/08/2022*
                                                                *Designation: Retained*
                                                                *Bar Number: 18196*
                                                                *Bar Status: Terminated*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|------------|-----|-------------|
| 02/10/2023 | 136 | TRANSCRIPT of Jury Trial Volume – Day Seven held 8/9/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's |

| | | |
|---|---|---|
| | | Office. Volume: Seven.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (nw) (Entered: 02/10/2023) |
| 02/10/2023 | 137 | TRANSCRIPT of Jury Trial Volume – Day Eight held 8/10/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Eight.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (nw) (Entered: 02/10/2023) |
| 02/10/2023 | 138 | TRANSCRIPT of Jury Trial Volume – Day Nine held 8/11/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913–735–2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Nine.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (nw) (Entered: 02/10/2023) |
| 02/10/2023 | 139 | TRANSCRIPT of Motion Hearing held 12/21/2021 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913–907–1434, |

| | | dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | 140 | TRANSCRIPT of Telephone Conference held 7/5/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | 141 | TRANSCRIPT of Jury Trial Day 1 held 8/1/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 1. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | 142 | TRANSCRIPT of Jury Trial Day 2 held 8/2/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. |

| | | Volume: Day 2. |
| --- | --- | --- |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | 143 | TRANSCRIPT of Jury Trial Day 3 held 8/3/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 3. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | 144 | TRANSCRIPT of Jury Trial Day 4 held 8/4/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 4. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | 145 | TRANSCRIPT of Jury Trial Day 5 held 8/5/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, |

| | | |
|---|---|---|
| | | dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Day 5.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/10/2023 | 146 | TRANSCRIPT of Sentencing Hearing held 12/13/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/11/2023. (dm) (Entered: 02/10/2023) |
| 02/11/2023 | 147 | TRANSCRIPT of Jury Trial Voir Dire held 8/1/2022 as to Bruce L. Hay before Judge Julie A. Robinson, Court Reporter Dani Murray, 913−907−1434, dani_murray@ksd.uscourts.gov. Transcript purchased by: Public Defender's Office. Volume: Voir Dire.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/12/2023. (dm) (Entered: 02/11/2023) |
| 02/14/2023 | 148 | TRANSCRIPT of Jury Trial Volume Day Six held 8/8/2022 as to Bruce L. Hay before Judge Julie A Robinson, Court Reporter Nancy Wiss, 913−735−2354, |

nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender's Office. Volume: Day Six.

**<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.</span>**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/15/2023. (nw) (Entered: 02/14/2023)

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
2
UNITED STATES OF AMERICA,          )
3                                  )
            Plaintiff,             ) Case No. 19-20044-JAR
4                                  ) Circuit No. 22-3276
vs.                                )
5                                  )
BRUCE L. HAY,                      ) Kansas City, Kansas
6                                  ) Date:  21 December, 2021
            Defendant.             )
7    ...........................

8                    TRANSCRIPT OF MOTIONS HEARING
               BEFORE THE HONORABLE JULIE A. ROBINSON
9             SENIOR UNITED STATES DISTRICT COURT JUDGE

10

11                   A P P E A R A N C E S

12    FOR THE PLAINTIFF:

13          Mr. Ryan Huschka
            OFFICE OF THE UNITED STATES ATTORNEY
            500 State Avenue
14          Kansas City, Kansas 66101

15    FOR THE DEFENDANT:

16          Ms. Chekasha Ramsey
            OFFICE OF THE FEDERAL PUBLIC DEFENDER
17          500 State Avenue
            Suite 201
18          Kansas City, Kansas 66101

19

20

21

22

23

24    _____
                 Proceedings recorded by machine shorthand,
25       transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2       THE COURT:  We're here in United States versus Bruce Hay,
 3  19-20044.  Your appearances, please.
 4            MR. HUSCHKA:  Ryan Huschka appearing on behalf of the
 5  United States, and seated with me at counsel table is Special
 6  Agent Kerry Baker.
 7            MS. RAMSEY:  Che Ramsey on behalf of Bruce Hay who
 8  appears in person.  Seated with me is Shajiah Jaffri, attorney
 9  with the Federal Public Defender.
10            THE COURT:  We're here on Mr. Hay's motion to
11  suppress.  I understand you're going to present argument but
12  not evidence; is that correct?
13            MR. HUSCHKA:  That's correct, Your Honor.
14            THE COURT:  All right.  I'll hear from you,
15  Ms. Ramsey.
16            MS. RAMSEY:  Your Honor, we don't -- I'm not going to
17  take up a lot of the court's time with additional argument.
18  Most of the argument is contained in our motion.  We did not
19  necessarily file a response or reply to the government's reply
20  to our motion.
21            So just to address one thing, which is in the
22  government's motion the secondary argument is that the good
23  faith exception under *Leon* or *Davis* applies to this case, and
24  we would ask the court to consider that part of what our
25  argument is, Your Honor, is that *Carpenter* set a new precedent,
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.10

1    and so to the extent that officers in this case or the VA

2    Office of Inspector General law enforcement were bound by any

3    particular precedent, it would have been an intervening

4    decision in *Carpenter*.  But outside of that we would rest on

5    the arguments in our motion unless the court has any additional

6    questions.

7            THE COURT:  I think I have a couple of questions for

8    the government.  But other than that, I don't have anything

9    more at this time.

10           Mr. Huschka.

11           MR. HUSCHKA:  Yes, Your Honor.  We would primarily

12   rely on our written response.  I just -- I'll get to the good

13   faith point in a moment, but in terms of the merits of the

14   argument, I think the *Tuggle* case, which was a Seventh Circuit

15   case, is the most recent opinion dealing with this issue, and

16   that opinion was particularly comprehensive.

17           It dealt with basically -- it really almost surveyed

18   the law from the state court level to the district court level

19   up through the federal court of appeals, and ultimately in that

20   case it held that an 18-month pole camera that recorded

21   continuously was not a search under the Fourth Amendment, and

22   it noted that to hold it otherwise would create a circuit

23   conflict when at this point every circuit to address this issue

24   has addressed it uniformly.

25           And I think that's important because you can contrast

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.11

1   that to the facts here, at least as the public defender's

2   motion lays them out.  This was about a month and a half of

3   surveillance, and it was not around the clock.  It was just

4   during the day for 15, 16 hours a day.  And then there was

5   about five-month break, and there were six days of

6   surveillance, and there's about one-month break, and an

7   additional six days of surveillance.  So this was not

8   continuous for the duration that some courts have been

9   concerned about when addressing this issue.

10          And on the good faith point, we noted this, but

11   *Carpenter* was decided after the surveillance at issue in this

12   case, so to the extent it upended or changed the landscape as

13   it relates to this issue, and we submit that it does not, but

14   to the extent it did, that happened after the surveillance, so

15   the exclusionary rule is of course to deter unlawful conduct

16   and in this case, Judge, two controlling Tenth Circuit cases

17   that were on the books before *Carpenter* was decided, and so we

18   don't think *Carpenter* would have deterred any government

19   conduct in this case.

20          So other than that, we're happy to answer any

21   questions that -- the court mentioned it may have a couple.

22          THE COURT:  Just a couple of questions that may be

23   obvious, but I still think the record needs to clarify this.

24   The first is, did the pole camera capture audio?

25          MR. HUSCHKA:  No, it did not.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.12

1        THE COURT:  Okay.  And then I think defendant's motion

2   said that it has a zoom feature.  Did the pole capture -- pole

3   camera capture anything happening inside of the house?  Was it

4   able to zoom in through the windows or whatever?

5        MR. HUSCHKA:  No, Your Honor.

6        THE COURT:  All right.  Those are the only questions I

7   have.

8        Anything more from you, Ms. Ramsey?

9        MS. RAMSEY:  I would just note that I believe that

10  there is now pending in the First Circuit *United States vs.*

11  *Moore-Bush*, and it's been set for I think a hearing *en banc*

12  addressing this very issue, so to the extent that this -- may

13  be issue that the Tenth Circuit has taken up, I think the court

14  can see that *Tuggle* and under *United States vs. Moore-Bush* that

15  this issue is rapidly approaching in front of the courts, is

16  still an issue that needs to be vetted and decided -- needs to

17  be vetted and decided when in fact there is surveillance

18  outside of a home that is ongoing.

19        It may not have been for the amount of time as in the

20  other cases, but it -- to the extent it was continuous over a

21  period of time and did capture every particular movement of

22  Mr. Hay and those associations coming to and from his home, we

23  would then stand on the rest of our motion.

24        THE COURT:  All right.  Thank you.  I will take this

25  motion under advisement, issue a written decision.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.13

1         Let's talk about the trial date.  We originally set

2   this for March 21st, but we're not able to hold to that date.

3   I think Bonnie sent you all an e-mail saying that we'd like to

4   set this for April 18th, which is our next available two-week

5   block of time.

6         And I think, Ms. Ramsey, you indicated you might have

7   a witness problem with one of your witnesses?

8         MS. RAMSEY:  I do, Your Honor.  I apologize.  I just

9   had a note of those dates.  I do.  My witness will be

10  unavailable -- and it is an expert witness -- until after I

11  think approximately May 6th given the court's request at this

12  time.

13        THE COURT:  Well, we've got a trial that -- a criminal

14  trial and two civil trials on its heels set beginning May 9th

15  and a 2017 criminal case set for June.  I mean, we only have

16  for sure -- we have to go to July to block out two weeks unless

17  I can bump a trial in May, which I would have to work on.

18  Again, it's a 2017 case, so it's pretty old.

19        How do you all feel about moving this to July?

20        MS. RAMSEY:  Your Honor, I have talked with Mr. Hay

21  about the possibility.  We discussed the fact that court's

22  schedule and the need for our witness may push this out until

23  those months, so we would be fine and available moving it to

24  July.  And I have discussed his right to a speedy trial, and he

25  understands the effect of the continuance.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.14

1        THE COURT:  We have three open weeks in July right

2   now, so it would be a good -- we could nail this down and not

3   have to worry about moving it again.  If we were to start this

4   case, say, on July 11th, would that work for you all?

5        MR. HUSCHKA:  I have something upcoming in July of a

6   personal nature, so I think what I would say from the

7   government's perspective is we'll find a way to try it then

8   even if I'm not able to do it.

9        THE COURT:  I mean, we've got some wiggle room here in

10  terms of July.  Is there a particular time in July that you're

11  unavailable.

12       MR. HUSCHKA:  Starting around early July probably for

13  a couple weeks or so.  Sorry to be a little vague about that.

14       THE COURT:  That's fine.  We could start this

15  July 18th.  We could start it July 25th.  We also could start

16  it August 1st if that works for Ms. Ramsey's client.

17       MR. HUSCHKA:  If we could have just a moment, Your

18  Honor.

19       So, Your Honor, I think for us the best would be -- we

20  have two competing things going on here, but I think later in

21  July or early August is probably better for the government and

22  safer approach at this point.

23       THE COURT:  August 1st work?

24       MR. HUSCHKA:  I think so.

25       THE COURT:  Does that work for you all, Ms. Ramsey?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.15

19-20044-JAR   USA v. BRUCE L. HAY   12.21.21                    8

1          MS. RAMSEY:  Yes, Your Honor.

2          THE COURT:  Okay.  Well, let's nail down those two

3    weeks then.  August 1st through August 12th thereabouts, Bruce

4    Hay.  We appreciate your willingness to work with us on that.

5          All right.  We'll enter an order continuing and order

6    setting and excluding speedy trial time based on the agreement

7    of both parties to August 1st.  We'll plan on picking a jury

8    August 1st and then going from there.

9          We'll need to do a *limine* conference if you all -- do

10   you anticipate there would be *limine* motions?

11         MS. RAMSEY:  Yes, I do, Your Honor.

12         THE COURT:  So we'll push out a trial order that gives

13   a deadline for *limine* motions and a *limine* hearing as well.

14   And anything else we need to do at this point as far as that?

15         MS. RAMSEY:  Your Honor, the only thing I could think

16   of is I think when we originally set this case for March, we

17   set some pretty -- I think lots of deadlines leading up so we

18   could try and stay on track.

19         THE COURT:  Oh, sure, we can push those out.

20         MS. RAMSEY:  Right.  What might be more efficient is

21   if myself and Mr. Huschka could talk and figure out those

22   dates.  Obviously not to intrude on the court's calendar, but

23   maybe we could look at those dates and send a new proposed

24   schedule to the court.

25         THE COURT:  That would be great.  Okay.  Appreciate

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.16

1   that.

2          All right.  Okay.  So we'll be in recess until I

3   believe 1:30.

4          (The proceedings were adjourned at 9:14 a.m.)

5

6              C E R T I F I C A T E

7      I, Danielle R. Murray, a Certified court Reporter and the

8   regularly appointed, qualified, and acting official reporter of

9   the United States District court for the District of Kansas, do

10  hereby certify that the foregoing is a true and correct

11  transcript from the stenographically reported proceedings in

12  the above-entitled matter.

13     SIGNED 8th of February, 2023

14
                    /s/Danielle R. Murray
15                  DANIELLE R. MURRAY, RMR, CRR
                    United States court Reporter
16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.17

1           UNITED STATES DISTRICT COURT
                 DISTRICT OF KANSAS
2

UNITED STATES OF AMERICA,          )
3                                   )
            Plaintiff,              ) Case No. 19-20044-JAR
4                                   ) Circuit No. 22-3276
vs.                                 )
5                                   )
BRUCE L. HAY,                       ) Kansas City, Kansas
6                                   ) Date:  5 July, 2022
            Defendant.              )
7    ...........................

8           TRANSCRIPT OF TELEPHONE CONFERENCE
         BEFORE THE HONORABLE JULIE A. ROBINSON
9        SENIOR UNITED STATES DISTRICT COURT JUDGE

10

                A P P E A R A N C E S
11

FOR THE PLAINTIFF:
12

        Mr. Ryan Huschka
13      OFFICE OF THE UNITED STATES ATTORNEY
        500 State Avenue
14      Kansas City, Kansas 66101

15   FOR THE DEFENDANT:

16      Ms. Chekasha Ramsey
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
17      500 State Avenue
        Suite 201
18      Kansas City, Kansas 66101

19

20

21

22

23

24   _____
         Proceedings recorded by machine shorthand,
25    transcript produced by computer-aided transcription.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.18

19-20044-JAR   USA v. BRUCE L. HAY   07.05.22                    2

1              P R O C E E D I N G S

2        THE COURT:  And the next case we will call is United States

3   versus Bruce Hay.  The case number is 19-20044.  Your

4   appearances, please.

5            MR. HUSCHKA:  Ryan Huschka appearing on behalf of the

6   United States, Your Honor.

7            MS. RAMSEY:  Che Ramsey on behalf of Bruce Hay.  I did

8   give my client the phone number to call in.  I don't know if

9   there's any way for me to acknowledge if he's on the line

10  except to ask.

11           Mr. Hay, are you on the line?

12           THE DEFENDANT:  Yes, I am, Ms. Ramsey.

13           MS. RAMSEY:  Thank you.  And he consents to appear by

14  telephone.

15           THE COURT:  Thank you.  This case was set for trial

16  beginning August 1st.  We set aside two weeks or 10 days for

17  the trial.  There has been a superseding indictment that was

18  filed on June 14th that I want to ask about, and then also the

19  government filed a 404(b) notice.  The defendant filed a motion

20  to strike.  The government has now filed a supplemental notice,

21  so I want to talk to you all about that.

22           But first, with respect to the superseding indictment,

23  I've reviewed it.  It seems to be based on the same evidence,

24  so I assume we're still good with the August 1st trial date.

25  Is that the case, Ms. Ramsey?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.19

1          MS. RAMSEY:  Yes, Your Honor.

2          THE COURT:  Okay.  And, Mr. Krug, do you think it will

3    take a full ten days?

4          MR. HUSCHKA:  Sorry.  Ryan Huschka, Your Honor.

5          THE COURT:  I'm sorry.

6          MR. HUSCHKA:  That is -- yeah, that is our

7    expectation.  We think that the government's case would

8    probably take just a little over a week, you know, maybe

9    spilling into the second week, and then, you know, I think we

10   previously had discussions with the defense and we think that,

11   you know, the defense will call some witnesses in this case,

12   but we still think two weeks is sufficient.

13         THE COURT:  All right.  What about the 404(b) notice

14   that's now been supplemented, Ms. Ramsey?

15         MS. RAMSEY:  Your Honor, I think the supplement would

16   make the motion to strike possibly moot at this time.  I don't

17   know -- what I might do, Your Honor, I'm not sure if we'll file

18   a direct response to their 404(b) notice.  Some of the issues

19   may come up in our *limine* motion, so I don't know if this court

20   prefers me technically moving to withdraw that motion to strike

21   I think based on the government's supplemental notice or

22   finding it moot.

23         THE COURT:  I think we could just do a text entry

24   based on what you've represented with us, a text entry alluding

25   to that.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.20

1          MS. RAMSEY:  Okay.

2          THE COURT:  So we have a *limine* conference set for

3   July 26th at 1:30.  Okay.  So we'll take up *limine* motions then

4   and then any other final matters before the trial is going to

5   start.

6          Is there anything that we need to talk about even

7   before July 26th?  Any other issues?

8          MS. RAMSEY:  Your Honor --

9          MR. HUSCHKA:  Not from the government.

10         THE COURT:  Okay.

11         MS. RAMSEY:  Your Honor, I do anticipate that my

12   client will need some frequent breaks due to health issues in

13   this case, so I did want to put that on the court's radar.  I'm

14   not sure how the court would like to handle that.  I don't know

15   if it's something we wanted to talk about at the *limine*

16   conference, you know, how often that might be with scheduling

17   it or how I need to notify the court based on his health

18   conditions of needing those breaks.

19         THE COURT:  Let's talk about it now.  Tell me, is

20   there like a certain time limit?  Is there a --

21         MS. RAMSEY:  Yes.

22         THE COURT:  Tell me about what you need.

23         MS. RAMSEY:  Thank you.  I think we'll need breaks --

24   my client has problems sitting for long periods of time which

25   causes him pain and stiffness and also may need more frequent

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.21

1    bathroom breaks, so it may be that we have to just take a short

2    break every couple hours because, as we said, I think, you

3    know, the court's schedule on your -- on the website of kind of

4    your courtroom rules, I think we're going to go from 8:30 to

5    5:00 or 9:00 to 5:00, and so I don't -- we could build in a

6    break every couple of hours for approximately maybe 15 minutes.

7         THE COURT:  Okay.  That generally is the schedule we

8    follow, although sometimes it goes longer than that, so we'll

9    have to stay on top of that.  It's, as you know, difficult to

10   adhere to 15 minutes with that many jurors because they need

11   breaks too, but we'll make it work.  And I'll just ask you to

12   remind me, either that or signal to me if we need to take a

13   break sooner than planned.

14        MS. RAMSEY:  Understood.

15        THE COURT:  All right.  Anything else you can think of

16   at this point?

17        MS. RAMSEY:  Your Honor, the only other thing I can

18   think of is I will try to do the same, but this may be to

19   try -- I know the government has a significant amount of

20   witnesses.  I don't know if they have any coming from out of

21   state.  I do.  So I am going to do my best to try not to have

22   any dead time or breaks between those witnesses that are going

23   to testify.  So I'll try to communicate with Mr. Huschka and

24   Mr. Oakley daily about who I think we'll be calling, and I

25   think that will be helpful maybe if the parties can maybe make

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.22

19-20044-JAR   USA v. BRUCE L. HAY   07.05.22                    6

1    that informal agreement to try and do that.

2         THE COURT:  Yeah, I think that's a good idea.  And I

3    frequently check in as well at the end of the day and see how

4    things are progressing and whoever's case it is, who they're

5    planning to call the next day.

6         If you all can work out an agreement among yourselves

7    that you give each other a heads-up so you can make sure we

8    don't have any idle time or make sure a witness is not waiting

9    too long, that would be great, particularly people coming from

10   out of town.

11        MS. RAMSEY:  All right.  That's all I have, Your

12   Honor.  Thank you.

13        THE COURT:  All right.  We'll talk more on July 26th.

14   As far as exhibits we usually have the final pretrial

15   conference quite a bit before the trial starts, but as far as

16   the electronic JERS system --

17        COURTROOM DEPUTY:  The week before and I think I

18   already sent out information, but I'll check and make sure.

19        THE COURT:  Bonnie will be checking with your staff on

20   the electronic evidence or digital evidence for the jury room,

21   that system.

22        Okay.  All right.  Well, unless there's anything else,

23   we'll recess and we'll see you back on July 26th.

24        (The proceedings were adjourned at 9:11 a.m.)

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.23

1                   C E R T I F I C A T E

2       I, Danielle R. Murray, a Certified court Reporter and the

3   regularly appointed, qualified, and acting official reporter of

4   the United States District court for the District of Kansas, do

5   hereby certify that the foregoing is a true and correct

6   transcript from the stenographically reported proceedings in

7   the above-entitled matter.

8       SIGNED 7th of February, 2023

9
                            /s/Danielle R. Murray
10                          DANIELLE R. MURRAY, RMR, CRR
                            United States court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.24

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

UNITED STATES OF AMERICA,          )
3                                   )
          Plaintiff,                )
4                                   ) Case No. 19-20044-JAR
     vs.                            ) Circuit No. 22-3276
5                                   )
BRUCE L. HAY,                       )
6                                   ) Kansas City, Kansas
          Defendant.                ) Date:  1 August, 2022
7     ...........................

8                    TRANSCRIPT OF JURY TRIAL
                           *VOIR DIRE*
9              BEFORE THE HONORABLE JULIE A. ROBINSON
               SENIOR UNITED STATES DISTRICT COURT JUDGE
10

11                    A P P E A R A N C E S

12   FOR THE PLAINTIFF:

13         Mr. Ryan Huschka
           Mr. Christopher Oakley
14         OFFICE OF THE UNITED STATES ATTORNEY
           500 State Avenue
15         Kansas City, Kansas 66101

16   FOR THE DEFENDANT:

17         Mr. David Magariel
           Ms. Chekasha Ramsey
18         OFFICE OF THE FEDERAL PUBLIC DEFENDER
           500 State Avenue
19         Suite 201
           Kansas City, Kansas 66101
20

21

22

23

24   ─────────────────────────────────────────────────────
            Proceedings recorded by machine shorthand,
25     transcript produced by computer-aided transcription.

```
 1              P R O C E E D I N G S

 2        (The following proceedings occurred outside the presence of

 3   the jury.)

 4        THE COURT:  Before you study that much, I wanted to do

 5   another Lafler-Frye inquiry and the other thing I'll tell you I

 6   didn't mention this last week, but I will always be available

 7   at 8:30 every morning, so if you want to take something up

 8   outside the jury's hearing, plan to be here at 8:30.  So I want

 9   to return to the Lafler-Frye inquiry that I started last week.

10        So my understanding is just to recap -- actually let's

11   have appearances first.  I'm sorry.  I came in before everybody

12   was here.  Who appears for the government?

13        MR. HUSCHKA:  Ryan Huschka on behalf of the United

14   States, Your Honor.

15        MR. OAKLEY:  And also Chris Oakley, Your Honor.

16        MR. HUSCHKA:  And seated with us at counsel table is

17   Special Agent Kerry Baker and Special Agent Sam Cairns.

18        MS. RAMSEY:  Che Ramsey and David Magariel on behalf

19   of Bruce Hay who appear in person.

20        THE COURT:  Last week I began the Lafler-Frye inquiry

21   to ensure that any and all plea offers had been communicated to

22   Mr. Hay so he can make an informed decision.  Ms. Ramsey, if

23   you would beg my indulgence, let's return to that subject.  You

24   told me there had only been one offer and it was a offer of

25   diversion.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.26

1        MS. RAMSEY:  Yes.  There was another offer, but there

2   weren't necessarily any -- there was another offer, and it has

3   been communicated to Mr. Hay.  The -- it wasn't something that

4   we had worked out the details about though, so that was made to

5   Mr. Hay as well.

6        THE COURT:  Okay.  How long ago was the diversion

7   offer made and when did you have that consultation with

8   Mr. Hay?

9        MS. RAMSEY:  If you'll give me a moment, Your Honor,

10   to get into my file and my notes.

11        MR. HUSCHKA:  Your Honor, if I could have a moment

12   while Ms. Ramsey is looking that up, I just to want clarify.

13   From the government's perspective Ms. Ramsey and I did discuss

14   some potential resolutions of this case, but the government

15   never made an offer of diversion.  We discussed that as a

16   potential possibility.  Of course every defendant charged in

17   federal court here has the opportunity to apply for diversion.

18   That never happened.  The U.S. Attorney is the only person who

19   can approve a diversion, and Mr. Hay never applied for and was

20   never considered for diversion for that reason.

21        I just wanted to make sure from the government's

22   perspective that was clear.

23        THE COURT:  Right.  I understand.  Thanks for

24   clarifying the process.

25        MS. RAMSEY:  Approximately April 29th.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.27

1          THE COURT:  Okay.  And you had a full discussion with

2    Mr. Hay about what diversion entailed and the risks and

3    benefits of applying for diversion versus the risk and benefits

4    of going to trial?

5          MS. RAMSEY:  Yes, Your Honor.

6          THE COURT:  All right.  And Mr. Hay understood?

7          MS. RAMSEY:  It's my understanding, yes, Your Honor.

8          THE COURT:  All right.  Mr. Hay, you understood?

9          THE DEFENDANT:  We had a conversation, Your Honor.

10          THE COURT:  Did you understand?

11          THE DEFENDANT:  We had a conversation.

12          MS. RAMSEY:  Your Honor, if the Court would inquire

13    further, we'd ask for an *ex parte* sidebar.

14          THE COURT:  Come forward.

15      (The following proceedings were had at the bench).

16          THE DEFENDANT:  We had a conversation, Your Honor.  We

17    disagreed with the understanding of the contents.  But since

18    it's -- they're irrelevant issues, the details are moot, I

19    would consider.

20          THE COURT:  Okay.  I mean, when we talked before, you

21    -- I think what you related to me was that you did not like

22    some of the provisions of what the -- their standard diversion

23    agreement included; is that fair?

24          THE DEFENDANT:  Correct, Your Honor.  I went home and

25    highlighted several parts of it.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.28

1          THE COURT:  Okay.  I don't need to know what that was,

2    but you did understand the agreement; you read it and you

3    decided it was not something you wanted to pursue?

4          THE DEFENDANT:  Correct, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          MS. RAMSEY:  Thank you, Your Honor.

7      (Thereupon, the proceedings continued in open court.)

8          THE COURT:  All right.  Let me check with the parties.

9    Is the government ready to proceed?

10          MR. HUSCHKA:  Yes, Your Honor.

11          THE COURT:  Is the defense?

12          MS. RAMSEY:  Yes, Your Honor.

13          THE COURT:  We will bring in the potential jurors.

14    We're going to put 35 people in the box, and the defendant will

15    have a total of 12 strikes.  The government will have a total

16    of eight strikes, leaving us with 15: 12 plus 3 alternates.

17      (Off the record.)

18          THE COURT:  Do you all see who's designated as the

19    alternates on the seating charts?  You'll each have two of that

20    group.

21      (The jury entered the courtroom, after which the following

22    proceedings were had.)

23          THE COURT:  Thank you.  You can be seated.

24          All right.  I will start by calling the case, United

25    States versus Bruce Hay, 19-20044.  Your appearances please.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.29

1          MR. HUSCHKA:  Ryan Huschka on behalf of the United

2    States, Your Honor.

3          MR. OAKLEY:  Chris Oakley on behalf of the United

4    States, Your Honor.

5          MS. RAMSEY:  Good morning.  Che Ramsey and David

6    Magariel on behalf of Mr. Bruce Hay who appears in person with

7    counsel.

8          THE COURT:  The parties have announced they're ready

9    for trial?

10         MS. RAMSEY:  Yes, Your Honor.

11         MR. HUSCHKA:  Yes, Your Honor.

12         THE COURT:  All right.  All of you that have reported

13   here for jury service this morning -- and that includes those

14   of you that are back in the pews as well -- if you will stand

15   as you're able to and raise your right hand to take an oath.

16     (The potential jurors were duly sworn for *voir dire*

17   examination.)

18         THE COURT:  All right.  You can be seated.

19         All right.  Thank you all for being here bright and

20   early on this Monday morning.  My name is Julie Robinson.  I am

21   a senior United States district judge for the District of

22   Kansas.  Senior just means that I have reached retirement age

23   and opted to keep working, as crazy as that may sound.

24         I'm going to start by introducing a few of the key

25   players in the courtroom to you, and then I will get right into

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.30

 1  some of the most important questions that are probably swirling

 2  in your mind right now.

 3       But I want to just start by thanking you for being

 4  here.  I understand it's a high of 98 degrees, so maybe it's

 5  not such a bad place to be.  We've got good air-conditioning in

 6  this courtroom.

 7       Seated right in front of me is Dani Murray.  Dani is a

 8  certified shorthand court reporter is what we call them, and

 9  she's going to be taking down literally every word that I say,

10  every word that you say, every word that a witness or the

11  lawyers say.  But hopefully you'll remember this; people

12  sometimes don't.  But that does not mean, for those of you that

13  are going to end up on this jury, does not mean there will be a

14  transcript of available for you to read.  She can prepare

15  transcripts later, but it won't be ready by the time of

16  deliberations.

17       But she performs a very important service, and I think

18  it's an amazing talent and skill to have, and it's somewhat of

19  a dying profession.  So we're glad that Dani is with us.

20       Seated next to Dani is Bonnie Wiest.  Bonnie is my

21  courtroom deputy, office administrator, right hand, and she's

22  the person that you're going to have contact with about

23  logistics, questions about -- not about the case, but, you

24  know, just about the trial and where to go to lunch and those

25  sorts of things.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.31

1    Now I'm going to introduce the people that are here at

2    the table, and then I'm going to introduce the parties a little

3    later after I cover some other things with you.

4    But here to the left is Sarah Spegal.  Sarah is also a

5    courtroom deputy.  She's actually a courtroom deputy for

6    another senior judge, but that other senior judge and I are

7    going to share Sarah as our courtroom deputy in 2023, assuming

8    I allow Bonnie to retire next year as she keeps threatening to

9    do.  I feel if I'm willing to work past retirement age, I don't

10   know why she can't, but oh well.  Sarah is here to observe.

11   She's going to be working closely with me when Bonnie retires.

12   Seated next to Sarah is Audra Harper.  Audra is a

13   courtroom deputy for another senior judge, and Audra is new so

14   she's here for training purposes.

15   Seated next to them is Joy Merklen.  Joy is one of my

16   law clerks.  Law clerks for federal judges are actually

17   lawyers.  Joy is a KU law grad.  She's a licensed attorney, but

18   this is her first job out of law school.  She's going to be

19   leaving very shortly at the end of August, and she's going to

20   get a raise, if you will, because she's going to work for a

21   Tenth Circuit judge, which is the appellate level that the

22   trial courts feed up to, and the level above the appellate

23   courts is the U.S. Supreme Court.  But anyway Joy will be

24   clerking this trial, and you may see some other law clerks from

25   time to time, but she's assigned to clerk this trial.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.32

1          So, again, thank you all for being here.  I have been

2     called for jury service in Johnson County a couple of times

3     where I live so I've been in your shoes, and even though this

4     is my profession and this is what I do and I was a trial lawyer

5     before I became a trial judge and I love trials, when I was

6     sitting in your chair I remember going how long is this trial

7     going to take and what's going to happen.  Those are the big

8     questions.

9          So I will tell you that this is -- this is estimated

10    to be a two-week trial.  Probably what that means is you're

11    going to hear evidence all this week and it will bleed into

12    next week and probably not the entire week next week.  But when

13    we factor in jury deliberations, you could be here all of next

14    week because jury deliberations can take hours, it can take

15    days.  That's up to the jury.

16         So we always, if you will, try to give you the long

17    end of what our estimate is because it's very important that

18    you understand and we understand that you are going to be

19    available.  So if you're going to be on the jury, you need to

20    be available all this week and all next week because I intend

21    to be in session every day Monday through Friday.

22         We'll probably start at 9:00 every morning, and we'll

23    close about 5:00.  Generally we finish by 5:00, but if there's

24    a witness on the stand that's almost finished, we may stay past

25    5:00, but that's only if the jury can stay past 5:00.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.33

1    Sometimes people have evening jobs or they have child care

2    issues or whatever.  Your schedule always comes first.

3         So that's generally -- that's generally how this will

4    go.  So let me start by asking if anyone has any serious

5    scheduling issues with being here this week and next.  I will

6    evaluate those.  If I think you have a scheduling issue, I may

7    ask you to sit here, but I won't let you go yet because we have

8    to make sure we get a jury of -- a jury seated today.  And

9    we'll likely, if we're lucky, if things go smoothly, we may get

10   the jury seated by lunchtime, by late lunchtime even.  But in a

11   case of this size, sometimes it takes longer.  So you could.

12        So let me ask, does anyone have any serious schedule

13   issues with being here this week and next week?  If so, raise

14   your hand and I'll call on you.  Well, that may be a first.

15   I'm excited.  I am excited.

16        All right.  So I'm going to introduce the parties.

17   I'm going to tell you just a little bit about what this case is

18   about, and the only reason is to find out whether you know any

19   of them or whether you've ever heard anything about this case

20   or have any familiarity with the case.

21        So I will start with the United States Government.

22   Mr. Huschka, if you'll introduce the people at your table -- or

23   Mr. Oakley.

24        MR. HUSCHKA:  Yes, Your Honor.  Ryan Huschka.  I'm an

25   Assistant United States Attorney.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.34

1          MR. OAKLEY:  Chris Oakley, I'm also an Assistant

2    United States Attorney.  And sitting with us throughout trial

3    will be Special Agent Kerry Baker, who is with the Department

4    of Veterans Affairs Office of Inspector General, and his

5    colleague Samantha Cairns, who's always a special agent with

6    VA-OIG.

7          And they're not in here in the courtroom with us right

8    now, but assisting us throughout trial will likely be Pauletta

9    Boyd with our office and Sandy Kessler, who is a paralegal with

10   our office.

11         THE COURT:  Thank you.  Do any of you think you know

12   Mr. Huschka, Mr. Oakley, or either of two agents from the VA

13   that are seated at the table?  Have any of you -- as you are

14   answering your questions, raise your hand and I'll call on you

15   individually.  Have any of you ever had any dealings with the

16   U.S. Attorney's Office?

17         The U.S. Attorney's Office is really the trial law

18   firm, if you will, for the United States, so they handle

19   criminal cases, they handle civil cases involving the United

20   States.  Have any of you had any business dealings or other

21   dealings with them?

22         All right.  And I will call you by name so we can

23   identify you.  You're Juror No. 0088?

24         JUROR NO. 0088:  Juror No. 0088.  My niece is actually

25   an attorney for the United States in Georgia.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.35

1        THE COURT:  Okay.  Is she in the U.S. Attorney's

2  Office there?

3        JUROR NO. 0088:  Yes.

4        THE COURT:  Does she do civil work or criminal work,

5  do you know?

6        JUROR NO. 0088:  Criminal.

7        THE COURT:  She's a prosecutor.  Has she ever talked

8  to you about her work?

9        JUROR NO. 0088:  Some cases, yeah, after they're done.

10        THE COURT:  Yeah.  Sure.  She can't talk about it

11  while they're going on.

12        Okay.  Anything about the fact that your niece is a

13  federal prosecutor that you think would impair your ability to

14  be objective in this case because this is a criminal case?

15        JUROR NO. 0088:  Well, I hope I would be impartial.  I

16  hope that I would be fair.

17        THE COURT:  Okay.  Well, the instructions that I will

18  give you and that judges give in every trial is you have to

19  decide the case based solely on the evidence and based solely

20  on the law that's instructed to you about the charges.

21        Can you do that?

22        JUROR NO. 0088:  Yes.

23        THE COURT:  And will you do that?

24        JUROR NO. 0088:  Yes.

25        THE COURT:  All right.  And that means you're going to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.36

1   be fair and objective?

2          JUROR NO. 0088:  I will be fair and objective.

3          THE COURT:  Okay.  All right.  Anybody else that's

4   ever had any dealings with the U.S. Attorney's Office?

5          Are you Juror No. 0001?

6          JUROR NO. 0001:  Yes.  I'm a CPA and my previous --

7   I've retired now, but in my old firm I did some litigation

8   support for the Department of Justice, and there was a court

9   trial in the U.S. District Court in Arizona.  That's my

10  exposure to the district court.

11         THE COURT:  So you were a -- you were a witness on

12  behalf of the United States in the trial?

13         JUROR NO. 0001:  Yes, that's correct.

14         THE COURT:  Was it a civil or criminal case?

15         JUROR NO. 0001:  It was -- I think it was a criminal

16  case.

17         THE COURT:  Okay.  How long ago was that?

18         JUROR NO. 0001:  Oh, it's been 40 years ago.

19         THE COURT:  Okay.  And so you actually testified?

20         JUROR NO. 0001:  I didn't actually.  I was part of the

21  support team.

22         THE COURT:  Okay.  So were you actually employed by

23  the government or were you a contractor?

24         JUROR NO. 0001:  We were a contractor.  The CPA firm I

25  worked for contracted with the Department of Energy.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.37

14

1          THE COURT:  Okay.  And so was your -- the company you

2   worked for, you did forensic accounting; would that be fair?

3          JUROR NO. 0001:  Yes.

4          THE COURT:  Did you work in other litigation support

5   too?

6          JUROR NO. 0001:  I did.  A couple other firms, yes.

7          THE COURT:  All right.  How long did you do that kind

8   of business?

9          JUROR NO. 0001:  My career, I probably did litigation

10  support seven, eight years all together.

11         THE COURT:  Okay.  Anything about that experience,

12  Juror No. 0001, that you think would make it difficult for you

13  to be fair and impartial in this particular case?

14         JUROR NO. 0001:  Not at all.

15         THE COURT:  Okay.  I understand.  And the reason why

16  we these questions, and we ask them repeatedly, we understand

17  that everyone wants to and tries very hard to be fair and

18  objective.  We also understand, though, that in any particular

19  case for whatever reason, something about the case may make it

20  hard for any one of us to be fair and impartial in that

21  particular case, so that's why we go into this.

22         All right.  Anybody else that's had any dealings with

23  the U.S. Attorney's Office?

24         How about with the Veterans Administration?  You're

25  about to raise your hand.  Okay.  Let's see.  You are -- I can

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.38

 1  never read these -- okay.  Juror No. 0152.

 2       JUROR NO. 0154:  Yes, not directly with the Veterans

 3  Administration, but I -- my father was an Army veteran or was

 4  in the military for 20 years, and I have multiple veterans in

 5  my family.

 6       THE COURT:  Okay.

 7       JUROR NO. 0154:  And I also had medical dealings and

 8  psychiatric dealings with the VA.

 9       THE COURT:  Was it your father that was a patient of

10  the VA?

11       JUROR NO. 0154:  Yes.

12       THE COURT:  Okay.

13       JUROR NO. 0154:  And again other family members also.

14       THE COURT:  Okay.  So have you ever taken them to

15  appointments, been involved in their medical care?

16       JUROR NO. 0154:  Yes, somewhat.

17       THE COURT:  Okay.  How long ago was that?

18       JUROR NO. 0154:  I guess for my father it's been some

19  time.  For other relatives maybe a few years ago.

20       THE COURT:  Okay.  All right.  I'm going to return --

21  I want to ask you some additional questions about that, so I'm

22  going to make a note of that, Juror No. 0154.

23       Anybody else who's had dealings with the VA?  Let's

24  see.  That would be Juror No. 0057?

25       JUROR NO. 0057:  Yes.  I have a father that's a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.39

1   veteran, but I have never done anything with them as far as the

2   VA goes.

3          THE COURT:  Okay.  And then there was another.  Let's

4   see.  You are -- tell me your name.

5          JUROR NO. 0090:  Juror No. 0090.

6          THE COURT:  Got you.  Okay.

7          JUROR NO. 0090:  I'm a patient of the VA currently.

8          THE COURT:  Okay.  So you are a military veteran?

9          JUROR NO. 0090:  Yes, ma'am.

10          THE COURT:  I'm going to return and ask you a few

11   questions here shortly.

12          Anyone else that's been a patient of the VA or has

13   family that's been involved with medical care at the VA?

14          Yes.  Let's see.  Are you Juror No. 0035?

15          JUROR NO. 0035:  Correct.  Just my father is VA, and

16   I've gone to with his visits, but that's it.

17          THE COURT:  Okay.  I've had the people -- I'm sorry.

18   Yes.  You are Juror No. 0096?

19          JUROR NO. 0096:  Juror No. 0096.  I have two brothers,

20   both veterans that are being served by the VA.

21          THE COURT:  Okay.  I'll make a note of that as well.

22          JUROR NO. 0096:  They live in Minnesota.  I don't have

23   much contact with them.

24          THE COURT:  Yes.  Those of you that are back in the

25   pews, I won't call on you now, but if you should happen to be

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.40

1    up here in the first 35, please remind me and I'll make sure we

2    cover that with you.

3         Okay.  All right.  Yes, Juror No. 0088.

4         JUROR NO. 0088:  My brother-in-law has been -- he was

5    in the Vietnam war, so he's been at VA hospital in Wichita.  I

6    don't know.  I've never taken him to appointments though, but

7    I've heard stories.

8         THE COURT:  Okay.  All right.  Anybody else?

9         All right.  We've had folks at the table here

10   introduce themselves.

11        Ms. Ramsey, if you will introduce the people at your

12   table.

13        MS. RAMSEY:  Thank you, Your Honor.  My name is Che

14   Ramsey.  I'm with a Federal Public Defender's Office in the

15   District of Kansas.  With me is David Magariel, also an

16   attorney there at the Federal Public Defender's Office in the

17   District of Kansas.  And this is my client, Mr. Bruce Hay,

18   53 years old.  And that's all I have, Your Honor.

19        THE COURT:  All right.  Thank you.  Do any of you know

20   Ms. Ramsey or Mr. Magariel or anyone that works for the Federal

21   Public Defender's office?  I see not.

22        Do any of you know Mr. Bruce Hay?  I see not.

23        All right.  So there are two types of cases as you

24   know, civil and criminal.  Civil cases are cases, generally

25   speaking, where someone, a person or a company or an entity of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.41

1    some sort, even the government, is suing someone else for

2    money, for damages, based on an injury, based on some sort of

3    dispute.  That's a civil case.

4          This is a criminal case.  In this case the United

5    States is bringing this case, and in this case Mr. Hay has been

6    indicted.  I'm not going to read the entire indictment.  I'm

7    going to just summarize it.

8          It is 16 counts, 16 charges in the indictment that

9    basically charges Mr. Hay with -- from about January 2011 to

10   about August 2018 here in Kansas and elsewhere, with the intent

11   to defraud, knowingly devised a scheme and artifice to defraud

12   the Department of Veterans Affairs to obtain money and property

13   by means materially false and fraudulent pretensions,

14   representations, and omission of material facts while knowing

15   and having reason to know that said pretenses and

16   representations were and would be false and fraudulent when

17   made and caused to be made and that omissions would be

18   material.

19         And the indictment goes on to explain a number of

20   things about Mr. Hay applying and receiving disability benefits

21   from the VA based on a certain diagnosis and says that the

22   object of his scheme to defraud was to fraudulently obtain

23   disability benefits from the VA and that as part of the scheme

24   to defraud he allegedly made fraudulent representations

25   regarding his claimed disabilities, faked or exaggerated

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.42

1    symptoms, and failed to disclose his true physical conditions,

2    capabilities, and daily activities.

3           And the indictment goes into more detail, but the

4    charges relate to wire communications, which really are just

5    banking transactions of deposits in Mr. Hay's bank account from

6    the U.S. Government, the VA, disability payments if you will,

7    and deposits in his bank account located here in Kansas City,

8    Kansas.  So those are the first six charges are wire fraud.

9           And then the charges that are in Count 7 through 16

10   charge him with theft of government funds, and this relates to

11   again monetary compensation paid by the VA in certain monthly

12   periods.  So that's what he's charged with.

13          Now, an indictment is only an allegation.  It's only a

14   charge.  It's not evidence of anything.  You're not to consider

15   it as evidence.  You're not to consider that these allegations

16   have any truth to them at all.  In fact, under the law Mr. Hay,

17   as any of us if we're charged with something, he is presumed to

18   be innocent of the charges.

19          And you will hear from me again and again that when

20   someone is charged with a crime, they're presumed to be

21   innocent, and that is the government's duty to prove guilt

22   beyond a reasonable doubt by presenting evidence to the jury in

23   the courtroom.

24          So those of you that are selected for this jury will

25   hear evidence, and then after you've heard all of the evidence,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.43

1    it will be up to you to decide whether the government has

2    proven Mr. Hay guilty beyond a reasonable doubt.

3        Beyond a reasonable doubt is actually the standard of

4    proof that the evidence must meet.  I'll be giving you more

5    specific instructions about what that means.  But unless the

6    government proves Mr. Hay guilty beyond a reasonable doubt, as

7    the jury you must find him not guilty.

8        And there are 16 separate charges in this case, so I

9    will be instructing you that you have to consider each and

10   every one of those charges separately and independently and

11   determine has the government proved this charge beyond a

12   reasonable doubt.

13       Because Mr. Hay under the law is presumed to be

14   innocent, he has no duty or responsibility to present any

15   evidence at all.  That's what the presumption of innocence

16   means.  And the reason we have this presumption of innocence

17   under our law is I think a fundamental understanding that none

18   of us as individuals have the money or the power or the

19   investigative tools to investigate like the government does.

20   So we're really fortunate in the United States that we have

21   this presumption of innocence, which is our constitutional

22   right, understanding that the government has powers that we

23   could never have, no matter how much money we might have, so

24   this is why we have the presumption of innocence.  This is why

25   we require the government to overcome that presumption with

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.44

1   evidence of proof beyond a reasonable doubt.

2        And, again, the charges in the indictment are

3   allegations.  So those are the most fundamental rules of law

4   that I will instruct you on, and I will instruct you again and

5   that's how important they are.

6        But I've told you just in very summary fashion what

7   this case is about, what the trial will be about.  Raise your

8   hand if you think you've ever heard about this issue, this --

9   what's at issue in this trial, if you think it sounds familiar

10  to you at all.

11       I see -- do I see a hand?  Okay.  Let me call on you.

12  Ms. -- I'm sorry.  You're No. 0054.  That helps, Juror No.

13  0054.

14       JUROR NO. 0054:  I've heard -- I've heard of various

15  people that have been charged, but that's about the size of it.

16       THE COURT:  Okay.  So when you say you've heard

17  various people, are you talking about Mr. Hay or someone else?

18       JUROR NO. 0054:  No.

19       THE COURT:  You're not talking about Mr. Hay?

20       JUROR NO. 0054:  No.

21       THE COURT:  Okay.  So even if -- one of the

22  instructions I will give all of you, even if you were to come

23  across newspaper accounts or TV reporting about this particular

24  trial, I instruct you to disregard that, and in fact when

25  you're selected as jurors, if you come across a newspaper

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.45

1   article about this case, don't read it, don't listen to the

2   news reports because you have to decide this case based solely

3   on the evidence in this case.

4          I think we all understand that the only people that

5   really are equipped to decide any case are the jurors that hear

6   all of the evidence and what the law is, not a reporter that

7   may have very limited understanding or think -- may not even

8   know or may get things wrong.  We've all read news accounts

9   that are wrong.  Those are the sort of things that you have to

10  disregard.  They're not evidence.

11         So, Juror No. 0054, I'll ask you, because you say

12  you've heard cases or heard stories about other people that may

13  have similar charges, and I don't really know if they do or

14  not, can you set that aside, anything you've heard so that if

15  you're selected on this jury, you can focus on the evidence in

16  this case?  Can you do that?

17         JUROR NO. 0054:  Yes.

18         THE COURT:  And would you do that?

19         JUROR NO. 0054:  Yes.

20         THE COURT:  Okay.  Anyone else that thinks they've

21  heard anything familiar about what I've said about this case so

22  far?  Okay.

23         All right.  So I've already instructed you a little

24  bit on the law, on the most important law, first of all, the

25  presumption of innocence, and I've explained to you why we have

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.46

1   that very important right.  I think all of you can appreciate

2   that if you were falsely accused of something, you'd be hanging

3   on to that presumption of innocence because that's an important

4   protection for all of us when we're accused of something.

5        Is there anyone though that thinks they could not

6   abide by the presumption of innocence, that they could not

7   follow the instruction that unless the government overcomes

8   that presumption with proof of guilt beyond a reasonable doubt,

9   that they would have difficulty with that?

10       Yes, you are Juror No. 0090.  Tell me about that.

11       JUROR NO. 0090:  Being a vet and also being under vet

12  care right now, I don't think I can be totally honest or

13  objective because I am pro-VA and Veterans Association forever.

14       THE COURT:  And I understand that.

15       JUROR NO. 0090:  I already have -- I already have my

16  decision.  I can't change it.

17       THE COURT:  Okay.  I appreciate that, Juror No. 0090.

18  I appreciate your candor and honesty.  I know the parties do as

19  well.

20       So I'll ask you to be excused.  I'm going to have you

21  stay with us -- actually I'm not going to have you because

22  you're basically telling me you can't be fair and objective in

23  this case, and I appreciate that because that's sometimes a

24  hard thing to admit.  I'm going to go ahead and release you.

25  You will need to call the code-a-phone -- what day -- Friday?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.47

1          COURTROOM DEPUTY:  I think so.  Yes, Friday.

2          THE COURT:  You'll need to call that code-a-phone

3   number after 5:00 this Friday to see if you need to come in for

4   the next trial.  More trials to come, so the next one may be

5   about a subject matter that's not at issue for you.  Thank you.

6          Let's call another name and replace Juror No. 0090 in

7   Chair No. 27.

8          COURTROOM DEPUTY:  Juror No. 0014.

9          THE COURT:  All right.  Juror No. 0014, I don't have a

10  long memory, but fortunately it was just a few minutes ago I

11  saw you raise your hand about I think the VA; is that right?

12         JUROR NO. 0014:  Yeah.

13         THE COURT:  Tell me about that.

14         JUROR NO. 0014:  My grandfather is a vet.  He used the

15  VA for a bit.

16         THE COURT:  Were you involved in his medical care or

17  taking him to appointments?

18         JUROR NO. 0014:  No.  He lived with me when he passed

19  away, but outside of that I really wasn't involved in that.

20         THE COURT:  Okay.  All right.  I'm going to make a

21  note though because some of you that have been involved with

22  yourselves or others with care at the VA, I'm going to come

23  back and have some more questions for you.  So I appreciate

24  that, Juror No. 0014.

25         Okay.  All right.  Anyone else that thinks in this

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.48

1    particular case they would have difficulty abiding either by

2    the presumption of innocence or following the instruction that

3    the government has this high burden of proof beyond a

4    reasonable doubt?

5            Anyone struggling with or questioning whether they

6    could follow those instructions?  Because those are very

7    critical, all instructions are, but this is really the rule of

8    law that governs in criminal cases.  Okay.  I don't see anyone

9    that does.

10           Okay.  Let's go back to talking about the schedule.

11   As I've told you this week, next week, 9:00 to 5:00-ish.  The

12   plan is to take an hour for lunch midday.  We'll take about a

13   15- to 20-minute break mid-morning and another one of those

14   mid-afternoon.  Today our breaks will be longer because we need

15   to accommodate a bigger group, but when we're down to our trial

16   jury, that's about the schedule.

17           What that means is you may have to sit for, say, two

18   hours at a time without a break.  So does anyone have any

19   medical issues, pain issues, or any kind of medical issue that

20   would make it difficult for you to sit for two hours at a

21   stretch?  Okay.

22           Oh, yes.  Okay.  You are Juror No. 0142?

23           JUROR NO. 0036:  Juror No. 0036.

24           THE COURT:  I'm sorry.  Juror No. 0036.

25           JUROR NO. 0036:  I have herniated disks in my neck and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.49

1    lower back, but I think I can endure it, but it may not be

2    super comfortable.

3              THE COURT:  How does that work?  Are you in pain right

4    now?

5              JUROR NO. 0036:  No.  I'm fine now.

6              THE COURT:  If you start -- if it starts coming on,

7    what do you usually do?

8              JUROR NO. 0036:  I typically need to stand and walk

9    around.

10             THE COURT:  Is two hours usually about when it happens

11   or?

12             JUROR NO. 0036:  It's variable.  It depends on other

13   things.  It may not be an issue.  It might be a major issue.

14   Depends.

15             THE COURT:  Okay.  So if you're selected for the trial

16   and you start having pain, if you could stand up in your seat

17   and stretch as you're listening, would that work or will we

18   need to break so you can walk?

19             JUROR NO. 0036:  I'm sure that will be fine.

20             THE COURT:  You'd let us know if you needed to break

21   so you could walk?

22             JUROR NO. 0036:  Yes.

23             THE COURT:  That would be fine.  The main thing is we

24   want to make sure we can accommodate it.  If we can't

25   accommodate it, I'll want to excuse you now.  What do you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.50

1    think?

2         JUROR NO. 0036:  I think it will be okay.  I needed to

3    present it.  If I need to stand up in the middle of trial, I

4    wouldn't want that to be an issue.

5         THE COURT:  It's not an issue.  It's not an issue for

6    anybody.  I think those of you selected for jury service, I

7    hear this all the time, like I thought it was going to be so

8    much easier just sitting in a chair and listening all day, this

9    is the most exhausting thing I've ever done.  People that are

10   up and move around find it hard to sit.  Not that it hurts, but

11   it's different and it can be exhausting.  I do sit all day, and

12   I'm still tired at the end of a trial day.  We'll do our best

13   to accommodate that.  You just need to let us know.

14        Anybody else, any pain issues, bathroom issues,

15   whatever it may be, that you might need to take a break before

16   two hours?  And if it does happen, just let us know and we'll

17   accommodate.  We understand how these things work.

18        How about vision or hearing issues that again

19   hopefully we can accommodate but we need to know about?  Anyone

20   vision issues or hearing?

21        The witness will sit here and there's a microphone,

22   and everybody has to speak into a microphone.  So at this point

23   is anybody having any hearing issues with us speaking into the

24   microphone?

25        Okay.  Vision issues.  The witness will be here.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.51

1   There's large screens where exhibits will likely be displayed

2   as well.  So okay.  We'll move on from that.

3         Okay.  Let's read off the names of potential witnesses

4   in this case and see if anybody thinks they recognize any

5   names.  These are just potential witnesses.

6         MR. HUSCHKA:  Yes, Your Honor.  Clint Bass, Dr. Robert

7   Beck, Dr. Ellen Barry, Jason Cassity, Dolly Cherian, Kevin

8   Hawker, Dr. Kathryn Hedges, Dr. Carolyn car, Dr. Genevieve Sue

9   Keefer, Dr. Paul Kindling, Dr. Emmett McWoods, Dr. Milada

10  Medvedeva, Dr. Karyn Bentley, Aimee Rogers, James Sharpnack,

11  Don Krahn, Jessica Zarazua, Dr. Danielle Becker, Lauren Clary,

12  David Ellis, Joe Hughes, Paul Kalmar, Stacy Macom, Bert Snyder,

13  Ronda Snyder, Myron Stroup, Suzy Tousey, Wes Ungeheuer, Kerry

14  Baker, James Carmack, Nathen Howard, Tim Mugrage, Shane

15  Osterhaus, Chris Tauai, Dan White, and Jodi Arnold.

16        THE COURT:  Thank you, Mr. Huschka.

17        Were there any additional names that you think should

18  be added to that list, Ms. Ramsey?

19        MS. RAMSEY:  Besides our list, Your Honor?

20        THE COURT:  No.  Your list.

21        MS. RAMSEY:  Yes, Your Honor.  Give me one second.

22        Yes, Your Honor.  Those would be Dr. Harry Wilkins,

23  Dr. Daryl Callahan, Dr. Lewis Giron, Dr. Brian Lewis, Dr. Vikas

24  Singh, Joseph Bell, Barbara Brown, Raymond Brunet, George

25  Feeback, Scott Jackson, Leon Zook, Dr. Mary O'Neal, Allen Acre,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                            USA v. Bruce L. Hay
                                                            ROA - Volume 3, p.52

1    Rebecca Branson, Ashley Hay.

2            THE COURT:  All right.  Again these are potential

3    witnesses?

4            MS. RAMSEY:  Yes.

5            THE COURT:  So you've heard a lot of names.  Any names

6    that you think sound familiar to you, someone you may have

7    encountered and may know?

8            Let's see you are Juror No. 0057.

9            JUROR NO. 0057:  I am.  Joe Hughes, if it's the same

10   one, that is my father.

11           THE COURT:  Joe Hughes, what town does he reside?  In.

12           JUROR NO. 0057:  Lenexa.

13           THE COURT:  Does he work?

14           JUROR NO. 0057:  No.  He's retired.

15           THE COURT:  What did he do before retirement?

16           JUROR NO. 0057:  He was an IT person at a yearbook

17   company.

18           THE COURT:  Okay.  I don't remember who read his name.

19   Does that sound like the same Joe Hughes?

20           MR. HUSCHKA:  No, Your Honor.  This Joe Hughes was

21   previously in law enforcement.

22           JUROR NO. 0057:  Oh.  That is not my dad.  I'm can

23   100 percent say that's not him.

24           THE COURT:  Anybody else?

25           Yes.  Let's see, you are Juror No. 0006?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.53

1          JUROR NO. 0006:  Yes.  The name Rhonda Snyder.  At my

2   workplace I knew a Rhonda Snyder.  I don't know if it's the

3   same person.

4          THE COURT:  Where do you work?

5          JUROR NO. 0057:  I worked at the Osawatomie State

6   Hospital, and that Rhonda Snyder was an employee there also.

7          THE COURT:  Does that sound like the person?

8          MR. HUSCHKA:  It could be.  Rhonda Snyder is an R.N.

9   so works in the medical field and lives relatively close to

10  Osawatomie.

11         THE COURT:  Okay.

12         JUROR NO. 0057:  This person wasn't an R.N. at that

13  time, but it doesn't mean she's not now.

14         THE COURT:  How long ago was it?

15         JUROR NO. 0057:  For me it was probably six years ago.

16         THE COURT:  Do you know if she's been an R.N. more

17  than six years?

18         MR. HUSCHKA:  I do not know for sure, Your Honor.  I

19  believe she has been an R.N. -- I believe it has been more than

20  six years, but I don't know for sure.

21         THE COURT:  Okay.  Are you still at that Osawatomie

22  hospital?

23         JUROR NO. 0057:  No.

24         THE COURT:  What time period did you work with Rhonda

25  Snyder there?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.54

1          JUROR NO. 0057:  From maybe the '90s to 2013, maybe.

2          THE COURT:  Okay.  Don't know okay.  Did you have a

3    close relationship with her?

4          JUROR NO. 0057:  I knew who she was.  It's hard not to

5    work in a small community and not know people.

6          THE COURT:  Okay.  The fact that you know a witness is

7    not necessarily disqualifying.  The question is, you know,

8    would you judge what that witness says the same way you would

9    every other witness as far as credibility, as far as knowledge?

10   Would you follow the instructions in assessing that witness's

11   testimony just like you would with the witnesses that you've

12   never met before?  And that may depend on the closeness of your

13   relationship with someone.  So what do you think about that?

14         JUROR NO. 0057:  I think -- I know I could.

15         THE COURT:  Okay.

16         JUROR NO. 0057:  I could be objective, yes.

17         THE COURT:  Okay.  All right.  Anyone else think they

18   recognize any names?

19         Yes, Juror No. 0152.

20         JUROR NO. 0152:  The Wes Ungeheuer, that would be

21   living in Linn or Miami County?

22         THE COURT:  What's the name again?

23         JUROR NO. 0057:  Wes Ungeheuer.  I don't know if I

24   could ask, but would he live in Linn or Miami County?

25         THE COURT:  Do you know whether Wes Ungeheuer lives in

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.55

1    Linn or Miami County?  Tell us more about if you know what he

2    does for a living.

3          MR. HUSCHKA:  I don't know.  We don't know where he

4    lives, but he is the owner of scrap recycling business.

5          JUROR NO. 0057:  Yes.  I lived in -- I used to live in

6    Linn County, not far from his recycle center and had some

7    dealings with Wes.

8          THE COURT:  You had dealing with him and his business?

9          JUROR NO. 0057:  Yes Wes' Recycle, but he also has a

10   big business, so I'm sure he's dealt with a lot of other

11   people.

12         THE COURT:  I'll ask you the same questions I asked

13   Juror No. 0006.  The nature of the relationship or your

14   familiarity with this gentleman, do you think it would impair

15   your ability to assess his testimony, following the same rules

16   that you assess every other witness's testimony?

17         JUROR NO. 0057:  I don't believe it would.  Not as far

18   as the witness is concerned, more so the veteran issue I

19   suppose.

20         THE COURT:  Okay.  And we'll return to that.  Okay.

21   Anybody else think they have any familiarity with any of these

22   names?  Okay.

23         Well, let's return to the veteran issue.  So I'm going

24   to call on Juror No. 0088 first.  I think you told us that

25   whoever it is in your family, you haven't been involved in

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.56

1   their medical care, but go ahead and explain.  You've got a

2   veteran in your family that receives care from the VA?

3          JUROR NO. 0088:  Yes.  He received care from the VA

4   for years and finally just was done with the VA because of how

5   inept they were, the medical facility was, and so he just won't

6   even go there.  He didn't even go there to get a COVID shot

7   because he just felt it was very -- the care was inadequate.

8          THE COURT:  And who is this person?

9          JUROR NO. 0088:  My brother-in-law.

10          THE COURT:  And was it here in this town or somewhere

11   else?

12          JUROR NO. 0088:  Wichita.

13          THE COURT:  In Wichita?

14          JUROR NO. 0088:  Uh-huh.

15          THE COURT:  So having had those conversations with

16   your brother-in-law about his feelings about the inadequate

17   care that he thinks he got at the VA, do you think that would

18   impair your objectivity and your impartiality in this case

19   where Mr. Hay is charged with defrauding the VA?

20          JUROR NO. 0088:  I would try to be extremely objective

21   because I know that the VA has in the last few years, they have

22   just totally revamped things and things have improved in the

23   VA.  I think I would be fine.  I think I would be objective.

24          THE COURT:  Okay.  All right.  I appreciate that.  And

25   sometimes it helps to just sort of think about it and talk it

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.57

1    through and then decide and only you can decide.

2          JUROR NO. 0088:  Correct, correct.

3          THE COURT:  Okay.  Juror No. 0154, and I am having

4    difficulty hearing you.  We don't have any handheld mics?  You

5    won't be the only person, I assure, you who uses it.

6          JUROR NO. 0154:  Yes.

7          THE COURT:  So you have a family member who is a

8    patient or was a patient at the VA?

9          JUROR NO. 0154:  Yes, my father was.  I also have a

10   brother.  And then I'm sorry, I failed to mention I have a best

11   friend who I recently took to the VA for alcohol-related

12   issues.  And I guess the relatives were treated for

13   post-traumatic stress disorder.

14         THE COURT:  Okay.  And you're not really holding it up

15   to your mouth.

16         JUROR NO. 0154:  Sorry.

17         THE COURT:  So multiple people in your life have been

18   patients at the VA including your father.  And you said you

19   just recently took a friend there to get treatment?

20         JUROR NO. 0154:  Yes.  Sorry for failing to mention

21   that earlier.

22         THE COURT:  No, no.  It's fine.  So have you been

23   involved with the medical care of any of the folks in your

24   family, meaning taken them to appointments or helping them to

25   evaluate information, taking care of them at home, et cetera?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.58

1        JUROR NO. 0154:  Taking them to appointments.  Again,

2   more recently with the friend, taking him to sort of the, I

3   guess, sort of the alcoholism program, I guess, trying to get

4   him the help he needs.

5        THE COURT:  Okay.

6        JUROR NO. 0154:  So, yes, sort of directly involved.

7        THE COURT:  Okay.  So based on all of that -- and I

8   know one of these people is your father, and I think you said

9   another was a brother?

10       JUROR NO. 0154:  Yes.

11       THE COURT:  Based on all of that, do you have any

12  issues with the VA that you think would impair your objectivity

13  in this particular case?

14       JUROR NO. 0154:  I don't have any negative opinions

15  about the VA.  I might find it difficult to be objective, but I

16  would like to try my best because they have -- they really

17  needed the help -- after their service they really needed the

18  help of the VA to help recover, and I can see the importance of

19  the VA.  And it might be -- and, again, without knowing the

20  details, it might be difficult to -- it might be difficult to

21  be objective, but I don't -- I don't know.

22       THE COURT:  Okay.  So you have positive feelings about

23  the VA, but you may not be objective at least with, you know --

24  from Mr. Hay's standpoint you may not be objective because you

25  have positive feelings about the VA; is that fair?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.59

1          JUROR NO. 0154:  Yes.  But without knowing -- without

2    seeing the evidence, without knowing more of the case, I

3    couldn't say for certain being presumed innocent I suppose if

4    that makes sense.

5          THE COURT:  Okay.  So you're struggling with whether

6    you can presume Mr. Hay to be innocent?

7          JUROR NO. 0154:  Perhaps.

8          THE COURT:  Okay.  I'm going to ask you to step down.

9    I'm not going to let you go yet because we may want you to come

10   back and ask more questions, but for now if you'll be seated

11   back there and we'll call somebody to take your place, Juror

12   No. 0154.

13         COURTROOM DEPUTY:  Juror No. 0113.

14         THE COURT:  All right.  Juror No. 0113, we'll try to

15   do a quick recap here.  We've covered some ground, and we want

16   to cover that same ground with you.

17         Any questions I've asked that you recall so far that

18   you would have raised your hand and given an answer to?  We'll

19   start there.

20         JUROR NO. 0113:  No.

21         THE COURT:  Do you have any scheduling issues being

22   here the next week?

23         JUROR NO. 0113:  Only for my kiddos because they need

24   to be picked up by 4:00, 4:30.

25         THE COURT:  Okay.  So what time would you have to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.60

 1  leave this building to pick them up by that time?

 2       JUROR NO. 0113:  I'm in Olathe, so takes about 40, 45

 3  minutes depending on traffic.

 4       THE COURT:  That's a big one.  So we would have to

 5  break by 3:00 or 3:30?

 6       JUROR NO. 0113:  Yes.

 7       THE COURT:  Okay.  I think I'm going to excuse you

 8  because we -- in order to get this case in in two weeks, I

 9  think we probably want to go towards 5:00.

10       And I just recall my 30-something-year-old kids, I

11  picked them up late one time, 25 years ago, and they're still

12  talking about it.  I totally understand.  We're going to excuse

13  you.  We're going to go ahead and let you go, but you still are

14  going to need to call the code-a-phone because, you know, I

15  don't know what the next trial's schedule will be exactly.

16  Sometimes there are only trials that go half-days, it's up to

17  the judge.

18       We'll excuse you, but if you'll call the code-a-phone

19  after 5:00 on Friday.

20       COURTROOM DEPUTY:  Juror No. 0106.

21       THE COURT:  All right.  Juror No. 0106, would you have

22  answered yes to any of the questions thus far?  I'll go back

23  over them, but anything that strikes you right now you need to

24  tell us about?

25       JUROR NO. 0106:  Just with the VA, I did do some of my

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.61

1  clinical rotations through the VA a couple years ago for

2  medical school.

3       THE COURT:  For medical what?

4       JUROR NO. 0106:  School.

5       THE COURT:  So you're a physician?

6       JUROR NO. 0106:  I'm an audiologist.

7       THE COURT:  Okay.  And did you do your medical

8  rotation -- which VA hospital were you at?

9       JUROR NO. 0106:  Kansas City VA and Topeka VA.

10       THE COURT:  Did you recognize the names of any of the

11  medical practitioners?

12       JUROR NO. 0106:  No.

13       THE COURT:  Okay.  The fact that you did a rotation

14  through there, do you think it would affect at all your ability

15  to be fair and impartial?

16       JUROR NO. 0106:  No.

17       THE COURT:  All right.  Something that I neglected to

18  mention at the outset which I'm reminded I should because,

19  Juror No. 0106, some of you have face coverings on, and I

20  understand that we all have different vulnerabilities and that

21  sort of thing, and if any of you don't have a mask, a face

22  covering, and would like one, we have plenty of them here.

23       We are still following some COVID protocols, and we've

24  got hand sanitizer and those sort of things in the jury

25  deliberation room, and in the jury deliberation room it allows

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.62

 1   for social distancing and that sort of thing.  You'll see that

 2   there's not a whole lot of paper that will be presented at

 3   trial.  Most of it is electronic evidence.

 4        So we're still following some protocols and we've been

 5   doing this a while.  We shut down, we reopened, we shut down

 6   again in the 2020, 2021 timeframe.  We've been open for trial

 7   since April of '21 now I think.

 8        I want to assure you -- and I should ask for those of

 9   you -- particularly those of you that are wearing face

10   coverings, you may have vulnerabilities.  Does that give you

11   any concern about sitting on the jury in this case?  Anyone?

12   Okay.  I see not.  All right.

13        We have a protocol in place too if anybody gets sick

14   in the course of trial, and that's why I said at the outset

15   things do happen.  We estimated this two-week period, but if

16   somebody gets sick, you know, that's going to change things.

17   But hopefully that won't happen.  We've been in pretty good

18   shape around here lately.

19        Okay.  All right.  So, Juror No. 0106, did I say your

20   name right?

21        JUROR NO. 0106:  Perfect.

22        THE COURT:  Okay.  Any of the other -- so no

23   scheduling issues, correct?

24        JUROR NO. 0106:  Correct.

25        THE COURT:  Vision, hearing, pain, or anything that --

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.63

1    two -- a two-hour stretch of sitting wouldn't be a problem?

2           JUROR NO. 0106:  Correct.

3           THE COURT:  Okay.  Don't think you recognize any of

4    the names that were read, potential witnesses?

5           JUROR NO. 0106:  No.

6           THE COURT:  Know any of these folks that were

7    introduced thus far?

8           JUROR NO. 0106:  No.

9           THE COURT:  Or have any dealings with the U.S.

10   Attorney's Office or the Federal Public Defender's Office?

11          JUROR NO. 0106:  No.

12          THE COURT:  Do you still have any dealings with the

13   VA?

14          JUROR NO. 0106:  No, no.

15          THE COURT:  Where is your audiology practice at, what

16   town?

17          JUROR NO. 0106:  Lawrence and Shawnee Mission.

18          THE COURT:  Are you associated with a hospital or is

19   it just clinical?

20          JUROR NO. 0106:  Just clinical.

21          THE COURT:  Okay.  All right.

22          Okay.  Let's see.  Let's go back to the questions with

23   those of you that raised your hand about the VA.

24          Juror No. 0014, yes.  So you have somebody in your

25   family that is a VA patient?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.64

1          JUROR NO. 0014:  My grandfather was before he passed

2    away.  I never took him to any appointments or any of that.  I

3    just wanted to be upfront.

4          THE COURT:  Okay.

5          JUROR NO. 0014:  I'm pretty impartial either way.

6          THE COURT:  You can be fair and impartial.  Okay.

7          Juror No. 0096.

8          JUROR NO. 0096:  I have two brothers that enlisted in

9    the Army during the Vietnam era.  They never served in Vietnam.

10   One is on partial disability for hearing because he served on a

11   U.S. Army shooting team.  Other than that I know very little

12   about their health care, and they're in Minnesota.  And I don't

13   have any -- anything that would prejudice me either way.

14         THE COURT:  Okay.

15         JUROR NO. 0096:  For this trial.

16         THE COURT:  Okay.  All right.  Thank you for sharing

17   that.

18         Let's see Juror No. 0035.

19         JUROR NO. 0035:  Yeah.  My dad is currently receiving

20   VA benefits.  He's there today.  I've taken him to a few

21   appointments and whatnot.  Both my grandpa and get --

22         THE COURT:  We may need to have you repeat all that.

23         JUROR NO. 0035:  All right.

24         Yeah.  My father is receiving VA benefits at this

25   time.  He has an appointment today even.  And my grandfather

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.65

1  received benefits, and I helped take both of them to certain

2  appointments and whatnot.

3          THE COURT:  Okay.  Anything about your familiarity

4  with their situations that you think would affect your ability

5  to be fair and impartial to the government and to Mr. Hay?

6          JUROR NO. 0035:  No.

7          THE COURT:  Okay.  All right.  Okay.  Did I get

8  everyone?  Juror No. 0096, Juror No. 0014, Juror No. 0106.  Did

9  I miss anybody?  Okay.

10          Show of hands, how many of you have had military

11  service?

12          Okay.  Let's see.  You are Juror No. 0060.  Tell me

13  about that.

14          JUROR NO. 0060:  I -- I was Army National Guard.  I

15  made it through basic training, partial AIT, but I had a hip

16  injury, so I couldn't continue.  I was released from service.

17          THE COURT:  Okay.  All right.  But you're not a

18  patient at the VA?

19          JUROR NO. 0035:  No.

20          THE COURT:  Anyone else that's had military service?

21          JUROR NO. 0035:  Juror No. 0035.  Contractor for the

22  Marine Corps and contractor for the Army, but did not serve.

23          THE COURT:  Okay.  Anyone else?

24          I've been around long enough it used to be like

25  75 percent of people raised their hands.  Isn't that amazing?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.66

1    We're in different times now.

2          All right.  Law enforcement background.  Any of you

3    have a background -- any experience in law enforcement?  Show

4    of hands.  All right.  Nobody.

5          Do any one of you have anyone that you're close to

6    whether it's spouse, partner, child, parent, somebody that

7    lives in your home with you that has a background in law

8    enforcement?

9          Okay.  Let's start with you, Juror No. 0002.

10         JUROR NO. 0002:  My stepdad used to be a DEA agent,

11   and then I think right now he works for the state reviewing

12   fraud cases for like, what is it -- I think it's tax-related

13   though.

14         THE COURT:  It's what?

15         JUROR NO. 0002:  It's a new job.  I don't know

16   anything about it.  The last two or three years he started.  I

17   haven't lived with them since 2008.

18         THE COURT:  So your stepdad, is he a retired DEA

19   agent?

20         JUROR NO. 0002:  Yeah.

21         THE COURT:  Is he here in town?

22         JUROR NO. 0002:  He's in -- well, like Overland Park

23   area.

24         THE COURT:  Okay.  So was he a DEA agent here in

25   this -- in this DEA branch office?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.67

1              JUROR NO. 0002:  Yeah.  I mean, we moved up here in

2    2002, and he was there from 2002 to, I want to say 2016 or '17

3    and went to Arizona after that.

4              THE COURT:  Where is he at now, in Arizona?

5              JUROR NO. 0002:  He's in Overland Park.

6              THE COURT:  Okay.  And he's doing some sort of

7    contract work?

8              JUROR NO. 0002:  He's an agent of some sort.  I might

9    have his card.  I'm not sure what the whole title is or

10   anything like that.

11             THE COURT:  What's his name?

12             JUROR NO. 0002:  Robert Taylor.

13             THE COURT:  Robert Taylor.  DEA agents often work with

14   the U.S. Attorney's Office and investigate and prosecute drug

15   cases, so I asked, but are you familiar with any of the people,

16   the prosecutors in the U.S. Attorney's Office?

17             JUROR NO. 0002:  No.  He doesn't tell me about his

18   job.

19             THE COURT:  That's not uncommon for law enforcement,

20   play it close to the vest and don't talk to their families

21   about what they do.

22             Well, that's okay, Juror No. 0002.  But to your

23   knowledge he's not an investigator with the VA?

24             JUROR NO. 0002:  No.

25             THE COURT:  The fact that he has this background in

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.68

1    law enforcement, do you think that you would have difficulty

2    evaluating the testimony of law enforcement officers the same

3    way as any other witness?

4            JUROR NO. 0002:  No, ma'am.

5            THE COURT:  Okay.  That's good because you'll get an

6    instruction from me that law enforcement officers, their

7    testimony is to be evaluated the same way as civilian

8    witnesses, if you will; they're human beings, sometimes they

9    make mistakes, sometimes they get things wrong just like the

10   rest of us.

11           And so you're required -- there are people that say

12   it's a law enforcement officer, I'm going to kind of give their

13   testimony more weight than somebody who's not and got that

14   background, but you can't do that.  You have to evaluate them

15   the same.

16           Can you do that?

17           JUROR NO. 0002:  Yes, ma'am.

18           THE COURT:  Okay.  Is there anybody that thinks they

19   would have difficulty weighing the testimony of a law

20   enforcement officer the same as any other person using the same

21   factors to evaluate their testimony?  Okay.  I see not.

22           Okay.  So let's see, Juror No. 0002, and then, Juror

23   No. 0123, was it you that raised your hand about law

24   enforcement?  I'll start with you.

25           JUROR NO. 0123:  Juror No. 0123.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.69

```
 1              THE COURT:  Tell me about it.
 2              JUROR NO. 0123:  My father is a retired police
 3    officer.
 4              THE COURT:  What department?
 5              JUROR NO. 0123:  Johnson County.  He was a sheriff.
 6    He did a lot through them, but his recent one was a sheriffs
 7    office where he took 911 calls.
 8              THE COURT:  Okay.  And this is your father?
 9              JUROR NO. 0123:  Yes.
10              THE COURT:  What's his name?
11              JUROR NO. 0123:  Sam Soliday -- or Samuel I guess.
12              THE COURT:  Anything about -- sounds like he had a
13    long career in law enforcement.  Is there anything about that
14    that you think would make it difficult for you to be fair and
15    impartial to Mr. Hay and to the government?
16              JUROR NO. 0123:  No.
17              THE COURT:  Okay.  Juror No. 0078.
18              JUROR NO. 0078:  I have -- my grandfather was a county
19    sheriff in Los Angeles, and then I have through marriage an
20    uncle and a cousin who are both detectives in LAPD.
21              THE COURT:  So not around here it sounds like?
22              JUROR NO. 0078:  No.
23              THE COURT:  Do you think that you would have
24    difficulty following the instructions to evaluate the testimony
25    of law enforcement the same as any other witness?
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.70

```
 1              JUROR NO. 0078:  No.

 2              THE COURT:  Okay.  All right.  I did miss anyone?

 3    Okay.  Law enforcement we've covered.  And we're going to take

 4    a break here shortly, but we've covered law enforcement.  We've

 5    covered military service.

 6              Medical.  How many of you have a background,

 7    education, or training anything to do with medicine?  Okay.

 8    Let me make a note.  Let me go row by row.  The back row, Juror

 9    No. 0057's row, any of you?  Any of you?  Looks like not.

10              Juror No. 0006.

11              JUROR NO. 0006:  I am a registered nurse.

12              THE COURT:  Are you working at Osawatomie now?

13              JUROR NO. 0006:  No, I'm not.  I'm retired.

14              THE COURT:  Did you depend your whole career in

15    psychiatric nursing?

16              JUROR NO. 0006:  That and education.

17              THE COURT:  Where did you teach?

18              JUROR NO. 0006:  National American University, the

19    bachelor science of nursing program.

20              THE COURT:  All right.  So that's Juror No. 0006.

21              Who else in Juror No. 0006's -- yes, you are Juror No.

22    0023.

23              JUROR NO. 0023:  I'm not a clinician, but I have

24    worked for a medical institution for 15 years.

25              THE COURT:  What kind of work do you do?
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.71

1          JUROR NO. 0023:  I'm a research business partner, so

2    I've worked in research for KU Med and then now currently

3    Children's Mercy.

4          THE COURT:  You're a researcher?

5          JUROR NO. 0023:  No.  I'm a research administrator.

6          THE COURT:  So you administer research grants and

7    other paperwork that researchers are involved in?

8          JUROR NO. 0023:  Yeah, that's correct.

9          THE COURT:  Let's see.  Juror No. 0123.

10          JUROR NO. 0123:  I just graduated school for

11    occupational therapy, and then my mom is a pediatric nurse at

12    Children's Mercy and my sister is a speech language pathologist

13    at Saint Joseph's Hospital.

14          THE COURT:  Sounds like you could open your own

15    practice together.

16          JUROR NO. 0123:  We could actually.

17          THE COURT:  Let's see.  Moving up to the first row.

18    Anyone -- I'm sorry.  Juror No. 0088.

19          JUROR NO. 0088:  When she said that about -- my

20    daughter-in-law is in NICU nurse at KU.  I'm throwing that out

21    there.

22          THE COURT:  Let's expand the question because I was

23    going to ask it anyway not just you but people that you're

24    close to that have a background in medical.

25          JUROR NO. 0088:  And my mother-in-law is an -- well,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.72

1    she was an R.N.

2         THE COURT:  Okay.  Anyone in the back row then if I

3    expand that question.  Juror No. 0048.

4         JUROR NO. 0048:  My cousin is an R.N.

5         THE COURT:  Okay.  Is she here in town?

6         JUROR NO. 0048:  Yes.

7         THE COURT:  Okay.  Anybody else in the back row?

8    Juror No. 0036.

9         JUROR NO. 0036:  My grandfather was a doctor.

10        THE COURT:  Okay.  What kind of physician was he?

11        JUROR NO. 0036:  He was a DO.

12        THE COURT:  Okay.  All right.  Anybody in Juror No.

13   0006's row that I missed?

14        Move up to the front row now.  Juror No. 0046's row.

15   Anybody --

16        JUROR NO. 0023:  Sorry.

17        THE COURT:  Okay.  I'm sorry.  Come back to you, Juror

18   No. 0023.

19        JUROR NO. 0023:  My mom is a pediatric nurse.

20        THE COURT:  Is she here in town as well?

21        JUROR NO. 0023:  Yes.

22        THE COURT:  Now we'll move up.  I saw several hands.

23   Starting with Juror No. 0060.

24        JUROR NO. 0060:  My aunt and uncle are both doctors in

25   Arizona, Tucson area.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.73

1          THE COURT:  Juror No. 0016.

2          JUROR NO. 0016:  I work for KU, but I'm on the admin

3    side.  I do have some interaction with physicians, but more or

4    less on admin side.

5          THE COURT:  Juror No. 0106, you're an audiologist.

6          JUROR NO. 0106:  Doctor of audiology.

7          THE COURT:  How about let's move on to -- what seat

8    are you?  You're Juror No. 0032.

9          JUROR NO. 0032:  My mother-in-law is a retired R.N.

10          THE COURT:  Okay.  Anybody else in Juror No. 0032's

11    row?.

12          PROSPECTIVE JUROR:  My wife is a research coordinator

13    for KU.

14          THE COURT:  Okay.

15          PROSPECTIVE JUROR:  She works in the research

16    department for lymphoma.

17          THE COURT:  Over at the cancer center?  Okay.

18          Juror No. 0100.

19          JUROR NO. 0100:  Yeah, my fiancée is in clinical

20    medical research on like a global level.  He works with Moderna

21    and other big pharmaceutical companies.

22          THE COURT:  Juror No. 0043.

23          JUROR NO. 0043:  My brother-in-law is a doctor.

24          THE COURT:  What kind of doc?

25          JUROR NO. 0043:  Eyeballs.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.74

1          THE COURT:  I bet he doesn't call himself an eyeball

2    doc.

3          Juror No. 0035.

4          JUROR NO. 0035:  Sister-in-law is an R.N.

5          THE COURT:  Juror No. 0053, did you raise your hand?

6    No.

7          We've got a lot of people that are at least related to

8    someone that is in the medical field.  I think the reason this

9    is a good question too is you're going to be hearing evidence

10   about medicine, about disability, and that sort of thing, and

11   it will be important that you focus on the evidence.

12         For example, if there's testimony of expert witness

13   about some of these things, you focus on their testimony as

14   well and that you ultimately decide this case based on the

15   evidence that's presented in this case, not perhaps on what

16   your sister told you about this area of medicine.  That's not

17   evidence.  You have to focus on the evidence that's presented

18   in this case.

19         Any of you think you'd have difficulty doing that

20   given that you have relationships with people in medicine and

21   some of you are in medicine yourself?  Okay.

22         All righty.  Have any of you -- any of you have legal

23   training, education, or experience as a lawyer, as a legal

24   assistant, as a paralegal, as an arbitrator, anything like

25   that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.75

1              Let's start with that back row, Juror No. 0048's row.

2    Moving up Juror No. 0006's row.  Juror No. 0006.

3              JUROR NO. 0006:  I took a year's training when Johnson

4    County Community College had their certified legal nurse

5    consultant program, and I took that.

6              THE COURT:  Was it a good program?

7              JUROR NO. 0006:  Very good program.

8              THE COURT:  I know a number of companies like to have

9    R.N.s with that sort of certification come in and review

10   charts.  Did you ever do that kind of work?

11             JUROR NO. 0006:  No.  I got busy doing other things.

12             THE COURT:  All right.  I should expand this question

13   just like I did the medical question.  Not just you but people

14   that you're close to, people in your close family, people you

15   live with, et cetera, that have legal education experience,

16   training.  Anyone in Juror No. 0048's row now that I've

17   expanded the question?

18             Juror No. 0088.

19             JUROR NO. 0088:  My niece who's an assistant attorney

20   for -- yes.

21             THE COURT:  Oh, yes.

22             Anybody else in that row?

23             Moving up to Juror No. 0060's row anybody?  Nobody.

24             Okay.  Juror No. 0032 row.

25             PROSPECTIVE JUROR:  I worked in a law office 39 years

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.76

1    ago, and I just packed briefcases and collected stuff to go to

2    court was all I did for the attorneys.

3             THE COURT:  That was a very poor use of your time.

4    That's all you did?

5             PROSPECTIVE JUROR:  You wouldn't -- they took

6    everything with them.  You had to know where it was to get it

7    in there.

8             THE COURT:  Oh, okay.  Yeah, at trial I can understand

9    that.  Okay.  Was that here in town?

10            PROSPECTIVE JUROR:  I worked for Dick Reid Law Office

11   39 years ago.

12            THE COURT:  KCK, right?  I remember him.

13            Okay.  Let's see.  Juror No. 0054.

14            JUROR NO. 0054:  I have a paralegal degree.

15            THE COURT:  Do you use that?  I'm going to ask you

16   more about it.  When did you get the degree and from where?

17            JUROR NO. 0054:  Johnson County Community College.

18            THE COURT:  I've heard that is a really great program.

19   Did you ever use it?

20            JUROR NO. 0054:  Actually, yes.

21            THE COURT:  Tell me about it.

22            JUROR NO. 0054:  I ended up working in the area of

23   child support, and I worked for the Johnson County DA's office

24   and for the State of Kansas doing child support.

25            THE COURT:  How long did you do that?  What years are

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.77

1    we talking?

2            JUROR NO. 0054:  About 15 years.

3            THE COURT:  Did you enjoy it?

4            JUROR NO. 0054:  In the beginning, yes.  After a

5    while -- after 15 years I seen and heard everything and got out

6    of it.

7            THE COURT:  Okay.  Did you stay in the legal field

8    after that?

9            JUROR NO. 0054:  I'm sorry?

10            THE COURT:  Did you stay in the legal field, move on

11    to a different type of legal job?

12            JUROR NO. 0054:  No.  I did not stay in the legal

13    field.

14            THE COURT:  All right.  How about that background,

15    Juror No. 0043's row?  Any of you have that kind of background?

16    The reason I ask this question is you have to decide this case

17    solely on the evidence presented in trial, but you also have to

18    decide it on the basis of the law that I'm going to instruct.

19            So to the extent you know things about the law through

20    your work experience or talking to somebody that has that

21    expertise, just keep in mind you have to decide this case based

22    on the law that's instructed in this case, not perhaps on some

23    understanding of law you've developed outside of this case.

24            Can you all do that?  If you cannot, raise your hand

25    or if you will not, raise your hand.  Okay.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.78

1        All right.  This is why as a lawyer -- lawyers tend to
2   get struck off juries.  We say yeah, sure.  They don't believe
3   us.  Usually lawyers don't end up on juries which I think is
4   too bad.  But that's probably the question why most of them get
5   struck when they find out they're lawyers and they're afraid
6   they'll import their own legal knowledge in the case which they
7   really should not do.
8        We're really clicking along here well, so I'm pretty
9   happy.  I think we may actually be able to get everything done
10  by lunchtime.  Although we're going to slow down because I'm
11  going to call on you individually and ask things, and when I
12  finish my questioning, the government will have 30 minutes for
13  follow-up questions and so will the defendant, so that may take
14  us close to noon.
15       At this point what we'll do is we'll go ahead and take
16  our mid-morning break, and when we come back, I'm going to be
17  calling only the 35 of you individually asking you some very
18  specific questions, and I'll turn it over to the lawyers and
19  then they'll make their selection.  So that's kind of where
20  we're headed.
21       We're going to take a longer break than normal because
22  there's so many of us in the building.  So, Ms. Spegal, or who
23  is --
24       COURTROOM DEPUTY:  They're going to go back down to
25  180, and she's down there waiting for them.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.79

1          THE COURT:  You'll go back to the original room on the

2     first floor.  There's bathrooms on that floor.  And when

3     everybody is ready, they'll bring you back up in mass.  So you

4     can leave your numbers on your chair as long as you can

5     remember what number you are, so you'll come back to your

6     seats.

7          And those of you that are back there, you'll go back

8     to your -- you're not home free yet, I guarantee, so you'll

9     come back as well.  And why don't we try for 20 minutes.  If it

10    takes longer, I understand.

11      (The following proceedings occurred outside the presence of

12    the jury.)

13         THE COURT:  There is some subject matter I did not get

14    to upon further review, so we'll be here a little longer than I

15    thought.  But anyway we'll be in recess for about 20 minutes.

16      (Recess taken at 10:25 a.m.)

17      (The jury entered the courtroom, after which the following

18    proceedings were had.)

19         THE COURT:  You can be seated.  Do we think we have

20    everyone, Bonnie?

21         COURTROOM DEPUTY:  I think here on the first 35.  I

22    think someone is still coming.

23         THE COURT:  I do have a few more general questions,

24    and when we get to the individual questions, you're going to

25    pass those out.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.80

1          COURTROOM DEPUTY:  We already did.

2          THE COURT:  I have a few more general questions for

3    everybody.  And the first is -- the first is have any of you

4    ever been involved in a lawsuit of any kind, civil case,

5    criminal case?  Okay.  So I'll start over on that end then with

6    Juror No. 0096.

7          JUROR NO. 0096:  As my -- in my former employment as a

8    petroleum geologist in Oklahoma, I was sued for defamation

9    based on a phone call I made to another -- I was sued by a

10   third party based on a phone call I made to a contractor of

11   mine.  Lost the case before jury in Oklahoma County.  That's

12   all about all I can say about it.

13         THE COURT:  Did you work for Phillips?

14         JUROR NO. 0096:  No.  I worked for -- at that time it

15   was a company called Ladd Petroleum.

16         THE COURT:  So was that the end of it or did you

17   appeal it?

18         JUROR NO. 0096:  That was the end of it.

19         THE COURT:  Well, it's never great, right, to be in

20   that position?

21         JUROR NO. 0096:  Never great.

22         THE COURT:  Has that affected your opinion of the

23   justice system in a general way or specific way that you think

24   would make it difficult for you to serve as a juror?

25         JUROR NO. 0096:  No.  As a matter of fact, I'd like to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.81

1   serve as a juror because of that.

2          THE COURT:  What does that mean?

3          JUROR NO. 0096:  If anything at all, I would like to

4   serve on the jury.

5          THE COURT:  All right.  Because you want to be a fair

6   and impartial person?

7          JUROR NO. 0096:  Exactly.

8          THE COURT:  You understood the importance of that.

9          JUROR NO. 0096:  I do.

10          THE COURT:  Okay.  Got it.

11          JUROR NO. 0096:  Personally.

12          THE COURT:  I understand.  Juror No. 0032.

13          JUROR NO. 0032:  In Virginia Beach we appeared with

14   our daughter in a custody hearing just in front of the bench.

15   We were present in the discussion.

16          THE COURT:  Okay.

17          JUROR NO. 0032:  That was all it was.

18          THE COURT:  Those are always a emotionally fraught

19   situations, I know.  Was there anything about going through

20   that experience with your daughter that affected you in a way

21   that would make it difficult for you to be a part of the

22   justice system as a juror?

23          JUROR NO. 0032:  I don't believe so.

24          THE COURT:  Okay.  All right.  Anybody else in Juror

25   No. 0032's row?  Juror No. 0054.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.82

1            JUROR NO. 0054:  I had a case someone sued me because
2      of a car wreck.
3            THE COURT:  Did it settle or go to trial?
4            JUROR NO. 0054:  It was settled.
5            THE COURT:  Insurance company was involved probably?
6            JUROR NO. 0054:  Yeah, insurance company -- well, it
7      had gone past the insurance company, and it was in small claims
8      court.
9            THE COURT:  Okay.  Anything about that experience that
10     you had that affected you in a negative way?
11           JUROR NO. 0054:  No, not at all.
12           THE COURT:  Unless there's somebody else in Juror No.
13     0054's row?  We'll go back to who raised their hand in the back
14     row, Juror No. 0043's row.  Anybody?  Let's come over here.
15     Juror No. 0023.
16           JUROR NO. 0023:  I served on a county trial as a
17     juror.
18           THE COURT:  You're jumping ahead.  I was going to ask
19     that next.
20           JUROR NO. 0023:  I thought the question expanded to
21     that.
22           THE COURT:  When I say involved in a lawsuit, that's
23     broad enough to cover jury service.  Tell me about your jury
24     service.
25           JUROR NO. 0023:  It was a county murder trial,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.83

1    first-degree murder trial.

2           THE COURT:  And did the jury reach a verdict?

3           JUROR NO. 0023:  Yes.

4           THE COURT:  And do you recall what the verdict was?

5           JUROR NO. 0023:  Yes, it was guilty.

6           THE COURT:  And were you the presiding foreperson?

7           JUROR NO. 0023:  No.

8           THE COURT:  And was it in Johnson County, Wyandotte

9    County, where was it?

10          JUROR NO. 0023:  I live in Johnson County, but at the

11   time it was in Wyandotte County.

12          THE COURT:  Anything about that prior jury service

13   that has affected you in a way that you think would affect your

14   ability to be impartial and objective in this case?

15          JUROR NO. 0023:  No.

16          THE COURT:  Anyone else in Juror No. 0023's row?

17   Juror No. 0088.

18          JUROR NO. 0088:  I was also sued for a car accident,

19   and it went to the insurance company, settled.

20          THE COURT:  Okay.  Anything about that experience that

21   has adversely affected you?

22          JUROR NO. 0088:  No.  It just makes me mad.

23          THE COURT:  Of course.  Okay.  Anyone else in Juror

24   No. 0023's row?  Let's see.  This is the first time we've

25   talked, Juror No. 0121.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.84

1         JUROR NO. 0121:  I was -- previously worked for MODot,

2   and I was rear-ended by actually a guy who was on his way to

3   the VA, and he had some meds he was off or whatever, but he

4   rear-ended me in the state car, and so then I had to go to

5   court to testify against him.

6         THE COURT:  Did you get injured?

7         JUROR NO. 0121:  No.  It was fairly minor luckily.

8         THE COURT:  It was one of those construction site sort

9   of things that people are supposed to slow down, and he didn't

10  do that I guess?

11        JUROR NO. 0121:  Correct.

12        THE COURT:  Anything about that experience that has

13  adversely affected you to serve in this case?

14        JUROR NO. 0121:  I don't believe so.

15        THE COURT:  Anybody else in Juror No. 0121's row?

16  Juror No. 0001.

17        JUROR NO. 0001:  I did litigation support work as I

18  mentioned earlier for about seven or eight years, CPA firm.

19  And I worked in two big cases.  One was them I worked on

20  full-time for over three years.  That was a case where the

21  State of Wisconsin brought a lawsuit against an insurance

22  company that had gone bankrupt, and they brought a lawsuit

23  against their advisors, the actuarial firm, and the accounting

24  firm.

25        And so the insurance company was in liquidation, so I

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.85

1   worked partially on getting the insurance company liquidated,

2   and the other part as kind of a forensic accountant for the

3   plaintiffs, which we were law firm hired by the University of

4   Wisconsin.

5           So then I had another case that I talked about earlier

6   that involved the Department of Energy filing a suit against

7   the refiner back in the early '80s, and that I worked on

8   probably full-time maybe nine months, something like that.

9           THE COURT:  Okay.

10          JUROR NO. 0001:  I've done a lot of forensic

11  accounting work in some lawsuits.

12          THE COURT:  Okay.  Appreciate that.  Do you think that

13  at all affects your fairness and objectivity?

14          JUROR NO. 0001:  No.

15          THE COURT:  I think it's accounting; it's a given you

16  have to be objective and impartial.

17          JUROR NO. 0001:  Exactly, exactly.

18          THE COURT:  Juror No. 0048.

19          JUROR NO. 0048:  Yes.  I worked for the Field

20  Compliance Bureau, and occasionally we have to testify if

21  there's like cases for personnel, cases for the audit cases.

22          THE COURT:  I didn't understand the first word.  You

23  said something compliance bureau.

24          JUROR NO. 0048:  Yeah, I work for the Field Compliance

25  Bureau for the State of Missouri, and we could be called to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.86

1   testify on a case and also personnel cases as well in my

2   position as an administrator.

3           THE COURT:  You've served as a witness then in a

4   hearing or a trial?

5           JUROR NO. 0048:  Yes.  Not a witness.  Expert.

6           THE COURT:  But a fact witness?

7           JUROR NO. 0048:  Yes, yes.

8           THE COURT:  Okay.  Anything about that experience that

9   you think has adversely affected your ability to serve in this

10  case?

11          JUROR NO. 0048:  No.

12          THE COURT:  Is there anybody else in Juror No. 0048's

13  row, litigation experience?  Juror No. 0036.

14          JUROR NO. 0036:  It's been ten years ago, but I was an

15  area manager for Enterprise Rent-A-Car for a number of years,

16  and when someone who doesn't return a car, we would prosecute,

17  and a lot of times I would be called on behalf of Enterprise to

18  represent Enterprise as a witness.

19          THE COURT:  Did you have to testify in trial ever?

20          JUROR NO. 0036:  Yes.

21          THE COURT:  Anything about that experience that you

22  think has adversely affected your ability to serve?

23          JUROR NO. 0036:  No.

24          THE COURT:  Did I miss anybody in this front row here,

25  litigation experience?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.87

1    Okay.  So Juror No. 0023 already answered this

2    question.  How many of you have served on a jury before?

3    Okay.  So we'll start with you, Juror No. 0096.  Do

4    you want to tell us about that what type of case it was, when

5    it was, if you recall, what the outcome was?

6    JUROR NO. 0096:  I served on two trials in district

7    court in Tulsa, Oklahoma.  I was called for jury duty seven

8    times and got to two trials through that.  One was a civil

9    trial concerning a dispute with where the city wanted to put a

10   median to cut off access to another man's property.  We ruled

11   in favor of the plaintiff for that.

12   Another one was a retrial of a rape case.  None of the

13   facts in that case were in dispute.  It was a question of --

14   they were able to make love in the front seat of a small car,

15   and as soon as the man achieved penetration, the woman told him

16   to stop, which he did.  None of those facts were in dispute.

17   And we ruled in favor of the man in that case.

18   THE COURT:  All right.  Were you the presiding juror

19   in either one of those cases?

20   JUROR NO. 0096:  I was the foreman of the second case.

21   THE COURT:  The rape case?

22   JUROR NO. 0096:  Yes.

23   THE COURT:  Okay.  All right.

24   JUROR NO. 0096:  I should also point out that in my

25   employment as a petroleum geologist, I probably testified as an

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.88

1  expert witness before the Oklahoma Corporation Commission,

2  which serves as lower court, probably 100 times.

3          THE COURT:  Okay.

4          JUROR NO. 0096:  Defamation case that I was personally

5  and corporately sued for arose out of a dispute in corporation

6  commission.

7          THE COURT:  You had a lot of experience as a witness,

8  as a party, as a juror.  Any of those experiences adversely

9  affect your ability to serve in this case?

10          JUROR NO. 0096:  Adversely, no.

11          THE COURT:  Okay.  All right.  Anybody else in Juror

12  No. 0096's row?  We'll go back to Juror No. 0043's row.

13  Anybody in that row that's had jury service?  Come back to this

14  first row.  Yes.  You are Juror No. 0094?

15          JUROR NO. 0094:  Yes.  I served on a grand jury duty

16  in Leavenworth County.  It was once a month for a couple months

17  and then the pandemic hit, and I served also for Leavenworth

18  County on a civil case.  Personal property against a nursing

19  home and a deceased patient's family.

20          THE COURT:  Juror No. 0094 has served as a trial jury

21  and also a grand juror.

22          JUROR NO. 0096:  Yes.

23          THE COURT:  Which is a unique experience in federal

24  court or state court.

25          JUROR NO. 0096:  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.89

```
1          THE COURT:  There aren't that many people that get to
2     serve on a grand jury.  In a grand jury you're in a very
3     different role.  You're not determining guilt, whether there's
4     sufficient evidence to prove someone beyond a reasonable doubt
5     guilty; you're determining whether there's probable cause to
6     believe that someone committed a different crime, which is a
7     very low standard compared to the standard at trial like this.
8     You understand that difference?
9          JUROR NO. 0096:  Yes, Your Honor.
10         THE COURT:  Okay.  Anybody else in Juror No. 0096's
11    row?  Yes, Juror No. 0028.
12         JUROR NO. 0028:  I missed the part earlier where --
13    involved in lawsuits.  I had a contractor that didn't complete
14    a job, and I took him to court.
15         THE COURT:  How did that work?
16         JUROR NO. 0028:  He didn't show up.
17         THE COURT:  Got a default judgment?
18         JUROR NO. 0028:  Yeah.
19         THE COURT:  Were you able to collect it?
20         JUROR NO. 0028:  Absolutely not.
21         THE COURT:  Sometimes happens, which is not a happy
22    outcome obviously.  Anything about that experience that you
23    think would adversely affect you in this case?
24         JUROR NO. 0028:  Nope.
25         THE COURT:  Okay.  All right.  Anybody else in this
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.90

1   Juror No. 0028's row that's had jury service?  Yes, Juror No.

2   0044.

3           JUROR NO. 0044:  It's been a few years.  It's a little

4   fuzzy, but it was in Johnson County, and it was -- we were

5   trying to decide if the individual was impaired because he had

6   hit a car or whether the car was out in the road on I-35, but

7   there wasn't enough facts to actually make a conviction towards

8   him.

9           THE COURT:  Okay.  So the jury reached a verdict

10  but --

11          JUROR NO. 0044:  Not guilty.

12          THE COURT:  I'm sorry?

13          JUROR NO. 004:  Of not guilty.  It was a criminal

14  case.

15          JUROR NO. 0044:  It's been a while.  It's kind of

16  fuzzy.

17          THE COURT:  Was somebody suing somebody for damages?

18          JUROR NO. 0044:  There was a car on I-35, and the

19  person hit the car, so it was, was the car left too far out in

20  the road or was he impaired when he hit it.  But there wasn't

21  any evidence submitted that he had blood work or anything done

22  that would tell us, toxicology report, so we couldn't base

23  anything off of that.

24          THE COURT:  So you found in the favor of the person

25  being sued because there was not enough evidence?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.91

1          JUROR NO. 0044:  Yes, uh-huh.

2          THE COURT:  Civil case.

3          JUROR NO. 0044:  Civil case.

4          THE COURT:  One thing I will point out to you, for

5    those of you who served in a civil case, which is usually

6    somebody sued somebody else for money because they're owed

7    money on a contract and they weren't paid or there was injury

8    or something like that.  The civil case, the standard of proof

9    is different, so in your case, in that civil case, you found

10   that plaintiff, the one that was injured or got hit or

11   whatever, didn't have enough evidence to prove that the person

12   they were suing was impaired.

13          In a civil case the standard that the plaintiff, the

14   one bringing the lawsuit, has to bring is the preponderance of

15   the evidence, which is if you can visualize, it's like the

16   scales of justice.  In your case had the person that brought

17   the lawsuit had their evidence weigh just a little heavier than

18   the other side's, they should have won, but you found it did

19   not.

20          In a criminal case, very different standard of proof

21   the government has to meet.  It's not a preponderance of the

22   evidence.  It's proof beyond a reasonable doubt.  Much heavier

23   burden of proof on the government.  It's an important

24   distinction for those of you that have had jury service before.

25          Okay.  Did I cover everybody in this first row?  In

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.92

1   Juror No. 0006's row, other than Juror No. 0023, have any of

2   you had prior jury service?

3          Juror No. 0088.

4          JUROR NO. 0088:  I didn't really have jury service,

5   but I was -- my niece was repeatedly raped and murdered, shot

6   execution style, drove over her body with a truck by two

7   brothers here on death row.  So for six weeks I sat in a trial

8   and watched all that, so it was a criminal case.

9          THE COURT:  How long ago was that?

10          JUROR NO. 0088:  2000.

11          THE COURT:  Was it here in town?

12          JUROR NO. 0088:  In Wichita, the Carr brothers.

13          THE COURT:  It was your niece was one of the victims

14   of the Carr brothers?

15          JUROR NO. 0088:  And her sister is the attorney.  Do

16   you think there's a reason why she's an attorney for the United

17   States?  Yeah.

18          THE COURT:  So this is a criminal case.  Obviously

19   this is not charging a violent crime.

20          JUROR NO. 0088:  I understand that.  I understand

21   that.  So I wanted to throw that out.

22          THE COURT:  I think that's an important thing, and

23   that is a good question and something I should have been very

24   more specific of asking if someone had been a victim or close

25   to a victim like you because sometimes that affects people in a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                           USA v. Bruce L. Hay
                                                           ROA - Volume 3, p.93

1   way they can't serve in a criminal case.  Maybe they can in

2   some criminal cases.  But I'm guessing it would be difficult

3   for you to be fair and objective in a murder case; is that

4   fair?

5           JUROR NO. 0088:  Totally fair.  Or a rape case or if

6   they were robbed.

7           THE COURT:  A violent crime.

8           JUROR NO. 0088:  Yeah.

9           THE COURT:  How about this case?  Do you think you

10   could serve fairly and objectively in this case?

11          JUROR NO. 0088:  I think it's apples and oranges, you

12   know what I'm saying?  The charge that you -- the tentative

13   charges you have posted are not a murder, they're not a rape,

14   so --

15          THE COURT:  Correct.

16          PROSPECTIVE JUROR:  Yeah.

17          THE COURT:  Thank you for pointing that out though.  I

18   think it's important people understand if you've been a victim

19   of a crime, that's something we probably want to hear about as

20   well.

21          So anybody else in Juror No. 0088's row that have been

22   on a jury?

23          In that last row, Juror No. 0002's row?  We'll start

24   you, Juror No. 0064.

25          JUROR NO. 0064:  I was on a self-defense case, and it

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.94

1    ended up not in a verdict.

2         THE COURT:  It did not end in a verdict.  The jury was

3    not able to reach a decision.  And were you the presiding

4    foreperson of that?

5         JUROR NO. 0064:  No.

6         THE COURT:  Okay.  All right.  Anybody else?  Juror

7    No. 0048.

8         JUROR NO. 0048:  I was on Wyandotte County jury

9    before.  I believe one was a civil case several years ago.  And

10   another one was a criminal case, but it was not guilty.

11        THE COURT:  Okay.

12        JUROR NO. 0048:  They didn't have enough evidence.

13        THE COURT:  Okay.  Were you the presiding foreperson

14   in either one of those cases?

15        JUROR NO. 0048:  No.

16        THE COURT:  All right.  And then I think Juror No.

17   0003.

18        JUROR NO. 0003:  Uh-huh, yeah.  Here in Wyandotte

19   County.  I think it was like probably ten years ago.  It was a

20   criminal case, murder.  So it was -- what you call it -- a hung

21   jury.  So there's like three counts, and we couldn't fully

22   decide on all three to -- for the trial.  So yeah.

23        THE COURT:  Okay.  Were you the presiding foreperson

24   of that case?

25        JUROR NO. 0003:  Foreman?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.95

1          THE COURT:  Yeah.

2          JUROR NO. 0003:  Yeah, I got selected as foreman.

3          THE COURT:  Okay.  All right.  Anything about that

4    experience that has affected your ability to be fair and

5    impartial in this case?

6          JUROR NO. 0003:  No.

7          THE COURT:  Okay.  Anyone else in Juror No. 0003's

8    row, prior jury service?

9          Juror No. 0048, Juror No. 0064, any of you that have

10   served on a jury before, Juror No. 0023, any of you have a

11   negative experience that you think would make it difficult for

12   you to be a juror in this case?  I see not.

13         Is there anyone that's been like Juror No. 0088 that

14   has had themselves or been a family member who's been a victim

15   of a crime?  All right.  I see not.

16         Anyone been charged with a crime or had someone that

17   you're close to charged with a crime?  I should say if it's

18   something you don't want to share any of these questions, you

19   can come up here, and the lawyers and I and the court reporter

20   will hear you because there's a microphone, and you can share

21   it so you don't have share it in the courtroom as well if

22   there's any of these questions you find sensitive.

23         JUROR NO. 0088:  I'm sorry for always raising my hand.

24         THE COURT:  It's all right.

25         JUROR NO. 0088:  I have a niece who embezzled from

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.96

1  Dillon's in Wichita.

2       THE COURT:  And that happened to that -- in that

3  situation.

4       JUROR NO. 0088:  She took $5,000, and it was her first

5  offense, so she -- do they -- is it called a deferment?

6       THE COURT:  Diversion.

7       JUROR NO. 0088:  Diversion, that's what she got.  So I

8  don't know if she can vote.  I don't know if you get a

9  diversion, you know, when you're charged with a felony, how

10  that affects things.

11       THE COURT:  All right.  Did you go through that with

12  her, that situation?  Were you with her in court?

13       JUROR NO. 0088:  That was happening at the same time

14  her mom was dying, so it was like -- it was all really, to tell

15  you the truth, a big blur.

16       THE COURT:  I understand.

17       JUROR NO. 0088:  My family is really normal.  I'm just

18  throwing that out there.

19       THE COURT:  I was going to say nobody's family is

20  normal.  But anyway -- not completely anyway.  Just kidding.

21       All right.  Juror No. 0002.

22       JUROR NO. 0002:  Yeah.  My -- I have family members

23  that have gone to prison in California.  I don't know what for

24  or whatever.  It's like my dad's side of the family, and to be

25  honest with you, I didn't grow up with them.  I didn't even see

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.97

1   my dad for the ten years of my life.  So it's kind of a huge

2   gap, but I know there's family when we had our first reunion or

3   whatever that was supposed to be out of prison, but they

4   weren't there.

5           So again for me, as far as impartiality, I know people

6   from all walks of life, so I don't prejudge anybody.  I just

7   kind of take them by what I see and interact with.  That

8   wouldn't affect me, but I wanted to throw that out there.

9           THE COURT:  I appreciate that.  Because sometimes --

10  it doesn't sound like it wouldn't have affected you at all, but

11  sometimes you know people that go -- walk through something

12  difficult like that with a family member or somebody, a friend,

13  somebody they care about, it does affect them.  So that's why

14  we ask these questions.  Okay.  Thank you though.  I appreciate

15  you sharing that.

16          Anyone else that I missed?  Yes, Juror No. 0036.

17          JUROR NO. 0036:  I have a colorful husband.  When he

18  was young, had a number of legal issues and was convicted of an

19  aggravated assault when he was 18 years old.

20          THE COURT:  All right.  So were you with him at the

21  time?  I mean, married to him or in a relationship?

22          JUROR NO. 0036:  I was not.

23          THE COURT:  So it was before you were married to him?

24          JUROR NO. 0036:  Correct.

25          THE COURT:  Anything about his having gone through

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.98

1   that and gone through the criminal justice system that leaves

2   you with any sort of I guess feelings that would make it hard

3   for you to serve in this case?

4          JUROR NO. 0036:  No.

5          THE COURT:  Okay.  All right.  Juror No. 0060.

6          JUROR NO. 0060:  My father has been in and out of

7   prison for the past 18 years due to drugs, violation of parole,

8   theft, robbery, that kind of stuff.  So he's currently I think

9   in prison in Virginia.

10         THE COURT:  Do you still have a relationship with him

11  or are you in touch with him?

12         JUROR NO. 0060:  Barely.

13         THE COURT:  Probably been difficult off and on over

14  the years to maintain a relationship?

15         JUROR NO. 0060:  Yeah.

16         THE COURT:  Yeah.  Anything about that that would make

17  it difficult for you to serve in a criminal case like this one?

18         JUROR NO. 006:  No, ma'am.

19         THE COURT:  Okay.  All right.  Did I get everyone?  I

20  hope.  Okay.  I think now what we'll turn to -- let me just

21  make sure I covered all my topics before we go to individual

22  questions.

23         Is there -- sometimes there are people that based on

24  their religious views or just their views in general, they

25  just -- they are of the mind that they cannot sit in judgment,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.99

1    and what they mean by that is they don't want to serve on a

2    jury and determine whether the government has presented

3    sufficient evidence to prove someone guilty beyond a reasonable

4    doubt.  There are some people that just, you know, that's sort

5    of their own ideology or their personal views, they don't want

6    to be a person that serves on a jury.

7           Are any of you in that category that you, just for

8    whatever reason, don't think this is something that you can do?

9           Okay.  All right.  So I think Bonnie provided you with

10   this list of questions.  I'm going to -- we're going to pass

11   the mic because we're going to make sure that everyone can hear

12   and the most important person can hear and makes sure she gets

13   your words down right.

14          What we're looking at, we don't want your address,

15   just the city or, if you don't live in a city, the town you

16   reside in or near, what you do for a living.  If you are

17   retired, tell us what your employment was before that, what

18   your career employment was.  Your families, we're really

19   talking about your close families.  You know, unless you live

20   with your cousin, we don't need to go that far, just the people

21   that live in your home and your adult children, what their

22   background is, what they do for a living, their educational

23   background.  And your educational background.  And then just a

24   little bit about how you like to spend your time, your

25   interests, your hobbies, your news sources, what you like to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.100

1   read, your Internet sites of preference, and any clubs and

2   organizations that you're a member of.

3           So we'll start with you, Juror No. 0064.

4           JUROR NO. 0064:  Kansas City, Kansas.

5           THE COURT:  The batteries don't hold out sometimes.

6           COURTROOM DEPUTY:  There we go.

7           JUROR NO. 0064:  I live in Kansas City, Kansas.  I

8   retired, worked at Ford Motor Company assembly plants.  I have

9   a wife, daughter, and son, all have high school education.  My

10  daughter works for Michael's warehouse.  My boy works for Sun

11  Fresh grocery.  I have a college bachelor's degree in

12  technology from Pittsburg State University.  I walk six miles a

13  day.  I watch a lot of TV.  I collect coins.  I don't have a

14  favorite publication.  Television show is mostly westerns.  No

15  Internet sites, no clubs or organizations.

16          THE COURT:  I always tell people, you know, that if

17  you end up on a jury, chances are there's going to be one of

18  the other people that you have some shared interest with.  So

19  that's -- and you're not allowed to talk about the case until

20  the conclusion of the case and I release you to deliberate, so

21  I always say pay attention because if you're both NASCAR fans,

22  you can talk about NASCAR because you can't talk about the

23  case.  Just an aside.

24          Go ahead, Juror No. 0048.

25          JUROR NO. 0048:  I live in Kansas City, Kansas.  What

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.101

1  I do for a living, I am an administrator over the Field

2  Compliance Bureau in the State of Missouri, and we conduct

3  civil tax audits on businesses.  My husband is a feeder driver

4  for United Parcel Service.  My daughter is a manager at a

5  software company, and my son works for Apple in Cupertino.

6  Let's see.  Family.

7          I have a degree from the University of Missouri Kansas

8  City in accounting.  I like to spend my time watching cooking

9  channels and draw.  I don't watch a lot of TV, only like the

10  cooking network, that kind of thing and get on Facebook.  I'm

11  not a part of any organization or club.

12          THE COURT:  All right.  Thank you.  Juror No. 0002.

13          JUROR NO. 0002:  All righty.  I live in Olathe.  I

14  currently am a biomedical technician, so I fix infusion pumps.

15  On the side I'm also an audio engineer.  I live with my brother

16  and my niece.  My brother also has a job with me, I got him on

17  there, so we're good.  I went to the Los Angeles Film School

18  actually, and I graduated with honors for music production.

19  That's where the audio part kicks in.

20          Other than that most of my interests, actually just

21  reading all kinds of different things, anything from

22  astrophysics to just history, things like that.  Music is also

23  big interest, sports, all kinds of sports.

24          Favorite publications I would -- I don't know.  I

25  don't have like a news source that I take to.  I kind of like

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.102

1   to see both sides and see somewhere in the middle, that's

2   probably where things are.  Other than that like streaming

3   could be more like Netflix or whatever, just depends on what's

4   out there.

5          I'm not part of any club other than the honor society

6   for the music thing, but I mean they're not that active if I'm

7   being honest.  That's it.

8          THE COURT:  Thank you.  Juror No. 0003.

9          JUROR NO. 0003:  Yes.  I live in Lenexa, Kansas.

10  Currently I'm employed at Barton Solvent, Inc., in Kansas City,

11  Kansas, here.  It's a chemical company.  I live with my

12  fiancée.  She works at Amazon in Olathe.  I went to school at

13  Mid-American Nazarene University in Olathe.  I have a degree in

14  communications.

15         I spend time mainly just watching sports for fun.  I

16  play like fantasy football with friends and family.  I

17  mainly -- I just watch -- enjoy movies, just spending time with

18  family.  And then I'm not a part of any clubs or organizations.

19         THE COURT:  All right.  Thank you.  Juror No. 0001.

20         JUROR NO. 0001:  I live in Overland Park.  I'm a

21  retired CPA, and I worked for two international accounting

22  firms.  In the last 25 years I had my own firm.  My family, I'm

23  married.  I have two adult daughters.  I went to school and got

24  a bachelor's in accounting at Northern Illinois University.  I

25  also got a CFP, certified financial planner, certification

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.103

1   during my career.

2        I like to travel, like to play golf.  As far as

3   publications I like to watch CNN, news programs basically.  And

4   as far as clubs I belong to Brookridge Country Club.

5        THE COURT:  Okay.  Thank you.  Juror No. 0142.

6        JUROR NO. 0142:  I live in Lenexa, and my husband and

7   I own a small restaurant.  A lot of my family members have

8   worked there as well.  I have two boys.  One of them is working

9   on his MBA at the University of Kansas, and he's a graduate

10  assistant for the women's basketball team.  And my youngest is

11  a junior at KU.  He's transferring to KU.

12       I went to the University of Nebraska and have a

13  bachelor of journalism.  And I like spending time with family,

14  socializing with friends, watching cooking shows as well, and

15  really no clubs or organizations that I'm involved with.

16       THE COURT:  All right.  Thank you.  Juror No. 0036.

17       JUROR NO. 0036:  I also live in Lenexa.  I'm in

18  technology sales, so I sell technology for businesses of global

19  H.R. and payroll.  I travel quite a bit and work from home.

20       It's just my husband and I.  He is vice president of

21  marketing for a small family-owned business that sells logoed

22  apparel and specialty items.

23       I went to KU and have a BA in environmental studies.

24  Our faith is really important to us, so we spend several days a

25  week in bible studies and prayer groups.  I like social media

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.104

1    and streaming television.  We watch different movies and

2    things.  And no formal clubs or organizations.

3            THE COURT:  Juror No. 0057.

4            JUROR NO. 0057:  I live in Shawnee, Kansas.  I am

5    actually a real estate agent with my broker's license also.  I

6    have a husband who owns a used car lot, and I have a daughter

7    who will be a junior in high school and a son who will be a

8    freshman in high school.

9            I got my undergraduate degree at Northern Iowa and

10   have an MBA from the University of Phoenix.  Honestly most of

11   my time is spent carting kids to various sporting events.  My

12   daughter is in volleyball and my son is in baseball and

13   basketball, so a lot of my free time is stuck -- I get the

14   pleasure to be with them.  And as far as TV, it's whatever

15   sports is on in the background that my husband and son have put

16   on so...

17           THE COURT:  All right.  All right.  And let's see you

18   are Juror No. 0026.

19           JUROR NO. 0026:  Yes, Juror No. 0026.  I live in

20   Lawrence, Kansas.  I am the events coordinator for the Lawrence

21   Chamber of Commerce.  My wife is a database -- she just took a

22   new position for Enel Power, a wind energy company, and is

23   working remotely on some of their CRM software database entry,

24   stuff like that.

25           My oldest brother works as an aviation mechanic for

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.105

1  EuroTec at the Lawrence Municipal Airport, and my mother owns

2  and operates automotive shop in Lawrence.  My father has since

3  passed.

4      I went to school at KU, studied marketing, got my

5  bachelor's there.  Spend my free time playing mini golf, turned

6  professional a few years ago.  Believe it or not you can make

7  money at the sport, so it's kind of fun.

8      Some publications, every day we visit our local

9  newspaper and our local KCTV sitcoms are kind of a regular, and

10  my wife makes me watch HGTV quite a bit, so I'm familiar there.

11  And some clubs and organizations that I participate in through

12  my employment are just a variety of B2B networks clubs and

13  organizations.

14      THE COURT:  All right.  Thank you.  Let's see.  Juror

15  No. 0050.

16      JUROR NO. 0050:  Uh-huh.  I live in Overland Park.

17  I'm a cook.  I make pizza.  Father was a lineman for AT&T.

18  Mother went to Emporia State, magazine editor.  Both retired.

19  I just went to high school.  And stuff I'm into, I don't know,

20  regular stuff, TV movies, video games, reading, that sort of

21  thing.

22      THE COURT:  All right.  Thank you.  Juror No. 0043.

23      JUROR NO. 0043:  Yeah.  I live in Lawrence.  I'm a

24  biology professor at KU.  Both of my parents are retired.  They

25  also live in Lawrence.  I have one daughter who's in her 20s.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.106

1    She works in public health in Columbia, Missouri.  My younger

2    daughter is in high school.  She lives with me.

3           My last degree was from the University of Chicago.

4    That was a Ph.D.  Spending time, I do research science so most

5    of my time is either research science or spending time with my

6    daughter or managing my parents.  I don't belong to any clubs

7    or organizations.

8           THE COURT:  What's your main area of research?

9           JUROR NO. 0043:  Genetics.

10          THE COURT:  Let's see.  Juror No. 0035.

11          JUROR NO. 0035:  Yes.  I'm from Gardner, Kansas.  I'm

12   a cybersecurity consultant for Burns & McDonnell.  My wife is

13   special education teacher for Gardner.  My daughter is going in

14   seventh grade.  I have a bachelor's from Emporia State.  Enjoy

15   boating, Jeeping, computer gaming, golf, too many TV shows to

16   list out loud.  I'm part of a Jeep club and Gardner Lake

17   Association IT director.

18          THE COURT:  Juror No. 0053.

19          JUROR NO. 0053:  I live in Shawnee, Kansas.  I'm the

20   chief financial officer for Swagger Construction Company.  My

21   husband works for the Federal Aviation Administration.  He's an

22   HR specialist.  I have three children.  My oldest son is

23   married and has two kids, stays at home.  My second son is a

24   project manager with company in Saint Louis for fire and water

25   damage restoration.  My daughter is a seamstress and designer

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.107

1   of theatrical costumes.

2        I graduated University of Kansas with a BS in business

3   administration and accounting.  I like to be outside hiking,

4   biking, kayaking, gardening, hang out with my grandkids a lot.

5   And my husband watches sports on TV.  When I can grab the

6   remote, I get to watch a movie.  And I don't belong to any

7   clubs.

8        THE COURT:  Thank you.  If you could pass that up to

9   Juror No. 0100.

10       JUROR NO. 0100:  I live in Overland Park.  I'm a CPA.

11  Previously did corporate and partnership tax, but now I work

12  for a real estate development company.  My fiancée works in

13  clinical medical research globally working with people in the

14  EU.  My dad is insurance claims advisor.  My mom is a retired

15  teacher.  I went to KU.  I have my master's in accounting and

16  taxation, have my CPA license.

17       I like to play sports, soccer, volleyball, wakeboard,

18  go to the lake, and then love to read really any type of book

19  and love *The Office* and *30 Rock* and no clubs or organizations.

20       THE COURT:  Thank you.  Juror No. 0096.

21       JUROR NO. 0096:  I reside in Lenexa, Kansas.  I was a

22  professional geologist in my career, 14 years in the petroleum

23  industry and 28 years as an environmental geologist.  I have a

24  wife of 49 years, who is a -- was a teacher.  Bachelor and

25  master's in education.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.108

1    I have my son, is a Lutheran pastor in Illinois, and

2    my daughter is genetics counselor.  Both of them have master's

3    and bachelor's degrees.  I got a bachelor and master's degree

4    in geology at the University of Minnesota.

5    I spend way too much time watching TV.  I also spend

6    way too much time reading.  I read anything I can get my hands

7    on.  Favorite publications would be *National Geographic*.

8    *Geology*, which is a publication of Geological Society of

9    America, which I'm a member.  All sorts of TV shows that I will

10   watch.  And active member of my church here in town, Lutheran

11   church in town.

12   THE COURT:  Thank you.  Juror No. 0054.

13   JUROR NO. 0054:  I live in Fairway, Kansas.  I

14   currently work for the federal government.  I have two adult

15   daughters.  Their education, one has two master's degrees; the

16   other one has three master's degrees.  They work in the

17   education sector.  I actually have three college degrees.  I

18   have a paralegal degree and H.R. degree and the highest being

19   an MBA.

20   I also like to read.  And I don't have a whole lot of

21   time for hobbies since I live alone and I have a yard to take

22   care of.  When I get a chance, I love to read.  And clubs and

23   organizations would be my church.

24   THE COURT:  Tell me what kind of work you do for the

25   federal government right now.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.109

1            JUROR NO. 0054:  I'm sorry?

2            THE COURT:  What kind of work are you doing for the

3    federal government right now?

4            JUROR NO. 0054:  I work for the treasury department.

5            THE COURT:  Okay.  What role are you in there?

6            JUROR NO. 0054:  Well, my current job is either to

7    answer the phone or I do computer work.

8            THE COURT:  Okay.  So you do an administrative work?

9            JUROR NO. 0054:  I'm sorry?

10           THE COURT:  Administrative work for the treasury

11   department?

12           JUROR NO. 0054:  Basically it's a little higher than

13   that, but it's a lot of just basically clerical work or phone

14   work.

15           THE COURT:  Okay.  All right.  Juror No. 0014.

16           JUROR NO. 0014:  I live in Kansas City, Kansas.  I

17   work for Hallmark cards.  I'm married, no kids.  My wife has a

18   master's in public health.  I do not have any degrees.  I like

19   to cook as a hobby.  I like shooting sports.  I'm a USCCA

20   member.  I have a membership to the local shooting range.

21   Outside of that I like a lot of DIY stuff on YouTube, and I'm a

22   natural introvert so telling you all of this about me makes me

23   very uncomfortable.

24           THE COURT:  You've done very well, very well.  Juror

25   No. 0032.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.110

1          JUROR NO. 0032:  I live in Overland Park, Kansas, and

2    I've been a stay at home mother.  Last time I worked, I worked

3    for Lantern Trucking and I did payout and kept track of

4    truckers' miles and loads they hauled.  My husband graduated

5    from KU and was doing master's work at Avila, and he is a CBDO

6    of Phoenix, which is a polyuria company.

7          I have two daughters.  One lives in Virginia, works in

8    a school system, and is attending college to get her education

9    degree, and a daughter that has an associate's degree that

10   works as a title clerk for a car dealership.  I attended Kansas

11   City Kansas Community College.

12         I spend a lot of time doing photography.  I like to

13   craft and do whatever I want to do.  I like to travel.  I like

14   to read multiple news sources.  And I like a lot of old

15   television shows or movies.  I attend church, and I am a Beta

16   Sigma Phi, and I've been an officer= and worked in the

17   philanthropic programs.

18         THE COURT:  Thank you.  Juror No. 0065.

19         JUROR NO. 0065:  I'm in Olathe, Spring Hill area.  I'm

20   a data analyst in machine learning for Garmin.  Family, my wife

21   and I have -- we have five little girls.  My wife is a

22   financial advisor.  So the five kids pretty much checks off the

23   last three on this list.  It's a lot.  But I do dabble in ice

24   hockey and boxing.  Education, computer information systems

25   certifications across the board, those kind of things.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.111

1        THE COURT:  Thank you.  We'll -- let's see, Juror No.

2   0044.

3        JUROR NO. 0044:  Hello.  I currently live in

4   Stillwell, Kansas.  I'm an H.R. professional for a general

5   contractor based in Texas, so I work remote.  Family, I have

6   three children.  The oldest one is a graphics designer.  She

7   graduated from KU and lives in Seattle.  The middle son just

8   graduated from K-State, mechanical engineer.  The youngest one

9   is also at K-State, also an engineer, and he's going to go into

10  the Air Force.  My husband is a vice president at a local

11  hospital, and he manages their facilities and construction.

12       I went to Baker.  Let's see.  Spend my time -- I

13  garden.  I have a new garden this year, so I'm learning about

14  that and canning.  I am into working out and walking and

15  exercising.  And favorite shows, I like watching GMA in the

16  morning, and I like watching the Discovery Channel and cooking

17  shows.  Then as far as clubs and organizations, I'm a member of

18  SHRM and have my certification there.

19       JUROR NO. 0106:  I live in Overland Park.  I'm a

20  doctor of audiology.  I live with my fiancée who works in

21  manufacturing.  My mom is a teacher and my dad is a chemist.  I

22  went to undergrad at K-State.  Doctoral degree from KU Med.  In

23  our free time just like to relax at home, wedding planning,

24  that kind of thing.  We watch a lot of sitcoms and movies and

25  then just professional audiology clubs.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.112

1     THE COURT:  Thank you.  Let's see -- I'm losing my

2   place here.  Juror No. 0016.

3     JUROR NO. 0016:  Kansas City, Kansas.  I work for the

4   University of Kansas Bone Marrow Transplant Unit and I'm a

5   bartender.  I live with my boyfriend who is a security officer

6   at Children's Mercy Hospital.  Two adult daughters who both

7   work at O'Reilly's.  My oldest is married to UPS driver and

8   they have three daughters.  I also for education went to a

9   vocational school and have a certificate in or have a license

10   for cosmetology.  So between the two jobs, three

11   granddaughters, that's about all I have time.  We do a lot of

12   *True Crime*, *Forensic Files*, *Snapped*, that kind of stuff.

13     THE COURT:  Juror No. 0060.

14     JUROR NO. 0060:  I live in Leavenworth, and I'm

15   currently an upfront review clerk for Lincare in the billing

16   department.  I live in a house with my four-year-old son and

17   currently my grandfather, but he's returning to Arizona as soon

18   as they predict snow.  I went to school.  I graduated high

19   school in Tonganoxie, tried a couple colleges, did a year or so

20   in criminal justice, didn't quite catch on in photography.  I

21   spend my free time watching people's game streams and streaming

22   games myself.  I don't really pay attention to the news much,

23   but I do like to binge watch on Netflix and I'm currently

24   watching *Stranger Things*.  No clubs or organizations and

25   anything like that.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.113

1          THE COURT:  All right.  Thank you.  Juror No. 0086.

2          JUROR NO. 0086:  I currently live in Kansas City,

3    Kansas.  I work for the Unified Government Public Health

4    Department as a teen pregnancy case manager.  Both my parents

5    are retired.  I'm currently going to KU to earn a master's in

6    social work.  Who has hobbies when you're in school and works

7    full-time?  I like to watch Netflix when I have the time, and I

8    don't belong to any clubs or organizations.

9          THE COURT:  All right.  Thank you.  Juror No. 0028.

10         JUROR NO. 0028:  I currently live in Overland Park,

11   Kansas.  I do residential property management, look after

12   residential houses.  I have a family.  Wife MBA, civil

13   engineer.  I have an MBA both from KU and did undergrad at

14   Saint Louis University.  Any kind of special training, I used

15   to fly for a living.  And spending our time mostly working,

16   that is my hobby.  And enjoy watching Tucker Carlson.  Or clubs

17   would be shooting sports and trap league.

18         THE COURT:  What kind of aircraft did you fly?

19         JUROR NO. 0028:  All different kinds, but the most

20   recent one I owned a 182 for travel, but before for that

21   Jetstream 31 out on the east coast.

22         THE COURT:  All right.  Thank you.  Juror No. 0094.

23         JUROR NO. 0094:  I live in Tonganoxie.  I work for the

24   State Historical Society.  I'm an archaeologist.  I have three

25   kids I live with.  My oldest is pursuing her science degree at

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.114

1   KCKCC. The other two are still in high school. I have

2   master's of art and anthropology from KU.

3           In my spare time I enjoy visual arts cooking and

4   peer-reviewed anthropology articles. I don't watch much TV.

5   And I'm in a couple of state archaeology studies for Kansas,

6   Missouri, and Nebraska.

7           THE COURT: All right. Thank you. Juror No. 0046.

8           JUROR NO. 0046: Juror No. 0046. I live in Olathe. I

9   work as a Class A driver. I work in warehouse also.

10   Education, high school. Special trainings would be the Class

11   A. I also am a forklift trainer, and I work on -- I work a

12   crane operator with the -- we do granite and marble, the big

13   slabs.

14           So my interests are flying kites, bowling, bingo. And

15   TV shows, they're old TV shows, *Big Bang Theory* and *Two and A

16   Half Men*. Clubs and organizations, bowling and the brickyard.

17   That's it.

18           THE COURT: All right. Thank you. Could you pass

19   that back to Juror No. 0006. Juror No. 0006.

20           JUROR NO. 006: I live in Louisburg, Kansas. I'm

21   currently retired. My husband is retired also. He worked for

22   Kansas Gas Service. Family. I have five children. The oldest

23   one lives in Denver. He has a plumbing supply company. The

24   second one, she's a nurse. The third one, he's in

25   Bartlesville, Oklahoma. He works for ConocoPhillips as fire

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.115

1   protection.  The fourth one, I don't know what he's doing.  He

2   left and went with his fiancée to Washington State, so I

3   FaceTime him every now and then, but that's it.  And the

4   youngest one, she works for Bushnell Golf.

5        My final degree was my master's degree in nursing at

6   KU.  Retired.  I like to spend my time doing anything I want to

7   do or not do.  But we like to go down to Stockton Lake and I

8   love the pontoon.  I love being on the lake.  I love movies and

9   I love sports a lot, and you can watch a lot of that on TV.

10  Clubs and organizations, I'm not in any.

11       THE COURT:  All right.  Thank you.  Juror No. 0121.

12       JUROR NO. 0121:  My wife and I, we live in Shawnee.

13  I'm a civil engineer, work for a private company, do lead our

14  construction inspection group.  My wife works from home.  She's

15  an accountant and oversees retirement plans as a client

16  manager.  And we have two daughters.  One is six; one is two

17  weeks, so no sleeping.

18       I went to -- my undergrad for civil engineering, I

19  went to Southern Illinois University, and I got my master's

20  through KU.  I'm a licensed professional engineer in the state

21  of Missouri and in Kansas.

22       As far as free time and interests, my wife and I play

23  a lot of sand volleyball with our friends in leagues a couple

24  nights a week, and as far as shows Disney Plus.  Big daughter

25  loves Doc McStuffins, so I can talk about that all you want,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.116

1    I'm happy to join.  No official clubs or organizations.

2              THE COURT:  Juror No. 0005.

3              JUROR NO. 0005:  I live in Overland Park.  I do

4    receiving and accounting for a grocery store.  I live with my

5    wife and my four kids.  We've got a 14-year old, a 12-year old,

6    and two-and-half-year-old twins.  No education past high

7    school.

8              My wife is a -- she works for Ceva Biomune.  They do

9    vaccines for livestock, stuff like that.  Spend most of our

10   time at home with the family, but I try to get out a few nights

11   a week and go play softball.  And our TV is usually stuck on

12   kid shows, but we'll switch it over and do like CNN, ESPN.

13   Mostly the kids get it.  And no clubs or organizations.

14             THE COURT:  All right.  Thank you.  Juror No. 0088.

15             JUROR NO. 0088:  I live in Overland Park.  I'm a

16   retired elementary education teacher.  My husband of 38 years

17   -- yay -- is a nuclear engineer, so he's the nuclear director

18   at Burns & McDonnell.  And we have two boys that are both

19   married.  We're all K-State grads.  So our oldest is a software

20   engineer, and he works for Purple Wave, which is an online

21   auction company in Manhattan.  And our youngest is a biological

22   anthropology manager, and he works for Cerner.  One's married

23   to a teacher; one is married to NICU nurse.

24             I like to do pilates.  I like to walk.  I'm in two

25   book clubs.  We love anything K-State.  We bleed purple, so

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.117

1  we're up there through all the seasons.  When we lose to KU all

2  the time, we're there watching that.

3          Favorite publications, I listen to a couple podcasts.

4  One is Bible in a Year, and the other is Holy Family School of

5  Faith.  Pray the rosary every morning and start by reading the

6  bible every morning.

7          Watch *Friends* reruns.  I finished *Stranger Things* on

8  Netflix, and I watch Fox News at night.  I'm in PEO, which is

9  the Philanthropic Education Organization, and I also teach

10  religion at Saint Michael's to little third graders.

11          THE COURT:  You're busy.  Juror No. 0009.

12          JUROR NO. 0009:  I'm in Lawrence, Kansas, and I have a

13  shop that I run, so I spend most of my time working.  My

14  brother lives in Oklahoma, and I have a sister who works for

15  the FAA doing retirement plans.  I have a history degree from

16  KU, and I would like to travel more and watch a lot of TV, of

17  course spend time with friends and a lot of time cleaning the

18  house, a lot of HGTV.  And I belong to the Daughters of the

19  British Empire, and we support several retirement homes across

20  the U.S. and local charities.

21          THE COURT:  Juror No. 0023.

22          JUROR NO. 0023:  I live in De Soto, Kansas, with my

23  husband.  He's an electrician.  And my daughter is going to be

24  in third grade, and my son is going to be in fifth grade.  They

25  go to school in Shawnee.  Let's see.  I went to KU.  I have a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.118

1    bachelor degree in sociology.  I forgot to mention -- I

2    mentioned earlier I'm a research business partner for

3    Children's Mercy Hospital.

4         Free time, doing stuff with the kids, their sports,

5    their activities.  My husband is a member of the Knights of

6    Columbus with our church, so we do a lot of activities with our

7    church and involved with our school.

8         THE COURT:  Juror No. 0078.

9         JUROR NO. 0078:  I live in Olathe.  I work in

10   aerospace.  My wife is an account administrator.  My daughter

11   is going into the third grade.  I have some vocational training

12   in automotive engineering and aerospace power plant.  My

13   hobbies, anything outdoors, camping, fishing, hunting.  TV is

14   whatever the wife is watching.  And no clubs or organizations.

15        THE COURT:  All right.  Thank you.  And Juror No.

16   0123.

17        JUROR NO. 0123:  I live in Olathe:  I just graduated

18   from occupational therapy school and about ready to set my

19   licensing board exam, and so I'm not employed.  My father is a

20   retired police officer.  He currently teaches technology for

21   middle school and high schoolers.  My mom is a registered nurse

22   for Children's Mercy, and my sister is a speech language

23   pathologist at St. Joe.

24        I have a bachelor in science in kinesiology and a

25   master's in occupational therapy.  I like photography,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                          USA v. Bruce L. Hay
                                          ROA - Volume 3, p.119

1  traveling, painting, and watching TV and reading, really

2  anything that's on Netflix or *Friends* reruns mainly.  And no

3  clubs and organizations.

4          THE COURT:  All right.  Thank you.  Well, that

5  completes my questions, so it's almost noon.  I have allotted

6  each party 30 minutes.  They may use the whole 30, they may

7  not, I don't know.  So I guess we're at a fork in the road.

8          Should we break for lunch now or should we plow ahead

9  for 45 minutes or an hour?  I'm going to leave it up to you.

10          If we keep going -- and we don't have to, but if we

11  keep going, we'll be done by 1:00.  They'll take probably ten

12  minutes or 15 minutes to decide, so we'll take a break while

13  they're deciding.  But then you can go home.

14          On the other hand, some people need to take medicine

15  and they need to break for lunch now.  Show of hands, who wants

16  to break for lunch now?  Who needs to break for lunch now?

17  Okay.  Let's plow ahead.

18          I'm sorry.  Yes.  I am so sorry.

19          JUROR NO. 0046:  One of your previous questions, I

20  don't feel comfortable passing judgment on another individual.

21  I just don't feel like I would be on a jury.  I don't feel

22  comfortable.

23          THE COURT:  Why don't you come talk to us up here at

24  the sidebar.

25          (The following proceedings were had at the bench).

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.120

1          THE COURT:  Go ahead.  Talk into this microphone so

2     she can hear you.

3          JUROR NO. 0046:  The more I thought about it in the

4     last question, when you asked about passing judgment on

5     somebody else and what I believe in, I don't feel that I would

6     be -- I don't want to pass judgment on any person or I don't

7     want to pass on the government either.  I don't want to -- I

8     don't want to do the wrong thing.

9          THE COURT:  Okay.  So passing judgment is not the

10    right -- that's the words I used, and my question was some

11    people think of it as passing judgment.  I'm the judge.  I'm

12    the one that passes judgment.  What a jury does is they listen

13    to the evidence and they hear me instruct the law and they

14    decide whether the government has presented enough evidence to

15    prove this charge or these charges individually beyond a

16    reasonable doubt.

17         So that's what you're doing.  You're not passing

18    judgment.  You're not sentencing someone.  You're not doing any

19    of that.  So you understand the distinction?

20         JUROR NO. 0046:  Yeah.

21         THE COURT:  Okay.  Now let's go back to what you said.

22    You don't feel comfortable doing that?

23         JUROR NO. 0046:  No, ma'am.

24         THE COURT:  Okay.  All right.  We'll excuse you.  Any

25    objection?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.121

1          MR. HUSCHKA:  No, no, Your Honor.

2          MS. RAMSEY:  No.

3          THE COURT:  All right.

4      (Thereupon, the proceedings continued in open court.)

5          THE COURT:  I'm excusing Juror No. 0046.  Let's call

6   someone to change his place.  Juror No. 0046, you can go out

7   those middle doors there.  We'll call someone else, and we'll

8   have to regroup and ask them all these questions.

9          COURTROOM DEPUTY:  Juror No. 0119.

10          THE COURT:  Juror No. 0119, if you'll take seat No.

11   17.  See, I told you folks in the back you weren't home free

12   yet, didn't I?  All right.

13          So we'll have to change our plan of action a little

14   bit here because I need to cover the same grounds with you that

15   I covered with everybody else, Juror No. 0119, and I'll do that

16   and then I'll ask again what your feeling is, should we keep

17   going or should we take our lunch break.

18          So, Juror No. 0119, did you recognize any of the folks

19   here that were introduced that are at the government and the

20   defense table?

21          JUROR NO. 0119:  I wondered if Mr. Oakley was Sharon

22   Oakley's wife.  I do know her.

23          THE COURT:  Was who?

24          JUROR NO. 0119:  Sharon Oakley.

25          MR. OAKLEY:  No, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.122

1        THE COURT:  And the long list of potential witness

2   names, did any of those names sound familiar to you?

3        JUROR NO. 0119:  No, ma'am.

4        THE COURT:  Are you able to be with us for this week

5   and next week pursuant to the estimated schedule?

6        JUROR NO. 0119:  I am.

7        THE COURT:  You've heard me read or really summarize

8   the charges in the indictment which are mere allegations.  Was

9   there anything about that that you thought was familiar to you?

10        JUROR NO. 0119:  No.

11        THE COURT:  Okay.  I've asked a lot of questions, and

12   I want to make sure we cover it, but was there anything as you

13   were sitting there as I was asking questions that you would

14   have responded to that you can recall at this point?

15        JUROR NO. 0119:  I am a retired school nurse, and my

16   father was an attorney for 40 years for Butler Manufacturing

17   Company.

18        THE COURT:  Have you had prior jury service?

19        JUROR NO. 0119:  I was selected and dismissed.

20        THE COURT:  You didn't reach a verdict in other words?

21        JUROR NO. 0119:  No.  I was dismissed because of the

22   graphic nature of the case, and I felt like I would not be

23   comfortable listening to the information and making an

24   impartial judgment.

25        THE COURT:  So you were not on the jury?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.123

1           JUROR NO. 0119:  I did not end up on the jury.

2           THE COURT:  Okay.  The fact that you are an R.N., can

3    you set aside that and focus on the evidence that's presented

4    in this case as you're required to do?

5           JUROR NO. 0119:  I believe I can.

6           THE COURT:  Can you accord Mr. Hay the presumption of

7    innocence that the law requires you to accord him at this

8    point?

9           JUROR NO. 0119:  Yes.

10          THE COURT:  And throughout the case?

11          JUROR NO. 0119:  Yes.

12          THE COURT:  And you understand that the government has

13   to present evidence that rises to the level of proof beyond a

14   reasonable doubt in order to convict?

15          JUROR NO. 0119:  Yes.

16          THE COURT:  Do you have any opposition to either one

17   of those important rules of law, the burden of proof the

18   government has or the fact that Mr. Hay is presumed innocent

19   under the law?

20          JUROR NO. 0119:  No.

21          THE COURT:  Okay.  From what you've heard about this

22   case, and it sounds like you were called for jury service

23   before and you told them you weren't comfortable and you were

24   excused, I'm guessing it was a different kind of case, perhaps

25   violent?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.124

1           JUROR NO. 0119:  Yes, it was violent.

2           THE COURT:  Anything you've heard about this case that

3   makes you feel as if you would have difficulty being fair

4   impartial and objective to Mr. Hay and to the government?

5           JUROR NO. 0119:  No.

6           THE COURT:  Okay.  Have you ever had any experience in

7   litigation or as a victim of a crime, anything like that?

8           JUROR NO. 0119:  No.

9           THE COURT:  Anyone that you're close to that's had

10  those experiences?

11          JUROR NO. 0119:  No.

12          THE COURT:  Do you have any background in law

13  enforcement?

14          JUROR NO. 0119:  No.

15          THE COURT:  Your father did?

16          JUROR NO. 0119:  Yes.

17          THE COURT:  The fact that he was a law enforcement

18  officer, do you think that you'll be able to follow the

19  instruction to evaluate the testimony of a law enforcement

20  witness the same as you would any other witness?

21          JUROR NO. 0119:  He was a corporate attorney, I'm

22  sorry.

23          THE COURT:  I'm sorry.

24          JUROR NO. 0119:  That's okay.

25          THE COURT:  We'll ask you that though, can you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.125

1   evaluate the testimony of a law enforcement witness the same as

2   everyone else?

3          JUROR NO. 0119:  Yes.

4          THE COURT:  And your father background's was as a

5   corporate attorney?

6          JUROR NO. 0119:  Yes.

7          THE COURT:  Can you set aside anything you learned

8   about the law from him and decide this case based solely on the

9   instructions that I provide in this case?

10          JUROR NO. 0119:  Yes.

11          THE COURT:  Do you personally have a background in law

12   enforcement?

13          JUROR NO. 0119:  No.

14          THE COURT:  Do you have military service?

15          JUROR NO. 0119:  No.

16          THE COURT:  Have you ever had any dealings with the

17   Veterans Administration?

18          JUROR NO. 0119:  My father did receive medication

19   through the Veterans Administration, and I was his caretaker

20   through end of life.

21          THE COURT:  Did you take him to appointments at the

22   VA?

23          JUROR NO. 0119:  I did not.  I consulted a little bit

24   with him on his medications.

25          THE COURT:  I see.  Was there anything about the fact

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.126

1   that he did get some treatment or at least medication from the

2   VA that affected you in a way that you think you would have

3   difficulty being fair and impartial in this particular case?

4           JUROR NO. 0119:  I don't believe so.

5           THE COURT:  So the schedule of two weeks, how about

6   the trial day schedule itself, 9:00 to 5:00 with mid-morning

7   break, mid-afternoon break, midday break of an hour, does that

8   work for you?

9           JUROR NO. 0119:  Yes.

10          THE COURT:  Do you have any medical issues, vision,

11  hearing issues that hopefully we can accommodate but that we

12  need to know about?

13          JUROR NO. 0119:  I have a history of brachial

14  neuritis, which is nerve damage in my shoulder, and I can

15  typically take over-the-counter medication to control the pain.

16          THE COURT:  Okay.  If that should start bothering you

17  during the trial, you'll let us know.  And do you think it's

18  something we can accommodate by taking short break or --

19          JUROR NO. 0119:  I do.

20          THE COURT:  So we're going to do this 9:00 to 5:00

21  schedule or thereabouts, but tomorrow is an election day.  So

22  for those of you that are selected for the jury today because

23  we will get a jury seated today, I assure you we'll figure out

24  what we're going to do.  Some of you may need to vote in the

25  morning or in the evening.  We'll start late or we'll end early

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.127

1  tomorrow, whatever works best for the group we end up with.

2  That's something that we'll figure out once we figure out who's

3  actually sticking with us.

4        Let's see, you understand that the indictment is just

5  allegations?

6        JUROR NO. 0119:  Correct.

7        THE COURT:  Do you have any legal training, education,

8  or experience?

9        JUROR NO. 0119:  I do not.

10       THE COURT:  Are you close to anyone that does?

11       JUROR NO. 0119:  Other than my father, no.

12       THE COURT:  All right.  So the individual questions,

13  are those still on the seat over there?

14       JUROR NO. 0119:  I got it.

15       THE COURT:  Will you run through those with us.

16       JUROR NO. 0119:  Certainly.  I live in Prairie

17  Village, and I was a school nurse for my early career, stopped

18  when I had my three children, stayed at home.  I opened an

19  embroidery business at my home.  My husband is project manager

20  in IT for a local company here in Kansas City.  He received his

21  bachelor's degree from Baylor University.  I also received my

22  RN/BSN from Baylor University.

23       I have three grown children.  My oldest went to DePauw

24  University, and now he lives in Thailand and is the director of

25  a study abroad program.  My middle son went to Western

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.128

1  University in Gunnison, and he currently works for Gunnison

2  university.  My third daughter graduated from KU with graphic

3  design, and she lives here in Kansas City.

4          I enjoy reading, walking, participating in a bible

5  study with my church.  I'm a part of the Kansas City Modern

6  Quilting Guild, and a member of the Kappa Alpha Theta sorority.

7  I don't spend a lot of time watching television.  I think I've

8  about answered them all.

9          THE COURT:  I think so.  And I think I've asked this

10 one quicker than I anticipated -- I asked you about prior jury

11 service.  You didn't serve; you asked to be excused?

12         JUROR NO. 0119:  Correct.

13         THE COURT:  All right.  I am ready to ask you all

14 again.  It's five after 12.  Do you want to keep going or do

15 you want to take a break?  Anyone need to take a break at this

16 point with a show of hands?

17         JUROR NO. 0044:  Bathroom break.

18         THE COURT:  Juror No. 0044.

19         JUROR NO. 0044:  Bathroom break.

20         THE COURT:  Right now?

21         JUROR NO. 0044:  Well, if we decide to take a break,

22 yeah.

23         THE COURT:  Let's do that.  You all are okay with a

24 late lunch?  Okay.  So let's do that.  It takes a while for

25 everybody to take a bathroom break, but let's take a bathroom

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                   USA v. Bruce L. Hay
                                   ROA - Volume 3, p.129

1    break for about 20 minutes.  We'll come back, the government

2    will ask their questions, defense will ask their questions, and

3    then unless there's more substituting of people at that point,

4    they'll make their selections, and those are of you that aren't

5    staying will go home; the rest of us will take a late lunch

6    break.

7            Let's take a break for 20 minutes, 15 if we're ready.

8    You'll have to go down to Room 180 again.

9        (Recess taken at 12:05 p.m.)

10       (The jury entered the courtroom, after which the following

11   proceedings were had.)

12           THE COURT:  All right.  I think that completes my

13   questions.  So turn to the government.

14           MR. HUSCHKA:  Yes, Your Honor.

15           I have just a few questions for you all.  Judge, you

16   were very thorough, so we only have a few left here.

17           My first question is, if any of you have heard of a

18   disorder called conversion disorder.  Have you heard of that?

19           Okay.  We've talked a lot about the VA today, but

20   other than the VA, do any of you have any strong feelings

21   concerning the United States Government that might affect your

22   ability to serve as a fair and impartial juror in this case?

23           Does anybody on the panel think that the United States

24   should be held to a higher standard of proof than a reasonable

25   doubt?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.130

1      Does any member of the jury panel feel that you might

2  in any way treat the allegations in this case as either less

3  serious or less important because it was the government and not

4  an individual who suffered loss as a result of criminal

5  conduct?

6      Is there anything else that we have not discussed

7  today that makes any of you think that you would not be an

8  appropriate juror for this case?

9      Those are all the questions we have.  Your Honor.

10      THE COURT:  Pass for cause?

11      MR. HUSCHKA:  Excuse me?

12      THE COURT:  Pass for cause?  Well, I'll wait and ask

13  later.

14      MR. HUSCHKA:  Okay.  Thank you, Your Honor.

15      THE COURT:  Ms. Ramsey.

16      MS. RAMSEY:  Good afternoon.  You got so quiet when we

17  got up.  It's a little different when the judge is talking to

18  you.  I'm going to ask for a little bit of participation from

19  you, just a little while longer.  I'm not going to take too

20  much of your time though.

21      I did have some questions about some of your

22  background that was not answered by kind of the few questions

23  that were set out in that sheet.

24      And so I wanted to know is there anyone in the jury

25  that would consider themselves coming from a rural area where

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.131

1   you grew up around a farm?  Okay.  You got to put your number

2   up for me because I didn't bring my sheet up.

3          Juror No. 25, where did you grow up?

4          JUROR NO. 0065:  McLouth.

5          THE COURT:  I'll make the record if you want me to.

6   This is Juror No. 0065.

7          MS. RAMSEY:  Thank you.

8          And I sorry, I have to apologize.  I am from the

9   Missouri side.  Where is McLouth?

10         JUROR NO. 0065:  North of the Tonganoxie ten minutes,

11  so north of Lawrence all those areas.

12         MS. RAMSEY:  Did you spend most of your childhood

13  there?

14         JUROR NO. 0065:  Until I was 15, 14.

15         MS. RAMSEY:  Was this family land?

16         JUROR NO. 0065:  Yes, uh-huh.  It was cattle, yes.

17         MS. RAMSEY:  Did you have any other animals on the

18  farm?

19         JUROR NO. 0065:  I don't know, four or five horses, a

20  few dogs, a goat that chewed up everything, got rid of him.

21  Mainly cattle.

22         MS. RAMSEY:  Were you responsible growing up to take

23  care of this land?

24         JUROR NO. 0065:  We set hay bales out in the morning.

25  We checked fences, those kind of things.  Pairing the bulls as

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.132

1    I got older.  We numbered everything obviously, paired them up

2    with calves and put heifers on the different side of the fields

3    and everything.

4            MS. RAMSEY:  About how old were you when you were able

5    to leave that?

6            JUROR NO. 0065:  I don't know.  Junior in high school,

7    sophomore in high school.

8            MS. RAMSEY:  All right.  Thank you for sharing.

9            Anybody else?  All right.  We're going to go in a

10   circle here.  Number 9, which is Juror No. 0006.

11           JUROR NO. 0006:  We purchased a small 40-acre farm

12   about 35 -- we purchased a small 40-acre farm about 35 years

13   ago in Louisburg, Kansas.  That's south of here.

14           MS. RAMSEY:  You still currently own that land?

15           JUROR NO. 0006:  We still currently own it, but we

16   lease it out.  We don't grow cattle or chickens or any of that

17   stuff anymore.

18           MS. RAMSEY:  Okay.  Great.  Thank you very much.

19           We're going to go to the back row.  Is it -- was it

20   Juror No. 0003, did you have your hand up?

21           THE COURT:  Juror No. 0001.

22           MS. RAMSEY:  Juror No. 0001.

23           JUROR NO. 0001:  I grew up in a farm in central

24   Illinois.  It was a -- we had dairy cattle.  We had chicken.

25   We had sheep.  And I -- that's my entire growing up period

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.133

1   until I was 18 was on the form.  Of course I worked in

2   maintenance of the barn and the physical facilities and taking

3   care of the animals.  But definitely.

4           MS. RAMSEY:  Was this family land?

5           JUROR NO. 0001:  It was family land?

6           MS. RAMSEY:  You still own that land?

7           JUROR NO. 0001:  Yes.  My father owned the land, yes.

8           MS. RAMSEY:  And all right.  We're going to go Juror

9   No. 0088.

10          JUROR NO. 0088:  Juror No. 0088.  My husband grew up

11  on a farm, and then his parents had passed away, so now that is

12  our land and we lease it for corn, wheat, soybeans.

13          MS. RAMSEY:  Thank you.  And Juror No. 0121.

14          JUROR NO. 0121:  Yeah, I grew up in central Illinois

15  as well, and my best friend growing up, he had pigs, and so I

16  would help him every now and then do that.

17          MS. RAMSEY:  It wasn't your family farm?

18          JUROR NO. 0121:  Not mine, no.

19          MS. RAMSEY:  You helped work on that farm?

20          JUROR NO. 0121:  Correct.

21          MS. RAMSEY:  Am I missing anyone else down on that

22  right side?  Okay.  Juror No. 0035.

23          JUROR NO. 0035:  I helped my wife's family with her

24  farm currently, off and on.

25          MS. RAMSEY:  You still do farming work?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                            USA v. Bruce L. Hay
                                                            ROA - Volume 3, p.134

 1          JUROR NO. 0035:  A little bit here and there, yes.

 2          MS. RAMSEY:  How often would you say you do that?

 3          JUROR NO. 0035:  Once, twice a month.

 4          MS. RAMSEY:  And what type of work do you do?

 5          JUROR NO. 0035:  Move hay bales, help feed the cows,

 6   pigs, chicken, whatnot.

 7          MS. RAMSEY:  You said this was your wife's land?

 8          JUROR NO. 0035:  My in-laws, my wife's grandparents.

 9          MS. RAMSEY:  All right.  Thank you.  Thank you for

10   sharing that information with me.

11          I next want to talk about -- I know that Your Honor

12   has had some questions about training in the medical field, and

13   you've talked and I think I've gotten down who on my sheet has

14   that, but I did want to talk to you about specifically with

15   something within the medical field.

16          Who has experience with or knows something about

17   people who have been affected by possibly a mental illness?

18   Okay.  I see lots of hands.

19          What I'm going to do is I'm going to start -- and this

20   could mean you learned something about the subject for a class

21   or volunteer work or you've known someone who's been personally

22   diagnosed.  Can you explain what your experience has been?

23          JUROR NO. 0057:  I worked at Osawatomie State Hospital

24   which is a mental health facility.  I started there in '73 as

25   an aid and then went and got the R.N., and I retired there in

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.135

1  2000.  And I worked on the units, I was in the education, I was

2  in the administration, and it was all psychiatric illness.

3          MS. RAMSEY:  Okay.  And specifically I think

4  Mr. Huschka, the government's attorney, asked about whether or

5  not anyone has heard of something called conversion disorder.

6  I'm going to put it differently.  Have you ever heard of

7  functional neurological disorder?

8          JUROR NO. 0057:  Not titled like that, no, I have not.

9  I can say no.

10         MS. RAMSEY:  You say "not titled like that" which

11  makes me think maybe you're thinking of something else, but I'm

12  using the wrong term for you.

13         JUROR NO. 0057:  Over the years there have been the

14  same illness, but they tend to relabel them.  So I can't say I

15  am not familiar with what you're saying.

16         MS. RAMSEY:  Juror No. 0088, I saw you shake your head

17  to the last point there.

18         JUROR NO. 0088:  I was thinking post-traumatic stress

19  disorder.

20         MS. RAMSEY:  That was going to be my next question,

21  but let's stick with you first we go on.  Have you had --

22  opportunity is the wrong word because it probably was a part of

23  your job, but have you ever worked with someone diagnosed with

24  PTSD?

25         JUROR NO. 0057:  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.136

1           MS. RAMSEY:  I'm assuming you'd had some training and

2     experience with that?

3           JUROR NO. 0057:  Yes.

4           MS. RAMSEY:  When you say that you've had training and

5     experience with that, was it mostly just the treatment of the

6     patients or was it part of your formal education around that

7     particular disorder?

8           JUROR NO. 0057:  It would be the treatment of the

9     parties.

10          MS. RAMSEY:  Okay.  All right.  Anybody else had any

11    experience with someone with a mental health disorder, PTSD?

12          All right.  I'm going to come down here, Juror No.

13    0060.

14          JUROR NO. 0060:  I have an uncle who has down

15    syndrome, and my sister has schizoaffective disorder.  That's

16    basically my extent of mental illness.

17          MS. RAMSEY:  Anyone else have contact?  We're going to

18    go to Juror No. 0088.

19          JUROR NO. 0088:  I have a niece -- I had a niece,

20    she's passed away, who had -- who was bipolar.  She was killed

21    in a motorcycle wreck, but she was bipolar.  My mother suffered

22    from depression.  My brother-in-law has post-traumatic stress

23    disorder from Vietnam.  Both my sons suffer from anxiety where

24    they're under psychiatric care.

25          MS. RAMSEY:  Okay.  Thank you for sharing that.  And I

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.137

1   think, Juror No. 0009, you held your number up.

2           JUROR NO. 0009:  My brother, I think he's bipolar.  I

3   think that's his --

4           MS. RAMSEY:  You think that's his diagnosis?

5           JUROR NO. 0009:  Yeah, I think so.  I know he takes

6   medication and he needs it.

7           MS. RAMSEY:  Okay.  And let me know if I'm prying too

8   much, but are you and your brother close?  Have you had much

9   interaction with him I guess?

10           JUROR NO. 0009:  He lives down in Oklahoma.  And, you

11   know, like I went to visit him for the day last week.  I do see

12   him, and when he was -- before he was diagnosed and was not

13   well and would not accept treatment, I spent a lot of time with

14   him.

15           MS. RAMSEY:  Thank you for sharing that.

16           We're going to go to the back row.  Is it Juror No.

17   0003?  Is there anyone before then?  Okay.  Thank you for

18   passing the microphone.

19           JUROR NO. 0003:  So I kind of misunderstood the

20   question at first, and then she said something about PTSD.  My

21   mother has depression from domestic violence, but so I didn't

22   think about that upfront, as far as what the other question

23   was, so I didn't really kind of connect the dot there.

24           MS. RAMSEY:  Thank you for sharing that.

25           Anybody else we've missed?  We're going to go down the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.138

1  row here in the back.  Pass it on down.  Seat No. 8, thank you.

2  I'm trying to connect with these names so stay with me.

3          PROSPECTIVE JUROR:  You're fine.  I just have my

4  father-in-law, my uncle, and then I've had two friends pass

5  away from suicide.

6          MS. RAMSEY:  Thank you for sharing that.

7          JUROR NO. 0123:  My schooling offers a wide range of

8  conditions, physical, mental, et cetera.  I've treated patients

9  that have some sort of mental.

10         MS. RAMSEY:  Has this been a part of your treatment

11  with occupational therapy?

12         JUROR NO. 0123:  Uh-huh.

13         MS. RAMSEY:  Okay.

14         JUROR NO. 0123:  Yes.

15         MS. RAMSEY:  Okay.  How many would you say?

16         JUROR NO. 0123:  Probably like two.

17         MS. RAMSEY:  Okay.

18         JUROR NO. 0123:  And I wasn't like the full therapist

19  on the case.  I was a student at the time.

20         MS. RAMSEY:  A student at the time, assistant

21  therapist?

22         JUROR NO. 0123:  Yes.

23         MS. RAMSEY:  Okay.  All right.  Anybody else that I

24  missed?  We're going to go down.  We'll stay up the back row

25  then.  Seat No. 32.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.139

1        PROSPECTIVE JUROR:  I have a grandfather with

2   essential tremors, a neurological condition that makes your

3   handshake.

4        MS. RAMSEY:  Thank you.  I think we're down to the

5   front row here.  Seat No. 28.

6        PROSPECTIVE JUROR:  My ex-husband had bipolar disorder

7   and my grandson did also.

8        MS. RAMSEY:  Okay.  As far as your husband, do you

9   mind if I ask how long you were married?

10        PROSPECTIVE JUROR:  That's been years ago.  We were in

11   our 30s.  We were probably 30, 40 years old.

12        MS. RAMSEY:  And your grandson, do you have much

13   contact with your grandson?

14        PROSPECTIVE JUROR:  He's deceased.

15        MS. RAMSEY:  I'm sorry.  I'm sorry.  I missed that

16   part, I apologize.  Thank you for sharing that.

17        Did I miss anyone?

18        JUROR NO. 0096:  I just have a nephew in Minnesota

19   that has bipolar disorder.

20        MS. RAMSEY:  I think is it -- you have two brothers in

21   Minnesota as well, right?

22        JUROR NO. 0096:  I have two brothers that served in

23   Vietnam era, never at Vietnam, and they've both been treated at

24   the VA.

25        MS. RAMSEY:  Okay.  And do you know -- may I ask, I

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.140

 1  don't know that this was specifically asked, but what have they

 2  been treated for?

 3       JUROR NO. 0096:  Just general health care with the

 4  exception of my oldest brother who is partially disabled,

 5  hearing loss due to the fact that he was on a competitive

 6  shooting team with the Army.

 7       MS. RAMSEY:  All right.  Thank you.  Thank you very

 8  much.

 9       I am going -- I'm getting -- oh, yes.  Sorry I missed

10  you.

11       JUROR NO. 0086:  I don't have a family history, but

12  working with the social service industry, I have served a lot

13  of clients that have anxiety, depression.

14       MS. RAMSEY:  That's right.  You're working on your

15  masters in sociology.

16       JUROR NO. 0086:  Social work.

17       MS. RAMSEY:  Social work.  Does part of your training

18  and experience in school right now, does it involve dealing

19  with individuals with mental health issues?

20       JUROR NO. 0086:  Correct.

21       MS. RAMSEY:  Okay.  All right.  Is there any

22  particular training or experience in your schooling now that

23  deals with mental health issues that's like a specific

24  specialty?  Are you working on any specific specialty of

25  dealing with individuals with mental health issues?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.141

1        JUROR NO. 0086:  Not currently, no.

2        MS. RAMSEY:  Okay.  All right.  All right.  The next

3   thing I want to talk about is Judge Robinson has talked a

4   little bit about this with you, but I wanted to dig in a little

5   bit more on it, and I wanted to ask this general question.

6        Who here believes they've heard any evidence yet?

7   Okay.  That was an easy one.  Who here believes they've heard

8   just allegations?  Okay.  All right.

9        The next thing I want to talk to you a little bit

10  about we've -- this is -- I'm trying not to repeat myself, but

11  the subjects are a little bit overlapping.

12       Does anyone have a family member, friend, someone that

13  -- rather than just associate you're close with, that has been

14  designated by the government as being disabled rather than just

15  having a disability?  Does anyone know anyone?  We're going to

16  go -- start in the back.  Yes.

17       Juror No. 0057.

18       JUROR NO. 0057:  My father is fully 100 percent

19  disabled from his service.  And he has -- he'll get -- he gets

20  benefits for that.

21       MS. RAMSEY:  That's from the VA, correct?

22       JUROR NO. 0057:  Sure.  I just know he told me --

23  well, at one point when he reached it.  He was 100 percent

24  considered.

25       MS. RAMSEY:  So he's 100 percent disabled?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.142

1              JUROR NO. 0057:  Yeah.

2         MS. RAMSEY:  Can I ask you a little bit -- does he

3    live alone?

4              JUROR NO. 0057:  No.  He lives with my mom.

5         MS. RAMSEY:  How old is he?

6              JUROR NO. 0057:  75.

7         MS. RAMSEY:  Very good.  Thank you.

8              JUROR NO. 0057:  Yep.

9         MS. RAMSEY:  Anybody else on -- let's go to the second

10   row.  We'll go down to -- is it Juror No. 0009?  We didn't want

11   to skip you.

12             Trying to keep a little order here.

13             JUROR NO. 0009:  My husband has an uncle that we're

14   close with that is fully disabled for back and neck injury.

15        MS. RAMSEY:  Thank you.  I think we can go to the

16   second row.

17             PROSPECTIVE JUROR:  Was it just a family member?

18        MS. RAMSEY:  Family member, someone you're close to.

19   I know that people have different associates, but family

20   members or someone close to you.

21             PROSPECTIVE JUROR:  I think my brother is too, but I

22   also have a very close friend who's permanently disabled.

23        MS. RAMSEY:  Okay.  Thank you.

24             PROSPECTIVE JUROR:  My sister-in-law is permanently

25   disabled.  So is her partner and my brother-in-law.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.143

1          MS. RAMSEY:  Okay.  And just to make sure I'm clear

2     about the question, the permanent disability is something

3     that's been designated to them by some sort of agency or

4     government agency?

5          PROSPECTIVE JUROR:  By the government, uh-huh.

6          MS. RAMSEY:  Thank you.  Juror No. 0121.

7          JUROR NO. 0121:  Yeah, my mother-in-law was before she

8     passed away and then as well my sister-in-law is currently.

9          MS. RAMSEY:  Designated?

10         JUROR NO. 0121:  Yes.

11         MS. RAMSEY:  Thank you.  Seat No. 9.

12         PROSPECTIVE JUROR:  My daughter has MS, and she is

13    disabled.

14         MS. RAMSEY:  Okay.  Do you mind if I ask a few

15    follow-up questions about that?  Thank you.

16         Does she live on her own?

17         PROSPECTIVE JUROR:  She lives with her husband.

18         MS. RAMSEY:  Okay.  All right.  And has she always --

19    not always, obviously you've known her since she's been born so

20    that's a silly question.  How long has she been designated as

21    100 percent disabled?

22         PROSPECTIVE JUROR:  Let's see.  Maybe four or

23    five years.  I'm not good on that.  I don't know.

24         MS. RAMSEY:  All right.  Thank you.

25         PROSPECTIVE JUROR:  Because she was working prior to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.144

1  that.

2          MS. RAMSEY:  Okay.  All right.  Thank you.

3          All right.  We're going to come down to juror -- if

4  you pass the mic down to the first row to Juror No. 0044.

5          JUROR NO. 0044:  Yeah, I have a brother -- had a

6  brother, he's deceased, who had muscular dystrophy and he was

7  disabled and did receive checks once a month because he

8  couldn't work.

9          MS. RAMSEY:  Okay.  Do you know with his disability

10  was that most of his life or was it just part of his life that

11  he was designated?

12          JUROR NO. 0044:  We weren't really close, but I think

13  it was most of his life.

14          MS. RAMSEY:  All right.  Thank you.  Anyone else I'm

15  missing?

16          JUROR NO. 0060:  My sister is -- was designated as

17  disabled, and my stepfather before he passed away was also

18  disabled due to diabetes.

19          MS. RAMSEY:  Your father was due to diabetes?  Do you

20  mind if I ask what your sister was.

21          JUROR NO. 0060:  She's schizoaffective disorder, in

22  and out of hospitals.

23          MS. RAMSEY:  You mentioned that earlier.  You said

24  this was your stepsister?

25          JUROR NO. 0060:  She's my -- she's my half sister.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.145

1          MS. RAMSEY:  And were you two -- are you two close?

2          JUROR NO. 0060:  We haven't been since I was 12.

3          MS. RAMSEY:  Okay.

4          JUROR NO. 0060:  I haven't seen her much.

5          MS. RAMSEY:  All right.  Thank you.  All right.

6   There's specific -- I'm getting close.  I promise you.

7          There's a specific question that I do have for those

8   that have talked to me a little bit about having medical

9   training.  As you know, Your Honor has informed you that your

10  decision will have to be based on the evidence that you hear in

11  this case, and part of that evidence may be about medical

12  issues.  And so what I'm wondering for those of you that have

13  medical training -- and I think, Juror No. 0106, tell me again,

14  audiologist, right?

15         JUROR NO. 0106:  Yep.

16         MS. RAMSEY:  Okay.  Is whether or not you're going to

17  be able to put some of that personal information and training

18  that you have aside so that it's not going to create a bias

19  with you with listening to the investigation and evidence

20  you're going to hear in this trial.

21         So knowing now kind of -- that that's kind of what the

22  standard is, do you think you'll have a problem doing that?

23         JUROR NO. 0106:  No problem.

24         MS. RAMSEY:  Anyone else that had any type of

25  training?  Now, knowing kind of that's what we're asking you to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.146

1  do, will anyone have a problem doing that and then have a

2  problem being fair and impartial in this case and listening to

3  all the evidence?  All right.  I see no hands.

4        I think that is all the questions I have.  Thank you,

5  Your Honor.

6        THE COURT:  Will counsel approach the bench, please?

7     (The following proceedings were had at the bench).

8        THE COURT:  Does the government have any challenges

9  for cause?

10       MR. HUSCHKA:  No, Your Honor.

11       THE COURT:  Defendant have any challenges for cause?

12       MS. RAMSEY:  Nope.

13       THE COURT:  All right.  Here's the sheet.  So, Bonnie,

14  I want to make sure the sheet was changed to conform to the

15  number of strikes they need for the alternates so they each

16  have two strikes.

17       COURTROOM DEPUTY:  For the alternates.

18       THE COURT:  Which leaves us with three.  You know how

19  it goes.  So start with the government, fill in and pass it

20  back and forth.

21       Do you -- I assume you want them to stay put while

22  you're doing this so you can look at them.  We'll lose a little

23  time bringing people up and down stairs.

24       MS. RAMSEY:  I think that's fine.

25       MR. HUSCHKA:  Yeah.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.147

1          THE COURT:  All right.

2     (Thereupon, the proceedings continued in open court.)

3          THE COURT:  All right.  You all can stand in place,

4     stretch, whatever you're going to do.  The parties are going to

5     make their selections.  They're going to pass this sheet back

6     and forth to do that, so it will take a little bit, but as soon

7     as they finish that, I will be announcing those of you that are

8     excused.

9          And those of you in the pews, we'll ask you to stick

10    with us.  Every once in a while as soon as I let you go home,

11    something will go wrong.  And you will need to call the

12    code-a-phone after 5:00 on Friday just to see if you need to

13    report next week.  I think you're on deck for the month of

14    August.

15         PROSPECTIVE JUROR:  I think it's tonight.

16         THE COURT:  I think when you're called for service in

17    a trial, you don't have to call again until that Friday.  She's

18    going to confirm with the experts, but at least that's what I

19    always thought.  We don't expect you to drive back down here

20    later this week.  She's going to confirm that just to be sure.

21         I stand corrected.  Somebody should get a prize for

22    this.  I think it's you.  You are supposed to call tonight

23    after 6:00.

24    (Peremptory strikes made.)

25         THE COURT:  All right.  I'm going to read the names of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.148

1   those of you that have been excused by the parties.  If you

2   don't hear your name, it means you're with us.  Those of you in

3   the pews, thank you for your patience.  You are excused as

4   well.  Everyone is to call the phone after 6:00 tonight and

5   then follow whatever instructions you're given on that

6   recording.

7         So the following people are excused, and again we

8   thank you for being here and being patient today.  Juror No.

9   0086, Juror No. 0001, Juror No. 0054.  And you can leave as

10  you're hearing your name if you like.

11        Juror No. 0060, Juror No. 0016, Juror No. 0106, Juror

12  No. 0088, Juror No. 0119, Juror No. 0006, Juror No. 0009, Juror

13  No. 0005, Juror No. 0078, Juror No. 0094, Juror No. 0014, Juror

14  No. 0032, Juror No. 0064, Juror No. 0043, Juror No. 0035, Juror

15  No. 0096, and Juror No. 0050.  You're all excused.

16        Juror No. 0078, you are excused.

17        PROSPECTIVE JUROR:  Thank you.

18        THE COURT:  Yeah.  Make sure we have -- I'm confused.

19        All right.  So we're going to break.  I know you're

20  more than ready for it, but before you do, if you'll stand as

21  you're able and raise your right hand.  You'll take a separate

22  oath now as the trial jury.  Bonnie will take you back to at

23  least the jury room we're going to use for now.

24        COURTROOM DEPUTY:  What I'd like for them to do before

25  we leave is to shift down.  Those are in these rows, after

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.149

1   we're done with the oath, shift down so you know where your

2   seat is, and then we'll go back to the jury room.

3          THE COURT:  Okay.  If you'll raise your right hand.

4      (The jurors were duly sworn to try the case.)

5          THE COURT:  So, Bonnie, you may need to -- Juror No.

6   0048, you'll be in one.  Juror No. 0002, you'll be in number

7   two.  Everybody shift down and fill up these first.

8          COURTROOM DEPUTY:  You'll be last according to the

9   numbers.  You'll want to be in your numerical order.

10          THE COURT:  So these three will shift to -- ten,

11   you'll be over here.  And you're No. 14, you'll be over there.

12   16.  You'll go after her.  Your numbers will be changing.

13          Got it nailed down.  Bonnie, will if you will lead

14   them back to the jury room.  It's 1:15.  I think we should

15   break until 2:30 because they don't know all the lunch places,

16   not that there's a lot of them, and give us a little bit of

17   cushion.  We'll plan to come back at 2:30 and do opening

18   statements and start evidence this afternoon.

19          All right.  I will remind you, don't talk about any of

20   the matters in this case, the evidence, subject matter, the

21   people involved.  You're now under an oath to not talk about

22   anything, not to your family.  You can tell them you've been

23   selected obviously, but not any details about the case.  We

24   want to shelter you from people giving you their opinions or

25   their views.  You don't need to hear any of that.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.150

1        All right.  We'll talk to you more when you come back

2   after lunch.  She'll take you back to the jury room, and that's

3   where you'll report when everybody is here.

4      (The following proceedings occurred outside the presence of

5   the jury.)

6        THE COURT:  You'll get an updated seating chart after

7   lunch.  Try to be here 5 or 10 minutes early.  We do have

8   notebooks that's not something.  I mentioned to you before.  We

9   do have notebooks available to them to take notes.  I'll be

10  giving instructions about that and reminding them that open

11  statements aren't evidence.  But anyway we'll let them take

12  notes.

13       Anything I need to be aware of or anything you need to

14  take up before we break?  We'll try to reconvene about 2:25.

15     (Recess taken at 1:18 p.m.)

16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.151

1              C E R T I F I C A T E

2      I, Danielle R. Murray, a Certified Court Reporter and the

3  regularly appointed, qualified, and acting official reporter of

4  the United States District Court for the District of Kansas, do

5  hereby certify that the foregoing is a true and correct

6  transcript from the stenographically reported proceedings in

7  the above-entitled matter.

8      SIGNED 11th of February, 2023

9

                        /s/Danielle R. Murray
10                       DANIELLE R. MURRAY, RMR, CRR
                        United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.152

```
 1                   UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2
   UNITED STATES OF AMERICA,      )
 3                                )  Case No. 19-20044-JAR
             Plaintiff,           )  Circuit No. 22-3276
 4                                )
   vs.                            )
 5                                )  Kansas City, Kansas
   BRUCE L. HAY,                  )  Date:  1 August, 2022
 6                                )
             Defendant.           )  Day 1 (Pages 1-87)
 7   ...........................
 8                   TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE JULIE A. ROBINSON
 9            SENIOR UNITED STATES DISTRICT COURT JUDGE

10
                       A P P E A R A N C E S
11
     FOR THE PLAINTIFF:
12
             Mr. Ryan Huschka
13           Mr. Christopher Oakley
             OFFICE OF THE UNITED STATES ATTORNEY
14           500 State Avenue
             Kansas City, Kansas 66101
15
     FOR THE DEFENDANT:
16
             Mr. David Magariel
17           Ms. Chekasha Ramsey
             OFFICE OF THE FEDERAL PUBLIC DEFENDER
18           500 State Avenue
             Suite 201
19           Kansas City, Kansas 66101

20

21

22

23

24   _____
               Proceedings recorded by machine shorthand,
25       transcript produced by computer-aided transcription.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.153

1                            I N D E X

2
     Government's Witnesses:                                   Page
3
     SPECIAL AGENT DANIEL WHITE
4       Direct Examination by Mr. Oakley                        25

5

6                          E X H I B I T S

7
        Government's
8       Exhibits              Offered              Received

9          1                    41                    41
           2                    45                    45
10         3                    47                    47
           4                    49                    49
11         5                    52                    52
           6                    54                    54
12         8                    59                    60
           9                    61                    62
13        10                    62                    63
          11                    64                    64
14        12                    67                    67
          13                    70                    70
15        14                    72                    72
          15                    75                    75
16        16                    76                    76
          17                    81                    81
17        18                    82                    82
          19                    83                    83
18        20                    83                    83
          21                    84                    84
19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.154

| 1 | P R O C E E D I N G S |
|---|---|

1          P R O C E E D I N G S

2          (The following proceedings occurred outside the presence of

3     the jury.)

4               THE COURT:  Are we ready?

5               MR. OAKLEY:  I think we're having technical

6     difficulties, Your Honor, displaying the PowerPoint

7     presentation.

8               MS. RAMSEY:  Your Honor, I was just wondering if the

9     court -- I know that as part of our proposed instructions, we

10    did submit a proposed preliminary instruction.

11              THE COURT:  Oh.

12              MS. RAMSEY:  And so I wasn't sure what the court was

13    going to read.  I didn't know.  Is the court going to give the

14    instructions?  I think you have them on your -- the district

15    website.  Was that the --

16              THE COURT:  The preliminary.

17              MS. RAMSEY:  Yes.

18              THE COURT:  I mean, I don't usually read them

19    verbatim.  What I usually do is presumption of innocence,

20    beyond a reasonable doubt, direct/circumstantial evidence,

21    note-taking, how the trial will proceed, and that I will be

22    giving them a full set of instructions later on the law, how to

23    evaluate witness testimony and the like.

24              What was your proposed preliminary?

25              MS. RAMSEY:  Your Honor, I can bring up the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.155

1   difference.  It was filed Document 85.  And what I'm trying to

2   figure out -- and our proposed preliminary had a change

3   regarding the direction for the presumption of innocence.  I

4   don't know if the court has -- so that's it.

5           THE COURT:  I think she just went to print it out for

6   me.  If it's short enough, you can just read it to me.

7           MS. RAMSEY:  The portion -- okay.

8           THE COURT:  Bonnie, will you go see?  Because I

9   thought she was coming in.  Never mind, that's her.

10          MS. RAMSEY:  I think the only thing we've added is

11  bolded language, proposed bolded language, the third paragraph

12  under the preliminary section where it says "this presumption

13  of innocence remains with Mr. Hay throughout every stage of the

14  trial, including most importantly during your deliberations,

15  and is extinguished only if all 12 of you unanimously find that

16  the government has proved Mr. Hay's guilt beyond a reasonable

17  doubt.  He may not be found guilty by you unless you find that

18  the government has proved his guilt beyond a reasonable doubt."

19          THE COURT:  I have it in writing here.  Does the

20  government have any objection to me giving this proposed

21  preliminary instruction?

22          MR. HUSCHKA:  No, Your Honor.

23          THE COURT:  I'm not going to give them the elements,

24  but I will insert the note-taking instruction that I ordinarily

25  give.  So -- okay.  I just want to make sure this covers

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.156

1    everything I ordinarily tell them.

2              MS. RAMSEY:  Yeah, I'm trying to make sure.  I'm going

3    to compare it against --

4              THE COURT:  Okay.  This looks fine.

5              MS. RAMSEY:  Thank you, Your Honor.

6              THE COURT:  The only thing is I don't think it says

7    anything about direct and circumstantial evidence so I might

8    mention that as well.

9              Okay.

10        (The jury entered the courtroom, after which the following

11   proceedings were had.)

12             THE COURT:  You can be seated.  All right.  Members of

13   the jury, at the end of the trial I will give you detailed

14   guidance on the law and how you will go about reaching your

15   decision, but for now I simply want to generally explain how

16   the trial will proceed.

17             So this is a criminal case.  It's been brought by the

18   United States Government.  I will sometimes refer to the

19   government as the prosecution, and the government is

20   represented by Assistant United States Attorneys.  Ryan Huschka

21   and Chris Oakley.  The defendant, Bruce Hay, is represented by

22   his lawyers, Chekasha Ramsey and David Magariel, for the

23   Federal Public Defenders Office for the District of Kansas.

24             The superseding indictment charges Mr. Hay with six

25   counts of wire fraud and ten counts of theft of government

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.157

1   funds.  The indictment is simply the description of the charge

2   made by the government against the defendant.  It is not

3   evidence of guilt or anything else.

4        Mr. Hay pleaded not guilty and is presumed to be

5   innocent of the charges.  This presumption of innocence remains

6   with Mr. Hay throughout every stage of the trial, including,

7   but most importantly, during your deliberations and is

8   extinguished only if all 12 of you unanimously find that the

9   government has proven Mr. Hay guilty beyond a reasonable doubt.

10        He may be found not guilty by you -- I'm sorry.  He

11  may not be found guilty by you unless all 12 of you unanimously

12  find that the government has proved his guilt beyond a

13  reasonable doubt.

14        The first step in the trial which we're about to start

15  is the opening statements.  The government, in its opening

16  statement, will tell you about the evidence which it intends to

17  present to you.  Just as the indictment is not evidence,

18  neither are the opening statements.  Their purpose is only to

19  help you understand what the evidence will be.  It's a roadmap,

20  if you will, to show you what is ahead.

21        After the government's opening statement, Mr. Hay's

22  attorney will then make an opening statement.  After the

23  opening statements, evidence will be presented from which you

24  will have to listen and determine the facts.  The evidence will

25  consist of the testimony of witnesses, documents, and other

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.158

1   things received into the record as exhibits and any facts about

2   which the lawyers agree to or which they stipulate to.

3        The evidence may be direct evidence, such as the

4   testimony of an eyewitness or an earwitness, or it may be

5   circumstantial, which is all other evidence that's not the type

6   of evidence that someone has perceived through their senses.

7   That's what's considered circumstantial evidence.

8        The government will offer its evidence.  After the

9   government's evidence, Mr. Hay's lawyer may present evidence,

10  but they are not required to do so.  I remind you that Mr. Hay

11  is presumed innocent, and it is the government that must prove

12  his guilt beyond a reasonable doubt.  If defense counsel

13  submits evidence, the government may introduce rebuttal

14  evidence.

15       At times during the trial a lawyer may make an

16  objection to a question asked by another lawyer or an objection

17  to an answer by a witness.  This simply means that the lawyer

18  is requesting that I make a decision on a particular rule of

19  law or rule of evidence.  Do not draw any inferences or

20  conclusions from any objections or from my rulings on the

21  objections.

22       If I sustain an objection to a question, the witness

23  may not answer it.  Do not attempt to guess what answer might

24  have been given if I had allowed the question and answer.  If I

25  overrule the objection, treat the answer as any other.  If I

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                     USA v. Bruce L. Hay
                                     ROA - Volume 3, p.159

1   tell you not to consider a particular statement or -- if I tell

2   you not to consider a particular statement, you may not refer

3   to that statement in your later deliberations.  And similarly,

4   if I tell you to consider a particular piece of evidence only

5   for a specific purpose, you may consider it only for that

6   purpose.

7          During the course of the trial I may have to interrupt

8   the proceedings to confer with the attorneys about the rules of

9   law that should apply.  Sometimes we talk briefly up here at

10  the bench and we put on white noise so that we're having a

11  private discussion about that.

12         Sometimes there are things that come up and we need to

13  discuss the rules of law and it will take longer.  If that

14  should happen, I'll excuse you so you won't just be sitting

15  there waiting on us.  I will try to avoid any such

16  interruptions whenever possible, but please be patient if the

17  trial seems to be moving slowly, because conferences often will

18  save time in the end.

19         You are to consider all the evidence received in this

20  trial.  It will be up to you to decide which evidence to

21  believe and how much of any witness's testimony to accept or

22  reject.

23         After you have heard all the evidence, the government

24  and the defense will be given time for their final arguments.

25         During the course of the trial I may ask a question of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.160

1   a witness.  If I do that, that does not indicate that I have

2   any opinion about the facts in the case.  I'm only trying to

3   bring out facts that you may consider.

4          Now, you've been given notebooks to take notes.  Each

5   notebook belongs to you, and you'll need to keep it in the jury

6   room overnight.  It should not leave the courthouse with you,

7   but just keep in mind that you do not have to take notes.  Some

8   people are prolific note-takers.  Other people do far better

9   observing information without taking any notes at all or

10  without taking a few notes.

11         Here's what you need to keep in mind.  Your notes are

12  not evidence.  What you hear from the witnesses and exhibits

13  admitted, those are the evidence.  Oftentimes it's important

14  you watch the witnesses because you're going to be judging

15  their credibility and deciding how much weight to give their

16  testimony if their testimony should conflict with another's,

17  and oftentimes the best way to do that is not to take notes but

18  to watch them and watch their body language and watch their

19  demeanor while they're testifying.

20         Your notes are not evidence, and so when you take your

21  notes back and when it's time to deliberate, keep in mind if

22  there are conflicts between one juror's notes and another

23  juror's notes, the notes never control.  It's what the 12 of

24  you recall the evidence to be.  We believe that the collective

25  memory of 12 people is better than notes and often much better

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.161

1    than the memory of just one of you.

2            During the course of the trial, you should not talk

3    with any witness.  You should not talk with Mr. Hay.  You

4    should not talk with any of the lawyers involved in this case.

5    In addition, during the course of the trial you should not talk

6    about the trial with anyone else.  Do not discuss the case with

7    anyone or provide any information outside the courtroom until

8    after the verdict is received.

9            Do not use the Internet or any form of electronic

10   communication to communicate with anyone about this case.

11   Similarly, do not communicate with anyone about the trial until

12   your verdict is received.

13           Also that means you should not even discuss the case

14   among yourselves until I have instructed you that it's now time

15   to start your deliberations, which will be after the trial is

16   over, you've heard all of the evidence and the closing

17   arguments.  It is important that you wait until all of the

18   evidence is received and that you heard my instructions on the

19   controlling rules of law before you deliberate among

20   yourselves.

21           Let me also add that during the course of the trial

22   you will receive all of the evidence that you should have to

23   properly consider and decide the case.  Because of this, you

24   should not attempt to gather any information or do any research

25   on your own.  That would be highly improper.  Do not attempt to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.162

1   visit any places mentioned in the case either actually or on

2   the Internet, and do not in any other way try to learn about

3   the case outside the courtroom.

4         If you hear a word you've never heard before, don't

5   look up the definition.  The lawyers should make sure that you

6   understand all that you're hearing.  It's up to them to do

7   that.  Particularly it's up to the government because they have

8   the burden to prove this -- these charges.

9         The court reporter is making stenographic notes of

10   everything that is said.  However, a typewritten copy of the

11   testimony will not be available for your use during

12   deliberations.  On the other hand, any exhibits that are

13   admitted into evidence will be available to you during your

14   deliberations.  You'll have all of that with you in the jury

15   room.

16         Now that the trial has begun, you must not hear or

17   read about it in the media.  The reason for this is that your

18   decision in the case must be made solely on the evidence

19   presented at this trial.

20         All right.  With that, whoever is going to present the

21   opening statement on behalf of the government, you can proceed.

22         MR. OAKLEY:  Thank you, Your Honor.  This case is

23   about two people, two people with markedly different abilities

24   and disabilities, and I'd like to describe both of them here

25   briefly.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.163

1         The first person reports that he requires a walker to

2    maneuver.  The first person continuously has abnormal movements

3    of his arms and his neck and his back and his body.  The first

4    person continuously has a backwards movement.  This first

5    person cannot drive.  This first person reports that he cannot

6    do a job of any kind.  This first person goes to a neurologist

7    and gets a brain scan, an EEG, and the brain scan is normal,

8    but this first person is diagnosed with conversion disorder.

9         And you'll hear an explanation of what conversion

10   disorder is, but, simply put, it's a diagnosis for someone who

11   has these involuntary movements and seizures that cannot be

12   explained by a physical injury and cannot be explained by a

13   neurological injury.

14        This first person is seen using a walker.  This first

15   person reports that at no time during the day does he not

16   involuntarily shake.  This first person requires assistance

17   from his wife to help him get out of a truck, to open doors,

18   and to walk.  This first person reports that he's unable to

19   perform even the most basic self-care responsibilities such as

20   bathing and going to the bathroom, shaving, putting on

21   clothing.

22        Now I'd like to talk to you about the second person.

23   The second person walks without assistance.  The second person

24   is often seen carrying a walking stick or a cane, but rarely

25   uses it for support, but it appears it's more like a prop.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.164

1        This second person is able to engage in manual labor.

2   Indeed the second person is a farmer.  The second person has

3   the ability and is seen picking up hay bales and putting those

4   hay bales onto a flatbed trailer.  The second person is seen,

5   as a flatbed trailer is being driven, standing on the back of

6   it while it's moving and stacking hay bales.

7        This second person is seen in a parking lot bending

8   down and picking up change.  The second person has the ability

9   to jump in and out of a pickup truck.  The second person is

10  seen running a short distance.

11       Now, the fact of the matter is that that first person

12  and that second person are the same person, and it's the

13  defendant, Bruce Hay.  And the evidence will show that the

14  defendant, Bruce Hay, concocted that first person, the person

15  with physical disabilities, so that he could defraud the

16  Veterans Administration and the United States Government in

17  order to obtain VA disability benefits.

18       Now, I expect that the evidence will show that the

19  defendant was involved in a car accident in February 2005.

20  Indeed that's not in contention.  There's no question about it.

21  It happened.  And this was a serious accident.  The defendant

22  was in a pickup truck.  He was a passenger in a pickup truck

23  that was hit, and as a result of the accident, the pickup truck

24  flipped over, and the defendant was transported to St. Luke's

25  Hospital in Kansas City.  He was released from the hospital

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.165

1    within 24 hours, and physical examinations showed no injuries.

2          The defendant reported, however, a short time later

3    that he had tremors and reported that he could not walk.

4          Now, this accident happened while the defendant was

5    near his home, but at the time he was on active duty with the

6    U.S. Army, and because of that, if those injuries were real, he

7    would be entitled to VA disability benefits.

8          And so about a year after the accident the defendant

9    applied for VA benefits, and based upon what he told VA, it was

10   determined that he was 100 percent disabled.  And you'll hear

11   witnesses from the VA that will come and they will explain what

12   this means.  They will explain to you the process that one goes

13   through to apply for VA benefits.

14         And you'll also hear that after someone is determined

15   to be disabled and it's service-connected, and even if they

16   receive VA disability benefits, they're still required to

17   periodically appear for examinations at the VA.

18         And so the defendant had to continue to report to the

19   VA, and you'll hear about these examinations.  They're called

20   compensation and pension examinations, sometimes shorthand C&P

21   or comp and pen examinations.  You'll hear what the defendant

22   said -- you'll read what the defendant said during these

23   examinations, and he reported disabilities, the things that

24   we've discussed.

25         You'll also hear about the way that he presented

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.166

1    himself.  He presented himself during these examinations as

2    someone who had involuntary movements similar to someone that

3    has cerebral palsy, that his gait was shaky, that he had

4    constant movement of his head, his back, his neck, and his

5    arms.

6            However, the evidence will show that the way that the

7    defendant presented himself during those examinations was a

8    fraud and actually the defendant was able to engage in a full

9    range of physical activities.

10           Around 2012 the Veterans Administration Office of

11   Inspector General, commonly referred to VA-OIG -- this is the

12   law enforcement arm that's charged with investigating fraud,

13   waste, and abuse at the VA -- opens an investigation into the

14   defendant, and as part of that investigation they conduct

15   surveillance.  And you'll hear about this, and basically highly

16   summarized, they follow the defendant and they followed the

17   defendant on his way to appointments; they followed the

18   defendant while he's engaged in activities apart from benefits

19   examinations; and at one point in time the agents install a

20   camera across the street from the defendant's house that's able

21   to pick up what's going on outside, and so you'll be able to

22   see the defendant as he leaves his residence, as he gets into

23   his car, as he walks without the walker.

24           At one point in time the defendant makes a claim to VA

25   for what's called permanent and total disability, and, if

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.167

1    approved, this means the defendant wouldn't have to go to any

2    more examinations and it means that he would be entitled to

3    other benefits that are associated with that, with someone

4    that's 100 percent disabled and is determined that is total

5    100 percent and permanent, won't get better.

6           You will see the two versions that I've described to

7    you yourself.  You will hear witnesses who saw the two

8    versions.  For instance, I anticipate -- this is a portion of

9    what I anticipate will be Government's Exhibit 46.  This is

10   videotape surveillance of the defendant as he was in a VA

11   hospital, and I anticipate the evidence will be that that is

12   the defendant as he's utilizing a walker in the VA.  You'll be

13   able to see this.

14          That same day -- so he's seen in the VA hospital and

15   he's maneuvering with the walker.  You'll see that because

16   agents were in the hospital at the time recording him.  You'll

17   also see before he goes to that appointment this video is

18   taken.  I anticipate it will be Government's Exhibit 100-Y.

19   And you'll see once it's in evidence the defendant carries the

20   walker out to the truck and the defendant puts the walker in

21   the truck, and then the defendant and his wife go to the

22   appointment.

23          But it wasn't just before this appointment -- now it's

24   playing.  This is the defendant before the VA appointment.  The

25   evidence will be that's the defendant carrying the walker out

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.168

1  to the truck.  The defendant's wife gets into the truck and the

2  defendant's wife drives him to the VA.

3         If we go back to the video, this is the defendant in

4  the VA.  This is how he maneuvered in the VA.

5         After this appointment the defendant and his wife go

6  to Sam's Club, and agents see the defendant and his wife at

7  Sam's Club.  And you'll hear testimony about what the defendant

8  did while at Sam's Club, and I anticipate that you will see --

9  and this is a portion of what is expected to be admitted as

10 Government's Exhibit 100-Z.  This is after the defendant gets

11 home from Sam's Club after he carried the walker to the car.

12 After the VA appointment the defendant and his wife go home,

13 and that's the defendant carrying groceries into his house,

14 carrying his cane.

15        A couple hours later, you'll see what I expect will be

16 into evidence as Government's Exhibit 100-BB.  This is a

17 portion of it.  And I anticipate that you'll see the defendant

18 walk out of his house unassisted, go to the red pickup truck,

19 pop the hood, and begin working on the truck.  Again, the same

20 day, hours after he's in the VA with the walker, you'll see how

21 the defendant walks without the aid of either a cane or a

22 walker.

23        You'll hear from the agents that conducted the

24 surveillance.  You'll see the surveillance video.  So there's

25 another example that I expect will be admitted as Government's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.169

1    Exhibit 8, and this is video that agents were taking as they

2    surveilled the defendant arriving at a Social Security

3    appointment.  I anticipate the evidence will be that

4    immediately following this appointment at Social Security, the

5    defendant's wife, driving to a pawnshop that's over a mile

6    away, and this video, a portion of what I show you that's

7    admitted into evidence as Government's Exhibit 11, the

8    defendant is able to walk from the pawnshop, maneuver between

9    two parked pickup trucks, have a conversation with his wife,

10   who, by the way, I believe the evidence will show did not need

11   to assist him into the pawnshop.

12       The next video from that day, a portion of which I

13   will show you and I expect it will be admitted into evidence as

14   Government's Exhibit 12, defendant enters the pawnshop, buys a

15   tool, comes back out to the truck, is able to carry it without

16   assistance, is able to open the truck without assistance, is

17   able to take his jacket off without assistance.

18       So you'll see and you'll hear about the walker that we

19   saw the defendant use in the VA, and I'd ask that you pay

20   attention to how many times you or other people see the

21   defendant using that walker and pay attention to what the

22   defendant reports to the VA as far as whether or not he needs

23   to use that walker.

24       Oftentimes he's seen with the walking stick, with the

25   cane that I described, and as I described, I expect you'll see

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.170

1   and you'll hear that it's more of a prop.

2          If we could play a portion of Government's Exhibit 15.

3          This is the same day he went to Social Security, the

4   same day as the pawnshop.  And the defendant walks out, gets

5   into his truck, and drives away.

6          But it's not just the video evidence.  You'll hear

7   from VA employees.  You'll hear from people who had

8   conversations with the defendant about his claimed

9   disabilities.  You'll hear from the agents that observed him,

10  and you'll hear from members of the community, members of Bruce

11  Hay's community, people who don't know the first Bruce Hay, the

12  one with the claimed disabilities, because the Bruce Hay they

13  know is a farmer who has remarkable physical abilities.

14         And I submit that the evidence will convince you

15  beyond a reasonable doubt that this first Bruce Hay was

16  concocted to defraud the VA.

17         As Judge Robinson mentioned in both during *voir dire*

18  and her initial instructions, the defendant is charged with 16

19  counts.  The first six counts are wire fraud, and it's based

20  upon the defendant devising and executing a scheme to defraud.

21  Judge Robinson will instruct you what that means and what you

22  must find in order to find the defendant guilty of that.

23         And the other ten counts are counts of theft of

24  government money, specifically VA benefits, that he wouldn't be

25  entitled to if he didn't lie to the VA.  Judge Robinson will

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.171

1    instruct you what you must find to prove those counts as well.

2          All 16 counts relate to the same thing, that the

3    defendant lied to the VA in order to obtain VA benefits that he

4    was not entitled to.  And you'll hear these witnesses, you'll

5    see the things that defendant said, you'll see the video, and

6    at the end of the day Judge Robinson will instruct you on the

7    law.

8          And after that, after you've been instructed on the

9    law, you've seen and heard the evidence, and Mr. Huschka will

10   stand up and Mr. Huschka will ask you to render a verdict, the

11   only verdict that will be consistent with the law and

12   consistent with the facts.

13         I thank you for your time.

14         MS. RAMSEY:  This case is about a disorder, conversion

15   disorder now called functional neurological disorder, a

16   disorder that is misunderstood, situations misinterpreted by

17   the VA and mishandled.

18         Bruce is a veteran of the United States Army.  He

19   served three separate times, gave up approximately nine years

20   of his life.  And in 2003 to 2004 after 9/11 he was activated

21   again, he signed back up, and he went to Iraq.

22         Bruce was a truck driver in Iraq.  Now, that may not

23   sound like a dangerous job, but you're at war.  He was under

24   the threat of gunfire, the possibility of IED's going off at

25   any moment because his job was to take people, vehicles from

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.172

1    one place to another.  Those were his missions.

2         He saw the carnage of war.  It was a traumatic

3    experience, and he didn't come back the same.  When he came

4    back on February 25, 2005, Mr. Hay, Bruce; his friend Reverend

5    Ray Brunet; his two-year-old; and four year-old daughter got in

6    his red pickup truck to go to the family farm.  And before you

7    know it, they were sideswiped by a dump truck into the back

8    panel.

9         As the glass shattered and the metal crunched, the car

10   spun around and it ended up in a ditch.  And Reverend Brunet

11   was seriously injured, and his 2- and 4-year-old daughters were

12   severely injured, unconscious, and both had to be life-flighted

13   from the scene.  They thought his youngest wasn't going to make

14   it.

15        Now, at first Bruce could get people out of a truck.

16   He had some injuries to his -- bruising to his head and to his

17   knees and he was taken and seen at St. Luke's Hospital by

18   Dr. Harry Wilkins.

19        Ultimately, because the next day he woke up and he

20   couldn't walk and he had body tremors all over his body, and

21   Dr. Hairy Wilkins examines him and decides to send him to a

22   neurologist, Dr. Kathryn Hedges.  And there are MRIs done and

23   EEGs done, and as a result of it being a rule-out process, he

24   is diagnosed with conversion functional neurological disorder,

25   having symptoms of weakness in his lower legs, body tremors,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.173

1    and muscle cramping of his body.  Multiple doctors over the

2    years diagnosed this disorder.

3         His symptoms became so severe that he was honorably

4    but medically discharged from the army.  And when he was out,

5    processed, filed for benefits from the VA, and the VA rated him

6    100 percent at that time -- we're talking about 2005, 2006 --

7    for 100 percent for conversion disorder -- for two things:

8    Conversion disorder with a mental health problem, major

9    depression disorder; and secondly, for choreiform movement

10   disorder for the body tremors and the muscle cramping and the

11   weakness.  He was assigned 100 percent whenever at least one

12   major seizure or full-body tremor for a month occurred over the

13   last year.

14        Now, the VA found him eligible for other benefits, but

15   that was the VA; Mr. Hay didn't ask for those benefits.

16        Between 2007 to 2012, approximately, the VA does not

17   rerate Bruce, and he continues to have problems.  You will hear

18   from Bruce's community.  Those will include his family,

19   sometimes his friends, people that know him well and attend

20   church with him, and they're regular people just like Bruce;

21   they're not doctors.  And they will come in and they will

22   describe to you what they observed, what they observed

23   happening to Bruce, and they will use terms like attacks,

24   episodes, seizures, but it's all the same.

25        Ultimately they will tell you that it gets so bad that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                           USA v. Bruce L. Hay
                                                           ROA - Volume 3, p.174

1   he folds up like a lawn chair, and he uses a cane for stability

2   when these episodes may start.  During these times he can't

3   speak.  He can barely walk.  Sometimes he has to be told to

4   breathe.  He needs help dressing and bathing himself.

5          You'll hear from a Dr. O'Neal.  Now, Dr. O'Neal is a

6   board certified neurologist.  She's a director of a clinic for

7   functional neurological disorder.  She treats patients day in

8   and day out with this disorder.  And she will tell you it is

9   sometimes confusing and misunderstood.  She will educate you on

10  the symptoms.  She will tell you it is inconsistent, that it

11  often starts as a result of a traumatic experience and that

12  sometimes there are irregularities in the person, that it's a

13  rule-out process, that part of actually diagnosing is finding

14  there's no medical or physiological evidence to explain it.

15  It's a disconnect.

16         Bruce has good days and Bruce has bad days.  And, yes,

17  there will be video where you will see him doing things on his

18  farm, upkeep, and those are his good days, days when he tries

19  not to let his disability control him and he works through

20  them.  But on his bad days, when he's totally debilitating,

21  daily activities are impossible.  The government has picked

22  these videos for their theory, but you will hear from the rest

23  of the community about what really happens to Bruce.

24         There are what's called C&P exams, compensation and

25  pension exams.  These are exams where the VA will go in and do

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.175

1   medical examination of the person's disability, possibly

2   severity of their disabilities.  Bruce participates in these

3   examinations in 2006, 2007, close in time to the accident, in

4   2013 and 2017.  And he's questioned about his disability during

5   these exams, and he answers those questions truthfully about

6   his disability when he is disabled by the disorder.

7            He is honest.  I want you and I actually ask you to

8   listen to what he tells them in 2013 and 2017 because it's

9   their decision on how they rate him, not Bruce.  He has

10  episodes.  He has attacks.  But sometimes he's completely

11  normal.  He drives short distances and he dinks around on the

12  farm.

13           The government has charged fraud based on these

14  cherry-picked videos, but they have nothing to do with the real

15  VA rating decision.  It's what Bruce honestly tells them when

16  he's in those exams.

17           A complicated disorder, misunderstood, misinterpreted,

18  and mishandled.  At the end of this case we will get up and we

19  will ask you to render the only verdict based on the evidence,

20  and that will be innocent.  Thank you.

21           THE COURT:  Is the government ready with their first

22  witness?

23           MR. OAKLEY:  Yes, Your Honor.  United States calls

24  Special Agent Dan White.

25                    SPECIAL AGENT DANIEL WHITE,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.176

1    called as a witness on behalf of the government, having first

2    been duly sworn, testified as follows:

3            THE WITNESS:  Good afternoon, Your Honor.

4            THE COURT:  Good afternoon.

5                    DIRECT EXAMINATION

6    BY MR. OAKLEY:

7    Q.   Sir, could you please state and spell your name.

8    A.   Yes.  It's Daniel White, D-a-n-i-e-l, W-h-i-t-e.

9    Q.   How are you currently employed?

10   A.   I'm currently a special agent with Office of Veterans

11   Affairs Office of Inspector General.

12   Q.   Is that commonly referred to as VA-OIG?

13   A.   Yes, sir, it is.

14   Q.   How long have you been employed with VA-OIG?

15   A.   Since June 2008.

16   Q.   Is a VA-OIG special agent a law enforcement officer?

17   A.   Yes, sir, it is.

18   Q.   And so through the typical day you carry a badge and a gun?

19   A.   Yes, sir.  We have full arrest authority.

20   Q.   How long have you been in law enforcement?

21   A.   27 years.

22   Q.   I want to start with the beginning of your career and then

23   work towards VA.  How were you first employed?  What law

24   enforcement capacity were you first employed as?

25   A.   1995, started as a Kansas City, Missouri police officer.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.177

1    Q.    How long were you with Kansas City, Missouri?

2    A.    Until the fall of 2000.

3    Q.    What did you do with KCMO Police Department?

4    A.    Well, after a six-month-long academy, which effectively

5    doubled the minimum Missouri post hours required, we received a

6    lot of training in basic patrol tactics, criminal

7    investigations, marksmanship, typical police duties, as well

8    as, again, criminal investigation and surveillance.

9    Q.    So how many years were you at Kansas City Missouri Police

10   Department?

11   A.    Approximately five years.

12   Q.    And so your first five years in law enforcement was with

13   them.  Did you go someplace after Kansas City Missouri Police

14   Department?

15   A.    Yes, sir.  Then I -- that fall I applied for and got

16   accepted with the United States Secret Service.

17   Q.    What did you do with Secret Service?

18   A.    Special agent criminal investigator assigned to Kansas

19   City; Springfield, Missouri; and headquarters in Washington,

20   D.C.

21   Q.    What does a special agent with Secret Service do?

22   A.    They've got a unique dual mission, protection as well as

23   criminal investigations concerning the financial infrastructure

24   of the United States.

25   Q.    How long were you with Secret Service?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.178

1    A.   Approximately eight years.

2    Q.   After you left Secret Service, where did you go?

3    A.   I came here to the VA-OIG in Kansas City.

4    Q.   And so when did you start with VA-OIG?

5    A.   June 2008.

6    Q.   You've been a special agent with VA-OIG since then?

7    A.   In 2014 I was promoted to assistant special agent in

8    charge.

9    Q.   That was 2014 you said?

10   A.   Yes, sir.

11   Q.   Tell me a little bit about what a VA-OIG special agent

12   does.  Give us a picture of a day in the life of a VA special

13   agent.

14   A.   VA-OIG has a broad mission, basically protecting veterans

15   and taxpayers from any criminal or civil activity that can

16   affect the Department of Veterans Affairs.  We're a watchdog

17   agency for the VA.

18   Q.   What types of cases, generally speaking, would a VA-OIG

19   agent be involved in?

20   A.   We run the entire gamut from threats to assaults to drugs

21   to criminal investigations, fraud, embezzlement, all the way up

22   to homicide.

23   Q.   Let me talk to you about training that you've received

24   throughout your course as a law enforcement officer.  Have you

25   had any training either at Kansas City or Secret Service, or

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.179

1    now VA?

2    A.   Yes, sir.  Continually been training for 27 years.

3    Q.   Can you just generally describe the types of things that

4    you receive training on?

5    A.   KCPD is about six months, as I said, very extensive

6    training academy.  Again, basic police procedures, but they go

7    above that and add quite a bit of additional activity.  We have

8    a lot of role-playing scenarios that they put us through for

9    that training or after that training.

10        And Secret Service academy is twofold.  It starts with

11   about three months down at Glynco, Georgia, with FLETC at CITP,

12   its investigative training program -- Criminal Investigator

13   Training Program, I believe.  That has standard police training

14   as well as legal, ethics, criminal investigations,

15   surveillance, and again, a lot of role-playing is done where

16   you follow a case throughout every step of it.

17        There's an add-on school that Secret Service does that's

18   another three months of training in Maryland, gets into more

19   specific Secret Service issues, protection issues, as well as

20   counterfeiting and some of the more finely-tuned aspects of

21   what the Secret Service does.

22        Coming over to VA-OIG, they have a transitional training

23   program covering some of the internal cases that we don't

24   typically see with an agency like the Secret Service, and then

25   throughout we've had continuing education that averages about

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.180

1    40 hours a week [*sic*].

2    Q.   So your training has included how to conduct surveillance

3    in a law enforcement capacity?

4    A.   Yes, sir.

5    Q.   What type of education do you have?

6    A.   I have a bachelor's degree from the University of

7    Pennsylvania.

8    Q.   And what's your bachelor's degree in?

9    A.   Psychology.

10   Q.   I want to transition and talk to you about an investigation

11   involving a person by the name of Bruce Hay.  Are you familiar

12   with that investigation?

13   A.   Yes, sir.

14   Q.   And were you a VA-OIG agent when you were involved in that

15   investigation?

16   A.   Yes, I was.

17   Q.   And when were you assigned to that investigation?

18   A.   Roughly the summer of 2012 I was assigned a hotline

19   investigation.

20   Q.   Now, you said hotline investigation.  Does VA-OIG have a

21   hotline for -- for people to make complaints?

22   A.   Yes, sir.  They're an organization that handles -- I think

23   in the most recent semiannual report to congress covering the

24   last six months, I think they handled something like 17,000

25   contacts, and they triage those between health care complaints,

1    maybe you went to see a family member at the VA hospital and

2    noticed the floor was dirty and that irritated you, so that

3    would go to health care.  Or -- and if there's issue with the

4    way a program is run, they would route that to audit.  If it's

5    criminal activity, they route it to our office.

6    Q.   And so based upon a hotline complaint, you were assigned to

7    work on an investigation involving Bruce Hay?

8    A.   Yes, sir.

9    Q.   And so once you were assigned to the investigation of Bruce

10   Hay, what did you do as a -- as an investigator, as a law

11   enforcement agent?

12   A.   For most benefit fraud cases we walk through standard

13   review of the claims file, review the complaint.  While we

14   review a claim file, we look for the criteria that the subject

15   is being paid for.

16   Q.   And so you examine the file?

17   A.   Yes, sir.

18   Q.   The electronic or paper file and look at what's

19   contained --

20   A.   Yes, sir.

21   Q.   -- in there?

22        And what else do you typically do?

23   A.   We run background checks on the subjects.  We look up -- we

24   obtain, like, driver's license photos or veteran ID photos if

25   we're going to make contact so we can identify them.  We look

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.182

 1   at what their statements were to VA.

 2   Q.   And as it relates specifically to the Bruce Hay

 3   investigation, did you determine that Mr. Hay was also

 4   receiving Social Security benefits?

 5   A.   Yes, sir.

 6   Q.   So at some point did you interact with law enforcement

 7   officials from Social Security?

 8   A.   Yes, sir, we did.   Pretty common in benefits cases to have

 9   income coming from both of those sources.

10   Q.   I want to talk to you a little bit about VA benefits.   What

11   are VA benefits?

12   A.   The type applicable in this case are compensation benefits.

13   Some people refer to them as disability benefits, but they

14   cover illnesses or injuries caused by or aggravated by active

15   duty service.

16   Q.   And so who's eligible to receive benefits from the VA?

17   A.   Any veteran who's discharged with anything other than

18   dishonorable is eligible to apply.

19   Q.   And what are the benefits based on?

20   A.   Compensation benefits are based on the disability claimed

21   and then the medical support of those injuries.

22   Q.   And is there an application that the veteran goes through

23   in order to obtain the VA benefits?

24   A.   Yes, sir.

25   Q.   And as part of that process, do people from the VA have the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.183

1    veteran fill out forms or ask the veteran questions to

2    determine physical conditions and things of that nature?

3    A.   Yes, sir.  It's done in a variety of ways.  Sometimes at

4    the VBA office, sometimes through other volunteer coordinators

5    that assist the veterans in getting their claims and supportive

6    material.

7    Q.   When you said you were assigned to the Bruce Hay

8    investigation -- and I'm sorry, what year was that?

9    A.   2012.

10   Q.   Did you determine that Mr. Hay had been receiving benefits

11   for several years prior to 2012?

12   A.   I believe his initial claim was in 2006.

13   Q.   And so you said the first thing you do is look at the file

14   from VA.  After you're looking at the file, reviewing the file,

15   gathering that type of information, what did you do in this

16   case?

17   A.   Well, in this case I observed the claim was for a wide

18   variety of issues including wrist fusion, conversion disorder,

19   post-head trauma, PTSD, irritable bowl syndrome.  It was a wide

20   variety of claims, the largest ones appeared to be something

21   called conversion disorder.

22   Q.   Did you, in reviewing the file, look at the things that

23   Mr. Hay said he could and could not do as part of this

24   conversion disorder?

25   A.   Yes, we do.  We focus mainly on that because we are not

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.184

1    doctors; we don't try to be doctors.  We look at the claims the

2    claimant says they can or can't do to establish the monetary

3    benefit.

4    Q.   And so once you have that information, what do you do?

5    A.   At that point we typically go to observe what the -- what

6    the claim made, if there's injuries to it, if there's an

7    allegation that somebody is doing something they claim they

8    can't do, we go see if they are in fact doing that.

9    Q.   And would you call that surveillance?

10   A.   Correct.

11   Q.   Now, prior to actually conducting surveillance in this

12   case, did you have occasion to speak to the primary care

13   physician for Bruce Hay?

14   A.   Yes.  The most recent document I believe I saw in his

15   claims file was spring of 2012, and it was letter by his

16   attending physician, Dr. Emmett McWoods, that supported his

17   claim for 100 percent disability.

18   Q.   So I don't want you to tell us what Dr. McWoods told you,

19   but you went to go talk to Dr. McWoods?

20   A.   I contacted him.

21   Q.   Before you conducted surveillance?

22   A.   Yes, telephonically.

23   Q.   You called him on the telephone.  Without telling us what

24   Dr. McWoods said, what was the purpose for you calling

25   Dr. McWoods?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.185

1  A.   I wanted to ensure I understood what the issue was, and I

2  wanted to understand exactly what Mr. Hay claimed he couldn't

3  or could do.

4  Q.   After you had that conversation with Dr. McWoods, is it

5  then that you conducted surveillance?

6  A.   Yes.  We checked the VA database of upcoming appointments

7  and confirmed Mr. Hay had an appointment on October 29th.

8  Q.   Of 2012?

9  A.   Yes, sir.

10  Q.   Before we get into actually what you observed when you

11  conducted the surveillance on October 29, 2012, I want to

12  generally discuss with you what surveillance means from your

13  perspective, what you do when you're conducting surveillance.

14  So walk us through how you conduct surveillance or how you

15  conducted surveillance back in 2012.

16  A.   Right.  Basically, I mean, in essence we're just trying to

17  observe someone acting naturally.  We try to do it in a covert

18  manner so they don't see us obviously.  We all act differently

19  when people are watching.  We try to just observe their daily

20  habits in a variety of scenarios.

21  Q.   So you said "covertly."  So is the person that you're

22  trying to surveil, do you try and make sure they don't know

23  they're being watched by a law enforcement officer?

24  A.   Correct.

25  Q.   How do you do that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.186

1    A.   We try to keep as much distance as practical.  That's one

2    of the things that we get trained on extensively in those

3    academies I discussed, is it might seem easy, but it really

4    isn't.  It depends on how observant the subject is, but

5    typically you're following them in a mixture of vehicle and on

6    foot, and when you can, you capture that via photography or

7    video.

8    Q.   In this case did you learn where Mr. Hay lived?

9    A.   Yes.

10   Q.   In what town?

11   A.   Osawatomie, Kansas.

12   Q.   That's in the District of Kansas?

13   A.   Yes, sir.

14   Q.   You said you learned that the defendant had an appointment

15   on October 29, 2012.  Where was that appointment at?

16   A.   The Community-Based Outpatient Center or CBOC.

17   Q.   That's commonly referred to as CBOC?

18   A.   Yes, sir.

19   Q.   Is that a VA --

20   A.   Yes, sir.

21   Q.   -- building?

22   A.   Smaller clinics, they distribute throughout the community

23   to save veterans from having to go all the way into bigger

24   cities for appointments.

25   Q.   VA has hospitals located in larger cities ; is that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.187

1   correct?

2   A.   Yes.

3   Q.   Such as Topeka or Leavenworth?

4   A.   Correct.

5   Q.   But there's also these CBOC facilities that are located in

6   more rural areas?

7   A.   Correct.

8   Q.   And so on October 29, 2012, after you learned that the

9   defendant had an appointment at the CBOC, what did you do?

10  A.   I solicited volunteers from the office of anybody that was

11  available to conduct surveillance.  Typically the more people

12  you have, the easier it is because you're not spotted as

13  easily.  We had a relatively small office, so three of us went

14  out to conduct surveillance.

15  Q.   I want to talk to you about the size of the VA-OIG.

16  Specifically back in 2012 or even today, is there, like, a

17  central location for VA-OIG?

18  A.   VA-OIG is spread out throughout the entire country.  Larger

19  cities typically have larger offices.  Our parent field office

20  at that time was Chicago, and we had satellite offices in the

21  region that were typically three to five agents.

22  Q.   The satellite office that would cover Osawatomie and that

23  part of the state would be located where?

24  A.   Kansas City, Missouri.

25  Q.   Kansas City, Missouri.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.188

1    A.   We cover four states out -- four states and occasionally

2    other assignments out of that office.

3    Q.   And so agents in the Kansas City office have four states.

4    What four states?

5    A.   Nebraska, Iowa, Kansas, and Missouri.  And occasionally

6    southern Illinois.

7    Q.   Agents from that office are responsible for the entire

8    District of Kansas?

9    A.   All VHA/VBA facilities, every case in those areas comes

10   down to our office.

11   Q.   October 29, 2012, you said there were you and how many

12   other agents involved in surveillance?

13   A.   Two other agents.

14   Q.   When you're conducting surveillance, what type of vehicle

15   -- do you show up in a van marked VA-OIG or something a little

16   more covert?

17   A.   Typically limited to using our assigned government vehicle.

18   Q.   Do you remember what kind of vehicle you had back in 2012?

19   A.   Yes, sir, I do.  It was a hybrid Hyundai Sonata.

20   Q.   Is that a passenger car?

21   A.   It is a very small vehicle and not typical in rural areas

22   in Kansas.

23   Q.   What do you mean by that and why would that be of interest

24   for you?

25   A.   The key in surveillance is fitting in, and when you are on

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.189

1    a gravel road in a rural area in Kansas, there's not a lot of

2    Hyundai Sonatas.  I grew up in a very rural area.  You

3    recognize people who aren't from there, vehicles that aren't

4    from there.  And it was a little more difficult to blend in,

5    not to mention navigate gravel roads.

6    Q.   You mentioned earlier that you would video record

7    surveillance?

8    A.   Yes, sir.

9    Q.   And explain for the jury how you did that in 2012.

10   A.   Our office had a still camera that could take poor quality

11   video and a Handycam of -- I don't remember which version of

12   the Sony Handycam, but a handheld video recorder and a pole for

13   stability.

14   Q.   And so agents who were recording surveillance would use the

15   Handycam?

16   A.   Yes, sir, if it was available.

17   Q.   So when you're out conducting surveillance, you're not

18   recording everything that you see?

19   A.   No, sir.

20   Q.   And so do you have to determine when to pick up the camera,

21   hit record, and how to do that?

22   A.   Yes, typically for anything that could potentially be

23   applicable to the investigation, but there's a limited amount

24   of space on the cameras.

25   Q.   Now, you learned that on that day, October 29, 2012, that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.190

1  the defendant had an appointment at the CBOC?

2  A.  Yes, sir.

3  Q.  And where was the CBOC at?

4  A.  Paola, Kansas.

5  Q.  And did you learn from the records that the defendant would

6  typically visit Dr. McWoods at the CBOC in Paola?

7  A.  Yes, sir.

8  Q.  And so knowing that, you decided to conduct surveillance

9  that day?

10  A.  Yes, sir.

11  Q.  Did you go directly to the CBOC or did you go someplace

12  else first?

13  A.  No, sir.  As I said, we try to get as much natural activity

14  as we can, so we went to Mr. Hay's residence prior to the

15  appointment and we observed the vehicle there that we knew

16  belonged to him, so we waited to see -- hoping he would leave

17  and we could just observe his actions before and after the

18  appointment.

19  Q.  And so you show up outside of his house?

20  A.  Yes.

21  Q.  How far away were you?

22  A.  We were in a parking lot across the street, maybe 100 yards

23  away.

24  Q.  And at some point did you see Bruce Hay come out of the

25  residence?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                     2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.191

1    A.   Yes.

2    Q.   And tell us what you saw.

3    A.   Mr. Hay came out carrying what looked to maybe be a walking

4    stick in his hand, walked over to the white Chevy truck that

5    records show belonged to him, opened the hood, had a jug of

6    what appeared to be anti-freeze, was doing something in the

7    engine with it, did that for a minute or so, slammed the hood,

8    put the anti-freeze back, took the cane, put it in the truck,

9    and got into the passenger side, was doing this without any

10   apparent difficulty.

11   Q.   Were you able to obtain any video footage of what you saw?

12   A.   Yes, sir, I did.

13        MR. OAKLEY:  Your Honor, may I approach?

14        THE COURT:  Yes.

15   BY MR. OAKLEY:

16   Q.   I'm going to hand you what's been marked as Government's

17   Exhibit 1.  Do you recognize that?

18   A.   Yes, sir, I do.

19   Q.   What is Government's Exhibit 1?

20   A.   It is video footage from our observation of Mr. Hay prior

21   to his appointment, initialled and dated by me.

22   Q.   So that's a computer disk that contains the footage you

23   took?

24   A.   Yes.

25   Q.   You said initialled by you.  Prior to court did you verify

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.192

1   that Government's Exhibit 1 contains the footage you took from

2   October 2012?

3   A.  Yes, sir.

4         MR. OAKLEY:  Your Honor, I offer Government's

5   Exhibit 1.

6         THE COURT:  Any objection?

7         MR. MAGARIEL:  No, Your Honor.

8         THE COURT:  Exhibit 1 admitted.

9   BY MR. OAKLEY:

10  Q.  And so, again, before we play Exhibit 1, this is -- in

11  order to take this footage, you or other agents would have to

12  use the Handycam?

13  A.  Right.

14  Q.  And so you were able to see things both before and after

15  using the Handycam that weren't captured on video; is that

16  correct?

17  A.  Yes, sir.

18  Q.  Now, we're talking about 2012, almost ten years ago.  How

19  were you able to remember what you saw back then?

20  A.  I remember certain cases pretty well, but reviewing my

21  reports and the video refresh my memory.

22  Q.  As part of your job you prepare reports related to what

23  you're doing, what you're seeing, those sort of things?

24  A.  Yes, sir, every day.

25  Q.  Do you prepare those reports when what you saw and what you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.193

1   observed is fresh in your mind?

2   A.   As soon as possible after the activity we write a status

3   report documenting what we saw, what we did, who was there.

4   Q.   So the video that's contained in Government's Exhibit 1 is

5   the first time that you saw Bruce Hay and this is prior to his

6   appointment on that day at the CBOC?

7   A.   Yes, sir.

8            MR. OAKLEY:   Your Honor, may we play Exhibit 1?

9            THE COURT:   Yes.

10           THE WITNESS:   I apologize for my lack of camera skills

11   at that point.   When he exited the residence, we recognized him

12   from the veteran ID photo and the driver's license photos that

13   we had pulled previously.   When --

14           MR. MAGARIEL:   Your Honor, there hasn't been a

15   question posed to this witness.   I object to his commentary.

16           MR. OAKLEY:   Let's watch, and I'll have some follow-up

17   questions.

18   BY MR. OAKLEY:

19   Q.   You see at the end of the video Bruce Hay getting into the

20   passenger side of that truck?

21   A.   Yes, sir.

22   Q.   Did the truck leave after that --

23   A.   Yes, it did.

24   Q.   -- video?

25       And who was driving the truck?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.194

1    A.    The subject we identified as his wife, Laurie.

2    Q.    Where did the truck go from the residence?

3    A.    At that point it -- we followed it through Osawatomie north

4    towards Paola.

5    Q.    And is that -- so the defendant went to a CBOC appointment

6    immediately following that video?

7    A.    No, sir.  He made a stop just prior to that at a title

8    company I believe it was.

9    Q.    Can we go back to the very first part of the video?  Go

10   ahead and pause.

11       So the first point, do you see Bruce Hay carrying items in

12   his left hand?

13   A.    Yes, what appears to be a walking stick and another object.

14   Q.    And then later in the video we see Bruce Hay putting, I

15   think you described as anti-freeze into the engine part of his

16   truck?

17   A.    It appeared to be, yes.

18   Q.    Does it appear he was carrying out the anti-freeze along

19   with the walking stick?

20   A.    Yes.

21   Q.    Now, I notice and I think you acknowledge that the video

22   can be shaky.  At one point you got a good view of his roof.

23   But explain for the jury what you're doing to record that and

24   then also if you have any other concerns while you're recording

25   that affects your ability to get footage that's not as shaky.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.195

1   A.   Right.   Partially blame two good-sized guys in a small

2   vehicle.   As well as trying not to stand out any more than we

3   already did by keeping it down and low.   If you remember the

4   old camcorders, you tilt the viewing screen.   Trying to keep

5   the viewing screen on a stability stick that didn't really

6   work, trained on him and focused to where we can really see his

7   activities, as well as identify his face.   Had a few challenges

8   in that scene in particular.

9   Q.   And so you're recording the video, but you're also trying

10  not to let the person recording see you're recording?

11  A.   We're looking around and trying to act natural.

12  Q.   You said that prior to his CBOC appointment you see the

13  defendant go to another business?

14  A.   Yes, sir.

15  Q.   And did you -- you saw that yourself with your own eyes?

16  Did you take any video footage of that?

17  A.   Yes, sir, we did.

18       MR. OAKLEY:   May I approach, Your Honor?

19       THE COURT:   Yes.

20  BY MR. OAKLEY:

21  Q.   I'm going to hand you what's been marked as Government's

22  Exhibit 2 and ask you if you recognize what Government's

23  Exhibit 2 is.

24  A.   Yes, sir.   It's a DVD containing video footage of his visit

25  prior to his doctor appointment, initialled and dated by me.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.196

1    Q.   This is the same day as the footage that we just saw?

2    A.   Yes, sir.

3              MR. OAKLEY:   Your Honor, I offer Government's

4    Exhibit 2.

5              THE COURT:   Any objection?

6              MR. MAGARIEL:   No, Your Honor.

7              THE COURT:   Exhibit 2 admitted.

8              MR. OAKLEY:   Could we publish Exhibit 2?

9              THE COURT:   Yes.

10   BY MR. OAKLEY:

11   Q.   In that video you see a building that has a sign, Landmark

12   Title Company.  Is that the building that the defendant is

13   walking out of?

14   A.   Yes, sir.

15   Q.   Do you know what the defendant was doing in that building?

16   A.   No idea, sir.

17   Q.   You saw him walking out?

18   A.   Right.

19   Q.   Can we replay the first part, please?

20        Again, it looks as though the defendant is carrying

21   something in his left hand.  Can you tell us what it is?

22   A.   It appears to be a walking stick and maybe some papers

23   along with it.

24   Q.   When you saw the defendant with the walking stick both at

25   the house and during your initial observation and coming out of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.197

1    the title company, can you tell whether or not he was relying

2    on the walking stick to aid him in walking?

3    A.    No, sir, it doesn't appear he's putting any weight on it

4    whatsoever, just carrying it.

5    Q.    Again, this is prior to the CBOC appointment?

6    A.    Yes, sir.

7    Q.    Did you follow the defendant from this location anywhere

8    else?

9    A.    We did.  He then proceeded to his appointment after this.

10   Q.    So he goes from the house to the title company to the CBOC

11   appointment?

12   A.    Yes.

13   Q.    And did you surveil him during that time?

14   A.    Yes, we did.

15   Q.    And were you able to take any video footage of the

16   defendant as he arrived at the CBOC appointment?

17   A.    Yes, we were.

18   Q.    I'm going to hand you what's been marked as Government's

19   Exhibit 3 and ask you if you recognize that.

20   A.    Yes, sir.

21   Q.    What is Government's Exhibit 3?

22   A.    A DVD containing footage of his arrival at his appointment,

23   initialled and dated by me.

24   Q.    Is that the video footage that you took when he arrived at

25   the CBOC on October 29, 2012?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.198

1    A.   Yes, sir, it was.

2         MR. OAKLEY:   Your Honor, I offer Government's

3    Exhibit 3.

4         THE COURT:   Any objection?

5         MR. MAGARIEL:   No, Your Honor.

6         THE COURT:   Government's Exhibit 3 admitted.  You can

7    publish.

8         MR. OAKLEY:   Thank you, Your Honor.

9         Can we go back to the beginning of the video?

10   BY MR. OAKLEY:

11   Q.   So do you -- it looks like there's some lines on this

12   video.  Can you see what I'm talking about?

13   A.   Yes, sir.

14   Q.   Do you know why that is?

15   A.   That appears to be the back window of Special Agent

16   Carmack's vehicle, defrost lines.

17   Q.   This video is being picked up through the back window?

18   A.   Yes, sir.

19   Q.   You said this was a CBOC appointment?

20   A.   Yes, sir.

21   Q.   Of the defendant with Dr. McWoods?

22   A.   Yes.

23   Q.   So this was not -- well, do you know whether or not this

24   was a benefits appointment or was this just a normal visit

25   between the defendant and his primary care physician?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.199

1   A.   At the CBOC it's just medical care.  So anything

2   benefit-related would happen -- shouldn't happen at this CBOC.

3   Q.   Could we scroll to the part where the defendant enters the

4   building.  And can we pause right there.

5        So looking at the front door of the building, it appears

6   that there's two -- drawing in the wrong place, but do you see

7   to the defendant's right there's a stand?

8   A.   Yes.

9   Q.   Can you tell from looking at that what that is?

10  A.   It appears to be an assisted entry handicap button which

11  matches the insignia on the door for "handicap."

12  Q.   Is that similar to what's at the courthouse where if you

13  push a button and the door will open?

14  A.   Yes, sir.

15  Q.   Can we go ahead and play.  Thank you.

16       So the defendant didn't utilize that, correct?

17  A.   No, he did not.

18  Q.   If you push at the bottom right hand of your screen, that

19  should remove -- yes, sir.

20  A.   The green button?

21  Q.   I think it just goes backwards.  For some reason my -- is

22  off.

23       Can you push your arrow, Special Agent White?  On the top

24  right where it said "clear," can you hit that clear?

25  A.   Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.200

1    Q.   Push it again.

2    A.   Didn't appear to do anything.  I'll try again.  There we

3    go.

4    Q.   And so you were able to observe the defendant and his wife

5    as they entered the CBOC appointment.  Did you or any of your

6    agents record the defendant while he was in his medical

7    appointment?

8    A.   No, sir.

9    Q.   However, did you see the defendant as he left that

10   appointment?

11   A.   Yes, sir, we did.

12   Q.   And were you able to capture video of the defendant leaving

13   his appointment on October 29, 2012 at the CBOC?

14   A.   Yes, we did.

15   Q.   Handing you what's been marked as Government's Exhibit 4.

16   Do you recognize Government's Exhibit 4?

17   A.   Yes, sir.  It's a DVD containing footage of Mr. Hay leaving

18   his appointment, initialled and dated by me.

19   Q.   Does that video footage -- taken that same day?

20   A.   Yes, sir, it was.

21           MR. OAKLEY:  Your Honor, I offer Government's

22   Exhibit 4.

23           THE COURT:  Any objection?

24           MR. MAGARIEL:  No, Your Honor.

25           THE COURT:  Four admitted.  You may publish.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.201

1    BY MR. OAKLEY:

2    Q.   Now, the portion of the video that you recorded of the

3    defendant leaving was different from him entering, in that you

4    didn't see him walking.  You just picked him up as he was

5    getting to the truck?

6    A.   Right.  Due to our vantage point, other vehicles, the trees

7    in the way, we weren't able to get as clear as we did on the

8    initial.

9    Q.   What you're able to capture on video was dictated by what

10   was going on and the need to maintain covert surveillance?

11   A.   Yes, sir.

12   Q.   Do you recall where the defendant and his wife went after

13   leaving the CBOC appointment?

14   A.   I believe he proceeded to Miami County Administration

15   Building, also in Paola, Kansas.

16   Q.   Miami County.  That's in Paola?

17   A.   Yes.

18   Q.   It was the Miami County Administration Building?

19   A.   Yes, sir.

20   Q.   This is a public county government building; is that

21   correct?

22   A.   Correct.

23   Q.   And were you able to observe him as he entered that

24   building?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.202

1    Q.   Were you able to obtain video of the defendant entering

2    that building?

3    A.   Yes, we were.

4    Q.   I'm going to hand you what's been marked as Government's

5    Exhibit 5.   What is Government's Exhibit 5?

6    A.   It is video footage of Mr. Hay leaving the Miami County

7    Administration Building, initialled and dated by me from the

8    same day.

9    Q.   So this is the defendant leaving that building?

10   A.   Yes.

11   Q.   And so in order for you to get the footage -- so you were

12   at the CBOC facility.  Did you have to then drive to the Miami

13   County building?

14   A.   Yes.  So we typically pass observation to other people

15   assisting, so if we're the ones that are closest to them and

16   potentially being watched, we stay back and let the other car

17   follow so they're not seeing the same vehicle over and over

18   again.

19   Q.   I think you said there were four agents involved in the

20   surveillance?

21   A.   Yes, sir.

22   Q.   Does that mean there were four cars?

23   A.   I believe we had two agents in each vehicle, so two

24   vehicles.

25   Q.   So do each of the cars or each of the agents have radios

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.203

1   they can communicate with each other?

2   A.  Yes.

3   Q.  And you had mentioned earlier that a part of the covert

4   surveillance is not getting observed.  Is part of that you need

5   to maintain distance between the person you're surveilling and

6   not always be right on the person?

7   A.  Yes, sir.

8        MR. OAKLEY:  I think I had you identify Government's

9   Exhibit 5, but I have not offered it.

10       Your Honor, I offer Government's Exhibit 5.

11       THE COURT:  Any objection?

12       MR. MAGARIEL:  No, Your Honor.

13       THE COURT:  Exhibit 5 admitted.  You can publish.

14  BY MR. OAKLEY:

15  Q.  So, again, this was taken outside the Miami County

16  Administration Building?

17  A.  Yes, sir.

18  Q.  Is that the last time that you saw the defendant on

19  October 29, 2012?

20  A.  No, sir.  We continued the surveillance.

21  Q.  Tell us what you next saw.

22  A.  At that point, again, we switched off to the other vehicle,

23  and he -- it appeared they were heading back to Osawatomie.

24  Q.  You said "they" were heading.  Who do you mean?

25  A.  The vehicle driven by Laurie Hay, and Bruce Hay in the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.204

1    passenger seat.

2    Q.   And so did you go to Osawatomie?

3    A.   We -- one of the other surveillance teams told us on the

4    radio after, again, like we said, backing off of him for a bit,

5    that his vehicle was headed west --

6            MR. MAGARIEL:   Objection; hearsay.

7            THE COURT:   Sustained.

8    BY MR. OAKLEY:

9    Q.   What did you do?

10   A.   I backed off and let the other vehicle take primary on the

11   surveillance.

12   Q.   At some point that day did you have -- did you observe the

13   defendant later?

14   A.   Yes, sir, we did.

15   Q.   Where were you at when that happened?

16   A.   We were west of Osawatomie.

17   Q.   Where at?

18   A.   Off of 379th Street.  I believe it was between Perssonville

19   and Pleasant Valley Road.

20   Q.   And what did you see?

21   A.   As we were navigating the gravel road with a hill and came

22   over the top of the hill, I saw the same vehicle that we had

23   been following, Mr. Hay's truck, down in a grassy ditch in a

24   pasture and Mr. Hay pushing a large bale of hay into the bed of

25   the vehicle, hopping on the bed of the vehicle, and then as he

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.205

1  did so, the truck started driving across the grass down through

2  the ditch and back up on the road.

3  Q.   Where were you at when you saw the defendant pushing the

4  hay bale?

5  A.   Just cresting the hill.

6  Q.   So how far were you away from the defendant when you saw

7  him pushing the hay bale?

8  A.   Under 50 yards probably.

9  Q.   Were you able to obtain any video footage of what you saw?

10  A.   I got the camera up and on as quickly as I could.

11  Q.   I'm going to hand you what's been marked as Government's

12  Exhibit 6.   What is Government's Exhibit 6?

13  A.   That is a DVD containing video footage of Mr. Hay in a

14  truck bed with a hay bale, dated and signed by me from the same

15  day.

16  Q.   And is -- that disk contain the footage that you saw after

17  you saw the defendant put the hay bale up?

18  A.   Yes.  So he had thrown it in the truck and jumped up, and

19  that's when I was able to get the camera up and on and capture

20  a brief glimpse of him driving the truck down the ditch.

21           MR. OAKLEY:  Your Honor, I offer Exhibit 6.

22           THE COURT:  Any objection?

23           MR. MAGARIEL:  No objection.

24           THE COURT:  Exhibit 6 admitted.  You can publish.

25  BY MR. OAKLEY:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.206

1   Q.   Obviously that's a short video, correct?

2   A.   Correct.

3   Q.   Can we go to the beginning, hit play, and pause it

4   immediately.  Can we pause?

5        And so you described the defendant lifting up a bale of hay

6   and putting it into the bed of the pickup truck.  Is that the

7   pickup truck you saw the defendant putting a bale of hay into?

8   A.   Yes, it is.

9   Q.   After you saw that, him lift it up, is that when you picked

10  up your camcorder to record it?

11  A.   That's right when I hit record and tried to get as much as

12  we could of it.

13  Q.   Can we go ahead and hit play, please.  Can you hit pause.

14       At some point in the video do you see the defendant look at

15  a direction --

16  A.   Just prior to where it is now it appeared he was staring

17  right at our vehicle as we were going over the road.

18  Q.   Did that cause you any concern?

19  A.   Yes.

20  Q.   After you saw that, what did you do?

21  A.   We continued past, put the camera down, and just passed his

22  truck, passed the residence, kept driving.

23  Q.   And so you explained why you have the first part of the

24  footage?

25  A.   Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.207

1    Q.   And the reason why it is you didn't capture on is why?

2    What concern did you have that made you keep going?

3    A.   Him seeing us holding a camera up watching him, so we just

4    wanted to look like we were lost or whatever else and leave the

5    area as quickly as we could.

6    Q.   And so is what you were able to observe that day better

7    than the video that we played?

8    A.   Yes.

9    Q.   Why?

10   A.   The part that I wasn't able to capture included him pushing

11   the bale up and him jumping up, and the bale -- I've thrown a

12   few hay bales, and they're considerably heavy.

13   Q.   We've been talking about Bruce Hay.  Was it Bruce Hay that

14   you saw push the hay bale up and riding in that truck?

15   A.   Yes, sir, it was.

16   Q.   And the person that we've been talking about as Bruce Hay,

17   do you see that person in the courtroom here today?

18   A.   Yes, sir, I do.

19   Q.   And could you please identify that person, describe where

20   he's seated, and tell us what he's wearing?

21   A.   He's seated at the far right of that table with the purple

22   shirt.

23        MR. OAKLEY:  Your Honor, I ask the record reflect that

24   the witness has identified the defendant.

25        THE COURT:  The record will so reflect.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.208

1    BY MR. OAKLEY:

2    Q.    You had mentioned having a phone conversation with

3    Dr. McWoods prior to your surveillance --

4    A.    Yes, sir.

5    Q.    -- on October 29th.  After you conducted surveillance on

6    October 29th and obtained this video, did you have any other

7    contact with Dr. Emmett McWoods?

8    A.    Yes, sir.  I actually went to the CBOC and contacted him

9    personally.

10   Q.    The first contact was by phone.  The second contact you

11   actually went to Dr. McWoods' office at the CBOC?

12   A.    Yes.

13   Q.    And were you able to talk to Dr. McWoods?

14   A.    Yes, sir.  We waited until he had time between appointments

15   and talked to him directly.

16   Q.    Now, I don't want you to tell us anything that Dr. McWoods

17   told you during this conversation, but during this conversation

18   did you show him anything?

19   A.    Yes, sir.  I showed him the video directly from the

20   camcorder that we just seen today.

21   Q.    And so the exhibits that we just admitted into evidence,

22   that's the video that you showed Dr. McWoods?

23   A.    Yes, sir.

24   Q.    Again, I don't want to know what Dr. Woods said, but do you

25   remember how he appeared to you after you showed him the video?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.209

1    A.    Frustrated, irritated.

2    Q.    After your surveillance of the defendant on October 29,

3    2012, did you have occasion to conduct further surveillance of

4    him?

5    A.    Yes, sir, we did.   Special Agent Carmack advised of another

6    doctor appointment this time for Social Security benefits.

7    Q.    Special Agent Carmack, do you know his first name?

8    A.    Jim Carmack.

9    Q.    Do you know how he was employed at the time?

10   A.    He had been with the KBI, was assigned to a task force of

11   sorts with us with Social Security Administration.

12   Q.    And so you and Special Agent Carmack were both involved in

13   surveillance on November 19, 2012?

14   A.    Yes, sir.

15   Q.    And do you know, at that date did the defendant have an

16   evaluation at Social Security Administration?

17   A.    Yes.

18   Q.    And were you able to conduct surveillance both at the

19   defendant's residence and then also as he entered the Social

20   Security Administration building?

21   A.    Yes.   We actually missed him coming out of his residence,

22   picked him up on the road, but we did capture footage of him

23   prior to and after the appointment.

24   Q.    You weren't able to obtain video footage of him leaving.

25   Were you present when he left that day or did you end up

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.210

1    picking him up someplace else?

2    A.   We actually spotted his vehicle in town.  We were hoping to

3    do the same thing, get to his house, see him operating

4    naturally, and they had left early and went by us.

5    Q.   So you don't have footage of the defendant walking out; you

6    didn't even see the defendant leave that day?

7    A.   Correct.

8    Q.   Okay.  Were you able to see the defendant after the Social

9    Security Administration appointment?

10   A.   Yes, we were.

11   Q.   And after the appointment were you able to obtain video of

12   the defendant?

13   A.   Yes, sir.

14   Q.   And so after you got video, did you get video of him

15   arriving at the Social Security appointment?

16   A.   Yes.

17   Q.   I'm going to hand you what's been marked as Government's

18   Exhibit 8.  Can you tell us what that is?

19   A.   Yes, sir.  It's a DVD containing video footage of Mr. Hay

20   arriving at his Social Security evaluation, initialled and

21   dated by me, taken November 19, 2012.

22   Q.   Okay.  And...

23        MR. OAKLEY:  Your Honor, I offer Government's

24   Exhibit 8.

25        THE COURT:  Any objection?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.211

1          MR. MAGARIEL:  No, Your Honor.

2          THE COURT:  Exhibit 8 admitted.  You can publish.

3          MR. OAKLEY:  Will you pause real quick?

4   BY MR. OAKLEY:

5   Q.   Do you recognize that building?

6   A.   Yes, sir.

7   Q.   And so what are we seeing?  What's the building?

8   A.   It was like a strip mall setup that had a doctor's office

9   in it at 511 North Mur-Len in Olathe, Kansas.

10  Q.   So this appointment was in Olathe?

11  A.   Yes, sir.

12  Q.   Go ahead, please.

13       Is this the same white truck we saw in the October video?

14  A.   Yes, sir, it is.

15  Q.   Do you know who was driving that day?

16  A.   Again, it was driven by his spouse, Laurie Hay.

17  Q.   Was the defendant arriving for a medical appointment

18  related to Social Security benefits?

19  A.   Yes, sir.

20  Q.   And so did you or other agents record what happened inside

21  that medical appointment?

22  A.   No, sir, we did not.

23  Q.   And, again, did you record this similar to what you did

24  previously with the handheld Handycam and you were set up

25  someplace in order to --

1    A.    Correct.  When they pulled in, we tried to find a vantage

2    point where we can see them and hopefully not be seen but get a

3    clear picture of their movements.

4    Q.    And were you able to -- in addition to the video, were you

5    able to see the defendant that day?

6    A.    Yes.

7    Q.    And did it appear that he needed assistance getting out of

8    the truck?

9    A.    Yes.

10   Q.    And did it appear that he needed assistance actually

11   walking up to the stairs?

12   A.    Yes.  He was wobbling and bobbing his head and assisted

13   greatly by his wife.

14   Q.    Did you or other agents conduct surveillance as the

15   defendant left that appointment that day?

16   A.    Yes, sir, we did.

17   Q.    I'm going to hand you what's been marked as Government's

18   Exhibit 9.  Do you recognize that?

19   A.    Yes, sir.

20   Q.    What is Government's Exhibit 9?

21   A.    It is a DVD containing footage of Mr. Hay leaving that

22   evaluation on the 19th, initialled and dated by me.

23          MR. OAKLEY:  Your Honor, I offer Government's

24   Exhibit 9.

25          THE COURT:  Any objection?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.213

1        MR. MAGARIEL:  No, Your Honor.

2        THE COURT:  Exhibit 9 admitted.  You can publish.

3   BY MR. OAKLEY:

4   Q.   Special Agent White, I think you mentioned that you were

5   with other agents on this particular date, including Special

6   Agent Carmack?

7   A.   Yes, sir.

8   Q.   Were there any other agents that were conducting

9   surveillance as well?

10  A.   Special Agent Chris Tauai and Special Agent Kerry Baker.

11  Q.   Do you know if other agents were able to obtain video

12  footage of the defendant and his wife leaving the -- that

13  building?

14  A.   Yes, sir, they were.

15  Q.   And I'm going to hand you what's been marked as Exhibit 10.

16  And what is Government's Exhibit 10?

17  A.   A disk containing video footage of Mr. Hay leaving that

18  same evaluation on November 19th, initialled and dated by me.

19  Q.   And so was that -- that footage was taken at the same time?

20  A.   Yes, sir, by the other vehicle.

21  Q.   And is it just a different perspective?

22  A.   Slightly different vantage point, correct.

23        MR. OAKLEY:  Your Honor, I offer Exhibit 10.

24        THE COURT:  Any objection?

25        MR. MAGARIEL:  No, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.214

1        THE COURT:  Exhibit 10 admitted.  You can publish.

2    BY MR. OAKLEY:

3    Q.   When you observed the defendant both going into that

4    appointment and then leaving, did he need assistance during

5    certain things?

6    A.   Yes, sir.  He appeared very unsteady on his feet, head was

7    bobbing, his arms were moving, leaning heavily on the cane, his

8    wife was providing assistance up and down the stairs.  It looks

9    like he nearly fell at the bumper of his truck.

10   Q.   And the defendant's wife was driving that day?

11   A.   Yes, sir.

12   Q.   Do you know where the defendant and his wife went after

13   leaving that appointment?

14   A.   Several blocks away.  Approximately five minutes later they

15   pulled into Alpha Pawn.

16   Q.   Is Alpha Pawn a pawnshop?

17   A.   Yes, sir.

18   Q.   And so how long after that video that we just saw did you

19   see the defendant and his wife at the pawnshop?

20   A.   I would say five minutes or less.

21   Q.   And were you able to capture any footage of the defendant

22   and his wife at the pawnshop?

23   A.   Yes, sir, we did.

24   Q.   I'm going to hand you what's been marked as Government's

25   Exhibit 11.  Do you recognize that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.215

1   A.   Yes, sir.  It's a DVD containing video footage of Mr. Hay

2   at the pawnshop immediately after the evaluation on

3   November 19th, initialled and dated by me.

4             MR. OAKLEY:  Your Honor, I offer Government's

5   Exhibit 11.

6             THE COURT:  Any objection?

7             MR. MAGARIEL:  No, Your Honor.

8             THE COURT:  Government's Exhibit 11 admitted.  You can

9   publish.

10  BY MR. OAKLEY:

11  Q.   This is five minutes after the video we just saw?

12  A.   Approximately, yes, sir.

13  Q.   If we can back up to the beginning, I have a couple

14  questions I want to ask you about this video.  First of all, if

15  we can pause right there.

16       It's video of the defendant coming out of the pawnshop; is

17  that correct?

18  A.   Correct.  By the time the vehicle that's shooting this

19  video got in position, he had already gone inside.

20  Q.   And the defendant appears to have something in his left

21  hand.  Could you tell what it was when you saw him?

22  A.   It appears to be a walking stick he's carrying.

23  Q.   In this video there's a white piece of paper or cardboard

24  that appears to be between the two trucks?

25  A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.216

1   Q.   Is that actually in the median and -- perhaps if we could

2   play it again.

3   A.   It looks like a sign that -- I'm not sure if you want me

4   touching the screen again, but it looks like a sign or a flag

5   that's anchored down there.

6   Q.   And so that wouldn't be between the two trucks that would

7   have obstructed the defendant's path in this?

8   A.   No.  It appears to be on the near side of the parking lot.

9   Q.   It's between the camera and the trucks?

10  A.   Yes, sir.

11  Q.   Do you recognize the white truck on the left?

12  A.   Yes.

13  Q.   And whose truck was that?

14  A.   That was Mr. Hay's vehicle.

15  Q.   Do you recognize the red --

16  A.   No.

17  Q.   -- truck on the right?

18  A.   No, sir.

19  Q.   This is a parking lot for the pawnshop?

20  A.   Yes.

21  Q.   When the defendant came out, he had to walk in between that

22  red truck and his truck?

23  A.   Yes, sir.  He had to blade his body to get between the

24  mirrors, it looks like.

25  Q.   Can we go ahead and play.  You can pause.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.217

1      Do you know how close those trucks were together?

2   A.   They were -- like, the mirrors themselves were within a

3   foot and a half maybe.

4   Q.   When the defendant -- can we continue playing?  And if you

5   could pause.  I keep asking you to pause when the car is

6   passing.

7      Does it appear that the defendant is having a conversation

8   with someone?

9   A.   Yes.

10  Q.   And do you know who that someone was?

11  A.   His spouse, Laurie Hay, driving the vehicle.

12  Q.   Did you ever see the defendant's wife get out of the truck

13  at the pawnshop?

14  A.   No, sir.

15  Q.   So did anyone assist the defendant getting out of the truck

16  at the pawnshop?

17  A.   No.

18  Q.   Did anyone help the defendant walk from the parking lot to

19  the front door of the pawnshop?

20  A.   No, sir.

21  Q.   Did you see anyone help the defendant as he came out of the

22  pawnshop?

23  A.   No, they didn't.

24  Q.   Did anyone help the defendant as he maneuvered between the

25  red truck and the white truck?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.218

1   A.   No, they didn't.

2   Q.   Did you obtain another video of the defendant at the

3   pawnshop?

4   A.   Yes, sir, we did.

5   Q.   I'm going to hand you what's been marked as Government's

6   Exhibit 12.  Do you recognize that?

7   A.   Yes, sir.  It's a DVD containing video footage of Mr. Hay

8   leaving the pawnshop immediately after his SSI appointment on

9   November 19th, initialled and dated by me.

10  Q.   Was this taken just after that video we just saw?

11  A.   Yes.  He was inside for several minutes where we could see

12  him somewhat through the glass, but we just waited for him to

13  come out again to get additional activity.

14          MR. OAKLEY:  Your Honor, I offer Government's

15  Exhibit 12.

16          THE COURT:  Any objection?

17          MR. MAGARIEL:  No, Your Honor.

18          THE COURT:  Exhibit 12 admitted.  You can publish.

19  BY MR. OAKLEY:

20  Q.   So if we could go back to the beginning.

21      You said the defendant was in the pawnshop for a few

22  minutes.  If we can pause.

23      So when he comes out, did that red truck leave the parking

24  lot?

25  A.   Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.219

1  Q.  And the defendant appears to be carrying something in his

2  right hand.  Can you tell what that is?

3  A.  We guessed -- to me it looks like one of those plastic

4  power tool boxes.

5  Q.  It appears he's carrying something in his left hand.  Had

6  you seen that item in his left hand before?

7  A.  It appears to be the walking stick he's carried.

8  Q.  Can we go ahead and play.  If we could pause.

9      With the video we saw from SSA, we saw the defendant

10  entering and leaving that appointment.  Describe how the

11  defendant walked based on what you saw.

12          MR. MAGARIEL:  Objection, Your Honor.  The jury can

13  see the video.

14          THE COURT:  Overruled.

15          THE WITNESS:  Our observation was the defendant was

16  leaning heavily on the cane, shuffling his feet, apparently

17  having difficulty walking.  His head was making slight bobbing

18  movements, and it appeared that he needed assistance to walk.

19  BY MR. OAKLEY:

20  Q.  Was that different than what you saw at the pawnshop?

21  A.  Yes, sir, it was very different than what we observed.

22  Q.  Why do you say that?

23  A.  He is carrying the cane or the walking stick.  When it does

24  touch the ground, it just taps off the ground.  He's carrying

25  other objects in his hand.  He's not assisted.  He's navigating

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.220

1    between vehicles, in and out of doors, taking his jacket off

2    without any apparent difficulty.

3    Q.   I talked to you on the previous video, I asked you if he

4    needed assistance getting out of the truck or getting into the

5    building.  When you saw him come out of the building the second

6    time carrying the red item, did he need any assistance carrying

7    the red item?

8    A.   No, sir, he did not.

9    Q.   Did he need any assistance exiting the door to the

10   pawnshop?

11   A.   No, sir.

12   Q.   Did he need any assistance opening the truck door?

13   A.   No.

14   Q.   And you mentioned, and I think at this point in the video,

15   if we could play, he takes his jacket off?

16   A.   Correct.

17   Q.   He was able to do that by himself?

18   A.   Yes, sir.

19   Q.   Thank you.  After the defendant left the pawnshop, do you

20   know where his wife drove him to?

21   A.   They then stopped at TransAm Trucking in Olathe as well.

22   Q.   How far if you know -- well, how many minutes after the

23   pawnshop did you see the defendant at TransAm Trucking?

24   A.   That was, again, a matter of 5 to 10 minutes.  I don't

25   recall accurately.  It was nearby.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.221

1   Q.   Were you able to obtain any video --

2   A.   Yes, sir.

3   Q.   -- of the defendant at that business, the TransAm Trucking?

4   A.   Yes, sir, we were, although due to the distance, it wasn't

5   great video.

6   Q.   I'm going to hand you what's been marked as Government's

7   Exhibit 13.  Do you recognize that?

8   A.   Yes, sir.  It's a DVD containing video footage of Mr. Hay

9   at TransAm on November 19th, initialled and dated by me.

10  Q.   Do you know what the defendant was doing at that business,

11  TransAm Trucking?

12  A.   No, sir.

13  Q.   But you were able to capture the video surveillance of him.

14  Was he outside at some point of that business?

15  A.   It appeared he stood in the parking lot and talked to

16  another individual for several minutes.

17         MR. OAKLEY:  Your Honor, I offer Government's

18  Exhibit 13.

19         THE COURT:  Any objection?

20         MR. MAGARIEL:  No, Your Honor.

21         THE COURT:  Exhibit 13 admitted.  You can publish.

22  BY MR. OAKLEY:

23  Q.   Do you know in this video which -- can you hit pause.

24       There appears to be two people.  Do you know which is the

25  defendant?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.222

1    A.   I believe he's the one on the left.

2    Q.   You mentioned that you're a ways away.  Do you remember how

3    far you are away?

4    A.   If you look at an aerial shot of that parking lot, it's

5    gigantic.  It's got a lot of semis off to one side and the

6    parking lot is huge, and we were at the far end of that.  The

7    camera was zoomed in to the max, which is why it's shaking so

8    badly.

9    Q.   Were you able to hear anything that was being said?

10   A.   No, sir, not at all.

11   Q.   Go ahead and hit play.

12        Again, you took that the same day as the SSA video and the

13   pawnshop video?

14   A.   Yes, sir.

15   Q.   Do you know where the defendant and his wife went after

16   leaving that business?

17   A.   I believe at that point they went back to Osawatomie, and

18   then he was seen going to another building nearby his home that

19   I believe was his daughter's or she was staying there.

20   Q.   And so did you conduct surveillance or continue

21   surveillance at the defendant's home that same day,

22   November 19, 2012?

23   A.   Yes.

24   Q.   And I'm going to hand you what's been marked as

25   Government's Exhibit 14.  Do you recognize that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.223

1    A.   Yes, sir.  It's a DVD containing video footage taken at

2    Mr. Hay's residence on November 19th after his evaluation,

3    initialled and dated by me.

4         MR. OAKLEY:  Your Honor, I offer Government's

5    Exhibit 14.

6         THE COURT:  Any objection?

7         MR. MAGARIEL:  No, Your Honor.

8         THE COURT:  Exhibit 14 admitted.  You can publish.

9    BY MR. OAKLEY:

10   Q.   We can back up to the beginning.

11        At the pawnshop you said you saw the defendant take off

12   his -- go ahead and play it.

13        You saw the defendant take off a jacket or an over-shirt or

14   something like that?

15   A.   Yes, sir.

16   Q.   Is that true?

17   A.   Like a long sleeve flannel insulated jacket.

18   Q.   If we can pause right here.

19        When the defendant got out of the truck, did he need

20   assistance?

21   A.   No, sir, he did not.

22   Q.   Did it appear he had something in his left hand?

23   A.   He was carrying the same walking stick.

24   Q.   He gets into the back of the pickup truck -- backseat of

25   that pickup truck?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.224

1   A.   Yes.

2   Q.   It appears he grabs something.  Can you tell us what it

3   appears he was grabbing?

4   A.   It looks like he grabs a jacket that he took off, throws it

5   over the same arm that's carrying the walking stick, and closes

6   the door.

7   Q.   You can pause.

8        As the defendant is doing that, you said he had a walking

9   stick in his hand.  Did you see him use it at all to help

10  stable himself as he was performing that physical function?

11  A.   No, sir, not at all.

12  Q.   Go ahead and play, please.  If we could pause right here.

13       The defendant appears to be stepping on something.  Can you

14  tell what it is?

15  A.   It looks like he's stepping onto the front steps of his

16  residence while carrying the walking stick.

17  Q.   And so in order for the defendant to get into his

18  residence, he had to go up the stairs?

19  A.   Yes.

20  Q.   Did it appear the defendant was using his walking stick to

21  get up the stairs?

22  A.   No, sir.

23  Q.   Do you remember back in the Social Security appointment

24  where the defendant had to get up a set of stairs and come down

25  the set of stairs on his way out?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.225

1   A.   Yes, sir.

2   Q.   Do you recall the defendant needing assistance by his wife?

3   A.   Yes.  He utilized the walking stick heavily, put a lot of

4   weight on it, and needed assistance.

5   Q.   During your surveillance of the defendant at his house, did

6   you ever see the defendant need assistance getting up the

7   stairs at his house?

8   A.   No, sir.

9   Q.   Go ahead and play.  It appears the defendant goes up to the

10  door.  Does it appear he tries to enter the house?

11  A.   Yes.  Again, he takes his jacket and walking stick, holding

12  it off the ground, had his left hand, tries the lock, and

13  apparently it's locked.

14  Q.   Does it appear he waits for his wife to unlock the door?

15  A.   Yes, sir.

16  Q.   But other than having her unlock the door, did it appear

17  the defendant needed assistance to get into the house?

18  A.   No, sir, it did not.

19  Q.   And so during the video that we just saw, the defendant's

20  wife drove; is that true?

21  A.   Yes, sir.

22  Q.   At some point that day did you see the defendant driving

23  that same truck?

24  A.   Yes.

25  Q.   I want to hand you what's been marked as Government's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.226

1   Exhibit 15.  Do you recognize that?

2   A.   Yes, sir.  This is a DVD containing video footage of

3   Mr. Hay operating his vehicle on November 19th after the

4   evaluation, initialled and dated by me.

5          MR. OAKLEY:  Your Honor, I offer Government's

6   Exhibit 15.

7          THE COURT:  Any objection?

8          MR. MAGARIEL:  No, Your Honor.

9          THE COURT:  Exhibit 15 admitted.  You can publish.

10  BY MR. OAKLEY:

11  Q.   Again, this is that same day we've been looking at with the

12  Social Security appointment and the pawnshop and the TransAm?

13  A.   Yes.

14  Q.   And the defendant drives away.  Was there anyone else in

15  the truck with him?

16  A.   No, sir, there was not.

17  Q.   Do you know where he went?

18  A.   I believe that's when he went to the house nearby or back

19  out to his dad's farm.  He had several residences that were

20  associated with his name in Osawatomie, one that, again, I

21  believe a daughter was staying at and then his father lived out

22  just west of town.

23  Q.   Were you able to capture surveillance later that day of him

24  leaving the residence?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.227

1  Q.  I'm going to hand you what's been marked as Government's

2  Exhibit 16.  Do you recognize that?

3  A.  Yep.  That's -- this is a DVD containing the video footage

4  of leaving the house in his neighborhood on the same date,

5  November 19th, initialled and dated by me.

6  Q.  And so we've been viewing these videos in a chronological

7  order the same way that they happened?

8  A.  Yes.

9       MR. OAKLEY:  Your Honor, I offer Government's

10 Exhibit 16.

11      THE COURT:  Any objection?

12      MR. MAGARIEL:  No, Your Honor.

13      THE COURT:  Exhibit 16 admitted.  You can publish.

14 BY MR. OAKLEY:

15 Q.  So, again, he got into that same pickup truck?

16 A.  Yes.

17 Q.  The video doesn't show it, but does he drive away?

18 A.  Yes.

19 Q.  Did it appear that he had the cane with him, if we can go

20 back to the beginning?

21 A.  He may be carrying it in his left hand again off the

22 ground.

23 Q.  Again, other than having the cane, did you observe any

24 difficulty walking like he did at the Social Security

25 appointment?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.228

1   A.   No, sir, drastically different gaits.

2   Q.   And so that was all on November 19th of 2012.  Did you also

3   conduct surveillance of the defendant on November 28th of 2012?

4   A.   Yes, sir, we did.

5   Q.   And tell us about that.  Where did you go?

6   A.   Special Agent Carmack suggested we try getting, at this

7   point, a closer contact so we could get better footage, again,

8   of his movements, of his normal body movements.

9   Q.   When you say his movements, who are you referring to?

10  A.   Mr. Hay.

11  Q.   And so Special Agent Carmack suggested that you get the

12  footage.  So did you attempt to get more footage?

13  A.   Yes, sir.  We contacted Mr. Hay out at his father's

14  residence.

15  Q.   When you say we contacted Mr. Hay, whom?

16  A.   Special Agent Carmack and I, as well as Detective Tim Brown

17  from the Miami County Sheriffs Department.

18  Q.   That was on November 28, 2012?

19  A.   Yes, sir.

20  Q.   Did you or other law enforcement agents -- let me back up.

21  Did you actually have contact or did either you -- strike that.

22      Did either you or other law enforcement agents actually

23  have contact with the defendant on that date, November 28th?

24  A.   Yes, sir.

25  Q.   Now, did you or other law enforcement agents tell the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.229

1   defendant, hey, we're VA-OIG and we're here to investigate VA

2   benefits?

3   A.   No, sir, we did not.

4   Q.   What did you all do?

5   A.   Special Agent Carmack had printed out some pictures of deer

6   carcasses from the Internet, and they were simply shown to

7   Mr. Hay and asked if he had any information about deer being

8   poached in the area.

9   Q.   So you knew that the defendant lived in the house that we

10  saw in Osawatomie, and then you also saw him with the hay --

11  A.   Correct.

12  Q.   -- as he lifted it up?

13       Did you know that he was in a rural area?

14  A.   Yes.

15  Q.   And did you know that he was also -- either him or his

16  family had some farm ground?

17  A.   Correct.  My online research had shown a significant amount

18  of acreage that had he and his father's name associated with

19  it.

20  Q.   And so this contact, you said Special Agent Carmack printed

21  off just some photographs of dead deer?

22  A.   Correct.

23  Q.   And so the conversation was about dead deer and alleged

24  poaching around the area?

25  A.   Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.230

1   Q.   Were you asking Mr. Hay whether he had any information

2   about the deer and that sort of thing?

3   A.   Yes.

4   Q.   And so who all -- other than you and Special Agent Carmack,

5   were there other people that were out there at this time on

6   November 28, 2012?

7   A.   Special Agent Carmack and Detective Brown made contact at

8   the residence while I sat back trying to get video from my

9   vantage point of the exchange.

10  Q.   You said they contacted at the residence?

11  A.   I'm sorry.  They initially -- at his father Abraham's

12  residence.  Abraham was home and said that Bruce was down the

13  street --

14          MR. MAGARIEL:  Objection; hearsay.

15          THE COURT:  Right.  I'll sustain and ask the jury to

16  disregard the statement about what Mr. Hay's father said.

17  BY MR. OAKLEY:

18  Q.   You said Abraham.  That's Mr. Hay's father?

19  A.   Yes, sir.

20  Q.   So the initial contact was with Mr. Hay's father?

21  A.   Yes, sir.

22  Q.   And then following that initial contact, did you or other

23  agents actually have an opportunity to speak with Bruce Hay,

24  the defendant?

25  A.   Yes, sir.  Several minutes later Mr. Hay appeared.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.231

1    Q.   Where did that conversation take place initially?

2    A.   Took place in the yard of Abraham Hay's residence.

3    Q.   We're talking about residence.  We're not talking about the

4    defendant's residence we've been seeing; we've been talking

5    about the defendant's father's residence?

6    A.   Correct, the one out in rural -- the farmhouse.

7    Q.   How far from the defendant's residence was that?

8    A.   Three to five miles, just outside of town.

9    Q.   And you said that Special Agent Carmack, and I think you

10   said Detective Brown?

11   A.   Yes, sir.

12   Q.   And who was he with?

13   A.   Miami County sheriff.

14   Q.   And so they're the ones that actually had conversation with

15   the defendant?

16   A.   The initial conversation, yes.

17   Q.   And so while they had the initial conversation, where were

18   you?

19   A.   I was just down the road.

20   Q.   What were you doing down the road?

21   A.   Taking video of the contact.

22   Q.   Were you using your Handycam?

23   A.   Yes, sir.

24   Q.   Were you close enough you could hear what was being said?

25   A.   No, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.232

1  Q.  And so you were a ways away and you had visual observation?

2  A.  Correct, just observing his movements.

3  Q.  I'm going to hand you what's been marked as Government's

4  Exhibit 17, and I'll ask you again if you recognize that.

5  A.  Yes, sir.  It's a DVD containing video footage of

6  surveillance conducted on November 28th of Mr. Hay, the initial

7  conversation, initialled and dated by me.

8          MR. OAKLEY:  Your Honor, I offer Government's

9  Exhibit 17.

10          THE COURT:  Any objection?

11          MR. MAGARIEL:  No, Your Honor.

12          THE COURT:  Exhibit 17 admitted.  You can publish.

13  BY MR. OAKLEY:

14  Q.  Can we start that at the beginning and pause, please.

15      Do you recognize the people in this video?

16  A.  Yes, sir.  In this shot Mr. Hay has the orange hat, and in

17  the center right by the flag and immediately to his right is

18  Detective Brown.

19  Q.  Did you take other video --

20  A.  Yes, sir.

21  Q.  -- at that time?

22  A.  We did.

23  Q.  I'm going to hand you what's been marked as Government's

24  Exhibit 18.  Do you recognize Government's Exhibit 18?

25  A.  Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.233

1   Q.   And what is Government's Exhibit 18?

2   A.   Again, it's a DVD containing video footage from

3   November 28th of surveillance we took showing Mr. Hay standing,

4   shaking hands, initialled and dated by me.

5            MR. OAKLEY:  Your Honor, I offer Government's

6   Exhibit 18.

7            THE COURT:  Any objection?

8            MR. MAGARIEL:  No, Your Honor.

9            THE COURT:  Exhibit 18 admitted.  You can publish.

10  BY MR. OAKLEY:

11  Q.   If we could pause this.

12       In this video do you see other people?

13  A.   Yes, sir.  Abraham Hay is also present, as well as Special

14  Agent Jim Carmack.

15  Q.   Go ahead.

16       Again, this is the same day, November 28th, and during that

17  same discussion about deer?

18  A.   Yes, sir.

19  Q.   Did you take other video footage that day?

20  A.   Yes, we did.

21  Q.   I'm going to hand you what's been marked as Government's

22  Exhibit 19.  Do you recognize Government's Exhibit 19?

23  A.   Yes, sir, a DVD containing video footage from the same day,

24  November 28th.  Additional surveillance of Mr. Hay standing,

25  gesturing, initialled and dated by me.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.234

1          MR. OAKLEY:  Your Honor, I offer Government's

2     Exhibit 19.

3          THE COURT:  Any objection?

4          MR. MAGARIEL:  No, Your Honor.

5          THE COURT:  Exhibit 19 admitted.  You can publish.

6          Mr. Oakley, I think when you're at a good stopping

7     point, I don't know when that is, we should close for the day.

8     I don't know, do you have more of the same day or are you going

9     to be a while with this?

10          MR. OAKLEY:  Yes, Your Honor, I have two more videos

11     that are short like that one.

12          THE COURT:  And that would be a good breaking point?

13          MR. OAKLEY:  Yes, Your Honor.

14     BY MR. OAKLEY:

15     Q.   Did you take more surveillance?

16     A.   Yes, sir.

17     Q.   Handing you what's been marked as Government's Exhibit 20.

18     Does that disk contain more surveillance?

19     A.   Yes.  This is a closer perspective utilizing a different

20     camera of Mr. Hay again standing, walking, gesturing, from that

21     same date, the 28th, initialled and dated by me.

22          MR. OAKLEY:  Would offer Government's Exhibit 20.

23          THE COURT:  Any objection?

24          MR. MAGARIEL:  No, Your Honor.

25          THE COURT:  20 admitted.  You can publish.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.235

1  BY MR. OAKLEY:

2  Q.  Can you tell on this footage, does Mr. Hay appear to have

3  something in his left hand?

4  A.  It appears he's carrying, again, a walking stick of some

5  sort, carrying it off the ground.  I apologize.  This was not

6  the other vantage point; this is still the same.

7  Q.  If we could pause this.

8      And obviously this video, we're not even halfway through,

9  but the video you saw was the same -- this video continues on

10  with the same conversation and is what you were able to

11  visually observe from the defendant?

12  A.  From a distance, correct.

13  Q.  During this conversation were you able to see him gesturing

14  and moving during the conversation?

15  A.  Yes.  He seemed to be walking with no difficulty, not using

16  the walking stick, and gesturing with his arms and having what

17  appears to be a very normal conversation.

18  Q.  Next I'll hand you what's been marked as Government's

19  Exhibit 21.  Is this additional surveillance from that day?

20  A.  Yes, sir, it is.

21      MR. OAKLEY:  Your Honor, I offer Government's

22  Exhibit 21.

23      THE COURT:  Any objection?

24      MR. MAGARIEL:  No, Your Honor.

25      THE COURT:  21 admitted.  You can publish.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.236

1   BY MR. OAKLEY:

2   Q.   Who just got into the car?

3   A.   Detective Brown.

4   Q.   And so Detective Brown and Detective -- excuse me, Special

5   Agent Carmack arrived in Detective Brown's car?

6   A.   Yes.

7   Q.   So they're leaving so the conversation with the defendant

8   is over?

9   A.   At this point, correct, the one at Abraham's house.

10  Q.   There was further conversation later?

11  A.   Yes, sir.

12       MR. OAKLEY:   Your Honor, I think this would be a good

13  time to break.

14       THE COURT:   Okay.   All right.   So, Special Agent

15  White, we'll see you back on the stand tomorrow.

16       Let's talk about start time, end time tomorrow.   How

17  many of you need to vote tomorrow, show of hands?   I don't

18  remember all the communities you live in.   Are any of you more

19  than an hour away?

20       JUROR NO. 0044:   Depends on traffic.

21       THE COURT:   If you're coming up I-35, right?

22       JUROR NO. 0044:   Yeah.

23       THE COURT:   So how many of you would rather do -- we

24  could start at 9:00, I mean if you're at the poll at 7:00, but

25  I don't know if that's doable or we could break early.   What

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.237

1   would your pleasure be?

2          JUROR NO. 0044:  9:00.

3          THE COURT:  9:00 is our normal starting time.  We

4   could delay until 9:30 or we could maybe break at 4:00 or 4:30.

5   What would you prefer?  I mean, I think the polls are open from

6   7:00 to 7:00; is that right?  Anybody prefer the afternoon or

7   are we better starting at 9:30 tomorrow morning?

8          JUROR NO. 0044:  9:30 start would be great.

9          THE COURT:  Let's recess until 9:30.  So you'll need

10  to be back at 9:30.  I'll remind the jury -- we call this the

11  overnight admonition -- to not do any independent research or

12  reading about any of the subject matter and not communicate in

13  any way on Twitter, on Facebook, on Instagram, no social media.

14         Don't talk to anybody about the substance of this

15  case.  Obviously you need to tell perhaps your employers or

16  your family that you're going to be here for a while, but don't

17  go into any detail about what this is all about.

18         So Bonnie is going to take you back to the jury room

19  and answer any questions you have before you leave the building

20  about how to get here in the morning or how to get in the

21  building itself, and we'll see you back at 9:30.

22     (The following proceedings occurred outside the presence of

23  the jury.)

24         THE COURT:  Why don't you all be available at 9:00 if

25  you need anything.  I'll be available at 9:00.  Just let us

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.238

1   know.

2        Have a good evening.  We'll be in recess until 9:30.

3     (The proceedings were adjourned at 4:43 p.m.)

4

5              C E R T I F I C A T E

6     I, Danielle R. Murray, a Certified Court Reporter and the

7   regularly appointed, qualified, and acting official reporter of

8   the United States District Court for the District of Kansas, do

9   hereby certify that the foregoing is a true and correct

10   transcript from the stenographically reported proceedings in

11   the above-entitled matter.

12     SIGNED 7th of February, 2023

13

14                    /s/Danielle R. Murray
                   DANIELLE R. MURRAY, RMR, CRR
15                    United States Court Reporter

16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.239

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2

UNITED STATES OF AMERICA,        )
3                                )  Case No. 19-20044-JAR
            Plaintiff,           )  Circuit No. 22-3276
4                                )
vs.                              )
5                                )  Kansas City, Kansas
BRUCE L. HAY,                    )  Date:  2 August, 2022
6                                )
            Defendant.           )  Day 2 (Pages 88-288)
7        ...........................

8                    TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE JULIE A. ROBINSON
9           SENIOR UNITED STATES DISTRICT COURT JUDGE

10

11                   A P P E A R A N C E S

12   FOR THE PLAINTIFF:

13           Mr. Ryan Huschka
             Mr. Christopher Oakley
             OFFICE OF THE UNITED STATES ATTORNEY
14           500 State Avenue
             Kansas City, Kansas 66101
15

     FOR THE DEFENDANT:
16

17           Mr. David Magariel
             Ms. Chekasha Ramsey
             OFFICE OF THE FEDERAL PUBLIC DEFENDER
18           500 State Avenue
             Suite 201
19           Kansas City, Kansas 66101

20

21

22

23

24   _____
                 Proceedings recorded by machine shorthand,
25       transcript produced by computer-aided transcription.

```
 1                        I N D E X

 2
        Government's Witnesses:                        Page
 3
        SPECIAL AGENT DANIEL WHITE
 4        (Continued) Direct Examination by Mr. Oakley   91
          Cross-Examination by Mr. Magariel             106
 5        Redirect Examination by Mr. Oakley            136
        AIMEE ROGERS
 6        Direct Examination by Mr. Huschka             139
          Cross-Examination by Ms. Ramsey               217
 7        Redirect Examination by Mr. Huschka           235
          Recross-Examination by Ms. Ramsey             235
 8      DR. EMMETT MCWOODS
          Direct Examination by Mr. Oakley              237
 9        Cross-Examination by Ms. Ramsey               261
        DR. ROBERT BECK
10        Direct Examination by Mr. Huschka             273
          Cross-Examination by Ms. Ramsey               283
11

12

13                      E X H I B I T S

14      Government's
        Exhibits              Offered          Received
15
             22                 94                94
16           23                 97                97
            201                193               193
17          202                193               193
            203                193               193
18          204                193               193
            205                193               193
19          206                193               193
            207                171               171
20         208-A               193               193
           208-B               193               193
21          209                193               193
            215                178               178
22          216                181               182
            217                184               184
23          227                259               259
            229                250               250
24          235                275               275

25
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.241

19-20044-JAR   USA v. BRUCE L. HAY   08.02.22                90

| Defendant's Exhibits | Offered | Received |
|---|---|---|
| 823 | 119 | 120 |
| 824 | 119 | 120 |
| 826 | 272 | 272 |

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.242

1                     P R O C E E D I N G S

2        (The following proceedings occurred outside the presence of

3   the jury.)

4            MR. HUSCHKA:  Your Honor, do you want Special Agent

5   White on the stand?

6            THE COURT:  Yes.

7        (The jury entered the courtroom, after which the following

8   proceedings were had.)

9            THE COURT:  Special Agent White, you're still under

10  oath to tell the truth.

11           THE WITNESS:  Yes, ma'am.

12                 SPECIAL AGENT DANIEL WHITE,

13  called as a witness on behalf of the government, having first

14  been sworn previously, testified as follows:

15                 (CONTINUED) DIRECT EXAMINATION

16  BY MR. OAKLEY:

17  Q.   Special Agent White, when we broke yesterday afternoon, we

18  had just finished talking about a conversation between Special

19  Agent Carmack and the defendant that you had recorded from some

20  distance away, correct?

21  A.   Yes, sir.

22  Q.   And, again, that was on November 28, 2012?

23  A.   Correct.

24  Q.   Now, later that day did you and Special Agent Carmack have

25  another conversation with the defendant?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.243

1   A.   Yes, we did.

2   Q.   Where did that take place at?

3   A.   It was -- if I recall correctly, it was north of the

4   residence on a gravel road, maybe on Perssonville.

5   Q.   When you say "north of the residence" --

6   A.   I'm sorry.  North of his father Abraham's residence.

7   Q.   North of his father's residence?

8   A.   Yes, sir, in rural Osawatomie.

9   Q.   You mentioned yesterday that the first conversation we saw

10  video of, that you weren't able to hear what was going on

11  because you were so far away.  Were you able to hear this

12  conversation?

13  A.   No.

14  Q.   This second one?

15  A.   No, we were not.  I'm sorry.  I was able to hear it.  We

16  did not record the audio of that.

17  Q.   So just to be clear, you were able to hear what the

18  defendant was saying?

19  A.   Yes, sir.

20  Q.   You didn't -- well, we'll get to it, but you or others

21  recorded that interaction, but the recording didn't contain

22  audio; is that correct?

23  A.   Correct.

24  Q.   Okay.  But you were -- were you a part of this conversation

25  with the defendant?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.244

1    A.    Yes, sir.  It was a close proximity, face-to-face

2    conversation.

3    Q.    And yesterday you had mentioned that Special Agent Carmack

4    had initiated the conversation based on asking about deer

5    poaching and had photographs of dead deer?

6    A.    Correct.

7    Q.    What was this second conversation about?

8    A.    Mr. Hay had showed us an area where he had found dead deer

9    in the past that he believed was evidence of a poaching on or

10   near his father's property.

11   Q.    The second conversation you were a part of was also about

12   the deer?

13   A.    Yes, sir, it was a continuation.

14   Q.    And how was -- you had described yesterday that when you

15   were recording footage, that you had a Handycam that you

16   were -- is that what you used to record this conversation about

17   the deer?

18   A.    No, sir.  The Handycam would obviously not be a very covert

19   way to record that up close, so Special Agent Carmack had a key

20   fob camera that looked like a set of keys.

21   Q.    And you said Special Agent Carmack had that?

22   A.    Yes, sir.

23   Q.    And so it looked like a key fob.  You say key fob, like, I

24   unlock my car?

25   A.    Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.245

```
 1   Q.  But it was actually a video recorder?

 2   A.  Yes.

 3   Q.  But it did not record audio?

 4   A.  Correct.

 5           MR. OAKLEY:  Your Honor, may I approach the witness?

 6           THE COURT:  Yes.

 7   BY MR. OAKLEY:

 8   Q.  I'm going to hand you what's been marked as Government's

 9   Exhibit 22 and ask you if you recognize that.

10   A.  Yes, sir.  It's a DVD containing video footage from

11   surveillance we conducted at the Hay farm on the day.  It's

12   dated and initialled by me.

13           MR. OAKLEY:  Your Honor, I offer Government's

14   Exhibit 22.

15           THE COURT:  Any objection?

16           MR. MAGARIEL:  No, Your Honor.

17           THE COURT:  Exhibit 22 admitted.  You can publish.

18   BY MR. OAKLEY:

19   Q.  Do you recognize the person in the orange hat?

20   A.  Yes, sir.  That is Mr. Hay.

21   Q.  Now I want to point out on the bottom right, it appears

22   that there's a date, 2012/11/29.  Do you know, was the date on

23   the key fob actually a day off?

24   A.  It was.

25   Q.  So this conversation actually happened November 28, 2012?
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.246

1    A.   Correct, yes, sir, it did.  And the vantage point is low,

2    like, handheld.  So maybe waist high.

3    Q.   Is Special Agent Carmack having to hold that camera -- or

4    the key fob in order to record this?

5    A.   Yes, sir.

6    Q.   And the person on the left, do you know who that is?

7    A.   That is Abraham Hay.

8    Q.   And the person on the left in the Kansas sweatshirt, who is

9    that?

10   A.   Special Agent Jim Carmack.  So Detective Brown -- in this

11   particular exchange Detective Brown is holding the fob while

12   Detective Carmack engages Mr. Hay in conversation.

13   Q.   Does this -- the video that we saw yesterday where you were

14   talking from a distance, is that this interaction?

15   A.   Yes, sir.  This is simultaneous to what we saw yesterday

16   just before we broke.  I'm recording this from a distance and

17   he's getting it close up, again just trying to get his

18   movements, natural activity.

19   Q.   And so this footage is close-up footage from what you were

20   taking from a ways away?

21   A.   Yes, sir, where the view is partially occluded by some

22   construction equipment.

23   Q.   And do you see an item in the defendant's left hand in this

24   video?

25   A.   Yes, sir.  It appears to be a walking stick.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.247

1   Q.   Again, this portion of what's going on, you were far enough

2   away that you weren't able to hear any conversation from

3   anyone; is that correct?

4   A.   Correct.

5   Q.   If we can pause that portion.

6        And then you said later you were involved in a conversation

7   where you were able to hear what was going on?

8   A.   Yes.

9   Q.   You said it wasn't at this location; it was a little bit

10  further away?

11  A.   Correct.

12  Q.   And so yesterday when we were watching the video, we see

13  the detective and Special Agent Carmack get into, I think it

14  was a Charger, and drive away?

15  A.   Right.

16  Q.   So the portion of the conversation, the interaction you

17  were involved with happened after that and, therefore, after

18  this interaction; is that correct?

19  A.   Right.  Special Agent Carmack then got in the vehicle with

20  me, and we contacted him within, I think, half an hour later or

21  so.

22  Q.   Okay.  So Special Agent Carmack and the detective leave

23  there, and then Carmack gets in with you?

24  A.   Correct.

25  Q.   And so the next conversation that you were a part of, was

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.248

1    the detective around during that time?

2    A.   No, sir.

3    Q.   And similar to this video that the detective recorded with

4    the key fob, you said that Special Agent Carmack had the key

5    fob during the second interaction?

6    A.   Yes, sir.

7    Q.   I'm going to hand you what's been marked as Government's

8    Exhibit 23.  Do you recognize that disk?

9    A.   Yes, sir.  It's a DVD containing footage of the video

10   surveillance on the Hay farm on that same day, dated and

11   initialled by me.

12        MR. OAKLEY:  Your Honor, I offer Government's

13   Exhibit 23.

14        THE COURT:  Any objection?

15        MR. MAGARIEL:  No, Your Honor.

16        THE COURT:  Admitted.  You can publish.

17   BY MR. OAKLEY:

18   Q.   So obviously this portion, it appears, is in a vehicle?

19   A.   That would be my Hyundai Sonata.  That's Special Agent

20   Carmack in the passenger seat.

21   Q.   And do you see the person that's on the screen now?  Who is

22   that?

23   A.   Yes.  Mr. Hay is pointing out where he believes some

24   deer -- poached deer carcasses were found.

25   Q.   Does it look like that's a ditch on the property?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.249

1    A.   Yes.  There's a pretty steep incline with a stone retaining

2    wall and a drainage culvert.

3    Q.   And so Special Agent Carmack is operating the video?

4    A.   Correct.  I'm in the background near Mr. Hay in that shot.

5    Q.   So you see Mr. Hay --

6    A.   Carrying the walking stick and gesturing.

7    Q.   So earlier did you see where he motioned like this?

8    A.   Correct.

9    Q.   Do you recall what he was discussing at the time?

10   A.   I remember the context was people poaching deer, throwing

11   them into the ditch.  He was obviously upset about that, which

12   I would be as well.  And, again, the conversation was just --

13   the object was just to engage him in conversation.  It didn't

14   really matter what at that point.

15   Q.   Somebody is in the ditch here.  Who is that?

16   A.   I climbed down in the ditch to try to show the slope, and

17   Mr. Hay also went part way down the ditch.

18   Q.   During this conversation obviously Mr. Hay had the walking

19   stick.  Did it appear he was relying on it to maneuver, to walk

20   around, to look into the ditch?

21   A.   No, sir.  It seemed like he was just carrying.  It would

22   occasionally touch the ground or he might lean on it while we

23   were talking, but it didn't appear he was using it to assist

24   him in walking.

25   Q.   Obviously this did not -- you mention this wasn't recording

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.250

1  audio.  Do you remember what the discussion was about and the

2  things the defendant said during this conversation?

3  A.   I recall parts of it, which I memorialized in my report.

4  The parts that stood out to me -- which again, the main goal

5  was to engage him in conversation for a long time to get a good

6  idea of his movements and his abilities.

7       We discussed deer poaching, and I'm a deer hunter as well

8  so it was easy to talk to him about deer hunting.  He mentioned

9  how he's an avid deer hunter on the property, how he hunts

10  every year, how he hunts out of a tree stand, rifle hunts.

11      And we talked about the type of tree stand that he used

12  because we've seen some of those high-dollar ones that are

13  essentially just a ladder and a comfortable box.  And he said

14  that he used the hang-on variety where you essentially screw

15  steps which are just bent pieces of metal into the side of the

16  tree about every two feet or so, climb up the tree, either with

17  that stand, which is 40 to 50 pounds, on your back, or you pull

18  it up with a rope later.

19      But essentially you screw the steps in, climb up the tree

20  to the desired height, and with one hand while you're hanging

21  onto the tree, put straps around the tree and cinch them tight

22  so you don't fall out of the tree.  And the tree stand is

23  essentially a back pad and a seat and a place to put your feet.

24      Getting them up is a considerable amount of work.  Getting

25  in and out of them for hunting is not easy, especially if

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.251

1  you're hunting early in the morning.  You typically get on the

2  stand while it's still dark, so you're navigating the woods in

3  the dark, climbing up in the stand in the dark, getting your

4  rifle up safely.

5  Q.  Did the defendant tell you an instance where he was hunting

6  with his pastor?

7  A.  Yeah, the retired pastor friend that he mentioned that was

8  overweight, and he mentioned having to haul him up into the

9  stand more than once.

10  Q.  To help the pastor get into a deer stand?

11  A.  Correct.  And I've never hauled anybody into a stand.  I

12  have a hard enough time getting myself in, so I'm not sure how

13  that went down, but it didn't sound like an easy task.

14  Q.  During the conversation that you had with the defendant

15  during this time, did you notice any abnormal head movements --

16  A.  No, sir.

17  Q.  -- from the defendant?

18  A.  No.  The tremors and bobbing and jerking that we observed

19  during previous engagements with him were not there during this

20  exchange.

21  Q.  You said that this location was near the farm property; is

22  that --

23  A.  I believe it was just north of the farm.  The farm was

24  pretty expansive, and it -- it wasn't all contiguous.  If I

25  remember correctly, there were 80 acres here, 100 acres there,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.252

1  so it was spread out.  But I think we were just north of the

2  residence on -- I think that's Perssonville Road that makes an

3  S-curve to the north.

4  Q.  What type of road is that that we're looking at in the

5  video?

6  A.  I don't know if in Kansas if they call those level B

7  maintenance, just a gravel road.

8  Q.  In the earlier conversation the defendant's father was

9  present.  Did he come with you all to this location, the short

10  distance away?

11  A.  No, sir, he did not.

12  Q.  So this was just you, Special Agent Carmack, and the

13  defendant?

14  A.  I believe Laurie is in the vehicle -- is in his truck

15  parked just down the road.  I think we see that later on in the

16  shot.

17  Q.  Did the Miami County detective -- did he go someplace else?

18  Was he present during this, if you recall?

19  A.  No, he disengaged completely from my recollection.  I think

20  he went back to work.

21     And this was a pleasant conversation.  I mean, it was just

22  -- again, the goal was just beginning to engage him in

23  conversation and see how much we could observe.  The longer it

24  went on, the better.

25  Q.  I think you testified yesterday that during the initial

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.253

1   contact with Carmack that no one told him, hey, we're out here

2   to investigate an allegation of VA benefits fraud?

3   A.   No, sir.

4   Q.   Correct.  And at any point during this conversation did you

5   disclose that?

6   A.   No.

7   Q.   And so this was somewhat covert.  Obviously you were all

8   having a conversation?

9   A.   Right.

10  Q.   But he didn't know that you were investigating him?

11  A.   He did not.

12  Q.   The conversation was about deer poaching and the

13  information he may have about deer poaching?

14  A.   Deer poaching the farm, how much labor it takes to run a

15  cattle farm, the physical labor involved, life in the country.

16  He spoke about maintaining that large of an acreage.  I believe

17  earlier that day he was dealing with a fence issue.  I don't

18  know if it was broken or what the issue was.  But he had some

19  fence, and we were talking about the physical strain it is to

20  repair fencing, as well as install fencing.

21  Q.   And so did you and Special Agent Carmack -- I mean, did you

22  try and engage in conversation to prompt discussion about

23  physical activity?

24  A.   We would -- we were just talking about the farm in general,

25  and we would make comments like -- again, for me it was natural

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.254

1  because I grew up in an agricultural area working on farms, so

2  I knew how much work it was to maintain those, and at no point

3  did he say this work is doubly hard for me because I have a

4  disability or I have this cane, which the walking stick, I

5  would have thought it would be a natural thing to mention

6  because it was in his hand, but he never mentioned any

7  difficulty in doing any of the tasks involved in farming.

8  Q.   Just a second ago on the video it appeared the defendant

9  lifted the walking stick and walked backwards.  Did you notice

10 things such as that?

11 A.   Yes, and would often use it to point, gesture.

12 Q.   And so this conversation, it doesn't appear

13 confrontational; it appears as though --

14 A.   Yeah.  He's laughing.  It's a pleasant conversation.

15      And on occasion, too, he would carry the walking stick --

16      MR. MAGARIEL:  Objection; there's no question here,

17 Your Honor.

18      THE COURT:  Objection sustained.

19 BY MR. OAKLEY:

20 Q.   Did it appear to you that the defendant had any difficulty

21 talking, speaking.

22 A.   No, sir.  In fact, he carried the conversation.

23 BY MR. OAKLEY:

24 Q.   In the first video that we saw from the key fob, I pointed

25 out that the day was a day off.  So, again, this says

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.255

1  November 29th, but this actually occurred November 28th?

2  A.  Correct.  It's still one day off.

3  Q.  I'm noticing the time that this has been running that no

4  cars have come down that street.  Was this a pretty rural area?

5  A.  Very.

6  Q.  This is not too far from the farm?

7  A.  Correct.

8  Q.  Approximately how far is this area from where you saw the

9  defendant lift up the bale of hay in the white pickup truck a

10 couple months before this?

11 A.  That location was just east of his father's residence, so

12 this is maybe half a mile north, maybe a quarter mile, I'm not

13 sure, but pretty close.

14 Q.  In the video it appeared the defendant moved the walking

15 stick from his left hand to right hand?

16 A.  He would frequently change hands while he was gesturing

17 with the other.  I believe one of his claims was for a wrist

18 fusion which he claimed he had trouble holding and carrying

19 items.  I don't remember which wrist it was listed in the

20 claim.

21 Q.  That was the defendant's truck we just saw up the road?

22 A.  Yes, sir.

23 Q.  Was that a flat road, if you recall?

24 A.  Road had a slight incline to it, I believe.  It was a windy

25 road, slight incline going towards the truck.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.256

1    Q.   The defendant just walked off the road.  Was that a ditch

2    that runs there?

3    A.   Right.  That's the other end of the culvert where -- some

4    stone around it to stabilize it, or concrete, and then maybe

5    six-foot wide culvert or so.

6    Q.   And when he walked over and looked down the ditch, do you

7    recall exactly what he said at that point?

8    A.   I'm not sure the details of his comment.  I believe we were

9    still talking about deer.

10   Q.   And so the video ends.  It appears the defendant is walking

11   back to the truck.  Is that the end of the conversation?

12   A.   I believe it was, yes.

13   Q.   So what we just saw was that entire second conversation

14   that you were a part of?

15   A.   Correct.

16   Q.   And as the defendant was walking back up the slight incline

17   on the gravel road, did it appear to you he had any difficulty

18   walking up that road?

19   A.   No, sir, he didn't.

20   Q.   So after this point did you yourself conduct any

21   surveillance of the defendant that you recall?

22   A.   I don't believe so, no.

23   Q.   At some -- do you know what the U.S. Department of

24   Agriculture is, USDA?

25   A.   Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.257

1   Q.   At some point did you make contact with someone at USDA?

2   A.   I did.  I contacted a Special Agent Dan Mason.

3   Q.   At some point did you make an effort to try and obtain USDA

4   records, specifically subsidy records?

5   A.   Yes, I did.

6   Q.   At some point was this investigation passed on to another

7   VA-OIG special agent?

8   A.   Yes, sir, it was.  I took a promotion and went to another

9   division with VA-OIG, and my cases were distributed to the

10  remaining agents in the office.

11  Q.   And was that the end of your involvement in this

12  investigation after your promotion?

13  A.   Yes, sir.  Yes, sir, it was.

14           MR. OAKLEY:  Your Honor.  I have no further questions

15  of this witness.

16                    CROSS-EXAMINATION

17  BY MR. MAGARIEL:

18  Q.   Good morning?

19  A.   Good morning, sir.

20  Q.   My name is David Magariel.  I'm one of the attorneys for

21  Mr. Hay.  As I understand, this investigation began in 2012; is

22  that right?

23  A.   Yes, sir.

24  Q.   And if I understand what you explained, I think about the

25  VA process, you weren't investigating whether Mr. Hay's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.258

1   injuries that he claimed were service-connected or not?

2   A.   No, sir.

3   Q.   Okay.  There's no doubt that assuming that the injuries

4   were what he claimed, that he would have been eligible for VA

5   benefits?

6   A.   Yes, sir.  The determination for service-connected or not

7   takes place at the VBA level, Veteran Benefits Association.

8   Q.   That basis wasn't the basis of your investigation?

9   A.   Correct.

10  Q.   So now we're in 2012.  You've described some of the

11  mechanisms that your office uses for investigation.  So you

12  discussed having a handheld camera; is that right?

13  A.   Yes, sir.

14  Q.   And at the end the jury was able to see that at least

15  somebody in your office had a key fob camera?

16  A.   Special Agent Carmack with Social Security had a key fob,

17  correct.

18  Q.   Okay.  And I think we maybe even saw on the last video the

19  Hyundai Sonata we talked about?

20  A.   Yes, sir.

21  Q.   Was that in the background there?

22  A.   Yes, sir.

23  Q.   If I understood what you were saying, were you trying to

24  tell the jury that your office did not have sufficient

25  resources to investigate this case properly?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.259

1   A.   No, sir.  We had sufficient resources.

2   Q.   I want to talk to you a little bit about some of the

3   specific work that you did.  On October 29th, is this the first

4   day that you followed and/or surveilled Mr. Hay?

5   A.   Yes, sir.

6   Q.   And you were shown some exhibits.  I think I might, if I

7   could, display a few of them just so we can orient the jury as

8   to what we're talking about on some of these.  So as I

9   understand, you surveil Mr. Hay starting at his home that

10  morning; is that right?

11  A.   Yes, sir.

12  Q.   Of the 29th of October?

13  A.   Correct.

14  Q.   Was this around 8:45 a.m.?

15  A.   I believe so, 8:30, 8:40.

16  Q.   And as I understood your description of events, you

17  followed Mr. Hay to a title company in Paola, Kansas?

18  A.   Yes, sir.

19  Q.   Twenty-minute drive, something like that?

20  A.   That's a reasonable estimation.  I'm not familiar with

21  rural Kansas all that well and it was ten years ago, but that

22  sounds pretty close.

23  Q.   And then you also followed or surveilled Mr. Hay as he

24  drove to the Paola CBOC?

25  A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.260

1    Q.   If you would be so kind as to just display Government's

2    Exhibit 3.  If you could pause that for me, please.

3         This was already shown to the jury on direct; is that

4    right?

5    A.   Yes, sir.

6    Q.   And as I understand your testimony, this is the

7    surveillance of Mr. Hay getting out of his truck in the parking

8    lot of that CBOC?

9    A.   Yes.

10   Q.   I want to make sure I understand what that CBOC is.  It's a

11   community-based sort of outreach by the VA; is that right?

12   A.   Yes.  They try to put smaller clinics in more rural areas

13   to save people from having to drive all the way into larger

14   cities to find treatment.

15   Q.   And so are the providers that are located inside that

16   building that I think we saw at the end of that video all

17   associated with the VA?

18   A.   I believe so.  But we don't have anything to do with

19   staffing for the Veterans Health Administration, so I'm not

20   sure of the specialties that are in that clinic.

21   Q.   But it is a VA-run clinic?

22   A.   Yes, sir.

23   Q.   Okay.  You obviously don't know every single doctor inside,

24   I understand that.  But it's not there for nonveterans in the

25   community?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.261

1   A.   Correct.

2   Q.   It's oriented towards veterans eligible for VA benefits?

3   A.   Exactly.

4   Q.   If you could continue to play that video, please.  We're

5   still on Exhibit 3.

6        Am I correct in this video, Mr. Hay gets out of the truck

7   on his own power and closes the door the same?

8   A.   Yes, sir.

9   Q.   He doesn't need any help with that here?

10  A.   No, sir.

11  Q.   He walks from the truck -- could we pause there, please.

12       He walks from the truck to the front door, I assume front

13  door of that building, under his own power?

14  A.   Yes, sir.

15  Q.   In this photo or this still of a video, there is an item in

16  Mr. Hay's left hand.  Do you see that?

17  A.   Yes, sir.

18  Q.   And I've heard it be called by a couple different names.  I

19  heard you refer to it as a walking stick or a cane a few times;

20  is that right?

21  A.   I think I referred to it as a walking stick.  I think in

22  the file it's listed as a cane.

23  Q.   When you say "in the file," are you talking about the work

24  you did back in 2012-2013?

25  A.   In his statement, the claim file where he said he had

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.262

1    difficulty walking without a cane or walker, I think is how it

2    was listed.

3    Q.   Did you also write a report to, I think you already said,

4    commemorate some of the investigation you did in this case?

5    A.   Yes, sir.

6    Q.   And was one of those reports called a summary report of

7    investigation?

8    A.   I believe we call them comprehensive ROI's, but...

9    Q.   Would it refresh your memory if I showed you a copy of a

10   report?

11   A.   Yes, sir.

12        MR. MAGARIEL:  May I approach, Your Honor?

13        THE COURT:  Yes.

14        THE WITNESS:  I didn't know -- this report appears to

15   be done by Social Security.  Yes.  That's the --

16   BY MR. MAGARIEL:

17   Q.   None of this is yours?

18   A.   No, sir.

19   Q.   Okay.

20        MR. MAGARIEL:  Can I have just a moment, Your Honor?

21        THE COURT:  Yes.

22        MR. MAGARIEL:  Thank you for letting me know I had the

23   wrong report.

24        May I approach?

25        THE WITNESS:  We do generate a lot of paperwork.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.263

1  BY MR. MAGARIEL:

2  Q.  Is that report a document that you have seen, and I think,

3  prepared?

4  A.  Yes, sir.

5  Q.  I think you titled it correctly, comprehensive report; is

6  that right?

7  A.  Correct.

8  Q.  Did you write that report back in 2012-2013 time period?

9  A.  Probably 2014.

10  Q.  And so it's a comprehensive report.  It's supposed to

11  commemorate the work you did over that time period on this

12  case?

13  A.  It's supposed to summarize my contribution to date before I

14  handed it off to another agent.

15  Q.  And when you wrote that back in approximately 2014, do you

16  remember writing in that report that Mr. Hay held a cane?  And

17  if it refreshes your memory to review the document.

18  A.  I do mention cane or walker in the claim file review.  I do

19  mention cane.

20  Q.  A number of times in that report?

21  A.  Correct.

22  Q.  Do you remember if you refer to it as a walking stick back

23  in 2012-2014?

24  A.  I know we use the term interchangeably because I don't know

25  the actual difference between a walking stick and a cane, and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.264

1   when it comes down to -- when I think of a cane, I think more

2   of a medical piece of equipment versus a -- this appeared to be

3   a wooden -- what I would use if I was hiking.

4   Q.  Okay.  But in that report, as you were able to review it at

5   least, it looked like you used the word cane?

6   A.  Correct.

7   Q.  Today it seems like you mostly used the word walking stick?

8   A.  Yes, sir.

9         MR. MAGARIEL:  May I retrieve that report, Your Honor?

10        THE COURT:  Yes.

11  BY MR. MAGARIEL:

12  Q.  Okay.  On the screen we still have Government's Exhibit 3,

13  and if we could continue playing that video, please.

14        As I remember your testimony earlier, I think the

15  government even asked you if you thought that little button

16  there to the right was to assist someone with opening the door,

17  and I think you said that you believed it was?

18  A.  Yes, sir.

19  Q.  And Mr. Hay obviously didn't use that there?

20  A.  No, sir, he didn't.

21  Q.  And he opened the door with his own power?

22  A.  Yes, sir.

23  Q.  And, in fact, it looked like his wife was trailing a little

24  bit behind him there?

25  A.  Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.265

1    Q.   Do you know which doctor or what provider Mr. Hay was

2    seeing that day?

3    A.   I don't know that it mattered which provider it was.  When

4    we do these investigations, we just try to determine -- we know

5    that he's going from point A to point B so we know that we can

6    at least see some movements.

7         I know that his primary there was Dr. McWoods, but I don't

8    know who that exact appointment was with that day.

9    Q.   You can take down that exhibit.  Thank you.

10        And the reason doesn't matter.  I think you've already said

11   everybody in that building is somehow associated with the VA?

12   A.   Correct.

13   Q.   And then if we could display Government's Exhibit 4,

14   please.

15        And this, I believe, is Mr. Hay leaving the building.  And

16   if I understood your testimony, the video maybe didn't pick up

17   the entire part of him leaving, at least that particular video?

18   A.   Correct.  If I recall, it was a crowded lot, so we try to

19   reposition, if we can, to get a better look or different

20   vantage point.  That obviously wasn't a great one.

21   Q.   For the part that is at least picked up on that video,

22   Mr. Hay opens the door to the truck by himself; is that right?

23   A.   Yes.

24   Q.   And he's able to get into the truck under his own power?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.266

1    Q.   In that video at least?

2    A.   Right.

3    Q.   And in this video, again, Mr. Hay is the passenger as the

4    car leaves the CBOC in Paola; is that right?

5    A.   Yes, sir.

6    Q.   As I understood your testimony, Mrs. Hay drives Bruce Hay

7    to the Miami County administration building; is that right?

8    A.   Right.

9    Q.   Do you remember about what time that was when they go

10   from --

11   A.   If I recall, that was back on the other side of town,

12   closer to the title company, so 5, 10 minutes.  Again, I'm not

13   really sure with Paola distances because we're doing a lot of

14   things while we're trying to follow subjects.

15   Q.   Do you remember taking notes in your report as to the times

16   of these various events?

17   A.   I think I offered estimated times, yes.

18   Q.   As I remember, at least I think in your testimony, you said

19   that these events you've discussed are in chronological order?

20   A.   Yes, sir.

21   Q.   Okay.  But I don't remember if you gave specific times for

22   these events.  Do you remember writing in your report that

23   Mr. Hay arrived at the Miami County administration building at

24   approximately 1100 hours?

25   A.   That sounds reasonable.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.267

1   Q.  Okay.  So just so we understand the differences in time, I

2   think you already testified Mr. Hay leaves his home at

3   approximately 8:45 in the morning?

4   A.  Around there, yes.

5   Q.  And so he goes to a title company, goes to the CBOC, spends

6   some time at a medical appointment presumably; is that right?

7   A.  Right.

8   Q.  And then goes to this Miami County administration building?

9   A.  Yes.

10  Q.  Can we display Government's Exhibit 5 and maybe pause it

11  once it starts playing, please.

12      Okay.  So it was paused at a very good time.  On the right

13  side of the screen it looks to me like, although it's a little

14  bit blurry, that says Miami County.  Do you see that?

15  A.  Yes.

16  Q.  So that red brick building that's in the background, is

17  that the Miami County administrative building?

18  A.  I believe so.

19  Q.  And I think as opposed to the CBOC, the VA doesn't have a

20  relationship with the Miami County administrative building?

21  A.  Not that I know of, no.

22  Q.  And the Social Security Administration wouldn't have a

23  relationship with that building either?

24  A.  I'm not sure, sir.

25  Q.  You don't have any reason to think that they do?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.268

1   A.   No.  I would guess that that was a state-level building.

2   Q.   Associated with governing of Miami County?

3   A.   Miami County business, right.

4   Q.   And so if we could play this video.  I think you've already

5   described this video a little bit, but Mr. Hay is walking quite

6   slowly on this video; fair to say?

7   A.   Fair to say, yes, sir.

8   Q.   And does it look like his body is pretty ridged as he's

9   moving?

10  A.   It does.

11  Q.   And as opposed to the last video where he was walking in

12  front of his wife, now he's trailing a little bit behind there;

13  is that right?

14  A.   Appears to be, yes.

15  Q.   If we could take that down.  Thank you.

16       So, again, this is at approximately 11:00 in which he, I

17  think, enters into the Miami County administrative building; is

18  that right?

19  A.   Yeah.  That's what my report reflects, yes.

20  Q.   Do you remember if he spent a fairly short amount of time

21  in that building, maybe ten minutes?

22  A.   That sounds right.

23  Q.   And then as I understood your testimony, Mr. Hay with his

24  wife leaving -- driving, leaves the Miami County administrative

25  building, and they drive down to Osawatomie?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.269

1   A.   Correct.

2   Q.   You, as I understood your testimony, testified that Mr. Hay

3   was seen by you in the back of a truck on his property later

4   that day; is that right?

5   A.   Yes.

6   Q.   Was that approximately an hour after he left that

7   administrative building in the Miami County administrative

8   building?

9   A.   Yeah, that's what my report reflects.  Again, ten years

10  ago, I'm not sure the exact timeline, but it was shortly

11  thereafter.

12  Q.   I'm glad to show you a report, but if your report reflected

13  that he left at approximately 1110 hours and that yourself and

14  SA Tauai saw Mr. Hay at approximately 1207, does that sound

15  correct to you?

16  A.   That sounds correct because I believe we dropped off

17  briefly while the other surveillance crew saw him headed

18  westbound in Osawatomie, so we caught up and that's where I had

19  done some research that showed there was some rural property

20  affiliated with his name, so that's where we went to see if

21  that's where he was headed.

22          MR. MAGARIEL:  May I approach, Your Honor?

23          THE COURT:  Yes.

24  BY MR. MAGARIEL:

25  Q.   You just actually helped me transition into a topic I want

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.270

1   to talk about, which is just sort of the relative locations of

2   some of the things you just talked about.

3        I'm handing you two exhibits.  If you could look at them

4   and then I'm going to ask you some questions about them.

5   They're labeled as Defendant's 823 and 824.

6        Did you get a chance to look at those exhibits?

7   A.   Yes, sir.

8   Q.   And does it appear to you that those are Google Maps of, at

9   least on 823, a broad area including Olathe, Osawatomie, Paola,

10  and Lane?

11  A.   Yes.

12  Q.   And does that appear to be accurate as to the locations of

13  those as they would appear on a Google map?

14  A.   Yes, sir.

15  Q.   And turning to 824, is this a little more zoomed in map of

16  Olathe that has highlighted a couple of locations, the Quik

17  Trip that I think you testified to already off of 169 Highway

18  and the office of Dr. Neufeld at 511 North Mur-Len?

19  A.   Yes, sir.

20  Q.   Does that appear to be an accurate depiction of the area

21  surrounding those two locations?

22  A.   I believe so, yes.

23            MR. MAGARIEL:  Move to admit those two exhibits.

24            THE COURT:  Any objection?

25            MR. OAKLEY:  No, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.271

1          THE COURT:  Exhibit 823 and 824 admitted.  You can

2    publish.

3          MR. MAGARIEL:  Thank you.  If we could start with 823.

4    BY MR. MAGARIEL:

5    Q.   So this map, I think as you've already helped me describe,

6    is sort of a broader look at the area from Olathe down south to

7    Lane and maybe a little further south; is that right?

8    A.   Yes, sir.

9    Q.   And then I see a highway that goes a little bit right of

10   center from Olathe down through Spring Hill into I think

11   probably maybe a little bit of the outskirts of Paola and

12   Osawatomie labeled 169.  Did you see that?

13   A.   Yes, sir.

14   Q.   Is that the highway that you followed Mr. Hay up from

15   Osawatomie to Olathe on November 19th?

16   A.   I don't accurately recall if he took the highway or if he

17   took back roads, sir.

18   Q.   So you're not sure if that's the road that was taken?

19   A.   No.

20   Q.   That is obviously a very possible route to take?

21   A.   Yes, a logical route, correct.

22   Q.   As I understood your testimony, Mr. Hay ended up off of 169

23   Highway at that Quik Trip?

24   A.   Yes, sir.

25   Q.   Okay.  So you're not saying that he didn't take that route;

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.272

1    you're saying you don't remember?

2    A.   Correct.

3    Q.   And tell me if you disagree with me that it's logical if he

4    ended up on 169 highway just on the outskirts of Olathe, that's

5    presumably the route he took up?

6    A.   Could be, yes.

7    Q.   Okay.  And then heading south from Olathe, we see Paola

8    there, and that's where I think we just talked about that Miami

9    County administrative building that's actually in Paola; is

10   that right?

11   A.   I believe so, yes.

12   Q.   As we head further south on 169, that's Osawatomie?

13   A.   Correct.

14   Q.   If we continue to head south on 169, it sort of jumps more

15   southwesterly even maybe than it was before, and then Lane is

16   there sort of not off of the highway, but near the highway; is

17   that right?

18   A.   Those addresses west of there showed as Osawatomie, Lane,

19   and I think there was another one as well.

20   Q.   And as I understood your testimony, the property that

21   Mr. Hay's father owned was in or near Lane?

22   A.   I believe it's actual address is Lane, Kansas.

23   Q.   I think you've already described that to be rural?

24   A.   Correct.

25   Q.   How about the property that is in Osawatomie?  I think you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.273

1   called Mr. Hay's property in Osawatomie -- did you call that

2   rural Osawatomie; did I hear you say that?

3   A.   No.  Bruce's house is a normal neighborhood house across

4   from a school on a street.

5   Q.   How about the land that the family owns there?  Is that in

6   a rural part of Osawatomie?

7   A.   Yes, sir.

8   Q.   Maybe that's what you were referencing earlier when you

9   said it was in a part of rural Osawatomie.  That's the family's

10  land?

11  A.   Correct, just west of Osawatomie.  Again, I believe the

12  actual address comes up as Lane, Kansas.

13  Q.   Okay.  If we could go -- okay.  So before I go to the next

14  exhibit, as I understood your testimony, you don't remember the

15  route that Mr. Hay's wife drove from Osawatomie to Olathe on

16  November 19th?

17  A.   No, sir.  The route was irrelevant.  We just wanted to

18  observe his activities, so we just stick with the vehicle.

19  Q.   Okay.  If we could go to 824, please.

20       And so, again, orienting that map, this is more of a

21  close-up of largely Olathe, but left of center do you see 169

22  Highway there?

23  A.   Yes, sir.

24  Q.   And then -- so, again, I understand you don't remember

25  whether Mr. Hay took 169 or not, but that address there, 15710

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.274

1   U.S. 169, that has a dot in the left of center, do you see

2   that?

3   A.   Yes, sir.

4   Q.   Is that the address to the Quik Trip?

5   A.   I'm not -- I don't recall exactly what the address was,

6   sir.

7   Q.   Would it help your memory if I showed you your report?

8   A.   Yes, sir.

9   Q.   Might it refresh your memory on the issue of what highway

10  was taken if I also showed you that same report?

11  A.   Sounds like it could, sir.

12  Q.   Okay.

13       MR. MAGARIEL:  Judge, may I approach again?

14       THE COURT:  Yes.

15  BY MR. MAGARIEL:

16  Q.   I think I've turned to your summary of November 19th if

17  that's helpful to you.

18  A.   Yes, sir.

19  Q.   Did you get enough time to review that report?

20  A.   Yes, I did.

21  Q.   Did it help you refresh your memory on a couple of those

22  topics?

23  A.   Yes, sir.

24  Q.   Did the report help refresh you it was 169 Highway that was

25  taken to Olathe?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.275

1    A.    Yes.

2    Q.    That address on that map, 15710 U.S. 69 [verbatim], the

3    address of the Quik Trip that you viewed Mr. Hay stop at on his

4    way to that medical appointment?

5    A.    That's what I listed, yes.

6    Q.    All right.  The other address on this map is listed as 511

7    North Mur-Len Road.  It's sort of at the northern most part of

8    the map towards the center, and it's got a little red dot on

9    it.  Do you see that?

10   A.    Yes, sir.

11   Q.    Is that the address of Dr. Neufeld's office in Olathe?

12   A.    That's the address I list in the report, yes.

13   Q.    But I don't see in your report the route that Mrs. Hay

14   drove from the Quik Trip to Dr. Neufeld's office; is that

15   right?

16   A.    Correct.  Again, the route taken isn't -- wasn't applicable

17   during this.  We were just hoping to see him ambulate or walk.

18   Q.    Okay.  I think you said there was about ten minutes between

19   when Mr. Hay left the Quik Trip and when he arrived at the

20   doctor's appointment?

21   A.    Shows approximately 16 minutes on the report.

22   Q.    All right.  So could have been any of these routes, I

23   guess, that are outlined on the map?

24   A.    Yes, sir.

25   Q.    Do you have a memory whether he got on I-35 that day?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.276

1   A.   I have no idea, sir.

2   Q.   Do you see towards the top of the map there's a street

3   that's in that kind of blue outlining of that possible route

4   that says East Santa Fe Street on one side, sort of on the

5   western side, and then if you go to the east side, it says

6   135th Street; do you see that there?

7   A.   Yes, sir.

8   Q.   Do you know that road?

9   A.   I have been out there occasionally.

10  Q.   Sounds like you're not familiar with Olathe particularly?

11  A.   I'm on the Missouri side.

12  Q.   You don't know if that's kind of the main drag in Olathe or

13  not?

14  A.   I don't know, sir.

15  Q.   Fair enough.  You don't remember that day whether that was

16  a busy street or not?

17  A.   No.  The driver is focused on being a safe driver while the

18  passenger is running a camera or radio and attempting to figure

19  out where they are at the same time.

20  Q.   Didn't notice the traffic that day is what you're telling

21  me?

22  A.   No.

23  Q.   Didn't notice whether it was a busy day, light day, heavy

24  traffic, no idea?

25  A.   No, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.277

1          MR. MAGARIEL:  Judge, may I retrieve that report?

2          THE COURT:  Yes.

3    BY MR. MAGARIEL:

4    Q.   On this -- so I want to be clear that we've transitioned to

5    a different day.  This is November 19th that we're talking

6    about now, right?

7    A.   Correct.

8    Q.   This is three weeks after the CBOC appointment we were

9    talking about a moment ago?

10   A.   Correct.

11   Q.   And this route we're discussing is at least the potential

12   route that Mr. Hay took from his home to that Quik Trip and

13   then to the doctor's appointment at Dr. Neufeld's office?

14   A.   It could be, yes.

15          THE COURT:  Mr. Magariel, when you're at a good

16   stopping point, let's take a break.

17          MR. MAGARIEL:  I can stop now, Your Honor.

18          THE COURT:  Let's take a 15-minute break and try to

19   resume at ten 'til the hour.

20       (Recess taken at 10:35 a.m.)

21       (The jury entered the courtroom, after which the following

22   proceedings were had.)

23          THE COURT:  You can be seated.

24   BY MR. MAGARIEL:

25   Q.   Agent, I think when we left off, we were talking about

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                           2:19-cr-20044-JAR
                                                         USA v. Bruce L. Hay
                                                         ROA - Volume 3, p.278

1   November 19th and Mr. Hay's going to see Dr. Neufeld; is that
2   right?
3   A.   Yes, sir.
4   Q.   As I understand Dr. Neufeld, he's not associated with the
5   VA?
6   A.   Not that I know of, no.
7   Q.   He's in private practice?
8   A.   I believe so.
9   Q.   But it sounds like in this particular case, he was doing
10  some sort of consulting maybe for social security?
11  A.   That was my understanding, yes.
12  Q.   And I think you described the building -- and if we could
13  display Government's Exhibit 10 so we could reorient what
14  exhibit we're talking about.  Just maybe pause it there.
15      Can see some of the building at least.  I understand you
16  were kind of across the street there, but I think you described
17  this as being part of a strip mall?
18  A.   In a strip mall-type of an area from my recollection.
19  Q.   Multiple businesses in that area?
20  A.   Correct.
21  Q.   And it looks like this is maybe one of those buildings that
22  has a lot of different doctors and dentists and various
23  providers; is that right?
24  A.   That would be my understanding, yes.
25  Q.   And your understanding is Dr. Neufeld had an office within

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.279

1   that building?

2   A.   Correct.

3   Q.   We can take that down.  Thank you.

4        And so you've already discussed, I think with the

5   government, Mr. Hay at -- outside that building walking in and

6   then obviously presumably having an appointment, and then you

7   did some surveillance of him walking back out; is that right?

8   A.   Correct.

9   Q.   And in the parking lot it looked like he had some

10  difficulty walking in and out of that appointment?

11  A.   It appeared so, yes.

12  Q.   But he was able to get in and out of the truck on his own

13  power?

14  A.   Yes, sir.

15  Q.   And, again, he was holding a cane walking in and out of

16  that appointment?

17  A.   Correct.

18  Q.   And this is, I think, what the government talked to you

19  about next, was that you surveilled Mr. Hay going to a

20  pawnshop; is that right?

21  A.   Yes, sir.

22  Q.   And you could see largely from that video Mr. Hay getting

23  in and out of a truck; is that right?

24  A.   Yes, sir.

25  Q.   And walking in and out of a pawnshop?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.280

1    A.   Correct.

2    Q.   You didn't make an effort to surveil him actually in the

3    pawnshop?

4    A.   No, sir.

5    Q.   And on that video that the government showed you, Mr. Hay

6    again had his cane and was using it to walk in and out of the

7    pawnshop?

8    A.   He was carrying the cane.  It didn't appear he was

9    utilizing it, to my recollection.

10   Q.   He had it with him all those times?

11   A.   I believe he did.

12   Q.   And then as I understand, again, the timeline of events

13   after Mr. Hay being driven by his wife, leave the pawnshop,

14   they drive back to Osawatomie; is that right?

15   A.   I believe they stopped in route at the TransAm -- at or

16   near a TransAm Trucking.

17   Q.   And that's back sort of near that Quik Trip; is that right?

18   A.   I believe so, yes.

19   Q.   And there was a video we saw from some distance where he

20   was maybe standing talking to someone?

21   A.   Right.

22   Q.   And the jury did see that as well; is that right?

23   A.   I believe so, yes.

24   Q.   Thank you for that reminder.  After leaving TransAm, is

25   that when Mr. Hay, again driven by his wife, drive back to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.281

1   Osawatomie?

2   A.   Yes.

3   Q.   And he was there at that truck stop for 20 minutes or so?

4   A.   That sounds about right, yes.

5   Q.   And then you've described back in Osawatomie, and we talked

6   about the map earlier, you were nervous being seen in your

7   Hyundai around there?

8   A.   It's not the best vehicle to blend in that area, no.

9   Q.   And did it look like when you were parked there by Mr. Hay

10   that you got Missouri plates on it?

11   A.   That vehicle did have Missouri plates I believe.

12   Q.   And is that the vehicle that we could see kind of in the

13   back left of the video behind Mr. Hay?

14   A.   With the gravel road.

15   Q.   It looked like it was parked on the right side of the road?

16   A.   Correct.

17   Q.   But from our angle we were looking at the front of the car,

18   and it was to our left?

19   A.   Yes.

20   Q.   But it would have been parked properly on the right side of

21   the road; is that right?

22   A.   Right.

23   Q.   And as I understand it, Mr. Hay went to his home after

24   leaving that trucking stop?

25   A.   I believe so, yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.282

1   Q.   And Mr. Hay remained inside his home for approximately an

2   hour before you saw him get into a truck and drive to another

3   location?

4   A.   That sounds right.

5   Q.   And the address that he went to was, you think another

6   address owned by a family member after he left his home?

7   A.   I believe some of our research show that it was affiliated

8   with his name, but had another name, maybe Tiffany Hay,

9   associated with it.

10  Q.   And he stayed at that residence for a few minutes?

11  A.   Correct.

12  Q.   And then went out towards the farm property that I think

13  we've already discussed some; is that right?

14  A.   Yes, sir.

15  Q.   And, again, we just talked about this, but this is the more

16  rural area that we discussed --

17  A.   Correct.

18  Q.   -- is that right?

19       And this is when you say you saw him driving a truck on

20  that property?

21  A.   Towards that property, yes.

22  Q.   That Pleasant Valley Road property?

23  A.   Yes.

24  Q.   I want to turn your attention to November 28th, and, again,

25  the government walked through this day with you.  This is the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.283

1   day where initially I think you are surveilling Mr. Hay

2   speaking to a Miami County sheriffs officer and another agent;

3   is that right?

4   A.   Correct.

5   Q.   And the initial one that I think the jury saw, you're not

6   listening or involved in that conversation; you're at some

7   distance recording; is that right?

8   A.   Yes, sir.

9   Q.   And just video because of your distance; is that right?

10  A.   Yes.

11  Q.   And, again, so we're clear where we are, this is on his

12  father's property in Lane, Kansas?

13  A.   Correct.

14  Q.   It looks like when we got the closer up video that Carmack

15  was holding the key fob, the Miami County sheriffs officer

16  didn't look like he was dressed in uniform?

17  A.   I wasn't -- I don't recall his attire at the time.

18  Q.   And Carmack, plain clothes?

19  A.   Yes.

20  Q.   And it looked like you were also in plain clothes, although

21  I know you weren't in that initial conversation; is that right

22  though?

23  A.   Yes, sir.

24  Q.   You don't remember what -- is it Deputy Brown with Miami

25  County?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.284

1    A.   Yes, correct.

2    Q.   You don't remember what Deputy Brown was wearing?

3    A.   Beyond what I can see in the video, no.

4    Q.   In the portion of the video -- well, in the portion of the

5    conversation that you were in, did you identify yourself to

6    Mr. Hay?

7    A.   No.

8    Q.   You didn't say who you were, who you were with?

9    A.   No.

10   Q.   Did you hear whether anybody else identified themselves?

11   A.   I don't accurately recall, no.

12   Q.   You don't know?

13   A.   No, sir.

14   Q.   You didn't say, I'm with the VA-OIG?

15   A.   No, sir.

16   Q.   But you're saying you didn't say you were with some other

17   agency, Miami County or otherwise?

18   A.   No, sir.

19   Q.   You were just sort of some unknown investigator looking

20   into deer poaching?

21   A.   That could have been his take, yes.

22   Q.   Is that how you were presenting yourself?

23   A.   I'm not sure I understand the question.

24   Q.   Well, I mean, I understood you were presenting yourself to

25   Mr. Hay like you were on that property for a reason; is that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.285

1   right?

2   A.   Yes.

3   Q.   And the reason was to investigate deer poaching, if I

4   understood?

5   A.   Asking if he -- correct, asking if he had any information

6   about.

7   Q.   I think you said that Carmack had gone on the Internet and

8   printed some photos of deer carcasses?

9   A.   Yes.

10   Q.   To support the idea that's what you were investigating?

11   A.   Yes.

12   Q.   And that was the general questioning you were doing of

13   Mr. Hay?

14   A.   Right.

15   Q.   But, again, you don't think you identified that you were

16   with any particular government entity, agency, state, or

17   federal, or otherwise?

18   A.   No, sir.

19   Q.   Weren't wearing a badge around your neck I guess?

20   A.   No, sir.

21   Q.   Didn't have a gun that he could see?

22   A.   Not that could be seen, no.

23   Q.   But you had something on you?

24   A.   Always.

25   Q.   Shoulder holster?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.286

1    A.   No.

2    Q.   How do you wear a gun normally, or would have back in 2012?

3    A.   On my belt.

4    Q.   And I think you've given a summary of what you perceived

5    there talking to Mr. Hay in a summary of the conversation.  He

6    admitted to you that he hunted; is that right?

7    A.   Correct.

8    Q.   I think you said he admitted to you that he did work around

9    the farm repairing fencing relating to ranching cattle?

10   A.   Yes, sir.

11   Q.   And I understood the nature of this conversation, it was

12   nonconfrontational?

13   A.   No, sir.

14   Q.   No, it was not?

15   A.   No, it was not confrontational.

16   Q.   So it was nonconfrontational?

17   A.   Yes.

18   Q.   And it was relaxed?

19   A.   Absolutely.

20   Q.   We're talking about topics Mr. Hay is familiar with,

21   hunting, farming?

22   A.   Farming, correct.

23   Q.   Those are the -- sounds like those are the main two things

24   you talked about with him?

25   A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.287

1   Q.  And this was on his family property?

2   A.  On or near his family property just north of his father's

3   residence.

4   Q.  You don't know where all the lines are drawn, I understand

5   that.  But it could have been on his family property or also

6   near his family property, and it's in a rural part of Kansas

7   and you've already described no cars were coming or going on

8   that road?

9   A.  Correct.

10          MR. MAGARIEL:  That's all I have.  Thank you.

11                    REDIRECT EXAMINATION

12  BY MR. OAKLEY:

13  Q.  Starting with some of the last questions that Mr. Magariel

14  asked you, you didn't say during that conversation about the

15  deer that you were with another agency or lie to the defendant,

16  but based on your experience as a law enforcement officer

17  beginning with the Kansas City, Missouri Police Department, to

18  the United States Secret Service, and then with VA-OIG, is it

19  uncommon for law enforcement officers to act in an undercover

20  capacity in which they present themselves as something that

21  they're not?

22  A.  Absolutely not.  We do it all the time.

23  Q.  And so for instance in undercover drug buys, the person

24  that's a law enforcement officer buying drugs doesn't say, I'm

25  a law enforcement officer buying drugs, correct?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.288

1    A.   Correct.

2    Q.   But in this particular instance you didn't say one way or

3    the other; you just asked about deer poaching?

4    A.   Asked a question and he discussed it, correct.

5    Q.   So let me get back to the -- to the CBOC on October 29th.

6    And you mentioned that CBOC is a VA community medical service,

7    correct?

8    A.   Correct.

9    Q.   And you said that you don't know why the defendant was

10   there that particular day, but you do know that Dr. McWoods had

11   an office in the Paola CBOC, correct?

12   A.   Yes, sir, and he was his attending physician.

13   Q.   And so Dr. McWoods, he wrote a letter on the defendant's

14   behalf, correct?

15   A.   Yes, for the spring of 2012 supporting his 100 percent

16   claim.

17   Q.   This CBOC is not a location that someone goes to to apply

18   for VA benefits, is it?

19   A.   No, sir.

20   Q.   Are you familiar with compensation and pension

21   examinations?

22   A.   I am.

23   Q.   Comp and pen, or C&P, they're sometimes referred to.  So

24   the defendant wasn't at the CBOC that day for a comp and pen or

25   a C&P examination; is that your understanding?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.289

1        MR. MAGARIEL:  Objection; leading.

2        THE COURT:  Overruled.

3   BY MR. OAKLEY:

4   Q.  Was the defendant at the CBOC -- do you know why the

5   defendant was at the CBOC?  Was it related to benefits

6   application or was it related to receiving medical care?

7   A.  Medical care, sir.

8   Q.  And that same day Mr. Magariel asked you about the title

9   company and he asked you about the Miami County, correct?

10  A.  Correct.

11  Q.  Do you know why the defendant was at Miami County?

12  A.  No, sir.

13  Q.  Now, I don't recall him asking you on cross-examination

14  about your observations of seeing the defendant pick up the

15  bale of hay and then what we saw in the pickup truck, but that

16  all happened the same day?

17  A.  Yes, sir.

18        MR. OAKLEY:  No further questions, Your Honor.

19        THE COURT:  Any other questions?

20        MR. MAGARIEL:  Not for this witness, Your Honor.

21  Thank you.

22        THE COURT:  May this witness be excused?

23        MR. OAKLEY:  Yes, Your Honor.

24        THE COURT:  You're excused.  You can call your next

25  witness.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.290

1              MR. HUSCHKA:  United States calls Aimee Rogers.

2                        AIMEE ROGERS,

3    called as a witness on behalf of the government, having first

4    been duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6    BY MR. HUSCHKA:

7    Q.   Ms. Rogers, could you state your name for the record and

8    where do you live?

9    A.   Amy Rogers.  I live at 14020 --

10   Q.   Let me stop you there.  Just city and state.

11   A.   Aimee Rogers, Wichita, Kansas.

12   Q.   And let's start with some of your background.  Can you

13   start with your educational background?

14   A.   I have a master's degree in sociology from WSU.

15   Q.   And where are you currently employed?

16   A.   With the Department of Veterans Affairs in Wichita, Kansas.

17   Q.   What is your role with the Department of Veterans Affairs?

18   A.   I'm the veteran service center manager.

19   Q.   Can we start -- how long have you been with the Department

20   of Veterans Affairs?

21   A.   22 years.

22   Q.   Can you walk us through some of the various positions you

23   held when you've been with the VA and what part of the VA

24   you've been employed with?

25   A.   Okay.  So my entire length of time with VA has been with

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.291

1  the Veterans Benefits Administration in Wichita.  I started in

2  2000 as a veteran service representative, and then I was

3  promoted to a rating veteran service representative and then an

4  assistant supervisor and then a supervisory veteran service

5  representative and then the veteran service center manager.

6  Q.  Can you explain to the jury what the purpose of the

7  Veterans Benefits Administration is?

8  A.  So we administer disability benefits to veterans that have

9  incurred disease, injury, or illness as a result of their

10  military service.

11  Q.  Okay.  I want to talk about some of the responsibilities

12  with the different positions you've held.  So starting with

13  veteran service representative, is that often referred to as a

14  VSR?

15  A.  Yes.

16  Q.  Could you explain what your role was there?

17  A.  VSR are usually the first employees that see a claim that

18  comes in from a veteran.  They are responsible for obtaining --

19  requesting all relevant medical and other evidence in support

20  of a veteran's claim.

21  Q.  Okay.  And then your next position, I think you said, was a

22  rating veteran service manager; is that right?

23  A.  Rating VSR.

24  Q.  Is that often referred to as RVSR?

25  A.  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                         USA v. Bruce L. Hay
                                                         ROA - Volume 3, p.292

1   Q.  Can I call it a rating specialist?

2   A.  Yes.

3   Q.  Can you explain what your duties and responsibilities were

4   as a rating specialist?

5   A.  Once all the evidence and information is obtained in

6   support of a claim from the VSR, then the claim goes to the

7   rating specialist to then make a decision on if they are able

8   to grant service connection for disabilities or illnesses.

9   Q.  And then could you describe your responsibilities now in

10  your current position?

11  A.  So now I manage all of the folks that work within the

12  Veteran Service Center in Wichita, so it would be the employees

13  that are developing the claims and the employees that are

14  making decisions on those veterans' claims.

15  Q.  In your positions have you received training related to

16  your role?

17  A.  Yes.

18  Q.  Could you describe some of the training that you receive?

19  A.  So as a VSR we had a training session, centralized

20  training, which we basically learned just the very basics of

21  the position.  And the RVSR rating specialist go through the

22  same thing and you have a centralized training where everybody

23  gets the same information, and then when you go back to your

24  home station, you continue with mentoring and training for

25  several months until you are deemed to be sufficient --

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.293

1    training sufficient enough to do the position on your own.

2    Q.    Okay.  And then what about a rating specialist?

3    A.    Pretty much the same thing.  They have a centralized

4    training that they attend as well, and then when they return

5    from that, they are under 100 percent review for anywhere

6    between three to six months where everything they look at is

7    reviewed, and then once that period of time is done, then

8    they're released to work on their own.

9    Q.    Okay.  And in your current position, are you sometimes

10   involved in reviewing the work or the ratings that have been

11   applied by rating specialists?

12   A.    Yes.

13   Q.    So given the various roles you've had, how long have you

14   been involved in approving or denying applications for

15   disability benefits with the VA?

16   A.    Pretty much the entire 22 years.

17   Q.    And could you estimate how many benefits applications

18   you've been involved with reviewing?

19   A.    Tens of thousands.

20   Q.    So you're with the VBA.  Are you familiar with the VHA?

21   A.    Yes.

22   Q.    What is the VHA?

23   A.    VHA handles all of the health care for veterans.  So we're

24   all under the same VA umbrella, but they're a certain entity

25   dealing with health care and we deal with the disability

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.294

1   benefit payments.

2   Q.   Are the VBA and VHA separate functions within the VA?

3   A.   Yes.

4   Q.   Does the VBA provide medical treatment?

5   A.   No.

6   Q.   So how does the application for disability benefits start?

7   Where does that process begin?

8   A.   So a veteran files a claim and they list whatever

9   disability, disabilities, diseases, injury illness they are

10  claiming is related to their military service.  Then we again

11  obtain the relevant records, medical records, nonmedical

12  records to support that claim.

13       And once all of the evidence is received, we may determine

14  that we need a VA exam to determine the level of severity of

15  the disability, and then that information goes to the rating

16  specialist to make a decision on whether we're able to grant

17  service connection for those disabilities, and then after that

18  the notification letter goes out to the veteran and if there's

19  payments, then the payments begin.

20  Q.   So I want to go back to -- you mentioned an exam.  Are you

21  referring to a compensation and pension exam?

22  A.   Yes.

23  Q.   A C&P examination?

24  A.   Yes.

25  Q.   So compensation and pension, what does compensation mean

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.295

1  and what does pension mean?

2  A.    So compensation is for disabilities, diseases, injuries,

3  that are related to a veteran's military service.  Pension is a

4  nonservice-connected payment that is made to a veteran that has

5  wartime service, is -- has a medical disability that basically

6  renders them unable to work that is not due to the military

7  service, and then they have a low income threshold so it's

8  based on a financial need.

9  Q.    So generally -- well, let me back up.  A compensation and

10  pension exam, is that an interview that is done by a medical

11  provider?

12  A.    Yes.

13  Q.    And generally how do C&P examiners obtain the information

14  that is in their report?

15  A.    That information is obtained by a review of the veteran's

16  claim folder.  And also upon the exam they will do an interview

17  with a veteran and then their objective findings during the

18  interview.

19  Q.    Do these examinations rely on the veteran's self-reporting?

20  A.    Yes.

21  Q.    Once a C&P examination has been done and a report has been

22  completed, what do the ratings specialists then look for in

23  those reports in determining how they're going to assign a

24  rating?

25  A.    So we look to see if we have evidence of incurrence of a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.296

1   disease, injury, or illness in service.  We look for current

2   evidence of the disability, and then once we have an in-service

3   finding, a current diagnosis that links those two together,

4   then we use the CFR, 35 CFR Part 4.

5   Q.   Let me stop you there.  What's a CFR?

6   A.   Code of Federal Regulations, sorry.

7   Q.   Could you explain to the jury why that matters to the work

8   you do?

9   A.   The Code of Federal Regulations guides, the evaluations

10  that we assign to disabilities that are deemed to be service-

11  connected.

12  Q.   So once you consult that information, then how is a rating

13  assigned?  In other words, what's a scale that may be applied

14  to a given application for benefits?

15  A.   Disabilities differ, so some disabilities can be evaluated

16  from 0 percent service-connected all the way up to 100 percent

17  service-connected.  Some disabilities don't -- within the Code

18  of Federal Regulations don't have 100 percent evaluation

19  assigned, so the Code of Federal Regulations helps us to

20  determine based on the laws what evaluation we can sign.

21  Q.   So if 100 percent could be applied to a given disability,

22  based on the rating specialist review, could that rating be any

23  where between 0 and 100 percent?

24  A.   Yes.

25  Q.   And are those in 10 percent increments that could be

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.297

1    applied?

2    A.   Yes.

3    Q.   So you mentioned the rating specialist makes the initial

4    determination of what the rating will be.  Once that initial

5    rating has been made and benefits are ultimately granted, is

6    there a possibility of another examination happening in the

7    future?

8    A.   Yes.

9    Q.   Could you explain under what circumstances that might

10   happen.

11   A.   So there's several different circumstances.  One could be

12   that the veteran indicates that their disability has worsened,

13   and so they could come into the VA and file a claim for an

14   increase in that disability.  And so most of the time that

15   would trigger then us requesting a C&P exam.

16        Other times certain disabilities have a likelihood of

17   improving over time, and those disabilities, we can request

18   what's called a routine future exam in which at a certain

19   period into the future, which is usually, like, 18 months or

20   two years into the future, then we automatically go back in,

21   review the claim, order an exam, and then determine the level

22   of disability.

23   Q.   So for certain disabilities that may be automatic at some

24   point in the future?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.298

1   Q.   Are there other ways that an examination could be triggered

2   other than something that is automatically entered so that it

3   happens in the future?

4   A.   So we could receive information from VHA, Veterans Health

5   Administration, that a disability has changed, that's either

6   improved or has worsened, and that's based on their treatment

7   of the veteran with that disability.  We get information

8   sometimes from social workers, psychologists, psychiatrists

9   within the VA as well.  And then we can get information that

10  comes across the VBA on hotline complaints, tips or reports to

11  law enforcement that we would then have to review.

12  Q.   What does it mean to have a permanent and total disability

13  rating?

14  A.   So permanent and total indicates that based on -- based on

15  the veteran's level of disability.  So there's symptoms such as

16  gross impairment in thought, gross impairment in communication,

17  inability to perform activities of daily living, inability or

18  gross social impairment, those things that rise to the level of

19  precluding a veteran from most occupations and most social

20  interaction.

21  Q.   So if an individual is designated as having a permanent and

22  total disability, is that person subject of future examinations

23  by the VBA?

24  A.   No.

25  Q.   Are there special benefits that a veteran may receive if

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.299

1    they receive a permanent and total disability designation?

2    A.   Those are called ancillary benefits.

3    Q.   Could you describe some of those.

4    A.   Right, so one of those would be Chapter 35 dependents'

5    educational assistance.  It's very similar to benefits that a

6    veteran might receive for going to college as part of their GI

7    Bill.  It's pretty similar to that.  Those benefits are then

8    available to a veteran's spouse and veteran's children for

9    education beyond high school.

10        And then the other one is medical benefits, so that's

11   through -- I don't know what it stands for -- the DEERS

12   program.  It's a medical program that basically provides

13   insurance again to veteran's spouse and dependent children.

14   Q.   Somebody who has 100 percent disability rating would not be

15   entitled to these dependents' educational benefits?

16   A.   Not unless they were determined to be permanent and total.

17   Q.   Could a veteran's application for permanent and total

18   disability or for an increase in their benefits, could that

19   result in -- actually result in a decrease in their benefits?

20   A.   Potentially.

21   Q.   And how might that happen?

22   A.   If the medical evidence that we have, including private

23   evidence, VA medical evidence, and a C&P exam shows that the

24   condition has improved, then we may look at doing a proposal to

25   reduce their benefits based on they no longer meet the Code of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.300

1  Federal Regulations criteria for the evaluation.

2  Q.  Okay.  And have you been -- ever been a part of being

3  involved in reducing a veteran's benefits?

4  A.  Yes.

5  Q.  In your role do you have a responsibility to the taxpayer

6  as well as the veteran when you're doing these ratings?

7  A.  Yes.

8  Q.  What is that responsibility?

9  A.  Well, obviously the VA is funded through tax money, federal

10  tax money, so we are -- we pay benefits when they're due to

11  veterans, but we also have to be good stewards of taxpayer

12  money and make sure that the funds and the disability payments

13  that we're authorizing are actually what is appropriate in that

14  situation.

15  Q.  Does the VBA rely on the information that the veteran

16  provides during the application process and during the

17  evaluation process?

18  A.  Yes.

19  Q.  Are you familiar with Bruce Hay?

20  A.  Yes.

21  Q.  Did he receive disability benefits from the VA?

22  A.  Yes.

23  Q.  In the course of your duties as a service manager, have you

24  had a chance to review the entirety of his VBA file?

25  A.  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.301

1           MR. HUSCHKA:  Your Honor, may I approach?

2           THE COURT:  Yes.

3    BY MR. HUSCHKA:

4    Q.  Ms. Rogers, I'm handing you what have been marked as --

5    excuse me -- Government's Exhibits 200 through 209.  Do you

6    recognize Government's Exhibits 200 through 209?

7    A.  Yes.

8    Q.  Did you have an opportunity to review those before your

9    testimony today?

10   A.  Yes.

11   Q.  And are these records that are kept in the ordinary course

12   of the business at VBA?

13   A.  Yes, they are.

14          MR. HUSCHKA:  Your Honor, we would move to admit

15   Government's Exhibits 200 through 209.

16          MS. RAMSEY:  May I approach, Your Honor?

17          THE COURT:  Yes.

18       (The following proceedings were had at the bench).

19          MS. RAMSEY:  Your Honor, I have an objection, but this

20   may take me a minute.  But I don't have a notebook, so I'm

21   trying to navigate them through my computer at this time.

22          THE COURT:  I've got them right here if you want to

23   refer to them.

24          MS. RAMSEY:  Okay.  Your Honor, I believe

25   Exhibit 201 -- if it will open for me -- I believe it's a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.302

1   compensation and pension exam note by a Mr. Kevin Hawker.

2        THE COURT:  Yes.

3        MS. RAMSEY:  We would object that admission of that

4   includes hearsay.  I think that although the government has

5   laid a possibility for foundation, there's a confrontation

6   issue and it includes hearsay.  So we would object to the

7   admission of that exhibit on that basis because Exhibit 201 is

8   a report written by a Dr. Kevin Hawker.

9        MR. HUSCHKA:  Your Honor, for the C&P exams that are

10  in here, we are -- these are based on system reported

11  information that's reflected in here.  Anything else we are not

12  offering for its truth.  We're offering the portions that have

13  the defendant's statements, which is the majority of all of

14  these C&P exams, and they're what VBA relies on to assign the

15  benefits.

16       And, I mean, we have all six of these C&P examiners

17  who we can bring in to read from their reports if necessary,

18  but this is what the VBA relies on in assigning these ratings,

19  so we're offering the portions that contain the benefits -- or

20  the defendant's statements and representations, but anything

21  else we're not offering for its truth.

22       MS. RAMSEY:  I guess the problem is I'm not sure I

23  understand the government's argument.  If you're not offering

24  it because you're relying on it because it's the truth, but

25  you're saying the VBA relied on it for the basis of determining

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.303

1  the benefits, that is in fact relying on statements made to an

2  individual not here testifying for purposes of asserting that

3  it is the truth.  So I don't understand the government's

4  argument.

5       THE COURT:  All right.  So in 201 there are -- first,

6  it says there's a review of medical records, which I'm not sure

7  is based on a statement of the defendant, but then on the

8  second page, page 2, it speaks of him being evaluated, he was

9  discharged, those aren't -- I don't think those are offered --

10  well, I don't know.

11       I mean, there are definitely statements of Mr. Hay in

12  here that are being -- it says "veteran reports," "veteran

13  denies," "veteran denies."  And then just physical examination

14  and findings.

15       So what parts of this -- I understand the government's

16  position is these statements are just relating what Mr. Hay

17  said.  You're relying on those as a party admission?

18       MR. HUSCHKA:  Yes, Your Honor.

19       THE COURT:  But then in terms of the evaluative notes,

20  blood pressure, that sort of thing, what's your -- you're not

21  offering those for truth of the matter asserted?

22       MR. HUSCHKA:  No, Your Honor.

23       THE COURT:  The only thing you're offering for truth

24  of the matter asserted are the statements purportedly made by

25  Mr. Hay.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.304

1          MR. HUSCHKA:  Give me one minute, Your Honor.

2          Yeah, and they're business records.  But, yes, there

3    are statements by Mr. Hay or observations of the providers,

4    we're offering those, and we have six providers who we can

5    call, but I mean, we expect them to just testify as to what's

6    in the report.

7          THE COURT:  Okay.  Lay the foundation for this being a

8    business record of VBA, VHA, or both.  I'm willing to admit

9    this, but with a limiting instruction that the jury is only

10   supposed to consider those statements that the report indicates

11   came from Mr. Hay himself, all other valued findings are not

12   admitted, and I think if you're going to publish it, you need

13   to block out the other.  And then ultimately, like if these

14   doctors don't testify, I'm going to require you to redact so

15   the jury is not reading this other stuff.

16         MR. HUSCHKA:  Okay.

17         MS. RAMSEY:  We would like to make clear that it is

18   really largely also about confrontation.  The problem with

19   these records without introducing the actual doctor is these

20   are statements -- this is a report written by the doctor of

21   purportedly what Mr. Hay said to them without being able to

22   confront the doctor as to their credibility or whether or not

23   it's actually simply the doctor's interpretation of a statement

24   or observation versus statement made by Mr. Hay.  We can't do

25   without that witness being here.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.305

1        THE COURT:  I do think there may be a confrontation

2    issue.  What does the government say about that?  Even in terms

3    of what Mr. Hay said to the treating doctors.

4        MR. HUSCHKA:  Yeah, I mean, they're business records

5    in that I think she can testify that they were made at or near

6    the time by a person with knowledge kept in the ordinary

7    course, and there's no confrontation issue with respect to

8    business records.  I think it would be a separate issue if it's

9    hearsay within hearsay.

10       THE COURT:  Right.

11       MR. HUSCHKA:  And we would not be relying on any

12   reference by the person who made the note at the time -- they

13   are talking about something someone else said for instance.

14       THE COURT:  I think I'm not going to admit these at

15   this point.  I think you need to lay the foundation.  I think

16   this is probably the right witness to do this as a business

17   record, and she can testify they relied on this, but I do think

18   in terms of admission of the statements that Mr. Hay reported

19   to a person, that needs to come in through the person that they

20   are reported to.

21       MR. HUSCHKA:  We can have those six witnesses

22   available.

23       THE COURT:  But go ahead and lay all the foundation

24   you need to at this point.

25       MR. HUSCHKA:  Yes, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.306

 1            MS. RAMSEY:  I want to make sure, Your Honor, for the

 2    record -- I think that -- you said these are Exhibits 201 to

 3    209.

 4            THE COURT:  200 to 209.

 5            MR. HUSCHKA:  201 is the first one that presents this

 6    issue.

 7            MS. RAMSEY:  201, 203, 204, 203 is VA rating decision.

 8            THE COURT:  You're objecting to 201, 203, and what

 9    else?

10            MS. RAMSEY:  204, 205, 208.

11            MR. HUSCHKA:  I want to -- I think 203 is a rating

12    decision.  This is not a C&P exam.  This is something they do.

13            MS. RAMSEY:  Okay.  And I have a separate objection

14    for that.  Just for the ones for purposes of --

15            THE COURT:  So 201 through 203, 204 through 205, and

16    208 you're objecting.  You're not objecting to 200 or 209 at

17    this point?

18            MS. RAMSEY:  Not objecting to 200.  I have 208.  208-A

19    and -B.

20            MR. HUSCHKA:  Those are compensation and pen, two

21    different ones.

22            MS. RAMSEY:  Okay.  So if they're separately two,

23    208-A and -B, we object to them, same objection.

24            THE COURT:  How about 207 and 209 and 206?

25            MS. RAMSEY:  Not 207.  I think it depends on what kind

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.307

 1   of foundation they lay for 206 at this point, Your Honor.  I'm

 2   kind of confused.  The way I understand the VA rating decisions

 3   to be made, I think this is a rating decision back in 2007 that

 4   in fact also may present some confrontation issues.  Although

 5   it may come in as a business record, this rating decision was

 6   not done by Ms. Rogers, who's on the stand testifying at this

 7   time, so we have a confrontation objection to that as well.

 8           THE COURT:  All right.  I think I'm going to -- I hear

 9   no objection to exhibits 200 and 207, so I'm going to admit

10   those.  Lay the foundation individually with respect to each

11   one, and then she can make her objection.  I'll rule

12   individually, including for 206.  Depending on what the

13   foundation is and her objection, I may or may not admit that.

14           Was 209 objected to?

15           MS. RAMSEY:  I think it would depend -- I may have

16   jumped up too fast.  I think it depends.

17           THE COURT:  Let's proceed by laying these one at a

18   time.

19           MS. RAMSEY:  Thank you, Your Honor.

20       (Thereupon, the proceedings continued in open court.)

21           THE COURT:  All right.  For the record, I am admitting

22   Exhibits 200 and 207.  You may want to discuss what those are,

23   at least identify them for the record for now, but Exhibits

24   200, 207 admitted.

25           MR. HUSCHKA:  Your Honor, can we publish Exhibit 200,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.308

 1  please?
 2           THE COURT:  Go ahead.
 3  BY MR. HUSCHKA:
 4  Q.  Now, Ms. Rogers, can you explain what Government's
 5  Exhibit 200 is?
 6  A.  It's a VA Form 21-526, veteran's application for
 7  compensation and/or pension.
 8  Q.  Okay.  Do you see in Section 1 there where there's a
 9  checkmark?  Which one does this application relate to?
10  A.  Compensation.
11  Q.  Okay.  Do you see the name there in Box 3?
12  A.  Yes.
13  Q.  What does that say?
14  A.  Bruce Leroy Hay.
15  Q.  If you could turn to page 4, please.
16      In 21-B there, which branch of service did Mr. Hay serve?
17  A.  The Army.
18  Q.  And what does the monthly payment amount there say on the
19  right?
20  A.  $1,263.30.
21  Q.  And what is that?
22  A.  That is -- that's indicated from block 21-A that says that
23  he's receiving retired or retainer pay based on military
24  service.
25  Q.  Okay.  And if you could turn to page 5.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.309

1       Up in Box 25, is this signed?

2   A.   Yes.

3   Q.   And what's the date there on the right?

4   A.   February 28th of 2006.

5   Q.   Turn to page 6, please.

6       In the second box there, the second to disabilities listed,

7   what does say that?

8   A.   Conversion disorder, post-head injury with tremors.

9   Q.   In Column 2 it says, "When did your disability begin?"

10  What does that say?

11  A.   2 of 2005.

12  Q.   So after filing this application, did the defendant have a

13  C&P examination?

14  A.   Yes.

15  Q.   When a C&P examiner conducts an examination, does that

16  examiner at that time memorialize the examination in a report?

17  A.   Yes.

18  Q.   Do they include the information that they received from the

19  veteran in that report?

20  A.   Yes.

21  Q.   Do they include their observations of the veteran?

22  A.   Yes.

23  Q.   And is that report then kept by the VBA in the ordinary

24  course of its business?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.310

1   Q.   I want to refer you to Government's Exhibit 201.   Is

2   this -- is that a C&P exam report?

3   A.   Yes.

4   Q.   And is this kept in the ordinary course of business of VBA?

5   A.   Yes.

6          MR. HUSCHKA:   Your Honor, we would offer Government's

7   Exhibit 201 into evidence.

8          MS. RAMSEY:   Your Honor, I would renew my objection.

9   If the court would like us to approach, we can.

10         THE COURT:   All right.   Is this consistent with what I

11  said at the bench?   I will sustain the objection at this time

12  subject to further foundation and the proffered issues being

13  resolved.

14  BY MR. HUSCHKA:

15  Q.   And is Government's Exhibit 201 something that the VA or

16  the VBA would rely on in assigning a rating?

17  A.   Yes.

18  Q.   I refer you to Government's Exhibit 202.   Is this also a

19  C&P examination report?

20  A.   Yes, it is.

21  Q.   And is this something that the VBA would rely on?

22  A.   Yes.

23         MR. HUSCHKA:   We move to admit Government's

24  Exhibit 202.

25         MS. RAMSEY:   Same objection, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.311

 1          THE COURT:  Same ruling.  Not admitted at this time.
 2   BY MR. HUSCHKA:
 3   Q.   Now I want to refer you to Government's Exhibit 203.  Do
 4   you recognize that?
 5   A.   Yes.
 6   Q.   What is it?
 7   A.   This is a Department of Veteran Affairs rating decision.
 8   Q.   And is this rating decision something that is made near the
 9   time that the rating specialist is reviewing the veteran's
10   application?
11   A.   Yes.
12   Q.   Is this maintained in the ordinary course of VBA's
13   business?
14   A.   Yes.
15          MR. HUSCHKA:  Your Honor, we would move to admit
16   Government's Exhibit 203.
17          MS. RAMSEY:  Your Honor, this was -- we would make the
18   same objection.  If you'd like us to approach, there may be
19   additional objections to make.
20          THE COURT:  All right.  Approach.
21      (The following proceedings were had at the bench).
22          THE COURT:  Go ahead.
23          MS. RAMSEY:  Thank you, Your Honor.
24          Your Honor, the way I understand the process of which
25   I think the government has laid out is a separate VA rater, not

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.312

1   Ms. Rogers who's currently testifying, is the one that makes

2   this decision and writes this particular report.  Although they

3   may have relied upon it in making their decision, this is

4   testimonial and is in fact the statement by someone else not

5   testifying here in court, which violates Mr. Hay's right to

6   confrontation.

7        And so we would argue that despite the fact that they

8   may have laid a foundation for it being a business record,

9   there are confrontation issues under the Sixth Amendment that

10  are being violated if the person that wrote this report is not

11  here to testify.

12       MR. HUSCHKA:  Your Honor, it's a business record for

13  one.  Two, it's a public record of the regular course of

14  business of a government agency.  So I think it's admissible on

15  either basis.

16       THE COURT:  It's not a public record.

17       MR. HUSCHKA:  It's part of the regularly conducted

18  activity of the Department of Veteran Affairs.

19       THE COURT:  Yeah, it is, but I mean, there are --

20  there are certain statements in here that I don't -- there's

21  just rating decisions, you know, which if there are others that

22  seem to be testimonial -- you know, the claimant is considered

23  competent.  It discusses the background or basis, and some of

24  this relates to things that seem to be reported by Mr. Hay.

25  But it also just is an account of medical records, and I don't

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.313

1    think that is necessarily testimonial.  It might be, I don't

2    know.

3           I think at this point, again -- I mean, I don't think

4    it has to necessarily be offered by the person that wrote all

5    this, but do you intend to call this person, the rater?

6           MR. HUSCHKA:  No, Your Honor.  I mean, Ms. Rogers

7    reviewed this file and is familiar with it, and these are all

8    records that are made near the time and during the regular

9    course of VBA's business.

10           MS. RAMSEY:  Your Honor, but I think as the court --

11   as the government has laid out, the VSR, the person that

12   studies the body of the medical evidence, medical and not

13   evidence -- sorry, medical and nonmedical evidence and then

14   makes a determination based on that particular evidence is the

15   person that then writes this report, and so it's an

16   interpretation of other records in hearsay and is testimonial

17   because it's an individual actually making the rating.  And so

18   while Ms. Rogers may rely on that in making their decision, it

19   still presents a confrontation issue.

20           THE COURT:  When I look at this, the first two pages I

21   think are admissible.  It is just the rating decision that's a

22   business record.  It's not testimonial.  The reasons for the

23   decision, though, are problematic in the sense that it gives a

24   lot of explanation, some of which is based on medical records,

25   some of which is based on self-reporting, based on out-of-court

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.314

1    statements.

2          So I'm willing to at this point allow this -- I don't

3    think -- first two pages have come in through the person that

4    did the rating itself.  This is just the ultimate finding and

5    it's a business record.  It's regular activity at the VA, and I

6    don't see anything in here that's testimonial in the first two

7    pages, but beyond that I sustain the objection at this time.

8          And those are the reasons for the decision.  Some of

9    it -- some of these reasons there's an explanation of the

10   disability rating process, which I think this is something you

11   could ask this witness about if she's familiar with it, but

12   there are embedded in some of these -- some of these

13   explanations, I think, a reliance on out-of-court statements,

14   and I do think there's a confrontation problem to that extent.

15         If you want to work on this exhibit and, I don't know,

16   cure it by redaction if you can't bring in anyone; on the other

17   hand, it could be that you could -- you can get the reasons in

18   later once you have the doctors testify, et cetera, because

19   they're going to be testifying, I assume, about the medical

20   evaluations.

21         MR. HUSCHKA:  So -- right.  So the underlying C&P

22   examiners will testify, and then anything in here would be

23   covered by their testimony, the C&P examiners, because that's

24   what's reflected --

25         THE COURT:  Right.  So ultimately that may come in.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.315

1    At this point the actual rating decision itself because that's

2    part of the record, it's not relying on anything -- I mean,

3    it's not relying on any of the -- it is relying, but it's not

4    testifying in terms of what is the basis for these decisions.

5    It's not explaining the medical records or the doctor's

6    records, et cetera.  So the first two pages I'll let in.

7         Or you could wait and offer it later when you have

8    more background and the confrontation issues are resolved

9    through testimony of people that made some of these evaluations

10   and decisions.

11        MR. HUSCHKA:  Do you -- should I continue to offer

12   these for admission if we get to them?

13        THE COURT:  That's up to you.  Make the foundation

14   that you need to, offer them through somebody else.

15        MR. HUSCHKA:  Right.

16        THE COURT:  It's up to you if you want to offer them,

17   that's fine.  Make a record and we'll just keep going.

18        MS. RAMSEY:  Thank you, Your Honor.  I apologize.  I

19   wanted to approach for that one because I know it was different

20   than the other C&P exams we've gone over.

21     (Thereupon, the proceedings continued in open court.)

22        THE COURT:  So that is Exhibit 203.  I'll sustain the

23   objection at this time, at least with respect to all but the

24   first two pages.

25   BY MR. HUSCHKA:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.316

1  Q.  Ms. Boyd, could you publish the first page of Government's

2  Exhibit 203.

3      Ms. Rogers, could you explain what Government's Exhibit 203

4  is to the jury?

5  A.  This is a VBA rating decision dated March 8th of 2007.

6  Q.  Okay.  And who does this rating decision relate to?

7  A.  Bruce L. Hay.

8  Q.  And what is the date of the rating decision?

9  A.  March 8th of 2007.

10 Q.  Could you read the portion there below introduction?

11 A.  "The records reflect that you are a veteran of the

12 peacetime and Gulf War era.  You served in the Army from

13 June 12, 1987 to June 11, 1991; from August 26th of 1996 to

14 August 9, 1998; and from January 21, 2003 to February 28, 2006.

15 You filed an original disability claim that was received on

16 March 9, 2006.  Based on a review of the evidence listed below,

17 we have made the following decisions on your claim."

18 Q.  All right.  And could you read the first two decisions

19 there under decision?

20 A.  "(1) Service connection for conversion disorder is granted

21 with an evaluation of 100 percent effective March 1, 2006.

22     "(2) Service connection for psychomotor abnormal tremors or

23 body movements is granted with an evaluation of 100 percent

24 effective March 1, 2006."

25 Q.  And, Ms. Boyd, could you turn to page 2.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.317

1      Ms. Rogers, could you read the portion there, number 11?

2   A.   "Entitlement to special monthly compensation based on aid

3   and attendance criteria being met is granted for March 1,

4   2006."

5   Q.   Could you explain what that means?

6   A.   Special monthly compensation is an additional amount

7   payable to a veteran where the disability rises to the level

8   above the 100 percent evaluation and is granted for

9   disabilities that require the assistance of another person to

10  help perform activities of daily living such as personal

11  hygiene, medication management, mobility assistance, activities

12  of daily living such as bathing, toileting, those types of

13  things.

14  Q.   Is this something that they receive over and above whatever

15  they would receive for their 100 percent disability rating?

16  A.   Yes.

17  Q.   Ms. Boyd, could you highlight the portion there at the

18  bottom under evidence.

19      What did the VBA rely on in this case in assigning the

20  ratings that it did?

21  A.   We relied on review of his service medical records from all

22  three periods of his military service and VA examinations that

23  were dated September 8, 2006 and September 21, 2006.

24  Q.   And are those the C&P examinations we've been referring to?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.318

1   Q.   And so in assigning this rating, is the VBA relying on the

2   information that the veteran provided during those

3   examinations?

4   A.   Yes.

5   Q.   So in summary, the defendant, on the basis of this rating,

6   was assigned 100 percent disability rating, and on top of that

7   he received this aid and attendance as well because of his

8   physical disabilities being so limiting that he required the

9   aid and attendance of another person?

10  A.   That's correct.

11  Q.   So you talked earlier about how -- to be able to continue

12  to receive these benefits, you may still be subject to

13  re-examination.  Do you know if that was the case here?

14  A.   Yes, it was.

15  Q.   Was another C&P examination requested by the VA at some

16  point?

17  A.   Yes.

18  Q.   Could you look at Government's Exhibit 204.  What is

19  Government's Exhibit 204?

20  A.   This was a compensation and pension exam report for

21  neurological disorders including a miscellaneous exam.

22  Q.   Is this a note that is made near the time by the person who

23  conducted the examination?

24  A.   Yes.

25  Q.   Is it maintained by VBA in the regular course of its

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.319

1   business?

2   A.   Yes.

3            MR. HUSCHKA:   Your Honor, we move to admit

4   Government's Exhibit 204.

5            MS. RAMSEY:   Your Honor, same objection.   Sixth

6   Amendment.

7            THE COURT:   All right.   I'll sustain at this time.

8   BY MR. HUSCHKA:

9   Q.   Ms. Rogers, does the VBA rely on C&P exams like this when

10   you're subject to re-examination?

11   A.   Yes.

12   Q.   And is it a similar process to which you initially apply

13   for disability benefits?

14   A.   Yes.

15   Q.   I want to refer you to Government's Exhibit 205.   What is

16   Government's Exhibit 205?

17   A.   This is a compensation and pension exam psychology.

18   Q.   Did this relate to the re-examination of the defendant's

19   disability?

20   A.   Yes.

21   Q.   Is this maintained by VBA in the ordinary course of

22   business?

23   A.   Yes.

24   Q.   Is this note made at or near the time by the person that

25   conducted the examination?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.320

1    A.   Yes.

2            MR. HUSCHKA:  Move to admit 205.

3            MS. RAMSEY:  Same objection.

4            THE COURT:  All right.  Sustain the objection at this

5    time.

6    BY MR. HUSCHKA:

7    Q.   I want to refer you to Government's Exhibit 206.  What is

8    Government's Exhibit 206?

9    A.   A Department of Veterans Affairs VBA rating decision.

10   Q.   And is this rating decision something that VBA keeps in the

11   ordinary course of business?

12   A.   Yes.

13   Q.   Is it made at or near the time by the person that is

14   issuing the rating decision?

15   A.   Yes.

16           MR. HUSCHKA:  Would move to admit Government's

17   Exhibit 206.

18           MS. RAMSEY:  May I have one moment, Your Honor?

19           THE COURT:  Yes.

20           MS. RAMSEY:  Your Honor, same objection.

21           THE COURT:  I'm going to admit the introduction

22   decision and evidence sections of this at this time and sustain

23   the objection with respect to the other sections of the

24   document.

25           MR. HUSCHKA:  Ms. Boyd, would you pull up just page 1.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.321

1    BY MR. HUSCHKA:

2    Q.   Ms. Rogers, who does this rating decision relate to?

3    A.   Bruce L. Hay.

4    Q.   And was this issued following the C&P examinations in

5    Government's Exhibit 204 and 205?

6    A.   Yes.

7    Q.   What was the date?

8    A.   The date of this rating decision is September 12, 2007.

9    Q.   Could you read the portion under introduction just starting

10   at "we have received"?

11   A.   "We have received a copy of your recent VA examinations

12   dated August 16, 2007 and August 24, 2007.  Based on a review

13   of the evidence listed below, we have made the following

14   decisions on your claim."

15   Q.   Can you read the two decisions that were made in this

16   instance?

17   A.   "(1) Evaluation of generalized choreiform movement disorder

18   (previously evaluated as psychomotor abnormal tremors or body

19   movements), which is currently 100 percent disabling is

20   continued.

21       "(2) Evaluations of conversion disorder, which is currently

22   100 percent disabling is continued."

23   Q.   May I refer you to Government's Exhibit 207.  Do you

24   recognize that?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.322

1    Q.   What is it?

2    A.   This is a VA Form 12-4138, statement in support of claim.

3    Q.   Is this something that is submitted by the defendant to the

4    VA?

5    A.   Yes.

6         MR. HUSCHKA:   Your Honor, we would move to admit

7    Government's Exhibit 207.

8         THE COURT:   I believe there's no objection to 207; is

9    that correct?

10        MS. RAMSEY:   Correct, Your Honor.

11        THE COURT:   207 admitted.

12        MR. HUSCHKA:   Permission to publish.

13   BY MR. HUSCHKA:

14   Q.   Ms. Rogers, could you read the name there in the box on the

15   top left?

16   A.   Bruce L. Hay.

17   Q.   And what -- if you could just scroll out a little bit,

18   Ms. Boyd.

19        There's a date here on the kind of middle-bottom right

20   corner.   When was this received by the VA?

21   A.   It was received on April 10th of 2012.

22   Q.   Could you read the statement at the top there just under

23   "the following statement is made" and then read the text

24   underneath that, please?

25   A.   "I request that my 100 percent for conversion disorder and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.323

1   seizure disorder be changed to reflect a permanent and total

2   disability rating.  I contend that these conditions will never

3   improve.  I have enclosed a letter from my physician at the VA

4   clinic in Paola, Kansas supporting this request.  I currently

5   receive all my treatments at the VAMC in KC and the VA clinic

6   in Paola, Kansas.  Please secure my records in support of this

7   request."

8   Q.   And then on the bottom of the page there is this statement

9   in support of claims signed?

10  A.   Yes.

11  Q.   Could you read the text that is right above the signature

12  there?

13  A.   "I certify that the statements on this form are true and

14  correct to the best of my knowledge and belief."

15  Q.   And is it dated?

16  A.   Yes.

17  Q.   What's the date?

18  A.   April 3, 2012.

19  Q.   If you turn to page 2, please.

20       All right.  Could you read the date here?

21  A.   March 12th of 2012.

22  Q.   And starting with the text there, "Mr. Bruce L. Hay," could

23  you please read that?

24  A.   "Mr. Bruce L. Hay has been a patient at the Paola

25  Community-based Outpatient Clinic and followed by me since

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.324

1    July 30th of 2007.  He has a history of a traumatic brain
2    injury sustained in 2005 and a seizure disorder and conversion
3    reaction subsequent to this.  He has been on medication for
4    these conditions and is seen regularly in follow-up.  In my
5    opinion, he has a total and permanent disability.  He continues
6    to have multiple problems with activities of daily living and
7    requires assistance from his family to manage these."
8    Q.   Does the VBA rely on this certification and statement in
9    support of claim that was provided here by the defendant?
10   A.   Yes.
11   Q.   And does the VBA rely on the statement from his doctor that
12   he provided with that application?
13   A.   Yes.
14   Q.   So what changes if an application like this for permanent
15   and total disability is granted?
16   A.   If we determine that a veteran is permanent and totally
17   impaired, then that's when we are able to grant the additional
18   ancillary benefits such as Chapter 35 dependents' educational
19   assistance which also then grants the medical or insurance to
20   his spouse and to his children.
21   Q.   And after this time if this application were granted, would
22   the defendant continue to be subject to a re-examination by the
23   VBA in order to maintain his same level of benefits?
24   A.   No.
25   Q.   So after a form like this is submitted, then what happens?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.325

1  A.   So in this situation we had the letter from his physician,

2  so we would request a VA examination to determine the current

3  level of disability to determine if there has been any

4  improvement, and then we would make a decision based on all the

5  medical evidence.

6  Q.   If you take a look at Government's Exhibits 208-A and

7  208-B, what are those?

8  A.   These are compensation and pension exam reports.

9  Q.   And did these take place after the defendant's application

10  for permanent and total disability?

11  A.   Yes.

12  Q.   Are these reports that are done by the examining provider

13  at or near the time they conduct the exam?

14  A.   Yes.

15  Q.   They continue to be maintained by VBA in its regular course

16  of business?

17  A.   Yes.

18        MR. HUSCHKA:  Your Honor, we move to admit

19  Government's Exhibits 208-A and 208-B.

20        MS. RAMSEY:  Same objection, Your Honor.

21        THE COURT:  I'll sustain at this time.

22  BY MR. HUSCHKA:

23  Q.   Ms. Rogers, if I could refer you to Government's

24  Exhibit 209.  Do you recognize that?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.326

1   Q.   What is that?

2   A.   That is a VBA rating decision.

3   Q.   And is this rating decision, like the others we've

4   discussed, made by the rater at or near the time they issue the

5   rating?

6   A.   Yes.

7   Q.   Is it maintained by the VBA in its ordinary course of

8   business?

9   A.   Yes.

10          MR. HUSCHKA:  Your Honor, we move to admit

11  Government's Exhibit 209.

12          THE COURT:  Is there an objection?

13          MS. RAMSEY:  Yes, Your Honor.  Same objection.  Yes,

14  same objection; confrontation.

15          THE COURT:  I'm going to admit the introduction

16  decision and evidence sections of this exhibit at this time.

17  Sustain the objection to the rest of it at this time.

18  BY MR. HUSCHKA:

19  Q.   Ms. Boyd, could you pull up just page 1, please.

20          So, Ms. Roger, who does this rating apply to?

21  A.   Bruce L. Hay.

22  Q.   Is this the rating that was issued after his application

23  for permanent and total disability and after the C&P

24  examinations were conducted?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.327

1   Q.   Could you read the date of this rating decision?

2   A.   April 20th of 2013.

3   Q.   And then could you read the portion under introduction

4   starting "you filed a claim"?

5   A.   "You filed a claim for increased evaluation that was

6   received on April 10, 2012.  Based on a review of the evidence

7   listed below, we have made the following decisions on your

8   claim."

9   Q.   And then under decision could you read number two and

10   number three?

11   A.   "(2) Evaluation of generalized choreiform movement

12   disorder, which is currently 100 percent disabling, is

13   continued.

14       "(3) Evaluation of conversion disorder with major

15   depressive disorder, which is currently 100 percent disabling,

16   is continued."

17   Q.   So at this point is the defendant now entitled to dependent

18   educational assistance or the other type of ancillary benefits

19   that you described earlier?

20   A.   Yes.  Issue number four is where we granted the basic

21   eligibility to dependent educational assistance.

22   Q.   That's because of the permanent and total disability

23   rating?

24   A.   Correct.

25   Q.   And at this point he's no longer subject to regular

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.328

1  examinations to determine whether his disabilities have

2  improved?

3  A.   Correct.

4  Q.   Under what circumstances other than a routine future

5  evaluation might the VA learn about the defendant's disability

6  having improved?

7  A.   We could receive information from his provider within the

8  VA Medical Center, we could receive information from --

9  potentially from law enforcement, and we can get information

10  through Office of Inspector General on a hotline complaint.

11        THE COURT:  When you're at a good stopping point,

12  we'll take a lunch break.

13        MR. HUSCHKA:  Your Honor, I think I have about three

14  exhibits and we can go fairly quickly here.

15        THE COURT:  Okay.

16        MR. HUSCHKA:  May I approach?

17        THE COURT:  Yes.

18  BY MR. HUSCHKA:

19  Q.   Ms. Rogers, I'm handing you what's been marked as

20  Government's Exhibit 215.  Do you recognize that?

21  A.   Yes.

22  Q.   What is it?

23  A.   This is a historical payment inquiry screen.

24  Q.   And does Government's Exhibit 215 -- is that a fair and

25  accurate depiction of information that's contained in VBA's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.329

1   computer system?

2   A.  Yes.

3        MR. HUSCHKA:  Move to admit Government's Exhibit 215.

4        MS. RAMSEY:  No objection.

5        THE COURT:  Exhibit 215 admitted.  You can publish.

6   BY MR. HUSCHKA:

7   Q.  Ms. Boyd, could you pull up the first page, please.  So --

8   and highlight those two left columns, if you would please, at

9   the top.  So what's -- if you could go over so we could see the

10  date as well, please.

11       Ms. Rogers, could you explain to the jury what is reflected

12  here on these two columns, amount and pay date?

13  A.  So the first line shows an amount of $1,012.08 that was

14  paid October 1st of 2018.

15  Q.  And if you go down a little bit, starting with -- let's

16  start at the bottom, June 30, 2017.  Is this the amount of

17  disability benefit payments that the defendant is receiving at

18  that time?

19  A.  Yes.

20  Q.  Are these paid on a monthly basis?

21  A.  Yes.

22  Q.  And you'll notice at some point the amount changes a little

23  bit about $80 from 3,990 and 4,070.  Could you explain to the

24  jury those minor changes in the amount of benefits?

25  A.  So changes in benefits can be based on cost of living

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                      2:19-cr-20044-JAR
                                   USA v. Bruce L. Hay
                                   ROA - Volume 3, p.330

1    adjustment that occur on a regular basis.  It can also change

2    based on the status of dependents within the household.

3    Q.   Okay.  And then, Ms. Boyd, if you can zoom out and go to

4    the last page, please.  And then just highlight those two left

5    columns or two or three left columns there.

6         So does this Government's Exhibit 215 continue to have sort

7    of chronological listing of the disability payments that the

8    defendant received over time?

9    A.   Yes.

10   Q.   And this goes back to 2011.  Did you -- are you familiar

11   with the system that maintains this information?

12   A.   Yes.

13   Q.   Does it only go back so far in the computer in terms of

14   what you're able to pull on this screen?

15   A.   Yes.

16   Q.   So it doesn't mean that the defendant started receiving

17   benefits in 2011, right?

18   A.   Correct.

19   Q.   Did he receive benefits in approximately this amount at the

20   time his initial benefit claim was granted back in 2007?

21   A.   Correct.

22   Q.   Did there come a time when you were contacted by the VA-OIG

23   regarding the defendant?

24   A.   Yes.

25   Q.   When was that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.331

1  A.   In April of 2017.

2  Q.   Is it common for the OIG to contact the VBA regarding

3  disability benefit payments?

4  A.   Yes.

5  Q.   Who did you meet with at that time?

6  A.   Kerry Baker.

7  Q.   Did he share any evidence of his investigation with you?

8  A.   Yes.

9  Q.   What did you do after that?

10  A.   After that we requested another C&P exam for Mr. Hay so

11  that we could determine if there had been improvement in his

12  current disability.

13  Q.   Did those C&P examinations take place?

14  A.   Yes.

15  Q.   Then after those C&P examinations were the defendant's

16  disability payments for conversion disorder and choreiform

17  movement disorder terminated?

18  A.   Yes.

19  Q.   Do you recall when they were officially terminated?

20  A.   In August of 2018.

21  Q.   Now, were there certain benefits that the defendant was

22  receiving that were totally separate from the conversion

23  disorder and the choreiform movement disorder?

24  A.   Yes.

25  Q.   Did those remain intact?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.332

1    A.   Yes.

2    Q.   So he was entitled for that even though you terminated for

3    choreiform and movement disorder?

4    A.   Yes.

5    Q.   I think on Government's Exhibit 215 -- if you could pull

6    that back up, Ms. Boyd.

7         Ms. Rogers, you are describing the first couple payments

8    listed there that showed about a thousand dollars.  Was that

9    the amount that the benefits received after his benefits for

10   conversion disorder and choreiform movement disorder were

11   terminated?

12   A.   Yes.

13   Q.   Ms. Rogers, I'm handing you what has been marked as

14   Government's Exhibit 216.  Do you recognize that?

15   A.   Yes.

16   Q.   What is it?

17   A.   This is a spreadsheet of different effective dates and

18   payments that were made.

19   Q.   And is that a fair and accurate summary of information

20   that's maintained in VBA's records?

21   A.   Yes.

22        MR. HUSCHKA:  We would move to admit Government's

23   Exhibit 216.

24        THE COURT:  Any objection?

25        MS. RAMSEY:  One moment, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.333

1          No objection.

2          THE COURT:  216 admitted.  You can publish.

3   BY MR. HUSCHKA:

4   Q.   Ms. Rogers, could you just explain each column here in the

5   information starting with the evaluation column here.

6   A.   So the evaluation indicates 100 percent, which would be the

7   amount that was assigned to the veteran.

8   Q.   And do these -- are these each individual payments related

9   to the defendant's disability benefits on the dates listed

10  there?

11  A.   Yes.

12  Q.   And so what does SMC refer to?

13  A.   Special monthly compensation.

14  Q.   Is that what you described earlier about being so disabled

15  you need the aid and attendance of another person to be

16  entitled to this benefit?

17  A.   Yes.

18  Q.   And then next to the total payment column it says

19  100 percent rate only.  What does that mean?

20  A.   So that is the rate payable for a veteran that's in receipt

21  of 100 percent service-connected disability without any

22  additional benefits on top of that.

23  Q.   And then next to that where it says SMC, is that the amount

24  per month he's getting because of aid and attendance?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.334

1   Q.   And to the right, additional dependents, are those amounts

2   that he's getting for his number of dependents?

3   A.   Yes.

4   Q.   And so the three of those, do those make up what's

5   reflected in the total monthly payment column?

6   A.   Yes.

7   Q.   And so if you look at the second column from the right that

8   says "entitlement after 2008 termination," what do those

9   figures reflect?

10  A.   So this reflects the remaining disabilities that he is

11  service-connected for that are not related to conversion

12  disorder or the choreiform disorder or the aid and attendance.

13  Q.   So after his benefits are terminated, does VBA go back and

14  determine what he would have been entitled to had he never

15  received them in the first place?

16  A.   Yes.

17  Q.   The amounts listed in this column are not related to the

18  conversion disorder?

19  A.   Correct.

20  Q.   And then on the right, overpayment for conversion disorder,

21  what does that reflect?

22  A.   That is the difference between the total payment and the

23  entitlement after the 2018 termination.

24  Q.   So the overpayment for conversion disorder is what the VBA

25  has determined the defendant received as a result of his claim

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.335

1    for conversion disorder; is that correct?

2    A.   Yes.

3    Q.   Handing you what's been marked as Government's Exhibit 217.

4    Do you recognize that?

5    A.   Yes.

6    Q.   What is it?

7    A.   These are overpayment calculations for the period of

8    January 1, 2011 through August 31st of 2018.

9    Q.   Okay.  And is the information that is in Government's

10   Exhibit 17 a fair and accurate depiction of information

11   maintained in VBA's systems?

12   A.   Yes.

13          MR. HUSCHKA:  I would move to admit Government's

14   Exhibit 217.

15          MS. RAMSEY:  No objection.

16          THE COURT:  Exhibit 217 admitted.  You can publish.

17   BY MR. HUSCHKA:

18   Q.   So, Ms. Rogers, can you -- and, Ms. Boyd, if you can

19   highlight the bottom portion there that has the total.

20      What does that figure relate to right there?

21   A.   That is the total amount of overpayment that was paid to

22   Mr. Hay for the period of January 1, 2011 through August 31,

23   2018.

24   Q.   So those figures we just saw in Government's Exhibit 2016

25   on the far right side of the column, is this the total from

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.336

1   August back to the beginning of 2011 that the defendant was

2   paid for his conversion disorder claim?

3   A.   Yes.

4   Q.   And I'll note this goes back to 2011.  Were you asked to

5   just calculate the amount back to that time?

6   A.   Yes.

7   Q.   In other words, if you were to go back further, it would be

8   greater than --

9        MS. RAMSEY:  Objection, Your Honor.  Objection.  May

10  we approach?

11       THE COURT:  Let's take a lunch break.  We'll take this

12  up while the jury is eating.  Let's come back at 1:30 because I

13  have some other matters to take up with you as well.  We'll

14  recess until 1:30.

15      (The following proceedings occurred outside the presence of

16  the jury.)

17       THE COURT:  Ms. Rogers, you can leave as well and come

18  back at 1:30 to resume.

19       Okay.

20       MS. RAMSEY:  Thank you, Your Honor.  Our objection was

21  to -- I believe the government was asking Ms. Rogers about

22  whether or not there would be a larger estimation of loss prior

23  to that 2011 date.  The reason we did not object to

24  Government's Exhibit 217 was, I believe the court's limine

25  ruling was that as far as getting into total estimation of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.337

1    loss, that the government could get into such between the time

2    limits set out more specifically in the indictment, 2011, up to

3    until 2018, I believe.

4           And I believe the question was going to -- and I

5    believe that anything -- any total estimation of loss or loss

6    discussed prior to 2011, the court ruled that it would fail the

7    403 balancing test.

8           So we were anticipating the question asked by the

9    government was to ask Ms. Rogers about loss prior to that 2011

10   date.

11          MR. HUSCHKA:  Your Honor, the jury had just heard that

12   the defendant started receiving these payments -- and the -- we

13   created the exhibit from January 2011, but I think explaining

14   to the jury some context for why this stops at 2011, the fact

15   that he received disability payments prior to that is not an

16   issue.  That fact has been put before the jury.

17          THE COURT:  I think it's permissible to ask this

18   witness if he had received disability payments for these two

19   particular disorders, one or both of them, before that date,

20   but not go beyond that and ask her to calculate loss or

21   anything like that because doesn't the indictment say "on or

22   about" or maybe "at least by," whatever it says, 2011?  That's

23   sort of the starting point, although it's a little -- it could

24   go back before then obviously.

25          MR. HUSCHKA:  Yes, Your Honor.  I mean, the indictment

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.338

1  alleges "beginning on a date unknown but at least by on or

2  about."  We do expect the evidence in trial will be that it

3  goes all the way back to when these benefits were applied for,

4  but until that evidence comes in, we are introducing only this

5  exhibit consistent with the court's ruling.

6         THE COURT:  Okay.  I think you can ask her whether he

7  was receiving payments before that date -- I don't think

8  there's any dispute about that -- and leave it at that, and

9  then I'll deal with later, if you want to go into amounts

10 before that date with evidence that there was some issue with

11 payments before that date.  I don't know that I've heard that

12 yet.

13        I'm going to -- it's been a while since I've looked at

14 *Crawford*.  I'm going to look at *Crawford*.  When we're talking

15 about these medical records that I've sustained the objections

16 to, there are parts of them that obviously rely upon statements

17 that the defendant made as part of his medical treatment and

18 evaluation, and I think those are not hearsay, at least they're

19 statements of a party-opponent.  On the other hand, so far the

20 witness that's testifying to them wasn't the one that heard

21 these statements from the defendant.  So I just want to assure

22 myself that there is indeed a confrontation issue.  At the same

23 time, even if there isn't with respect to those, there's also

24 statements in these medical records that I think could be

25 viewed as interpretive, and again, without having the author of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.339

1    the medical records, or at least the person that evaluated the

2    defendant, and had those impressions or observations, you know,

3    those could be viewed as hearsay for sure.  So -- despite it

4    being a business record.

5             So I'm going to review that.

6             If there's anything else you want to argue to me when

7    we come back before I bring the jury back after lunch, let's

8    plan on -- let's plan on being here at 20 after 1:00, and we

9    can take up any further argument if there is any about that,

10   but I'm going to review *Crawford* and assure myself that this is

11   correct.

12            So all right.  So we'll be in recess until 1:20.

13        (Recess taken at 12:22 p.m.)

14        (The following proceedings occurred outside the presence of

15   the jury.)

16            THE COURT:  All right.  Let's return to the issue at

17   hand, which are Exhibits 201 through 206, 208 through 209.

18   I've either not admitted them -- I think there's one I didn't

19   admit -- the rest of them I admitted the first two pages --

20   sustaining the defendant's objection.  There were confrontation

21   clause issues.

22            So I spent the lunch hour reviewing *Crawford*,

23   reviewing the Tenth Circuit's further explanation of *Crawford*

24   in *United States v. Smalls*, which is a 2010 case, and I'm going

25   to admit these exhibits.  There's one I'm not sure -- let me go

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.340

1    through them.

2          But in general what we have here is we've got, for

3    example, Exhibit 201 is -- Exhibit 201 is a C&P examination

4    report.  Exhibit 202 is a C&P examination report.  Exhibit 203

5    is VA rating decision.  Exhibit 204 is a C&P examination

6    specific, I think, to neurological disorders report.

7    Exhibit 205 is the C&P examination related to psychology

8    records -- or evaluation, rather.  Exhibit 206 is VA rating

9    decision September 12th of 2007.  Exhibit 208 is C&P

10   examination report, and there's a subpart A and subpart B.

11   Subpart A is March of 2013 and so is subpart B of 208.  And

12   finally Exhibit 209 is a rating decision dated April 20, 2013.

13         So my analysis of this is as follows.  These exhibits

14   that are offered are all VBA records or, you know, either

15   related to compensation, pension, disability ratings, and

16   they're all business records.  This witness has established

17   that they're regularly conducted.  They're based on regularly

18   conducted activity.  VBA cited that draws from the health side

19   of it, the medical records in other words.  So it's a regularly

20   conducted activity.

21         These records are made in the ordinary course.

22   They're kept in the ordinary course.  It's the regular practice

23   to do this.  It's part of their disability evaluations and

24   reevaluations.

25         So there's statements in these records, some of which

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.341

1    are statements of Mr. Hay; some of which are statements,

2    observations, findings of medical doctors.

3           With respect to the statements of Mr. Hay in these

4    records, they're not hearsay, as they're statements of a

5    party-opponent so they're outside of the hearsay rules, so

6    there's really not a confrontation issue because you can't

7    confront yourself over your own statements.

8           With respect to the other statements of medical

9    practitioners, they're not hearsay because they're under the

10   803(4) exception for statements made for purposes of diagnosis

11   or treatment.  And statements that fall within the ambit of

12   that exception to the hearsay rule are not testimonial so long

13   as they're not made for the purpose of prosecution.  And the

14   Tenth Circuit says that should be viewed objectively and

15   subjectively.

16          The language that the Tenth Circuit uses in the *Smalls*

17   decision is as follows:  "We might today formulate a definition

18   of a testimonial statement which reads: a formal declaration

19   made by the declarant that, when objectively considered,

20   indicates the primary purpose for which the declaration was

21   made was that of establishing or proving some fact potentially

22   relevant to a criminal prosecution.  Or, to better conform to

23   the current state of Tenth Circuit precedent, we might say:  A

24   formal statement is testimonial if a reasonable person in the

25   position of the declarant would objectively foresee that the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.342

1   primary purpose of the statement was for use in the

2   investigation or prosecution of a crime."

3          With that test, neither the statements, findings,

4   observations that are recorded in the medical records that were

5   made by the medical treatment providers, none of those are

6   testimonial within that definition.  They were made for the

7   purpose of treating and diagnosing Mr. Hay, not for use in

8   investigation or prosecution of a crime.

9          And even if Mr. Hay's statements were hearsay --

10  they're not because they're statements of a party-opponent --

11  they, too, would fall under 803(4).  They were statements made

12  as he was seeking treatment, diagnosis, not statements to stake

13  out some position he had with respect to investigation or

14  prosecution of a crime.

15         So based on that I am admitting the following exhibits

16  in their entirety:  Exhibits 201, 202, 203, 204, 205, 206,

17  208-A and B, and 209.

18         And I think defendant has made a record about their

19  concerns under *Crawford* and the confrontation clause issues as

20  they see them, but that's my ruling.

21         So you can resume your examination of this witness if

22  you like and make a record, Mr. Huschka, that all of these are

23  now exhibited -- admitted in their entirety.

24         MR. HUSCHKA:  Sorry, Your Honor.  I want to make sure

25  I understand and clarify.  So do you want me to raise this

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                     2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.343

1    issue when Ms. Rogers is on the stand?

2          THE COURT:  When the jury is back in, I'll just

3    announce that Exhibits 201 through 206, 208-A and -B, and 209

4    in their entirety are admitted, and you can take it from there.

5          MR. HUSCHKA:  Thank you, Your Honor.

6          THE COURT:  And get the witness back on the stand.

7          MR. HUSCHKA:  Yes.

8       (The jury entered the courtroom, after which the following

9    proceedings were had.)

10         THE COURT:  You can be seated.

11         MR. HUSCHKA:  Your Honor, they're locating Ms. Rogers

12   right now.

13         THE COURT:  Did you see her over the lunch hour?

14         MR. HUSCHKA:  I did not, Your Honor.

15         THE COURT:  I hope she didn't leave the building.

16         MR. HUSCHKA:  We think she just went to lunch, so

17   we're hopeful they're able to find her here shortly.

18   BY MR. HUSCHKA:

19   Q.  Ms. Rogers, before the lunch hour we had walked through a

20   series of exhibits.  I want to go back to a few of those.

21      Ms. Boyd, could you publish Government's Exhibit 200.

22      So this is the initial application for compensation in the

23   form of VA disability benefit payments that Mr. Hay filed in

24   2006?

25   A.  Yes, it is.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.344

1  Q.  And you testified about Government's Exhibits 201, 202,

2  203, 204, 205, 206, and 208-A and 208-B as being -- and 209 as

3  being records that VBA maintains in the ordinary course of

4  business; is that correct?

5  A.  Yes.

6          MR. HUSCHKA:  Your Honor, we would move to admit --

7          THE COURT:  I am fully admitting Exhibits 201 through

8  206 as well as 208-A and -B and 209.  Those are all fully

9  admitted at this time.

10         MR. HUSCHKA:  Ms. Boyd, could you publish Government's

11 Exhibit 201, please.  And if you could highlight the top part.

12 Thank you.

13 BY MR. HUSCHKA:

14 Q.  Ms. Rogers, what is Government's Exhibit 201?

15 A.  This is a compensation and pension exam report.

16 Q.  And what was the date of this exam?

17 A.  The exam was conducted on September 8th of 2006.

18 Q.  And who was the provider?

19 A.  Hawker.

20 Q.  And, Ms. Boyd, could you scroll out just a little bit and

21 move down just a little bit.

22     Where did this exam take place?

23 A.  This exam took place at the Topeka VA Medical Center.

24 Q.  Do you see a portion at the bottom that says "veteran

25 claims"?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.345

1    A.   Yes.

2    Q.   Could you read that one sentence there, please?

3    A.   "Veteran claims SC for head injury with tremors."

4    Q.   Ms. Boyd, if you could turn to page 2.

5         Ms. Rogers, there's a note there that starts "medical

6    history subjective complaints."  Could you read that paragraph,

7    please?

8    A.   "Medical history (subjective complaints):  Veteran reports

9    full body tremors occurring on a daily basis that began

10   approximately 72 after the MVA on 2/2005."

11   Q.   At the very bottom there's a paragraph titled "posture and

12   gait."  Could you read that, please?

13   A.   "Posture is erect with a spastic gait and retropulsion.

14   Veteran ambulates with a walker."

15   Q.   Page 3.  There's a note there about the middle that says

16   Diagnosis.  Could you read that?

17   A.   "Diagnosis:  Impaired gait and muscle spasm secondary to

18   conversion disorder."

19   Q.   Ms. Boyd, could you pull up Government's Exhibit 202.

20        Is this another C&P examination report?

21   A.   Yes.

22   Q.   Do you -- could you read the provider and date there?

23   A.   Provider was Medvedeva and examination took place on

24   September 15th of 2006.

25   Q.   These are two C&P exams related to the same claim for

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.346

1    benefits; is that right?

2    A.   Yes.

3    Q.   And why would the VA need two different C&P exams related

4    to the same claim?

5    A.   Whenever there's disability or disabilities claimed that

6    effect multiple body systems, then we have specific exam

7    templates related to those body systems and those disabilities.

8    Q.   If you turn to page 2.

9         Could you read the portion that the defendant reported

10   regarding present medical history?

11   A.   Okay.  "Present medical history over the past year:

12   Patient continues to have problems with weakness of his legs.

13   Can move only using walker.  Patient continuously has abnormal

14   movement of hands, neck, head, and body.  He cannot sit still.

15   His neck has involuntary movements, backwards.  He is not able

16   to concentrate or perform any goal-oriented activities.  In his

17   current condition, driving a vehicle is not a possible option

18   for him, what has been already recommended to patient before,

19   patient admits that he cannot do it."

20   Q.   Okay.  And down two more paragraphs, examination, could you

21   read that?

22   A.   "Examination:  It appears that after being in the motor

23   vehicle accident soon after patient returned back from Iraq, he

24   developed conversion disorder, affecting his ability to

25   function significantly.  Patient is not able to drive a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.347

1  vehicle.  Patient is not able to do any kind of job.  Patient

2  is not able to sit and not move his neck.  Patient is not able

3  to work without help of a worker."

4  Q.  And then could you read that last paragraph there starting

5  with "both"?

6  A.  "Both these symptoms affect his level of functioning to a

7  significant degree, make him unemployable."

8  Q.  Page 5.  About midway down there's a paragraph that starts

9  "he is not able."  Could you read that please?

10  A.  "He is not able to participate in any activities because of

11  not being able to walk, has significant problem with

12  involuntary movements, which are constant, very disabling,

13  symptoms are not intentionally produced, psychological factors

14  exacerbates symptoms, (tremors, movements, weakness)."

15  Q.  Could you read the next paragraph as well?

16  A.  "The patient has been discharged from military in 2006.

17  MVA February 2005.  His condition, ability to function, problem

18  with movement did not change or improve since that period of

19  time."

20  Q.  And then you can skip the next paragraph and read "the

21  patient also presents."

22  A.  "The patient also presents with conversion disorder, which

23  appears to be significantly disabling condition and is also

24  service-connected disability.  Patient cannot work, drive, and

25  sit without experiencing involuntary muscle spasms."

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.348

1   Q.   Page 6.  Could you read the paragraph titled "activities

2   and leisure pursuits"?

3   A.   "The only one leisure activity which he can do is to stay

4   away from everybody.  He is not able to walk or to participate

5   in other significant activities.  Very isolative due to

6   significant movement problem."

7   Q.   And then under "significant medical problems," can you read

8   the portion that says "his main cause"?

9   A.   "His main cause of disability appears to be involuntary

10  movements, tremors, and lag weakness, which has been

11  established after neurological workup as conversion disorder."

12  Q.   And then could you read the paragraph titled "summary of

13  statement of current psychosocial function"?

14  A.   "Patient has significant disability.  Patient cannot walk.

15  Patient has involuntary movements in neck and hands, which

16  increases under incidences of different stressors.  Tremors and

17  involuntary movements are so severe that patient cannot be a

18  driver.  Patient cannot perform any goal-directed activities.

19  Anger, depression, are affecting his marital life.  His role as

20  a husband is significantly affected after he returned from

21  Iraq."

22  Q.   You can stop there.  Page 7, please.  Could you read the

23  paragraph titled "leisure pursuits"?

24  A.   "Limited only to being able to sit on his own.  The patient

25  admits he is not able to enjoy life."

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.349

1   Q.  Page 8, down at Axis IV, could you read the portion

2   starting "unemployable"?

3   A.  "Unemployable, severe problems with ADL functioning:

4   Unable to walk, constant involuntary movement significantly

5   affecting communication with patient."

6   Q.  Could you read Axis V?

7   A.  "Axis V:  25.Pt is unable to function in almost all areas

8   (job, family as above).  Behavior is considerably influenced by

9   motor deficits, which are qualified conversion disorder.  The

10  patient consistently has problem of walking, sitting position,

11  he has problem of staying still.  He is not able to perform any

12  goal-oriented activity due to significant involuntary

13  movements."

14  Q.  Page 9.  The bottom there's a paragraph 2 "conversion

15  disorder," but could you read subparagraph B?

16  A.  "Because trauma preceding the initiation of the deficits

17  and psychological stressors contribute to exacerbation of

18  involuntary movements.  Patient's deficits are not

19  intentionally produced."

20  Q.  Could you read part E?

21  A.  "Patient's every day activity is affected by his condition.

22  Patient is not able to provide care of himself without help of

23  his wife, including simple activities of daily living.  Patient

24  has constant consistent involuntary movements of his body.

25  Those involuntary movements are not controlled by the patient,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.350

1    although they are increased at the time of different stressors.

2    Patient is unemployable."

3    Q.   Ms. Boyd, if you could pull up Government's Exhibit 203.

4         You previously testified, Ms. Rogers, that this is the

5    rating decision that was issued as a result of those C&P

6    examinations; is that right?

7    A.   Yes.

8    Q.   Ms. Boyd, if you could turn to page 3.  Does this lay out

9    the reason for VBA's decision as to the level of disability

10   benefits the defendant would receive?

11   A.   Yes.

12   Q.   Could you -- on page -- so item 1 there, could you read the

13   portion that starts "the VA examination dated September 8,

14   2006"?

15   A.   "The VA examination dated September 8, 2006 shows you have

16   secondary conditions to this conversion, that will be addressed

17   separately, that cause you great difficulty in your activities

18   of daily living.  You are unable to concentrate and perform

19   goal-oriented activities.  You are unable to hold any kind of a

20   job.  You display irritability and have a sense of a

21   foreshortened future.  An evaluation of 100 percent is assigned

22   whenever there is evidence of total occupational and social

23   impairment due to such symptoms as:  Gross impairment in

24   thought processes or communication; persistent delusions or

25   hallucinations; grossly inappropriate behavior; persistent

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.351

1   danger of hurting self or others; intermittent inability to

2   perform activities of daily living (including maintenance of

3   minimal personal hygiene); disorientation to time or place;

4   memory loss for names of close relatives, own occupation, or

5   own name.

6   Q.   And that next part, could you read that last two sentences

7   there?

8   A.   "Since there is a likelihood of improvement, the assigned

9   evaluation is not considered permanent and is subject to a

10   routine future" -- I'm sorry -- "subject to a future review

11   examination."

12   Q.   What does that mean?

13   A.   That means that based on the evidence that was reviewed

14   when this decision was made, it appeared that the condition

15   could improve over time.

16   Q.   If you could read the paragraph under -- could you read the

17   heading for paragraph 2 and then the paragraph below it as

18   well?

19   A.   "Service connection for psychomotor abnormal tremors or

20   body movements as secondary to the service-connected disability

21   of conversion disorder.

22       "Service connection for psychomotor abnormal tremors or

23   body movements has been established as related to the

24   service-connected disability of conversion disorder.  This

25   condition is shown on the VA examination dated September 8,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.352

1    2006, and noted by the examiner to be secondary to your

2    conversion disorder.  The tremors affect your hands, neck,

3    head, and body.  These tremors occur daily.  An evaluation of

4    100 percent is assigned whenever there is an average of at

5    least one major seizure or whole body tremor per month over the

6    last year."

7    Q.   And so in issuing this rating decision, is the VBA relying

8    on information that was provided by the defendant during these

9    C&P examinations?

10   A.   Yes.

11   Q.   And then if you could turn to page 5, please.

12   A.   On that same --

13   Q.   Yes, the same exhibit, the very bottom.  Number 11, could

14   you read that?

15   A.   "Entitlement to special monthly compensation based on aid

16   and attendance.

17        "Entitlement to special monthly compensation based on aid

18   and attendance criteria being met is granted from March 1,

19   2006.  Because of your 100 percent evaluation, difficulty

20   ambulating, and meeting the needs of daily activities, we have

21   granted the allowance for the aid and attendance of another

22   person.  Entitlement to special monthly compensation based on

23   aid and attendance criteria being met is granted from March 1,

24   2006."

25   Q.   Ms. Rogers, is this what you testified earlier, this is the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.353

1  additional benefit that a veteran may receive if they actually

2  require the aid and attendance of another person to engage in

3  the activities of daily living?

4  A.   Yes.

5  Q.   Ms. Boyd, if you could pull up Government's Exhibit 204.

6      I think you testified earlier this is another C&P

7  examination that was conducted.  Was this one of the routine

8  C&P examinations you talked about?

9  A.   Yes.

10 Q.   Could you read the priority of exam, examining provider,

11 and examined on date?

12 A.   Priority of exam is review; examining provider, Kindling;

13 and examined on August 16, 2007.

14 Q.   Does this review mention this is a routine re-review?

15 A.   Yes.

16 Q.   Where was the examination?

17 A.   At the Topeka VA hospital.

18 Q.   And could you read the portion that says "this

19 examination"?

20 A.   "This examination is given a priority of a review and under

21 general remarks is stated review examination for (1) conversion

22 disorder, (2) psychomotor abnormal tremors or body movements

23 associated with conversion disorder."

24 Q.   And when we looked at the rating document, it listed

25 several different disorders, a couple of which were conversion

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.354

1    and one associated with tremors.

2        Why does this C&P exam only discuss those two ratings?

3    A.   These were the only two disabilities that were determined

4    had the potential to improve over time, and so those were the

5    only two that indicated a review exam was needed.

6    Q.   Were these the two disabilities that were rated at

7    100 percent?

8    A.   Yes.

9    Q.   Page 3, the middle paragraph there that starts "at the

10   present time," can you read that, please?

11   A.   "At the present time the veteran states he has frequent

12   problems with falls, discoordination, uncoordination, dropping

13   objects, inability to grasp, and has frequent considerable

14   difficulty with particularly upper body movements constantly.

15       "At times he has muscle cramps.  He denies major problems

16   as far as pain is concerned.  He has had several falls and at

17   the present time requires a cane to walk.  He walks with his

18   back bent backwards and feels he needs to hold on to other

19   objects frequently.  He uses often a walker, although the exam

20   today came with a cane."

21   Q.   And then could you read a portion of the next paragraph

22   starting with "he states he is unable"?

23   A.   "He states he is unable to walk very well and he is unable

24   to drive or do other activity, and the functional assessment is

25   that he is markedly impaired, unable to tie his shoes, and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.355

1   unable to put on his socks.  It takes him a long time to eat

2   because of the constant shaking.  He feels sometimes that

3   particularly if he is able to focus sharply on a particular

4   activity, that the tremors are more tolerable and decrease

5   somewhat.  They never totally disappear.  He is generally sleep

6   deprived.  Initially he slept on a couch, but at this time has

7   a different kind of bed that he can adjust differently so he

8   can be relatively" --

9   Q.  And you can continue on to the next page.

10  A.  "So he can be relatively comfortable although the shakes

11  persist.  There is no time -- there is no time at any time

12  during the day that he does not have some type of shaking and

13  tremors.  They are random."

14  Q.  Could you also read the next three short paragraphs under

15  physical examination?

16  A.  "The gait has the appearance of similar to a patient with

17  cerebral palsy.  He always hold on to nearby objects and a

18  number of times appears as if he is on the verge of falling.

19  He is able to untie his shoes, remove his socks and trousers

20  with some difficulty.  He is not able to dress himself without

21  help.

22      "The veteran has constant movements of the head, neck,

23  thorax, back, arms, trunk, and legs, generally more of the

24  upper body than the lower."

25  Q.  And then at the bottom of page 4, continuing on to page 5,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.356

1    could you read the diagnosis?

2    A.    "Diagnosis:   (1) Diffuse generalized choreiform movement

3    disorder of unclear etiology, previously diagnosed as

4    associated with conversion disorder.

5        "(2) S/P traumatic brain injury, secondary to MVA

6    February 2005."

7    Q.    Ms. Boyd, could you pull up Government's Exhibit 205.

8        Could you tell us what the date is of this exam as well as

9    the provider?

10   A.    Date of exam was August 24th of 2017, and the provider was

11   James Sharpnack.

12   Q.    And, Ms. Boyd, could you turn to page 3 of the PDF.

13       But it's page 2, Ms. Rogers, if you're looking at the

14   bottom page numbers on your exhibit.  Could you read the

15   portion near the bottom of that first paragraph that starts

16   with "he reported"?

17   A.    "He reported having the following problems:  Standing,

18   maintaining his balance, frequent falls, coordination, walking,

19   grabbing items.  He displayed involuntary movement of his head,

20   neck, and arms.  While walking, he walks with his back bent

21   backwards to help him maintain his balance.  His wife reported

22   that there are occasions when he cannot walk, and his wife

23   reported that the last incident occurred about 2.5 months ago."

24   Q.    If I could call your attention up near the top there where

25   it says "it also says he reported that he now uses," if you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.357

1   could read that.  It's the first paragraph near the bottom of

2   the very first paragraph.

3   A.   "He reported that he now uses a walker or a cane to move

4   around.  He reported that he struggles to keep his balance.  He

5   reported that began having a tremor after the accident.  He

6   reported that he has difficulty grabbing items with his left

7   hand.  He reported having muscle spasms and possible seizures.

8   He reported being sent on convalescent leave and terminal

9   leave."

10  Q.   Ms. Boyd, it's page 7 of the PDF.

11       And, Ms. Rogers, it would show page 4 at the bottom of the

12  physical exhibit.  Near the middle of that page there's a

13  heading examination and one mental status.  Could you read the

14  portion that he says "he displayed tremors" through the end of

15  that paragraph?

16  A.   "He displayed tremors in his hand, neck, head, and body.

17  He walked with the aid of a cane.  At the end of the interview

18  he had difficulty keeping his balance and had to get extra

19  assistance by leaning against the wall or on the doorframe."

20  Q.   And, Ms. Boyd, could you publish Government's Exhibit 206.

21       Now, Ms. Rogers, I think you testified about the first

22  couple pages of this.  Is this a rating decision that was

23  issued as a result of these the C&P examinations?

24  A.   Yes.

25  Q.   If you could turn to page 2.  Under reason for decision,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.358

1   can you read the portion that starts in the second paragraph

2   "you reported"?

3   A.   "You reported frequent problems with falls, discoordination

4   and coordination, dropping objects, inability to grasp, and

5   frequent difficulty with upper body movements.  At times you

6   have muscle cramps.  You denied major problems as far as pain

7   is concerned.  You have had several falls and currently require

8   a cane to walk.  You denied headaches, migraines, syncopal

9   episodes.  You denied seizure activity of a repetitive nature.

10  You are unable to drive.  You have constant tremors and shakes

11  and are generally sleep deprived.

12      "Upon examination your gait had the appearance similar to a

13  patient with cerebral palsy in that you hold on to nearby

14  objects and appear as if you are on the verge of falling.  You

15  were unable to tie your shoes and remove your socks with some

16  difficulty and unable to dress yourself without help.  You had

17  constant movement of the head, neck, back, arms, trunk, and

18  legs.

19      "Your neck muscles at times demonstrated some spasm.

20  Cranial nerves 2 through 12 were grossly intact and vibratory

21  sense was preserved.  Your reflexes were present.  The examiner

22  diagnosed defused generalized choreiform movement disorder of

23  unclear etiology previously diagnosed as associated with

24  conversion disorder."

25  Q.   Could you read that next paragraph as well?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.359

1    A.    "This disability is not specifically listed in the rating

2    schedule; therefore, it is rated analogous to a disability in

3    which not only the functions affected but anatomical

4    localization and symptoms are closely related."

5    Q.    Can you explain what that means?

6    A.    So the rating schedule, again, is 38 Code of Federal

7    Regulations Part 4, and within Part 4 are disabilities,

8    injuries, diseases that are listed out by body part or system.

9    Not every disability is captured within 38 CFR Part 4.  So

10   there is a regulation.  38 CFR 4.20 that allows us to -- if the

11   disability is not specifically listed, allows us to rate using

12   a similar disability that shares similar functions, similar

13   anatomical location, similar symptoms.

14   Q.    Is that what was happening in this case?

15   A.    Yes.

16   Q.    And you listed off a lot of different physical limitations

17   and information that had been provided during the C&P

18   examinations.  Did the VA rely on those symptoms that were

19   reported by the defendant during the C&P examinations?

20   A.    Yes.

21   Q.    And did they -- did the VBA rely on his representation and

22   his presentation that he suffered from shakes and tremors that

23   were constant?

24   A.    Yes.

25   Q.    Was this a permanent disability designation?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.360

1   A.   No.

2   Q.   So he was still subject to future examinations?

3   A.   Yes.

4   Q.   Could you turn to page 3 under heading two, if you read the

5   bottom there where it says "an evaluation"?

6   A.   "An evaluation of 100 percent is continued for symptoms

7   creating total occupational and social impairment including

8   depressed mood, irritability, and impulse control.  An

9   evaluation of 100 percent is assigned whenever there is

10  evidence of total occupational and social impairment due to

11  such symptoms as gross impairment in thought processes or

12  communication, persistent delusions or hallucinations, grossly

13  inappropriate behavior, persistent damage of hurting self or

14  others, intermittent inability to perform activities of daily

15  living, including maintenance of minimal personal hygiene,

16  disorientation to time or place, memory loss for names of close

17  relatives, own occupation, or own name."

18  Q.   So after this rating decision is issued and the 100 percent

19  disability rating is continued, does the defendant continue

20  then to receive the same level of disability payments?

21  A.   Yes.

22  Q.   If it was determined during this evaluation that his

23  disability had improved, would he have been potentially subject

24  to a lesser disability rating?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.361

1  Q.  Would he have received less in disability compensation if

2  that were the case?

3  A.  Yes.

4  Q.  Ms. Boyd, could you publish Government's Exhibit 207?

5      Ms. Rogers, you testified earlier that this was a statement

6  that the defendant filed for permanent and total disability.

7  Could you read the date on the bottom of that again?

8  A.  The date that it's signed?

9  Q.  The date that it's signed, yes, please.

10 A.  April 3, 2012.

11 Q.  So this is approximately five years after the rating

12 decision that we just talked about?

13 A.  Yes.

14 Q.  And, Ms. Boyd, if you could highlight the text at the top

15 there.

16     And could you just read his statement?

17 A.  "I request that my 100 percent for conversion disorder and

18 seizure disorder be changed to reflect a permanent and total

19 disability rating.  I contend that these conditions will never

20 improve.  I have enclosed a letter from my physician at the VA

21 clinic in Paola, Kansas supporting this request.  I currently

22 receive all my treatments at the VAMC in Kansas City and the VA

23 clinic in Paola, Kansas.  Please secure my records in support

24 of this request."

25 Q.  Could you pull up 208-A.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.362

1      I think you testified that 208-A was a compensation and

2   pension examination report that resulted after the defendant's

3   application for permanent and total; is that right?

4   A.   Yes.

5   Q.   Could you read the examining provider and the date that

6   this examination took place?

7   A.   Examining provider was Perry/Karyn B. and the examination

8   occurred on March 18th of 2013.

9   Q.   And where did the examination take place?

10  A.   At the VA Medical Center in Kansas City.

11  Q.   Page 3.  Could you read just the portion there, Axis IV,

12  about midway through the page?

13  A.   "Psychosocial and environmental problems (describe, if

14  any):  Mental and physical health conditions, unable to work."

15  Q.   Page 5.  Could you read -- there's an X there.  Could you

16  read what that says where the box is checked right above B?

17  A.   "Total occupational and social impairment."

18  Q.   What does that mean?

19  A.   So that means that the veteran displays behavior such as

20  impairment in thought process, impairment in social

21  interactions.  They can display an inability to maintain

22  personal hygiene, inability to perform activities of daily

23  living, delusions, hallucinations, those types of behaviors.

24  Q.   Page 8.  Could you read the portion right under paragraph

25  6, remarks about midway through the page?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.363

1   A.   "This report represents the review of symptoms since

2   veteran's last C&P evaluation on August 31, 2007.  Veteran is

3   100 percent service-connected for conversion disorder, and the

4   evidence suggests that there has been no improvement since the

5   time of his last evaluation.  Veteran's symptoms are considered

6   at this time to be permanently disabling with little reasonable

7   chance for appreciable improvement."

8   Q.   Next page, the third paragraph, there's a portion that

9   starts "veteran exhibited regular," could you read that

10  portion?

11  A.   "Veteran exhibited regular muscle spasms, cramping of

12  limbs, hyperextensions of arms and hands, head nods and bobs

13  and jerking movements throughout the evaluations.  At time his

14  limbs would lock up, freeze, and he was suspended in that pose

15  for several moments until his wife massaged the limbs and/or

16  apply the force to move them into a different position.

17      "Much of the time veteran is unable to independently engage

18  in most activities of daily living including needing help with

19  bathing, toileting, shaving and putting on clothing.  Veteran

20  is able to sort laundry, but other chores are completed by

21  others in the house."

22  Q.   You can stop there.  Is this important to a finding of

23  permanent and total disability?

24  A.   Yes.

25  Q.   208-B, who conducted this examination and when did it take

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.364

1    place?

2    A.    The examination was conducted by Genevieve Sue Keefer on

3    March 18th of 2013.

4    Q.    Page 3.  And, Ms. Rogers, it will show page 12 at the

5    bottom of your physical exhibit.  Could you read the portion

6    under medical history where it says "veteran comes"?

7    A.    "Veteran comes ambulatory using single point cane (with

8    very rigid stance and difficulty walking) and is accompanied by

9    wife who gives much of history.  She/he says that last year

10   while trying to get education benefits for one of their five

11   children, that they were told to place another claim.  He is

12   presently service connected at 100 percent for seizure

13   disorder, yet the only time that seizures are mentioned on his

14   CPRS/VA record they're in quotes (and he himself says he

15   doesn't have seizures).  Veteran had an attack while in this

16   exam room which wife/patient says is typical and that sometimes

17   he's normal and sometimes he has these spasms (via wife)."

18   Q.    And you can stop there.  Can you turn to page 10 on your

19   physical document?

20         Ms. Boyd, it's page 19 on the PDF.  Under functional

21   impact --

22   A.    I think it's one page before that one.

23   Q.    Yeah, page 10.  There you go.

24         At the top there it says "functional impact."  What is

25   being referenced here?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.365

1   A.   So this is looking at the impact that the disability has on

2   his ability to function physically.

3   Q.   And there's a letter that's excerpted here.  Do you see

4   that?

5   A.   Yes.

6   Q.   Is that the letter that Mr. Hay had attached to his

7   application for permanent and total disability?

8   A.   Yes.

9   Q.   Could you pull up 209.

10       I believe you testified this is the rating decision that

11  was issued as a result of the C&P examinations that were

12  conducted in 2013; is that right?

13  A.   Yes.

14  Q.   Ms. Boyd, if you could turn to page 3.

15       Could you read the top portion -- read the heading, as well

16  as the next sentence?

17  A.   Under number two?

18  Q.   Yes.

19  A.   "Evaluation of generalized choreiform movement disorder

20  currently evaluated as 100 percent disabling.

21       "The evaluation of generalized choreiform movement disorder

22  is continued as 100 percent disabling.  We reviewed the

23  evidence received and determined your service-connected

24  condition hasn't increased in severity sufficiently to warrant

25  a higher evaluation."

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.366

1   Q.   Then you can stop there.  Could you read the portion that

2   says "we have assigned"?

3   A.   "We have assigned a 100 percent evaluation for your

4   generalized choreiform movement disorder (previously evaluated

5   as psychomotor abnormal tremors or body movements) based on an

6   average of at least one major seizure per month over the last

7   year."

8   Q.   Page 4, item 3, could you read the sentence right under the

9   heading?

10  A.   "The evaluation of conversion disorder with major

11  depressive disorder is continued as 100 percent disabling."

12  Q.   There is a number of factors listed there under the reasons

13  for 100 percent evaluation.  Can you read the bottom where it

14  says "intermittent inability"?

15  A.   "Intermittent inability to perform activities of daily

16  living."

17  Q.   Read the next one as well, please.

18  A.   "Intermittent inability to perform maintenance of minimal

19  personal hygiene."

20  Q.   Next page.  Can you read the reference there under the

21  "Global Assessment of Function score"?

22  A.   "Your Global Assessment of Function (GAF) score is 30."

23  Q.   Sorry.  The bullet right above that.

24  A.   I'm sorry.  "Total occupational and social impairment."

25  Q.   And then at the bottom of page -- the bottom heading four,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.367

1   bottom of page 5, continuing on to page 6, could you read that?

2   A.   "Eligibility to dependents' educational assistance under 38

3   U.S.C. Chapter 35.

4        "Eligibility to dependents' educational assistance is

5   derived from a veteran who was discharged under other than

6   dishonorable conditions; and has a permanent and total

7   service-connected disability; or a permanent and total

8   disability was an existence at the time of death; or the

9   veteran died as a result of a service-connected disability."

10  Q.   Are these the additional benefits that you've talked about

11  today?

12  A.   Yes.

13  Q.   With the discussion of intermittent activities of daily

14  living, is the VA relying on information that the defendant

15  gave in the examinations in making those findings?

16  A.   Yes.

17  Q.   And issuing these ratings that gave him 100 percent

18  permanent and total disability designation?

19  A.   Yes.

20  Q.   So once he received this examination, was he subject to any

21  future examinations?

22  A.   No.

23  Q.   And then are there any circumstances under which he could

24  be examined again?

25  A.   If we received sufficient evidence from his medical

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.368

1  provider that his condition had improved or if we had received

2  a request from Office of Inspector General based on a hotline

3  complaint.

4  Q.   And you testified earlier regarding Government's

5  Exhibit 217 and the figures that you were asked to calculate,

6  and those went back to 2011; is that right?

7  A.   Yes.

8  Q.   Was the defendant receiving disability benefit payments

9  prior to 2011?

10  A.   Yes.

11          MR. HUSCHKA:   No further questions, Your Honor.

12                         CROSS-EXAMINATION

13  BY MS. RAMSEY:

14  Q.   Ms. Rogers, first I'd like to talk to you about what you

15  covered kind of early on in your testimony, how veterans

16  benefits are determined.   Okay?

17  A.   Okay.

18  Q.   So once a veteran submits a claim, it goes to, you said, I

19  think a VSR; is that right?

20  A.   Yes.

21  Q.   Veteran service representative?

22  A.   Yes.

23  Q.   And is that person just compiling, for lack of a better

24  word, information and medical documents and things in the file?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.369

1   Q.   Is that person making a decision, a rating decision?

2   A.   No.

3   Q.   That file is then passed on to an RSVR?

4   A.   RVSR, rating veteran service representative.

5   Q.   So can we call them rating examiner?

6   A.   We usually call them rating specialist.

7   Q.   Rating specialist, okay.

8        So that then goes to the rating specialist and that's the

9   person that makes the rating determination, correct?

10  A.   Yes.

11  Q.   All right.  Now, that person is trained on Title 38,

12  Section 4 of the Code of Federal Regulations?

13  A.   Part 3 and Part 4 of the federal regulations.

14  Q.   Part 3 and Part 4.  If you could, how many parts of that

15  code are there, do you know?  Hundreds?

16  A.   There's a lot.

17  Q.   Okay.  All right.  And this is kind of a code of laws that

18  guide them in determining how to figure out what a veteran's

19  rating is?

20  A.   Correct.

21  Q.   This code, that seems to make up more sections than we can

22  approximate, also has diagnostic codes for disabilities,

23  correct?

24  A.   Yes.

25  Q.   And it is the rating specialist's job to decide how to code

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.370

1    the disability?

2    A.   Yes.

3    Q.   And they do that by having a body of evidence, not just one

4    particular, let's say, C&P exam, correct?

5    A.   Yes.

6    Q.   And that code has diagnostic codes for all types of

7    disabilities?

8    A.   Yes.

9    Q.   PTSD, major neurological disorders, physical disorders, and

10   mental health disorders?

11   A.   Yes.

12   Q.   And it's the rating specialist's decision to see which one

13   fits, right?

14   A.   Yes.

15   Q.   The rating specialist doesn't get one statement from a

16   veteran and make a decision of how they're going to rate that

17   individual, correct?

18   A.   Correct.

19   Q.   Now, there are times when -- there's also a separate manual

20   that's based on this code, correct?  Is it called an M12?

21   A.   There's an M21 that is a manual that the Veterans Benefits

22   Administration has compiled that helps to establish the policy

23   and procedures for the employees to implement the Code of

24   Federal Regulations Part 3 and Part 4.

25   Q.   Okay.  So there's also a separate code -- well, manual that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.371

1   they use in addition to the Code of Federal Regulations?

2   A.   Yes.

3   Q.   Do you know how many codes for disabilities are contained

4   in the federal code of regulations?

5   A.   No.

6   Q.   Too many to count?

7   A.   Yes.

8   Q.   And, again, the rating examiner is determining which one of

9   these to assign to the veteran, which disability, which code?

10  A.   The rating specialist, yes.

11  Q.   It's not up to the veteran in any way?

12  A.   No.

13  Q.   Now, when the veteran -- the file is being coded, I think

14  you said there are instances where there may be a disability

15  that the rating specialist sees that doesn't fit into any

16  particular code?

17  A.   If there's a diagnosis that does not have -- if that

18  specific diagnosis is not specifically listed in 38 CFR Part 4,

19  then that's when they would do the analogous code.

20  Q.   When you say "do the analogous code," what you mean by that

21  is the rating specialist has to look at the file and then they

22  make an independent determination based on their view of how to

23  code this disability because there's not one that necessarily

24  goes to the diagnosis?

25  A.   So they determine the diagnostic code for rating purposes

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.372

1   based on the body system that's affected, the symptoms that are

2   associated, and the diagnosis.

3   Q.   They take all this information and they decide on how to

4   code it?

5   A.   Yes.

6   Q.   And what disability to rate it for?

7   A.   Yes.

8   Q.   Now, the rating specialist, they're not doctors, right?

9   A.   Correct.

10   Q.   They're just VA personnel?

11   A.   Correct.

12   Q.   Very little medical training?

13   A.   Correct.

14   Q.   And you're in the position of also reviewing medical

15   records as they are, correct?

16   A.   Yes.

17   Q.   And you have no medical degree?

18   A.   Correct.

19   Q.   And you're not a medical doctor?

20   A.   Correct.

21   Q.   All right.  Now, there's something called a DBQ, disability

22   benefits questionnaire, I think; is that correct?

23   A.   Yes.

24   Q.   Okay.  And these are forms of a sort that are given to the

25   C&P examiner to fill out; is that right?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.373

1    A.   Yes.

2    Q.   The rating specialist, who decides what type of form the

3    C&P examiner is going to get?

4    A.   The type of form that's determined is based on the

5    disability or disabilities being claimed, so based on that they

6    would look at the body system affected, and it's either the

7    veteran service representative or the rating specialist that

8    determines the DBQ to be selected.

9    Q.   Okay.  So the rating specialist or the veteran services

10   representative decides; the veteran doesn't have any input in

11   this in any way?

12   A.   Correct.

13   Q.   I want to talk to you about something called pyramiding or

14   maybe I should say anti-pyramiding.  Can you tell me what

15   pyramiding means?

16   A.   Pyramiding would be basically using the same symptoms to

17   grant more than one evaluation.  So I can give you an example

18   if it would help.

19   Q.   Well, maybe I can give you an example.  Let's say if

20   someone has a diagnosis of PTSD and someone has a diagnosis of

21   conversion disorder, but the examiner finds that those symptoms

22   overlap and they cannot determine which symptom is attributable

23   to one or the other.

24   A.   Okay.

25   Q.   The examiner then makes the decision about which one to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.374

1   rate the veteran for, correct, because you can't give them both

2   the same rating?

3   A.   Right.   So both of those disabilities use the same rating

4   schedule.   If they're related to each other, we would rate them

5   together as one disability.

6   Q.   Okay.   But you -- the pyramiding means you can't rate them

7   together because you can't assign both the same 100 percent or

8   same evaluation; is that right?

9   A.   Well, we couldn't -- I couldn't give 100 percent for PTSD

10  and 100 percent for another mental health disability.   So we

11  would -- whatever the primary mental health disability is, then

12  we would rate as, for example, PTSD with major depressive

13  disorder, and there would be one evaluation assigned.

14  Q.   If the veteran -- the rating specialist determines that

15  they don't have enough information in front of them to make a

16  rating decision, they could send that file back for more

17  information, correct?

18  A.   Yes.

19  Q.   They could seek out additional medical records, is one

20  thing they could do?

21  A.   Yes.

22  Q.   They could send the person for a C&P exam?

23  A.   Yes.

24  Q.   Now, when the rating specialist is done coding, I think, or

25  figuring out what codes, there's also a separate computer

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.375

1  software that assists them in figuring out how to rate the

2  disability and what percentages, correct?

3  A.   Yes.  It's ultimately the rating specialist's

4  responsibility to make sure that the evaluation that is being

5  assigned is -- matches what the symptoms associated with that

6  disability.

7  Q.   But then it's also inputted into a particular software that

8  helps them make that rating decision?

9  A.   Yes.  It confirms the decision.

10 Q.   When the rating specialist -- I want to talk about -- now

11 turn and talk to you about additional benefits.  I think you've

12 talked about aid and attendance benefits and special monthly

13 compensation benefits, correct?

14 A.   Yes.

15 Q.   When a veteran applies and is deemed to be 100 percent

16 disabled, it's the rating specialist who decides whether or not

17 they qualify for additional benefits, correct?

18 A.   Yes, based on the medical evidence.

19 Q.   Okay.  The veteran has nothing to do with that.  They

20 don't -- they're not asking, generally speaking, for the

21 additional benefits?

22 A.   They can.

23 Q.   They can?

24 A.   A veteran can request aid and attendance or special monthly

25 compensation.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.376

1   Q.   But they're not required to?

2   A.   No.

3   Q.   The rating specialist on their own can grant those

4   benefits?

5   A.   Yes.

6   Q.   And that's the same with dependent educational assistance

7   benefits?

8   A.   Yes.

9   Q.   And when the rating specialist makes a decision to grant

10  these additional benefits, sometimes the veteran doesn't even

11  know they're being considered for eligibility for additional

12  benefits?

13  A.   Yes.

14  Q.   I want to talk to you about aid and attendance benefits.

15  Do you know what code that is defined in?

16  A.   That is -- I don't know the specific code, no.

17  Q.   Does 38 CFR 3.352 sound right?

18  A.   Yes.

19  Q.   Part of the definition of aid and attendance is that -- for

20  aid and attendance the code says it is the particular functions

21  which the veteran is unable to perform should be considered in

22  connection with his or her condition as a whole, correct?

23  A.   Yes.

24  Q.   And it doesn't require in the code that that individual be

25  in constant need, correct?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.377

1   A.   Correct.

2   Q.   It says that the determination will be made and not be made

3   solely based on an opinion that the claimant's condition is

4   such that would require him or her to be in bed; they can be up

5   and about, correct?

6   A.   Yes.

7   Q.   Okay.  I want to talk specifically about this case and I

8   want to talk to you about Government's Exhibit 203.

9        MS. RAMSEY:  Would you mind putting up Government's

10  Exhibit 203 for me?  Page 5.

11       Do you have that in front of you?

12       THE WITNESS:  I'm sorry, what page?

13       MS. RAMSEY:  Page 5.

14       Could you switch over to allow Ms. Boyd --

15       COURTROOM DEPUTY:  Sure.

16  BY MS. RAMSEY:

17  Q.   Paragraph 11, this was the March 8, 2007 rating decision,

18  correct?

19  A.   Yes.

20  Q.   All right.  Paragraph 11 indicates in this particular

21  rating decision that Mr. Hay was entitled to special monthly

22  compensation based on aid and attendance, correct?

23  A.   Yes.

24  Q.   So this was based on 2007.  He was already getting special

25  monthly compensation and aid and attendance?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.378

1  A.  This was the -- this was the original rating decision that

2  granted that benefit.

3  Q.  Yes.  That's all I'm asking.

4  A.  Yes.

5  Q.  We then have another rating decision, Government's

6  Exhibit 206.  Would you display that, please?  And -- page 2.

7      And if you would, Ms. Rogers, if you'd read where it starts

8  under subsection one, "this disability is not specifically

9  listed."

10  A.  "This disability is not specifically listed in the rating

11  schedule; therefore, it is rated analogous to a disability in

12  which not only the functions affected but atomical localization

13  and symptoms are closely related."

14  Q.  Does that indicate to you that the rating specialist was

15  not necessarily diagnosing under a specific code for disability

16  but was finding an analogous code to rate it under based on the

17  symptoms?

18  A.  Correct.  Generalized choreiform movement disorder is not

19  specifically listed in Part 4.

20  Q.  So the rating specialist made the decision on how to rate

21  this because there was no code with it?

22  A.  Yes.

23  Q.  Okay.  I want to talk about Government's Exhibit 209.  Do

24  you mind putting that up, Ms. Boyd.

25      And Government's Exhibit 209, that's the rating decision in

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.379

1   April 20, 2013, correct?

2   A.   Yes.

3   Q.   Could you read paragraph 3 for me on that first page?

4   A.   Under decision?

5   Q.   Yes.

6   A.   "Evaluation of conversion disorder with major depressive

7   disorder, which is currently 100 percent disabling, is

8   continued."

9   Q.   And so there were separate -- 100 percent for the

10  choreiform movement disorder, which were the body tremors, but

11  there was also 100 percent major depressive disorder, correct?

12  A.   Conversion disorder with major depressive disorder.

13  Q.   Okay.  I want to turn to page 3 of Government's Exhibit

14  No. 209 that we were looking at and paragraph 2 ultimately down

15  at the bottom.

16       It says, "We have assigned a 100 percent evaluation for

17  your generalized choreiform movement disorder," and it goes on

18  to say "based on an average of at least one major seizure per

19  month over the last year"; is that correct?

20  A.   Yes.

21  Q.   There is a Code of Federal Regulations that deals with

22  neurological disorders, correct?

23  A.   Yes.

24  Q.   And those neurological disorders also have to do with

25  convulsive disorders; there's a schedule rating, correct?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.380

1   A.   I believe so, yes.

2   Q.   Does 38 CFR 4.124a sound familiar as the neurological

3   conditions and convulsive disorders?

4   A.   Yes.

5   Q.   And within that code it talks about major seizures, minor

6   seizures, and how often they have them per month.  Would you

7   agree that it says that 100 percent is assigned to averaging at

8   least one major seizure per month over the last year?

9   A.   Yes.

10  Q.   All right.  I want to talk to you specifically about

11  Government's Exhibit -- excuse me.  Give me a moment.

12       Could you bring up Government's Exhibit 201, please.

13       Government's Exhibit 201 is a report by a Dr. Kevin Hawker,

14  correct?

15  A.   Yes.

16  Q.   And just so I'm clear, you did not participate in this exam

17  in any way, so you can't testify to whether or not Mr. Hay said

18  something or the doctor interpreted something, correct?

19  A.   Correct.

20  Q.   This report was done back in 2006, over 15 years ago?

21  A.   Correct.

22  Q.   And as part of that report, for medical diagnosis the

23  report states that the tremors and muscle weakness occurred

24  after a motor vehicle accident in 2005, correct?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.381

1  Q.  I'd like to talk to you about Exhibit 202.  If you have

2  that in front of you, if you could bring that up, please.

3      And, again, same thing here.  This was a report done by a

4  Dr. Medvedeva almost 15 years ago, correct?

5  A.  Correct.

6  Q.  And I'd like to call your attention to page 2, and as far

7  as examination, there are statements that patient is not able

8  to drive a vehicle, not able to do any kind of job.  You don't

9  know if that was the interpretation by the doctor or statements

10 made by Mr. Hay, correct?

11 A.  Correct.

12 Q.  Ultimately -- and I'd like to turn to page 8.

13     Ultimately the doctor, Dr. Medvedeva, diagnosed two

14 disorders, correct?  Conversion disorder, as well as

15 post-traumatic stress disorder?  Well, three really, and major

16 depressive disorder; is that correct?

17 A.  Correct.

18 Q.  Could you bring up Government's Exhibit 203.  And can we go

19 to page 6, paragraph 13 there.

20     Can you read paragraph 13?

21 A.  "Service connection for post-traumatic stress disorder is

22 denied.  Although you have the medals that denote combat and a

23 diagnosis of post-traumatic stress disorder, we are unable to

24 grant this condition as a separate disability because it and

25 the symptoms are inextricably intertwined with your conversion

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.382

1   disorder.  We cannot consider both mental disorders as separate

2   issues, as this would be pyramiding, which is prohibited by

3   regulation."

4   Q.   This is the VA rating specialist against pyramiding?

5   A.   Yes.

6   Q.   So here the specialist made the determination that they

7   would rate the PTSD rather than the conversion disorder?  I'm

8   sorry.  The other way around, rate the conversion disorder

9   rather than the PTSD?

10  A.   Yes.

11  Q.   Could you bring up Government's Exhibit 208, please.

12  208-B, I apologize.  I want to go to page 3.

13       Well, I think down at the bottom here.  It's page -- and

14  I'd like to call your attention to part two, the medical

15  history.  There's indication here that Mr. Hay reports that he

16  himself says he doesn't have seizures, but he had an attack

17  while in the exam room; is that correct?

18  A.   Yes.

19  Q.   And there's indication that he says no one can explain why

20  he has these attacks, but they suddenly began with family while

21  he was in a motor vehicle accident while still in the military

22  but on medical leave; is that correct?

23  A.   Yes.

24  Q.   Now, this exam was titled DBQ for seizure disorders and

25  epilepsy; is that correct?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.383

1    A.   Yes.

2    Q.   At some point that is what the rating specialist decided to

3    send the form for C&P exam for?

4    A.   Correct.

5    Q.   Looking at this exhibit, page 15, if you would, it says,

6    "Has the veteran ever had major seizures?"  Part C.  And it

7    says -- someone has marked "no" there, correct?

8    A.   Yes.

9    Q.   I'm going to go to page 16.  Would you read for me

10   subsection G?

11   A.   "Has the veteran ever had epilepsy associated with a

12   psychotic disorder, psychoneurotic disorder, or personality

13   disorder?"  Yes.

14   Q.   Okay.  And separately then was a mental disorder

15   questionnaire recommended?

16   A.   Yes.

17   Q.   When -- during these C&P exams, these are medical doctors

18   or some sort of medical practitioner, correct?

19   A.   Yes.

20   Q.   And they are not -- their purpose is not necessarily to

21   treat the individual; it is just to examine them?

22   A.   Correct.

23   Q.   When the rating specialist is reviewing the file, the full

24   file of medical records, would that include medical records

25   that are from other private doctors?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                           2:19-cr-20044-JAR
                                                         USA v. Bruce L. Hay
                                                         ROA - Volume 3, p.384

1    A.   Yes.

2    Q.   Also from other doctors that are within the VA system that

3    have access to those electronic records?

4    A.   I'm not sure I understand the question.

5    Q.   Is there an electronic records system that the VA has for

6    purposes of doctors putting in medical information?

7    A.   Yes.

8    Q.   Okay.  And if a doctor is associated with the VA or the VA

9    clinic in any way, would that particular doctor have access to

10   the electronic management system of those records?

11   A.   I don't know.  That's the Veterans Health Administration,

12   and I don't know how their systems operate.

13   Q.   You don't rate on that system at all?

14   A.   Not at the level that they do.

15   Q.   Okay.  I want to talk to you about the VA rating decision,

16   I think Government's Exhibit 2013 [*sic*].  I'm sorry, 213.

17        Do you mind bringing that up, Government's Exhibit 213.

18             MR. HUSCHKA:  What exhibit?  I think that's --

19             THE COURT:  Not admitted.

20   BY MS. RAMSEY:

21   Q.   Now, ultimately you, in this case -- well, not in this

22   case.  But part of what you do is you review the rating

23   specialist's decision; is that correct?

24   A.   At times, yes.

25   Q.   On occasion?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.385

 1    A.    Yes.

 2    Q.    And in this particular case did you review any of the

 3    rating decisions yourself independently?

 4    A.    Yes.

 5    Q.    Ultimately speaking, when a rating specialist is reviewing

 6    the file, it is up to them to decide which disability to code

 7    and what rating to make, correct?

 8    A.    Yes.

 9    Q.    And also, ultimately speaking, what benefits to grant and

10    at what percentage?

11    A.    Yes.

12          MS. RAMSEY:  One moment, Your Honor.

13          THE COURT:  Yes.

14    BY MS. RAMSEY:

15    Q.    I think I have only one further area I want to talk to you

16    about.

17          I'm sorry.  Could you bring up again Exhibit 208-B,

18    page 12, under 2(a), medical history.

19          Could you start in the middle of the paragraph there where

20    it says -- and read for me, it says, "Veteran had an attack"?

21    A.    "Veteran had an attack while in the exam room, which

22    wife/patient says is typical and that sometimes he's normal and

23    sometimes he has these spasms (via wife)."

24          MS. RAMSEY:  Thank you.  I don't have anything

25    further.  Thank you.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.386

1          THE COURT:  We'll try to finish up your redirect so

2  she can go back to Wichita, right?

3          THE WITNESS:  Yes.

4          THE COURT:  She can get back on the road.

5          MR. HUSCHKA:  I'll be brief, Your Honor.

6                      REDIRECT EXAMINATION

7  BY MR. HUSCHKA:

8  Q.  Ms. Rogers, so rating specialist, in applying the rating,

9  are they doing so relying on the fact that the information that

10 the veteran has reported is truthful?

11 A.  Yes.

12 Q.  And in determining whether a veteran should be entitled to

13 aid and attendance, or any other additional benefit, are they

14 relying on the information that they're viewing as having been

15 truthfully conveyed by the veteran?

16 A.  Yes.

17         MR. HUSCHKA:  No further questions.

18         THE COURT:  Anything more on this witness?

19         MR. HUSCHKA:  No, Your Honor.

20         MS. RAMSEY:  Your Honor, just two questions.

21                      RECROSS-EXAMINATION

22 BY MS. RAMSEY:

23 Q.  The rating specialist that's making a decision about the

24 disability and the benefit, it's a totality of a whole file

25 called a C file; is that right?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.387

1    A.    Yes.

2    Q.    Someone in Mr. Hay's case that has records dating back, at

3    least from what you've testified, to 2005, that can be

4    thousands of documents from independent medical providers, C&P

5    exams, military records even?

6    A.    Potentially, yes.

7    Q.    So it's not just one statement that the examiner is relying

8    on or statements relying on from the veteran, it's a whole body

9    of information?

10   A.    Yes.

11           MS. RAMSEY:   Thank you.

12           THE COURT:   Anything more?

13           MR. HUSCHKA:   No, Your Honor.

14           THE COURT:   May Ms. Rogers be excused?

15           MR. HUSCHKA:   Yes, Judge.

16           THE COURT:   Excused?

17           MS. RAMSEY:   Yes, Judge.

18           THE COURT:   You're excused.   Thank you.

19           Good time to take about a 15-minute break and have

20   your next witness ready to go.   We'll be in recess for

21   15 minutes.   We'll reconvene, let's just say, ten after.

22      (Recess taken at 2:52 p.m.)

23      (The jury entered the courtroom, after which the following

24   proceedings were had.)

25           THE COURT:   You can call your next witness, please.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.388

1         MR. OAKLEY:  Your Honor, the United States next calls

2    Dr. Emmett McWoods.

3                    DR. EMMETT MCWOODS,

4    called as a witness on behalf of the government, having first

5    been duly sworn, testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. OAKLEY:

8    Q.   Let me grab these from you.

9         Sir, could you please state your name and spell it for the

10   court reporter.

11   A.   Emmett, E-m-m-e-t-t.  McWoods, M-c-W-o-o-d-s, and I'm

12   a junior.

13   Q.   Dr. McWoods, are you a doctor?

14   A.   Yes, I'm a medical doctor.  Graduated from UMKC School of

15   Medicine, 1978.

16   Q.   And are you presently employed?

17   A.   I work part-time for the VA.  I retired in September 2019

18   and have done fill-in work.  If there's a provider that is out

19   and they need someone to replace them, they have given me a

20   call.

21   Q.   So -- but you're retired full-time from full-time

22   employment in 2019?

23   A.   Yes, yes.

24   Q.   And what were you doing in 2019 when you retired?

25   A.   At the time that I retired, I was a primary care physician

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.389

1    and I was at the Paola Community-Based Outpatient Clinic.

2    Q.   And how long were you a primary care physician at the Paola

3    Community-Based Outpatient Clinic?

4    A.   I started with the VA in April of 2003.

5    Q.   And so you said that you graduated medical school in 1978.

6    Let's talk about your experience just beginning out of med

7    school.  What was your first job?

8    A.   My first job was residency training.  I did my first year

9    with Truman Medical Center and affiliated hospitals and then

10   that was until 1979.  And in '79 I joined the Public Health

11   Service to pay back scholarship and was stationed in St. Louis

12   at a clinic until June of 2000 -- I'm sorry, until June of

13   1981.

14        At that time I returned to Kansas City to finish up my

15   residency training in internal medicine and did that from July

16   of '81 to June of '83.  And at that time I went into private

17   practice, and that was here in the Kansas City area also.

18   Q.   And how long were you in private practice?

19   A.   Let's see.  Private practice with different groups until I

20   joined the VA in April of 2003.

21   Q.   And so I want to talk to you about your employment with VA

22   beginning 2003.  You mentioned earlier that at the time you

23   retired you were a primary care physician at the Paola

24   Community-Based Outpatient Clinic.  Is that commonly referred

25   to as CBOC?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.390

1    A.   Yes, that is what CBOC stands for.

2    Q.   And so when you started in 2003, were you at the Paola CBOC

3    or were you someplace else?

4    A.   You get initial training up at the main hospital, and I

5    think that lasted for me about ten days.  And so it was

6    probably about April 13th or 14th that I went down to the Paola

7    clinic.

8    Q.   And so you were at the Paola clinic from 2003 until 2019?

9    A.   Correct, yes.

10   Q.   You said the main hospital.  Did you mean the main VA

11   hospital?

12   A.   The main hospital in Kansas City, Missouri.

13   Q.   And so the VA has hospitals such as the one in Kansas City,

14   Missouri?

15   A.   Yes.

16   Q.   Are there other VA hospitals in the region?

17   A.   There are VA hospitals all across the country, but there

18   are hospitals and they also have what's called the

19   community-based outpatient clinics, and Kansas City has several

20   of them from Belton -- let's see, Belton, the Honor Annex, the

21   Shawnee clinic, Lenexa.  There's one in Excelsior Springs, and

22   there are others also.

23   Q.   Okay.  Including the one in Paola that you worked at?

24   A.   Yes, yes.

25   Q.   What's the difference between a VA hospital and a VA CBOC?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.391

1    A.   The CBOCs are in outlying communities just to provide

2    better access for the veterans to get their primary care, and

3    now some specialty clinics will visit the CBOCs also.

4    Q.   And at the CBOC in Paola you said you were a primary care

5    physician?

6    A.   Yes.

7    Q.   So what's the duties?  What's the job entail of a primary

8    care physician?

9    A.   Providing primary care is looking after their routine

10   medical problems, sometimes getting history, and there's some

11   vets that primarily use the VA because medications may be a lot

12   cheaper than getting them through the VA than outside of the

13   VA.

14       And so they need to become established with the VA usually

15   through a primary care provider that can be a physician, a

16   nurse practitioner, and then they're able to get those

17   medications/supplies for treating different type of problems

18   also.

19       And then they -- then vets that only use the VA, they get

20   their routine health care there also, or they may get their lab

21   work, medications if they need it, X-rays, CAT scans, or

22   other -- or to see specialists and they may be referred outside

23   or up to the main hospital.

24   Q.   And the VA, the veterans administration, it has the health

25   care side.  Is that commonly referred to as VHS?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                          USA v. Bruce L. Hay
                                          ROA - Volume 3, p.392

1    A.   Yes.

2    Q.   Is there also a veterans benefits side that deals with what

3    veterans may or may not be entitled to receive as far as

4    benefits?

5    A.   That is correct also, yes.

6    Q.   As a primary care physician, would you fall under the

7    health care side?

8    A.   Yes.

9    Q.   Did you have any involvement in the benefits side in

10   determining whether or not a particular veteran or even a

11   patient of yours qualified for certain benefits?

12   A.   At times we would be asked to complete information about

13   the problems that they were being seen for or that we were

14   following them for just so that the benefits department could

15   make a determination whether or not it was service-connected

16   and what the degree of disability related to that was.

17   Q.   As a primary care physician did you have any specialties?

18   A.   My specialty was internal medicine and that's like a

19   general practitioner for adults.

20   Q.   I want to talk to you about an individual by the name of

21   Bruce Hay.  Was Bruce Hay a patient of yours?

22   A.   Yes, he was.

23   Q.   And do you recall when you first started seeing Bruce Hay?

24   A.   I do not recall the exact time, but I knew that it was a

25   number of years ago.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.393

1   Q.   And where did you -- you said that you were at the Paola

2   CBOC?

3   A.   Yes.

4   Q.   Did you work at any other location?

5   A.   During the 16 years I may have worked elsewhere one or

6   two days, so I was primarily at the Paola clinic.

7   Q.   And is that where you saw Bruce Hay was at the Paola

8   clinic?

9   A.   Yes, it was.

10  Q.   And you said that you saw him for several years?

11  A.   Yes.

12  Q.   Do you know how many patients you saw during the time that

13  you were at the Paola CBOC?

14  A.   I do not know the exact number, no.

15  Q.   In preparation for your testimony here today, did you

16  review any of your reports, medical examinations, and things

17  like that?

18  A.   I did review several office visits and -- just to refresh

19  my memory, yes.

20  Q.   And so let me ask you this, how well do you remember

21  Mr. Hay as far as when he would show up and meet with you?

22  A.   I remember he usually came to the office with his wife.  I

23  usually would go out to the patient waiting area and then ask

24  -- him and his wife would usually come back with him, and then

25  we would go to an exam room to do the interview and the exam.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.394

1  Q.   Do you know how many times you saw Mr. Hay during the time

2  that he was a patient of yours?

3  A.   It was usually once or twice a year.

4  Q.   And you said that when you would see Mr. Hay, that you

5  personally would go out to the waiting room to get him to bring

6  him back to the examination room?

7  A.   Most of the time, yes.

8  Q.   And do you recall how far it was from the waiting room to

9  the examination room?

10 A.   Probably 40 to 50 feet.

11 Q.   And were you able to see his walk or his gait as he came

12 from the waiting room to the examination room?

13 A.   Yes.

14 Q.   When I say "gait," what does that mean to you?

15 A.   Gait means the way that a person walks.  If they have

16 normal stride, you observe their balance and if they're using

17 any assistive devices and how smoothly they walk and move also.

18 Q.   What do you recall about Mr. Hay's gait based on your

19 observations of him?

20 A.   I remember that he usually had a cane or a walking stick

21 and that his gait was not normal.  He had some abnormal

22 movements, or ataxia, not smooth and flowing, but sort of

23 staggered and sometimes looked like he would use the cane to

24 help maintain his balance.

25 Q.   And you described the item that he had as a cane or a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.395

1   walking stick.  As a physician are you familiar with a cane?

2   A.   Yes.  Yes, I am.

3   Q.   And persons who -- as a physician, are you able to

4   prescribe something such as a cane for a patient?

5   A.   Yes.  We would refer them to the prosthetics department

6   where they would help make a choice as to what type of -- what

7   type of device would be best to use, whether a cane, whether a

8   walker, whether a rollator.  And a rollator is a walker that

9   has brakes on it and a seat where you would be able to sit

10   down.  They're able to make sure that they know how to use them

11   properly.

12   Q.   Did you ever prescribe a cane or other assistive device to

13   Mr. Hay?

14   A.   I think that he was using a cane or walking stick the first

15   time that I met him.

16   Q.   And so you didn't prescribe that to him; he had it before

17   you started treating him?

18   A.   Yes.

19   Q.   And describe the -- when you would meet with Mr. Hay -- and

20   do you see Mr. Hay in the room here today?

21   A.   I do not.  Well, that's him with the beard.

22   Q.   Can you describe what he's wearing?

23   A.   A blue shirt.  That's all that I can see.

24   Q.   You can stand up if you need to stand up to see him better.

25   A.   Blue shirt, a white undershirt, and that's all that I can

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.396

1    see.

2          MR. OAKLEY:  Your Honor, I ask the record reflect that

3    the witness has identified the defendant.

4          THE COURT:  The record will so reflect.

5    BY MR. OAKLEY:

6    Q.  When you would meet with the defendant for examinations,

7    typically how much time would you spend with him?

8    A.  We usually were allotted a half an hour, and I would spend

9    20 to 30 minutes sometimes more.  I was known for being slow.

10   Q.  And what would you do during the time, the 20 to 30 minutes

11   or even a little bit longer, that you spent with the defendant?

12   A.  Would generally ask questions, review medications, ask if

13   they were experiencing any problems at home or -- and sometimes

14   would request blood work.  Bruce did not like needles, and we

15   would draw blood on an infrequent basis.

16   Q.  You said that you would talk to the defendant, to Mr. Hay.

17   And what kinds of things would you talk about?

18   A.  We would -- I would ask if he had any episodes where he had

19   any type of seizure activity, ask if he was taking the

20   medications that were prescribed, see if there were refills

21   that were needed.  Some of the medications occasionally would

22   need -- would need to have lab work in order to make sure that

23   they were at the proper blood levels, and I think that's one of

24   the areas where he did not like having blood drawn, did not

25   like needles.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.397

1   Q.   And so you said that you would ask the defendant about

2   seizures?

3   A.   Yes.

4   Q.   Did he report to you whether or not he had seizure-type

5   activity?

6   A.   Sometimes he would ask his wife about the number that he

7   had or he at times did not remember them, but we did talk about

8   that, yes.

9   Q.   And would you rely on the information that he told you in

10  diagnosing and treating Mr. Hay?

11  A.   Yes, I would.

12  Q.   Now, you mentioned that your specialty is in internal

13  medicine?

14  A.   Yes.

15  Q.   And the seizure-type activity, is that typically a

16  neurological-type disorder?

17  A.   Most physicians I think would have seen some type of

18  seizure activity sometime during school or training, and there

19  were some episodes where he would have a seizure during one of

20  the visits.

21  Q.   Did you see the defendant have a seizure during one of the

22  visits?

23  A.   Yes, I did.

24  Q.   And describe what you saw.

25  A.   He would have tonic-clonic activity with his muscles, sort

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.398

1   of jerking of his muscles, would lose consciousness.  His head

2   would turn, and sometimes there would be a postictal phase,

3   meaning after the muscular activity stopped, there would be a

4   short while before he was alert and responsive and would be

5   able to answer questions or things again.

6   Q.   And do you know how many times you saw this sort of

7   physical activity?

8   A.   I would say probably a couple of occasions, but I do not

9   remember the exact number.

10  Q.   And that type of seizure activity, is that something that

11  would fall within the specialty of a neurologist possibly?

12  A.   Yes.

13  Q.   Did you ever talk to the defendant about going to see a

14  neurologist?

15  A.   Yes.  Ask him about going up -- coming up to the main

16  hospital to see a neurologist or also to have further testing

17  done to see what type of electrical activity was going on with

18  the brain; to see if there may be other medications that might

19  be more beneficial; to see if when they do an EEG -- they're

20  electrical wires that are applied to the scalp and they also

21  monitor heart rate, oxygen levels, eye movements -- just to see

22  if that correlates.  And I don't think he liked coming up to

23  the main hospital much.  We never did get the EEG scheduled,

24  and he did not want to come back up to the main hospital to see

25  the neurologist.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.399

1   Q.   So you suggested to him that he go see a neurologist to get

2   an EEG to try and determine what was going on?

3   A.   To get the EEG and then see the neurologist also to see if

4   they had additional recommendations about whether to change

5   medications, keep things the same, or exactly what's the best

6   course to proceed with.

7   Q.   Do you know how many times throughout the course of

8   treating the defendant you suggested that he go see a

9   neurologist?

10  A.   I am not sure, but I think it was on several occasions.

11  Q.   And was his response each time that he did not want to see

12  a neurologist?

13  A.   He did not like coming up to the main hospital and did not

14  like going through all the traffic and the busyness of the main

15  hospital.

16  Q.   And that's what he told you?

17  A.   Yes.

18  Q.   Around 2008 do you recall a conversation with the defendant

19  related to a request to install an elevator in his house?

20  A.   Yes.

21  Q.   What do you remember about that?

22  A.   Not much in that there may have --

23          MS. RAMSEY:  Objection; relevance, Your Honor.

24          THE COURT:  Overruled.

25  BY MR. OAKLEY:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.400

1   Q.   You may answer.

2   A.   Okay.  In that he had difficulty getting around -- around

3   the house and to get upstairs, it would be of some benefit if

4   they were able to get an elevator in the house.

5   Q.   And so what was your response to that request?

6   A.   I told him that I was not sure that the VA provided that

7   but that we could put a request in to see what they said.

8   Q.   And did you have a conversation with the defendant about a

9   chair lift instead of an elevator?

10  A.   I may have.  I do not recall that right offhand.

11  Q.   You mentioned that you observed seizure-like activity in

12  your office?

13  A.   Yes.

14  Q.   And at the time -- well, when you described it, are you

15  basing it on your own physical observations?

16  A.   Yes.

17  Q.   At the time was the defendant hooked up to any sort of

18  medical machine such as an EEG?

19  A.   Not attached to any equipment, any diagnostic tools.

20  Q.   And so is your description of the seizure based on what you

21  saw and what the defendant said?

22  A.   Based on my observations.

23  Q.   At some point did the defendant ask you to write a letter

24  on his behalf?

25  A.   Yes, he did.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.401

1  Q.  I'm going to hand you what's been marked as Government's

2  Exhibit 229.

3         MR. OAKLEY:  Your Honor, may I approach the witness?

4         THE COURT:  Yes.

5  BY MR. OAKLEY:

6  Q.  Dr. McWoods, what is Government's Exhibit 229?

7  A.  It is an office visit dated 3/12/2012, 1247.

8  Q.  Is that a report of an office visit or a medical record of

9  an office visit?

10  A.  Yes, it is.

11  Q.  And does that relate to an office visit of the defendant,

12  Bruce Hay?

13  A.  Yes, it does.

14         MR. OAKLEY:  Your Honor, I offer Government's

15  Exhibit 229.

16         THE COURT:  Any objection?

17         MS. RAMSEY:  One moment, Your Honor.  No, Your Honor.

18         THE COURT:  Exhibit 229 admitted.  You can publish.

19  BY MR. OAKLEY:

20  Q.  And so directing your attention to the top part of this

21  report, and this says "Standard title:  Primary care note.  The

22  author:  McWoods, Emmett."  Is that you?

23  A.  That is me.

24  Q.  And the institution is the Paola/Louisburg CBOC and the

25  division is the Paola CBOC?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.402

1  A.   Yes, it is.

2  Q.   And if we could scroll down a little bit, it says "he needs

3  a letter about his disability"?

4  A.   Yes.   CC stands for chief -- for chief complaint and the

5  reason that they are there, and then that paragraph are some of

6  the things that we talked about.

7  Q.   And so CC means chief complaint?

8  A.   Yes.

9  Q.   And for this particular visit it says "he needs a letter

10 about his disability"?

11 A.   Yes.

12 Q.   And he, being the defendant, Bruce Hay?

13 A.   Yes.

14 Q.   Then there's a portion you said that discusses -- so it

15 says "PT".   Does that mean patient?

16 A.   Patient, correct.   With -- okay.

17 Q.   Can we pull that back up?

18      With H/O.   What does "H/O" mean?

19 A.   With a history of.

20 Q.   "Disability dating back to a TBI."   What does "TBI" mean?

21 A.   Traumatic brain injury.

22 Q.   And 2/25/2005?

23 A.   That is correct, yes.

24 Q.   That's a brief history of the defendant's medical condition

25 in this chart?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.403

1    A.   Yes.

2    Q.   And then there's a section below, do you see where it says

3    PTSD?

4    A.   Yes.

5    Q.   And then it says Medvedeva, Milada.  So it looks like

6    there's -- is that a series of diagnoses below the PTSD?  It

7    says conversion disorder for instance?

8    A.   Yes.  Generally with the medical record there's several

9    portions.  The active problems would be what is -- things that

10   are on the problem list, and then they list the -- list the

11   coding for the diagnoses, the physician that entered it, and

12   the date that diagnoses was first entered.

13   Q.   And so the PTSD and the conversion disorder were both

14   entered by Medvedeva on September 18, 2006?

15   A.   Yes.

16   Q.   And I see your name on here for asthma and it looks like

17   allergies, and so does that indicate that that was an entry

18   that you made in 2007?

19   A.   That is correct, yes.

20   Q.   That's just a summary of diagnosis that you see in the

21   chart?

22   A.   Yes.

23   Q.   And so the chief complaint was that the defendant needed a

24   letter.  Could I direct your attention to page 4 which is page,

25   I guess, red number 7.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.404

1       And this is still part of the medical record; is that

2   correct?

3   A.   That is correct, yes.

4   Q.   And here it appears there's a portion that begins March 12,

5   2012, and it says "Re:  Hay, Bruce Leroy" and "To whom it may

6   concern."

7       Is this a part of a letter that you drafted?

8   A.   Generally if I drafted a letter, I would copy and paste it

9   into the note from that day.

10  Q.   And so that's what you did here, was make a note with I

11  guess the body of the letter?

12  A.   That's -- yes, that is the entirety of the letter.

13  Q.   And then was an actual physical letter on your letterhead

14  prepared as a result of this note?

15  A.   That is correct, yes.

16  Q.   And so it says "to whom it may concern."  Can you read the

17  next portion of that?

18  A.   "Mr. Bruce L. Hay has been a patient at the Paola

19  Community-Based Outpatient Clinic and followed by me since

20  July 30, 2007.  He has a history of a traumatic brain injury

21  sustained in 2005 and a seizure disorder and conversion

22  reaction subsequent to this.  He has been on medication for

23  these conditions and is seen regularly in follow-up.  In my

24  opinion he has a total and permanent disability.  He continues

25  to have multiple problems with activities of daily living and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                            USA v. Bruce L. Hay
                                                            ROA - Volume 3, p.405

1   requires assistance from his family to manage these.  Thank you

2   for your time and consideration.  Sincerely, Emmett McWoods,

3   Jr., MD, primary care/internal medicine."

4   Q.   That's language that you drafted based on the defendant's

5   request?

6   A.   That is correct.

7   Q.   Could we please bring up Government's Exhibit 207 that I

8   believe has already been admitted into evidence.

9        So the first page of this, this says "statement in support

10  of claim."  Now, is that something that you had any involvement

11  with drafting or preparing or submitting?

12  A.   That looks like a standardized form from the VA.

13  Q.   If I could direct your attention to an attachment to that

14  form.

15       Could we turn to the second page.  Could we zoom in just on

16  the body.

17       Does this appear to be the actual letter that you wrote?

18  A.   Yes, with some information removed on the date of birth.

19  Q.   Okay.

20  A.   Uh-huh.

21  Q.   Perhaps there's been some redactions?

22  A.   Yes.

23  Q.   Okay.  But other than that, this is the letter that you

24  wrote?

25  A.   Yes, that is my signature.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.406

1   Q.   And if we can scroll to the top, you drafted this on VA --

2   A.   Letterhead.

3   Q.   -- Medical Center letterhead?

4   A.   Yes.

5   Q.   And this was dated March 12th of 2012; is that correct?

6   A.   Yes, it is.

7   Q.   Several months later, around October of 2012, do you

8   remember receiving a phone call from a special agent with VA's

9   Office of the Inspector General?

10  A.   I remember receiving the phone call.  I'm not sure exactly

11  when, but they said that they would like to make an appointment

12  just to speak with me.

13  Q.   And at some point do you recall meeting in person with a VA

14  Office of the Inspector General special agent?

15  A.   Yes.

16  Q.   And during that meeting do you remember the special agent

17  showing you any video footage?

18  A.   Yes.  Yes, I do.

19  Q.   And was that in October of 2012, if you remember?

20  A.   Don't remember the exact date, but I think it was in

21  October.

22  Q.   Was it after you wrote the letter in March?

23  A.   Yes, it was.

24  Q.   And could we please bring up Government's Exhibit 1.

25       Was this -- do you recall if this was one of the videos

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.407

1    that the special agent showed you?

2    A.   Yes, it is.

3    Q.   Did you recognize the person in the video as being Bruce

4    Hay?

5    A.   Yes.  Yes, I did.

6    Q.   And the things that you observed in the video, was that

7    different than the way that the defendant Bruce Hay presented

8    himself to you in office visits?

9    A.   It is different from the way that he normally walked and

10   moved as very smooth, fluid, flowing movements in this video.

11   Q.   Could we show what's been admitted as Government's

12   Exhibit 2.

13       Is this another video that you were shown by the special

14   agent?

15   A.   Yes, it is.

16   Q.   And did you recognize the defendant as the person in the

17   video?

18   A.   Yes.

19   Q.   And was his gait different than what you observed

20   personally?

21   A.   That's not typically what we would see when he would come

22   to the clinic.

23   Q.   Was it also different than what he told you as far as his

24   daily abilities and functioning?

25   A.   Yes, it was different.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.408

1    Q.   How so?

2    A.   In that he was walking without the -- without the assistive

3    device and he was moving a lot more freely than he normally

4    would when he came to the clinic.

5    Q.   Could we please show Government's Exhibit 3.

6         Do you remember if the special agent showed you this video?

7    A.   I do remember seeing this video also.

8    Q.   Was this more consistent with the way that the defendant

9    appeared when you saw him?

10   A.   Yes.

11   Q.   Could we please show Government's Exhibit 4.  I think this

12   is just a short video of it.

13        You weren't able to observe the defendant's gait, but did

14   he report to you that he was unable to drive, if you recall?

15   A.   If you have a history of seizures, you're not allowed to

16   drive in the state of Kansas.  You have to be seizure-free for

17   a certain length of time before you can get a driver's license.

18   Q.   And so based on what the defendant reported to you, should

19   he have been driving even if he were capable of driving on a

20   particular day?

21   A.   Should not have been driving.

22   Q.   Could we please show Exhibit 5.

23        Do you remember if the special agent showed you this video,

24   if you remember?

25   A.   I think I remember seeing this.  I'm not sure though.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.409

1   Q.  Is that more consistent with the -- again, similar to the

2   previous video, is that more consistent with the way that the

3   defendant presented himself to you?

4   A.  Yes.

5   Q.  And then can we bring up Government's Exhibit 6, please.

6       Do you remember seeing that video?

7   A.  Yes, I do.  I think it was a little longer at the time that

8   I saw it.

9   Q.  And did that appear that the defendant was on a truck with

10  hay standing in the bed of the truck?

11  A.  Yes.

12  Q.  When the special agent showed you this video footage, did

13  that surprise you?

14  A.  I was -- I was quite surprised by it.

15  Q.  Why?

16  A.  Just there was a portion of it that it showed him loading

17  the hay and moving one bale, picking up another, just moving

18  like this and tossing it and stacking it, and I had never seen

19  him have that fluidity with his movement before.

20  Q.  If you would have known that, would you have written the

21  letter that you did?

22  A.  No, I would not have written the letter.

23  Q.  I'm going to next hand you what's been marked as

24  Government's Exhibit 227.  Dr. McWoods, do you recognize that

25  document?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.410

1    A.   Yes.  It is an office visit from April 21, 2010.

2    Q.   And is that of the defendant, Bruce Hay?

3    A.   Yes, it is.

4         MR. OAKLEY:  Your Honor, I offer Government's

5    Exhibit 227.

6         THE COURT:  Any objection?

7         MS. RAMSEY:  No, Your Honor.

8         THE COURT:  Exhibit 227 admitted.

9    BY MR. OAKLEY:

10   Q.   And so is this another example of notes that you took

11   during an office visit with the defendant?

12   A.   Yes, it is.

13   Q.   And the date of the office visit was April 21, 2010?

14   A.   That is correct.

15   Q.   And you read the first part -- so there's some vital signs

16   and that sort of thing.  After that can you read the first part

17   of your report of the notes that you made?

18   A.   "Patient with history of he has been quite tired the last

19   few days.  He has had a few days of increased problems with his

20   ataxia.  He was cutting the grass and had considerable

21   difficulty standing and was unable to finish a job that usually

22   takes him 30 minutes to complete.  He was also quite SOA (short

23   of air) during that time and his mouth felt watery.  He was a

24   bit better the following day.  He has not had a recurrence of

25   the GB (or gallbladder) pain.  He would like to discuss

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.411

1   surgical options with surgery."

2   Q.   And so is this an example of another office visit that you

3   had with the defendant?

4   A.   Yes.

5   Q.   And, again, when you're performing examinations, the

6   primary care physician for someone, how much do you rely on

7   what they tell you as far as their abilities and conditions?

8   A.   Generally would try to put the majority of the symptoms

9   down as the patient tells them to me.

10  Q.   And do you assume or rely on the fact that the patient is

11  giving you truthful information?

12  A.   Yes.

13  Q.   When you're meeting -- when you met with the defendant, how

14  close would you be to him physically?

15  A.   Within probably 2 to 4 feet.

16  Q.   Did you notice anything about his muscular traits

17  physically that was inconsistent with the things that he had

18  been telling you?

19  A.   He was fairly well built, and musculature was symmetric,

20  meaning muscles on the right side were roughly equal in size to

21  the left side.   And he had a broad healthy chest, legs, did not

22  see any significant atrophy or wasting of any muscles.

23  Q.   Could we bring up the second page of Exhibit 207 again.

24      You state in there "In my opinion he has a total and

25  permanent disability.   He continues to have problems of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.412

1   activities of daily living and requires assistance from his

2   family to manage these."

3       When you said that "in my opinion he has a total and

4   permanent disability," what did you base that on?

5   A.   Based on the seizure activity that he was having, the

6   difficulty working, and just that if seizures were not

7   controlled, it would be difficult working outside of the home

8   or holding down a regular job.  That's basically what it was

9   based on.

10  Q.   Okay.  And the things you based it on were things that he

11  had told you, correct?

12  A.   Correct.

13  Q.   And, again, if you would have known he was capable of the

14  physical activities that you later learned, would you have

15  written that letter?

16  A.   I would not have, no.

17          MR. OAKLEY:  No further questions, Your Honor.

18                      CROSS-EXAMINATION

19  BY MS. RAMSEY:

20  Q.   Good afternoon, Dr. McWoods.

21  A.   Good afternoon.

22  Q.   I'm Che Ramsey.  I think we spoke before, if you remember.

23  A.   I'm trying to remember.

24  Q.   Yes.  All right.  I want to start and talk to you a little

25  bit about you working at the CBOC Paola VA clinic.  It's a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.413

1   veteran administration clinic you said, correct?

2   A.   Correct.

3   Q.   And in your capacity as the kind of treating physician

4   there, you said that you're not really involved in assessing a

5   veteran for benefits; is that correct?

6   A.   Do not do the assessment.  You may report medical history,

7   physical findings, and then that is reviewed by someone else.

8   Q.   And so do you practice in a system in which the -- kind of

9   the notes you were seeing earlier displayed on the screen were

10  given to you as exhibits, those notes go into an electronic

11  system that is able to be accessed by the larger veteran

12  benefit organization?

13  A.   Yes.

14  Q.   I want to talk to you specifically about your time and

15  interaction with Mr. Hay.  I think you said that you usually

16  saw Bruce once or twice a year; is that right?

17  A.   Correct.

18  Q.   Okay.  And your visit would last -- I know you said you go

19  a little long -- but usually 20 to 30 minutes; is that correct?

20  A.   That's correct.

21  Q.   I want to talk to you about some specific instances of you

22  treating Mr. Hay, and I know that it's been a while and so I do

23  have some of your reports here to refresh your recollection if

24  you need to.

25       But do you remember when you started, what year you started

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.414

1   treating Mr. Hay?

2   A.   No, I do not.

3        MS. RAMSEY:   Excuse me.   I need my glasses.

4   BY MS. RAMSEY:

5   Q.   When you would see Mr. Hay, and I'm assuming like any

6   patient, would you make a note of your visitation with Mr. Hay?

7   A.   Yes, yes, I would.

8   Q.   I'm going to ask you about a particular time you saw

9   Mr. Hay on December 8, 2008.   Would it help to have your

10  consult reports to refresh your recollection from that visit?

11  A.   Definitely.

12       MS. RAMSEY:   May I approach, Your Honor?

13       THE COURT:   Yes.

14  BY MS. RAMSEY:

15  Q.   All right.   That report, December 8, 2008, does that look

16  like a record that you would have made at the time when you

17  were visiting with Mr. Hay?

18  A.   Yes.

19  Q.   Would you agree that in that report under PTSD it says he

20  has been awakening at night with night sweats, he still has bad

21  dreams, and has problems while riding in heavy traffic?

22  A.   Yes.

23  Q.   You have a portion there that says seizures.   And then

24  there's parentheses, epilepsy, but it says he's had six

25  seizures in the last month.   Is that something you would note?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.415

1    A.   That is correct, yes.

2    Q.   And there's a section under abnormality of gait or ataxia.

3    Can you read what you have there?

4    A.   He has had a couple of minor falls.  One and a half months

5    ago he fell and sustained a -- excuse the spelling --

6    laceration to the right eyebrow.

7    Q.   And so that would indicate to you by your note that Mr. Hay

8    at the time you saw him in 2008 was having problems riding in

9    heavy traffic, reporting six seizures in the last two months,

10   and has had a fall where he kind of hurt his right eyebrow; is

11   that correct?

12   A.   Yes.

13   Q.   I want to talk to you and turn to a time where you saw

14   Mr. Hay on May 14th.

15        MS. RAMSEY:  Again, if I may approach, Your Honor?

16   BY MS. RAMSEY:

17   Q.   I'm going to present you with your notes from that visit to

18   help refresh your recollection.  Okay?

19   A.   Okay.

20   Q.   In that visit on May 14, 2009, can you tell us what your

21   note says there about your interaction with Mr. Hay?

22   A.   Patient with a history of -- he feels beat up by the

23   weather.  States that every joint in his body hurts.  He is not

24   taking anything for this to see if it helps.  He has forms that

25   he would like a letter sent to the Federal Student Aid about

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.416

1   his medical condition.

2   Q.  And under seizures, what note did you make there?

3   A.  Let's see.  He states that he's having at least a couple of

4   seizures per week.

5   Q.  And did you make any note about his ataxia?

6   A.  He has -- he was evaluated by several neurologists in one

7   day that did not feel that there was a neurologic problem.

8   Q.  So he indicated to you he had seen several neurologists,

9   but no one had found a neurological problem?

10  A.  Correct.

11  Q.  I want to talk to you about a time when you examined or at

12  least visited with Mr. Hay on April 21, 2010.

13          MS. RAMSEY:  May I approach, Your Honor?

14          THE COURT:  Yes.

15  BY MS. RAMSEY:

16  Q.  In this note -- I believe the government already talked to

17  you about it, but in this note you indicate that he's indicated

18  to you that he was quite tired in the last few days, and he had

19  tried to cut his grass but had problems standing and he was

20  unable to finish that job; is that correct?

21  A.  That is correct.

22  Q.  Okay.  I want to talk to you another -- about another time

23  you visited Mr. Hay on June 7th.  That's June 7, 2011.

24          MS. RAMSEY:  And if I may approach, Your Honor?

25          THE COURT:  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.417

1   BY MS. RAMSEY:

2   Q.   Is that note on June 7th?  Again, looks like a primary care

3   note that you authored?

4   A.   Yes, it is.

5   Q.   Okay.  And can you tell me what it says there starting with

6   CC?

7   A.   Chief complaint:  Follow-up of his chronic medical

8   problems.  Patient with a history of -- he has had some

9   problems with cramping when he works in the heat.

10  Q.   And so would that indicate to you that he had been working

11  in the heat and had some problems with cramping of his body; is

12  that right?

13  A.   Yes.

14  Q.   And I want to talk to you then about -- and turn to a visit

15  Mr. Hay had with you on October 7, 2011.  I'm going to provide

16  you with your report to help refresh your recollection.  Could

17  you read for me what you found in that visit with Mr. Hay?

18  A.   With what I found or --

19  Q.   Starting with CC, what did you notate in your --

20  A.   I need assistance -- I need assistance with completion of

21  forms.  Patient with history of -- that he needs forms

22  completed.  Intermittent problems with flare-ups of his muscle

23  spasms and trouble with walking and his coordination.

24  Q.   And so as part of his visit with you on that day, you were

25  informed that he was having intermittent problems with his

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.418

1    flare-ups of muscle spasms; is that correct?

2    A.   Yes.

3    Q.   I want to talk to you about a visit you had with Mr. Hay on

4    May 14, 2012.  Can you tell me on May 14, 2012, what your

5    interaction and you were told by Mr. Hay at that time starting

6    with CC, chief complaint?

7    A.   Follow-up of his chronic medical problems.  Patient with a

8    history of -- he still has episodes with spasms and unsure if

9    they are less severe with the new muscle relaxer.  Patient was

10   at his daughter's graduation and some flashing lights from his

11   left lateral field of vision and had a headache an hour later.

12   He developed significant muscle spasms one and a half hours

13   later and feels a bit out of it today.

14   Q.   Okay.  So he indicates to you that he's having episodes

15   with the spasms; is that correct, muscle spasms?

16   A.   Yes.

17   Q.   It sounds like he had been prescribed a muscle relaxer.  I

18   can't tell from the type of medication.  Maybe you can, looking

19   at this record if he was taking one.  But it sounds like he

20   didn't know whether they were -- the muscle spasms were more or

21   less severe at that point; is that correct?

22   A.   That is correct.  Looking to see his current list of

23   medications, and number ten, the tizanidine, is a muscle

24   relaxer.

25   Q.   That would have been a muscle relaxer?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.419

1    A.  Yes.

2    Q.  Would that have been something you would have prescribed?

3    A.  Yes.

4    Q.  I want to talk to you about a visit you had with Mr. Hay on

5    July 25, 2012.  I'm going to hand you a copy of your consult

6    notes.  Would you read for me starting again with chief

7    complaint from that date?

8    A.  Follow-up of his chronic medical problems.  Patient with a

9    history of -- overall things are going about the same.  He has

10   had a few episodes of the spasms and has not been able to

11   speak, although he was fully alert and knew what he wanted to

12   say.

13   Q.  So, again, he's indicating to you that he's having these

14   episodes, a few of these muscle spasms, and that he was alert

15   but couldn't necessarily speak?

16   A.  Yes.

17   Q.  I want to talk to you about an October 29, 2012 visit you

18   had with Mr. Hay.  Again, can you tell me starting with chief

19   complaint what that visit was about?

20   A.  Follow-up of his chronic medical problems.  Patient with a

21   history of -- he was a little more off balance yesterday and

22   nearly fell at church.  He has not had any of the recent

23   episodes where he has lost his memory after an episode of the

24   spasms.  He has not had to use the EpiPen this summer.

25   Q.  So he had a complaint to you that he nearly fell while at

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.420

1   church, and he was still having these kind of muscle spasms?

2   A.   Yes.

3   Q.   I think you indicated in your direct testimony that you had

4   referred Mr. Hay for an EEG, but in your memory he had not

5   gone; is that correct?

6   A.   That is correct.

7   Q.   I'm going to show you what I've marked as Defendant's

8   Exhibit No. 822.  Will you just take a moment to look at that

9   and read that?

10  A.   Read it out loud?

11  Q.   No.  To yourself.  You can just skim it, and let me know

12  when you're done.

13       Dr. McWoods, I'm actually going to stop you.  What I'd like

14  to call your attention to would be the top of Defendant's

15  Exhibit 822.  Do you see the top of Defendant's 822 where it

16  says "referring physician"?

17  A.   On the first page?

18  Q.   On the first page, yes, sir.

19  A.   Referring physician, yes.

20  Q.   And is your name listed there?

21  A.   Yes, it is.

22  Q.   And would you agree that this is a report regarding an EEG

23  procedure consult?

24  A.   Yes, from August 27, 2012.

25  Q.   All right.  So you would agree that after review of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.421

1  Defendant's Exhibit 822, that Mr. Hay was referred for an EEG

2  to a Dr. Louis Giron by you?  That looks like a report from

3  Dr. Louis Giron, correct?

4  A.   Correct.

5  Q.   So Mr. Hay did follow up in getting the EEG in 2012 after

6  being referred by you?

7  A.   After several requests or discussions about having the EEG

8  done, I guess it was several years later that he did have one

9  done.

10  Q.   All right.  And that was referred by you?

11  A.   Yes.

12  Q.   I want to also talk to you about a visit you had with

13  Mr. Hay on June 7, 2011.  It's marked Defendant's Exhibit 826.

14  Defendant's 826, I think we've already talked about this, but

15  this is a primary care note that you wrote in June 7, 2011,

16  correct?

17  A.   Yes, it is.

18  Q.   Okay.  And I think you said when Mr. Hay, for as long as

19  you've been seeing him, when he comes to see you, he walks with

20  a cane, correct?

21  A.   Yes.

22  Q.   And so by the time you wrote the letter in March 12th of

23  2012, you knew Bruce had -- was having at least episodes of

24  muscle spasms?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.422

1    Q.  Muscle cramping?

2    A.  Uh-huh.

3    Q.  He was prone to falls?

4    A.  Right.

5    Q.  Now, when you were treating Bruce, did you know he owns

6    farmland or his family owned farmland?

7    A.  I used to see Bruce's father also and he was a patient at

8    the clinic also.

9    Q.  So you knew he would go out to the farm sometimes?

10   A.  Yes, uh-huh.

11   Q.  Bruce Hay would?

12   A.  Yes.

13   Q.  Now, I think you testified on direct testimony that you had

14   witnessed one of these -- I think you keep saying seizures, I

15   think is your term, how you would refer to what you saw happen

16   to him; is that correct?

17   A.  What I saw in the office I think would be described as a

18   seizure in that he was unable to respond, he was having

19   rhythmic -- rhythmic contractions of a number of different

20   muscles, and it looked like a seizure.

21   Q.  And, again, as part of working at the Paola CBOC clinic,

22   you're not directly involved in filling out, let's say, a DBQ

23   disability questionnaire form?

24   A.  That is correct.

25   Q.  You're not directly involved in treating someone for

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.423

1    purposes of examining them for disability, but you can comment

2    on it; is that correct, fair to say?

3    A.   Yes.

4         MS. RAMSEY:   May I have one moment, Your Honor?

5         THE COURT:   Yes.

6         MS. RAMSEY:   Your Honor, I apologize.   I forgot to do

7    this.   I would move to admit Defendant's Exhibit 826.

8         THE COURT:   Any objection?

9         MR. OAKLEY:   No objection, Your Honor.

10        THE COURT:   826 admitted.

11        MS. RAMSEY:   I have no further questions.   Thank you,

12   Dr. McWoods.

13        MR. OAKLEY:   I have no further questions.

14        THE COURT:   May Dr. McWoods be excused?

15        MR. OAKLEY:   Yes, Your Honor.

16        THE COURT:   You're excused.   You can leave those right

17   there.

18        Ready to start your next witness?

19        MR. HUSCHKA:   Yes, Your Honor.   The government calls

20   Dr. Robert Beck.

21        THE COURT:   Are you all right?

22        THE WITNESS:   Yes.

23        THE COURT:   Sorry about that.

24        THE WITNESS:   That's okay.

25        THE COURT:   I assume this witness will take us past

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.424

1    5:00 or no?

2         MR. HUSCHKA:  I believe so, Your Honor.  It depends a

3    little bit on what happens, but we don't anticipate it will

4    take too long.

5         COURTROOM DEPUTY:  Ryan, who is it?

6         MR. HUSCHKA:  Dr. Robert Beck.

7                    Dr. ROBERT BECK

8    called as a witness on behalf of the government, having first

9    been duly sworn, testified as follows:

10                   DIRECT EXAMINATION

11   BY MR. HUSCHKA:

12   Q.   Dr. Beck, could you state your name for the record and tell

13   us where you live.

14   A.   Robert Allen Beck.  I live in Lawrence, Kansas.

15   Q.   What do you do for a living?

16   A.   I'm a neurologist at Lawrence Memorial Hospital.

17   Q.   How long have you been a neurologist?

18   A.   I graduated in 2007, I believe, with a neurology residency.

19   Q.   And so I want to bring you back to 2005.  Were you in your

20   residency at that time?

21   A.   I was in my first-year residency.  It's a three-year

22   residency.

23   Q.   Where was that?

24   A.   Walter Reed.  It was combined program -- I was in the Navy,

25   but it was combined Army-Navy program, so most of our time was

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.425

1  at Walter Reed.

2  Q.  So back in 2005 when you were in your residency at Walter

3  Reed, do you recall seeing an individual by the name of Bruce

4  Hay?

5  A.  I do not have those memories myself, but I can recognize

6  the document that I was shown before.

7  Q.  And at the time that you examined him, would you have

8  completed a report of that examination?

9  A.  My typical practice at the time was to complete the report

10 during the visit.  By the end of the visit, the report would

11 have been done.

12 Q.  So you would document your report contemporaneous with

13 having met with the patient?

14 A.  Yes, I would usually type the report as we talked.

15 Q.  And would that report then be kept as part of the medical

16 records at Walter Reed?

17 A.  Yes, it would.

18      MR. HUSCHKA:  Your Honor, may I approach?

19      THE COURT:  Yes.

20 BY MR. HUSCHKA:

21 Q.  Dr. Beck, I'm handing you what's been marked as

22 Government's Exhibit 235.  Do you recognize that?

23 A.  Yes, I do.

24 Q.  What is it?

25 A.  It is a clinic record from the neurology clinic at Walter

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.426

1    Reed for initial evaluation.

2    Q.  And was this report the one that you made at the time you

3    met with him?

4    A.  Yes.  It looks like the type of report that I would do, so

5    I can verify it's fine.

6         MR. HUSCHKA:  Your Honor, we move to admit

7    Government's Exhibit 235.

8         MS. RAMSEY:  No objection.

9         THE COURT:  235 admitted.  You can publish.

10   BY MR. HUSCHKA:

11   Q.  And, Dr. Beck, up at the top there's an appointment date.

12   Do you see that?  What date did you meet with Mr. Hay?

13   A.  May 17, 2005.

14   Q.  And if you look just a little bit down before the line

15   there where it says "comments."  What does that say?

16   A.  Sorry.  My glasses aren't as good.  "Comments:  Unable to

17   obtain blood pressure/pulse due to patient shaking; allergy,

18   penicillin."  The technician would have written that, the

19   medic.

20   Q.  Whichever you prefer, Dr. Beck, we can pull that up on the

21   screen.

22   A.  That's bigger.  Thank you.

23   Q.  The text is enlarged a little bit?

24   A.  Yes, it is.

25   Q.  Can you read the report that says "chief complaint"?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1414                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.427

1    A.   "Head shaking (consultation requested by Fort Riley,

2    Kansas).

3    Q.   Below there's a name?

4    A.   Uh-huh.

5    Q.   What does that say?

6    A.   Says "Hays, Bruce" [*sic*].

7    Q.   We see down just below the date where it says CC.  If we

8    could focus on that just a little bit further down.

9    A.   Thank you.

10   Q.   What does "CC" mean?

11   A.   That's my typing of the chief complaint in the patient's

12   words.

13   Q.   So here it says "what's causing the shakes"?

14   A.   Yes.  The chief complaint above was written by the

15   technician or someone checking him in, not by myself.

16   Q.   Okay.  And then there's a portion that says "HPI."  What

17   does that mean?

18   A.   History of present illness.

19   Q.   In parentheses there, it says "please note that patient

20   comes without medical records."  Why did you write that?

21   A.   Probably to acknowledge that the patient had traveled all

22   the way from Fort Riley, and we had no records for him and he

23   came specifically to see us.

24   Q.   And then a little ways down where it says "next day."  Can

25   you read that paragraph?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.428

1   A.   Yes, I can.  "Next day could not move legs, either hip

2   flexion or knee extension or knee flexion but had full function

3   of feet with plantar dorsiflexion and wiggle feet.  Could hold

4   the legs up if they were raised by someone else but could not

5   raise them on his own.  Had full sensation in legs.  Could

6   stand if helped to stand upright, only needing minimal help to

7   steady himself and stood without knees locked.  Reports that he

8   had a physician/trauma surgeon evaluate him with physical exam

9   and nothing -- and noted nothing abnormal, including that he

10  had a normal anal/penis tone and sensation.  He left the

11  hospital unable to walk normally."

12  Q.   Could you read the very next paragraph?

13  A.   "Started with head bobbing/shaking about three to four days

14  afterwards, very slight, coming and going.  He has continued

15  this back and forth motion of the head since that time, present

16  most of the time, though more or less vigorous during the day."

17  Q.   Then a couple lines down it says "he reports that," can you

18  read that please?

19  A.   "He reports that he had multiple radiographic studies and

20  doctor visits without finding any abnormalities.  The details

21  about which studies these were is not clear."

22  Q.   And then could you read the next line below that?

23  A.   "He currently walks with a walker and is doing pool

24  therapy."

25  Q.   Page 2.  About two-thirds of the way down there's a portion

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.429

1    that says "soc HX," what does that mean?

2    A.   Hold on.

3    Q.   We'll blow it up for you.

4    A.   Social history is what it means.

5    Q.   And could you read the text there?

6    A.   Oh, nothing.  I didn't follow it up with anything.  After

7    that it says "PE" which is physical exam.

8    Q.   What's under "physical exam"?

9    A.   Patient has near constant head shaking about 3 to 6 -- that

10   must be 3 to 6 inches, arm and leg movements about 3 to

11   6 inches.

12   Q.   So here you're just documenting the extent to which you are

13   observing it?

14   A.   Documenting, kind of trying to describe his head shaking

15   and his arm and leg movements and trying to get a sense of the

16   amplitude, the range of motion either forward or backwards.

17   Q.   So are the numbers there referring to that?

18   A.   I think that's what I'm trying to say, yes.

19   Q.   And then at the very bottom coordination, could you read

20   what that says?

21   A.   Normal finger to nose.  Implies normal rapid alternating

22   movements, and normal heel to shin.

23   Q.   Could you explain what you mean here and what you're

24   describing?

25   A.   Motion, like, for finger to nose.  Normal, this rapid,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.430

1   alternating movements.  And heel to shin, taking your heel and

2   going down your shin with the other foot.

3   Q.   Page 3, can you read the paragraph at the top that starts

4   with "gait"?

5   A.   "Using walker, with chest out and hips forward, legs

6   behind.  Poor leg lift, wide based.  Unable to walk without

7   holding on to a walker/objects," maybe something in the room.

8   Q.   Are you documenting here your observations of the defendant

9   that day?

10  A.   It looks like I'm doing my best to do that just to put down

11  what I observe as was customary to me at the time.

12  Q.   And what do you mean by gait?

13  A.   How your ability to walk is, what you would say.

14  Q.   So is what you're describing here a normal gait?

15  A.   No.

16  Q.   What are you describing here?

17  A.   A very abnormal, unusual-looking gait.

18  Q.   There's a portion below that says assessment and plan.

19  What does this section entail?

20  A.   This entails the -- an attempt to create some sort of

21  diagnosis, whether final or just preliminary, and make some

22  sort of plan of action.

23  Q.   So are you trying your best here to come up with

24  conclusions based on what you've observed and what you've been

25  told?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.431

1   A.   This part as opposed to the previous part is probably an

2   awful lot of input from my attending physician, and so I cannot

3   tell how much of this part is me and how much is her.  Being a

4   first-year resident, I would imagine most of what is in this

5   section comes from her experience and her planning, especially

6   with the very detailed plan she has at the end.

7   Q.   So would you document the information that we had seen up

8   to this point based on what you were told and what you

9   observed?

10  A.   Yes, everything up to this assessment/plan would have been

11  hopefully without much error what I observed, what I asked, the

12  questions I asked, what he told me, and I would record it the

13  best that I could, as accurate as I could.

14  Q.   You mentioned earlier in this case you didn't have the

15  benefit of medical records, so you were relying entirely on

16  what was being conveyed to you?

17  A.   Yes, I was.

18  Q.   Could you read -- so you initially document it and then you

19  have a discussion with your attending physician?

20  A.   Yes.  It is a resident clinic, and as a first-year

21  resident, every patient I review with the attending.  Patients

22  with unusual physical exams in my recollection are almost

23  always evaluated personally by the attending to see those

24  physical findings.  We go back to the room, the attending's

25  office, and we talk and it's educational, educating me about

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.432

1    things I may or may not have seen and coming up with a plan and

2    an assessment if we know a diagnosis, preliminary or

3    definitive, and then a plan, and then I go back and I type that

4    up the best I can to fit what we've talked about.

5    Q.   So after you have that discussion, you go memorialize what

6    it is that you discussed with your attending and what you

7    decided to do?

8    A.   And I typically would do it while the patient is still

9    there within that visit so that the whole note is done by the

10   time the patient leaves so they understand the plan as well.

11   Q.   Okay.  Could you read the first step in that assessment

12   there, number one?

13   A.   It says tic disorder -- then unlikely to be Tourette's due

14   to the late -- probably too late and rather acute onset without

15   history of tics or OCD, meaning obsessive-compulsive disorder,

16   as a child.  Normal neurological exam other than the tics,

17   meaning movements.  A possible diagnosis could be conversion

18   disorder, with parentheses, due to trauma/stress of the

19   accident mentioned in the history of present illness.

20   Q.   And so here you're just observing something that may apply

21   based on what you've observed?

22   A.   Yes.

23   Q.   And could you read number two?

24   A.   His apparent spastic gait takes place in the absence of

25   physical findings to support spasticity and may be related to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                            USA v. Bruce L. Hay
                                                            ROA - Volume 3, p.433

1   prior paragraph.

2   Q.   Could you explain what that means to the jury?

3   A.   My attending would have made the decision that she did not

4   think that the way he was walking and his physical exam fit

5   with what she calls spasticity, which is a disorder of the

6   central nervous system.

7   Q.   And could you read number three.

8   A.   Unable to fully comment on etiology at this point due to

9   lack of supporting evidence (tests from prior hospitalization,

10  MRI, doctor records.)  For example, or i.e., if he had any

11  brain damage from the accident, but given the physical exam

12  today, anticipate these tests were normal.  Patient reports

13  that they were normal as well.

14  Q.   What do you mean by "unable to fully comment on etiology"?

15  A.   I'm just being thorough.  I would like, before I give a

16  definitive diagnosis, to just see all the data to give -- to do

17  that.  I think that's what I'm commenting on.

18  Q.   Could you read number five?

19  A.   Patient may return to me, Dr. Beck, or a physician in

20  Kansas when all the information/workup is gathered.

21  Q.   Could you read six as well?

22  A.   Suggest continuing with psychiatry, addressing conversion

23  with treatments to address tics, such as behavior feedback and

24  hypnosis.

25  Q.   Was this your only interaction with Bruce Hay?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.434

1    A.   I have no recollection of any others, so I would say yes,

2    that's the only one.

3            MR. HUSCHKA:   No further questions.

4                         CROSS-EXAMINATION

5    BY MS. RAMSEY:

6    Q.   Good afternoon, Dr. Beck.

7        All right.   You said that looking at Government's

8    Exhibit 235, the chief complaint was "what's causing the

9    shakes," correct?   Do you have that in front of you?

10   A.   I could see it down here.   It's no longer up here.   It says

11   CC -- I wrote that.

12   Q.   Bruce -- Mr. Hay, rather -- you don't have any note that

13   indicates to you that he walked into your office and said, I

14   have conversion disorder, correct?

15   A.   I didn't write anything like that.

16   Q.   Okay.   The date that you saw him was -- looks like the

17   vitals date, so I'm assuming that was a report date May 17,

18   2005; would you agree with that?

19   A.   It does appear to be that, yes.

20   Q.   As part of your diagnosis, or at least your treatment, part

21   of what you do is you get personal information and medical

22   background from the individual or the patient, correct?

23   A.   I take a history where I listen to what the patient tells

24   me and try to gather information, yes.

25   Q.   Okay.   And in this case he informed you that -- Mr. Hay

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.435

1    informed you that he had been in an auto accident on

2    February 25, 2005; is that correct?

3    A.   That's what I wrote.

4    Q.   That's what you wrote.  Due to the date on this note,

5    that's two months prior to him coming to see you; would you

6    agree with that?

7    A.   Yes, it appears to be.

8    Q.   Okay.  Now, you are currently a neurologist, correct?

9    A.   Yes, I am.

10   Q.   All right.  And how long have you been practicing as a

11   neurologist?

12   A.   So board-certified neurologist probably since 2007.

13   Q.   And so you have seen patients with conversion disorder?

14   A.   Since I have been board certified, yes.

15   Q.   What -- is it referred to by a different name currently?

16   A.   I'm not sure.

17   Q.   Is it referred to as functional neurologic disorder?

18   A.   Am I being asked to comment as an expert on conversion

19   disorder or functional neurologic disorder?

20   Q.   No, I'm not asking you to comment as an expert.  I'm simply

21   trying to engage -- in this particular report that you wrote in

22   meeting Mr. Hay, you said that you could not comment on the

23   etiology at that point; is that right?

24   A.   I think it says I cannot comment fully, fully.

25   Q.   Okay.  And that a possible diagnosis could be conversion

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.436

1  disorder?

2  A.   That is -- again, that is the assessment plan that was

3  probably put together and directed by my attending physician,

4  so that is -- you have to take that as what she came up with.

5  Q.   Okay.  As part of the history that you're getting for

6  purposes of diagnosis and treatment -- and I'm looking at the

7  first page -- Mr. Hay tells you that right after the accident

8  he was fine; is that fair?

9  A.   Let me see.  It says, "at first had no symptoms."

10 Q.   And he could get other people out of the car?

11 A.   It says he was helping other people out of the car when the

12 emergency people arrived.

13 Q.   And he was the one that reported to you that, hey, I've had

14 a physical exam and there's no abnormal findings?

15 A.   He reports that he had a trauma surgeon evaluate him with

16 physical exam and he told me nothing abnormal was found.

17 Q.   Okay.  And then I believe he also told you that the head

18 bobbing and shaking was more or less vigorous during the day?

19 A.   More or less vigorous means sometimes more, sometimes less,

20 coming and going, I think is what I meant.  But it is a little

21 vague.

22 Q.   Fair enough.  I know it's been a while.

23 A.   I think that's what I meant.

24 Q.   Thank you.  And he also told you that he's had multiple

25 radiographic studies and doctor visits without any findings of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.437

1   abnormalities; he told you that?

2   A.   Yes, that's the only way I would have known that, yes.

3   Q.   As a neurologist it's common not to find any physiological

4   or medical evidence when you're dealing with someone diagnosed

5   with conversion disorder; would you agree?

6   A.   It's hard for me to know at the time what we thought given

7   that the attending's -- the attending's experience with

8   patients like Mr. Hay that drove the diagnosis.  Unfortunately,

9   it's hard for me now 17 years later to make a diagnosis based

10  on what I'm writing.

11  Q.   Sure.  And I'm not asking you to do that, I want to be

12  clear, but as a neurologist at least somewhat familiar with

13  conversion disorder, it's common not to find necessarily any

14  neurological, physiological medical evidence that would support

15  the diagnosis; in fact, that's part of the rule-out process?

16  A.   That may be correct.

17          MS. RAMSEY:  Thank you.  Nothing further.

18          MR. HUSCHKA:  We have no redirect, Your Honor.

19          THE COURT:  All right.  May Dr. Beck be excused?

20          MR. HUSCHKA:  Yes.

21          THE COURT:  May Dr. Beck be excused?

22          MS. RAMSEY:  Yes, Your Honor.

23          THE COURT:  You're excused.  Thank you.

24          MS. RAMSEY:  Your Honor?

25          THE COURT:  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.438

1          MS. RAMSEY:  I apologize.  May we approach prior to

2     Dr. Beck being excused?

3          THE WITNESS:  You want me to sit back?

4          MS. RAMSEY:  Yes, please.

5       (The following proceedings were had at the bench).

6          MS. RAMSEY:  I'm sorry.  This is a little strange.

7     He's under subpoena for both sides.

8          THE COURT:  Okay.

9          MS. RAMSEY:  Mr. Magariel had to remind me, and we're

10    not sure we want to release him from our subpoena.  I didn't

11    want there to be any confusion.  We may do that.  We don't know

12    today.

13         THE COURT:  You don't want me to announce he's under

14    subpoena.  Will you whisper in his ear and remind him he's

15    still under subpoena?

16         MR. HUSCHKA:  We will, Your Honor.

17      (Thereupon, the proceedings continued in open court.)

18         THE COURT:  Dr. Beck, you can step down.  Government

19    counsel will share something with you on the way out.

20         This is a good time to recess unless you have a

21    30-second witness.

22         MR. HUSCHKA:  No, Your Honor.

23         THE COURT:  Let's be in recess until 9:00 tomorrow

24    morning.  And, counsel, be ready at 8:30 in case we need to

25    take something up.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.439

1        I'll remind you all not to do any independent research

2   or reading, not allow yourself to be exposed to any media

3   reports, and do not communicate in any way with anyone about

4   the subject matter of the case.

5        Have a good evening.  Be safe.  We'll see you at 9:00

6   tomorrow.

7     (The proceedings were adjourned at 4:45 p.m.)

8

9                    C E R T I F I C A T E

10    I, Danielle R. Murray, a Certified Court Reporter and the

11  regularly appointed, qualified, and acting official reporter of

12  the United States District Court for the District of Kansas, do

13  hereby certify that the foregoing is a true and correct

14  transcript from the stenographically reported proceedings in

15  the above-entitled matter.

16    SIGNED 7th of February, 2023

17

18                    /s/Danielle R. Murray
                      DANIELLE R. MURRAY, RMR, CRR
19                    United States Court Reporter

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.440

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2
     UNITED STATES OF AMERICA,      )
 3                                  ) Case No. 19-20044-JAR
              Plaintiff,            ) Circuit No. 22-3276
 4                                  )
     vs.                            )
 5                                  ) Kansas City, Kansas
     BRUCE L. HAY,                  ) Date:  3 August, 2022
 6                                  )
              Defendant.            ) Day 3 (Pages 289-445)
 7   ...........................
 8                    TRANSCRIPT OF JURY TRIAL
                 BEFORE THE HONORABLE JULIE A. ROBINSON
 9             SENIOR UNITED STATES DISTRICT COURT JUDGE

10
                       A P P E A R A N C E S
11
     FOR THE PLAINTIFF:
12
              Mr. Ryan Huschka
13            Mr. Christopher Oakley
              OFFICE OF THE UNITED STATES ATTORNEY
14            500 State Avenue
              Kansas City, Kansas 66101
15
     FOR THE DEFENDANT:
16
              Mr. David Magariel
17            Ms. Chekasha Ramsey
              OFFICE OF THE FEDERAL PUBLIC DEFENDER
18            500 State Avenue
              Suite 201
19            Kansas City, Kansas 66101

20

21

22

23

24   _____
              Proceedings recorded by machine shorthand,
25       transcript produced by computer-aided transcription.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.441

19-20044-JAR   USA v. BRUCE L. HAY   08.03.22                290

1                          I N D E X

2

     Government's Witnesses:                              Page
3
     DR. KATHRYN HEDGES
4       Direct Examination by Mr. Huschka                 297
        Cross-Examination by Ms. Ramsey                   307
5    SPECIAL AGENT KERRY BAKER
        Direct Examination by Mr. Huschka                 319
6       Cross-Examination by Ms. Ramsey                   409
        Redirect Examination by Mr. Huschka               430
7    DR. CAROLYN KARR
        Direct Examination by Mr. Oakley                  437

8

9

10                       E X H I B I T S

11   Government's
     Exhibits              Offered           Received
12
           24                366               366
13         42                367               367
           43                367               367
14         48                351               351
           49                351               351
15         91                435               435
           92                435               435
16         100               369               369
           100-A             370               370
17         100-AA            370               370
           100-B             370               370
18         100-BB            370               370
           100-C             370               370
19         100-CC            370               370
           100-D             370               370
20         100-E             370               370
           100-F             370               370
21         100-G             370               370
           100-H             370               370
22         100-I             370               370
           100-J             370               370
23         100-K             370               370
           100-L             370               370
24         100-M             370               370
           100-N             370               370
25         100-O             370               370
           100-P             370               370

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.442

| | | |
|---|---|---|
| 100-Q | 370 | 370 |
| 100-R | 370 | 370 |
| 100-S | 370 | 370 |
| 100-T | 370 | 370 |
| 100-U | 370 | 370 |
| 100-V | 370 | 370 |
| 100-W | 370 | 370 |
| 100-X | 370 | 370 |
| 100-Y | 370 | 370 |
| 100-Z | 370 | 370 |
| 101 | 405 | 405 |
| 166 | 356 | 357 |
| 167 | 356 | 357 |
| 210A | 441 | 441 |
| 236 | 299 | 299 |
| 237 | 299 | 299 |
| 238 | 299 | 299 |
| 239 | 306 | 306 |
| 327 | 358 | 359 |

| Defendant's Exhibits | Offered | Received |
|---|---|---|
| 808 | 412 | 412 |
| 812 | 315 | 315 |
| 813 | 310 | 310 |
| 814 | 313 | 313 |
| 825 | 426 | 426 |
| 827 | 424 | 424 |
| 828 | 424 | 424 |
| 829 | 426 | 426 |

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.443

1                       P R O C E E D I N G S

2          (The following proceedings occurred outside the presence of

3     the jury.)

4               THE COURT:  So there's something you'd like to take up

5     now before the jury comes in?

6               MR. HUSCHKA:  Yes, Your Honor.  Yesterday we received

7     Defendant's Exhibit 825, which is a clip from the body camera

8     footage when the defendant was arrested on the charges in this

9     case.  The clip that is in Defendant's Exhibit 825 is a portion

10    where the defendant is sitting on a couch in his residence in

11    his underwear.

12             There's a discussion between law enforcement and him

13    about the need to hurry so he can -- they can get him from

14    Osawatomie up here before 9:00 so he can see the judge that day

15    and be able to go home.  His daughters and his grandchild are

16    both there on the couch with him.  And the video ends at about

17    the time the agents are helping him put his clothes on so they

18    can leave the residence.

19             We're objecting on relevance grounds.  It's not clear

20    what relevance this has to any of the issues in this case, and,

21    you know, most of the conversation is about the need to hurry,

22    it's on a Friday, so that they can get him to the courthouse in

23    time so he doesn't have to stay in jail over the weekend if

24    they don't make the cutoff.

25             And I think any marginal relevance that it may have,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.444

 1   he's sitting throughout this interaction, would be outweighed

 2   by any prejudice.  I think really it's more geared towards

 3   sympathy and having the jury see his daughters and his

 4   grandchild there while the officers are executing the arrest

 5   warrant.

 6            THE COURT:  So I watched a little bit of 825.  I don't

 7   know that I watched the entire clip, but it looked like he was

 8   seated, Mr. Hay was seated.  It looked like he was in his

 9   underwear on the couch.  Nothing -- no clothes on from the

10   waist up, and it looked like he was handcuffed behind his back;

11   is that correct?

12            MR. HUSCHKA:  Yes, Your Honor.

13            THE COURT:  So he was in custody.  Was he Mirandized?

14            MR. HUSCHKA:  No, Your Honor.  They were just

15   explaining to him why they needed to hurry at that time.  There

16   was no statements that we intend to use there in that

17   interaction.

18            THE COURT:  I know.  You're not even offering it.

19            MR. HUSCHKA:  Yes, Your Honor.

20            THE COURT:  But did he make statements, I guess is

21   what I'm asking?

22            MR. HUSCHKA:  There's a discussion.  It's -- it is

23   predominantly the officers explaining to him and his wife why

24   they're trying to hurry and to sort of work together so they

25   can get him out of there and up to the courthouse to meet the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.445

1    9:00 deadline so he doesn't spend the weekend in custody here

2    because they missed the deadline.

3              THE COURT:  Okay.  Got it.  Ms. Ramsey.

4              MS. RAMSEY:  Your Honor, that exhibit clearly shows

5    Mister -- clearly shows Mr. Hay exhibiting symptoms.  There's

6    head bobbing.  There's shaking.  There is stiffness in his

7    body.  I believe there is a time where he's having trouble

8    talking, and his eyes are rolling back.

9              The court has heard the government's theory up to this

10   point of their case, which is that this disorder, conversion

11   functional neurological disorder is what is the fraud in this

12   case, and I think it is relevant to the extent that the jury

13   gets to determine the credibility of not only all the witnesses

14   in this case but of Mr. Hay.  And so we are presenting this

15   exhibit for purposes of showing that, not for any necessarily

16   statements that were made by the officers or by Mr. Hay.

17             THE COURT:  So I -- this boils down to me doing a 403

18   analysis.  So defendant says it's probative because it shows

19   how he was -- his body was moving or how he was presenting at

20   the time of his arrest.  It is prejudicial because he's, for

21   the most part, other than underwear, not wearing clothing.

22   He's handcuffed behind his back.  He's sitting.  There's

23   discussion about he's under arrest.  All of that I think is

24   prejudicial.

25             If the government were offering this, I would be

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.446

1  saying, are you kidding me, there's no way I'm admitting this.

2  Defendant, though, says that there's some probative value here,

3  so I need to weigh that against the prejudice to the defendant.

4        I mean, I think it's obviously something you can ask

5  the arresting officers about as to how he was presenting.  I'm

6  just concerned about playing the video itself given other

7  things that are visible in the video and given the

8  circumstances of the video, that he was under arrest and

9  handcuffed.  That's highly prejudicial I think.

10        Is there a way to play the video where you can just

11  see -- not see his entire body or you can see the head bobbing

12  and those sort of things and not play the audio?  Is it

13  something that can be edited to ameliorate the prejudicial

14  concerns I have?

15        MS. RAMSEY:  Your Honor, I could check and see what

16  our IT people can do to see if there's a way to edit that way.

17  I mean, I think obviously editing out the audio is probably not

18  at issue, but whether or not it can be cropped in a manner to

19  only show what we're arguing the relevance is.

20        And obviously, you know, the court is making a

21  balancing test as to the prejudicial effect as normally you

22  would if the government were trying to introduce this video,

23  but we do believe that it's highly relevant, and if the court

24  would like us to try and take out the audio and crop that, I

25  can see what I can do.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                            2:19-cr-20044-JAR
                                          USA v. Bruce L. Hay
                                          ROA - Volume 3, p.447

1        I think this -- the court's consideration also may

2   have to do with obviously what the government's witness will

3   admit or testify to regarding their observations.  I think at

4   that point it becomes extremely highly relevant, so I can check

5   and see what we do to modify the video, but also I think it's

6   dependent -- it's dependent on what the government's witness

7   says.

8        We can also give a limiting instruction as well.  We

9   could ask the court to give a limiting instruction and that

10   could be something that the parties agree to come up with.

11        THE COURT:  All right.  Let's proceed.  I do think

12   it's appropriate to ask the arresting officers how Mr. Hay --

13   how he presented at the time of his arrest, and then we'll go

14   from there, return to this issue if you still want to offer the

15   exhibit.  It's 825, right?

16        MS. RAMSEY:  Yes, Your Honor.

17        THE COURT:  All right.  Anything else at this point?

18        MR. HUSCHKA:  No, Your Honor.

19        THE COURT:  Okay.  Let's bring the jury in.  And we've

20   got a new witness.  Is that witness keyed up?

21        MR. HUSCHKA:  Yes, Your Honor.

22        THE COURT:  Okay.

23     (The jury entered the courtroom, after which the following

24   proceedings were had.)

25        THE COURT:  You can be seated.  Call your next

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.448

1   witness.

2          MR. HUSCHKA:  The United States calls Dr. Kathryn

3   Hedges.

4                    DR. KATHRYN HEDGES,

5   called as a witness on behalf of the government, having first

6   been duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8   BY MR. HUSCHKA:

9   Q.   Good morning, Doctor.

10  A.   Good morning.

11  Q.   Could you state your name for the record and tell us where

12  you live.

13  A.   My name is Kathryn Hedges, and I live in Kansas City,

14  Missouri.

15  Q.   What do you do for a living?

16  A.   I'm a neurologist.

17  Q.   How long have you been a neurologist?

18  A.   30 years.

19  Q.   So were you a neurologist then, I take it, in 2005?

20  A.   Yes.

21  Q.   Are you familiar with an individual named Bruce Hay?

22  A.   Through my records.

23  Q.   And do you recall when he first came to your attention?

24  A.   I believe it was 2005.

25  Q.   Do you know how he came to your attention?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.449

1   A.   He was referred from an attorney regarding an auto

2   accident.

3   Q.   And do you remember the attorney's name?

4   A.   I believe it was Annette Griggs.

5   Q.   What type of law does Ms. Griggs practice?

6          MS. RAMSEY:  Objection, Your Honor; relevance.

7          THE COURT:  Sustained.

8   BY MR. HUSCHKA:

9   Q.   Do you recall when you received that referral regarding the

10  defendant?

11  A.   I don't have my records right here, so I don't recall.

12  Q.   After you received the referral, did you have a series of

13  appointments with Mr. Hay?

14  A.   Yes.

15  Q.   And was the information that you learned during those

16  examinations reported to you by Mr. Hay?

17  A.   Yes.

18  Q.   And did you complete letters or reports of some sort

19  memorializing those examinations?

20  A.   Yes.

21         MR. HUSCHKA:  Your Honor, may I approach?

22         THE COURT:  Yes.

23  BY MR. HUSCHKA:

24  Q.   Dr. Hedges, I'm handing you what has been marked as

25  Government's Exhibits 236 through 238.  Do you recognize those?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.450

1    A.   Yes.

2    Q.   What are they?

3    A.   These are my notes.

4    Q.   And are these fair and accurate copies of letters or notes

5    or letters that you would have made at or near the time you had

6    those appointments?

7    A.   Yes.

8    Q.   Are they maintained by your practice in the ordinary course

9    of business?

10   A.   Yes.

11        MR. HUSCHKA:   We move to admit Government's Exhibits

12   236 through 238.

13        MS. RAMSEY:   No objection.

14        THE COURT:   236, 237, 238 are admitted.  You can

15   publish.

16   BY MR. HUSCHKA:

17   Q.   Ms. Boyd, could you pull up 236, please.

18        Dr. Hedges, you can either view on the monitor or the hard

19   copy in front of you, whichever you prefer.

20   A.   Okay.

21   Q.   There's a date there at the top.  What does that say?

22   A.   May 19, 2005.

23   Q.   Was that the date of your first appointment with Mr. Hay?

24   A.   Yes.

25   Q.   And can you read in the second paragraph --

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.451

1      If you could zoom in on that, Ms. Boyd, near the bottom

2  there's a portion that starts "about the third day."

3      Do you see that?

4  A.  Yes.

5  Q.  Could you read that through the end of the paragraph,

6  please?

7  A.  "About the third day he began having a tremor.  The tremors

8  have been progressively worse.  They are not constant.  They

9  seem to increase with agitation or when he is riding in a

10 vehicle.  He has some troubles coming up with words.  He never

11 had these before the accident.  He consistently has these

12 unusual jerking tremors.  His wife says that he even has these

13 when he is drowsy, but they do not consistently persist through

14 all of sleep."

15 Q.  Could you turn to page 2, please.

16     Bottom two-thirds or so there's a paragraph there about

17 mid-way down.  It says "motor exam revealed."  Can you read

18 those next couple sentences?

19 A.  Yes.  "Motor exam revealed he had normal strength, but he

20 had marked jerkiness and tremor of his head, which did not

21 significantly decrease with distraction techniques.  The

22 movement disorder was not easily classified, but the closest

23 that I can come was that it was a choreiform movement

24 disorder."

25 Q.  Can I stop you there.  What do you mean by choreiform

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.452

1    movement disorder?

2    A.   Choreiform is a constant movement of twisting, sometimes

3    some jerkiness with it.  It is usually kind of quick movements

4    that occurred while he was sitting talking to me.

5    Q.   Is that a rare disorder?

6    A.   As a neurologist I probably see it monthly.

7    Q.   And are there any other more well-known disorders that you

8    could compare it to?

9    A.   It looks a lot like the movement disorder we see if someone

10   is taking too much Parkinson's medication.  And so I tell

11   patients if they've seen Michael J. Fox who has Parkinson's

12   disease, he has that twisting movement because he's on

13   Parkinson's medication.  It looked kind of like that.

14   Q.   That's how the defendant was presenting to you that day?

15   A.   Yes.

16   Q.   There's a portion near the bottom there starting

17   "cerebellar exam."  Can you read that?

18   A.   "Cerebellar exam was normal on finger-to-finger-to-nose,

19   heel-to-shin, and rapid alternating movement."

20   Q.   And could you read the next two sentences as well?

21   A.   "Fine motor movement was normal.  Gait show he uses a

22   walker and is very" -- should say off balance.

23   Q.   And then could you read the bottom paragraph there, "it is

24   very unusual"?

25   A.   "It is very unusual that he would be able to do

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.453

1   finger-to-finger-to-nose, rapid alternating movement, and

2   heel-to-shin normally and still has this marked choreiform

3   activity."

4   Q.  Let me stop you there.  Can you explain what those tests,

5   finger to nose, rapid alternating movement are?

6   A.  Yes.  On finger-to-finger-to-nose I hold out my finger and

7   I have the patient touch my finger then touch their nose back

8   and forth.  I'll show back and forth like this.

9       For rapid alternating movement I have them put their hand

10  on their thigh and flip their hand over and back like this.

11      And for heel-to-shin it's hard to do behind the -- but I'll

12  show you.  I'm going to back up.  I don't know if you guys can

13  see me.  I have them put the heel on their shin and run it down

14  to see if they have normal coordination, and I have them do it

15  on both sides.  Can you all see me?  Okay.

16  Q.  And so did you have the defendant do all of those tests?

17  A.  Yes.

18  Q.  Were the results normal?

19  A.  Yes.

20  Q.  And why did you note that that was unusual?

21  A.  Usually if someone has choreiform problems, they can't do

22  those because they have this movement throughout all their

23  movements.  For example, they might not be able to touch my

24  finger.  It might veer wildly or they might not be able to keep

25  their heel on their shin.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.454

1   Q.   Page 3.  Can you read that last paragraph that follows on
2   to page 3?
3   A.   "If it did turn out that this was related to a conversion
4   disorder, I would probably have him go back to see his current
5   psychiatrist."
6   Q.   Okay.  Exhibit 237, please.
7        And the date at the top, is this the next time that you saw
8   Mr. Hay?
9   A.   Yes.
10  Q.   And it's addressed here to Harry Wilkins.  Who is that?
11  A.   He was the trauma surgeon who had been involved in his care
12  that thought he needed a neurologic evaluation.
13  Q.   Could you read the first paragraph of this letter?
14  A.   "Mr. Bruce Hay returns to see me in follow-up today for his
15  movement disorder.  In the interim he had had an MRI scan of
16  the brain which was completely normal.  I am enclosing copies
17  of that.  Mr. Hay and I spent all of our 25-minute visit in
18  counseling today.  I believe that his movement disorder is as a
19  result of a conversion disorder."
20  Q.   And then could you read the first two sentences of the next
21  paragraph?
22  A.   "I have recommended that he continue his physical therapy
23  at Miami County Medical Center.  I find that conversion
24  disorders respond well to physical therapy."
25  Q.   And then if you could read the last paragraph?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.455

1   A.   "At this point I will see him back in about three months in

2   follow-up.  With a conversion disorder people usually do

3   improve if they are given an opportunity to do so through

4   physical therapy and through counseling.  I believe that the

5   conversion disorder probably came out because of his shock at

6   seeing his two-year old injured during a motor vehicle accident

7   and combined with a history of combat stress/post-traumatic

8   stress disorder."

9   Q.   238, please.

10      And what's the date of this letter?

11  A.   August 31, 2005.

12  Q.   Was this the three-month follow-up appointment that you had

13  mentioned in the last appointment note?

14  A.   Yes.

15  Q.   Could you read paragraph one, please.

16  A.   "Bruce Hay returned to see me in follow-up today for his

17  movement disorder.  As you know, he has had an MRI scan of the

18  brain which was completely normal.  I feel that he has a

19  conversion disorder."

20  Q.   And then could you read paragraph 2, the first sentence?

21  A.   "He has now plateaued with his physical therapy."

22  Q.   And the next sentence as well.

23  A.   "He still uses a walker for long trips but uses a cane

24  otherwise."

25  Q.   Okay.  And then a couple paragraphs down "on neurologic

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.456

1   exam today," could you read that paragraph?

2   A.   "On neurologic exam today he has slow, deliberate walking

3   and walks with a walker.  He has a continuous head tremor which

4   is like a bobble-headed doll.  He can do foot tapping, rapid

5   alternating movement, finger tapping, finger-to-finger-to-nose

6   all with the tremor of his head is stopping while he

7   concentrates on these other activities.  His arm strength

8   continues to be completely normal with no atrophy and well

9   developed muscles.

10       "I still feel that Mr. Hay has a conversion disorder,

11  possibly caused by a post-traumatic stress disorder from both

12  his time in Kuwait and his accident.  I think he needs to

13  continue his home exercise program.  He says he will not ride

14  on a stationary bicycle because it is boring, but if he were

15  able to get a paddle boat, he would put it on his father's pond

16  and be able to use that.  I have written him prescription that

17  I have recommended a paddle boat.  He is going to try to buy

18  one from a friend."

19  Q.   And then if you could read that last paragraph on the first

20  page.

21  A.   "I have high hopes that he will continue to improve.  I

22  have told him that if he is not improved by when I next see him

23  in three months, I would suggest he see one of the movement

24  disorder specialists at KU to confirm my diagnosis."

25  Q.   And was an appointment scheduled approximately three months

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.457

1   out from this visit?

2   A.   Yes, it was.

3   Q.   Dr. Hedges, I'm handing you what's been marked as

4   Government's Exhibit 239.  Do you recognize that?

5   A.   Yes.

6   Q.   What is it?

7   A.   It is a phone message from Mr. Hay.

8   Q.   Are these notes memorializing the message he left with your

9   office?

10  A.   Yes.

11  Q.   Are these notes made at the time he left the message?

12  A.   Yes.

13  Q.   Is it in the normal course of business for your practice to

14  keep notes like this?

15  A.   Yes.

16        MR. HUSCHKA:  Move to admit Government's Exhibit 239.

17        MS. RAMSEY:  No objection.

18        THE COURT:  239 admitted.  You can publish.

19  BY MR. HUSCHKA:

20  Q.   Could you read the top portion there?  What date does that

21  say?

22  A.   11/30/2005.

23  Q.   What does it say?

24  A.   Patient was going to be 20 minutes late due to another

25  doctor appointment and then rescheduled.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.458

1    Q.   Did he cancel this appointment?

2    A.   Apparently.

3    Q.   Did you ever have any further interaction with Mr. Hay?

4    A.   No.

5    Q.   He never scheduled another appointment after this?

6    A.   I don't know whether he didn't schedule or didn't show up.

7    Q.   Okay.

8    A.   We don't have records from that anymore.

9    Q.   Okay.

10            MR. HUSCHKA:  No further questions.

11                        CROSS-EXAMINATION

12   BY MS. RAMSEY:

13   Q.   Good morning, Dr. Hedges.

14   A.   Good morning.

15            MS. RAMSEY:  Bonnie, would you mind switching over to

16   David for me?

17            Put up Exhibit 813, please.

18   BY MS. RAMSEY:

19   Q.   Dr. Hedges, before we get into your treatment of Mr. Hay

20   back in 2005, I just want to talk to you a little bit about

21   your practice right now.  So you practice as a neurologist, and

22   how long have you been board certified?

23   A.   I was board certified a year after I went into practice so

24   approximately 1993, I believe.

25   Q.   And so back in 2005 then you were already board certified

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.459

1    as a neurologist?

2    A.   Yes.

3    Q.   Okay.  And as a neurologist what do you do?

4    A.   I see patients with diseases of the brain, the spinal cord,

5    the muscles, and the nerves.

6    Q.   Can you tell me what conversion disorder is?

7    A.   Conversion disorder is a problem where some type of

8    psychiatric problem or stress that's happened to a body

9    manifests itself in some other way.  It could be neurologic,

10   but it could be any type of physical problem.

11   Q.   And oftentimes then -- so conversion disorder will have a

12   preceding traumatic event, but it's not required before the

13   onset?

14   A.   The ones that I've seen have always had some type of

15   traumatic event that happened at some point in their life.

16   Q.   Understood.  Do individuals with conversion disorder, in

17   your knowledge and experience, often have what we call comorbid

18   issues:  Mental health issues, PTSD, major depression, that

19   kind of thing?

20   A.   Yes.

21   Q.   And regarding the symptoms if they have kind of sensory

22   motor symptoms, is it possible the conversion disorder, that

23   those symptoms can be sometimes inconsistent?

24   A.   Yes.

25   Q.   And brought on by stress?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.460

1    A.   Yes.

2    Q.   I want to talk about the neurological exam that you did.

3    And I believe you described in an exam where you had Mr. Hay

4    perform certain movements, the finger to finger, nose to nose,

5    heel-to-shin, rapid alternating movement; is that correct?

6    A.   Correct.

7    Q.   And you said that movement was normal?

8    A.   Yes.

9    Q.   With someone with conversion disorder, sometimes you do a

10   distraction technique, like trying to make them concentrate on

11   doing something, body tremors will go away; is that correct?

12   A.   Correct.

13   Q.   So it wouldn't be abnormal that someone with choreiform or

14   conversion disorder would be able to perform these tests and

15   those tremors might go away during that time as they're being

16   distracted?

17   A.   Yes.  If it was a conversion disorder, it could go away.

18   Q.   I want to show you what's been marked as Defense

19   Exhibit 813.

20        MS. RAMSEY:  I'm sorry, Your Honor.  May I approach?

21        THE COURT:  Yes.

22        MS. RAMSEY:  Thank you.

23   BY MS. RAMSEY:

24   Q.   Do you recognize Defense Exhibit 813?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.461

1   Q.  And is this a note that you made after seeing Bruce Hay on

2   May 19, 2005?

3   A.  Yes.

4   Q.  And is this a note that you've reviewed before that's kind

5   of regularly maintained in the records, your medical records?

6   A.  Yes.

7           MS. RAMSEY:  Your Honor, I move to admit Defendant's

8   Exhibit 813.

9           THE COURT:  Any objection?

10          MR. HUSCHKA:  One moment, Your Honor, please.

11          No objection, Your Honor.

12          THE COURT:  813 admitted.  You can publish.

13          MS. RAMSEY:  Thank you, Your Honor.

14  BY MS. RAMSEY:

15  Q.  I want to call your attention to really kind of the first

16  paragraph of 813, so as part of your examination in coming up

17  with the diagnosis, is it important to get the historical

18  background information from the patient?

19  A.  Yes.

20  Q.  And you did that in this case with Mr. Hay; is that

21  correct?

22  A.  Yes.

23  Q.  And it appears in that first paragraph that he indicated to

24  you that he was in the motor vehicle accident on February 25,

25  2005; is that correct?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.462

1   A.   Correct.

2   Q.   And so you're seeing him just three months approximately,

3   on May 19, 2005, after that?

4   A.   Yes.

5   Q.   I want to go down to the second paragraph where it starts

6   in the middle there where it said "he saw Dr. Wilkins."  Could

7   you start and read to the end of that paragraph for me out

8   loud?

9   A.   "He saw Dr. Wilkins, a trauma surgeon.  About the third day

10  he began having a tremor.  The tremors have been progressively

11  worse.  They are not constant.  They seem to increase with

12  agitation or when he's riding in a vehicle.  He has some

13  troubles coming up with words.  He never had these before the

14  accident.  He consistently has these unusual jerking tremors.

15  His wife says that he even has these when he's drowsy, but they

16  do not consistently persist through all of sleep."

17  Q.   So one thing he indicates to you is that these tremors are

18  not constant to him; is that correct?

19  A.   Correct.

20  Q.   And one of the things that causes them to increase is kind

21  of when he's agitated and when he's riding in a vehicle?

22  A.   Yes.

23  Q.   And in the second paragraph did you also learn that he had

24  served in Kuwait?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.463

1   Q.   And that he was actually seeing doctors which was a

2   psychiatrist at Fort Riley for combat stress?

3   A.   Yes.

4   Q.   And you ultimately ordered an MRI of the brain.  Was that

5   because you wanted to rule out the fact that there may have

6   been any brain injury or anything else going on?

7   A.   Yes.

8   Q.   And in diagnosing conversion disorder, it's important to do

9   that, find out whether or not there's anything actual, for lack

10   of a better word -- you may have a better word for me, but

11   neurological or physiological happening with the body?

12   A.   Correct.  I wanted to be sure there were no structural

13   abnormalities that could cause him to have these movements.

14   Q.   Okay.  Ultimately on May 19, 2005, you considered that what

15   you were seeing in your neurological examination was a

16   psychiatric response to the accident because it worsens when

17   he's anxious and riding in a car; is that fair to say, in

18   looking at the second page in the last paragraph?

19   A.   Correct.

20   Q.   And he was then told to follow back up with you after you

21   ordered the MRI; is that right?

22   A.   Yes.

23   Q.   Let's now turn to when you saw him on May 31, 2005.  I'm

24   going to show you what's been marked as Defense Exhibit 814.

25       Do you recognize Defendant's Exhibit 814 as a letter that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.464

1    you wrote to Dr. Wilkins on May 31, 2005?

2    A.  Yes.

3    Q.  And are these your notes after having seen Mr. Hay again

4    for an evaluation or a visit?

5    A.  Yes.

6    Q.  All right.  And would you agree that this particular record

7    was made close in time to when you did the evaluation or saw

8    Mr. Hay?

9    A.  Yes.

10   Q.  And these are regularly kept as part of the records of

11   medical records that you have in your office; is that correct?

12   A.  Yes.

13           MS. RAMSEY:  Your Honor, I move to admit Defendant's

14   Exhibit 814.

15           MR. HUSCHKA:  No objection.

16           THE COURT:  814 admitted.  You can publish.

17   BY MS. RAMSEY:

18   Q.  All right.  Now, you said this was a letter that you wrote

19   to Dr. Wilkins.  Was that doctor, the Dr. Wilkins that was

20   treating him, in trauma surgery at St. Luke's?

21   A.  Yes.

22   Q.  In that first paragraph you had the results of the MRI scan

23   of the brain come back, right?

24   A.  Yes.

25   Q.  And it was completely normal?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.465

1   A.   Yes.

2   Q.   And, again, that's not abnormal; that would be the

3   expectation of someone having a diagnosis for conversion

4   disorder?

5   A.   Yes.

6   Q.   And, again, you give the opinion that this disorder is as a

7   result -- or you believe that the movement disorder is as a

8   result of conversion disorder for the second time?

9   A.   Correct.

10  Q.   At that time Mr. Hay was seeking treatment for that

11  disorder.  I believe the second paragraph notes that he is

12  going to physical therapy at the Miami County Medical Center?

13  A.   Correct.

14  Q.   And in that second paragraph -- sorry, the third paragraph,

15  you make a note that with conversion disorder, people usually

16  do improve if they're given the opportunity to do so through

17  physical therapy and through counseling; is that correct?

18  A.   Correct.

19  Q.   And so in your opinion that sounds more like a general

20  opinion not necessarily to Mr. Hay, but in your opinion with

21  appropriate and adequate treatment, you believe that

22  individuals can improve with conversion disorder?

23  A.   Yes.

24  Q.   Part of also what you thought brought on the disorder for

25  Mr. Hay was not just the car accident, but possibly caused by

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.466

1   post-traumatic stress disorder from his time in Kuwait as well;

2   is that correct?

3   A.   Correct.

4   Q.   I want to talk a little bit about Defendant's Exhibit 812,

5   which I believe are your notes memorializing your visit with

6   Mr. Hay on August 31, 2005.

7            MS. RAMSEY:  May I approach, Your Honor?

8            THE COURT:  Yes.

9   BY MS. RAMSEY:

10  Q.   Again, Dr. Hedges, do you -- have you reviewed this note

11  previously?

12  A.   Yes.

13  Q.   Is this a note that you made after a visit and evaluation

14  again of Mr. Hay?

15  A.   Yes.

16  Q.   And, again, is this particular note and record, Defendant's

17  Exhibit 812, kept in the regular course of business for the

18  medical records for your office?

19  A.   Yes.

20           MS. RAMSEY:  Your Honor, I move to admit Defendant's

21  Exhibit 812.

22           MR. HUSCHKA:  No objection.

23           THE COURT:  812 admitted.  You can publish.

24  BY MS. RAMSEY:

25  Q.   All right.  This appears also to be another letter to the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                            2:19-cr-20044-JAR
                                          USA v. Bruce L. Hay
                                          ROA - Volume 3, p.467

1    trauma surgeon, Dr. Wilkins; is that correct?

2    A.   Correct.

3    Q.   And you note in that first paragraph that I think this

4    is -- this is your third visit that you still feel that he has

5    conversion disorder, correct?

6    A.   Yes.

7    Q.   And it also looks like that you had some information that

8    he had been continuing physical therapy, but had plateaued at

9    that point in time?

10   A.   Yes.

11   Q.   What did you mean by "plateaued"?

12   A.   It mean he reached maximum medical improvement; that going

13   on with physical therapy, he had not continued to improve.

14   Q.   You also note -- could you read for me after that -- in the

15   second paragraph of the first sentence where it says "he

16   still"?

17   A.   "He still uses a walker for long trips but uses a cane

18   otherwise."

19   Q.   Okay.  And so that indicates to you when he was going on

20   long trips, he used a walker, but he had a cane.  Do you know

21   at the point in that visit if he came with a walker or a cane?

22   A.   I didn't note that.

23   Q.   Okay.

24   A.   I don't remember.  Oh, wait.  He walks with a walker.

25   Q.   And, again, this was in August and the car accident was in

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.468

1   February, so this wasn't a visit too long after the initial car

2   accident that caused the -- that you believed caused the trauma

3   for conversion disorder, correct?

4   A.   Yes.

5   Q.   You also note in here that not only has he done physical

6   therapy, but he was undergoing counseling with a Dr. William

7   Moffitt in Olathe and also seeing a psychiatrist in Fort Riley;

8   is that correct?

9   A.   Correct.

10   Q.   And did you note whether or not he was taking any

11   medication?

12   A.   He had gone off of his Zoloft and was switching over to

13   Zyprexa, but he -- I had noted his medications on the first

14   visit that he was taking besides his psychiatric medications.

15   Q.   Understood.   But the Zyprexa was a psychiatric medication?

16   A.   Yes.

17   Q.   Did you prescribe that?

18   A.   No.

19   Q.   In that second [*sic*] paragraph you note that his arm

20   strength appears to be completely normal with no atrophy and

21   well-developed muscles.   Do you see that in the third

22   paragraph?

23   A.   Yes.

24   Q.   With conversion disorder there's no particular type of body

25   type that someone must have to have a diagnosis of conversion

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.469

 1  disorder, correct?

 2  A.   No.

 3  Q.   Doesn't matter if they're muscular build, thin; their

 4  muscular tone or build doesn't matter either way to the

 5  diagnosis of conversion disorder, correct?

 6  A.   It does not matter.

 7  Q.   Dr. Hedges, in 2005 when you saw Mr. Hay for those three

 8  times, you were in private practice; is that correct?

 9  A.   Correct.

10  Q.   You weren't working for the Veterans Administration in any

11  way?

12  A.   Correct.

13  Q.   I don't think you ever have, correct?  You've never worked

14  for the Veterans Administration?

15  A.   I didn't work for them.  When you're a resident, oftentimes

16  you rotate through the VA hospital, but that was many years

17  before that.

18  Q.   Many years before 2005?

19  A.   Yes.

20  Q.   In 2005 you had no connection to the VA?

21  A.   Correct.

22       MS. RAMSEY:  All right.  Thank you so much.  I have

23  nothing further.

24       MR. HUSCHKA:  We have no questions, Your Honor.

25       THE COURT:  All right.  Thank you, Dr. Hedges.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.470

1        Call your next witness.

2        MR. HUSCHKA:  Your Honor, the United States calls

3   Special Agent Kerry Baker.

4                SPECIAL AGENT KERRY BAKER,

5   called as a witness on behalf of the government, having first

6   been duly sworn, testified as follows:

7        THE WITNESS:  Good morning, Your Honor.

8        THE COURT:  Good morning.

9                DIRECT EXAMINATION

10  BY MR. HUSCHKA:

11  Q.   Agent Baker, could you introduce yourself to the jury and

12  tell them a little bit about your background.

13  A.   Yes.  My name is Kerry Baker.  I'm a special agent with

14  Department of Veterans Affairs Office of Inspector General.

15  I'm based here in the Kansas City field office.  I've been with

16  Department of Veteran Affairs as a criminal investigator since

17  2008.

18  Q.   What did you do prior to joining the VA?

19  A.   From 2002 to 2008 I was a United States Secret Service

20  agent also based in the Kansas City field office.

21  Q.   Prior to that?

22  A.   I was a Kansas City, Missouri police officer from 1996 to

23  2002.  My first four years I worked East Patrol Division at

24  27th and Van Brunt and my last two years I was a homicide

25  detective.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.471

1   Q.   Did you serve in the military?

2   A.   I did.  I'm a United States Army infantryman.

3   Q.   Can you explain to the jury how the VA-OIG relates to the

4   VA?

5   A.   Yes.  The VA-OIG is the oversight agency for Department of

6   Veterans Affairs.  We investigate allegations of criminal

7   offenses involving VA employees, VA properties, or VA programs.

8   Q.   And can you describe just some of your duties and

9   responsibilities in investigating those types of crimes?

10   A.   Sure.  So generally speaking when we receive a referral in

11   our office, depending on the nature of the referral and

12   manpower constraints, that referral will be assigned to an

13   agent who will handle the initial investigation and decide

14   whether it needs further investigation.

15        Based on my own background specifically, because we do work

16   a very wide range of cases, everything from violent crimes to

17   drug crimes to death investigations, I do handle -- I believe

18   the entire time I've worked there I've at least assisted, if

19   not led, investigation on all of the death investigations, so

20   then we'll work that out and decide whether or not the case

21   needs to be open for further investigation.

22   Q.   And what other types of crimes do you investigate?

23   A.   We also investigate fraud.  Ideally fraud waste and abuse,

24   that's our mission with VA-OIG.  But employee cases, everything

25   from theft to practice problems.  If we have a provider who's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.472

1  committing crimes, we'll investigate those as well.  We

2  investigate fraud, everything from contract fraud to

3  procurement fraud and then again back to the violent crimes

4  investigations.

5  Q.  Do you receive any specialized training from the VA-OIG?

6  A.  VA-OIG actually does a wonderful job of continuing

7  education for our agents.  I have received a great deal of

8  training with VA-OIG.  My initial training with them, there was

9  a transitional program we went through that was -- I can't

10 remember how many days, but really specific to the Inspector

11 General's Office and what type of investigations we would be

12 working.

13      After that I went through a number of other trainings.

14 I've had another homicide death investigation course through

15 VA-OIG.  I've worked through a number of procurement and

16 contract fraud investigation courses with them.  I am the

17 control tactics/defensive tactics instructor.  I've been in

18 that role for about ten years.

19      And then -- well, very -- within the last probably four

20 years, five years, our agency has adopted some additional

21 training with regard to medical training, so I have -- I think

22 I've been through two or three -- it's called TCCC, which is

23 tactical combat casualty care, and I completed the emergency

24 medical response training program at Johnson County Community

25 College.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.473

1    Q.   So through your duties as a special agent, are you familiar

2    with the process of obtaining disability benefits from the VA?

3    A.   Yes, sir.

4    Q.   What is your understanding of that process?

5    A.   The process initiates with the veteran applying for the

6    benefits.  He or she will submit the application itself and

7    then any supporting documentation.  That may come from an

8    outside provider who has seen this veteran for this particular

9    issue and they can -- it's called a fully developed claim.

10   They can actually submit -- the outside provider can actually

11   submit a completed packet on behalf of the veteran that

12   supports that claim.

13   Q.   And other than the disability benefit programs that are

14   within the Veterans Benefits Administration, are there other

15   benefits within the VA that are available to veterans?

16   A.   Yes, there are.  There are educational benefits.  There are

17   -- assistance outside -- and even within the disability

18   benefits, there are additional programs available for veterans

19   who need additional financial assistance or additional money to

20   pay for care.

21   Q.   And what is the caregivers assistance program?

22   A.   That is one of those programs.  So when a veteran is rated

23   100 percent disabled, service-connected disabled, and permanent

24   and total, which is an additional rating, assuming that the

25   patient is not -- I'm sorry, the veteran is not going to get

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.474

1   any better, no improvement or very unlikely, then the caregiver

2   assistance program can kick in.  It can be automated through

3   the VBA process, the Veterans Benefits Administration, or the

4   veteran or spouse can apply for it.

5   Q.   And so separate from any sort of benefits like that that

6   are administered with VBA, is there a separate social work

7   function that also gives caregivers assistance benefits?

8   A.   Yes.  Actually, the caregiver's assistance program is

9   administered through the VA Medical Center, and so it does fall

10  to a social work program that administers the caregiver

11  assistance.

12  Q.   Are you familiar with aid and attendance benefits?

13  A.   Yes.

14  Q.   Is the caregivers benefits program distinct from that?

15  A.   Yes, sir.

16  Q.   Would that be separate and in addition to what a veteran

17  received for aid and attendance if they received aid and

18  attendance?

19  A.   Yes, sir.

20  Q.   Can you explain to the jury what it means to be case agent

21  of a given investigation?

22  A.   Yes.  When -- again, back to the referral process, when we

23  receive a referral, again, depending on manpower constraints,

24  depending on caseload, a case agent is selected.  Most of the

25  time in our office if we receive the call, we keep the case.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.475

1    But the case agent is the -- is the supervisor of the case.  So

2    everything from investigative steps to be taken, all the way up

3    through and to include trial, if necessary.

4    Q.   So does every referral that is received by VA-OIG actually

5    opened as an investigation?

6    A.   No, sir.

7    Q.   And why might a referral not be opened?

8    A.   So we have a 90-day period where we can review the

9    investigation that comes in, and during that 90 days we can

10   determine if this is something that either doesn't rise to our

11   level of attention and could be handled maybe better

12   administratively or maybe better through VA police, because the

13   hospitals have their own police departments, or it may be a

14   situation where we conduct some initial investigation and

15   realize that it's simply unfounded.

16   Q.   During your investigations do you ever coordinate with

17   other law enforcement agencies?

18   A.   Yes, sir, we do when possible.

19   Q.   And which type of agencies would you coordinate with in a

20   disability benefits fraud case?

21   A.   Social Security is probably the most frequent by far.  It's

22   very common for someone to receive Social Security benefits as

23   well as VA benefits.

24   Q.   When did you first become familiar with the Defendant Bruce

25   Hay?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.476

1   A.   I believe it was 2012.  One of my coworkers, Special Agent

2   Daniel White, was working an investigation on Mr. Hay and was

3   proposing a surveillance operation, and so we tried to help

4   each other out with that so we have additional manpower,

5   additional vehicles so that we can operate mobile surveillance

6   undetected.

7   Q.   During your investigation have you had an opportunity to

8   observe the defendant?

9   A.   Yes, sir.

10  Q.   Do you see him in the courtroom today?

11  A.   I do.

12  Q.   Could you describe what he's wearing?

13  A.   I believe he has on a gray shirt today with a white

14  undershirt.  He's seated to the far right of counsel.

15         MR. HUSCHKA:  Your Honor, could the record reflect the

16  witness has identified the defendant?

17         THE COURT:  The record will so reflect that.

18  BY MR. HUSCHKA:

19  Q.   Generally speaking, over the course of your investigation,

20  what are some of the types of investigative steps you took in

21  this investigation?

22  A.   In this investigation I initially attempted just spot

23  surveillance.  Osawatomie is a bit of a drive, and so when

24  able, I would just set aside a day to go out and try to observe

25  Mr. Hay either at his residence or at the family farm that I

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.477

1   learned he does spend some time.

2   Q.   Did you interview witnesses?

3   A.   Initially I really didn't.  I was very careful.  We were

4   still trying to stay as covert as possible.  With a smaller

5   town, didn't really have any idea who knew Mr. Hay, might be

6   familiar with him.  So I didn't do much on the interview side

7   of it on the front end of the case.

8   Q.   So I want to bring your attention then to November 19,

9   2012.  Were you involved in a surveillance operation regarding

10  the defendant that day?

11  A.   I was.

12  Q.   And who was the lead case agent at that time?

13  A.   Special Agent White.

14  Q.   Could you describe that operation for the jury?

15  A.   Sure.  Special Agent White advised the surveillance team

16  that Mr. Hay had a Social Security administrative benefits exam

17  that was to occur in Olathe, Kansas, and so Special Agent White

18  and I don't recall specifically who were going to start their

19  surveillance operation at Mr. Hay's residence.  And so I was

20  with another agent that day, and we sat at the facility where

21  his exam was to occur, the doctor's office.

22  Q.   And so what did you observe from your vantage point during

23  that surveillance operation?

24  A.   So we had a vehicle description ahead of time.  It was a

25  white Chevrolet pickup truck, and from our vantage point we

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.478

1    were able to see the pickup truck pull into the parking lot.

2    Mrs. Hay was driving.  She got out of the vehicle, went around

3    the rear of the vehicle to the passenger side, opened the door,

4    and couldn't really tell if she helped Mr. Hay out of the

5    vehicle or waited for him to get out of the vehicle.

6         Mr. Hay got out of the vehicle and the two of them walked

7    toward the stairs leading up.  It's an outside entry to this

8    doctor's office.  And so they walked across the parking lot,

9    slight incline.  Mrs. Hay seemed to be providing him great

10   assistance.  Mr. Hay seemed to be struggling greatly with just

11   walking, a lot of body movement and jerking.  He had a cane

12   that day and seemed to be using it to help assist him and

13   ambulate.

14        And then he struggled greatly getting up the stairs.  I

15   mean, it was very much one stair at a time, two feet on each

16   stair, and, again, she's assisting him all the way up and into

17   the outside entry into the doctor's office.

18   Q.   After he went into the building, did you stay in the

19   parking lot and wait for him to come out?

20   A.   Yes, sir.

21   Q.   What did you observe when he came out?

22   A.   Very similar as far as the level of assistance required.  I

23   did think it odd that Mrs. Hay followed him down the stairs

24   even though he was struggling as much as he was.  Maybe I was

25   over thinking, I don't know.  But she assisted him again

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.479

1  greatly.

2      He relied heavily on the cane to get back to the vehicle.

3  Just prior to passing behind the vehicle where he would be

4  somewhat blocked from our view, we noticed a really obvious and

5  large almost fall backward movement that he recovered and then

6  went on back to the vehicle.

7      Mrs. Hay accompanied him to the passenger side of the

8  vehicle again, and he was able to get in, and then she came

9  around to the driver's side, and we finished at that location.

10  Q.  So what happened after the defendant left the Social

11  Security parking lot?

12  A.  So it was actually a doctor's office, the Social Security

13  exam, yes, sir.  We decided to follow and to see where they

14  went next.  We didn't really have any anticipation of where

15  they might go, and so we progressed through driving through

16  some of the streets in Olathe.  I would guess no more than ten

17  minutes maybe, and we went to a pawnshop very close by.

18  Q.  What did you observe there at the pawnshop?

19  A.  So the agent and I in my vehicle -- or in our vehicle, we

20  parked across the street from the pawnshop.  Mrs. Hay parked

21  the white Chevrolet pickup truck.  Mr. Hay got out of the

22  passenger side and went into the pawnshop without her

23  assistance.  He did have his cane.  He did have maybe a little

24  bit of a limp, but certainly a grand departure from what we had

25  just seen a few moments -- a few minutes earlier.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.480

1  Q.  And so he went in by himself?

2  A.  Yes, sir.

3  Q.  And you said he had a cane.  Was he relying on it?

4  A.  No.  He was more carrying the cane at that point.

5  Q.  And did he make trips in and out of the pawnshop?

6  A.  He did.

7  Q.  And ultimately was there a point where he came out carrying

8  an object?

9  A.  Yes.  I'm not very mechanically-inclined, so I'll

10  apologize.  But it looked to me like a red toolbox or maybe a

11  power toolbox.

12  Q.  And just overall your interactions at the pawnshop, could

13  you elaborate a little bit more about how -- what you observed

14  there compared to what you observed ten minutes earlier at the

15  doctor's office for the Social Security evaluation?

16  A.  Sure.  So from exiting the vehicle to go in, to back and

17  forth opening the door to the pawnshop, Mrs. Hay did not exit

18  the vehicle throughout any of his time at the pawnshop.  He was

19  completely by himself, did not seem to struggle with opening

20  the door to get in and out.

21      Also, the door to the vehicle, was able to get in and out

22  on his own.  After he put the red box in the back of the

23  truck -- in the, I guess -- I think they're called suicide

24  doors, I know there are other names for it, but the truck had

25  suicide doors so they opened this way.  And so he had to open

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.481

1   the passenger door to open the back door, and looked like he

2   probably put the red toolbox behind the passenger seat.  I

3   could see he took off his jacket that he had on unassisted, and

4   then was able to get back into the truck and leave.

5        We did notice that at one point -- and I believe it was

6   when they arrived, if I recall correctly, but there was another

7   truck parked in fairly close proximity, and side view mirrors

8   on trucks tend to be protrude -- they stick out from the

9   vehicle so that the driver has, you know, better vantage point

10  and vision.  And so there was -- I would guess maybe 2 feet

11  between the rear view mirrors -- or I'm sorry, the outside view

12  mirrors of the truck, and Mr. Hay was able to turn his body to

13  go between the two trucks and then into the business.

14  Q.   Was there additional surveillance that was conducted that

15  day after the pawnshop?

16  A.   There was.

17  Q.   Were you involved in that?

18  A.   No, sir.

19  Q.   So was there a point in time in which you took over primary

20  responsibility for this investigation?

21  A.   Yes, sir.  I believe it was June 2015.

22  Q.   And why did you take over responsibility?

23  A.   Special Agent White received a promotion, and so his

24  caseload was divided up between the remaining agents.

25  Q.   So in the course of your investigation or in the course of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.482

1    any of your investigations, do you have access to certain VA

2    records?

3    A.    Yes, sir.

4    Q.    What types of records do you have access to to aid your

5    investigations?

6    A.    So we have access to the VBA, the benefits records, and

7    then their own records, their own work product, which would be

8    rating decisions, that type of information -- pardon me -- but

9    also the documents submitted to support those rating decisions,

10   so everything from service medical records to private

11   physician's records if they're used to submit and support a

12   claim for benefits.

13   Q.    So during your investigation of the defendant did you

14   review disability rating information related to him?

15   A.    Yes, sir, I did.

16   Q.    And what did you learn during your review?

17   A.    Mr. Hay was 100 percent service-connected disabled.  The

18   two 100 percent ratings were noted as choreiform gait and

19   conversion disorder.  He reported to providers that he required

20   assistance with activities of daily living, which to my

21   understanding are everything from bathing to toileting, really

22   just cooking, those types of things, getting dressed, that

23   he -- an early claim, I believe it was 2006, 2007, he claimed

24   he was unable to drive, that he required a walker, that he had

25   this muscle spasticity, tremors, and that he required

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.483

1   assistance.

2   Q.   So how did what you reviewed in the rating information and

3   related documents compare to what you had observed in person in

4   2012 at the doctor's office for the Social Security

5   examination?

6   A.   For that particular part of my surveillance it was

7   consistent.  My observation -- I mean, he did have -- he did

8   require assistance.  He did need a cane.  He did, you know,

9   need his wife to assist him in and out.  His stride or gait

10  was -- it was very erratic.  I mean, it was a whole lot of

11  muscle movement.  And so, yes, that was very consistent with

12  what I read in the chart -- or in the file, I'm sorry.

13  Q.   And how did what you read in the file compare to what you

14  observed at the pawnshop in 2012?

15  A.   I would -- I think I would characterize it as exaggerated

16  at least.  It was not consistent at all with what we observed.

17  Q.   So given what you knew after your review of the file and

18  your prior surveillance of the defendant, what initial

19  investigative steps did you take once you took over primary

20  responsibility for the case?

21  A.   Right.  And I apologize, so this is when I actually started

22  to go to Osawatomie and try to, I guess, spot check and just to

23  see Mr. Hay.  And I was also trying to determine some type of

24  routine so that we could plan surveillance around whatever

25  routine he might have.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.484

1      I did not have any luck.  I struck out.  I did not see him

2   leave his house.  I did not see him at the farm.  And so -- and

3   there were several attempts, and so I did some online -- may I?

4   Q.  What did you do after those initial attempts?

5   A.  Thank you.  So I did online research.  I learned that

6   Mr. Hay and his family are involved in the Scottish heritage

7   events, particularly the Highland Games, so there are a number

8   of Highland Games throughout the United States, I would assume

9   throughout the world.

10     And so the Hays were participants in the Highland Games,

11  and so I realized that -- I believe there was one in maybe

12  Augusta, Kansas, that we were not able to attend and so we did

13  have one coming up here local at Riverside -- in Riverside,

14  Missouri.  I believe it was at Argosy Park, and that was in

15  June of 2016.

16  Q.  Did you observe the defendant that day?

17  A.  I did.  I went alone.  It was a Saturday.  So I went alone

18  with my Sony camcorder I believe you heard about earlier.  I

19  tried to observe Mr. Hay that day as much as I could and to

20  record his symptoms.

21  Q.  How long did you observe him that day?

22  A.  I believe I was there for about three hours.  It was June.

23  It was absolutely a miserably hot day, and so I felt I had

24  exhausted my resources that day.

25  Q.  Did you see the defendant with a walker that day?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.485

1   A.   I did not.

2   Q.   Did you observe any impairment like you observed outside

3   the medical building in 2012?

4   A.   I did not.  Mr. Hay was in a -- so his family had a tent or

5   canopy set up with a sign "Clan Hay" on the front of it, so

6   that was a pretty good clue for me that's where he might be.

7         And so I started to observe him there.  I did notice that

8   he had his cane with him.  He was, you know, dressed in

9   Scottish regalia, and most of my observation was he was either

10  seated in the tent or standing in the tent.  I mean, he milled

11  about a little bit, but he really -- I didn't see him leave the

12  tent to go do anything.

13  Q.   What was the atmosphere like at this festival?

14  A.   More renaissance festival, less KISS concert.  It was

15  active.  It was loud.  People were having fun and they had a

16  beer garden.  It was a festival environment.

17  Q.   Was there loud music?

18  A.   There was.  I got to take in a pipe and drum procession

19  that goes through the parade grounds and very entertaining,

20  very loud.  I don't know if you're familiar, but when they

21  start up the bag pipes, they have to warm them up and warm up

22  the bellows, so there's like a rumble that starts a little bit,

23  and then the drums, and it's very loud.

24  Q.   So after observing the defendant at the Highland Games,

25  what was the next step you took as far as your investigation?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.486

1  A.   I had spoken with -- so we have a technical operations

2  division that's comprised of agents who have taken it upon

3  themselves to learn about technical operations, technical

4  surveillance, and so I had discussed with those agents some

5  best options and explained to them sort of our limitations of

6  where Mr. Hay lived, where the farm was located, and so based

7  on those discussions, I went back out and did a surveillance

8  survey, an assessment of where our best locations might be.

9      We agreed that our ideal opportunity would probably be a

10 pole cam installation.  Because of the location of the farm,

11 the only power sources there were -- I'm sorry, power poles and

12 those are administered by the local power company.  And, again,

13 small town, not knowing who knows Mr. Hay, we ruled that out.

14 And so we continued to discuss our options, and directly across

15 the street from Mr. Hay's residence is a school, and we made

16 contact and received permission to install the pole cam at the

17 school.

18 Q.   Can you just take a minute and explain to the jury what a

19 pole camera is?

20 A.   Sure.  So a pole cam camera, this one particularly is a

21 covert motion-sensored wireless camera.  It's put into a

22 location where you can have as best vantage point as agreed

23 upon by not only the technical operations agents, but the case

24 agent as well.  Like this is exactly what we want to see or

25 need to see, is this achievable.  And so based on those

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.487

1   considerations, we install the camera there.

2      This particular camera has -- again, it's motion-sensored

3   and I believe we had eight hours, the overnight hours that we

4   did not record at all.

5   Q.   So this camera is physically located across the street from

6   the defendant's residence?

7   A.   Yes, sir.

8   Q.   But then is it backed up so that you can view it wirelessly

9   from some other location?

10  A.   Yes, sir.  So it is a wireless camera.  All of the

11  surveillance footage is downloaded onto a router and saved, but

12  we do have the capabilities as the case agents and also as the

13  technical operations agents to remote into that camera.  I can

14  watch a live feed of the camera.

15     If I see something that I want the technical operations

16  agents to zoom in, theoretically the case agent has that

17  capability, but I don't think that's refined yet, and so I

18  didn't mess with it.  So if I had anything, they would be able

19  to remote in and zoom in to something or pan, turn the camera

20  to a direction that we needed to do that.

21  Q.   And so other than somebody, you know, specifically

22  manipulating it, it would just record any motion?

23  A.   Correct.

24  Q.   Why did you want a pole camera across from his residence at

25  that time?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.488

1    A.   I wanted to be able to see Mr. Hay's residence.  I mean, I

2    needed to see his activity, because up to that point we really

3    didn't have a date -- a day in the life of Mr. Hay, and so I

4    kind of needed to see him -- I really needed to see him to see

5    if he had disabilities that we could identify, to see if he had

6    any of these very noticeable muscle spasms, anything like that

7    that we could identify.

8    Q.   So you got the pole camera installed?

9    A.   Yes, sir.

10   Q.   Do you recall when that went up for the first time?

11   A.   Yes, sir, it was October 2016.

12   Q.   And how long did it run for?

13   A.   The initial coverage period was eight weeks.

14   Q.   So just describe for the jury generally what you observed

15   during those eight weeks of pole camera footage.

16   A.   Yes, sir.  The vantage point we initially had and wanted to

17   cover in the pole cam was from -- I believe it was the east

18   corner of the residence to just beyond the driveway on the west

19   side, so we had the vehicles in the view and then we also had

20   the front of the residence, the porch.

21        And so immediately I was able to see Mr. Hay within maybe

22   the day we activated, if I remember correctly, leave the house

23   carrying his cane, walking like you or I would walk, no signs

24   of any tremors or muscle spasm or unusual gait.  I didn't see

25   him using the cane.  I did not see Mrs. Hay accompany him.  And

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.489

1  I believe it was maybe day one of activation Mr. Hay got into

2  the driver's side of a red Chevrolet pickup, backed out of the

3  driveway, and drove away by himself.

4  Q.  Did you -- how often did you see him drive during your

5  review of that pole camera surveillance?

6  A.  Nearly every day.

7  Q.  Did you see him engaged in physical activities?

8  A.  I did.  Mr. Hay would engage in family activities in the

9  front yard, just hanging out with his family.  And also I

10 observed him climb into and jump down from a truck bed, which

11 I'm almost 55 now and Mr. Hay and I are fairly close to the

12 same age, and I have to be a little cautious --

13        MS. RAMSEY:  Objection, Your Honor; personalizing.

14        THE COURT:  Overruled.

15        THE WITNESS:  And so that seemed unusual to me.  I saw

16 Mr. Hay load items into and out of the truck bed, large items.

17 At one point I believe he moved two of the collapsible

18 canopies, I can't tell for sure on the video, but two of the

19 collapsible canopies they would use probably at the Highland

20 Games by himself, reaching over the truck bed, lifting it out,

21 putting it into the other truck bed.  I don't know if you have

22 experience of that, but they're heavy and awkward.

23        Mr. Hay moved -- that same incident, he moved the two

24 canopies -- I believe to be canopies.  He also moved a door.

25 It looked like probably a solid door with glass window panes at

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                            USA v. Bruce L. Hay
                                                            ROA - Volume 3, p.490

1    the top that he lifted up and over and carried and put in the

2    other truck bed.  Also when Mr. Hay -- oftentimes when he would

3    leave, he would be gone for extended periods, maybe several

4    hours a day by himself.  And out of our view obviously.

5           At one point I saw Mr. Hay run from his truck to the

6    front of the house and then jog back to the truck after.  He

7    moved items.  One day I noticed he moved items from inside the

8    truck -- I'm sorry, inside the house.  They appeared to be

9    possibly cabinets -- or maybe cabinet drawers, I'm sorry, from

10   the inside of the house into the back of a white SUV parked in

11   his driveway.

12          And then another day I observed Mr. Hay back one truck

13   to the other truck so they were bed to bed, and he moved two

14   very large -- I have no idea what they were -- appeared to be

15   awkward weight and large from one truck bed to the other.

16          So just very daily activity.  What I did -- never saw

17   him exhibit any of the symptoms that he has described to VA.

18   BY MR. HUSCHKA:

19   Q.   So this was between around the beginning of October through

20   around the end of November 2016?

21   A.   Yes, sir.

22   Q.   Did you activate the pole camera again after that time?

23   A.   We did.  In March of 2016 [*sic*].

24   Q.   Sorry.  So that -- it initially was October to November,

25   right?  So is this the following year?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.491

1   A.   Yes, sir.  So it would be March of 2017.  I apologize.

2   Q.   And so why did you reactivate it at that time?

3   A.   So I was able to determine that Mr. Hay had two upcoming

4   health-related appointments through the VA, and we wanted to be

5   able to see him from the morning of, until after the

6   appointment -- through and after the appointment.

7   Q.   And do you recall when that first appointment that you

8   learned about was?

9   A.   Yes, sir.  It would have been March 24, 2017.

10  Q.   What kind of appointment was it?

11  A.   That was a dental appointment.

12  Q.   So was this in any way related to benefits?

13  A.   No, sir.

14  Q.   So this was part of the VHA?

15  A.   Yes, sir.

16  Q.   They provide dental services?

17  A.   They do.

18  Q.   Did you do your own surveillance that day separate from the

19  pole camera?

20  A.   We did.  We operated mobile surveillance that day.

21  Q.   What did you observe during the defendant's dental

22  appointment?

23  A.   So I had agents in the lobby of the VA Medical Center in

24  Kansas City to observe as Mr. Hay arrived and proceeded through

25  the facility.  The dental clinic, if I remember correctly, is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.492

1   on the second floor, so he took the elevator up, and I had an

2   agent in the dental waiting room who -- obviously we had covert

3   cameras, and they were able to record Mr. Hay as he waited to

4   be called back for his dental appointment.

5   Q.   And was he carrying a cane with him that day?

6   A.   He was.

7   Q.   Did he appear to be placing any weight on it?

8   A.   He did not.

9   Q.   And did Ms. Hay provide any sort of assistance to him in

10  maneuvering around?

11  A.   She did not.

12  Q.   Do you recall how long that dental appointment was?

13  A.   I don't.

14  Q.   Did you later observe the defendant leaving the VA facility

15  after that appointment?

16  A.   Yes, we did.

17  Q.   What did you see at that point?

18  A.   After the appointment one agent followed the Hays from the

19  dental -- sorry, my mind is blank -- dental clinic to the

20  elevators and downstairs.  The Hays went to another appointment

21  apparently, and we lost sight of them for a little bit.  I

22  don't know how many minutes.  I'm not even going to try to

23  guess.

24       But in the meantime I positioned myself by their vehicle.

25  I was in the back of my government vehicle, which was a minivan

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.493

1   at the time, laying down in the back -- well, of the minivan

2   with a camera.  And was able to observe and record them leaving

3   the dental exam.

4   Q.   And when they came out, did the defendant require any

5   assistance?

6   A.   He did not.

7   Q.   Did you see any spasms or involuntary movements?

8   A.   I did not.  No, I did not.

9   Q.   Do you recall -- you said he did something after the dental

10  exam.  Do you know what that was?

11  A.   I would have to -- I would have to look at my notes to

12  refresh.

13  Q.   Let's move now to the next appointment that you learned

14  about.  When was that?

15  A.   That would have been March the 30th, 2017.

16  Q.   And what was happening that day?

17  A.   That day he had an appointment with his primary care

18  physician at the Paola community-based outpatient clinic, the

19  CBOC, which is a VA facility.

20  Q.   Who is that physician?

21  A.   Dr. Emmett McWoods.

22  Q.   Did you conduct surveillance there?

23  A.   We did.

24  Q.   What did you observe during that appointment or on the way

25  up to that appointment?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.494

1  A.   Sure.  So we had agents position their vehicles -- I had

2  agents position vehicles in and around the parking lot of the

3  CBOC.  I was actually inside and had a covert camera to try to

4  record Mr. Hay's movements very close -- or very closely, I

5  apologize.  And so the agents were able to observe and record

6  the arrival at the appointment.  When the Hays came into the

7  clinic, I was unable to record them, but we were also able to

8  record them on the way out.

9  Q.   And so you were physically sitting inside the lobby?

10  A.   Yes, sir.

11  Q.   What happened after the defendant came inside the building?

12  A.   He and his wife sat down very closely to me and we engaged

13  in conversation, very polite, small talk, if you will.  We

14  discussed our military histories.  I don't remember anything,

15  you know, if it was activity related or anything, but at some

16  point he had asked about, you know, my being there, and I

17  explained that I was between jobs, that I had been in Wichita

18  and he very politely offered to introduce me to his

19  brother-in-law to see if I could go to work for him for the

20  remodeling company.

21  Q.   Did he indicate if he worked for this remodeling company?

22  A.   He did.  He did indicate that he worked sometimes with his

23  brother-in-law.

24  Q.   What did you observe during that interaction with respect

25  to his physical demeanor?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.495

1  A.   He did get up to get a cup of coffee.  I did not see him

2  need his cane at any point.  I did not see any head bobbing,

3  muscle spasms, unusual gait.  Mr. Hay sometimes walks with a

4  slight limp.  I can't recall if he did that day or not.  But

5  nothing like we had seen previously.

6  Q.   What happened after the appointment?

7  A.   The Hays left the CBOC, the building itself, came out of

8  the doors.  One of our agents put some change on the ground on

9  the passenger side outside of the Hay's vehicle.  I don't know,

10 maybe a dollar's worth, whatever.  And Mr. Hay bent down and

11 squatted down to pick up the change and at one point actually

12 used his cane to fish money out from under the car.  It had

13 rolled under, and so he used his cane to retrieve those coins.

14 Q.   Did you review the pole camera footage before and after

15 this appointment?

16 A.   Yes, sir.

17 Q.   Did you observe any involuntary movements or anything like

18 that on the pole camera footage that day?

19 A.   I did not.

20 Q.   Do you recall seeing him need any assistance from his wife

21 that day?

22 A.   No, sir.

23 Q.   At some point during your investigation did you alert the

24 Veterans Benefits Administration about what you had learned

25 about the defendant's true physical abilities?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.496

1    A.    I did.

2    Q.    When was that?

3    A.    I believe it would have been maybe April of 2017.

4    Q.    Did that ultimately result in additional C&P examinations

5    being scheduled?

6    A.    It did.

7    Q.    Do you recall when those were scheduled?

8    A.    They were scheduled for May the 3rd, 2017.

9    Q.    Did you take any steps in advance of those C&P

10   investigations to further your investigation?

11   A.    Yes, sir.  So as the C&P exams are benefits examinations,

12   we will ask the regional office if they should see fit to

13   schedule another C&P examination, if they would be so kind as

14   to alert us to the date and time, location, and provider.

15   Q.    So did you -- so you took steps then to try to record those

16   examinations?

17   A.    That's correct.

18   Q.    Did you also initiate the pole camera around the time of

19   these appointments?

20   A.    We did.  The week around those appointments we reinitiated

21   the pole cam.

22   Q.    Did you view the footage from around the time of these C&P

23   examinations?

24   A.    Yes, sir, I did.

25   Q.    What did you observe the day before?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.497

1  A.   So as I mentioned earlier -- so the day before was, as I

2  mentioned earlier, with, again, I believe to be canopies,

3  collapsible canopies and the door, and so that was the day

4  before his VA compensation and pension examination.

5  Q.   What did you see on the footage?

6  A.   Just that he was able to pick up these items and move them

7  into the other vehicle.  Again, he's moving in and out of the

8  house without assistance, sometimes with a cane, sometimes

9  without.  I believe that day he didn't have his cane with him

10 when he went out to the truck to move these items.

11 Q.   Now, the morning of the C&P examinations, where were you?

12 A.   The morning of I was located with the technical operations

13 agent at the VA Medical Center.

14 Q.   So were you able from where you were at at the medical

15 center to view the pole camera footage from that morning?

16 A.   Yes, sir, I was.

17 Q.   What did you see that morning?

18 A.   So we were remoted in on my government laptop, so again,

19 old eyes, but I saw Mr. Hay leave the residence carrying

20 something.  I couldn't readily tell what it was.  It was

21 raining that morning.

22     And so he carried an item around the truck to the passenger

23 side, same truck with the suicide doors, opened the front

24 passenger door so that he could access the rear compartment and

25 put this item in behind the passenger seat of the truck.  And

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.498

1   then when they left their residence, Mrs. Hay was driving and

2   Mr. Hay was in the passenger seat.

3   Q.   And so then what happened once the Hays arrived at the

4   medical center for the C&P examinations?

5   A.   So when they arrived, we had an agent -- we had agents in

6   the parking lot.  We had an agent in the lobby of the VA

7   Medical Center, all with covert recording cameras, and so when

8   the agent in the lobby was able to see Mr. Hay for the first

9   time and record him, we learned that the item that he had

10  loaded in the truck was a walker, a rollator walker.  So it's a

11  walker with wheels.  It has hand brakes on it.

12  Q.   Did he walk into the VA using the walker?

13  A.   He did.

14  Q.   And that's what you saw initially that morning when you

15  weren't sure what it was at that time?

16  A.   Correct.

17  Q.   So as he's coming in and you have other agents getting

18  surveillance of him entering the building, where are you at?

19  A.   I am in the -- there's actually a C&P unit, and so I'm in

20  an exam room in the C&P unit.

21  Q.   And was Mr. Hay eventually brought to an exam room for the

22  examination?

23  A.   Yes, sir, he was.

24  Q.   Were you able to observe that examination?

25  A.   Yes, sir, I was.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.499

1   Q.   Did you observe the entirety of the two examinations that

2   were conducted that day?

3   A.   I did.

4   Q.   What did you observe during the examinations?

5   A.   When the Hays entered the first exam room, Mr. Hay was --

6   both in the lobby as well as into the exam room, extreme

7   difficulty moving, extreme difficulty walking, very shaky,

8   reliant on the walker, like a Frankenstein walk where he's kind

9   of staggering.

10      And so into the exam room to -- for the first exam, much

11  the same, struggling to navigate the walker into the office.

12  It was a tight space, but still it seemed a bit exaggerated.

13  He was able to get -- and Mrs. Hay was assisting him.  He was

14  able to get positioned and seated near the provider.

15      When she initially started the interview, I believe

16  Mrs. Hay had to use the restroom, and so she tried to start her

17  interview or her exam, and Mr. Hay was kind of moaning and

18  mumbling.  I -- may I demonstrate?

19  Q.   Yes.

20  A.   (Indicating) eyes rolled back in his head and his head

21  bobbing to the point, if I remember correctly, I think there

22  was some concern of whether or not the provider could go

23  forward with the exam because he was unable to answer questions

24  I think is what seemed to be, just from my observations.

25      But eventually Mrs. Hay returned and they were able to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.500

1  proceed with, you know, this was a behavioral health exam.  So

2  there was no physical exam at this portion.  This was -- it was

3  an interview.  It was the doctor asking questions and Mr. Hay

4  answering them.

5  Q.   Out of all the pole camera surveillance you had watched in

6  the weeks and months leading up to that, had you ever observed

7  him struggling to maneuver like that?

8  A.   Never.

9  Q.   What happened at the end of that first examination, the

10 mental examination?

11 A.   Mrs. Hay helped Mr. Hay up.  He -- you know, they got the

12 walker over to him, and as he stood and tried to steady himself

13 on the walker, I saw the big movement back where, you know, it

14 looked like he was going to fall either back into the chair or

15 into the wall.  He steadied himself and they left that exam

16 room.

17 Q.   Had you ever seen him have a balance problem like that?

18 A.   In 2012 at the Social Security exam.

19 Q.   Did you ever see that on any of the pole camera

20 surveillance you reviewed?

21 A.   I did not.

22 Q.   What happened after the mental examination?

23 A.   So his next examination was the physical portion of the

24 comp and pen examination.  Again, great difficulty maneuvering

25 the walker, but again, tight fit.  But -- so he needed kind of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.501

1    -- to function and maneuver everything, Mrs. Hay again assisted

2    him.  At one point in that examination, it may have been at the

3    very beginning, she assisted him in taking off his jacket.

4        And so the physical examination, the provider did a number

5    of -- she interviewed him first for health history, and then

6    she proceeded with the actual physical examination.

7    Q.  What happened after that examination was done?

8    A.  So immediately after the examination agents were waiting in

9    the downstairs lobby to try to pick him up and observe his

10   movements on the way out.  Very much the same movement on the

11   way out as on the way in, great difficulty, very slow pace,

12   very stomping, and he was -- they left the building together.

13       When they arrived, Mrs. Hay had dropped him off at the

14   door.  When they departed, they left together to go out to the

15   vehicle, and so we had an agent in the parking lot who was able

16   to observe them get to the vehicle and, again, Mr. Hay fold up

17   the walker, open the doors, put the walker behind the passenger

18   seat, and then he entered the passenger side of the vehicle --

19   of the truck and Mrs. Hay drove.  They left --

20   Q.  Let me stop you there.

21   A.  Yes, sir.

22       THE COURT:  And let me stop you as well.  I think we

23   need to take a break for 15 minutes or so, and then we'll

24   resume the testimony then.  All right.  So we'll be in recess

25   for 15 minutes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.502

1       (Recess taken at 10:31 a.m.)

2       (The jury entered the courtroom, after which the following

3   proceedings were had.)

4            THE COURT:  You can be seated.

5   BY MR. HUSCHKA:

6   Q.  Agent Baker, before the break you testified about the C&P

7   examinations on May 3, 2017 that you observed?

8   A.  Yes, sir.

9            MR. HUSCHKA:  Your Honor, may I approach?

10           THE COURT:  Yes.

11  BY MR. HUSCHKA:

12  Q.  I'm handing you what has been marked as Government's

13  Exhibits 48 and 49.  Do you recognize those?

14  A.  Yes, sir.

15  Q.  What are they?

16  A.  These are DVD recordings of the 5/3/17 C&P physical

17  examination and the 5/3/17 C&P mental examination.

18  Q.  Are Government's Exhibits 48 and 49 accurate depictions of

19  what you observed that day?

20  A.  Yes, sir, they are.

21           MR. HUSCHKA:  Move to admit Government's Exhibits 48

22  and 49.

23           THE COURT:  Any objection?

24           MS. RAMSEY:  No, Your Honor.

25           THE COURT:  Exhibits 48 and 49 admitted.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.503

1   BY MR. HUSCHKA:

2   Q.  So after the C&P examinations were done that day, what

3   happened after the defendant and his wife left the VA facility?

4   A.  So agents were positioned in the parking lot to conduct

5   mobile surveillance to follow the white Chevrolet pickup truck

6   as it left the VA parking lot.  Agents were also able to see

7   and record the Hays as they exited the hospital and walked

8   toward their vehicle.

9       I apologize if I'm repeating myself, but Mr. Hay was

10  observed folding up the walker, putting it into the back

11  compartment behind the passenger seat of the truck.  Mrs. Hay

12  was driving.  They left the parking lot.

13      So Osawatomie is considerably south of the Kansas City

14  area, downtown Kansas City area, but instead they headed north.

15  So we had no idea really where they were going to wind up, so

16  agents continued to follow them until they arrived at the

17  Social Security Administration Office in Kansas City, Missouri.

18  Q.  And were you present for that?

19  A.  I was not.

20  Q.  What happened after the defendant left the Social Security

21  office?

22  A.  After they left the Social Security office, agents

23  continued to follow them.  If I remember correctly, got out on

24  I-35 southbound and went to the Sam's Club at 95th and I-35.

25  Q.  And what happened after they were done shopping at Sam's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.504

1  Club?

2  A.  After Sam's Club we -- I terminated the surveillance

3  operation at that point.

4  Q.  Did you later review the pole camera footage from the

5  afternoon of that same day in front of the defendant's

6  residence?

7  A.  Yes, sir.

8  Q.  What did you observe?

9  A.  Later that afternoon I observed Mr. Hay -- I'm sorry.  When

10  they arrived back home, first I saw Mr. Hay get out of the

11  truck, and he carried in -- looked like two bags of groceries

12  and his cane, not using it, he was carrying it with groceries,

13  and walked into the residence unassisted.

14      Mrs. Hay took some more grocery items out of the vehicle,

15  and then I believe one of their children assisted her, and

16  eventually Mrs. Hay removed the walker from the back of the

17  truck and carried it into the house.

18  Q.  So after the C&P examinations were conducted, did you then

19  take additional investigative steps to further your

20  investigation?

21  A.  Yes, sir.

22  Q.  Did you talk to people in the community?

23  A.  I did.

24  Q.  Did you talk to medical providers?

25  A.  I did.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.505

1   Q.   To gain their insights?

2   A.   Yes, sir.

3   Q.   Did you show some of those medical providers some of this

4   pole camera footage and other surveillance footage you had

5   obtained of the defendant?

6   A.   Yes, sir, I did.

7   Q.   Did you do that so that you could get their perspective and

8   insight as to what you were seeing?

9   A.   Yes, sir.

10  Q.   You mentioned earlier the caregivers assistance program.

11  Did the Hays seek and receive additional benefits for

12  caregivers assistance?

13  A.   Yes, sir, they did.

14  Q.   How much?

15  A.   The total I believe was in the neighborhood of $70,000.

16  Q.   And you also described Dependents' Educational Assistance

17  or other benefits like that.  Did the Hay family seek and

18  receive Dependents' Educational Assistance?

19  A.   Yes, sir, they did.

20  Q.   And how much?

21  A.   Right around $115,000.

22  Q.   And both of those benefits were over and above anything

23  that the defendant received for his 100 percent permanent

24  disability?

25  A.   That's correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.506

1  Q.  And above the amount he received for aid and attendance for

2  another person?

3  A.  Yes, sir.

4  Q.  During the course of your investigation did you visit the

5  Hay family farm?

6  A.  I did.

7  Q.  When was that?

8  A.  May of 2021.

9  Q.  What did you observe when you were there?

10  A.  So I met with a member of the Hay family, and the farm is

11  expansive.  I mean, it's -- I don't know how many -- probably

12  several hundred acres, if not thousands.  Lots of country roads

13  connecting all of it.  And it's parcelled, so it's not like a

14  continuous pasture or farm, I guess.

15      I was driven around on the property.  I was shown an

16  outbuilding that I believe belongs to Mr. Hay, is my

17  understanding, that it's a workshop or outbuilding.

18      We left that area and went down to more of the western edge

19  of the farm.  I observed -- we went into a gated area,

20  fenced-in gated area, pastureland I suppose, and there were a

21  couple more outbuildings there with, like, scrap metal, quite a

22  lot of that.

23      And then when we finished there and remembered to close the

24  gate behind us, we went back toward the residence -- the

25  sister's residence and again went into one of the pastured

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.507

1   areas that was gated, and back there I observed -- there were

2   some, like, industrial air-conditioning units.  I don't believe

3   that they were visible from the road.  They were kind of, you

4   know, several probably 100 yards or more off of the road so

5   they were over a small berm, but it was a lot of scrap metal,

6   but definitely several of these industrial-sized, like,

7   commercial air-conditioning units.

8   Q.   Did you take a couple photographs?

9   A.   Yes, sir.

10          MR. HUSCHKA:  Your Honor, may I approach?

11          THE COURT:  Yes.

12   BY MR. HUSCHKA:

13   Q.   I'm handing you what have been marked as Government's

14   Exhibit 166 and 167.  Do you recognize those?

15   A.   Yes, sir, I do.

16   Q.   What are they?

17   A.   Two photographs of a green -- appears to be metal building,

18   a workshop, or garage.

19   Q.   Is that the workshop that you saw on the Hay family farm?

20   A.   Yes, sir, it is.

21   Q.   Are Government's Exhibit 166 and 167 fair and accurate

22   depictions of what you observed?

23   A.   Yes, sir, they are.

24          MR. HUSCHKA:  Move to admit 166 and 167.

25          MS. RAMSEY:  No objection.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.508

1          THE COURT:  166, 167 admitted.  You can publish.

2   BY MR. HUSCHKA:

3   Q.   So could you describe where this is on the farm?

4   A.   So I would say within just a few hundred yards of the

5   sister's residence, Mr. Hay's sister.  There is a gravel road

6   that leads up a steep incline, so this is in a very covered,

7   wooded area near the sister's -- near Mr. Hay's sister's home.

8   Q.   Where is this at relative to the scrap metal you observed?

9   A.   Maybe within a quarter of a mile.

10  Q.   167, is this just a closer vantage point of the same shed?

11  A.   Yes, sir, it is.

12  Q.   So during your investigation did you obtain certain records

13  from Miami County District Court?

14  A.   Yes, sir, I did.

15  Q.   Where is Miami County District Court located?

16  A.   It's in Paola, Kansas.

17  Q.   How did you obtain those records?

18  A.   Just with my government-issued credentials and badge.

19  Q.   What did you learn when you retrieved those records?

20  A.   There were a number of certified court records that Miami

21  County provided to me.  One of them --

22  Q.   I want to talk about the mechanic's lien in particular

23  right here.

24  A.   Yes, sir.  So the mechanic's lien was a new document to me.

25  I wasn't familiar.  But the document itself indicated that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.509

1    Mr. Hay was the -- and I apologize if I get the verbiage

2    incorrect, but he was the sole owner and operator of the Hay

3    family farm.

4    Q.   Did that mechanic's lien incorporate an employment

5    agreement?

6    A.   Yes, sir, it did.

7    Q.   What was the nature of that employment agreement?

8    A.   It was signed by Mr. Hay.  It indicated again that he had

9    been the sole owner/operator/manager of this family farm for --

10   I would have to guess at the number of years, but there was a

11   date on it.  It was several years.

12   Q.   Handing you what's been marked as Government's Exhibit 327.

13   Do you recognize that?

14   A.   Yes, sir, I do.

15   Q.   What is that?

16   A.   This is the mechanic's lien from Miami County.

17   Q.   Is that a certified copy you received from Miami County

18   District Court?

19   A.   Yes, sir, it is.

20        MR. HUSCHKA:  Move to admit Government's Exhibit 327.

21        THE COURT:  Any objection?

22        MS. RAMSEY:  Your Honor, we just generally -- may we

23   approach just briefly on 327?

24        THE COURT:  Okay.

25        (The following proceedings were had at the bench).

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.510

1          MS. RAMSEY:  Your Honor, we would just renew our

2  limine objection.  I believe we made objection to both the

3  mechanic's lien as well as the employment agreement.  I believe

4  our objection was to relevance as well as under the 403

5  balancing test that it would be overly prejudicial, and so we

6  would renew those to preserve the record.

7          THE COURT:  So noted and overruled.

8          MS. RAMSEY:  Thank you.

9      (Thereupon, the proceedings continued in open court.)

10         THE COURT:  Exhibit 327 admitted.

11  BY MR. HUSCHKA:

12  Q.   Ms. Boyd, can you pull up the first page, please.

13      So, Agent Baker, could you focus in on the top paragraph,

14  please.

15  A.   Yes, sir.

16  Q.   And is this the mechanic's lien you referred to?

17  A.   Yes, sir, it is.

18  Q.   Can you read the first sentence there, "notice is hereby

19  given"?

20  A.   "Notice is hereby given that Claimant Bruce L. Hay of" --

21  redaction.

22  Q.   Okay.

23  A.   -- "claims a lien for labor as farm manager with all of the

24  duties that entails under the laws of the State of Kansas."

25  Q.   I'll stop you there.  Can you read the last sentence of the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.511

1   same paragraph?

2   A.   "The work was furnished for the period of January 1, 1985

3   to December 31, 2020, upon land situated in the county of

4   Miami, state of Kansas, said land described as follows."

5   Q.   Page 2, could you read the paragraph up there that starts

6   with "the lien is claimed."

7   A.   "The lien is claimed for the following labor, service,

8   equipment, or material furnished by the claimant:  Equipment

9   repair, livestock management, property upkeep (fence repair,

10  water gaps, et cetera), crop planting and harvesting and hay

11  harvesting."

12  Q.   Could you read the last sentence as well?

13  A.   "Claimant is owed $62,400 per year for a period of 35 years

14  for work furnished."

15  Q.   And is it signed?

16  A.   Yes, sir, it is.

17  Q.   And during your investigation have you had occasion to view

18  Mr. Hay's signature?

19  A.   Yes, sir, I have.

20  Q.   Does this appear to be his signature?

21  A.   It appears to be.

22  Q.   What's the date that this mechanic's lien was signed?

23  A.   26 January 2021.

24  Q.   And at the bottom there, is it notarized?

25  A.   Yes, sir, it is.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.512

1   Q.  Page 3, so what is this document titled at the top?

2   A.  Employment agreement.

3   Q.  Can you read the first paragraph there, please?

4   A.  Yes, sir.

5       "This employment agreement (this "agreement") is executed

6   as of May 15, 2015, by and between Linda Joan Hay ("employer")

7   of" -- redacted -- "and Bruce L. Hay ("employee") of" --

8   redacted -- "Osawatomie, Kansas 66064."

9   Q.  Do you know who Linda Hay is?

10  A.  I do.

11  Q.  Who is that?

12  A.  Mr. Hay's mother.

13  Q.  Start reading the employment section.  I'll stop you.

14  A.  Yes, sir.

15      "The parties hereby acknowledge and agree that Linda Hay,

16  along with her late husband, Abraham Hay, together referred to

17  herein as "employer," have employed Bruce Hay, herein referred

18  to as "employee," as a farm manager since on or before

19  January 1, 1985, and hereby agree to continue such employment."

20  Q.  You can stop there.  Can you read the paragraph titled (2)

21  compensation?

22  A.  "As compensation for the services provided by employee

23  under this agreement, employer will pay employee an annual

24  salary of $62,400.  Employer shall retain employee's earned

25  wages and agrees to execute a note to employee for the amount

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.513

1  owed hereunder, and shall further execute a mortgage on all of

2  employer's real estate to secure said note."

3  Q.   And the last page, please.  See where it lists the employer

4  there?

5  A.   Yes, sir, I do.

6  Q.   Who does that say?

7  A.   Linda Joan Hay.

8  Q.   And the employee?

9  A.   Bruce L. Hay.

10  Q.   What dates was this signed?

11  A.   5/15/2015.

12  Q.   What was the significance of this to your investigation?

13  A.   Well, my interpretation of this document is that it

14  indicates that Mr. Hay was a full-time farmer throughout his

15  benefits period that's being investigated.

16  Q.   And did it describe certain physical abilities?

17      Ms. Boyd, could you pull up page 2, in the full paragraph

18  there at the top of page 2, please.

19      Says "the lien is claimed..."

20  A.   Yes, sir.

21  Q.   Are the physical abilities described there consistent with

22  what the defendant represented to the VA in the rating forms

23  that you reviewed during your investigation?

24  A.   No, sir, it is not.

25  Q.   What happened to the defendant's benefits as a result of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.514

1   your investigation?

2   A.   Mr. Hay had a -- had an outstanding claim that had already

3   been adjudicated and awarded, so he was already rated, it was

4   unrelated to this investigation.  That rating remains intact to

5   date.  The benefits associated with this investigation were

6   terminated and an overpayment was determined.

7   Q.   Approximately when was the last payment that the defendant

8   received from the VA for his conversion disorder and related

9   claims?

10  A.   I believe it was in August of -- it may have been

11  August 30, 2018.

12  Q.   Ms. Boyd, could you pull up Government's Exhibit 216,

13  please.

14       So, Agent Baker, could you explain to the jury what is

15  reflected here in Government's Exhibit 216?

16  A.   Yes, sir.  So obviously the date column.  The total payment

17  is the amount received.  That's adjusted, so if there are any

18  outstanding -- if he owes any outstanding, that would be

19  adjusted.  If he was underpaid for a month, that would be

20  adjusted.  So that reflects the total payment for that -- those

21  periods noted.

22  Q.   Let me make sure I'm clear.  So the total payment is what

23  he actually received on the dates listed?

24  A.   Yes, sir, that's correct.

25  Q.   And then the second column from the right, "entitlement

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.515

1    after 2018 termination," what's reflected there?

2    A.    That reflects his payment after the reduction for this --

3    these particular claims.

4    Q.    So is that what he would have been entitled to had he not

5    been receiving benefits for the 100 percent conversion disorder

6    disability rating?

7    A.    Yes, sir, that's correct.

8    Q.    And then on the right, is that the difference between what

9    he received and this other claim that you mentioned that

10   predate his conversion disorder claim?

11   A.    Yes, sir, that's correct.

12   Q.    Could you pull up 217, please.

13        So can you explain to the jury here what is captured in

14   these calculations?

15   A.    These are the actual overpayment calculations based on

16   those particular pay periods covered.

17   Q.    So does this essentially, for the time period listed, note

18   the total amount that was paid for the defendant's conversion

19   disorder claim?

20   A.    Yes, sir, that's correct.

21   Q.    And that's approximately $273,000?

22   A.    Yes, sir.

23   Q.    After -- you can take that down.

24        After the defendant was charged in this case, did you serve

25   a warrant for his arrest?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.516

1   A.   Yes, sir, we did.

2   Q.   When did you do that?

3   A.   July 2019.

4   Q.   And did you arrest the defendant?

5   A.   Yes, sir.

6   Q.   At any point in time during that interaction did he need

7   the use of a walker?

8   A.   No, sir.

9   Q.   Did he need the use of a cane?

10   A.   No, sir.

11   Q.   All right.  So I want to bring you back now to 2012.

12   You've talked about some of the surveillance that you conducted

13   around that time.

14        MR. HUSCHKA:  And, Your Honor, may I approach?

15        THE COURT:  Yes.

16   BY MR. HUSCHKA:

17   Q.   I'm handing you what's been marked as Government's

18   Exhibit 24.  Do you recognize that?

19   A.   Yes, sir, I do.

20   Q.   What is it?

21   A.   That is a DVD with my initials and date entitled 3/24/17

22   VAMC dental appointment.

23   Q.   Is that surveillance that you did around the time of the

24   defendant's dental appointment?

25   A.   Yes, sir, it is.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.517

1        MR. HUSCHKA:  Move to admit Government's Exhibit 24.

2        THE COURT:  Any objection?

3        MS. RAMSEY:  No, Your Honor.

4        THE COURT:  Exhibit 24 admitted.  You can publish.

5    BY MR. HUSCHKA:

6    Q.  So could you explain to the jury where you're located right

7    here?

8    A.  Yes, sir.  As you see the horizontal black lines, I'm in

9    the rear well of my government-issued minivan.

10   Q.  Is this after the dental appointment?

11   A.  Yes, sir, it is.

12   Q.  And you had mentioned earlier that you lost him for a

13   period of time.

14       Could you pause it right there.

15       Reviewing this video, does that refresh your recollection

16   as to where he went after the dental examination?

17   A.  Yes, sir.  He had a lab appointment after the dental

18   appointment.

19   Q.  Okay.  You can play it.

20       Does he appear here to have a bandage?

21   A.  He does, yes, sir, on his right elbow.

22   Q.  Does this video appear to be a little slower than what you

23   observed in realtime?

24   A.  Yes, sir, it does.

25   Q.  Did you see any assistance provided by Ms. Hay there?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.518

1  A.   No, sir.

2  Q.   You mentioned that you also conducted surveillance on

3  March 30, 2017 at the CBOC?

4  A.   Yes, sir.

5  Q.   Around the time of Dr. McWoods' appointment.

6       I'm handing you what have been marked as Government's

7  Exhibits 42 and 43.  Do you recognize those?

8  A.   Yes, sir, I do.

9  Q.   What are they?

10  A.   DVDs with my initials and date.  The first is entitled

11  3/30/17 leaving CBOC appointment, and the second is entitled

12  3/30/17 leaving CBOC appointment angle two.

13  Q.   Are these videos of surveillance that you were involved in

14  that day?

15  A.   Yes, sir, they are.

16       MR. HUSCHKA:  Move to admit Government's Exhibit 42

17  and 43.

18       THE COURT:  Any objection?

19       MS. RAMSEY:  No objection, Your Honor.

20       THE COURT:  42, 43 admitted.  You can publish.

21  BY MR. HUSCHKA:

22  Q.   So, again, is this video being taken from the back of the

23  vehicle?

24  A.   Yes, sir.

25  Q.   And, again, this was the CBOC?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.519

1   A.   Yes, sir, that's correct.

2   Q.   Was this a benefits exam?

3   A.   No, sir.  This would have been a general health care exam

4   of some sort.

5   Q.   Was that with Dr. McWoods?

6   A.   Yes, sir.

7   Q.   What's the -- can you pause it there?

8        What's the defendant doing right here?

9   A.   This is where Mr. Hay is picking up the change I mentioned

10  earlier that the agent had put on the ground outside the

11  passenger side of the vehicle.

12  Q.   Okay.  You can play.

13       Does Ms. Hay appear to provide any assistance here?

14  A.   None.

15  Q.   And you can stop it there.  If you can pull up 43, please.

16       So is this the same exit; it's just a different angle?

17  A.   Yes, sir, that's correct.

18  Q.   Different member of the surveillance team that's shooting

19  this footage?

20  A.   Yes, sir.

21  Q.   You can stop it there.

22       Agent Baker, I'm handing you what's been marked as

23  Government's Exhibit 100.  Do you recognize that?

24  A.   Yes, sir, I do.

25  Q.   What is it?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.520

1    A.   This is a Western Digital Elements external hard drive.

2    Q.   And what is on that hard drive?

3    A.   Well, it's marked with my initials and the date.  This hard

4    drive contains the entirety of the pole cam footage.

5    Q.   Is the footage on there a fair and accurate copy of all of

6    the pole cam footage that you obtained during the

7    investigation?

8    A.   Yes, sir, it is.

9         MR. HUSCHKA:  Move to admit Government's Exhibit 100.

10        MS. RAMSEY:  No objection.

11        THE COURT:  Exhibit 100 admitted.  You can publish.

12   BY MR. HUSCHKA:

13   Q.   I'm handing you now what have been marked as Government's

14   Exhibits 100-A through 100-CC.  Just take a minute to look at

15   them.  You don't have to read each one.

16   A.   Yes, sir.

17   Q.   What are those exhibits?

18   A.   These are DVDs with my initials and date on them.  They

19   contain video footage from the pole cam.

20   Q.   So are these select versions or snippets of the total pole

21   camera footage?

22   A.   Yes, sir, they are.

23   Q.   And is what's on those exhibits a fair and accurate

24   depiction of what's on the pole camera footage?

25   A.   Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.521

 1           MR. HUSCHKA:  Move to admit Government's Exhibits
 2  100-A to 100-Z and 100-AA through 100-CC.
 3           MS. RAMSEY:  No objection.
 4           THE COURT:  Exhibits 100-A through 100-CC are
 5  admitted.
 6  BY MR. HUSCHKA:
 7  Q.  Ms. Boyd, could you pull up 100-A, please.
 8       Could you explain to the jury what we are seeing right
 9  here?
10  A.  Yes, sir.  This is the front of Mr. Hay's residence from
11  the vantage point of the pole cam across the street.
12  Q.  Okay.  Can you pause it there, Ms. Boyd.
13       So is this near the beginning of when the pole camera
14  became operational?
15  A.  Yes, sir.  10/8/2016.  I believe we installed 10/6/2016.
16  Q.  You can go ahead and play.  Could you pause there.
17       Who is that?
18  A.  That's Mr. Hay.
19  Q.  Continue to play, please.  And could you fast-forward to
20  about 3 minutes and 9 seconds.
21       What does the defendant appear to be doing here?
22  A.  There were a number of articles on the front porch.  I'm
23  not sure what they were.  So he went out there.  It looked like
24  when he first went out there, that he kicked something that
25  went off to the right.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.522

1    Q.   Can you pause it there.  Could you go back just a few

2    seconds.

3         As Mr. Hay approaches the house here and he goes up the

4    stairs, does he appear to be using his cane?

5    A.   He appears to be swinging the cane.

6    Q.   Does he use it to get up the stairs?

7    A.   No, sir.

8    Q.   Could you pull up 100-B.

9         What's the date here?

10   A.   10/8/2016.

11   Q.   Is this the same day?

12   A.   Yes, sir, it is.

13   Q.   Is there a timestamp as well indicating the time of day?

14   A.   Yes, sir.  6:12 p.m.

15   Q.   What does the defendant appear to be doing here?

16   A.   He's moving these items on his front porch.  He's bending

17   at the waist, the little bit of squatting, nothing that appears

18   to be any kind of balance issue, no muscle spasms, or tremors,

19   or anything like that.

20   Q.   What's he doing there?

21   A.   He's lifting an item.  I can't quite tell what he's doing

22   with it, but lifting and moving it around.

23   Q.   Could you fast-forward to 3 minutes and 35 seconds.

24        All right.  100-C.

25        Now is this zoomed in a little bit more?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.523

1    A.   Yes, sir, it is.

2    Q.   And is this what you described earlier that somebody can

3    zoom in if you ask them to?

4    A.   Yes, sir.  After speaking with the technical operations

5    agents, we agreed that it would be beneficial to zoom in and

6    just to additionally confirm this is indeed Mr. Hay.

7    Q.   This is early on in your surveillance still?

8    A.   Yes, sir, 10/13.

9    Q.   Could go back about 10 seconds.

10        Does the defendant appear to have a cane here?

11   A.   No, sir.

12   Q.   Can you pull up 100-D and you can fast-forward about 45

13   second into this one.

14        What's the defendant doing here?

15   A.   Carrying something, kind of looks like a cake.  I'm not

16   sure.

17   Q.   Could you go to 1:45 seconds.

18        Is he carrying something else here?

19   A.   Yes, sir, a large box.

20   Q.   Did he have any trouble getting down the stairs while

21   carrying it?

22   A.   No, sir, he did not.

23   Q.   Could you go to 4:15 seconds.

24        Did he appear to use his cane down the stairs there?

25   A.   No, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.524

1    Q.   Can you pause it right there.

2         What did he do with his cane?

3    A.   Again, going up the stairs, he swings it.

4    Q.   Okay.  You can hit play.

5         Could you pull up 100-E and you can jump on this one to

6    about 55 seconds.

7         What's the defendant doing here?

8    A.   Just standing still without a cane or any visible tremor,

9    balance issues.

10             MS. RAMSEY:  Your Honor, objection.  May we approach?

11             THE COURT:  Yes.

12        (The following proceedings were had at the bench).

13             MS. RAMSEY:  Your Honor, we would object to the

14   continued narration of the video about whether or not he

15   observed any impairment or tremors or things of that nature.  I

16   feel like it's invading the province of the jury.  We don't

17   need him to narrate what he's necessarily seeing.  In

18   particular he's just watching the video.  He wasn't there

19   watching it in realtime.  So that would be our objection.

20             THE COURT:  All right.  I think he -- it's permissible

21   for him to testify to what he's observing as he watches it, but

22   I think he shouldn't be narrating it.  It should be in response

23   to questions.

24             MR. HUSCHKA:  Okay.  Can we instruct him?

25             THE COURT:  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.525

1        (Thereupon, the proceedings continued in open court.)

2            THE COURT:  So I've ruled that you shouldn't narrate

3   what you're seeing on the video.  Mr. Huschka can ask you

4   specific questions about your observations but not just

5   narrative.

6            THE WITNESS:  Yes, ma'am.  Yes, ma'am.

7   BY MR. HUSCHKA:

8   Q.  All right.  Hit play.

9        Could you pull up 100-F and you can jump to about

10  53 seconds.

11       What do you see here?

12  A.  Mr. Hay is carrying a baby carrier, a baby seat, and a

13  bucket in the other hand.

14  Q.  Could you jump to 3:58 seconds.

15       And who is this exiting the residence?

16  A.  Mrs. Hay.

17  Q.  Did the defendant exit the residence before her?

18  A.  Yes, sir.

19  Q.  Could you jump to about 5:50 seconds.

20       Is that the defendant that just went off screen to the

21  right?

22  A.  Yes, sir, it is.

23  Q.  And is he coming back on the screen right now at

24  8:37 seconds?

25  A.  Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.526

1   Q.   Or 8:37 a.m.?

2   A.   I'm sorry.  Yes, sir.

3   Q.   Is he holding something in his hand?

4   A.   Appears to be holding some type of cup or mug.

5   Q.   Is he holding a cane?

6   A.   Does not appear to be.

7   Q.   Could you pull up 100-G.

8        What's in the back of the truck there?

9   A.   A number of items.  I'm not able to readily identify any of

10  them.

11  Q.   Is the truck full?

12  A.   It is.

13  Q.   The bed of the truck?

14  A.   Yes, sir.

15  Q.   Did you see the defendant?

16  A.   Yes.

17  Q.   This is near the end of October?

18  A.   Yes, sir.  October 28, 2016.

19  Q.   So are you a little less than a month into your

20  surveillance at this point?

21  A.   That's correct.

22  Q.   Is that the defendant walking up the stairs there?

23  A.   Yes, sir.

24  Q.   Does it appear that he's holding a baby?

25  A.   It does.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.527

1  Q.  Could you jump to 2:15 seconds?

2      What's the defendant doing here?

3  A.  He has a box in both hands and it appeared that he used his

4  leg to kick the door closed, maybe doors.

5  Q.  100-H.  Can you fast-forward to about 1:10 seconds.  Can

6  you pause it there and go back just a few seconds.

7      Did the defendant appear to be with his cane there?

8  A.  He raised his cane up, I would say akin to a long gun, a

9  rifle.

10  Q.  100-I.

11     Who is driving the red truck that just pulled up?

12  A.  Mr. Hay.

13  Q.  What's he doing here?

14  A.  It looks like he took two gas cans with his left hand out

15  of the bed of the red pickup truck and put them in the bed of

16  the white pickup truck.

17  Q.  100-J.

18     What's he carrying here?

19  A.  Mr. Hay is carrying the cane in his left hand and the baby

20  carrier car seat in his right hand.

21  Q.  Was he using the cane?

22  A.  No, sir, he was not.

23  Q.  What about right now?

24  A.  Mr. Hay reached into the bed of the white truck, removed a

25  gas can with his right hand, and bent over in the driveway and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.528

1   placed it in the bed of the red truck.

2   Q.   And which truck is pulling away here first?

3   A.   The white truck.

4   Q.   Who is driving that truck?

5   A.   Mrs. Hay.

6   Q.   Which truck is pulling away now?

7   A.   The red truck.

8   Q.   Who is driving that truck?

9   A.   Mr. Hay.

10  Q.   100-K.  You can jump to 55 seconds.

11       What did he do there?

12  A.   Threw an object with his left hand to Mrs. Hay.

13  Q.   Could you jump to 4:55 seconds.

14       Who just came out?

15  A.   Mrs. Hay.

16  Q.   And is she assisting the defendant in any way?

17  A.   No, sir, she is not.

18  Q.   100-L.  What's the defendant doing here?

19  A.   Mr. Hay appears to be kicking mud or dirt, something off of

20  his shoes, his boots.

21  Q.   100-M.  You can jump to about 28 seconds.

22       Who was driving the red truck there that just backed in?

23  A.   Mr. Hay.

24  Q.   What did he just do there?

25  A.   Mr. Hay climbed up, it looked like onto the tailgate of the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.529

1    pickup truck.

2    Q.   What he's doing now?

3    A.   Moving a large box or cabinet from one truck bed to the

4    other.

5    Q.   Does it appear to be heavy?

6    A.   It does.

7         The white truck, you can see it --

8              MS. RAMSEY:  Objection, Your Honor.  Same objection as

9    previously made, invading the province --

10             THE COURT:  Overruled.

11             MS. RAMSEY:  -- in violation of Rule 701.

12             THE COURT:  Overruled.

13   BY MR. HUSCHKA:

14   Q.   Did it appear to skip ahead a little bit in time there?

15   A.   Yes, sir.

16   Q.   Can you explain to the jury how that might happen?

17   A.   Sure.  It's a wireless camera, and as such it's subject to

18   cell signal and interruptions and so forth, so you'll

19   occasionally see some skips in the video.

20   Q.   Could you jump to 6:35 seconds, please.

21        Who is backing the red pickup truck in?

22   A.   That's Mr. Hay.

23   Q.   Did the camera pan over there?

24   A.   Yes, sir.

25   Q.   Why did it do that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                          USA v. Bruce L. Hay
                                          ROA - Volume 3, p.530

1    A.   One of the technical operations agents was observing and

2    decided to pan over and zoom in for closer picture.

3    Q.   So this one of those instances where somebody happened to

4    see this in realtime as opposed to going back and reviewing the

5    footage?

6    A.   Yes, sir, that's correct.

7            THE COURT:  Let's, as soon as we're finished with

8    this --

9            MR. HUSCHKA:  I think we can stop it here, Your Honor.

10   We have several more of these and we can pick back up.

11           THE COURT:  Let's take our lunch break now, and we'll

12   reconvene at 1:15.

13      (The following proceedings occurred outside the presence of

14   the jury.)

15           MS. RAMSEY:  Your Honor, can we -- I'd like to make a

16   record on two objections.

17           THE COURT:  Sure.

18           MS. RAMSEY:  Your Honor, first, we would like to make

19   a record and a continuing objection to Agent Baker's narration

20   of the video.  Although he's being asked a question, we believe

21   it's prohibited under Rule 710 as opinion testimony by a lay

22   witness.  We don't necessarily believe that it's rationally

23   based on the witness's perception or helpful to clearly

24   understanding the witness's testimony or determining a fact in

25   issue because (1) what he's doing is narrating the actual video

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.531

1   to the jury of what his perception of the video is.

2         The reason we also have witnesses allowed to give lay

3   testimony when they have personal knowledge is because they are

4   there at the time and they may be able to share additional

5   information that the jury themselves cannot perceive by

6   watching the video.

7         So we believe it's improper opinion testimony under

8   710, and it is not helpful to the trier of fact to determine

9   the fact at issue and it's invading the province of jury

10  because he's basically stating his opinion in watching a video

11  that the jury can determine themselves, and he has no

12  additional information to add under the rule which would allow

13  opinion testimony because he wasn't there personally observing

14  him.

15        I think it's clear that he's not sitting behind the

16  camera, and he's not there at the time it's happening.  He's

17  just sitting watching the video telling what's happening in the

18  video, and we believe that's improper opinion testimony.  That

19  would be the record we would like to make for that.

20        MR. HUSCHKA:  Your Honor, Agent Baker has testified

21  that he reviewed all of this pole camera footage, so he does

22  have the unique perspective of having seen the defendant coming

23  and going, knows what the defendant looks like, knows the

24  various things that are seen in here because he's seen it so

25  many times throughout his review of the pole camera footage, so

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.532

1   simply stating what he is observing or what it appears to him I

2   think is rationally based on his perception given all the pole

3   camera footage that he's reviewed.

4        MS. RAMSEY:  For instance, Your Honor, he's testifying

5   whether or not he sees necessarily impairment or he says a

6   particular action by Mr. Hay.  That's not helpful to the jury.

7   That is on video.  And his perception of that is also what in

8   fact the government is alleging should be decided by the jury

9   in this case, whether or not those symptoms -- whether or not

10  he's exhibiting particular symptoms or not.

11       And so, again, he's not -- he wasn't there watching it

12  in realtime.  He has no personal knowledge.  He has no

13  additional identifying factors that typically I think the case

14  law would allow someone to get into like if they were there for

15  a recorded conversation, if they were watching someone's

16  demeanor, something additional that you could add to maybe that

17  that wasn't on a recording, but there's not here.  This is all

18  for the jury to make their own determination.

19       THE COURT:  All right.  Well, first of all, while the

20  witness early on was testifying to things such as his

21  observations about whether Mr. Hay's movements were so-called

22  normal or normal gait or that sort of thing, since the

23  defendant has objected to the narrative, there hasn't been any

24  questions targeted to that and there hasn't been any testimony

25  about that.  The testimony has been, you know, identifying that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.533

1    it's Mr. Hay and some description of what was going on.

2          This witness does have the benefit of having done

3    other surveillance over quite a long period of time of Mr. Hay

4    and, you know, the ability to recognize him, although I think

5    by now the jury can probably recognize him as well from the

6    video, although there was one instance where there was another

7    gentleman, had similar build and might have needed some

8    clarification at that point.

9          But Rule 701 is opinion testimony by a lay witness,

10   lay witnesses, which is what this witness would be.  He is not

11   being offered as an expert.  If the testimony is rationally

12   based on the witness's perception, and it is, and if it's

13   helpful to clearly understanding the witness's testimony or to

14   determine a fact in issue and not otherwise based on scientific

15   technical or other specialized knowledge, it's permissible.

16         I think his testimony is helpful in the sense that

17   he's testifying to what he's observing, the presence of a cane

18   or not, or what's being done with it, objects in the hand,

19   being carried, and that sort of thing, the lack of assistance,

20   to be sure the jury can observe for itself this evidence and it

21   doesn't have to accept this witness's perception.  He can

22   certainly be cross-examined about his observations and

23   perception.

24         But I do think under the subparts (a) and (b) of Rule

25   701 his testimony is permissible.  So I will note that this is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.534

1    a continuing objection to this witness testifying about

2    anything he observes in these videos as they are played.  I

3    will say there are some other questions that don't necessarily

4    go to observation or this witness has been asked to orient what

5    is being seen in time, and I also think that that is

6    permissible as well.

7         So I'll overrule and deny the objection, but note it's

8    a continuing objection to this type of testimony.

9         MS. RAMSEY:  Thank you, Your Honor.

10        The other thing we'd like to take up again is the

11   government's objection to our exhibit, I believe it was 825,

12   which is the arrest of Mr. Hay.  I believe the government at

13   this point has opened the door to allow not only that snippet

14   of video, but the whole video in.

15        Mr. -- Agent Baker was asked whether or not when

16   Mr. Hay was arrested did he use a cane or a walker.  Now, that

17   video shows immediately that Mr. -- when the agents entered the

18   house, Mr. Hay was placed into handcuffs and was not given the

19   opportunity to have a cane or a walker.  He was not offered

20   one.  He was not given that opportunity.

21        So I believe they have not only -- not only do our

22   previous arguments, I think, support allowing for us

23   to constitutionally submit a defense when the government has

24   submitted multiple what they call surveillance videos of him

25   showing no symptoms, but then the government has a video of him

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.535

1   showing symptoms.  We would offer that in support of our

2   defense.

3        But also, now that the government has opened the door

4   to allow us to submit that video for purposes of showing that

5   in fact Mr. Hay was in no way -- had the ability to use a cane

6   or walker.

7        MR. HUSCHKA:  Your Honor, the court's ruling this

8   morning was with respect to the video and all of the things in

9   the video.  We did not ask anything about head bobs or jerking

10  movements.  We simply asked if he needed the use of a cane or a

11  walker when they arrested him.  The court ruled this morning

12  that the defendant can ask Agent Baker about his observations

13  including those that they're referring to right now without

14  getting into the video, so I don't think us asking simply if he

15  needed the use of a cane or walker to move opens the door,

16  changes anything with respect to what the court ruled this

17  morning with the video and the prejudicial nature of the video.

18  They can still, as the court ruled this morning, ask him about

19  what they saw when they were there.

20       THE COURT:  All right.  So Exhibit 825, does it pick

21  up with the defendant sitting on the couch with his handcuffs

22  behind him or does it pick up before that?  I'm not clear about

23  that.

24       MS. RAMSEY:  I believe our exhibit picks up with him

25  sitting on the couch.  We put it in a snippet.  But at this

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.536

1    point, in fact, I think what would be relevant -- we're still

2    asking to submit that video, but I think all of the video may

3    be relevant because of the way the arrest occurred, the

4    immediacy in which Mr. Hay was placed in the handcuffs, and

5    undoubtedly the fact that the agents did not allow him to use a

6    walker or cane.

7         Without showing that video, the jury is left to

8    presume that what Agent Baker says is true, and we will not be

9    readily able to attack his credibility, what he says is true,

10   which is that he was not in need of a cane or a walker which,

11   in fact, that's not what the actual facts and video bear out.

12        THE COURT:  So there is an issue now as to whether Hay

13   needed the use of a cane or a walker when he was arrested,

14   which I think is inextricably tied to what his movements were,

15   the tremors, all of that, it's all related to that, so I do

16   think it's a proper inquiry as to, did he need the use of a

17   walker or cane, what were the other things going on with him.

18        I think the video now takes on more probative weight

19   in light of this being an issue.  I'm a little bit unclear

20   whether you're going to offer a video that shows what happened

21   before he was on the couch or not, but while he was on the

22   couch, I mean, I observe when I had looked at it that he had

23   tremors of his head and perhaps upper body, so I do think it's

24   probative.

25        Given that, I will allow the admission of this exhibit

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.537

1  for whatever probative weight it has.  Finding that under Rule

2  403 it outweighs what I think is some prejudicial effect as

3  well given that it illustrates that he's under arrest and he's

4  in handcuffs and all of that, but it is offered by the

5  defendant.  And I still think the audio should not because the

6  audio tends to get into more prejudicial subject matter

7  including what the agents were saying to him and what he was

8  saying back, but I'll hear any further argument on that if you

9  think the audio has probative value now.

10        MR. HUSCHKA:  Just a moment, Your Honor.

11        MS. RAMSEY:  Your Honor, what I'd like to do is, we

12  did make a copy and taking out the audio of that particular

13  snippet.  I think what will be pertinent to the court's

14  decision about whether or not any audio should be played would

15  be based on possibly Agent Baker's statements as a result, and

16  so I would ask the court to defer ruling on that particular

17  issue.

18        MR. HUSCHKA:  And, Your Honor, our view is that if the

19  video is admitted, I think taking the audio out would leave the

20  jury to wonder what is being discussed between Agent Baker and

21  the defendant, which is throughout the two-minute clip that the

22  defendant has excerpted is largely them telling him the reason

23  they need to hurry in order to get him there on a Friday by

24  9:00 so he can make the cutoff and not be in lockup over the

25  weekend.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.538

1          So the jury I think would speculate as to what is

2     going on during that conversation.  I think that that audio, if

3     the exhibit is admitted, is necessary for that context.

4          MS. RAMSEY:  We don't have any objection to that, Your

5     Honor, including the audio.

6          THE COURT:  All right.  Exhibit 825 will be admitted

7     as is with audio.

8          Okay.  Anything else?

9          MS. RAMSEY:  Your Honor, just to note, we may resubmit

10    the clip of that video, but we will take that up only because

11    now it's become an issue about whether -- the issue has been

12    raised by the government about whether or not Mr. Hay was able

13    to use a cane or a walker, and so the immediacy under which he

14    was placed under arrest may be relevant.  I'm going to take a

15    look over the lunch break and try to take that up with the

16    court beforehand.

17         THE COURT:  I agree that if you decide to offer more

18    of the tape to show what happened before he was actually

19    sitting on the couch, that would be probative given the issue

20    about his movements and his abilities at that particular point

21    in time, so I will admit it if you decide to give a larger

22    excerpt of that incident.

23         MS. RAMSEY:  Thank you, Your Honor.

24         THE COURT:  All right.  We will be in recess until,

25    what did we say?  1:15.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.539

1          (Recess taken at 12:18 p.m.)

2          (The jury entered the courtroom, after which the following

3    proceedings were had.)

4              THE COURT:  You can be seated.

5    BY MR. HUSCHKA:

6    Q.   Agent Baker, so earlier this morning during your testimony

7    you talked about when you went to arrest the defendant related

8    to the charges in this case, do you remember that?

9    A.   Yes, sir.

10   Q.   So when you visited him at his home, were you executing a

11   federal warrant for his arrest?

12   A.   Yes, sir.

13   Q.   Do you recall what day of the week that was?

14   A.   It was a Friday.

15   Q.   Was that the first day that he could be seen by a

16   magistrate judge after his indictment was returned in this

17   case?

18   A.   I believe so.  I spoke with the marshal service, and I

19   believe that was the earliest we could get him in.

20   Q.   And if you had -- do you recall how many days before that

21   the indictment was returned?

22   A.   Two days, I believe.

23   Q.   So on a Wednesday?

24   A.   I believe so.

25   Q.   And so if you had brought him in on a Thursday, what would

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.540

1    have happened?

2    A.   He would have had to remain overnight in custody.

3            MS. RAMSEY:   Objection, Your Honor; relevance.

4            THE COURT:   All right.   I'll sustain and ask the jury

5    to disregard that.

6    BY MR. HUSCHKA:

7    Q.   What time were you going to arrest the defendant?

8    A.   I believe we arrived at his house somewhere around 6:30 in

9    the morning.

10           MS. RAMSEY:   Objection; relevance.

11           THE COURT:   Approach the bench, please.

12       (The following proceedings were had at the bench).

13           THE COURT:   I mean, this is relevant if the video is

14   going to be played that the defendant intends to offer.

15           MS. RAMSEY:   I don't -- if we intend to play the

16   video, I'm not sure what purpose when he was arraigned or -- I

17   understand if the court is saying that it's -- I really don't

18   understand the relevance.   I'm sorry.

19           THE COURT:   From what I've seen of it, I didn't watch

20   the whole thing, we need to hurry, we need to get you going

21   because we've got get you to the judge by 9:00, it provides

22   context for why they're telling him that.   That's the

23   relevance.

24           MS. RAMSEY:   Thank you, Your Honor.

25       (Thereupon, the proceedings continued in open court.)

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.541

1     THE COURT:  All right.  Objection overruled.  You can

2  answer.

3  BY MR. HUSCHKA:

4  Q.   So what time then were you going to arrest the defendant?

5  A.   I believe we arrived somewhere around 6:30 Friday morning.

6  Q.   Why were you doing it at that time?

7  A.   Based on my surveillance up to that point, gauging

8  Mr. Hay's daily activity when he started his day, when he would

9  leave home, I believed him to be home at that time in the

10  morning.

11  Q.   Had you talked to the marshals about the timing of this in

12  advance?

13  A.   Yes, sir.

14  Q.   If you had conducted that arrest or executed that arrest

15  warrant on, say, a Thursday would he have been able to see the

16  judge that same day?

17  A.   No, sir.

18  Q.   Would he have had to stay in lockup overnight?

19  A.   Yes, sir.

20  Q.   So the first day a judge could see him was on Friday?

21  A.   Yes, sir, per the marshals.  That was my understanding.

22  Q.   How many agents were with you?

23  A.   Two agents with me.

24  Q.   And did you also bring a uniformed local police officer?

25  A.   Yes, sir, an Osawatomie police officer.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.542

1    Q.   Why did you do that?

2    A.   For officer safety, also for -- the local police officers

3    have body cam recorders that we don't have.

4    Q.   And was the body camera footage active that day?

5    A.   Yes, sir, it was.

6    Q.   Are you trained in how to conduct an arrest like this?

7    A.   Yes, sir.

8    Q.   What sort of training do you receive?

9    A.   Well, where I received the training would have been all the

10   way back to the police department, and then continuing on,

11   every academy does some arrest training.  I'm also a control

12   tactics/defensive tactics instructor, so we train quite a lot

13   with effecting an arrest, physical arrest.

14   Q.   So when you're executing an arrest warrant like this, what

15   are you concerned about going into that situation?

16   A.   Paramount is everyone's safety, both the officer and the

17   agents executing the arrest warrant as well as anyone in the

18   house.

19   Q.   Are you trained on assertiveness in these types of

20   situations?

21   A.   Yes, sir.

22   Q.   What training do you receive on that?

23   A.   We're taught to be, first of all, quick and decisive rather

24   than have a negotiation.  We immediately take control of the

25   situation.  Command presence is very important, so I have a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.543

1    completely different voice that seems to pop out.  And so we

2    immediately identify ourselves and take charge of the situation

3    and effect the arrest immediately.

4    Q.   So in this case did you do that?  Did you effect the arrest

5    immediately?

6    A.   Yes, sir.

7    Q.   Did you place the defendant in handcuffs immediately?

8    A.   Yes, sir.

9    Q.   Why didn't you let him get dressed before you placed him in

10   handcuffs?

11   A.   The scene wasn't secure.  We believe and have trained that

12   any delay in effecting that arrest and taking control, physical

13   control with cuffing allows an arrestee the opportunity to

14   think about what's about to happen and sometimes that causes

15   additional problems.  So we just do it immediately.

16        Once we have the scene secure, once we have the area

17   immediately around the arrestee secure, we can have a seat.  We

18   can get him dressed.  We can take care of everything.  Once we

19   effect the arrest, we can slow down.

20   Q.   By the time you went to execute this arrest warrant, were

21   you aware the defendant was a hunter?

22   A.   Yes, sir.

23   Q.   How long did the entire interaction take place from the

24   time you knocked on the door until you left for the federal

25   courthouse?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.544

1   A.   I believe it was under 15 minutes.

2   Q.   And were you in a hurry that morning?

3   A.   Absolutely.

4   Q.   Why was that?

5   A.   Well, speaking with the marshals, they gave us a drop time.

6   I believe they said 9:00 a.m., if I remember correctly, but we

7   needed to get him here to be booked in so that he could be in

8   front of a magistrate judge that afternoon so he could be

9   released on a signature bond that afternoon.

10  Q.   If you had not been able to get him there by 9:00, what

11  would have happened?

12  A.   He would have had to spend the weekend incarcerated.

13  Q.   Is that something you have to do?

14  A.   No, sir.

15  Q.   Coordinate with the marshals in advance?

16  A.   We do as a matter of practice.

17  Q.   But did you have to coordinate to get him there by

18  9:00 a.m.?

19  A.   No.

20  Q.   When you left Osawatomie, how did you travel to get to the

21  federal courthouse?

22  A.   Is it 169 Highway?  North.

23  Q.   Did you notice the defendant's demeanor being exacerbated

24  in any way by the drive up 169 Highway?

25  A.   At one point I noted a slight head bob.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.545

1    Q.  Did he need the use of a walker at any point during your

2    interaction?

3    A.  No, sir.

4    Q.  Did he need the use of a cane?

5    A.  No, sir.

6    Q.  Was that both at his house and when you arrived at the

7    federal courthouse?

8    A.  While I was interacting with him at the federal courthouse,

9    yes, sir.

10   Q.  Now, before the lunch break we were, I think, on 100-M.  Do

11   you recall testifying about the defendant moving boxes between

12   a couple trucks?

13   A.  Yes, sir.

14   Q.  I want to go back to that.  Ms. Boyd, could you pick up

15   with Government's Exhibit 100-M at 8 minutes 35 seconds,

16   please.

17       Is this after the camera had been zoomed in?

18   A.  Yes, sir.

19   Q.  And did you notice the camera toggle over a little bit?

20   A.  Yes, sir.

21   Q.  So is that the agent who's watching this in realtime and

22   moving the camera as the defendant moves?

23   A.  Yes, sir.

24   Q.  Is the agent zooming in here?

25   A.  Yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.546

1   Q.   What's the date on this video?

2   A.   November -- I'm sorry, 11/4/2016.

3   Q.   Is this about a month into your pole camera surveillance?

4   A.   Yes, sir.

5   Q.   Did the defendant just go out of the screen on the

6   left-hand side?

7   A.   Yes, sir.

8   Q.   Ms. Boyd, could you pull up 100-N.

9        Is this later the same day?

10  A.   Yes, sir.

11  Q.   Who is driving the red pickup?

12  A.   Mr. Hay.

13  Q.   What does he appear to be doing here?

14  A.   He's moving a large box from the white truck bed to the red

15  truck bed.

16  Q.   What about now?

17  A.   Moving a door, appeared to be a screen door from the white

18  truck bed to the red truck bed.

19  Q.   Ms. Boyd, could you pull up 100-O.

20       Where is the defendant right now?

21  A.   He's up in the truck bed of the red Chevrolet pickup.

22  Q.   Could you go to 100-P.

23       Where is the defendant here?

24  A.   He is walking towards the white Chevrolet pickup truck.

25  Q.   Where is the defendant right now?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.547

1    A.   He is behind the white Chevrolet pickup truck between the

2    truck and a flatbed trailer.

3    Q.   What does the defendant appear to be doing here?

4    A.   It appears he's connecting the flatbed trailer to the white

5    Chevrolet pickup truck.

6    Q.   Turn to 100-Q.  And you can fast-forward about 30 seconds.

7         100-R.  Where is the defendant here?

8    A.   He's walking out across the yard now wearing the purple

9    shirt carrying -- looks like a black box of some sort.

10   Q.   Could you fast-forward to 7 minutes 25 seconds.

11        I asked Ms. Boyd to fast-forward it here, but during the

12   footage we fast-forwarded, did the defendant continue to work

13   on the vehicle?

14   A.   Yes, sir.

15   Q.   What's the date on this video?

16   A.   11/27/2016.

17   Q.   So is this nearing the end of the first set of pole camera

18   footage that you got?

19   A.   Yes, sir.

20   Q.   Where is the defendant right now?

21   A.   At the front of the silver vehicle between the silver sedan

22   and the white pickup truck.

23   Q.   Could you pull up 100-S, please, and you can fast-forward

24   about 30 seconds.

25        Where is the defendant here?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.548

1    A.   He is walking across the yard wearing an orange shirt and

2    carrying either boxes or possibly cabinet drawers.

3    Q.   Are you familiar with the truck that the boxes are being

4    put into?

5    A.   I'm not.

6    Q.   Do you see a logo on the side of the truck there?

7    A.   Yes, sir, I do.

8    Q.   Can you tell what that says?

9    A.   I cannot.

10   Q.   Can you tell if there's something up on the porch?

11   A.   I can't.

12   Q.   Do you see the defendant there?

13   A.   Yes, sir.

14   Q.   What did he appear to be doing?

15   A.   Skipping or maybe jogging a little bit.

16   Q.   Ms. Boyd, could you fast-forward just a couple minutes.

17        What's the defendant doing here?

18   A.   He's holding a baby.

19   Q.   You can pause it there.

20        So you mentioned earlier that you reactivated this pole

21   camera around the time of certain of the defendant's

22   appointments that you were able to learn about?

23   A.   Yes, sir.

24   Q.   Was one of those times around his March 30, 2017

25   appointment at the CBOC in Paola?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.549

1   A.   Yes, sir.

2   Q.   Could you pull up 100-T, and about 50 seconds in.

3        Is this prior to his appointment that morning?

4   A.   Yes, sir, I believe it is.

5   Q.   Go to 100-U, about 30 seconds in.

6        Is this after his appointment at the CBOC?

7   A.   Yes, sir.

8   Q.   Earlier that day when you saw him at the CBOC, was he using

9   a cane on his way up to the building?

10  A.   Yes, sir.

11  Q.   Was he carrying one?

12  A.   Carrying one, yes, sir.

13  Q.   Is that what he used to take the change out from under the

14  vehicle?

15  A.   Yes, sir.

16  Q.   Go to 100-V, about 1 minute 10 seconds in.

17       Could you fast-forward to about 2 minutes in.

18       Where is the defendant right now?

19  A.   He's to the right of the front door bent over.  It's hard

20  to see him.

21  Q.   Go up to 100-W.  Is this still the same day as that CBOC

22  appointment?

23  A.   Yes, sir, it is.

24  Q.   You can stop it there.

25       So you testified earlier that you activated the pole camera

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.550

1    again around the time of the C&P examinations in May of 2017;

2    is that right?

3    A.   Yes, sir.

4    Q.   Could you pull up 100-X, and you can fast-forward 1 minute

5    38 seconds, please.

6        Is this the day before the C&P examinations?

7    A.   Yes, it is.

8    Q.   Are these the canopies that you talked about earlier?

9    A.   Yes, sir.

10   Q.   Is this the door you were talking about earlier?

11   A.   Yes, sir, it is.

12   Q.   All right.  Could you pull up 100-Y.

13       Is this the morning of C&P examination?

14   A.   Yes, sir, it is.

15   Q.   And so where were you when you were watching this?

16   A.   I was at the Kansas City VA Medical Center.

17   Q.   Could you pause it right there?

18       Is this what you referred to earlier when you said you

19   didn't know what this was initially when you saw it on the pole

20   camera?

21   A.   Yes, sir.

22   Q.   Go ahead and hit play.

23       What did you later learn that that was?

24   A.   That was the rollator walker.

25   Q.   You can stop it there.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.551

1       So after the C&P examinations and after your surveillance

2    that day, did you go review the pole camera footage later in

3    the afternoon?

4    A.   Yes, sir.

5    Q.   Could you pull up 100-Z.

6        What does the date and time say at the top?

7    A.   2017/5/3, so May 3, 2017.  1513 is military time, so

8    3:13 p.m.

9    Q.   Could you fast-forward to about 2 minutes 15 seconds.

10       What does Ms. Hay appear to have in her hand?

11   A.   That would be the same -- I presume the same rollator

12   walker.

13   Q.   Can you pull up 100-AA.  You can fast-forward about

14   25 seconds.

15       Later this afternoon?

16   A.   Yes, sir.

17   Q.   And 100-BB, about 55 seconds in.

18       Still the same day?

19   A.   Yes, sir.

20   Q.   Ms. Boyd, could you fast-forward to 2 minutes 15 seconds.

21       I just had Ms. Boyd fast-forward, but did the defendant

22   continue to work on his car during that time?

23   A.   Yes, sir.

24   Q.   Or his truck?

25   A.   Truck, yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.552

1   Q.   And then about 4 minutes in.

2        Did one of the agents zoom in here?

3   A.   Yes, sir.

4   Q.   100-CC.

5        Is this later that evening?

6   A.   Yes, sir.  2200 hours would be 10:00.

7   Q.   In that last clip we watched, did the red truck drive away?

8   A.   Yes, it did.

9   Q.   Is it returning now?

10  A.   Yes, sir.

11  Q.   Was anybody with the defendant when the truck pulled away

12  earlier in the day?

13  A.   No, sir.

14  Q.   Do you see the defendant here?

15  A.   Yes, sir.

16  Q.   Where is he at?

17  A.   This is in front of his home.

18  Q.   Is he the one walking up right here?

19  A.   Yes, he is.

20  Q.   You can stop it there.

21       So, Agent Baker, we've seen a lot of pole camera clips here

22  or subsets of the footage you obtained, but did you actually

23  yourself review the entirety of the pole camera footage?

24  A.   Yes, sir, I did.

25  Q.   And, again, what time periods did that cover?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.553

1   A.   It would have been from the install, October 2016 through

2   November 2016 and then one week in March 2017 and another week

3   in May 2017.

4   Q.   And did you create a summary of all of that activity that

5   you observed on the camera?

6   A.   Yes, sir.

7   Q.   Was the footage that you reviewed voluminous?

8   A.   Yes, sir.

9        MR. HUSCHKA:  May I approach, Your Honor?

10        THE COURT:  Yes.

11   BY MR. HUSCHKA:

12   Q.   Agent Baker, I'm handing you what's been marked as

13   Government's Exhibit 101.  Do you recognize that?

14   A.   Yes, sir, I do.

15   Q.   What is it?

16   A.   This is the summary of my review.

17        MR. HUSCHKA:  Would move to admit Government's

18   Exhibit 101.

19        MS. RAMSEY:  Can we have one moment, Your Honor?

20        THE COURT:  Do you need to read?

21        MS. RAMSEY:  Yes, Your Honor.  I apologize.  I thought

22   this was going to be a little faster than I thought.  Could we

23   take a short break?

24        THE COURT:  I know you all are going to confer about

25   it.  Let's take a break now, and if we need to, we'll take

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.554

1    another break later this afternoon, but let's be in recess for

2    15 minutes.

3        (The following proceedings occurred outside the presence of

4    the jury.)

5            THE COURT:  I should tell you that the facilities

6    security committee met today and voted that the building will

7    again follow the CDC mask and guidelines in public spaces.  So

8    that's elevator, hallways, lobbies, and public restrooms

9    effective tomorrow.

10           People will need to wear masks in these public areas:

11   Elevators, hallways, lobbies, public restrooms.

12           I'm not requiring them in the courtroom.  It's a

13   semi-public space.  Every other agency like, you know, the U.S.

14   Attorney's Office, FPD, they decide what they want to do within

15   their own space.  The courtrooms are the court space, so we're

16   going to offer the jurors -- we have plenty of masks.  We're

17   going to offer them if they want to wear them.  I mean,

18   transmission rates, as you know, are going back up.

19           But as far as the rest of the courthouse, the quarters

20   and stuff, you're under that rule starting tomorrow.  We'll

21   recess for 15 minutes.

22       (Recess taken at 2:26 p.m.)

23       (The following proceedings occurred outside the presence of

24   the jury.)

25           THE COURT:  Let's make a record on the summary.  Is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1474                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.555

1  there an objection to Exhibit 101 which is the summary?  I

2  mean, I ruled on it on the limine conference, but you all were

3  going to confer on the description of action.  Have you

4  resolved that?

5            MS. RAMSEY:  Yes, Your Honor.  I don't believe the new

6  exhibit that has been handed to me we have an objection to.  I

7  don't know if it's yet been provided to the court.

8            THE COURT:  I have it.  So you'll need to offer it and

9  all of that when the jury comes back in.  Are we otherwise

10  ready to go?

11           MR. HUSCHKA:  Yes, Your Honor.

12           MS. RAMSEY:  Yes, Your Honor.

13        (The jury entered the courtroom, after which the following

14  proceedings were had.)

15           THE COURT:  All right.  You can be seated.

16  BY MR. HUSCHKA:

17  Q.  Agent Baker, before the break we were discussing the

18  summary of the pole camera surveillance that you prepared after

19  your review of it.  Do you remember that?

20  A.  Yes, sir.

21           MR. HUSCHKA:  Your Honor, may I approach?

22           THE COURT:  Yes.

23  BY MR. HUSCHKA:

24  Q.  I'm handing you now what's been marked as Government's

25  Exhibit 101.  It contains a few changes.  Do you recognize

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.556

1   that?

2   A.   Yes, sir, I do.

3   Q.   And is that a copy of the pole camera surveillance summary

4   that you prepared?

5   A.   Yes, it is.

6            MR. HUSCHKA:  Move to admit Government's Exhibit 101.

7            MS. RAMSEY:  No objection.

8            THE COURT:  101 admitted.  You can publish.

9   BY MR. HUSCHKA:

10   Q.   Agent Baker, could you just start by explaining to the jury

11   what is seen here in each of these columns?

12   A.   Sure.  The date is the date of the pole cam footage that it

13   was recording.  The start time and stop time are the times

14   related specifically to the clips.

15       Because it's a motion sensor camera, it starts with

16   movement.  It stops when movement stops, but also because it's

17   a busy road; there's quite a lot of just footage with nothing

18   on it, no movement from Mr. Hay.

19       Also, even just a limb blowing in front of the camera can

20   activate it.  These are strictly start/stop time and dates of

21   clips where we observed Mr. Hay to move.

22   Q.   What about the description of action column?

23   A.   That's just a summary of my observations of the activities

24   that I observed.

25   Q.   Okay.  If you look down at 10:42 a.m. on October 12th.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.557

1    A.   Yes.

2    Q.   Do you see that?  It says "tech ops remote zoom."

3    A.   Yes, sir.

4    Q.   What are you referring to there?

5    A.   When we initially set up the camera and the field of view,

6    we had it from the -- again, from the corner of the house to

7    the driveway, and so this is -- if you remember when one of the

8    videos, they narrowed the field of view down just to the front

9    of the house.

10   Q.   And so you're noting here the time that that happened?

11   A.   That's correct.

12   Q.   Okay.  And then if you look down a couple rows at 6:19 p.m.

13   it says "leaves alone/cane" right at the top there.  What do

14   you mean by that?

15   A.   Once we were zoomed in, I couldn't tell if he was driving

16   or not.  So I would say whether or not he was leaving the house

17   or coming to the house, whether or not he had his cane with

18   him.

19   Q.   And when you note cane, does that mean he just has it with

20   him?

21   A.   Yes, sir.

22   Q.   Are you saying that he was using it or just that he had it?

23   A.   That he had it.

24   Q.   If you look at down at 3:06 p.m., there are two entries,

25   "leaves no cane," "returns no cane"?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.558

1  A.   Yes, sir.

2  Q.   What are you referring to there and what do you mean?

3  A.   When he left the field of view, he did not have his cane

4  with him, and when he returned, he did not have the cane with

5  him.

6  Q.   Okay.  If you could turn to page 5.

7       And, Agent Baker, there's no page numbers on yours, but if

8  you're looking at the screen there, the very bottom,

9  November 4, 2016, at 1:19 p.m., do all of these surveillance

10 entries describe activity involving the defendant unless you

11 noted otherwise in here?

12 A.   Yes, sir.

13 Q.   So the generic description here is of activity the

14 defendant is engaged in?

15 A.   That's correct.

16 Q.   Turn to page 8, please.

17      Here you'll notice the very top there, the top entry says

18 November 10th, and the next entry says November 15th.  Could

19 you explain why there's a jump there in five days?

20 A.   Yes, sir.  In discussing with my technical operation agent,

21 we believed that the camera went offline for three days.  We

22 weren't watching it live, so we didn't know, and once we caught

23 it, they were able to remotely address the issue and get it

24 back online and start recording again.

25 Q.   You can take that down.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.559

1      So just in general, over all of the video that you reviewed

2   in this case, all the pole camera, all the surveillance, what

3   did you observe with respect to the defendant and his cane?

4   A.   Mr. Hay carried the cane -- leaving the house, sometimes he

5   carried it, sometimes he didn't.  Mr. Hay actually using the

6   cane anywhere around his house, I did not observe that.

7      At the -- some of the VA health care appointments, he would

8   use it more, but again, not anything that would be -- like you

9   saw in the video when he was going for the benefits exam, it

10  was very weightbearing.  I didn't see that at any of the health

11  care appointments.

12  Q.   What did you observe with respect to the defendant driving?

13  A.   Mr. Hay drove nearly every day that we monitored with pole

14  cam footage.

15  Q.   During your review of all of this video, did you ever

16  observe the types of head bobs or jerking motions that you saw,

17  for instance, in the November 2012 Social Security parking lot?

18  A.   No, I did not.

19  Q.   If you had saw that, would you have noted it on this log?

20  A.   Absolutely.

21  Q.   Did you ever see the defendant walk in the way you observed

22  in the Social Security parking lot or the Miami County

23  administration building?

24  A.   Well, with the exception of the -- when he came for his C&P

25  exam, no.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.560

1  Q.  So the two times in 2012 and then in May of 2017 at his C&P

2  examination?

3  A.  That's correct.

4  Q.  And that's it?

5  A.  Yes, sir.

6  Q.  Did you ever see any instances where, during your review of

7  the pole cam footage, that he needed his wife's assistance?

8  A.  No, sir.

9  Q.  Over the course of your entire investigation, all the video

10 that you reviewed, how many times did you see the defendant

11 need the use of a walker?

12 A.  One day.

13 Q.  And which day was that?

14 A.  The day of his VA compensation and pension examination.

15        MR. HUSCHKA:  No further questions.

16                    CROSS-EXAMINATION

17 BY MS. RAMSEY:

18 Q.  Agent Baker, I want to start by talking to you about the

19 March 30, 2017 recording of Mr. Hay going to the medical

20 appointment at CBOC.

21 A.  Yes, ma'am.

22 Q.  Do you remember that?

23 A.  Yes, ma'am.

24 Q.  That was his appointment with Dr. McWoods?

25 A.  Yes, ma'am.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.561

1  Q.  His wife drove him to this appointment, right?

2  A.  Yes, ma'am.

3  Q.  They drove to this appointment from his home?

4  A.  I believe it was direct, yes, ma'am.

5  Q.  So you would agree, having surveilled them, that the CBOC

6  is only about 14 minutes, 10 miles between his home and the

7  CBOC facility?

8  A.  Yes, sir.

9  Q.  And on this date, it looks like on the video he walks in

10  with his cane about 20, 25 yards?

11  A.  Yes, ma'am.

12  Q.  Holds the door open for his wife?

13  A.  I was inside.  I don't recall.

14  Q.  Okay.  So you were -- you reviewed the video, but you were

15  actually inside at the time; other agents were surveilling the

16  outside?

17  A.  Yes, ma'am.

18  Q.  So you are in the CBOC clinic on that day, and you say that

19  Mr. Hay was there to see, as far as you know at least, a

20  medical appointment and I think you said Dr. McWoods, right?

21  A.  Yes, ma'am.

22  Q.  You had a conversation with him?

23  A.  I did.

24  Q.  And you said that he told you he worked with his

25  brother-in-law?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.562

1    A.   Yes, ma'am.

2    Q.   He told you specifically he just makes some cabinets?

3    A.   I believe so.

4    Q.   Throughout your investigation, as you said, you've been on

5    this case for a while, you don't have any information or

6    evidence that Mr. Hay was ever, let's say, receiving a paycheck

7    for the work -- any work that he's done?

8    A.   I don't know how he was compensated, ma'am.  No.

9    Q.   You've done some investigation.  You don't know.  He's

10   never filed any W-2s or anything like that, that a job or

11   employer would require you to file, correct?

12   A.   That is correct.

13   Q.   I want to talk to you about the May 3, 2017, going to the

14   C&P exam.  You conducted covert surveillance that day, correct?

15   A.   Yes, ma'am.

16   Q.   And there's a video that shows Mr. Hay leaving for the C&P

17   exam that morning, correct?

18   A.   Yes, ma'am.

19   Q.   And I believe it's fairly early in the morning, sometime

20   around 7:00 to 9:00 a.m.?

21   A.   I believe so.

22   Q.   I'm going to show you what's been marked as Defendant's

23   Exhibit 808.

24        MS. RAMSEY:  Mr. Magariel --

25   BY MS. RAMSEY:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.563

1  Q.  I'm going to show you a copy of what's been marked as

2  Defendant's Exhibit 808.  And Defendant's Exhibit 808, would

3  you agree that that's kind of a Google Maps area of Mr. Hay's

4  home to the VAMC in Missouri?

5  A.  Yes, it appears to be so.

6  Q.  And is it kind of a fair and accurate depiction of the

7  route that they possibly would have taken that day, taken the

8  main highway?

9  A.  I believe so.  This is very small print, and I'm 55 years

10 old.  So I think it is.  I believe it is.

11 Q.  And so it looks like the main Highway 169, and it looks

12 like that would have taken approximately an hour and one

13 minute, is that fair to say, if they're staying on the main

14 highway?

15 A.  Yes, ma'am.  Google Maps shows 1 hour 1 minute.

16         MS. RAMSEY:  Your Honor, I move to admit Defendant's

17 808.

18         THE COURT:  Any objection?

19         MR. HUSCHKA:  No, Your Honor.

20         THE COURT:  Exhibit 808 admitted.  You can publish.

21 BY MS. RAMSEY:

22 Q.  You've been shown a video, Government's Exhibit 100-Y, of

23 the morning, him leaving for the C&P exam.  Do you remember

24 viewing that video?

25 A.  Yes, ma'am.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.564

1    Q.   Fair to say it was raining that morning as well?

2    A.   Yes, ma'am.

3    Q.   So it's raining that morning.  They're going from their

4    home to the VAMC Missouri, which takes at least -- about an

5    hour and a few minutes, and it's about 7:00 to 9:00 a.m.,

6    around rush hour traffic; fair to say?

7    A.   Yes, ma'am.

8    Q.   I want to talk about the pole camera video.  Now, pole

9    camera -- the camera itself was attached to the high school

10   that was, for lack of a better word, across the street from

11   Mr. Hay's residence in Osawatomie?

12   A.   It was actually on a tripod mount.  But, yes, it was on top

13   of a school across the street.

14   Q.   And if I've correctly done my homework, I believe that's

15   about at least 200 feet from between the high school and the

16   home, maybe a little more, but I'm giving a short distance

17   there?

18   A.   That would probably be accurate.

19   Q.   Okay.  Now, you've seen several -- we've gone through

20   several videos of the pole cam today.  Would you agree in

21   viewing that pole cam you can't make out any facial features of

22   the individual; you can't see their eyes, their lips, their

23   nose on that video?

24   A.   I agree.

25   Q.   Fair to say sometimes the video is a little fuzzy or

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.565

1   grainy?

2   A.   Yes, ma'am.

3   Q.   Fair to say it would be difficult to see if someone had a

4   slight body tremor?

5   A.   A slight body tremor.

6   Q.   Yes.  And from 200 feet and looking at a grainy video

7   because you didn't -- you weren't personally sitting outside

8   watching these things occur, right?  You're re-reviewing the

9   video yourself?

10  A.   That's correct.

11  Q.   And so we're looking at a video from a distance of 200 feet

12  that's possibly very grainy at times, and so you're making a

13  judgment of what he's doing from that view?

14  A.   Making my observations.

15  Q.   Okay.  When was that pole cam put up?

16  A.   October 2016.

17  Q.   Okay.  But you have been -- when did you start as an agent

18  on this case?

19  A.   June 2015.

20  Q.   Okay.  But you have had the opportunity to view, let's say,

21  any surveillance from 2012 going forward; is that fair?

22  A.   Yes, ma'am.

23  Q.   As far as you know, as far as the investigation and

24  evidence in this case, there's no video prior to 2012?

25  A.   Not that I'm aware of.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.566

1    Q.   The pole cam -- you went through great strides to make sure

2    the pole camera recording was covert, meaning no one knew it

3    was occurring?

4    A.   Correct.

5    Q.   And at least that's your understanding, that Mr. Hay did

6    not know he was being recorded?

7    A.   That is my understanding.

8    Q.   And if my math is correct, I think this recording occurred

9    about 15 hours a day for 68 total days.  Does that sound right?

10   A.   That's probably about right.

11   Q.   Okay.  Throughout that time period, Mr. Hay is seen

12   regularly carrying his cane to and from the home, correct,

13   which is what's being recorded on the pole camera?

14   A.   He does carry it sometimes.  He does not carry it

15   sometimes.

16   Q.   And you've noted those when he's using the cane, correct?

17   A.   Or carrying the cane, yes.  Any time he's seen with the

18   cane it's noted.

19   Q.   He doesn't know anybody's watching him?

20   A.   Correct, as far as we know.

21   Q.   When you are reviewing the pole cam video, prior to

22   Government's Exhibit 101, did you also make other spreadsheets

23   when you were reviewing the pole cam video during your

24   investigation?

25   A.   Yes, ma'am.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.567

1   Q.   Okay.  Do you remember on reviewing the pole cam video on

2   October 9, 2016 at 10:28 and 10:30 -- I'm sorry, yes, at 10:28

3   and 10:30 noting an impairment?

4   A.   May I refresh?

5   Q.   Sure.  And I have actually a copy of it if you would like

6   to refresh your memory.

7   A.   I'm sorry.  What was the date, ma'am?

8   Q.   10/9 at 10:16.  I'm not looking at Exhibit 101.  I'm

9   looking at a separate sheet I believe authored by you.  Can I

10  show it to you --

11  A.   Certainly.

12  Q.   -- to see if that's correct?

13  A.   Absolutely.  I'm sorry what was the date again?

14  Q.   Sure.  It was 10/9/2016, 10:28 to 10:30.

15  A.   It says "impairment."

16  Q.   Okay.  Is this a sheet that you authored much like

17  Exhibit 101?  It looks like reviewed by SA Kerry Baker on

18  May 11, 2021?

19  A.   Yes.  We did a re-review, my understanding was, to assist

20  your office of all of the pole cam footage looking specifically

21  for any signs of impairment and that was due to the volume.  It

22  was divided up among ten agents through the central field

23  office, and those agents were able to go back and review a week

24  each and then make their observations.  And so this very well

25  could have been mine.  I think I did take the first week, so

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.568

1   this probably would have been my notation.

2   Q.   Okay.  Thank you.  I appreciate that.

3        And so on October 9, 2016, 10:28 to 10:30 you note

4   "impairment," correct?

5   A.   Yes, ma'am.

6   Q.   Meaning you noticed some type of impairment of Mr. Hay,

7   correct?

8   A.   Yes, ma'am.  Sorry.

9   Q.   On 10/10/2016 also, 9:14 to 9:15 you note an impairment?

10  A.   Yes, ma'am.

11  Q.   Meaning you noticed some impairment of Mr. Hay?

12  A.   Yes, ma'am.

13  Q.   Again, on October 10, 2016 at 9:38 to 9:40, you note again

14  "observable impairment"?

15  A.   Yes, ma'am.

16  Q.   Meaning you noticed some observable impairment of Mr. Hay?

17  A.   Yes, ma'am.

18  Q.   Okay.  Do you have Government's Exhibit 101 in front of

19  you?

20  A.   Yes, ma'am.

21  Q.   All right.  I'm going to try and call your attention to,

22  looks like the first page, which reflects October 9, 2016.  Do

23  you see those dates there?

24       I think are five -- would you actually mind, I'm sorry,

25  Ms. Boyd, bringing up Exhibit 101.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.569

1    Do you see the first page where it says October 9th, there

2    are four entries there?

3    A.   I do.

4    Q.   Would you agree with me there's no entry there on

5    October 9, 2016 on that first page that reflects what you

6    re-reviewed the camera on noting an impairment on 10/9/2016?

7    A.   I would agree.

8    Q.   That's not on here?

9    A.   Correct.

10   Q.   And then going to the second page, if you would.  I'm

11   sorry.  I got these wrong.  I'm looking at the wrong thing.

12       Back to the first page.  What I'm looking at are the

13   entries under 10/9 for 10/10.  Would you agree there's two

14   entries there on Government's Exhibit 101?

15   A.   Well, there's -- there are several entries for 10/9 and

16   10/10 on Exhibit 101.

17   Q.   I want to call your attention to the two entries for

18   October 10, 2016.

19   A.   I'm sorry.

20   Q.   Would you agree that there's notation on government's

21   exhibit 10/10/16 that would match what I'm giving you to

22   refresh your recollection, which is your previous re-review

23   noting not only just an impairment, but an observable

24   impairment; those entries are not on Exhibit 101?

25   A.   That is correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.570

1   Q.   I want to talk to you about Government's Exhibit 327.  If

2   you'll give me a moment, I'll bring it up.

3        Would you mind bringing up Government's Exhibit 327.

4        All right.  Government's Exhibit 327 I think includes --

5   you were previously questioned about a mechanical's lien and

6   employment agreement.  During this investigation you learned

7   that the Hay family owned farmland; is that correct?

8   A.   That is correct.

9   Q.   Now, this mechanical's lien was filed, and you view the

10  mechanical's lien as something as being filed that he never

11  actually got paid for any employment that is alleged in the

12  employment agreement, correct?

13  A.   I can't testify to whether or not he's ever been paid.  The

14  mechanic's lien mentions the amount he believes he should be

15  compensated.

16  Q.   That is correct.  But I guess I'm asking your

17  interpretation.  Did you ever send an e-mail to, I believe the

18  AUSA in this case, indicating you interpreted this lien as a

19  sworn statement he didn't receive money for work completed?

20  A.   If that's what my e-mail says, I don't recall that, but if

21  my e-mail says that, then that's what I said.

22  Q.   Okay.  Thank you.  Now, regarding Defense Exhibit -- I'm

23  sorry, Government's Exhibit 327.  Could you go to I think the

24  third page.

25        That is the employment agreement.  And I believe your

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.571

1  testimony was that he was employed on the farm.  You would

2  agree with me that paragraph 1 states that he's employed simply

3  as a farm manager?

4  A.   Yes, ma'am.

5  Q.   Okay.  And as a manager you manage other people to do work,

6  correct?

7  A.   That's correct, but I believe this document further

8  explains what he's citing as his activities of employment.

9  Q.   Right.  And we'll get to that.

10  A.   Okay.

11  Q.   Because I believe your testimony was that you -- if you

12  could -- could you go to page 2, please.

13       You interpreted where it says the lien is claimed for the

14  following as indication that those were physical activities

15  that Mr. Hay was doing; is that correct?

16  A.   Well, the document states "the lien is claimed for the

17  following:  Labor, service, equipment, or material furnished by

18  the claimant, equipment repair, livestock management, property

19  upkeep (fence repair, water gaps, et cetera), crop planting and

20  harvesting, and hay harvesting."

21  Q.   As a farm manager, that was his title in this document?

22  A.   Okay.  Yes, ma'am.

23  Q.   Now, we've watched a lot of video in this case and during

24  your surveillance you never have any video of Mr. Hay doing any

25  farm equipment repair, correct?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.572

1    A.   I do not.

2    Q.   You don't have any video of him actually doing any

3    livestock management?

4    A.   No, I do not.

5    Q.   No video of him repairing a fence?

6    A.   No, ma'am.

7    Q.   Or filling water gaps?

8    A.   No, ma'am.

9    Q.   Crop planting, no video of that?

10   A.   No, ma'am.

11   Q.   Or harvesting?

12   A.   No, ma'am.

13   Q.   Okay.  So this is just your interpretation, but you've

14   never seen Mr. Hay doing any of these things and you don't have

15   any video of him doing any of them, correct?

16   A.   My investigation revealed there is video of him doing these

17   things.

18   Q.   Okay.  But you just said there was no video of equipment

19   repair, correct?

20   A.   You were referring to my video.

21   Q.   Yes, that's what I'm asking.

22   A.   I have not taken video of Mr. Hay doing any of these

23   things.

24   Q.   Okay.  That's all I'm asking you.

25   A.   Okay.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                         USA v. Bruce L. Hay
                                                         ROA - Volume 3, p.573

1  Q.  Thank you.  As part of your investigation in this case you

2  were working with, I think it's the VBA, the veteran benefit

3  side of the VA, correct?

4  A.  Yes, ma'am.

5  Q.  And part of what you were trying to determine in your

6  investigation is what kind of level -- what you were seeing

7  versus the VA's definition of level of unemployability,

8  correct?

9  A.  Initially I think I did look at unemployability.  Mr. Hay

10  was not being compensated as unemployable.

11  Q.  Okay.  And did you become aware of the VA's kind of

12  definition, definitions of unemployability or determining

13  unemployability?

14  A.  Yes, ma'am.

15  Q.  And would you agree in that definition that working on kind

16  of a farm was not to be considered as part of whether or not

17  someone was unemployable or not, a veteran was unemployable or

18  not?

19  A.  It's been a very long time ago.  If memory serves

20  correctly, we discussed it.  I don't remember what the -- what

21  the outcome was or what the final determination was regarding

22  farms.

23  Q.  So you don't remember asking for a definition from

24  Ms. Aimee Rogers about that?

25  A.  I do.  I don't remember what her response was.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.574

1   Q.   You don't remember her sending you any document indicating

2   what farming means as to unemployability?

3   A.   I can't remember.

4   Q.   Okay.  All right.  I want to turn to talk to you about

5   recording Mr. Hay at the Highland Games.

6   A.   Yes, ma'am.

7   Q.   And this was in 2016?

8   A.   Yes, ma'am.

9   Q.   All right.  And at some point you decide you want to try

10  and get more footage of Mr. Hay?

11  A.   That's correct.

12  Q.   And you determined that he attends these Scottish Highland

13  Games?

14  A.   Yes, ma'am.

15  Q.   Now, the Scottish Highland Games, this is, for lack of a

16  better word, kind of ethnic festival where individuals get

17  together that are of Scottish heritage?

18  A.   That's correct.

19  Q.   Is that a good way to describe?

20  A.   That's probably how I would describe it as well.

21  Q.   And at this particular festival there are games; that's why

22  they call it the Scottish Highland Games?

23  A.   Yes, ma'am.

24  Q.   Those include gentlemen wearing kilts and testing their

25  strength, throwing poles, hammer throws, things of that nature?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.575

1  A.   That's correct.

2  Q.   And you said that you were there for three hours?

3  A.   That's an approximation, but I believe it was about three

4  hours.

5  Q.   I'm going to play for you -- but first let me ask you if

6  you can identify -- previous to testifying, at least speaking

7  with me, were you able to view Defense Exhibits 827 and 828?

8  A.   I believe those were the numbers.  Yes, ma'am.

9  Q.   And were those videos a fair and accurate depiction of the

10  recording that you took on that day at the Highland Games of

11  Mr. Hay?

12  A.   Yes, ma'am.

13          MS. RAMSEY:  Can I ask that you play Defendant

14  Exhibit 827 --

15          Your Honor, may we please admit Exhibit 827 and 828.

16          MR. HUSCHKA:  No objection.

17          THE COURT:  827 and 828 admitted.  You can publish.

18  BY MS. RAMSEY:

19  Q.   Would you agree Defendant's Exhibit 827 just shows Mr. Hay

20  kind of sitting down under a tent?

21  A.   Yes, ma'am.

22          MS. RAMSEY:  Please play Exhibit 828.

23  BY MS. RAMSEY:

24  Q.   All right.  Would you agree that Defendant's Exhibit 828 is

25  the video at the Highland Games on that day, and it shows

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                              2:19-cr-20044-JAR
                                                           USA v. Bruce L. Hay
                                                           ROA - Volume 3, p.576

1    Mr. Hay kind of leaning on his cane, just swaying back and

2    forth?

3    A.  Yes, ma'am.

4    Q.  Okay.  At no time did you see Mr. Hay doing any -- really

5    any other activities during the three hours you were there

6    besides sitting under that tent?

7    A.  Sitting and standing, walking around a little bit in the

8    tent, but not leaving the tent, no, ma'am.

9    Q.  Not practicing or participating in any strength games?

10   A.  No, ma'am.

11   Q.  Not throwing any light poles or hammers or hay over to see

12   how far you can throw it?

13   A.  No, ma'am.

14   Q.  You conducted what's called a trash pull at some point in

15   time at Mr. Hay's residence; is that correct?

16   A.  That's correct.

17   Q.  And a trash pull is something where you as an investigator

18   will actually take someone's trash that they've set out on the

19   side of the road and go through them looking for evidence; is

20   that correct?

21   A.  Yes, ma'am, that's correct.

22   Q.  You did that in this case?

23   A.  I did.

24   Q.  And you didn't find anything valuable or useful?

25   A.  I did not.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.577

1    Q.  I want to talk to you about Mr. Hay's arrest in 2019.  I

2    believe in your previous testimony you were asked whether

3    Mr. Hay used a cane or a walker.  Do you remember being asked

4    that?

5    A.  Yes, ma'am.

6    Q.  And your answer was no?

7    A.  That's correct.

8    Q.  I'm going to ask you prior to your testimony with me here

9    today, were you able to watch Defendant's Exhibits 825 and 829?

10   A.  Are those the arrest videos you showed me previously?

11   Q.  They are.

12   A.  I did.

13   Q.  Were those videos an accurate depiction of the body cam of

14   the arrest of that day?

15   A.  Yes, ma'am.

16          MS. RAMSEY:  Your Honor, I move to admit Defendant's

17   Exhibit 825 and 829.

18          MR. HUSCHKA:  No objection.

19          THE COURT:  825, 829 admitted.  You can publish.

20          MS. RAMSEY:  Thank you.

21          Would you play Exhibit 825, please.  Thank you.

22          I'm sorry.  Exhibit 829.  I apologize.  Give me one

23   second.

24   BY MS. RAMSEY:

25   Q.  All right.  You would agree Exhibit 829 shows you and looks

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.578

1   like other agents and Osawatomie police officer, I think you

2   told me, entering Mr. Hay's residence early in the morning?

3   A.   Yes, ma'am.

4   Q.   He was immediately placed into handcuffs?

5   A.   Yes, ma'am.

6   Q.   And I think you gave an explanation of why you did that,

7   but he wasn't able to access a cane or walker when you put him

8   in handcuffs, correct?

9   A.   We just put him in handcuffs immediately.

10  Q.   Right.  So he did not have the opportunity to grab a cane

11  or walker.  In fact, you would have probably prevented him from

12  reaching for anything; is that correct?

13  A.   That is correct.

14  Q.   Okay.  And at no time throughout your encounter with

15  Mr. Hay during the arrest did you offer him the assistance of a

16  cane or walker, correct?

17  A.   I did not.

18  Q.   Now, being in handcuffs is a stressful situation.  I think

19  you would even agree you've been in handcuffs before, correct?

20  A.   Many times.

21  Q.   Okay.  And you would agree that it was obviously a

22  stressful situation?

23  A.   Yes, ma'am.

24  Q.   I want to play what's been marked now as Exhibit 825.

25       So in this video you would agree that Mr. Hay has

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.579

1   noticeable head bobbing?

2   A.   Yes, ma'am.

3   Q.   He's shaking his upper head and torso or is moving back and

4   forth?

5   A.   Yes, ma'am.

6   Q.   It looks like at one point he leans back and his eyes kind

7   of go back and he's stuttering to talk, too, when he's talking

8   about having the rod in his arm?

9   A.   Yes, ma'am.

10  Q.   I believe your previous testimony was after you get Mr. Hay

11  in the vehicle and you drive from Osawatomie down to the

12  federal courthouse and you get to the federal courthouse, that

13  he also does not use a walker or a cane at that point?

14  A.   He did not request one.

15  Q.   You didn't offer him one?

16  A.   No, ma'am.

17  Q.   He wasn't able to bring his walker or cane from his home?

18  A.   He didn't ask for it either there, ma'am.

19  Q.   And so when he gets here, he doesn't have access to his

20  cane or his walker because they're at home?

21  A.   Correct.  But he didn't ask for it either.

22  Q.   Okay.  I believe that you said that in your time of

23  surveilling Mr. Hay that he does sometimes walk with a slight

24  limp; is that correct?

25  A.   That is correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.580

1   Q.  And the surveillance video that you've been shown from when

2   -- the instances when Mr. Hay and Ms. Hay are going from their

3   home in Osawatomie to the VA Medical Center in Missouri, all

4   those instances, his wife, Laurie Hay, is making that drive,

5   correct?

6   A.  Yes, ma'am.

7   Q.  Mr. Hay never drives the hour and -- 56 miles from his home

8   to the Veterans Administration in Missouri, correct?

9   A.  I have never seen him make that drive.

10  Q.  Okay.  I believe you also testified that on the pole cam

11  you seen Mr. Hay driving -- leaving his house and coming back

12  to his house; is that correct?

13  A.  Yes, ma'am.

14  Q.  There's nothing on the pole cam that would indicate to you

15  the distance that he is driving when he leaves and when he

16  comes home, correct?

17  A.  No, ma'am.

18  Q.  And there's no way necessarily from you -- for you to

19  figure out how far he's driving by simply reviewing the pole

20  cam?

21  A.  No.  That would be another level of surveillance.

22  Q.  Okay.

23       MS. RAMSEY:  Your Honor, can I have one moment?  Thank

24  you.

25       THE COURT:  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.581

1    MS. RAMSEY:  I don't have any further questions.

2    Thank you.

3                    REDIRECT EXAMINATION

4    BY MR. HUSCHKA:

5    Q.   Agent Baker, Ms. Ramsey asked you a few questions about

6    whether or not you could see facial features or at certain

7    points the pole camera footage was grainy.  But were you able

8    to see any physical limitations on the part of the defendant

9    when you reviewed the pole camera surveillance?

10   A.   No, sir.

11   Q.   And you were asked about whether or not you have video

12   prior to 2012 in this case.  Were you referring to surveillance

13   video?

14   A.   Yes, sir.

15   Q.   In other words, are you aware of potentially some other

16   video but not that was taken by law enforcement?

17   A.   I'm not aware of any other video.

18   Q.   Taken by law enforcement?

19   A.   Taken by law enforcement, yes, sir.  Sorry.

20   Q.   And with respect to Government's Exhibit 101, the

21   surveillance log, so did you prepare this prior to trial?

22   A.   Yes, sir.

23   Q.   And for each entry here did you yourself review each of

24   these entries and confirm their accuracy?

25   A.   I did.  I re-reviewed all of the clips again.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.582

1  Q.  And does the defendant have the pole camera footage

2  himself?

3           MS. RAMSEY:  Objection, Your Honor.

4           THE COURT:  Overruled.

5           MS. RAMSEY:  May we approach before the court rules?

6           THE COURT:  Yes.

7      (The following proceedings were had at the bench).

8           MS. RAMSEY:  Your Honor, this is getting into burden

9  shifting to the extent that he is asking about whether or not

10 what we had access to and what we can or can't do with that

11 video is burden shifting.

12          THE COURT:  Well, I thought that this particular

13 question was okay, but if any next question would be

14 problematic, it is a good thing to come up here now.  I can

15 give -- well, did he answer the question or not?

16          MR. HUSCHKA:  He did not.  This is only my question on

17 this subject.

18          THE COURT:  You want me to give a limiting

19 instruction?

20          MS. RAMSEY:  No.  I'd ask that --

21          THE COURT:  I could give a limiting instruction that

22 says whether or not the defendant has the video or not, it's

23 not his burden to prove anything.  It's the government's

24 burden.

25          MS. RAMSEY:  Yes.  At this point the question is out

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.583

1    there.

2         THE COURT:  I won't give it unless you want me to.  If

3    you want me to, that's the instruction I'll give.

4         MS. RAMSEY:  Yes.

5         THE COURT:  Okay.

6         MS. RAMSEY:  Thank you.

7    (Thereupon, the proceedings continued in open court.)

8         THE COURT:  I'll sustain the objection.

9         Ladies and gentlemen of the jury, I'm going to give

10   you what I call an instruction, a limiting instruction.

11   Whether or not Mr. Hay has access or possession of any of this

12   video, I remind you that he is presumed innocent under the law

13   and he has absolutely no obligation to prove anything.

14        The only party in this case that must prove something

15   is the government, and the government must prove guilt beyond a

16   reasonable doubt.  When a person is accused in our system, they

17   are never under any obligation to prove anything.  That's what

18   the presumption of innocence means.  All right.

19        MR. HUSCHKA:  May he answer the question?

20        THE COURT:  No.  I sustained the objection.

21   BY MR. HUSCHKA:

22   Q.  You were also questioned about Government's Exhibit 327.

23        Ms. Boyd, could you pull that up.  Could you turn to

24   page 2.

25        So the description here, could you read "the lien is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.584

1   claimed"?

2   A.   "The lien is claimed for the following labor, service,

3   equipment, or material furnished by the claimant:  Equipment

4   repair, livestock management, property upkeep (fence repair,

5   water gaps, et cetera), crop planting and harvesting and hay

6   harvesting.  Claimant is owed $62,400 per year for a period of

7   35 years for work furnished."

8   Q.   And if you could go down a little bit to the signatures

9   there.  You were asked about your interpretation of this

10  document, but whose signature is that above claimant?

11  A.   Bruce Hay.

12  Q.   And could you read the bottom?  Is this a sworn statement?

13  A.   Yes, sir, it is.

14  Q.   And could you read the portion there "on this day"?

15  A.   "On this 1/26/21 before me personally, Bruce L. Hay, to me

16  known to be the person described in and who executed the

17  foregoing instrument, and acknowledged that said grantor

18  executed the same as grantor's free act and deed."

19  Q.   And was that physical activity that is mentioned there, was

20  that significant to your investigation?

21  A.   It was.

22  Q.   Why was that?

23  A.   It wouldn't be consistent with what Mr. Hay was presenting

24  to VA for compensation and pension benefits.

25  Q.   You were -- you were asked a few questions about Mr. Hay's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.585

1    arrest in 2019.  Did that situation continue after the footage

2    that you were shown?

3    A.  Yes, sir.

4    Q.  Did the defendant walk to his vehicle from his house?

5    A.  He walked to our vehicle.

6    Q.  To your vehicle?

7    A.  Yes, sir.

8    Q.  Did he walk to the courthouse when you arrived in Kansas

9    City?

10   A.  He did.

11   Q.  Did he ever ask for a walker?

12   A.  He did not.

13   Q.  Did he ever ask for a cane?

14   A.  No, he did not.

15   Q.  Did he appear to be stressed out?

16   A.  No.  He was -- he was joking with us during booking.  He

17   was making jokes.  I mean, he did not appear to be stressed.

18   Q.  You were asked a few questions about the Highland Games and

19   you were shown a few videos.  Did you take several other videos

20   that day in addition to those that were shown?

21   A.  Yes, sir, I did.

22        MR. HUSCHKA:  Your Honor, may I approach?

23        THE COURT:  Yes.

24   BY MR. HUSCHKA:

25   Q.  I'm handing you what have been marked as Government's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.586

1   Exhibits 91 and 92.  Do you recognize those?

2   A.   Yes, sir, I do.

3   Q.   Are those other surveillance videos from the Highland

4   Games?

5   A.   They are.  These are DVDs containing those videos.  I know

6   they're mine because I have initialed and dated both of them.

7           MR. HUSCHKA:  Move to admit Government's Exhibits 91

8   and 92.

9           THE COURT:  Any objection?

10          MS. RAMSEY:  One moment.  Excuse me, Your Honor.

11          No objection.

12          THE COURT:  91, 92 admitted.  You can publish.

13          MR. HUSCHKA:  Can you pull up 91, please.

14   BY MR. HUSCHKA:

15   Q.   Is the audio level here reflective of what you heard at the

16   festival?

17   A.   It is a little subdued right now.

18   Q.   Pause it there.

19          Is this the defendant's tent here just straight ahead in

20   the video?

21   A.   Yes, sir, the blue awning.

22   Q.   Could you go back about five seconds or so.

23          What does the defendant appear to do there?

24   A.   Doesn't really stand all the way up.  He rises up enough to

25   adjust his kilt underneath and sits back down.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.587

1    Q.   Does he require any assistance to do that?

2    A.   He did not.

3    Q.   Could you publish 92.  Can you pause it right there.

4         So then in the background here, is that the defendant's

5    tent?

6    A.   Yes, it is.

7    Q.   So you're shooting through kind of a processional of people

8    there?

9    A.   Yes, sir.

10   Q.   Could you go back a few seconds.

11        Describe what the defendant is doing at this point.

12   A.   He's standing, leaning.  Again, just moving around inside

13   the tent, but he is standing without assistance and he is

14   leaning over here.

15   Q.   Can you hit play.

16        Do you see the defendant again here?

17   A.   Yes, sir, I do.

18   Q.   What's he doing?

19   A.   Standing, walking.  He was bent over and uprighted and then

20   walked about, stood, and still standing.

21   Q.   Is he requiring any assistance?

22   A.   No, sir.

23             MR. HUSCHKA:  No further questions.

24             MS. RAMSEY:  No further questions.  Thank you, Your

25   Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.588

1          THE COURT:  All right.  You can step down.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  Call your next witness.

4          MR. OAKLEY:  Your Honor, the United States calls

5    Dr. Carolyn Karr.

6                    DR. CAROLYN KARR

7    called as a witness on behalf of the government, having first

8    been duly sworn, testified as follows:

9                    DIRECT EXAMINATION

10   BY MR. OAKLEY:

11   Q.   Could you please state and spell your name for the record.

12   A.   Yes.  Carolyn Karr.  First name is C-A-R-O-L-Y-N.  Last

13   name, K-A-R-R.

14   Q.   Could you pull the microphone closer to you so we can hear

15   you?

16   A.   Sure.  Is that better?

17   Q.   Yes.  How are you employed?

18   A.   I'm a psychologist at the VA.

19   Q.   And how long have you been a psychologist at the VA?

20   A.   Full-time, ten years.  Before that, part-time another

21   roughly six years or so.

22   Q.   And so as a VA psychologist, what type of education do you

23   have?

24   A.   I have a PhD in counseling psychology.  I have a two-year

25   post-doc in clinical psychology and other training.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.589

1   Q.  What do you currently do for the VA?

2   A.  I'm a licensed psychologist.  I do clinical psychology,

3   mostly therapy, some evaluations.

4   Q.  I want to talk to you about May 5th of 2017.

5   A.  Uh-huh.

6   Q.  On that date did you have occasion to be involved in a

7   compensation and pension examination of an individual by the

8   name of Bruce Hay?

9   A.  Yes.

10  Q.  And back around that time, back around May 5, 2017, how

11  many -- let me back up.  Compensation and pension exams, are

12  they sometimes referred to C&P exams?

13  A.  Uh-huh.

14  Q.  Around that time, May 5, 2017, how many C&P examinations

15  had you been a part of?

16  A.  I was thinking about this last week, and I initially

17  thought it was about 1,000 or so because I did that job

18  full-time for four years, roughly 17 a week, and then I started

19  thinking I've done much more than that.  I was selling myself

20  short.  And so with both the full-time and part-time -- you

21  know, the part-time was sometimes two days a week.  And so

22  roughly 4,500 to 4,800, a little more accurate.  Vacations ,

23  you know.  It's my best guess.

24  Q.  And I guess I said May 3, 2017, but actually I want to talk

25  to you about May 5th of 2017.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.590

1    A.    Okay.

2    Q.    And an individual by the name of Bruce Hay, do you remember

3    that individual?

4    A.    Yeah, vaguely, uh-huh.

5    Q.    And you say "vaguely." How do you remember that particular

6    C&P examination?

7    A.    So I had the C&P scheduled, and we -- I was aware that

8    there was going to be potential for some video for that

9    evaluation to be recorded. And so I believe it was Agent Baker

10   that asked me before then if that was okay with me. I said

11   sure, I don't see any reason why not. And so that's how I

12   remember it.

13   Q.    And so was that unusual that the C&P examination of Mr. Hay

14   was video recorded?

15   A.    Yes.

16   Q.    Is that one of the reasons that it sticks out in your mind?

17   A.    Yes.

18   Q.    Now, did you even -- though this examination was video

19   recorded, did you treat it any differently than any of the

20   other C&P examinations that you do?

21   A.    No. It's the same. They have a template we use. I did

22   plenty of other mental health evaluations in the past, both

23   inside the VA, outside the VA, prior jobs. It's really the

24   same.

25   Q.    And you said that the examination was video recorded. Was

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.591

1   it also audio recorded?

2   A.   I believe so.

3   Q.   And do you know -- was the camera in the room with you

4   during the examination?

5   A.   So, yeah, I didn't know exactly where beforehand.  I knew

6   it was going to be set up somewhere.  But, yeah, I knew there

7   would be a mic, at least one camera, maybe a couple cameras, I

8   didn't know where.

9   Q.   Did Special Agent Baker or someone with VA-OIG take care of

10  that, of setting up the cameras and actually physically

11  recording the examination?

12  A.   Agent Baker did as far as I know, yeah.

13  Q.   You said that you treated this as any other C&P

14  examination.  Did you prepare a report based on that

15  examination?

16  A.   Yes.

17  Q.   I'm going to hand you --

18       MR. OAKLEY:  Your Honor, may I approach the witness?

19       THE COURT:  Yes.

20  BY MR. OAKLEY:

21  Q.   I'm going to hand you what's been marked as Government's

22  Exhibit 210.  And, Dr. Karr, can you look at that and tell me

23  if you recognize it.

24  A.   This is my report.

25       MR. OAKLEY:  Your Honor, I offer Government's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.592

 1   Exhibit 210-A.

 2           THE COURT:  210-A?

 3           MR. OAKLEY:  Yes.

 4           THE COURT:  Any objection?

 5           MR. MAGARIEL:  I'm sorry.  Your Honor, I need a

 6   moment.  I think I have an outdated exhibit list I'm looking

 7   at.  If I could just have one moment.

 8           MS. RAMSEY:  No objection.

 9           THE COURT:  210-A admitted.  You can publish.

10   BY MR. OAKLEY:

11   Q.  So, Dr. Karr, directing your attention to the top of the

12   report where it says title, date of note, the date of note is

13   May 3, 2017; is that correct?

14   A.  Yes.

15   Q.  And was that the date that the examination occurred?

16   A.  Yes.

17   Q.  And then if we could zoom out and just scroll through, I'm

18   not going to have you read all of this, but is this typically

19   what a C&P examination report looks like?

20   A.  Yes.

21   Q.  You said that there's a series of questions that you ask on

22   C&P examinations and you follow the standard protocol when you

23   conducted this examination?

24   A.  Yes, it's semistructured, but the headings here are the

25   general template, and then I can add subheadings like these --

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.593

1    the relationship like marriage, kids, family just to be more

2    specific and clear.

3    Q.   And in filling out that report, are you basing the report

4    on the answers that you get during the interview?

5    A.   Yes.

6    Q.   And since this interview was recorded, someone who watched

7    that interview would see the same thing that you did?

8    A.   Yes.

9         MR. OAKLEY:  Your Honor, at this time I ask for

10   permission to play Government's Exhibit 49 that's already been

11   admitted into evidence.

12        THE COURT:  Go ahead.

13        MR. OAKLEY:  Your Honor, before we do that, just for

14   the court's information, this video is about an hour and five

15   minutes.

16        THE COURT:  Okay.  So I need to ask, because we took a

17   slightly earlier break this afternoon, does anyone need a

18   break?  You said how long, an hour and 15 minutes?

19        MR. OAKLEY:  And hour and five minutes, Your Honor.

20        THE COURT:  That would take us right now to 5:00.  Can

21   we do that or do we need to take a break?  Anybody -- you need

22   to take a break?  No.  Anybody else need a break?  Okay.  Let's

23   do it and then we'll close with that.

24        MR. OAKLEY:  Your Honor, while this is playing, may I

25   be seated?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.594

1          THE COURT:  Yes.

2          MR. OAKLEY:  Your Honor, the audio and the video is

3   not synced.  Could we try and restart it to correct that?

4          THE COURT:  All right.  So that completes the playing

5   of this exhibit, correct?

6          MR. OAKLEY:  Yes, Your Honor.

7          THE COURT:  We'll resume with Dr. Karr's testimony

8   tomorrow morning at 9:00, and so we'll be in recess until 9:00.

9   Everyone be safe going home.

10         And reminder of the overnight admonition, to not

11  conduct any research, reading, and not communicate with anyone

12  about any of the issues in this case.

13         We'll see you at 9:00 in the morning.  Thanks.

14     (The following proceedings occurred outside the presence of

15  the jury.)

16         THE COURT:  We'll see you back at 9:00, Dr. Karr.

17  Thank you.

18         I'd like to check in to see how you're progressing.

19         MR. HUSCHKA:  We're about where we thought we would

20  be, Your Honor.

21         THE COURT:  So you're thinking maybe Monday?

22         MR. HUSCHKA:  Yes.  I think there's likely to be some

23  spill over, but nothing substantial.

24         THE COURT:  Okay.  And you, Ms. Ramsey, you've

25  subpoenaed your witnesses for Tuesday, correct, or for Monday?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.595

1         MS. RAMSEY:  I have some -- I'm just trying to keep

2    some for Monday so we don't have gaps.  But, yes, for Tuesday

3    for sure.

4         THE COURT:  All right.

5         MS. RAMSEY:  Hopefully I'll know more by Thursday or

6    Friday whether or not we can actually get people in on Monday

7    because, like I said, I've got some people in from out of town.

8         THE COURT:  Sure.  And we probably need to do an

9    instruction conference too, so maybe if there's some time on

10   Monday, we could at least do the informal part of it then and

11   then do a formal record after the close of all the evidence or

12   getting close to the close of all the evidence.  We'll see.

13   We'll make it work.

14        Have a good evening.  We'll see you at 9:00 tomorrow.

15   I'll be available at 8:30 if you need me.

16        (Recess taken at 5:08 p.m.)

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.596

1              C E R T I F I C A T E

2       I, Danielle R. Murray, a Certified Court Reporter and the

3   regularly appointed, qualified, and acting official reporter of

4   the United States District Court for the District of Kansas, do

5   hereby certify that the foregoing is a true and correct

6   transcript from the stenographically reported proceedings in

7   the above-entitled matter.

8       SIGNED 7th of February, 2023

9

                    /s/Danielle R. Murray
10                   DANIELLE R. MURRAY, RMR, CRR
                    United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.597

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2
     UNITED STATES OF AMERICA,      )
 3                                  ) Case No. 19-20044-JAR
              Plaintiff,            ) Circuit No. 22-3276
 4                                  )
     vs.                            )
 5                                  ) Kansas City, Kansas
     BRUCE L. HAY,                  ) Date:  4 August, 2022
 6                                  )
              Defendant.            ) Day 4 (Pages 446-614)
 7   ...........................
 8                    TRANSCRIPT OF JURY TRIAL
                 BEFORE THE HONORABLE JULIE A. ROBINSON
 9            SENIOR UNITED STATES DISTRICT COURT JUDGE

10
                      A P P E A R A N C E S
11
     FOR THE PLAINTIFF:
12
              Mr. Ryan Huschka
13            Mr. Christopher Oakley
              OFFICE OF THE UNITED STATES ATTORNEY
14            500 State Avenue
              Kansas City, Kansas 66101
15
     FOR THE DEFENDANT:
16
              Mr. David Magariel
17            Ms. Chekasha Ramsey
              OFFICE OF THE FEDERAL PUBLIC DEFENDER
18            500 State Avenue
              Suite 201
19            Kansas City, Kansas 66101

20

21

22

23

24   _____
              Proceedings recorded by machine shorthand,
25      transcript produced by computer-aided transcription.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.598

19-20044-JAR   USA v. BRUCE L. HAY   08.04.22          447

1                          I N D E X

2
       Government's Witnesses:                          Page

3
   CAROLYN KARR
4    Direct Examination by Mr. Oakley                   453
     Cross-Examination by Mr. Magariel                  455
5    Direct Examination by Mr. Oakley                   473
   DOLLY CHERIAN
6    Direct Examination by Mr. Huschka                  476
     Cross-Examination by Mr. Magariel                  481
7  SHANE OSTERHAUS
     Direct Examination by Mr. Huschka                  495
8    Cross-Examination by Ms. Ramsey                    504
   TIM MUGRAGE
9    Direct Examination by Mr. Huschka                  507
   LAUREN CLARY
10   Direct Examination by Mr. Oakley                   517
     Cross-Examination by Ms. Ramsey                    529
11   Redirect Examination by Mr. Oakley                 533
   MYRON STROUP
12   Direct Examination by Mr. Oakley                   535
     Cross-Examination by Ms. Ramsey                    541
13 RHONDA SNYDER
     Direct Examination by Mr. Huschka                  543
14   Cross-Examination by Ms. Ramsey                    552
   BERT SNYDER
15   Direct Examination by Mr. Huschka                  555
     Cross-Examination by Ms. Ramsey                    558
16 STACY MACOM
     Direct Examination by Mr. Oakley                   560
17   Cross-Examination by Mr. Magariel                  567
   JOE HUGHES
18   Direct Examination by Mr. Huschka                  582
   DAVID ELLIS
19   Direct Examination by Mr. Huschka                  586
   NATHEN HOWARD
20   Direct Examination by Mr. Huschka                  589
     Cross-Examination by Mr. Magariel                  593
21   Redirect Examination by Mr. Huschka                595
   YESSIKA ZARAZUA
22   Direct Examination by Mr. Oakley                   597

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.599

1                        E X H I B I T S

2    Government's
     Exhibits                Offered              Received
3
            26                590                  590
4           27                590                  590
            28                590                  590
5           31                509                  509
            36                509                  509
6           46                511                  512
            50                497                  497
7           52                513                  513
            53                501                  501
8           54                501                  501
            55                503                  503
9           65                503                  503
            71                551                  551
10          72                551                  551
            74                566                  567
11          75                557                  557
            77                557                  557
12          78                514                  514
            79                514                  514
13          80                514                  514
            81                514                  514
14         110                524                  524
           111                524                  524
15         112                524                  524
           113                524                  524
16         114                524                  524
           115                524                  524
17         116                525                  525
           117                525                  525
18         118                525                  525
           119                525                  525
19         120                525                  525
           121                525                  525
20         122                525                  525
           123                525                  525
21         124                525                  525
           125                525                  525
22         126                525                  525
           127                525                  525
23         128                525                  525
           129                525                  525
24         130                525                  525
           131                525                  525
25         132                525                  525
           133                525                  525

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                            2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.600

| | | | |
|---|---|---|---|
| 1 | 134 | 519 | 519 |
| | 135 | 528 | 528 |
| 2 | 136 | 528 | 528 |
| | 137 | 528 | 528 |
| 3 | 138 | 528 | 528 |
| | 139 | 528 | 528 |
| 4 | 140 | 528 | 528 |
| | 141 | 528 | 528 |
| 5 | 142 | 528 | 528 |
| | 143 | 528 | 528 |
| 6 | 144 | 528 | 528 |
| | 145 | 528 | 528 |
| 7 | 146 | 528 | 528 |
| | 147 | 528 | 528 |
| 8 | 148 | 528 | 528 |
| | 149 | 528 | 528 |
| 9 | 150 | 528 | 528 |
| | 151 | 528 | 528 |
| 10 | 152 | 528 | 528 |
| | 153 | 528 | 528 |
| 11 | 154 | 528 | 528 |
| | 155 | 528 | 528 |
| 12 | 156 | 528 | 528 |
| | 157 | 528 | 528 |
| 13 | 158 | 528 | 528 |
| | 159 | 528 | 528 |
| 14 | 160 | 528 | 528 |
| | 161 | 528 | 528 |
| 15 | 162 | 528 | 528 |
| | 210B | 481 | 481 |
| 16 | 300 | 607 | 607 |
| | 301 | 608 | 608 |
| 17 | 302 | 609 | 610 |
| | 304 | 610 | 610 |
| 18 | 308 | 611 | 611 |
| | 309 | 612 | 612 |
| 19 | 325 | 536 | 536 |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.601

```
1                    P R O C E E D I N G S

2        (The following proceedings occurred outside the presence of

3    the jury.)

4            THE COURT:  Good morning.  Something you'd like to

5    take up?

6            MS. RAMSEY:  Yes, Your Honor, two things.  We

7    anticipate the government may seek to admit I think Exhibit 74,

8    and I made this objection at the limine conference, but the

9    court had not I think had a period of time to look at it.

10           This is a video I believe that was taken as a part of

11   surveillance in 2001 -- I'm sorry, 2021, allegedly of my client

12   on top of a roof engaging in activities, I think repairing a

13   roof.  We made the argument then that we believe that it's

14   irrelevant because it's outside the scope and time frame of the

15   indictment, therefore overly prejudicial and gives no probative

16   value to the government's case.  So we would just renew that

17   objection.

18           THE COURT:  All right.  Based on the evidence I heard

19   thus far, I do think it's relevant.  For one thing Mr. Hay

20   submitted paperwork or requested total and permanent

21   disability.  And so -- and as I said in ruling on it before, he

22   also presents here in the courtroom with tremor or indications

23   that the condition is ongoing, so I do think the evidence

24   concerning more recent events or his more recent condition is

25   relevant.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.602

1        So I'll note the objection for the record.  It is

2   overruled and considered a continuing objection to the extent

3   there's questions about this particular video.

4        MS. RAMSEY:  Thank you, Your Honor.  We have one

5   further issue.

6        MR. MAGARIEL:  I think I need to raise the issue

7   because it happened during this last witness.  We filed in

8   Document 80 a motion *in limine*.  There was in paragraph 8 -- we

9   asked that the government not submit any evidence to reference

10  allegations of child abuse.  In paragraph 10 we asked that the

11  government not put forward any evidence about Mr. Hay attending

12  anger management classes.  In paragraph 11 we asked there not

13  be any message of parenting classes.

14        Yesterday Exhibit 49 was played, a video of a C&P exam

15  involving Mr. Hay in 2017 in which a number of those items

16  remained in the video.  We did not object yesterday.  I think

17  that was probably our mistake.  Mr. Hay does not wish to waive

18  the issue.

19        We're asking the court to instruct the government not

20  to reference any parts of those video -- that video in further

21  witness questioning or argument.

22        THE COURT:  The only thing I heard was Mr. Hay talking

23  about going to anger management classes.  I don't remember -- I

24  remember that.  I don't remember hearing anything else that

25  referenced any other part of the limine ruling.  Was there some

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.603

1    mention of something else?

2         MR. MAGARIEL:  There was a discussion about I think an

3    allegation of child abuse, that SRS was involved, and I think I

4    remember the doctor said something like, was that unfounded,

5    and they were like, yes, it was unfounded.  But there was a

6    mention of an investigation.

7         THE COURT:  Oh, gosh, that went by me.  Frankly I had

8    some difficulty understanding Mr. Hay.  He was kind of

9    mumbling.  Some of it I didn't hear.  I'm not questioning that

10   didn't happen.

11        I will instruct the government.  So this particular --

12   what's the exhibit number?

13        MR. MAGARIEL:  I believe it's 49, Your Honor.

14        THE COURT:  This one we should not let go back to the

15   jury, and if they do want to rehear it, we'll have to talk

16   about redaction if we're going to allow them to rehear it.

17        And I'll further instruct the government to not

18   mention these subjects through examination of witnesses or

19   otherwise.

20        Okay.  Anything else?  And again, what exhibit number

21   was that?

22        MR. HUSCHKA:  That was 49.

23        THE COURT:  49.  So we need to take that out of JERS.

24        COURTROOM DEPUTY:  Okay.

25        THE COURT:  Okay.  All right.  We'll bring the jury

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.604

1  in.

2      (The jury entered the courtroom, after which the following

3  proceedings were had.)

4          THE COURT:  Dr. Karr, get her back on the stand.

5          You can be seated.

6                      CAROLYN KARR,

7  called as a witness on behalf of the government, having

8  previously been duly sworn, testified as follows:

9          THE COURT:  I'll remind, Dr. Karr, you're under oath

10  to tell the truth.

11          THE WITNESS:  Okay.

12                    DIRECT EXAMINATION

13  BY MR. OAKLEY:

14  Q.  Good morning, Dr. Karr.

15  A.  Good morning.

16  Q.  I think when we left yesterday, we had just watched the

17  video from the compensation and pension examination of the

18  defendant, correct?

19  A.  Yes.

20  Q.  First thing I'd like to do is go back to my questions

21  before that, and I think probably what will not go down in

22  history is the greatest moment in lawyering, I asked you a

23  question about a date.  I gave you the wrong date, and in

24  trying to clarify that, I gave you the wrong date again.

25  A.  Oh, wow.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.605

1    Q.   If we could bring up Government's Exhibit 210-A and clarify

2    what date this examination occurred.  And I'll hand you a paper

3    copy if that helps you.

4    A.   Sure.

5    Q.   What date was this examination?

6    A.   I believe it was on the earlier date, May 3rd.

7    Q.   This would be the date of the note?

8    A.   So I see them and then I get to take a couple days and kind

9    of, you know, review records and clean up, you know, sentence

10   structure and spell check and all that, and then it goes

11   into -- I sign it.  So I think I probably signed it on -- yes,

12   on May 5th.  So that's the second date.

13   Q.   Okay.  And so up here there's the date of note, May 3rd,

14   and entry date, May 5th.  And I think I relied on the entry

15   date in forming my question.

16   A.   Okay.

17   Q.   But the date of the interview was actually May 3rd of 2017?

18   A.   Yes, uh-huh.

19   Q.   Okay.  Was this the only time that you ever saw the

20   Defendant Bruce Hay?

21   A.   I believe so.

22   Q.   And, again, this examination was a benefits examination, a

23   C&P examination; is that correct?

24   A.   Yes.

25          MR. OAKLEY:  No further questions, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.606

```
1                        CROSS-EXAMINATION
2    BY MR. MAGARIEL:
3    Q.   Good morning, Dr. Karr.
4    A.   Good morning.
5    Q.   Am I correct that you had no memory of Mr. Hay other than
6    your notes and the video?
7    A.   Correct.  I believe I met him on May 3rd as far as I can
8    recall.
9    Q.   Right.  But before this trial, you interviewed him -- and
10   the government just clarified this -- back in 2017, five years
11   ago?
12   A.   Yes.
13   Q.   Before this trial did you have an independent memory of
14   that 2017 interview?
15   A.   Before this trial did I have independent memory?
16   Q.   So, for example, if the case agent would have reached out
17   to you and said you may be needed to testify at a trial
18   involving Bruce Hay, would you have responded back to him in an
19   e-mail and said, I have no memory of this person?
20   A.   No.  I remember the May 3 evaluation.
21   Q.   You remembered it independently?
22   A.   I remember there was a recording and that that was Bruce
23   Hay's evaluation.
24            MR. MAGARIEL:  Can I have a moment, Your Honor?
25            THE COURT:  Yes.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.607

1           MR. MAGARIEL:  May I approach, Your Honor?

2           THE COURT:  Yes.

3    BY MR. MAGARIEL:

4    Q.   Doctor, I'm handing you what's been marked as Defendant's

5    830.  Would you look at that for a moment, please.

6    A.   An e-mail.

7    Q.   Did you get a chance to look at that?

8    A.   Yeah.

9    Q.   And is that an e-mail from you to Case Agent Baker about

10   this case?

11   A.   Yes.

12   Q.   Does it help refresh your memory that as of, I think last

13   year, you had no independent memory of Mr. Hay?

14   A.   As of last year I don't think I recalled the name.  I

15   remember that there was something recorded, but I don't keep

16   names in my memory.

17   Q.   You sent an e-mail to the case agent when the case agent

18   reached out to you and said you may be a witness in this trial

19   and the trial involved Bruce Hay, and largely you wrote back

20   and said, I don't remember this person, I don't have any memory

21   of this; is that right?

22   A.   Yes.

23   Q.   But you're telling us now, once you've had a chance to

24   review the video, look at your notes, that helped spark your

25   memory?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.608

1   A.   Well, I remembered the evaluation because there was a

2   recording, and I've seen thousands of patients, so I think I

3   was just focusing on the name.

4   Q.   I understand.  This was, as you said, a C&P exam and that's

5   something that you frequently have done and do for the VA; is

6   that right?

7   A.   In that position, yes.

8   Q.   And I think you said, if I heard you correctly earlier,

9   that around the time that this happened back in 2017 you were

10  doing 17 a week; did I hear you right?

11  A.   Yes.

12  Q.   Math is not my strong suit, so that means you were doing

13  three or more every day?

14  A.   Yes.  Those were scheduled.

15  Q.   Were all of them similar to this one where it took an hour

16  or so?

17  A.   Yes.

18  Q.   To prepare for these C&P exams, do you look back at prior

19  medical records that are available to you?

20  A.   Yes, as much as possible.

21  Q.   So the records that the VA have in their system, is that

22  something that you have access to?

23  A.   Yes.

24  Q.   Have you had a chance to, I assume, recently review 210-A,

25  your C&P exam?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.609

1   A.   Yes.

2   Q.   And am I correct that some of the records that you reviewed

3   are almost kind of cut and pasted at the end of that document?

4   A.   Yes.   Those are meant as examples to support some of the

5   diagnoses I made.

6   Q.   So if I understand what you're saying, in a normal C&P exam

7   you are relying on what the person tells you in the interview

8   combined with prior interviews, prior evaluations; is that

9   right?

10   A.   Yes.

11   Q.   And so do you prepare in advance for these interviews?

12   A.   If I get a chance, I can.

13   Q.   I assume part of that preparation would be looking at these

14   old records that you've just discussed?

15   A.   Yes.

16   Q.   Is part of your preparation for the exam looking out the

17   window to see people walking in or walking out of C&P exams

18   with you?

19   A.   No.

20   Q.   I didn't hear in this particular interview, but do you

21   normally warn people that if they fail to disclose anything to

22   you, they could potentially be charged with a crime?

23   A.   That is not part of the C&P protocol.

24   Q.   I want to talk to you a little bit about your actual

25   interview with Mr. Hay.   Obviously we all got to hear it

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.610

1    yesterday.  I'm not going to repeat every part of it, but I

2    want to highlight a few things with you.

3        At the beginning of the interview there's kind of some back

4    and forth about the weather that day.  Do you remember that?

5    A.   Sure, some pleasantries.  That's common.

6    Q.   And it sounded like the weather wasn't great that day?

7    A.   I don't remember the weather.  I think it, from my

8    comments, may have been some rain or traffic or something like

9    that.

10   Q.   So you remember, and obviously we all heard yesterday,

11   there's some back and forth about the weather not being great

12   and that there was traffic for the Hays coming in; is that

13   right?

14   A.   I believe so.

15   Q.   Can you tell me where that office is located where the

16   interview happened?

17   A.   That was on the second floor.

18   Q.   What's the address of the building?

19   A.   I don't know the address.  It's on Linwood.  It's the

20   Kansas City VA Medical Center.

21   Q.   And is that on Linwood east of downtown Kansas City,

22   Missouri?

23   A.   My directions are not great.  I believe the mailing address

24   is Kansas City, Missouri.  So I believe it's in Kansas City,

25   Missouri.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.611

1    Q.   All right.  Fair enough.  Do you remember Mr. Hay telling

2    you that traffic and overpasses were something that were a

3    stressor or a trigger for him?

4    A.   Yes.  And part of the -- specifically part of the PTSD

5    symptoms that I was asking for, looking for, he mentions some

6    of that.

7    Q.   And do you remember Mr. Hay mentioning that he was a truck

8    driver in Iraq, and that's part of the reason why traffic is a

9    stressor for him?

10   A.   Yes.

11   Q.   I want to ask you some specific questions also about the

12   report that you created.

13        And if you'd be kind enough to display Government 210-A

14   again, please.

15        Dr. Karr, there should be a copy on the screen or in front

16   of you, whichever is easiest to reference, please go ahead.

17   They should be identical.

18   A.   Okay.

19   Q.   If we could go to the bottom of page 5, if you don't mind

20   highlighting those last few paragraphs, please, so we can see

21   them a little better on the screen.

22        Doctor, do you see those last two paragraphs that pick up

23   "with prior records"?

24   A.   Yes.

25   Q.   And do you remember Mr. Hay telling you that traffic is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.612

1   something that's a trigger for him.  He might see a random

2   truck, and overpasses are also things that are triggering for

3   him?

4   A.   Yes.

5   Q.   You also noted in that report that even sitting in traffic

6   was a trigger or stressful for him?

7   A.   Intrusive memories, I think it's under that section.

8   Q.   And what are intrusive memories?

9   A.   Well, in PTSD, intrusive memories in general are when

10  there's some kind of reminder of the traumatic event, and then

11  they all of a sudden have some sort of memory, feeling, some

12  intrusive experience that essentially reminds them that that

13  event occurred.  It can be accompanied by anxiety.  It cannot.

14  It depends on at that moment.

15  Q.   You mentioned both of these things as relevant to PTSD.

16  A.   Yes.

17  Q.   But obviously Mr. Hay had more than one diagnosis that you

18  were looking for that day; is that right?

19  A.   Correct.

20  Q.   So one was PTSD as you've mentioned; is that right?

21  A.   Yes.

22  Q.   But also had a diagnosis for conversion disorder; is that

23  right as well?

24  A.   Correct.

25  Q.   Are you familiar with conversion disorder?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.613

 1   A.   Yes.

 2   Q.   Can you give just a shorthand definition of what conversion

 3   disorder -- what you were looking for to confirm a diagnosis of

 4   conversion disorder in 2017?

 5   A.   Sure.  In general it's a motor or sensory symptom that

 6   arises.  It's not due to neurological condition or any other

 7   psychological condition.

 8   Q.   Is it in a category of disorders that may be even broader

 9   than this where you have sort of a physical manifestation of

10   something that is caused solely in the brain or mentally?

11   A.   I'm not sure what you mean by a category of disorders.

12   Q.   Are there a number of disorders that are similar to this

13   where someone will have some sort of physical symptom that

14   isn't caused by something you can see on an MRI or you can

15   see --

16   A.   There are some other disorders like that.

17   Q.   If we could turn to the next page, page 6, please.  If we

18   could highlight maybe those top two paragraphs.

19        We heard this in the report yesterday, but it sounds like

20   Mr. Hay mentioned traffic to you a few times, and you've noted

21   that as such in your report; is that right?

22   A.   Yes.

23   Q.   We talked about conversion disorder a moment ago, and you

24   said that these things you associate with PTSD.  Is conversion

25   disorder something that you normally see with someone having a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.614

1    comorbidity or some other issue that may be contributing to

2    that conversion disorder?

3    A.   When you just said these things relate to PTSD, what

4    exactly were you asking?

5    Q.   Sure.  I think I asked you some things that I defined as

6    stressors or triggers?

7    A.   The traffic, is that what you're referring to?

8    Q.   Yes.  And I don't think I said stressor or trigger for

9    PTSD.  I think I just said stressor or trigger.  If I heard you

10   correctly -- and if I didn't, please tell me.  I think you said

11   that these things were stressors or triggers for Mr. Hay's

12   PTSD.  Did I understand you correctly?

13   A.   Yes.  That part.  There was a long sentence where you

14   combined some things, so I was just trying to clarify what you

15   meant.

16   Q.   I'm sorry.  I don't always ask the best questions, and I

17   appreciate you asking me to clarify.

18   A.   No problem.

19   Q.   Could those things also be stressors or triggers for

20   conversion disorder?  And by those things, I mean the traffic,

21   the overpass, those types of things?

22   A.   We don't usually see that.  Sometimes it can bring it up.

23   In my report the area that was near -- under the anxiety

24   heading, that was what I was looking for, for the conversion

25   disorder.  That's what I think of most when I think of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.615

1    conversion disorder.

2    Q.   Things that cause anxiety?

3    A.   Well, the things he said specifically.  So he had some

4    thrashing and some abnormal movements, and we don't usually see

5    what he described as a result of -- I think I asked the

6    question, you know, is he stressed or anxious.  And so he gave

7    that response, and it's mostly these -- the hands fold in, the

8    muscles contract, can't move them, those things are -- they

9    sound sort of seizure-like, but yet there's no substantiation

10   of seizures in the medical record.

11   Q.   But if I understood earlier, conversion disorder, there

12   isn't a physical manifestation for the effects of it?

13   A.   No.  I said the definition is a sensory or motor symptom

14   that arises not due to a neurological condition or another

15   psychological condition.

16   Q.   Okay.  I don't entirely understand.  So I want to make sure

17   I do.

18   A.   Sure.

19   Q.   Someone with conversion disorder, would you expect to be

20   able to do an imaging of their brain and have a neurologist or

21   some other qualified person say, a-ha, I see an abnormality?

22   A.   Not to see a conversion disorder, correct.

23   Q.   Okay.  But to see something in the brain that's abnormal

24   that might have caused the conversion disorder?

25   A.   No.  That would be -- if there was something that came up

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.616

1   on imaging or an EEG or something like that, that would be a

2   neurological condition.

3   Q.   Okay.  And so part of the reason why someone might do

4   imaging or an EEG, as you just described, is to find out if

5   whatever symptom you're seeing is caused by a neurological

6   condition?

7   A.   Yeah.  Neurological tests measure to see if there's a

8   neurological condition there.

9   Q.   And so -- if this isn't your experience, I guess tell me,

10  but when someone makes a diagnosis of conversion disorder, they

11  often rule out other causes of whatever symptoms they're

12  seeing?

13  A.   Yes, as much as possible.

14  Q.   So the reason you would do the imaging or the brain scan

15  that you've just discussed is to rule out those type of causes?

16  A.   To see if there's a neurological condition there, true.

17  Q.   And I think you told me earlier that sometimes in

18  conversion disorder cases they'll have a comorbid issue like

19  PTSD or some sort of other prior trauma in their life?

20  A.   There can be.  There's some research -- I was just

21  reviewing this last week.  There's some research that shows

22  that 50 to 55 percent of people with conversion disorder have

23  some kind of traumatic experience in their past.

24  Q.   And I heard you say you did research on this last week.  Is

25  your expertise in conversion disorders?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.617

1   A.   No.  I was just curious.

2   Q.   Knew you had this trial coming up?

3   A.   Well, it's been on my calendar of course.

4   Q.   Of course.  Understandable.

5        Let's talk a little bit about what you knew about Bruce's

6   military background when you did this.

7        If we could expand.  I think we're on page 6, but take off

8   that focused-in paragraph.

9        Am I correct that one of the prior VA exams that you

10  reviewed was by Dr. Medvedeva?

11  A.   Yes.

12  Q.   And kind of in the middle of that page I see it says "the

13  following was reported by Dr. Medvedeva."

14  A.   Yes.

15  Q.   Do you see that kind of in the middle?

16  A.   Yes.

17  Q.   And so you knew that Mr. Hay was an Army veteran?

18  A.   Yes.

19  Q.   And you knew that he had served eight months in Iraq in

20  2004 and 2005?

21  A.   Yes.

22  Q.   And you knew from that prior evaluation before you walked

23  in that fireworks were one thing that were a stressor or

24  trigger for him?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.618

1   Q.   And you knew from this prior report that one of the

2   things -- actually I think Mr. Hay told you this, that one of

3   the things that he does to try to drown out the nose of

4   fireworks is he'll turn the music up loud.  Do you remember him

5   telling you that?

6       I don't think it's in your report, but I think he told you

7   that in the interview.  Do you remember that?

8   A.   I don't recall that specifically.  That's common.  Veterans

9   often do that to try to cope with the symptoms.

10  Q.   So you've seen other veterans that are triggered by

11  fireworks?

12  A.   Absolutely.

13  Q.   It's the boom that's associated with it I think that is a

14  problem for them?

15  A.   It's usually, not always, but usually it's a loud noise

16  coming out of nowhere that's unexpected.

17  Q.   You've heard other veterans -- if Mr. Hay didn't say in the

18  interview, you've heard other veterans say, I turn up the music

19  real loud and that helps drown out the noise?

20  A.   Yes.

21  Q.   The unpredictability of it, is that what they complain

22  about it?

23  A.   Some do and some don't.  It just depends.

24  Q.   You also knew that Mr. Hay had been in a pretty serious,

25  serious car accident; is that right?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.619

1   A.   Yes.

2   Q.   You knew that from prior reports?

3   A.   Yes.  It said he had a car accident in the military.

4   Q.   You knew from reviewing prior reports that Mr. Hay's

5   daughters were also involved in that accident?

6   A.   I believe that was mentioned, yeah.

7   Q.   Did you know -- well, you know to some extent that Mr. Hay

8   has met with a lot of doctors since that accident in 2005; is

9   that right?

10   A.   Yeah.  There were several notes in the chart.

11   Q.   So in the chart you know that Mr. Hay had seen a

12   Dr. Sharpnack; is that right?

13   A.   Yes.

14   Q.   Do you know Dr. Sharpnack?

15   A.   No.

16   Q.   Okay.  Do you know Dr. Sharpnack is a psychologist at the

17   VA?

18   A.   I don't recall that.

19   Q.   On page 6?

20   A.   I see Dr. James Sharpnack, but I don't know personally.

21   There are a lot of psychologists that work for the VA.

22   Q.   I'm sure.  I understand.  And on page 7 you know that

23   Mr. Hay had previously seen a Dr. Kindling; is that right?

24   A.   Yes.

25   Q.   And you know from page 8 that Mr. Hay had previously seen a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.620

 1   nurse practitioner named Keefer?

 2   A.   Yes.

 3   Q.   Could we turn to page 8 on that exhibit, please.

 4        In the middle if you could highlight -- it's -- the

 5   formatting is a little strange on there, but if you could

 6   highlight the middle third -- thank you.  That's perfect.

 7        Is this the section that was written by nurse practitioner

 8   Keefer?  I know I cut that off on this, but --

 9   A.   Yes, uh-huh.  This part about -- the only time that

10   seizures are mentioned, he says himself he doesn't have

11   seizures, that quote?

12   Q.   Yes.

13   A.   Yes.

14   Q.   And then I didn't go as far as I wanted to.

15        Yes.  And then right, I think, after that part that you

16   read, do you see there where it says "wife/PT," do you take

17   that to mean patient, "PT" there in the middle towards the

18   bottom?

19   A.   I believe that's her shorthand.

20   Q.   Yeah.  Do you assume that means patient?

21   A.   I'm guessing.

22   Q.   Do you see where it says -- says is typical because he had

23   an attack in the office, but that -- either some combination of

24   wife and patient says sometimes he's normal and sometimes he

25   has these spasms.  Did you see that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.621

1    A.   I saw that.

2    Q.   You knew that before you interviewed Mr. Hay that day?

3    A.   I don't remember if I -- if I looked at this particular

4    passage before the interview or if it was while I was

5    completing the report.

6    Q.   Okay.  It's been five years?

7    A.   Absolutely.

8    Q.   Hard to remember that stuff.

9    A.   Why would I remember?

10   Q.   Of course.

11   A.   No one can remember that.

12   Q.   You've done a lot of these.

13        You also knew from page 13, and I think Mr. Hay actually

14   mentioned this, that Mr. Hay had been to counseling with a

15   Dr. Moffitt because I think in the interview you said, oh, that

16   name is familiar.  Do you remember that --

17   A.   There were some parts where I couldn't make out what I said

18   and/or what he said.  I don't know if it was a video-mic thing

19   or what.  Can you point out where in the report I say that?

20   Q.   On page 13 it mentions Dr. Moffitt.  I think these are also

21   in prior notes that you may or may not have reviewed in

22   advance, but reviewed at some point.

23   A.   Okay.  The wife stated that he saw Dr. Moffitt for a little

24   while, but that wasn't helping so he stopped.  Is that the part

25   you're talking about?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.622

1   Q.   Yes.  You don't remember hearing on the audio that --

2   A.   I remember him talking about therapy.  I didn't remember

3   the name in particular, but, yeah, that he had seen -- and I

4   think I assumed therapy, but it could have been potentially for

5   this citalopram, I didn't get that.

6   Q.   I want to talk to you a little bit about how Mr. Hay

7   presented himself to you.  Did you get the impression Mr. Hay

8   was trying to win you over in that interview?

9   A.   Win me over how?

10  Q.   By saying things like "I hate people."

11  A.   I take that as a symptom of some, you know, issues with

12  relationships, mood regulation, things like that.

13  Q.   Okay.  He said that a few times?

14  A.   He did.

15  Q.   And told you he has a hard time getting along with people?

16  A.   Yes.

17  Q.   And even told you about a time he got into an argument with

18  this preacher and she threatened to call the police?

19  A.   Yes.

20  Q.   You took it as a symptom, a symptom of what?

21  A.   PTSD, depression, either or both of those.

22  Q.   That's what you ascribed those comments to?

23  A.   Well, frustration, agitation, isolation, kind of general

24  negative comments about others, those could be part of either

25  or both of those disorders.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.623

1    Q.   Let's go back to your exhibit -- or your report for a

2    moment.  If we could display Exhibit 210-A, page 5.

3         There's a lot of text on this page.  That big chunk of text

4    there in the middle, if we could highlight that, please, that

5    starts with "anxiety."  Thank you.

6         Do you remember Mr. Hay telling you that he has bigger

7    episodes once or so a month?

8    A.   Yes.  Of this kind of shaking and folding the muscles and

9    all that, yes.

10   Q.   You asked Mr. Hay some questions about work.  For example,

11   I think you just asked Mr. Hay, you're not working right now,

12   are you?  Do you remember him responding that he plays around,

13   if you want to call it that, and he tries to stay active?

14   A.   I do recall that.

15   Q.   And do you remember that you asked for a little

16   clarification about what playing around meant and he talked

17   about going around on the farm and dinking around?

18   A.   Yes.

19   Q.   Do you remember at some point in the audio that I think

20   maybe Mrs. Hay volunteered that Mr. Hay would sometimes need to

21   go out to his shop on the farm?

22   A.   Yes.

23   Q.   Do you remember Mr. Hay also telling you that he has

24   smaller episodes several times a week that might cause cramping

25   or other smaller problems for him?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.624

1    A.   Smaller episodes.  I didn't recall the several.

2    Q.   I think it starts with maybe the sixth or seventh line

3    there.

4    A.   I'm reviewing it now.  "Weekly...even the little ones...my

5    arms or my legs will cramp up...some weeks may be only one

6    time."  And then he talks about July 4th.  You figure at that

7    time it would be daily.  And then bigger, once a month, maybe

8    twice.

9    Q.   It sounded like you knew there was another interview for

10   Mr. Hay after yours; is that right?

11   A.   Yeah.  I knew he had another examination that day.

12   Q.   And you said something to him toward the end like you've

13   got a physical examination next and you've got to, you know,

14   get over to wherever that is, something like that?

15   A.   Yeah.

16        MR. MAGARIEL:  Judge, can I have just one moment?

17        THE COURT:  Sure.

18        MR. MAGARIEL:  That's all I have.  Thank you, Doctor.

19                  DIRECT EXAMINATION

20   BY MR. OAKLEY:

21   Q.   Mr. Magariel asked you about comments that the defendant

22   said and whether or not he was trying to win you over.  And

23   then there was a discussion about things he said about hating

24   people and that sort of thing.

25   A.   Uh-huh.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.625

1   Q.   He said that to you frequently during that interview,

2   didn't he?

3   A.   Yes.

4   Q.   In fact, he said it unprompted.  In other words, you were

5   asked a question about one thing, and he kind of throws that

6   in.  Is that your recollection?

7   A.   Yes.

8   Q.   And oftentimes was it in response to a question you asked

9   or did it just seem like he wanted to make sure to plug that in

10  there?

11  A.   Either/or.

12  Q.   The -- Mr. Magariel asked you about other medical

13  professionals that had involvement with the defendant?

14  A.   Yes.

15  Q.   And for instance, he asked you about Dr. Kindling and

16  Medvedeva and whether or not you reviewed records related to

17  those two medical professionals?

18  A.   Yes.

19  Q.   Part of what you looked at were benefits examinations

20  conducted by other professionals, correct?

21  A.   Correct.

22  Q.   Do you recall Kindling?  Was that a C&P examination, in

23  other words a benefits examination that you relied on for the

24  prior medical records?

25  A.   I don't recall which it was.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.626

1   Q.   How about Medvedeva?  Do you remember if that was a

2   benefits examination that you relied on in order to gather

3   information from?

4   A.   I don't recall that either.

5   Q.   Another thing that Mr. Magariel asked you about on

6   cross-examination was the statement of tinkering out on the

7   farm.  Do you remember that?

8   A.   Yes.

9   Q.   In fact, during the interview when you prompted the

10   defendant, what do you mean, he said, I watch the cattle,

11   correct?  Did you remember that?

12   A.   Part of it, yes.

13   Q.   And something about he also has chickens?

14   A.   He mentioned chickens, yeah.

15   Q.   And that was in response to your question, what do you mean

16   when you say you tinker?

17   A.   Yeah, we were talking about the farm at that point.

18          MR. OAKLEY:  No further questions, Your Honor.

19          THE COURT:  Anything more?

20          MR. MAGARIEL:  Nothing of this witness, Your Honor.

21   Thank you.

22          THE COURT:  Dr. Karr, you can step down.

23          Call your next witness.

24          MR. HUSCHKA:  United States calls Dolly Cherian.

25          MR. OAKLEY:  Your Honor, she's in the restroom.  She's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.627

1    on her way.

2          THE COURT:  Okay.  Anyone else need a break?

3                          DOLLY CHERIAN,

4    called as a witness on behalf of the government, having first

5    been duly sworn, testified as follows:

6                          DIRECT EXAMINATION

7    BY MR. HUSCHKA:

8    Q.   Good morning, Ms. Cherian.

9    A.   Good morning.

10   Q.   Could you state your full name for the record and tell us

11   where you live.

12   A.   Dolly Cherian.  I live in the Kansas City metro area.

13   Q.   And what do you do for a living?

14   A.   I'm a nurse practitioner at the Kansas City VA.

15   Q.   How long have you been with the VA?

16   A.   I've been with the VA full-time since 2015.  Prior to that

17   I've been working with the VA since 2016 on and off as an

18   agency nurse.

19   Q.   So what sort of duties and responsibilities do you have in

20   your work with the VA?

21   A.   You're talking about my current position?

22   Q.   Let's start back in 2006 and work forward from there.

23   A.   Okay.  In 2006 I worked as an R.N. as an agency nurse for

24   the Kansas City VA, so basically I floated from different

25   departments based on the needs.  Then I graduated, got my nurse

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.628

1  practitioner in 2008, and I started off in October of 2013 as a

2  fee basis employee in comp and pen.  2015 I was offered a

3  full-time position which I took as a comp and pen examiner.

4  Q.   And so a comp and pen examiner.  We've heard about C&P

5  examinations; is that what you're referring to?

6  A.   Yes, sir.

7  Q.   What is a C&P examination?

8  A.   A C&P examination basically is a disability exam that is

9  done based on the request that we get from the regional office.

10 So there are different kinds of -- there's an original, which

11 is assessing a disability that a veteran has sustained during

12 his military service.  So basically our job is to verify the

13 diagnosis and provide the functional disability that the

14 veteran has related to that particular established diagnosis.

15     The second kind is for an increase, if there's an increase

16 in their functional disability which is already an established

17 service-connected condition.  And the other kind is like a

18 review where the regional office would like to know what's

19 going on with this chronic condition, whether it's increased or

20 whether things have changed from the original.

21 Q.   So when you say "regional office," are you referring to the

22 Veterans Benefits Administration?

23 A.   Yes.

24 Q.   And so are these C&P examinations benefits examinations?

25 A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.629

1   Q.   How do you obtain the information during the C&P

2   examination?

3   A.   We look through the request first that the regional office

4   sends us asking us what we are supposed to assess the veteran

5   for.   And we obtain the information from their medical records

6   that the regional office provides, which is called a C-file,

7   and any of the other medical records that is available to us,

8   and of course the veteran's statements with regards to...

9   Q.   Are there different types of C&P examinations, for example,

10  neurological examinations?

11  A.   Yes, sir.   So we have a psychologist that does mental

12  health, we've got a neurologist that does the TBIs, and we've

13  got us, the nurse practitioners/doctors who do the medical

14  portion of it, and we also do have registry exams like for

15  Agent Orange and other exams of that sort.

16  Q.   So as part of the type of C&P examinations that you

17  conduct, are you asking the veteran questions during that

18  examination?

19  A.   Yes, sir.

20  Q.   And are you also making your own observations and sort of

21  seeing the level of functionality?

22  A.   Yes, sir.

23  Q.   Do you recall a C&P examination with Bruce Hay on May 3,

24  2017?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                                2:19-cr-20044-JAR
                                                              USA v. Bruce L. Hay
                                                              ROA - Volume 3, p.630

1   Q.   What facility did you see Mr. Hay at?

2   A.   At the Kansas City VA.

3   Q.   Was that examination with Mr. Hay recorded?

4   A.   Yes, sir.

5   Q.   Did you know that it would be recorded in advance?

6   A.   Yes.  I was told the exam would be recorded, and I was

7   asked permission to do so, which I did provide them.

8   Q.   Did that change anything about the way you conducted the

9   exam?

10  A.   No, sir, because I did not even know where they put the

11  cameras.  I was just told that the exam would be recorded, and

12  I was asked if I had the permission to -- that I gave consent

13  basically, and I did, and the attachment of the camera was done

14  at a time when I was not even there in the building.

15  Q.   Have you seen a recording of the examination?

16  A.   Yes.

17  Q.   Did you have any contact with Mr. Hay after the examination

18  that day?

19  A.   No, sir.

20       MR. HUSCHKA:  Your Honor, at this time I would ask to

21  publish Government's Exhibit 49 for the jury, and like the last

22  video -- it's a little shorter, but it's almost an hour long.

23       THE COURT:  So we'll finish about 10 'til 11:00.

24       MR. HUSCHKA:  Sorry.  I was answering one question for

25  Bonnie quickly.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.631

```
 1            COURTROOM DEPUTY:  It's 48.

 2            THE COURT:  Does anyone think they'll need a break

 3  before -- will it be -- we'll finish about 10:45 or 10:50?  Is

 4  that good for everyone?

 5            Okay.  Proceed.

 6            MR. HUSCHKA:  Your Honor, may I be seated while the

 7  video plays?

 8            THE COURT:  What's the exhibit again?

 9            MR. HUSCHKA:  I said 49.  I should have said 48.

10            THE COURT:  Is this already admitted?

11            MR. HUSCHKA:  It is, Your Honor.

12            THE COURT:  Okay.  Go ahead.

13            All right.  Let's take -- I'm sorry.

14            MR. HUSCHKA:  I think we're on the exact same page,

15  Your Honor.

16            THE COURT:  Let's take a recess until 11:00.

17       (Recess taken at 10:43 a.m.)

18       (The jury entered the courtroom, after which the following

19  proceedings were had.)

20            THE COURT:  You can be seated.

21  BY MR. HUSCHKA:

22  Q.  Ms. Cherian, shortly after the examination or during the

23  examination, were you completing a report for the examination?

24  A.  Yes, sir.

25            MR. HUSCHKA:  May I approach, Your Honor?
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.632

1          THE COURT:  Yes.

2    BY MR. HUSCHKA:

3    Q.   I'm handing you what's been marked as Government's

4    Exhibit 210-B.  Do you recognize that?

5    A.   Yes.  That is the DVD that I had to fill for the particular

6    request for the regional office for the veteran.

7          MR. HUSCHKA:  Move to admit Government's

8    Exhibit 210-B.

9          THE COURT:  Any objection?

10         MR. MAGARIEL:  No, Your Honor.

11         THE COURT:  210-B admitted.  You can publish.

12   BY MR. HUSCHKA:

13   Q.   Can you pull up the first page, please.

14         At the very top there's a date on the left that says date

15   of note?

16   A.   Yes, sir.

17   Q.   Was that the date of the examination?

18   A.   Yes, sir.

19   Q.   And then entry date on the right, is that the date that

20   this report was submitted?

21   A.   Yes.

22         MR. HUSCHKA:  No further questions, Your Honor.

23                    CROSS-EXAMINATION

24   BY MR. MAGARIEL:

25   Q.   Good morning.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.633

1   A.   Good morning.

2   Q.   I want to talk to you for just a moment about the location

3   of where you did that interview that we just watched.

4   A.   Yes, sir.

5   Q.   Is that the VA in Kansas City?

6   A.   Yes, that is the Kansas City VA.

7   Q.   And just sort of orienting where it is in Kansas City, is

8   it east of downtown Kansas City, Missouri?

9   A.   I'm not --

10  Q.   That's okay.  Is it just south of I-70?

11  A.   I don't know -- yes, it is.

12  Q.   Okay.  All right.  Did your thinking help you know whether

13  it was east of downtown Kansas City or you're not sure?

14  A.   I'm not sure.  I'm not very good at GPS and mapping and so

15  forth.

16  Q.   Okay.  I understand.  No problem.  During the interview I

17  heard I think maybe Ms. Hay said to you when they drove in, it

18  took over an hour; do you remember that?

19  A.   Yes, sir.

20  Q.   Do you remember some discussion about the weather not being

21  great, it raining, and there being bad traffic because of that?

22  A.   Yes.

23  Q.   I want to talk to you for just a little bit about the

24  purpose of this examination.  So this is I think generally

25  referred to as C&P exam; is that right?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.634

1    A.    Yes.

2    Q.    As part of your preparation for this, do you review prior

3    records related to a patient?

4    A.    Yes, we do.  If we have the ability to review the chart

5    ahead, we do as much as we could, but after the exam also we

6    take the time to make sure we got all our information in prior

7    to submitting it.

8    Q.    We heard from another witness, I think during this trial,

9    that did these.  Is this something that at the time back in

10   2017 you were doing frequently?

11   A.    Yes, sir.

12   Q.    Were you doing them, like, every day?

13   A.    Yes.

14   Q.    And often more than one a day?

15   A.    Yes.

16   Q.    I assume at this point you've done hundreds, if not

17   thousands of these?

18   A.    Done quite a few, yes.

19   Q.    And then obviously you review medical records related to

20   the patient, and as we've just seen, you interview the patient;

21   is that right?

22   A.    Yes, sir.

23   Q.    At some point towards the end there was a physical

24   examination you also do; is that right?

25   A.    Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.635

1   Q.  Do you remember explaining to Mr. Hay, and maybe this is

2   your common practice, what you're doing during this interview?

3   A.  I think I did in the beginning.

4   Q.  Yeah, at the beginning you said something to the effect of,

5   I'm filling out this form, I have a number of questions for

6   you, I'll ask you questions.  I think you said you'll type in

7   the answer or something along that line; is that right?

8   A.  Yes.

9   Q.  I assume that's maybe a common introduction you give before

10  you do these?

11  A.  Yes.

12  Q.  I want to talk to you a little bit about the purpose of the

13  interview.  Do you still have Government's Exhibit 210-B there

14  in front of you?

15  A.  Yes, sir.

16  Q.  Can we display that exhibit, please.

17      And I think what you have in front of you is the same as

18  what's on the screen?

19  A.  Yes.

20  Q.  Whichever is easier for you to refer to, please do.

21      If we could highlight the top section of that, please, so

22  we could see that a little more clearly.

23      So there at the top I see a title.  It says "C&P consult";

24  is that right?

25  A.  Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.636

1   Q.   And then sort of centered there at the top it says "Seizure

2   Disorders (Epilepsy) Disability Benefits Questionnaire"; is

3   that right?

4   A.   Yes, sir.

5   Q.   So if I understand these C&P exams, they're different forms

6   that you use based on sort of the general problem that a

7   particular patient has; is that right?

8   A.   That is correct.

9   Q.   And so in this particular case you used the form for

10  seizure disorders?

11  A.   Yes.

12  Q.   And I guess epilepsy is an example of a seizure disorder

13  there; is that right?

14  A.   Yes, sir.

15  Q.   Okay.  Thank you.

16       Do you remember during the interview Mr. Hay telling you he

17  doesn't have a seizure disorder?

18  A.   Yes.

19  Q.   And I think when you filled out this form -- and I think

20  this is on page 2 and 3 -- you checked "no" related to seizure

21  disorder; is that right?

22  A.   That is correct.

23  Q.   And I assume that's based at least part on the fact that

24  Mr. Hay said, I don't have a seizure disorder?

25  A.   That is correct, and plus the review of records too.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.637

1    Q.   And I heard at some point you also asked Mr. Hay about

2    whether he had hemorrhoids or not; is that right?

3    A.   Uh-huh.

4    Q.   I assume that's based on prior information you had reviewed

5    before --

6    A.   Yes.   That was a form that was filled for aid and

7    attendance, so basically we review their past medical history

8    and see what is current and what is not.

9    Q.   Okay.   And if I understood correctly, Mr. Hay said, I've

10   never had hemorrhoids, I don't know why that's on there; is

11   that right?

12   A.   Yes.

13   Q.   I want to talk to you a little bit about some of the

14   symptoms that Mr. Hay described to you during this interview.

15   I won't talk about all of them.   We just watched the video, but

16   I do want to highlight a few of them with you.

17        You obviously asked him a few different ways about his

18   symptoms; is that correct?

19   A.   That is correct.

20   Q.   And at one point did Mr. Hay tell you that he was having a

21   little quiver right now?

22   A.   I don't recall.

23   Q.   Would it help if I provided you a transcript of that video

24   that you just watched to refresh your memory about whether

25   Mr. Hay said something like that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.638

```
 1   A.   Sure.

 2            MR. MAGARIEL:  May I approach, Your Honor?

 3            THE COURT:  Yes.

 4   BY MR. MAGARIEL:

 5   Q.   I'm sorry about the formatting on this.  I know it's a

 6   little hard to read.  But I'm handing you a copy of the

 7   transcript of the interview that we just watched.  Whatever

 8   time you need to orient yourself to that, please take your

 9   time.

10       Did you get a chance to look at the formatting of that?

11   A.   Yeah.

12   Q.   I see there's four pages on every page, I think?

13   A.   That is correct.

14   Q.   If you could turn to what is page -- the page that starts

15   with page 10.  I think it's the fourth page of that actual

16   document.

17   A.   Uh-huh.

18   Q.   Do you see it has page 10, and then below it 11, and then

19   up in the corner 12, and then in the bottom right-hand corner

20   13.  Do you see how that order is?

21   A.   Uh-huh.

22   Q.   On page 11, lines 14 and 15, and please feel free to read

23   above and below if that helps you get context of that part of

24   the interview.

25       Does that help refresh your memory that Mr. Hay told you he
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.639

1    had a little quiver right now?

2    A.   I see that, yeah.

3    Q.   Okay.  And I think it's in the same general area of the

4    transcript, but do you remember asking Mr. Hay to describe in

5    more detail how often he has these type of symptoms?

6    A.   Uh-huh, yes.

7    Q.   And did he tell you that it gets really bad once or twice a

8    month; does that sound right?

9    A.   Yes.

10   Q.   And did he also tell you that sometimes he has smaller

11   symptoms, shaking and similar reactions once or twice a week?

12   A.   Yes.

13   Q.   Do you remember asking -- and this is in a completely

14   different part of the interview -- Mr. Hay, if he had a trigger

15   that caused his episodes?

16   A.   Yes.

17   Q.   Did he tell you that there are what he called telltale

18   signs that something is about to happen?

19   A.   Uh-huh.

20   Q.   Is that yes when you say uh-huh?

21   A.   Yes.  Sorry.

22   Q.   That's okay.  I'm trying to help our court reporter.  It's

23   hard to type that answer.

24        And he also told you that there's certain things that he

25   knew set him off.  He mentioned fireworks, war movies, and bad

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.640

1    traffic; is that right?

2    A.   That is correct.

3    Q.   Do you also remember him mentioning sitting too long in one

4    position can set him off?

5    A.   Yes.

6    Q.   I want to talk to you a little bit about your discussion

7    with Mr. Hay about his abilities, and it seemed like you had a

8    form where you were going through a list of different things

9    that the patient may or may not have been able to do.  Am I

10   correct that that was a form you were going through?

11   A.   Yes, that is correct.

12   Q.   And so, for example, one of the things you asked Mr. Hay

13   about was whether he could drive or not; is that correct?

14   A.   That is correct.

15   Q.   And Mr. Hay told you that he drove some?

16   A.   Yes, he did.

17   Q.   And he also was I think a little more specific and said he

18   drove short distances?

19   A.   That is correct.

20   Q.   And he said his wife was the one who would drive the longer

21   distances?

22   A.   That is correct.

23   Q.   Did you ask Mr. Hay about whether he was able to bathe

24   himself?

25   A.   Yes, I did.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.641

1    Q.    And he told you for the most part he could?

2    A.    Yes.

3    Q.    And I think he was even more specific and said some days he

4    can touch his toes and other days it ain't happening; is that

5    right?

6    A.    Yes.

7    Q.    And it was one of the questions that you asked Mr. Hay,

8    whether he could dress himself?

9    A.    Yes.

10   Q.    And Mr. Hay told you that he could put his shirt and pants

11   on, but some days he had difficulty putting on his shoes and

12   socks?

13   A.    Yes.

14   Q.    And is one of the questions that you asked Mr. Hay was

15   whether he could feed himself?

16   A.    Yes.

17   Q.    Did he tell you most of the time that he could?

18   A.    Yes.

19   Q.    And I think in the similar area, you asked him questions

20   with regards to food preparation; is that right?

21   A.    Yes.

22   Q.    I think he said basically he was capable of doing it, but

23   he preferred not to?

24   A.    Yes.

25   Q.    And you asked him some questions about his ability to use

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.642

1   the bathroom; is that right?

2   A.   Yes.

3   Q.   And he said he could do that?

4   A.   Yes.

5   Q.   You asked him whether he could use a telephone; is that

6   right?

7   A.   Yes.

8   Q.   And Mr. Hay said, yes, but I think then he complained about

9   using one of those damned things; is that right?

10  A.   Yes.

11  Q.   You asked Mr. Hay if he could go shopping; is that right?

12  A.   Yes.

13  Q.   And he told you that he doesn't like shopping, but he does

14  go in, gets what he needs, and leaves; is that right?

15  A.   Yes.

16  Q.   Did you ask Mr. Hay some questions about his ability to do

17  things around the home?

18  A.   Yes.

19  Q.   And he told you that he could do some laundry and he could

20  fold towels; is that right?

21  A.   Uh-huh, yes.

22  Q.   And he said he liked to sort his own socks because if his

23  socks aren't the same, he'll walk in circles?

24  A.   Yes.

25  Q.   Is another section of the form that you're filling out

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.643

1    related to work?

2    A.   I do not understand your question.

3    Q.   Are there questions on the form that you're supposed to

4    direct to the patient about their ability to work or have a

5    job?

6    A.   Yeah.

7    Q.   Is that right?

8    A.   I do ask all my patients that.

9    Q.   Is that part of the actual form you're filling out or is

10   that something you do normally when you --

11   A.   Some forms have it and I usually ask all my patients what

12   they do.

13   Q.   So you say "some forms have it."  I think I understand what

14   you're saying.  This isn't the only form that you fill out for

15   C&P exams, this seizure form.  You do other topics as well; is

16   that right?

17   A.   Yes, sir.

18   Q.   And so you're just saying you don't remember if the seizure

19   form has that question or not?

20   A.   I think aid and attendance has that question if I remember

21   right.

22   Q.   But sounds like it was your practice to include that

23   question either way?

24   A.   Yes, I usually include that question.

25   Q.   Okay.  Thank you.  And so you asked Bruce some questions

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                           2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                       ROA - Volume 3, p.644

1  that were related to that.  For example, you asked him to

2  describe his day.  Do you remember that?

3  A.   Yes, sir.

4  Q.   And did Mr. Hay tell you that he goes out to the farm as

5  part of his day?

6  A.   Yes, sir.

7  Q.   And then I think you even asked him some more questions or

8  details about his farm.  Do you remember that?

9  A.   Yes.

10 Q.   And did he tell you that he had cows?

11 A.   Yes.

12 Q.   And I think you even asked more questions about that,

13 whether it was for meat or whether it was for milking?

14 A.   Yes.

15 Q.   And he also told you that they had donkeys and chickens on

16 the farm too?

17 A.   Yes.

18 Q.   Do you remember -- I think at some point you noticed maybe

19 Mr. Hay had an injury on his finger.  Do you remember that?

20 A.   I saw it on the video.  After seeing the video, yes.

21 Q.   And do you remember now at least that Mr. Hay told you that

22 he hurt himself out on the farm?

23 A.   Uh-huh, yes.

24 Q.   And I think he said he thought he was using baling wire or

25 barbed wire?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.645

1  A.  Yes.

2  Q.  Do you know what those things are used for on a farm?

3  A.  Maybe to mend the fence or something like that.

4  Q.  Do you also remember Mr. Hay telling you that as, I think

5  part of his day, he'll go out to his shed and tinker?

6  A.  Yes.

7  Q.  I think at some point again you noticed another injury to

8  Mr. Hay where he had cut himself; is that right?

9  A.  Yes.

10  Q.  And did he tell you that he thought he did that using

11  electrical tape?

12  A.  Yes.

13        MR. MAGARIEL:  Judge, can I have just a moment?

14        THE COURT:  Yes.

15        MR. MAGARIEL:  Thank you.  That's all I have for this

16  witness, Judge.

17        MR. HUSCHKA:  We have no questions, Your Honor.

18        THE COURT:  All right.  Thank you.  You're excused for

19  now.  Yes, you can step down.  You can leave that there.

20        You can call your next witness.

21        MR. HUSCHKA:  United States calls Special Agent Shane

22  Osterhaus.

23                    SHANE OSTERHAUS,

24  called as a witness on behalf of the government, having first

25  been duly sworn, testified as follows:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                         2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.646

1                    DIRECT EXAMINATION

2   BY MR. HUSCHKA:

3   Q.   Agent Osterhaus, could you state your full name for the

4   record and tell the jury what you do for a living.

5   A.   Sure.  Shane Osterhaus and I am a special agent with the

6   Department of Veteran Affairs Office of the Inspector General.

7   Q.   And how long have you been with your agency?

8   A.   I have been with the VA-OIG for the last eight years.

9   Q.   Let's go back before that.  Can you start with what you

10  first did out of college?

11  A.   Yes.  So I graduated from Emporia State University with a

12  degree in chemistry, and after I graduated, I started with the

13  Kansas City Missouri Police Department and I was a police

14  officer for five years.  Then I switched and became a special

15  agent with the U.S. Secret Service and I did that for ten

16  years.  Then went to Walmart and was a senior global

17  investigator with Walmart for one year in Bentonville,

18  Arkansas.  And then I came back and have been with the VA-OIG

19  for the last eight years.

20  Q.   As part of your work with the VA-OIG, were you involved in

21  a surveillance operation on May 3, 2017?

22  A.   Yes, I was.

23  Q.   Did that involve the Defendant Bruce Hay?

24  A.   Yes, it did.

25  Q.   What was your role during that surveillance operation?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.647

1  A.   So I was part of the mobile surveillance team, so to do the

2  surveillance during the C&P exam either inside the hospital or

3  if Mr. Hay went anywhere after the appointment.

4  Q.   So you were at the hospital around the time of the

5  defendant's scheduled C&P examinations?

6  A.   Yes, I was.

7  Q.   Did you -- where were you located when he arrived at the

8  hospital?

9  A.   So I was already in my vehicle outside the hospital at the

10  front entrance of the hospital in a parking spot on the -- it

11  would have been the west side of the hospital.

12  Q.   And were you with another agent during the surveillance?

13  A.   Yes, I was.  So Agent Tim Mugrage, also with the VA-OIG,

14  was with me.  I stayed outside in the car, and Agent Mugrage

15  went inside the hospital on Mr. Hay's arrival to the

16  appointment.

17  Q.   So then did you obtain surveillance of the defendant

18  leaving his examinations that day?

19  A.   Yes.  So then Agent Mugrage -- after Mr. Hay was in his

20  appointment, Mr. Mugrage -- or Agent Mugrage came back to the

21  car, and I used the same surveillance equipment to go back into

22  the hospital to get Mr. Hay's exit from the hospital.

23  Q.   Could you describe what you were using, what kind of camera

24  you had?

25  A.   So we have a series of covert cameras, but the one we were

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.648

1   using that day looks like a Starbucks coffee cup with a lid,

2   and then it has a camera on the inside of it.  So it appears

3   you're walking around with a coffee.

4          MR. HUSCHKA:  Your Honor, may I approach?

5          THE COURT:  Yes.

6   BY MR. HUSCHKA:

7   Q.   Agent Osterhaus, I'm handing you what's been marked as

8   Government's Exhibit 50.  Do you recognize that?

9   A.   Yes, I do.

10  Q.   Is that a copy of the surveillance footage that you took

11  that day?

12  A.   Yes, it is.

13         MR. HUSCHKA:  Move to admit Government's Exhibit 50.

14         THE COURT:  Any objection?

15         MS. RAMSEY:  No objection.

16         THE COURT:  Exhibit 50 admitted.  You can publish.

17  BY MR. HUSCHKA:

18  Q.   Ms. Boyd, if you can fast-forward to about 1 minute

19  55 seconds.

20         Can you explain -- does it appear to be shaky here?

21  A.   Yes.  This is me walking with the camera in my hand trying

22  to keep it as steady as I can as I'm walking to where I believe

23  Mr. Hay will -- after leaving his appointment, come back down

24  to the first floor, the floor that I'm on.

25  Q.   So you had received a notification that his appointments

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.649

1  were done?

2  A.   Yes, from an agent on the inside of the hospital.  He told

3  us when the appointment was done.

4  Q.   All right.  What are we seeing now?

5  A.   So now I'm just starting to come up to the elevator bay

6  where -- that is where I thought Mr. Hay would come out, and

7  that's Mr. Hay there and his wife.  So I'm realizing that I'm

8  really close to him.

9  Q.   Are you trying now to switch your vantage point so you can

10  get behind him?

11  A.   Yeah.  I didn't want to make it too obvious I was doing the

12  surveillance, that's why I tried to get behind him.

13  Q.   They're heading down a corridor.  Are you still trying to

14  stay back as far as you can while still maintaining footage?

15  A.   Yes, I am.

16  Q.   Where is the defendant at this point?

17  A.   So he is behind his wife in the orange-ish shirt, so he's

18  about two people ahead on the left of the hallway.  So now he's

19  more in the center of the camera.

20  Q.   Was it easy to maintain distance during the defendant's

21  exit from the hospital?

22  A.   It was difficult just because of how slow he was walking.

23  I didn't want it to be so obvious that I was just walking

24  really slow behind that same type of person, that same pace, so

25  that did make it difficult.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.650

1  Q.  At times were you just standing in place?

2  A.  Yes, yes, I was.

3  Q.  You just started moving; is that right?

4  A.  Yes, I'm moving now.

5  Q.  Is that one of those times where you just stood there as

6  the defendant was exiting?

7  A.  Yes, I was trying to just let him get some distance on me.

8  Q.  At this point can you see the defendant even though your

9  camera has not picked him up throughout the entirety of your

10  time following him?

11  A.  Yes.  The hole on the cup is very small, and so you try

12  your best to keep it angled at him, but at times obviously I

13  can't see what the camera is seeing.

14  Q.  Do you see the defendant at this point?

15  A.  Yeah.  He's just now walking through the double doors.

16  Q.  Where is the defendant now?

17  A.  He's walking with his wife on the sidewalk.

18  Q.  Are you going out a different door here?

19  A.  I am.

20  Q.  Why are you doing that?

21  A.  So now trying to get back to my car because I know we're

22  going to turn it into a mobile surveillance, and I want to make

23  sure that I'm ready to be able to drive the car.

24  Q.  So you're just trying to capture whatever footage you can

25  as you head towards your own vehicle?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                2:19-cr-20044-JAR
                              USA v. Bruce L. Hay
                              ROA - Volume 3, p.651

1    A.   Yes.

2    Q.   You can stop it there.

3         So what happened after the defendant and his wife left the

4    VA facility?

5    A.   So then they drove to the Social Security Administration

6    building.  That's about ten minutes away, but still in Kansas

7    City, Missouri.

8    Q.   Did you know where they would be going?

9    A.   I did not.

10   Q.   Were you just planning to follow them wherever they went?

11   A.   Yes.

12   Q.   What did you observe once they arrived at the Social

13   Security building?

14   A.   So Mr. Hay's wife pulls the vehicle up in front of the

15   building, and then she gets out of the vehicle and comes over

16   to the passenger side, the side he was sitting in, and then he

17   exits the vehicle.  It's a white truck.

18        And then there's a -- it's a double set of doors, so the

19   back door of the truck swings open towards the truck bed to

20   then give you access to the second row.  And then Mr. Hay pulls

21   out the walker and then expands it open and then uses the

22   walker to walk into the building with his wife.

23   Q.   And then he was in the building.  Did you also see him exit

24   the building?

25   A.   Same thing.  He exits with his wife and comes back to the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.652

1   vehicle and then he puts -- he folds the walker back up and

2   puts it in the vehicle, and then he also, and his wife, picked

3   up some change that's outside the vehicle that one of the

4   agents left on the ground outside the vehicle.

5   Q.   I'm handing you what have been marked as Government's

6   Exhibits 53 and 54.   Do you recognize those?

7   A.   Yes, I do.

8   Q.   What are they?

9   A.   So they are the video that we took of him entering the

10  Social Security Administration building and then exiting it.

11         MR. HUSCHKA:   Move to admit Government's Exhibits 53

12  and 54.

13         MS. RAMSEY:   No objection.

14         THE COURT:   53, 54 admitted.   You can publish.

15  BY MR. HUSCHKA:

16  Q.   So where are you recording from here?

17  A.   So we are across the street from the building in another

18  parking lot.

19  Q.   Did the defendant's wife help him get the walker out?

20  A.   No, she didn't.

21  Q.   Actually could you go back maybe ten seconds.

22         Agent Osterhaus, do you notice a change, if at all, in the

23  defendant's demeanor once he gets inside the Social Security

24  building?   And we'll play that right now.

25  A.   It appears that as he's walking in, his head is pretty

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.653

1  steady, and once he reaches the door, then his head does start

2  to shake a little.

3  Q.   Could you pull up Government's Exhibit 54, please.  Is this

4  after he was inside the building?

5  A.   Yes, it is.

6  Q.   How long was he inside?

7  A.   Best guess, 40 minutes.

8  Q.   And can you go back about five seconds, please.

9       What does defendant appear to do there?

10  A.   If you watch his left hand, he appears to reach down.  He's

11  going to pull the lever to fold up the walker and he's moving

12  it closer to -- between the truck doors to pull the lever.

13  Q.   You can stop it there.  What happened after the defendant

14  and his wife left the Social Security building?

15  A.   So then they drove about 20 to 25 minutes and went to a

16  Sam's Club in Overland Park, Kansas.

17  Q.   And how far away was the Sam's Club in Overland Park from

18  the Social Security building?

19  A.   About a 20- to 25-minute drive.

20  Q.   Did you observe the defendant entering and exiting Sam's

21  Club?

22  A.   Yes, I did.

23  Q.   I'm handing you what have been marked as Government's

24  Exhibits 55 and 65.  Do you recognize those?

25  A.   Yes, I do.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.654

1    Q.   What are they?

2    A.   So one is the video of him entering Sam's Club, and the

3    other one is the video after he exits Sam's Club.

4         MR. HUSCHKA:   Move to admit Government's Exhibits 55

5    and 65.

6         MS. RAMSEY:   No objection.

7         THE COURT:   55, 65 admitted.   You can publish.

8    BY MR. HUSCHKA:

9    Q.   55, please.

10        Was it raining when you were at Sam's Club?

11   A.   Yes, it was.

12   Q.   And what do we see here?

13   A.   So that is Mr. Hay walking across the parking lot, and he's

14   got a cane.

15   Q.   Were you trying to adjust there so you could see him?

16   A.   Yeah.

17   Q.   Was he using a walker as he walked in?

18   A.   Yes, he was.

19   Q.   A walker?

20   A.   Not a walker.   I'm sorry.   He was using a cane.

21   Q.   Could you publish 65, please.   You can fast-forward to

22   about 1 minute 40 seconds here.

23        Does the rain appear to be fairly heavy here?

24   A.   Yes, it was.

25        MS. RAMSEY:   Your Honor, I don't think -- objection.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.655

1    I don't think Exhibit 65 has been admitted.

2          THE COURT:  It was offered, 55 and 65.

3          MS. RAMSEY:  Oh, it was.  I apologize.  I thought that

4    was 54 and 55.

5    BY MR. HUSCHKA:

6    Q.  What do you see here?

7    A.  Mr. Hay is standing with the cane by the grocery cart that

8    they brought out from Sam's Club.

9    Q.  You can play.  Can you pause it there.

10        What did he appear to do with the cane?

11   A.  He took the cane and he put it on the inside of the grocery

12   cart.

13   Q.  You can hit play.  Could you go back about five seconds.

14        What do you see here after Mr. Hay puts the box in the

15   vehicle?

16   A.  He makes a rather quick movement towards the bed of the

17   truck right there.  From my vantage point I couldn't see why he

18   made the movement.

19   Q.  You can stop it there.

20          MR. HUSCHKA:  No further questions.

21                    CROSS-EXAMINATION

22   BY MS. RAMSEY:

23   Q.  So, Mr. Osterhaus, you were surveilling on May 3, 2017 to

24   the C&P exam; is that correct?

25   A.  Yes, ma'am.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.656

1   Q.   And so you saw Mr. and Mrs. Hay in the white truck arrive

2   at the VA hospital?

3   A.   Yes, ma'am.

4   Q.   VAMC?

5   A.   Yes.

6   Q.   So Ms. Hay was the one that drove to the hospital?

7   A.   Yes, she did.

8   Q.   And she's also the one that drove when they left the C&P

9   exam?

10   A.   Yes, she did.

11   Q.   Out to Overland Park?

12   A.   Eventually to Overland Park, yeah.

13   Q.   Eventually.  And I'm sorry, yes.  I skipped the Social

14   Security Administration in between then; is that correct?

15   A.   Yes, she drove there to the Social Security Administration,

16   and then she drove on to Sam's Club.

17   Q.   I believe you said that you noticed when Mr. Hay was

18   walking into the Social Security Administration a difference in

19   his demeanor I think that was the question, and you -- your

20   response was you noticed some head bobbing; is that correct?

21   A.   Yes, that's correct.

22   Q.   You weren't able to surveil him while he was in that Social

23   Security Administration building, correct?

24   A.   No, I did not.

25   Q.   You don't know anything about his demeanor within that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.657

1    building?

2    A.   I don't.

3    Q.   And am I correct that the recording of the C&P exams were

4    being done in realtime?  Were you watching those recordings?

5    A.   I was not.

6    Q.   The surveillance in Government's Exhibit -- of Sam's Club,

7    so when Mr. Hay is walking to Sam's Club, he has his cane,

8    correct?

9    A.   Yes.

10   Q.   And when he comes out, he has his cane?

11   A.   He does.

12   Q.   And when there are items being loaded into the truck, I

13   think you said he put his cane in a basket?

14   A.   In the grocery cart.

15   Q.   But you see at the time he was still -- he had the basket

16   to hold onto; is that correct?

17   A.   Yes.

18        MS. RAMSEY:  I don't have any further questions.

19   Thank you.

20        MR. HUSCHKA:  No questions, Your Honor.

21        THE COURT:  You can step down.

22        You want to start your next witness?

23        MR. HUSCHKA:  Yes, Your Honor.  United States calls

24   Special Agent Tim Mugrage.

25                     TIM MUGRAGE,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.658

1   called as a witness on behalf of the government, having first

2   been duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4   BY MR. HUSCHKA:

5   Q.   Agent Mugrage, could you state your full name for the

6   record and tell the jury what you do for a living.

7   A.   Yes.  Is it all right if I remove my mask?

8            THE COURT:  Yes.

9            THE WITNESS:  Thank you.  My name is Tim Mugrage.  I'm

10  a special agent of Veterans Administration Office of the

11  Inspector General.

12  BY MR. HUSCHKA:

13  Q.   Let's start with the beginning of your career in law

14  enforcement.  Where did you start?

15  A.   Excuse me.  I began my career with the Department of

16  Housing and Urban Development Office of the Inspector General

17  in approximately January of 2010.

18  Q.   What did you do after that?

19  A.   I became a special agent at the VA-OIG in approximately

20  June of 2014.

21  Q.   You've been there since -- been there since that time?

22  A.   I have.

23  Q.   And what's your current position?

24  A.   I'm currently the resident agent in charge at the VA-OIG,

25  and that's been since May of this year so just a few months.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.659

1    Q.   So how are your duties different as the special agent in

2    charge?

3    A.   I'm still a special agent.  I just kind of oversee the

4    Kansas City office, supervise all the employees, and oversee

5    field operations for our office which covers Kansas, Nebraska,

6    Iowa, Missouri, and North and South Dakota.

7    Q.   I want to bring your attention to March 24, 2017.  Were you

8    involved in a surveillance operation regarding the defendant

9    that day?

10   A.   Yes.

11   Q.   Where was that surveillance operation taking place at?

12   A.   That was at the VA Medical Center in Kansas City, Missouri.

13   Q.   And why were you doing surveillance there that day?

14   A.   Because the defendant, Mr. Hay, had a dental appointment, I

15   believe.

16   Q.   Were there several agents involved in this surveillance?

17   A.   There were.

18   Q.   What was your role that day?

19   A.   I was just one of the agents that was there to get video of

20   him coming and going.

21   Q.   We've heard about these covert cams that are used.  What

22   kind of camera were you using that day?

23   A.   I believe that day I had a covert camera, like you said,

24   that would have been either some kind of tumbler or coffee cup,

25   disguised as a tumbler or coffee cup.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.660

1    Q.  Did you obtain footage of the defendant walking through the

2    lobby that day and then later exiting the building?

3    A.  Yes.

4           MR. HUSCHKA:  Permission to approach, Your Honor.

5           THE COURT:  Yes.

6    BY MR. HUSCHKA:

7    Q.  I'm handing you what have been marked as Government's

8    Exhibits 31 and 36.  Do you recognize those?

9    A.  I do.

10   Q.  Is that surveillance footage you took that day at the -- of

11   the defendant's dental examination?

12   A.  It is.

13          MR. HUSCHKA:  Move to admit Government's Exhibit 31

14   and 36.

15          THE COURT:  Any objection?

16          MS. RAMSEY:  No objection.

17          THE COURT:  31, 36 admitted.  You can publish.

18   BY MR. HUSCHKA:

19   Q.  31, please.  Could you pause it right here.

20      Agent Mugrage, can you explain to the jury -- tell us where

21   we're at here and what's reflected on the screen.

22   A.  Yeah, I don't recall what floor this is.  I think it might

23   be two if I'm -- but I'm kind of at a corner waiting room where

24   there's kind of a T-intersection in the hallway, so if you're

25   looking at the paused video, if you look straight down that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.661

1    hallway that goes straight, the elevators I believe are down

2    that way, and the dental office is in the hallway that's right

3    in front, it goes horizontally in the video.

4    Q.   And is this prior to his dental examination?

5    A.   I believe so, yes.

6    Q.   You can hit play.

7         Could you pull up 36, please.

8         All right.  Can you tell us what's happening right here?

9    A.   Yeah.  This was after the dental appointment, and Mr. Hay

10   and Mrs. Hay were leaving the VA Medical Center at this time.

11   Q.   So are you stationary here?

12   A.   Yeah.  I'm sorry.  Could you repeat that?

13   Q.   Are you stationary here?

14   A.   Yeah, I believe I'm standing, and I believe as the clip

15   goes on, I just kind of follow them out.

16   Q.   What's the defendant doing here?

17   A.   He's talking to his wife, and I believe that's an employee

18   that's in the elevator.

19   Q.   Do you recall him making small talk in the elevator?

20   A.   Yeah, I don't recall what was said specifically, but just

21   small talk, like you said.

22   Q.   Were you also involved in a surveillance operation around

23   the time of the defendant's C&P examinations in May of 2017?

24   A.   Yes.

25   Q.   And where were you situated in that operation?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.662

1    A.   When he arrived at the VA Medical Center in Kansas City,

2    Missouri, I was situated inside the building kind of between

3    the two entrances in a waiting lobby there.

4    Q.   Were you with Agent Osterhaus that day?

5    A.   Yeah, I was riding with him that day.

6    Q.   Did you obtain footage of the defendant entering the

7    medical center that day?

8    A.   I did.

9    Q.   What did you observe?

10   A.   It was probably called out to me on the radio or something

11   that -- which side he was coming in so I was able to position

12   myself.  But I observed him come in, enter the hospital through

13   the emergency side.  I believe somebody even said that his wife

14   had dropped him off.  So I was able to observe him kind of

15   walking down the hallway towards me using the assistance of a

16   walker to navigate.

17   Q.   And did you record that?

18   A.   I did, again, with the covert camera.

19   Q.   I'm handing you what's been marked as Government's

20   Exhibit 46.  Do you recognize that?

21   A.   I do.

22   Q.   What is it?

23   A.   It's a disk containing the video.

24        MR. HUSCHKA:  Move to admit Government's Exhibit 46.

25        MS. RAMSEY:  No objection.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.663

1          THE COURT:  46 admitted.  You can publish.

2    BY MR. HUSCHKA:

3    Q.   So could you explain what's happening right here?

4    A.   Yeah, so he had entered from down the hall on the emergency

5    room side of the building, and I believe he stopped to talk to

6    somebody at that window or desk there.

7    Q.   Is this shortly after he entered the facility?

8    A.   It is shortly after, yes.

9    Q.   So this was sort of the first surveillance inside the

10   building of the defendant that day?

11   A.   I believe so, yes.

12   Q.   So were you trying to stay back?

13   A.   I was.

14   Q.   Why were you doing that?

15   A.   Because I knew we were going to surveil him for a good

16   portion of that -- before the exam -- this is before the exam

17   and also after, so I wasn't going to get too close.

18   Q.   Did you observe the defendant later when he exited the

19   facility?

20   A.   Yes.

21   Q.   And was that recorded as well?

22   A.   That was.

23   Q.   Handing you Government's Exhibit 52.  Is that surveillance

24   footage of the defendant exiting --

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.664

1    Q.   -- the VA?

2    A.   Yes.

3           MR. HUSCHKA:  Move to admit Government's Exhibit 52.

4           MS. RAMSEY:  No objection.

5           THE COURT:  52 admitted.  You can publish.

6    BY MR. HUSCHKA:

7    Q.   Sir, are you in a vehicle at this point?

8    A.   Yeah.  Like you mentioned earlier, I believe I was in the

9    vehicle with Special Agent Osterhaus.

10   Q.   Is it raining?

11   A.   It is raining.

12   Q.   What's happening here?

13   A.   Mr. Hay and Mrs. Hay are leaving the VA Medical Center and

14   heading towards the parking lot.

15   Q.   Are you sort of adjusting your position to try to get a

16   shot as best you can in the rain?

17   A.   Yeah.  If I remember correctly, my vantage point -- they

18   were kind of at my right and passing in front of me and to the

19   left, and so I was moving the camera to whatever worked to get

20   a shot, and obviously with the rain I wasn't able to get a good

21   focus, so I'm kind of moving it a lot there.

22   Q.   You can stop it there.

23        What happened after they left VA facility?

24   A.   I believe after they left there, they had went to the

25   Social Security office.  I think I was the passenger, so I'm

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.665

1  not exactly sure the address, but wasn't too far from the

2  medical center if I remember correctly.

3  Q.   Are you with agents who observed them at the Social

4  Security building?

5  A.   Yes.

6  Q.   What happened after they left the Social Security building?

7  A.   After they left there, they kind of got on the Highway

8  I-35, kind of heading towards their home, and they stopped at a

9  Sam's Club in Lenexa, Kansas, off of 95th Street.

10 Q.   And did you observe the defendant that day entering and

11 exiting Sam's Club?

12 A.   Yes.

13 Q.   After the operation that day did you request surveillance

14 footage from Sam's Club?

15 A.   I did.

16 Q.   I'm handing you what have been marked as Government's

17 Exhibit 78, 79, 80, and 81.  Is that copies of the surveillance

18 footage that you requested from Sam's Club?

19 A.   It is.

20      MR. HUSCHKA:  Move to admit Government's Exhibits 78

21 through 81.

22      MS. RAMSEY:  No objection.

23      THE COURT:  78 through 81 admitted.  You can publish.

24 BY MR. HUSCHKA:

25 Q.   Can you start with 78, please.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.666

 1          What do we see here?

 2   A.   This is Mr. and Mrs. Hay entering the Sam's Club store.

 3   Q.   Who goes in first?

 4   A.   Mr. Hay.

 5   Q.   And approximately how long was this after he left the

 6   Social Security building?

 7   A.   I can't say for certain.  If I had to guess, definitely

 8   less than an hour.  I would say however long it takes to -- I

 9   would guess 30 minutes is an estimate.

10   Q.   Could you publish 79, please.  What are we seeing here?

11   A.   At the bottom of the screen towards the middle, that's

12   Mr. Hay just navigating throughout the store, shopping.

13   Q.   Did you have other agents inside Sam's Club?

14   A.   Yeah.  If I recall correctly, there was another agent, and

15   there was also a task force officer both with cameras inside

16   there.

17   Q.   Where is Mr. Hay at this point?

18   A.   Sorry.  I got kind of jumbled up there.  I'll be honest, I

19   may have lost my focus.

20   Q.   Do you see him at the top left?

21   A.   Yeah, I see him right there, Mr. Hay, Mrs. Hay.  They're on

22   the left side of the screen.

23   Q.   Do you recall what section of the store this was?

24   A.   I think this was the meat area.

25   Q.   Pull up 80, please.  You can move to about one minute in.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.667

1   Can you pause it right there.

2       What do you see here?

3   A.   As Mrs. Hay pulls the vehicle up, Mr. Hay begins loading

4   groceries or -- groceries or goods into the truck.  What I

5   observe here is his cane was in his cart as he was loading, and

6   once he took the first load out, the cart began to move and is

7   heading towards the bed of the truck and almost strikes it.

8   Q.   Hit play.

9   A.   Mr. Hay was able to quickly maneuver to catch the cart

10  before it struck the truck.

11  Q.   Could you publish 81, please.

12      Is this the exit to Sam's Club?

13  A.   This is.  Just would have been just before the last video,

14  yes.

15  Q.   This is just a different vantage point inside?

16  A.   Correct.

17  Q.   Do you see where Mr. Hay is at this point?

18  A.   Yeah.  He's standing next to that pillar with his cart at

19  the top middle part of your screen.

20  Q.   Do you see a gentleman there on his cell phone?

21  A.   Yes.

22  Q.   Do you know who that is?

23  A.   Yeah.  That's Task Force Officer Jim Carmack.

24  Q.   Is he one of the agents you had inside the building that

25  day?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                         USA v. Bruce L. Hay
                                                         ROA - Volume 3, p.668

1  A.   Yes.  He was one of the law enforcement personnel that was

2  involved in surveillance throughout that day.

3  Q.   You can stop it.

4         MR. HUSCHKA:  No further questions.

5         THE COURT:  Do you want to cross-examine or break for

6  lunch?

7         MS. RAMSEY:  Your Honor, we have no questions for this

8  witness.

9         THE COURT:  Okay.  All right.  Thank you.  So we'll

10  break for lunch.  Let's return at 1:15.

11     (Recess taken at 12:06 p.m.)

12     (The jury entered the courtroom, after which the following

13  proceedings were had.)

14         THE COURT:  You can be seated.  Call your next

15  witness.

16         MR. OAKLEY:  Your Honor, the United States calls

17  Lauren Clary.

18                        LAUREN CLARY,

19  called as a witness on behalf of the government, having first

20  been duly sworn, testified as follows:

21                      DIRECT EXAMINATION

22  BY MR. OAKLEY:

23  Q.   Ma'am, could you please tell the jury your name and spell

24  it for the court reporter.

25  A.   Lauren Clary, L-a-u-r-e-n, C-l-a-r-y.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.669

1   Q.   How are you presently employed?

2   A.   I work for Kansas Gas Service.

3   Q.   And prior to working for Kansas Gas Service, did you work

4   for Kansas Farmers Union?

5   A.   Yes.

6   Q.   And what is Kansas Farmers Union?

7   A.   They are an advocacy organization that represents family

8   farmers.

9   Q.   And when did you work for Kansas Farmers Union?

10  A.   It was 2010 to 2013 approximately.

11  Q.   What did you do for Kansas Farmers Union?

12  A.   I was the communication specialist.

13  Q.   As part of Kansas Farmers Union work, did they occasionally

14  have farm tours for people who were interested in learning

15  about farming to tour other farms?

16  A.   Yes.

17  Q.   And as the communications director, would you sometimes

18  document these tours and other Kansas Farmers Union events

19  through photography and also write a newsletter that would go

20  to members of the Kansas Farmers Union?

21  A.   Yes.

22            MR. OAKLEY:  Your Honor, may I approach?

23            THE COURT:  Yes.

24  BY MR. OAKLEY:

25  Q.   I'm going to hand you what's been marked as Government's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.670

1   Exhibit 134.  Do you recognize that?

2   A.   Yes.

3   Q.   And what is Government's Exhibit 134?

4   A.   The Kansas Kontact, so it was a bi-monthly newsletter that

5   got mailed to all members of the organization.

6   Q.   And are there a couple articles in there that you wrote?

7   A.   Yes.

8          MR. OAKLEY:  Your Honor, I offer Government's

9   Exhibit 134.

10         MS. RAMSEY:  No objection.

11         THE COURT:  134 admitted.  You can publish.

12   BY MR. OAKLEY:

13   Q.   So if we could just highlight the top half of that where it

14   shows --

15       And so Kansas Kontact, this was a publication in the Kansas

16   Farmers Union; is that correct?

17   A.   Yes.

18   Q.   And the first article on here is -- the headline in this

19   newsletter is Aspiring Farmers Learn at Specialty Crop Farm

20   Tours, and then I see it says by Lauren Clary.  Did you write

21   this article?

22   A.   Yes.

23   Q.   And does this article generally describe a farm tour that

24   occurred on July 31st around Lawrence and Edgerton?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.671

1    Q.   And then along with this article in this newsletter,

2    there's a photograph on the right side.  Do you see that

3    photograph?

4    A.   Yes.

5    Q.   Did you personally go out on these farm tours?

6    A.   I did.

7    Q.   Did you take photographs of the people that attended and

8    the things that they were doing?

9    A.   Yes.

10   Q.   Now, in this particular newsletter there's an arrow pointed

11   to someone.  Did someone add that arrow at a later date?

12   A.   Yes.  That's not something I put in there when we mailed it

13   to members.

14   Q.   Okay.  Could we go to the second page of that exhibit,

15   please.  And so directing your attention to the top part, could

16   we zoom in on that first paragraph.

17        And is this a photograph that was part of the newsletter

18   that you took during one of those farm tours?

19   A.   Yes.

20   Q.   And then can we zoom in on the second part containing the

21   second photograph.

22        And is this another photograph that was part of that

23   newsletter?

24   A.   Yes.

25   Q.   Can we zoom in on the headline that says "Get to Know Some

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.672

1   of Kansas' Farmer-Veterans," just above that.

2       And as part of this newsletter did you interview veteran

3   farmers that were part of this farm tour?

4   A.   Yes.

5   Q.   And so could we please scroll in on the part that says

6   "Bruce Hay, Osawatomie, Kansas," at the bottom of that same

7   page.

8       So as part of this newsletter did you interview Mr. Hay?

9   A.   I -- yes, I interviewed all the farmers that were in the

10  picture here in the newsletter individually.

11  Q.   Okay.  Let me ask you, this happened in 2012.  Other than

12  reviewing the article, do you remember Mr. Hay?

13  A.   No.

14  Q.   Were there quite a few people that were along on these farm

15  tours?

16  A.   Yeah.  We'd have anywhere from 20 to 50 people, and they'd

17  be -- most of the time it would be different each tour.

18  Q.   Okay.  And so as part of this newsletter, you have this

19  portion of an interview, and so for instance, here there's a

20  description, and then it says "are you currently farming or own

21  land?"  And then it says yes and there's quotation.  So why is

22  that next part in quotation?

23  A.   So prior to working at Farmers Union, I worked for a

24  newspaper and so my background is journalism, and part of my

25  journalism training if you're -- anything that you're using

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.673

1   that's a quote that's something someone said, you put it in

2   quotes; otherwise if it's my words, then I wouldn't have.

3   Q.   Okay.  And then if we could scroll back out and then the

4   next part that starts with "why did you decide to attend the

5   tours?"  On the third column just below the picture.

6        And so that -- the upper left-hand corner where it says

7   "why did you decide to attend the tours," is that a carryover

8   from the quotes of Mr. Hay in the article?

9   A.   Yes.

10  Q.   And, again, since this is in quotation, the "I'm looking to

11  consolidate some of our growing.  We're thinking of breaking

12  off 20 or 30 acres to do this (growing vegetables) and maybe a

13  small orchard," was this all a quote from Mr. Hay?

14  A.   Yeah.  What I would have put in parentheses there would

15  have been referring to what "this" was because we would have

16  been at a tour.  That field is a tour of vegetables, so when he

17  said "this," I just filled in the blank of what he was

18  referring to, pointing towards.

19  Q.   Okay.  And then if we could scroll -- if we go back to the

20  first page, that first article "Aspiring Farm Learn at

21  Specialty Crop Farm Tours."

22       And so could you read just the first paragraph below your

23  name beginning with "on July 31st"?

24  A.   "On July 31st Kansas Farmers Union hosted tours of five

25  farms around Lawrence and Edgerton."

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.674

1  Q.  Were these -- how many -- so there were five farm tours

2  around that time.  Do you know how many farm tours you went on

3  as part of your employment at the Kansas Farmers Union?

4  A.  I don't.

5  Q.  But you said as part of these farm tours you would go along

6  and take photographs?

7  A.  Correct.

8  Q.  And then in the -- that first column at the second

9  paragraph from the bottom it says "pictures can be found on

10  flickr.com/ksfarmersunion."

11      Have you had a chance recently to go to that web address to

12  see if the photos you took are still up?

13  A.  Yes.

14  Q.  In preparation for your testimony here today were you able

15  to go through and look at those photos to help you refresh your

16  recollection?

17  A.  Yes.

18  Q.  I'm going to hand you Exhibits 10 -- excuse me, 110 through

19  115 and just ask you to look through those, please.

20      Ms. Clary, Government's Exhibit 110 through 115, are those

21  all photographs that you took at a veteran farming workshop put

22  on by the Kansas Farmers Union?

23  A.  Yes.

24  Q.  Are all of those fair and accurate depictions of the things

25  that were going on at the time you made those photographs?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.675

1   A.   Yes.

2          MR. OAKLEY:  Your Honor, I offer Government's

3   Exhibit 110 through 115.

4          MS. RAMSEY:  No objection.

5          THE COURT:  110 through 115 admitted.  You can

6   publish.

7   BY MR. OAKLEY:

8   Q.   Can we bring up 110, please.

9          And, again, this was one of many events that you attended

10  as part of your employment with the Farmers Union?

11  A.   Yes.

12  Q.   Do you remember anything in particular about this event or

13  anyone that attended?

14  A.   Nothing in particular, no.

15  Q.   111, please.  112, please.  113, please.  114, please.  And

16  115, please.

17         Next I'm going to hand you Government's Exhibits 116

18  through 133 and, again, I'd ask that you look through those,

19  please.

20         Have you had a chance to look through those?

21  A.   Yes.

22  Q.   And are Government's Exhibits 116 through 133 all

23  photographs that you took at a farming workshop in Emporia?

24  A.   Yes.

25  Q.   And are they all fair and accurate depictions of the things

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.676

1   that you observed when you took the photographs at that

2   workshop?

3   A.   Yes.

4        MR. OAKLEY:  Your Honor, I offer Government's Exhibits

5   116 through 133.

6        MS. RAMSEY:  No objection.

7        THE COURT:  116 through 133 admitted.  You can

8   publish.

9   BY MR. OAKLEY:

10  Q.   Could you just generally describe for the jury what

11  occurred at these farming workshops, what they were for, and

12  what you all did when you went to the workshop?

13  A.   Our -- I wasn't involved with the organizing of the event,

14  but I just went and took pictures and reported on it, but at

15  these tours we would visit farmers or locations that were

16  already up and running and had a successful operation so that

17  we could learn from someone who's done it before to spark ideas

18  in new farmers or existing farmers.

19       And we would sometimes -- we would drive from location to

20  location and have addresses and we'd try to caravan, but mostly

21  followed each other or had GPS directions.  And then when we

22  arrived, the owner/farmer would greet us and show us to the

23  first thing that they wanted to show us.

24       Sometimes they had chairs available for us to sit down.

25  Most of the time we were walking through fields or looking at

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.677

1  production facilities.

2  Q.  And so the fact that these were farms, are we talking about

3  rural areas?

4  A.  For the most part they were just outside city limits is

5  what I would describe them as.

6  Q.  And so anyone on the workshop would physically be at the

7  farm walking around the farm ground and that sort of thing?

8  A.  Yes.

9  Q.  Could we please show 116.

10     So you mentioned that some of the farmers would have chairs

11  for people to sit on.  Do you remember looking at this

12  photograph?  It appears that someone is talking.  Do you

13  remember if that was one of the established farmers?

14  A.  Yes, an established farmer and owner of farm.

15  Q.  Okay.  And so does it appear he was talking to other

16  members of the workshop, the persons that wanted to learn more

17  about farming?

18  A.  Yes.

19  Q.  117, please.

20     You mentioned that sometimes as part of the tour you all

21  would walk and look at fields.  Does that appear what's going

22  on here?

23  A.  Yes.

24  Q.  118, please.  119, please.  120, please.  121, please.

25  122, please.  123, please.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.678

1       Let me back up.  So for instance, it appears in this photo
2   that some people are sitting down and some people are standing.
3   A.   Yes.  This one, he had trailer, hay wagon, whatever you
4   might want to call it, and offered to drive people around to
5   the different locations between the chickens and the other
6   produce that he was growing on his property.
7   Q.   When you say "he," do you mean that particular farmer?
8   A.   Yes, that farmer.
9   Q.   Okay.  And so in this photograph the person on the right
10  that appears to be speaking, is that the farmer that was
11  presenting the workshop?
12  A.   Correct.
13  Q.   And then on the left side of this photograph, is that some
14  of the people that attended that farmers workshop?
15  A.   Correct.
16  Q.   124, please.  125, please.  126, please.  127, please.
17  128, please.  129, please.
18       Does this appear to be like a greenhouse structure?
19  A.   Yes.
20  Q.   And so with some of the farm tours you'd be outside looking
21  at fields.  It looked like in a previous photo there was some
22  chicken houses.  And so would you often stay in one place or
23  would you move about the farm, the particular farm?
24  A.   We would -- it would depend.  Sometimes we would come and
25  listen, and sometimes there would be several -- there would be

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.679

1   different locations where they would -- the farmers would maybe

2   have a growing area and then they'd have a production area in a

3   different location.

4   Q.   130, please.  131, please.  132, please.  And 133, please.

5        Was there a similar farm tour that occurred around that

6   same time in Lawrence, Kansas?

7   A.   The same year.  I can't remember what dates each one was,

8   but it would have been the same year.

9   Q.   So 2012?

10  A.   Yes.

11  Q.   I'm going to hand you what's been marked as Government's

12  Exhibits 135 through 162.  And, again, I'd just ask that you

13  look at those.

14       Ms. Clary, are Exhibits 135 through 162 all photographs you

15  took at the farm tour that happened in Lawrence, Kansas in

16  2012?

17  A.   Yes.

18  Q.   Are they all fair and accurate depictions of the way things

19  appeared when you photographed them back in 2012?

20  A.   Yes.

21           MR. OAKLEY:  Your Honor, I offer Government's

22  Exhibit 135 to 162.

23           MS. RAMSEY:  No objection.

24           THE COURT:  135 to 162 admitted.  You can publish.

25  BY MR. OAKLEY:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.680

1    Q.   Can we please bring up 135.

2         So, again, this is another farm tour.  This one is in

3    Lawrence; is that correct?

4    A.   Lawrence area, yes.

5    Q.   And this one appears to be inside; is that correct?

6    A.   Yes.

7    Q.   Or at least this portion of the farm tour occurred inside?

8    A.   Yes.

9    Q.   136, please.  137, please.  138, please.  139, please.

10   140, please.  141, please.  142, please.  143.  144.  145.

11   146.  147, please.  148.  149.  150.  151.  152.  153.  154.

12   155.  156.  157.  158.  159.  160.  161.  And 162, please.

13        MR. OAKLEY:  Your Honor, I have no further questions

14   of this witness.

15                        CROSS-EXAMINATION

16   BY MS. RAMSEY:

17   Q.   Good afternoon, Ms. Clary.

18   A.   Hello.

19   Q.   Would you mind bringing up Government's Exhibit 134.

20        Now, on July 31st, it looks like 2012, you said you

21   attended this farm tour; is that correct?

22   A.   Correct.

23   Q.   And this was a farm tour specifically geared towards

24   disabled veterans?

25   A.   From what I remember that we got -- Kansas Farmers Union

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.681

1   got a grant to help connect veterans to farming.

2   Q.   Okay.

3   A.   And then we also opened it up to the public to attend the

4   events as well.

5   Q.   Okay.  And so I know this was a while back in 2012, so just

6   do your best, okay?  But as part of the farm tours I think you

7   said that the participants would kind of be educated by some of

8   the farmers on just farming in general?

9   A.   Correct, yeah.  And like I said, I didn't have anything to

10  do with the development of the program.  I just came to the

11  events and took pictures and reported on what happened at the

12  event.  And, yes, it would be farmers who were successful who

13  were currently selling their product to the public would be the

14  ones that would be giving us the tours.

15  Q.   You don't know or remember or maybe you didn't have any

16  involvement in whether or not the tour was specifically

17  designed to kind of help disabled farmers figure out how to

18  deal with farming?

19  A.   I don't remember those details no.

20  Q.   Okay.  Fair enough.  In Government's Exhibit 134, it looks

21  like there are two pages -- and let's see what the first page

22  is.  There's a page with an arrow there.  There may be a bigger

23  picture.  But do you recognize that individual in any way?

24  A.   I'm sorry.  Which one?

25  Q.   First page, the photograph with the arrows pointing.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.682

1   A.   No, not until I saw the picture, I wouldn't have recognized

2   him.

3   Q.   And so fair to say that you don't have really any

4   independent recollection of a particular participant that

5   attended that farm tour in 2012?

6   A.   No.  That is correct, yeah.  I don't have a recollection of

7   any particular person on the tour.

8   Q.   Okay.

9   A.   Other than our staff and board members that attended.

10  Q.   Fair enough.  I think you said when you were

11  interviewing -- could you go to page 2 of 134, please.

12       When you were interviewing the -- fair to say that on

13  page 2, the title of the second section of the article that you

14  wrote is "Get to Know Some of Kansas' Farmer-Veterans"; is that

15  correct?

16  A.   Yes, that's what it says.

17  Q.   I believe the government called your attention to comments

18  made by a Mr. Bruce Hay.  I want to talk to you in general

19  about kind of when you're interviewing someone.  When you

20  interview someone, do you tell them that you are a reporter of

21  some sort or you're getting information for purposes of writing

22  an article?

23  A.   Yes.  With this program I do remember approaching each

24  veteran and saying that our members wanted to get to know them

25  and so we wanted to publish something just a little bit about

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.683

1    them in our newsletter.

2    Q.   The individual purportedly would know their comments could

3    be put in a publication and made public?

4    A.   Yes.

5    Q.   All right.  Can you take a look at the photos from the farm

6    tour in July 31, 2012, the photos that you have there.  Let

7    me -- yeah, those would be 110 to 133.

8    A.   I don't have those in front of me.

9    Q.   You don't have those.  I have them here, I believe.

10              MS. RAMSEY:  May I approach, Your Honor?

11              THE COURT:  Yes.

12   BY MS. RAMSEY:

13   Q.   These may be out of order now, so I do apologize.

14        I'm going to show you -- if you would please bring up 117.

15        It's appearing at the screen in front of you, Ms. Clary, so

16   you don't have to look for it.  Do you see gentleman there

17   holding a cane?

18   A.   Yes.

19   Q.   Would you please put up Exhibit 124.

20        Do you see a gentleman there also in the right corner there

21   holding a cane?

22   A.   Yes.

23   Q.   And would you put up Exhibit 133.

24        Do you see the same gentleman there holding a cane?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.684

1    Q.   And you've looked through Government's Exhibits 110 to 133

2    for yourself, but I've showed you a few.  Would you agree you

3    keep continuing to see that same individual holding that same

4    cane in those photos?

5    A.   Yes.

6    Q.   Okay.  And I think you've said this, but just to be clear,

7    you have no independent recollection of this tour in 2012, and

8    I'm assuming also the same tour in Lawrence in 2012, you don't

9    have any recollection of any specific participant attending

10   there outside of your staff, correct?

11   A.   Specific participants -- I did recognize there's two ladies

12   in the pictures that I now would consider friends that we've

13   kept in touch since then, but outside of those two and then

14   board and staff, no.

15   Q.   So fair to say you couldn't say that you would be able to

16   tell whether any particular participant at either one of those

17   farm tours was walking or riding a tractor around, correct?

18   A.   Can you say that again?

19   Q.   Because you have no independent recollection of the

20   participants, you can't say whether or not any of those

21   participants walked during that tour or rode a tractor or rode

22   around in a different manner?

23   A.   Other than what's in the pictures, yes.

24        MS. RAMSEY:  Nothing further.  Thank you.

25                     REDIRECT EXAMINATION

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.685

1    BY MR. OAKLEY:

2    Q.   Ms. Ramsey pointed out on cross-examination someone that

3    appeared to be holding a cane.  In any of the photographs did

4    you see anyone using one of those walkers that had the four

5    legs with the wheels?

6    A.   I don't recall.

7    Q.   And, again, this was a farm tour that was outside; it

8    wasn't inside in a confined area for the most part; is that

9    correct?

10   A.   The farm tours were outside.  There's -- the one picture

11   that's inside, it was a market that was inside where they sold

12   their product in a little, like -- little house.

13   Q.   Other than that, it was outside, correct, in open land?

14   A.   Correct, other than the workshops.

15            MR. OAKLEY:  No further questions, Your Honor.

16            MS. RAMSEY:  Nothing further.

17            THE COURT:  May this witness be excused?

18            MR. OAKLEY:  Yes, Your Honor.

19            THE COURT:  You're excused.  Thank you.

20            THE WITNESS:  Just leave this here?

21            THE COURT:  Yes.

22            You can call your next witness.

23            MR. OAKLEY:  Your Honor, the United States calls Myron

24   Stroup.

25                         MYRON STROUP,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.686

1    called as a witness on behalf of the government, having first

2    been duly sworn, testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. OAKLEY:

5    Q.   Sir, could you please state your name and spell your name

6    for the court reporter.

7    A.   Myron Stroup, M-y-r-o-n, S-t-r-o-u-p.

8    Q.   And how are you presently employed?

9    A.   I'm a self-employed.

10   Q.   At some point did you work for the Farm Service Agency?

11   A.   Yes.

12   Q.   And when did you work for the Farm Service Agency?

13   A.   I started in 1982 and retired in 2012, I believe.

14   Q.   And so you were working for the Farm Service Agency in

15   2009?

16   A.   Yes.

17   Q.   And is the Farm Service Agency part of the United States

18   Department of Agricultural?

19   A.   Yes.

20   Q.   Is that commonly referred to as USDA?

21   A.   Yes.

22   Q.   What did you do for the Farm Service Agency?

23   A.   I was a county executive director for Miami County and then

24   later on in my career included Johnson County.

25   Q.   And so as the executive director, what were your job

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.687

1    duties?

2    A.   To administer the farm programs to the producers in those

3    two counties.

4         MR. OAKLEY:   Your Honor, may I approach?

5         THE COURT:   Yes.

6    BY MR. OAKLEY:

7    Q.   I'm going to hand you a document that's marked as

8    Government's Exhibit 325 -- I'll take these from you, sir --

9    and ask you to look through that.   Sir, what is Government's

10   Exhibit 325?

11   A.   It's an in-house letter that is sent to a producer after

12   certain forms and determinations are made regarding actually

13   engaged in farming.

14   Q.   And did you send that letter?

15   A.   Yes.

16   Q.   And did you send that letter to an individual known as

17   Bruce Hay?

18   A.   Yes.

19        MR. OAKLEY:   Your Honor, I offer Government's

20   Exhibit 325.

21        MS. RAMSEY:   No objection.

22        THE COURT:   325 admitted.   You can publish.

23   BY MR. OAKLEY:

24   Q.   Can we please pull up 325.   If we can scroll in on the body

25   of the letter.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.688

1     And so up at the top it says "Bruce Hay" and then there's a
2  portion that's redacted, and then it says, "Dear producer."  In
3  this case is Bruce Hay the producer?
4  A.   Yes.
5  Q.   It says "The Miami/Johnson County FSA Committee has
6  completed its review of your farm operating plan for 2009.
7  Based on the information submitted, the committee determined
8  the following," and there's a couple bullet points.
9     And it says "you are 'actively engaged in farming' and
10  eligible for payments and benefits that may be requested under
11  programs subject to the payment eligibility and payment
12  limitation provisions."
13     And then the second bullet point is "you are restricted to
14  one limitation for payment limitation purposes."
15     Did I read that correctly?
16  A.   Yes.
17  Q.   And so what was this purpose of this letter?
18  A.   It's to tell the producer, Bruce Hay, that he was eligible
19  to receive government subsidies on certain farm programs
20  administered through the office.
21  Q.   And could we scroll to the date of the letter at the top,
22  please.
23     So you mentioned in the body it was for 2009.  Was this
24  dated July 17, 2009?
25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.689

1  Q.  Now, do you know Bruce Hay?

2  A.  I know of him.

3  Q.  And how well do you know Mr. Hay?

4  A.  Just from the interactions there in the office.

5  Q.  Did you know Mr. Hay's father?

6  A.  Yes.

7  Q.  And how did you know Bruce Hay's father?

8  A.  Just from the interactions within the office there.

9  Q.  And did you know both of them to be involved in farming?

10 A.  Yes.

11 Q.  Other than interactions that occurred in your farming --

12 excuse me, in your office at the FSA, did you know either

13 Mr. Hay or his father outside of that professional capacity?

14 A.  I would -- I would know them when I run into them on the

15 street or at some other function.  I would know them.

16 Q.  Did you live in the same area generally?

17 A.  In the general area.  I live in northern Linn County.

18 Q.  The -- that exhibit, Government's Exhibit 325, has a couple

19 pages attached to it.  Could I have you look at the second

20 page.  And could we pull that up, please.

21     In order for USDA or FSA to make a determination that

22 someone is actively engaged in farming, are there forms that

23 must be filled out?

24 A.  Yes.

25 Q.  And then as the executive director, would you review the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.690

1   forms to help you make a determination as to whether the

2   applicant was actively engaged in farming?

3   A.   Yes.

4   Q.   What does that term mean, "actively engaged in farming"?

5   A.   In order for a producer to be eligible to receive these

6   payments or benefits, they had to be at risk in producing the

7   crop.

8   Q.   What does that mean, "at risk"?

9   A.   They had to make a significant contribution of management,

10   labor, equipment, land, and there's five things.  But they had

11   to -- they had to make a significant contribution to that, and

12   that contribution had to be at risk.

13   Q.   Okay.  And what does at risk mean?

14   A.   Means that if the crop fails, they lose that money

15   investment they had in caring for that crop or...

16   Q.   And so directing your attention to the back, to the second

17   page of this exhibit, it looks like this is a questionnaire

18   with some checkmarks by it.  And is this what's referred to as

19   a Form CCC-903?

20   A.   Yes.

21   Q.   In fact, if we can scroll at the very top left corner.

22       And who prepares this form, or who prepared this particular

23   form?

24   A.   This form was prepared -- it's in the office.  It's kind of

25   an in-house form.  It's completed based on how a producer

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.691

1    filled out a 902I.

2    Q.   Can we look at the third page.

3         And is that third page the 902I form?

4    A.   That is the rest of the 903, second page is 903.

5    Q.   I'm sorry.  The next page.  So the form that's in-house has

6    two pages on it?

7    A.   Yes.

8    Q.   So the last page is the 902I form?

9    A.   Yes.

10   Q.   So if we could scroll to the signature at the bottom,

11   please.

12        And does it appear that this is the form that Bruce Hay

13   submitted in order for FSA to make its determination?

14   A.   Yes.

15   Q.   And was this form dated June 25, 2009?

16   A.   Yes.

17   Q.   And if we could highlight section D, please.

18        And is part of that form labeled Part D, labor?

19   A.   Yes.

20   Q.   And does it appear the question is "(1) active personal

21   labor," and then it says "enter the percentage" -- and I can't

22   read that next part, but to be provided by the individual

23   identified in part A.  Can you tell us what that relates to?

24   A.   How much labor they're going to provide, the person filling

25   this form out, how much labor they will provide in producing --

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.692

1    operating the farm.

2    Q.   And in this particular form the person filling out the form

3    was Bruce Hay?

4    A.   Yes.

5    Q.   And how much percentage did he indicate he would be

6    providing as the person filling out the form?

7    A.   100 percent.

8    Q.   And what does that mean, the active personal labor in a

9    percentage to be provided by the individual filling the form

10   out?  What does that mean on this particular form?

11   A.   It means the producer provides all the labor in operating

12   this farm, in producing the crop that's going to be eligible to

13   receive some government subsidy payments.

14   Q.   And then the second part of Part D, labor, it says "hired

15   labor.  Enter the percentage or hours of labor that will be

16   hired by the individual identified in Part A."  What does

17   "hired labor" mean?

18   A.   If I had too much work to do, couldn't get it all done

19   myself, I could hire you to come and help me complete the job.

20   Q.   And on this particular form filled out by Mr. Bruce Hay,

21   what did he put as the percentage of hire labor?

22   A.   Zero.

23            MR. OAKLEY:  No further questions, Your Honor.

24                       CROSS-EXAMINATION

25   BY MS. RAMSEY:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.693

1   Q.   Is it Stroup?

2   A.   Stroup or Stroup.  I'm not real sure.

3   Q.   Sir.  How about that?

4   A.   That works.

5   Q.   So you said that you do know Bruce just kind of living in

6   the area; is that right?

7   A.   Correct.

8   Q.   And so -- but he's also been to your office when you were

9   working for the USDA?

10  A.   Yes.

11  Q.   When he's come into the office, you've seen him use a cane

12  and walk slowly?

13  A.   Yes.

14  Q.   Generally that's how you've seen him out in the community

15  as well?

16  A.   Yes.

17  Q.   Can you put up Exhibit 325, please.  Would you go to -- I

18  think it's the third page.  Can you highlight Part E for me.

19   Maybe I'm on the wrong page here.  Give me one second.  I'm

20  sorry.  It's page 4.  Thank you.

21       And I would confess, sir, that it's a bit difficult to

22  read, but it looks like Part E says "management" there; is that

23  correct?

24  A.   Yes.

25  Q.   It looks like that's part of the form that has to do with

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.694

1   whether the person is actively engaged in personal management

2   of a farm?

3   A.   Yes.

4   Q.   And you would agree that says 100 percent there?

5   A.   Yes.

6          MS. RAMSEY:   Thank you.   I have no further questions.

7          MR. OAKLEY:   I have no further questions, Your Honor.

8          THE COURT:   May Mr. Stroup be excused?

9          MR. OAKLEY:   Yes, Your Honor.

10         THE COURT:   Call your next witness.

11         MR. HUSCHKA:   United States calls Rhonda Snyder.

12         THE COURT:   You can leave that there, thank you.

13                    RHONDA SNYDER,

14  called as a witness on behalf of the government, having first

15  been duly sworn, testified as follows:

16                   DIRECT EXAMINATION

17  BY MR. HUSCHKA:

18  Q.   Ms. Snyder, could you state your name for the record for

19  the court reporter and tell us where you live.

20  A.   Rhonda K. Snyder.   I live at ███ --

21         THE COURT:   Don't give us your address.

22  BY MR. HUSCHKA:

23  Q.   Just the city.

24  A.   Lane, Kansas.

25  Q.   How long have you lived there?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.695

19-20044-JAR   USA v. BRUCE L. HAY   08.04.22

1   A.   At the current address, 26 years.

2   Q.   And have you lived in the area your entire life?

3   A.   Entire life.

4   Q.   What do you do for a living?

5   A.   I'm a registered nurse.

6   Q.   Prior to that did you serve in the military?

7   A.   Yes, I did.

8   Q.   Where did you serve?

9   A.   Kansas Air National Guard in Topeka, Kansas.

10   Q.   Do you know the Defendant Bruce Hay?

11   A.   Yes.

12   Q.   How do you know him?

13   A.   He and his family have lived in the area all their life and

14   so have I, so I know the family.

15   Q.   And does his family have property near where you live?

16   A.   Yes, they do.

17   Q.   And where is that property located related to your house?

18   A.   From my front door it -- I face the west so across the

19   road.

20   Q.   So it's just right across a gravel road?

21   A.   Gravel road, uh-huh.

22   Q.   From your residence, have you had an opportunity to observe

23   Bruce Hay in person?

24   A.   Yes, I have.

25   Q.   Have you observed Bruce Hay engaged in physical activities?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.696

1   A.   Yes, I have.

2   Q.   Could you describe what kinds of physical activities you

3   have seen him engaged in?

4   A.   Hauling hay and shooting guns and hauling junk, I guess.

5   Q.   Let's start with the hay.  Can you just describe what you

6   mean by hauling hay and what it is you observed?

7   A.   So they're small bales of hay.  They weigh maybe 50 or so

8   pounds, and I observed him picking them up from the ground and

9   putting them on a hay trailer, stacking them.

10  Q.   And have you seen this on more than one occasion?

11  A.   Yes, I have.

12  Q.   And what about the target shooting?

13  A.   Just there was a car with several people there, and they

14  were around the car.  He was helping them get the guns ready

15  and things like that to shoot and just walking around a lot of

16  the car and amongst the people there.

17  Q.   Have you seen that on more than one occasion?

18  A.   No.  Just the one time.

19  Q.   Okay.  And can you describe what you meant by hauling junk?

20  A.   Like a trailer, just full of -- I'm not really for sure

21  what, but there's been, like, a trailer being pulled behind a

22  truck going into the property.

23  Q.   And when you've seen him, have you seen him -- was he

24  coming or going with the junk?  In other words, is he loading

25  the junk at the farm or is he taking the junk from the farm?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.697

1    A.   He is coming to the farm.

2    Q.   So he has brought stuff to the farm?

3    A.   Yes.

4    Q.   Have you ever seen him drive away after he hauls that stuff

5    to the farm?

6    A.   Yes.

7    Q.   And is the trailer empty at that point?

8    A.   Yes.

9    Q.   Could you describe kind of just the Hay family farm from

10   what you can view from your residence, what's the terrain like?

11   A.   It's a hay ground and then there's some crop ground and

12   then there's some -- on a hillside, it's kind of rugged, muddy

13   dirt.

14   Q.   Have you ever seen the defendant building fences near your

15   property?

16   A.   Yes.

17   Q.   And do you recall when that was?

18   A.   I want to -- around 2010.

19   Q.   Can you describe the fence that you saw him building?

20   A.   It's similar to, like, a dog fence, like a kennel would

21   look like.

22   Q.   And how long was the fence?

23   A.   I would say roughly 50 yards.

24   Q.   And you saw him building that fence?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.698

1   Q.   Have you observed the defendant driving?

2   A.   Yes.

3   Q.   How often?

4   A.   Gosh, quite a bit.  Any time that he comes to the farm, so

5   some months it's more than others.

6   Q.   Have you -- do you typically see anybody with him in the

7   vehicle?

8   A.   Usually not.

9   Q.   And all of these activities that you've been talking about,

10  what's the general time frame that you're talking about here?

11  A.   Around 2009 to 2011, '12.

12  Q.   With respect to the driving, do you still see him driving a

13  lot?

14  A.   Yes.

15  Q.   To this day?

16  A.   Yes.

17  Q.   Have you ever observed the defendant when he's out working

18  on the farm when another vehicle has either approached or

19  driven up the gravel road?

20  A.   Yes.

21  Q.   What have you seen him do?

22  A.   Just get out and talk with them or they just visit in the

23  truck.

24  Q.   And when you've seen him out on the farm, does he typically

25  need the use of a cane?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.699

1    A.   Sometimes.  I've seen him with a cane.  I've seen him also

2    when a car is coming down the road that he picks up the cane if

3    he doesn't have it.

4    Q.   Okay.  Have you observed the defendant away from the farm

5    but in the community with other individuals in town?

6    A.   Yes, I have.

7    Q.   How does that compare to when you've observed him out on

8    the farm?

9    A.   Usually he has his cane most of the time if he's in -- if I

10   see him out in public.

11   Q.   And what types of public places are we talking about?

12   A.   Like events like Lane Fair.  I've seen him at a funeral,

13   grocery store.

14   Q.   Do you know the defendant's sister, Stacy Macom?

15   A.   Yes, I do.

16   Q.   Have you and your husband at times recorded some of these

17   physical activities that you've talked about today?

18   A.   Yes, we have.

19   Q.   Approximately when did you record those videos?

20   A.   2010, and then the last one was, like, October of 2011.

21   Q.   And do you recall why you know that it was that general

22   time frame?

23   A.   I worked in the emergency room with a nurse and her husband

24   was a workman's comp investigator for fraud, and so I kind of

25   visited with her, and she said the best way to --

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                          USA v. Bruce L. Hay
                                                          ROA - Volume 3, p.700

1        MS. RAMSEY:  Objection, Your Honor.

2        THE COURT:  Sustained.

3        MS. RAMSEY:  May we approach?

4        THE COURT:  I'll sustain.

5    (The following proceedings were had at the bench).

6        MS. RAMSEY:  I anticipate that her answer is going to

7    be, well, the best way to get someone engaging in fraud is to

8    record them.  I think that is totally improper to give that

9    type of testimony at this time.

10        THE COURT:  I agreed.  I sustained.  Is there anything

11    else you want me to do at this point?  What are you going to

12    ask her next?

13        MR. HUSCHKA:  I think I can do it a different way,

14    orient her to the time frames to get off the subject.

15        THE COURT:  We don't need to hear why she decided to

16    do this.

17        MR. HUSCHKA:  Right, yeah.

18        THE COURT:  Okay.

19    (Thereupon, the proceedings continued in open court.)

20    BY MR. HUSCHKA:

21    Q.   So how -- did you use a camcorder to record these

22    activities?

23    A.   Yes, I did.

24    Q.   And were you present when some, but not all, of those

25    videos were recorded?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.701

1    A.   Yes, I was.

2    Q.   And who had the camcorder?

3    A.   My husband.

4    Q.   At some point did you then download those videos to your

5    computer?

6    A.   Yes, I did.

7    Q.   And did that include some of the videos that you were

8    present for but also some that you were not, that your husband

9    recorded?

10   A.   Yes.

11   Q.   And were those videos downloaded along with other just

12   personal videos, significant moments in your life?

13   A.   Yes.

14   Q.   So when you talked about the time frame here, were those

15   personal moments at the same time in approximately 2010?

16   A.   Yes.

17          MR. HUSCHKA:  Your Honor, may I approach?

18          THE COURT:  Yes.

19   BY MR. HUSCHKA:

20   Q.   Ms. Snyder, I'm handing you what have been marked as

21   Government's Exhibits 71 and 72.  Do you recognize those?

22   A.   Yes, I do.

23   Q.   Are those videos that you and your husband recorded?

24   A.   Yes, they are.

25   Q.   Are those two instances in which you were present?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.702

1   A.   Yes, they are.

2         MR. HUSCHKA:  Move to admit Government's Exhibits 71

3   and 72.

4         MS. RAMSEY:  No objection.

5         THE COURT:  71 and 72 admitted.

6   BY MR. HUSCHKA:

7   Q.   Could you publish 71, please.

8        Could you describe the area where this is being recorded

9   from?

10  A.   Yes.  This was on my front porch.  I have a front door, so

11  it was just inside the front door and it was facing west across

12  the road.

13  Q.   And where is the defendant at this point?

14  A.   He's right inside the car with the white shirt on.

15  Q.   Is that the defendant right there that's walking back

16  towards the vehicle?

17  A.   Yes, sir.

18  Q.   Publish 72, please.

19       Again, are you recording from here?

20  A.   The same area, on the front porch at the front door.

21  Q.   Is this the same general area we just saw?

22  A.   Same general area, yes, sir.

23  Q.   And where is the defendant here?

24  A.   He is on the hay trailer with the white shirt on and the

25  hat.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.703

1   Q.   Do you know who the other individuals are in this video?

2   A.   The one is his sister, and I'm not for sure the other one.

3   Q.   Do you know which sister?

4   A.   Tina.

5   Q.   Is the truck moving there?

6   A.   Yes.

7   Q.   And had you seen other instances of the defendant engaged

8   in hay baling like this that you just didn't record?

9   A.   Yes.

10  Q.   Approximately how many times over the years you've lived

11  there have you observed the defendant out at his family's farm?

12  A.   Gosh, for multiple years.  Again, varying on the time of

13  the season.  Roughly 25 times, 20 to 25 times a month going to

14  the farm.

15  Q.   So fair to say you've seen him out there hundreds of times?

16  A.   Yes.

17  Q.   How many times have you seen his wife out there with him?

18  A.   Twice.

19  Q.   Have you ever seen him out there with a walker?

20  A.   No.

21       MR. HUSCHKA:  No further questions.

22                      CROSS-EXAMINATION

23  BY MS. RAMSEY:

24  Q.   Ms. Snyder, do you know Stacy Macom?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.704

1    Q.   That's Bruce's sister?

2    A.   Yes.

3    Q.   Do you talk often?

4    A.   Yes.  She's my neighbor.

5    Q.   She's your neighbor so she lives close to you?

6    A.   Yes.

7    Q.   Do you spend time in her house?

8    A.   Some.

9    Q.   She spent some time your house?

10   A.   Pardon?

11   Q.   Has she spent some time at your house?

12   A.   Not very often.

13   Q.   Have you guys gotten together at family functions or

14   anything like that?

15   A.   Yes.

16   Q.   You've never been to Bruce's home?

17   A.   No.

18   Q.   Don't hang out with him?

19   A.   No.

20   Q.   Don't talk to him?

21   A.   No.

22   Q.   Don't spend any time with him on a regular basis?

23   A.   No.

24   Q.   But you are friends with his sister, Stacy Macom?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.705

1   Q.  Can we play Government's Exhibit 71, please.  Could you

2   pause it, please.  Thank you.

3       Now, you said that you also served in the Army; is that

4   right?

5   A.  Air Force.

6   Q.  Have you fired a gun?

7   A.  Yes, ma'am.

8   Q.  Okay.  Sounds like a silly question, but -- and have you

9   ever had to wear the earmuffs that cover them when you're

10  firing the gun?

11  A.  Yes.

12  Q.  You'd agree they're designed to keep the loud sound and

13  noises of the gunfire from being able to be heard, correct?

14  A.  Yes.

15  Q.  Okay.  You would agree in Government's Exhibit 71, it looks

16  like everyone is wearing protective ear coverings, correct?

17  A.  Most of them.

18  Q.  That would include the gentleman you identified as Mr. Hay

19  in wearing those earmuffs?

20  A.  Yes.

21  Q.  Do you know any other family members of Mr. Hay?

22  A.  I know his mother and two other sisters, actually three

23  other sisters.  I don't -- I know of one, but I don't know her.

24  Q.  Understood.  You said you live across the street from the

25  property, from the Hay property or land.  Do you ever go on the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.706

1    property outside of Stacy's home?

2    A.   Yes.

3    Q.   Okay.

4         MS. RAMSEY:  May I have one second, Your Honor?

5         THE COURT:  Yes.

6         MS. RAMSEY:  I have nothing further.  Thank you, Your

7    Honor.

8         MR. HUSCHKA:  We have no questions, Your Honor.

9         THE COURT:  May Ms. Snyder be excused?

10        MR. HUSCHKA:  Yes, Your Honor.

11        THE COURT:  You're excused.

12        THE WITNESS:  Thank you.

13        THE COURT:  All right.  Call your next witness.

14        MR. HUSCHKA:  United States calls Bert Snyder.

15                        BERT SNYDER,

16   called as a witness on behalf of the government, having first

17   been duly sworn, testified as follows:

18                     DIRECT EXAMINATION

19   BY MR. HUSCHKA:

20   Q.   Mr. Snyder, could you state and spell your name for the

21   record and tell us where you live, just the city and state?

22   A.   Yes, sir.  Bert Snyder.  Lane, Kansas.

23   Q.   Are you married to Rhonda Snyder?

24   A.   Yes.

25   Q.   What do you do for a living?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.707

1    A.    I'm retired.  I worked for ExxonMobil for 42 years.

2    Q.    Prior to that did you serve in the military?

3    A.    Yes.

4    Q.    What branch did you serve in?

5    A.    National Guard.

6    Q.    Do you know Bruce Hay?

7    A.    Yes.

8    Q.    How do you know him?

9    A.    He's a neighbor.

10   Q.    When you say he's a neighbor, are you referring to his

11   family's farm?

12   A.    Yes.

13   Q.    Have you observed Mr. Hay engaged in various physical

14   activities on his farm?

15   A.    Yes.

16   Q.    What sort of things have you seen him engaged in?

17   A.    Pick up hay, walk, shoot guns, drive tractor, drive trucks.

18   Q.    And on occasion have you recorded the defendant engaged in

19   those activities?

20   A.    Yes.

21   Q.    And have you seen him engaged in those activities on

22   instances where you did not record him?

23   A.    Yes.

24   Q.    When you've seen him on the farm, does he typically use a

25   cane?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.708

1   A.   I'm sorry.  I couldn't hear you.

2   Q.   When you've seen him on the farm, does he typically use a

3   cane?

4        When you've seen him on the farm, does he use a cane?

5   A.   Yes, sometimes.

6   Q.   And if you have any trouble hearing me, don't hesitate to

7   speak up and let me know.

8   A.   I'm hard of hearing.  I'm sorry.

9   Q.   No, that's okay.  Just let me know.

10       Have you ever seen him with a walker?

11  A.   No.

12           MR. HUSCHKA:  Your Honor, may I approach?

13           THE COURT:  Yes.

14  BY MR. HUSCHKA:

15  Q.   Mr. Snyder, I'm handing you what have been marked as

16  Government's Exhibit 75 and 77.  Do you recognize those?

17  A.   Yes.

18  Q.   Are those recordings that you took of the defendant?

19  A.   Yes.

20           MR. HUSCHKA:  Move to admit Government's Exhibit 75

21  and 77.

22           THE COURT:  Any objection?

23           MS. RAMSEY:  One moment, Your Honor.  No objection.

24           THE COURT:  75, 77 admitted.  You can publish.

25  BY MR. HUSCHKA:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.709

1    Q.   Start with 75, please.

2         So is this being shot from your front porch?

3    A.   Yes.

4    Q.   Are you familiar with hay baling?

5    A.   Yes.

6    Q.   Approximately how much do the bales of hay that are being

7    shown here weigh?

8    A.   50 to 70 pounds.

9    Q.   What's that noise we hear in the background?

10   A.   It's my dog.

11   Q.   Pull up 77, please.  Can you describe where this is?

12   A.   It's -- it would be to the north of where the hay field

13   was.

14   Q.   And which one is the defendant?

15   A.   On the right.

16        MR. HUSCHKA:  I have no further questions.

17                    CROSS-EXAMINATION

18   BY MS. RAMSEY:

19   Q.   Mr. Snyder, do you know Stacy Macom?

20   A.   Yes.

21   Q.   We've -- so you're married to Rhonda Snyder, so I'm

22   assuming you live with Ms. Snyder?

23   A.   I'm sorry?

24   Q.   Your wife's name is Rhonda Snyder?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.710

1  Q.  So you live together, so you're next-door neighbors with

2  Stacy Macom; is that correct?

3  A.  Yes.

4  Q.  Have you spent some time with Stacy Macom?

5  A.  Yes.

6  Q.  How often?

7  A.  Maybe once or twice a week.

8  Q.  Once or twice a week?

9  A.  A month, a month.  Not a week.

10 Q.  And for how many years?

11 A.  I've known them for probably 25 years.

12 Q.  Once or twice a month for 25 years.  Okay.

13     Let's talk about -- you don't really know Bruce Hay; you're

14 not friends, correct?

15 A.  No.

16 Q.  You don't hang out together?

17 A.  No.

18 Q.  You don't talk to him regularly?

19 A.  No.

20 Q.  Never spent time in his home?

21 A.  No.

22 Q.  Don't speak to him?

23 A.  I'm sorry?

24 Q.  You don't speak to him?

25 A.  I have spoke to him on occasion.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                             USA v. Bruce L. Hay
                                             ROA - Volume 3, p.711

1    Q.   But you don't speak to him regularly?

2    A.   I don't see him regularly, no.

3    Q.   Okay.  And so you're not having any contact with him kind

4    of day in and day out?

5    A.   No.

6    Q.   And you've seen him on the farm, and you said sometimes

7    you've seen him and he does use the cane, correct?

8    A.   Yes.

9         MS. RAMSEY:  No further questions.  Thank you.

10        THE COURT:  Anything else?

11        MR. HUSCHKA:  No, Your Honor.

12        THE COURT:  All right.  May Mr. Snyder be excused?

13        MR. HUSCHKA:  Yes, Your Honor.

14        THE COURT:  All right.  Thank you.  You're excused.

15        Let's get started with the next witness, and then

16   we'll take a break before too long.

17        MR. OAKLEY:  Your Honor, the United States calls Stacy

18   Macom.

19                      STACY MACOM,

20   called as a witness on behalf of the government, having first

21   been duly sworn, testified as follows:

22                   DIRECT EXAMINATION

23   BY MR. OAKLEY:

24   Q.   Ms. Macom, let me clear off the stand for you.

25        Would you please start by telling the jury your name and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.712

1   spelling it for the court reporter, please.

2   A.   Can I take this off now?

3        THE COURT:  Yes.

4        THE WITNESS:  Is that okay?  My name is Stacy,

5   S-T-A-C-Y, Macom, M-A-C-O-M.

6   BY MR. OAKLEY:

7   Q.   And, ma'am, how are you employed?

8   A.   I work for Paola School District USD368, and I work through

9   the school year.  And then I am PRN for Crossroads Hospice.

10  Q.   What does PRN mean?

11  A.   As necessary.  I just have to pull one shift a month.

12  Q.   And what type of work do you do for the school district?

13  A.   I'm a school nurse for medical fragile.

14  Q.   Would you mind scooting that microphone a little bit.  It

15  will move, too, on its base if that's more comfortable.

16       And so do you have a nursing degree?

17  A.   I do.

18  Q.   What do you have?

19  A.   LPN.

20  Q.   Do you know an individual by the name of Bruce Hay?

21  A.   Yes, I do.

22  Q.   How do you know Bruce Hay?

23  A.   He's my brother.

24  Q.   Other than Mr. Hay do you have any other brothers or

25  sisters?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.713

1   A.   I have four sisters.  Four sisters.

2   Q.   And is Bruce Hay the only boy in your immediate family?

3   A.   Yes.

4   Q.   And where does Bruce Hay live?

5   A.   Greeley, Kansas.

6   Q.   And where do you live?

7   A.   Lane, Kansas.

8   Q.   And is Lane near Greeley?

9   A.   About ten minutes.

10  Q.   And has Bruce lived in Osawatomie?

11  A.   He has.

12  Q.   And how close is Osawatomie to Lane?

13  A.   It's north of me 10 minutes.  So 10 minutes and --

14  10 minutes.

15  Q.   How long have you lived in Lane?

16  A.   My whole life, 51 years.

17  Q.   And so since 2005 have you and Bruce lived within

18  20 minutes or so of each other?

19  A.   Yes.  Except when he was overseas, but yeah.

20  Q.   How frequently do you see Bruce?

21  A.   That varies depending on my work schedule, if I'm at home,

22  if I'm in my yard, if he drives by.  I'd say -- I could go see

23  him two or three times a day or I may not see him for a week or

24  whenever we meet -- I mean see each other again.  So just

25  varies when our paths cross.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.714

1   Q.   Generally speaking, how well do the two of you get along?

2   A.   There's just no relationship there.

3   Q.   And how long has it been like that?

4   A.   Where there's no relationship, probably since 2020.  It's

5   been recent.

6   Q.   And generally speaking, prior to 2020 what was your

7   relationship like with Bruce Hay?

8   A.   We just didn't see a lot of each other.  I stayed my way.

9   He stayed his way.  And, I mean, that kind of varies on -- over

10  a ten-year period on if you're having a minor argument or

11  something, you know, like siblings do, but I mean, as a rule we

12  got along for the most part.

13  Q.   Does Bruce have any involvement in farming?

14  A.   Yes.  After Dad died, he tried to farm.  It's -- he's not

15  good at it.  But, yeah, he farmed.  He did -- he does hay work.

16  Q.   When did your father pass away?

17  A.   2015.

18  Q.   And you said that Bruce does hay work?

19  A.   Yes.

20  Q.   When you say "hay work," can you explain what you mean?

21  A.   One instance I can come up with that is vivid is after Dad

22  died, we're going to all stick together and make the farm work,

23  and beings Bruce probably had the most knowledge of what to do,

24  because I don't farm, but I am capable of putting up hay, we

25  would put up hay together.  I only did it once or twice because

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.715

1    it's really not that much fun.  But you just -- they were

2    square bales at the time.  I'm thinking it's, like, 2015, the

3    summer of that year that we put up hay together.

4    Q.   Prior to 2015 -- well, let me back up.  Do you know whether

5    or not Bruce was involved in a car accident when he was in a

6    truck around 2005?

7    A.   Yes, he was.

8    Q.   So let me talk to you about the time period after his

9    accident in the truck.  Was Bruce involved in putting up hay

10   after that time?

11   A.   Yes.

12   Q.   How frequently?

13   A.   I can't answer that completely because I don't see him all

14   the time, plus I was working in the city, so I was not on the

15   farm.  But I do know that when Dad put up hay, he'd just need

16   hay help so you have -- you know, whoever is willing to work in

17   the field go with you.

18   Q.   And can you explain for the jury what putting up hay means,

19   what that entails?

20   A.   When it's a square bale, you have a hay hook, and you I

21   don't know -- can I stand up?

22   Q.   Sure.

23   A.   It's hard to do this -- if I was doing it, I would take the

24   hay hook, hit the hay bale and grab the wire, and either throw

25   it up or kick it up.  I kick a lot because -- stronger.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.716

1  Q.  And so when you're saying putting up hay, are you referring

2  to once the hay is cut and put into bales, then what you're

3  describing, you refer to as putting up?

4  A.  Right.  You stack it on the trailer from the field, and

5  then you would drive it to the barn and you would throw it in

6  the barn, and somebody would drag it and stack it in the barn.

7  Q.  And after your father died, you said that Bruce was

8  involved in putting up hay?

9  A.  Yes.

10  Q.  How frequently?

11  A.  That's hard to put a number on because depends on how many

12  hay fields you have, but -- and then how many times you cut it

13  per season, and of course I don't know how many times he cut

14  per season, but you cut a hay field at least once a season.  I

15  don't know.

16  Q.  Okay.  And has that been continuous since -- well, let me

17  ask you this.  Prior to your father passing away, from 2005

18  until your dad passed away, was Bruce involved in helping

19  putting up hay?

20  A.  Yes.

21  Q.  And then after your father passed away, has Bruce been

22  involved in putting up hay?

23  A.  Yes.

24  Q.  Have you seen him out there putting up hay?

25  A.  I put up hay with him.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.717

1    Q.   Do you remember when that was?

2    A.   It was after Dad died, so I'm assuming it was the summer

3    that Dad died because we were trying to make this farm thing

4    work.

5    Q.   Was that the only time after your dad died that you were

6    involved with Bruce in putting up hay?

7    A.   It's the only time I recall.

8    Q.   I want to talk to you about an incident, September of 2021.

9    Was there a time where you saw Bruce on a roof?

10   A.   Yes.

11   Q.   And where was that at?

12   A.   In Greeley, Kansas.

13   Q.   And whose house?

14   A.   Bruce's house.

15   Q.   And did you record what you saw?

16   A.   I did.

17   Q.   I want to hand you what's been marked as Government's

18   Exhibit 74.  And is that a disk containing the video that you

19   took?

20   A.   Yes.

21        MR. OAKLEY:  Your Honor, I offer Government's

22   Exhibit 74.

23        THE COURT:  Any objection?

24        MR. MAGARIEL:  Nothing beyond what we previously made

25   a record, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.718

1          THE COURT:  I've made the record on that before.

2    Exhibit 74 admitted.

3          MR. OAKLEY:  May we play 74?

4          Thank you.  I have no further questions, Your Honor.

5                    CROSS-EXAMINATION

6    BY MR. MAGARIEL:

7    Q.   Good afternoon, ma'am.

8    A.   Good afternoon.

9    Q.   The government asked you some questions about Mr. Hay's car

10   accident in 2005.  Do you remember that?

11   A.   Faintly.  I know when it happened, and I know some

12   circumstantial -- I guess that's the word I want to use.  I

13   wasn't at the scene, put it that way.

14   Q.   Okay.  But sounds like you were at least talking to Bruce

15   back in 2005?

16   A.   Oh, yeah.

17   Q.   And you know that he was injured in that accident?

18   A.   I don't recall all that.  I remember more about his

19   daughter.

20   Q.   Okay.  So you're telling the jury that you don't remember

21   if Mr. Hay suffered any injuries in that car accident?

22   A.   In all fairness, no, I don't remember that.

23   Q.   Okay.  So the government asked you some questions about

24   whether -- we're using the word "hay" a lot here, but whether

25   Mr. Hay did hay work back in 2005; do you remember that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.719

1    A.    Uh-huh.

2    Q.    Is that yes?

3    A.    Yes.

4    Q.    And your answer was you believed that he was?

5    A.    That he was doing hay work?

6    Q.    Yes, ma'am.

7    A.    100 percent.

8    Q.    Are you saying that from the day after that car accident he

9    was doing hay work?

10   A.    I'm not saying a day after, but since then he has done hay

11   work, yes.

12   Q.    Was he doing it in 2005?

13   A.    That I can't remember.  That's a long time ago.

14   Q.    Okay.  Was he doing it 2006?

15   A.    That I don't remember either.  I don't remember 17 years

16   ago.

17   Q.    All right.  So I want to make sure that the jury

18   understands the point you were trying to make there.  You

19   weren't saying he was in the car accident this day, and then

20   the next day I know for a fact he was out baling hay?

21   A.    Oh, I can't recall that.

22   Q.    Okay.  Your point is sometime after 2005 you have seen him

23   bale hay?

24   A.    I have seen Bruce put up hay numerous times over the past

25   17 years.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.720

1    Q.   I appreciate that clarification.  Thank you.

2         You were shown an Exhibit 74 where Mr. Hay was, it looked

3    like, working on the roof; is that right?

4    A.   He was removing fire debris from the house fire they had --

5    Q.   Okay.

6    A.   -- out the back -- or the upstairs window.

7    Q.   And you knew that that house had caught on fire?

8    A.   I did.

9    Q.   What was your reaction to that?

10   A.   Of the house fire?

11   Q.   Uh-huh?

12   A.   Sad.

13              MR. OAKLEY:  Objection, relevance, Your Honor.

14              THE COURT:  I don't know what the relevance is.

15              MR. MAGARIEL:  Goes to her bias, Your Honor.

16              THE COURT:  All right.  Go forward.  I'll decide

17   whether it's relevant.  Keep going.

18   BY MR. MAGARIEL:

19   Q.   You said it was sad?

20   A.   Anybody's house fire is sad.

21   Q.   That was your reaction?

22   A.   Yeah.

23   Q.   Do you remember being interviewed by Agent Baker?  And I

24   think that's the gentleman that's sitting here on the right of

25   the table.  Do you remember that?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.721

1   A.   Yes, uh-huh.

2   Q.   Okay.  And did you meet with him in May, specifically

3   May 23rd of 2021?

4   A.   I don't know the date exact, but that sounds about right.

5   Q.   Okay.  Was that at your house?

6   A.   Yes.

7   Q.   And was your husband present for that interview as well?

8   A.   Yes, I asked him to be for my moral support.

9   Q.   Okay.  And Agent Baker came to your home, spoke to you and

10  your husband, interviewed you; fair to say?

11  A.   Uh-huh, yes.

12  Q.   Asked you a lot of questions, mostly about Bruce?

13  A.   Yes.

14  Q.   I want to talk to you about some of the things that you

15  told Agent Baker that day.  Do you remember telling Agent

16  Baker -- and, again, this is May of 2021 -- that you did

17  believe that Mr. Hay has a disability?

18  A.   I do believe he has a disability of some sort.  I can't

19  pick up on what it is, but it's not as severe as it's made out

20  to be.  I don't know how to put that nicely.

21  Q.   I understand.  So do you remember telling Agent Baker an

22  example of the disability is if Mr. Hay hears a firecracker,

23  he'll jump and have a reaction?

24  A.   Yes.  I have seen that.

25  Q.   And do you remember in fact telling Agent Baker you wanted

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.722

1    to set off a bunch of Black Cats just to see him jump?

2    A.   Yes, only because I'm scared of them too, so I would never

3    set them off.

4    Q.   But you told that to Agent Baker?

5    A.   Yes.

6    Q.   Last year.  Is that yes?

7    A.   Yes.

8    Q.   I saw you nod your head.  I want to make sure.

9         And you said the reason that you might want to make Bruce

10   jump in setting off Black Cats is because Bruce makes you mad?

11   A.   He has made me mad, yes.

12   Q.   And you said that after Bruce hears a firecracker, he would

13   shake like he had Parkinson's?

14   A.   It's not at the same time.  Like, I think my son set a

15   firecracker off, and I seen him jump once, do, like, a half

16   step.  Does that make sense?

17   Q.   So are you saying that my statement that you told Agent

18   Baker in May of '21 that if Bruce hears a firecracker, he'll

19   shake like he had Parkinson's, that I'm not correct; you did

20   not say that to Agent Baker?

21   A.   It seems extreme.  If I said it, I can't deny it, but I

22   don't recall saying it in that form.  Does that make sense?

23   Q.   Okay.  I just want to make sure I'm clear.  You deny making

24   that statement?

25   A.   I don't recall it.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.723

1   Q.   Okay.  Do you remember telling Agent Baker that one time

2   you and your husband had to assist Mr. Hay getting to his truck

3   after he heard fireworks?

4   A.   No.  That -- that didn't -- that didn't -- that's not what

5   happened on that -- the one time that I seen him, Laurie helped

6   him to the car.

7   Q.   Okay.  So you deny that statement as well?

8   A.   Yeah, I didn't help him to the car.

9   Q.   So you deny telling Agent Baker that you and your husband

10  helped Mr. Hay get to his truck?

11  A.   I deny that because -- I mean, because that didn't happen

12  that way, because he was in my house, but his wife helped him

13  to the car.

14  Q.   And do you remember telling Agent Baker that day Mr. Hay

15  was disabled?

16  A.   He had a disabled moment that day, I guess.  I don't know

17  what -- I can't define his disability.

18  Q.   Okay.  I'll ask that question again.  Do you deny saying to

19  Agent Baker that day he, referring to Bruce Hay, was disabled?

20  A.   I don't know if that day he was disabled.

21  Q.   I'm asking if you said that to Agent Baker in May of 2021.

22  A.   That's been a year ago.  I don't know exactly my wording,

23  but if I said it, I said it.

24  Q.   Okay.  I'm asking you if you said it, ma'am.

25  A.   I guess I said it.  I mean, I don't know exactly the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.724

1    wording.  I don't recall that entire conversation.

2    Q.   Okay.  And do you remember telling Agent Baker that you

3    have seen this, referring to Mr. Hay, acting like he had

4    Parkinson's and disability?

5    A.   I have seen him at my house do that.

6    Q.   Okay.  And was that after he heard a firecracker?

7    A.   You know, I don't know why he was at my house that night.

8    It's not like he came out all the time, but we -- I remember

9    having a long conversation.  I don't know even what month it

10   was in.  I know they left before dark.  It was just one of

11   those things you see him at your house, he started having his

12   little episode, and then they left after we visited for an

13   hour.

14   Q.   Okay.  You don't remember if anything in particular caused

15   Mr. Hay to have that -- I think what you called an episode?

16   A.   Yeah, I don't know why it happened.

17   Q.   Okay.  And so I'll get back to the question I think I

18   asked.  Do you remember telling Agent Baker that day he was

19   disabled, "So I will say, I have seen this," in reference to

20   Mr. Hay, appearing disabled?

21   A.   I have seen it.  I have seen it that time.

22   Q.   Okay.  You don't remember what -- I'm sorry?

23   A.   I don't know what you're going for there.

24   Q.   I'm just trying to ask you questions about what you told

25   Agent Baker last year.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.725

1   A.   Okay.

2   Q.   Do you remember also telling Agent Baker -- and I think you

3   maybe referenced this earlier -- that your son was blowing up

4   loud firecrackers one day?

5   A.   Uh-huh.

6   Q.   Is that yes, ma'am?

7   A.   Yes.

8   Q.   And do you remember describing if you put those

9   firecrackers inside of metal, like a metal tube or something

10  like that, it makes them particularly loud?

11  A.   Correct.

12  Q.   And do you remember telling Agent Baker that Bruce Hay was

13  walking by your mother's porch, and you knew that your son, who

14  I think is Corey, was setting off these particularly loud

15  fireworks in metal?

16  A.   Correct.

17  Q.   And do you remember that you knew that he was doing this,

18  but Bruce had just arrived, so he was unaware that this was

19  happening?

20  A.   Correct.  My son did not know he was there.

21  Q.   And Bruce did not know your son was there?

22  A.   Correct.

23  Q.   And do you remember telling Agent Baker that when the next

24  firework, I guess, blew up, that Bruce stumbled and missed a

25  step and you saw him have that reaction?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.726

1    A.   I did.

2    Q.   And so you said something to the effect of -- to Agent

3    Baker, you believe it's valid that Bruce is setoff or scared by

4    those kind of booms?

5    A.   Oh, sure, yes.  But I'm scared of them too, so I think it's

6    a normal reaction.

7    Q.   Do you also remember telling Agent Baker that there were

8    three different times you've seen Mr. Hay have a reaction where

9    it appears he has a disability?

10   A.   I don't remember the three times right now.  I do remember

11   him being at my table.  If you knew the other times to get my

12   memory, but...

13   Q.   But when you referenced the table, I think what you were

14   talking about earlier that Mr. Hay had some sort of reaction,

15   but you don't remember what triggered it?

16   A.   Yeah, I don't know what triggered that.

17   Q.   Do you remember telling Agent Baker an additional time you

18   believe Mr. Hay has a disability?

19   A.   He has something going on, but I don't know what it is.

20   And it could be a disability, for lack of knowing what to call

21   it.

22   Q.   I think to your point I think you made earlier that you

23   told Agent Baker you didn't believe it was a full disability

24   and you thought that Mr. Hay could work because you seen him do

25   tasks where you thought he could work; is that right?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.727

1    A.   That is correct.

2    Q.   And, in fact, do you remember telling Agent Baker that

3    there's a period of time where Bruce wasn't safe to drive

4    because of his disability?

5    A.   You know, that came and went, just random.

6    Q.   But some period of time in the past Bruce was not safe to

7    drive, and Laurie was driving him everywhere; is that right?

8    A.   I don't know how much that was involuntary -- or voluntary.

9    I don't know --

10   Q.   That's not the question I asked you.  I asked you if you

11   had told Agent Baker there was a period of time where Bruce

12   wasn't safe to drive, Laurie would drive him everywhere?

13   A.   I would have said that, but I don't know the circumstances

14   to why she was driving him.

15   Q.   Do you remember telling Agent Baker that you seen Bruce

16   lock up?

17   A.   Lock up?

18   Q.   Lock up, l-o-c-k u-p?

19   A.   It's usually when he's having that episode, like, I think

20   he'll do that (indicating), but it's -- it's infrequent.

21   Q.   I think you told Agent Baker it's not a thing that happens

22   all the time, but you told Agent Baker, "I'm not saying that he

23   doesn't do it," as far as the locking up?

24   A.   I have seen that, but I can't even remember a specific time

25   when it happened.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.728

1  Q.  Do you think the times -- and I said three, and you aren't

2  sure it was three, but the times you've seen Bruce lock up, was

3  that after the car accident?

4  A.  That I cannot recall.

5  Q.  Do you remember times when he would lock up before the car

6  accident in 2005?

7  A.  I can't even tell you -- I cannot visualize a memory of

8  when he was locked up, but I do know I have seen it, but I

9  can't visualize when it happened.  Like at the kitchen table, I

10 remember seeing that, so I can visualize that.

11 Q.  So there have been some occasions, you don't know the exact

12 number, when you have seen Mr. Hay, as you described, lock up?

13 A.  Maybe once or twice at the most, but I have not seen it

14 frequent.

15 Q.  Okay.  So -- and I think I asked you this earlier.  I want

16 to circle around.  Did you tell Agent Baker in May of 2021

17 there were three times that you had seen Mr. Hay where it

18 appears he has a disability?

19 A.  Yes.  I do recall saying that, but I don't remember the

20 other two times I seen that.

21 Q.  Okay.  So --

22 A.  A lot has happened.  A lot has happened, and I do not

23 remember the other two times I saw it, but I can say he did it

24 once at my kitchen.

25 Q.  If I understood your testimony, you've largely had no

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.729

1   relationship with Mr. Hay since 2020; is that what you said?

2   A.   It's a relationship, seeing him drive up and down the road,

3   I try to avoid because I don't like conflict, and to avoid the

4   conflict, you avoid him.

5   Q.   But after that in 2021 you told Agent Baker you've seen him

6   look like he has a disability three times?

7   A.   Over the past 20 years, I could -- I could imagine I seen

8   three times over 20 years.  I can't remember the specifics of

9   those.

10        MR. MAGARIEL:  I don't know if this is a good time to

11  take a break, but this is a good time in my examination if it's

12  a good time for the court.

13        THE COURT:  We'll take a break for 15 minutes.

14  (Recess taken at 3:12 p.m.)

15  (The following proceedings occurred outside the presence of

16  the jury.)

17        THE COURT:  You wanted to take something up?

18        MR. MAGARIEL:  We do, Your Honor.  I wonder if it

19  would be appropriate to excuse this witness.

20        THE COURT:  Or come up here.

21  (The following proceedings were had at the bench).

22        MR. MAGARIEL:  Judge, I have prepared -- I had three,

23  but I think for this purpose I have two clips from the recorded

24  interview with her and Mr. Baker that I am going to request to

25  play for impeachment purposes.  I gave her an opportunity to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.730

1    admit to the statements.  She denied them.  It's a short clip.

2    I almost asked her word for word the statement.

3          The third statement I had was about the fireworks

4    thing, and she admitted to that, so I don't think it's proper

5    impeachment, but the other two are.  The first one is the

6    statement that she believes he has a disability and a

7    description that she makes of seeing him shake like he has

8    Parkinson's, which she specifically denied, and then the second

9    is the statement where she said she seen him like that three

10   times, that she believes he has a disability, and that it does

11   have that -- I didn't cut it weird short [verbatim] where she

12   says, "I don't think it's all the time, but it is something

13   I've seen and I do believe he has a disability."

14         I've given her a chance to admit it.  She's denied it,

15   so I'd like to play those for impeachment purposes.

16         THE COURT:  I think she's caved on everything she

17   talked about.  You worked her over pretty well.  I mean, you're

18   right; at first she was saying, no, no, I don't recall or

19   whatever.  But I thought she specifically at some point said,

20   well, yeah, it's kind of like that.  She acknowledges the

21   Parkinson's, and she acknowledged it could have been three

22   times.  She doesn't have an independent recollection of the

23   specifics of the three times.

24         MR. MAGARIEL:  I thought she specifically denied the

25   Parkinson's, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.731

1          MR. OAKLEY:  My recollection is as the court said,

2    that after a little beating up on that, she came around, and I

3    don't know that --

4          THE COURT:  I'm trying to remember specifically.  I

5    know on the three times she acknowledged finally, but the

6    Parkinson's, I thought she did that too.  But, I mean, I can't

7    swear to it obviously.

8          Why don't you play that clip, the Parkinson's clip.  I

9    mean, she has said several times now that, yeah, it could have

10   been three times.  She made a big thing about it over the

11   course of 20 years, I just can't talk about specifics, I can

12   only visualize the one at my tables.  As far as the Parkinson's

13   one, go ahead and play that.

14         MR. MAGARIEL:  Thank you, Your Honor.

15         MR. OAKLEY:  Just to be clear, Your Honor, this is

16   only offered for impeachment, not offered for the jury?

17         MR. MAGARIEL:  I agree.  That's why I'm offering it.

18         THE COURT:  Okay.  All right.

19      (Thereupon, the proceedings continued in open court.)

20      (The jury entered the courtroom, after which the following

21   proceedings were had.)

22         THE COURT:  Counsel, will counsel approach the bench?

23      (The following proceedings were had at the bench).

24         THE COURT:  I went back to my notes.  If my notes are

25   any good, she did acknowledge, I've seen him at my house acting

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.732

 1   like he has Parkinson's, not sure if this was in reaction to

 2   fireworks.  He had an episode, and they left.  I don't know why

 3   he had the episode.

 4        So you had asked about Parkinson's, and she

 5   acknowledged.

 6        MR. MAGARIEL:  I obviously don't want to fight with

 7   you, Your Honor, but my memory is different than that.

 8        THE COURT:  All right.  Set the stage again.  Ask her

 9   again about the Parkinson's, and then if she denies, then you

10   can play the clip.

11        MR. MAGARIEL:  Thank you.

12     (Thereupon, the proceedings continued in open court.)

13   BY MR. MAGARIEL:

14   Q.  Mrs. Macom?

15   A.  Yes.

16   Q.  I want to go back to a couple of topics that I think we've

17   covered somewhat, but I want to make sure I'm clear on what

18   answer you gave me.

19     I asked you some questions about you meeting with Agent

20   Baker in May of 2021.  Do you remember that?

21   A.  Yes.

22   Q.  And you remember he came to your house, he interviewed you,

23   spoke to you and your husband?

24   A.  Yes.

25   Q.  Did you tell Agent Baker in that interview that on a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.733

1  particular occasion you saw Mr. Hay shake like he had

2  Parkinson's?

3  A.   I did say that, yes.

4  Q.   And do you remember telling Agent Baker that there were

5  three times that you had seen Mr. Hay shake like that, and you

6  believe he had a disability?

7  A.   I can't to this day remember the other two times that I was

8  thinking at the time.  A lot has happened since then.

9  Q.   That's at least what you told the agent last year?

10 A.   Yes.

11      MR. MAGARIEL:  That's all I have, Your Honor.  Thank

12 you.

13      MR. OAKLEY:  I have no redirect, Your Honor.

14      THE COURT:  All right.  May Ms. Macom be excused?

15      MR. OAKLEY:  Yes, Your Honor.

16      THE COURT:  All right.  Thank you.

17      You can call your next witness.

18      MR. HUSCHKA:  The United States calls Joe Hughes.

19                    JOE HUGHES,

20 called as a witness on behalf of the government, having first

21 been duly sworn, testified as follows:

22                DIRECT EXAMINATION

23 BY MR. HUSCHKA:

24 Q.   Mr. Hughes, good afternoon.

25 A.   Good afternoon.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.734

1    Q.   Could you state your full name for the record.

2    A.   Joseph Gordon Hughes.  I go by Joe.

3    Q.   What is your occupation?

4    A.   I'm retired.

5    Q.   What did you do before you retired?

6    A.   I was a deputy sheriff for Miami County, Kansas.

7    Q.   How long were you deputy sheriff?

8    A.   I was there -- I retired at 23 years.

9    Q.   Were you with the sheriffs office back in 2012?

10   A.   Yes, I was.

11   Q.   I want to bring your attention specifically to July 12,

12   2012.  What was your position at that time?

13   A.   I was a road patrol sergeant for Miami County.

14   Q.   Were you called out to an incident that day?

15   A.   Yes, I was.

16   Q.   What did that incident relate to?

17   A.   It was a car motor vehicle -- motorcycle versus a cow, and

18   a car was also involved.

19   Q.   So was -- did a motorcycle hit a cow?

20   A.   Yes.

21   Q.   And where did that happen?

22   A.   Happened on 379th Street just west of Perssonville Road.

23   Q.   Do you recall what time of day it was?

24   A.   We were dispatched about 5:00 in the morning, 5:08.

25   Q.   And what city is that in, the area that you're describing?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.735

1   A.   It's rural Osawatomie.

2   Q.   Is it close to Lane?

3   A.   Yes.  It's east of Lane.

4   Q.   And were you familiar with that area back at the time?

5   A.   Yes, I was.

6   Q.   Was it part of your road patrol area?

7   A.   Yes, it was.

8   Q.   What happened when you arrived on the scene?

9   A.   I made contact with the deputy working the accident.  I

10  assisted the deputy with the accident investigation.

11  Q.   And who did you have contact with on the scene?

12  A.   Besides the deputy?

13  Q.   Yes.  Individuals who were at the scene.

14  A.   A Mr. A.E. Hay, Bruce Hay, a Dennis (Joe) Hay, goes by Joe.

15  Q.   And did you speak with Bruce Hay that day?

16  A.   Yes, I did.

17  Q.   Were you trying to determine whose cow it was that had

18  gotten out that led to the accident?

19  A.   Yes, I was.

20  Q.   And what did Mr. Hay say?

21  A.   He said it wasn't his cow or A.E. Hay's cow.

22  Q.   Do you know who A.E. Hay is?

23  A.   I think -- it's my belief it's Bruce's father.  It's a

24  close relative.

25  Q.   Okay.  Did Bruce Hay indicate why he did not think that it

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.736

1   was either him or his father's cow that had gotten out?

2          MR. MAGARIEL:  Objection; relevance.

3          THE COURT:  Overruled.

4          THE WITNESS:  He said that the cow had short legs, and

5   A.E. Hay would not have cows that had short legs.

6   BY MR. HUSCHKA:

7   Q.   And did he discuss the state of the fence along their

8   property line?

9   A.   Yes, he did.

10  Q.   What did he say about that?

11  A.   He said that he had fixed, repaired, or replaced the fence

12  from County Line to Perssonville Road.

13  Q.   How far is that, the County Line to Perssonville Road?

14  A.   Three miles.

15  Q.   When you were on the scene, did you observe the fence that

16  Mr. Hay was talking about?

17  A.   I did.

18  Q.   And what was the state of the fence?

19  A.   The state of the fence was fair.  It should have held the

20  cows.

21  Q.   Did it look like it had been fairly recently replaced?

22  A.   I don't remember.

23  Q.   Did it look like it was in good condition?

24  A.   It was in fair condition.

25  Q.   And this was in July of 2012?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.737

1   A.   Yes.

2   Q.   During your interaction with Bruce Hay that day, did he

3   need the use of a walker?

4   A.   I don't remember.

5   Q.   Do you recall if his wife was with him?

6   A.   I don't remember.

7           MR. HUSCHKA:  No further questions.

8           MR. MAGARIEL:  Nothing for this witness, Your Honor.

9           Thank you for your time, sir.

10          THE COURT:  May this witness be excused?

11          MR. HUSCHKA:  Yes, Your Honor.

12          THE COURT:  You're excused.  Call your next witness.

13          MR. HUSCHKA:  United States calls David Ellis.

14                      DAVID ELLIS,

15   called as a witness on behalf of the government, having first

16   been duly sworn, testified as follows:

17                  DIRECT EXAMINATION

18   BY MR. HUSCHKA:

19   Q.   Mr. Ellis, what do you do for a living?

20   A.   Now I'm a code enforcement officer for the City of

21   Osawatomie.

22   Q.   How long have you been doing that?

23   A.   Since 2019.

24   Q.   What did you do prior to that?

25   A.   Prior to that I was a police chief of Osawatomie Police

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.738

1   Department, and then prior to that I was a game warden for the

2   State of Kansas.

3   Q.   Are you familiar with the Defendant Bruce Hay?

4   A.   Yes.

5   Q.   How do you know Bruce Hay?

6   A.   Well, my daughter was in high school and their daughter was

7   in high school at or about the same time, and also he was a

8   neighbor, just one house down the street.

9   Q.   And during what years were you neighbors with Bruce Hay?

10  A.   Well, let's see, the teacher that lived in the house, the

11  rental house, she moved out 2011, so I'm assuming 2015 -- or

12  correction, 2012 to 2015, 2016, right in that area.

13  Q.   So during the time that you lived next to Bruce Hay, did

14  you ever see him needing the use of a walker to move about?

15  A.   I would see him use a cane now and then, yes.

16  Q.   And I want to bring your attention now to approximately

17  2012 or 2013.  Did you have occasion to observe the defendant

18  at a yard sale?

19  A.   Yes, I did.

20  Q.   What do you recall about that incident?

21  A.   I was just out in my driveway.  I don't know why I was

22  outside.  But they were having a yard sale in their front yard,

23  and we live on pretty much a main thoroughfare through the

24  western part of town.

25  Q.   Did it start to rain that day?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.739

1   A.   Yes, kind of a brief rainstorm just all the sudden just

2   kind of popped up, and they had some furniture items out in the

3   front yard and they were trying to get them to someplace dry.

4   Q.   When you say "they," who are you referring to?

5   A.   I know the Defendant Bruce was one of them and another

6   white male.  I didn't recognize him.

7   Q.   Were they physically moving furniture into the house?

8   A.   Yes.  They picked up -- it was like a love seat or a couch.

9   It wasn't a big couch.  It was more of a love seat type where

10  they grabbed each end and put it up on the porch.

11  Q.   Was Bruce on one end of that?

12  A.   He was.

13  Q.   And did he drop his cane and move that in once the rain

14  started?

15  A.   I don't even remember him carrying a cane out there.

16          MR. HUSCHKA:  No further questions, Your Honor.

17          MR. MAGARIEL:  I don't have anything for this witness,

18  Your Honor.  Thank you, sir.

19          THE COURT:  May Mr. Ellis be excused?

20          MR. HUSCHKA:  Yes, Your Honor.

21          THE COURT:  Thank you, Mr. Ellis.

22          Call your next witness.

23          MR. HUSCHKA:  United States calls Special Agent Nathen

24  Howard.

25          It will be just a moment, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.740

1                          NATHEN HOWARD,

2    called as a witness on behalf of the government, having first

3    been duly sworn, testified as follows:

4                         DIRECT EXAMINATION

5    BY MR. HUSCHKA:

6    Q.   Agent Howard, what do you do for a living?

7    A.   I'm a criminal investigator with the Department of Veterans

8    Affairs Office of the Inspector General.

9    Q.   How long have you been with VA-OIG?

10   A.   Been an employee with VA-OIG here in Kansas City since

11   2013.

12   Q.   What did you do prior to that?

13   A.   Prior to that I was a criminal investigator with the Air

14   Force Office of Special Investigations, and I was a criminal

15   investigator with the VA police -- the Veteran Affairs

16   Administration.

17   Q.   I want to bring your attention to March 24, 2017.  Were you

18   involved with a team of agents who observed the Defendant Bruce

19   Hay that day?

20   A.   Yes, I was.

21   Q.   Was that in connection with a dental examination that he

22   had at the VA Medical Center?

23   A.   As I recall, it was a dental examination, yes.

24   Q.   And were you tasked with filming some of his movement

25   within the VA facility that day?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.741

1    A.   I was.

2           MR. HUSCHKA:  May I approach, Your Honor?

3           THE COURT:  Yes.

4    BY MR. HUSCHKA:

5    Q.   I'm handing you what have been marked as Government's

6    Exhibits 26, 27, and 28.  Do you recognize those?

7    A.   Yes, I do.  I initialed and dated them.

8    Q.   Is that surveillance footage from the VA on that date?

9    A.   Yes, it is.

10          MR. HUSCHKA:  Move to admit Government's Exhibits 26

11   through 28.

12          MR. MAGARIEL:  No objection, Your Honor.

13          THE COURT:  Exhibits 26 through 28 admitted.  You can

14   publish.

15   BY MR. HUSCHKA:

16   Q.   Pull up 26, please.

17       So can you just orient the jury and tell us what we are

18   seeing right here and where are you at?

19   A.   From the -- from what it looks like, I would probably be

20   sitting down in a chair that looks exactly like the one you see

21   in the picture just across from it.

22       During that day I had a Starbucks coffee cup which was

23   outfitted with a covert camera.  The VA facility had a

24   Starbucks in the lobby, so it didn't look out of place.  So I

25   was tasked with surveillance during that time, and I was

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.742

1   carrying a Starbucks cup so it wouldn't look out of place, and

2   it had an audio recorder in it.  And I was sitting there.  I

3   believe at this time I had the coffee cup sitting on my knee.

4   Q.   At this point are you just waiting for the defendant to

5   arrive in the lobby area?

6   A.   That seems probably about right.  I don't recall exactly,

7   but if I was sitting there, it was probably communication on

8   the radio there.

9   Q.   Were you in contact with other agents who may have been in

10  other places throughout the medical center?

11  A.   Yes.  There was other agents and we were in contact at that

12  time.

13  Q.   Can you go to about 9:50 seconds.

14       Did you continue to wait here for a little bit?

15  A.   As I recall, I probably would have waited until I either

16  left or, you know, whoever we were looking at showed up.

17  Q.   Who is that?

18  A.   Looks like Mr. Bruce Hay.

19  Q.   Is he with anybody else?

20  A.   Not that I can see in the video at this time.

21  Q.   Could you fast-forward to about 12 minutes.

22       Do you just sit in the lobby here with him while he's there

23  waiting?

24  A.   Yeah, I would have sat there as long as he sat there.  The

25  sole purpose -- the reason I was there was to obtain

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.743

1    surveillance video evidence.

2    Q.   Can you go to 13 minutes 40 seconds, please.

3         Do you recall what the defendant was doing here?

4    A.   I believe he was watching TV.  As I recall, I think I was

5    close to a corner, if I recall correctly, and I think there was

6    a TV in the corner overhead that was TV playing.

7    Q.   So we've been fast-forwarding here at times through this

8    clip, but you've been sitting here across from him filming that

9    entire time as we've jumped from point to point?

10   A.   Yes.

11   Q.   Could you publish 27.

12        So can you explain these cameras are -- this appears to be

13   a continuous recording, but they're broken up.  Is there a

14   reason for that?

15   A.   From what I understand of the data the camera captures is

16   it can only -- it captures continuously, but the way the files

17   are broken down is it segments those files into certain time

18   frames.  But they are continuous -- it is a continuous video

19   for purposes of capturing it live.  But when you download the

20   data, it fragments it to compress it because the data is so

21   large.  That's my understanding of what we were explained.

22   Q.   So 27, which follows 26, is just a continuation of the sort

23   of same period of time that you were conducting surveillance?

24   A.   Yes.  At no time did I turn the camera off.  It was a

25   continuous -- the camera ran continuously.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.744

1   Q.   Could you fast-forward to about 13 minutes 50 seconds.

2        Do you recall when his name was called if the defendant's

3   wife went back with him?

4   A.   I don't recall if she did or not.

5   Q.   And then if you could publish 28.

6        Does this refresh your recollection?

7   A.   Yeah, it appears that he went back on his own.

8   Q.   And at this point does the video continue to run, but the

9   defendant is back in the room at this point in the dentist

10  office?

11  A.   Correct.

12            MR. HUSCHKA:  You can stop it there.

13            No further questions.

14                    CROSS-EXAMINATION

15  BY MR. MAGARIEL:

16  Q.   Good afternoon, Agent Howard.

17  A.   Good afternoon.

18  Q.   I have a couple of questions for you about some of these

19  videos.

20       Would you please display Government's Exhibit 26 again.

21  Can you start about the 12 minute 38 second mark.  You can stop

22  that.  Thank you.

23       Agent, do you remember watching that when you were there in

24  the room?

25  A.   Do I remember -- do I remember watching it?  I don't recall

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.745

1   watching.  I mean, this is the video I took.  You know, I don't

2   recall being there at that time, if that makes any sense.

3   Q.   Okay.  Obviously what we saw on the screen was it looked

4   like Mr. Hay somewhat awkwardly sat up and had his wife look at

5   something on his back?

6   A.   Yeah, that's what it looked like.

7   Q.   Can we turn to the 28 -- Government's Exhibit 28, and it's

8   actually the part that was just played, that last 15 seconds or

9   so.

10       I know we didn't watch all of this video, Agent, but is

11   Mr. Hay largely in a similar position staring at the television

12   through most of this video?

13   A.   From what I see, yeah.  It looks like he's leaning back,

14   just looking at the TV.

15   Q.   Did you review these before you came in to testify today?

16   A.   I looked at the videos just prior -- not prior to coming

17   here, but I've seen them prior to testifying, yeah.

18   Q.   The other parts of the video that we haven't shown the

19   jury, is he largely just sitting there looking at the

20   television?

21   A.   I wouldn't want to make that statement without viewing it

22   here.

23   Q.   You don't remember, I guess?

24   A.   I don't remember every single second of the video.

25   Q.   Okay.  Could we run those last few seconds again.  Maybe

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.746

1  pause it before it completely shuts off.  Thank you.

2      Did you -- I assumed you watched this a few moments ago

3  when the government played it for you?

4  A.  Yes.

5  Q.  When Mr. Hay gets up, is he leaning on his cane and on the

6  right arm of that chair?

7  A.  It looks like it, yes.

8          MR. MAGARIEL:  Thank you.

9                    REDIRECT EXAMINATION

10 BY MR. HUSCHKA:

11 Q.  Was this surveillance operation at the main VA hospital in

12 downtown Kansas City, Missouri?

13 A.  Yes.

14         MR. HUSCHKA:  No further questions.

15         THE COURT:  May this witness be excused?

16         MR. HUSCHKA:  Yes, Your Honor.

17         THE COURT:  You're excused.

18         Call your next witness.

19         MR. OAKLEY:  United States calls Yessika Zarazua.

20         Your Honor, may we approach?

21         THE COURT:  Yes.

22     (The following proceedings were had at the bench).

23         MR. OAKLEY:  Your Honor, we're moving much faster than

24 we anticipated, so this witness we did not disclose to the

25 defense yesterday.  I wanted to make sure they were --

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.747

19-20044-JAR   USA v. BRUCE L. HAY   08.04.22

1              THE COURT:  She's on the witness list?

2              MR. OAKLEY:  She's on the witness list.

3              THE COURT:  Is she brief?  Who are you going to call

4      next?

5              MR. OAKLEY:  I think this is it.

6              MR. HUSCHKA:  We have a stipulation we intend to read

7      into the record, but we've run out of witnesses for today.

8              THE COURT:  We'll close.  Can I tell the jury that

9      we're on track and maybe even little ahead --

10             MR. HUSCHKA:  Yes.

11             THE COURT:  -- you think?

12             MR. HUSCHKA:  I believe that's fair.

13             THE COURT:  Okay.  All right.  Is that fine with you?

14     I mean, a little ahead meaning we had promised maybe the whole

15     next week, so we're ahead of that at least.

16             MS. RAMSEY:  I'm hoping so, yeah.  Yeah, sure.

17             THE COURT:  I don't want to say it if you think that's

18     not right.

19             MS. RAMSEY:  I think that's right.  I don't know that

20     we'll go all the way to Friday next week.  I think that's fair

21     to say.

22             THE COURT:  I think I'll say we're on track, not

23     behind.

24         (Thereupon, the proceedings continued in open court.)

25                     YESSIKA ZARAZUA,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.748

1   called as a witness on behalf of the government, having first

2   been duly sworn, testified as follows:

3                       DIRECT EXAMINATION

4   BY MR. OAKLEY:

5   Q.   Ma'am, could you state your name and spell it for the

6   record.

7   A.   Yes, it's Yessika, Y-e-s-s-i-k-a, Zarazua, Z-a-r-a-z-u-a.

8   Q.   How are you employed?

9   A.   I'm an operation supervisor for Social Security

10  Administration.

11  Q.   How long have you been employed with Social Security

12  Administration?

13  A.   14 years.

14  Q.   And where are you currently working for Social Security?

15  A.   I am out of the Dallas region in El Paso, Texas.

16  Q.   How long have you been in the El Paso area for Social

17  Security?

18  A.   Just two months actually, two months today.

19  Q.   And so prior to working in Dallas, did you work in Kansas

20  City?

21  A.   Yes.

22  Q.   For Social Security?

23  A.   Yes.

24  Q.   And where did you work?  What's the location of the Social

25  Security office that you worked at?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.749

1    A.   Okay.  The Gateway Social Security Office off of

2    Independence Avenue and then -- I started there.  Then I worked

3    at the Independence, Missouri office and that's the -- that was

4    before I left --

5    Q.   Okay.

6    A.   -- and went to the Dallas region.

7    Q.   I want to talk to you about May 3, 2017.  Which office were

8    you working on that day?

9    A.   The Independence Avenue office.  Sorry.  It's Independence

10   Avenue in Kansas City, Missouri.

11   Q.   In Kansas City, Missouri?

12   A.   Yes.

13   Q.   And on that date did an individual by the name of Bruce Hay

14   come into the office?

15   A.   Yes.

16   Q.   At the time what was your job with Social Security?

17   A.   I was a claims specialist.

18   Q.   And so what does that mean?

19   A.   So we take claims.  We process denials.  We, you know, do

20   change of addresses, deal with the public, handle the front

21   desk if needed, answer phones.  But my main duty was taking

22   claims for claimants.

23   Q.   And so would you sit up front so you would have contact

24   with the people who were coming in?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.750

1   Q.   Now, again we're talking about May 3, 2017.  And I assume

2   that you've seen a lot of people as part of your job since

3   then?

4   A.   Yes.

5   Q.   At the time did you memorialize the contact that you had

6   with Mr. Hay in any way?

7   A.   I mean, just based on what I've seen as far as like, you

8   know, documentation that I've done, yes.

9   Q.   Did you prepare a report of contact that day or shortly

10  thereafter?

11  A.   Yes.

12  Q.   And so does that -- have you had a chance to review that

13  prior to testifying today?

14  A.   Yes, yes.

15  Q.   And so was that how you're able to recall that particular

16  date?

17  A.   Yes.

18  Q.   And do you remember whether or not on May 3, 2017, when

19  Mr. Hay came in, whether anyone was with him?

20  A.   There was a woman with him.  Based on my report of contact,

21  there was a woman with him that was assisting him.

22  Q.   Did your report indicate whether or not Mr. Hay had any

23  sort of device to help him walk?

24  A.   I believe there was -- he was with a cane or -- he had a

25  device, and I would have to look at the report of contact to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.751

1   remember.  But, yes, he had some assistance.

2          MR. OAKLEY:  Your Honor, may I approach the witness?

3          THE COURT:  Yes.

4   BY MR. OAKLEY:

5   Q.   Is that a copy of the report of contact that you prepared?

6   A.   Yes.

7   Q.   Have you had a chance to review your report to see if it

8   refreshes your recollection as to whether or not he had a

9   walker or a cane?

10  A.   Yes.  He came in with a woman.  He used a walker.

11  Q.   Could we please play what's been admitted as Government's

12  Exhibit 53.

13       Do you recognize the exterior of this building as the

14  Social Security Office?

15  A.   Yes.

16  Q.   Can we fast-forward a little bit.

17       Does watching this video also help you refresh your

18  recollection as to whether or not Mr. Hay had a walker?

19  A.   Yes.

20  Q.   And did Mr. Hay and his wife come into the office so that

21  Mr. Hay could discuss disability benefits?

22  A.   That's correct, yes.  It was an overpayment that he had on

23  his record.

24  Q.   And did he want to discuss that particular overpayment on

25  that day?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.752

1    A.   Yes.  And he wanted to know why his disability --

2              MS. RAMSEY:  Objection.

3              THE COURT:  Ask the jury to disregard that.

4    BY MR. OAKLEY:

5    Q.   Now, in your report you also made remarks as far as whether

6    or not the woman that came with the defendant helped him at

7    all.

8    A.   Yes.

9    Q.   Okay.  Let me have you review -- there's a -- the last

10   paragraph of your report is highlighted.  Can you read to

11   yourself and see if that helps refresh your recollection?

12   A.   Okay.

13   Q.   Have you had a chance to read it?

14   A.   Yes.

15   Q.   And so do you recall noting whether or not the woman that

16   was with the defendant helped him sit up and get from his

17   chair?

18   A.   Yes.

19   Q.   And did you report whether or not it appeared to you that

20   Mr. Hay was in pain at all during the time he was sitting?

21   A.   Yes.  It appeared he was not in pain.

22   Q.   And then did you also note in here that he seemed upset,

23   but he was cooperative during the encounter that you had with

24   the defendant?

25   A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.753

1    Q.   Now, how long have you worked for Social Security?

2    A.   14 years, 14 years, yes.

3    Q.   I'm sorry?

4    A.   14 years.

5    Q.   And so having been employed with Social Security for

6    14 years, are you familiar with the records Social Security

7    keeps and maintains during the normal course of its business?

8    A.   Yes.

9    Q.   I want to hand you what's been marked as Government's

10   Exhibit 300 and ask you to take a look through that.

11   A.   Okay.

12   Q.   And you've had a chance to review that document?

13   A.   Correct.

14   Q.   Is that a copy of a record that Social Security kept and

15   maintained during the normal course of business as it relates

16   to the Defendant Bruce Hay?

17   A.   Yes.

18        MR. OAKLEY:  Your Honor, I offer Government's

19   Exhibit 300.

20        MS. RAMSEY:  Your Honor, objection.  Can we approach?

21        THE COURT:  Yes.

22     (The following proceedings were had at the bench.)

23        MS. RAMSEY:  Your Honor, I don't believe they've laid

24   the proper foundation.  She's not a custodian of record.  She's

25   someone that works at the front of the office at the Social

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.754

1   Security building.  She cannot attest to them being regularly

2   kept in the course of business.  I mean, it's not the proper

3   foundation or the person for that.  As far as I know, you're

4   going to try to get into which exhibits?

5         MR. OAKLEY:  I'm just going to admit the exhibits

6   through her if she can identify them as records that are kept

7   and maintained in the normal course of Social Security

8   business.

9         THE COURT:  I don't think -- from what I've heard so

10  far you haven't laid enough foundation.  She can -- even if she

11  could testify these are records that are normally kept, she

12  can't necessarily testify that this particular record was

13  normally kept.  She's not appearing here as someone with

14  knowledge that's been kept and maintained, this specific

15  record.

16        MR. OAKLEY:  Okay.  I'll try and lay more foundation

17  Your Honor.

18    (Thereupon, the proceedings continued in open court.)

19  BY MR. OAKLEY:

20  Q.  Ma'am, let me direct your attention to Government's

21  Exhibit 300.  What type of document is this?

22  A.  This is the Continuing Disability Report Form 454, and they

23  use this -- do you want me to tell you what it's used for?

24  Q.  Yes.

25  A.  When they're going under review for continuation of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.755

1  disability benefits, they have to complete this form, and it

2  just goes over their functions, any doctors they've seen since

3  their last review, medications, you know, their daily

4  activities.

5  Q.   Okay.  And so when you say "they," are you referring to the

6  claimant, the applicant?

7  A.   The claimant or the applicant.

8  Q.   Is this a form that you're familiar with based upon your

9  employment with Social Security?

10 A.   Yes.

11 Q.   And so we talked a little bit about what you were doing

12 with Social Security in 2017.  What types of jobs have you had

13 with Social Security during the course of your employment

14 there?

15 A.   I was hired as a customer service representative.

16 Q.   What did you do as a customer service representative?

17 A.   You deal with the intake of the public.  You see them to

18 see what they're there for.  You check them in if they have any

19 appointments.  You answer the phones.  You answer questions.

20 You update their address, direct deposit, if there's any

21 changes on their record, things like that.

22 Q.   Does Social Security keep and maintain its records in

23 electronic format using a computer?

24 A.   Yes.

25 Q.   As a customer service representative did you have access to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.756

1    Social Security -- to Social Security's computer system, its

2    electronic records?

3    A.   Yes.

4    Q.   And were you able to access those records?

5    A.   Yes.

6    Q.   And based upon your access of the records, are you familiar

7    with the types of records that Social Security keeps and

8    maintains?

9    A.   Yes.

10   Q.   Being a government entity, does Social Security utilize

11   forms that are standard throughout each particular claimant's

12   file?

13   A.   Correct.

14   Q.   Is this an example of a standard form that's used in each

15   case?

16   A.   Can you repeat the question?

17   Q.   Is this typical of a standard continuing disability review

18   report?  It says "form approved OMB," and then there's a number

19   that ends in 72.  So is this a standard form that Social

20   Security uses?

21   A.   Yes.

22   Q.   Other than customer service representative, what else have

23   you done with Social Security?

24   A.   I was promoted to a claims specialist.

25   Q.   And what did you do as a claims specialist?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.757

1   A.   I took claims, disability claims, retirement claims from

2   claimants.

3   Q.   And in that capacity did you have an opportunity to use

4   Social Security disability claims forms?

5   A.   Yes.

6   Q.   And, again, during that time did you still have access to

7   Social Security's electronic records system?

8   A.   I did.

9   Q.   Have you had any other positions with Social Security?

10  A.   Yes.  I was promoted to an operations supervisor.

11  Q.   As an operations supervisor -- is that currently what you

12  do?

13  A.   Yes.

14  Q.   So what do you do as an operations supervisor?

15  A.   I monitor, you know -- I'm in charge of employees.  I

16  monitor their work.  I assign work.  We open mail, do clerical

17  duties, just -- there's so many duties that we do.

18  Q.   Do you continue to have access to Social Security's

19  electronic system so that you can see the types of records that

20  Social Security keeps and maintains?

21  A.   Yes.

22  Q.   So directing your attention back to Government's

23  Exhibit 300, you said this is a continuing disability review

24  report?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.758

1  Q.  And what does -- what does -- well, who fills out this

2  form?

3  A.  The beneficiary, the beneficiary fills it out.

4  Q.  And does this appear to you that this was a form that was

5  submitted by Bruce Hay --

6          MS. RAMSEY:  Objection, Your Honor.  It's not in

7  evidence.

8          THE COURT:  I'll overrule as to his foundational

9  question.

10  BY MR. OAKLEY:

11  Q.  Does it appear this form was submitted by a Bruce Hay, the

12  address is redacted on this form, but Osawatomie, Kansas?

13  A.  Yes.

14          MR. OAKLEY:  Your Honor, I offer Government's

15  Exhibit 300.

16          MS. RAMSEY:  Same objection, Your Honor; lack of

17  foundation.

18          THE COURT:  All right.  I'm going to overrule.  I

19  think sufficient foundation has been laid that this is a

20  business record of Social Security, regularly kept in the

21  course of business, regularly maintained, and it is the record

22  of business to do this.  So I will admit Exhibit 300.

23  BY MR. OAKLEY:

24  Q.  I want to hand you what's been marked as Government's

25  Exhibit 301.  I'll take that first one from you.  I'll also

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.759

1   take those disks to get them out of your way.  And I'd ask you

2   to review that form, that Government's Exhibit 301, please.

3   A.   Okay.

4   Q.   What type of record is this?

5   A.   This is the function report that the beneficiary would have

6   to complete, that the disability determination services mails

7   to the beneficiary.  It is part of the review process.

8   Q.   And, again, is this a standard form that Social Security

9   utilizes as part of its business?

10  A.   Yes.

11  Q.   And this particular form, was it sent to Bruce Hay in

12  Osawatomie, Kansas?

13  A.   Yes.

14  Q.   Does it appear the form was filled out and submitted to

15  Social Security by or on behalf of Mr. Hay?

16  A.   Yes.

17          MR. OAKLEY:  Your Honor, I offer Government's

18  Exhibit 301.

19          THE COURT:  Any objection?

20          MS. RAMSEY:  May I have one moment, Your Honor?

21          THE COURT:  Sure.

22          MS. RAMSEY:  Your Honor, we'd object as to hearsay.

23          THE COURT:  I think sufficient foundation has been

24  laid as a business record of Social Security.  I'll admit

25  Exhibit 301.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.760

1   BY MR. OAKLEY:

2   Q.   I'll next hand you what's been marked as Government's

3   Exhibit 302 -- trade you here -- and ask if you can look at

4   302.   And tell me what type of document that is, please.

5   A.   This is the function report, but it's completed by a third

6   party.

7   Q.   And in this particular case can you tell who prepared --

8   who the third party was that submitted this report?   Directing

9   your attention to the third page of that.   It looks like the

10  first name is redacted, but is there a relationship that's

11  listed?

12  A.   Wife.

13  Q.   And what's the last name right after the redacted?

14  A.   Hay.

15  Q.   And so is this another form that is utilized by Social

16  Security that's -- as part of its normal business?

17  A.   Yes.

18  Q.   And it's kept and maintained as part of Social Security's

19  records for the beneficiary?

20  A.   It is.

21       MR. OAKLEY:   Your Honor, I offer Government's

22  Exhibit 302.

23       MS. RAMSEY:   Continuing the same objection;

24  foundation, Your Honor.

25       THE COURT:   All right.   So noted.   Exhibit 302

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.761

1  admitted.

2  BY MR. OAKLEY:

3  Q.   I'll take that from you, and I'll hand you Government's

4  Exhibit 304 and ask you if you recognize 304.

5  A.   Yes.  It's a request for reconsideration.

6  Q.   And is this on a Social Security form?

7  A.   It is.

8  Q.   And is this something that Social Security keeps and

9  maintains as part of the course of its ordinary business?

10  A.   It is.

11  Q.   Was this particular form, this request for reconsideration,

12  submitted by a Bruce Hay from Osawatomie, Kansas?

13  A.   Yes.

14         MR. OAKLEY:  Your Honor, I offer Government's

15  Exhibit 304.

16         MS. RAMSEY:  Same objection, Your Honor.

17         THE COURT:  All right.  So noted.  Admitted for the

18  reasons stated before.

19  BY MR. OAKLEY:

20  Q.   I'll take that exhibit for you.  I'll hand you what's been

21  marked as Government's Exhibit 308.  Do you recognize

22  Government's Exhibit 308?

23  A.   Yes.

24  Q.   What is 308?

25  A.   It's the decision.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.762

1  Q.  Does this appear to be a fax that was sent from Bruce Hay

2  to the Social Security Administration attaching certain

3  documents including a copy of a Department of Veterans Affairs

4  rating decision?

5  A.  Yes.

6  Q.  So does it appear -- you said this was submitted by Bruce

7  Hay.  When a claimant submits forms for documents and other

8  information to Social Security, does Social Security keep and

9  maintain those records as part of the claimant's Social

10 Security file?

11 A.  We do.

12 Q.  And so this is a record that's kept and maintained during

13 the normal course of Social Security's business?

14 A.  It is.

15       MR. OAKLEY:  Your Honor, I offer Government's

16 Exhibit 308.

17       THE COURT:  Same objection?

18       MS. RAMSEY:  Yes, Your Honor.

19       THE COURT:  All right.  Overruled.  Exhibit 308

20 admitted.

21 BY MR. OAKLEY:

22 Q.  I'll next hand you what's been marked as Government's

23 Exhibit 309.  Is that a one-page document?

24 A.  It is.

25 Q.  Is that a Social Security Administration form request for

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.763

1    hearing by administrative law judge?

2    A.   It is.

3    Q.   And is that a form that is a standard form that's utilized

4    by Social Security as part of its normal and ordinary business?

5    A.   Yes.

6    Q.   And in this particular case was this a request for hearing

7    that was submitted by a claimant by the name of Bruce Leroy

8    Hay?

9    A.   Yes.

10             MR. OAKLEY:   Your Honor, I offer Government's

11   Exhibit 309.

12             THE COURT:   All right.   Noting a continuing objection,

13   I'll admit 309.

14             MR. OAKLEY:   I have no further questions of this

15   witness, Your Honor.

16             MS. RAMSEY:   May we approach, Your Honor?

17             THE COURT:   Yes.

18        (The following proceedings were had at the bench).

19             MS. RAMSEY:   Your Honor, there is a report that's been

20   referred to by this witness several times.   We don't have it in

21   discovery.   I have never seen it.   And at this point I'm not

22   asking necessarily that there's a violation of discovery rules,

23   but we'd like time to review it and see it.

24             THE COURT:   Okay.

25             MS. RAMSEY:   I don't know how long that will take,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.764

1    but...

2           THE COURT:  We'll recess for the night, bring her back

3    tomorrow.

4           MR. HUSCHKA:  And for the record, we -- it's Bates

5    stamped and we provided it, so it may have just gotten lost in

6    the shuffle, but --

7           MS. RAMSEY:  I will look for it.

8           MR. HUSCHKA:  I tried to e-mail it.  It's got a Social

9    Security number, so it may be encrypted, so I sent it to them

10   while we've been sitting here in court.

11          THE COURT:  We'll recess for the night.  We'll

12   reconvene at 9:00.  I'll tell the jury that we're on track,

13   maybe slightly ahead.

14       (Thereupon, the proceedings continued in open court.)

15          THE COURT:  We need to take some matters up outside of

16   the hearing, so we need to recess for the day and reconvene at

17   9:00 tomorrow morning.

18          The case is on track.  It may actually be slightly

19   ahead at this point, so that's good news, I think.  So we'll

20   reconvene.  We'll recess for the night.

21          Recall the overnight admonition to not discuss the

22   case or communicate in any way about the subject matter or

23   people involved in the case and do not do independent reading,

24   research, looking things up.

25          Be safe.  We'll see you back tomorrow at 9:00.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.765

19-20044-JAR   USA v. BRUCE L. HAY   08.04.22                    614

1        (The following proceedings occurred outside the presence of

2   the jury.)

3             THE COURT:  I'll be available at 8:30 if you need to

4   take something up in the morning.  All right.  Have a good

5   evening.  We'll be in recess otherwise until 9:00.

6        (The proceedings were adjourned at 4:28 p.m.)

7

8                    C E R T I F I C A T E

9        I, Danielle R. Murray, a Certified Court Reporter and the

10  regularly appointed, qualified, and acting official reporter of

11  the United States District Court for the District of Kansas, do

12  hereby certify that the foregoing is a true and correct

13  transcript from the stenographically reported proceedings in

14  the above-entitled matter.

15       SIGNED 7th of February, 2023

16

17                      /s/Danielle R. Murray
                        DANIELLE R. MURRAY, RMR, CRR
18                      United States Court Reporter

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.766

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2
      UNITED STATES OF AMERICA,      )
 3                                   ) Case No. 19-20044-JAR
              Plaintiff,             ) Circuit No. 22-3276
 4                                   )
      vs.                            )
 5                                   ) Kansas City, Kansas
      BRUCE L. HAY,                  ) Date:  5 August, 2022
 6                                   )
              Defendant.             ) Day 5 (Pages 615-785)
 7     ...........................
 8                    TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE JULIE A. ROBINSON
 9           SENIOR UNITED STATES DISTRICT COURT JUDGE

10
                     A P P E A R A N C E S
11
      FOR THE PLAINTIFF:
12
              Mr. Ryan Huschka
13            Mr. Christopher Oakley
              OFFICE OF THE UNITED STATES ATTORNEY
14            500 State Avenue
              Kansas City, Kansas 66101
15
      FOR THE DEFENDANT:
16
              Mr. David Magariel
17            Ms. Chekasha Ramsey
              OFFICE OF THE FEDERAL PUBLIC DEFENDER
18            500 State Avenue
              Suite 201
19            Kansas City, Kansas 66101

20

21

22

23

24   _____
             Proceedings recorded by machine shorthand,
25     transcript produced by computer-aided transcription.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.767

1                        I N D E X

2
    Government's Witnesses:                          Page
3
   YESSIKA ZARAZUA
4     Cross-Examination by Ms. Ramsey                622
      Redirect Examination by Mr. Oakley             627
5  DR. ELLEN BERRY
      Direct Examination by Mr. Oakley               628
6     Cross-Examination by Mr. Magariel              632
   KLEORA TOUSEY
7     Direct Examination by Mr. Oakley               634
      Cross-Examination by Mr. Magariel              636
8  PAUL KALMAR
      Direct Examination by Mr. Oakley               642
9  WESLEY UNGERHEUER
      Direct Examination by Mr. Oakley               671
10    Cross-Examination by Ms. Ramsey                684
      Redirect Examination by Mr. Oakley             686
11 DR. DANIELLE BECKER
      Direct Examination by Mr. Huschka              689
12    Cross-Examination by Ms. Ramsey                718
   JAMES CARMACK
13    Direct Examination by Mr. Oakley               757
      Cross-Examination by Mr. Magariel              776

14

15

16                     E X H I B I T S

17    Government's
      Exhibits            Offered          Received
18
          7                760              761
19        44                767              768
          51                768              768
20        56                769              769
          57                769              769
21        58                769              769
          59                769              769
22        60                769              769
          61                769              769
23        62                769              769
          63                769              769
24        64                769              769
          67                774              774
25        68                774              774
          69                774              774

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.768

19-20044-JAR   USA v. BRUCE L. HAY   08.05.22

| | | |
|---|---|---|
| 70 | 774 | 774 |
| 83 | 682 | 682 |
| 84 | 683 | 683 |
| 85 | 684 | 684 |
| 168 | 649 | 649 |
| 169 | 650 | 650 |
| 170 | 651 | 651 |
| 171 | 652 | 652 |
| 172 | 654 | 655 |
| 173 | 656 | 656 |
| 174 | 658 | 658 |
| 175 | 659 | 659 |
| 176 | 660 | 660 |
| 177 | 661 | 661 |
| 178 | 662 | 662 |
| 179 | 663 | 663 |
| 180 | 665 | 665 |
| 181 | 666 | 666 |
| 251 | 639 | 639 |
| 331 | 675 | 675 |

| Defendant's Exhibits | Offered | Received |
|---|---|---|
| 831 | 637 | 638 |

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.769

```
 1                   P R O C E E D I N G S

 2        (The following proceedings occurred outside the presence of

 3   the jury.)

 4             THE COURT:  Did you have something to take up?

 5             MS. RAMSEY:  Yes, Your Honor.  I'd like to make a

 6   record on some previous objections that I've made and the court

 7   did overrule this and constitutionalize them.  We previously

 8   objected to particular government's exhibits, and I will number

 9   them for the court but describe them first.  They are,

10   generally speaking, compensation and pension exam reports done

11   by doctors that were not called to testify and/or the VA rating

12   decision.  I think it was objected to early on, and the

13   court -- I made a confrontation objection to admission of those

14   exhibits.

15             And to the best of my ability I think there are 201,

16   202, 203, 204, 205, 206, 208-A, 208-B, 209 -- and let me take

17   this one off.

18             And just to make sure there is a record, Your Honor,

19   we're objecting to those C&P examination reports by the doctors

20   that have not been called to testify and for the rating

21   decisions where no one has been called to testify in violation

22   of my client's Sixth Amendment right in Crawford, his right to

23   confrontation.

24             While the court has ruled that these exhibits are

25   medical documents which have an exception to the hearsay rule,
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.770

1    I believe under 803(4) they are -- in fact, they're legal

2    documents, those documents being documents only used for

3    determination of benefits.  I think it's been made clear by the

4    government throughout this process that part of the process of

5    determining the ratings decision is the C&P exam, which are

6    actually ordered by the VA.  They're ordered for purposes of

7    then determining level of disability and whether or not my

8    client would receive money or compensation as such being called

9    C&P examinations, compensation and pension examinations.

10           So we don't believe that they fall under the hearsay

11   exception and that there's still a confrontation right.  We

12   also don't believe that they're simply admissible on the basis

13   that they contain purported admissions by the party-opponent.

14   The government has not necessarily made the case that my client

15   made these admissions, and even if so, if the court finds that

16   they are admissions by a party-opponent and therefore not

17   hearsay, those documents outlined to the court include not just

18   statements by Mr. Hay but statements by doctors and/or those

19   decision-makers that made the ratings decisions.  So they would

20   not fall, therefore -- they would still be hearsay and not fall

21   under any exception and be a violation of my client's right to

22   confrontation.

23           To prohibit Mr. Hay from an opportunity to attest the

24   credibility and voracity of the declarant statements in these

25   documents prohibits him from exercising that constitutional

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.771

1  right, and so we would just like to make a record of our

2  objection, understanding that the court has previously

3  overruled.

4          THE COURT:  Anything for the government?

5          MR. HUSCHKA:  Your Honor, I think the court's rulings

6  are well founded.  We would just reiterate that the statements

7  that we have offered with respect to these exhibits, the C&P

8  examinations were not offered for their truth.  In fact, they

9  were offered to the government's theories that they were lies.

10 We think they're business records, that they are related to

11 diagnosis and also that they're public records under 803(A).

12         THE COURT:  All right.  I made a record before with

13 the reasons for my ruling.  The only difference I think in the

14 arguments now are the defendant is arguing that these are legal

15 documents and not medical records.  I had found that 803(4) was

16 a basis for finding that these met the hearsay exception made

17 for diagnosis or for treatment, understanding that there are

18 two arms to VA, the benefits arm and the medical treatment arm.

19 But these benefits records pull from medical records, and so

20 the records at issue include both.

21         Also there's been substantial foundation laid that

22 these are business records at the VA, and while I don't think

23 the government offered before that, they weren't offered for

24 truth of the matter asserted, the evidence that the government

25 has presented is certainly borne out that at least with respect

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                         2:19-cr-20044-JAR
                                       USA v. Bruce L. Hay
                                       ROA - Volume 3, p.772

1    to statements or information in these records that was based on

2    statements of Mr. Hay, they're not being offered for truth of

3    the matter asserted but just to show that he made certain

4    statements that the VA relied on in granting certain benefits.

5          So for all of those reasons and for the reasons that I

6    set out before, these Exhibits 201 through 206, 208-A and -B,

7    and 209 are properly admitted and don't present confrontation

8    clause issues under *Crawford*.  They're not testimonial for the

9    reasons that I've stated before.  We've made a record so we can

10   proceed.

11         Anything else, Ms. Ramsey?

12         MS. RAMSEY:  Yes, sadly.  I forgot a folder

13   downstairs.  Could I have a few moments --

14         THE COURT:  I'm sorry?

15         MS. RAMSEY:  I forgot a folder downstairs.  Can I have

16   a few minutes to run down?  I do apologize, Your Honor.

17      (Recess.)

18      (The jury entered the courtroom, after which the following

19   proceedings were had.)

20         THE COURT:  You can be seated.  Resume with

21   cross-examination.

22         Ms. Zarazua, you're still under oath to tell the

23   truth, the whole truth, and nothing but the truth.

24         THE WITNESS:  Yes.

25         THE COURT:  All right.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.773

1                      YESSIKA ZARAZUA,

2     called as a witness on behalf of the government, having

3     previously been duly sworn, testified as follows:

4                      CROSS-EXAMINATION

5     BY MS. RAMSEY:

6     Q.   Would you mind pronouncing your last name for me so I could

7     try to get this right?

8     A.   Zarazua.

9     Q.   Zarazua.  I apologize if I get it wrong.

10    A.   You're fine.

11    Q.   Ms. Zarazua, my understanding is you were working back in

12    2012 at the Social Security office in Independence, Missouri?

13    A.   Yes.

14    Q.   And you were -- tell me your title again.

15    A.   At the time?

16    Q.   Yes, at that time.

17    A.   Okay.  So in 2012 I would have been a claims specialist.

18    Yeah, I would have been a claims specialist at the time.

19    Q.   You were kind of working the front area where you would

20    greet people coming into the office; is that right?

21    A.   If I was a claims specialist, I would have been more in the

22    back taking claims, You know, maybe answering phones, but

23    mainly taking claims.  But, yes, I would greet -- if I was in

24    the rotation, yes, I would go up front and help with the lobby.

25    Q.   I want to talk to you about some of the government's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.774

1    exhibits that you testified to recognizing.

2        Would you bring up Government's Exhibit 300.  Would you

3    scroll down to the third page, please.

4        Now, I believe you testified to these records being kept in

5    the regular kind of course of business of Social Security; is

6    that right?

7    A.  That's correct.

8    Q.  You didn't enter this record into that system, correct?

9    A.  Correct.

10   Q.  In fact, you've never seen this record before being shown

11   it by the government or previous to coming in to testifying

12   today?

13   A.  I would not -- I can't recall if I did or not.

14   Q.  Okay.  But you did not receive this and enter it into any

15   computer system, correct?

16   A.  Can you go back to page 1 --

17   Q.  Sure.

18   A.  -- where we see the barcode?  It does not appear so.  I

19   wouldn't have entered this into the system, no.

20   Q.  Okay.  So prior to preparing -- either preparing for

21   testifying or seeing this yesterday, you had not seen this

22   record before, correct?

23   A.  I don't know if I had just because, you know, when we're --

24   can I elaborate?

25   Q.  Sure.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.775

1   A.   So when we're -- if someone comes in and they're asking

2   questions or they call and they're asking questions, it is

3   routine for us to go into the system and review certain

4   documents.  I mean, I could have seen this at the time, but

5   that I recall, no, I don't recall.

6   Q.   Right.  You don't have any independent memory of reviewing

7   this particular document, correct?

8   A.   Correct.

9   Q.   All right.  So you cannot testify to who filled it out,

10   correct?

11   A.   Correct.

12   Q.   You weren't there when it happened obviously, when the

13   document was filled out, correct?

14   A.   When the document was filled out, no.

15   Q.   Let's go to Government's Exhibit 302, please.

16      I believe you were shown Government's Exhibit 302

17   yesterday.  And it was entered upon you testifying that it was

18   a record Social Security kept.  Does that barcode tell you

19   anything about whether or not you processed this claim?

20   A.   No, it doesn't tell me.

21   Q.   Okay.  So as far as you can recall, you have no independent

22   recollection of seeing this particular exhibit either prior to

23   being prepared to testify today or yesterday, correct?

24   A.   Correct.

25   Q.   So you can't testify to who filled this out or -- you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.776

1   weren't a witness to anyone filling out this document, correct?

2   A.   Correct.

3   Q.   And I think I skipped one.  Can we go back to Government's

4   Exhibit 301.

5        Does that barcode tell you anything about whether you

6   processed this claim or exhibit?

7   A.   No, it does not.

8   Q.   Okay.  So, again, Government's Exhibit 301, you have no

9   independent recollection of ever seeing this exhibit prior to

10  either preparing to testify here or yesterday when it was shown

11  to you, correct?

12  A.   Correct.

13  Q.   So you don't know who filled that out; you weren't a

14  witness to it, correct?

15  A.   Correct.

16  Q.   Let's go to Government's Exhibit 304, please.  Does that

17  barcode tell you anything about whether or not you would have

18  processed that claim?

19  A.   No.

20  Q.   Okay.  Government's Exhibit 304.  Again, same question, you

21  have no independent recollection of reviewing this or seeing

22  this prior to being shown this by the government or preparing

23  to testify?

24  A.   Correct.

25  Q.   You can't testify to who filled it out for the accuracy of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.777

1  the information, correct?

2  A.   Correct.

3  Q.   Let's go to Exhibit 3 -- I think the next one was 309,

4  please.

5       All right.  Government's Exhibit 309, same question, you

6  don't have any independent recollection about that particular

7  exhibit at all either, do you?

8  A.   Correct.

9  Q.   Prior to being shown by the government yesterday, you had

10 no independent recollection of ever viewing it before?

11 A.   I don't.

12 Q.   So you don't have any idea who filled this out; you weren't

13 a witness to it, correct?

14 A.   I was not a witness, no.

15 Q.   And it looks like, if you could highlight section -- I

16 think Section 309.

17      Exhibit 309, it says "claimant's signature" where it says

18 "redacted."  Do you see that?

19      I think it's Section 9.  Thank you.

20      Do you see that portion?

21 A.   Yes, I see.

22 Q.   I believe it says "claimant signature" there in Section 8

23 next to Section 9.  Would you agree there's no signature there?

24 A.   Correct.

25 Q.   But there's a representative name there and in Section 9.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.778

1    I think it says Gari Hartley.  You would agree that's in the

2    representative signature, correct?

3    A.    Correct.

4    Q.    I'm assuming you don't know who Geri Hartley is, correct?

5    A.    Correct.

6    Q.    All right.  Can we go to Government's Exhibit 302.  Can we

7    go to the second page.  I'm sorry.  The third page.  Could you

8    highlight Section 1 and 2?

9         Would you agree that Section 1 says the name of this

10   disabled person is Bruce Hay?

11   A.    Correct.

12   Q.    And two, although the first name is redacted, the last name

13   is Hay there again?

14   A.    Correct.

15   Q.    It says "person completing the form"?

16   A.    Wife.

17   Q.    Right.

18        MS. RAMSEY:  I have no further questions.  Thank you.

19                      REDIRECT EXAMINATION

20   BY MR. OAKLEY:

21   Q.    Could we please pull back up Government's Exhibit 309 and

22   can you highlight the signature portion again.

23        It appears that next to claimant's signature there's

24   another word.  Could you please read that?

25   A.    Optional.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.779

1          MR. OAKLEY:  No further questions, Your Honor.

2          MS. RAMSEY:  Nothing further, Your Honor.

3          THE COURT:  All right.  May this witness be excused?

4          MR. OAKLEY:  Yes, Your Honor.

5          THE COURT:  You're excused.  Thank you.

6          THE WITNESS:  Thank you.

7          THE COURT:  Call your next witness.

8          MR. OAKLEY:  United States calls Dr. Ellen Berry.

9                          DR. ELLEN BERRY,

10   called as a witness on behalf of the government, having first

11   been duly sworn, testified as follows:

12                       DIRECT EXAMINATION

13   BY MR. OAKLEY:

14   Q.   Ma'am, could you please tell the jury your name and spell

15   it for the record.

16   A.   My name is Ellen Berry, E-l-l-e-n, B-e-r-r-y.

17   Q.   How are you employed?

18   A.   I work at the Kansas City VA hospital.

19   Q.   What do you do for the Kansas City VA hospital?

20   A.   I'm a dentist.

21   Q.   How long have you been a dentist at the VA hospital?

22   A.   I've worked there for eight years.

23   Q.   And so my math is not the best.  When did you start?

24   A.   2014.

25   Q.   And you said that you work at the VA.  Let me back up a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.780

1   little bit.  What type of degrees do you have?

2   A.   Say that --

3   Q.   What type of degrees do you have?

4   A.   I have DDS degree and biology undergrad degree.

5   Q.   DDS, is that doctor of dentistry?

6   A.   Correct, yes.

7   Q.   You work for the VA.  Are you a veteran?

8   A.   I am, yes.

9   Q.   So you said that you work at the VA hospital?

10  A.   Yes, sir.

11  Q.   And so there's a dental office -- your dental office is in

12  the VA hospital?

13  A.   Correct, yes.

14  Q.   And where is that hospital located?

15  A.   It's located here in Kansas City.

16  Q.   Is that the main VA hospital?

17  A.   It is.  It's at 4801 Linwood Boulevard.

18  Q.   Is that the one that's east of downtown and south of I-70?

19  A.   Yes.  I'm not the best with directions.  Yes.

20  Q.   Do you know or have you had a patient by the name of Bruce

21  Hay?

22  A.   Yes, sir.

23  Q.   And he was a patient of yours?

24  A.   Yes.

25  Q.   How long did you see Mr. Hay?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.781

1   A.   I think about three years.

2   Q.   Did you start seeing him in December of 2014 or around that

3   time period?

4   A.   Yes, sir.

5   Q.   You said that you saw him for about three years?

6   A.   Uh-huh, yes.

7   Q.   And how often did you see Mr. Hay during that time period?

8   A.   Every few months.  We had some, you know, treatment plan

9   that we were working through, so I think I saw him, like, 8 to

10  10 times during that time.

11  Q.   And you said treatment plan.  Like, you know, typically

12  speaking, did you ever perform any dental procedures that were

13  lengthy?

14  A.   Yes.

15  Q.   Do you remember what the longest time that you saw Mr. Hay

16  at one time was?

17  A.   Probably two hours.

18  Q.   Do you remember when he arrived at the VA hospital for

19  appointments, did he ever have anyone with him?

20  A.   I do think he sometimes had family with him, yes.

21  Q.   Let me talk to you a little bit about your area there.

22  Would you go out to a waiting room to get your patients?

23  A.   I would sometimes, or my dental assistant would, yes.

24  Q.   Do you ever remember going out to bring Mr. Hay back?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.782

1   Q.   And what do you remember as far as his physical appearance?

2   A.   He had some difficulty walking.  I think he used a cane.

He walked -- you know, we walked together down the hallway.

4   Q.   Did he ever have a walker at any of your appointments that

5   you recall?

6   A.   Not that I remember, no.

7   Q.   Other than the cane, do you remember any other physical

8   characteristics of Mr. Hay?

9   A.   Like, I mean, he was in his mid 50s.  He had some

10  difficulty walking.  He didn't walk very fast.  He walked slow.

11  Q.   Let me ask you this: As a dentist -- now, you're a dentist.

12  Would you also have other staff members who would be involved

13  in dental procedures?

14  A.   Yes, sir.

15  Q.   Now, this is probably an obvious and a dumb question, but

16  what part of the body as a dentist are you working on?

17  A.   Patient's mouth.

18  Q.   And so when you're doing these procedures, would you or

19  your staff physically have your fingers in the patient's mouth?

20  A.   Yes, sir.

21  Q.   If you saw a patient who had involuntary movements of the

22  body, would that be something that you would be concerned with

23  or would want to know?

24  A.   Yes.

25  Q.   And did Mr. Hay ever tell you that he had involuntary

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.783

1   movements that you recall?

2   A.   I don't recall talking about that with him, no.

3   Q.   Do you recall any instances where you were working on

4   Mr. Hay and he had involuntary movements?

5   A.   No, not where we had, like, an adverse reaction.  No

6   accidents or anything like that that I recall, no.

7   Q.   Do you remember the date of the last time that you saw

8   Mr. Hay?

9   A.   It was in March of 2017.

10           MR. OAKLEY:  No further questions, Your Honor.

11                     CROSS-EXAMINATION

12   BY MR. MAGARIEL:

13   Q.   Good morning.

14   A.   Good morning.

15   Q.   I only have a few short questions for you.

16       If I heard you correctly when you were speaking with the

17   prosecutor there, you said that you remembered at some point

18   Mr. Hay having -- I think you said some difficulty walking; is

19   that right?

20   A.   Yes, sir.

21   Q.   Okay.  Do you remember also talking to an investigator at

22   some point in this case saying that you thought Mr. Hay may

23   have had a back problem because he walked with kind of an

24   unusual gait?

25   A.   I do, yes, sir.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.784

1  Q.  Okay.  And I'm trying to understand, I think what you've

2  already said.  So at some point it seemed like Mr. Hay had a

3  back problem or something like that because of his walk; is

4  that right?

5  A.  Correct.

6  Q.  And did it seem like what you've described today, kind of

7  the slow walking with the cane was an improvement over the

8  previous problem?

9  A.  I don't -- an improvement over his back problem?

10  Q.  I'm trying to understand if the slow walk with the cane was

11  sort of the back problem or that was the more recent thing you

12  observed?

13  A.  Oh, I mean, I think the back pain could be contributing to

14  his slow walk, yeah.

15  Q.  Okay.  But at some point you thought he had an even more

16  unusual gait than just the slow walking and the cane?

17  A.  I did, yeah.  I thought he had, you know, an unsteady gait

18  or a -- like a -- like a toddle or, you know --

19  Q.  Kind of a side to sidewalk?

20  A.  Yeah.

21  Q.  But in more recent visits it's more just the slow walking

22  with the cane; is that right?

23  A.  Yeah.  I don't -- I don't remember how many times the

24  investigator -- I think I talked to him twice during that

25  period of time if I remember correctly.  So, yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.785

1   Q.   Okay.

2           MR. MAGARIEL:  That's all I have for you.  Thank you,

3   ma'am.

4           MR. OAKLEY:  I have no redirect, Your Honor.

5           THE COURT:  All right.  May this witness be excused?

6           MR. OAKLEY:  Yes, Your Honor.

7           THE COURT:  All right.  You're excused.  Thank you.

8           THE WITNESS:  Okay.  Thank you.

9           THE COURT:  Call your next witness.

10          MR. OAKLEY:  The United States calls Suzy Tousey.

11                       KLEORA TOUSEY,

12  called as a witness on behalf of the government, having first

13  been duly sworn, testified as follows:

14                    DIRECT EXAMINATION

15  BY MR. OAKLEY:

16  Q.   Ma'am, could you please state your name and spell it for

17  the record.

18  A.   Kleora Tousey, K-l-e-o-r-a, T-o-u-s-e-y.

19  Q.   How are you presently employed?

20  A.   I am the criminal justice coordinator of Kansas City Kansas

21  Community College.

22  Q.   And at some point in time were you employed with Osawatomie

23  Police Department?

24  A.   Yes, I was.

25  Q.   And when did you work for the Osawatomie Police Department?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.786

1    A.    I believe from 2003 to 2007.

2    Q.    And I want to talk to you about December 18th of 2005.  On

3    that date did you have occasion to respond to a motor vehicle

4    accident in Osawatomie?

5    A.    I did.

6    Q.    And do you remember who the driver -- well, let me back up.

7    In preparation for your testimony today did you have a chance

8    to review a report that you prepared at that point?

9    A.    I didn't review it, but I was -- it was read to me, the

10    information report that I wrote.

11    Q.    I have a copy of the report if you need to see it.

12          The accident that you referred -- that you responded to on

13    that day, could you just generally describe what happened?

14    A.    A gentleman, Bruce Hay, was driving a suburban full of

15    children and slid into a telephone pole in making a turn from

16    what I recall.

17    Q.    Was anyone injured in this accident?

18    A.    No.

19    Q.    Was it -- it was in December, so were there weather events

20    that occurred that may have contributed to the accident?

21    A.    I'm sure there was.  It should be noted on the accident

22    report.

23    Q.    Does looking at the accident report refresh your

24    recollection at all?

25    A.    I believe it was icy out.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.787

1   Q.  Were you able to determine approximately the speed the

2   vehicle was traveling?

3   A.  It wasn't go very fast.

4   Q.  Not very fast?

5   A.  No.  Maybe 10 miles an hour.

6   Q.  And who was the driver that day?

7   A.  Bruce Hay.

8   Q.  And what day was this?

9   A.  December -- I believe it was December 18th.

10  Q.  Of what year?

11  A.  2005.

12          MR. OAKLEY:  No further questions, Your Honor.

13                      CROSS-EXAMINATION

14  BY MR. MAGARIEL:

15  Q.  Good morning, Ms. Tousey.

16  A.  Uh-huh, morning.

17  Q.  Is that right, Tousey?

18  A.  Yes.

19  Q.  Do you have that report in front of you?

20  A.  I do.

21  Q.  As I understand, it was a one-car accident that occurred at

22  about Main and 15th Street in Osawatomie, Kansas; is that

23  right?

24  A.  That is correct.

25  Q.  Did you note on your report the home address of Mr. Hay at

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.788

1    the time?

2    A.   I'm sure, if I got his driver's license.  If this -- the

3    519 15th Street Terrace.

4    Q.   Is that what's on your report?

5    A.   I believe that's, yes, the address and street for

6    everybody.  I listed their addresses and everything in there.

7    Q.   For all the residents of the car?

8    A.   Yes.

9    Q.   I want to make sure I have that right.  Did you say 519

10   15th Street Terrace, Osawatomie, Kansas?

11   A.   That is correct.

12          MR. MAGARIEL:  May I approach, Your Honor?

13          THE COURT:  Yes.

14   BY MR. MAGARIEL:

15   Q.   I'm handing you what's been marked as Government's

16   Exhibit 831.  Could you look at that for a moment, please.  Did

17   you get a chance to look at that?

18   A.   Yeah.

19   Q.   Is that a map that shows a portion of Osawatomie, Kansas,

20   sort of a Google Maps version?

21   A.   Yes.

22   Q.   Does that look like at least the part of Osawatomie that's

23   displayed there, is that an accurate map of that area?

24   A.   I would assume so.

25          MR. MAGARIEL:  Move to admit 831.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.789

1        MR. OAKLEY:  No objection.

2        THE COURT:  831 admitted.  You can publish.

3        MR. MAGARIEL:  Thank you.

4        Bonnie, would you mind switching to our table, please?

5   Thank you very much.

6   BY MR. MAGARIEL:

7   Q.   And so in the middle of that map there's a little red dot

8   of some sort, and then it says 519 15th Street Terrace,

9   Osawatomie, Kansas?

10  A.   Uh-huh.

11  Q.   That's the same address that I think is listed on your

12  report; am I right about that?

13  A.   That's correct.

14  Q.   If I understand it, the accident that you responded to was

15  at 15th and Main Street?

16  A.   Yes.

17  Q.   And so there's a little arrow that's going to scroll to

18  Main Street or right on top of Main Street; do you see that

19  sort of running down the middle of that picture?

20  A.   Yes.

21  Q.   Is that Main Street?

22  A.   Yes.

23  Q.   So the accident is about four houses away from 519 15th

24  Street Terrace; is that right?

25  A.   That appears to be correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.790

1   Q.  And from the report that you did, this was a very slow

2   moving vehicle, going maybe 10 miles an hour; is that right?

3   A.  Yes.

4   Q.  That's what was told to you at least?

5   A.  That's what was told to me, yes.

6           MR. MAGARIEL:  That's all I have.  Thank you.

7           MR. OAKLEY:  No redirect, Your Honor.

8           THE COURT:  May this witness be excused?

9           MR. OAKLEY:  Yes, Your Honor.

10          THE COURT:  Call your next witness.

11          MR. HUSCHKA:  Your Honor, at this time the parties

12  have a joint stipulation that's been filed.  We have marked it

13  as Government's Exhibit 251.  I'd like to tender this to the

14  court and move to admit the parties' stipulation into evidence.

15          THE COURT:  Do you want me to read it or are you going

16  to read?

17          MR. HUSCHKA:  I can read it, Your Honor.

18          THE COURT:  Exhibit 251 is admitted into evidence.  It

19  will be included in the jury instructions that they receive at

20  the end of the case in its entirety, but if you'd like to go

21  ahead and read it at this point.

22          MR. HUSCHKA:  Thank you, Your Honor.

23          THE COURT:  I don't know if you want me to provide any

24  further instruction.  I think you do that.  I think you sort of

25  do that at the end of this.  Go ahead and read it into the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.791

1    record.

2            MR. HUSCHKA:  Thank you, Your Honor.

3            Ms. Kessler, could you pull up 251.

4            So Government's Exhibit 251 is in the case of United

5    States of America versus Bruce L. Hay.  It's entitled "Joint

6    Stipulation No. 1," and it reads that "The parties hereby

7    stipulate and agree to the following with respect to each count

8    identified below:

9            "(1) the June 30, 2017, ACH payment transaction

10   identified in Count 1 traveled in, affected, and flowed in

11   interstate commerce by being transmitted from Illinois to

12   Kansas.

13           "Count 2, the August 1, 2017, ACH payment transaction

14   identified in Count 2 traveled in, affected, and flowed in

15   interstate commerce by being transmitted from Illinois to

16   Kansas.

17           "Count 3, the September 1, 2017, ACH payment

18   transaction identified in Count 3 traveled in, affected, and

19   flowed in interstate commerce by being transmitted from

20   Illinois to Kansas.

21           "Count 4, the March 1, 2018, ACH payment transaction

22   identified in Count 4 traveled in, affected, and flowed in

23   interstate commerce by being transmitted from Illinois to

24   Kansas.

25           "Count 5, the May 1, 2018, ACH payment transaction

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.792

1    identified in Count 5 traveled in, affected, and flowed in

2    interstate commerce by being transmitted from Illinois to

3    Kansas.

4           "Count 6, the August 1, 2018, ACH payment transaction

5    identified in Count 6 traveled in, affected, and flowed in

6    interstate commerce by being transmitted from Illinois to

7    Kansas.

8           "The parties therefore stipulate and agree that the

9    United States has satisfied its burden of proof beyond a

10   reasonable doubt for the required element concerning interstate

11   commerce for each of Counts 1 through 6.  The defense reserves

12   the right to raise any challenges and arguments concerning

13   other elements and burdens that are not contained within this

14   stipulation."

15          And on the last page there it is dated and signed on

16   behalf of the United States by myself, Ryan J. Huschka, and

17   Christopher Oakley and it is dated and signed on behalf of the

18   defendant by his attorney, Chekasha Ramsey.

19          THE COURT:  For the record, Exhibit 251 is admitted,

20   the stipulation.

21          All right.  You can call your next witness.

22          MR. OAKLEY:  Your Honor, the United States calls Paul

23   Kalmar.

24                      PAUL KALMAR,

25   called as a witness on behalf of the government, having first

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.793

1    been duly sworn, testified as follows:

2                        DIRECT EXAMINATION

3    BY MR. OAKLEY:

4    Q.   Sir, could you please tell the jury your name and spell it

5    for the record.

6    A.   Paul Steven Kalmar, K-A-L-M-A-R.

7    Q.   And without giving us your street address, generally

8    speaking, where do you live?

9    A.   Northwest of Kingman, Kansas, about 20 miles.

10   Q.   Is that in Reno County?

11   A.   Yes.

12   Q.   How long have you lived there?

13   A.   Since about 11 or 12 years ago.

14   Q.   Are you presently employed?

15   A.   Part-time only.

16   Q.   And are you retired?

17   A.   Yes.

18   Q.   And what did you used to do?  What did you retire from?

19   A.   I'm a retired police chief from Spring Hill, Kansas.  I

20   spent a little over ten years there.  Prior to that I was a

21   police chief in Kingman, Kansas for a long time.

22   Q.   How long were you in Spring Hill?

23   A.   About ten years, a little over ten years.

24   Q.   Approximately what dates were you in Spring Hill?

25   A.   December of '95 until July 6th of 2006.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.794

1   Q.   Do you know an individual by the name of Bruce Hay?

2   A.   Yes, I do.

3   Q.   And how do you know Mr. Hay?

4   A.   We attended the same church in Osawatomie, Kansas, the

5   Church of the Nazarene.

6   Q.   Is that where you met Mr. Hay, was at church?

7   A.   Yes.

8   Q.   And so approximately when did you meet Mr. Hay?

9   A.   We attended other churches prior to going there.  I'm not

10  sure when we went there for sure, but we went there several

11  years.

12  Q.   I'd first like to talk to you about a car accident that

13  occurred on December 18th of 2005.

14  A.   Yes, sir.

15  Q.   Now, Mr. Kalmar, you and I spoke last week, correct?

16  A.   Uh-huh, that's true.

17  Q.   When I first asked you about a car accident on that date,

18  did you remember anything?

19  A.   No, sir.

20  Q.   Anything that happened?

21  A.   Not at first, no.

22  Q.   I then provided you with police reports from an Osawatomie

23  police officer, Suzy Tousey; is that correct?

24  A.   That's correct.

25  Q.   And have you had a chance to look at those reports?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.795

1   A.   Yes, I did.

2   Q.   After you looked at those reports, Officer Tousey's

3   reports, does that refresh your recollection as far as what

4   happened on December 18, 2005?

5   A.   Yes, sir, it does.

6   Q.   Could you just -- now, was Mr. Hay involved in a car

7   accident on that day?

8   A.   Yes, sir.

9   Q.   Did you see the accident?

10  A.   I was right behind him.

11  Q.   So can you describe for the jury what happened?

12  A.   Well, we were on snow-covered streets, a little bit slushy,

13  if I recall correctly, and he turned left to go down the street

14  to turn into the parking lot, and his vehicle slid into a poll.

15  Q.   Were you and Mr. Hay going to the same place?

16  A.   Yes, sir.

17  Q.   Where were you going?

18  A.   Osawatomie Church of the Nazarene.

19  Q.   Did you just -- were you traveling together or did you just

20  happen to be behind him?

21  A.   I just happened to be there.

22  Q.   Could we please bring up Defendant's Exhibit 831.

23       So, Mr. Kalmar, you've got a physical copy too.

24  A.   Thank you.

25  Q.   In front of you is an item that's been admitted as a map,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.796

1  and I think there's a red dot there with an address.  But

2  generally speaking, is that the location where the accident

3  occurred?

4  A.   Yeah, it occurred on -- right there at the intersection of

5  Main and 15th terrace.

6  Q.   Okay.  And that day were you able to see who was driving?

7  A.   Not until I got out of the truck.

8  Q.   And who got out of the truck?

9  A.   Bruce Hay.

10  Q.   And by that time had you and Mr. Hay been going to the same

11  church for a period of time?

12  A.   Yes.

13  Q.   And so you recognized him?

14  A.   Yes.

15  Q.   I want to talk to -- about the time period around August of

16  2005.

17  A.   Yes, sir.

18  Q.   Did you have anything significant going on in your personal

19  life?

20  A.   Yes, sir.

21  Q.   What's that?

22  A.   We were building a new home south of Princeton, Kansas on

23  Montana Road -- east of Princeton.  Sorry.

24  Q.   Okay.  When you say "we," was this your personal home?

25  A.   Yes.  My wife and I and her sister and husband built a

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.797

1   large house in the woods there off of Montana Road.

2   Q.   And when you say that you were building it, describe what

3   you mean.

4   A.   Well, my wife and I and my wife's sister and husband and my

5   pastor, Ray Brunet, who was my contractor, helped build it, and

6   one of Pastor Brunet's employees or helpers was Bruce Hay.

7   Q.   And what day did you start construction on this house?

8   A.   August of 2005, I believe.

9   Q.   And Pastor Brunet you said was the contractor?

10  A.   Yes.   REB Construction -- or REB Construction, and that was

11  Raymond E. Brunet, was his initials.   That was what it stood

12  for.

13  Q.   Can you describe for the jury the house that you were

14  building back then?

15  A.   It was a very large house, over 4,000 square feet, top and

16  bottom.   The walls were made out of sips panels, which is a

17  piece of plywood, four inches of Styrofoam, plywood compressed

18  and stuck together with glue, and all your electrical conduits

19  were drilled into that, so you could put it up piece by piece

20  by piece, and the same with the roof, only it was -- the roof

21  was 6 inches in diameter or in thickness.   The top floor was

22  probably over 2,000 square feet, and so was the basement, full

23  basement underneath it, it was a large home.

24  Q.   When that home was being constructed, were you out there?

25  A.   Oh, yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.798

1    Q.   How frequently were out there during construction?

2    A.   Almost every day.

3    Q.   You said Pastor Brunet.  Did he have a construction

4    business in addition to being a pastor of the church?

5    A.   Yes, sir, he did.

6    Q.   You said that Mr. Hay was one of his employees?

7    A.   Yes.

8    Q.   Did you ever see Mr. Hay out at that -- at your house

9    working?

10   A.   Yes.

11   Q.   How frequently?

12   A.   Many times.

13   Q.   I'm going to hand you -- let me back up.

14   A.   Okay.

15   Q.   You said that construction was started in August of 2005?

16   A.   Yes.

17   Q.   When was construction completed?

18   A.   I got to move in a little early because we had to have a

19   bathroom and we had to have a sink and we had to have a shower.

20   When we got that all done, I stayed there most of the time.  We

21   finished probably in late 2006 maybe, somewhere in that

22   neighborhood.

23   Q.   So from 2005 until late 2006 construction was ongoing?

24   A.   Yes, sir.

25   Q.   Now, was Mr. Hay involved in the construction that entire

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.799

1   time, all the way from August 2005 until completion?

2   A.   No, sir.

3   Q.   Why not?

4   A.   I don't know why not.  He failed to show up for work.

5   Q.   Do you know approximately when or how far into the

6   construction did Mr. Hay stop showing up to work?

7   A.   Probably between half and two-thirds of the way through,

8   something like that.

9   Q.   At some point did you pay Mr. Hay for his work?

10  A.   Yes, I did.

11  Q.   And do you remember when or where you did that?

12  A.   It was in church on a Sunday morning.  I had him a check.

13  Q.   And did he say anything in response to you handing him a

14  check?

15  A.   Yes, he did.

16  Q.   And what did he say to you?

17  A.   He said that's not enough money.

18  Q.   What did you say in response?

19          MS. RAMSEY:  Objection, Your Honor; relevance.

20          THE COURT:  Overruled.

21  BY MR. OAKLEY:

22  Q.   What, if anything, did you say in response?

23  A.   I said I had to hire someone else to take your place.

24  Q.   I'm going to hand you a copy of a photograph that's been

25  marked as Government's Exhibit 168.  Do you recognize that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.800

1   photograph?

2   A.   Yes, I do.

3   Q.   What's that a photograph of?

4   A.   It's a photograph of the interior walls of the basement

5   foundation, and there are two people in the photograph.

6   Q.   Is that photograph a fair and accurate depiction of the way

7   that the construction on your house appeared?

8   A.   Yes, sir.

9        MR. OAKLEY:  Your Honor, I offer Government's

10  Exhibit 168, please.

11       MS. RAMSEY:  No objection.

12       THE COURT:  Exhibit 168 admitted.  You can publish.

13  BY MR. OAKLEY:

14  Q.   So do you recognize the two individuals in Government's

15  Exhibit 168?

16  A.   Yes, I do.  The one in the red hat is Pastor Brunet, and

17  the one in the white T-shirt is Mr. Bruce Hay.

18  Q.   And so generally speaking, at what point in construction

19  are we here?

20  A.   This is early on, just after we got the foundation walls

21  poured and set, and I believe they're measuring for sewer

22  lines.

23  Q.   And so you say construction began in mid to late August of

24  2005?

25  A.   Yes, that's correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.801

650

1  Q.  And so do you know the exact date that this photograph was

2  taken?

3  A.  Not the exact date, no, sir.

4  Q.  Was it shortly after that time period?

5  A.  Yes.  The leaves are still on the trees.

6  Q.  I'll next hand you what's been marked as Government's

7  Exhibit 169.  Do you recognize that photograph?

8  A.  Yes, sir, I do.

9  Q.  What is that a photograph of?

10  A.  That's a picture of more of the same interior walls of the

11  basement foundation, and that's a person involved and Mr. Bruce

12  Hay, and he's holding a reciprocating saw, battery powered.  It

13  looks like he's cutting sewer pipe.

14       MR. OAKLEY:  Your Honor, I offer Government's

15  Exhibit 169.

16       MS. RAMSEY:  No objection.

17       THE COURT:  Exhibit 169 admitted.  You can publish.

18  BY MR. OAKLEY:

19  Q.  So this photograph only shows one person in it; is that

20  correct?

21  A.  That's correct.

22  Q.  And who is that person?

23  A.  Mr. Bruce Hay.

24  Q.  And what's he doing?

25  A.  He's cutting a piece of -- looks like about maybe

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.802

1   two-inch -- could be a water drain or sewer drain from a sink

2   with a battery-operated, looks like a DeWalt reciprocating saw.

3   Q.   Next I'll hand you what's been marked as Government's

4   Exhibit 170 and ask you to take a look at that exhibit, please.

5   Do you recognize Government's Exhibit 170?  Do you recognize

6   Government's Exhibit 170?

7   A.   Yes, sir, I do.

8   Q.   What is Government's Exhibit 170?

9   A.   That's a photograph of part of the walls of the house.

10  That's of the back of the house.  The square hole in the bottom

11  by the floor is where the fireplace would have been.  And

12  that's Mr. Bruce Hay standing by the large cutout where the

13  doors of the deck would be eventually.  And that's Mr. Bruce

14  Hay, and I can't tell for sure who the other person is because

15  of the glare.  It could be my brother-in-law.

16  Q.   And is that photograph -- is that photograph a fair and

17  accurate depiction of the construction that was going on at the

18  house at that time?

19  A.   Yes, sir.  You can see the sips panel there and see what

20  I'm talking about.

21        MR. OAKLEY:  Your Honor, I offer Government's

22  Exhibit 170.

23        MS. RAMSEY:  No objection.

24        THE COURT:  170 admitted.

25  BY MR. OAKLEY:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.803

1    Q.   And you said that there are two people in here, one you

2    couldn't recognize, but you could recognize the other?

3    A.   Yes.

4    Q.   Who can you recognize?

5    A.   I believe the one on the right is my brother-in-law, Merle,

6    but I'm not certain.  I think it is.

7    Q.   Is there, like, a sun glare that shows up in this

8    paragraph?

9    A.   Yes.

10   Q.   And so that person's to the right.  It looks like there's

11   another person to the left.  Who is that?

12   A.   Mr. Bruce Hay.

13   Q.   I'm going to hand you what's been marked as Government's

14   Exhibit 171.  Is that another photograph involving construction

15   and kind of the -- similar to the walls that we just looked at?

16   A.   Yes, it is.

17   Q.   Is that a fair and accurate depiction?

18   A.   Yes.

19          MR. OAKLEY:  Your Honor, I offer Government's

20   Exhibit 171.

21          MS. RAMSEY:  No objection.

22          THE COURT:  171 admitted.  You can publish.

23   BY MR. OAKLEY:

24   Q.   Do you see Bruce Hay in that paragraph?

25   A.   Yes, I do.  He's holding a tape measure amidst that 2-by-4

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.804

1    or 2-by-6 holding up the wall.

2    Q.   You described -- you described these walls earlier, and you

3    gave them a name.  And I'm sorry, but I don't remember the

4    names.

5    A.   Sips panel.  It's a called a structural integrated panel.

6    Q.   Does this go up as one piece?

7    A.   Many pieces.

8    Q.   Approximately how big are the individual pieces?

9    A.   Depends.  Some of them were quite large.  The roof panels

10   were huge.  We had to have a crane to put them up.  But these

11   were mainly lifted up by two or three people, and we would pick

12   them up, set them on a 2-by-4 which was screwed to the floor,

13   and there was a groove that would sit over and you screwed them

14   in and then brace them up temporarily until you got more pieces

15   put together.

16   Q.   What's going on in this photograph?

17   A.   It appears Bruce was measuring something there.  I'm not

18   quite sure.  That 2-by-6, that's what was holding up the wall

19   until we got it better secured.

20   Q.   It looks like there's a --

21   A.   I see the other one is a tape.  It's clear over -- the tape

22   dropped clear down here.  Whoever is on that ladder has got the

23   other end of that tape.  They were measuring something to see

24   if it was square, I presume.  I'm not sure exactly, but we were

25   measuring something.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.805

1   Q.   Did you ever have any involvement in lifting up these

2   panels?

3   A.   Oh, yes.

4   Q.   And were they light?

5   A.   No.  Very heavy.  Took three or four of us to pick them up,

6   depending on the size of the panel, but they were all pretty

7   good size.

8   Q.   I'll next hand you what's been marked as Government's

9   Exhibit 172.  Do you recognize that, sir?

10  A.   Yes, I do.

11  Q.   And what is Government's Exhibit 172?

12  A.   That's the inside of the basement again, the foundation,

13  and some of the sips panels.  You can see them laying on the

14  ground on the cement.  The one to the right -- whoops, that's

15  not the right one.  The one to the right is the big wall

16  section for a basement fireplace.  That was a huge piece of

17  sips panel, very heavy.  That's -- and some of the studs we

18  used to get the walls up to the right height so we could put

19  the other panels on.

20  Q.   Let me -- sorry.  Let me stop you there and just ask you,

21  is that photograph a fair and accurate depiction of the way the

22  construction appeared?

23  A.   Yes, exactly.

24       MR. OAKLEY:  Your Honor, I offer Government's

25  Exhibit 172.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.806

1          MS. RAMSEY:  No objection.

2          THE COURT:  172 admitted.  You can publish.

3   BY MR. OAKLEY:

4   Q.   I'm sorry.  Now that the jury can see that, can you explain

5   what's going on at this part of the construction?

6   A.   This is one of the sips panels.  It's laying down.  It

7   would be stood up and then braced in place, and this would be

8   on top of one of those other pieces, this piece here.  There's

9   another piece of sips panel.  There's one and right at the

10  corner.

11  Q.   I think that monitor in front of you, actually if you draw

12  on, it will leave a mark.

13  A.   Oh, okay, didn't know that.

14  Q.   So do you -- how many people are in this photograph?

15  A.   Three?

16  Q.   Do you recognize any of them?

17         Let me ask you, are their backs all facing, or two of their

18  backs are facing and one from the side?

19  A.   I'm sure Pastor Brunet is on the ladder, and Mr. Bruce Hay

20  is right there.  And that's -- I believe that's my

21  brother-in-law, Merle.

22  Q.   And so this is an example of the walls of the house going

23  up?

24  A.   Yes.

25  Q.   So far are we kind of going in progression as far as the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.807

1  photographs we've looked at, would follow the timeline as it

2  actually occurred?

3  A.   Yes, pretty close.

4  Q.   I'll next hand you what's been marked as Government's

5  Exhibit 173.  And do you recognize that?

6  A.   Yes, sir.

7  Q.   And what is 173?

8  A.   That's along the backside of the house showing people on a

9  scaffold and the sips panel being put in.  That one piece is

10  what we saw on the floor a while ago.  It's the top of a window

11  in the upstairs portion of the house.

12  Q.   Is that photograph a fair and accurate depiction of the

13  construction that was going on?

14  A.   Yes, sir.

15        MR. OAKLEY:  Your Honor, I offer Government's

16  Exhibit 173.

17        MS. RAMSEY:  No objection.

18        THE COURT:  173 admitted.  You can publish.

19  BY MR. OAKLEY:

20  Q.   What's going on in Government's Exhibit 173?

21  A.   There's three people involved: Bruce Hay; I believe that's

22  my son, Doug; and one of his Army buddies, Allen.  Doug and

23  Mr. Hay.

24  Q.   Could you circle the person you recognize as Mr. Hay?

25        What is Mr. Hay doing in this paragraph?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.808

1  A.   He's -- him and my son apparently are lifting the piece of

2  that sips panel.  That's the top of that window frame in place.

3  Q.   When did you say that you were able to move in?

4  A.   Maybe July, mid July maybe.

5  Q.   And you started in August of 2005?

6  A.   Yes.

7  Q.   And just so we're clear, so it would have been July of the

8  next year, 2006?

9  A.   Yes.  Maybe a little later than that, but it was in that

10 time period.

11 Q.   The summer of '06?

12 A.   Uh-huh, yes, sir.

13 Q.   The state of the house -- you weren't moving in at this

14 point, were you?

15 A.   No roof on it.

16 Q.   Do you know approximately when this photograph was taken?

17 A.   It was in the wintertime.

18 Q.   2005?

19 A.   Yeah, or very early in '06, probably in the winter of '05.

20         MR. OAKLEY:  Ms. Wiest, my monitor is not calibrated.

21 Would you mind removing the marks?

22         COURTROOM DEPUTY:  I think I can do that.  There you

23 go.

24         MR. OAKLEY:  Thank you so much.

25         COURTROOM DEPUTY:  You're welcome.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.809

1    BY MR. OAKLEY:

2    Q.  I'll next hand you what's been marked as Government's

3    Exhibit 174.  Do you recognize that?

4    A.  Yes, I do.

5    Q.  What's Government's Exhibit 174?  What is Government's

6    Exhibit 174?

7    A.  It is a picture of -- I believe it's more the front of

8    the house, and there's a -- showing two people up on the roof

9    of the house.  The roof panels have been installed.

10          MR. OAKLEY:  Your Honor, I offer Government's

11   Exhibit 174.

12          MS. RAMSEY:  No objection.

13          THE COURT:  174 admitted.  You can publish.

14   BY MR. OAKLEY:

15   Q.  Looks like there's two people up on the roof.  Do you

16   recognize who those two people are?

17   A.  I believe I do.

18   Q.  Who are they?

19   A.  I believe that's Pastor Brunet on the right, and that's

20   Mr. Hay on the left.

21   Q.  They're standing on top of the roof?

22   A.  Yes.

23   Q.  And it looks like there's a ladder attached to the roof?

24   A.  Yes.

25   Q.  Is that how they got up there?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.810

1   A.   Yes, sir.

2   Q.   And, again, as far as the construction process, this one is

3   after the one that we just saw?

4   A.   Yes, quite a bit after.

5   Q.   And so it looks like the wall panels are up at this point

6   and starting to work on the roof?

7   A.   Yes, sir.

8   Q.   I'll next hand you what's been marked as Government's

9   Exhibit 175.  Do you recognize Government's Exhibit 175?

10  A.   Yes, sir, I do.

11  Q.   What's that a photograph of?

12  A.   That's the rear of the house, scaffolding, and at least two

13  people on the scaffolding, and that's about what -- showing the

14  installation of a large window.

15          MR. OAKLEY:  Your Honor, I offer Government's

16  Exhibit 175.

17          MS. RAMSEY:  No objection.

18          THE COURT:  175 admitted.  You can publish.

19  BY MR. OAKLEY:

20  Q.   You said there's two people on the scaffolding.  Do you

21  recognize the two people on the scaffolding?

22  A.   Yeah, I think I do.

23  Q.   Who are they?

24  A.   That's Bruce Hay right there, and that's I think my son,

25  Doug.  And that's Bruce right there.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.811

1    Q.   What are they doing in this photograph?

2    A.   Installing a very large trapezoid shape, insulated window.

3    Q.   What are they standing on?

4    A.   Scaffolding with wood planks.

5    Q.   And is Mr. Hay standing on something that's on top of the

6    scaffolding?

7    A.   Yes, a ladder.

8    Q.   How did those two individuals get up there?

9    A.   Climbed up the scaffolding.

10   Q.   And then once Mr. Hay was on the scaffolding, he also had

11   to climb up on the ladder in order to get that window in?

12   A.   That's correct.

13   Q.   I'll next hand you what's been marked as Government's

14   Exhibit 176.  Mr. Kalmar, what's Government's Exhibit 176?

15   A.   It's a very similar picture to the one we just seen.  Same

16   people involved on the scaffolding and a ladder, and it's on

17   the rear of the home, and that's a window that's to the left of

18   the living room.

19   Q.   Is that a fair and accurate depiction of the construction

20   that was going on at the house at that time?

21   A.   Yes, sir, it is.

22           MR. OAKLEY:  Your Honor, I offer Government's

23   Exhibit 176.

24           MS. RAMSEY:  No objection.

25           THE COURT:  176 admitted.  You can publish.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.812

BY MR. OAKLEY:

Q.   Are those the same two individuals that we discussed in the previous photo?

A.   Yes, sir.

Q.   Do you remember how large these -- this particular window was?

A.   Six or 8 feet tall on one side, and 4.5 feet tall on the other, trapezoid shape, and it was very heavy.

Q.   I'll next hand you what's been marked as Government's Exhibit 177.   Sir, what is Government's Exhibit 177?

A.   That's a photograph of some people working on the living room area of the home cutting some sheets of plywood.

Q.   And is that a fair and accurate depiction of the construction?

A.   Yes, it is.

     MR. OAKLEY:   Your Honor, I offer Government's Exhibit 177.

     MS. RAMSEY:   No objection.

     THE COURT:   177 admitted.   You can publish.

BY MR. OAKLEY:

Q.   And it looks like there's four people in this paragraph, but two that are in the main room there; is that correct?

A.   Yes, correct, uh-huh.

Q.   Do you recognize either of those two individuals?

A.   Yes, I do.   That's Bruce Hay right here, and I believe

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.813

1    that's my son, Doug.  And that could be my wife there, and I'm

2    not sure who that is back there.

3    Q.   Is Mr. Hay cutting plywood in this photograph?

4    A.   Yes.

5    Q.   And, again, are we continuing to go sequentially; in other

6    words, this occurred after the roof was on and the window?

7    A.   That's correct, yep.

8    Q.   So I've handed you Government's Exhibit 178.  What is

9    Government's Exhibit 178?

10   A.   It's a photograph of the front door of the house with a

11   person kneeling down.

12   Q.   And is that a fair and accurate depiction of the

13   construction that was going on in your house?

14   A.   Yes, it is.

15         MR. OAKLEY:  Your Honor, I offer Government's

16   Exhibit 178.

17         MS. RAMSEY:  No objection.

18         THE COURT:  178 admitted.

19   BY MR. OAKLEY:

20   Q.   You mentioned that there was a person kneeling down?

21   A.   Yes.

22   Q.   Do you recognize that person?

23   A.   Yes, sir.

24   Q.   And who is that person?

25   A.   Bruce Hay right there.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.814

1  Q.  And what's he doing in this photograph?

2  A.  He's adjusting -- he's adjusting the front door of the

3  house.

4  Q.  And did he help install that door?

5  A.  Yes, he did.

6  Q.  I'll next hand you what's been marked as Government's

7  Exhibit 179.  Mr. Kalmar, can you tell us what Government's

8  Exhibit 179 is?

9  A.  I think we're on the stairway going down to the basement,

10  and we're putting up some sheeting on the trusses.

11  Q.  Is 179 a fair and accurate depiction of the construction --

12  A.  Yes.

13  Q.  -- of your house?

14  A.  Yes, sir.

15       MR. OAKLEY:  Your Honor, I offer Government's

16  Exhibit 179.

17       MS. RAMSEY:  No objection.

18       THE COURT:  179 admitted.  You can publish.

19  BY MR. OAKLEY:

20  Q.  Do you recognize the two people in this paragraph?

21  A.  Yes, I do.

22  Q.  And who is the one in the back that we can see his face?

23  A.  That's my small boy, Dennis.

24  Q.  You say "small boy."

25  A.  He's 6' 8", 300 pounds, yeah.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.815

1  Q.  It looks like Dennis is standing in the photograph behind

2  somebody facing somebody.  Do you recognize that person?

3  A.  Yes, that's Bruce Hay right there.

4  Q.  Now, it looks like Mr. Hay's face in this photograph is

5  obstructed by the roof truss?

6  A.  Yes.

7  Q.  How can you tell that's Mr. Hay?

8  A.  Same baseball cap, same shirt, same jeans, and I just know

9  that's who was there that day.

10  Q.  What's going on at this point in the construction?

11  A.  The house is nearing -- not nearing completion, but it's

12  getting close and they're working on the trusses.  I'm not sure

13  why -- maybe that was just for some extra framing, putting some

14  sheeting up on the trusses.

15  Q.  I'll next hand you what's been marked as Government's

16  Exhibit 180.  Do you recognize that?

17  A.  Yes, I do.

18  Q.  What is Government's Exhibit 180?

19  A.  That's depicting a hole in the ground with a water

20  connection.

21  Q.  Is that a fair and accurate -- was that -- let me back up.

22  Is that part of the construction of your house, the water

23  connection?

24  A.  Yes, sir.

25  Q.  Is that a fair and accurate depiction of the construction

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.816

1    work, specifically of the water connection related to your

2    house?

3    A.   Yes, sir, it is.

4            MR. OAKLEY:   Your Honor, I offer Government's

5    Exhibit 180.

6            MS. RAMSEY:   No objection.

7            THE COURT:   180 admitted.   You can publish.

8    BY MR. OAKLEY:

9    Q.   You mention that's a water connection.   Is someone

10   performing the work for the water connection?

11   A.   Yes.

12   Q.   Who?

13   A.   Bruce Hay.

14   Q.   And is that water connection aboveground or below ground?

15   A.   Below ground.   That's the rural waterline right here, and

16   that's the connection going into the house.

17   Q.   And so in this photograph is Mr. Hay below grade, below

18   ground?

19   A.   Yes, sir.

20   Q.   I'll next hand you what's been marked as Government's

21   Exhibit 181.   And do you recognize that photograph?

22   A.   Yes, sir, I do.

23   Q.   What's that a photograph of?

24   A.   I believe we're putting up the roof trusses.

25   Q.   Is that the roof trusses to the house?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.817

1    A.   Either the house or the garage.  I think it's the garage

2    probably.

3    Q.   After you built the house or did you also build a garage?

4    A.   Yes.

5    Q.   Did you build the house first?

6    A.   Yes, sir.

7    Q.   And is that photograph a fair and accurate depiction of the

8    construction that was going on?

9    A.   Yes, sir.

10            MR. OAKLEY:  Your Honor, I'd offer Government's

11   Exhibit 181.

12            MS. RAMSEY:  No objection.

13            THE COURT:  181 admitted.  You can publish.

14   BY MR. OAKLEY:

15   Q.   Do you recognize the individuals in that photograph?

16   A.   I believe I do.

17   Q.   And can you tell us who they are?

18   A.   That's Pastor Brunet, that's Bruce Hay, and I believe

19   that's myself.  And I'm not real sure if that's Doug or -- I'm

20   not certain who that is.

21   Q.   But you do recognize Bruce Hay in that?

22   A.   Yes, uh-huh.

23   Q.   What are the four of you doing in this photograph?

24   A.   We're using 2-by-4s with something adapted to them to push

25   up the roof trusses and hold them while they're nailed in place

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.818

1    or screwed in place.

2    Q.  I want to show you some other items that have been admitted

3    into evidence.

4        Could we please bring up Government's Exhibit 200.

5        And so this has been admitted into evidence, and I want to

6    direct your attention to the right -- top right portion of this

7    where it says "received," and there's a date of March 9, 2006.

8    Can you see that on the --

9    A.  Yes, sir.

10   Q.  Sandy, can we please zoom in on that, the very top, the

11   stamp portion.

12       And so the document for the record says -- is titled

13   "Veteran's Application for Compensation and/or Pension" and

14   there's that date stamped of March 9, 2006.  I want to just

15   kind of talk about the timing of this document as it relates to

16   the construction of your home.

17   A.  Yes, sir.

18   Q.  So was this in the middle of the construction?

19   A.  Yes, sir.

20   Q.  Could we please bring up Government's Exhibit 202, please.

21       And so, Mr. Kalmar, if we could just go to the "examined

22   on" date on the top portion.  So when did you move in?

23   A.  Mid to late '06, 2006.

24   Q.  You said you moved in while some of the finishing

25   construction was still going on?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                           2:19-cr-20044-JAR
                                         USA v. Bruce L. Hay
                                         ROA - Volume 3, p.819

1   A.   That's correct.

2   Q.   And you see on this document, Government's Exhibit 202, a

3   date of September 15, 2006.  So would that have been towards

4   the end or maybe the construction had even been completed at

5   that time?

6   A.   It was getting close.

7   Q.   Finally could we bring up Government's Exhibit 238, please.

8   This is a copy of a letter that's been admitted into evidence.

9   Could we please highlight the top portion showing the date.

10       And so this letter is dated August 31, 2005?

11  A.   Yes, sir.

12  Q.   And so would construction have just begun at that time?

13  A.   That's correct.

14           MR. OAKLEY:  I have no further questions, Your Honor.

15           MS. RAMSEY:  I have no questions for this witness.

16           THE COURT:  May this witness be excused?

17           MR. OAKLEY:  Yes, Your Honor.

18           THE COURT:  Thank you.

19           THE WITNESS:  Thank you.

20           THE COURT:  Let's take a 15-minute break at this

21  point.

22       (Recess taken at 10:15 a.m.)

23           THE COURT:  Is there something you wanted to take up?

24           MR. HUSCHKA:  Yes, Your Honor.  We wanted to update

25  the court on the anticipated schedule.  We have three more

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.820

1  witnesses.  We're going to call one here momentarily.  And then

2  we have a slew of cancellations and re-bookings yesterday

3  afternoon and last night, but we have our expert witness here.

4  She just arrived at the courthouse, so we would suggest after

5  this witness maybe taking an early or long lunch break and then

6  we'll call Dr. Becker.  We'll have one more witness after that,

7  and then we intend to rest at that time.

8              THE COURT:  Is Dr. Becker your expert?

9              MR. HUSCHKA:  Yes, Your Honor.

10             THE COURT:  You want to take Dr. Becker after lunch?

11             MR. HUSCHKA:  Yes.

12             THE COURT:  So there's one more witness before lunch?

13             MR. HUSCHKA:  Yes, Your Honor.

14             THE COURT:  Quick or long?

15             MR. HUSCHKA:  I think fairly quick.

16             THE COURT:  So what you're asking, I think, is to take

17 an early lunch break?

18             MR. HUSCHKA:  Yes, Your Honor.

19             THE COURT:  And then what time will you want to resume

20 with your expert?

21             MR. HUSCHKA:  I think whatever the court prefers,

22 we'll be ready.  She just arrived at the courthouse, so we just

23 want to give her a chance to get something to eat.  She's been

24 on the road yesterday -- since yesterday afternoon.

25             THE COURT:  After that witness how much more do you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.821

1   have?

2         MR. HUSCHKA:  Just one.

3         THE COURT:  You'll finish before 5:00 today?

4         MR. HUSCHKA:  Yes, Your Honor.

5         THE COURT:  We'll break.  How are you situated with

6   your witnesses on Monday?

7         MS. RAMSEY:  Your Honor, I intend to have a meeting

8   with my investigator this afternoon, because as the trial has

9   gone on, there's been some overlap in witnesses that we had

10  under subpoena.

11        So I think we will have them lined up for hopefully a

12  full day on Monday and Tuesday and then possibly get to

13  Wednesday and maybe be done.

14        THE COURT:  Okay.  I didn't realize there was that

15  much.  So you may consume Monday, Tuesday, and maybe part of

16  Wednesday?

17        MS. RAMSEY:  Yes.  If I'm thinking about it, I think

18  our expert comes in not until Wednesday.

19        THE COURT:  Okay.  And then we're going to need to

20  figure out when to do the informal instruction conference, and

21  then we'll probably do the formal instruction conference on

22  Wednesday.  So let's maybe on Monday afternoon or something,

23  depending on if you take up until 5:00, it depends.  We'll see

24  how it goes.  Okay.  All right.  Let's bring the jury in.

25        (The jury entered the courtroom, after which the following

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.822

1   proceedings were had.)

2          THE COURT:  All right.  You can be seated.  And you

3   can call your next witness.

4          MR. OAKLEY:  Your Honor, the United States calls Wes

5   Ungerheuer.

6                    WESLEY UNGERHEUER,

7   called as a witness on behalf of the government, having first

8   been duly sworn, testified as follows:

9                    DIRECT EXAMINATION

10  BY MR. OAKLEY:

11  Q.   Sir, would you please tell the jury your name and spell it

12  for the court reporter.

13  A.   It's Wesley Ungerheuer, W-e-s-l-e-y, U-n-g-e-r-h-e-u-e-r.

14  Q.   And what city do you live in?

15  A.   Blue Mound, Kansas.

16  Q.   What do you do for a living?

17  A.   I'm a recycler.

18  Q.   When you say you're a recycler, what does that mean?

19  A.   Scrap metal dealer, buy scrap metal and process it and then

20  sell it.

21  Q.   And so how do you buy the scrap metal?

22  A.   It comes in our yard.  We have a facility and it has

23  scales, and they bring the scrap in the yard, and then we

24  unload it for the customers, and then we pay them.  And then we

25  process it, and then we haul it to a facility that -- to buy it

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.823

1   from us.

2   Q.   Do you just have one facility?

3   A.   I have two.

4   Q.   Where are your facilities located?

5   A.   One is at Centerville, Kansas, and the other one is at

6   Prescott, Kansas.

7   Q.   Do you know an individual by the name of Bruce Hay?

8   A.   I do.

9   Q.   How do you know Bruce Hay?

10   A.   He's one of our customers.

11   Q.   And which facility does he --

12   A.   He goes to the Centerville facility.

13   Q.   And how long have you known Bruce Hay?

14   A.   Oh, I've probably known Bruce for 15-plus years.

15   Q.   And how long has Mr. Hay been bringing in scrap metal to

16   your facility?

17   A.   Oh, probably at least 10, 12 years.

18   Q.   And when you say that you buy scrap metal, what type of

19   things are we talking about?

20   A.   Anything from appliances, plumbing, stainless steel sinks,

21   cars, farm equipment, anything metal basically, pipe, anything

22   scrap metal.

23   Q.   And have you seen Mr. Hay bring metal, scrap metal to your

24   facility?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.824

1   Q.   How frequently do you have contact with Mr. Hay?

2   A.   Oh, sometimes he comes once a day.  Sometimes he comes

3   twice a day.  Sometimes he doesn't come at all.  So it's

4   random.

5   Q.   When someone brings in scrap metal to your facility, do you

6   have employees or you yourself that help unload the scrap

7   metal?

8   A.   Yes, we help unload.  We have a full staff of people that

9   we have cranes, claws, magnets, and/or buy hand and forklifts.

10  So we have -- we unload most of the material for the customers.

11  Q.   The people that are bringing you the scrap metal, however,

12  do you help them load it so they can bring it to you?

13  A.   No.  They load it on their own or they have -- they get it

14  loaded with their ways and means.

15  Q.   And when Mr. Hay comes into your facility, has he ever been

16  by himself?

17  A.   Yes, he comes by himself.

18  Q.   And have you ever talked to Mr. Hay about scrap metal and

19  how he obtains his scrap metal to sell to you?

20  A.   Yes, I have.

21  Q.   And has he told you where he finds or how he obtains the

22  scrap metal?

23          MS. RAMSEY:  Objection; relevance.

24          THE COURT:  Overruled.

25  BY MR. OAKLEY:

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.825

1   Q.   Has he told you how he obtains the scrap metal he sells to

2   you?

3   A.   Yeah.   They had a yard, kind of a small yard, his dad did,

4   and his dad has passed away.   He's been cleaning up some of

5   that, and I think he goes and gets it from residents in town on

6   curbside, and they do -- in the town, Osawatomie, there's

7   curbside trash, and you can pick up metal for no charge and

8   things of that nature.

9   Q.   Does your business maintain records of the scrap metal that

10   you buy?

11   A.   Yes.

12   Q.   I'm going to hand you what's been marked as Government's

13   Exhibit 331.

14   A.   Okay.

15   Q.   Is Government's Exhibit 331 a spreadsheet containing

16   transactions of a certain individual as far as the scrap metal

17   that you bought?

18   A.   Yes, it's Bruce Hay's paperwork.

19   Q.   And have you -- do you currently have a computerized system

20   that you keep track of that on?

21   A.   Yes.

22   Q.   Have you always had that computerized system?

23   A.   No.   We put it in approximately ten years ago.   I don't

24   have the exact date, but before we did manual tickets.

25   Q.   So I think, if I may borrow this from you, the first date

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.826

1    on this is 2017 and then the last date is July of 2022.  Does

2    Government's Exhibit 331 contain all of the transactions you've

3    ever completed with Mr. Hay or is that just what you have in

4    your computer?

5    A.   That's just from -- that date of 1/13/17 to the current,

6    current date of '22, July of 22.

7    Q.   And that's something -- what's the name of your business?

8    A.   It's called Wes' Recycling.

9    Q.   Are you the owner?

10   A.   Yes.

11   Q.   Are those records you keep and maintain during the normal

12   course of your business?

13   A.   Yes, it's by law.  We have to keep those for the State of

14   Kansas too.

15        MR. OAKLEY:  Your Honor, I offer Government's

16   Exhibit 331.

17        MS. RAMSEY:  No objection.

18        THE COURT:  331 admitted.  You can publish.

19   BY MR. OAKLEY:

20   Q.   And so if we can zoom in at the top part.

21        This says "purchases by customer" and the ticket range is

22   January 13, 2017 through July 25, 2022; is that correct?

23   A.   Yes.

24   Q.   And then the customer -- there's a customer number and then

25   a name.  So all of these records relate to Bruce Hay?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.827

1   A.   Yes.

2   Q.   And then if we could zoom out, and then if we could just

3   zoom in on the next part but maybe the top half of that next

4   part.

5        And so there's columns here, and I want you to explain to

6   the jury the columns.  So the first column has numbers.  What

7   are those numbers related to?

8   A.   Well, the first number is the ticket number and then the

9   date, and then it's got the material, copper number one, clean,

10  and then it's 40 pounds, and then it's $2 a pound is $80, and

11  it continues on.  And when it gets -- one transaction can have

12  multiple different items for scrap metal.

13  Q.   So let's talk about transaction 168271, so I see there that

14  there are 1, 2, 3, 4, 5, 6 different rows with that particular

15  transaction number?

16  A.   Yes.

17  Q.   And so does that signify one instance of Mr. Hay bringing

18  you a series of different types of metal?

19  A.   Yes, that's one series, that's one ticket, so that would be

20  all them items are unloaded on that same date and they sort

21  them, and then he's paid off of the weight.

22  Q.   Okay.  And so the second column is the date, and for 168271

23  that was January 18, 2017, correct?

24  A.   Correct.

25  Q.   Then the next column, is that a description of the metal?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.828

677

1    A.   Stainless steel 304 is a description, yes.

2    Q.   So do you pay different prices depending on the type of the

3    metal that's brought in?

4    A.   Yes.

5    Q.   And so in order to calculate the price, that's why there's

6    so many rows for one transaction; is that accurate?

7    A.   Yes.  So there's a -- to understand, you pull in a building

8    and there's a scale there that's a 4-by-4 scale, and everything

9    is put on the scale and weighed, and then it's individually

10   weighed, and it goes into the computer, and it's got a picture

11   that's taken -- every time it's weighed, it has a picture of

12   the material.  And then the customer goes around to the office

13   when he's done and they pay him.

14        And there's also a large scale, truck scale, and you can

15   bring scrap metal in on it and then go out back and unload by

16   magnet or claw or by hand and then you weigh back empty, and

17   then you get your money that way.

18   Q.   And so that third column is a description of the -- you

19   mentioned the stainless steel, or there's also a number two,

20   "clean cop."  Does "cop" stand for copper?

21   A.   Copper, yes.

22   Q.   And then there's a number in the fourth column.  For

23   instance, that top one, it says 40.0.  What does that signify?

24   A.   That's the weight.

25   Q.   And is that the weight that was brought into you?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.829

1   A.   That's the net weight, the net weight.

2   Q.   And so on January 13, 2017, Mr. Hay brought in a series of

3   metal items including 40 pounds of that number one clean

4   copper?

5   A.   Correct.

6   Q.   And then after -- so the "LB," does that signify pound?

7   A.   Yes.

8   Q.   And then there's a dollar next to it, $2.  What does that

9   signify?

10  A.   That's the price.

11  Q.   The price that you pay?

12  A.   Yes.

13  Q.   And so then it says pound and then there's an $80.  What's

14  the $80?

15  A.   That's the 40 times the $2 is $80.

16  Q.   And so could we zoom out and could we just scroll through

17  these pages.

18       And so does each page of this exhibit list particular metal

19  along with the date that was brought in?

20  A.   Yes.

21  Q.   And, again, this starts in January of 2017, and so this is

22  just for the time period of January 2017 to the present; is

23  that fair?

24  A.   That's correct.

25  Q.   Okay.  And at the very bottom -- so we jumped ahead to the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.830

1   bottom, but I think we skipped over a page.  But each page is

2   similar as far -- it's the same as far as layout.  It's just

3   dependent on that particular --

4   A.   Different dates and different items, but it's the series of

5   tickets.

6   Q.   Okay.  Could we please scroll in at the very bottom.

7        And so the last transaction that's contained in here, was

8   it July 25, 2022?

9   A.   That's correct.

10  Q.   And then on that one it says "shred" and there's 1,280.

11  Does that the 1,280 -- what does that relate to?

12  A.   That's pounds.

13  Q.   And so typically what's shred?

14  A.   It would be refrigerator appliances, tin, car parts,

15  anything kind of scrap metal, miscellaneous scrap metal around

16  your house, household stuff, or farm stuff.

17  Q.   So then at the very bottom it says, Bruce Hay 1/13/2017 to

18  7/25/2022.  Total weight, what does that signify, the total

19  weight?

20  A.   The total weight is all the weight added up to the end for

21  that series of tickets.

22  Q.   And what was the total weight that Mr. Hay brought in from

23  January 13th, 2017 to July 25, 2022?

24  A.   Well, it says -- is it 1,057,520 pounds?

25  Q.   And then does that also contain the total amount that you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.831

1   paid, that Wes' Recycling paid Mr. Hay?

2   A.   Yes.

3   Q.   Is that last number, would that be the total from July 13,

4   2017 -- January 13, 2017 to July 25, 2022?

5   A.   Yes.

6   Q.   And how much was Mr. Hay paid during that time period?

7   A.   $162,253.81.

8   Q.   When did you first meet Mr. Hay, if you recall?

9   A.   I've known him for a long time.  I hauled scrap metal for

10   his father in the '90s, late '80s, middle '90s, and he was

11   around some, so I've known him for a long time.

12   Q.   Did you do business with Mr. Hay prior to January 13, 2017?

13   A.   Yes.

14   Q.   When you see Mr. Hay, have you ever seen him using a

15   walker?

16   A.   I've never seen a walker.

17   Q.   Have you ever seen Mr. Hay using a cane?

18   A.   I've seen a cane.

19   Q.   And have you ever seen him where he's not using either --

20   well, you said you've never seen him with a walker.  Have you

21   ever seen him where he's not using a cane?

22   A.   I've seen him not use a cane.

23   Q.   Which is more frequent, seeing him with a cane or without a

24   cane?

25   A.   Without.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.832

1  Q.   Does your business have camera installed, video camera

2  installed?

3  A.   Yes, we have surveillance.

4  Q.   And does the surveillance capture at least part of the

5  transaction when somebody brings in scrap metal to you?

6  A.   Yes.

7  Q.   Now, does your system keep video forever or does it ride

8  over?

9  A.   It rides over -- I don't know the exact time, I imagine a

10  few days or a week or something.

11  Q.   I'm going to hand you what's been marked as Government's

12  Exhibit 83.  And is that a DVD containing surveillance video of

13  Mr. Hay?

14  A.   Yes.

15  Q.   And prior to testifying here today, did you have a chance

16  to review the video on that disk to confirm that it was video

17  from Wes' Recycling?

18  A.   I did.

19  Q.   And does it appear that someone was capturing the video off

20  of a monitor, so using a camera to capture what was shown on a

21  monitor?

22  A.   Yes.

23  Q.   But is the monitor the fair and accurate video from Wes'

24  Recycling?

25  A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.833

 1              MR. OAKLEY:  Your Honor, I offer Government's

 2    Exhibit 83.

 3              MS. RAMSEY:  No objection.

 4              THE COURT:  Exhibit 83 admitted.  You can publish.

 5    BY MR. OAKLEY:

 6    Q.   Do you recognize the person -- well, let me back up.  It

 7    looks to me like there's a sliding window there.  Can you

 8    explain what we're seeing in this video?

 9    A.   That's what we call our customer window or pay window.  The

10    customer is unloading.  They come in there and we pay them

11    through the window.

12    Q.   Do you recognize the customer in this video?

13    A.   That's Bruce Hay.

14    Q.   Can we pause right there.

15         So it looks like Mr. Hay is reaching into something.  What

16    is that?

17    A.   It's a cooler.  We have some water.  We have free water for

18    customers.

19    Q.   It looks like on the counter on the far right there's

20    something else.  What is --

21    A.   There's a coffee pot on the right.

22    Q.   Go ahead and play.

23         Does it appear that Mr. Hay had a cane with him on that

24    occasion?

25    A.   It doesn't appear so.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.834

1   Q.   Next I'll hand you another disk that's been marked as

2   Government's Exhibit 84.  And do you recognize this as

3   surveillance -- as a disk containing surveillance video from

4   Wes' Recycling?

5   A.   Yes.

6   Q.   And the first video, was that taken July 11, 2022?

7   A.   Yes.

8   Q.   And is this video from the same date?

9   A.   Yes.

10           MR. OAKLEY:  Your Honor, I offer Government's

11   Exhibit 84.

12           MS. RAMSEY:  No objection.

13           THE COURT:  84 admitted.  You can publish.

14   BY MR. OAKLEY:

15   Q.   Can you pause.

16       It looks like on the way out Mr. Hay grabbed another bottle

17   of water?

18   A.   Yes.

19   Q.   Does it appear in this video that he dropped the bottle of

20   water?

21   A.   It appears that way.

22   Q.   Is he now bending down to pick it up?

23   A.   Yes.

24   Q.   And that's where the video -- that clip ends?

25   A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.835

1   Q.   I'll next hand you what's been marked as Government's

2   Exhibit 85.  And do you recognize that as a disk containing

3   surveillance video from Wes' Recycling?

4   A.   Yes.

5   Q.   Is that video from a transaction involving Mr. Hay on

6   July 25th of 2022?

7   A.   That's correct.

8           MR. OAKLEY:  Your Honor, I offer Government's

9   Exhibit 85.

10          MS. RAMSEY:  No objection.

11          THE COURT:  85 admitted.

12  BY MR. OAKLEY:

13  Q.   And so on July 25th of 2022 when Mr. Hay was at Wes'

14  Recycling, he did have a cane with him?

15  A.   Yes.

16          MR. OAKLEY:  No further questions, Your Honor.

17                      CROSS-EXAMINATION

18  BY MS. RAMSEY:

19  Q.   Good afternoon, sir.

20      So when Mr. Hay would bring the scrap metal to your shop,

21  you had other employees or machinery that would unload that

22  scrap metal, correct?

23  A.   Yes, we unload.

24  Q.   I'm sorry?

25  A.   Yes, we unload.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.836

1   Q.   Okay.  And so you don't know how the person gets the scrap

2   metal -- you're not there when they load it up to bring it to

3   your shop; fair to say?

4   A.   That's fair to say.

5   Q.   I believe you said that Mr. Hay's father -- is that Abraham

6   Hay, that was his name?

7   A.   Yes.

8   Q.   -- used to also come to your shop to scrap metal?

9   A.   Most of that I came to his place, and I do a lot of onsite

10  loading -- onsite loading and I do a lot of that, and I went to

11  his place a lot and loaded the truck there directly.

12  Q.   He's passed away, correct?

13  A.   Yes.

14  Q.   Okay.  And did you attend his funeral?

15  A.   I did not.  I was out of town.  My family went but wife and

16  I were out of town.

17  Q.   Okay.  All right.  I believe you said that you have seen

18  both Mr. Hay come in when he's carried the cane, and there's

19  times when he's not; is that correct?

20  A.   That's correct.

21  Q.   You have a disability yourself, do you not?

22  A.   Yes, I do.

23  Q.   And are there times when people don't recognize that you

24  have a disability?

25  A.   There's times.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.837

1   Q.  And that's because, in fact, you have a problem with your

2   leg, correct?

3   A.  I have a prosthetic leg, yes.

4   Q.  And many people wouldn't know that to look at you?

5   A.  No.

6          MS. RAMSEY:  Okay.  No further questions.  Thank you,

7   Your Honor.

8                  REDIRECT EXAMINATION

9   BY MR. OAKLEY:

10  Q.  Just to make sure I'm clear, when you said that you would

11  go out to the Hay residence, that was for Bruce's father, A.E.

12  Hay?  When you said you would go out to help --

13  A.  I've hauled for Bruce too.

14  Q.  And so on occasion you would go out and load for both A.E.

15  and Bruce?

16  A.  That's correct.

17  Q.  How frequently?

18  A.  Two, three times a year we'd load semis.  I'm talking

19  loads, full loads, may load five or six trucks.

20  Q.  Would that just be large loads?

21  A.  Large piles they've accumulated, and they put them in a big

22  field and there would be 150 ton of scrap there.

23  Q.  And you mentioned that -- well, let me ask you this: You

24  mentioned some of the scrap you buy comes from people that

25  leave it on the side of the road for pick up.  Does the city,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.838

 1   for instance, have a day that citizens can leave out old

 2   appliances and that sort of thing?

 3   A.   You can leave out appliances on trash day, and people --

 4   it's free will, so you can -- anybody can pick up the

 5   appliances.  If it's on the curb, you can pick it up.

 6   Q.   Did Bruce ever tell you that's -- whether or not that's one

 7   of the ways that he got scrap metal?

 8   A.   Yes, he did.

 9         MR. OAKLEY:  No further questions, Your Honor.

10         MS. RAMSEY:  Nothing further.  Thank you, Your Honor.

11         THE COURT:  All right.  Can this witness be excused?

12         MR. OAKLEY:  Yes, Your Honor.

13         THE COURT:  Thank you.

14         THE WITNESS:  Thank you.

15         THE COURT:  All right.  We're ready to take a break at

16   this point?

17         MR. HUSCHKA:  Yes, Your Honor.

18         THE COURT:  All right.  All right.  Ladies and

19   gentlemen, we're going to take a very early lunch break because

20   the evidence has run faster than we thought and the next

21   witness won't be available until, what, about 1:00?

22         MR. HUSCHKA:  That would be great, Your Honor.

23         THE COURT:  We'll take a long lunch break.  I will

24   tell you we conferred this morning and we are right on track,

25   and in all likelihood this case will go to you for deliberation

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.839

 1   midweek next week, not at the end of the week as we first

 2   predicted.  In that sense we're probably ahead of the game.

 3   Probably, can't promise, but probably we'll finish a little

 4   early this afternoon; is that fair to say?

 5            MR. HUSCHKA:  We believe we may.

 6            THE COURT:  Okay.  Not for sure.

 7            MR. HUSCHKA:  Don't want to overpromise.

 8            THE COURT:  We'll take a long lunch break, and with

 9   luck we'll maybe break a little early this afternoon for the

10   weekend as well.

11        All right.  So we'll plan on reconvening at 1:00.

12     (The following proceedings occurred outside the presence of

13   the jury.)

14            THE COURT:  Do you anticipate needing to talk before

15   1:00?

16            MR. HUSCHKA:  No, Your Honor.

17            MS. RAMSEY:  No.

18            THE COURT:  I'll see you at 1:00 then.

19     (Recess taken at 11:07 a.m.)

20     (The jury entered the courtroom, after which the following

21   proceedings were had.)

22            THE COURT:  You can be seated.

23            Call your next witness.

24            MR. HUSCHKA:  The United States calls Dr. Danielle

25   Becker.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.840

```
 1                    DR. DANIELLE BECKER,

 2  called as a witness on behalf of the government, having first

 3  been duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5  BY MR. HUSCHKA:

 6  Q.   Dr. Becker, good afternoon.  Could you state and spell your

 7  full name for the court reporter.

 8  A.   Yes, it's Danielle Becker.  D-A-N-I-E-L-L-E.  Last name

 9  Becker, B-E-C-K-E-R.

10  Q.   And how are you employed?

11  A.   I'm a medical doctor that works at a place called

12  MetroHealth System in Cleveland, Ohio.

13  Q.   Did the United States ask you to appear today to talk about

14  conversion disorder?

15  A.   Yes, they did.

16  Q.   So I want to start just by asking you a few questions about

17  your background.  So could you tell the jury what your

18  educational background is.

19  A.   Yes.  So I did college.  I actually then did four of

20  six years of a PhD program in neuropsychology, but left to take

21  a master's, took a leave of absence to go to medical school.

22       So I completed my medical degree and then did one year of

23  internship in internal medicine and then three years of

24  neurology residency, followed by two years of neurophysiology

25  and epilepsy fellowship.
```

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                      USA v. Bruce L. Hay
                                                      ROA - Volume 3, p.841

1   Q.   What did you do then after your residency and after your

2   fellowships?

3   A.   So I have been an attending physician in neurology since

4   2014.

5   Q.   And where are you at now?

6   A.   You mean where I work?

7   Q.   Yes.

8   A.   I currently work at MetroHealth System in Cleveland, Ohio.

9   Q.   And what are your general duties at MetroHealth?

10  A.   So I am an attending physician.  I take care patients with

11  neurological disorders.  I take care of patients with many

12  neurological disorders.  I consult with other colleagues based

13  on general neurology and other questions.  I also teach.  I

14  teach nurse practitioners.  I teach med students.  I teach

15  residents.  And I also read EEGs.

16  Q.   So as part of your practice have you evaluated patients for

17  conversion disorder?

18  A.   Yes, I have.

19  Q.   How often do you see patients with potential conversion

20  disorder?

21  A.   I see at least a couple a week.

22       I didn't add, I'm also board certified in neurology and

23  psychiatry -- the board certification is psychiatry and

24  neurology, and I'm also boarded in epilepsy.

25  Q.   Are you a member of any organizations that relate to your

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.842

1    specialty?

2    A.   I am.  I am a member of the American Academy of Neurology

3    as well as the American Epilepsy Society.

4    Q.   Have you published in the field of neurology?

5    A.   Yes, I have.

6    Q.   Could you describe some of what you published.

7    A.   Yes.  So I've published numerous papers.  I've also done

8    poster presentations and actually given platform presentations

9    at national meetings.  I have published on different

10   neurological symptoms associated with bariatric surgery, other

11   general neurological things, and more recently on epilepsy and

12   rescue medications and also on quality of life and things like

13   that with neurological disorders.

14   Q.   So you talked about some of the lecturing that you've done.

15   Did that include courses regarding the diagnosis of conversion

16   disorder?

17   A.   Yes.  So I was at the University of Pennsylvania for seven

18   years.  I left in 2020.  At that time I was the associate

19   program director for the medical students, and every single

20   month for five years I taught the medical students a course --

21   or I should say a lecture on conversion disorder.

22   Q.   Have you ever been retained as an expert in neurological

23   medicine?

24   A.   Yes, I have.

25   Q.   In what city are you based?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.843

19-20044-JAR   USA v. BRUCE L. HAY   08.05.22

1   A.   Currently I'm based in Cleveland, Ohio.

2   Q.   Who paid for your travel to be here today?

3   A.   So far I did, but I will get compensated.

4   Q.   Do you expect to be compensated by the United States?

5   A.   I do.

6   Q.   And are you also being compensated by the government for

7   the work you've done to review materials in this case?

8   A.   Yes, I have.

9   Q.   How much have you billed for work on the case?

10   A.   So far I've billed about 15,000.

11         MR. HUSCHKA:  Your Honor, the United States tenders

12   Dr. Becker as an expert in the field of neurology.

13         THE COURT:  All right.  Any objection?

14         MS. RAMSEY:  No objection, Your Honor.

15         THE COURT:  The court recognizes Dr. Becker as an

16   expert in the field of neurology.

17   BY MR. HUSCHKA:

18   Q.   So, Dr. Becker, we have heard a lot about conversion

19   disorder this week.  Could you just explain to the jury what

20   conversion disorder is.

21   A.   Yes.  So I'll give you the definition.  If you guys have

22   heard of the DSM-5, it's a diagnostic manual that we use that's

23   published multiple different editions.

24         In that diagnostic manual, conversion disorder, the

25   definition of conversion disorder is presenting with one or

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.844

1  more symptoms of motor or sensory symptoms.  Those symptoms,

2  they are not consistent with a neurological disorder or any

3  other type of medical disorder, and those symptoms severely

4  impact functioning across multiple different situations

5  including social situations, occupational situations, and other

6  important situations.

7  Q.  And what are some of the types of symptoms that might

8  suggest that somebody is potentially suffering from conversion

9  disorder?

10  A.  So the symptoms are thought to be subconscious,

11  unpredictable, unplanned.  They can be different motor

12  symptoms, so they can be tremor; head bobbing, as you have seen

13  on videos; seizure-like activity of shaking or spasms or

14  tightening up; different sensory things as well.  I had already

15  mentioned like head bobbing and tremor and inconsistent kind of

16  motor movements.

17  Q.  So how is diagnosing conversion disorder different than,

18  for example, diagnosing say a brain injury or a seizure

19  disorder?

20  A.  So conversion disorder is a diagnosis of exclusion.

21  Obviously you don't want to miss anything.  So you first look

22  at the patient of trying to figure out what medical disorder

23  they have, so you will do potentially an MRI to look if there's

24  any brain injury or abnormality and also an EEG if someone is

25  questionably having seizure-like activity.  So those are the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.845

1   first objective tests that you will do.

2       When those are normal -- and we'll talk about it later, but

3   those were normal with Mr. Hay -- you then move onto other

4   things as well, and so you look to see if, again, the symptoms

5   that are being presented are across multiple different

6   circumstances, situations, unpredictable, subconscious, and

7   then you look to see how it's impairing their daily functioning

8   and the limitations it's causing them.

9   Q.   We've also heard a few times throughout trial about

10  functional neurological disorder.  Can you explain what that

11  is?

12  A.   Yes.  But I don't want to forget, so just to go back to

13  conversion disorder, kind of how I think about it in simple

14  terms, conversion/convert.  So even Sigmund Freud said that

15  what the patient is doing is they're converting psychological

16  symptoms to something that looks neurological but then on

17  testing is not proven to be consistent with a neurological

18  disorder that shows any abnormal brain functioning on an MRI

19  and EEG.

20      So functional neurological disorder is thought to be the

21  same thing, so it's synonymous.  For years and all of my

22  training we have used conversion disorder.  The medical doctors

23  that I have reviewed records on all use the word conversion

24  disorder, but more recently they kind of gave another term

25  called functional neurological disorder, which is synonymous.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.846

1   It used to be conversion disorder and then the parentheses was

2   functional neurological disorder.  Now in the new edition of

3   DSM-5 it's functional neurological disorder --

4           THE REPORTER:  I'm sorry, ma'am.  Could you please

5   slow down.

6           THE WITNESS:  Oh, sorry.  I am from New Jersey and I

7   knew that.  Just remind me.  I apologize.

8           Do you need me to repeat anything?

9           THE REPORTER:  Yeah.

10      (A portion of the record was read by the reporter.)

11          THE WITNESS:  And now it's called functional

12  neurological disorder (conversion disorder).  So basically they

13  are synonymous terms.

14  BY MR. HUSCHKA:

15  Q.   So if you had questions about whether somebody who was

16  presenting possible symptoms of conversion disorder actually

17  suffered from that disorder, what would you look for?

18  A.   So, again, I would rule out the medical diagnoses first,

19  and if those were ruled out, I then would look at the pattern

20  of their symptoms.  So I would look to see are they

21  unpredictable, appear to be subconscious, not planned, do they

22  occur across multiple situations.  So, you know, socially,

23  occupationally, you know, what is the limiting daily

24  functioning that the patient displays.

25  Q.   So what would be the best evidence to make that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.847

1    determination?  Or maybe put another way, what's the closest

2    thing you can come to in the context of conversion disorder to

3    like an MRI or an EEG?

4    A.   So conversion disorder can sometimes be hard to prove, and

5    so you want to find something that's objective.  Again, an MRI

6    and an EEG is objective.  So the other evidence that

7    potentially can be objective is surveillance video, seeing how

8    someone functions across multiple different situations, seeing

9    how someone functions when they don't know a video is on.

10        You also can use validity testing as well, so there's

11   different like personality tests and things like that that have

12   validity subscores or validity testing to basically see how

13   someone responds to answers and if they respond consistently in

14   various different ways.

15   Q.   Are symptoms of conversion disorder voluntary or

16   involuntary?

17   A.   Involuntary and subconscious and unpredictable and

18   unplanned.

19   Q.   So how then are the day-to-day lives of people who suffer

20   from conversion disorder impacted by it?

21   A.   So, I mean, I can speak to even the patients that I treat.

22   So I have treated at least 100, if not hundreds, of patients

23   with conversion disorder, and so it impacts their lives where

24   they are not able to function.  It's unpredictable, right?  So

25   if it's unpredictable, if you don't know when something is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.848

1  going to happen, if it's going to come out of the blue when you

2  least expect it, you're not necessarily going to drive

3  especially if it impairs -- if you lock up and can't move or if

4  you're shaking and tremoring.  If it impairs any of your

5  reaction time, you can't slam on your brakes; you can't stop at

6  a stop sign if a light turns red.

7       So a lot of patients don't drive or can't drive.  They

8  might not be able to work.  They -- you know, it depends on the

9  disability and what, you know, patients are claiming with

10 disability, but for some that claim, you know, great

11 disability, you may not be able to work or function in every

12 day activities.

13 Q.   So did you review a number of records related to Bruce Hay

14 in preparation for your testimony today?

15 A.   Yes, I did.

16 Q.   Among other things did that include medical records related

17 to his diagnosis after a car accident in 2005?

18 A.   Yes, it did.

19 Q.   Did that include VA benefit forms or reports or videos of

20 examinations?

21 A.   Yes, I did -- yes, they did.

22 Q.   And did that also include covert recordings of the

23 defendant?

24 A.   Yes, it did.

25 Q.   Based on your review of these material what did you observe

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.849

1  regarding the defendant's reported versus actual functioning?

2  A.   So I observed marked discrepancies and inconsistencies.

3  Q.   And did you form an opinion concerning the discrepancy

4  between the reported abilities and his abilities that were

5  captured on surveillance?

6  A.   Yes, I did.

7  Q.   What was that opinion?

8  A.   My opinion is that there is a marked discrepancy in what

9  both Mr. Hay and his wife have documented on forms and also

10  demonstrated in evaluations, compensation benefit evaluations

11  versus what was seen with actual every day daily functioning

12  when surveillance was taken, when they were unaware that

13  surveillance was taken.

14       What I've seen is that I've only seen deficits in one

15  circumstance.  That one circumstance is around compensation or

16  benefit exams or a medical exam.  I did not observe any

17  deficits in any other circumstances, every day activities,

18  activities when the defendant may not have known that the

19  camera was on.

20  Q.   Ms. Kistler, could you pull up Government's Exhibit 202.

21  And could you focus in on the top portion there.

22       This is a C&P exam.  The provider is listed as Medvedeva on

23  September 15, 2006.  Did you review this prior to your

24  testimony?

25  A.   Yes, I did.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.850

1    Q.   Could you turn to page 2 and focus in on paragraph 2, if

2    you could.  Present medical history, please.

3         So you see there where it says that the patient continues

4    to have problems with weakness of his legs, can move only using

5    a walker.  Patient continuously has abnormal movement of hands,

6    neck, head, and body.  He cannot sit still.  His neck has

7    involuntary movements backwards.  He is not able to concentrate

8    or perform any goal-oriented activities.

9         Did you review this prior to your testimony?

10   A.   Yes, I did.

11   Q.   And then could you go down to the second paragraph, just

12   the top couple sentences.  Sorry, the paragraph right below.

13   A.   It also said that he could not drive in that first

14   paragraph.

15   Q.   And, Dr. Becker, can you read this portion as well?

16   A.   Yes.  Patient did not have any remission in his condition

17   after involuntary movements in his body started.  In fact, they

18   continued to persist and progress at different stressful

19   situations.

20   Q.   Could you pull up 204, please.

21        So this is a C&P examination.  The examining provider is

22   listed there as Kindling and the examined-on date says

23   August 16, 2007.  Did you review this?

24   A.   Yes, I did.

25   Q.   Could you turn to page 4, please.  There's a portion there

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.851

1    that says physical examination.  Can you highlight the first

2    maybe three paragraphs or so there.

3         Could you read this, Dr. Becker?

4    A.   The gait has the appearance of similar to a patient with

5    cerebral palsy.  He always holds onto nearby objects and a

6    number of times appears as if he is on the verge of falling.

7    He is able to untie his shoes, remove his socks, and trousers

8    with some difficulty.  He is not able to dress himself without

9    help.

10        The veteran has constant movements of his head, neck -- I

11   think that's thorax -- back, arms, trunk, and legs, generally

12   more of the upper body than the lower.

13   Q.   Could you play Government's Exhibit 72.

14        Now, how does the defendant's physical activity here

15   compare to what you just read from Government's Exhibits 202

16   and 204?

17   A.   So it said that he couldn't walk without a walker.  It said

18   that he wasn't able to do multiple different functions.  But

19   here you can see he's actually on a moving car, so he's

20   balancing on the bed of a moving car and he's actually -- and

21   you'll see later he says he can't lift, he can't bend, he can't

22   do certain things.  You're seeing him lift -- bend, lift heavy

23   bales of hay, and put them on a truck, and/or take them off the

24   truck, again as you saw the truck was moving while he was

25   balancing.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.852

1      You'll hear later he says that his equilibrium -- he falls

2   multiple times a week, he's unsteady on his feet.  Looking at

3   him move here, I don't see any deficits whatsoever at all.  I

4   don't see any unsteadiness on his feet, and actually he's

5   balancing, again, on a moving truck, throwing off bales of

6   hail [*sic*] -- or sorry.

7   Q.  Did you mean hay?

8   A.  I meant hay.

9   Q.  Ms. Kistler, could you pull up Government's Exhibit 207,

10  please.

11     This is a statement in support of claim.  Did you review

12  this prior to your testimony?

13  A.  Yes, I did.

14  Q.  What does the date say at the bottom there?

15  A.  It say 4/13/2012.

16  Q.  Ms. Kistler, could you focus on the text there.

17     And what does that say, Dr. Becker?

18  A.  Just to put in context, this is 2012.  We just saw a video

19  that was from 2010, so previous to this.  It says I request

20  that my 100 percent for conversion disorder and seizure

21  disorder be changed to reflect a permanent and total disability

22  rating.  I contend that these conditions will never improve.  I

23  have enclosed a letter from my physician at the VA clinic

24  supporting this request.  I currently receive all my treatments

25  at the VA in Kansas City and the VA in Paola -- I think that's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.853

1   Kansas City, I'm sure.  Please secure my records in support of

2   this request.

3   Q.   What was the significance of this to your opinion?

4   A.   So the significance of this is that we just saw in 2010

5   that he is able to do a lot of things that he claims he can't.

6   We saw inconsistencies again in what we can see on video versus

7   what he's reporting on form.  We just saw that he is not

8   100 percent permanently and totalled disabled.  You just saw

9   him balance on a truck and again remove hay from the truck.

10          MS. RAMSEY:  Your Honor, may we approach?  Objection.

11      (The following proceedings were had at the bench).

12          MS. RAMSEY:  Your Honor, excuse me.  I'm going to

13   object under invading the province.  I think her testimony that

14   she says that we just saw that he wasn't 100 percent totally

15   disabled invades the province of the jury and goes to the

16   ultimate issue in fact.

17          We tried to limine on this particular issue, and

18   although the court ruled -- we specifically talked about

19   malingering or whether or not he was misrepresenting his

20   symptoms.  Her testimony is no different at this point, so we

21   would object to her making the statement that he is not -- he

22   is not 100 percent disabled and coming to that conclusion,

23   which is the ultimate fact of the jury -- for the jury.

24          MR. HUSCHKA:  She is not saying anything about

25   deliberate misrepresentations or malingering.  She's simply

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.854

1    saying I am -- I have reviewed these and then, you know, my

2    opinion, there are inconsistencies and she's putting that in

3    the context of conversion disorder.

4         So it's equivalent sort of to they're not as blind as

5    they say they are; they couldn't do these things if they were

6    as blind as they say they are.

7         THE COURT:  My limine order went to the ultimate

8    issues, which none of these experts -- or anybody for that

9    matter should be able to testify, and that is state of mind,

10   his intent.

11        What his abilities were and were not are also

12   obviously at issue in this case.  This is a medical expert that

13   I think appropriately can look at a video and say this is

14   inconsistent with something that's been recorded by him or is

15   inconsistent with conversion disorder, however she wants to say

16   it.

17        And I think she can also opine that it's inconsistent

18   with having a total and permanent disability, meaning not being

19   able to do certain functions.  I think it's appropriate.

20        I think the better course, though, here is for you to

21   do more -- not leading, but sort of -- being more directive in

22   your questioning rather than just have her -- I mean, because

23   there are limine rulings and I don't want her crossing the

24   line, but the limine rulings have to do with opinions about

25   what he intended and what his state of mind was, and that is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.855

1    the province of the jury.

2           MR. HUSCHKA:  Thank you, Your Honor.

3       (Thereupon, the proceedings continued in open court.)

4    BY MR. HUSCHKA:

5    Q.  So I want to turn now to 2012.  Did you review surveillance

6    footage from around the time of a Social Security benefits

7    examination in 2012?

8    A.  Yes, I did.

9    Q.  Ms. Kistler, could you play Government's Exhibit 8, please.

10   And you can fast-forward in about 1:20.

11          Was this prior to the Social Security examination?

12   A.  Yes, it was.

13   Q.  Could you play Government's Exhibit 9, please.

14          Is this after the examination?

15   A.  Yes, it is.

16   Q.  Could you please play Government's Exhibit 11, and you can

17   fast-forward about 26 seconds.

18   A.  Am I allowed to make a comment?

19   Q.  Let me ask you a question here.  And once Ms. Kistler hits

20   play here.

21          How does what we're seeing here compare to what we just saw

22   here on Government's Exhibits 8 and 9?

23   A.  So I'm going to ask you to repeat it -- or rewind it and

24   replay.  But I did want to note that when he left -- this was a

25   Social Security visit -- that was actually at 10:06, and this

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.856

1    is at 10:13.  This is seven minutes later.

2         And then I want to re-watch how he gets out of the car and

3    how he maneuvers.  Not even using his cane.  Very well -- very

4    well-balanced.  He said there was equilibrium and issues with

5    balance, and he maneuvers to the point you see those two

6    side-view mirrors, he doesn't even hit them.  He's able to

7    squeeze perfectly right in between them, and I'd like to see

8    that again.

9    Q.   Go to 26 seconds, please.

10   A.   Again, this is seven minutes after you just saw that other

11   exam.

12        So I see him standing without any issues at all.  I see no

13   functional -- he's not even really using the cane.  As you saw,

14   again, he just turned sideways and was able to walk through

15   those two rearview [verbatim] mirrors, not touching them at

16   all.  I see no evidence of functional disability in this video.

17   Q.   Can you reconcile the symptoms you saw in the Social

18   Security parking lot with what we're seeing here in

19   Government's Exhibit 11?

20   A.   So what I can see is that, again, as I talked about the

21   time, so I saw, you know, at 9:20 in the morning when he was

22   walking into the exam, at 10:06 when he's walking out of the

23   exam, you see marked presentation of symptoms, again going both

24   in and out of a compensation exam which shows circumstantial.

25   It's around compensation exam.  But then seven minutes later

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.857

1   when there is no one in sight around compensation exam or

2   anything like that, seven minutes later you see absolutely no

3   deficits whatsoever, not even mild.  No, to the point where

4   there's perfect balance, and he doesn't hit either of those two

5   rearview mirrors.

6   Q.   Is that compatible with conversion disorder?

7   A.   Conversion disorder -- again, the definition of conversion

8   disorder is that you see it across multiple different

9   circumstances.  It is not predictable.  It is not planned.  It

10  is not conscious.  It is subconscious, unplanned,

11  unpredictable.  You don't see it turn on and turn off, and you

12  don't see it in only circumstances surrounding compensation and

13  benefit exams.

14  Q.   Can we go to Government's Exhibit 14.

15       Is this the same day?

16  A.   This is.  His cane is not even on the ground.  He's holding

17  his cane in the air and walking without any deficits.

18  Q.   How does that compare to what you saw in Government's

19  Exhibits 8 and 9 in the Social Security exam parking lot?

20  A.   So, again, it shows inconsistencies and marked

21  discrepancies in his functioning when there's no camera -- no

22  known, I guess, evaluation for benefits or compensation.  You

23  see that he has no functional impairments whatsoever at all.

24  That is a marked discrepancy of what I just saw and you saw

25  surrounding the benefit exam.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.858

1  Q.  Could you pull up Government's Exhibit 15, please.

2      Is this the same day?

3  A.  It is the same day.

4  Q.  What are we seeing here?

5  A.  The reason why I pointed out where he said he couldn't

6  drive before is because here you actually see him by himself,

7  again walking out with no assistive device, getting in a car,

8  and driving with no issues by himself.

9  Q.  And do symptoms of conversion disorder just come and go

10 like that?

11 A.  So symptoms of conversion disorder can come and go, but,

12 again, the definition is across multiple different

13 circumstances, not only one circumstance, not only around

14 compensation exams.  And, again, in what was written down and

15 what was said in medical exams by Mr. Hay and his wife were

16 that it can happen unpredictable any time of day, multiple

17 times of day, and I've now looked at multiple times of day, and

18 I've only seen it in one circumstance around a benefit and

19 compensation exam.

20 Q.  Could you pull up Government's Exhibit 208-A.  And could

21 you focus up there at the top on the examining provider and

22 date, maybe midway -- there you go.

23     So what was the date of this examination?

24 A.  March 19, 2013.

25 Q.  You see the examined-on down at the very bottom?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.859

1    A.   March 18, 2013.

2    Q.   And the provider is Karyn Perry?

3    A.   Yes, it is.

4    Q.   And so is this about approximately four months after those

5    videos that we just watched?

6    A.   Yes, it is.

7    Q.   Could you turn to page 9.  And if you could focus in on

8    that big body of text kind of in the middle.

9         Dr. Becker, do you see the part there that starts "veteran

10   exhibited regular"?  It's about three lines down.

11   A.   Sorry.  Yes, I do.

12   Q.   Can you read that, please?

13   A.   Veteran exhibited regular muscle spasms, cramping of his

14   limbs, hyperextensions of the arms and hands, head nods and

15   bobs, and jerking movements throughout the evaluation.  At

16   times his limbs would lock up and freeze and be suspended in

17   that pose for several minutes until his wife massaged the limbs

18   or applied force to move them into a different position.

19        Much of the time the veteran is unable to independently

20   engage in most activities of daily living including needing

21   help with bathing, toileting, shaving, and even putting clothes

22   on.  The veteran is able to sort laundry, but other chores are

23   completed by others in the house.

24   Q.   Let me stop you there.

25        So what was the significance of those statements to your

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.860

1  opinion?

2  A.   So, again, this is a compensation evaluation that we talked

3  about, and in that evaluation he is again demonstrating his

4  deficits, you know, in his arms, his legs, in his head and

5  jerking movements.  He locks up and freezes again and holds a

6  pose for several minutes.  If you lock up and freeze in a spasm

7  for 20 minutes and you're driving, like, that's dangerous.

8       And so you can see here, again, in an evaluation situation,

9  you're seeing the symptoms.  So several minutes of being

10  frozen, of not being able to function, unable to independently

11  engaged in most activities.  He's got issues with bathing,

12  toileting, shaving.  I mean, this shows significant impairment.

13  Q.   Did you review pole camera videos that were recorded in

14  front of the defendant's residence?

15  A.   Yes, I did.

16  Q.   Did you see in your review of that video any indication of

17  functional impairment that would be indicative of conversion

18  disorder?

19  A.   No, I did not.

20  Q.   And how does what you observed on the pole camera footage

21  compare to the symptoms that you just read that he described in

22  2013?

23  A.   Again, it's markedly inconsistent.  So I only see or read

24  about the functional impairment in the setting of compensation

25  and benefit evaluations.  On the pole camera footage, all of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.861

1  the pole camera footage that I looked at, I never saw any

2  impairments in functioning.

3  Q.   Could you play 100-M, please.  You can fast-forward to

4  about 3:15 in.

5      What did you observe here regarding the defendant's

6  physical abilities?

7  A.   I see he's able to bend.  He's able to move.  He's steady.

8  He just jumped off a truck.  I don't know what those are; I

9  don't know if they're large boxes or a dryer.  It looks like

10 there are drawers or something popping out.  It's something

11 that looks heavy.  He's able to go back and forth on two

12 different cars with no balance issues, no head bobbing, no

13 functional impairment.  He's now able to move again a heavy box

14 from one truck to another without any abnormal functioning and

15 any of the symptoms that were reported in the comp and pen --

16 and/or around the compensation and benefit exams.

17 Q.   This goes on for many more minutes, but did you observe the

18 defendant exhibit any symptoms of conversion disorder?

19 A.   I did not observe any symptoms of conversion disorder.

20 Q.   Could you go to 100-T.

21 A.   I didn't observe any abnormal disability at all in this

22 video.

23 Q.   About 50 seconds in, please.

24      What did you observe here?

25 A.   So he's holding a baby carriage with a small child in it

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.862

1    and walking, able to balance it, not using his cane at all,

2    again able to balance, open the car door, and put the baby

3    carriage into the car, which is very difficult to do from

4    personal experience.

5    Q.   And was this relevant to your opinion?

6    A.   This is very relevant to my opinion.

7    Q.   Could you pull up 100-W.

8         What's the date on this video?

9    A.   3/30/2017.

10   Q.   And what did you observe here?

11   A.   So first I saw him walk out.  Again, there's no cane;

12   there's no walking assistive device.  He said he cannot walk

13   without a walker or cane.  You actually see him running across

14   the lawn.  Again, there is no functional impairment.  This is

15   normal functioning that is seen.  And he's also driving.

16   Q.   Was that relevant to your opinion?

17   A.   Yes, it is.

18   Q.   Could you pull up 100-X, about 2:30 in, please.

19        What's the date on this video?

20   A.   It's 5/2/2017.

21   Q.   What did you observe in this video?

22   A.   This is the day before his compensation exam on 5/3/2017.

23   I see him lift a door, a big wooden door, which looks like

24   without effort, and move it from one car to another car.  I'm

25   seeing him walking without any assistive device, no walker, no

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.863

1   cane.  I'm seeing him not have any issue with balance, any head

2   bobbing.  I see him bending.  I see him moving his arms and his

3   legs.  I see normal functioning.  I see no evidence of abnormal

4   disability or functioning -- no abnormal functioning and no

5   evidence of disability.

6   Q.   Could you pull up 100-Y, please, about 35 seconds in.

7        What's the date on this?

8   A.   5/3/2017.

9   Q.   Is this the date of the C&P examination?

10  A.   Yes, it is.  It's 7:15 a.m.

11  Q.   About 35 seconds approximately.

12       What did you observe in this video that's relevant to your

13  opinion?

14  A.   I see him walk out again carrying a walker, so carrying an

15  assistive device and not using it at all.  He's actually able

16  to walk steadily holding the walker in his hand, put the walker

17  into the truck without any issues at all.  I see no abnormality

18  in functioning.  I see normal functioning and walking.

19  Q.   Could you pull up Government's Exhibit 46, please, about 25

20  second in.

21       What do you see here?

22  A.   I now see him using that walker in a completely different

23  capacity.  I see him pushing the walker.  I don't see him

24  leaning on the walker, but I see him pushing it.  Typically

25  when people use walkers when they have deficits, they're

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.864

1    leaning on the walker to support them.  I see him just pushing

2    and walking very slowly and very deliberately, somewhat

3    staggered gait.

4    Q.   How does that compare to what you just viewed in front of

5    his residence earlier that morning?

6    A.   Again, this is a marked discrepancy.  We saw him carrying

7    the walker without any difficulty whatsoever at all.  He's now

8    at a compensation benefit exam.  We see him using the walker

9    and functioning completely differently than what I just

10   observed.

11   Q.   Could you pull up Government's Exhibit 53.  And you can

12   fast-forward about 50 seconds in.

13        What are you seeing here?

14   A.   I see him pulling out the walker with no issues at all.

15   He's actually standing straight, no head bobbing, nothing that

16   you see of abnormality.  Now, seconds later he kind of fixes

17   himself again.  He had no issues with walking, and now you see

18   him using the walker to push.

19   Q.   And is the ability to take the walker out like that

20   consistent with how he's presenting as he walks inside?

21   A.   That is inconsistent.  He now is showing symptoms again of

22   dysfunction.  When you actually saw him drive up and pull out

23   of the car, there was no symptoms of dysfunction, and then as

24   soon as he moves out and goes to walk into the building, you

25   see the symptoms of dysfunction.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.865

1  Q.  Can you pull up 54.

2      What are we seeing here?

3  A.  He just walked out of the building.  Symptoms of

4  dysfunction again as he was walking slowly and using the

5  walker.  He's still using the walker, but if you saw, he's

6  about to actually pick it up.  He stopped -- again, no problems

7  with balance at all.  He's able to fold it.  He's able to pick

8  it up, fold it, bend down, and put it back in without any

9  evidence of any dysfunction where you literally saw dysfunction

10  five seconds ago as he was walking out before he was putting

11  the walker.  Now, you see him bending down.  Again, he said he

12  couldn't bend.  You see him bending down and balancing and

13  picking up money on the ground where five seconds ago you saw

14  him with dysfunction.

15  Q.  Was this difference between him walking in and walking out

16  and either right before or right after that relevant to your

17  opinion?

18  A.  It's very relevant to my opinion.

19  Q.  Why is that?

20  A.  Because a conversion disorder does not turn on and turn

21  off.  It is not planned.  It is not conscious.  It is not

22  predictable.  And everything that I have seen is predictable.

23  He's getting in and out of the car, there are no issues.  As

24  soon as he moves away from the car, you all of a sudden

25  predictably see that he has deficits walking into the building.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.866

1   Walking out of the building, again you see he has deficits.

2       But as soon as he gets to the car, he's able to fold the

3   walker up.  He's able to put it in without any evidence of any

4   dysfunction.  He's able to kneel down and balance and pick up

5   money off the ground and then get into the car.

6       So, again, conversion disorder happens.  It can happen on

7   and off but across multiple situations.  It's not planned.  It

8   is not conscious.  It doesn't turn off within literally five

9   seconds of moving in and out of a car and then turn on as you

10  walk into a Social Security building and/or compensation

11  examination.

12  Q.  Could you play Government's Exhibit 80.  And you can

13  fast-forward one minute in.

14      And where is this?

15  A.  This is at Sam's Club shortly after the video that we just

16  saw where he was showing dysfunction.  Unassisted, able to pick

17  up a box with many things in it.

18  Q.  What are we seeing right here?

19  A.  Well, the cane -- if you can -- can you rewind it, please?

20      You see the cane is actually in the cart, but I want to

21  rewind it.  You can see --

22  Q.  Go back ten seconds or so, Ms. Kistler.

23  A.  He was picking up a box, no issues with moving.  He grabs

24  the cart, so the cart is wheeling away.  He's able to be steady

25  and grab it and keep it from wheeling away.  And then, again,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.867

1  take things out of the cart and put them into the car with zero

2  evidence of disability or dysfunction.

3  Q.  Could you pull up --

4  A.  Again, the cane was actually in his hand, not being used on

5  the ground.

6  Q.  Could you pull up Government's Exhibit 74.

7      All right.  What are we seeing here?

8  A.  Here -- actually can you let me see him come out of the

9  house again?

10 Q.  Start at the beginning.  You can pause it maybe right after

11 it starts.

12 A.  He stated he has equilibrium issues, unsteady on his feet,

13 falls multiple times a day if not a week.  You see him coming

14 out of a building on a roof.  I just want to see him come out.

15 So he balances.  He jumps out of the window and balances, no

16 issues at all, no dysfunction.  Picking up huge pieces of wood

17 and throwing them off of a building.  No issues, no

18 dysfunction, no balance, no disequilibrium, no head bobbing, no

19 jerking, being able to bend, pick up, use his arms, have

20 balance on a roof that potentially he could fall off given the

21 symptoms that he claims.

22     So I'm watching him move in and out without any balance

23 issues and actually very good balance.

24 Q.  You can stop it there.

25     So you mentioned earlier the involuntary nature of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.868

1   conversion disorder.  So is what you've seen in these videos

2   compatible with the involuntariness that is associated with

3   conversion disorder?

4   A.   No, it is not.

5   Q.   So at bottom, why is it your opinion that the defendant did

6   not suffer from conversion disorder to the extent that he

7   claimed?

8   A.   So I just want to say why it is incompatible.  So when

9   someone says that they have disequilibrium, that they need a

10  walker to walk, they can't walk without a walker, that they

11  cannot drive, that they're falling multiple times a day,

12  multiple times a week, you would not expect -- and that it is

13  unpredictable -- so in the records Mr. Hay and his wife

14  actually say that it can happen out of the blue at any time, it

15  can last minutes, it can last hours.  We see no video of

16  anything lasting hours.

17      If something is like that and unpredictable and you don't

18  know when it's going to happen and you are unsteady, you

19  wouldn't necessarily be on a roof because you could fall off

20  and get hurt.  You wouldn't drive a car because you could kill

21  yourself or someone else if you lock up.

22      So this is inconsistent.  If someone has a conversion

23  disorder that comes and goes over multiple different

24  situations, that is unpredictable, unplanned, you can't plan

25  it, so that affects your life.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.869

1    I have patients who have conversion disorder that cannot

2  drive because they have impaired awareness.  Even though it is

3  related to a psychological issue versus a neurological issue,

4  it is unpredictable.  So it has affected their life.  It has

5  limited their life.  It actually has done what he claims in his

6  forms.  Those patients -- those people, they can't work.  They

7  can't drive.  They can't function.  They can't socialize.

8  They're debilitated.

9    And so here you see him claiming all of those things, but

10  yet in every video that I looked at, hours, hours of videos,

11  the only time I see and/or read about those symptoms of

12  impairment are around benefit exams and/or medical exams.  I do

13  not see them across any other situation.

14              MR. HUSCHKA:  No further questions.

15                        CROSS-EXAMINATION

16  BY MS. RAMSEY:

17  Q.  Good afternoon.

18  A.  Good afternoon.

19  Q.  Give me one moment here.

20    Dr. Becker, I first want to talk to you about kind of your

21  background and resume and expertise.  So you are an associate

22  professor at Case Western University of Medicine and medical

23  director of epilepsy particularly, right?

24  A.  Correct.

25  Q.  Not functional neurological disorder or conversion

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.870

1   disorder?

2   A.   Well, actually conversion disorder, I see hundreds of

3   patients with conversion disorder, so I see --

4   Q.   I'm just asking specifically, if you could answer my

5   question, if you work for the -- are you the medical director

6   of the epilepsy clinic?

7   A.   So I have to explain it because --

8   Q.   I'm not sure you do.  I'm just asking if you're the medical

9   director of epilepsy.

10  A.   So, yes, but anyone who presents with any type of symptom

11  that could be epilepsy, so that's why you have to be careful.

12  It's anyone with anything that looks like a neurological

13  disorder that could be a seizure.  I am the medical director of

14  that program.

15  Q.   Okay.  Your resume says the epilepsy, so you're also the

16  assistant professor at the Hospital of the University of

17  Pennsylvania, director again of the epilepsy education?

18  A.   So that's different.  So I was an assistant professor at

19  the University of Pennsylvania from 2014 to '20.  I'm now an

20  associate professor at Case Western University.  I moved in

21  2020.

22  Q.   Okay.  Right.  I'm just asking, it says from 2014 to 2020

23  you were the assistant professor of clinical neurology --

24  A.   Correct.

25  Q.   -- Hospital of the University of Pennsylvania and it says

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.871

1    epilepsy division.

2    A.    It says clinical neurology.  That is clinical neurology.  I

3    see all different clinical patients with a specialty in

4    epilepsy, but at Penn I saw all neurological disorders.

5    Q.    Specialty in epilepsy?

6    A.    Correct.

7    Q.    Not a specialty in conversion disorder?

8    A.    Incorrect, because I see hundreds of patients with

9    conversion disorder because they're suspected to potentially

10   have epilepsy.  So I would consider myself an expert in

11   conversion because I have seen over hundreds of patients with

12   it, and I have diagnosed it.

13   Q.    Okay.  Let's talk about -- you've had some research

14   positions, University of Pennsylvania, MetroHealth System.  You

15   were the principal investigator and directory -- director of

16   pregnancy in an epilepsy clinic there; is that correct?

17   A.    Correct.

18   Q.    University of Pennsylvania Department of Neurology,

19   research implant devices.  Again, was that for epilepsy

20   patients that need implant devices?

21   A.    Correct.

22   Q.    University --

23   A.    Any type of devices.  I actually -- it says

24   neuromodulation.  One of those devices, the vagal nerve

25   stimulator, is FDA approved for depression and treatment of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.872

1    mood disorders.  So, again, it is psychiatric and neurological,

2    not just epilepsy.

3    Q.   Okay.  University of Pennsylvania Department of Neurology,

4    Global Health Research.  You worked in epilepsy clinics, was

5    that in Africa and Ecuador?

6    A.   So I actually -- so, yes, in Africa and Ecuador, but it

7    wasn't just epilepsy.  I did general neurology.  I saw all

8    general neurology patients.

9            THE REPORTER:  Ma'am, I need you to slow down again.

10           THE WITNESS:  I saw all general neurology patients,

11   kids and adults, in Africa and Ecuador.

12   BY MS. RAMSEY:

13   Q.   Would it help you maybe if -- help you to kind of look at

14   your resume?  I'm going to hand you a copy of your resume.

15           MS. RAMSEY:  May I approach, Your Honor?

16           THE COURT:  Yes.

17           MS. RAMSEY:  Thank you.

18   BY MS. RAMSEY:

19   Q.   All right.  At the bottom there -- I think I was talking

20   about -- it says investigation, evaluation, and implication of

21   bringing EEG to rural region in Africa, monitoring compliance

22   with routine epilepsy.  So that's where I was getting because

23   you listed here in your resume as working at an epilepsy

24   clinic; is that right?

25   A.   So you see from March 2015 to present I went to Africa four

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.873

1   times.  One of those four times I brought an EEG machine, but

2   the way Africa works is that we are treating and teaching the

3   providers there all general neurology, and I was teaching them

4   epilepsy as well.  I was actually teaching them to

5   differentiate between conversion because many patients there

6   actually had things that looked like seizures that weren't, and

7   I brought the EEG there to objectively be able to tell if they

8   had conversion disorder or not in patients in Tanzania.

9   BY MS. RAMSEY:

10  Q.   Okay.  That's not listed on your resume, though; would you

11  agree with that?

12  A.   So my resume is many pages long, and I have to pick and

13  choose what I put on it, but I would agree with that.

14  Q.   All right.  It says -- I know that the government asked you

15  about publications that you've done.

16  A.   Yes.

17  Q.   Have you done any specific publications on conversion

18  disorder or functional neurological disorder?

19  A.   No, I have not.

20  Q.   The government asked you -- well, I think you volunteered

21  that you did -- you've done some poster presentations.  Have

22  any of those been on conversion disorder or functional

23  neurological disorder?

24  A.   No, they have not.  Well, actually some were life

25  challenges and patients potentially with epilepsy and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.874

1   caregivers, and 30 percent of patients with epilepsy have

2   conversion disorder as well because of the trauma of epilepsy,

3   so actually some of those did look at some of those aspects of

4   patients with epilepsy.

5   Q.   Was it specifically an article that addresses conversion

6   disorder or functional neurological disorder?

7   A.   No, it was not.

8   Q.   Thank you.  You've performed some lectures?

9   A.   Yes, I did.

10   Q.   And in those lectures you have not done any lecture

11   specifically addressing conversion disorder or functional

12   neurological disorder, correct?

13   A.   That's actually incorrect.  So I had a specific lecture --

14   it's actually --

15   Q.   Is that the teaching course?

16   A.   It's a teaching course.

17   Q.   Okay.  I'm asking for like a specific lecture --

18   A.   I apologize then.  You are correct.

19   Q.   I'm correct; nothing specifically on conversion or

20   functional neurological disorder, correct?  You're actually

21   teaching courses?

22   A.   So I would call it a lecture.  So every single month for

23   five years straight -- so 12 times 5, 60 times -- I gave a

24   lecture specifically on conversion disorder to medical students

25   that talked about conversion disorder, somatization disorder,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.875

1  factitious disorder, and malingering disorder, specifically on

2  that topic.

3  Q.  Okay.  And that's listed on your resume.  I guess I'm

4  specifically asking as to your poster presentation -- I'm

5  sorry.  Your lecture, not the class you're teaching.

6  A.  Yes.  Sorry, it's hard because lectures -- for me lectures

7  are --

8  Q.  You're from academia so lectures --

9  A.  Yes, everything is a lecture.

10  Q.  Everything is a lecture.  And I think what I'm

11  differentiating is from the class that you talked about

12  repeatedly teaching versus actually giving a lecture.  I'm

13  asking specifically about the lecture.

14  A.  So it was an hour lecture, and it was as an expert teaching

15  medical students about conversion.

16  Q.  Okay.  National teaching courses, you have not taught any

17  specific national teaching courses on functional neurological

18  or conversion disorder, correct?

19  A.  Correct.

20  Q.  All right.  I think you said that you see patients on a

21  regular basis.  Was that your testimony?

22  A.  Yes, I do.

23  Q.  Okay.  And is this in your current position as the medical

24  director of epilepsy?

25  A.  Yes, it is.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.876

1   Q.   Let's talk about the difference between epilepsy and

2   conversion disorder.

3   A.   Uh-huh.

4   Q.   You might have to help me through this because I've got

5   some information here.

6        So epilepsy is a neurological disorder?

7   A.   Correct.

8   Q.   And it's caused by, is it abnormal electric brain activity?

9   A.   Yes.

10  Q.   So there are tests to diagnose epilepsy, for instance, like

11  an EEG?

12  A.   Correct.

13  Q.   Now, people with epilepsy usually have -- they can have

14  unprovoked seizures; is that correct?

15  A.   That's actually in the definition of epilepsy.

16  Q.   Okay.  It could be treated with different things like

17  medication; is that correct?

18  A.   Correct.

19  Q.   Implant devices?

20  A.   Correct.

21  Q.   Even dietary changes?

22  A.   Correct.

23  Q.   It can be severe, meaning people can have hundreds of

24  epileptic seizures per day?

25  A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.877

1  Q.   It can also be less severe, intermittent.  I think I read

2  something where if you even have like two epileptic seizures a

3  day, you're still diagnosed with epilepsy; is that fair to say?

4  A.   That's fair to say.  And it's also fair to say that

5  50 percent of patients with epilepsy have mood and anxiety

6  issues, and 30 percent of patients with epilepsy actually have

7  conversion disorder.

8       What happens is that stress and that trauma of having a

9  seizure causes depression and anxiety and converts to

10  nonepileptic events as well.

11  Q.   The seizures themselves, that can be mild for lack of a

12  better word.  There's kind of a continuum of maybe how bad

13  someone's seizures can be; they could be severe or could be

14  very mild; is that fair?

15  A.   Yes.  But you have to have the patient weigh into that as

16  well because what I might think is mild may still keep a

17  patient from working and driving.

18  Q.   Right.  So it is somewhat dependent upon the patient

19  themselves telling you -- describing to you what's happening to

20  you or how bad it is?

21  A.   Or looking at actually how it's affecting their every day

22  activities.

23  Q.   Right.  Now, when someone is having a severe seizure, they

24  can't function, can't walk, can't talk, possibly lose control

25  over their body?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                  2:19-cr-20044-JAR
                                                USA v. Bruce L. Hay
                                                ROA - Volume 3, p.878

1   A.   For a brief period of time.

2   Q.   Brief period of time.  Totally kind of disabling or

3   debilitating?

4   A.   Potentially.

5   Q.   Okay.  So you've said that they can be mild or severe and

6   that they can be in high occurrence or low occurrence, correct?

7   So if you followed someone around with epilepsy with a camera

8   and you didn't catch them having any seizures, would that mean

9   they were not epileptic?

10  A.   So you are correct that it would -- it depends on how long

11  you carry them around.  So we actually bring them into an

12  epilepsy monitoring unit especially when they have nonepileptic

13  events, and we do monitor them for 72 hours.  When patients

14  have nonepileptic events, 80 percent of the time we do capture

15  them on video.

16  Q.   But there are times when people are walking around in their

17  lives where they may have epileptic seizures and they're not

18  being videotaped, correct?

19  A.   Correct.  But they will also tell you that that fear --

20  patients will say what one of the most debilitating things

21  about seizures is that fear that one can come at any time, and

22  that actually paralyzes them through all of many different

23  circumstances in their life, socially, again in their jobs, in

24  multiple different circumstances.  Even when they're not having

25  a seizure, they still say they're paralyzed with the fear of

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.879

1    having a seizure.

2    Q.   Now, FND can also be called a neurological disorder; is

3    that fair or what would you call it?

4    A.   So I'll be honest, I use conversion disorder.  I do not use

5    FND because that is a newer term and I think it's more

6    confusing.

7         So it's actually -- it is really, again, as Sigmund Freud

8    said, it's a psychological disorder that presents like a

9    neurological disorder, but is actually shown to be inconsistent

10   with neurological disorder and that there is no evidence in

11   changes in the brain and/or other objective tests to confirm

12   that it is caused by a neurological abnormality.

13   Q.   Right.  And I think your testimony was that you would get

14   -- normally you would order an MRI and something like an EEG to

15   basically rule out or determine that there was nothing else

16   going on neurologically with that individual so that there may

17   be a proper diagnosis of conversion disorder?

18   A.   Correct.

19   Q.   Okay.  Now, one of the common -- so we've talked a little

20   bit about MRIs, and I do want to talk about EEGs.  So the

21   purpose of giving an EEG is to determine whether or not there

22   is abnormal electric brain activity, correct?

23   A.   So the purpose of an EEG is differential diagnosis.  So,

24   yes, it does look for abnormal brain activity, but it also

25   looks at patients who are having abnormal motor actions to see

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                        2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.880

1   if there's any change on EEG to help determine if they have

2   potentially a conversion disorder or they have an actual

3   epilepsy diagnosis.

4   Q.   And so that's why EEGs are done sometimes in conversion

5   disorder, you'll sometimes get a normal EEG for lack of a

6   better word?

7   A.   Yes.  Well, again, normal is relative.  You see an abnormal

8   movement and abnormal activity in how a patient is interacting,

9   but then you see normal brain waves.

10  Q.   I guess, yeah, that's my point.  The EEG itself is seeing

11  normal brain waves, but there may be some psychomotor activity

12  going on during the EEG, correct?

13  A.   Yes.

14  Q.   And is that what you would call psychogenic nonepileptic

15  seizures or functional seizures?

16  A.   Essentially.

17  Q.   And so functional seizures or psychogenic -- PNES, they

18  shortened it because it's pretty hard to say -- are seizures

19  that occur that are psychomotor, that may not be picked up by

20  an EEG; is that --

21  A.   So --

22  Q.   That's one way to define it?

23  A.   It's hard.  So I actually don't call them seizures; I call

24  them psychogenic nonepileptic events.  And because when someone

25  goes to an ER, it's confusing to tell what it is and you don't

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                             USA v. Bruce L. Hay
                                             ROA - Volume 3, p.881

1   want them to be treated incorrectly.

2       That being said, again, it's looking to see if there's any

3   changes in brain wave activity.  So I probably order EEGs more

4   for differential diagnosis than I actually do for epilepsy.  In

5   the EEGs that I order, I probably only capture epilepsy, you

6   know, half of the time, and the other half of the time I'm

7   capturing conversion disorder potentially where I see an event

8   on the EEG and there's no change in brain waves.

9   Q.  Do you mind if I call them functional seizures because --

10  A.  Yes, I know what you mean.

11  Q.  All right.  So the functional seizures are -- would you

12  agree that with conversion disorder, functional seizures,

13  sometimes there are triggers?

14  A.  So with conversion disorder, yes, there can be.  But,

15  again, that's why you see it over multiple different

16  circumstances, not just one circumstance.

17  Q.  Okay.  And also with conversion disorder it's common to see

18  kind of other comorbid disorders like PTSD, anxiety,

19  depression; is that correct?

20  A.  That is correct.

21  Q.  Okay.  And you've treated individuals with functional

22  seizures?

23  A.  I have, in conjunction with psychiatry and psychology, but

24  I do continue to see them back, yes.

25  Q.  And much like my example before, those functional seizures

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.882

1   can be mild or severe, meaning they could be slight body

2   tremors or they could possibly be full-body cramping/shaking;

3   full-body seizure, that's a possibility?

4   A.   Yes, but when I give them the diagnosis of nonepileptic

5   events, actually the majority of them improve, so you see

6   improvements, and we can talk about that as well.

7        With psychiatry, psychology, and just having the education

8   of what it is, you see the majority of nonepileptic events

9   and/or conversion disorder improve, and you see patients

10  actually work with psychiatry and psychology and sometimes even

11  physical therapy.  So they are involved in trying to get

12  treatment and trying to get better, and you see that over time

13  that they improve.

14       I would again say probably 50 percent of my patients with

15  conversion when working with psychiatry and psychology and

16  myself -- I'm educating them and showing them videos -- have

17  improvement.

18  Q.   All right.  I'm glad you said that.  So in your position as

19  a neurologist, it's important to make sure that when you have a

20  patient with conversion disorder, you're explaining to them

21  what is happening to them because it's difficult for someone to

22  understand that they're having these body movements but their

23  brain is not really in control.

24       So it's important as a treatment provider that you fully

25  explain to them kind of what's going on and the disorder and

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.883

1    how follow-up treatment is going to work?

2    A.   So, yes.  And so in Dr. Hedges' and Dr. Beck's

3    recommendations they actually end -- and another doctor,

4    Dr. Rupert [ph] -- they actually recommended Mr. Hay because of

5    the benefits of that, to go to physical therapy and

6    psychotherapy both individual and cognitive and learn about the

7    diagnosis and also learn about stress management with this

8    diagnosis.

9    Q.   And in Dr. Hedges' report -- do you remember in Dr. Hedges'

10   report that said that he was actually in physical therapy, but

11   he had plateaued -- but Mr. Hay had plateaued?

12   A.   She did, but she actually still recommended both physical

13   therapy and counselling.  She said that for them to continue.

14   She said that typically she does see improvement with physical

15   therapy, and she said in most patients -- she quotes -- in most

16   patients conversion disorder does improve with continued

17   physical therapy and conversion.

18       So not just, you know, a couple months, but actually

19   months, years of continued therapy with improvements, and I

20   have seen that as well in the hundreds of patients that I have

21   treated over time.

22   Q.   Right.  You reviewed Mr. Hay's medical records.  What you

23   know is that he at least with Dr. Hedges said that he had --

24   had been attending physical therapy and that he had plateaued?

25   A.   For a couple months.  He attended it for a couple months,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.884

1    yes.

2    Q.   When you -- let's turn back to functional seizures.  You

3    said that there could possibly be triggers to functional

4    seizures, correct?

5    A.   Correct.

6    Q.   Sometimes those could be stress?  Is that *yes*?

7    A.   Yes, that is correct.

8    Q.   Sometimes even just like thoughts or emotions?

9    A.   That is correct.

10   Q.   Sounds?

11   A.   That is correct.

12   Q.   It kind of really depends on the individual what the

13   trigger might be?

14   A.   Correct.

15   Q.   And so I heard you -- your prior testimony say that the

16   conversion disorder symptoms are always unpredictable, but if

17   they have a trigger, it's possible that people can try at least

18   to avoid those things that are triggering the symptoms of

19   conversion disorder, correct?

20   A.   So potentially, yes.

21   Q.   Now, you've read through Mr. Hay's medical records.  I'm

22   assuming you've also read through many of the C&P exams in

23   2006, I believe 2012, and 2017; is that correct?

24   A.   Correct.

25   Q.   And throughout those exams he talks about things that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                     USA v. Bruce L. Hay
                                                     ROA - Volume 3, p.885

1   trigger him like traffic?

2   A.   Uh-huh.

3   Q.   Is that correct?

4   A.   That is correct.

5   Q.   I'm sorry.  The reason I'm asking you --

6   A.   No, I know.

7   Q.   -- whether "uh-huh" -- is she's taking --

8   A.   I know, I know, I know.  Yes.

9   Q.   Stress.  Stress also?

10   A.   Yes.

11   Q.   Sounds can trigger it?

12   A.   Yes.

13   Q.   And so if someone knows what is going to trigger these

14   symptoms, they can try to avoid them at all cost?

15   A.   Yes.

16   Q.   And possibly if they had these triggers for functional

17   seizures, there's a possibility that there are times when

18   they're normal because they're not suffering from a functional

19   seizure?

20   A.   Correct.

21   Q.   All right.  I want to talk to you about people coming to

22   see you as a doctor, and we kind of touched on this when we

23   discussed how important it was to kind of explain to the

24   patient what this disorder was and how it affects you.

25       Now, you see patients with neurological disorders.  I'm

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.886

1  assuming when they come to you, you tell them -- you have at

2  least maybe some spiel.  You tell them you're a doctor, you're

3  there to help them, and what you're going to do; is that

4  correct?

5  A.   Correct.

6  Q.   And they know that they're coming to you presumably as if

7  someone would go to a store to buy things or a lawyer to get

8  advice, they know when they're coming to you, they're coming

9  for some sort of treatment or diagnosis for what is wrong with

10 them, correct?

11 A.   Ideally.

12 Q.   Okay.  And so if they're there for a neurological disorder

13 and you ask them, you know, kind of how the disorder affects

14 them, you would expect them to tell you exactly how they're

15 affected or you would hope?

16 A.   I would hope, yes.

17 Q.   Right.  Now, you have reviewed the compensation and pension

18 exam on May 3, 2017, by a Dolly Cherian.  Do you remember

19 reviewing that?

20 A.   Yes, I do.

21 Q.   And do you remember in that interview Mr. Hay tells that

22 nurse, specifically Dolly Cherian, that he has muscle cramps?

23 A.   Yes.

24 Q.   And he just kind of locks up, folds up like a lawn chair?

25 A.   Yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.887

1    Q.   He tells her these are not actually constant; they happen

2    possibly once or twice per month?

3    A.   Right, for hours on end he said, yes.

4    Q.   Right.  And then on some days when the seizures are

5    happening, those days are when his wife has to give him a hand?

6    A.   Right.  And then he also says that he can -- multiple times

7    a day can have smaller, like, head shaking, bobbing, imbalance

8    as well.

9    Q.   Right.  And so on those days when he's having the seizures,

10   he tells her that he needs possible help dressing, I think; is

11   that correct?

12   A.   Yes.

13   Q.   And he also says, hey, I go out on the farm.  That's

14   something he tells the nurse?

15   A.   Yes.

16   Q.   And so in Mr. Hay's case, in review of his medical records

17   and his description of his symptoms, the symptoms are happening

18   inconsistently; would you agree?

19   A.   Yes.  But what I would also say is that he's actually -- he

20   is saying -- you know, earlier on he said it was all the time.

21   He needed a walker, he couldn't walk without a walker.  And

22   then now he actually is saying I have a couple days, you

23   know -- I only -- the very severe ones only happen once or

24   twice a month, and that would be an improvement to me because

25   in 2005 and 2006 and 2007 he said it's all the time, he

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.888

1   actually can't do anything, and now he's saying, well, yes,

2   multiple times a day, multiple times a week, I have imbalance,

3   I have instability, I may not be able to walk.  And I have

4   these bigger ones maybe only a couple times a month, not every

5   day now because actually in one of his reports in 2012 with

6   Dr. Neufeld he said that he had seizures every day from 2005 up

7   until 2012, and now he's saying he doesn't have seizures every

8   day.

9       So that's also showing inconsistency because it's showing

10  he did improve and does not have permanent disability.

11  Q.  So let me ask you this.  So that was a lot.  So you said

12  that he had -- in 2005 he had described having kind of seizures

13  every day?

14  A.  Yes.

15  Q.  So you read medical records, and there was documented that

16  Mr. Hay had had not only an accident in February of 2005 and --

17  excuse me, also possibly trauma from his combat experience in

18  Iraq, could have been the preceding event, traumatic event,

19  could have been because conversion disorder doesn't require a

20  lot of time, but could have been the preceding event for the

21  onset of conversion disorder, correct?

22  A.  Correct.

23  Q.  And when you're talking about his description -- and I'm

24  trying to kind of keep track -- but his description of him

25  having those seizures every day, I just read to you or spoke

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.889

1   with you about his 2017 statements.  You're saying those are

2   different than his 2005 statements?

3   A.   Yes.  I'm saying that some of them show improvement.

4   Q.   So 2005 is closer to the car accident, and now in 2017 in

5   the C&P exam you're saying that's different?

6   A.   2005, 2006, 2007, and 2012 when he handwrote or typed that

7   he had 100 percent permanent disability that would never

8   improve, that was all the way up to 2012.  And in 2012, which

9   again is seven years out, he told Dr. Neufeld that he was

10  having seizures every day from 2005 until 2012.  That's seven

11  years.

12  Q.   Let's talk about -- you keep saying 100 percent disabling.

13  A.   Or permanent I guess is what he wrote, permanent.

14  Q.   I've heard you on direct talk, and I think you said

15  something particularly about a video being 100 percent

16  disabling.  And I want to talk to you about what you know about

17  what that means for the Veterans Administration regulations.

18       Have you discussed that with the government's attorney?

19  A.   Not -- --

20  Q.   All right.  Let's talk about it.  So you were not made

21  aware that the VA's definition of what qualifies someone for

22  being 100 percent disabled is a sign where an individual is

23  unable to secure and follow what they call substantially

24  gainful employment?

25  A.   Correct, yes.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.890

1    Q.   So in forming your opinion, you weren't made aware or did

2    not consider that according to what's called 38 CFR 4.16, that

3    actual like -- if someone is able to do marginal employment,

4    that that shall not even be considered substantially gainful

5    employment as part of their definition of what is 100 percent

6    disabling?

7    A.   I wouldn't say that exactly because I reviewed all of the

8    VA rating papers, and I reviewed kind of the points that say

9    that --

10   Q.   And I'll stop you because I don't want to get you too far

11   off.

12   A.   Okay.

13   Q.   What I'm talking about is the actual VA's definition, not

14   Mr. Hay's rating decisions, but the regulations that guide

15   individuals at the VA in determining what they define as

16   100 percent disabling.

17   A.   So in what I reviewed, it said 100 percent disabled

18   because, and then it -- it would list like can't do this, can't

19   do this, can't do this, can't do this.

20   Q.   Yes, right.  But there actually is a code, a regulation

21   that gives the definition.  Were you aware of that?

22   A.   I would say in what I reviewed, I saw that there are

23   criteria that they use.

24   Q.   And you know that their actual criteria is -- 100 percent

25   is assigned where an individual is unable to secure and follow

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.891

1    substantially gainful employment, that's their definition.

2    A.   I did see that, but I saw other things as well, yes.

3         Actually I saw where -- and, again, where it said he could

4    not perform any job.  And I also saw -- well, I'll just leave

5    it at that, that could not work across multiple situations.

6    But then I saw videos where he is working.

7    Q.   Okay.  And working, let's talk about that differently.

8    Working, you mean doing something that's physical labor, not

9    at a --

10   A.   Physical labor, but also reviewed paper that said that he

11   actually made money and had gotten like a certain amount of

12   money from working on his dad's farm and things like that as

13   well.

14   Q.   You did.  Okay.

15        Would you agree that you weren't made aware that the VA

16   regulation that determines whether someone is 100 percent

17   disabled doesn't mean that someone is running a family business

18   or sheltered workshop is disqualified from 100 percent

19   disability?

20   A.   So I did read something about that, but I also read that

21   you can't apply for unemployment.  So if you are saying you

22   can't work, you can't apply for unemployment --

23   Q.   I'm going to stop you for a moment.

24   A.   He did apply for unemployment.

25   Q.   I'm going to stop you.  I'm trying to determine whether or

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.892

1   not in your conversations with the government or your

2   preparation for testimony here.

3   A.   Okay.

4   Q.   When you're using the term 100 percent disabling, is that

5   the VA's -- it's not the VA's definition because that's defined

6   in a federal code, 38 CFR 4.16.

7   A.   I'm using his definition on his paperwork.

8   Q.   That's what you're using; you're not using the VA's

9   definition?

10   A.   So I'll be honest, it's hard for me to tell the difference

11   because in multiple papers it's saying permanent.  It uses the

12   word 100 percent service-connected, it uses that.  So if it

13   says 100 percent SC, 100 percent service-connected, like that

14   is kind of what I thought was -- that is what I'm taking as the

15   definition, and then he also says permanent, that he is not

16   able to do anything.

17   Q.   Right.  And I understand that.  And you understand what

18   Mr. Hay is charged with.  So I guess my question goes to, you

19   know, when you're using the term 100 percent disabled, whether

20   or not you're using the Veterans Administration definition who

21   decided to give him benefits -- and it sounds like, no, you're

22   not aware of Title 38, the federal Title 38 code?

23   A.   That's fine, yes.

24   Q.   Correct?

25   A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.893

742

1  Q.  All right.  I want to talk about -- we talked about your

2  definition I think of epileptic seizure and you told me what

3  that was.

4  A.  I didn't tell you the definition of an epileptic seizure.

5  Q.  Maybe I -- I thought I heard it because you told me what

6  was on an EEG, so I figured it was kind of the same thing.

7  A.  I think I told you the definition of a nonepileptic

8  seizure, but I didn't tell you the definition of an epileptic

9  seizure.

10 Q.  Okay.  What is an epileptic seizure?

11 A.  An epileptic seizure would be something -- an epileptic

12 seizure would be something that is -- it is either one seizure

13 that is in a patient that is unprovoked that also is

14 accompanied by an abnormal EEG or abnormal MRI or two

15 unprovoked events over 24 hours, and the reason you use

16 epilepsy is because it predisposes -- it gives the idea that

17 the patient is predisposed to have more seizures without

18 medication.  That is what the word epilepsy means.

19      But in that sense you use the word epilepsy, but there's

20 also the word seizure.  And so, for example, I see many

21 patients who have a question of seizure, not necessarily

22 epilepsy.  Any patient who has an abnormal motor movement that

23 shakes or tremors I see because they want to figure out if it's

24 a seizure or not.

25 Q.  All right.  Let's talk about the word "seizure."  You would

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.894

1  have to agree that as a neurologist, the word "seizure" has a

2  very specific medical definition for you.  If I saw someone

3  exhibiting certain behavior as a normal person, I might say

4  they're having a seizure?

5  A.   Well, so some neurologists will use the word "seizure" with

6  nonepileptic seizure events too, so it depends who you're

7  talking to.  But there's definitely neurologists that will use

8  seizure in the wrong term potentially.

9  Q.   Just like every day people could see someone having what's

10  called an episode and call it a seizure?

11  A.   Yes.

12  Q.   And you reviewed Mr. Hay's medical records in this case,

13  and it kept coming up that he was having what's called -- seem

14  to be called different things:  Seizures, muscle cramping, body

15  shakes, episodes.  Would you agree these terms kept coming up?

16  A.   They did.  Although, he actually said he doesn't have

17  seizures in one of his compensation exams.

18  Q.   Right.  And I want to get to that.  He very well said -- I

19  think he was asked by Dr. Cherian whether or not he had

20  seizures, and he said, no, I don't know -- I don't know why the

21  paperwork said that; they keep saying I have seizures.

22  A.   Right.  So some of his doctors, like Dr. McWoods, did write

23  down seizures, and so -- and he did tell Dr. Neufeld that he

24  was having seizures.  So, again, there's inconsistencies in

25  what he's telling different medical providers.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.895

1  Q.  Well, it's the way you describe it, right?  So if he tells

2  them I have muscle cramps or I have episodes or I have attacks,

3  when he's describing what happens to him to his body, they're

4  all the same thing?

5  A.  I would have to ask him if he thinks they're all the same

6  thing.  But I mean, he does tell one provider he's having

7  seizures every day for seven years, and he tells another

8  provider he's not having seizures, so I don't know which one he

9  follows.

10  Q.  You would agree that it was consistent in what he tells the

11  providers that he was having some sort of tremor or muscle

12  cramping?

13  A.  So he has different things that look neurologic that are

14  inconsistent at different times, but I mean, he's got a variety

15  of neurological things.  I don't know exactly which one of

16  those he was calling seizure or not seizure.

17  Q.  Correct.  All right.  So let's talk about the records you

18  reviewed in this case.

19      And excuse me one moment.

20      All right.  So you reviewed the reports from Dr. Kathryn

21  Hedges; is that right?

22  A.  Yes, I did.

23  Q.  She is a neurologist; is that your understanding?

24  A.  That is my understanding.

25  Q.  And she diagnosed Mr. Hay with conversion disorder?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.896

1   A.   Yes.

2   Q.   You reviewed a May 5, 2005, medical evaluation report; is

3   that correct?

4   A.   Correct.

5   Q.   And I believe that doctor diagnosed with him conversion

6   disorder.  I think that may have been a psychiatrist or

7   psychologist; is that your memory?

8   A.   Yes.

9   Q.   You reviewed records from a Dr. Moffitt, and Dr. Moffitt

10  diagnosed Mr. Hay with conversion disorder; is that right?

11  A.   Yes.

12  Q.   You reviewed records from a Dr. Beck who saw him briefly,

13  but Dr. Beck's possible diagnosis was conversion disorder,

14  correct?

15  A.   Correct.

16  Q.   You reviewed a report by a Dr. Medvedeva.  And I believe

17  her diagnosis was PTSD and conversion disorder?

18  A.   Yes.

19  Q.   You reviewed a report by a Dr. Kevin Hawker.  And Dr. Kevin

20  Hawker's diagnosis of Mr. Hay was conversion disorder?

21  A.   Yeah, nurse practitioner.

22  Q.   Nurse practitioner?

23  A.   It was conversion disorder.

24  Q.   You reviewed the C&P exam, and I couldn't tell from your

25  report, but it said October 13, 2006, and that diagnosed

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.897

1   Mr. Hay with conversion disorder?

2   A.   Correct.

3   Q.   You reviewed an evaluation by clinical psychologist I think

4   Karyn Perry, and Dr. Perry diagnosed conversion disorder?

5   A.   Correct.

6   Q.   So we've got approximately 12 previous diagnoses over a

7   period of time that has consistently diagnosed Mr. Hay with

8   conversion disorder, correct?

9   A.   Correct.  You have different medical professionals saying

10  that someone has conversion disorder.  But even if multiple

11  medical professionals say that, if you don't have other

12  objective testing -- so, for example, I see hundreds of

13  patients that come to me with a diagnosis of seizures, and then

14  I do an EEG and they actually don't have seizures.  So even

15  though they were diagnosed by multiple other professionals with

16  seizures, I then do the objective testing and I see that they

17  don't have that.

18      So just because many people may say that someone has

19  something, doesn't mean that they have it without objective

20  testing and/or evidence.

21  Q.   Understood.  Now, you talked about diagnostic testing.  And

22  Mr. Hay did have a couple of EEGs, correct?

23  A.   Correct.  He had three.

24  Q.   He had three.  And that would be a test that you would want

25  to do as diagnostic testing to help you figure out what's going

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.898

1   on with someone that's having possible psychomotor movements or

2   seizure disorders?

3   A.   Correct.

4   Q.   And, again, you would expect someone with conversion

5   disorder to possibly have a normal EEG?

6   A.   They could have a normal EEG.  You've got to be careful

7   with normal because when someone has abnormal movements, their

8   brain waves are normal, but it's not normal necessarily to have

9   a nonepileptic event, right?  That's what you're trying to

10  figure out.  So you have to -- so in two of the EEG reports

11  they do capture, again, it's a medical procedure where they in

12  -- a medical procedure he's displaying in a circumstance his

13  abnormal activity.  So in two of the three, one he was doing

14  tremor and then another one he was doing something different

15  where he --

16  Q.   Let me stop you.  Let's back off and go back specifically

17  because your point was is that if you were to diagnose

18  conversion disorder like these doctors, you would have

19  follow-up at minimum EEG testing?

20  A.   Right.  But I'm also looking at -- I'm not just looking at

21  conversion disorder, I'm looking at any type of disorder that

22  isn't backed by a neurological diagnosis.  So I'm looking at

23  conversion, factitious, malingering, all of those things and

24  I'm doing an EEG.

25  Q.   Let's talk about the EEGs done with Mr. Hay.  It looked

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.899

1    like in August 20, 2012, there was a EEG done by a Dr. Louis

2    Giron, I believe.  Does that sound familiar?

3    A.   Yes.

4    Q.   It was an awake and sleep EEG?

5    A.   Yes.

6    Q.   There was a physical expression of a seizure, a

7    nonphysiological tremor on that EEG, correct?

8    A.   Yeah, I don't think he called it a seizure.  I think he

9    just called that there was a tremor that looked

10   nonphysiological in that particular one.

11   Q.   And the finding was that they suggested the seizures for

12   your report are kind of nonepileptic in origin?

13   A.   Yeah, yes.

14   Q.   So capturing a body tremor or psychomotor movements on an

15   EEG is one way to assist in determining whether or not someone

16   has conversion disorder, correct?

17   A.   Well, so, no, it's used to actually show whether it's a

18   seizure or not, not that it confirms conversion disorder.  It

19   confirms that it's not a seizure, and then it confirms that

20   there's something nonneurological that could be motivating or

21   behind whatever they are showing, but it is showing it is not

22   related to abnormal brain activity.

23   Q.   Right.  Which means could possibly be conversion disorder?

24   A.   Could possibly be conversion disorder, yes.

25   Q.   And then one on November 1, 2017.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.900

1    A.    That one I think showed the nonepileptic event.

2    Q.    I'm sorry?

3    A.    Sorry.  I'll let you -- I think that one is actually when

4    they do capture a nonepileptic event of him stiffening and

5    shaking his head and moving his arms asymmetrically.

6    Q.    That was done by Dr. Singh?

7    A.    Yes.

8    Q.    Again, that would have been a capturing -- he calls a spell

9    a nonepileptic --

10   A.    Well, what he calls a seizure.  I don't know what he calls

11   that.

12   Q.    You interpreted it to be that it is an EEG where there's

13   normal electric brain activity, but there was also a spell, an

14   episode, attack, waxing and waning, something to describe the

15   body movements, correct?

16   A.    Yes, and it said it went on actually for 20 minutes, so

17   that, again, longer than the things that we've seen on video,

18   but again in a medical procedure seeing dysfunction --

19   Q.    Okay.

20   A.    -- in a particular circumstance.

21   Q.    So -- but the EEGs I think you said are diagnostic testing

22   that some of those doctors that would have diagnosed conversion

23   disorder would have wanted to do?

24   A.    An EEG is diagnostic testing for seizures.  An EEG is

25   not -- it potentially could be conversion, but it didn't

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.901

1    necessary support conversion.  What it supports is that it is

2    not a seizure.

3    Q.   Right.  I think maybe I want to see if I can maybe clarify

4    my question for you.  I'm not asking if the EEG confirms

5    conversion.

6    A.   Okay.

7    Q.   I'm asking -- you've said that there's certain diagnostic

8    testing you would do on a patient to kind of have this rule-out

9    process for purposes of diagnosing conversion, correct?

10   A.   You are correct.

11   Q.   Okay.  Mr. Hay had these done at least three times,

12   correct, an EEG that --

13   A.   He had an EEG.

14   Q.   He had that diagnostic testing?

15   A.   Right, that ruled out a neurological disorder.

16   Q.   I want to play Government's Exhibit 5, please.

17        If you'll take a look at that, Dr. Becker.

18        Okay.  Could you stop it for me.  Thank you.

19        Have you seen Government's Exhibit 5 before?

20   A.   I have.

21   Q.   Government's Exhibit 5 is Mr. Hay at the Miami County

22   Administration Building, correct?

23   A.   Correct.

24   Q.   He wasn't going to his C&P exam there, correct?

25   A.   I don't know what he -- it's an administration building, so

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.902

1  I don't know if it involved any Social Security benefits,

2  compensation.

3  Q.  You don't know?

4  A.  I do not know.

5  Q.  So you looked at -- we've taken you through -- you said you

6  watched multiple videos, looked at multiple records, looked at

7  multiple documents in this case.  From what you've reviewed,

8  you don't have any information from the documents you've

9  reviewed that at that particular time he was going to let's say

10  a C&P exam as you keep saying?

11  A.  So I'm trying to remember the date of this one.  I feel

12  like this was around either a Social Security question or --

13  I'd have to actually look at it in my report of when I

14  documented this date.

15  Q.  Okay.  But right now you don't -- you can't say that that

16  was around any time going to a C&P exam?

17  A.  I'm not sure.

18  Q.  Now, if someone -- as in Mr. Hay's case, you reviewed the

19  records and determined that he has triggers at least to some of

20  his symptoms that he can tell ahead of time.

21  A.  Well, stress.  I can say that, stress.

22  Q.  And traffic, that was mentioned multiple times?

23  A.  Right.  But I -- yes.  I've seen him in the car after

24  traffic without issues.

25  Q.  In the multiple medical records you reviewed and you never

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.903

1    saw any indication from a doctor that he was told that he

2    couldn't drive or he had to take his driver's license away or

3    he had to relinquish his driver's license, correct?  There was

4    no --

5    A.   I saw him say that I cannot drive.

6    Q.   I'm not asking you that.  Let me back up.  I'm asking you

7    whether or not in the medical records you reviewed there's any

8    doctors order that he not drive or that his license be

9    relinquished?

10   A.   I did not see that.  I just saw him say there's not a

11   possibility of driving, so if he said there's not a

12   possibility, they may not think he's driving since he says I

13   cannot drive.

14        I will say that I have many patients, because I assess them

15   for seizures, I ask them if they're driving and they say that

16   they're not driving or they cannot drive.  I don't then say --

17   I say -- I say he says he cannot drive, but I don't then say

18   I'm telling him he can't drive because he's already told me

19   he's not driving or he cannot drive or driving is not a

20   possibility.

21   Q.   You're not aware of whether or not in the state of Kansas a

22   doctor is required to have someone relinquish their license if

23   in fact --

24   A.   So I actually am aware.  There are six mandatory reporting

25   states, and Kansas is not one of the mandatory reporting

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.904

1    states.

2    Q.   When you were preparing for this case -- if you give me a

3    moment -- so you authored a report for the government in this

4    case, correct?

5    A.   Correct.

6    Q.   And in that report you reference three pieces of literature

7    that you reviewed in aiding with your report?

8    A.   Yes.

9    Q.   The literature I think helped shape your opinion in the

10   case?

11   A.   Yes.

12   Q.   One of those articles was by Dr. Wendy Phillips?

13   A.   Yes.

14   Q.   It was the *BMJ Neurology Open*, the title was "Functional

15   Neurological Disorders in Personal Injury"?

16   A.   Yes.

17   Q.   And even though I think you quote three sentences in your

18   report, you read the whole thing?

19   A.   Yes.

20   Q.   Because it would be inappropriate to kind of just read

21   three sentences of an article or five pages of an article and

22   rely on that, correct?

23   A.   Correct.

24   Q.   So the entirety of the article helped you form your opinion

25   in the case?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.905

1    A.    I read the entirety of the article, and parts of the

2    article helped me -- or actually more supported my opinion.

3    Q.    I want to talk to you about some of the other statements

4    and findings asserted by Dr. Phillips in her article.  She

5    points out that most signs of conversion disorder are based on

6    distraction.  For example, a patient's brain normalizes when

7    their brain is not focusing on the symptoms?

8    A.    She may have said in her -- in that.

9    Q.    Would you like a copy of the article to review?

10   A.    Yes, please.

11   Q.    Give me one second.

12   A.    Quoting an article does not mean that I agree with

13   everything in the article.

14   Q.    Does that mean you do not want a copy of the article to

15   review?

16   A.    No, I'll still take the article.  Thank you.

17   Q.    You're welcome.

18         And what I'm looking at is on page 2 where it says "most

19   signs are based on distraction" in the bottom there.

20   A.    Is it highlighted?

21   Q.    Yes.

22   A.    In the bottom of page 2 on the left?

23   Q.    Yes.  Where it says "most signs are based on distraction.

24   The patient's examination normalized when their brain is not

25   focusing on the symptom or lay belief about the illness."

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.906

1   A.   I'm just reading the -- yes.

2   Q.   And, importantly, she reminds that signs improve upon

3   distraction when the claimant thinks they're not being

4   observed?

5   A.   But I actually read somewhere -- I don't know if it was in

6   Dr. Hedges' -- actually it was in Dr. Hedges', that his

7   symptoms did not improve with distraction.

8   Q.   And then I want to call your attention -- she finishes by

9   saying at the end there, that last sentence highlighted, that

10   FND is very common and misdiagnosis rate is very low.

11   A.   So, yes, I see that.  But that doesn't address -- so it's

12   hard, right, with -- it doesn't address other motivating

13   factors.  It doesn't address external gain and things like that

14   as well in this sentence -- or secondary gain.  And, in fact,

15   it does say that it's difficult to figure out between secondary

16   gain --

17   Q.   Wait, wait.

18         MS. RAMSEY:  Your Honor --

19   BY MS. RAMSEY:

20   Q.   Please just wait for me to ask a question.

21   A.   I apologize.

22   Q.   Thank you.

23         MS. RAMSEY:  Give me one moment.

24         I have nothing further.  Thank you, Your Honor.

25         MR. HUSCHKA:  I have no redirect, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.907

1          THE COURT:  Okay.  May this witness be excused?

2          MR. HUSCHKA:  Yes, Your Honor.

3          THE COURT:  You're excused.  Thank you.

4          THE WITNESS:  Get down and leave, that's what that

5     means?  I'm just making sure.

6          THE COURT:  Most people don't hesitate to leave.

7          Let's take a recess for 15 minutes.

8      (Recess taken.)

9      (The following proceedings occurred outside the presence of

10    the jury.)

11         THE COURT:  Remind me, you have another witness or a

12    another two witnesses?

13         MR. OAKLEY:  One more witness, Your Honor.

14         THE COURT:  Do you think that will take us through the

15    end of the day?

16         MR. OAKLEY:  I think we'll be done well before.  I

17    think we'll be done with direct maybe by 3:30.

18         THE COURT:  Okay.  All right.

19         MR. OAKLEY:  There's some video.  It may take a little

20    bit longer.

21         THE COURT:  And you're planning to rest?

22         MR. HUSCHKA:  Yes, Your Honor.

23         THE COURT:  In the hearing of the jury?

24         MR. HUSCHKA:  Yes, Your Honor.

25         THE COURT:  Okay.  We're ready.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.908

1          (The jury entered the courtroom, after which the following

2     proceedings were had.)

3               THE COURT:  You can be seated.  Call your next

4     witness.

5               MR. OAKLEY:  The United States calls James Carmack.

6                         JAMES CARMACK,

7     called as a witness on behalf of the government, having first

8     been duly sworn, testified as follows:

9                       DIRECT EXAMINATION

10    BY MR. OAKLEY:

11    Q.   Sir, would you please tell the jury your name and spell it

12    for the record.

13    A.   James William Carmack, J-a-m-e-s, W-i-l-l-i-a-m,

14    C-a-r-m-a-c-k.

15    Q.   How are you presently employed?

16    A.   I'm presently employed as an enforcement agent with the

17    Kansas Racing & Gaming Commission out at Hollywood Casino at

18    the speedway.

19    Q.   Is that a law enforcement position?

20    A.   Yes.

21    Q.   How long have you been employed in law enforcement?

22    A.   Since February or March of '84.

23    Q.   And what type of law enforcement jobs have you had since

24    1984?

25    A.   Worked for sheriffs office and police department on the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                         2:19-cr-20044-JAR
                                       USA v. Bruce L. Hay
                                       ROA - Volume 3, p.909

1   Missouri side here in Kansas City.  Then I joined Kansas Bureau

2   of Investigations.  I spent 25 and a half years as a special

3   agent with them, all within the Kansas City area.  Came here as

4   a court security officer for about two years.  Then I was with

5   the Kansas Department of Labor as a contract employee assigned

6   to the Social Security Administration.

7   Q.   While you were a special agent with the Kansas Bureau of

8   Investigations, did you have occasion to serve on a task force

9   related to Social Security investigations?

10  A.   Yes, three years.

11  Q.   And then you said that after you left the KBI, at some

12  point you went to the Kansas Department of Labor?

13  A.   Correct.

14  Q.   Did you work on Social Security investigations when you

15  were at the Kansas Department of Labor?

16  A.   Correct, that's what I was hired to do.  That was just a

17  contract position.

18  Q.   I want to talk to you about an investigation involving an

19  individual by the name of Bruce Hay.  Were you involved in that

20  investigation?

21  A.   Yes.

22  Q.   And were you involved in that investigation both during the

23  time that you were a task force officer with the KBI and then

24  once you came back with the Department of Labor?

25  A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.910

1  Q.  And so you said that in between there's about a two-hour --

2  or two-year gap between those two employments, give or take?

3  A.  Yeah, pretty close.

4  Q.  And so when you started, you were a KBI special agent on

5  the task force.  Did you work with a VA-OIG special agent by

6  the name of Dan White?

7  A.  Yes.

8  Q.  And so was this a joint investigation involving, as well as

9  others, you and Special Agent White?

10 A.  Correct.  VA referred a case to us as a joint investigation

11 so...

12 Q.  I want to talk to you specifically about November 19, 2012.

13 Were you involved in conducting surveillance on that date of

14 Mr. Hay?

15 A.  Yes.

16 Q.  And did Mr. Hay have a Social Security meeting scheduled

17 that day?

18 A.  Correct.  It was a mental status exam.

19 Q.  And prior to that examination did you have occasion to

20 conduct surveillance of Mr. Hay while he was in a Quik Trip

21 convenience store?

22 A.  Yes.

23 Q.  And did you have an opportunity to record that interaction?

24 A.  Yes, I recorded it with what we called a key fob camera.

25 Q.  Did you use that -- other than this date, the November 19,

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.911

1   2012 date, did you use that key fob camera during other

2   surveillance activities in this investigation?

3   A.   Yes.

4   Q.   Could you explain for the jury what the key fob was?

5   A.   It's a commercial camera that is basically the size of a

6   key fob you would have on your own key ring.  It records video.

7   The ones that we ordered did not have audio.  They were ordered

8   from the manufacturer without audio.  So there was not a

9   problem with capturing any kind of -- excuse me -- voice

10  recording, so there weren't any issues with that.

11  Q.   And you indicated that you used that device on November 19,

12  2012 in the Quik Trip.  I'm going to hand you what's been

13  marked as Government's Exhibit 7.

14           MR. OAKLEY:  Your Honor, may I approach?

15           THE COURT:  Yes.

16  BY MR. OAKLEY:

17  Q.   Can you tell us what Government's Exhibit 7 is?

18  A.   It appears to be video from just prior to the mental status

19  exam in Olathe.

20  Q.   On November 19, 2012?

21  A.   Correct.

22           MR. OAKLEY:  Your Honor, I offer Government's

23  Exhibit 7.

24           THE COURT:  Any objection?

25           MR. MAGARIEL:  No, Your Honor.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.912

1        THE COURT:  Exhibit 7 admitted.  You can publish.

2   BY MR. OAKLEY:

3   Q.   So in the video at the beginning, we see someone who the

4   top part, including their head, is kind of not included in the

5   video, but they appear to be using a cane?

6   A.   Correct.

7   Q.   Did you recognize that person as the Defendant Bruce Hay?

8   A.   Yes.  Mr. Hay, yes.

9   Q.   And so this video was taken prior to a meeting at Social

10  Security on November 19, 2012.  Were you involved in other

11  surveillance activities that day?

12  A.   Yes.

13  Q.   And other agents were as well; is that --

14  A.   Correct.  VA-OIG had several individuals also assisting.

15  Q.   And other people were taking video of the things that they

16  may have observed; is that true?

17  A.   Oh, yes, yep.

18  Q.   Was this the day that the defendant went to a pawnshop

19  after the Social Security appointment?

20  A.   Yes.

21  Q.   So I then want to talk to you about November 28th of 2012.

22  On that date did you have occasion to go to the defendant's

23  house or a house associated with the defendant and have a

24  conversation with him?

25  A.   It was, I believe, his father's residence, primary

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.913

1    residence.  We did go there and spoke to his father, Mr. Hay

2    Sr., I guess, and then Bruce Hay later on, yes.

3    Q.    And you went there personally?

4    A.    Yes.

5    Q.    Now, what was the purpose of the conversation?

6    A.    The conversation, the meeting, and everything else was we

7    refer to a lot of times as ruse context to see how an

8    individual acts outside of a medical situation.

9    Q.    Did you create a ruse to give you a reason to have this

10   conversation on November 28, 2012?

11   A.    Yes.

12   Q.    What was the subject matter of the ruse?

13   A.    Illegal deer hunting or poaching.  It was in a very rural

14   area, so we threw that out as the conversation to start.

15   Q.    And did you bring with you some photographs of dead deer,

16   too, as part of that ruse?

17   A.    I kept several photographs that I developed to assist in

18   those type of situations, so yes.

19   Q.    And during this conversation, I think the jury has seen --

20   well, let me back up.  During this conversation you had with

21   the defendant, was Special Agent White video recording it from

22   a ways away?

23   A.    I believe so.  I know that we recorded some with the key

24   fob that day.

25   Q.    And then was there an initial conversation at the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.914

1  defendant's father's residence, and then did you and Special

2  Agent White go to another location nearby on a road and have a

3  second conversation with the defendant?

4  A.   Correct.  Initially we spoke to Mr. Hay's father.  Bruce

5  Hay was out on the property.  He came back.  We spoke to him,

6  ended that conversation, and shortly after that Bruce Hay,

7  along with, I believe his wife, caught us just down the road

8  and took us to a location not far from the residence to point

9  out an area where he said deer had been disposed of.

10 Q.   And did you have a conversation with the defendant and

11 Special Agent White about the deer at that location?

12 A.   Yes.  He talked about a number of issues of deer being

13 dropped there, illegal hunting.  He also talked about himself

14 deer hunting and -- excuse me -- using an elevated tree stand

15 when he did hunt.  It was a variety of that conversation.

16 Q.   Could we please play Government's Exhibit 23.  Could we

17 fast-forward a few minutes in.

18      Is this a video that was taken that day?

19 A.   Yes.

20 Q.   Did you take this video with the key fob that you described

21 earlier?

22 A.   Yes.

23 Q.   Now, the date on this says November 29th.  Is that date

24 accurate?

25 A.   No.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.915

1   Q.   And why is it not accurate?

2   A.   We can never get the key fob to sync and adjust to date and

3   time correctly.  We tried with the manufacturer, and it just

4   never worked.

5   Q.   And so although the imprint on the video says

6   November 29th, is this the day before, November 28th?

7   A.   Yes.

8   Q.   You said that the conversation during this time was about a

9   few things.  What all did you and Special Agent White discuss

10  with the defendant during this point in the conversation?

11  A.   Oh, besides the deer aspect, just the general weather and

12  property out there and that type of thing.  It was just general

13  conversation to see what we could obtain, you know, by talking

14  to him directly.

15  Q.   Did you or Special Agent White ever disclose that you were

16  investigating VA -- allegations of VA benefits fraud?

17  A.   No.

18  Q.   So you were just talking about deer and deer poaching and

19  that sort of thing?

20  A.   Correct.

21  Q.   Do you remember the defendant saying anything about whether

22  or not he was a deer hunter?

23  A.   He did say that he was a deer hunter.  Like I said, he

24  claimed he used an elevated stand.  He also talked about a

25  friend of his that he had to assist getting up one of the tree

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.916

1   stands because of his maybe mobility or age.

2   Q.   And so you mentioned that -- well, during this time,

3   November 29th of 2012 --

4   A.   28th.

5   Q.   I'm sorry?

6   A.   28th.

7   Q.   November 28, 2012, you were still at KBI?

8   A.   Correct.

9   Q.   You mentioned you left for a couple years.  When did you go

10  to the Department of Labor?

11  A.   I retired in the end of the '13 from KBI, and I went to

12  Department of Labor in September 2016.

13  Q.   And at some point after you came back to the Department of

14  Labor, did you have further involvement in the investigation of

15  Bruce Hay?

16  A.   Yes.

17  Q.   We can stop that.

18       I'd like to talk to you about March 30th of 2017.  Were you

19  involved in surveillance on that day of Bruce Hay?

20  A.   Yes.

21  Q.   And was that a date that Mr. Hay had an appointment at the

22  CBOC in Paola?

23  A.   Correct.  That was a VA appointment.  I was there assisting

24  the VA-OIG.

25  Q.   And were you one of a couple different agents who were

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.917

1   conducting surveillance that day?

2   A.   Yes.

3   Q.   And did you obtain surveillance of the defendant as he was

4   walking around in Paola?

5   A.   On the 30th I know I had video at the appointment and

6   leaving the appointment.

7   Q.   I want to talk to you about -- you mentioned the -- I think

8   you called it a ruse with the conversation about the deer.

9   Throughout your experience you said that you started law

10  enforcement in -- I'm sorry, nineteen-eighty-what?

11  A.   Four.

12  Q.   During that time have there been certain things you've

13  learned to do to help you with your investigations, certain

14  tools of the trade one might say?

15  A.   There were some things that we developed, I guess if you

16  want to call, through just a process of these cases to see how

17  people would react.  Like I said, on a day-to-day basis outside

18  of a medical setting there were several, I guess, techniques or

19  ruses, if you want to call, that we would use to see how they

20  acted.

21  Q.   Did one of those involve change, coins?

22  A.   Yes.

23  Q.   And can you explain for the jury that, what you would do

24  involving change in an investigation such as this?

25  A.   Well, besides losing quite a bit of change, we just thought

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.918

1    that -- in this particular case I dropped a handful of change

2    near the vehicle of Mr. Hay to see how he would react or what

3    they would do when they came out.  We've used that on a number

4    of occasions with people.

5        Hypothetically speaking, if you have a claim for being

6    totally blind and you come out and see change and bend down and

7    pick it up, that would indicate that possibly there's some

8    problems with your claim, but those type of things we would do

9    to see how they would react.

10    Q.  Would you ever have other people pick up your change?

11    A.  Yes, unfortunately.

12    Q.  Were you involved in other surveillance of Mr. Hay as part

13    of this investigation?

14    A.  Yes.

15    Q.  And were you involved in surveillance of the defendant at a

16    Sam's Club location?

17    A.  Yes.

18    Q.  Before we get to that, I want to get back to March 30th of

19    2017, and that was the date of the CBOC appointment.  And I

20    want to hand you what's been marked as Government's Exhibit 44

21    and ask you if you recognize that disk.

22    A.  Yes, I initialed that.  It was from March 30th of Mr. Hay

23    walking around in Paola.

24        MR. OAKLEY:  Your Honor, I offer Government's

25    Exhibit 44.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.919

1          THE COURT:  Any objection?

2          MR. MAGARIEL:  No objection, Your Honor.

3          THE COURT:  Exhibit 44 admitted.  You can publish.

4    BY MR. OAKLEY:

5    Q.   So this is in Paola?

6    A.   Correct.

7    Q.   Is that the defendant we see on the screen now?

8    A.   Yes, Mr. Hay.

9    Q.   Were you also involved in surveillance on May 3, 2017?

10   A.   Yes.

11   Q.   And was that the date of a C&P examination at VA?

12   A.   Yes.

13   Q.   And were you involved in surveillance as the defendant left

14   the VA that day on May 3rd?

15   A.   Yes.

16   Q.   I'm going to hand you what's been marked as Government's

17   Exhibit 51 and ask you if you recognize that disk.

18   A.   Yes.  I marked that also for May 3rd after the exam at the

19   VA.

20          MR. OAKLEY:  Your Honor, I offer Government's

21   Exhibit 51.

22          MR. MAGARIEL:  No objection, Your Honor.

23          THE COURT:  Exhibit 51 admitted.  You can publish.

24   BY MR. OAKLEY:

25   Q.   There appears to be a white pickup truck in this video.  Is

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.920

1   that the defendant's truck?

2   A.   Yes.

3   Q.   And are you located in the same parking lot?

4   A.   I am directly across, I believe, two or three spaces to the

5   side.

6   Q.   Do you remember, was it raining that day?

7   A.   Yes.

8   Q.   Was that the same day you were involved in surveillance at

9   the Sam's Club?

10  A.   Yes.

11  Q.   Did you go into the Sam's Club?

12  A.   Yes, I did.

13  Q.   Did you have your key fob video with you that day?

14  A.   Yes.

15  Q.   I'm going to hand you a series of disks and ask you if you

16  recognize them.  For the record, these are Government's

17  Exhibits 56, 57, 58, 59, 60, 61, 62, 63, and 64.

18       Have you had a chance to look through those?

19  A.   Yes.  These are from the Sam's Club at 95th Street in

20  Lenexa.

21            MR. OAKLEY:  Your Honor, I offer Government's

22  Exhibit 56 through 64.

23            THE COURT:  Any objection?

24            MR. MAGARIEL:  No, Your Honor.

25            THE COURT:  56 through 64 admitted.  You can publish.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.921

1           MR. OAKLEY:  Can we please show 56.

2    BY MR. OAKLEY:

3    Q.   So, again, this is inside the Sam's Club?

4    A.   Correct.

5    Q.   How were you capturing video that day on the key fob?

6    A.   I'm just -- it's just handheld at this point.

7    Q.   Were you walking around following the defendant?

8    A.   Yes, as much as we could.

9    Q.   Now, when you're conducting surveillance at some place like

10   this, can you walk along behind someone with a camera without

11   them noticing you?

12   A.   No.  There's not enough customers or traffic or whatever

13   and the aisles are considerably long, and it's a little

14   difficult to be seen multiple times in the same aisle.

15   Q.   Was this shortly after the defendant and his wife entered

16   Sam's Club?

17   A.   Yes.

18   Q.   And is that the defendant and his wife at the far end of

19   this row?

20   A.   Correct.

21   Q.   And I'm not going to play the entire video, but typically

22   is this portion of the video consistent with what you saw the

23   defendant and his wife walking through the store?

24   A.   Yes.

25   Q.   Could we scroll back to the very beginning.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.922

1      You mentioned that the date on this -- could you pause,

2   please.

3      So you mentioned that the date on this camera was off, but

4   did the time function still work?

5   A.   It was not synced with the actual time of the day.

6   Q.   So it says 2:13.  It may not have been 2:13?

7   A.   Correct.  The length of time would be correct for all the

8   videos.

9   Q.   Could we please show Exhibit 57.

10      And do you see the defendant and his wife in this video?

11  A.   Yes.

12  Q.   What are they doing?

13  A.   They're at the checkout line.

14  Q.   And the time on this was about 2:32; is that correct?

15  According to this --

16  A.   Correct.

17  Q.   -- to the -- okay.

18  A.   The time would have continued to run.

19  Q.   So while you were walking throughout the store, was the

20  defendant shopping the entire time?  Did he ever sit down

21  anywhere?

22  A.   No, he never sat down.

23  Q.   Did it appear as though this was a targeted shopping trip

24  where they went to the -- and looked at only the things they

25  were going to buy or did they meander a bit?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.923

1    A.   They roamed from one portion of the store to the other,

2    went from the west side where you enter, all the way over to

3    the east side, and then up to the checkout line.

4    Q.   Could we please play Government's Exhibit 58.

5         And so we kind of -- in time we went from the beginning to

6    the end, and are we back to the middle as far as when they

7    entered the store?  It looks like it's 2:17 on this time mark.

8    A.   This is about 4 or 5 minutes into the store from when we

9    entered.

10   Q.   Could we please play 59.  Could you scroll through about

11   halfway.

12        Did you have any contact with -- any conversation with the

13   defendant in the store?

14   A.   No.

15   Q.   So were you operating in a covert role at this time?

16   A.   Yes.

17   Q.   Could we please play Government's Exhibit 60.

18        I've noticed that some of this video is choppier than

19   others.  Were you able to stabilize the camera on occasion?

20   A.   Yes.  One of the things I learned, just holding the camera

21   as you walk, even as still as you try to be, there's a lot of

22   movement in the actual video that's captured, so I would get a

23   cart and stack some item like toilet paper or large enough item

24   that would be -- where I could play the camera on top of it and

25   make it more stable so it would see over the cart and the view

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.924

1   wouldn't be obstructed.

2   Q.   I assume at that point in 2017 you were able to buy toilet

3   paper at Sam's Club?

4   A.   Yes, that's what this is.  It's stationary on an object.

5   I'm not quite sure if it was toilet paper.

6   Q.   That's why it's more stable?

7   A.   Yes.

8   Q.   Could we please play 61.  Could you scroll about halfway.

9   Could we back up about 20 seconds from there.

10       Do you know what the defendant is doing in this part of the

11   video?

12   A.   He's sampling some product, food product they had on

13   display that day.  I'm not sure what in particular it was, but

14   that's a sample cart.

15   Q.   Could we please play 62.

16       Was this video taken by someone else?

17   A.   Yes.  This is a VA special agent.

18   Q.   I'm sorry.  Could we please play 64.

19       Is this at the end of the shopping trip of the defendant?

20   A.   Correct.  This is as they exited and loading up their

21   pickup truck, and you can tell from the movement that I'm just

22   holding this with my hand at this point.

23   Q.   Are you standing just inside the doorway?

24   A.   Yes, in the entry/exit/foyer area.

25   Q.   Thank you.  Did you have occasion to conduct surveillance

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.925

1  on June 2, 2017?

2  A.  Yes.

3  Q.  I'm going to hand you four disks.  For the record these are

4  Government's Exhibits 67, 68, 69, and 70.  Would you look

5  through those, please?

6  A.  These are all from June 2, 2017.

7  Q.  Are those all surveillance videos that you took?

8  A.  Yes.

9  Q.  On that day?

10       MR. OAKLEY:  Your Honor, I'd offer Government's

11  Exhibit 67 through 70.

12       THE COURT:  Any objection?

13       MR. MAGARIEL:  No, Your Honor.

14       THE COURT:  67 through 70 admitted.  You may publish.

15  BY MR. OAKLEY:

16  Q.  Did you go to the defendant's residence or near the

17  defendant's residence on that day?

18  A.  Yes.  I was just doing a spot check of his residence.

19  Q.  Were you with any other agents or were you alone that day?

20  A.  I was alone at that point.

21  Q.  Can we please play Government's Exhibit 67.

22       What is this a video of?

23  A.  This is Mr. Hay's truck on a trailer parked across the

24  street in the school parking lot that was just -- I believe

25  that would be north of his residence.  When I pulled up, I saw

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.926

1    that it was sitting there, so I drove to the far end of the

2    parking lot, turned around.

3    Q.   Did you recognize the truck as being the defendant's?

4    A.   Yes.

5    Q.   At some point did you see the defendant that day?

6    A.   Yes.  It was not until after I had gone to the end of the

7    parking lot, turned around, and came back that I observed

8    Mr. Hay in the grassy area just besides the truck.

9    Q.   So the -- were you on the school property when you took

10   this video?

11   A.   Yes.

12   Q.   The truck is on the school property?

13   A.   Yes.

14   Q.   The school property is across the street from the

15   defendant's residence?

16   A.   Yes.

17   Q.   Could we please play 68.

18        Do you recognize that as the Defendant Bruce Hay?

19   A.   Yes.

20   Q.   And does it appear there's a toddler with him?

21   A.   Yes, there is.

22   Q.   Does the defendant appear to be walking back towards his

23   residence in this video?

24   A.   That's what he did, yes.  His residence is the one with the

25   red pickup truck.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.927

1   Q.   Could we please play 69.  Did it appear whether or not to

2   you when you were viewing this, whether or not the defendant

3   used his cane as he walked up the steps carrying the child?

4   A.   No, he did not.

5   Q.   And could we please play Government's Exhibit 70.

6        Was this that same day?

7   A.   Yes.

8   Q.   And what type of -- where are we at in this video?

9   A.   This is mechanic shop, car repair place in town in

10  Osawatomie area.

11  Q.   Is that the defendant in the hat?

12  A.   Yes.

13  Q.   Were you able to hear any of the conversation that was

14  occurring?

15  A.   No.

16  Q.   Do you know who he was talking to?

17  A.   No, I have no idea.

18       MR. OAKLEY:  You can pause.

19       Your Honor, I have no further questions of this

20  witness.

21                    CROSS-EXAMINATION

22  BY MR. MAGARIEL:

23  Q.   Good afternoon, sir.

24  A.   How are you?

25  Q.   Did you say "how are you?"

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                        2:19-cr-20044-JAR
                                      USA v. Bruce L. Hay
                                      ROA - Volume 3, p.928

1    A.   Yes.

2    Q.   Fine.  Thank you.

3         I want to -- I think I'm going to try to go in timeline

4    order, so I'll talk about the date and make sure you understand

5    what date I'm talking to you about.  Okay?

6    A.   Okay.

7    Q.   As I understand your role in this investigation, one thing

8    that you did was surveilled Mr. Hay November 19, 2012; is that

9    right?

10   A.   Correct.

11   Q.   Were you one of the investigators who followed Mr. Hay from

12   Osawatomie up into Olathe?

13   A.   Yes.

14   Q.   And as I understand it, a place that Mr. Hay -- well,

15   first, his wife was driving from Osawatomie up to Olathe; is

16   that correct?

17   A.   Correct.

18   Q.   Mr. Hay was the passenger?

19   A.   Yes.  He never drove that day.

20   Q.   And as I understand it, one of the places that they stopped

21   was at a Quik Trip; is that right?

22   A.   Yes.

23   Q.   Can we again play Government's Exhibit 7, please.

24        If I understand, it's kind of a short clip here, but this

25   is your recording of Mr. Hay in the Quik Trip?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.929

1   A.   Right, correct, yes.

2   Q.   Would you start that again and play from the beginning one

3   more time, please.  You can pause that now.  Thank you.

4        As I understand I think from a prior report of yours, when

5   Mr. Hay is in the Quik Trip, you described him as walking with

6   an unusual side-to-side motion; is that right?

7   A.   I would have to look at my notes, but I believe that is

8   correct.

9   Q.   All right.  And you could see that on the video there.  I

10  played it a couple of times.  I assume you were able to see

11  that?

12  A.   Right.

13       MR. MAGARIEL:  Bonnie, if you wouldn't mind flipping

14  over, I'm sorry, from one to the other.

15  BY MR. MAGARIEL:

16  Q.   I'm going to display what's already admitted as defendant

17  Exhibit 823.  I'll give you a few minutes to get oriented to

18  that.

19       Did you get a chance to look at that?

20  A.   Yes.

21  Q.   That is a map that shows an area of Olathe and then on down

22  south into the Osawatomie and then kind of the surrounding

23  areas; is that right?

24  A.   Correct, yes.

25  Q.   And the route that the Hays took, and I assume you

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.930

1   followed, was to take that 169 Highway up from Osawatomie and
2   into Olathe; is that right?
3   A.   Yes.
4   Q.   And I think that Quik Trip was right off of 169 Highway; is
5   that right?
6   A.   Right.  It's just to the south of Olathe proper where Home
7   Depot and everything else is.
8   Q.   Before you get into more of the city?
9   A.   Right.  It's right before you get to the city part, yes.
10  It's on the west side of 169.
11  Q.   Okay.  So it's south of -- I think it's in Olathe proper,
12  but south of the more city part of Olathe?
13  A.   Correct.
14  Q.   You said on the west side of the road off of 169 Highway?
15  A.   Correct, yes.
16  Q.   Okay.  We can take that down.  Thank you.
17       All right.  I'll try to keep in timeline order.  The next
18  involvement you had on this case was November 28, 2012; is that
19  right?
20  A.   Yes.
21  Q.   And this is when you're on Mr. Hay's father's property near
22  Lane, Kansas; is that right?
23  A.   Yes.
24  Q.   I think you described it as a rural area earlier?
25  A.   Yes, what I would call more rural farm property.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434

2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.931

1    Q.   You were not there by yourself.  I think there was already

2    a mention that Agent White from the VA-OIG was there; is that

3    right?

4    A.   Yes.

5    Q.   And was there also a Miami County sheriffs deputy, Deputy

6    Brown?

7    A.   Correct.

8    Q.   Do you -- so -- and as I understood your testimony, there

9    were sort of two engagements.  There was an initial engagement

10   where Agent White was recording from a distance, and you had

11   your handheld key fob camera; is that right?

12   A.   Correct.

13   Q.   And then there was a second engagement where I think Deputy

14   Brown had left, and it was just you and Agent White speaking to

15   Mr. Hay?

16   A.   Correct.

17   Q.   In either of those engagements did you identify what agency

18   you were with?

19   A.   No.

20   Q.   Did -- I assume Deputy Brown did?

21   A.   Yes.  He was -- I believe he had a shirt that identified

22   himself as Miami County.

23   Q.   Okay.  Did you introduce yourself at all?  It's been 10

24   years; you may not remember.

25   A.   Right.  I will probably have to back up and say I did

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.932

1  introduce myself as a special agent with the KBI.  That's what

2  I would have done at that time.

3  Q.   I think you already discussed this with the government.

4  You had the ruse of your purpose to be related to deer

5  poaching; is that right?

6  A.   That was the purpose, yes, the conversation.

7  Q.   Do you remember when Agent White then approached later and

8  it was you and Agent White, if Agent White said what agency he

9  might have been with?

10  A.   I don't remember that, if he did or didn't.

11  Q.   What you do remember, it sounds like, is the Miami County

12  sheriffs deputy, Deputy Brown, said who he was with, and you

13  said that you were with the KBI?

14  A.   Correct.

15  Q.   And we obviously watched that video.  I'm not going to

16  repeat all of that, but Mr. Hay had a cane with him; is that

17  right?

18  A.   Yes.

19  Q.   And you've already summarized, I think, the interview, and

20  the jury has heard it before, Mr. Hay admitted to you he hunted

21  and talked freely and comfortably about that; is that right?

22  A.   Correct.

23  Q.   And same as to what he did around the farm, ranching

24  cattle, repairing fencing, things like that?

25  A.   Correct.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                2:19-cr-20044-JAR
                                              USA v. Bruce L. Hay
                                              ROA - Volume 3, p.933

19-20044-JAR   USA v. BRUCE L. HAY   08.05.22                    782

 1              MR. MAGARIEL:  That's all I have.  Thank you.

 2              MR. OAKLEY:  No redirect, Your Honor.

 3              THE COURT:  All right.  Special Agent, you can step

 4       down.

 5              Mr. Huschka.

 6              MR. HUSCHKA:  Your Honor, at this time the United

 7       States rests.

 8              THE COURT:  All right.  Counsel, approach the bench,

 9       please.

10          (The following proceedings were had at the bench).

11              THE COURT:  All right.  So we'll make a record after I

12       release the jury on the motion for judgment, but my plan is to

13       tell them to be back at 9:00 on Monday.  Does that work for

14       you?  Did you think you have a full day of witnesses?

15              MS. RAMSEY:  I'm working on it.  I'm working on it,

16       because we've got some people -- best I can say, I'm working

17       on.  Right now I think we've got about four witnesses lined up.

18       We'll try and put a fifth on there.

19              THE COURT:  Okay.  But right now you're still thinking

20       you're going to go into Wednesday?

21              MS. RAMSEY:  Yes.

22              THE COURT:  Okay.  All right.  I won't necessarily

23       tell them that.  I told them we may be ahead of schedule

24       midweek.  I can maybe repeat that, but I'll tell them to be

25       back at 9:00 Monday.  Standby after that, and we'll take up

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.934

1    motions.

2        (Thereupon, the proceedings continued in open court.)

3        THE COURT:  The government has rested its evidence.

4    The lawyers and I have some legal matters to take up.  We're

5    going to have an early day for you, send you home, ask you to

6    be back at 9:00 on Monday.

7        Again, it looks like we're somewhat ahead of schedule.

8    The case will be submitted to you for deliberations on

9    Wednesday, maybe Wednesday afternoon is my guess, if all things

10   stay as smooth as they've been so far.

11       So the case is not over.  Don't start making

12   decisions.  Certainly don't deliberate with anyone, not with

13   each other.  And don't talk about any of these things with

14   anyone.  We want to make sure that your deliberations when the

15   case is finally submitted to you sometime on Wednesday are

16   pristine and your deliberations will begin with all of your

17   fellow jurors at that point.

18       Don't read, listen to, at all take in any information.

19   If you should come across any information about this case or

20   even the subject matter of this case, conversion disorder, any

21   of the things you've heard in the evidence.

22       So have a pleasant weekend and we'll see you back at

23   9:00 Monday morning.

24       (The following proceedings occurred outside the presence of

25   the jury.)

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.935

1          THE COURT:  All right.  So you can be seated.  It's

2     typically my practice to take motions for judgment under

3     advisement at this stage of the case knowing that they'll be

4     renewed at the end of the case, and then I'll rule on them at

5     some point.

6          But if you'd like to make an oral record, you can

7     follow that with a written motion if you want.  That's not

8     necessary.  It's up to you, but if you want to make a written

9     record of your motion for judgment at this point, that's fine.

10          MS. RAMSEY:  Your Honor, we would just, under Rule 29,

11     move for motion for judgment of acquittal.  We don't need to

12     make an additional oral argument.  I will say we will be filing

13     something, but not waiving our general motion for judgment of

14     acquittal by filing that, but we'll get that on file this

15     afternoon.

16          THE COURT:  Okay.  All right.  Considered under

17     advisement, and then when you file something in writing, the

18     government will have an opportunity to respond in writing.

19     I'll consider that under advisement as well.

20          All right.  Anything else we need to take up at this

21     point?

22          MR. HUSCHKA:  No, Your Honor.

23          MS. RAMSEY:  No, Your Honor.

24          THE COURT:  Okay.  Have a good weekend.  We'll see you

25     back at 9:00 Monday.  I will be available at 8:30 if you need

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.936

1   me.

2       (The proceedings were adjourned at 3:58 p.m.)

3

4               C E R T I F I C A T E

5       I, Danielle R. Murray, a Certified Court Reporter and the

6   regularly appointed, qualified, and acting official reporter of

7   the United States District Court for the District of Kansas, do

8   hereby certify that the foregoing is a true and correct

9   transcript from the stenographically reported proceedings in

10  the above-entitled matter.

11      SIGNED 8th of February, 2023

12

13                  /s/Danielle R. Murray
                    DANIELLE R. MURRAY, RMR, CRR
14                  United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.937

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2
    UNITED STATES OF AMERICA,          Docket No. 19-20044-JAR
3
       Plaintiff,                      Kansas City, Kansas
4                                      Date: 8/8/2022
         v.
5
    BRUCE L HAY,
6
       Defendant.
7    ...................

8                         TRANSCRIPT OF
                      DAY 6 - JURY TRIAL
9            BEFORE THE HONORABLE JULIE A ROBINSON,
             UNITED STATES SENIOR DISTRICT JUDGE.
10
    APPEARANCES:
11
    For the Plaintiff:     Christopher Oakley & Ryan Huschka
12                         Asst US Attorneys
                           360 US Courthouse
13                         500 State Avenue
                           Kansas City, KS  66101
14
    For the Defendant:     Che Ramsey & David Magariel
15                         Asst Federal Public Defenders
                           201 US Courthouse
16                         500 State Avenue
                           Kansas City, KS  66101
17
    Court Reporter:        Nancy Moroney Wiss, CSR, RMR, FCRR
18                         Official Court Reporter
                           558 US Courthouse
19                         500 State Avenue
                           Kansas City, KS  66101
20
    Proceedings recorded by machine shorthand, transcript
21  produced by computer-aided transcription.

22

23

24

25

1                          I N D E X

2

3

4
     Defendant's Witnesses:                              Page
5
     ALAN ACKER
6      DIRECT EXAMINATION BY MS. RAMSEY                   790

7    HARRY WILKINS
       DIRECT EXAMINATION BY MR. MAGARIEL                 806
8
     DARYL CALLAHAN
9      DIRECT EXAMINATION BY MR. MAGARIEL                 823
       CROSS EXAMINATION BY MR. OAKLEY                    845
10
     LOUIS GIRON
11     DIRECT EXAMINATION BY MS. RAMSEY                   850

12   REBEKAH BRANSON
       DIRECT EXAMINATION BY MS. RAMSEY                   864
13

14                     E X H I B I T S

15

16
     Defendant's
17     Exhibits              Offered            Received

18       807                   791                791
         810                   816                816
19       822                   855                855
         832                   809                809
20       833                   820                820
         835                   828                828
21       836                   837                837

22

23

24

25

1        THE COURT:  All right.  You all don't have anything to

2   take up this morning before we bring in the jury?

3        MS. RAMSEY:  Your Honor, I don't have anything

4   specific.  I just would like to give the court an update.  I

5   tried to move some witnesses up.  I think we've got five today,

6   which means I think we'll end probably really early.

7        THE COURT:  Like mid-afternoon?

8        MS. RAMSEY:  No, possibly before lunch, and it's only

9   when we originally thought how long the government was going to

10  go, we thought it would go into Monday, so I originally set up

11  half of my witnesses for that afternoon.  I was only able to

12  move up one from another day, so I do apologize, but I just

13  wanted the court to know.

14       THE COURT:  And then how are you situated tomorrow?

15  Do you think you'll do the whole day tomorrow?

16       MS. RAMSEY:  I'm going to try.  We've got six set for

17  tomorrow, and then as far as I know, three on Wednesday.  I may

18  try and see after we're done today if I can move some more

19  witnesses on to Tuesday.

20       THE COURT:  Okay.  Is your expert witness testifying

21  today?

22       MS. RAMSEY:  No, so that's why we're going into

23  Wednesday.  I can't get her on, and she can't get here until

24  tomorrow, and so that's why I can't get her on until Wednesday.

25       THE COURT:  Okay.  So I'll -- well, we'll see how far

1    we get, but I'll explain to the jury that everything has gone

2    faster including the government's case, and so we're still on

3    track, but we'll just -- we'll use what time we can today, and

4    then this afternoon, I'll have you do an informal instruction

5    conference with Miss Merklen.  And then I would think you

6    should discuss with her, I mean, any proposed language from the

7    government on the winnowing down the indictment the government

8    has any ideas about that would be helpful.  Similarly, if the

9    defendant has any ideas about that.  I put the whole thing in

10   the instructions understanding that there might be an

11   objection, but we want to hear from you all on what you think

12   would be a good -- a good solution to this, how much of it

13   should be -- should be included.  All right.  We ready?

14           MR. HUSCHKA:  Yes, Your Honor.

15           MS. RAMSEY:  Yes, Your Honor.

16           THE COURT:  Okay.  Did she all ready -- did she go get

17   them?  Oh, okay.  We have moved them to a really large room

18   upstairs, so it's going to take longer to get them up and down.

19   It's on the sixth floor.  Unless they're all ready out there, I

20   don't know.  So it's going to cause us to slow down a little

21   bit on breaks.

22           MS. WIEST:  Are we ready for the jury?  It's going to

23   take a bit.

24           THE COURT:  Yes.  Yeah, I just explained.  I think

25   we're going to spread them out some over here, too.

1          (Jury entered courtroom.)

2          THE COURT:  All right.  Miss Ramsey, you can call your

3    first witness.

4          MS. RAMSEY:  Thank you, Your Honor.  The defense calls

5    Alan Acker.

6          MS. WIEST:  Please raise your right hand.

7          (Witness sworn.)

8          THE WITNESS:  Yes.

9          MS. WIEST:  Thank you.  You may have a seat.

10                        ALAN ACKER,

11   Called as a witness on behalf of the defendant, having been

12   first duly sworn, testified as follows:

13                      DIRECT EXAMINATION

14   BY MS. RAMSEY:

15   Q.  Good morning, Mr. Acker.

16   A.  Morning.

17   Q.  Would you please state and spell your name for the record?

18   A.  Alan Acker.  A L A N.  A C K E R.

19   Q.  Okay.  I'm going to ask you to pull that microphone a

20   little bit closer to you.  Yeah, that seat doesn't move.  There

21   you go.  All right.  And what city and state do you live in?

22   A.  Fremont, Nebraska.

23   Q.  Okay.  I want to first talk to you about your service in

24   the military.  Did you serve in the military?

25   A.  Yes.

1    Q.   Okay.  And what branch?

2    A.   Army Reserve.

3    Q.   Okay.  And how long were you in the military?

4    A.   '99 to 2004, I think.

5    Q.   Okay.  In total?  Did you go back and forth, or was that in

6    total time you spent there?

7    A.   It was all straight through.

8    Q.   Okay.  All right.  I want to talk to you about Mr. Bruce

9    Hay.  Do you know Bruce Hay?

10   A.   Yes.

11   Q.   Okay.  I'm going to show you what's been marked as

12   Defendant's Exhibit 807.  And is Defendant's 807, do you

13   recognize that as a photo of Bruce Hay as he would have

14   appeared in the military at that time?

15   A.   Yes.

16   Q.   Okay.

17          MS. RAMSEY:  Your Honor, I move to admit Defendant's

18   Exhibit 807.

19          THE COURT:  Any objection?

20          MR. OAKLEY:  No, Your Honor.

21          THE COURT:  Exhibit 807 will be admitted.

22   BY MS. RAMSEY:

23   Q.   How do you know Bruce?

24   A.   Umm, we served in the same squad in Iraq.

25   Q.   Okay.  And what squad was that?

1  A.   See, it was the 29th, transportation company, first

2  platoon, second squad.

3  Q.   Okay.  Where did you first meet?

4  A.   Umm, would have been right after I got activated, and we --

5  it was at their reserve center.  I can't remember the town.

6  Q.   Okay.  So I know you served in Iraq, and I'll get to that.

7  Did you first meet when you were training on base at Fort

8  Riley?

9  A.   No, at the reserve center.

10  Q.   Oh, at the reserve center.  And where is that?

11  A.   I'm not sure of the town.  I want to say Olathe.

12  Q.   Okay.  And what were you doing at the reserve center?

13  A.   They pulled us in for annual training, and we were there

14  three weeks or so before we went to Fort Riley, and then we did

15  all that same stuff again.

16  Q.   Okay.  And I'm sorry, I interrupted you.  I'm sorry,

17  Bonnie, will you switch over to our table?

18       MS. WIEST:  Right.

19  BY MS. RAMSEY:

20  Q.   And I move to -- thank you -- publish Exhibit 807.  All

21  right.  So you spent three weeks also at Fort Riley, and so

22  that was training before you went to Iraq; is that correct?

23  A.   Well, we were in Fort Riley from -- from February to April;

24  February to April, we were in Fort Riley.

25  Q.   And that was in 2003?

1  A.  Yes.

2  Q.  Okay.  And what was Bruce's rank, and what was your rank?

3  A.  Bruce was a sergeant, and I was a specialist.

4  Q.  Okay.

5  A.  And I was in some type of an officer candidate program at

6  the time.

7  Q.  Okay.  And for me, 'cause I don't know, is a sergeant rank

8  higher than a specialist?

9  A.  Yes.

10  Q.  Okay.  When were -- were you and both Bruce both deployed

11  to Iraq?

12  A.  Yes.

13  Q.  And when was that?

14  A.  We deployed in April 2003.

15  Q.  Okay.

16  A.  And the unit came back in May of 2004.

17  Q.  Okay.  And where were you stationed in Iraq?

18  A.  Umm, it was a -- there was -- a post was called Air John

19  air base, but we were in a satellite camp outside of that

20  called Darkville.

21  Q.  What were your -- for lack of a better word -- duties, or

22  what was your title while you were serving in Iraq?

23  A.  We would -- we drove the tank transporters.  We'd move

24  heavy equipment, just anything with wheels and tracks.

25  Q.  Okay.  Summarily, were you driving a truck on missions?

1   A.   Yes.

2   Q.   Okay.  Can you tell me what a mission consisted of?

3   A.   Umm, there were staging areas for units coming into the

4   country, and we would pick up the equipment for those units,

5   and then we'd move it forward to their operating base, and that

6   would usually take five days.

7   Q.   Okay.  So you were charged -- and was Bruce -- that was his

8   same -- were those his same duties as well?

9   A.   Yes.

10   Q.   Okay.  And so you were charged with using a truck to move

11   equipment.  Did you -- do you sometimes move troops or other

12   people from one area to another?

13   A.   No.

14   Q.   Okay.

15   A.   Just equipment.

16   Q.   Just equipment.  Okay.  And so can you describe to me on

17   these missions what type of, you know, terrain are you going

18   over?

19   A.   Umm, a lot of it is, you know, just looks like an

20   interstate, and then sometimes, it's barely a dirt road.

21   Q.   Okay.  And can you describe to me, what did the truck that

22   you and Bruce were driving, what did that look like?

23   A.   Umm, it's the largest truck the military has currently.

24   It's 13 feet wide and 13 feet tall.

25   Q.   Okay.  And were these trucks equipped to take under or be

1   exposed to gun fire in any way, or were they protected from

2   that?

3   A.   No.

4   Q.   Okay.  Approximately how many missions would you say that

5   you and Bruce went on during your time there in Iraq?

6   A.   I couldn't even begin to say.

7   Q.   Too many to recall?

8   A.   Yeah, it was usually one a week.

9   Q.   And you said the missions took approximately five days to

10  get from one location to the other?

11  A.   Yes, then after we get back, usually, we'd have two days to

12  get the trucks ready for the next run.

13  Q.   Okay.  So in my mind, I'm thinking of when being in Iraq,

14  that there is hot sand.  Can you tell me, is that correct,

15  and -- and a correct description of kind of what the

16  environment was like?

17  A.   Well, it's -- you know, it's just a -- it's not really a

18  desert like, you know, you think.  It's just dirt.

19  Q.   Okay.

20  A.   You know, it's tan dirt.

21  Q.   Okay.  And were you and Bruce required to wear uniforms?

22  Can you describe to me what you were required to wear?

23  A.   Just desert camouflage.  The vest that when we first got

24  there, it was pretty flimsy, and then we got upgraded to the

25  infiltrator, or infiltrator vest, and that had plates

1   integrated into it that was supposed to stop bullets.

2   Q.   Okay.  You said at first when you got there, they were

3   pretty flimsy, so you did not have the kind of protective gear

4   that you thought you needed.

5   A.   Yeah, the first thing I think was an M 85 vest, and it was

6   basically a little better than what they had in Vietnam.

7   Q.   Okay.  Did you and Bruce -- when you're on these missions,

8   did you and Bruce, were you armed with a weapon, and what kind?

9   A.   We both had M 16 A 2.

10   Q.   The missions that you went on with you and Bruce, were

11   these dangerous -- dangerous missions?

12   A.   Yes.

13   Q.   Okay.  What made them dangerous?

14   A.   The first and the last day, we went -- the areas were

15   pacified to an extent, but everything in the middle was -- the

16   second, third and fourth day was -- things got a little lively,

17   around Baghdad and Fallujah.

18   Q.   Okay.  What do you mean by lively?

19   A.   Exciting.

20   Q.   Were you ever -- during these missions, were you ever under

21   the threat of what I think you would call an IED?

22   A.   Oh, yes.

23   Q.   Okay.  Can you explain to the jury what an IED is?

24   A.   It's usually some type of an explosive device that's been

25   made to go off on command.  So with early ones, were just an

1    artillery shell, and they put a blasting cap in it with wires

2    going off, and then some guy would sit on the berm and wait for

3    you to go by, and then he'd just have a nine-volt battery and

4    get ya.

5    Q.   Okay.  And so it's an improvised explosive device.  Were

6    these often hidden in the road or ground, or in the terrain in

7    which your truck was required to maneuver around?

8    A.   Yes.

9    Q.   Okay.

10    A.   Yes.

11    Q.   And is that why there was that constant threat?

12    A.   Yes.

13    Q.   Did you or Bruce ever -- well, did you and Bruce, 'cause

14    I'm assuming -- maybe I should be clear.  Were you and Bruce

15    going on these missions together?

16    A.   While he was there, yes.

17    Q.   Okay.  And did you -- were there just two of you in the

18    missions or the truck?

19    A.   Yes.

20    Q.   Okay.  During your missions, did you and Bruce ever see a

21    truck or anything else being blown up by hitting an IED?

22    A.   Umm, for us, it was usually the aftermath.

23    Q.   Okay.

24    A.   There was an incident where we were the next group to go

25    through, and there was an IED that was spotted ahead of time,

1  so we were told to stop, and of course, nobody bothered to tell

2  us what was happening, and the -- they were trying --

3  the explosive guys were there trying to deal with it, and they

4  called in a couple Apache helicopters, and they found the

5  triggerman, and they dealt with him.

6  Q.  Okay.  So you and Bruce saw the aftermath of one of the

7  IED's which had gone off?

8  A.  Well, you see the aftermath all the time.

9  Q.  Okay.

10  A.  You know, craters everywhere.

11  Q.  When you say aftermath all the time and craters everywhere,

12  what other aftermath?

13  A.  Destroyed vehicles.

14  Q.  Okay.

15  A.  It was -- sometimes, we had to haul those vehicles back

16  that were knocked out, and sometimes they would still have

17  blood on the floor.

18  Q.  During your time on these missions, were you and Bruce ever

19  under the threat of gun fire?

20  A.  On our first mission, we were attacked by a small arms fire

21  coming out of -- it was the third day, and we were coming out

22  of a post called Anaconda, and just leaving there, the whole

23  convoy had come up to a highway, and another convoy of hamuts

24  (ph) was coming through, and they were making a left-hand turn

25  in front of us, and the insurgent was in a building off to our

1   left, and he was firing at them, and it was going towards --

2   through us, and the guys on the hamuts (ph), we couldn't fire

3   back because of the friendlies that were between us and them.

4   Q.   Okay.  But there was gun fire going on around you?

5   A.   Yes.

6   Q.   Okay.  I know that you said that -- that you've seen kind

7   of the results of the IED.  I'm assuming in general, though,

8   you saw the result of kind of the carnage of war, and witnessed

9   -- did you witness any other deaths during your time there?

10  A.   Yes.

11  Q.   And so I think, would you describe feeling like you were

12  under the threat of eminent death during your time while you're

13  in Iraq?

14  A.   Well, you know, at first, umm, I think kind of solace with

15  the numbers, everyday, somebody would be killed, I don't know

16  how many would be wounded, and you know, you look, there's, you

17  know, say 200,000 people, that's pretty good odds, but then you

18  realize that it's not one out of 200,000.  It's, you know, you

19  on that road.  That's where it's going to happen.  It's not

20  going to happen to everybody.  It's going to happen to somebody

21  on that road you are on.  So it's more like, you know, one in

22  100, one in 50.  I was really -- I was -- I knew I wouldn't

23  make it home, and made my peace, and I was like, there's no way

24  to get out of this.

25  Q.   Umm, so when you and Bruce were not on missions, can you

1    tell me kind of what your holding, or I'm probably going to use

2    the wrong word.  But it comes to my mind is like barracks, what

3    the holding place or the place where you stayed between

4    missions was like?

5    A.   Umm, it was a locally procured tent.  It leaked when it

6    rained, and it was hot.

7    Q.   And was it in a confined sort of base area where other

8    troops were also?  Is that --

9    A.   Yes.

10   Q.   Okay.  Okay.  But it was in a -- in a tent.  Is that what

11   you're saying.

12   A.   Yes.

13   Q.   Okay.  And in that area, was there a specific area in Iraq

14   that -- that those kind of holding stations where you would

15   sleep over night, where that was?

16   A.   When we were on the road, we would stay with the truck.  So

17   when it was really hot, we'd sleep on the roof, and -- but

18   later, I'd make up a little lean-to, and I'd get a cot, and

19   make me a little shelter on the side of the truck.

20   Q.   Okay.  And maybe I need to be clearer.  So there are times

21   on your missions where you would not make it back to the

22   holding place, and so you'd have to sleep kind of out in the

23   open.

24   A.   Yeah.

25   Q.   With the truck; is that correct?

1    A.   Yes.

2    Q.   Okay.  And was that dangerous, and why?

3    A.   Umm, well, this one particular day, umm, it was -- we were

4    at a -- what was called a Navstar, and the place that the

5    officer had us set up for the night, which was strange because

6    we didn't usually stay at Navstar, they didn't have a protected

7    area, and so we were just out in the middle of nowhere, and

8    umm, I slept outside like I usually do, and I had an experience

9    that I heard called sleep paralysis, and basically, I -- I was

10   awake, but I couldn't move, so I was -- I was worried.

11   Q.   I want to go back to the -- so how often in these missions,

12   which sounds like would take maybe an average of five days,

13   would you say that you and Bruce had to kind of sleep out in

14   the open with the truck?

15   A.   Most the time, we would have a -- we'd be inside of a

16   protected area, but we would still stay with the truck.

17   Q.   Okay.  I want to talk to you about -- well, how would you

18   describe you and Bruce's relationship?  Were you close?

19   A.   I would say so.

20   Q.   Okay.  Are you still close in relationship?

21   A.   Yeah, we still talk on the phone sometimes.  We've been

22   down to visit him.  They've come down to visit us.

23   Q.   Okay.

24   A.   And I don't have any other friends from military that I

25   have any kind of contact with except him.

1   Q.   Okay.  Ultimately, did Bruce leave Iraq before you did?

2   A.   Yes.

3   Q.   Okay.  You remember how much longer he left before you did?

4   A.   I'm not sure.  I would say -- I'd went on a mission, I come

5   back and he was gone.

6   Q.   Okay.  And then let's talk about -- you started to talk

7   about this, but kind of the contact you've had with Bruce when

8   you came back from the Army.  So do you remember when you came

9   back, and did you come back to Kansas when you came back from

10  the Army?

11  A.   Yes.  We were there for about a week, and then we went back

12  to our regular reserve units.

13  Q.   Okay.  So you said you and Bruce were close, and you stayed

14  in touch after the Army, that you talked on the phone, that

15  he's been up to see you, you've been up to see him.  Can you

16  describe to me what kind of changes you saw in Bruce after he

17  came back from Iraq?

18  A.   Well, he definitely had PTSD.  There was no doubt about

19  that.  And I would notice he would get these tremors

20  occasionally, you know, 'cause the untrained eye, it looked

21  like -- like a Parkinson's tremor is what it looked like.

22  Q.   Umm, let's talk a bit about that.  When -- let's talk about

23  when you've seen Bruce.  How often would you say when you came

24  back from Iraq, you have like actual physical contact with

25  Bruce, can you remember?

1    A.   He went to Omaha once, I believe, and we went down there to

2    see them at least three times, maybe four.

3    Q.   Okay.  So sounds like approximately five?

4    A.   Yeah.

5    Q.   Five, six times.  Okay.  And when Bruce has come to see

6    you, was he by himself, or was he with his family?

7    A.   He was with his whole family.

8    Q.   Okay.  And so he drove from Kansas to Nebraska?

9    A.   Yes.

10   Q.   Okay.  And did his wife Lori do that driving?

11   A.   I don't know.  I think she did, yeah.  Yeah, she drove.

12   Q.   Okay.  During these five to six times that you have had

13   some contact with Bruce since you got -- have got back from the

14   war, you said you noticed the tremors; is that correct?

15   A.   Yes.

16   Q.   Okay.  Can you describe to me more specifically what

17   you've -- what you've seen those tremors look like, what

18   happens to -- is there a part of his body, how long have you

19   seen them last?

20   A.   I -- like I say, it just looks like a Parkinson's shake.

21   Q.   Okay.

22   A.   And it just does that for a while, and then, people out of

23   Omaha, you see a lot of people with Parkinson's, it's really

24   bad in Omaha.  They're kind of the world leader in Parkinson's

25   disease.

1    Q.   Okay.  Do you -- in your interaction, do you know how long

2    it lasts, or is it constant?

3    A.   No, I think he has to do something with his hand to stop

4    it.  He seems to be self-conscious about it.

5    Q.   You said he seems to be subconscious -- self-conscious

6    about what happens?

7    A.   Yeah.

8    Q.   Have you noticed in your interaction with Bruce on these

9    times that anything in particular is happening that seems like

10   it might be triggering?

11   A.   Well, usually, just, you know, sitting there talking.

12   Q.   Since you've seen Bruce after the war, does he use any

13   assisting aids to walk?

14   A.   I've seen him use a cane.

15   Q.   Okay.  And is it every time you've had an interaction with

16   him, does he have his cane with him?

17   A.   I think he just needs -- uses it when it's needed.

18   Q.   Okay.  And you -- after you came back from the war, did you

19   have residual effects from the kind of carnage and trauma that

20   you saw there?

21   A.   Me personally?

22   Q.   Yes.

23   A.   Definitely.

24   Q.   And what were those, if you don't mind talking about 'em?

25   A.   If it helps Bruce, umm, I get little quirks.  I had a thing

1    where I would -- when I got in a stressful situation overseas,

2    I would flip my safety off -- on and off, and then when I got

3    real bad, it would go to semi to full auto, and kind of a

4    thing.  So sometimes my hand hits it, gets that back, sometimes

5    I gets tics in my face.

6    Q.  When was the last time that you had contact with Bruce, if

7    you can remember?

8    A.  Umm, was at his 50th birthday party, oh, probably three

9    years ago.

10   Q.  And did you see the tremors at that time?

11   A.  Yes.

12   Q.  And did he have a cane?

13   A.  Yes.

14   Q.  I have no further questions.  Thank you.

15          MR. OAKLEY:  Mr. Acker, thank you for your service.

16   Your Honor, I have no questions.

17          THE COURT:  All right.  Thank you.  You're excused.

18   Our next witness?

19          MR. MAGARIEL:  Your Honor, we call Harry Wilkins.

20          MS. WIEST:  Good morning.  If you could raise your

21   right hand for me, please.

22   (Witness sworn.)

23          THE WITNESS:  I do.

24          MS. WIEST:  Thank you.  You may have a seat.

25                    HARRY WILKINS,

1   Called as a witness on behalf of the defendant, having been

2   first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4   BY MR. MAGARIEL:

5   Q.   Good morning, sir.

6   A.   Good morning.

7   Q.   Would you please introduce yourself to the jury, and spell

8   your name, first and last, if you would?

9   A.   Yes.  Good morning.  My name is Doctor Harry Wilkins, H A R

10  R Y.  Last name is Wilkins.  W I L K I N S.  I am a currently

11  the CEO of Gift of Hope Organ and Tissue Network out of

12  Chicago, and I was a trauma surgeon for 36 years, practicing in

13  multiple states, one which was Kansas, Missouri, Texas, New

14  York, and Maryland.

15  Q.   Thank you, Doctor Wilkins.  You've all ready taken a few of

16  my initial questions, but let me focus on your time that you

17  were here in Kansas.  I believe you all ready said you were a

18  trauma surgeon.  That's your specialization; is that right?

19  A.   Correct.

20  Q.   And do you have any particular training as a trauma

21  surgeon?

22  A.   Yes.

23  Q.   Can you tell the jury what that was?

24  A.   After my general surgery residency, I did a fellowship in

25  trauma and surgical critical care at Maryland Institute For

1    Emergency Medical Services system in Baltimore from 1993 to

2    1994.  It was a one year fellowship resulting in certification

3    in trauma and surgical critical care.

4    Q.  Okay.  And so as I understand it, you practiced actively as

5    a trauma surgeon for approximately 25 years?

6    A.  I try not to do math in public, but I believe that's

7    correct.

8    Q.  Okay.  Thank you.  You said you practiced here in the

9    Kansas City area at some point during your career; is that

10   right?

11   A.  Yes.

12   Q.  Where were you working out of during that time?

13   A.  There was a time when I was the trauma medical director at

14   Overland Park Regional Medical Center from approximately 2000

15   to -- 2000 -- I believe it was 1999 to 2002, and then at St.

16   Luke's Medical Center in Kansas City, Missouri from 2005 to

17   2010.

18   Q.  When you were at St. Luke's, what were your particular

19   roles there?

20   A.  I was an attending trauma surgeon there in St. Luke's,

21   surgical specialist, and I practiced as a trauma attending

22   there.

23   Q.  So just generally, can you summarize the type of work you

24   were doing when you were there at St. Luke's?

25   A.  The critical practice I was involved in basically involved

1    taking care of patients who were injured in emergency fashion,

2    so -- and also in emergency surgical conditions.  So anyone --

3    most of my patients would come through the emergency

4    department.  I also maintained a practice where I had some

5    general surgery, and I would see patients in the clinic in

6    follow-up after surgical procedures, or if they were referred

7    to me.

8    Q.  So it sounds like the first time that a patient would be --

9    have been likely to see you might have been in the emergency

10   room; is that right?

11   A.  Yes.

12   Q.  But you also had I think as you said sort of a follow-up

13   practice.  Was that through a clinic at St. Luke's?

14   A.  Yes.

15   Q.  And what was that clinic called?

16   A.  I believe it was St. Luke's Surgical Specialists.

17   Q.  So if there's someone you had seen in the emergency room

18   that needed some additional care, that might come through the

19   clinic?

20   A.  Correct.

21   Q.  And is this -- were you in that role in 2005?

22   A.  Yes.

23   Q.  Was it common in your practice for you to take notes on

24   office consultations?

25   A.  Yes.

1          MR. MAGARIEL:  May I approach, Your Honor?

2          THE COURT:  Yes.

3   BY MR. MAGARIEL:

4   Q.  Doctor, I'm handing you what's been marked Defendant's 832.

5   Could you just look at that for a moment please?  Did you get a

6   chance to look at that, Doctor?

7   A.  Yes.

8   Q.  Is that an example of notes you might have taken on an

9   office consultation?

10  A.  Yes.

11  Q.  And does it have an electronic signature of your name at

12  the bottom of that document?

13  A.  I don't see an electronic signature here.

14  Q.  Does it reflect your name at least?

15  A.  Yes, it does.

16  Q.  And is that how documents were saved in whatever note

17  taking system you had back in 2005?

18  A.  Yes.

19          MR. MAGARIEL:  Move to admit Defendant's 832.

20          MR. HUSCHKA:  No objection.

21          THE COURT:  832 admitted.

22          MR. MAGARIEL:  Thank you, Judge.

23  BY MR. MAGARIEL:

24  Q.  Doctor, I want to ask you a few questions about this

25  particular document, and so it should be on the screen there in

1    front of you, or on that paper, although I think the copy I

2    gave you got turned the wrong way.  So whatever way is easier

3    for you to read, please reference that one.

4    A.   Thank you.

5    Q.   Is this note dated March 25th of 2005?

6    A.   Yes.

7    Q.   And then just to orient everything that's in there, there's

8    kind of a large block of text at the top, and then your -- I

9    call it electronic signature, but at least has your name there

10   at the bottom of that block of text; is that right?

11   A.   Correct.

12   Q.   And then I see some handwriting there.  Is that your

13   handwriting?

14   A.   No.

15   Q.   Okay.

16   A.   Below that's not my handwriting.

17   Q.   That's somebody else?

18   A.   Correct.

19   Q.   Okay.  I just want to talk to you about that block of text

20   that's associated with you.  Is this sort of, at least

21   initially, the background of the situation that you're dealing

22   with, at least the first few sentences of that paragraph?

23   A.   I'm sorry, you'll have to clarify for me.

24   Q.   Sure.  So I'm just kind of trying to go through that

25   paragraph in pieces.  So the first piece seems to say, this is

1  what I'm doing, this is the background of the situation that

2  I'm dealing with.  Is that generally right?

3  A.  Yes.

4  Q.  Okay.  And this note -- and I don't think I said this yet

5  -- is in reference to Bruce Hay; is that correct?

6  A.  Yes.

7  Q.  And so as I understand it, from your notes, Mr. Hay was in

8  a car accident February 25th of 2005?

9  A.  Correct.

10  Q.  And this is 17 years ago.  Do you have an independent

11  memory of this?

12  A.  I do not.

13  Q.  So we're helping you by giving you some of your notes that

14  you would have taken at the time; is that correct?

15  A.  Yes.

16  Q.  And as your notes seem to reflect, Mr. Hay had been seen at

17  multiple different hospitals; is that correct?

18  A.  Umm, this looks as though he was seen at several -- it says

19  several times at other facilities.

20  Q.  All right.

21  A.  So I would say yes.

22  Q.  I want to talk to you a little bit about some of the things

23  that you note in this particular document.  One thing, and if

24  I'm reading this correctly, is this a case like you've all

25  ready described where you may have seen Mr. Hay in the

1    emergency room, but then this note is actually a follow-up

2    through your clinic?

3    A.   That's two parts.  So to the first, no, but to the second,

4    yes.

5    Q.   Okay.  So you don't think you were the doctor that would

6    have seen Mr. Hay in the emergency room?

7    A.   I was not.

8    Q.   But in your clinic, you're able to follow up with folks

9    that were seen in the emergency room even if you weren't the

10   doctor that saw them there?

11   A.   Correct.

12   Q.   So one thing that is noted on your notes I think is that

13   Mr. Hay had severe ataxia, A T A X I A; is that right?

14   A.   Yes.

15   Q.   Can you explain to the jury what severe ataxia relates to?

16   A.   It can relate to a number of things.  What ataxia is, is

17   just a very unsteady gait or uncoordinated gait that's very

18   abnormal; basically, inability to find your extremities in

19   space is someone who would be ataxic is what -- that's the best

20   explanation I can give for that.

21   Q.   Okay.  And do I also see in that record that Mr. Hay had

22   gotten an MRI at some point, but there was no finding to sort

23   of back up that ataxia?

24   A.   Correct.

25   Q.   Is that common?

1  A.  I wouldn't be able to comment on how common or uncommon it

2  is.  It is not uncommon.  I wouldn't able to give you

3  statistics in terms of how common it is.  But for it to have no

4  imaging findings, but then to have a physical finding, that is

5  not uncommon.

6  Q.  You've seen that in other instances in your practice?

7  A.  Yes.

8  Q.  There's also a mention -- I think this is a little bit

9  further down in that paragraph -- of an intention tremor?

10  A.  Correct.

11  Q.  Can you explain what an intention tremor is please?

12  A.  So the intention tremor means that if you're trying to

13  perform a task, then you will have a tremor of the extremity,

14  whereas if you're resting, that may not be there.

15  Q.  And what is the relevance or importance; why did you note

16  an intention tremor in that paragraph?

17  A.  It's an abnormal physical finding, and when you're doing

18  your physical assessment, one of the things you do is, you can

19  ask someone to perform a task.  Typically, we call it a finger

20  to nose with their eyes closed.  And so in this case, if you

21  close your eyes and try to touch your nose, as you get closer

22  to your nose, your extremity tremors, and so the intention is

23  to try and touch your nose, and the closer you get to that,

24  the -- there's a tremor associated with that, and that is an

25  abnormal physical finding that's called an intention tremor.

1    Q.   And when you would see something like that, what is that

2    telling you in that particular situation?

3    A.   That it's an abnormality in the spinal reflex arm, some

4    sort of neurologic disorder.

5    Q.   Is that the reason -- I think I see in your note that you

6    want to refer Mr. Hay on to a neurologist?

7    A.   Correct.

8    Q.   And you mentioned that you did some physical tests in this

9    case.  Are these to try to help you identify what the

10   particular problem may be so you can make that appropriate

11   referral?

12   A.   Correct.

13   Q.   And so I'm sure with other things that you saw, but was the

14   intention tremor relevant to your decision to refer this

15   particular case on to a neurologist?

16   A.   Yes.

17   Q.   Is an intention tremor something that is difficult to fake?

18   A.   I would believe it's difficult to fake.

19   Q.   Why would you say that?

20   A.   Oftentimes, when you perform that exam, the individual

21   isn't really knowing exactly what it is that you're testing

22   for, and so you check to see if there's the ability to

23   replicate it.  So I wouldn't say it's impossible, but I believe

24   it's pretty difficult, simply because they're not aware that's

25   exactly what it is you're testing.

1   Q.   So I think as you explained to our jury, that you don't say

2   to them, I want to see if you have a tremor.  You give them a

3   task to do; is that right?

4   A.   That is correct.

5   Q.   And so I don't know if your notes say if this is the task

6   you gave them, but it sounds like often, the task is touch a

7   finger to your nose task?

8   A.   Often.

9   Q.   We can take that exhibit down.

10          MR. MAGARIEL:  May I approach, Your Honor?

11          THE COURT:  Yes.

12   BY MR. MAGARIEL:

13   Q.   Doctor, I'm handing you what's been marked as Defendant's

14   Exhibit 810.  Did you get a chance to look at that, Doctor?

15   A.   I did.

16   Q.   Is that a letter that you would have written back on

17   March 25th of 2005?

18   A.   Yes.

19   Q.   And I messed this up once.  I'll try that again.  Does it

20   have your actual signature on this document?

21   A.   Yes.

22   Q.   And is it on the heading of the group that you were

23   associated there at St. Luke's?

24   A.   Yes.

25          MR. MAGARIEL:  Move to admit Defendant's 810.

1          MR. HUSCHKA:  No objection.

2          THE COURT:  810 is admitted and can be published.

3          MR. MAGARIEL:  Thank you, Judge.

4     BY MR. MAGARIEL:

5     Q.  Doctor, I'm going to ask you a few questions about this

6     letter.  So you've all ready introduced it generally.  It's a

7     letter from March 25th, 2005, and am I correct that it relates

8     to Bruce Hay?

9     A.  Yes.

10    Q.  And I see you've addressed this to a Captain Divine.  Do

11    you know who that is?

12    A.  I do not.

13    Q.  You assumed you were asked to write the letter to Captain

14    Divine for some purpose?

15    A.  Yes.

16    Q.  And so as I see this letter, it looks like this is sort of

17    a summary of the visit that you had that were -- that was

18    memorialized in those notes that we just went over; is that

19    correct?

20    A.  Yes.

21    Q.  And I think date is even the same.  Both are March 25th; is

22    that right?

23    A.  I'm thinking.  I don't recall.

24    Q.  That's okay.  And I all ready took the exhibit from you, so

25    that's okay.  So at least close in time?

1    A.   Yes, March.

2    Q.   And you note here in the report that you had seen Mr. Hay

3    in your clinic, and that he had a significant muscle spasm; is

4    that correct?

5    A.   Yes.

6    Q.   And you note there that you believe there is a neurologic

7    problem?

8    A.   Yes.

9    Q.   And I think you mentioned here in the letter what you had

10   all ready reflected on that last exhibit, that you wanted to

11   refer him on to a neurologist?

12   A.   Yes.

13   Q.   Can you explain why referring someone with the conditions

14   that you had seen to a neurologist is important, and why you

15   made the referral in your notes, and are mentioning it in this

16   letter?

17   A.   Clarify that one more time, please.

18   Q.   Well, you've all ready said some things that you saw that

19   you thought were related to a neurological condition; is that

20   correct?

21   A.   Correct.

22   Q.   And so -- and maybe this is just too obvious, but what can

23   a neurologist do that maybe you can't do?  You've explained

24   your specialties.  You're a trauma surgeon?

25   A.   Yes.

1   Q.   Why do you refer this on to a neurologist?

2   A.   Oh, yes.  My -- my specialty is trauma and surgical

3   critical care, and so it gives me a certain purview, almost if

4   you were going to have a generalist, like a family practitioner

5   who was having difficulty managing your blood pressure, and

6   then got to be too difficult, they may refer you to someone who

7   specializes in that, or kidney disease, similarly.  I have --

8   my training covers a general view of neurologic injuries, the

9   initial treatment and management of those, and then if it gets

10  to become more specific, then I would want them to see a

11  specialist that deals with those particular injuries, and Mr.

12  Hay, according to these notes, fell into that category of

13  requiring a specialist.

14  Q.   And we talked a little bit about your specialty and your

15  fellowship, and I think you've all ready said this a little

16  bit.  You have some training in neurologic conditions as are

17  relevant to being a trauma surgeon?

18  A.   Correct.

19  Q.   And so you need to at least have that base of knowledge so

20  that you can make an appropriate referral on to a specialist;

21  is that right?

22  A.   Correct.

23  Q.   Going back to that letter there, Exhibit 810, you've also

24  mentioned that you're going to be referring Mr. Hay to

25  out-patient rehabilitation therapy; is that correct?

1   A.   Correct.

2   Q.   And what's the reason for that referral?

3   A.   When someone's been injured in a car crash such as this,

4   oftentimes, physical therapy is good to help with some of the

5   soft tissue injuries; in other words; the things that aren't

6   broken bones or something along those natures.  The physical

7   therapist can be very -- and rehab can be very good in terms of

8   getting them back to their former functioning.

9   Q.   And this letter concludes with you saying you don't

10  anticipate him, which I assume being Mr. Hay, to be able to

11  perform active duty; is that right?

12  A.   Correct.

13  Q.   Fair to assume that this letter is addressed again to

14  someone in the military about Mr. Hay's role in the military?

15  A.   Yes.

16          MR. MAGARIEL:  May I approach, Your Honor?

17          THE COURT:  Yes.

18  BY MR. MAGARIEL:

19  Q.   Doctor, I'm handing you what's now been marked as

20  Defendant's 833.  If you could look at that for a moment,

21  please.  Did you get a chance to look at that?

22  A.   Yes.

23  Q.   Is that another letter from you dated June 24, 2005?

24  A.   Yes.

25  Q.   And again, similar to the last letter, does it have your

1    signature on it?

2    A.   Yes.

3    Q.   And is again similar to that last letter; does it reflect

4    that it's from the St. Luke's medical group that you were

5    associated with in 2005?

6    A.   Yes.

7         MR. MAGARIEL:  Move to admit 833.

8         MR. HUSCHKA:  No objection.

9         THE COURT:  833 is admitted and you can publish.

10        MR. MAGARIEL:  Thank you.

11   BY MR. MAGARIEL:

12   Q.   And so Doctor, you had talked a little bit, I believe, when

13   we were discussing the last exhibit, about rehabilitation.  Is

14   this letter sort of on that topic?

15   A.   Yes.

16   Q.   And particularly, this is a note to the Miami County

17   Medical Center Rehabilitation Services about Mr. Hay; is that

18   correct?

19   A.   Yes.

20   Q.   And does that letter reflect that Mr. Hay had done 17

21   aquatic treatments?

22   A.   Yes.

23   Q.   Is that a form of physical therapy?

24   A.   Yes.

25   Q.   And is that consistent with the recommendation that you

1    made back in that previous letter about doing some sort of

2    rehabilitation therapy?

3    A.   Yes.

4    Q.   And as I understand this letter, you recommend that Mr. Hay

5    continue in that physical therapy?

6    A.   Yes.

7    Q.   Is that partly based on, that you note in that letter some

8    improvement was seen?

9    A.   Yes.

10   Q.   I'll be careful with my common, uncommon question.  In your

11   practice, do you see people who have improvement when they do

12   various forms of rehabilitation therapy?

13   A.   Yes.

14   Q.   What is your understanding about why we see that type of

15   improvement when we do this type of therapy?

16   A.   As someone is healing from an injury, they seem to improve

17   if they're actively working on things like stretching and

18   muscle strengthening as the injury itself heals, and so we'll

19   see improvement.  That's basically what rehabilitation

20   specialists do, and so I think that's why we see that

21   improvement.

22   Q.   Is it common, or was it common back in 2005 for you to do

23   the type of work that we're seeing reflected in these documents

24   for someone who had previously been in the emergency room?

25   A.   Yes.

1    Q.  You said at the beginning that you did follow-up in your

2    clinic.  Is that the follow-up that you were talking about?

3    A.  Yes.

4    Q.  So you would meet with a patient who had been in the

5    emergency room, and it sounds like you would often do some sort

6    of physical examination of the person; is that right?

7    A.  Yes.

8    Q.  And then based on that examination and probably a review of

9    records, you would refer them on to other providers?

10   A.  Yes.

11   Q.  And potentially on to physical therapy, occupational

12   therapy, something like that?

13   A.  Yes.

14           MR. MAGARIEL:  Judge, may I have a moment?

15           THE COURT:  Yes.

16           MR. MAGARIEL:  That's all I have.  Thank you for your

17   time, Doctor.

18           THE WITNESS:  Thank you.

19           MR. HUSCHKA:  Your Honor, I have no questions for

20   Doctor Wilkins.

21           THE COURT:  All right.  Thank you.  You're excused.

22   Call your next witness.

23           MR. MAGARIEL:  Judge, we are calling Doctor Daryl

24   Callahan.

25           MS. WIEST:  Morning.  Raise your right hand for me.

1    (Witness sworn.)

2         THE WITNESS:  I do.

3         MS. WIEST:  Thanks.  You may have a seat.

4                      DARYL CALLAHAN,

5    Called as a witness on behalf of the defendant, having been

6    first duly sworn, testified as follows:

7                   DIRECT EXAMINATION

8    BY MR. MAGARIEL:

9    Q.  Good morning, sir.

10   A.  Good morning.

11   Q.  Would you please introduce yourself to the jury, and spell

12   your first and last name in that introduction, please?

13   A.  Yes, I'm Daryl Callahan, D A R Y L, C A L L A H A N.  And

14   I'm an osteopathic physician, so I have DO after my name.

15   Q.  Doctor Callahan, you just mentioned that you're a

16   physician.  Where did you go to school and get that education

17   to have that title?

18   A.  Here in Kansas City at Kansas City University.

19   Q.  And I think you've all ready mentioned your area of

20   practice.  You're a family practice doctor?

21   A.  I am.  I'm board certified in family practice.

22   Q.  And after you finished school, where did you go to practice

23   initially?

24   A.  A very rural area in Kansas called Phillipsburg, out in

25   Phillips County.  It's northwest Kansas.

1   Q.   And when were you there?  When did you start, and when did

2   you finish practicing there?

3   A.   From 1989 to 2002.

4   Q.   And there you were engaged in family practice?

5   A.   Yes, the classic cradle to grave kind of practice.

6   Q.   At some point, did you start working at Fort Riley?

7   A.   I did, in 2002.

8   Q.   And what were you doing specifically at Fort Riley starting

9   in 2002?

10  A.   Joint civil service, and I was family practice physician at

11  Irwin Army Community Hospital.

12  Q.   Can you just sort of generally describe what that practice

13  would have been like at that time?

14  A.   Umm, 2002 was before the Iraq war, so it was peace time,

15  and so it was classic family practice type of work.

16  Q.   So you're just seeing patients who are associated with the

17  Army, doing the general practice that any civilian might get

18  anywhere else; is that right?

19  A.   That's correct, and we had obstetrics there.  It was a

20  young population, so the most common procedure in the hospital

21  was a delivery.

22  Q.   Okay.  How long were you in that role?

23  A.   Umm, I moved between Fort Riley and the VA a couple of

24  times in my civil service career for promotion purposes, so I

25  was at Irwin until '06, and then moved over to a VA clinic that

1    they built in Junction City for several years, and then I went

2    back to Fort Riley as a supervisor, so what they called soldier

3    health services.

4    Q.   Would you have been at Irwin in 2005?

5    A.   I was.

6    Q.   So this was before you left to work at that VA clinic in

7    Junction City; is that right?

8    A.   That's correct.

9    Q.   And then just to complete the picture, you went to the VA

10   clinic, and then I think you returned to Fort Riley as a

11   supervisor; is that right?

12   A.   Yes.

13   Q.   Still practicing as a family practitioner?

14   A.   Yes, I was still on staff at the hospital and saw patients,

15   but less of that and more of supervising other physicians.

16   Q.   And then at some point, did you retire from that role?

17   A.   Yes, I ended up finishing out with the VA in western

18   Montana for three years.

19   Q.   And then since you've retired from those roles, are you

20   still working?

21   A.   I do.

22   Q.   What are you doing?

23   A.   Umm, independent contractor for veterans' evaluation

24   services.  It's a contractor that does the compensation pension

25   exams for veterans.

1    Q.   And do you do those today?

2    A.   I do.

3    Q.   How often do you do those?

4    A.   About once a week, and then I also work for Tele-medicine

5    Company (ph).

6    Q.   All right.  I'd like to focus your attention on the first

7    time you were at the Fort Riley primary care clinic at Irwin,

8    okay?

9    A.   Okay.

10   Q.   And am I correct that you were there approximately 2002 to

11   2006?

12   A.   Yes, sir.

13   Q.   You said at the beginning in 2002, it was peace time, and

14   that changes the nature of the practice; is that right?

15   A.   Yes, it is.

16   Q.   Were things changing in 2005?

17   A.   Yes, they were.

18   Q.   Can you explain why that is?

19   A.   You have a cycle, a battle cycle that develops in a longer

20   war, and we were two years into the Iraq conflict at that time,

21   and so brigades would come and go through the fort mobilizing,

22   and so they developed a cycle of mobilization, and depending on

23   the unit, helicopter unit might go for three months, infantry

24   unit might go for a year, a support unit might go for six

25   months, so it -- you know, different longevities of that would

1    develop, and we did a lot of soldier processing, screening

2    soldiers as they either came or went, and it became mandatory

3    to do that, of course, and try to find out who had been

4    injured, and how and whether they needed medical care.

5    Q.  I think we'll talk about some of that in a moment.

6                 MR. MAGARIEL:  Your Honor, may I approach?

7                 THE COURT:  Yes.

8    BY MR. MAGARIEL:

9    Q.  I'm handing you what's been marked as Defendant's

10   Exhibit 835.  If you could take a look at that document,

11   please.

12   A.  Okay.

13   Q.  Did you get time to take a look at that document?

14   A.  Yes, sir.

15   Q.  Is that a document that you would have kept when you were

16   in the practice that we just described at Irwin from 2002 to

17   2006?

18   A.  Yes, sir.

19   Q.  And is this, in fact, specifically a document that was kept

20   there from May 4th of 2005?

21   A.  Yes, sir.

22   Q.  On the second page, there's some handwriting.  Is that

23   yours?

24   A.  Yes, it is.

25   Q.  And does this document relate to a patient, Bruce Hay?

1    A.   Yes, it does.

2           MR. MAGARIEL:  Move to admit 835.

3           MR. OAKLEY:  No objection.

4           THE COURT:  835 admitted, and you can publish.

5           MR. MAGARIEL:  Thank you, Judge.

6    BY MR. MAGARIEL:

7    Q.   And once we publish, if we could turn to the second page,

8    please.  Thank you.  So Doctor, I think the -- on your screen

9    should be the exact same document that's in front of you,

10   whichever's easier for you to refer to; they should be

11   identical.

12   A.   Yes.

13   Q.   We just sort of oriented this document, but is this where

14   you would have taken -- it literally says your notes -- in

15   relation to a particular patient that you were seeing?

16   A.   Yes, sir.

17   Q.   And I think I all ready said this all ready, but this is

18   from a visit May 4, 2005?

19   A.   Yes.

20   Q.   And this was a visit that you had with Bruce Hay?

21   A.   Yes, sir.

22   Q.   I want to walk through these notes a little bit and make

23   sure I understand the things that you have noted here.  As I

24   understand, you are taking a note in relation to a motor

25   vehicle accident that Mr. Hay had February 25th of 2005; is

1    that correct?

2    A.   Yes, sir.

3    Q.   And it looks like you even sort of summarized your

4    understanding of that accident.  A dump truck had clipped the

5    vehicle that he was traveling in, and knocked it into a rock

6    embankment; is that right?

7    A.   Yes, sir.

8    Q.   I want to talk to you a little bit about the things that

9    you note in your visit here with Mr. Hay.  Do I see somewhere

10   in here that you noted that Mr. Hay had been seen at a few

11   different places before he came to your clinic?

12   A.   Yes.

13   Q.   And specifically, I think it notes St. Luke's, Overland

14   Park Regional; is that correct?

15   A.   Yes, I think Miami County was involved there, too, maybe.

16   Q.   Okay.  And that at this point, it looks like he had maybe

17   seen a neurologist, or an appointment was set with a

18   neurologist?

19   A.   Yes, at Walter Reed.  WRAMC is Walter Reed, 17 May.

20   Q.   So that abbreviation that you have sort of right in the

21   middle, WRAMC is Walter Reed in Washington, DC?

22   A.   Yes.

23   Q.   Is that a common place for folks in the military to be

24   referred on to for care?

25   A.   Umm, common.  Okay, so most the things we see are uncommon

1    when they get to that point, yeah, so I'm going to stumble on

2    common a little bit, because in medicine, they've all ready

3    self-selected to come see us 'cause they're sick, so, and Bruce

4    would -- or Mr. Hay was sicker than most, so...

5    Q.   I said this wasn't the only case that you saw where

6    somebody was following up with care at Walter Reed?

7    A.   No, it wasn't very common, though, from Fort Riley to send

8    someone to Maryland.

9    Q.   Is there a reason why Walter Reed would have been used?  I

10   think maybe you've all ready said, because of the nature of

11   this case?

12   A.   Yeah, because of the nature of the case, and if you go back

13   to the first page, there's a process that's going on here, and

14   that -- that part that's written at the bottom there, patient

15   here for referral to be evaluated for disability, that part

16   kind of set that he's going through a process, and I think

17   there's pages before and after this visit that also maybe

18   describe that he's going through a process to determine if he's

19   fit for duty, if he's going to be able to perform as a soldier.

20   Q.   And I did want to talk to you about that process, so let's

21   do it now.

22   A.   Okay.

23   Q.   It sounds like this document reflects early stages of that

24   process; is that correct?

25   A.   Right, I think I'd had a couple telephone consults about

1   this case prior to this visit, if I remember right, in April

2   maybe.

3   Q.   Okay.  And so can you describe just maybe not even specific

4   to Mr. Hay, but generally, what is that process?

5   A.   So it's a medical board process.  It's a process where you

6   end up doing what's called a profile on a soldier.  So you

7   sprain your ankle, you can't run, you get a profile.  No

8   soldier wants a profile, 'cause they can't go to formation, and

9   they can't do their job, and so maybe that's a profile for two

10  weeks.  So they're asking my opinion in his case to help do the

11  profile and determine if he's going to be able to go back to

12  work, and we're saying we have to send him to Walter Reed to

13  figure that out.  So he's going to get a profile that's

14  probably going to end up not retaining him in the military.

15  Q.   And this is the beginning of I think a much longer process

16  even than you've described.

17  A.   Right, it's a board process.  Board processes are very

18  proscribed.  They're laid out in Army regulations, and they

19  have -- they literally have a board meeting, there's, you know,

20  senior officers there, and they discuss what they're going to

21  do with cases.  Sometimes, a doctor or two might be involved in

22  the board process, and that's what I was helped setting up

23  here.

24  Q.   And what do they call that board?

25  A.   Medical board.

1    Q.   Is there an abbreviation that's used for it?

2    A.   MEB, Medical Examination Board.  In the Army side, that's

3    what they call it.  On the VA side, they have a little

4    different process, but similar.

5    Q.   All right.  Umm, let's talk about this document a little

6    bit more, and then we'll move on with that process.  So as I'm

7    reading your notes here, you noted a few different things about

8    Mr. Hay.  One is it looks like you note head bobbing and body

9    weaving; is that right?

10   A.   Yes.

11   Q.   And it also looks like you noted blurred double vision?

12   A.   Yes.  So there's -- to this document, there's a subjective

13   and an objective, and then impressions.  So the subjective

14   above about bright red blood in his stools from constipation,

15   and painful, bladder frequency is increased, arrow up, and then

16   arrow up, memory problems, and concentration, difficult word

17   search.  So that's the subjective part, activities of daily

18   living, along with, of course, the part written above that, and

19   then the objective starts just below the bladder frequency with

20   the VSS; that's vital signs are stable, afebrile, no fever, and

21   then my observations of him in the room, head bobbing, body

22   weaving, he had conjugate gaze which means he can move his eyes

23   conjugately together, but it was painful, so he had some

24   difficulty with that.  But his pupils were equal and reactive

25   to light, that's pearl, P E A R L, and E M O I is external

1    ocular muscles were moving independently, E A C P is I looked

2    in his ear canal, his external auditory canal was patent which

3    means it was open.  T M I, tympanic membranes were intact.

4    Throat was clear, neck, radiating motion stiffness, he had some

5    stiffness to his cervical range of motion.  And then ambulation

6    would be walking.  He walks with a walker.  D T R is his deep

7    tendon reflexes, that he had deep tendon reflexes bilaterally

8    equally plus two which is normal.  Monofilament, it's like a

9    fishing line that we poke somebody with to see if they can feel

10   it, and so he had monofilament hypersensitivity in his right

11   leg, so it was more sensitive on the right side than the left,

12   abnormal finding.  His quadriceps were weak, quads weak, intact

13   left leg, quads weak.  So had him push up against me, you know,

14   against resistance to test that, and then have him stand up and

15   walk heel to toe.  He was not able to do that.

16   Q.   And so you described the process as subjective and

17   objective.  Obviously, part of that is what the patient reports

18   to you; is that correct?

19   A.   Right.

20   Q.   And then you also do your own examination which I think

21   you've just summarized here; is that right?

22   A.   Correct.

23   Q.   And then I see at the bottom sort of under that larger

24   block of texts, does that say plan?

25   A.   Right.  So you use your subjective/objective to develop an

1    impression of what the patient had, so the impression is closed

2    head injury, and then this wrist, he's post-surgical,

3    post-fusion on his right wrist, and then the plan is what

4    you're going to do with what you've observed, and what your

5    impressions were.  And OT/PT is occupational therapy, physical

6    therapy, neuro-consult.  So he needs OT/PT and neuro to

7    evaluate him and help put the plan together is what that's

8    saying, and then there's some lab work under that.  I ordered a

9    panel of lab work that later showed he had a thyroid condition

10   as well, so...

11   Q.  So as I understand it, you used the subjective and

12   objective topics that you reviewed to develop a plan, and that

13   included a neurological consultation?

14   A.  Yes, sir.

15   Q.  What about the things that you found made you think you

16   needed to refer this on to a neurologist?

17   A.  Umm, he had some soft and hard findings, we call 'em in

18   neuro.  So he had some -- like the hypersensitivity, you know,

19   that's kind of between a hard and a soft finding, but the

20   weakness is, you know, more of a hard finding, I would say.

21   The inability to heel/toe walk, you know, the head bobbing,

22   weaving, you put these all together, and you say he has some

23   harder findings on his neuro exam that need to be explained.

24   Q.  Are the other topics that you mentioned that maybe doesn't

25   seem so obviously neurological, including the bladder and those

1    type of things, is that possibly an evidence of a neurological

2    condition?

3    A.   Correct, bowel and bladder are two areas that we always

4    want to assess on a neuro exam.

5    Q.   And why is that?

6    A.   It involves one of the larger bodies in the vagus nerve,

7    control of the parasympathetic part of the body in terms of a

8    vagus nerve.  Also, if you had a back injury or sacral lumbar

9    injury, you could have compromise of the nerves that go to the

10   gut from there or to the bladder from there.

11   Q.   Some of things that aren't -- I mean, I think it's maybe

12   somewhat obvious to non-medical professionals that head bobbing

13   and body weaving might be related to a neurological condition,

14   maybe not so obvious that bright red blood, bladder could also

15   be associated with a neurologic condition; is that right?

16   A.   Yes, sir.

17   Q.   And so based on all these observations, and you've all

18   ready I think answered this, you believe that Mr. Hay may have

19   had a closed head injury?

20   A.   Correct.

21   Q.   And you thought that someone who specialized in neurology

22   would be the next sort of place to go?

23   A.   Yes, sir.

24   Q.   I assume as a family practitioner, you do have some

25   training in at least how to spot neurologic conditions; is that

1   right?

2   A.  Yes, sir.

3   Q.  But that's obviously not your -- you're not board certified

4   as a neurologist?

5   A.  No, I'm not.

6        MR. MAGARIEL:  May I approach, Your Honor?

7        THE COURT:  Yes.

8   BY MR. MAGARIEL:

9   Q.  I'm handing you what's been marked Defendant's Exhibit 836.

10  If you'd again take a look at that please.

11  A.  Okay.

12  Q.  Did you get a chance to look over that, Doctor?

13  A.  Yes, sir.

14  Q.  Is this another document that you would have prepared from

15  the clinic at the Irwin Army Community Hospital?

16  A.  Yes, sir.

17  Q.  And does this particularly reflect an appointment June 3rd

18  of 2005?

19  A.  Umm, let's see.  I see an authorization June 4th.  Oh,

20  there it is, June 3rd, yes.

21  Q.  Okay.  And does this again have your handwriting on the

22  document?

23  A.  No.  Umm, that's probably the nurse that worked in the

24  clinic that wrote that treatment plan that way.  I wrote the

25  typed part above, I think.

1    Q.   Okay.

2    A.   I'm the requesting physician, requesting a consultation and

3    mental health.

4    Q.   Is that a document that would have been created and kept in

5    your clinic at the time?

6    A.   Yes, sir.

7    Q.   And I assume as a medical doctor, you're getting assistance

8    from nurses, nurse practitioners, others who are employed in

9    that clinic?

10   A.   Yes, sir.

11             MR. MAGARIEL:   Move to admit 836.

12             MR. OAKLEY:   No objection.

13             THE COURT:   836 is admitted and can be published.

14   BY MR. MAGARIEL:

15   Q.   I think in just a second, it will -- there we go.   All

16   right.   So the handwriting there, that's not yours; is that

17   right?

18   A.   No.

19   Q.   Okay.   I'm probably not going to ask you a lot of questions

20   about the handwriting, but as I understand from this document,

21   did Mr. Hay meet with a neurologist?

22   A.   This is a mental health consult, and in the reason for the

23   consult, it mentions a little bit of the history of why we're

24   requesting it as far as, you know, his age and the motor

25   vehicle accident, MVA in February, and then the persistent

1    tics, spastic gait diagnosed at Walter Reed, and civilian

2    neurology as conversion disorder, so this is a psychiatric

3    request.  He's all ready had the neurology I think at this

4    point at Walter Reed.

5    Q.   Okay.  So if I'm reading -- and this is the typed part

6    that's toward the top that starts 36-year old --

7    A.   -- white male.

8    Q.   Thank you.

9    A.   Uh-huh.

10   Q.   You've all ready mentioned seeing the tics and a spastic

11   gait, but it looks like between the last meeting that you had

12   with Mr. Hay in May and this meeting in June, that he's been to

13   Walter Reed and seen a civilian neurologist?

14   A.   Correct.

15   Q.   And it looks like from this report, that they diagnosed him

16   with conversion disorder?

17   A.   Yes, sir.

18   Q.   And so now, Mr. Hay has returned to your clinic for -- and

19   says there a plan of care?

20   A.   Correct, a plan of care including the MEB, the medical exam

21   board/disability and profiling, kind of what we talked about at

22   the start, we're trying to figure out if he's going to be

23   retained, and where to put him, and so the next sentence is,

24   patient is med hold, that's where he's at, he's not in a unit

25   anymore, he's in a medical hold unit which is a unit that's run

1   by the hospital, not by the armor or infantry or --

2   Q.   So are we sort of proceeding along with that process you

3   discussed at the beginning?

4   A.   Yes.

5   Q.   Where does the case generally go from a med hold?

6   A.   Well, to get to Walter Reed, he had to get into med hold,

7   'cause they're going to transport him, they're going to figure

8   out the transport, and there's another document that talks

9   about Aid & Attendance in that, too.

10   Q.   You said they're going to transported him?

11   A.   Yeah, how is the Army going to get him from Point A to

12   Point B.  And so it's about accountability.  So every soldier

13   has to be accountable for pretty much every hour of the day.

14   And so his unit is no longer going to be accountable for him,

15   but the medical unit is going to be accountable for him.  So

16   they put him in med hold.  They're going to transport him, and

17   they're going to take care of him, so he's on his way out of

18   the Army.

19   Q.   And so where does the process go from med hold?  Is then --

20   is there some sort of review that's done before it goes in

21   front of the MEB?

22   A.   He's being reviewed all along.  We're gathering these

23   consultations, you know, confirming his diagnosis, you know,

24   confirmed his limitations, you know, establishing that his

25   profile is what we consider a permanent profile.  This is a

1    temporary, and then they'll eventually hold a medical board

2    where he and maybe several other soldiers are presented.  It's

3    several hours long, the board, and they'll determine the

4    outcome from there as to whether he'll be retained or not.

5    Q.  So the board, there are actual members of that board?

6    A.  Yes, sir.

7    Q.  Who is generally included as the membership of the board?

8    A.  Whatever's needed pretty much.  So if they need a family

9    practice doctor there, they might call me in to be a part of

10   the board.  I'm speaking of it as a board process, though,

11   that's actually done on a computer.  So the profile is put into

12   the computer.  It's sent to a nurse that helps manage the

13   board, and that's why this treatment plan is needed.  She has

14   to have that to show that, where the progress is, 'cause even

15   before they get to the board, the first part of the board

16   session is how many do we have in the cue, how many do we have

17   coming in, how many do we need to do next week, do we need to

18   add another day.  So there's scheduling to all of this, too,

19   and then which cases are we actually seeing today that are

20   ready?  Are they really ready or do we think they're ready, you

21   know.  So there's some of that, and then they say, okay, we

22   need to have a cardiologist here.  We want to ask questions of

23   a neurologist.  Do we have their report?  What do they mean by

24   that?  You know, it's examined closely.

25   Q.  And you've -- you've talked about we, and you said that

1    there could be specialists.  But who are the ultimate decision

2    makers on the board?

3    A.   Okay, I'm sorry.  Yeah, the decision makers on a board,

4    it's an 06 level decision typically, so it's a colonel

5    decision.  The commander of the hospital is a colonel.  So

6    the -- the chairman of the board is typically the hospital

7    commander.  Sometimes they will bring in a brigade commander

8    which is also 06; usually doesn't go to the general officer

9    level, but sometimes it can.  There have been some famous ones

10   that did, not this one, but some do, but generally, it's

11   decided at the 06 level, the colonel level.

12   Q.   And is that who makes the final decision, the colonel?

13   A.   Yeah, they actually vote, and they'll have -- if the unit

14   commander wants to have a role in it, he can have a role in it,

15   too, so...

16   Q.   And how often does the board generally meet?

17   A.   As often as they're needed, and this time, they were

18   meeting pretty regular, probably once a week.

19   Q.   Is that because we had shifted to more of a war time type

20   of practice?

21   A.   Correct.

22   Q.   What -- what happens after the -- so let's say, MEB meets,

23   they make the decision.  And what are the two decisions that

24   they're making when they have to make a decision?

25   A.   Well, sometimes there's decisions that we don't really talk

1    about too much where somebody gets better, and they take them

2    out of med hold, and send them back to the unit.  So that does

3    happen, and those are the easier cases, you know, and then

4    there's the ones that you're trying to figure out where are we

5    really at with this, what's the diagnosis, is this going to get

6    better, you know, what's the treatment plan, what's the opinion

7    of the treating -- you know, the prognosis of the treating

8    doctor, and so those -- those become more difficult, depending

9    on the diagnosis.

10   Q.  It sounds like the process isn't necessarily favored

11   towards moving someone to inactive?

12   A.  They try not to.  You know, it's a resource that they don't

13   want to lose, you know, if they don't have to.

14   Q.  But if they do make the decision that this person, for

15   whatever reason or reasons, cannot remain active in the

16   military, what happens?

17   A.  There's a whole occupational piece to this that I kind of

18   left out, too, probably, 'cause on the board can be somebody

19   that helps determine at what rank someone can do certain

20   functions.  So if you're like an E-5, you know, if you're NCO,

21   non-commissioned officer, O5, O6, O7, you may be retained with

22   the same diagnosis that somebody at E-3, 4, E-2, would not be

23   retained at, because they're more manual workers, and the

24   others are more administrative workers, and so there's that

25   piece that comes into it as well.

1    Q.   But if for whatever reason MEB determines the particular

2    soldier cannot be retained, what happens?

3    A.   The profile is finalized, so in the -- in the system, that

4    electronic system that I probably generated his initial

5    profile, it moves through stages, and after the MEB meets, then

6    the final signatures are put on the profile, as a permanent

7    profile, and the disposition is determined by Army personnel,

8    and if they're retained or not, can still maybe be negotiated

9    depending on the rank of the individual and what they're

10   actually going to do for the Army, but generally that starts

11   the process of non-retention.

12   Q.   And you were a civilian in the system for a number of

13   years.  It sounds like you've learned all of the regulations

14   and policies; is that right?

15   A.   We left out the military part of my CV.  I had 30 years in

16   the national guard, so yeah.

17   Q.   Okay.  But as in this particular role, you were acting as a

18   civilian.

19   A.   Correct.

20   Q.   But you also served for 30 years, you said?

21   A.   Yes, sir.

22   Q.   Okay.  I assume both of those combined is where you learned

23   the process, I guess I should say?

24   A.   Right, they're very similar.

25   Q.   Is there some sort of process where the Army says we can't

1    retain this person anymore, do they get moved somewhere else to

2    get services?  What happens to those folks?

3    A.   Yeah, that -- in '05, that was difficult, 'cause the funnel

4    was becoming pretty full of med hold, you know, and it narrows

5    down to where they have to go to the VA, and the VA was not yet

6    on campus, they weren't yet on post with us at that time.

7    There was a lot of discussion I think about how we're going to

8    get people to the VA, get their compensation pension figured

9    out so they could get that from the VA, and so the decision

10   would be, is he going to the med board and given an Army

11   pension, or will he rely more on his compensation pension from

12   the VA?  So -- and that's a mixture of years served and other

13   factors that you are really more in the personnel realm, and

14   not something I usually get involved in, so...

15   Q.   But was there some sort of exchange or handoff between the

16   two different branches, the Army and the VA, to make sure that

17   a particular soldier's care is met?

18   A.   Yes, sir.

19   Q.   And how was that done?

20   A.   Umm, the case manager and the treatment plan, the person

21   that's helping put that together, that's helping on the board,

22   they would do what's called a warm handoff to the VA, to a case

23   manager at the VA.

24   Q.   And a warm handoff is literally just an exchange of

25   documents and sort of a transfer of responsibility?

1   A.   Right.   The VA is not on the same electronic system as the

2   DOD, so it's usually a paper handoff.

3   Q.   And so if a particular veteran is discharged from the Army,

4   it sounds like depending on their rank, they may retain some

5   level, but if they aren't able to be retained, then their

6   service get shifted over to the VA at that point?

7   A.   Correct.   It's called a PEB, that part of it, so you go

8   from an MEB, so a PEB.   So once the profile is finalized, med

9   board is met and they say non-retainable, that goes from the

10  medical examine board to the personnel exam board, and that's

11  more administrative personnel senior officers that decide that.

12  Q.   And this is part of the --

13  A.   And I'm not a party to that.

14  Q.   But this is part of the warm handoff I think you just

15  described?

16  A.   Right; correct.

17        MR. MAGARIEL:   Judge, can I have just a moment?

18        THE COURT:   Yes.

19        MR. MAGARIEL:   That's all I have.   Thank you for your

20  time, Doctor.

21        THE COURT:   Okay.

22                    CROSS EXAMINATION

23  BY MR. OAKLEY:

24  Q.   Doctor Callahan, do you still have Defense Exhibit 836

25  there in front of you?

1    A.   Yes, sir.

2    Q.   And so you mentioned that the -- the typewritten part is

3    the part that you prepared of 836, and you said that that was

4    just a summary of what -- what you learned from looking at Mr.

5    Hay's record; is that correct?

6    A.   Umm, it's -- it's a summary as a reason for the consult.

7    Q.   Okay.

8    A.   So it's just enough information for them to decide whether

9    they will see the patient or not.

10   Q.   Okay.

11   A.   And mental health.

12   Q.   And so in that, you said that diagnosed at Walter Reed and

13   civilian neurology as conversion disorder.  So you were just

14   regurgitating what someone else had diagnosed defendant Hay

15   with; correct?

16   A.   Yeah, I was trying to use the information they might need

17   to decide how to get an appointment for him in mental health.

18   Q.   Okay.  But you weren't making a diagnosis of conversion

19   disorder; correct?

20   A.   I don't usually make that diagnosis.

21   Q.   And in fact, in looking at medical records, is it fairly

22   common for physicians and other medical personnel to give a

23   summary of what others have diagnosed?

24   A.   It can be, yes.

25   Q.   And so certainly, if someone were to say that Doctor

1    Callahan diagnosed the defendant with conversion disorder, that

2    would be false, because you didn't make that diagnosis, someone

3    else did, and you just put it in your report; correct?

4    A.   That could be true, yes, sir, especially with conversion

5    disorder, 'cause I'm not a neurologist or a psychiatrist.

6    Q.   Okay.  So do you still have Defense Exhibit 835 with you?

7    A.   Yes, sir.

8    Q.   And I think you described that report as having both a

9    subjective part and an objective part; correct?

10   A.   Yes, sir.

11   Q.   And so the subjective part, as I understood your testimony,

12   is just information that you got from the patient, and in this

13   case defendant; correct?

14   A.   Right, and the nurse -- actually, on the first page, the

15   nurse did most of that.

16   Q.   Directing your attention to the second page, the clinic

17   note, and so you talk about a motor vehicle accident on

18   February 25th, 2005, and that the patient in this case,

19   defendant, was observed overnight, and released on

20   February 26th, 2005; correct?

21   A.   Yes.

22   Q.   And so that's a portion of that being the subjective part.

23   You got that from the defendant.  He told you that information;

24   correct?

25   A.   I think he did.  I suspect, though, I may have gotten some

1    of this from the nurse as well.  I have some margin stuff here

2    about Miami County Medical Center rehab, OT/PT Paola, Kansas.

3    He may have had some paperwork with them, and I jotted down

4    some information from there in case we needed to get in contact

5    with them, and same with his attorney's information, stuff like

6    -- so I think some of this may have come from other documents

7    that he had from his hospital stay, or that he brought with

8    him, and I was just jotting a few notes down for my memory.

9    Q.   Okay.  You mentioned an attorney.  In fact, he -- or at

10   least your notes identify lawyer McCollum & Griggs, LLC, and in

11   parenthesis, L Annette Griggs, and then there's a phone number?

12   A.   Yes, sir.

13   Q.   Correct?  And that was information related to the

14   defendant's attorney that you obtained; correct?

15   A.   Right.  So I probably had a -- a document that was given to

16   me as a part of his medical record or something like that,

17   probably.

18   Q.   Okay.  And then you mentioned that the date of this was May

19   4th of 2005; correct?

20   A.   Correct.

21   Q.   Then I also mentioned a neurology appointment at Walter

22   Reed, and in your notes, you identify that as 17 May.  So that

23   was a reference at this point to an upcoming neurology

24   appointment; correct?

25   A.   Correct, uh-huh.

1    Q.   And then after that, it says WRAMC, which you said means

2    Walter Reed; correct?

3    A.   Correct.

4    Q.   17 May, and then lawyer?

5    A.   I think it goes, and neurology in KC, and then when I wrote

6    the lawyer part, I was writing in the margins, and it kind of

7    got over close, so it looks like it's part of the sentence;

8    sorry.

9    Q.   So that lawyer is a reference to the note below to the

10   lawyer Annette; correct?

11   A.   Right.

12            MR. OAKLEY:   No further questions, Your Honor.

13            MR. MAGARIEL:   No follow-up.   Thank you, Doctor.

14            THE COURT:   All right.   Thank you.   You're excused.

15   Let's take -- we'll take a slightly longer break, since we've

16   got more logistical issues.   We'll break until about

17   11 o'clock.

18       (Whereupon jury left courtroom.   Proceedings then continued

19   as follows:)

20            THE COURT:   You have two more witnesses today?   Still

21   thinking we'll be done by noon, 12:30 or so, with the two

22   witnesses?   How much time -- what would be a good time to have

23   an informal instruction conference?   I know you need to think

24   about that indictment issue, but --

25            MR. OAKLEY:   Your Honor, from the government, I think

1   anytime.  I don't know that we'll have hammered out the

2   indictment portion, but we're certainly ready to have an

3   informal discussion about the proposed instructions.

4          THE COURT:  Okay.  I don't think I want to do it

5   immediately.  I want you to think about it, the indictment, and

6   maybe even confer, but okay.  All right.  We'll see you back

7   about 11 o'clock.

8       (Whereupon court took a recess.  Proceedings then continued

9   as follows:)

10         THE COURT:  All right.  We're ready.  Call your next

11  witness.

12         MS. RAMSEY:  Your Honor, defense calls Louis Giron.

13      (Witness sworn.)

14         THE WITNESS:  I do.

15         MS. WIEST:  Thank you.  You may have a seat.

16                         LOUIS GIRON,

17  Called as a witness on behalf of the defendant, having been

18  first duly sworn, testified as follows:

19                      DIRECT EXAMINATION

20  BY MS. RAMSEY:

21  Q.  All right.  Morning, Doctor Giron.

22  A.  Good morning.

23  Q.  I know that previous to taking the stand, you told me

24  you're a little bit hard of hearing; right?

25  A.  Yes.

1   Q.   If for some reason, you have trouble hearing me, just let

2   me know, okay, or any question that's asked of you?

3   A.   Thank you very much.

4   Q.   Would you please state your name, and spell it fully for

5   the jury, please?

6   A.   Louis Tellez Giron, Junior.  First name L O U I S.  Middle

7   name T E L L E Z.  Last name G I R O N.  Junior.

8   Q.   Thank you.  What is your current employment position?

9   A.   I'm retired.

10  Q.   You're retired now.  Okay.  Well, let's back up then and

11  talk a little bit about your previous education and employment.

12  Where did you get your medical degree from?

13  A.   Washington University in St. Louis.

14  Q.   Okay.  And did you have any residency that you did after

15  that?

16  A.   I did residency in medicine and neurology at University of

17  Iowa in Iowa City.

18  Q.   Okay.  And were you in the Army at all, any branch of the

19  military?

20  A.   Yes, I was in the Army medical corps for two years;

21  one year in Vietnam.

22  Q.   Okay.  And what is the Army medical corps?  Is it the

23  medical arm of the --

24  A.   The medical arm of the Army, yes.

25  Q.   Okay.  Fair enough.  And are you licensed by any state or

1    medical -- have you been licensed, have any licensed medical

2    certifications?

3    A.   I think two questions there.  The first, I'm currently

4    licensed to practice medicine in Missouri.  Second is in terms

5    of certification, I have board certification from the board of

6    psychiatry and neurology in neurology.

7    Q.   Okay.  So you're board certified neurologist?

8    A.   Correct.

9    Q.   Okay.  Prior to your retirement, where were you employed?

10   What were you doing?

11   A.   Prior to my retirement, I was a section leader of neurology

12   at the VA Medical Center in Kansas City, Missouri.

13   Q.   Okay.  And how long did you do that?

14   A.   I can't be exact right now; about -- about 30 years.

15   Q.   Okay.  And so you acted in the capacity as a neurologist

16   for 30 years at the VA hospital; is that correct?

17   A.   Correct.

18   Q.   All right.  During that time period, did you develop any

19   kind of other interests or expertise in specific areas of

20   neurology?

21   A.   Well, I did have training in clinical pharmacology at Iowa,

22   and biochemical neuropharmacology at Duke, and my interests in

23   clinical neurology were in disorders of movement.  I was also

24   directed by the hospital director and chief of staff to

25   establish an EEG laboratory which I did.

1    Q.   Okay.  And do you remember when you established that

2    laboratory?

3    A.   No, ma'am, not exactly; shortly after I got to the VA in

4    Kansas City.

5    Q.   Okay.  So that was at the VA in Kansas City?

6    A.   That was the VA in Kansas City.

7    Q.   Okay.  I want to talk to you about your employment back in

8    around 2012, August 2012, and it sounds like from your

9    description of your career, you would have been practicing as a

10   neurologist at the Veterans' Administration hospital; is that

11   correct?

12   A.   Correct.  And before that time, also on the staff at the

13   university hospital, University of Kansas.

14   Q.   Okay.  And for the University of Kansas staff, you were

15   there at the staff on the hospital; were you also acting or

16   practicing in neurology?

17   A.   Yes, I was, and I'm not sure at the time under question

18   when this EEG was performed whether I was still doing clinical

19   duties.  I still had academic employment, and was active in

20   teaching activities in the department.

21   Q.   And so you started an EEG clinic, I think you said, at the

22   VA.  Can you tell the jury what an EEG is?

23   A.   An EEG is a recording of electro activity from the brain.

24   Q.   And I'm assuming this is a machine that would be used by --

25   for lack of a better word, by a technologist that attaches to

1  the patient; is that correct?

2  A.   Umm, the EEG is a machine, a very complexity of a different

3  kind that records activity from different regions of the scalp

4  and head, sometimes other regions about the head and face,

5  sometimes, and it -- the electrodes are placed on the head and

6  designated areas by technologist, yes.

7  Q.   But the -- the purpose of it is to record kind of the

8  electricity of the brain; is that correct?

9  A.   To record electro activity from the neuron to the brain,

10 that's correct.

11 Q.   Okay.  Now, you're here.  Have you received a copy of an

12 EEG report performed on August 20th, 2012?

13 A.   Yes.

14 Q.   Okay.  And I have -- you have Defendant's Exhibit 822 in

15 front of you.  Do you recognize that report as a report that

16 you -- there I think up in the left-hand corner -- authored on

17 August 20th, 2012, date of note?

18 A.   Yes.

19 Q.   Okay.  And on the back of that, is that your electronic

20 signature there as the team leader of the neurology section?

21 A.   Correct.

22 Q.   All right.  And was this note, looks like done close in

23 time to when the EEG would have been done, and is it fair to

24 say in the left-hand column, this is an EEG done of a Bruce --

25 A.   Well, it was performed according to the record on

1   August 20th, 2012, and was signed September 28th, 2012.

2   Q.   Okay.  Fair enough.  Your signature on the back is an

3   indication that this is a note that you wrote; is that correct?

4   A.   That's correct.

5   Q.   All right.

6        MS. RAMSEY:  Your Honor, I would move to admit

7   Defendant's Exhibit 822.

8        MR. HUSCHKA:  No objection.

9        THE COURT:  822 admitted.  You can publish.

10       THE WITNESS:  I'm sorry, I didn't hear those comments.

11   Should I respond?

12       MS. RAMSEY:  No, I do apologize.  We were just asking

13   to admit the exhibit, and so it's been admitted.

14   BY MS. RAMSEY:

15   Q.   There are two ways that you can review and look at the

16   exhibit.  I want to talk to you about your consult report.  One

17   of them is there on the screen, is a little bit probably larger

18   than the one you have in front of you.  But they're the same

19   copies, okay?

20   A.   I understand.

21   Q.   Okay.  So you corrected me on kind of the date of the

22   notes.  But the date performed there on left -- up left-hand

23   corner, when it says August 20, 2012, that would have been the

24   date that the actual EEG was done?

25   A.   Correct.

1   Q.   And then we have a next section there titled referral

2   physician, and it says Emmett McWoods, MD.  Does that mean what

3   I think it means, that the person that would have referred,

4   looks like the doctor that would have referred to you for

5   purposes of having an EEG done would have been an Emmett

6   McWoods?

7   A.   Yes.

8   Q.   Okay.  I want to talk -- go through kind of some of the

9   information in the report with you prior to referring to this

10  report.  I'm guessing you didn't have any independent

11  recollection of doing -- interpreting this data from the EEG on

12  a Mr. Bruce Hay; correct?

13  A.   That's correct.

14  Q.   Okay.  But fair to say you've had some time to look at the

15  report, and a bit of time to refresh your recollection about

16  the actual EEG data?

17  A.   I've looked at the report, and yeah -- the answer is yes,

18  yeah.

19  Q.   Okay.  All right.  So as part of the EEG, it looks like

20  there's clinical information, there's a section called clinical

21  information there at the top.  What is the purpose of getting

22  that clinical information?

23  A.   In part, to understand the purpose of the EEG, why was it

24  performed.

25  Q.   Okay.  And what clinical information contained there did

1    you get regarding Mr. Bruce Hay?

2    A.  Well, in quotation marks, it says quote, atypical seizures,

3    so it's evaluation of that clinical issue.

4    Q.  Okay.  And is it fair to say it also has a section there

5    that says in the laboratory section, describes large spells for

6    which friends have to un-contract about once a week as well as

7    small spells recurring daily?

8    A.  Yes.

9    Q.  Is that information you had prior to interpreting this

10   data?

11   A.  Yes.

12   Q.  Okay.  What type -- and maybe there's no different types,

13   but I was assuming.  What type of EEG was this?

14   A.  It's a conventional, I guess you would say straight forward

15   EEG.  There are different kinds one could perform for research

16   purposes, or you could do intensive co-- epilepsy monitoring,

17   and specialized, do it for several hours or even days.  So this

18   was a conventional clinical tool that's used everyday.

19   Q.  Okay.  And I see in this report, it says that it was video

20   and auditory monitoring.  What does that mean?

21   A.  It means that there was a video recording of behavior or

22   movement, and there was also auditory recording of

23   vocalizations, for example.

24   Q.  So it would have been a video and audio recording of this

25   particular EEG; is that correct?

1  A.  Yes.

2  Q.  Do you know what happened to that?  Have you reviewed that

3  at all?

4  A.  No, ma'am.

5  Q.  Let's talk about -- said this was a typical EEG or normal,

6  not typical, normal I think is the word you used; is that

7  correct?

8  A.  Uh-huh.

9  Q.  How long did it take?

10  A.  The recording in our laboratory is customarily 30 minutes.

11  That was the duration of this recording.

12  Q.  Okay.  All right.  And was this -- I've seen different

13  reports for EEG's that say wake/sleep.  Was this a wake and

14  sleep EEG?

15  A.  Correct.

16  Q.  Okay.  And can you tell the jury what that -- what that

17  means?

18  A.  Well, from a simple -- simply they were awake and they were

19  asleep.  It's important from an EEG point of view, because

20  abnormal activity tends to occur in the shifts between waking

21  and sleeping.  So like, it's as if the brain is changing gears,

22  and sometimes something slips, and that's a critical period.

23  Q.  Okay.  I want to call your attention to the second --

24  second paragraph there, and I think towards the bottom, it says

25  no epileptiform discharges were noted.  What did you mean by

1   that?

2   A.   Well, there are usually characteristic morphological

3   features of electrical discharges associated with seizures, and

4   so there were none of those detected in this particular

5   recording.

6   Q.   Okay.  And then below that, it says that during the

7   recording, the patient experiences a number of spells, some of

8   which are not detectable clinically and not associated with

9   significant change in ongoing cortical activity.  What does

10  that mean?

11  A.   Well --

12  Q.   To your best recollection.  I know that this was a while

13  ago?

14  A.   Well, maybe the patient described subjective -- I'm

15  interpreting this in maybe going out on a limb, but I would

16  think that the patient may have reported that he felt he had a

17  spell, but there was no movement, no alteration in demeanor,

18  and at that time, and then he had other spells of different

19  kinds, but in either case, there was nothing that resembled

20  seizure discharges on the EEG.

21  Q.   Okay.  And let's talk about that.  We'll get back to that

22  in a minute.  There's also a note under that that says head

23  tremor changes in amplitude and frequency when he performs

24  finger to nose maneuver.  What is finger to nose maneuver and

25  why, and what does it mean in regards to your report?

1   A.   Well, finger and nose maneuver is something that's done in

2   the clinical context where he puts finger to the nose,

3   concentrates to do that.  In this case, this was a distraction

4   maneuver, so a patient was attending to the actual movement;

5   meanwhile, the tremor that he had in his head changed in

6   amplitude.

7   Q.   Did that tell you anything as a neurologist?

8   A.   Well, told me that to a certain extent, the tremor that he

9   had was likely of psychological origin; it required attention

10  to maintain that tremor.

11  Q.   Okay.  All right.  Now, I believe on the second page there,

12  you have a section called impression.  Do you see that section?

13  A.   Yes.

14  Q.   And so what was your impression of this EEG?

15  A.   Basically, he had a normal EEG awake and asleep.

16  Q.   Okay.  You also have a note there in the third paragraph on

17  that second page starting with lack of correlation between

18  cortical activity and physical expression of seizures, as well

19  as the demonstrated non-physiological tremor suggest that many

20  of these seizures are non-epileptic in origin.  And what did

21  you mean by that?  Did you mean that because there were no

22  brain electric discharges, that you did not think that this was

23  an epileptic seizure, but a psychological seizure?

24  A.   I didn't think this was a seizure that related to problems

25  to the brain or epileptic seizure, yes.

1   Q.   Now, you've been practicing -- I think you said you're
2   retired now, but you practiced with the VA for approximately
3   30 years; is that correct?
4   A.   That's correct.
5   Q.   Okay.  And I think you also said that you had some type of
6   at least interest or expertise in kind of movement disorders.
7   Fair enough?
8   A.   Correct.
9   Q.   Okay.  Now, so you're familiar with conversion disorder?
10  A.   Yes.
11  Q.   Okay.  Not asking you -- I'm just asking you if you're
12  familiar with it, and if you've seen patients in your 30 years
13  experience as a neurologist?
14  A.   It's inevitable, yes.
15  Q.   Okay.  Okay.  And in your treatment of these patients or
16  diagnosis of these patients with conversion disorder, was it
17  common to try to perform a test like an EEG?
18  A.   It would be essential.
19  Q.   Okay.  And why would it be essential?
20  A.   Well, one, if you misdiagnose and treat a conversion
21  disorder patient with anti-seizure medicines, it can have
22  adverse effects, and the risks the medicine would -- would
23  be very adverse, and not to the patient's best interests
24  health-wise, so that's one reason.  The other is that if you
25  have a conversion disorder, that may require referral for

1   psychological support and other kinds of treatment beyond or

2   instead of neurologic treatment.

3   Q.   Okay.  In your patients that you've treated with conversion

4   disorder and in your experience, is it common to have an EEG as

5   a result with those patients that do not pick up any

6   epileptiforms of discharge or brain activity?  Is that common?

7   A.   I'm sorry, could you repeat the question?  I don't think I

8   followed all of that.

9   Q.   That's okay.  It was a bad question.  I guess my question

10  is, with patients with conversion disorder, is it common that

11  they have a normal EEG?

12  A.   Yes.  You know, the problem is, someone can have a

13  conversion disorder and something else, but if they have --

14  don't have that something else, then they would -- they should

15  have a normal EEG.

16  Q.   And by normal EEG, would you agree that what that means, at

17  least for me, is that you're not detecting any epileptic

18  discharges or electric brain activity to explain the motor body

19  movements?

20  A.   That's correct, and in addition, there's no evidence of

21  injury to brain at the same time.

22  Q.   Okay.  And is it -- is that why it's common oftentimes with

23  patients with conversion disorder that you are also possibly

24  performing an MRI?

25  A.   Ordinarily, if someone's considered to have a seizure, MRI

1   would be required to evaluate that patient.

2   Q.   Okay.  And as a neurologist, are you familiar with the term

3   kind of functional seizure, or psycho non-epileptic seizures?

4   A.   Well, there are a whole variety of terms to describe that

5   condition, and non-epileptic seizure's probably one of the more

6   common ones.

7   Q.   Okay.  And what is a non-epileptic seizure?

8   A.   It's a seizure that -- a clinical event, I hate to use

9   seizure, but a clinical event of representing a seizure, not

10  arising from abnormal electrical discharge in the brain.

11  Q.   Okay.

12        MS. RAMSEY:  One moment, Your Honor.  I have no

13  further questions.  Thank you.

14        MR. HUSCHKA:  Your Honor, I have no questions for

15  Doctor Giron.

16        THE COURT:  Okay.  Thank you, Doctor.  You're excused.

17  Call your next witness.

18        MS. RAMSEY:  Your Honor, we would call Rebekah

19  Branson.

20        (Witness sworn.)

21        THE WITNESS:  I do solemnly swear.

22        MS. RAMSEY:  All right.  You can have a seat right

23  there.

24                   REBEKAH BRANSON,

25  Called as a witness on behalf of the defendant, having been

1    first duly sworn, testified as follows:

2                        DIRECT EXAMINATION

3    BY MS. RAMSEY:

4    Q.   All right.  Rebekah, I'm going to have you state your full

5    name, or tell your full name to the jury, and then spell it

6    please.

7    A.   My name is Rebekah Danielle Hay Branson.  R E B E K A H.  D

8    A N I E L L E.  H A Y.  B R A N S O N.

9    Q.   Okay.  Are you nervous?

10   A.   Yeah.

11   Q.   It's okay.  I'm going to take my time, and so if there's

12   a -- a time where you can't understand me, you let me know,

13   okay?  What city and state do you live in?

14   A.   I'm currently living in Kansas City, Missouri.

15   Q.   Okay.  And what is your relationship with Bruce Hay?

16   A.   I'm his daughter.

17   Q.   Okay.  How old are you?

18   A.   I'm 21.

19   Q.   And out of -- how many siblings do you have?

20   A.   I have four sisters.

21   Q.   Okay.  So there's a total of five of you --

22   A.   Yes.

23   Q.   -- ladies.  Okay.  So I want to talk to you about growing

24   up a bit, okay?  And so my first question is, is were you

25   raised by both your mother and father, Bruce Hay and Lori Hay?

1    A.   Yes.

2    Q.   Okay.  Was there ever a time when your father wasn't

3    around?

4    A.   Umm, there was a period of time where my dad was deployed,

5    and also, when he was staying in Fort Riley for a period of

6    time, but other than that, he was at home.

7    Q.   Okay.  So fair to say he's raised you and been in your life

8    physically almost all your life; is that correct?

9    A.   Yes.

10   Q.   Okay.  Is there a time when you have -- are you still

11   living at home now?

12   A.   No, I am not.

13   Q.   Okay.  How long have you been out or moved out?

14   A.   I went and lived in the dorm starting in August of 2019,

15   but then there was a period of time where it was like two

16   months that we were removed from the dorms because of CoVid, so

17   I lived at home for about two months, but then I did move out,

18   and that was in spring of 2020.

19   Q.   So in spring of 2020, you went back home and lived with

20   your mom and dad for two months?

21   A.   Yes.

22   Q.   And so you said that you lived in the dorms.  Are you in

23   school?

24   A.   Yes, I am.

25   Q.   And where are you in school?

1    A.   I go to the University of Missouri, Kansas City.

2    Q.   Okay.  UMKC?

3    A.   Yes.

4    Q.   Do you remember what year -- you said your dad was not in

5    the home during the time period he was deployed.  Do you

6    remember what year that was or how old you were?

7    A.   Umm, cannot say for certain, but I believe he was deployed

8    in the beginning of 2003.

9    Q.   Okay.  How old would you have been?

10   A.   I would have been two at that time.

11   Q.   Okay.  All right.  So can you give me kind of a -- a time

12   line, and I don't need the exact addresses, but like where you

13   grew up?

14   A.   So I lived in Osawatomie for the entirety of my time at

15   home except when I moved back, we lived in one house in

16   Osawatomie until I was about ten.  The summer before fifth

17   grade, we moved to a different house in Osawatomie, and we

18   lived there until I went to college, but then the fall of 2019,

19   my parents moved to Greeley, a different town.  So then when I

20   returned for those two months, it was in the house in Greeley.

21   Q.   Okay.  Since 2019 when you moved out to go to school and

22   moved into the dorms, let's say until present day, how often

23   are you seeing your mom and dad, and going back and forth to

24   see them in Greeley?

25   A.   So I see them one to two times a week.  I do go to church

1    with them, so that's a consistent day, and then not always, but

2    typically, I try to go down to do laundry at their house once a

3    week.

4    Q.   And you said that's about one or two times per week?

5    A.   Yeah, so total, including the time with church.

6    Q.   All right.  I want to talk to you about a car accident in

7    February of 2005.  Were you involved in the car accident in

8    February 25th, 2005?

9    A.   Yes, I was in that car accident.

10   Q.   Okay.  Can you tell me what you remember about that?

11   A.   Umm, so I was very young, I was four years old at that

12   time, but it was really traumatic, so I just remember a lot of

13   blood, and the experience like getting out of the car.  I, from

14   my memory, was the last person out of the vehicle because I was

15   the least injured, and then I remember being like stepped on or

16   something while someone else was trying to get out of the

17   vehicle, and when I was finally out, I mostly just -- I was

18   standing there with someone that I don't recognize, I don't

19   remember who they were, so probably like a first responder or

20   something, and then I was taken in an ambulance to Miami County

21   Medical Center in Paola, Kansas, and after that, they took me

22   in a helicopter to Children's Mercy.

23   Q.   Okay.  And who else was in the accident with you?

24   A.   My father was in that car accident, also a family friend

25   who was our pastor at the time Ray Brunet, and also, my younger

1    sister Rachel Hay.

2    Q.   Okay.  And how old was Rachel?

3    A.   Rachel was two.

4    Q.   And what were -- do you remember Rachel's injuries?  Do you

5    remember what happened to her?

6    A.   I do not know like the accurate like medical injuries, but

7    she had --

8    Q.   Well, let me ask you this.  Let me stop you.  Was she also

9    life-flighted ultimately to Children's Mercy?

10   A.   She was immediately life-flighted to Children's Mercy.  She

11   was in much more severe condition, yeah.

12   Q.   Fair enough.  Do you remember how long you were in the

13   hospital?

14   A.   I did not stay in the hospital over night, so they did send

15   me home that day.

16   Q.   Okay.  Was -- do you remember, was your -- your father,

17   your dad, taken to the hospital after the incident -- accident,

18   sorry?

19   A.   Yeah, he was taken to the hospital.  I am not sure of how

20   they took him to the hospital or what hospital he was taken to,

21   though.

22   Q.   Do you remember how long he was in the hospital for?

23   A.   I do not remember that.

24   Q.   Okay.  I know you were pretty young, so if you don't

25   remember, just let me know about some of these questions.  You

1    don't know how long he was in the hospital for.  Do you know
2    what hospital he was taken to?
3    A.   I do not know that.
4    Q.   Okay.  All right.  So I wanted to talk to you about your
5    memories of your father after the accident, and I know you were
6    four years old, so the car accident was traumatic, so you may
7    have some memory of that, but -- but -- so tell me when your
8    dad -- what memories did you start having of your dad after the
9    accident?
10   A.   So because I was so young, I don't know if these time lines
11   are like blended somewhat, but like, with the time he was
12   deployed, but before he was deployed, I remember like his
13   temper being a little different, like he was more patient, and
14   like, not that he's not nice, but more nice, and like, patient
15   and more kind before, but then there was definitely a
16   temperament change afterward, but because I was so young, that
17   could have also been blended with the car accident and effects
18   of the car accident.
19   Q.   Okay.  I think I want to focus your attention if I can on
20   the physical changes you saw in your father after the accident.
21   Did you see any physical changes happen to him?
22   A.   Yeah.  So he has mobility issues.  He uses a cane everyday.
23   I've -- he always uses a cane to walk around, get around, and
24   outside of that, outside of using the cane, he has these like
25   pain episodes where his muscles will cramp up, and he'll have

1    muscle spasms in that way where he can't move and function at

2    all by himself, and sometimes, that even progresses where he's

3    like not breathing, or he's choking on his tongue.

4    Q.   I want to come back to what you call -- I think you said

5    muscle cramping.  Is that how you refer to it?

6    A.   Yes.

7    Q.   Okay.  So you said that he has the cane and mobility

8    issues.  Does he have -- walk with a limp, and do you know what

9    the purpose of using a cane is for?

10   A.   I don't know that I would necessarily call the way he walks

11   with a limp.  I know that he has mobility issues, and when I've

12   definitely seen him like fall over without it when I was

13   younger at different points.  So I think it's more of a

14   stability thing and not necessarily for limping purposes, but

15   I'm not exactly sure, personally.

16   Q.   Okay.  Fair enough.  So I want to talk to you about the --

17   what you call muscle -- muscle cramps.  Can you describe to me

18   in your own words physically what you see happen to your father

19   when he's having the muscle cramps, or the severe muscle

20   cramps?

21   A.   Yeah.  So usually, there's some kind of like onset, which I

22   don't know that there's exact triggers to that.  I know certain

23   things that trigger like his PTSD, like fireworks and such

24   always trigger, but he could sneeze, and that could trigger

25   them as well.  So I don't think that there's a clear trigger to

1    it, but his head will start to shake, and oftentimes his nose

2    will itch.  I don't know why, but that's just a connection that

3    we've noticed, and he'll have some like tension in his body at

4    that point, but that's just the initial onset, and usually, by

5    that time, we know that like he probably needs to go home

6    because it's likely going to progress further, and when it does

7    progress further, his arms will sometimes thrash, and the

8    muscles all over his body will cramp up.  Usually, like his

9    hands will start, and his feet, and we'll have to like massage

10   his muscles out in his arms and his legs to try to release

11   those cramping, but then sometimes, it continues to progress

12   where like he's not breathing, and like I said before, where

13   his tongue is even cramping up, and he's like choking on his

14   own tongue.

15   Q.   Okay.  During these episodes -- so you said you kind of

16   know when it's coming on because his head starts bobbing and

17   shaking.

18   A.   Yeah.

19   Q.   Okay.  If his head is bobbing and shaking, does it always

20   turn into a full episode, or is it sometimes, the symptoms are

21   less?

22   A.   I wouldn't say that it always progresses to the choking and

23   the not breathing, but typically, it would progress a little

24   bit more even if it doesn't fully progress, but oftentimes,

25   yes, it does progress further.

1    Q.   Okay.  During this time when he is having kind of the

2    severe muscle cramps or episodes, where he's almost choking on

3    his tongue, he can't breathe, is he able do anything else?  Can

4    he walk, can he talk?

5    A.   No, no.

6    Q.   So he wouldn't be able to feed himself or bathe himself?

7    A.   No, at those times, he can't -- he wouldn't be able to

8    stand up at all.  Like, there's no chance that he would able to

9    get up to go to the bathroom or even eat at all.

10   Q.   Okay.  Have there been times when he loses control of his

11   bowels as a result?

12   A.   Yes, yes.  Sometimes before -- sometimes while that is

13   happening, but also sometimes if he like were to exert himself

14   during -- like before this onset, that would result in him

15   doing that.

16   Q.   And you said exert himself before the onset.  What do you

17   mean by exert himself?

18   A.   Like if he were to have to do some kind of labor, that

19   might result in him doing that.

20   Q.   Okay.  When the severe kind of muscle cramping happens,

21   what would you say, how common -- how long do they last?

22   A.   I would say at a minimum, like 20, 30 -- 20 to 30 minutes,

23   but it -- it's not consistently the same length, and

24   oftentimes, it would go longer than that before he's able to

25   like stop the cramping, but that doesn't mean that it's

1    completely over, because he's exhausted and exerted from the

2    activity that his body was doing, the cramping of the muscles

3    exhausts him, and then he's still not able to function like

4    regularly after that has stopped.

5    Q.   What does -- is there a time when you've seen the muscle

6    spasms happen that are severe, like times of day?  I know you

7    said that there were triggers in exertion, but times of day

8    when this happens more than others?

9    A.   Yeah, I would say that it typically does happen more often

10   in the evening after -- after the day's activities, but I have

11   seen it happen in the morning like at church, but usually, it

12   wouldn't -- I haven't seen it as often progress into the full

13   episode at church, because typically, we would try to take him

14   home at that point.

15   Q.   So it sounds to me that -- and you can tell me if I'm wrong

16   -- that the family has tried to adapt a bit, so if you see it

17   happening, you -- there's a -- is there a part of the family

18   that will take him -- take him home?

19   A.   Yes, yes.  We definitely have tried to adapt around it, and

20   to help him with this, because well, one, it's not as easy to

21   like help him with the cramping if we're just out in public,

22   because he can't move around.  So usually, he's just sitting or

23   laying down, and also, I mean, just from a personal thing, it's

24   probably embarrassing for him to have to experience that in

25   public.  So we try to take him home before it progresses,

1    usually.

2    Q.   Okay.  And so I think what you've described, has this been

3    happening since after -- from your memory, after the car

4    accident in 2005?

5    A.   Yes.

6    Q.   Okay.  I want to talk to you about some very specific

7    things.  So have you ever seen your dad use a walker?

8    A.   I have seen him use the walker, but as I've said before,

9    his primary choice is the cane.

10   Q.   Okay.  I want to talk to you about what other things --

11   excuse me -- you've seen your dad do.  Have you seen your dad

12   do things such as work on the family farm?

13   A.   Yes, I have seen him work on the farm, but typically, if

14   he's working, I'm not with him, so I'm not regularly with him

15   when he's doing those things.

16   Q.   Okay.  And let me -- I think maybe I can couch my questions

17   a little bit better.  Did you grow up working on the family

18   farm?

19   A.   Umm, yes, I did help on the farm some as a child.

20   Q.   Okay.  How old were you when you started helping on the

21   family farm?

22   A.   Probably five or six.

23   Q.   Okay.  And was part of the work that you had to do on the

24   family farm, was to bale hay?

25   A.   Lifting the bales of hay and loading them up on the

1    trailer.

2    Q.   I couldn't understand the first part you said.

3    A.   Lifting them up and loading them on the trailer.

4    Q.   And so how old were you when you started doing this?

5    A.   Like I said, probably five or six.

6    Q.   So five or six, you were baling hay.  How were you doing

7    that at such a young age?

8    A.   So we had hay hooks, but that would hook into the hay

9    bales, and we could lift them up, but they weren't like so

10   heavy that I wasn't able to lift them up.

11   Q.   Okay.  Okay.  So when did you -- you said earlier that you

12   were about six when you started doing that.  When would you say

13   you stopped kind of regularly going out to the farm and doing

14   any work?

15   A.   Well, I have asthma and pretty bad allergies, so at a

16   certain point, probably like maybe like 11, I wasn't

17   participating in those activities as much because they bothered

18   my asthma and my allergies.

19   Q.   Okay.  Okay.  Do you know if your dad does any like scrap

20   metaling?

21   A.   Yes, my dad does do scrap metaling.

22   Q.   Okay.  And largely -- so have you seen him actually do the

23   scrap metaling?

24   A.   Some, but as I've said before, I'm not typically with him

25   while he's doing that.

1   Q.   Okay.  And when he's scrap metaling, what position is he
2   normally in?
3   A.   He would mostly be sitting down and working with his hands.
4   Q.   Okay.  I wanted to talk a little bit more about the -- what
5   you're calling kind of the muscle spasms.  Did he ever have one
6   of these spasms while you were in the car and he was driving?
7   A.   Umm, never while he was driving, but I have been in the car
8   while he was having this go on.
9   Q.   Okay.  And maybe I should be clearer.  So you said you have
10  been in the car where he's had one of the muscle cramping going
11  on.  Was that because he was not the driver?
12  A.   He was not the driver at that time, yeah.
13  Q.   Okay.  Have you ever been afraid of being in a car with him
14  when he possibly might have one of these muscle spasms?
15  A.   Umm, no, because as I said before, there is some kind of an
16  onset, where he would be able to pull over, and then either
17  call someone, or if someone's with him, they would be able to
18  assist him and then drive, but also, most of the time, if
19  someone else is in the vehicle, he's not going to be the one
20  driving.
21  Q.   So you're saying oftentimes, if there's somebody else in
22  the vehicle, your dad's not driving, somebody else is driving.
23  Is that normally your mom?
24  A.   Yes.
25  Q.   Okay.  So are there -- are there days with your dad that he

1    can appear without these muscle cramps or head bobbing or

2    shaking; he could appear just normal?

3    A.   There are days where he does not have those episodes, but

4    part of his disability would also be like the pain he deals

5    with, which is going to be invisible to most people, so cannot

6    say that there's days where he's not experiencing any symptoms.

7    Q.   Okay.  And so I want to, just before I close up asking you

8    some questions here, talk to you a little bit more about when

9    he has the muscle spasms.  So if the family is there, how many

10   people have to work -- well, what happens?  Does the family

11   have to pitch in to try to work through these muscle spasms?

12   A.   Yeah.  So like I said before, usually we massage his

13   muscles out to try to release the cramping, and I mean, he's a

14   grown man with muscles, so when they're tightened, it's a lot

15   of work to work through that.  So typically, any able person

16   who's available would be helping.  Currently, my mom is the

17   only adult that lives with him, so right now, it would only be

18   my mom, which would be very difficult.  When I was still at

19   home, my sisters and I, any of us that were still at home would

20   be helping, but it's happened when we've had like my aunt over,

21   or one of my dad's family friends, and they've had to help as

22   well.  When I was a kid, I did not help as much, because it was

23   scary to see my dad like that, and to see him suffering, but

24   like as I've gotten older, like, it's not going away, so I just

25   want to help and to help ease that pain for him, so...

1  Q.  Okay.

2          MS. RAMSEY:  May I have one moment, Your Honor?

3          THE COURT:  Yes.

4          MS. RAMSEY:  I have nothing further.  Thank you.

5          MR. OAKLEY:  I have no questions, Your Honor.

6          THE COURT:  Oh, okay.  All right.  You're excused.

7  Umm, so approach the bench please counsel.

8      (Proceedings held at the bench, outside the hearing of open

9  court.)

10          THE COURT:  So this is all the witnesses you have

11  available.  I have a sentencing tomorrow at 9.  So you think

12  you have pretty much a full day of witnesses tomorrow?

13          MS. RAMSEY:  I'm going to try.  Hope to finish up most

14  of the people on Wednesday, so mostly, we'll have our expert

15  and closing, so I've got six, but with how this is rolling,

16  maybe I can get through some more.  I can move up.

17          THE COURT:  Do you think it would be fair for me to

18  tell 'em, we'll go home now, we probably have the full day

19  tomorrow, but we will definitely have the case submitted to

20  them maybe mid-day Wednesday, or could be, or early Wednesday

21  afternoon?

22          MS. RAMSEY:  I think so.

23      (Proceedings continued in open court.)

24          THE COURT:  All right.  This case is progressing

25  quicker than expected, and there are some additional witnesses,

1    but they're not available until tomorrow.  So we're going to

2    break early today.  I've just been conferring with the lawyers.

3    It looks like tomorrow will be a fairly full day, but it also

4    looks like this case will be submitted to you on Wednesday,

5    maybe by lunch time or at least by early afternoon, closing

6    arguments and all of that.  So we are ahead of schedule, and I

7    know Miss Ramsey's working to move some people up that were

8    scheduled for Wednesday into tomorrow.  So tomorrow may be a

9    full day, but there's at least one witness that can't be here

10   until Wednesday morning, so -- but you can plan on probably

11   jury deliberations starting on Wednesday.  So we'll go ahead

12   and recess now.  We will not want to start tomorrow, though,

13   until 9:30.  I have a hearing in another case I need do at 9,

14   so we'll plan on reconvening at 9:30 tomorrow.  All right.

15   Remind the jury not to discuss this case with anyone, to not

16   perform any independent reading, research about any of the

17   matters in this case.  9:30 tomorrow.

18        (Whereupon court took a recess.  Proceedings then continued

19   as follows:)

20        THE COURT:  Why don't you all take a lunch break, and

21   reconvene at 1:30 with Miss Merklen.  Hear any suggestions, if

22   you can confer about how to treat the indictment and the

23   instructions, that will be helpful.  All right.  Okay?

24        (Whereupon, court recessed proceedings.)

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4

5        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official reporter

7    of the United States District Court for the District of Kansas,

8    do hereby certify that as such official reporter, I was present

9    at and reported in machine shorthand the above and foregoing

10   proceedings.

11       I further certify that the foregoing transcript, consisting

12   of Day 6 - Pages 786-881 - is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED February 10, 2023.

16

17                          S/_____

18                          Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2
    UNITED STATES OF AMERICA,          Docket No. 19-20044-JAR
 3
       Plaintiff,                      Kansas City, Kansas
 4                                     Date: 8/9/2022
         v.
 5
    BRUCE L HAY,
 6
       Defendant.
 7    ...................
```

```
 8                         TRANSCRIPT OF
                         DAY 7 - JURY TRIAL
 9           BEFORE THE HONORABLE JULIE A ROBINSON,
                UNITED STATES SENIOR DISTRICT JUDGE.
10
    APPEARANCES:
11
    For the Plaintiff:       Christopher Oakley & Ryan Huschka
12                           Asst US Attorneys
                             360 US Courthouse
13                           500 State Avenue
                             Kansas City, KS  66101
14
    For the Defendant:       Che Ramsey & David Magariel
15                           Asst Federal Public Defenders
                             201 US Courthouse
16                           500 State Avenue
                             Kansas City, KS  66101
17
    Court Reporter:          Nancy Moroney Wiss, CSR, RMR, FCRR
18                           Official Court Reporter
                             558 US Courthouse
19                           500 State Avenue
                             Kansas City, KS  66101
20
    Proceedings recorded by machine shorthand, transcript
21  produced by computer-aided transcription.

22

23

24

25
```

1                          I N D E X

2

3

4
     Defendant's Witnesses:                              Page
5
     VIKAS SINGH
6       DIRECT EXAMINATION BY MS. RAMSEY                 885

7    BRIAN LEWIS
        DIRECT EXAMINATION BY MS. RAMSEY                 894
8       CROSS EXAMINATION BY MR. HUSCHKA                 912
        RE-DIRECT EXAMINATION BY MS. RAMSEY              915
9       CROSS EXAMINATION BY MR. OAKLEY                  935
        RE-DIRECT EXAMINATION BY MR. MAGARIEL            944
10      RE-CROSS EXAMINATION BY MR. OAKLEY               945

11   SCOTT JACKSON
        DIRECT EXAMINATION BY MS. RAMSEY                 948
12      CROSS EXAMINATION BY MR. OAKLEY                  956

13   BARBARA BROWN
        DIRECT EXAMINATION BY MS. RAMSEY                 961
14      CROSS EXAMINATION BY MR. HUSCHKA                 973

15   LEON ZOOK
        DIRECT EXAMINATION BY MR. MAGARIEL               977
16      CROSS EXAMINATION BY MR. HUSCHKA                 985

17   JOSEPH BELL
        DIRECT EXAMINATION BY MS. RAMSEY                 985
18      CROSS EXAMINATION BY MR. OAKLEY                  996

19

20                      E X H I B I T S

21   Government's
        Exhibits              Offered            Received
22
          332                   997                997
23
     Defendant's
24      Exhibits              Offered            Received

25        816                   897                897
          817                   897                897

| | | | |
|---|---|---|---|
| 1 | 818 | 897 | 897 |
| | 819 | 897 | 897 |
| 2 | 821 | 888 | 888 |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

NANCY MORONEY WISS, CSR, RMR, FCRR

1        THE COURT:  Did you all need to take anything up

2   before of the jury comes in.

3        MS. RAMSEY:  I don't think so.  I will tell the court

4   that one of my witnesses is a little delayed, but I think we

5   can skip over and move that around, so I think we can run

6   straight through, but --

7        THE COURT:  Okay.

8        (Whereupon jury entered courtroom.)

9        THE COURT:  All right.  Call your next witness.

10       MS. RAMSEY:  Your Honor, the defense calls Doctor

11   Vikas Singh.  Stand right here and she's going to have you

12   raise your right hand and swear you in.

13       (Witness sworn.)

14       THE WITNESS:  I do.

15       MS. WIEST:  Thanks.  You may have a seat.

16       MS. RAMSEY:  Seat right up there.

17                        VIKAS SINGH,

18   Called as a witness on behalf of the defendant, having been

19   first duly sworn, testified as follows:

20                     DIRECT EXAMINATION

21   BY MS. RAMSEY:

22   Q.  All right.  There's a microphone right there for you to

23   speak into, okay?

24   A.  Okay.

25   Q.  All right?  Could you please tell the jury your name for

1    the record?

2    A.   Vikas Singh.

3    Q.   Could you spell the first and last name?

4    A.   V I K A S.  Last name Singh, S I N G H.

5    Q.   Okay.  And Doctor Singh, where are you currently employed?

6    A.   Kansas City VA Medical Center.

7    Q.   And where did you get your medical degree?

8    A.   I did my medical school in India, but then I completed

9    leadership and fellowship in Madison, Wisconsin and Ann Arbor.

10   Q.   Ann Arbor?

11   A.   Yes.

12   Q.   Tell me a little bit about, after you finished your

13   residency, kind of what your medical career looked like?

14   A.   So after neurology residency, went to University of

15   Michigan.  So after Madison, I did my clinical neurophysiology

16   fellowship at the University of Michigan in Ann Arbor, and then

17   I joined Kansas City VA.

18   Q.   Okay.  So how long have you been -- and I know you were a

19   board certified neurologist?

20   A.   Yes.

21   Q.   How long have you been practicing as a neurologist?

22   A.   So in United States, since 2015.

23   Q.   Okay.  And so as part of your duties as a neurologist at

24   the VA, do you perform EEG's?

25   A.   Yes.

1    Q.   I want to take you back to approximately 2017.  Where were
2    you working at that time?
3    A.   The Kansas City VA Medical Center neurology department.
4    Q.   And so as part of your duties back then, were you involved
5    in giving EEG's to patients?
6    A.   Yes.
7    Q.   Do you have any independent memory of performing an EEG on
8    a Mr. Bruce Hay?
9    A.   I have the report in front of me, and it's written by me,
10   but it's too long ago, I don't remember.
11   Q.   Okay.  Have you had an opportunity to kind of refresh your
12   recollection by looking at that report?
13   A.   I did this morning and last night when I got report, yeah.
14   Q.   Okay.  You have in front of you what's been marked as
15   Defendant's Exhibit 821, and since you've had a moment to
16   review that, I'm going to call your attention to the bottom of
17   that exhibit on the first page where it says patient name.  Can
18   you see that?
19   A.   Yes.
20   Q.   Okay.  And does that say Bruce Leroy Hay?
21   A.   That's correct.
22   Q.   Okay.  And I want to take you to the second page of that
23   top under where it says consult requests.  Does the author say
24   Vikas Singh?  Were you listed there as the author?  It's the
25   second page.

1   A.   Yes.

2   Q.   At the very top.  Okay.  And then I believe you're looking

3   at probably the third page which is where I think your

4   electronic signature is; is that correct?

5   A.   Yes.

6   Q.   Okay.  So would this be a report of data from the EEG you

7   interpreted on a patient, Mr. Bruce Hay?

8   A.   That's correct.

9   Q.   Okay.

10         MS. RAMSEY:  Your Honor, I move to admit Defendant's

11  Exhibit 821.

12         MR. HUSCHKA:  No objection.

13         THE COURT:  821 is admitted and you can publish.

14  BY MS. RAMSEY:

15  Q.   Okay.  All right.  Doctor Singh, you have the report in

16  front of you, but it's also I think on the screen there -- just

17  right there beside you.

18  A.   Okay.

19  Q.   Feel free to use whichever one you want, okay?  All right.

20  As part of your interpreting the data and performing the EEG,

21  did you get some history or information about the patient?

22  A.   Yes.  So when the EEG is requested, we get the reason for

23  EEG, and then when we are putting in the note in the CPRS --

24  CPRS is electronic medical system for the VA, and when we are

25  putting in the report, we go in the chart to get a little bit

1    more history and put in the report, so that's where it's

2    extracted from the chart.

3    Q.   Okay.  So can you tell me what history there is listed that

4    you have for interpretation of the EEG?

5    A.   So they wanted a spell to identify what -- the EEG to

6    identify what the spells are of muscle spasms, patient falling

7    to the floor, eyes open but unresponsive and uncooperative, and

8    then the patient went to bed and sleep, this was the evening in

9    question, and he had similar spells in the past, and this EEG

10   is to evaluate for any abnormalities.

11   Q.   Okay.  And what was the EEG designed -- designed to

12   determine in this instance?

13   A.   So evaluate for focal features and epileptiform discharges

14   to focal features.  If there is any abnormality in the brain,

15   it will show up as a small area of abnormality or irritated

16   brain discharges, classified as epileptiform discharges.

17   Q.   Okay.  So what is designed to kind of detect epileptic

18   discharges; is that correct?

19   A.   Yes.

20   Q.   Okay.  And was this an -- under description, was this a

21   sleep or awake EEG?

22   A.   So it was awake, drowsy and sleep state, so patient did

23   sleep through the EEG.

24   Q.   Okay.  And under clinical event, can you please kind of

25   tell us what you found there as far as what, if any, clinical

1   events there were?

2   A.   So there was one event that was captured when we do focal

3   stimulation, when we use flashlights to the strobe light, and

4   the patient had an event which is described over there as

5   holding his upper torso stiff at one -- and at one time, brief

6   arching of the back, holding the bed rails very tightly with

7   superimposed rhythmic shaking.

8   Q.   Slow down a little bit for me.   Okay, go ahead.

9   A.   Sorry.

10   Q.   That's okay.

11   A.   And then even subsided a little bit, but then continued

12   onto the shaking of the other arm, which is the left arm, the

13   shaking started again during when we do the activating

14   procedure as we call it, hyperventilation, so -- and the

15   duration of the spell was long, which was 20 minutes, and it

16   had a waxing and a waning pattern, with side to side head

17   shaking, eyes were closed during the event, and the patient was

18   able to follow commands as well as perform hyperventilation

19   during the event, and there was no behavioral arrest, or he was

20   able to follow some commands.   We give three clues to the

21   patient to remember during the event; he did not remember the

22   clues.

23   Q.   And I'm going to stop you.   What do you mean by three

24   clues?

25   A.   So if the patient is having an event, we give them three

1    phrases or words to remember, and that determines whether the

2    patient has clear consciousness or sensorium, and can recall

3    that.

4    Q.   Sorry.  All right.  Can you turn to the next page, or the

5    second page, and I want to talk to you about the section called

6    electrographically, says there was myogenic and movement

7    artifact with preserved PDR and no epileptiform discharges.

8    And what does that mean?

9    A.   So because of the movement, so EEG, the brain waves, they

10   were contaminated by movement or myogenic muscle artifact, and

11   those are not the brain waves but the muscle activity, but at

12   the same time, the PDR is posterior dominant rhythm which we

13   see in any person who is getting an EEG who is laying down with

14   their eyes closed relaxed.

15   Q.   Okay.

16   A.   And there were no epileptiform discharges or epileptic

17   discharges during that time of the event.

18   Q.   Okay.  There was also a section called activation

19   procedures, and that portion says Hz was performed and evoked

20   asymmetric bioccipital driving response.  What does that mean?

21   A.   So focal stimulation is an activating procedure with some

22   kind of epilepsy.  If you shine the lights, it brings on

23   abnormalities, not necessarily, but sometimes.  So we use it to

24   increase the yield, and we flash it at 3 to 30 Hz, and the

25   usual response is bioccipital driving response; the -- means

1    the EEG brain waves will reflect the rhythm of the light.

2    Q.   Okay.

3    A.   Or that the frequency the light is being shined.

4    Q.   Okay.  In your -- what was your interpretation?

5    A.   The whole interpretation?

6    Q.   Yes.

7    A.   Okay.  So it was a normal EEG, drowsy and sleep EEG.  There

8    was one spell that was captured that was classified as minor

9    with waxing and waning pattern, and visually, the episode was

10   described as stiffness of torso with side to side head shaking

11   and bilateral arm shaking, one at a time, with impaired recall.

12   He could not recall the phrases, but he could follow commands

13   during focal stimulation as well as hyperventilation.  When the

14   spell happened and with this event, I did not see any abnormal

15   epileptiform discharges.

16   Q.   Okay.  But then you have there in the -- I think the last

17   paragraph there, a clinical correlation.  What does the

18   clinical correlation mean?

19   A.   So as a diagnostician, we are looking at the EEG, and

20   report what we see in the EEG.  And in the EEG, I saw that

21   there was no focal features or focal abnormalities, no

22   epileptic discharge around the event that we managed to capture

23   on the EEG; that event was non-epileptic.

24   Q.   Okay.  And so I think you have the words there

25   non-epileptic spell; is that correct?

1   A.   Yes.

2   Q.   And is this the same thing as what we call kind a

3   functional seizure or a psychogenic non-epileptic seizure?

4   A.   We don't call it seizure, because it's not a seizure.   The

5   event in question, we don't use the word psychogenic because of

6   the connotation attached with that, and so we just call it

7   non-epileptic spell.

8   Q.   Spell?

9   A.   So unclassified spell.   It can be anything.

10  Q.   Okay.   And am I correct on the first page that this -- the

11  date of this EEG or date of your note was November 9th, 2017?

12  A.   Yes.

13  Q.   Okay.   Okay.   I don't have any further questions.   Thank

14  you.

15          THE WITNESS:   Thank you.

16          MR. HUSCHKA:   Your Honor, I have no questions for

17  Doctor Singh.

18          THE COURT:   All right.   You can step down.   Thank you.

19  You're excused.

20          THE WITNESS:   Thank you.

21          THE COURT:   Call your next witness.

22          MS. RAMSEY:   Yes, Your Honor, give me one moment.   One

23  moment, Your Honor.   Your Honor, defense would call Doctor

24  Brian Lewis.

25          MS. RAMSEY:   She's going to have you hold your hand up

1    and swear to tell the truth.  Doesn't matter, you can stand

2    right here.

3         (Witness sworn.)

4              THE WITNESS:  I do.

5              MS. WIEST:  Thank you.  You may have a seat.

6                             BRIAN LEWIS,

7    Called as a witness on behalf of the defendant, having been

8    first duly sworn, testified as follows:

9                        DIRECT EXAMINATION

10   BY MS. RAMSEY:

11   Q.   All right.  Would you please state your name for the

12   record, tell the jury who you are?

13   A.   My name is Brian Lewis.  I'm a psychiatrist.

14   Q.   And we'll talk about that more in just a minute, okay?

15   What city and state are you from, or you live in?

16   A.   I currently live in Charlotte, North Carolina.

17   Q.   Okay.  You said you're a psychiatrist; correct?

18   A.   I am a psychiatrist; correct.

19   Q.   Where did you receive your medical degree?

20   A.   I went to the University of Missouri, Kansas City.

21   Q.   Okay.  Can you tell me a little bit about your medical

22   background after you completed your medical degree?

23   A.   I completed my medical degree in 2001, received my medical

24   doctorate and bachelor of science, and then I went directly

25   into the United States Military to do a psychiatry residency,

1    and that was at Walter Reed Army Medical Center.

2    Q.   Okay.  So did you serve in the military?

3    A.   I did.

4    Q.   Okay.  What branch?

5    A.   I was in United States Army.

6    Q.   How long were you there for?

7    A.   I was in the United States Army from approximately May of

8    2001 until May of 2013.

9    Q.   And so part of the time that you were serving in the Army,

10   you were also practicing as a psychiatrist?

11   A.   The entire time I was in, I was doing that.

12   Q.   Where are you actually currently employed now?

13   A.   I am currently employed through Atrium Healthcare Systems

14   in Charlotte, North Carolina.

15   Q.   So if you had to say, about how long have you been

16   practicing as a psychiatrist?

17   A.   I completed my training in 2005.  Those four years, I was a

18   training psychiatrist.  I tend to count those, because I

19   practiced psychiatry, although I wasn't practicing

20   independently, and then from 2005 until now, 2022, so 17 years

21   of individual practice, but around 20-ish years total in

22   practicing psychiatrist.

23   Q.   Okay.  I want to take you back to -- excuse me -- your

24   career in 2005.  We've established I think that you were

25   working as a psychiatrist and in the US Military at Walter Reed

1    Hospital; is that correct?

2    A.   Technically, at the beginning of 2005, that is accurate,

3    and middle of 2005, I transferred to Fort Riley, Kansas where I

4    practiced at Irwin Army Community Hospital, psychiatrist as an

5    independent provider.

6    Q.   Let's talk a little bit about then Irwin Army Hospital.

7    Did that hospital cater mostly or primarily to military

8    personnel, or exclusively?

9    A.   It wasn't exclusively, but it was the vast majority.  Very

10   few civilians had their care there.

11   Q.   Okay.  And where was it physically located, do you

12   remember?

13   A.   Umm, you drove on to post and turned right.  That's all I

14   can kind of remember from when I was there.

15   Q.   So it was on Fort Riley?

16   A.   It was on Fort Riley, closer to the front of Fort Riley.

17   Q.   Okay.  Fair enough.  All right.  I want to take you back

18   and ask you if you have kind of any independent memory of

19   treating or evaluating a Mr. Bruce Hay?

20   A.   In truth, I have no real memory of seeing him.

21   Q.   Okay.  Have you reviewed some reports provided to you that

22   refresh your recollection?

23   A.   I do remember some aspects of seeing him with my medical

24   records.

25   Q.   Okay.  I'm going to -- I want to talk to you about your

1    treatment of Mr. Hay, but I'm going to hand you what's been

2    marked as Defendant's Exhibits 816, 817, 818 and 819, and ask

3    if you take a look at them, okay?

4    A.   Yes, ma'am.

5         MS. RAMSEY:  Your Honor, may I approach?

6         THE COURT:  Yes.

7    BY MS. RAMSEY:

8    Q.   And just let me know after you've taken a look at 'em,

9    okay?

10   A.   Yes, ma'am.

11   Q.   And have you seen a copy of those?

12   A.   Yes, I have reviewed these records.  That's why I went

13   relatively quickly.

14   Q.   Okay.  Fair enough.  Do those records, Exhibits 816, 817,

15   818 and 819, are those records that you would have authored?  I

16   think your signature is on most of those there.

17   A.   Yes, these were records that I completed myself.

18   Q.   Okay.  And they're, I'm guessing, a fair and accurate

19   depiction of the original records; correct?

20   A.   Yes.

21        MS. RAMSEY:  Your Honor, I would move to admit

22   Exhibits 816, 817, 818 and 819.

23        MR. HUSCHKA:  No objection.

24        THE COURT:  Exhibits 816 through 819 are admitted and

25   you can publish.

1    BY MS. RAMSEY:

2    Q.   After review of these records, would you agree or concur

3    that these are records of treatment that you would have

4    provided to a Mr. Bruce Hay?

5    A.   Yes, ma'am.

6    Q.   Okay.  And after review, do you -- can you tell how Mr. Hay

7    came to be a patient of yours?

8    A.   Well, I don't have very good memory.  This was 17 years ago

9    at this point, 16 plus.  So the initial one I believe was like

10   a Friday at 5 o'clock, and he was sent over to be evaluated

11   because he was -- had I believe recently returned to Fort Riley

12   from overseas, if I remember correctly in reviewing this

13   process, and he was about -- he was noted to be having some

14   symptoms.  He had records which showed that he was having some

15   disfunction, and one of the case managers sent him over to be

16   evaluated for mental health purposes.

17   Q.   Okay.  It looks like from Defendant's Exhibit 816, your

18   first treatment would have been -- was that November 14th,

19   2005?

20   A.   As best as I can recall, yes.

21   Q.   And when you're making these -- these notes, I guess what I

22   want to be clear, he's coming to you for treatment as a

23   referral for psychiatry; correct?

24   A.   Correct.

25   Q.   Okay.  Can you tell me after a review or refreshing your

1    recollection from Defendant's 816 kind of what the subjective

2    information you received about why Mr. Hay was there?  And

3    Exhibit 816 is there in front of you on the screen.

4    A.  So I don't have the records that I reviewed, but I was

5    summarizing records that I apparently had at the time, and this

6    individual had been sent, and had had now two neurological

7    evaluations, feeling that he had conversion disorder symptoms

8    at the time.  He was showing pretty significant signs of

9    disfunction, which would ultimately prevent him from staying on

10   active duty status, and it didn't take very long to sort that

11   out as such since I had a diagnosis of conversion disorder, and

12   he was showing obvious signs of disfunction, I went ahead and

13   pushed forward with the medical evaluation board.

14   Q.  Okay.  Let's talk individually about each exhibit and

15   information that you had there.  And then we'll talk about the

16   medical board a little bit, okay?

17   A.  Okay.

18   Q.  In subjective information.  So the patient presents for

19   evaluation with a history of conversion disorder and PTSD; is

20   that correct?

21   A.  Yeah, he came in with some significant traumatic anxiety

22   symptoms which were mostly consistent with PTSD, which there

23   were some atypical features which I assessed in the lack of

24   reaction, lack of reaction to a traumatic stress or that did

25   not involve intense horror or fear.

1   Q.   Okay.  And so you note there that he had had some

2   flashbacks, but -- but poorly defined, and some avoidant

3   behaviors which was usually driving; is that correct?

4   A.   Yes.

5   Q.   Okay.  And so did you make any notation about his mood

6   there after that section?

7   A.   Umm, in general, he was depressed when he came in.

8   Q.   Okay.  Did you note anything about his physical -- physical

9   behavior?

10   A.   I believe he required an ambulatory aid.

11   Q.   Okay.

12   A.   Which was one of the biggest tip-offs that he wasn't going

13   to be a soldier that was going to be fighting in a war.  We

14   don't tend to have folks with ambulatory aids in a combat

15   environment.

16   Q.   And under subjective, the subjective section, did you note

17   a non-neurological tremor?

18   A.   Yes.

19   Q.   And did you note that it had been longstanding and

20   refractory to treatment?

21   A.   If I annotated it as such, I had some records that I no

22   longer have access to that I would have been referring for that

23   from.

24   Q.   Okay.  As a result of the review of the records, and

25   getting the background information, and any evaluation of Mr.

1    Hay, did you come up with an axis of diagnosis on that day?

2    A.   Yes, I did.

3    Q.   Let's talk about those.  And what was your -- well, in this

4    record, we see five -- looks like five separate axes there.

5    A.   Yes.

6    Q.   What is -- an axis?  I'm saying access.  Axis I believe is

7    how it's pronounced.

8    A.   Axis, correct, ma'am.  Well, it's actually an artifact of

9    history at this point actually, because we don't use it

10   anymore, but at the time, it was the standard of care in which

11   we have Axis I, which is the shorthand major mental health

12   disorder; Axis II is personality disorders and intellectual

13   disfunction including at this time mental retardation, now

14   called mental disability; Axis III tends to have medical

15   problems listed; and then Axis IV would be related to

16   psycho-social stressors; and then Axis V, there's a global

17   assessment of functioning, which is just a general ballpark of

18   how somebody is functioning currently.

19   Q.   So Axis I would be the diagnosis?

20   A.   How we would tend to consider what a diagnosis is, yes.

21   Q.   Okay.  And what did you diagnose Mr. Hay with at that time?

22   A.   At that time, anxiety disorder, not otherwise specified, or

23   NOS is what that means, and then conversion disorder because of

24   the supporting neurologic documentation that came with him.

25   Q.   I want to talk to you about Exhibit 817, and before we get

 1    into the substance of that, I want to ask you in general, what

 2    is a medical evaluation board?

 3    A.   So I'm having to pull from some old memories, so I'll do my

 4    best.

 5    Q.   Okay.

 6    A.   So all soldiers -- and this is the United States Army

 7    process, all soldiers must meet retention standards in

 8    accordance with AR 40-501, Chapter 3, and this is massive

 9    regulation that says what diagnoses, from stubbed toe to

10    cancer, that will put somebody basically out of the military.

11    The psychiatric diagnosis fall under 3-30's area.  I couldn't

12    remember exactly which ones they were, and I would have

13    annotated in his medical board exactly where he would have

14    fallen within that.  And so we -- we have a diagnosis that

15    actually creates some degree of disfunction, and they have this

16    diagnosis.  We then put together a medical evaluation board

17    annotating the medical problems they have which would prevent

18    them from being fully functional on active duty service, the

19    limitations that they would have.

20    Q.   Okay.  So what were you -- Exhibit 817 is titled medical

21    evaluation board addendum.  Were you writing this for purposes

22    of sending this report onto the medical board?

23    A.   I don't -- I don't want to correct you too much.

24    Q.   No, please do.

25    A.   So the medical board's in and of itself its own thing.  I

1    was doing an addendum, because these documents are all

2    encompassing, and so they must start from a place of primary

3    care, so everything.  So any ear -- hearing, or any broken

4    bones you had, or anything you have has to be encompassed

5    within this medical board.  Very often, the primary issue that

6    we dealt with was mental health boards that were like almost

7    the whole thing, and there was very little, but sometimes who's

8    been in for like 16, 17 years would have multiple medical

9    problems which would have to be addressed as part of a separate

10   medical board evaluation process, and we would just provide

11   this addendum for mental health purposes.

12   Q.  Okay.

13   A.  And so this was my part of it.  We -- we treated it as the

14   medical board within our specialty, because this was the only

15   aspect of the medical board that we would put together, and so

16   then this global super document that has everything that's

17   happened medically -- psychiatrically is medically, but there

18   would be other addendums.  So there often would be a

19   neurological addendum for somebody who has a neurological

20   disorder, or if somebody had cancer, they'd have an oncological

21   addendum.  All these things would kind of come together as part

22   of the medical evaluation board, and then when this was

23   completed, and we had all the documentation together, this

24   would all be sent off to San Antonio where there was a physical

25   evaluation board, and it was usually made up of either senior

1    like colonels or retired officers, physicians usually, and they

2    would go through all these big documents, and then they would

3    determine overall what that meant on the other side,

4    percentages of disability, whether they actually should be

5    retained on active duty service or not.  They -- they would

6    take all of that, and then they would make their determinations

7    based upon our evaluation process.

8    Q.   So you were -- to try and summarize all that, you were

9    writing this kind of addendum or report as part of submitting

10   to a larger group of records that would be considered by the

11   medical evaluation board ultimately?

12   A.   Physical evaluation board, yes.

13   Q.   Okay.  And so -- but your kind of report was part of the

14   psychiatric addendum; is that correct?

15   A.   Correct.

16   Q.   Okay.  Let's talk about Page 1.  What was the chief

17   complaint that he had there?

18   A.   He had had problems since a wreck he had been in.

19   Q.   Okay.  Did you get any more information about that wreck?

20   A.   My understanding was the wreck happened while he was a

21   civilian, and he was having psychiatric symptoms, but still

22   mobilized, and then after he had been mobilized, when he came

23   back is my best understanding of how this whole process went.

24   Q.   Okay.  All right.  And towards the -- under history of

25   present illness, towards the bottom there, did you note that he

1    had been referred for group therapy and started Zoloft?

2    A.   Yes, I did annotate that.

3    Q.   Okay.  And what is Zoloft?

4    A.   Zoloft is a -- how technical do I -- should I get on this?

5    Q.   What's it used to treat, how about that?

6    A.   Anxiety and depression.

7    Q.   Okay.  You also note there that the consensus of the

8    evaluations were that of conversion disorder of neurological

9    symptoms which encompassed his difficulty in walking.  Was that

10   based on not only your diagnosis but a recognition that you had

11   had records that made that diagnosis?

12   A.   Yes.  At this time, we did not have as robust of electronic

13   medical records, so I would have had a case file with paper

14   evaluations that I no longer have access to.

15   Q.   Okay.  I'd like to turn to the second page if we could.

16   And that second page, do we have information about whether or

17   not he had done any follow-up care with psychology and mental

18   health or psychiatry?

19   A.   Yes, while he was there at Irwin Army Community Hospital,

20   he was activated to get the medical board process completed,

21   and he received services through our community mental health

22   services building there at Irwin Army Community Hospital.

23   Q.   Okay.  And in that second part, do you note, looks like

24   noting several different types of medications, including that

25   Zoloft, and looking at that section starting with he had Zoloft

1    increased, looks like he had also been prescribed Ativan?

2    A.   Uh-huh.

3    Q.   And what is that used to treat?

4    A.   Anxiety.

5    Q.   Okay.  And Zyprexa; what that is used to treat?

6    A.   A lot of things.  Primarily, it's used for psychotic

7    symptoms.  It can also be used as a mood stabilizer.

8    Q.   Okay.  And Klonopin, is it also used to treat psychiatric

9    health issues?

10   A.   Yeah, clonazepam, rifonivan (ph) and Ativan are

11   structurally very, very similar, and essentially do the same

12   thing.

13   Q.   You make a note that at that time, his history was reviewed

14   and was consistent in interview as it was throughout his

15   out-patient record.  What do you mean by that?

16   A.   He had a consistent presentation.

17   Q.   Okay.

18   A.   He did not have an inconsistent presentation is all.  It

19   just matters if for some reason that these symptoms were not

20   always present, if for some reason, they just resolved, we were

21   able to show that there was a difference in different days.  He

22   had the same symptoms every time he showed up.

23   Q.   Okay.  You also have a section here regarding that he had

24   some consistent aspects for I think PTSD, but he didn't meet

25   the criteria at that time; is that correct?

1    A.   Yes, they -- at the time, DSM 4 had a relatively, for lack

2    of a better phrase, thorny diagnosis process, and we tended to

3    have to pars that down; because there were so many people who

4    were experiencing trauma, we needed to have like per hoyle (ph)

5    diagnoses that would meet the criteria or not meet the

6    criteria.

7    Q.   Want to turn to the third page.  And on that third page,

8    did you do a review of systems?

9    A.   Yes, ma'am.

10   Q.   Okay.  And what were your findings?  What is a review of

11   systems?

12   A.   Umm, so review of symptoms would also be a review of

13   medical symptoms that would be potentially pertinently relevant

14   to a case.  So if somebody had some medical symptoms which

15   could theoretically affect their psychiatric concerns, we would

16   tend to annotate it there.

17   Q.   And what did you find regarding Mr. Hay?

18   A.   He had consistent chronic pain concerns.  He had this same

19   tremor that I've been annotating multiple times in the record,

20   and that has been annotated as not of neurological origin or

21   psychiatric in nature.

22   Q.   Okay.  You also did a mental status examination; is that

23   correct?

24   A.   Yes, ma'am.

25   Q.   What does that entail?

1    A.   A mental status examination is our generally objective

2    assessment.  It's often what we're actually evaluating, asking

3    questions that would tend to put together a more objective

4    process.  So we usually do an assessment of orientation, and we

5    assess for psychotic symptoms, we assess for a variety of

6    things that would be kind of present there in the room.  It's

7    not -- that doesn't tend to be historical aspect of the care,

8    but what's going on right now kind of a thing.

9    Q.   Sure.  And so under -- in his mental status examination,

10   was it fairly normal except did he have occasional

11   hallucination of ghost trucks?

12   A.   Yeah, the sunglasses in the military indoors was not

13   typical.

14   Q.   Okay.  Okay.  Fair enough.  You also have a section there

15   called treatment course, and it says that he was fully

16   cooperative, and I'm going to the next page which was Page 4,

17   and fully compliant with his treatment course or

18   recommendations.  What were your recommendations?

19   A.   Medications, he went to individual psychotherapy, and I

20   believe he even did some group while he was there.

21   Q.   Okay.

22   A.   But I don't remember exactly.

23   Q.   And on Page 4, ultimately, what was your finding about his

24   kind of condition and ability to function?

25   A.   Umm, that he did not meet retention standards in accordance

1    with the AR 40-501, Chapter 3 -- something I think it's 33, but

2    that's my best guess.  I don't see it anywhere, but I would

3    have written it somewhere.

4    Q.   Okay.  And let's talk about Page 5.  Ultimately, again,

5    what was your diagnosis?

6    A.   Anxiety disorder, not otherwise specified, and conversion

7    disorder.

8    Q.   Okay.  What did you attribute -- did you attribute the

9    diagnosis of the anxiety and conversion disorder to any

10   particular psychological factor?

11   A.   Yeah, specifically, this was consistently tied back to this

12   car wreck he had had earlier in the year.

13   Q.   Okay.  Did it also have to do with his exposure to trauma

14   in Iraq that may be exacerbating any tremors?

15   A.   Umm, it's possible.

16   Q.   Okay.

17   A.   It wasn't clear.

18   Q.   Okay.  All right.  I want to talk about Defendant's

19   Exhibit 818.  It looks like after November, did Mr. Hay come

20   see you again, it looks like December 20th, 2005?

21   A.   Yes.

22   Q.   Okay.  And was that for follow-up kind of psychiatric

23   treatment or evaluation?

24   A.   Yes, while he was waiting for the medical board to go

25   through, instead of being taken off of active duty orders, he

1    -- 'cause he was guard reserve, he was kept on active duty

2    orders, and placed there at Fort Riley until he could be taken

3    out of the military, and while he was there, he had had his own

4    civilian providers closer to home, and he needed providers, and

5    we tended to do our best to have 100 percent management of all

6    the soldiers who needed treatment while they're there, so I

7    assumed his care at that time.

8    Q.   Okay.  And so it looks like there's a notation that he was

9    still taking Klonopin and Ativan for anxiety and the

10   depression; is that right?

11   A.   Correct.

12   Q.   Was he taking any other sleep medication?

13   A.   He also had Ambien.

14   Q.   Okay.  It looks like there that you continued your

15   diagnosis as anxiety disorder and conversion disorder; is that

16   correct?

17   A.   Yes, ma'am.

18   Q.   Okay.  He did make a request about a prescription for a

19   sleep number bed and filling out a form from his Sears credit

20   card?  Is that something that he had asked you about?

21   A.   I -- I -- I'm going to have to say, I don't remember doing

22   this, but there's documentation that I did it, so...

23   Q.   Okay.  Right.

24   A.   It's there.

25   Q.   All right.  And so part of that was 'cause he was having

1   the trouble sleeping; is that correct?

2   A.  Yes, ma'am.

3   Q.  Okay.  So did you continue this care and see Mr. Hay again

4   on January 10th, 2016, as noted in Defendant's Exhibit 819?

5   A.  I did.

6   Q.  All right.  And so again, was he coming to you for

7   follow-up care?

8   A.  Yes, ma'am.

9   Q.  Okay.  Did you note whether or not he had had any kind of

10  change in his -- his symptoms of any kind?

11  A.  They'd been relatively consistent again.  He didn't have a

12  substantial improvement or decline while he was there waiting

13  for his medical board to be completed.  And then the goal was

14  to move him away from the Zyprexa which is really more for mood

15  and/or psychosis, and get him on to things that were more

16  consistent with anxiety management.

17  Q.  Okay.

18  A.  So --

19  Q.  And so he was still on medication for the anxiety and the

20  depression.  Any medication for sleep?

21  A.  Yeah.  Yes, ma'am, the Ambien was also there.  So the

22  Clonazepam, the Ativan, we -- I think we consolidated to the

23  Clonazepam with the Clonopin which can also be sedating.  The

24  Ambien is also a sedative, so he had pretty substantial sleep

25  medications.

1   Q.   Okay.  Now, on that date again, did you make a diagnosis of

2   anxiety and conversion disorder?

3   A.   I did, ma'am.  I had no reason to change his diagnosis at

4   that time.

5   Q.   Okay.  Regarding your -- your diagnosis, now, I know you

6   said that part of what you were doing was that your treatment

7   included having prior records of Mr. Hay, prior medical records

8   of Mr. Hay; is that correct?

9   A.   Yes, ma'am.

10  Q.   Okay.  And so you reviewed those records as a part of your

11  diagnosis; is that correct?

12  A.   Yes, ma'am.

13  Q.   But you also made an independent diagnosis of anxiety and

14  conversion disorder.  I don't want to say on your own, but that

15  was your diagnosis in conjunction with what you were seeing in

16  the medical records?

17  A.   With the support of his medical records, yes, ma'am.

18  Q.   Okay.

19          MS. RAMSEY:  May I have one moment, Your Honor?

20          THE COURT:  Yes.

21          MS. RAMSEY:  I don't have any further questions.

22  Thank you.

23                          CROSS EXAMINATION

24  BY MR. HUSCHKA:

25  Q.   Good morning, Doctor Lewis.

 1   A.   Good morning.

 2   Q.   I just have a few questions.  So Miss Ramsey just walked

 3   you through these series of notes, and your testimony today is

 4   based on your review of the notes that she walked you through;

 5   right?

 6   A.   Yes, ma'am -- sir.

 7   Q.   So that starts November 14th, 2005, and then you see him a

 8   total appears of four times, the last time being January 10th,

 9   2006?

10   A.   Yes, sir.

11   Q.   And so you -- you don't have any knowledge of what the

12   defendant was doing before you saw him on November 14th, 2005;

13   right?

14   A.   I had medical records that I don't have now, so I could not

15   tell you what that was, and I don't have enough memory to

16   explain, but I had some ability to review things that had

17   happened while he was deployed, and some records from prior to

18   being mobilized, but I don't have those now, so I couldn't tell

19   you anything.

20   Q.   And let me ask it -- ask a slightly different question.  So

21   other than the medical records you had access to at the time,

22   but your physical observations, your interactions, it was

23   limited to those instances; right?

24   A.   Those were the only times I saw him, yes.

25   Q.   So you still have in front of you there Defendant's

1    Exhibit 817.  If you could turn to Page 4, and you note here,

2    there's a paragraph, present condition and current functioning?

3    A.   Yes.

4    Q.   And near the bottom of that paragraph, you note here that

5    this soldier is largely unable to perform much more than the

6    basic activities of daily living.  He is unable to drive.  His

7    typical day consists of self-care activities.  So was that

8    based in part of -- on your observations of him and your

9    interactions with him when you met with him?

10   A.   Yes, sir.

11   Q.   And in fact, I think you say here, too, it's my opinion

12   he's currently incapable to work in civilian employment?

13   A.   Yes, we have to make an annotation as to our best

14   understanding based upon what we have in front of us as to his

15   ability to work as a civilian.

16   Q.   Okay.  And then if you could, if I could refer you to

17   Defendant's Exhibit 818, this is the note from December 20th --

18   A.   Yes, sir.

19   Q.   -- 2005.  There's a note here at the top, it's under

20   subjective.  It says patient requested that one, write a

21   prescription for a sleep number bed.  So here you're annotating

22   the fact that during this visit, the defendant asked you to

23   write something for a sleep number bed?

24   A.   Yes, sir.

25   Q.   And then the second part says, fill out a form for his

1    Sears credit card dealing with his disability.  Do you know
2    what you meant there?
3    A.   It's an unusual request.  I can't think of another time
4    that I've done that.
5    Q.   And so this was approximately three weeks after that --
6    that last note we just read from November 28th, 2005?
7    A.   Yes, sir.
8    Q.   And when you meet with him, I mean, you were writing down
9    even just these requests, so if he told you something
10   significant, you would have noted it here; right?
11   A.   Hopefully.
12   Q.   So if he had told you that he had been in a car accident
13   two days before this, and he was the one who was driving, you
14   would have noted that here; right?
15   A.   I would have definitely noted that.
16   Q.   No further questions.
17                    RE-DIRECT EXAMINATION
18   BY MS. RAMSEY:
19   Q.   Do you still have Defendant's Exhibit 817 in front of you?
20   A.   I have 817 in front of me, yes, ma'am.
21   Q.   Okay.  So the history of information you had was that Mr.
22   Hay had been in a car accident in February 25th, 2005; correct?
23   A.   That's as best as I can recall.
24   Q.   Okay.  And then your first visit, it looks like wasn't but
25   approximately November, eight or nine months later; is that

1   right?  I think that's the first visit.

2   A.  Yes, ma'am.

3   Q.  Okay.  And then the last date that you saw him in

4   January 10th, 2006, to your recollection, you don't know if he

5   got any additional follow-up care from any other psychiatry

6   treatment; is that correct?

7   A.  He was seen in our clinic after that, but I -- the record's

8   not great.  There's some issues related to one of the providers

9   that he did see there who didn't finish their documentation, so

10  I don't have that to review.

11  Q.  So he -- you don't have those documents to review because

12  something internal happened with the records, but he did

13  receive follow-up care for psychiatry --

14  A.  Yes, ma'am.

15  Q.  -- at the clinic; is that correct?

16  A.  Yes, for approximately a few more months, three,

17  four months, something like that.

18  Q.  Okay.  No further questions.  Thank you.

19          THE COURT:  All right.  Anything more?

20          MS. RAMSEY:  No, Your Honor.

21          MR. HUSCHKA:  No, Your Honor.

22          THE COURT:  All right.  Step down.  You're excused.

23  Leave those there.  All right.  Call your next witness.

24          MR. MAGARIEL:  Call Jessica Klinge.

25          MS. WIEST:  Raise your right hand please.

```
 1        (Witness sworn.)

 2             THE WITNESS:  I do.

 3             MS. WIEST:  Watch the cords there so you don't trip.

 4   BY MR. MAGARIEL:

 5   Q.   Good morning.  Will you please state your name?

 6   A.   Morning.  Jessica Klinge.

 7   Q.   And will you spell both the first and last?

 8   A.   J E S S I C A.  K L I N G E.

 9   Q.   Thank you very much.  Were you previously known with a

10   different last name?

11   A.   I was.

12   Q.   And what was that?

13   A.   Schuler.

14   Q.   Would you spell that as well for me?

15   A.   S C H U L E R.

16   Q.   Thank you.  Are you employed today?

17   A.   Yes.

18   Q.   Where do you work?

19   A.   The VA Medical Center.

20   Q.   What do you do there?

21   A.   I'm an occupational therapist.

22   Q.   And what type of degree is required to be an occupational

23   therapist?

24   A.   Master's of occupational therapy.

25   Q.   Where do you have that degree from?
```

1    A.   KU.

2    Q.   Can you summarize for the jury what an occupational

3    therapist does?

4    A.   Occupational therapy is to help promote independence with

5    daily activities, and safety with whatever they need to do to

6    function in daily life.

7    Q.   And I think you have all ready said this, but you're

8    employed today as an occupational therapist with the VA?

9    A.   Yes.

10   Q.   And that's in Kansas City, Missouri?

11   A.   Yes.

12   Q.   Were you in that same job in July of 2016?

13   A.   Yes.

14   Q.   Same location?

15   A.   Yes.

16   Q.   And is there an occupational therapy clinic at the VA

17   Medical Center?

18   A.   Yes, sir.

19   Q.   And there also was one back in July of 2016?

20   A.   Yes, sir.

21   Q.   You summarized what an occupational therapist does.  Is

22   there anything more specific you would have done in the clinic,

23   or just the general practice that you described previously?

24   A.   Can you rephrase the question?

25   Q.   Sure.  I just want to make sure I understand that the

1  clinic you worked in, was that just general practice of

2  occupational therapy, or were you doing something else?

3  A.  I was doing more orthopedic work in the clinic, and that is

4  what I still do, but they were wanting occupational therapy to

5  do evaluations for the caregiver program in 2016.

6  Q.  So that is one of the jobs that you would have done was an

7  evaluation for the caregiver program; is that right?

8  A.  Correct.

9  Q.  And what were you looking at when you do such an

10  evaluation?

11  A.  The veteran's level of independence and the requirements

12  for assistance with activities of daily living, as well as

13  safety, and how much they need a caregiver.

14  Q.  And is this to determine eligibility for the caregiver

15  program?

16  A.  Correct.

17  Q.  And so do you review prior records before you meet with a

18  particular veteran?

19  A.  As best I can.

20  Q.  And then you, I assume, have a one on one meeting with the

21  veteran --

22  A.  Yes.

23  Q.  -- and the caregiver; and is there an interview portion of

24  that?

25  A.  Yes.

1    Q.   And is there also some physical work that you do?

2    A.   We do a little bit of physical work, but a lot of it is

3    self-report by the veteran and the caregiver.

4    Q.   The veteran tells you their capabilities in a number of

5    categories; is that right?

6    A.   Yes.

7    Q.   And you note that in a form related to -- I think there's a

8    name for that form, occupational therapy caregiver assessment?

9    A.   Yes.

10   Q.   Within those categories, are there particular scores or

11   ratings that you provide?

12   A.   Yes.

13   Q.   And can you tell me, or describe what the scoring or rating

14   system is?

15   A.   It's a universal rubric, so it's used statewide.  It's not

16   something that I've created on my own.  But each category

17   measures a different aspect of life that the veteran may need

18   assistance with, and it is graded by level of assistance based

19   on certain requirements.

20   Q.   So you've all ready explained this a little bit, but

21   there's an -- I think you called it a rubric that you use in

22   your sort of looking to see where veteran fits in those

23   established criteria?

24   A.   Correct.

25   Q.   And so are there literally like numbers or letters that you

1    give to put them into these various categories, to put each
2    veteran into various categories?
3    A.   Yes.
4    Q.   And what are the numbers or letters system that you use?
5    A.   If I recall, it's a 0 through 4 category, but I don't have
6    the rubric in front of me.
7    Q.   Okay.  And do you remember which one was the low and which
8    one was the high?
9    A.   I have the numbers on my report.
10   Q.   Okay.
11   A.   But I'm not in the caregiver program anymore, so I don't
12   perfectly remember it.
13   Q.   Okay.  Was 0 meaning did not have limitation, or was 0
14   meaning had extreme limitation?
15   A.   Correct, 0 limitation, not a need for assistance.
16   Q.   And then if it was 4, it was extreme need for assistance or
17   whatever the appropriate word is?
18   A.   Correct.
19   Q.   Okay.
20        MR. MAGARIEL:  Your Honor, may I approach?
21        THE COURT:  Yes.
22   BY MR. MAGARIEL:
23   Q.   Miss Klinge, I'm handing you what has been marked as
24   Defendant's Exhibit 834.  If you just take a moment and orient
25   yourself with this document, please.  Did you get a chance to

1   look at that document?

2   A.  Yes, sir.

3   Q.  Does that appear to be an occupational therapy caregiver

4   assessment that you completed back in 2016?

5   A.  Yes.

6   Q.  And does it appear to relate to Bruce Hay?

7   A.  As far as I recall.

8          MR. MAGARIEL:  Judge, if I could have just a moment?

9          THE COURT:  Yes.

10  BY MR. MAGARIEL:

11  Q.  On the third page of that document, does it have your

12  signature on it, at least an electronic signature?

13  A.  Yes.  Yes.

14         MR. MAGARIEL:  Move to admit 834.

15         MR. OAKLEY:  No objection, Your Honor.

16         THE COURT:  834 is admitted and you can publish.

17         MR. MAGARIEL:  Thank you, Judge.

18  BY MR. MAGARIEL:

19  Q.  Miss Klinge, I think the document that's in front of you

20  will also appear in that screen just there to your right,

21  whichever is easier for you to take a look at it.  Should come

22  back here.  There we go.  I'm going to ask you a few questions

23  about this form.  It appears that you did this consultation

24  July 28th of 2016; is that right?

25  A.  According to this document, yes.

1   Q.   Okay.  And you've said that, because I assume you don't

2   have an independent memory of doing this evaluation?

3   A.   No.

4   Q.   Okay.  It's been a little over six years ago?

5   A.   (Nodded.)

6   Q.   Is that right?

7   A.   Yes.

8   Q.   Okay.  And you probably did a fair number of these back in

9   2016?

10  A.   Yes.  I'm also not in the caregiver program anymore, so it

11  is hard to recall.  I see like 12 patients a day.

12  Q.   Fair enough.  I'll try to direct you to the question and

13  where I'm getting it from this form.  If you are unclear, let

14  me know.  I'll try to direct you to where I'm asking the

15  question from.  Does it look like this was a referral from a

16  Doctor McWoods there on that first page?

17  A.   Correct.

18  Q.   And does it say that the veteran is a 47-year old male who

19  is accompanied by his wife for an annual caregiver support

20  assessment there on the first page?

21  A.   Yes.

22  Q.   If we could turn to the second page of that document.  I

23  see on the fourth paragraph of that second page, it says

24  something called an IADL.  Can you tell me what that is?

25  A.   It's called instrumental activities of daily living, and

1    they usually include cooking, cleaning, finances, medication

2    management, things like mowing and driving.

3    Q.   And so you would have asked questions related to those

4    needs?

5    A.   Correct.

6    Q.   And so I see in that paragraph that for this particular

7    person, veteran can cook, fold his laundry, load the washer and

8    dryer; is that right?

9    A.   Correct.

10   Q.   And then in the next section, it says ADLS and self-care.

11   What is ADLS?

12   A.   Activities of daily living are more related to personal

13   self-care - bathing, dressing, toileting, being able to

14   transfer, to be able to do those, feeding one's self, sexual

15   disfunction, too.

16   Q.   So you would have asked a series of questions related to

17   those type of needs?

18   A.   Yes.

19   Q.   And so I see them divided up.  The first says eating, and

20   it says 0.  If I understood what you said earlier, 0 means

21   pretty much no limitation?

22   A.   Correct.

23   Q.   And that's consistent --

24   A.   I'm sorry, can I correct that?

25   Q.   Please.

1  A.  O with that rubric means that they wouldn't need caregiver

2  assistance with that.

3  Q.  So they could have some limitation, but they could perform

4  the necessities to complete that task on their own?

5  A.  Yes.

6  Q.  Grooming is the next category, and that score is a 1.  Does

7  that mean some, but limited need for caregiver assistance?

8  A.  Yes.

9  Q.  The next category I see there -- well, and let's talk about

10 grooming briefly.  It says that his wife cuts his hair and

11 buzzes his beard, but he does his own oral care; is that right?

12 A.  Uh-huh, yes.

13 Q.  Okay.  The next category I see is bathing, and that is

14 again a 0, and then it says something else there, MOD 1 with

15 this task.  What is MOD 1?

16 A.  That means he's modified independent.  He's able to do the

17 task by either adapting the task or using an adaptive piece of

18 equipment to perform the task.

19 Q.  Okay.  And it says in that paragraph, maybe, the equipment

20 that you're referencing there, that he was provided with a long

21 sponge to reach his back.  Is that an example of that kind of

22 equipment?

23 A.  Yes.

24 Q.  So with that type of assistance, he was able to do this

25 without the need for a caregiver?

1   A.   Correct.

2   Q.   And then the next category is dressing, and I think this is

3   the same, O, so no need for caregiver assistance with MOD 1; is

4   that right?

5   A.   Correct.

6   Q.   And as I understand your description here, there's

7   something called a sock aid?

8   A.   Yes.

9   Q.   Can you tell me what that is?

10  A.   That is a device on a rope that you can put your socks on

11  if you don't do well at bending over.

12  Q.   Helps folks who can't reach all the way down to their feet?

13  A.   Right.

14  Q.   So with that assistance -- or as it says there, I think, a

15  long shoe horn and reacher, he is able to do -- to dress

16  himself without the need of a caregiver; is that right?

17  A.   Correct.

18  Q.   And then the next is toileting, and there's not much

19  description there, just says does not need caregiver

20  assistance; is that right?

21  A.   Yes.

22  Q.   And the same with prosthetics, this veteran did not have a

23  prosthetic?

24  A.   Correct.

25  Q.   The next category I see there is seizures, and I see that

1   you've put 0, which means there was not need for a caregiver

2   related to seizures; is that correct?

3   A.   Correct.

4   Q.   But it looks there in that paragraph that the veteran noted

5   episodes of tremors and cramping?

6   A.   Yes.

7   Q.   But denied that those episodes were actually seizures; is

8   that correct?

9   A.   Yes.

10  Q.   And then you have a larger paragraph there at the bottom of

11  the page that references planning and organization.  What type

12  of things are you looking at when you do these type of

13  questions?

14  A.   A lot of times, it's ability to organize one's medications

15  and remember appointments, be able to keep track of doctor's

16  appointments and places you need to be, and also just your

17  daily routine.  We also talk about finances with this, as well

18  as safety with cooking, can you follow directions with a

19  recipe, and can you turn off the stove or the oven in the

20  correct sequence, as well as managing a calendar with your

21  appointments?

22  Q.   It sounds to me, and you tell me if I'm misunderstanding,

23  that this is less physical and more memory or task based?

24  A.   Correct.

25  Q.   And so this was the one I think we've had the highest score

1  for so far, which was a 2.  What puts somebody in a Category 2

2  as far as need for caregiver assistance?

3  A.  Well, I don't have that rubric in front of me to give you

4  an exact answer, but with this, he preferred to have some

5  assistance with driving, and you can see that in some of the

6  other parts of the report, too, but he can drive, but he

7  preferred not to, because being around other people made it

8  difficult for him to focus, and he also didn't want to deal

9  with people on the road, which some of us don't.  He was able

10 to spend money appropriately, but his wife did that, was

11 responsible for their finances, and they're able to go out to

12 eat, to do errands, but he would not be doing that on his own

13 per his report, that he would only do that with his wife, or

14 preferred to have his wife with him, and he was able to fill

15 his own medications, but she had to remind him to take them,

16 and either didn't want to or -- or couldn't use an adaptive

17 piece of equipment to help him remember them, as well as

18 appointments.  She would remind him about his appointments as

19 well.

20 Q.  And did I also see in that paragraph, and you had I think

21 mentioned the driving, that he told that he's able to drive to

22 his family farm and his mother's house, which is approximately

23 ten minutes away?

24 A.  Correct.

25 Q.  But I think as you all ready mentioned, said he prefers his

1    wife to drive?

2    A.   Yes.

3    Q.   The next category that's there at the very bottom of that

4    page says safety.   What types of things are you looking for in

5    that category?

6    A.   We are looking for the ability to be at home safely on your

7    own, things like shutting off the oven and the stove, and

8    locking doors, but we're also looking at possible suicidal or

9    any hallucinations that might be present for the party.

10   Q.   And this is another one that got a 0 score.   You did not

11   believe he needed caregiver assistance for these type of needs?

12   A.   Correct.

13   Q.   If we could turn to the next page on that document.   And so

14   this sort of finishes with I think some of the things you've

15   all ready mentioned as far as operating safely electrical

16   devices, things of that nature.   The next category says sleep,

17   and again, this is the category in which you determined there

18   was no need for a caregiver assistance?

19   A.   Correct.

20   Q.   And then the same with delusions or hallucinations, it

21   sounds like in this case, the veteran denied any?

22   A.   Correct.

23   Q.   And then the next category is titled impairment of recent

24   memory, and this is another that got a 2 score.   Can you

25   describe generally what you're looking for in that category?

1    A.   With this program, we're looking at the ability to

2    remember, to perform your self-care tasks.  So in this case,

3    forgetting to brush your teeth regularly, being able to take

4    your medication as prescribed, more as a memory rather than not

5    wanting to take your medicine, and also being able to remember

6    events coming up on the calendar or an appointment.

7    Q.   And again, I think we mentioned this scored 2 points for

8    some -- some need for caregiver assistance; is that right?

9    A.   Correct.

10   Q.   The next category is called effective or behavioral

11   diagnoses regulation.  Can you describe again what you're

12   looking for in that category?

13   A.   Another good word for this category is anger management,

14   and the ability to regulate your own emotions, and control your

15   behavior.

16   Q.   And I think this is another one where I see some mention of

17   driving and running errands, things like that; is that right?

18   A.   Yes.

19   Q.   And you assessed a Category 1, or limited need for

20   caregiver assistance there?

21   A.   Correct.

22   Q.   Okay.  And so in the end, the final assessment, the veteran

23   scored 6, and it seems to me, math is not my specialty, but you

24   just added up the points that we've all ready gone through

25   there, and you got to 6; is that right?

1    A.    Yes.

2    Q.    And then I see below the assessment, there's three

3    categories there, high dependence, 28 to -- well, 21 to

4    28 points, moderate dependence, 13 to 20 points, and low

5    dependence, 1 to 12 points.  Did I state those categories

6    correctly?

7    A.    Yes.

8    Q.    And so if this particular veteran scored 6, they're clearly

9    in the low dependence category?

10   A.    For this rubric, yes.

11   Q.    And then I see the evaluation time was approximately

12   60 minutes noted there?

13   A.    Correct.

14   Q.    Where does this form go after you complete it?

15   A.    It's saved into his chart.

16   Q.    And is it used by the VA more broadly to determine whether

17   someone gets caregiver benefits or not?

18   A.    It is assessed by the caregiver committee who considers

19   this as well as prior records when they're determining

20   eligibility for that program.

21   Q.    Is someone normally eligible for the program if they score

22   low dependence or low need for a caregiver?

23   A.    Can you rephrase that, please?

24   Q.    Sure.  And if you don't know, you can tell me, but is

25   someone -- so as I understood this assessment, and tell me if

1    I've misunderstood you, this is in part to determine whether

2    someone qualifies for the caregiver assistance program; is that

3    right?

4    A.   It helps to determine that, but I don't believe this is the

5    only determining factor as to whether or not someone is

6    eligible, rather than what tier level they would be approved

7    for.

8    Q.   This isn't the end all, be all?

9    A.   Correct.

10   Q.   But it's a factor that is considered when determining

11   whether someone gets caregiver support or not?

12   A.   Correct.

13   Q.   Is being in the low dependence category something that

14   would reduce the chances of somebody qualifying for the program

15   or continuing in the program?

16   A.   It's always possible.

17   Q.   You don't know for sure, it sounds like?

18   A.   Everyone is a case by case basis.

19   Q.   Okay.  And it sounds like you weren't then and maybe aren't

20   now the person who made that ultimate decision?

21   A.   No, it's usually a whole committee.

22   Q.   But this is information that you record for the committee

23   to review at some point, and ultimately make that

24   determination?

25   A.   Correct.

1   Q.   Is that something that you explain at the beginning of the

2   evaluation to the veteran?

3   A.   That I recall, yes.

4   Q.   The purpose for the meeting?

5   A.   Yes.

6   Q.   What we're here for?

7   A.   Yes.

8   Q.   Okay.  And so as I understood this document, most of it is

9   based on what was reported to you by the veteran during your

10   meeting?

11   A.   Correct, veteran and his caregiver.

12   Q.   And then I see there at the bottom after your electronic

13   signature, it says acknowledged, receipt acknowledged by, and

14   then there's a couple of different other providers; Emmett

15   McWoods, MD, do you see that?

16   A.   Yes.

17   Q.   And then John Charles O'Roark who's an I think licensed

18   clinical social worker; is that right?

19   A.   Correct.

20   Q.   Do you know either of those folks?

21   A.   One of 'em, I know face to face, yes.

22   Q.   Okay.  Is that John Charles O'Roark?

23   A.   Yes.

24   Q.   Is that someone who you work with?

25   A.   Correct.

1    Q.  You spoke a little bit about the ultimate determiner on
2    this, and I think it's actually listed under your assessment
3    paragraph.  Does that last sentence say, the caregiver support
4    committee will consider the above updated information as well
5    as prior documentation to determine level of need?
6    A.  Correct.
7    Q.  I think you almost exactly said that before; is that right?
8    A.  That I recall, yes.
9    Q.  Pretty close.  Could I have just a moment, Judge?
10           THE COURT:  Sure.
11   BY MR. MAGARIEL:
12   Q.  Just -- just one other thing that I think I forgot to
13   mention.  If we could go back to Page 2 on that document.
14   When -- when you and I were discussing the eating category,
15   this was one that you scored as 0, or no need for caregiver
16   assistance; is that right?
17   A.  Correct.
18   Q.  And then it looks like the veteran told you that he had
19   episodes where his muscles cramp up and he gets tremors, but if
20   this happens, he's not going to attempt to eat at that time; is
21   that correct?
22   A.  Correct.
23   Q.  And is that part of the reason why you would have scored
24   this 0, is that even though he told you he has muscle cramping,
25   it does not impair his ability to feed himself and eat?

NANCY MORONEY WISS, CSR, RMR, FCRR

1    A.   Two reasons.  One was that he had a weighted spoon, which

2    means he's been evaluated by an OT before, and was able to be

3    modified independent with that device, and since he didn't

4    report that his caregiver required feeding him physically, then

5    he didn't require a caregiver to assist him with that task.

6    Q.   That's all I have.  Thank you for your time.

7    A.   Okay.

8                         CROSS EXAMINATION

9    BY MR. OAKLEY:

10   Q.   Miss Klinge, do you still have Defendant's Exhibit 834 in

11   front of you?

12   A.   Is that my report?

13   Q.   Yes.

14   A.   Yes.

15   Q.   And so this is a report of your consult that was July 28th,

16   2016; correct?

17   A.   Correct.

18   Q.   Now, I just want to talk to you about some of the things

19   that the defendant or his wife told you in July of 2016.

20   First, directing your attention to that first page under

21   subjective, defendant told you, I can drive.  I just don't like

22   people, so I prefer her to drive.  I just don't like driving.

23   Is that correct?

24   A.   Correct.

25   Q.   And I notice in your report that that part's in quotes, so

1    the defendant told you, I don't like people; correct?

2    A.  If it's in quotes, yes.

3    Q.  If you put it in quotes in your report, does that mean it's

4    a direct quote, word for word like he said?

5    A.  His word for word, as I can recall.

6    Q.  Can you please turn to the second page.  There was this

7    discussion on direct examination of IADL's, and you discussed

8    that one of the things that you asked relates to lawn mowing;

9    correct?

10   A.  Correct.

11   Q.  And in 2016, the defendant told you that he has a neighbor

12   who mows his yard for him; is that correct?

13   A.  Yes.

14   Q.  And then staying on that same page, but going down to the

15   last or second to last paragraph, planning and organization,

16   again, you discussed with the defendant the things that he's

17   able to do physically as part of this evaluation; correct?

18   A.  Yes.

19   Q.  And I assume as part of this evaluation, you assume that

20   defendant is going to be truthful with you; is that true?

21   A.  We hope, yes.

22   Q.  And you also assume or hope that the people you're

23   interviewing are going to disclose everything that's relevant

24   to your questions?

25   A.  We hope, yes.

1    Q.   And in preparing this report, you put in the report the

2    things that are told to you; correct?

3    A.   Correct.

4    Q.   You didn't conduct surveillance of the defendant while he

5    was engaged in these activities of daily living; is that a fair

6    assumption?

7    A.   I could not observe all, but I am able to observe someone

8    walk into the clinic, and range of motion, and that type of

9    thing.  So physically, maybe a little, but I'm not observing

10   directly these tasks most the time, no.

11   Q.   Okay.  And the physical observations that you're making are

12   as the person is presenting them to you; correct?

13   A.   Correct.

14   Q.   And so if I chose to bob my head, that's a physical

15   observation that you could make; correct?

16   A.   Correct.

17   Q.   Okay.  But other than those physical observations, you're

18   relying on what is told to you?

19   A.   Correct.

20   Q.   And so when you're discussing with the defendant what he's

21   able to do, he indicated he's able to initiate and complete

22   some household tasks with verbal cuing.  He is able to fold his

23   own laundry and wash it with reminders; correct?

24   A.   Correct.

25   Q.   He indicates that he's able to drive to the family farm and

1    to his mother's house, which is approximately ten minutes away,

2    and then there was this discussion I think that you talked

3    about on direct as far as going out to eat together, and run

4    errands together without difficulty, though he would not do

5    these on his own?

6    A.   True.

7    Q.   That's what you put in your report?

8    A.   Yes.

9    Q.   In other words, defendant told you that he would not do

10   activities on his own without someone?

11   A.   Yes.

12   Q.   Okay.  Now, you mentioned that this was a report of the --

13   of 2016, and I think you mentioned on direct that typically,

14   veterans have other similar interviews; correct?

15   A.   Can you rephrase the question please?

16   Q.   Yes.  Typically, this is not a one time deal.  Does this

17   occur annually, every two years, do you know?

18   A.   When they first apply for the caregiver support program,

19   they are evaluated, and if it seems that there's been a change

20   in medical status or significant change in function, they may

21   be reevaluated, but it was not a requirement that they all

22   become annually evaluated.  If nothing changes, then they may

23   stay on the same tier, and continue where they're at in the

24   program.

25   Q.   Now, on direct examination, you were just asked about this

1    particular examination in 2016, and I think you testified that

2    you have no independent recollection of this particular

3    examination; is that correct?

4    A.   Correct.

5    Q.   And so you're relying on the records?

6    A.   Correct.

7    Q.   Correct?  And you -- you did many of these around that

8    time; is that correct?

9    A.   Yes, I was part of this program for three years.

10   Q.   Okay.  Do you remember doing an examination of this

11   defendant any other time, two years earlier in 2014?

12   A.   I don't recall.

13        MR. OAKLEY:  Might I approach, Your Honor?

14        THE COURT:  Yes.

15   BY MR. OAKLEY:

16   Q.   I'm going to hand you a copy of progress reports.  Could

17   you turn to the -- to the second page of the progress notes,

18   and there at the bottom, do you see an entry of a note dated

19   July 23rd, 2014?

20   A.   Yes.

21   Q.   And does it appear that two years before 2016, on July --

22   well, in July of 2014, that you did another occupational

23   therapy caregiver assessment of the defendant?

24   A.   Looks like I did.

25   Q.   And so this one occurred July 23rd, 2014?

1    A.   Uh-huh.

2    Q.   So two years.  The other one was in August of '16, this is

3    July 2014; correct?

4    A.   Correct.

5    Q.   Do you have an independent recollection of the 2014

6    examination of the defendant?

7    A.   I don't recall personally, no.

8    Q.   But this report indicates that you did do that examination;

9    correct?

10   A.   Looks like it, yes.

11   Q.   So at any point when I'm asking you questions, if you need

12   to refer to the report to refresh your recollection, please do

13   so.

14   A.   Uh-huh, okay.

15   Q.   Staying on that second page, does it appear that defendant,

16   well, arrived at the clinic accompanied by his wife to be

17   reevaluated for caregiver assessment?

18   A.   Let me take a moment, and I'll try to answer that.

19   Q.   And if it helps, I think right under the date at the top,

20   July 23rd, 2014?

21   A.   Oh, yes, thank you.  Umm, yep, that looks like he was

22   accompanied by his wife for that evaluation.

23   Q.   And then if I could direct your attention to the middle of

24   the page, it says veteran and his wife do not hold jobs at this

25   time.  She states she is pretty much with him all the time;

1  correct?

2  A.  Correct.

3  Q.  And then if you could turn to the third page.  Now, this

4  evaluation was similar to the one that you talked about on

5  direct examination?

6  A.  Uh-huh.

7  Q.  You looked at the same types of things; correct?

8  A.  Correct.

9  Q.  And so, for instance, under the ADLS and self-care, you

10  provided that with built up handles and weighted spoon for

11  assistance with tremors; correct?

12  A.  Correct.

13  Q.  So earlier, you had mentioned in 2016 that there was a

14  discussion about a weighted spoon?

15  A.  Uh-huh.

16  Q.  You gave the defendant a weighted spoon at this interview?

17  A.  Correct; yes.

18  Q.  Directing your attention to -- to bathing, vet does require

19  assistance getting into and out of the tub at this time;

20  correct?

21  A.  At that evaluation, yes.

22  Q.  In 2014?

23  A.  Yes.

24  Q.  Mobility, you indicated that he ambulates with a cane, and

25  uses a rollator on his bad days, and bad days is in quotation;

1    correct?

2    A.   Yes.

3    Q.   Vet visibly had difficulty with sit to stand transfers and

4    decreased balance with ambulating through clinic, and so that's

5    something that you observed the way that defendant presented

6    himself in 2014?

7    A.   That day, yes.

8    Q.   Turning to the third page, that top paragraph, she does all

9    driving for his transportation, he chooses not to drive at this

10   time.  She being the wife; is that correct?

11   A.   Yes.

12   Q.   So in 2014, you indicated that defendant chooses not to --

13   to drive at that time?

14   A.   Correct.

15   Q.   And then in that paragraph, you also state, he does perform

16   small hobbies like organizing the games in his house,

17   attempting to garden, shelling nuts from the neighbor's

18   property, etcetera.  And so again, that's based on what the

19   defendant told you as far as the things that he was doing and

20   able to do; correct?

21   A.   Correct.

22   Q.   Now, the defendant didn't tell you that he was able to go

23   out and collect metal objects and bring them to a recycler to

24   sell them for cash; correct?  That's something you would have

25   put in your report?

1   A.   If he mentioned it to me, I may have documented it, yes.

2   Q.   And if the defendant told you that -- that he was able to

3   lift hay bales by himself without assistance, that would have

4   been something as an occupational therapist that would have

5   been important to you at the time; correct?

6   A.   Correct.

7   Q.   And not only in 2014 on this report, but in 2016, two years

8   later when you're talking to him, that's something that you

9   would have wanted to know; correct?

10  A.   Correct.

11  Q.   And then you put in here, she does all grocery shopping,

12  and usually takes him with her, or there is a daughter home

13  with him.  He will occasionally walk around the store with her,

14  but typically prefers to sit on the bench in the front of the

15  store to people watch.  And again, this is based on what

16  defendant told you during this 2014 interview; correct?

17  A.   Correct.

18  Q.   He may perform some small IADL tasks such as sorting

19  laundry, folding his own laundry, etcetera, and so that's what

20  he told you, correct?

21  A.   Yes, sir.

22  Q.   And then safety, the second to last sentence, it says, he

23  is not safe to drive, and his wife does not allow him to drive,

24  and that's based on what you were told during this 2014

25  interview; correct?

1    A.   Correct.

2    Q.   And then again, you have an assessment with the numerical

3    score in 2014 as you did in 2016; correct?

4    A.   Yes.

5    Q.   And in this 2014 assessment, vet scored a 16; correct?

6    A.   Appears so.

7    Q.   And that would be in the middle section?

8    A.   Correct.

9         MR. OAKLEY:  No further questions, Your Honor.

10        THE COURT:  We can take a break now, unless you just

11   have a few minutes?

12        MR. MAGARIEL:  I think it will just be a few minutes,

13   Judge.

14                    RE-DIRECT EXAMINATION

15   BY MR. MAGARIEL:

16   Q.   I guess I'll start with an obvious question.  It sounds

17   like when he met with you in 2016, Mr. Hay had improved.  Fair

18   to say?

19   A.   Correct.

20   Q.   And you made that determination that he improved, largely

21   based on what he told you during that interview?

22   A.   That is correct.

23   Q.   I want to talk to you a little bit about a few of the

24   things that he told you back in 2014.  Do you still have that

25   document in front of you?

1    A.   I do.

2    Q.   Under that section where it discusses ADLS and self-care,

3    in that 2014 document, you scored 2 points, so some need for

4    caregiver assistance as far as eating; is that right?

5    A.   Yes.

6    Q.   And I see in your description, you said that he

7    occasionally requires meal set-up if his tremors get bad

8    enough; is that right?

9    A.   Yes.

10   Q.   And in the dressing category, which is at the bottom of

11   that page, I think is spills over into the next, this was, you

12   assessed 1 point there based on the veteran being able to dress

13   himself, as you said, the majority of the time unless he's

14   having muscle cramps; is that right?

15   A.   Correct.  He also stated his wife does have to assist

16   occasionally, so that was the part that scored on that.

17   Q.   Okay.  And that's the reason why there would be a one point

18   score there?

19   A.   Yes.

20   Q.   That's all I have.  Thank you.

21        MR. OAKLEY:  Just very briefly, Your Honor.

22                     RE-CROSS EXAMINATION

23   BY MR. OAKLEY:

24   Q.   Mr. Magariel said that from 2014 to 2016, that defendant

25   had improved.  That's based on your reading of the report;

1    correct?

2    A.   Correct.

3    Q.   The defendant didn't tell you, oh, I've improved since the

4    last time we talked; correct?

5    A.   No, sir.

6    Q.   And in fact, if the defendant told someone at the VA that

7    his condition would likely never cause him to improve, that

8    would be consistent -- inconsistent; that would be inconsistent

9    with what you observed?

10            MR. MAGARIEL:  Objection, speculation.

11            THE COURT:  Overruled.

12            THE WITNESS:  I'm sorry, can you repeat it?

13   BY MR. OAKLEY:

14   Q.   If the defendant told someone at the VA that his condition

15   would likely never improve, that would be inconsistent with

16   what you observed?

17   A.   Correct.

18            MR. OAKLEY:  No further questions.  Your Honor.

19            MR. MAGARIEL:  Nothing else, Judge.  Thank you.

20            THE COURT:  All right.  Then you can be excused.

21   Let's take a recess until 12:20, or I'm sorry, 11:25.

22       (Whereupon court took a recess.  Proceedings then continued

23   as follows:)

24            THE COURT:  Are we ready to call the next witness?

25            MS. RAMSEY:  Yes, Your Honor, and I would let the

1    court know there were -- I've got four more witnesses, so I

2    think we're going to end earlier again today.  I did try to

3    move that one witness up that it's not my expert tomorrow, to

4    today, but they couldn't move -- move to today.

5         THE COURT:  So you have four more today?

6         MS. RAMSEY:  Yes.

7         THE COURT:  And then tomorrow, you have two?

8         MS. RAMSEY:  Two.

9         THE COURT:  Okay.  So we'll have another early --

10   we'll be back after lunch, though, obviously.

11        MS. RAMSEY:  Maybe.

12        THE COURT:  Oh, really, four people on and off that

13   quickly?

14        MS. RAMSEY:  No, no, no, we should, sorry.  Sorry.

15        THE COURT:  Okay.  All right.  All right.  Government,

16   at this point, do you anticipate a rebuttal case?

17        MR. HUSCHKA:  Not at this time, Your Honor.

18      (Jury entered courtroom.)

19        THE COURT:  Call your next witness.

20        MS. RAMSEY:  Defense calls Scott Jackson.

21      (Witness sworn.)

22        THE WITNESS:  Yes, ma'am.

23        MS. WIEST:  Thanks.  You may have a seat.

24                    SCOTT JACKSON,

25   Called as a witness on behalf of the defendant, having been

1    first duly sworn, testified as follows:

2                          DIRECT EXAMINATION

3    BY MS. RAMSEY:

4    Q.   Mr. Jackson, can you please state your full name for the

5    record, and introduce yourself to the jury?

6    A.   Scott Henry Jackson.

7    Q.   And how do you spell your first and last name?

8    A.   S C O T T.  J A C K S O N.

9    Q.   Mr. Jackson, where have you -- can you give me city and

10   state that you live in now?

11   A.   Edgerton, Kansas.

12   Q.   Did you recently move to Edgerton, Kansas?

13   A.   Six, seven years ago.

14   Q.   Okay.  Where did you live prior to that?

15   A.   Umm, rural Miami County, Paola, Kansas.

16   Q.   All right.  I want to talk to you about Mr. Bruce Hay.  Do

17   you know Bruce Hay?

18   A.   Yes.

19   Q.   Okay.  And how long have you known Bruce?

20   A.   All my life.

21   Q.   Okay.  You say all your life.  People use that term loosely

22   sometimes, and it doesn't necessarily mean all their life, but

23   have you actually known Bruce all his life?

24   A.   Yeah, his dad was best man at my mom and dad's wedding.

25   Q.   Okay.  And so would you describe your relationship as

1   friends, almost like close family?

2   A.   Yes.

3   Q.   Okay.  I want to talk to you about then kind of the time

4   that you've spent with Bruce, but I want to try and break it up

5   into chunks for you, and so I want to talk about the time you

6   spent with Bruce, let's say, prior to 2005.  Were you and Bruce

7   spending time together at that -- during that time period?

8   A.   Yes.

9   Q.   Okay.  How often, and what were the circumstances?

10  A.   Umm, usually, when it came time to put up hay.

11  Q.   So --

12  A.   I usually help 'em put up hay.

13  Q.   Okay.  And so you would usually help him put up hay on the

14  family farm; is that correct?

15  A.   Yes.

16  Q.   Okay.  Did you spend other time together, like at family

17  events or cook-outs, or just hanging out?  Were you friends of

18  that nature?

19  A.   Oh, usually, during -- around Christmas time, umm,

20  holidays, 4th of July, umm, weekends, whenever I had nothing

21  better to do, I guess would be the term.

22  Q.   Okay.  All right.  Let's turn to the time period after

23  2005.  After 2005, let's say up until 2018, were you and Bruce

24  living in the same kind of physical area or location?

25  A.   Yes.

1    Q.   Okay.  And where was that?  I don't need an address, but
2    where was that?
3    A.   In Miami County.
4    Q.   Okay.  And were you seeing Bruce as often as you would
5    before 2005, were you seeing him on a regular basis?
6    A.   Yes.
7    Q.   Okay.  So you've seen Bruce before 2005 and after 2005.
8    Were you aware that he was in a kind of a car accident?
9    A.   Yes.
10   Q.   Okay.  And I'm assuming you weren't present at the scene;
11   correct?
12   A.   No.
13   Q.   Okay.  But you came to be aware from information you either
14   would have received from Bruce or someone else in the family;
15   is that fair?
16   A.   News travels fast.
17   Q.   Okay.  I want to talk to you about how you've observed
18   Bruce before the accident versus after the accident, okay?
19   A.   Okay.
20   Q.   Before the accident in 2005, did you observe Bruce kind of
21   have any spells or tremors, attacks, seizures, anything you
22   would describe like that?
23   A.   Well, I don't remember exactly what, umm, brought it on.  I
24   know he was extremely injured during the car crash.
25   Q.   Okay.  Well, let's then talk about that, since you don't

1 have a memory kind of before then.  Can you tell me what you

2 have observed happen to Bruce when he's had a spell or a

3 seizure or an attack?

4 A.   Umm, the best way I could explain it maybe would be maybe

5 like an epileptic seizure.

6 Q.   Can you tell me what you've observed kind of with your

7 eyes; what happens to him physically or his body?

8 A.   Umm, it's almost like he goes completely rigid and is

9 unable to function, sweats profusely; can't hold a conversation

10 with him or anything during these episodes 'cause it's just

11 like he's not there.

12 Q.   Okay.  How often have you seen this happen?

13 A.   Quite often.

14 Q.   Okay.  I know you've known him for a long time, but can you

15 give me kind of an estimate, and where have you seen this

16 happen?

17 A.   Umm, I've seen it happen on the farm.  Mainly, I've seen it

18 happen at his house.  Usually it's late at night after sunset.

19 Q.   Okay.  And you said that at the time kind of, he goes rigid

20 and sweating profusely and he can't talk.  Is he able to walk

21 or really do anything else?

22 A.   No.

23 Q.   Okay.  You've kind of described a time or the locations of

24 when you've seen this happen, and you said you've seen it

25 often?

1    A.   Uh-huh.

2    Q.   I'm trying to narrow down maybe kind of how often you've

3    seen it.  Is it once or twice a week, once or twice a month?

4    A.   Umm, I've seen it happen probably five times a week.

5    Q.   Okay.  And how long -- when you've seen this happen, how

6    long is it lasting?

7    A.   Well, usually, I do not stick around for the duration,

8    because you know, it's -- you know, you can be talking to him

9    one minute, and then all of a sudden the episode happens, and

10   then you know, I could wait for 45 minutes or an hour or

11   something like that, and it would still be going on, and just

12   decide that, you know, Lori's there to take care of him, so

13   I'll just go ahead and go home.

14   Q.   Okay.  Have you ever witnessed -- and Lori is his wife; is

15   that correct?

16   A.   Correct.

17   Q.   Have you ever witnessed her have to take care of him?

18   A.   Yes.

19   Q.   Okay.  And what -- what -- what does -- what have you

20   witnessed?  What does she do?

21   A.   Umm, she's quite often had to come and take him from the

22   farm back to the house.  I don't know how any better way to --

23   I mean, 'cause it's usually a -- a process of getting him back

24   to the house.

25   Q.   And what do you mean by process?

1    A.   Sometimes, she needs help to get him in the truck to get

2    him back to the house.

3    Q.   Sometimes he has to be carried to the truck?

4    A.   Yes.

5    Q.   Okay.  Now, you've said you've seen this happen out on the

6    farm.  Can you remember any particular incident that this

7    happened, and describe to me what you saw?

8    A.   Usually, it was, you know, when we were throwing hay, umm,

9    what would -- I mean, just, you know, while -- while throwing

10   hay, he would have an episode.

11   Q.   Okay.  Tell me when you've seen in your interactions with

12   Bruce -- and I know you said all of your life?

13   A.   Uh-huh.

14   Q.   Does he carry a cane?

15   A.   Yes.

16   Q.   Okay.  And do you know why he carries that cane?

17   A.   Yes.

18   Q.   Can you tell me why?

19   A.   Umm, because of the extent of his injuries.

20   Q.   Okay.  In the process of observing what you call looks like

21   a seizure, has Mr. Hay ever fallen over or lost his balance?

22   A.   Yes.

23   Q.   Okay.  And is this during the time when you say he's having

24   some kind of a seizure?

25   A.   Yes.

1    Q.   Okay.  Are there times when -- I know that you specifically

2    talked about what you're calling as seeing him have a seizure.

3    Are there times when you've seen Bruce have kind of any other

4    symptoms, kind of less severe than having what you're calling a

5    seizure?

6    A.   No.  I know there's some days that he's just really stiff,

7    can't move very well, and I think it's because of the seizures.

8    Q.   Okay.  Now, when -- you said when Bruce has had these

9    seizures, his wife Lori's come to pick him up, and then you

10   talked about I think a process of kind of getting him to the

11   car.  How often has that happened?

12   A.   I've seen it two or three times.

13   Q.   Okay.  And besides -- I'm assuming you helped get him to

14   the car.  Does -- is there anybody else there that helps get

15   him to the car?

16   A.   Yeah, all of his kids.

17   Q.   All of his kids being there?

18   A.   Yes.  Umm, sometimes even his sister and brother-in-law.

19   Q.   Okay.  You talked about helping Bruce bale hay on the farm.

20   Is there anybody else that helps with the farm work?

21   A.   Usually, it was a family ordeal.  Everybody in the family

22   chipped in.

23   Q.   Okay.  And so would it be his sisters?

24   A.   Sisters, kids, when his dad was still alive, his dad was

25   out there with us.

1  Q.  Okay.  And did his sisters and his kids do most of the work

2  on the farm?

3  A.  Yes.

4  Q.  Okay.  And I think you said that most of the time, you've

5  seen these kind of what you're describing as seizures occur

6  while you were at Bruce's house in the evening; is that

7  correct?

8  A.  Yes.

9  Q.  Okay.  Have you been with Bruce when these what you're

10  calling seizures are over?  Have you seen him after?

11  A.  I've never stuck around long enough to see the end result.

12  Q.  Okay.  All right.  And so you don't know anything about how

13  he appears, or what -- what you've seen after one of these

14  seizures occurs.  Is that fair?

15  A.  Well, I know that he's usually pretty stiff afterwards.

16  Q.  Okay.

17  A.  It's usually after an episode that he can't really function

18  very well the next day.

19  Q.  Okay.  And is that because you've seen him the next day?

20  A.  Yes.

21  Q.  Okay.  After an episode?

22  A.  Yes.

23  Q.  And so you've observed him the next day as well?

24  A.  Correct.

25  Q.  Okay.  And what have you observed about him?

1   A.   Umm, often complaining about the pain and everything that

2   it's left him with.

3   Q.   Okay.  I don't think I have any further questions.

4                    CROSS EXAMINATION

5   BY MR. OAKLEY:

6   Q.   Mr. Jackson, did you ever help your friend fill out any VA

7   paperwork?

8   A.   No, I don't think so.

9   Q.   And did he ever show you any of the paperwork that he

10  filled out that he submitted to the VA?

11  A.   No, I don't -- no.

12  Q.   Did you ever help your friend by taking him to the VA?

13  A.   I've been with him when Lori's driven him to the VA.

14  Q.   Have you ever gone into benefit appointments with Mr. Hay

15  at the VA?

16  A.   No.

17  Q.   Have you ever gone with your friend to the social

18  security -- to the Social Security Administration?

19  A.   No.

20  Q.   Have you ever seen any paperwork that your friend has

21  filled out for social security?

22  A.   No.

23  Q.   Have you ever been present with your friend during these

24  social security appointments?

25  A.   No.

1 Q. And so, you don't know what your friend -- what Mr. Hay was
2 telling to the VA; correct?
3 A. No, I do not.
4 Q. And you don't know what he was saying to social security;
5 right?
6 A. No.
7 Q. Umm, you said that you've seen these seizures five times a
8 week?
9 A. It has happened on that many occurrences sometimes.
10 Q. Sometimes. You don't mean to imply that five times a week
11 every week since 2005; correct?
12 A. Well, I've not seen him that many times straight in a row.
13 Usually, I -- most of the time if I'm able to visit Bruce, it
14 was on the weekend, unless the time when I was unemployed and I
15 was helping them out on the farm all the time, but --
16 Q. So when you said on direct examination up to five times a
17 week, you didn't mean to imply that you've seen it five times a
18 week; correct?
19 A. I have before, yes.
20 Q. So you mentioned that Bruce was extremely injured in the
21 2005 car accident?
22 A. Correct.
23 Q. Did you go visit Bruce in the hospital after that accident?
24 A. No.
25 Q. You mentioned that when Bruce has one of these seizure

1    events, that he can't talk?

2    A.   Correct.

3    Q.   Correct?  And that's unusual for -- for Bruce, because he

4    likes to talk, doesn't he?

5    A.   He is very loud.

6    Q.   And in fact, he likes to talk not only to you, but he likes

7    to talk to strangers, people that he meets on the street,

8    people at his church; Bruce likes to talk, doesn't he?

9    A.   One could imply that.

10   Q.   Well, I'm asking you what you've seen.  Have you -- have

11   you seen Bruce engaged or being around people other than

12   yourself?

13   A.   Yes.

14   Q.   And Bruce likes to talk.  Bruce is a gregarious guy.  He's

15   a friendly guy, isn't he?

16   A.   Yes.

17   Q.   Bruce hasn't met a stranger, has he?  He'll engage anyone

18   in conversation?

19   A.   I don't know if that's accurate.

20   Q.   But you would certainly characterize Bruce as a friendly

21   guy?

22   A.   Yes.

23   Q.   And he's not just friendly to babies, he's not just

24   friendly to old people, he's friendly to everyone in between?

25   A.   If that's what you want to imply.  I mean, I've often heard

1    him say he hates people.

2    Q.   Okay.  You've heard him say that, but what you've observed

3    is that Bruce likes people; isn't that true?

4    A.   I -- I don't under-- I mean, I like to talk to people, too.

5    Q.   Okay.

6    A.   So how -- I mean --

7    Q.   I'm just asking you on your observations.  Tell you what,

8    we'll move on.  You said that you've seen these seizure

9    activities at the farm?

10   A.   Uh-huh.

11   Q.   Yes?

12   A.   Yes.

13   Q.   The farm is not located near a highway; correct?

14   A.   No.

15   Q.   And you've seen these seizure activities at his house?

16   A.   Correct.

17   Q.   And he doesn't live by a highway, does he?

18   A.   No.

19   Q.   And so you said that when he has these seizures, that Lori

20   and others have to help him to the car; correct?

21   A.   The truck.

22   Q.   The truck.  The truck.  Thank you.  So Lori and others have

23   to help him to the truck; correct?

24   A.   Correct.

25   Q.   And then Lori takes him home, and then Lori and whoever

1   else is available have to help Bruce from the truck into the

2   house; correct?

3   A.   Usually, it's the kids.

4   Q.   Usually, the kids.  And so if someone was sitting outside

5   of the house when Lori brought Bruce home from one of these

6   seizure events, they would be able to see Lori and whoever else

7   help carry Bruce from the truck into the house; correct?

8   A.   I would assume, yes.

9            MR. OAKLEY:  No further questions, Your Honor.

10           MS. RAMSEY:  Nothing further.  Thank you.

11           THE COURT:  Okay.  Thank you.  You're excused.

12           THE WITNESS:  All right.

13           THE COURT:  Umm, do you want to get started with your

14   next witness?  You want to take a lunch break?

15           MS. RAMSEY:  We can take a lunch break.

16           THE COURT:  All right.  Why don't we be in recess

17   until 1 o'clock.

18       (Whereupon court took a recess.  Proceedings then continued

19   as follows:)

20           MS. RAMSEY:  Your Honor, may I have one moment, make

21   sure our witnesses are back?

22           THE COURT:  Okay.

23           MS. RAMSEY:  Thank you.  And Bruce.  Thank you.  All

24   right.  I believe we're ready, Your Honor.

25           THE COURT:  Okay.

1      (Jury entered courtroom.)

2           THE COURT:  Call your next witness.

3           MS. RAMSEY:  Thank you, Your Honor.  The defense would

4      call Barbara Brown.

5      (Witness sworn.)

6           THE WITNESS:  Yes, I do.

7           MS. WIEST:  Thank you.  You may have a seat.

8                        BARBARA BROWN,

9      Called as a witness on behalf of the defendant, having been

10     first duly sworn, testified as follows:

11                       DIRECT EXAMINATION

12     BY MS. RAMSEY:

13     Q.  Miss Brown, could you please -- excuse me -- state your

14     name, and then spell it for the record please?

15     A.  Barbara Elizabeth Brown.  That's B A R B A R A.  Elizabeth,

16     E L I Z A B E T H.  Brown, B R O W N.

17     Q.  Okay.  I want to ask you a little bit of information just

18     about you very briefly, okay?

19     A.  Okay.

20     Q.  What city and state do you live in?

21     A.  Paola, Kansas.

22     Q.  Okay.  And are you currently working?

23     A.  No, I'm not.  I'm retired.

24     Q.  Okay.  What did you do before you were retired?

25     A.  I was a network analyst for the school district.

1    Q.   Okay.  And you said network analyst?

2    A.   Yes, computer technician.

3    Q.   Understood.  What is your relationship with Bruce Hay?

4    A.   He's my son-in-law.

5    Q.   Okay.  I want to talk to you about how long you've known

6    Bruce.  How long would you say you've known Bruce?

7    A.   For a little over 30 years.

8    Q.   Okay.  And so is Lori Hay your daughter?

9    A.   Yes.

10   Q.   So she's Bruce's wife.

11   A.   Yes.

12   Q.   Okay.  And you've got -- excuse me -- you've got -- (Sirens

13   outside courtroom) -- between Bruce and Lori, you've got is it

14   five granddaughters?

15   A.   Yes.

16   Q.   Okay.  Let's -- I'm going to try and make this succinct,

17   and talk to you about a period of time, okay?

18   A.   Okay.

19   Q.   But tell me, when did Bruce and Lori get married?

20   A.   I believe it was in '92.

21   Q.   Okay.  1992.  And so --

22   A.   Yes.

23   Q.   -- you knew Bruce when he was in the military?

24   A.   Just after he got out of the military.

25   Q.   Okay.  Did he at some point go back into the military?

1    A.   Yes, he did.

2    Q.   Okay.  And was that when he was deployed to Iraq?

3    A.   Yes.

4    Q.   Okay.

5    A.   Yes.

6    Q.   Okay.  I want to talk to you, and try and break up the time

7    periods about a little before 2004.

8    A.   Okay.

9    Q.   Possibly up to like 2011.  How often -- tell me about your

10   relationship with Bruce and Lori and your grandkids, and how

11   often you see them.

12   A.   I would see 'em several times a week, and for a short

13   period, just before he reenlisted, they lived with us for about

14   18 months.

15   Q.   Okay.  Let's talk about after -- kind of -- I know this is

16   still a while back, but after 2005.  Where did you live in

17   regards to where Bruce and Lori lived?  How far did -- where

18   did you live, and where did they live?

19   A.   We lived at -- where we're residing now, outside of Paola.

20   For a while, they lived in Georgia, and then they moved back to

21   Osawatomie, which is a town just south of Paola.

22   Q.   Okay.  And so how long do you think that drive is?  How far

23   away are they?

24   A.   Less than 20 minutes.

25   Q.   Okay.  And so since approximately 2011, would you say you

1    saw them a couple times a week?

2    A.   Yes.

3    Q.   Okay.  Do you all attend the same church?

4    A.   Yes, we did.

5    Q.   Okay.  And so is that where you would see them a couple

6    times a week, or they would also --

7    A.   They would also come over to the house.

8    Q.   Okay.  Was Bruce and your granddaughters, were they in a

9    car accident?

10   A.   Bruce and two of the granddaughters, yes.

11   Q.   Okay.  And do you remember when that was?

12   A.   It was I think February 25th of 2005, because we were at my

13   son's college graduation from DeVry when the accident happened.

14   Q.   Okay.  And so were you ever present at the scene of the

15   accident?

16   A.   No, I was not.

17   Q.   Okay.  Did you ever attend or go to the hospital when

18   either Bruce or your two granddaughters were in the hospital?

19   A.   Yes, while we were waiting for the helicopter to bring the

20   youngest daughter, Rebekah was there, and when she was just

21   discharged, we took her with us, 'cause she was going to spend

22   the night with us, and she wanted to see her dad, so we stopped

23   at the hospital to see Bruce, and then we took her on home.

24   But when we were there at the hospital, we were just told that

25   he had -- Bruce had a closed head injury, and that's all they

1    knew at that time, and that's all we were told.

2    Q.   Okay.  And so you were able to see Bruce then sounds like

3    the day of at the hospital; is that correct?

4    A.   Yes, that's correct.

5    Q.   And then were you able to see Bruce after he left the

6    hospital?

7    A.   Oh, yes, we did.

8    Q.   Okay.  Do you remember how many days after?

9    A.   No, I do not.

10   Q.   Okay.  When you saw Bruce after he left the hospital, did

11   you recognize that he was having any physical problems?

12   A.   Not at the time, I did not.

13   Q.   Okay.  When did you start recognizing that he had some

14   physical problems?

15   A.   I can't say exactly, but it came on gradually.

16   Q.   Okay.  Let's talk about what you have observed with -- with

17   Bruce.  Are you aware that -- of his disability?

18   A.   Yes, I am.

19   Q.   Okay.  I want to talk to you about what you've physically

20   observed kind of happen to Bruce when he's having problems with

21   his disability.

22   A.   Okay.

23   Q.   Can you tell me what you have seen with your own eyes

24   happen to Bruce when he's having problems?

25   A.   Sometimes he shakes, and his whole upper body shakes, and

1    he doesn't seem to be able to control that.  I have seen him

2    when his whole body has tensed up, all of his muscles, and he

3    can't move.  I have seen where Lori and one of his daughters or

4    two of his daughters has helped him walk because he can't make

5    his legs move.

6    Q.  Okay.

7    A.  So they have moved his legs for him.

8    Q.  Okay.  I want to slow down and kind of talk about -- a

9    little bit about everything you've just said.  So you said

10   you've seen his upper body and -- kind of his head and upper

11   body shake; is that correct?

12   A.  Yes.

13   Q.  And how often are you seeing this?

14   A.  I can't say -- I don't see them that much on a regular

15   basis anymore, but maybe once a week, sometimes once every two

16   weeks, I see 'em.  There have been times when he has appeared

17   okay.  There are times when, you know, his body shakes.

18   Q.  Okay.  And just to clarify.  When did you say -- when would

19   you say you stopped seeing him on a regular basis?

20   A.  Oh, it's been a couple years.

21   Q.  Okay.  So couple years from now, so maybe back in 2020,

22   2019?

23   A.  They closed the church we went to.  The kids lived in

24   Osawatomie, and then they moved to Greeley, and when they moved

25   to Greeley is when we stopped seeing 'em as much on a regular

1   basis, and I think that's been about two years.

2   Q.   Okay.  Just about two years ago.  Okay.  I want to talk to

3   you about the specific times that you've seen kind of his

4   muscles -- I don't remember exactly how you described it, so

5   you correct me if I'm wrong, but his muscles freeze up.

6   A.   Correct.

7   Q.   Okay.  Where have you seen this happen?

8   A.   I have seen it in church, I have seen it at their house, I

9   have seen it in my house.

10  Q.   Okay.  When his muscles seize up, I think you told us a

11  little bit about what happens afterwards, but I want to talk to

12  you in a little more detail about that.  So has there been a

13  time at your home where it's happened so severely that 911 has

14  been called?

15  A.   Not at my house, no.

16  Q.   Okay.  Was it at someone else's house?

17  A.   It was at their home.

18  Q.   Okay.  How long ago was this, do you remember?

19  A.   Oh, no, I don't.

20  Q.   Okay.  Was it more than a couple years ago?

21  A.   No, it was since they moved to Greeley.

22  Q.   Okay.  When he has the issues so severe, what type of care

23  does he need?

24  A.   I think normally, it just takes time for him to relax.  I

25  don't know that for sure, because I don't know how long it

1    takes.

2    Q.   Fair enough.  So you don't know necessarily how long the

3    episodes last, but you've seen them with your own eyes?

4    A.   Yes.

5    Q.   Okay.  Can you -- are there times when I think you've

6    described kind of two things, times when you've seen Bruce's

7    kind of body shaking and bobbing.  Is that different than when

8    you see him seize up, or is it -- does it proceed when he

9    seizes up or --

10   A.   That, I could not tell you.

11   Q.   Okay.  You just know you've seen two -- the difference?

12   A.   Right.

13   Q.   Okay.  All right.  Has there been a time when you have had

14   Bruce come to your home based on an emergency he's had when

15   he's been out and has had a seizure or something like that

16   occur?

17   A.   Umm, that happened once, and Lori had called me and said

18   that they would like to stop by and use our shower because if

19   she took him home, he would be seized up too bad, that she

20   couldn't bathe him.  So they stopped by and took a shower, and

21   after the shower, he was a little better, and they left right

22   away.

23   Q.   Okay.  When you've seen Bruce seize up -- I may have asked

24   you this, but I apologize, I didn't hear the answer, but can

25   you recall how many times you've seen this happen?

1   A.   No.  I know it's been at least several times.  It's

2   probably 10 to 12, maybe.

3   Q.   Okay.  Umm, during those times, have you seen him have

4   trouble breathing?

5   A.   Yes.

6   Q.   Okay.  And I think your description, but I want to be sure,

7   can he walk during those periods of time?

8   A.   The one I really remember was when Lori had called us, and

9   we went down, and I told her she needed to call the ambulance,

10  and when we got there, she kept having to tell Bruce, breathe,

11  Bruce, breathe.

12  Q.   Okay.

13  A.   Because he would stop breathing.

14  Q.   Okay.

15  A.   And I think one of the EMS's also told him to breathe.

16  Q.   Okay.  During these time periods, this time when you've

17  seen that episode, or have him seize up and it's -- it's really

18  bad, have the -- your granddaughters been around?

19  A.   Some of the time, yes.

20  Q.   Okay.  Have you ever witnessed them have to help attend to

21  Bruce?

22  A.   Yes.

23  Q.   Okay.  Have you ever witnessed during any of these times

24  Bruce needing -- you talked about stopping at the house to need

25  to shower.  Was Lori required to help him do that that time?

1    A.   Yes, she did.

2    Q.   And have you ever witnessed Bruce need help getting

3    dressed?

4    A.   No, I have not.

5    Q.   Okay.  And what about eating or being fed, have you ever

6    seen that?

7    A.   No, I know that I've seen him eat, and his hands shake on

8    the way.  I was surprised he got it to his mouth a couple

9    times.

10   Q.   When you have witnessed Bruce either having the shaking of

11   the body or the seizing up, during those times really, is he --

12   is he -- well, let me ask you specifically.  During the times

13   that you've seen him seize up really, is he able to kind of --

14   is he able to do anything for himself at that point?

15   A.   I know that he's fed himself a few times, and he's able

16   with his cane to get up and go into the bathroom.

17   Q.   Okay.

18   A.   So you know, he does do some, but you know, it's not

19   without some sort of assistance.

20   Q.   Okay.  And I guess what I'm asking you is the difference

21   between the two.  So when you've seen him get up and use his

22   cane to go to the bathroom, is that when he's basically just

23   shaking, the body shaking?

24   A.   Right, just the shaking, but when his body freezes up, he

25   can't do anything.

1   Q.   Okay.  When you have had interaction with Bruce, whether

2   it's at your home or his home or it sounds like church, and I'm

3   sure there's other instances since you're his mother-in-law, is

4   he using a cane most the time?

5   A.   I would say at least 50 percent of the time.

6   Q.   Okay.  When have you ever seen Bruce -- I think I all ready

7   asked you that.  I apologize.  So are there times when you've

8   seen Bruce not have these symptoms?

9   A.   Yes.

10  Q.   Okay.  And at those times, may it appear to you that he's

11  completely normal?

12  A.   He appears to be, yes.

13  Q.   Okay.  But then there are times when he has these problems,

14  and you said that he's not much able to do anything; is that

15  correct?

16  A.   Yes, depending upon how severe.

17  Q.   Okay.  Now, you -- where -- what city and/or town did you

18  say that Bruce and Lori Hay live now?

19  A.   Greeley, Kansas.

20  Q.   Greeley, Kansas.  Umm, and do you remember, did they have a

21  house fire recently?

22  A.   Yes, they did.  Their grandson played with matches in their

23  aunt's bedroom.

24  Q.   Okay.

25  A.   And Lori called me, and said, my house is on fire, my house

1    is on fire.

2    Q.  Okay.

3    A.  So I went and got Sam, and we went down.

4    Q.  Okay.  So you were at the scene when the house was on fire?

5    A.  So we were at the scene.

6    Q.  And do you remember how far back that was?

7    A.  At least a year ago.

8    Q.  Okay.  And so you're present at the scene.  I want to -- I

9    did this a little out of order.  So do you know Bruce's other

10   family?  Ever interacted with them?

11   A.  Yes, I have.

12   Q.  Okay.  Does that include his sisters?

13   A.  Yes.

14   Q.  Okay.  Have you had interaction with his sister Stacy

15   Macom?

16   A.  Yes.

17   Q.  And so you know what she physically looks like?

18   A.  Yes, I do.

19   Q.  Okay.  And at the date of -- on the date the fire was

20   happening and you went to the scene, did you see Stacy Macom

21   there?

22   A.  Yes.

23   Q.  Okay.  And what was she doing?

24   A.  She was watching the fire, grinning and smirking, and there

25   were even times when she was laughing.

1    Q.   Okay.

2    A.   And she made a comment, too.

3    Q.   That's all.  Thank you.  Yeah, that would be hearsay.  And

4    I think you said at the -- at the time, until you guys recently

5    moved, until you recently, moved over the last couple of years,

6    Bruce and Lori's home was about 20 minutes from you; is that

7    right?

8    A.   Yes.

9    Q.   Okay.  When they've come over to your home, who's driving,

10   generally speaking?

11   A.   Lori.

12   Q.   Okay.  I don't think I have any further questions.  Thank

13   you.

14                       CROSS EXAMINATION

15   BY MR. HUSCHKA:

16   Q.   Miss Brown, you don't -- you don't know what Bruce told the

17   medical evaluation board in 2005, do you?

18   A.   No, I don't.

19   Q.   And you don't know what he told the VA in 2006, do you?

20   A.   No, I do not.

21   Q.   You weren't present with him at any of his evaluations at

22   the VA in 2006, were you?

23   A.   I was with him in -- when we went to Wichita.

24        MS. RAMSEY:   Objection, can we approach?

25        (Proceedings held at the bench, outside the hearing of open

1    court.)

2         MS. RAMSEY:  I know that this is my witness, but I

3    anticipate the witness possibly opening the door to

4    determination of fraud based on some of these questions, and

5    I'm just concerned with the court's limine instruction.

6         THE COURT:  What, now?

7         MS. RAMSEY:  So I anticipate that Miss Brown may

8    answer the government's questions regarding whether or not he

9    had an appeal of his termination benefits from the VA, which

10   the appeal was because of the fraud, and so I'm just afraid of

11   the violation of the court's limine motion.

12        THE COURT:  Okay.  Where are you going with this?

13        MR. HUSCHKA:  I'm not going to go past 2017, but just

14   that she wasn't there when the defendant was making statements

15   to the VA; she doesn't know what he told the VA.

16        THE COURT:  Okay.  Well, as long as your questions are

17   just asking her if she was there, and doesn't know, or that she

18   doesn't know what he said to the VA at certain points, that's

19   fine.  Well, at what point are you concerned that she -- her

20   testimony could go further?

21        MS. RAMSEY:  Just -- just knowing that -- that the

22   appeal was held in Wichita, and I'm just afraid it may -- she

23   gets into that side of the appeal of the VA, that that's going

24   to open the door into whether or not they were terminating the

25   benefits for fraud.  I just saw that coming.

1          THE COURT:  Okay, 'cause she just said that she went

2     to Wichita with them?

3          MS. RAMSEY:  Yes.

4          THE COURT:  So she was there for, what, the

5     termination hearing?

6          MS. RAMSEY:  Yes.

7          THE COURT:  Okay.  So are you going to ask her

8     anything more about that?

9          MR. HUSCHKA:  No, and frankly, I'll ask her if -- in

10    Kansas City, 'cause I think none of my questions go to anything

11    that happened in Wichita.

12         THE COURT:  Okay.  Why don't you specify to her you're

13    talking about Kansas City VA.

14         MR. HUSCHKA:  Okay.

15       (Proceedings continued in open court.)

16    BY MR. HUSCHKA:

17    Q.  Miss Brown, I want to clarify a little bit that last

18    question that I asked you.  So when I'm asking you questions

19    right now, I'm referring to compensation and pension

20    evaluations that occurred in Kansas City and that occurred in

21    Topeka.

22    A.  No.

23    Q.  And so you were not present in 2007 at one of those

24    evaluations?

25    A.  No, I was not.

1    Q.   You weren't present in 2013 at one of those evaluations?

2    A.   No, I was not.

3    Q.   You don't know what Bruce told the examiners during those

4    evaluations?

5    A.   No, I do not.

6    Q.   You weren't present at one of those evaluations in Kansas

7    City in 2017, were you?

8    A.   No.

9    Q.   So you don't know what Bruce told them in 2017?

10   A.   No.

11   Q.   And you don't know what Bruce told the Social Security

12   Administration, do you?

13   A.   No, I do not.

14   Q.   You don't know what your daughter told the Social Security

15   Administration, do you?

16   A.   No.

17            MR. HUSCHKA:  No further questions.

18            MS. RAMSEY:  No redirect.  Thank you.

19            THE COURT:  All right.  You're excused.  Thank you.

20   Call your next witness.

21            MR. MAGARIEL:  We call Leon Zook.

22       (Witness sworn.)

23            THE WITNESS:  I do.

24            MS. WIEST:  Thank you.  You may have a seat.

25                      LEON ZOOK,

1    Called as a witness on behalf of the defendant, having been

2    first duly sworn, testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. MAGARIEL:

5    Q.   Good afternoon, sir.

6    A.   Good afternoon.

7    Q.   Would you state your name please?

8    A.   Leon Zook.

9    Q.   And how do you spell that, sir?

10   A.   L E O N.  Z O O K.

11   Q.   Are you employed today?

12   A.   I'm not.

13   Q.   Retired?

14   A.   Yes.

15   Q.   Okay.  What did you do for a living?

16   A.   I worked at facilities for a college, Johnson County

17   Community College.

18   Q.   And what city and state are you living in today?

19   A.   My address is Wellsville, I live way out in the country,

20   Kansas.

21   Q.   And how long have you lived out in Wellsville?

22   A.   Going on 19 years.

23   Q.   Do you know a man named Bruce Hay?

24   A.   I do.

25   Q.   How did you initially meet Mr. Hay?

1  A.  I started attending church in Osawatomie, and that's where

2  I met him.

3  Q.  What church was that?

4  A.  Osawatomie Church of the Nazarene.

5  Q.  And about what year do you think you met Mr. Hay through

6  Church of the Nazarene?

7  A.  Early 2000's, 2003.

8  Q.  So you've known him nearly 20 years; is that right?

9  A.  Yeah, probably, uh-huh.

10  Q.  Okay.  Are there some gaps in there where maybe you didn't

11  see him as much?

12  A.  Yes.  I was only at that church seven years.

13  Q.  So let's start at Osawatomie Nazarene, and then we'll kind

14  of walk through that time period, okay?  Is Osawatomie Nazarene

15  still around today?

16  A.  No, it closed seven years ago, I believe.

17  Q.  But you attended that church about from what year to what

18  year?

19  A.  I attended seven years from 2015, back it up, whatever that

20  works out to be.

21  Q.  Okay.  All right.  And did you know Mr. Hay from another

22  church before that?

23  A.  No.

24  Q.  All right.  So you met Mr. Hay sometime in the 2000's

25  through Osawatomie Church of the Nazarene?

```
1   A.   Yeah.  Yes.
2   Q.   Okay.  How often did you see Mr. Hay in that initial time
3   period at Osawatomie Church of the Nazarene?
4   A.   Almost every week.
5   Q.   At church?
6   A.   Yes.
7   Q.   Did you see him a lot socially outside of the church?
8   A.   Very seldom.
9   Q.   Okay.  So largely fair to say, you and Mr. Hay were church
10  friends?
11  A.   Yes, it was always a church function of some sort.
12  Q.   So if it wasn't services on Sunday, it might have been some
13  other program the church had?
14  A.   Exactly, yes.
15  Q.   Do you remember if Mr. Hay had a car accident sometime
16  around 2005?
17  A.   Yes.
18  Q.   Okay.  I want to ask you about observations you had of Mr.
19  Hay after 2005.  Did you ever see him in which it appeared that
20  he had a disability?
21  A.   Yes.
22  Q.   Was this something that he appeared like all the time?
23  A.   Yeah.
24  Q.   Okay.
25  A.   Yes.
```

1  Q.  How did he generally appear to you on sort of an average
2  day?
3  A.  Umm, I never seen him without a cane, so he would stumble
4  sometimes without the cane.
5  Q.  Okay.  So the reason that you say he appeared like he might
6  have a disability is he carried a cane with him; is that right?
7  A.  Yeah.
8  Q.  But did you see him at times where it appeared that
9  whatever that disability was, was much worse?
10  A.  Yes.
11  Q.  Do you remember the first time you saw that?
12  A.  Well, I only recall one time, and it was pretty severe.
13  Q.  About when was that, do you remember?  Was it in that
14  window of the Osawatomie Church of the Nazarene?
15  A.  Yes, yes.  It was at church, yes.
16  Q.  It was at church?
17  A.  Yes.
18  Q.  On a Sunday?
19  A.  Sunday night or a Wednesday night.  I think it was a
20  Wednesday night.  I'm sure it was a Wednesday night.
21  Q.  Was there some program the church regularly had on
22  Wednesday nights?
23  A.  Yes.
24  Q.  And what was that?
25  A.  We used to call it prayer meeting, but it was just a time

1    to meet and have a mid-week service.

2    Q.   Okay.  And Mr. Hay attended this particular service that

3    you're talking about?

4    A.   Yes.

5    Q.   And it sounds like he had some sort of episode.  Can you

6    describe what you saw?

7    A.   Yeah.  I -- I didn't see him come in, because I was sitting

8    toward the front, but when I got ready to leave, he was sitting

9    behind us a little ways, and I seen he was kind of

10   unresponsive.  I seen obviously, something wrong, and his wife

11   was standing by him, and I stepped over, and I said, are we

12   okay, is there anything I can do to help you, take him back?

13   He was -- his hands were locked up, and he was shaking, and he

14   was just really stiff is what it appeared to me.

15   Q.   And so I heard you say that it looked like his muscles had

16   locked up?

17   A.   Yeah.

18   Q.   Did you try to talk to him?

19   A.   No, because I didn't know what to say.

20   Q.   Did you see other people who were trying to talk to him?

21   A.   Not at that moment, no.

22   Q.   Did he seem to be responsive to what was going on around

23   him?

24   A.   Yeah, somewhat, I guess, yeah.  Yes.

25   Q.   And so what -- what else happened besides you seeing him

1    like that?  Did you stay at the church?

2    A.  I did not.  I asked his wife -- she was there with him --

3    if I could help, and she said no, I need to leave him for a

4    little while, and he should be okay, and she assured me that

5    they would get out and be okay eventually, so I moved on.

6    Q.  And this was the particular time that sticks out in your

7    mind where you saw Mr. Hay have an attack or an episode,

8    whatever you would describe it?

9    A.  Correct.

10   Q.  Were there other times that you saw him, for example, on

11   the 4th of July where he had similar issues?

12   A.  Not as severe, yes.

13   Q.  Okay.  What did you see in relation to -- was there a

14   particular 4th of July where he had something that wasn't as

15   severe?

16   A.  No, there was only one 4th of July where we were around

17   each other, and it was a church get-together at the pastor's

18   house.

19   Q.  And what did you see that particular time?

20   A.  Well, toward evening, when kids' fireworks started going

21   off, he started to shake, and I don't know, kind of getting

22   nervous.  I don't know how to explain it.  It's unusual for

23   him, and then he left, so...

24   Q.  Obviously, lots of people are -- are maybe uncomfortable

25   around fireworks.  Was this more than just sort of a general

1   discomfort?

2   A.   Yeah, it was -- it wasn't a go in the house just to get

3   away from it type thing.  It was, he was starting that locking

4   up, shaking that he did sometimes.

5   Q.   Have you seen this on other occasions that maybe don't

6   particularly link to a moment in your mind?

7   A.   Umm, yeah, maybe a couple times at church, uh-huh.

8   Q.   Where he had sort of similar reactions to what you've all

9   ready described, or was it different than that?

10  A.   Similar to what I described.  It's always been the same,

11  except for the one which I call severe.

12  Q.   That was the first one on the Wednesday night in church?

13  A.   (Nodded.)

14  Q.   You say yes?

15  A.   Yes.

16  Q.   Okay.  So you think maybe you've seen this four or five

17  times, something like that?

18  A.   Yes.

19  Q.   Do you remember writing a letter to support Mr. Hay in

20  relation to this back in 2017?

21  A.   Yes.

22  Q.   And I assume you generally said the same thing that you've

23  testified to today; is that right?

24  A.   Correct; yes.

25  Q.   If I understood earlier, I think I asked you maybe not a

1   good question.  I asked if Mr. Hay seemed disabled all the

2   time; and I think you said yes, but as I understood you, you

3   were saying he carries a cane, and you associate that with

4   someone who's disabled.  Did I understand that correctly?

5   A.   I associate that with him, because if he set the cane down

6   and walked somewhere, he would be less stable than I am

7   walking.  That's why I associated that with his case.

8   Q.   Okay.  But the muscle spasms and some of the other things

9   that you saw, those weren't constant with Mr. Hay; is that

10  right?

11  A.   That's correct; yes.

12  Q.   That happened the four or five times that you've all ready

13  testified to; is that right?

14  A.   Yes.

15  Q.   But you said he appeared disabled, because when you've seen

16  him, he's carried a cane with him; is that right?

17  A.   He -- yes, but my idea is without the cane, there's an

18  issue with walking.

19  Q.   So it sounds like you've seen him on some occasion, at

20  least, when he did not have the cane?

21  A.   Yes, short, going to the bathroom or whatever is what comes

22  to my mind.

23  Q.   And you have some memory of having -- him having difficulty

24  walking in one of those moments?

25  A.   Sometimes, yes.

1    Q.   Okay.  That's all I have.  Thank you for your time.

2    A.   Uh-huh.

3                        CROSS EXAMINATION

4    BY MR. HUSCHKA:

5    Q.   Mr. Zook, you -- you don't know what Bruce Hay told the VA

6    during his benefits application process, do you?

7    A.   I have no idea, no, sir.

8    Q.   You don't know what he told the VA during his many

9    evaluations, do you?

10   A.   I do not.

11   Q.   You don't know what he told the Social Security

12   Administration either, do you?

13   A.   I do not.

14   Q.   No further questions.

15             MR. MAGARIEL:  Nothing additional, Your Honor.

16             THE COURT:  All right.  You're excused.  Thank you.

17             MS. RAMSEY:  Your Honor, we would call Joseph Bell.

18        (Witness sworn.)

19             THE WITNESS:  I do.

20             MS. WIEST:  Thank you.  You may have a seat.

21                        JOSEPH BELL,

22   Called as a witness on behalf of the defendant, having been

23   first duly sworn, testified as follows:

24                        DIRECT EXAMINATION

25   BY MS. RAMSEY:

1   Q.  Pastor Bell, can you state your full name for the jury, and

2   then spell your first and last name, please?

3   A.  Okay.  Doctor Joseph Bell.  J O S E P H.  B E L L.

4   Q.  Thank you.  I want to first talk to you a little bit about

5   you and your background.  You said Doctor, so I want to talk --

6   that's one reason why I want -- I kind of want to talk to you a

7   little bit about it.  Where did you receive your education?

8   A.  All of my education?

9   Q.  Yeah, let's start from college forward.

10  A.  Okay.  I received a bachelor of arts degree, and I received

11  that from Governor State University, University Park, Illinois.

12  I received a master -- master's degree in practical theology

13  from Mount Vernon Nazarene University, and I received a doctor

14  of education degree in ethical leadership from Olivet Nazarene

15  University.

16  Q.  Okay.  Thank you.  Where are you currently employed?

17  A.  I'm currently retired from the Church of the Nazarene, and

18  my -- although I am not presently serving a particular

19  congregation, I still am in active ministry in providing public

20  supply and room supply for the church.

21  Q.  Okay.  I want to talk to you about -- so would it be fair

22  to say that you have been a pastor of several churches?

23  A.  Yes.

24  Q.  Okay.  I didn't want to get that wrong, so I do apologize.

25  What were your responsibilities as a pastor?

1    A.    Responsibilities of a pastor are to preach the word of God,

2    to teach, to organize, to provide counsel, to marry

3    individuals, to officiate at funerals, to call on families and

4    help them through whatever situation arises.  The -- there are

5    other responsibilities.  Those are the primary

6    responsibilities.

7    Q.    Okay.  I want to talk to you about Mr. Bruce Hay.  Do you

8    know Bruce Hay?

9    A.    I do.

10   Q.    Okay.  Can you tell me how you first met?

11   A.    Bruce Hay was serving on the Osawatomie Church of the

12   Nazarene church board when I came to interview for the position

13   of pastor.

14   Q.    Osawatomie, so you -- so you met him at the Osawatomie

15   church.  Did you ultimately get that position?

16   A.    Ultimately, I became the -- the pastor for that

17   congregation, yes.

18   Q.    Okay.  How long were you a pastor at the Osawatomie church?

19   A.    I was with them for three and a half years, 2012 to 2015,

20   that window of time, but it was three and a half years.

21   Q.    And then the Church of the Nazarene -- so you left the

22   Osawatomie church in about 2015, and then went to Church of the

23   Nazarene; is that correct?

24   A.    Yes, I went to another congregation in the Church of the

25   Nazarene in Olathe, Kansas, the Westside Church of the

1   Nazarene, and my responsibilities there are -- the title there

2   was a compassionate ministry pastor, but I was one of many

3   pastors on staff there.

4   Q.   Okay, and just so I'm clear in my mind, Church of the

5   Nazarene, did Bruce Hay and his family ever attend that church

6   as well?

7   A.   After I was on staff at the Westside Church of the

8   Nazarene, Bruce Hay and his family began to attend probably a

9   year, year and a half after I made that move.

10  Q.   Okay.  All right.  So being a pastor of the Osawatomie

11  church from 2012 to 2015, how often would you say that you got

12  to see Bruce at the church?

13  A.   How often?

14  Q.   Yeah, during a week, I would say, how often would you see

15  him?

16  A.   Multiple times during the week; four, five times.

17  Q.   Okay.  And was that -- excuse me -- largely for the

18  duration of the time that you were at the Osawatomie church?

19  A.   Yes.

20  Q.   Okay.  Church of the Nazarene, it sounds like to me what

21  you've said is that you moved there, and started working as

22  a -- as a compassionate ministry pastor there about a year

23  before Bruce and his family started attending that church; is

24  that correct?

25  A.   I began to do that at the Westside Church of the Nazarene.

1   Q.   I'm sorry?

2   A.   Was the pastor at the Osawatomie church.

3   Q.   Okay.  And so before your retirement then, between the time

4   that you got to the Church of the Nazarene, how many years

5   would you say you spent time there where you would have had

6   contact with Bruce and his family?

7   A.   I'm a little unclear on that question.  Could you run that

8   question by me again?

9   Q.   Sure, and it may be because I'm -- I may be confusing the

10  names of the church, so maybe you can set out the time line for

11  me and make it easier.

12  A.   Okay.  The time line where I was the lead pastor for the

13  church, that was in Osawatomie, that was someplace between 2012

14  and 2015, I served in that period of time.  Then I served at

15  the Westside Church of the Nazarene immediately following that

16  until June of this year when I took on retired status, which is

17  basically in -- the Church of the Nazarene is a -- is a --

18  determining whether I'm assigned to a specific congregation or

19  carrying on other ministry.

20  Q.   Okay.

21  A.   After -- after going to the Westside church, the Hay family

22  began to attend in 2017, approximately July or August of that

23  year.

24  Q.   Okay.  I think I established how many -- how often you were

25  seeing Bruce at the Osawatomie church.

1   A.   Yes.

2   Q.   I think I'm trying to establish how often you saw Mr. Hay

3   and his family at the Westside church.

4   A.   The -- at the Westside church, I did not see them as

5   frequently, because they lived some distance from the church,

6   but I did see them weekly at least once, oftentimes two or more

7   times during the week, but at least once.

8   Q.   Okay.  Are you aware of Bruce's disability?

9   A.   I am.

10   Q.   Okay.  And have you seen Bruce display any symptoms that

11   you would attribute to him having a disability?

12   A.   Yes.

13   Q.   Okay.  I want to talk to you about those, and see if

14   there's any in general, and then see if there's a specific time

15   you remember, okay?

16   A.   Okay.

17   Q.   Okay.  In general, when you've observed Bruce having

18   symptoms of what you believe are his disability, what do you

19   see; what are you observing?

20   A.   Well, first of all, I know that Bruce walks with a cane,

21   has a cane with him for stability.  I've not, to the best of my

22   knowledge, ever seen Bruce where his cane wasn't close at hand.

23   I recognize that Bruce oftentimes will tighten up, and you can

24   see his muscles restricting, and his -- the first thing I

25   recognize when -- when Bruce is having difficulty is his head

1  will begin to bob back and forth, and you can see that he's

2  trying to control what he's dealing with, but --

3  Q.  Okay.  So is -- you said that you would see, I think,

4  Bruce, I think you said about five times a week?

5  A.  Yes, four or five.

6  Q.  Okay.  And that was because partly, you're seeing Bruce at

7  church proceedings and outside of church; correct?

8  A.  That is correct.

9  Q.  Okay.  Now, when you've seen the -- Bruce have these

10  symptoms of his muscles cramping up and his body shaking, has

11  this been during church services?

12  A.  I have seen that during church services, yes.

13  Q.  Okay.  And have you also seen it outside of church

14  services?

15  A.  Yes, I have.

16  Q.  Okay.  And when you've seen it outside of church services,

17  can you give me an idea of where that's been?

18  A.  I've seen that take place in his home.  I've seen that take

19  place on church grounds, but not during a service.

20  Q.  Okay.  So has there ever been a time when any proceeding or

21  service at the church has been interrupted by Bruce having an

22  episode?

23  A.  Yes.  Yes.

24  Q.  Okay.  When was that, if you can?

25  A.  That would have been in the Osawatomie church.  I'm unclear

1   on the date, but I'm going to say probably about 2014.  That's

2   about as close as I can get to the date --

3   Q.   Okay.

4   A.   -- of that.

5   Q.   And can you tell me what you remember happening to Bruce at

6   that time?

7   A.   I can remember that Bruce was sitting, I was behind the

8   pulpit, so he was sitting on my left about two/thirds of the

9   way back in the sanctuary, and you could see where he was --

10  his head was moving, and his -- he had his -- you could tell

11  that he was trying to control what was going on, and you could

12  see that his neck was -- was bulging.  His -- his arms began

13  to -- to cramp, and his -- you could tell that his entire body

14  was in -- in spasm to the place that we stopped the service to

15  assist Bruce during that time.

16  Q.   Okay.  And what did you -- did you -- you said we.  Who did

17  that involve besides yourself?

18  A.   Who -- who -- who gave assistance?

19  Q.   Yes.

20  A.   I gave assistance, family members gave assistance,

21  individuals that were in the sanctuary at the time, and

22  unfortunately, I don't remember names for those people at this

23  point.

24  Q.   Fair enough.  And when you said you gave assistance, what

25  type of assistance did you -- did you have to give?

1    A.   I gave emotional support to them, I gave physical

2    assistance in trying to open up his hands and his arms, and

3    trying to help him to -- to be released from these spasms.

4    There was assistance given, as that over a period of time began

5    to dissipate or -- or be less restrictive, to help him to his

6    feet, and help him out of the church.

7    Q.   Okay.  Was Bruce able to walk during this time when his

8    body was cramped up and restricted?

9    A.   Not originally, no.

10   Q.   Okay.

11   A.   There's a significant amount of time that passes, and Bruce

12   was so constricted that he was not even -- I mean, he used his

13   -- tried to use his cane.  That was very difficult for him to

14   use his cane to -- was he on his feet is your actual question?

15   Can he walk?  With -- only with assistance.

16   Q.   Okay.

17   A.   Only with assistance.

18   Q.   And so --

19   A.   Multiple people helping him.

20   Q.   Okay.  You said that Bruce uses -- I think you said you've

21   always seen him use a cane or have his cane nearby; is that

22   right?

23   A.   Correct.

24   Q.   Okay.  And if you've seen him without -- without -- doing

25   anything without his cane, has that been a short distance, or

1    it sounds like you're saying you always see him with his cane,

2    but I don't --

3    A.   Yes, I have always seen him with a cane within reach.  I --

4    I've seen him -- I have seen him take a step or two without --

5    without the use of the cane, but that is rare.

6    Q.   All right.  The church at Osawatomie, did the church have

7    like a 4th of July celebration that they would do or a barbecue

8    or something like that?

9    A.   The community had a 4th of July celebration, and the church

10   was often involved in that, and we as a congregation engaged in

11   that.

12   Q.   Okay.  And did Bruce attend these events?

13   A.   No.

14   Q.   Okay.  Where would Bruce go, and what would he do around

15   that time?

16   A.   Bruce would get as far away as possible from those

17   particular events.  He would -- he'd try to get out of town, in

18   someone's basement.  He would want to remove himself from the

19   sight or sound of the fireworks.

20   Q.   Okay.  The church, the Westside Church of Nazarene, you

21   said that was located in Olathe, Kansas?

22   A.   Yes.

23   Q.   And so I believe Bruce and Lori lived either -- is it

24   Osawatomie or Greeley?

25   A.   Originally, they lived in Osawatomie, and I think they're

1    in Greeley at this point.

2    Q.   Okay.  And so when -- the times when you were a pastor at

3    the Westside Church of Nazarene, do you know -- you may not

4    know this, but do you know who would be driving to that church

5    in Olathe, Kansas?

6    A.   Lori.

7    Q.   Okay.  His --

8    A.   His wife.

9    Q.   Thank you.  And so just to clarify, do Bruce and his

10   family, do they -- it sounds like you may not be as obviously

11   full-time pastor at the Westside Church of Nazarene, but do you

12   still participate in that church?

13   A.   I do.

14   Q.   Okay.  And do Bruce and his family still attend that

15   church?

16   A.   They do.

17   Q.   Okay.  You've described kind of what happens to Bruce, 2012

18   to 2015, when you were at the Osawatomie church.  Have you seen

19   him display or have some of these symptoms when you've seen him

20   attending the Westside Church of the Nazarene?

21   A.   I have.

22   Q.   Okay.  And I know I think you said you don't see them as

23   much obviously 'cause you're retired.

24   A.   Uh-huh.

25   Q.   But do you know how often you were -- and they live farther

1  away.  Do you know how often you were seeing them at the church

2  of the Westside Church of Nazarene?

3  A.  Yes, until June of this year, I was full-time at the

4  Westside church.  My primary responsibilities had to do with

5  compassionate ministry.  Because of that, I have records that

6  shows that they were in active attendance and participation

7  from August of 2017 until the present.

8  Q.  Okay.  And you were still also seeing Bruce along with his

9  family outside the church setting as well?

10  A.  On occasion, yes.

11  Q.  On occasion.  Okay.

12          MS. RAMSEY:  May I have one moment, Your Honor?

13          THE COURT:  Sure.

14          MS. RAMSEY:  I have nothing further.  Thank you.

15                      CROSS EXAMINATION

16  BY MR. OAKLEY:

17  Q.  Good afternoon, Doctor Bell.

18  A.  Good afternoon.

19  Q.  So I want to talk to you about the Westside Church of the

20  Nazarene.  You said that that's in Olathe, Kansas?

21  A.  It is.

22  Q.  And is that at 1700 West Santa Fe in Olathe?

23  A.  That is correct.

24  Q.  Okay.

25          MR. OAKLEY:  Your Honor, may I approach?

1          THE COURT:  Yes.

2   BY MR. OAKLEY:

3   Q.  Doctor Bell, I'm going to hand you what's been marked as

4   Government's Exhibit 332.  Do you recognize that as a print-out

5   of a Google map?

6   A.  I do.

7   Q.  And does that show the location of the Westside Church of

8   the Nazarene with directions to a location on Parker Avenue in

9   Osawatomie, Kansas?

10  A.  The map is very small, but I believe that to be correct.

11          MR. OAKLEY:  Your Honor, I'd offer Government's

12  Exhibit 332.

13          MS. RAMSEY:  No objection.

14          THE COURT:  332 admitted.  You can publish.

15          MR. OAKLEY:  Miss Wiest, could we have the ELMO

16  please?

17  BY MR. OAKLEY:

18  Q.  So Doctor Bell, I'm going to trade you, and show you a copy

19  of that.

20  A.  Okay.

21  Q.  If I can take the marked exhibit from you.  And so since

22  you were pastor in Osawatomie, I assume you're fairly familiar

23  with the location of Osawatomie?

24  A.  I am.

25  Q.  And it's south of Olathe; correct?

1    A.   That is correct.

2    Q.   And are you familiar with Google maps, when you plug in the

3    Google maps an address, they'll give you recommended driving

4    directions?

5    A.   I am; right.

6    Q.   And so in this case, it gives two suggestions for the best

7    way to get from Osawatomie to the Westside Church of the

8    Nazarene; correct?

9    A.   I see that, yes.

10   Q.   It looks like the fastest route would be to take

11   Highway 169, an alternative route would be to take I-35.  Is

12   that -- is that right, as far as what the map says?

13   A.   That would be correct according to the map, yes.

14   Q.   Okay.  You're also familiar with where Greeley is located;

15   correct?

16   A.   I am.

17   Q.   And Greeley is actually south of Osawatomie on 169, isn't

18   it?

19   A.   That is correct.

20   Q.   And in fact, if we look at the map, you can see the address

21   on Parker Avenue, and then if you follow 169 to the south,

22   you'll -- you'll get to Greeley; correct?

23   A.   I believe that's correct, yes.

24   Q.   And so it's actually longer of a drive from Greeley to the

25   Westside Church of the Nazarene than it is from Osawatomie;

1   correct?

2   A.   Correct; uh-huh.

3   Q.   You mentioned that Mr. Hay has been going to the Westside

4   church since 2017?

5   A.   Yes.

6   Q.   And that's pretty much every Sunday?

7   A.   Yes.

8   Q.   You mentioned earlier that you've seen Mr. Hay with the

9   cane; correct?

10   A.   That is correct.

11   Q.   You've never seen Mr. Hay need a walker at either the

12   Church of the Nazarene or the church in Osawatomie, have you?

13   A.   I may have seen him once, but I'm not positive on that.

14   Q.   Okay.  You don't recall --

15   A.   I do not recall.

16   Q.   -- having seen?  And when asked on direct examination, it

17   didn't come to mind; correct?

18   A.   That is not something that I certainly have seen

19   frequently.

20   Q.   Okay.  So you mentioned that you first met Mr. Hay because

21   he was on the church board that interviewed you for the pastor

22   position; is that correct?

23   A.   That is correct.

24   Q.   So I want to talk to you a little bit about the church

25   board.

1    A.   Okay.

2    Q.   Do you know how many people were on the church board at the

3    time?

4    A.   I believe that there were 11.

5    Q.   11 people on the church board?

6    A.   Uh-huh.

7    Q.   And the church board is basically a group of people that

8    meet together to discuss the church, what's best for the

9    church, to help move the church forward; correct?

10   A.   That's a basic description, yes.

11   Q.   And a person that's on the church board, that's a volunteer

12   position; right?

13   A.   That is correct.

14   Q.   So you're not forced to be part of the church board.  You

15   offer to be a part of the church board?

16   A.   That is correct.

17   Q.   And the church board meets, they have discussions about

18   certain things, including should we hire this particular

19   pastor?

20   A.   Correct.

21   Q.   Or this particular applicant to be a pastor?

22   A.   Correct.

23   Q.   And so being a part of a church board requires the board

24   members to work together; correct?

25   A.   Correct.

1    Q.   To have conversations with each other?

2    A.   Yes.

3    Q.   To have discussions about the business of the church board?

4    A.   Yes.

5    Q.   And so if I can direct your attention to the time when you

6    were the pastor at the Osawatomie church.

7    A.   Okay.

8    Q.   That would require you to be up at the front of the church,

9    correct; as the pastor, you're leading the church service?

10   A.   Yes, you're -- you've confused me a bit.  I thought we were

11   talking about the church board, and now we're talking about the

12   leading the church.  I want to make sure I'm answering the

13   question you're asking.

14   Q.   Absolutely, I appreciate that, and I've transitioned from

15   the church board to -- to your role as actual pastor of the

16   church.

17   A.   Okay, yes.

18   Q.   And so during the time at Osawatomie, you formed a

19   relationship with Mr. Hay; correct?

20   A.   That is correct.

21   Q.   Now, that relationship was formed in large part on

22   activities outside of the church service; correct?

23   A.   Actually, I would not agree with that, that the

24   relationship with Bruce Hay, although we did have contact

25   outside of the church facility, the contact that I have with

1    Bruce Hay was directly related to the -- the involvement as

2    part of the church family.

3    Q.   Okay.  Let me talk to you about the various ways that

4    people can be involved as part of the church family.

5    A.   Okay.

6    Q.   One of those is church services on Sunday; correct?

7    A.   That is correct.

8    Q.   And church services on Sunday as pastor, that's when you're

9    in front of the congregation; correct?

10   A.   That is a goodly portion of it, yes.

11   Q.   And so the bulk of your -- of your personal one on one

12   relationship with Mr. Hay would not have occurred at that time,

13   but it would occur at other church-related activities; correct?

14   A.   That's true.

15   Q.   And it was important -- well, let me ask you this.  Did the

16   church have various types of fellowship activities; church

17   dinners, for instance.

18   A.   We did.

19   Q.   And that was something that Mr. Hay would frequently

20   attend, isn't that true?

21   A.   That is true.

22   Q.   And these church dinners are church members getting

23   together, sharing a meal, having conversation, discussing their

24   families, discussing life in general; isn't that true?

25   A.   That's correct.

1    Q.   And Mr. Hay was frequently at these types of fellowship --

2    A.   Yes, he was.

3    Q.   You mentioned that when you observed Mr. Hay having -- I

4    think you called 'em episodes -- that you noticed that he would

5    have a head bob; correct?

6    A.   That is correct.

7    Q.   And that is something that you identified as being part of

8    an episode; correct?

9    A.   I would notice the head bob when an episode was taking

10   place, but I would also notice the head bob when I could tell

11   that he was struggling to keep control and not have a -- an

12   episode, that would -- he would -- his head would bob when he

13   was trying to control that, which was taking place to keep it

14   from going -- becoming a more significant episode.

15   Q.   And you noticed the head bobbing, because based on your

16   relationship with Mr. Hay, it was unusual.  Most of the time,

17   he didn't have a head bob; correct?

18   A.   He didn't always have a head bob, but he -- but it was not

19   uncommon to see a head bob.

20   Q.   Okay.

21   A.   I would say probably, I might recognize a head bob as often

22   as I would not.

23   Q.   Okay.  And you indicated that when you were in Osawatomie,

24   when you were the pastor of the Osawatomie church?

25   A.   Yes.

```
1    Q.   You would see Mr. Hay, I think you said four to five times
2    a week; is that correct?
3    A.   Yes.
4    Q.   And so you'd have the Sunday service, correct, and you
5    would have a Wednesday -- well, let me ask you this.  Would you
6    have a Wednesday service?
7    A.   Yes.
8    Q.   A Bible study type thing?
9    A.   Yes.
10   Q.   And --
11   A.   Typically, a Sunday evening service as well, so that would
12   be three.
13   Q.   Three?
14   A.   Uh-huh.
15   Q.   And then you would have the other fellowship type church
16   functions; correct?
17   A.   Yes, but also involved in pastoral care, includes calling
18   on individuals in their home.
19   Q.   Sure.
20   A.   And Osawatomie is a small community.
21   Q.   Sure.
22   A.   And so that community as a whole oftentimes have events
23   that we would gather, and we would have contact from that as
24   well.
25   Q.   Sure.  And so you would see Bruce both at the church
```

1  fellowship events, and then also out in the community since you

2  were both members of the community?

3  A.  That is correct.

4  Q.  At other type events?

5  A.  That is correct.

6  Q.  And again, these are -- are voluntary events.  Nobody

7  requires you to go to community events; correct?

8  A.  This is correct.

9  Q.  And Bruce would be engaged in the community.  He would talk

10 to fellow members of the church, for instance; correct?

11 A.  Yes.

12 Q.  He would talk to fellow members of the community; correct?

13 A.  Yes.

14 Q.  In fact, Mr. Hay is a very likable person, isn't he?

15 A.  I believe so.

16 Q.  In fact, he seems to get along with everyone, doesn't he?

17 A.  I don't think so.

18 Q.  As far as what you've observed, you've seen him get along

19 with a wide range of people all the way from babies to old

20 people and people aged in between?

21 A.  That is true.

22        MR. OAKLEY:  No further questions, Your Honor.

23        MS. RAMSEY:  I have no further questions.  Thank you.

24        THE COURT:  All right.  You're excused.  Thank you.

25        THE WITNESS:  Thank you.

1          MS. RAMSEY:  That's it.

2          THE COURT:  Do you want to come forward please?

3     (Proceedings held at the bench, outside the hearing of open

4     court.)

5          THE COURT:  Okay.  So you've got two more tomorrow?

6          MS. RAMSEY:  Tried to fit one from tomorrow, but I

7     couldn't get her.  I'm sorry.  I do apologize.

8          THE COURT:  Okay.  So if we convene at 9, how long do

9     you think you'll consume tomorrow morning with those two?

10          MS. RAMSEY:  Maybe a couple hours.

11          THE COURT:  Okay.  So -- okay.  I just wanted to give

12     them -- and you don't anticipate any rebuttal?

13          MR. HUSCHKA:  No.

14          THE COURT:  So what I think I'll tell them now, we're

15     going to send them home early, the last two witnesses will be

16     finished tomorrow morning, and we'll finish tomorrow morning,

17     and so the case will be submitted, too.  Oh, and we'll take a

18     break, but then we'll have an instruction conference this

19     afternoon.

20     (Proceedings continued in open court.)

21          THE COURT:  All right.  So we're having another short

22     day.  The remaining two witnesses are not available 'til

23     tomorrow morning, but it's estimated that those witnesses will

24     be completed tomorrow morning.  So then we'll have jury

25     instructions, closing arguments, the case will be submitted to

1   you tomorrow, probably early afternoon, mid-afternoon at the

2   latest, and then your deliberations will begin.  So remind you

3   not to discuss the case with anyone, and to not -- or

4   communicate in any way, and to not take in any extraneous

5   information outside of what you hear here in the courtroom

6   about this case, and we'll look forward to re-convening

7   tomorrow at 9.  We'll look forward to finishing the evidence

8   tomorrow morning as well, and having the case submitted to you

9   sometime tomorrow afternoon.  All right.  So we'll be in recess

10  until 9 o'clock tomorrow morning.

11       (Whereupon court took a recess.  Proceedings then continued

12  as follows:)

13       THE COURT:  You want to take a break before we take up

14  instructions?

15       MR. HUSCHKA:  Please, Your Honor.

16       THE COURT:  Let's reconvene at 2:45.  Does that work?

17       MS. RAMSEY:  Yeah, that's enough time.

18       THE COURT:  Okay.  I mean, we can wait 'til 3, too.  I

19  don't want to rush.

20       MS. RAMSEY:  2:45 is fine.

21       THE COURT:  All right.  I'll see you then.

22       (Whereupon court took a recess.  Proceedings then continued

23  as follows:)

24       THE COURT:  All right.  Everyone's here including --

25  everyone is here including Mr. Hay, so we'll proceed with the

1    final instruction conference.  First of all, we did circulate

2    to you all a proposed verdict form, and I don't believe there

3    were any objections to that; is that correct?

4         MR. OAKLEY:  That's correct, Your Honor.

5         MS. RAMSEY:  Correct, Your Honor.

6         THE COURT:  Okay.  So let me run through those things

7    that I think that are agreed to, and then the last thing we'll

8    take up is the -- the indictment.  So you each submitted

9    slightly different versions of a proposed limiting instruction

10   to address the VA's decision to terminate Mr. Hay's benefits,

11   so I gave you all a proposed -- the court's proposed limiting

12   instruction, and my understanding is that you all are fine with

13   that.  It reads, you have heard evidence indicating that the

14   Department of Veteran's Affairs, the VA, previously terminated

15   Mr. Hay's benefits.  Neither the fact that the VA previously

16   terminated Mr. Hay's benefits nor its reasons for doing -- it

17   should say nor its reasons for doing so have any bearing on the

18   issue of Mr. Hay's guilt.  In deciding whether the government

19   has proved every element of the crimes charged beyond a

20   reasonable doubt, you may not consider the fact that the VA

21   previously decided to terminate Mr. Hay's benefits.  You may

22   not speculate as to why it did so, and you may not otherwise

23   rely on the VA's decision in any way as evidence of Mr. Hay's

24   guilt.  So no objection to that by the government?

25        MR. OAKLEY:  No, Your Honor.

1        THE COURT:  Or by defendant?

2        MS. RAMSEY:  No, Your Honor.

3        THE COURT:  Okay.  And then both parties have

4   initially recommended using Tenth Circuit Pattern

5   Instruction 1.19, but in light of the Tenth Circuit's recent

6   decision in United States versus Cortez-Nieto which casts some

7   doubt, or at least some doubt on the part of this pattern jury

8   instruction, my proposal was to replace it with my standard

9   stock instruction, and my understanding is you all agreed to

10  that.  It reads -- my standard stock instruction reads, the

11  defendant is on trial only for the acts alleged in the

12  indictment.  He is not on trial for any other acts or conduct.

13  In determining whether the defendant is guilty or not guilty,

14  you are therefore to consider only whether defendant has or has

15  not committed the acts charged in this indictment.  Even if you

16  are of the opinion that he is guilty of some offense not

17  charged in the indictment, you must find defendant not guilty

18  if the evidence does not show beyond a reasonable doubt that

19  the defendant committed the specific acts charged in the

20  indictment.  So that's my stock.  Government okay with that?

21       MR. OAKLEY:  Yes, Your Honor.

22       THE COURT:  And the defendant?

23       MS. RAMSEY:  Yes, Your Honor.

24       THE COURT:  Okay.  And then the following stock

25  instructions, my understanding is, everyone agrees should be

1    deleted from the template we use, because they don't apply in

2    this case, and that is Page 31, unlawful acts conduct of

3    defendant instruction.  That's the 404 B instruction, Page 34,

4    transcripts, because we didn't have any transcribed

5    tape-recorded conversations, Page 38, credibility of the

6    witness convicted of a felony, that doesn't apply, Page 39,

7    drug abusers' testimony instruction, that doesn't apply.

8    Page 41 is the immunity instruction.  Page 42 is the accomplice

9    instruction, and Page 46 is the post-indictment statements

10   instruction, none of which apply.  Government agree?

11        MR. OAKLEY:  Yes, Your Honor.

12        THE COURT:  And defendant?

13        MS. RAMSEY:  Yes, Your Honor.

14        THE COURT:  Okay.  And then on the theft of government

15   fund elements instruction, the defendant requests that we omit

16   the words embezzle and convert from the instruction.

17   Government does not object, so we are going to delete those

18   words embezzle and convert.  Agree, government?

19        MR. OAKLEY:  Yes, Your Honor.

20        THE COURT:  Okay.  And the verdict form is okay.  So

21   that leaves us with the superseding indictment, and I have gone

22   through and struck some of the language.  First, on Page 2 of

23   that proposed instruction, I don't know if the pagination is

24   the same, but it would be Paragraph Number 4.  It starts, the

25   VA also administered the special monthly compensation.  The

1    defendant wanted beginning with, in essence, this means being

2    so helpless, that last sentence struck, and so I am going to

3    strike that.  I think there's no objection by the government to

4    striking that language; is that correct?

5         MR. OAKLEY:  That's correct.

6         THE COURT:  Okay.  So that's Paragraph 4.  Are you

7    with me, Miss Ramsey?  I want to make sure.

8         MS. RAMSEY:  Yes, Your Honor, I'm following you.

9         THE COURT:  Okay.  Good.  All right.  Then let's move

10   on to Paragraph Number 7, and I will tell you with respect to 7

11   and 8, I'm striking the language that defendant doesn't want in

12   these paragraphs, and I view this language differently than

13   some of the language defendant objects to under the manner and

14   means section.  So Paragraph 7, I plan to strike the language

15   which begins with, which Hay claimed began in February 2005,

16   period.  And then the language about the C&P examination in

17   September 2006.  So Paragraph 7 would start with on or about

18   February 20th, 2006, it would -- that first sentence would end

19   with head injury with tremors, period, and then pick back up

20   with in a March 8, 2007 rating decision, etc.  And then in

21   Paragraph 8, would strike the language, defendant complains of,

22   which is, this was based on Hay reporting that he had frequent

23   problems, blah, blah, blah, blah, and ends with constant

24   movement of the head, neck, back, arms, trunk and legs.  So

25   what would remain in Paragraph 8 would be the first sentence

1    and the last sentence, and my thought in striking this is, this

2    is really -- these are the decisions that were made before the

3    -- I guess the -- the time period of the charged scheme, and I

4    mean, they're -- obviously, they're prefatory.  They have to do

5    with benefits being granted and that sort of thing, but I did

6    not think it advisable to put the claims that he was making --

7    certainly, that they have evidentiary value, but the claims

8    that he was making at that particular time period in the

9    language of the indictment since it pre-dates when the grand

10   jury says this scheme began, which was by at least

11   January 2011.  So do you want to make a record on that, Mr.

12   Oakley?

13        MR. OAKLEY:  Your Honor, the only thing that we

14   would -- would ask that the record reflect is that because the

15   indictment is not firm in that it says, beginning, and I

16   don't -- beginning on a date unknown but no later than, we

17   didn't think that it should be included, but we certainly

18   understand and appreciate the court's ruling.

19        THE COURT:  Okay.  So noted.  So I am taking out that

20   detail there, but I'm not taking out as much detail when we are

21   firmly within the manner and means section.  So Paragraph 9,

22   and I do think -- well, the government suggests in response to

23   the defendant's objections on -- on the manner and means

24   paragraphs that we include in front of every paragraph the

25   government alleges, which I think is an appropriate thing to do

1  to ameliorate some of the problem, although I did want to talk

2  to you all about that, because it's actually the grand jury

3  that charged this, not the government.  I mean, I think from

4  the defendant's standpoint, it might be better to say the

5  government alleges rather than the grand jury charges over and

6  over and over again, but I'll let you all make a record on all

7  of that.  Let me just tell you -- okay, so with respect to

8  Paragraph 9, I'm going to not strike the language that's

9  objected to, because what I think is appropriate in the manner

10  and means section is to allow there to be language about what

11  the so-called fraudulent representations were, because that's

12  the heart of, you know, wire fraud.  So my attempt is to leave

13  in the fraudulent representations, and in Paragraph 9 to leave

14  in what the government alleges is the basis for the allegations

15  that are fraudulent, that what Mr. Hay was able to do at that

16  particular time.  So my plan is to leave in Paragraph 9 as is,

17  except to preface it by saying the government alleges that by a

18  date unknown, etcetera.  Then Paragraph 10, to strike the

19  language from it that defendant wanted stricken, so that

20  Paragraph 10 would end at the word entitled, and strike the

21  words after that, which are, had he provided true and accurate

22  representations regarding his physical condition and

23  capabilities.  So that's my plan on Paragraph 10.  On

24  Paragraph 11, here's what I intend to do.  Government alleges

25  that as part of the scheme to defraud, Hay made fraudulent

1   representations regarding his claimed disabilities and

2   symptoms, and failed to disclose his true physical condition,

3   capabilities and daily activity, and leave it at that.  So I'm

4   taking out faked and exaggerated, and then I'm taking out the

5   last sentence of that paragraph, which begins Hay's failure to

6   provide true and accurate information, etcetera.  Umm, then no

7   changes to Paragraph 12.  Paragraph 13, I intend to leave that

8   in its entirety except to preface it by saying the government

9   alleges that both Hay and LH, etcetera, but otherwise leave it

10   intact.  Paragraph 14, I intend to strike where it says, based

11   on Hay's fraudulent representations and omissions, but

12   otherwise leave that language intact.  So it would read, on

13   April 20, 2013, the VA found that Hay was disabled, etcetera.

14   So that Paragraph 14, Paragraph 15, I intend to leave intact,

15   except to preface it by saying that the government alleges

16   that, etcetera.  Government's 16, umm, this one is more

17   difficult.  Now, there was a limine motion where I precluded

18   any witness from testifying that something was faked or

19   feigned, and so I looked at this language and thought, is there

20   something that I can substitute this with or not, but this

21   again is just an allegation, and I think it goes to the heart

22   of this case, because I think the government's theory is not

23   only were there fraudulent representations in writing and

24   orally during examinations, but also, there were fraudulent

25   non-verbal representations in the sense of how Mr. Hay

1    presented himself to the treating providers.  So I think

2    Paragraph 16 should be partially deleted, but it should -- this

3    is what it should read.  Government alleges that to further and

4    conceal the scheme, Hay feigned or exaggerated physical

5    symptoms during appointments with examiners or providers,

6    period, and then strike that example that follows.  And then

7    Paragraph 17, umm, the government alleges that to further

8    conceal the scheme to defraud the VA, Hay made similar

9    fraudulent representations to, and omitted material facts from

10   the Social Security Administration regarding his physical

11   condition and capabilities, period, and then strike the rest of

12   that -- that sentence.  So in essence, all of the paragraphs

13   remain, but some of them are significantly abbreviated.  So let

14   me first start with the government.  We're focusing on the

15   manner and means section, and make any record you have about

16   objections to what I've just indicated.

17        MR. OAKLEY:  Your Honor, we don't have any objection

18   to the court's proposed modifications.

19        THE COURT:  All right.  Miss Ramsey?

20        MS. RAMSEY:  Your Honor, I think we -- we would

21   largely just maintain our objection that we submitted in the

22   written motion that this is -- even if you add the government

23   alleges -- still summarily a speaking indictment which sets

24   forth the government's theory of their case.  We would ask the

25   court maybe possibly consider as well that we be allowed to

1    submit an instruction on defense theory of the case.

2        THE COURT:  Okay.  Do you have it written?

3        MS. RAMSEY:  We have something written, Your Honor,

4    that we were working on very quickly.

5        THE COURT:  Okay.  Why don't you -- why don't you

6    e-mail that to us, copy the government.  If you can get it to

7    us today, that would be good.

8        MS. RAMSEY:  Okay.

9        THE COURT:  All right.  So I understand, but I'm going

10   to overrule and deny the objections, because I -- I think that

11   it's appropriate, and to be sure, there's -- this indictment is

12   a speaking indictment, but that's why I've tried to get rid of

13   some of it, but I do think the government should be able to set

14   out what at least some of the key fraudulent representations

15   that it is relying upon, rather than just tracking the language

16   of the statute itself, which is what it does under execution of

17   the scheme.  So what I've tried to do is keep in the key

18   fraudulent representations, and that would also -- that would

19   be both verbal and non-verbal, but beginning with the manner

20   and means section, and not having the government put all that

21   in the indictment prior to the manner and means section,

22   because that relates to earlier time periods, and I understand

23   the government's argument that they're not sure when this

24   scheme began, no later than January 2011, and maybe it began

25   before that, but again, I think those earlier paragraphs, 7 and

1    8, essentially just tell the story of how the benefits were

2    awarded, what benefits were awarded and when, and that I think

3    is an important thing to include, but not so much the detail

4    about what Mr. Hay was saying.  Obviously, that's evidence, and

5    the government can certainly address that in its closing

6    argument.  All right.  So if you can get us something this

7    afternoon, we'll take a look at it, and then government, you

8    can take a look at it and e-mail us, you know, hopefully before

9    tomorrow morning, or be prepared tomorrow morning to make any

10   argument you have about it.  Why don't we plan on convening

11   tomorrow morning at 8:30 so we can talk about that additional

12   instruction?  And so I take it from the road map you've given

13   us, that Mr. Hay, at this point at least, is not planning to

14   testify; is that correct?

15        MS. RAMSEY:  At this point, Your Honor, I -- we can

16   probably address that again, though, tomorrow, if -- probably

17   better off doing that.

18        THE COURT:  Okay.  Okay.  I'll want to do that.

19   Sometimes I do it in advance, but then I will -- at the close

20   of the defendant's case, I'll definitely do it again.  So we

21   can take that up tomorrow, too.  Okay.  All right.  Yes?

22        MR. OAKLEY:  Your Honor, can we discuss one other

23   thing?  I know the court's ruling on the government's expert

24   related to malingering, and as I understood the court's order,

25   she -- because malingering has in its definition criminal

1  intent basically, and presumably Doctor Becker would have

2  testified that in her opinion, defendant was malingering, and

3  that would have been made the province of the jury.  However,

4  with the defense expert, she doesn't have that opinion

5  certainly.  She's not going to say that the defendant was --

6  was malingering, so I don't think we have that concern with

7  her.  It's -- I think it's -- from the -- from the science part

8  of it, I think it's important for the jury to understand what

9  malingering is, as -- and I anticipate that Doctor O'Neal will

10  testify what conversion disorder or FND is, and as I understand

11  the literature, and as I understand the science, because

12  conversion disorder has these physical manifestations, the head

13  bobbing, that sort of thing, without an explainable

14  neurological injury, that in order to diagnose conversion

15  disorder, you have to exclude malingering, and you have to

16  exclude factitious disorder, which at least in my mind is

17  similar, the difference being, malingering is associated with

18  the expectation of secondary gain or -- or to get out of an

19  obligation.  So I think that the court -- that the -- we would

20  like to cross her on when you have this instance where somebody

21  presents with these sorts of, you know, head bobbing, or

22  other -- however she wants to phrase it, epileptic,

23  non-epileptic seizures, however she wants to phrase it, that it

24  could be conversion disorder, but it could also be malingering,

25  and this is what malingering is, or it could be factitious

1    disorder, and this is what factitious disorder is, and she's

2    not going to say, in her opinion, the defendant's malingering.

3    So she's not going to opine on the defendant's criminal intent,

4    but it should at least be defined so that the jury can make

5    that determination on their own, based on the evidence, and

6    based on the definition of malingering.

7              THE COURT:  Okay.  Miss Ramsey?

8              MS. RAMSEY:  If I understand the government's -- see

9    if I can -- I'm not quite sure I understand the government's

10   motion, but from what Mr. Oakley said, I think what his

11   understanding of the diagnosis of conversion disorder requires

12   ruling out malingering or factitious disorder, that is not --

13   and so on that basis, then he should be able to cross-examine

14   Doctor O'Neal, that is not my understanding of the diagnosis of

15   the disorder, and I -- it's not my understanding of the

16   literature that it is necessarily a requirement.  Conversion

17   disorder, much like fibromyalgia, much like migraines, much

18   like other psychological or psychiatric disorders is

19   diagnosable without figuring out whether a patient is

20   malingering or engaging in either a factitious disorder for

21   purpose of a secondary gain, and so if I understand, that would

22   be his basis in wanting to ask about that, but that's not my

23   understanding of the diagnosis of the disorder.  My

24   understanding is that -- that neurologists have called it or

25   ruled out, whether you call it rule out or rule in process,

1   you're ruling out the physical explanation for what seems to be

2   a neurological motor manifestation of its symptoms, meaning

3   you're doing MRI's, you're doing EEG's, you're finding out

4   whether there's some other physiological evidence for purposes

5   of the disease.  It's not that you're saying you're diagnosing

6   it by saying this person is malingering.  And in fact, I think

7   part of the government's expert report talks about tests for

8   malingering, and so if that's their basis, I would, you know,

9   disagree, and object that -- that that line of

10  cross-examination should be allowed.

11       THE COURT:  Okay.  So my limine ruling was based on

12  the definition of malingering, because it had this sort of

13  intent, secondary gain.  I mean, the inference being an intent

14  to defraud or intent to get something, or whatever, that it was

15  problematic to use that -- that particular word.  But I think

16  it's proper cross-examination or examination to inquire into

17  the legitimacy of a diagnosis, and the things upon which the

18  diagnosis is based, which my understanding is the conversion

19  disorder, like a lot of psychological disorders, umm, a lot of

20  the diagnoses is based on self-reporting and self-articulation

21  of symptoms.  So I mean, obviously, that's a proper thing to

22  get into on cross-examination.  I'm still troubled by using the

23  word malingering, but I do think without using that word, it's

24  proper for you to cross-examine the defense's expert on, you

25  know, okay, so this is a diagnosis that by definition, there's

1   no -- there's no physiological findings, there's no

2   neurologist's findings, it's based on self-reporting and

3   clinical observation, and you know, however you want to get to

4   the point of because it's based on in part self-reporting, you

5   know, that could affect the legitimacy of a diagnosis.  I mean,

6   I think that's a proper thing to inquire into.  I'm not quite

7   sure -- I mean, 'cause I have not heard the word factitious

8   diagnosis, or I forget whatever you called it.

9         MR. OAKLEY:  As I understand the DSM 5, malingering

10  and factitious disorder are both where someone presents these

11  symptoms that are not true.  Malingering is diagnosed when it's

12  for a purpose such as secondary gain, and I think the DSM even

13  talks about receiving benefits, or to avoid a -- an obligation

14  such as to get out of the service.  Factitious disorder is

15  presented, and I think some of the materials talk about the

16  patient wants to play the role of the sick person.  So in other

17  words, isn't doing it for monetary gain, but for the attention

18  that comes with -- with being diagnosed with whatever is being

19  examined.  So in this case, I think the evidence would suggest

20  that it's malingering, and the DSM 5 talks about not only FND

21  or conversion disorder, but also talks about malingering, and

22  defines malingering.  And so what I would like to do with her

23  is just say, when you have this situation where someone

24  presents with these physical attributes, and you have an EEG

25  that is -- that is a normal EEG, it could be FND, but it could

1    also be that they are malingering, and -- and presumably, as

2    the defense expert, she's not -- she's going to say he's not

3    malingering, and so therefore, she won't be opining on his

4    state of mind, but it will define it so that the jury can --

5    can make that determination on its own.

6         THE COURT:  Well, hmm, I think perhaps the better way

7    to get to that is just to ask if it's possible for someone to

8    falsely present their symptoms, rather than getting into

9    malingering.  I mean, in some ways, I think because I've

10   excluded one expert from getting into that, I have to exclude

11   both.  But that is not to say you can't cross-examine experts

12   about, you know, is it possible to present symptoms that

13   aren't -- that are not true, or that are exaggerated, or you

14   know, and I think that's one way to get to it, and I really

15   think your expert covered that, without perhaps using the word

16   exaggerate.  I mean, that was sort of the sense of her

17   testimony, that in viewing the video recordings, she kept using

18   the word inconsistent, and then she used other words like

19   unplanned, involuntary, unpredictable, and I don't know if

20   those come directly from the DSM or not, but anyway -- so

21   again, I mean, again, we're kind of walking a line.  I don't

22   want anyone testifying to his state of mind, or present state

23   of mind, and the problem with malingering is, there's an

24   element of this is the state of mind for this with the other

25   disorders, this is what a state of mind is for that, for the

1   other disorder, and I don't think anyone should opine as to his

2   state of mind, whether there's a legitimate disorder, and

3   there's no false representation at all, or was he doing that

4   kind of like Munchausen symptom with respect to himself,

5   whether he's doing it for attention, or doing it for disability

6   benefits.  So again, I don't want to go that far, and that's

7   the province of the jury, I think.  Okay.  Does that help?

8           MR. OAKLEY:  Yes, it does, Your Honor.

9           THE COURT:  Okay.  All right.  Anything else?

10          MS. RAMSEY:  No, I don't believe so, Your Honor.

11          THE COURT:  Okay.

12          MR. HUSCHKA:  Your Honor, how long were you thinking

13  for closing arguments?

14          THE COURT:  Oh, good idea.  How long would you like?

15          MR. HUSCHKA:  I think an hour would be sufficient.

16          THE COURT:  Okay.  And you will split that?

17          MR. HUSCHKA:  Yeah, probably 45, 15, something like

18  that.

19          THE COURT:  Okay.  And you all can tell Miss Wiest how

20  long a warning you want.  There's a countdown clock in here

21  now, so...  All right.  Anything else?  And you're going to --

22  are you going to need technical -- you want to make sure that

23  works, too, so...

24          MR. HUSCHKA:  We tested it out this afternoon just so

25  I think we're good.  We'll probably test it again tomorrow just

1    to be sure.

2         THE COURT:  Okay.  So we'll see you all at 8:30.

3    Okay.  Thank you.

4         (Whereupon, court recessed proceedings.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        C E R T I F I C A T E

4

5

6        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

7    the regularly appointed, qualified and acting official reporter

8    of the United States District Court for the District of Kansas,

9    do hereby certify that as such official reporter, I was present

10   at and reported in machine shorthand the above and foregoing

11   proceedings.

12       I further certify that the foregoing transcript, consisting

13   of Day 7 - Jury Trial - Pages 882-1025 - is a full, true, and

14   correct reproduction of my shorthand notes as reflected by this

15   transcript.

16       SIGNED February 10, 2023.

17

18                      S/_____

19                      Nancy Moroney Wiss, CSR, CM, FCRR

20

21

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
 2
     UNITED STATES OF AMERICA,          Docket No. 19-20044-JAR
 3
        Plaintiff,                      Kansas City, Kansas
 4                                      Date: 8/10/2022
          v.
 5
     BRUCE L HAY,
 6
        Defendant.
 7     ...................

 8                          TRANSCRIPT OF
                          DAY 8 - JURY TRIAL
 9              BEFORE THE HONORABLE JULIE A ROBINSON,
                UNITED STATES SENIOR DISTRICT JUDGE.
10
     APPEARANCES:
11
     For the Plaintiff:      Christopher Oakley & Ryan Huschka
12                           Asst US Attorneys
                             360 US Courthouse
13                           500 State Avenue
                             Kansas City, KS  66101
14
     For the Defendant:      Che Ramsey & David Magariel
15                           Asst Federal Public Defenders
                             201 US Courthouse
16                           500 State Avenue
                             Kansas City, KS  66101
17
     Court Reporter:         Nancy Moroney Wiss, CSR, RMR, FCRR
18                           Official Court Reporter
                             558 US Courthouse
19                           500 State Avenue
                             Kansas City, KS  66101
20
     Proceedings recorded by machine shorthand, transcript
21   produced by computer-aided transcription.

22

23

24

25
```

1      I N D E X

2
       Argument RE:   Instruction of Defense Theory of          1028
3      the Case
       Court's Inquiry of Mr. Hay and his right to               1105
4      testify or not
       Motion for Judgment of Acquittal by Defendant            1107
5      Court Read Instructions 1-33 to the Jury                 1112
       Closing Argument by Mr. Huschka                          1113
6      Defense Issue RE:   Exhibits 302 and 309                 1132
       Defense Motion for Mistrial                              1134
7      Closing Argument by Mr. Magariel                         1140
       Final Closing Argument by Mr. Huschka                    1170
8      Court Read Final Instructions                            1174

9

10

11     Defendant's Witnesses:                                    Page

12     GEORGE FEEBACK
         DIRECT EXAMINATION BY MS. RAMSEY                       1037
13       CROSS EXAMINATION BY MR. HUSCHKA                       1045

14     MARY O'NEAL
         DIRECT EXAMINATION BY MS. RAMSEY                       1046
15       CROSS EXAMINATION BY MR. OAKLEY                        1087
         RE-DIRECT EXAMINATION BY MS. RAMSEY                    1102
16

17                    E X H I B I T S
       Defendant's
18       Exhibits              Offered              Received

19        801                   1034                 1035
          802                   1034                 1035
20        803                   1034                 1035
          804                   1034                 1035
21        805                   1034                 1035

22

23

24

25

NANCY MORONEY WISS, CSR, RMR, FCRR

1        THE COURT:  All right.  We're all here including Mr.

2   Hay.  So we've received the defendant's proposed theory of --

3   defense theory of the case instruction.  Mr. Huschka or Mr.

4   Oakley, does the government have any objection?

5        MR. OAKLEY:  Yes, we do, Your Honor.  The -- this

6   instruction appears to be essentially a -- a preview or a Cliff

7   Notes version of the defense's closing argument, and so I think

8   for the court to instruct the jury on the defense theory of the

9   case in that manner would be improper.  It would -- it could

10  appear to the jury as though the court is endorsing the defense

11  theory of the case.  Additionally, there's a marked difference

12  between the court telling the -- this jury these are the

13  allegations in this case versus this is the government's theory

14  of the case.  The indictment is not necessarily the

15  government's theory of the case.  For instance, I think a

16  reasonable theory of the case is that defendant began this

17  scheme, you know, back in 2005.  That's something that's

18  appropriate for closing argument, but it's not the theory.  You

19  know, the theory of the case is appropriately given to the jury

20  by the attorneys during closing argument.  Additionally, the

21  things that the court has excised from the -- the indictment

22  are more of the argument type things, which this clearly is.

23  So for that reason, we think it's improper for the court to --

24  to instruct the jury on the defense theory of the case.

25       THE COURT:  All right.  Miss Ramsey?

1    MS. RAMSEY:  Your Honor, I don't think it's improper.

2    While I think the court has made some changes and redactions

3    from the indictment, I still think at this point, it would be

4    unfair to deny us an opportunity to put forth the theory of

5    defense.  We include at the bottom that the foregoing statement

6    of the defendant's theory of defense is nothing more and

7    nothing less to indicate to the jury that this is not

8    necessarily evidence, but an instruction that they can

9    consider.  If the court would like to add language regarding

10   that, then -- then we'd be open to that, but we think it's

11   appropriate.

12   THE COURT:  And what is your authority for the court

13   even instructing on the defense theory of the case?  I honestly

14   can't recall a time when someone has proposed such an

15   instruction.

16   MS. RAMSEY:  Your Honor, I think -- and I don't -- I

17   think in this particular case, because it's a fraud case, I do

18   think the Tenth Circuit pattern instructions do allow a theory

19   of defense when the character of the particular defendant is in

20   question, which I think obviously the charges in this case do

21   call into question.  I think it talks about it under Tenth

22   Circuit Pattern Instruction 1.091.  Now, that is a particular

23   instruction for -- excuse me -- evidence of reputation for

24   honesty, but it also talks about when that -- at least in this

25   kind of case, where that has been injected, then I think we get

1   to propose a theory of defense.  But other than that, I don't

2   have any additional authority.

3          THE COURT:  What is that particular -- can you read

4   that particular instruction?  I don't have it in front of me,

5   the pattern instruction.

6          MS. RAMSEY:  2.32.  Okay.  Your Honor, I think --

7   apologize.  I think what is included I think in two

8   instructions.  I think I said 1.19, and then 2.32 regarding

9   whether or not -- that's more in conjunction with whether or

10  not the court is giving a good faith legitimate instruction,

11  but we do believe here that -- that there's a possibility of

12  that sort of instruction, and so because the evidence supports

13  the theory in this case, we do believe that it's appropriate.

14         THE COURT:  2.32 is the good faith instruction.  Is

15  that what you're referencing?

16         MS. RAMSEY:  Yes, Your Honor, that was one of them.

17  I'm trying to go back and find the other one here.

18         THE COURT:  I think I'm going to allow this, but with

19  modification.  I'm not going to -- all right.  So here's what I

20  think.  I'll allow this as a defense, not as a theory to the

21  defense instruction.  So the first two paragraphs, I would

22  strike.  So it would start with, Mr. Hay accurately reported

23  his symptoms, he accurately answered questions, etcetera,

24  'cause that's a denial of the wire fraud counts, and he did not

25  steal money, but was properly given disability benefits.  He

1    did not specifically intend to defraud the VA.  Those two

2    paragraphs, I'll leave in because, again, those are essentially

3    denials.

4         MS. RAMSEY:  And Your Honor, did you say you're taking

5    off then the first paragraph as well?

6         THE COURT:  Yeah, the first two paragraphs.  The third

7    and fourth paragraph, I would leave in, and the last statement,

8    I would change as follows:  The foregoing is a statement of the

9    defendant's defense.  It is not evidence.  And I'm going to put

10   this either right before or right after the instruction about

11   the defendant testifying or not testifying, and that

12   instruction, of course, I think includes language that the

13   burden of proof is on the government.  I agree with the

14   government that it would be improper to instruct on a theory of

15   the defense, but there is a stock instruction that says that

16   the defendant has pled not guilty, which places all of the

17   elements in -- in issue, but I think this would be straight

18   forward enough to just say he -- he -- he claims he accurately

19   reported his symptoms, and he accurately answered questions,

20   and denies stealing money, but says that the benefits were

21   properly given to him, and he did not intend to defraud.  I

22   mean, it's essentially an instruction that says he's denying

23   these two offenses, so I think that's okay.  But, you know,

24   closing with the statement that this is not evidence.  The

25   foregoing is a statement of the defendant's defense,

1   semi-colon.  It is not evidence, period.  All right.  And

2   government's objection is noted.  Did you have a further

3   objection?

4        MR. OAKLEY:  Yes, Your Honor, on the -- on that last

5   substantive paragraph, we would ask that it read, Mr. Hay did

6   not steal money from the VA, and then the last portion of that

7   sentence be struck.  It seems that that is more argumentative,

8   and more appropriate in a closing argument than a statement

9   of -- of a defense.

10       THE COURT:  Joy, do you have the instruction packet,

11  or did I leave it up -- I must have left it upstairs.

12       MS. RAMSEY:  And I apologize, Your Honor, I think our

13  response would be dictated by what the court ultimately ruled

14  yesterday regarding the exclusions or redactions from the

15  indictment portion of that instruction, and I don't have that

16  with me.  I don't know.

17       THE COURT:  That's what I'm looking at now.

18       MS. RAMSEY:  Okay.

19       THE COURT:  So the indictment speaks to, you know, I'm

20  looking at it as modified.  Umm, I mean, there's no statement

21  in there that he was improperly diagnosed, or that he didn't

22  have conversion disorder.  The indictment sets out the history,

23  that he was diagnosed that way, and he received disability

24  benefits, but says that at some point, no later than January of

25  2011, he made false statements, representations, etcetera.  So

1    I'm -- I agree with the government.  I do think this is more

2    argumentative, and in terms of whether he was properly given

3    disability benefits for the conversion disorder, etcetera,

4    etcetera, and of course, there is the whole temporal aspect of

5    this, too, which you know, I think you all take perhaps

6    different views about.  So I'm going to strike in that fourth

7    paragraph, the first sentence, the one that says Mr. Hay --

8    well, I'm going to modify it as follows:  Mr. Hay did not steal

9    money from the VA.  Mr. Hay specifically did not intend to

10   defraud the VA, and did not devise a scheme to defraud the VA

11   of benefits, striking the language, but instead was properly

12   given disability benefits for his conversion disorder, PTSD,

13   and other ailments he suffers from.  I think that is a matter

14   of theory and argument, in particularly, the whole temporal

15   situation, and you know, my understanding is, there's no

16   dispute that Mr. Hay was entitled to disability benefits for

17   his PTSD and perhaps anxiety disorder.  What -- I don't know

18   about anxiety, but what's at issue here is the whole

19   continuation of benefits, and the permanent designation --

20   total and permanent for the conversion disorder.  So I think

21   it's a little confusing to -- to include in an instruction that

22   this is about all of these ailments, so the fourth paragraph

23   will read, Mr. Hay did not steal money from the VA.  Mr. Hay

24   specifically did not intend to defraud the VA, and did not

25   devise a scheme to defraud the VA of benefits.  The rest is

1   subject to argument, just as a number of the things that the

2   the government had in the -- in the indictment that I've

3   excised.  All right.  Any further record anyone wants to make

4   on this?

5       MR. OAKLEY:  No, Your Honor.

6       MS. RAMSEY:  No, Your Honor.

7       THE COURT:  Okay.  All right.

8       MS. RAMSEY:  Your Honor?

9       THE COURT:  Yes.

10      MS. RAMSEY:  Can we make another record briefly, and

11  then would it be possible prior to starting today, to get a

12  copy -- additional kind of clean copy of the jury instructions?

13      THE COURT:  I don't know if we can get that done in

14  ten minutes, but we can try.

15      MS. RAMSEY:  Okay.  Your Honor, the other matter that

16  we want to take up is that -- I don't believe there's any

17  objection from the government.  There are defense exhibits we

18  provided, a previous certificate of records for Defense

19  Exhibits 801 through 805, and so I don't think the government

20  objects to us for purposes of doing this now, admitting --

21  asking the court to admit those particular exhibits.  So we

22  would do that at this time.

23      THE COURT:  Exhibits 801 through 805, what are those?

24      MS. RAMSEY:  Those are photos of the red pick-up

25  truck.

1        MR. HUSCHKA:  No objection, Your Honor.

2        THE COURT:  All right.  Exhibits 801 and 805 are

3    admitted.

4        MS. RAMSEY:  I'm sorry, 801 through 805.

5        THE COURT:  801 through 805 are admitted.  Okay.  Did

6    we print those out, the instructions?  Okay.  What else?

7        MR. HUSCHKA:  One more thing, I believe, Your Honor.

8    So the court probably recalls the mental health exam that was

9    played in its entirety for the jury the other day.  There were

10   some portions in there that after discussions between the

11   defense and the government, we redacted out, so we removed

12   portions of that video.  I think we're in agreement on those

13   redactions.  So if the court prefers, we can provide a new

14   disk.  I think the defendant's concern was like having a disk

15   that said redacted.  So we were going to swap out Government's

16   Exhibit 49 with the new redacted version, but not sort of

17   explicitly note on it that there have been any redactions, and

18   this was an exhibit that was too large to actually load into

19   JERS, so I don't think we'll have a JERS --

20       MS. WIEST:  I actually got it, and they gave me the

21   flash drive yesterday, and I've loaded it, so the redacted

22   version is loaded in JERS.

23       THE COURT:  We need to make sure that it doesn't say

24   redacted on it in describing that exhibit in JERS.

25       MS. WIEST:  Right, hmm.  Yeah, it seems like I have

1   others that are showing redacted, so I probably need to check

2   that.

3           THE COURT:  What exhibit number is that?

4           MR. HUSCHKA:  49.

5           THE COURT:  Okay.  So let's make sure that that

6   doesn't say redacted in the description.  Is that something you

7   can change, Bonnie, the wording of it?

8           MS. WIEST:  I can take it out.

9           MR. HUSCHKA:  And then in the meantime, on a break,

10  we'll have Miss Kistler bring up the physical disk.

11          THE COURT:  It won't have redacted in the label.  The

12  disk isn't going to go in anyway, if it's in JERS.  Okay.

13          MS. RAMSEY:  And I apologize, Your Honor, the

14  instructions we're asking for, we need an electronic copy, not

15  for the court to necessarily print it out.  Did you all ready

16  do that?  If we could have a clean electronic copy.

17          THE COURT:  Okay.  Okay.  Five minutes.  Anything

18  else?  I think we'll just get the jury down here if they're

19  ready.

20          MR. HUSCHKA:  No, Your Honor.

21          MS. WIEST:  Okay.  Be right back.

22          THE COURT:  Okay.  I do have a meeting at noon, a Zoom

23  meeting, so I don't know how the evidence will roll in this

24  morning.  Do you think it will be finished very quickly, or do

25  you think we may use a couple of hours, or --

1     MS. RAMSEY:  I think the first witness is not going to

2   take long at all.  The second witness is our expert, and it's a

3   little difficult to tell.  That may also not take -- obviously,

4   depending on cross, but maybe an hour or two.

5     THE COURT:  Okay.

6     MS. RAMSEY:  So I don't know then if the court would

7   like to --

8     THE COURT:  I'm thinking maybe we'll break for an

9   earlier lunch if we can.  We'll see.  Okay.

10    (Jury entered courtroom.)

11    THE COURT:  Your next witness.

12    MS. RAMSEY:  Thank you, Your Honor.  The defense would

13  call George Feeback.

14    (Witness sworn.)

15    THE WITNESS:  Yes, I do.

16    MS. WIEST:  You may have a seat.

17    MS. RAMSEY:  All right.  Just have a seat right up

18  there.

19                    GEORGE FEEBACK,

20  Called as a witness on behalf of the defendant, having been

21  first duly sworn, testified as follows:

22                    DIRECT EXAMINATION

23  BY MS. RAMSEY:

24  Q.  That's okay.  All right.  Would you please introduce

25  yourself to the jury by stating your full name for the record?

1    A.   George Raymond Feeback.

2    Q.   Okay.  And could you spell your first and last name?

3    A.   G E O R G E.  F E E B E C K.

4    Q.   All right.  And what city and state do you live in?

5    A.   Live in Osawatomie, Kansas.

6    Q.   Okay.  What do you do for work?

7    A.   I drive a ready mix.

8    Q.   Drive a ready mix, kind of truck; is that right?

9    A.   Yes.

10   Q.   All right.  Do you know a Mr. Bruce Hay?

11   A.   Yes.

12   Q.   Okay.  And how do you know Bruce?

13   A.   Through the family for years, 40, 45 years plus.

14   Q.   Okay.  Do you have any family in common, or is it kind of

15   just from being in the small town knowing Bruce and the

16   families intermingling?

17   A.   We've know'd -- well, my family and his family's know'd

18   each other for years.  We did have family kind of common, but

19   not no more.

20   Q.   Okay.  So -- and I think you said -- so you've known Bruce

21   for about 30 years?

22   A.   30, 45, something like that.

23   Q.   45 years, okay.  So then you've known Bruce then before the

24   car accident in 2005 and after; correct?

25   A.   Uh-huh.

1    Q.   Is that a yes?

2    A.   Yes.

3    Q.   Okay.  I'm sorry.  She's taking down everything you say,

4    and so I just want to make sure you say yes or no, okay?  I

5    want to talk to you about Bruce after the accident, okay, in

6    2005.  Did you witness Bruce having any physical symptoms or

7    issues with his body after the accident in 2005?

8    A.   Oh, yeah.

9    Q.   Okay.

10   A.   Yes.

11   Q.   Can you tell me when you witnessed him having symptoms,

12   what would you call it?

13   A.   Shaking, that's all I can say is what I seen, was just

14   shaking.  First time I seen him, he was coming into the

15   restaurant where I was sitting at, and he was -- I just don't

16   know how he stood up, shaking so hard.

17   Q.   Okay.  And when you say shaking, are there particular parts

18   of his body, or all parts of his body?

19   A.    I only paid attention from about here up, from shoulders

20   up, and it's just -- I can't do it, but it's just shaking.

21   Q.   Okay.  And so you said the first time you saw him do it was

22   in -- when you were sitting in a restaurant?

23   A.   Yes.

24   Q.   Okay.  And does that memory stick out to you because of how

25   he appeared to you?

1   A.   Yes.

2   Q.   Okay.  Throughout the time after 2005 since you've seen him

3   kind of with the shaking and episodes, how often have you seen

4   this?

5   A.   I can't count how many times; numerous.

6   Q.   Okay.  Too many times to count?

7   A.   Yes.

8   Q.   Okay.  When you've seen him shaking, have you seen him --

9   well, does Bruce walk with a cane?

10  A.   Yes.  Oh, yeah.

11  Q.   How often?

12  A.   All the time.

13  Q.   Okay.  Your interactions with Bruce, we've kind of

14  established how long you've known -- known him.  In your

15  interactions with Bruce, have they been at your home?

16  A.   Yeah, been at my home, yeah.

17  Q.   Okay.  Have they been at Bruce's home?

18  A.   Yes.

19  Q.   Okay.  Have they been when you have been out of the home

20  and in the community?

21  A.   Yes.

22  Q.   Okay.  One time you talked about was the restaurant.  Is

23  there any other time in particular that stands out to you?

24  A.   We was going to get some friends of Bruce's up in Kearney,

25  Missouri couple days after Christmas.  Their vehicle broke

1    down.  They was going home.  Bruce asked me, can you go up and

2    get 'em?  Sure.  Well, on the way up, Bruce had one of his

3    little episodes going up to Kearney.

4    Q.  Okay.  And you were driving?

5    A.  Oh, yes.  Oh, yeah.

6    Q.  All right.

7    A.  I wouldn't let Bruce drive my vehicles.

8    Q.  Okay.  And you drove back, is that -- well, is that

9    correct?

10   A.  Yes.  Yes.

11   Q.  Okay.  Now, you have described Bruce having kind of the

12   body shakes.  Are there times when you've recognized Bruce

13   having symptoms that are worse than what you would describe as

14   worse than others?

15   A.  Pretty much.  He would have -- he'd have the shakes, and

16   then he'd just shake harder.  I guess that's what you'd want to

17   call it.  It just looked different to me.

18   Q.  Okay.  And just to clarify, what looked different to you?

19   A.  Him shaking.

20   Q.  Okay.  So it was the shaking had appeared worse to you than

21   at other times; is that correct?

22   A.  To where he's had to hold up himself onto a counter or

23   something, or somebody had to grab ahold of him to keep him

24   from falling.  I'd seen Lori do it, his wife, I've seen his

25   kids do it, I've grabbed him.

1    Q.   Okay.  So is it your understanding then that he has used

2    kind of the cane for stability?

3    A.   Yes.

4    Q.   Okay.  Now, Bruce has a family farm; is that right?

5    A.   Yes.

6    Q.   Okay.  Have you been out to that family farm?

7    A.   Yes, many times.

8    Q.   Okay.  And have you been out to that family farm with

9    Bruce?

10   A.   Many a times.

11   Q.   Okay.  As part of going out to the family farm with Bruce,

12   have you done work on the farm for Bruce?

13   A.   Yes.

14   Q.   Okay.  What kind of work have you done?

15   A.   I've cleaned out barns for him.  I have a little tractor

16   with a loader, and I've done -- I've cleaned out barns, I've

17   cleaned brush, that they have a dozer, I had -- or had a dozer.

18   I cleaned brush for 'em, cleaned all the stuff, helped 'em pick

19   up little stuff, twigs and stuff, and throw hay, and just stuff

20   that really, Bruce couldn't do.

21   Q.   Okay.  And so there were times when you would help Bruce do

22   things like throw hay, that he couldn't do.  Were there times

23   where you did help him with small things that he was also able

24   to do?

25   A.   Yes.

1    Q.   Okay.  So when you been out on the farm with Bruce, have

2    you ever seen him have an episode on the farm?

3    A.   Yes.

4    Q.   Okay.  And was that after he had tried to do something on

5    the farm?

6    A.   Yes.

7    Q.   Okay.  And what were those symptoms that you witnessed at

8    that time?

9    A.   Well, it would be about the same thing, but if he would get

10   stressed, he would just start shaking.

11   Q.   Okay.  When -- I think you said that you've helped him do

12   the work on the farm.  Have you ever had to help him kind of

13   stabilize, or help him work through the symptoms yourself

14   physically?

15   A.   Yes, I've held on to him until he's slowed down, you know,

16   grabbed ahold of him so he wouldn't fall and hurt himself.

17   Q.   Okay.

18   A.   And other than that, I -- you know, he just wait until it's

19   done.

20   Q.   Okay.  And you said wait until it's done.  So how long have

21   you seen these episodes last?

22   A.   30 minutes.

23   Q.   Okay.

24   A.   At the longest, basically about 30 minutes.

25   Q.   That you've seen?

1   A.  Yes, that I have seen.

2   Q.  Okay.  You said you lived in -- you live in Osawatomie now;

3   is that correct?

4   A.  Yes.

5   Q.  And so did Bruce move from Osawatomie?

6   A.  Yes, he moved.  Now, I think he lives in Greeley.

7   Q.  Okay.  And so would you say you saw him more often when he

8   lived in Osawatomie prior to his move?

9   A.  Yes.

10  Q.  Okay.  About what year was that, recently?

11  A.  About three, four years ago, something like that roughly.

12  I'm not sure.

13  Q.  Okay.  About 2018, 2019?

14  A.  Something like that, yes.

15  Q.  Sound about right?  Okay.  Have you ever seen Bruce when

16  he's out on the farm doing something, or -- or that you would

17  say maybe was labor, that he was just trying to push through,

18  and worked himself into having a -- having some symptoms?

19  A.  Well, I don't think he would want to push himself to

20  make -- to do that, but to have an episode; I just call it an

21  episode.

22  Q.  Sure.

23  A.  I don't think he'd do it on purpose to make himself do it,

24  no.

25  Q.  No, that wasn't what I was asking.  Let me be clear.  I was

1  asking whether or not you've seen that happen.

2  A.  Yes.

3  Q.  Not whether he intended to do that.

4  A.  Yes.

5  Q.  Okay.  All right.  I don't think I have any further

6  questions.  Thank you.

7                         CROSS EXAMINATION

8  BY MR. HUSCHKA:

9  Q.  Mr. Feeback, at the risk of stating the obvious, you -- you

10 don't know what Bruce is doing when you're not with him; right?

11 A.  Exactly.

12 Q.  So you don't -- you're not on the farm with him all the

13 time; right?

14 A.  No, sir.

15 Q.  And so you don't know what he does when you're not there?

16 A.  Exactly.

17 Q.  And you're not with him at his residence all the time?

18 A.  No, sir.

19 Q.  And so you haven't seen footage that was taken in front of

20 his residence for 11 weeks straight, and what he was doing for

21 those 11 weeks, have you?

22 A.  I have no clue.

23 Q.  And you likewise don't know what he told the VA about his

24 disability; right?

25 A.  No, I wasn't there.

1    Q.  And you don't know what he told the Social Security

2    Administration either, do you?

3    A.  No.

4            MR. HUSCHKA:  No further questions.

5            MS. RAMSEY:  Nothing further.  Thank you, Your Honor.

6            THE COURT:  All right.  Thank you.  You're excused.

7            THE WITNESS:  Thank you.

8            THE COURT:  All right.  Call your next witness.

9            MS. RAMSEY:  Your Honor, we would call Doctor Mary

10   O'Neal.

11       (Witness sworn.)

12            THE WITNESS:  I do.

13            MS. WIEST:  Thank you.  You may have a seat.

14                       MARY O'NEAL,

15   Called as a witness on behalf of the defendant, having been

16   first duly sworn, testified as follows:

17                    DIRECT EXAMINATION

18   BY MS. RAMSEY:

19   Q.  I'm sorry, Doctor O'Neal, if you just give me a moment to

20   get myself together here.  All right.  Doctor O'Neal, would you

21   please introduce yourself to the jury by stating your full name

22   for the record?

23   A.  My name is Doctor Mary O'Neal.

24   Q.  Okay.  And would you spell your first and last name for the

25   court reporter?

1    A.   Mary is M A R Y.  O'Neal is O ' N E A L.

2    Q.   Okay.  Doctor O'Neal, you obviously are a doctor.  What are

3    you a doctor in?

4    A.   I'm a neurologist.

5    Q.   Okay.  I want to talk to you about your background and

6    educational experience.  Did you receive your undergraduate

7    degree?

8    A.   Yes, I received my undergraduate degree at University of

9    California at Davis.

10   Q.   Okay.  And what was that degree in?

11   A.   Biology.

12   Q.   Okay.  And did you then attend medical school?

13   A.   Yes.

14   Q.   Where did you attend medical school?

15   A.   University of Oregon Health Sciences.

16   Q.   Okay.  And did you receive your medical degree from there?

17   A.   Yes, I did.

18   Q.   Okay.  After medical school, did you perform any kind of

19   post-doctoral training?

20   A.   I did an internship in medicine, and then a residency in

21   neurology, and then a stroke fellowship.

22   Q.   Stroke fellowship?

23   A.   Yes.

24   Q.   Okay.  After your post-doctoral training, have you had any

25   additional education or training?

1    A.   Umm, formal training after my fellowship?

2    Q.   Yes.

3    A.   No, I did not do any other sub-specialties, although

4    obviously, I continue to learn daily, so, yes.

5    Q.   As part of being a doctor and neurologist in your field,

6    does it require you to kind of continue your kind of education

7    as you go along in your career?

8    A.   Yes, we have continuing medical education requirements in

9    order to maintain our license.

10   Q.   Okay.  And so how many years have you been practicing as a

11   neurologist?

12   A.   Oh, boy, you're going to date me here.  I've been a

13   neurologist since 1989.

14   Q.   Okay.  I want to talk to you about any faculty academic

15   appointments that you've had, and probably need to clarify;

16   these are teaching positions.  Have you had any faculty

17   academic appointments where you're teaching courses?

18   A.   I have had a number of faculty appointments.

19   Q.   Okay.  Can you tell me about the most recent faculty

20   appointments that you've had?

21   A.   Well, I work at Brigham and Women's Hospital, it's a

22   Harvard teaching hospital, and my appointments there, I'm chief

23   of general neurology there.  I run the neurosciences ambulatory

24   clinic there.

25   Q.   Okay.  Do you also -- I think you said you run the medical

1   clinic there, but you also said that you -- you -- do you teach

2   classes at Harvard as a faculty appointment?

3   A.   Right, as part of our Harvard appointment, we have to teach

4   residents, medical students and internal medicine residents.

5   Q.   Okay.  I want to talk to you about those courses.  How long

6   have you been teaching -- teaching there?

7   A.   Well, since I joined Brigham which was in 2010.

8   Q.   Okay.  And what are those courses in?

9   A.   Well, so two ways we teach.  We teach in the clinic when

10  residents join us, I teach on the consult service when I'm on

11  the consult service, and then I run a Harvard Medical School

12  course.

13  Q.   Okay.  And what is that course?

14  A.   It's Updates in Women's Neurology and Psychiatry.

15  Q.   Okay.  And you've done that I think you said since 2010?

16  A.   Since I believe 2012.

17  Q.   2012.  Okay.  I want to talk to you about any

18  administrative leadership positions.  Have you held any

19  administrative leadership positions?

20  A.   Multiple.

21  Q.   Any of those specifically in neurology?

22  A.   Well, I told you two of those are in neurology.  I'm a

23  chief of general neurology at the Brigham, and run the

24  ambulatory neurosciences clinic, which is a clinic which

25  involves neurology, psychiatry and neurosurgery as well.

1   Q.   Okay.  Let's talk then -- I think we're kind of moving in

2   that direction, but let's kind of talk about your employment.

3   Where are you currently employed?

4   A.   Brigham Women's Hospital.

5   Q.   And how long have you been employed there?

6   A.   Since 2010.

7   Q.   And you're the medical director of I think a clinic you

8   said?

9   A.   Right, it's a neuroscience clinic; yes.

10  Q.   And how long have you been the medical director of that

11  clinic?

12  A.   So I was recruited to the Brigham to back the ambulatory

13  director of neurology, and when we moved into our neurosciences

14  building, which I believe was in 2019, I became the director of

15  the clinic, which is a multi-disciplinary clinic involving

16  neurology, neurosurgery and psychiatry.

17  Q.   Okay.  We'll come back to that, the clinic in a minute.

18  But before we get to that specific employment, do you currently

19  serve on any committees regarding neurology?

20  A.   Yes, I do.  I serve on a quality assurance committee, and

21  our clinical care delivery committee at the hospital.

22  Q.   Are you a member of any professional associations in

23  neurology?

24  A.   Yes, I'm a member of the American Neurologic Association

25  and the American Academy of Neurology.

1   Q.   Okay.  And are you board certified?

2   A.   Yes.

3   Q.   Okay.  By the American Academy of Neurology?

4   A.   Yes, I am.

5   Q.   Okay.  I want to talk to you about any publications or

6   articles you've been involved in.  Have you written or edited

7   any articles which have been published regarding functional

8   neurological disorder?

9   A.   I have.

10  Q.   Okay.  How many?

11  A.   Well, I should have counted before, but I think around five

12  or six.

13  Q.   When was the most recent one?

14  A.   Last year.

15  Q.   Okay.  Did you through your practice develop a

16  sub-specialty in functional neurological disorder?

17  A.   I have.

18  Q.   Okay.  And to be clear, we've heard this term conversion

19  disorder, and we'll get into that a little bit later, multiple

20  times.  Is functional neurological disorder synonymous -- I

21  know I'm going to use the wrong word, you're going to correct

22  me.  But when I say functional neurological disorder, it used

23  to be called conversion disorder.

24  A.   That's correct.  None of the experts in the field at this

25  time call it conversion disorder.  So it's called functional

1    neurologic disorder or FND.

2    Q.   Okay.  I want to go back to just your experience a little

3    bit more before we get into your employment in conversion --

4    sorry, functional neurological disorder.  I want to ask you,

5    have you been recently -- have you -- or have you given any

6    kind of national talks or presentations specifically on

7    functional neurological disorder?

8    A.   I have.

9    Q.   Okay.  Do you know how many times of those?  I know you

10   don't have your resume in front of you, but --

11   A.   Let's see, I organized a conference at the American

12   Neurologic Association on FND.  I just gave rounds a couple

13   months ago on FND at Columbia Hospital in New York.  I lecture

14   on this frequently.

15   Q.   Okay.  Let's talk about the clinic you recently -- that you

16   run at Brigham Women's Hospital.  You said you're the medical

17   director of that clinic; is that correct?

18   A.   I'm the medical director of the entire neurosciences

19   clinic.

20   Q.   Oh, okay.

21   A.   Are you referring to the multi-disciplinary functional

22   neurological disorder clinic?

23   Q.   Yes.

24   A.   Well, so I was actually asked by my former chair to run our

25   women's neurology program, and because of that, I was seeing a

1    lot of patients with functional neurological disorder.  That is

2    a high prevalence in women.  About 60 percent more patients

3    with FND are women.  And so I developed a sub-specialty

4    interest in FND, and corroborated with my epilepsy colleagues

5    and my neuropsychology colleagues to form a multi-disciplinary

6    FND clinic.

7    Q.  So you founded the clinic that specifically focuses on

8    functional neurological disorder?

9    A.  Absolutely.

10   Q.  Okay.  And how long has that clinic been up and running?

11   A.  Since around 2017.

12   Q.  Okay.  And so as a function of that clinic, are you seeing

13   patients day in and day out regularly, specifically for the

14   purpose of treating them and diagnosing them with functional

15   neurological disorder?

16   A.  Yeah.  I get tertiary referral, meaning from

17   sub-specialists send me referrals, so my colleagues who are

18   movement disorder colleagues and epilepsy colleagues send me

19   patients for FND, yes.

20   Q.  So you would consider yourself a specialist in functional

21   neurological disorder?

22   A.  Absolutely.

23        MS. RAMSEY:  Your Honor, I move to recognize and admit

24   Doctor O'Neal as an expert in this, in neurology and functional

25   neurological disorder.

1          THE COURT:  Any objection?

2          MR. OAKLEY:  No objection, Your Honor.

3          THE COURT:  Court recognizes Doctor O'Neal as an

4    expert in those disciplines.

5    BY MS. RAMSEY:

6    Q.  As part of the multi-disciplinary, and I'm going to call it

7    FND clinic for short, 'cause I can't seem to remember the full

8    name of the clinic, do you serve full-time at that clinic

9    seeing patients?

10   A.  Yes.

11   Q.  Okay.  All right.  I want to kind of just back up a little

12   bit before we talk about functional neurological disorder.  And

13   can you explain to the jury what a neurologist does?

14   A.  Umm, well, a neurologist examines the brain, spinal cord,

15   nerves and muscles.  So we see a variety of different

16   disorders, from things as common as migraines, to epilepsy,

17   stroke.  We see a lot of pain disorders like related to disk

18   disease, like cervical disk -- you know, pain related to

19   cervical disk neuropathy.  We see muscle diseases.  So we see a

20   lot of different varieties of things.

21   Q.  Okay.  We've all ready kind of explained that conversion

22   disorder is no longer called functional neurological disorder.

23   Was -- I'm sorry, that --

24   A.  The converse.

25   Q.  Thank you.  Conversion disorder is now -- the term that you

1    would use is functional neurological disorder; correct?

2    A.   Correct.

3    Q.   And was that changed by the DSM 5?

4    A.   Yeah, the diagnostical statistical manual for mental

5    disorders, sort of the Bible for psychiatry, we redefined the

6    condition many years ago, and is now called functional

7    neurological disorder.

8    Q.   Okay.  And what was the change in the definition?

9    A.   Umm, so the change was predominantly that functional

10   neurological disorder is what we call rule-in diagnosis.  We

11   rule in by showing on our clinical exam that the patient's

12   symptoms, even though they're neurologic in nature, weakness or

13   tremor or walking problems, gait difficulties, are not what we

14   know structurally about the nervous system.  What is no longer

15   required is that there's a psychological praecipit to these

16   conditions.

17   Q.   Okay.  And so if someone were to use the term conversion

18   disorder, that would be an outdated term not used by experts in

19   the field; is that correct?

20   A.   Yes.

21   Q.   Okay.  Let's talk about functional neurological disorder,

22   but before I go on, I think you said that part of the change in

23   the definition from conversion disorder to FND was that no --

24   there was no longer a requirement that a traumatic experience

25   be a praecipit for the disorder, or proceed the disorder; is

1    that correct?

2    A.   That is correct, although commonly that occurs, but it's no

3    longer required.

4    Q.   Okay.  But it is common that it occurs?

5    A.   Yes.

6    Q.   Okay.  So can you explain to the jury what functional

7    neurological disorder is?

8    A.   Okay.  Well, I think we just talked about it a little bit.

9    It's patients who come to our neurologists' attention or our

10   psychiatrists' attention who have neurologic symptoms.  They

11   may have tremor or weakness or spells when they black out, but

12   when you do a detailed exam, and you corroborate that with

13   appropriate testing, you can prove that the nervous system is

14   actually working even though the patient has symptoms.  We do

15   not think these symptoms are feigned.  They are clearly there.

16   The patients have clear disability.

17   Q.   Okay.  And so would you say it is a psychological or mental

18   disorder, or both psychological and neurological disorder?

19   A.   It's both.  It's on the interface between neurology and

20   psychiatry, because we share the same organ, right?  So it's

21   sort of arbitrary just to divide these into two different

22   disciplines.

23   Q.   Okay.  So I think you talked a little bit about this, but

24   is there a part of the brain in functional neurological

25   disorder that is affected?

1   A.  Well, it's a very complex disorder.  What we understand is

2   there's not an anatomical abnormality, right?  So you can't do

3   an MRI and see, oh, that's -- you know, there's the problem,

4   like a stroke.  What we think is it's a connectivity disorder

5   where the brain connections are not normal.  I think most of

6   you would know about migraine, which is a pain connectivity

7   disorder.  So when patients have migraine, we don't see

8   anything usually abnormal on their MRI, but they clearly have a

9   connectivity pain disorder.  So that's what we think about in

10  FND.  There's various structures involved.

11  Q.  Okay.  And how is it diagnosed?

12  A.  It's diagnosed by a careful clinical exam, showing that the

13  nervous system is intact.

14  Q.  Okay.  And so you said there's a clinical exam.  Are there

15  also tests that can be done -- is there also tests that can be

16  done to help you with the diagnosis?

17  A.  Right.  So -- so we usually do ancillary tests to make sure

18  -- to make sure that we're correct, to make sure we're not

19  missing anything; because patients can have functional symptoms

20  on top of other neurology conditions, it's very common to do

21  that.  So for example, a patient may have epilepsy and

22  functional seizures on top of that, so we often do -- almost

23  always, we -- I would say we do ancillary tests to make sure

24  that we're understanding the entire diagnosis.

25  Q.  Okay.  And we'll talk a little bit more about this, but are

1   some of those tests performing an MRI?

2   A.   Yes.

3   Q.   And possibly an EEG?

4   A.   If appropriate, yes.

5   Q.   Okay.  I want to talk about what part of the mind FND

6   operates in.  Does FND operate in a particular part of the

7   mind, a subconscious mind or --

8   A.   So it's thought to be a subconscious problem; where there's

9   connectivity disorder, we think there's overactive --

10  overactivity of the limbic parts of the brain, the mood, and

11  emotion parts of the brain, and these feed into parts of the

12  brain that have to do with what we call executive function of

13  the frontal lobes, and there's a mismatch between data that

14  comes from the frontal lobes to the motor cortex, and

15  mis-matched between that data that goes to the part of the

16  brain that we call -- allows us to have agency.  So a part of

17  the brain that has to do with knowing that you've done

18  something involves the right temporal parietal region, and that

19  area seems to be under-activated in people who have FND.  So

20  even though they've made the movement, they don't perceive that

21  they've made the movement correctly.  So there's clear evidence

22  from functional imaging and other studies to show that the

23  right temporal parietal junction, the area of our brain that

24  allows us to recognize that we've made a movement, that we

25  planned the movement, that we made it, and it's done and

1    accurate isn't working normally.

2    Q.   Okay.  So we talked about -- a little bit about some of the

3    testing you would do for functional neurological disorder.  One

4    of them was an MRI, and the other one was an EEG.  Is it normal

5    for purposes of diagnosing functional neurological disorder for

6    a patient to have no findings or normal findings on MRI or EEG?

7    A.   Right, they may have a normal MRI or incidental findings,

8    but they shouldn't have structural abnormalities that would

9    explain the condition.

10   Q.   Okay.  And you said incidental findings.  What do you mean

11   by that?

12   A.   Well, it's pretty common when we do an MRI, 'cause it's

13   such a sensitive test, to find things that have nothing to do

14   with why we ordered it.  So this happens on a daily basis.  So

15   you order the test because you want to make sure someone didn't

16   have a stroke, and you find out they have a tiny benign tumor,

17   for example, that had nothing to do with their symptoms.  So

18   you have to understand the nervous system to know if what you

19   find on the imaging correlates with their symptoms, or if it's

20   totally incidental.

21   Q.   Okay.  And then with the EEG, is it -- is part of that

22   using, though, to rule in the fact that there's also not some

23   other epileptiform of activity going on?

24   A.   Right, the EEG is a functional test to look at the brain's

25   electrical activity, and in -- if someone has true epilepsy, we

1    will often see an electrical discharge that's abnormal.  We

2    should not see that in a patient with FND, and the gold

3    standard is, if you capture an event where the patient is

4    having this spell, whatever it is, and there's no

5    electrographic -- in other words, you have a spell, but there's

6    no electrical changes in the brain, then we can be quite

7    confident that that spell is not an electrographic epilepsy

8    seizure kind of thing.

9    Q.   What are symptoms of FND?

10   A.   They're hugely varied.  Patients can have trouble with

11   strength, they can have trouble with sensation, they can have

12   cognitive problems, they can have dizziness, they can have gait

13   problems; any neurology symptom can pretty much be an FND

14   symptom.

15   Q.   So does that depend on that particular patient?

16   A.   Absolutely.

17   Q.   Okay.  What are then some of the most common FND -- are

18   there symptoms that are more common in FND than others?

19   A.   Yes, the most common are motor symptoms, sensory symptoms.

20   When I say motor symptoms, I mean weakness, tremor, spells

21   where they mimic a seizure, so they can have falls, they can

22   black out, those are the most common, but -- and then followed

23   by maybe cognitive difficulties.

24   Q.   Okay.  And when you say cognitive difficulties, what do you

25   mean by that?

1   A.   The patient will complain of memory difficulties, that you

2   can prove on exam that they have a good memory.  So for

3   example, they'll say, I -- I'm having trouble with word

4   finding, I'm having trouble with this and that, and yet, when

5   you take a history that's very detailed, very accurate, it's

6   not the kind of history we would get from somebody who is

7   suffering from like dementia.

8   Q.   And that would be a variable kind of inconsistency that

9   would help you rule in a diagnosis of functional neurological

10  disorder; is that right?

11  A.   Well, in this case, functional cognitive disorder, but

12  patients often have more than one symptom.  They can have

13  tremor, gait problems and sensory symptoms.  They can have more

14  than one symptom.

15  Q.   Okay.  And are these symptoms consistent or inconsistent?

16  A.   They're inconsistent.  That's the hallmark of the diagnosis

17  is that there's inconsistencies between the same task, and

18  throughout the day, inconsistency is a hallmark.

19  Q.   Okay.  And when you say hallmark, what do you mean by that?

20  A.   It's a core feature of making the diagnosis.

21  Q.   Okay.  What is -- so you talked about the symptoms being

22  inconsistent and being a hallmark of the diagnosis.  I want to

23  talk about specifically the common symptoms.  You discussed the

24  motor tremors, the falls, those kind of things.  Do certain --

25  in patients with those symptoms, do certain things trigger or

1   aggravate or cause -- can possibly cause those symptoms?

2   A.   Patients will describe various triggers for them.

3   Obviously, minor head trauma is a trigger.  But every patient's

4   triggers are different.  So sometimes medication side effects

5   can be a trigger for these symptoms.  There's a number of

6   different triggers that vary.  Other medical conditions can be

7   a trigger for the symptoms.

8   Q.   Okay.  And so that also may depend on the individual

9   patient; is that correct?

10  A.   Absolutely.

11  Q.   Is it common in patients with FND to have other mental

12  health disorders or co-morbid disorders?

13  A.   It's very common to have co-morbid disorders.

14  Q.   And why is that?  Is there a particular reason or --

15  A.   Yeah, these co-morbid disorders predispose or make it more

16  likely that you're going to have a -- develop FND.  They're not

17  necessary, but make it more likely.  So for example,

18  depression, anxiety, PTSD are all co-morbid diagnoses.  They're

19  not essential for the diagnosis, but make it more likely.

20  Q.   So do you often see that in your treatment of patients in

21  the clinic?

22  A.   Absolutely.  That's why we have a multi-disciplinary clinic

23  where they also see neuropsychiatry as well.

24  Q.   Okay.  I want to talk about functional seizures, or get

25  this right with you.  Psychogenic non-epileptic seizures, PNES,

1   do you see that in patients with functional neurological

2   disorder?

3   A.   Commonly.

4   Q.   Okay.  And what is that?  What is a functional seizure or a

5   PNES?

6   A.   So it's a spell that can mimic somebody who's having an

7   epileptic seizure.  So they can do different things.  They can

8   fall, they can black out, they often shake.  There's some

9   characteristics of the -- what we call the seminology, how it

10  looks like, that can help you.  For example, they might be

11  aware -- even patients with generalized epilepsy or with

12  generalized seizures aren't going to be aware that they had

13  this event, where patients with functional seizures should have

14  -- should have preserved awareness.  They're -- so there's a

15  number of things then on the seminology and the description

16  that can be helpful.  Obviously, we're getting that description

17  from the patient or other people who've witnessed it, and then

18  we do testing to make sure we're not missing epileptic

19  seizures.

20  Q.   And I think you said one of the gold standards of possibly

21  diagnosing a functional seizure is a video EEG where a spell is

22  captured; is that correct?

23  A.   That's the gold standard.

24  Q.   Okay.  And by gold standard, you mean -- I'm assuming I

25  understand what you mean, but by gold standard, you mean that

1   is one of the best ways to figure out or diagnose if someone

2   has the functional seizures?

3   A.   That is the -- we think gold is good, so that's the best.

4   Q.   Okay.  So wanted to make sure.  All right.  As part of your

5   general practice, are you required to review and interpret

6   medical records?

7   A.   Yes.

8   Q.   Is, in fact, a requirement when you're treating patients

9   with functional neurological disorder in your clinic?

10   A.   Yes.

11   Q.   Okay.  So you do this on a regular basis?

12   A.   Yes.

13   Q.   Okay.  I'm assuming you use your kind of background,

14   education and experience when you're looking at the medical

15   records and interpreting 'em; is that correct?

16   A.   Yes.

17   Q.   All right.  Now, you have reviewed some medical records and

18   evidence in this case; is that correct?

19   A.   I have.

20   Q.   Okay.  And so based on that, you're able to comment on Mr.

21   Hay's diagnosis, symptoms and treatment in this case?

22   A.   Based on his records.

23   Q.   Okay.  And we'll come back to this, but you've also

24   reviewed multiple other videos in this case; is that correct?

25   A.   I have.

1    Q.   Okay.  We'll talk about that.  In your review of the

2    medical records in this case, did you review records from Irwin

3    Army -- excuse me, Irwin Army Hospital and Walter Reed

4    Hospital?

5    A.   I did.

6    Q.   Okay.  And were those records generally prior to

7    about 2005?

8    A.   Yes.

9    Q.   Okay.  And then you also reviewed medical records after

10   2005, up until whenever -- I think it's approximately 2018 when

11   you would have gotten some of those; is that correct?

12   A.   Yes.

13   Q.   All right.  In reviewing any of those records, did it help

14   kind of form your opinion about the diagnosis of Mr. Hay in

15   this case?

16   A.   That is how I formed my opinion.

17   Q.   Okay.  All right.  I wanted to talk to you about specific

18   records.  I'm going to show you what's been marked as

19   Government's Exhibit 235.

20   A.   Thank you.

21   Q.   And do you recognize Government's Exhibit 235?

22   A.   Yes.

23   Q.   Okay.  And is that a report by Doctor Robert Beck?

24   A.   Yes.

25   Q.   Okay.  And in your review of that report, it looks like --

1    do you know, was he a neurologist or --

2    A.   He was a neurology resident.

3    Q.   Okay.  And in reviewing that report, do you know what his

4    diagnosis was of Mr. Hay at that time?

5    A.   He was concerned that there was a functional neurological

6    disorder, but due to lack of corroborative records, he wasn't

7    sure.

8    Q.   Okay.  But he was -- that was his possible diagnosis?

9    A.   Correct.

10   Q.   Okay.  I want to talk to you about Defendant's Exhibits --

11   excuse me -- 812 through 814.  I'm going to hand those to you.

12   Do you recognize Government's Exhibit -- I'm sorry, Defendant's

13   Exhibits 812 through 814?

14   A.   Yes.

15   Q.   Okay.  And are those three reports from a Doctor Kathryn

16   Hedges?

17   A.   Yes.

18   Q.   Okay.  And did you review those reports as part of your

19   review of the evidence in this case?

20   A.   I did.

21   Q.   Okay.  In your review of those reports, do you remember

22   what the diagnosis by Doctor Hedges was?

23   A.   She diagnosed at that time conversion disorder, but we

24   would call that FND, yes.

25   Q.   Okay.  And was Doctor Hedges a neurologist as well?

1    A.   Yes.

2    Q.   Okay.  Showing you what's been marked as Defense

3    Exhibit 822.  All right.  Do you recognize Defendant's

4    Exhibit 822?

5    A.   I do.

6    Q.   All right.  And is Defendant's Exhibit 822 an EEG, looks

7    like report from a Doctor Louis Giron on August 20th, 2012?

8    A.   Yes.

9    Q.   Okay.  And in review of that, looking at description, the

10   description portion on the first page, does it say whether it

11   was a video and auditory monitoring EEG?

12   A.   It is a video EEG.

13   Q.   Okay.  And is that one of the gold standards that you were

14   talking about --

15   A.   Yes.

16   Q.   -- for diagnosing FND?  Okay.  I want to turn to the second

17   page, which is -- this is double-sided on the back there.  It's

18   also on the big screen there, too, if you'd like to take a look

19   there.

20   A.   Thank you.  Otherwise, I need my glasses.

21   Q.   Okay.  Let me know if you do.  Could you tell me what the

22   impression was, or the result of that -- the gold standard EEG

23   was?

24   A.   That it was normal.

25   Q.   Okay.  Was there any activity present during this EEG?

1   A.   No electrical activity, no electrical seizure activity.

2   Q.   No electrical seizure.  Looking at -- calling your

3   attention to Page 1.

4   A.   Well, the patient had an episode on the EEG which did not

5   show any epileptic activity, so by this test, this is a

6   functional seizure.

7   Q.   Okay.  Gotcha.  I'm going to show you Defendant's

8   Exhibit 821.

9   A.   Getting your steps in.

10  Q.   All right.  Have you seen Defendant's Exhibit 821 --

11  A.   I have.

12  Q.   -- prior to today?  Okay.  And was that one of the reports

13  you reviewed in this case?

14  A.   Yes.

15  Q.   Okay.  And is that an EEG report from a Doctor Vikas Singh?

16  A.   Yes.

17  Q.   Okay.  And can you tell, was this also a video EEG or some

18  other form of EEG?

19  A.   It is a video EEG as well.

20  Q.   Okay.  And so based on -- and can you tell me what the

21  findings were?

22  A.   So the patient had an episode on the EEG, and it was felt

23  to be normal EEG with one non-epileptic spell captured.

24  Q.   Okay.  And so then, would this be another gold standard

25  for --

1    A.   So he had the gold standard twice.

2    Q.   Okay.  I want to talk to you about Government's

3    Exhibit 208.  I'm going to hand you a copy here.

4    A.   Thank you.

5    Q.   And do you recognize Government's Exhibit 208, and I'm

6    sorry, it's 208 B, as a record that you reviewed as part of

7    your work in this case?

8    A.   Yes.

9    Q.   All right.  I want to call your attention to the front and

10   back, so it would be the third page under medical history,

11   Paragraph A.  It starts there by saying, he is presently rated

12   at 100 percent for seizure disorder, yet the only time that

13   seizures are mentioned on the CPRSV record there in quotes, and

14   he himself says he doesn't have seizures.  I want to talk about

15   that.  This record claims that Mr. Hay says he doesn't have

16   seizures.  Is he correct about that?

17   A.   Yes, he is.

18   Q.   Okay.  And why would you say that?

19   A.   He doesn't have epileptic seizures, he has functional

20   seizures, so I think that he's interpreting that correctly.

21   Q.   So when he calls it an attack or an episode or muscle

22   cramping, that's more in line with what having a non-epileptic

23   or non-functional functioning seizure is called?

24   A.   It's in keeping with the functional issue, yes.

25   Q.   He also goes on to say that -- that also notes -- at least

1   the record notes that the veteran had an attack while in the

2   exam room, which is why if a patient says it's typical, that

3   sometimes he's normal, and sometimes he has these spasms.

4   Having being sometimes normal and sometimes having spasms, is

5   that consistent with the diagnosis of FND or inconsistent?

6   A.   The variability and discrepancy is how you make the

7   diagnosis, so absolutely.

8   Q.   So basically, the fact that there's a description of

9   variance in the symptoms is what helps to diagnose FND?

10  A.   Yes.

11  Q.   Okay.  I want to show you what's been marked as

12  Government's Exhibit 210 A.  Do you recognize Government's

13  Exhibit 210 A?  Is that one of the records you reviewed in this

14  case?

15  A.   Yes.

16  Q.   Okay.  I wanted to call your attention to -- do you know if

17  this -- the author of this report, Carolyn Karr, was she a

18  psychiatrist or psychologist, do you know?

19  A.   I'm not sure.

20  Q.   Type of medical doctor.  Fair enough.  I want to call our

21  attention to the top of the page of 210 A.  Does it look as if

22  this is -- this is an evaluation of some sort for mental

23  disorder?

24  A.   That's what it is.

25  Q.   Okay.  And under diagnosis, Section 1, there's several

1    noted there.  Would you agree that the first one, though, there

2    is mental disorder diagnosis, conversion disorder with mixed

3    symptoms?

4    A.   That's correct.

5    Q.   And in the second, looks like PTSD?

6    A.   Yes.

7    Q.   And the third is unspecified depressive disorder?

8    A.   Correct.

9    Q.   And is that pretty common with FND to see, as I said,

10   multiple co-morbid disorders?

11   A.   Very common.

12   Q.   Okay.  And I want to call your attention to the last page,

13   Page 16.  It says, the veteran's -- the last sentence says, his

14   depression symptoms likely increase when his conversion

15   disorder and PTSD symptoms increase, and as a result, these

16   disorders cannot be fully differentiated.  What I want to know

17   about that is, is that true, that -- that the -- sorry, the

18   symptoms of conversion disorder and PTSD and major depression,

19   can they aggravate one another in the sense that they make them

20   worse?

21   A.   Absolutely.

22   Q.   Okay.  All right.  In your review of the medical records in

23   this case, did you see a consistency in the diagnosis of Mr.

24   Hay?

25   A.   Every one of his providers had the same diagnosis, which is

1    FND with co-morbid PTSD, depression, and anxiety.

2    Q.   Okay.  And what does that tell you for purposes of forming

3    your opinion about the consistency in diagnosis of Mr. Hay?

4    A.   That it's likely correct.

5    Q.   In review of those medical records, did you see a

6    consistency in claims of symptoms made by Mr. Hay?

7    A.   Yes.

8    Q.   Okay.  And what were those?

9    A.   He had a variety of different symptoms, depending on when

10   he was interviewed, but he had a gait problem, he had spasms,

11   he had pain, he had tremors.

12   Q.   Okay.  And in review of those medical records, did he

13   consistently complain of the same type of symptom to the

14   medical providers?

15   A.   Yes.

16   Q.   Okay.  And what does that tell you in forming your opinion

17   regarding the diagnosis of FND that there's been consistency in

18   the type of symptoms recorded over a period of time?

19   A.   He consistently had the same issues.  However, they were

20   variable.  Sometimes they'd be present, sometimes they weren't.

21   But he was complaining about the same things over the decade of

22   time he was treated.

23   Q.   Okay.  So in reviewing of the medical records, did you note

24   whether or not Mr. Hay had any, what I would call triggers, you

25   may refer to them differently, for purposes of having symptoms

1    for functional neurological disorder?

2    A.   He describes triggers as long car rides, and traffic, and

3    loud noises were his triggers.

4    Q.   Okay.  And is it common to have not only those triggers for

5    functional neurological disorder, FND, and the other symptoms

6    of PTSD and possible major depression?

7    A.   Yes.

8    Q.   So in your practice, do you have patients who -- with FND

9    that have triggers, that have learned to try and kind of avoid

10   those triggers as part of dealing with their symptoms?

11   A.   That's one of the ways we attack treatment for these

12   patients is having them deal with their triggers, not only

13   avoid them, but learn to manage them.

14   Q.   Okay.  And so if someone with FND is able to manage those

15   triggers or try to avoid them, could they possibly get better,

16   or kind of rectify the symptoms?

17   A.   Yes.

18   Q.   And I think you said that that's part of actually how

19   you -- how you treat it; is -- is that correct?

20   A.   One of the core treatments for FND, particularly for people

21   who have episodic involvement like spells is what we call

22   cognitive behavioral therapy, and it's basically trying to look

23   for triggers, and have the patients learn to manage those

24   triggers.

25   Q.   Okay.  All right.  Let's talk again about the medical

1   records you reviewed with Mr. Hay.  I think you all ready said

2   that he had a consistent co-morbid diagnosis of PTSD and major

3   depression; correct?

4   A.   Yes.

5   Q.   Okay.  Even though he has all these diagnoses, are they

6   separate and independent issues, mental health issues?

7   A.   The co-morbid diagnoses that need to be looked at and

8   treated in order -- in order to help the patient.

9   Q.   So would it be fair to say that they -- the symptoms or the

10   disorder overlap?

11   A.   Correct.

12   Q.   Okay.  And so with the symptoms overlapping, if you --

13   let's say if you even possibly could cure one, would the other

14   co-morbid disorders still remain?

15   A.   So I mean, as a treating clinician, what you do is you try

16   to define all the co-morbid issues, and treat all of them,

17   because treating any or all of them can make the patient

18   better, so we treat all of them.

19   Q.   Understood.  So did you watch some of the surveillance

20   videos in this case, or actually, did you watch multiple

21   surveillance videos in this case?

22   A.   I did.

23   Q.   Okay.  We're going to go through some of those, but I just

24   kind of want to outline kind of what you -- you viewed so that

25   we can get a good grasp.  Did you view surveillance video of

1    Mr. Hay from a camera facing his house in which -- that was

2    kind of running constantly, would show the front of his house?

3    A.   I did.

4    Q.   Okay.  And did you view videos of Mr. Hay going to doctors'

5    appointments?

6    A.   I did.

7    Q.   Okay.  And did you review -- excuse me -- videos of Mr. Hay

8    going to other appointments or things that weren't doctors?

9    Have you reviewed videos of him going to a Quik Trip?

10   A.   Yes.

11   Q.   And Sam's Club?

12   A.   Yes.

13   Q.   And a pawn shop?

14   A.   Yes.

15   Q.   Okay.  I want to show you a few of these videos, and then

16   we'll talk about 'em, okay?  I want to show you Government's

17   Exhibit 8, if you'll just give us a moment to have this load,

18   okay?  Yes, please play it.

19            MR. MAGARIEL:  126?

20   BY MS. RAMSEY:

21   Q.   Please play up to 126.  I'm sorry, technical difficulties.

22   We're going to fast forward it here.  Can you stop it?  Thank

23   you.  And do you recognize that as a video that you've

24   previously seen --

25   A.   Yes.

1    Q.   -- in this case?  Okay.  I'm going to show you what's been

2    marked Government's -- well, before we go on to that, what

3    symptoms of functional neurological disorder did you recognize

4    Mr. Hay having in Government's Exhibit 8?

5    A.   You see him walking with this very stiff, like wooden,

6    soldier kind of posture, and he has this sort of limp, and it

7    doesn't fit with anything I've ever seen as a neurologic

8    condition with walking.

9    Q.   Okay.  And when you say doesn't fit, it doesn't fit in a --

10   you said neurologic condition?

11   A.   Right.  So it didn't -- it's not a spastic paresis.  It's

12   not a hemiparesis.  It's not a Parkinsonian gait.  It's not a

13   frontal gait.  It's not a spinal cord disorder.  It doesn't

14   fit.

15   Q.   And is that diagnostic, meaning a part of diagnosing

16   functional neurological disorder?

17   A.   Along with the rest of the clinical exam.

18   Q.   I'm going to show you what's been marked as Government's

19   Exhibit 11.  Would you please play Government's Exhibit 11?

20   All right.  You can stop it.  Thank you.  And do you recognize

21   Government's Exhibit 11 as a video of Mr. Hay after that social

22   security appointment that you saw in Government's Exhibit

23   Number 8?

24   A.   Yes.

25   Q.   Okay.  And do you -- were there any symptoms that you

1   watched in Government's Exhibit 11 that would suggest to you

2   that Mr. Hay is still having symptoms of functional

3   neurological disorder?

4   A.   What we see here is variability, right?  So we saw him

5   looking more impaired.  Now we see him looking less impaired,

6   the hallmark of FND.

7   Q.   Okay.  And it looks like he was carrying a cane in both.

8   A.   Yes.

9   Q.   Okay.  And so when you say that it's variability, the

10  hallmark of FND, what you're -- I was -- kind of want to make

11  sure I understand that.  What you're seeing is that there's

12  differences.  Is that what you mean by variability?

13  A.   Yes, there's differences in how he's walking.  The first

14  one, he looks more impaired, and he's using the cane more, and

15  now, we see he's using the cane, but looking a bit less

16  impaired, and walking what we would think more normally, and

17  again, variability within a task is the hallmark and diagnostic

18  of FND.

19  Q.   And so when -- is there any other examples that you can

20  think of, of a disorder that might have the same sort of

21  variability?

22  A.   Absolutely.  Let's just go back to migraine.  Let's say we

23  had a camera, and we followed a patient with migraine.  We want

24  to call it a her, because migraine is more common in women.

25  She leaves her house.  She doesn't have a headache.  She's

1   looking great.  She's stressed going to work.  She has a big

2   thing to do with her boss.  She gets a migraine.  She gets out

3   of her car.  She's impaired.  She has her sunglasses on.  She

4   looks like she's in pain, goes in, and then you video her

5   later, after she's had medications or whatever.  She doesn't

6   look as pale, not wearing her sunglasses.  Doesn't mean she

7   didn't have a migraine, doesn't mean that there -- that she was

8   feigning her symptoms.  It simply means that there's

9   variability as you video'd her throughout the day.

10  Q.   Okay.  I want to show you what's been marked as

11  Government's Exhibit 46, I believe.  And I think you can fast

12  forward it to about 31 seconds in.  Now, Doctor O'Neal, do you

13  recognize this as a video that you've seen in reviewing the

14  materials in this case?

15  A.   Yes.

16  Q.   Okay.  I think you can stop it.  Thank you.  And do you

17  recognize this as a video -- is your understanding that it was

18  at a time when Mr. Hay was attending a compensation and pension

19  exam?

20  A.   I do.

21  Q.   Okay.  I'm going to ask you to play Government's

22  Exhibit 50.  I think if you could fast forward until about two

23  minutes, 29 seconds.  I think.  Can you fast forward I think to

24  two minutes and 29 seconds?  Oh, is that what you did?  I

25  apologize.  Maybe I got it off.  Okay.  Was this also an

1  exhibit -- I'm sorry, a video that you reviewed prior, while

2  you were working on this case?

3  A.   Yes.

4  Q.   Okay.  You can stop it.  Thank you.  And was that your

5  understanding that that was a video of Mr. Hay leaving that

6  same C&P exam?

7  A.   I believe so, yes.

8  Q.   I'm going to show you what's been marked as Government's

9  Exhibit 80.  I think if you can go about a minute, two seconds

10  in.  Now, is this a video, Doctor O'Neal, that you have

11  reviewed also that you understand is a video of Mr. Hay on that

12  same day at Sam's Club?

13  A.   Yes.

14  Q.   Okay.  You can stop that video.  Thank you.  Now, the same

15  questions.  You can see a difference in the morning versus the

16  afternoon.  Can you see symptoms of functional neurological

17  disorder in both of those -- in all of those videos?

18  A.   What we're seeing is variability in the same task at

19  different times of the day, which is what we diagnose as FND.

20  Q.   And so part of the diagnosis of FND would be able to see

21  that someone has inconsistencies or variabilities within even

22  the same day moving about their lives.  Is that fair enough to

23  say?

24  A.   Yes.

25  Q.   Okay.  Did you also view a video of Mr. Hay attending

1   dental appointments?

2   A.  Yes.

3   Q.  Okay.  And did you notice symptoms of functional

4   neurological disorder in those videos?

5   A.  Yes.

6   Q.  What were they?

7   A.  He was using a cane, and his walking was similar to one of

8   the prior videos that we had seen, sort of stiff and peculiar

9   looking.

10  Q.  Okay.  I think you said that you also reviewed videos of

11  the front -- yard or front -- the front home of Mr. Hay, and I

12  know there were some quite a bit of those, but in review of

13  those videos, did you see Mr. Hay exhibit symptoms of FND?

14  A.  I saw one video, I hope this is one you're responding to,

15  where he was walking normally, and carrying the walker.

16  Q.  Uh-huh.  And is that still consistent with the diagnosis of

17  FND?

18  A.  Right, that they can function normally at times, yes.

19  Q.  In your clinic -- we've talked a lot about physical tremor

20  and non-functioning seizure.  Do you have -- have you ever

21  treated patients that have had -- claimed to you that they were

22  having trouble seeing or could not see?

23  A.  I have occasionally seen patients with functional visual

24  loss.

25  Q.  And what is that?

1   A.   Where the patients claim they can't see, but you can prove

2   that they can see.

3   Q.   And so that would be consistent with the -- with the

4   diagnosis of functional neurological disorder?

5   A.   It's a particular type, yeah.

6   Q.   Okay.  And I think we talked a little bit about this, but

7   one of the things you said is that the functional neurological

8   disorder operates on the subconscious mind; is that correct?

9   A.   Yes.

10   Q.   And so it is not operating as an intentional aspect?

11   A.   No, we do not think these people are feigning their

12   symptoms.  There's clear evidence from many, many studies

13   showing that these people are not feigning, that they have a

14   real disability, and they're really suffering.

15   Q.   Now, in your review of the medical records, reports, videos

16   in this case, were you also able to view videos of Mr. Hay

17   baling hay or working on a farm?

18   A.   I saw those videos.

19   Q.   Okay.  And again, is there anything that would change the

20   diagnosis of functional neurological disorder?

21   A.   What these videos display is variability in his

22   functioning.  That is not to be compared with feigning.

23   Q.   If someone has functional neurological disorder, and their

24   symptoms are functional seizures, but they have triggers, is

25   there any issue with them driving or having a driver's license?

1   A.   Usually, if they're severe, very frequent, we'll advise

2   them not to, but in general, if the triggers are identifiable,

3   then it's okay.

4   Q.   Okay.  And in your review of your medical records in this

5   case, I think you said you went back to 2000 of Mr. Hay, did

6   you ever review a record in which a medical doctor had informed

7   Mr. Hay that he was not to drive, or he was told by -- under

8   law, he was not supposed to drive?

9   A.   No, and if a neurologist -- when we have a patient with

10  epilepsy, you're actually mandated by law to tell them not to

11  drive, depending on state law; in Massachusetts is for six

12  months.

13  Q.   Okay.  I wanted to talk about functional neurological

14  disorder and distraction.  Is -- is it possible for an

15  individual with symptoms with functional neurological disorder

16  to change with distraction?

17  A.   Yes, that's actually how we -- those are the ways we use in

18  our clinical exam to make the diagnosis.  So for example -- so

19  for example, a patient has a functional gait disorder, you ask

20  them to do other things that distracts them, singing or doing

21  something with their hands, and when they do that, their

22  automatically normal anatomic pathways kick in, and they start

23  to be more normal.  So that's how you use this on a clinical

24  exam everyday.

25  Q.   Okay.  Can a patient with functional neurological disorder

1   get better?

2   A.   Yes, but unfortunately, the prognosis is not that great.

3   Q.   Okay.  Let's talk about that a little bit.  So you said the

4   prognosis is not that great.  Is there an issue that you've

5   identified with patients with functional neurological disorder

6   and seeking treatment?

7   A.   It's very difficult to engage patients with FND in

8   treatment.  It's stigmatizing.  Health care providers don't

9   know how to talk to these patients and explain the diagnosis,

10  and it's very frequently that we see the patients never get

11  into treatment or never follow through with treatment.

12  Q.   And is that because it's difficult for a person with FND to

13  comprehend that even though they're having complaints about

14  their physical self, their body, that it possibly is a problem

15  with their brain?

16  A.   Yeah, engaging patients in treatment is really part of

17  the -- the biggest problem is our health care providers.  They

18  don't explain it to the patient correctly.  So if you had

19  weakness on one side of your body or a walking problem, and I

20  said oh, this is stress, you need to see a psychiatrist, you

21  would look at me like I had three heads; how is that going to

22  help my walking.  So you need to really explain to them what

23  the path of physiology is, how we're going to make it better,

24  and why, right?  So -- so I think explanation is really

25  important.

1   Q.   Okay.  And -- and in review of Mr. Hay's medical records,

2   did you view or see that he had had any actual treatment for

3   functional neurological disorder?

4   A.   It looks like he was referred to physical therapy as well

5   as psychotherapy.

6   Q.   Okay.  And did that work?

7   A.   It's -- it's not clear that it worked, no.

8   Q.   And so you said physical therapy and psychotherapy; is that

9   correct?

10  A.   Correct.

11  Q.   Okay.  So just to be -- just to kind of be clear, people

12  with FND can appear normal at times, and then have symptoms,

13  mild or worse, and that is actually part of the diagnosis of

14  functional neurological disorder?

15  A.   Yes.

16  Q.   Okay.  Are there any other disorders like functional

17  neurological disorder?  I know that you talked about migraines.

18  Are there any other type of disorders like this that --

19  A.   There are a number of them.  There's a number of functional

20  disorders in other systems, like we think irritable bowel is a

21  GI functional illness.  We think fibromyalgia is probably a

22  functional illness, and these often overlap.  It's

23  controversial whether complex regional pain might be another

24  one.

25  Q.   When a person -- patient exaggerates their symptoms for

1    secondary gain, would you expect to see a -- a high level of

2    exaggeration?  So for instance, in Mr. Hay's case, would it be

3    -- an exaggeration would be, if you couldn't move your legs,

4    would be, you would be in a wheelchair rather than using a

5    walker?

6    A.   Right.  That's one of the things that stands out here.  We

7    see variability, so that sometimes, he's using a walker for his

8    visits, and sometimes using a cane, but if he's really only

9    doing this to exaggerate for secondary gain, why not always use

10   a walker?  Why -- why not appear in a wheelchair?  It doesn't

11   make any sense at all.  And then why deny that you have

12   seizures, and have episodes on the EEG?  It doesn't hang

13   together.  It's variable, inconsistent, much more common with

14   FND than feigning for secondary gain.

15   Q.   And so is -- is the misdiagnosis of FND -- you're looking

16   at me like I'm getting this wrong, so let me know, but is the

17   misdiagnosis of FND fairly low?

18   A.   Yes, it's quite low.  So people -- neurologists are the

19   same, concerned that we misdiagnose FND, but studies have shown

20   that we don't misdiagnose it any more common than we

21   misdiagnose other conditions, so take that, but it's not

22   usually misdiagnosed, no.

23   Q.   Okay.

24        MS. RAMSEY:  May I have a moment, Your Honor?

25        THE COURT:  Yes.

1   BY MS. RAMSEY:

2   Q.  You talked a little bit about that this disorder was

3   stigmatizing.  What do you mean by that, stigmatizing to --

4   A.  Well, we in the health care profession have stigmatized

5   these patients, because people have for decades thought that

6   they were feigning their symptoms, and that they had volitional

7   control over their symptoms, and that's simply not true, and

8   proven by good studies.

9   Q.  And if something is stigmatizing, if you're going to a

10  medical professional, and you may feel stigmatized, is that a

11  stressor as well?

12  A.  Oh, absolutely, and a huge barrier to get into treatment.

13          MS. RAMSEY:  I have nothing further.  Thank you.

14          THE COURT:  All right.  Let's take our recess for

15  20 minutes.

16      (Whereupon court took a recess.  Proceedings then continued

17  as follows:)

18      (Proceedings held at the bench, outside the hearing of open

19  court.)

20          THE COURT:  Given the testimony on direct, on the

21  question about symptoms for secondary gain, that line of

22  questioning as well as the fact that this witness has used the

23  word feigned several times now, I think it's appropriate to

24  cross-examine her using reference to feigning and fake

25  symptoms, or even malingering, because that has now been

1    introduced, or at least the definition of symptoms for

2    secondary gain.

3          MS. RAMSEY:  And I apologize, Your Honor, my

4    understanding was that we -- I thought the ruling was yesterday

5    you could not use the word malingering.  I thought you could

6    use the words --

7          THE COURT:  No, I not only -- with their expert, I

8    precluded questions about using the word malingering, because

9    the definition includes this sort of intent component, and I

10   instructed everyone to stay away from that.  This witness has

11   now crossed that line.

12         MS. RAMSEY:  Okay.

13         THE COURT:  I know you objected to their expert

14   crossing the line, and I don't think their expert crossed the

15   line, but I think the door is now open to get into all of

16   this -- malingering, feigning, all of that, so just give you

17   that head's up.

18         MS. RAMSEY:  Thank you.

19         (Whereupon court took a recess.  Proceedings then continued

20   as follows:)

21         (Jury entered courtroom.)

22                         CROSS EXAMINATION

23   BY MR. OAKLEY:

24   Q.  Good morning, Doctor O'Neal.

25   A.  Good morning.

1   Q.  I want to first talk to you about the terms that we've been

2   using, or that you've been using today, and you said on direct

3   examination that no one in the field calls it conversion

4   disorder anymore, that it's functional neurological disorder;

5   correct?

6   A.  Yes.

7   Q.  And you said that that has been true since the DSM 5 came

8   out; correct?

9   A.  Yes.

10  Q.  And the DSM 5 came out in 2013; correct?

11  A.  I believe so.

12  Q.  Okay.  I think you referred to the DSM 5 as the Bible of

13  psychiatry; correct?

14  A.  Yes.

15  Q.  Am I holding in my hand the DSM 5?

16  A.  Yes.

17  Q.  And so if I direct your attention to Page 318 -- Your

18  Honor, may I approach?

19       THE COURT:  Yes.

20  BY MR. OAKLEY:

21  Q.  -- of the DSM 5, under the DSM 5, it says, conversion

22  disorder, and then in parentheses, functional neurological

23  symptom disorder.  Did I read that correctly?

24  A.  There's been revisions, I believe.

25  Q.  Okay.  Well, so certainly, you use the term FND as opposed

1   to conversion disorder; correct?

2   A.   None of the experts in the field use conversion disorder at

3   this time.

4   Q.   Okay.  You've written articles on FND; correct?

5   A.   Yes.

6   Q.   Okay.  And I'm going to hand you an article that you wrote

7   in 2018 for the American Journal of Psychiatry.

8   A.   Yes.

9   Q.   Do you recognize that as an article that you wrote?

10  A.   Yes.  Yes, uh-huh.

11  Q.   And the title of this article is treatment for patients

12  with the FND, in parentheses, conversion disorder, an

13  integrated approach.  Did I read the title of your article

14  correctly?

15  A.   You did.

16  Q.   Now, perhaps you didn't write the title.  Did someone else

17  write the title?

18  A.   Oh, I wrote it.

19  Q.   Okay.  And then I want to talk to you about the body of

20  that article.  And do you see on the second column, the last

21  paragraph, it says a diagnosis of functional neurological

22  disorder, and then parentheses, you state conversion disorder.

23  Did I read that correctly?

24  A.   You did.

25  Q.   And then later in the article, if you turn to the second

1   page, the first column, it says right after Number 1, in a

2   functional neurological disorder, and then in parentheses, you

3   wrote also called conversion disorder or functional

4   neurological symptom disorder.  Did I read that correctly?

5   A.  I stand by my -- what I said.

6   Q.  Okay.  And did I read that correctly?

7   A.  You did.

8   Q.  That in this article, you said that functional neurological

9   disorder is also called conversion disorder?

10  A.  I did say that.

11  Q.  So if I use the term today, conversion disorder or

12  functional neurological disorder, you'll know that we're

13  talking about the same thing?

14  A.  Correct.  That was done to clarify those people, for those

15  people who are not in the field.

16  Q.  Well, now, this article appeared in the American Journal of

17  Psychiatry; correct?

18  A.  Correct.

19  Q.  And that's a journal for people in the field.  This isn't

20  something I'm going to pick up next to the People magazine at

21  Wal-Mart, is it?

22  A.  No, I don't believe so.

23  Q.  So in this article, directed towards people in the field,

24  you said that conversion disorder and functional neurological

25  disorder are the same thing?

1   A.   Sir, this is a -- an article written for general

2   psychiatrists.   These are not psychiatrists versed in FND.

3   Q.   Okay.   So just to be clear, however, if I use the term

4   conversion disorder or functional neurological disorder, you'll

5   know that we're talking about the same thing?

6   A.   Yes, although they're slightly different.

7   Q.   Okay.   Thank you.   I would like to see if you and I can

8   agree on some things.   You would agree that there is no

9   permanent neurological impairment associated with FND or

10  conversion disorder; correct?

11  A.   There's no permanent structural impairment.

12  Q.   There is no permanent neurological impairment associated

13  with FND?

14  A.   There's disability, but no anatomic abnormality.

15  Q.   And it is important to note that the diagnosis of

16  conversion disorder should be based on the overall clinical

17  picture, and not on a single clinical finding.   Would you agree

18  with that statement?

19  A.   It's -- I would agree that it's a rule-in diagnosis based

20  on your clinical history and exam and supportive documents.

21  Q.   It's in the DSM; correct?

22  A.   Yes.

23  Q.   In fact, I just read directly from the DSM.   It is

24  important to note that the diagnosis of conversion disorder

25  should be based on the overall clinical picture, and not on a

1  single clinical finding; correct?

2  A.  Correct.

3  Q.  Okay.  And when you're talking about FND or conversion

4  disorder, you're assuming that the symptoms are not feigned;

5  correct?

6  A.  We know that they're not feigned.

7  Q.  Well, with someone who actually has FND or conversion

8  disorder.  Is that what you mean?

9  A.  Correct; patients who have FND are not feigning their

10  symptoms.

11  Q.  Okay.  It is possible for people to feign their symptoms in

12  order to convince someone that they actually have FND when they

13  do not.  Would you agree with that?

14  A.  It is possible.

15  Q.  And in dealing with FND or conversion disorder, it's

16  important that the symptoms are not feigned or intentionally

17  produced?  If someone is intentionally producing or feigning

18  their symptoms, they do not have FND.  Would you agree with

19  that statement?

20  A.  If they're intentionally produced, yes.

21  Q.  In fact, in your article, Treatment For Patients With A

22  Functional Neurological Disorder, you discuss that, don't you?

23  A.  Yes.

24  Q.  And in your article Caring For Patients With Functional

25  Neurological Disorder, a case-oriented review, you point that

1    out, don't you?

2    A.   Yes.

3    Q.   And in fact -- and I have a copy of Caring For Patients

4    With A Functional Neurological Disorder, a case-oriented

5    review, you wrote that for the publication 'The Neurologist' in

6    2016; correct?

7    A.   That's correct.

8    Q.   So I'm going to hand it to you in case you need to refer to

9    it.  And in that article, directing your attention to the

10   bottom of the first column, in discussing what you as a

11   clinician do to -- to care for somebody with functional

12   neurological disorder, you state, importantly, the symptoms in

13   these patients are not intentionally produced or feigned;

14   correct?

15   A.   Yes.

16   Q.   And so if someone is intentionally producing or feigning

17   their symptoms, they don't have FND; correct?

18   A.   That's correct.

19   Q.   Now, it's also -- you said on direct examination that the

20   symptoms of FND are variable; correct?

21   A.   Yes.

22   Q.   And so some people suffer it worse than others; is that

23   correct?

24   A.   They -- there's a variability within patient and between

25   patients.

1   Q.   Okay.  And so I take from that, that my question to you

2   that, yes, there are people who have it worse, and people that

3   have it better is a true statement; correct?

4   A.   Yes.

5   Q.   And so since it's possible to completely feign or fake

6   having FND, I assume you would also agree that it's possible

7   for someone to feign or fake the extent to which they have FND;

8   true?

9   A.   I suppose.

10  Q.   And in fact, definitive evidence of someone feigning or

11  faking would suggest a diagnosis of something other than FND;

12  correct?

13  A.   If it was definitive.

14  Q.   Okay.  And the DSM talks about definitive evidence of

15  faking, doesn't it?

16  A.   Yes.

17  Q.   And the DSM discusses that if someone is faking or

18  feigning, it's not FND?

19  A.   That's correct.

20  Q.   I'm going to hand you the DSM in case you need to refer to

21  it.  And if you need to refer to it, it's on Page 321, but in

22  discussing conversion disorder or functional neurological

23  symptom disorder, the DSM specifically states that the

24  diagnosis of conversion disorder does not require the judgment

25  that the symptoms are not intentionally produced, i.e., not

1  feigned.  So in other words, as a clinician, you don't have to

2  make that determination; correct?

3  A.   That's correct.

4  Q.   However, definitive evidence of feigning would suggest the

5  diagnosis of something else; correct?

6  A.   Would suggest an alternative diagnosis.

7  Q.   And it would actually suggest an alternative diagnosis of

8  factitious disorder if the individual's apparent aim is to

9  assume a sick role or malingering, if the aim is to obtain an

10  incentive such as money; is that correct?  Is that what the DSM

11  5 says about someone who is faking or feigning their symptoms?

12  A.   That is what the DSM says.

13  Q.   Okay.  And you mentioned on -- earlier on one of my

14  questions, if there's definitive evidence of feigning; correct?

15  A.   Correct.

16  Q.   Now, the DSM gives an example of definitive evidence of

17  feigning in its definition, doesn't it?

18  A.   It does.

19  Q.   As you sit here, do you know word for word what that

20  definition is?

21  A.   I don't know it word for word.

22  Q.   Well; it's on Page 321 if you want to look at it, and it

23  says however, definitive evidence of feigning, E G, you know

24  that E G means such as; so in other words; it's giving an

25  example; correct?

1   A.   Yes.

2   Q.   Clear evidence that the loss of function is present during

3   the examination but not at home.  That's an example of some of

4   definitive feigning, isn't it?

5   A.   That's what the DSM gives an example.

6   Q.   And again, the DSM is the Bible of psychiatry that's relied

7   upon not only by you but everyone else in the field; correct?

8   A.   Correct.

9   Q.   And clear evidence that loss of function is presented

10  during the examination but not at home means that the patient

11  who is present with the symptoms acts differently during the

12  examination than they do at home; correct?

13  A.   Yes.

14  Q.   Someone who actually has functional neurological disorder

15  does not get to pick and choose when those symptoms present

16  themselves; correct?

17  A.   They present themselves in a variable way throughout their

18  day.

19  Q.   Correct.  Involuntarily; correct?

20  A.   It is felt to be involuntary.

21  Q.   I'm sorry?

22  A.   Yes, involuntarily.

23  Q.   And involuntarily means I'm not doing this on purpose;

24  correct?

25  A.   That's correct.

1    Q.   So in other words, someone doesn't get to decide during a

2    compensation and pension examination that I have these

3    symptoms, but when I'm at home picking up hay bales -- bales of

4    hay, I don't have these symptoms.   They come and go

5    involuntarily.   You would agree with that?

6    A.   I would agree that they come and go involuntarily.

7    Q.   They are subconscious, unpredictable and unplanned;

8    correct?

9    A.   Yes.

10   Q.   And in your testimony, you're relying on the medical

11   records; correct?

12   A.   Yes.

13   Q.   And you're relying on the things that defendant said during

14   the examinations, aren't you?

15   A.   Of course.

16   Q.   And based on that, it could be FND; correct?

17   A.   Yes.

18   Q.   Or it could be that defendant was feigning or faking or

19   exaggerating; isn't that correct?

20   A.   I think you're ignoring a number of facts in this case.

21   Q.   Okay.   But my question is, one alternative to it being FND

22   is it's not FND, it's malingering, correct, or factitious

23   disorder?   Is that an alternative diagnosis?

24   A.   Those are two other alternative diagnoses.

25   Q.   Okay.   And so in determining whether or not someone is

     1    feigning or faking or coming up or exaggerating their symptoms,

     2    in other words, it's malingering, one of the things that you

     3    look at is whether or not the patient has an incentive to fake

     4    or feign or exaggerate symptoms; correct?

     5    A.   Patients -- any patient, the answer is that's not entirely

     6    correct.

     7    Q.   You wouldn't look at someone's incentive to fake or feign?

     8    A.   Incentive is not how you make the diagnosis.

     9    Q.   I'm not asking you if that's how you make the diagnosis.

    10    I'm asking you if that's something that you would look at?

    11    A.   It's something that you would take under advisement, yes.

    12    Q.   Because you would look at whether or not a patient is

    13    malingering; correct?

    14    A.   I think you're missing a huge thing that we see commonly in

    15    clinical practice.

    16    Q.   All I'm asking is if somebody presents with FND, an

    17    alternative diagnosis is that they don't actually have FND, or

    18    they don't have it to the extent that they are telling the

    19    clinician.  You would agree with that; correct?

    20    A.   That's correct.

    21    Q.   And the diagnosis of FND is the absence of another

    22    neurological disorder.  So you look at somebody if they have a

    23    neurological -- excuse me, you look at someone, and they have

    24    an EEG that's normal, that's something you look at; correct?

    25    A.   The absence of a non-neurologic disorder does not rule in

1  FND, and in fact, FND is very common with other neurologic

2  disorders, and presence or absence of a normal EEG is only

3  somewhat helpful.

4  Q.  Okay.  But FND isn't caused by a neurological disorder that

5  you can pick up on an EEG or an MRI; correct?

6  A.  It's not structural; correct.

7  Q.  And so if you -- if I did not have -- if I had a normal

8  EEG, and you look at it, and you don't see anything that's

9  there, I could possibly have FND?

10 A.  Or you could have epilepsy.

11 Q.  Or I could be a malingerer?

12 A.  Sure.

13 Q.  And so in looking at whether or not someone is faking or

14 exaggerating their symptoms, you should look at an incentive

15 that would cause someone to fake or exaggerate their symptoms;

16 correct?

17 A.  That's one of the facts that you would look at.

18 Q.  Well, the DSM talks about that as being one of the facts

19 that you would look at, doesn't it?

20 A.  DSM is not a clinician.

21 Q.  Okay.  The DSM also talks -- well, let me back up.  So far

22 as looking at incentives or reasons why someone would -- would

23 fake or feign or exaggerate, secondary gain that you talked

24 about on direct examination, that's one thing you would look

25 at; correct?

1   A.   Yes.

2   Q.   And secondary gain means that someone stands to benefit

3   from the diagnosis.   And so when you're talking about a

4   benefits examination, that someone might be entitled to VA

5   benefits, the VA benefits is an example of secondary gain;

6   correct?

7   A.   I'm not sure I understand the question.

8   Q.   Let me try and ask it a different way.   Secondary gain

9   would include government benefits; correct?

10  A.   Yes.

11  Q.   Okay.   Avoiding a duty would be another reason that someone

12  might fake or exaggerate symptoms; correct?

13  A.   We also see that in FND, patients often avoid duty, and

14  that's the reason for their FND.   So the answer is no, that is

15  not correct.

16  Q.   That's fine -- that's fine, but avoiding a duty is

17  recognized as -- the DSM -- as something to look at in

18  determining whether or not somebody is faking or feigning or

19  exaggerating their symptoms; is that correct?

20  A.   I think you have a very narrow and black and white view of

21  this subject, and really don't understand it.

22  Q.   I'm sure I don't understand it the way that you do, and the

23  way that this works is, I get to ask you the questions, and you

24  get to answer the questions, and then if Miss Ramsey, on -- on

25  redirect, would like to expound, she can.   So my question to

1    you is, in addition to secondary gain, avoiding a duty is

2    something else that the DSM directs clinicians to look at in

3    making a determination as to whether or not someone is faking,

4    feigning, or exaggerating their symptoms; correct?

5    A.   Yes.

6    Q.   And an example of avoiding a duty would be to get out of

7    military service; correct, that's an example of avoiding a

8    duty?

9    A.   That would be an example.

10   Q.   And again, you said on direct examination, the people that

11   have -- that actually have FND, there are sometimes triggers;

12   correct?

13   A.   Yes.

14   Q.   And so in treating it, you would advise someone who

15   actually has FND to avoid the triggers, or to be able to deal

16   with particular triggers; correct?

17   A.   Yes.

18   Q.   And again, this is not something that the person who

19   suffers from FND gets to choose when they have the symptoms;

20   correct?

21   A.   Correct.

22   Q.   And so if someone has triggers on their way to a

23   compensation and benefits examination, but they also have the

24   same triggers on their way to a dental appointment at the exact

25   same location, they wouldn't be able to pick and choose which

1  of those triggers actually caused the symptoms; correct?

2  A.  No, not correct.

3  Q.  And again, in evaluating whether or not someone has FND, or

4  someone is exaggerating or feigning their symptoms, you said

5  one of the things that you look at is whether or not there's

6  possible secondary gain; correct?

7  A.  Yes.

8  Q.  So in other words, whether or not somebody financially

9  benefits from what they are saying is something that you should

10  look at; correct?

11  A.  It's one of the factors.

12  Q.  Doctor O'Neal, how much are you being paid per hour in this

13  case?

14  A.  It depends on what I'm doing.  I'm being paid differently

15  for testimony than for a written review.

16  Q.  How much are you being paid for testimony?  What's your

17  hourly rate?

18  A.  A thousand dollars.

19        MR. OAKLEY:  No further questions, Your Honor.

20                    RE-DIRECT EXAMINATION

21  BY MS. RAMSEY:

22  Q.  Doctor O'Neal, the government just asked you about being

23  paid for your testimony.  Have you been paid in full at this

24  point?

25  A.  No.

1    Q.   Have you been paid very little at this point of your bill?

2    A.   Yes.

3    Q.   Okay.  Do you get paid for every job that you do?

4    A.   Yes.

5    Q.   Let's talk about -- I think you were asked about whether or

6    not definitive evidence in the DSM 5 was clear evidence that

7    the function is present during the exam but not at home; is

8    that correct?

9    A.   Yes.

10   Q.   Okay.  In this particular case, I think you said you

11   watched multiple videos, some of them, Mr. Hay going to the C&P

12   exams, and some of them not; is that correct?

13   A.   Yes.

14   Q.   And in those C&P -- in those different videos, you saw

15   symptoms of functional neurological disorder; correct?

16   A.   I did.

17   Q.   And was that an issue when you viewed them of his gait and

18   him walking with a cane?

19   A.   That's correct.

20   Q.   Okay.  And in this case, I think you said that you reviewed

21   multiple medical records; correct?

22   A.   Yes.

23   Q.   And over a period from 2005 up to approximately 2018, I

24   think your previous testimony was that multiple doctors,

25   neurologists, psychiatrists, psychologists, medical providers

1   and nurses consistently diagnosed Mr. Hay with functional

2   neurological disorder; is that correct?

3   A.   Yes, and also, all the predisposing factors as well.

4   Q.   Okay.  And in those medical records that you reviewed, were

5   some of those medical records from private doctors such as

6   Doctor Hedges and Doctor Beck?

7   A.   Yes.

8   Q.   And were some of those doctors associated with the VA?

9   A.   Yes.

10  Q.   And did both the private and the doctors associated with

11  the VA diagnose Mr. Hay with functional neurological disorder?

12  A.   Yes, they did.

13  Q.   One moment, Your Honor.  Doctor O'Neal, is the fact that

14  you are being compensated or your rate for your testimony here

15  today, is your opinion as a result of you getting paid?

16  A.   Absolutely not.

17  Q.   Okay.  And in fact, you've never testified on behalf of

18  either the defense or the prosecution in a case like this?

19  A.   Never.

20  Q.   Okay.  I don't have any further questions.  Thank you.

21        MR. OAKLEY:  I have nothing further, Your Honor.

22        THE COURT:  All right.  You're excused.  Thank you.

23        MS. RAMSEY:  Can we take a break, Your Honor?

24        THE COURT:  Umm, yes, let's take a break for about

25  15 minutes, and counsel, stand by.  We'll take a break for

1    15 minutes.

2        (Whereupon court took a recess.  Proceedings then continued

3    as follows:)

4            THE COURT:  All right.  Miss Ramsey.

5            MS. RAMSEY:  Your Honor, we will rest when the jury

6    comes back, but I did not know if the court wanted to make any

7    inquiry at this point now since that was our actual last

8    witness.

9            THE COURT:  Okay.  So you'll rest in the hearing of

10   the jury, and at that point, I think we're going to send them

11   to an early lunch, unless the government has a rebuttal case

12   that we can start right away.

13           MR. HUSCHKA:  No, Your Honor.

14           THE COURT:  You don't intend to put any rebuttal

15   evidence on?

16           MR. HUSCHKA:  No.

17           THE COURT:  All right.  So defendant has announced

18   that they are ready to rest, meaning that Mr. Hay is not going

19   to testify.  Mr. Hay, are you aware that the decision whether

20   or not you testify in your own defense -- first of all, it's an

21   important decision.  You understand that?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  You can remain seated.  Can you -- can you

24   move the microphone over?  Don't -- you don't need to stand up.

25   Do you understand, Mr. Hay, that this important decision is one

1    that you make, it's not one that your lawyers make, it's not

2    one that your wife makes, it's not one that anyone makes, it's

3    your ultimate decision?  Do you understand that?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  All right.  Because of course, you're the

6    one that's accused, you're the one that potentially faces their

7    liberty being at stake, and so although your lawyers may give

8    you advice and consultation, it's important that you understand

9    that this critical decision is one that ultimately, it's your

10   call and your call alone.  Do you understand that?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  All right.  And is it your decision not to

13   testify in your own defense?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  All right.  There are alternative

16   instructions I give depending on whether a defendant testifies

17   or not, so with your decision to not testify, I will be giving

18   an instruction that tells the jury they're not to view that

19   adversely, that's what the presumption of innocence means,

20   etcetera, but I just wanted to make sure that you understood

21   the importance of a decision, and I wanted to assure myself

22   that it's a decision that you have made.

23             MR. MAGARIEL:  Judge, I think he had a question.  If

24   we could have just a moment.

25             THE COURT:  Oh, sure.

1        (Defendant conferring with attorney off the record.)

2        MR. MAGARIEL:  Judge, I think we answered his

3   question.

4        THE COURT:  Okay.  Great.  All right.  Anything more

5   from counsel, from Mr. Hay on this point?

6        THE DEFENDANT:  What was that, Your Honor?

7        THE COURT:  No, I was asking your lawyers, is there

8   anything more from them at this point?

9        MS. RAMSEY:  No, Your Honor.

10       THE COURT:  Okay.  All right.  So we will bring the

11   jury back, and send them to lunch.  After you rest, I will

12   explain to them that -- oh, well, here's the other thing.  Go

13   ahead and make your oral motion for judgment, which I'll take

14   under advisement.

15       MS. RAMSEY:  Okay, Your Honor.  At this time, we would

16   make an oral motion for judgment at the close of all the

17   evidence based on the fact the government has not met their

18   burden to prove beyond a reasonable doubt each element of the

19   charged count -- charge in the superseding indictment.

20       THE COURT:  Okay.  Umm, I'll take that under

21   advisement.  It will be wrapped into -- if there's a guilty

22   verdict, it will be wrapped into post -- post-verdict motions.

23   However, there is this discrete issue about the theft of

24   government property, and I'm not going to do that now, but I am

25   going to go ahead and rule on that orally.  My understanding is

1    that you're going to have other bases for your motion for

2    judgment other than the one that you've submitted in writing;

3    is that correct?

4          MS. RAMSEY:  We may, yes.

5          THE COURT:  Okay.  I am prepared to rule on that

6    particular issue so I am going to do that, but we can do that

7    after -- after the jury's sent to deliberate.  So we'll bring

8    them back, we'll send them to lunch, we'll get the instructions

9    to you.  Had we e-mailed them?  So you all have seen the final

10   set; right?

11         MS. WIEST:  I just sent the final one to Sandie and to

12   Jami, so...

13         THE COURT:  Okay.  So...

14         MS. WIEST:  It should be there.  They've been looking

15   at 'em everyday, so...

16         THE COURT:  Okay.  We need time to print them out,

17   because I think we'll want to print 14 for the jury.

18         MS. WIEST:  Sorry, I thought you were talking about

19   the exhibits.

20         THE COURT:  No, we're talking about the jury

21   instructions.

22         MS. MERKLEN:  I e-mailed them the non-final set which

23   included whether the defendant testified, and they're

24   un-numbered.

25         THE COURT:  We can print those out and get those to

1    you.  Why don't we do that now, and give them to them before we

2    go to - they go to lunch, and I have a meeting at noon, but if

3    we could reconvene maybe at 1 or even 1:15, and why don't we do

4    1:15 -- well, we'll see.  Anyway.  Will you all be ready to go

5    at 1 o'clock, 1:15?

6              MR. HUSCHKA:  Yes, Your Honor.

7              MR. MAGARIEL:  Yes, Your Honor.

8              MS. RAMSEY:  Yes, Your Honor.

9              MS. WIEST:  Want me to have them come back now?

10             THE COURT:  Yeah, tell 'em to come back, and then you

11   want an hour each.  You want to tell Bonnie what the split is

12   and what the warnings are you want.  Anything else you can

13   think of?  I think we've got everything uploaded in JERS.  Is

14   there anything we did not get uploaded, Bonnie?

15             MS. WIEST:  No, I think everything's taken care of.

16             THE COURT:  Okay.  Okay.  All right.  I think I'll

17   have 'em come back at 1.  I think we can manage that.  She's

18   gone -- I think she's gone to -- she's printing the

19   instructions for them right now; right?

20             MS. WIEST:  Right.  You want me to still bring the

21   jury in, though?

22             THE COURT:  Yes.

23             MS. WIEST:  Okay.

24             THE COURT:  I think I'll have you all come back at 1,

25   and we'll make a final record on the instructions, and I'll

1    tell the jury to come back at 1:15.

2        (Jury entered courtroom.)

3            THE COURT:  Miss Ramsey.

4            MS. RAMSEY:  Your Honor, the defense rests.

5            THE COURT:  All right.  All right.  So ladies and

6    gentlemen of the jury, the defense has now rested.  Anything

7    more from the government?

8            MR. HUSCHKA:  No, Your Honor.

9            THE COURT:  All right.  So our next step is

10   instructions and closing argument, and then your deliberations

11   will start this afternoon directly after that.  We're going to

12   have a prolonged lunch period at this point.  We've got to

13   finalize the instructions, which are quite a process, but we're

14   going to get those all printed, finalized, printed, so that

15   you'll each have a set, and then when we come back from lunch,

16   I'll read the instructions, most of the instructions to you.

17   You can read along with me, and then we'll go right into

18   closing arguments, and I think the closing arguments may go as

19   long as -- no longer, but as long as an hour per side, and then

20   the case will be submitted to you for deliberations.  So the

21   lawyers and I have some legal matters to take up as well over

22   the lunch hour, so we're going to need to, between that and

23   instructions, go a little longer than we normally do.  So I'm

24   going to have the lawyers come back at 1, and I'll have you all

25   come back at 1:15, and then we'll go right into instructions

1    and closing at 1:15.  So maybe you can get out and have a nice

2    restaurant lunch for a change around here.  We'll see -- even

3    though you've heard all of the evidence, it's not time to start

4    deliberating, making decisions, discussing.  So don't do that.

5    We'll plan on seeing you all back at 1:15.  I'll see you all

6    back at 1.  All right.  We'll be in recess.

7         (Whereupon court took a recess.  Proceedings then continued

8    as follows:)

9         THE COURT:  Okay.  We're all assembled here including

10   Mr. Hay.  You all have reviewed the instructions, court's final

11   set of instructions.  Anything further from the government?

12        MR. HUSCHKA:  No, Your Honor.

13        THE COURT:  From the defendant?

14        MS. RAMSEY:  No, Your Honor.

15        THE COURT:  Okay.  All right.  So we told them 1:15.

16   I guess we didn't really need to wait 'til 1:15.  Have you been

17   able to test out your tech stuff?

18        MR. HUSCHKA:  Your Honor, we may try to replicate the

19   screen, but other than that, I think we should be good to go.

20        THE COURT:  Okay.

21        MS. RAMSEY:  Your Honor, I think the court mentioned

22   that you wanted to take up defendant's motion for judgment of

23   acquittal.

24        THE COURT:  Well, I don't have that in front of me.  I

25   was going to do that later.  We can do it while they're

1   deliberating.  I just don't have it ready.  I think I left it

2   upstairs.

3          MS. RAMSEY:  That's fine.  I just wanted to remind

4   you.  You said you just wanted to bring it up.

5          THE COURT:  Actually, I do have it.  You can call and

6   see if they're ready.  If they're not, let me look and see if

7   I'm ready to do this.  Just FYI, I'm going to read Instructions

8   1 through 33, and so Instruction -- before closing, and so

9   Instructions 34 through 40 will be given on the back end.

10         (Jury entered courtroom.)

11         THE COURT:  All right.  So we have placed on your

12   chairs your individual copies of the instructions.  I'm going

13   to read them to you.  If you'd like to read along, you can.  I

14   ask that you stick with me, though, and not read ahead.  So

15   we'll begin with -- we'll read Instructions 1 through 30 -- 33

16   before closing arguments, and then the final remaining

17   instructions, I'll read to you after the closing arguments.

18         (Court read instructions to the jury.)

19         THE COURT:  All right.  So if you'll put your

20   instructions away for now, we'll return to the remaining ones

21   when the closing arguments are complete.  I think we'll proceed

22   with the government's first part of its closing argument,

23   probably take a break at that point, and then the defendant's

24   closing argument, and then the government's final rebuttal

25   argument.  All right.  You can proceed.  And have you given

1   Miss Wiest your split of time?

2          MR. HUSCHKA:  Yes.  Can you warn me in like

3   40 minutes?

4          MS. WIEST:  Okay.

5          MR. HUSCHKA:  Thank you.  Ladies and gentlemen, at the

6   beginning of this trial, Mr. Oakley told you that this case

7   involved two people.  You've now heard the evidence, and you

8   know the real Bruce Hay, but you also know benefits Bruce Hay,

9   the version of himself that he concocted to steal hundreds of

10  thousands of dollars from government agencies for disabling

11  conditions that he did not have.  Now, benefits Bruce Hay is

12  angry.  He hates people.  He will tell you unprompted that he

13  hates virtually everybody but babies and old people.  Now, the

14  real Bruce Hay, on the other hand, laughs, jokes, tells stories

15  to people he's never met before.  He mingles with strangers in

16  elevators, in lobby waiting rooms.  He goes to farming

17  workshops and farm tours.  He serves on the church board, and

18  he does Scottish festivals.  Now, benefits Bruce Hay has a

19  debilitating disability.  It causes constant jerking, shaking,

20  head bob movements.  He can't walk without the use of a walker.

21  He has balance issues.  He cannot engage in even the most basic

22  activities of daily living, and he requires the constant care

23  and attention and presence of his wife.  Now, the real Bruce

24  Hay, on the other hand, moves, walks, runs, bounds upstairs

25  without issue.  He drives regularly by himself.  He sometimes

1    carries a cane, and when I say carry, I mean that quite
2    literally, he carries it, he doesn't need it, it's a prop.
3    When he's out working on the farm, he'll often go grab it if he
4    sees somebody coming down the road.  The real Bruce Hay engages
5    in some of the most strenuous activities on a daily basis,
6    residential construction with power tools, scaffolding, ladders
7    and work up on rooftops.  He works on the farm, building miles
8    of fence, throwing hay bales up over his head on the back of
9    moving trucks.  He hunts deer from deer stands, and he shoots
10   target practice with friends.  He works on his truck, jumps in
11   and out of it even.  He moves crates, doors, and massive boxes
12   that shake the bed of the truck as he moves them back and
13   forth, and he jumps in and out of windows as he works on the
14   top of his roof.  The real Bruce Hay hauls several hundred
15   thousand pounds of scrap metal every single year.  By now, you
16   know that benefits Bruce Hay is a fiction created by defendant
17   to extract as much money as he possibly could from the VA and
18   the Social Security Administration.  Now, benefits Bruce Hay
19   shows up in the benefits examination parking lot.  He goes in,
20   and he lies to examiners, and then he disappears instantly upon
21   leaving the benefits examination parking lot.  Now, you know
22   this, because the overwhelming evidence in this case, the
23   testimony that you've heard, the videos that you've seen, and
24   the documents that have been admitted lift the veil on
25   defendant's years long disability fraud scheme.  And when you

1    consider those facts, you will reach the only verdict supported

2    by the evidence in this case, and that's that defendant is

3    guilty of all of the counts charged in the indictment.

4           Now, this week, we have thrown a lot at you, eight

5    days.  We packed in dozens of witnesses, you've watched a lot

6    of videos, a lot of documents have been admitted into evidence,

7    so -- and Bonnie, could you switch over to this, too -- so I

8    wanted to take you back through some of that.  We jumped around

9    at different moments in time, so I want to kind of start and

10   walk you through some of the evidence that you've heard this

11   week.  So you know that this story starts defendant's car

12   accident in 2005, and he goes and sees a series of doctors

13   starting in May.  He tells Doctor Beck he walks with a walker

14   and has constant head shaking.  The next day, his attorney

15   refers him to Doctor Hedges.  Doctor Hedges, he tells her he

16   has a consistently unusual jerking tremor, he uses a walker,

17   he's very off balance.  And you know, he sees Doctor Hedges

18   again in late August of 2005, and at that appointment, he has a

19   slow deliberate walk with a walker, tells her he has a

20   continuous head tremor.  And you recall he saw Doctor Lewis out

21   at Fort Riley, and told him that he was unable to perform much

22   more than basic activities of daily living.  He couldn't drive,

23   and he couldn't work.  What was the defendant actually doing in

24   August and November of 2005?  He was working on Paul Kalmar's

25   house, and you remember Paul Kalmar talked about starting

1    construction on his house in August of late 2005.  You can

2    still see the leaves on the tree.  And he told you that these

3    pictures that he went through are kind of a series of pictures

4    that progressed as the house was being built.  So this is at

5    the beginning.  You see the foundation being laid.  And

6    defendant is up during that time-frame -- and you can see in

7    this picture, the leaves are off the tree, so this is getting

8    later into 2005 -- on top of the roof.  Paul told you the only

9    way to get up there was to climb up that ladder.  The only way

10   to get up here was to climb up the scaffolding, and then get up

11   the ladder.  Circular saw, more power tools, getting near the

12   end of the construction, the interior here with the door.  What

13   else is he doing December 18th, 2005?  You heard from Suzy

14   Tousey and Paul Kalmar that defendant was in an accident when

15   he was driving a car full of children in icy conditions.

16   That's what he's doing at this time.  That was three weeks

17   after he told the medical board, Doctor Lewis, that he was

18   unable to drive, and it was actually two days before he went

19   into a follow-up appointment with Doctor Lewis.  You recall

20   Doctor Lewis -- defendant didn't tell him two days ago, I've

21   improved, I've been able to drive, I got in an accident.  No.

22   He asked him for a sleep number bed and a Sears credit card.

23   And you recall Doctor Lewis said he definitely would have known

24   it if the defendant had told him he had been driving two days

25   earlier.  And in February, February 28th, 2006, defendant

1    applies for VA disability benefits on the very same day that

2    he's discharged from the Army, and you've seen this, based on

3    conversion disorder and head injury with tremors.  But here's

4    what the defendant is actually doing during that time.  And you

5    can see here, the end -- this out house that Mr. Kalmar talked

6    about near the end -- very end of the construction, you see the

7    leaves on the trees, so this is well into the spring of 2006 at

8    this point.  And then he comes in for his very initial exams on

9    that claim for benefits.  The first one is September 8, 2006.

10   And he says he had had full body tremors on a daily basis that

11   began after that vehicle accident, on a daily basis.  He

12   presents himself with a spastic gait.  He ambulated with a

13   walker.  A week later, he has another one.  He tells the

14   examiner he can move only with a walker, continuously has

15   abnormal movement.  He can't concentrate and do any

16   goal-oriented activity.  He cannot drive a vehicle, and he

17   acknowledges that that's not an option for him.  That's what he

18   tells the examiner.  He cannot work, he cannot drive, he cannot

19   sit.  The only thing he can do is stay away from everybody.  He

20   can't walk, he can't participate in any activities because of

21   this problem.  At the same time, he's engaged in residential

22   construction, and you know, he ends up getting his 100 percent

23   disability rating based on the information he provided, and on

24   top of the 100 percent disability rating, you heard about aid &

25   attendance, that's the extra benefit, not just the 100 percent,

1    but he got an additional amount, because the information he

2    provided indicated that he was so disabled that he required the

3    constant aid and attention of another person, somebody to be

4    with him at all moments.  And you remember, initially, this

5    claim was subject to reevaluation, so the VA was going to check

6    in and see if it improved, and he had one of those evaluations,

7    a routine follow-up evaluation a year later, and what did he

8    say during that exam?  Said frequent problems with falls,

9    dropping objects, he couldn't grasp, considerable difficulty

10   with upper body movements, constantly, he often uses a walker.

11   That day, he came with a cane.  Can't drive, he can't untie his

12   shoes, he can't put on his socks, takes him too long to eat

13   because of the constant shaking.  And the examiner noted that

14   what that examiner was seeing that day was consistent with

15   somebody who had cerebral palsy.  Constant movements.  He had

16   another exam in August of 2007, said he uses a walker or cane

17   to move around, and he reported he struggled to stay balanced.

18   He had problems with virtually everything, standing,

19   maintaining balance, falls, coordination, walking, grabbing

20   items.  And after those exams, his benefits were continued at

21   the same rate of $4,000 per month tax free every single month.

22   And the VA rating decisions you've seen cite the various things

23   that the defendant said, and why the VA was going to continue

24   this rating at 100 percent.  Then in 2009, you know defendant

25   tells the USDA, so he tells everyone else something different

1   than what he tells the VA, so he tells the USDA, actually, he's

2   actively engaged in farming, and he submits a form that was

3   signed saying that for his father's farm, he provided

4   100 percent of the active personal labor.  This is in 2009.

5   And you recall Rhonda and Bert Snyder who would see defendant

6   out there working on the farm from their residence, and they

7   didn't record every time they saw him, but they recorded a few

8   of these instances of him engaged in activities like this, and

9   I think you recall that Rhonda Snyder mentioned that she tried

10  to do the math in her head, but ultimately, said hundreds --

11  she's seen defendant out there hundreds of times, and she's

12  seen his wife maybe once, maybe twice.  And these videos go on

13  for minutes.  This is another vantage point from Rhonda and

14  Bert's house where you could see the uneven ground kicking, no

15  functional impairment whatsoever, no cane, no walker when he's

16  out on the farm and he doesn't think anybody is looking.

17  You've seen the farming workshops that the defendant attended,

18  and this one was in March of 2012, and just shortly after that,

19  so to this point, defendant was still subject to routine

20  check-ins.  The VA would assess whether his disability had

21  improved, and if it had, his benefits could get reduced.  We

22  just saw all of that activity that defendant was engaged in,

23  construction, farm work.  Well, he comes in in 2012 and tells

24  the VA that he wants it to be changed, he wants it to be

25  changed to permanent and total, and he contends that his

1   conditions will never improve from what he was lying about in

2   2006 and 2007 to where he could do almost nothing, he's now

3   coming in 2012 and saying it has not improved at all, I want a

4   permanent rating, and he certifies that that statement is true

5   and that it's correct.  Month later, he's at a farming tour

6   again in Emporia.  And then the farming tour in July 2012 in

7   Lawrence, he's actually interviewed here, and tells the

8   reporter that he owns 80 acres, and he helps his dad on the

9   farm, and they're looking to consolidate some of their

10  operations, they're going to do some different things on the

11  farm.  You'll recall Agent Baker when he testified, he talked

12  about how common it is for the VA OIG to coordinate their

13  investigation with the social security agents as well, because

14  it's common for somebody who obtains VA disability benefits by

15  fraud to do the same thing with social security, and oftentimes

16  they will, in fact, use the rating that they got from one in

17  support of a claim for the other.  Well, in September of 2012,

18  defendant is submitting forms to social security.  And what is

19  he telling them?  That he has a cane that is used to stabilize

20  himself to minimize falling, that he tires easily, and has

21  frequent debilitating tremors.  October 2012, muscle spasms,

22  cramps, full body shakes make it difficult to accomplish most

23  tasks.  Balance issues when standing or walking, and fall over

24  frequently.  He can't maneuver safely in the kitchen.  The

25  spasms and cramping, and it lists virtually every function -

1    lifting, squatting, bending, standing, reaching, kneeling,

2    stair climbing, using hands.  And he says he has not worked

3    since his accident in February 2005.  Says he keeps a walker

4    close by.  And then his wife submits a form as well at the same

5    time that he's -- Bruce is unable to work, he has all over

6    shakes, she has to help him with every activity of daily

7    living, and she can't work outside the home because Bruce needs

8    someone readily available at all times to assist him.  Again,

9    checks the box for virtually every physical ability, and says

10   that he can't do it.  Well, two weeks later, the VA OIG starts

11   their surveillance, and you see defendant go walk out of the

12   house with no limited functional abilities here, works on his

13   truck, walked through town by the title company, and carrying

14   his cane but not putting weight on it.  And then you see his

15   demeanor changes when he gets to the CBOC parking lot, and this

16   is the doctor's office of Doctor McWoods who wrote the letter

17   in support of that permanent and total disability rating, and

18   he told you he would not have written that letter for defendant

19   had he known his true functional abilities, and this is -- this

20   is different than what you see at benefits exams, no doubt.

21   This is not a benefits exam.  He doesn't have to ham it up like

22   he does when he's going for a benefits appointment.  But you do

23   see that out here, outside the Miami County administration

24   building.  We don't know why he's in there.  It's a county

25   building.  It may have been for some type of benefits, it may

1    have been to get a handicapped sticker, but we know that

2    benefits Bruce was there.  This is what you see outside of

3    social security, and this is what you see at VA exams, and it's

4    what the defendant described back in '06 and '07.  What you

5    also notice him later that day in the back of a moving truck

6    with hay.

7              Now, we just walked through all of those social

8    security documents.  You know they did surveillance about a

9    month later in November of 2012, and defendant is inside Quik

10   Trip by himself.  He has his cane, but he's moving in a way

11   that is markedly different than what we see when he arrives at

12   the social security building for his benefits examination.  You

13   notice his wife was not with him inside Quik Trip.  That Quik

14   Trip was in Olathe.  That was after the drive from Osawatomie

15   to Olathe.  He was fine there.  He needs his wife's assistance,

16   and he has these symptoms once he arrives in the benefits

17   parking lot.  Same thing when he comes out.  But five minutes

18   later, down the road at Alpha Pawn Shop, he's a completely

19   different person.  And Doctor Becker told you, this is not how

20   conversion disorder works.  It is -- it's subconscious, it's

21   unpredictable, it's unplanned.  It doesn't just turn off when

22   you want it to, in whatever context you want it to, like it

23   does for the defendant.  He's carrying the cane, takes his

24   jacket off, doesn't need any assistance from his wife, and this

25   is five minutes after he left that parking lot.  Gets home,

1    doesn't need his wife's assistance.  In fact, he beats her to

2    the front door.  And then he leaves and drives by himself.

3    Now, you remember Agent White, and the last witness you heard

4    from, Special Agent Carmack, they went out -- I think Special

5    Agent Carmack called it a ruse, so they went out to just talk

6    to the defendant for an extended period of time, and there were

7    the two long videos, Government's Exhibits 23 and 24 where they

8    just walked around the farm with the defendant for about an

9    hour, and he talked about how he hunts deer, and he described

10   that Hang 9 tree stand that Special Agent White was familiar

11   with from deer hunting, where you manually install that in the

12   tree and climb up, and he talked about how he'd actually pushed

13   his retired pastor friend up into a stand like that.  He talked

14   about how much physical labor is involved in farming, and how

15   earlier that day, he'd actually had a fence issue that he was

16   dealing with.  There were no head tremors, no head bobbing, no

17   assistance from his wife.  He used his cane throughout that

18   interaction, if you recall, to point out things to the agents

19   and to gesture.  Now, in January of 2013, after Social Security

20   Administration had terminated his benefits, in an effort to get

21   them reinstated, he filed a form and said 2005, February of

22   2005, I have needed assistance with many activities of daily

23   living.  He's trying to get those benefits restarted, and he

24   actually sends the VA's initial rating decision to social

25   security in an attempt to try to get his benefits reactivated.

1   This is a fax that he sent to the Social Security

2   Administration.  And then in March, later in March, he has his

3   two C&P's as a result of his application for permanent and

4   total disability.  And during those, he tells them -- he talks

5   about his limbs locking up and freezing, and he tells them that

6   much of the time, he's unable to independently engage in most

7   activities of daily living, and he lists them - bathing

8   toileting, shaving, putting on clothing.  At the exam, he came

9   with a very rigid stance, what you've seen in some of these

10  other videos.  He's accompanied by his wife.  And ultimately,

11  he gets that permanent and total designation which then

12  entitles him to $4,000 per month that he's getting, but he gets

13  that for the rest of his natural life, and there will be no

14  more routine examinations to check in on whether he's

15  progressing or whether he's improved.  It also entitles him to

16  additional benefits in the form of dependents' educational

17  assistance, so money for college and things like that.  July of

18  2013, he's still trying to get the social security benefits

19  going again.  Sends a form; disability has been full and

20  permanent since 2005.  VA confirms, no improvement or expected

21  improvement.  ADL assistance is required, completely unable to

22  work.  100 percent disability, and he cites the VA's rating

23  decision in support.  So again, the defendant tells the VA one

24  thing when it suits him, and he says something completely

25  different when it doesn't.  In May of 2015, he enters an

1    employment agreement, and this is a signed agreement where he

2    says he is the farm manager of his mother's farm, and he's to

3    be compensated $62,400 annually for all of the work that he

4    does on that farm, and that was from the period 1985 to the

5    date this employment agreement was executed in 2015, signed by

6    the defendant.  And then you've seen the pole camera footage in

7    this case.  You've seen the types of things he was able to do

8    out in front of his house, again, when he doesn't realize

9    anybody's looking, for 11 weeks straight, you see no functional

10   impairment whatsoever.  And Doctor Becker noted, this is not --

11   not only did she not see any symptoms of conversion disorder,

12   she didn't see any symptoms of any functional impairment

13   whatsoever.  And you've seen some of the videos here.  You also

14   have Special Agent Baker's summary where he actually listed all

15   of the activity, and he told you if he had seen impairment, he

16   would have noted it.  If he would have seen a walker, he would

17   have noted it.  And you know that the only time you see a

18   walker is on May 3rd, the morning when he's going to his C&P

19   examination at the VA, defendant carries it out to his vehicle,

20   puts it in by himself, and what you see here is what controls

21   and what matters, but you'll see his wife come out, and see if

22   you see the cane?  Her husband carries the walker to the car,

23   she carries the cane to the car and puts it in.  And when they

24   get to the VA, that is when benefits Bruce shows up.  He's now

25   pushing the walker that he put into his vehicle.  So his first

1    exam that day was with Carolyn Karr, the mental health
2    examination.  Sorry, we may have to -- I may have to narrate
3    through some of the audio here, but you recall Carolyn Karr,
4    when he walks in, he actually lifts the walker up as he walks
5    in to the exam, and there's a point where Miss Karr is asking
6    him various questions, and he starts to go on a long rant about
7    coffee and water, and I want you to, when we get there, look at
8    the difference between the defendant's demeanor at that point
9    and then after his wife asks about a rating decision.  Bonnie,
10   I don't know if there's a way, if there's volume here.
11        MS. WIEST:  I think it might be on your end.
12        MR. HUSCHKA:  Yeah, that's -- we can muddle through.
13   So at this point, you can see defendant's demeanor about
14   50 minutes into the exam, and he's talking about how he doesn't
15   like water, he likes coffee and tea, and there's a marked
16   difference between how he is now, and then a few minutes later,
17   his wife asks about rating decision, how often do they change
18   people's rating decision, and it's after that that you see this
19   change in the defendant's demeanor.  He gets up.  His wife
20   helps him up.  He sort of leans back.  She helps him, and then
21   he leaves the room, and he's borderline non-responsive at this
22   point.  You remember then he walks into Miss Cherian's room,
23   and throughout these exams, they ask him a series of questions,
24   and they -- you know, he says things like, I haven't worked
25   since the accident in 2005.  Well, what do you do when you go

1   to the farm?  I watch the cows.  How long can you walk?  Can

2   you walk a half mile?  Well, maybe if you give me as many

3   breaks as I can have, then I might be able to make it a half

4   mile, but you're going to have to hold me up when we get there.

5   She asks him if he can stand.  He says, well, I could maybe

6   stand, but I don't want to get too carried away with that.  So

7   things like that throughout these examinations.  And where do

8   they go right after this?  To the Social Security

9   Administration where they pull the walker out again, but

10  defendant pulls it out by himself, he starts to go inside, but

11  I want you to watch close, watch and see if you see a change in

12  his demeanor.  He walks up slowly, but when he hits the door,

13  when he reaches the threshold of the Social Security

14  Administration building, you can see a considerable change.  He

15  comes out afterwards, and you'll notice he -- he starts to pick

16  it up, and he stops, waits 'til he can move it back behind the

17  truck door, and at that point, he collapses it and puts it into

18  the truck.  And then the walker that he supposedly needed to

19  get around, he doesn't use as he bends down and picks up change

20  that the agents had put on the ground.  And you know the next

21  place they went was Sam's Club, you heard about that, off the

22  highway, in Lenexa.  And again, this is -- Doctor Becker told

23  you, this isn't how it works.  It's not how conversion disorder

24  is.  It doesn't just snap on and snap off.  And he walks into

25  Sam's Club with no assistance.  His wife's trailing him, and

1  he's dragging his cane behind him.  And you see afterwards, he

2  loads the truck.  You see his cane's actually in the cart, and

3  he leaps to grab it as it heads towards his truck.  When he

4  gets home after Sam's Club, after the long drive, same drive he

5  took on the way there, he walks in without issue, and actually,

6  his wife takes the walker in a little bit later in this video.

7  Later that day, he comes out, no walker, no cane, works on his

8  truck, and then leaves for three hours by himself.  Again, the

9  marked discrepancy between what he's showing in the benefits

10 exam context and what he's showing literally everywhere else.

11 And Special Agent Carmack continued to do surveillance, and

12 this was about a month later.  You can see the functional

13 abilities here again when he doesn't think anybody's looking,

14 carrying his cane.  And you compare that to what he's telling

15 the VA.  This was the mechanics lien.  This was something that

16 was filed later in 2021, but it attached that employment

17 agreement we looked at earlier.  He actually filed the

18 mechanics lien in Miami County District Court to collect on the

19 money he was owed for all the work he had done as a farm

20 manager.  And he described the work here, the type of work

21 you've seen him do, that you've heard witnesses testify that he

22 did, that he himself says he did, and this was a sworn

23 notarized statement saying that he provided this work from 1985

24 until 2020.  And this is in September of 2021, up on the

25 rooftop.  So you remember Wes Ungerheuer came in and talked

1    about all of the scrap that defendant has hauled to his

2    business, and Government's Exhibit 331 goes on for pages and

3    pages and pages, and this is just a listing of all the

4    different times that he went, and it goes from January 2017 all

5    the way until July of 2022, and during that time period, it was

6    over a million pounds of scrap that was hauled.  And you recall

7    Mr. Ungerheuer told you, he would sometimes see defendant with

8    a cane, he usually would not, more often, he would see him

9    without a cane, and we see that here just less than a month ago

10   at Wes's recycling when defendant walks in without a cane,

11   without a walker, and this is not somebody who has ever been

12   described to the VA.  This person has never showed up to a

13   compensation and pension exam.  Whoever has showed up has never

14   told the VA about this person.  Leaning on one foot, this is

15   just two weeks ago.

16        Now, you've seen some of the figures in this case, so

17   I don't want to spend too much time on this, but this reflects

18   the amount that defendant was getting month on month, and you

19   can see the difference after he stopped receiving amounts for

20   the conversion disorder diagnosis that he submitted to the VA.

21   And Miss Rogers told you that she was asked to calculate that

22   from 2011.  So defendant was getting benefits well before that,

23   but we know just from 2011 until 2018, just for the conversion

24   disorder, that was $273,000 that defendant was paid by the VA.

25        Now, I want to talk to you a little bit about the

1   charges here, and walk you through some of the elements that

2   Judge Robinson just instructed you on.  So the charges are wire

3   fraud with aiding and abetting, there are six counts, and theft

4   of government funds with aiding and abetting.  So aiding and

5   abetting for both of these counts, Judge Robinson instructed

6   you, defendant doesn't need to perform every act of these

7   crimes.  If he's acting with someone else, that's enough.  Now,

8   for the wire fraud counts, there are four elements, so devise

9   and intended to devise the scheme.  Well, you know about the

10  scheme to defraud the VA.  Acted with specific intent.  You

11  know that defendant -- what was in his head.  He turned this on

12  and off right before and after exams when he's called back to

13  the VA.  He loads the walker in the car.  Tells you exactly

14  what he was thinking, and what he was doing, and why he was

15  doing it.  The third element, wire communications, there's not

16  much work for you to do here, 'cause the parties have

17  stipulated and agree that those ACH payment transactions flowed

18  in interstate commerce.  And finally, that the defendant

19  employed false and fraudulent pretenses.  Those false -- you've

20  heard of the litany of lies.  We just walked through dozens and

21  dozens and dozens of them, but that also includes half truths,

22  the types of things that he was telling the VA when he knew

23  they wanted additional information, and also omissions, the

24  things he was not telling the VA he could do that he knew were

25  material to the VA; that there were days where he's completely

1    fine, that he can throw hay bales up over his head, that he can

2    maintain a job in residential construction.  The reality is, he

3    flat out lied, but those things he didn't say that were

4    material that the VA wanted to know about, those are also false

5    representations.  The materiality means the natural tendency to

6    influence or is capable of influencing, and in this case, it's

7    the VA, and you heard from Aimee Rogers that -- the rating

8    specialist -- they rely on the veterans, given the nature of

9    these exams in particular, to be honest.  They rely on the

10   self-reporting, and they rely on physical observations.  They

11   rely on how the veteran presents themself at those

12   examinations.  So you know that defendant's representations and

13   how he presented himself was material to the VA.  So Counts 1

14   through 6, Government's Exhibit 216 sort of tracks this, and

15   we've set out the different counts and the amounts here that

16   relate to Counts 1 through 6 in Government's Exhibit 216, are

17   those separate payments that took place on each of those days,

18   and that is for the full amount, because that is the execution

19   of the scheme was the wire of that full amount.  Now, theft of

20   government funds; the disability benefits belonged to the VA,

21   you know that.  The defendant stole them for his own gain, and

22   the value was over a thousand dollars.  If you think about all

23   of the deceptions that I just talked about, you'll find that

24   defendant stole the disability payments from the VA.  They

25   didn't belong to him, and we know they were over a thousand

1    dollars.  And those are tracked also in Government's

2    Exhibit 216.  Counts 7 through 16 track the amounts here, and

3    what that is, that is the difference between what the defendant

4    received and what the VA later decided he was entitled to after

5    they terminated that conversion disorder.  So those are the

6    amounts with respect to theft of government funds charges.

7          Ladies and gentlemen, you all at the end of the day

8    are the judges of the facts here as Judge Robinson has told

9    you, and we're confident that when you review the evidence, you

10   apply it to the law that Judge Robinson has instructed you on,

11   that you'll return the only verdict that is supported by the

12   evidence here, and that's that defendant is guilty of all of

13   the counts charged in the indictment.  Thank you.

14         THE COURT:  All right.  Why don't we take a fairly

15   brief, maybe 15 minute recess, and then we'll continue on with

16   the defense's closing arguments.

17         (Whereupon the jury left the courtroom, and proceedings

18   continued as follows:)

19         MS. RAMSEY:  Your Honor, is it possible to take up

20   something briefly before we -- on the break?  So during the

21   government's closing arguments, they talked about Exhibits, I

22   think, 302 and 309.  I think if the court remembers correctly,

23   part of the limine -- motion in limine requests of the defense

24   was regarding keeping out things about the termination of VA

25   benefits and social security benefits.  Now, while the evidence

1    came in during trial, there was no real evidence of termination

2    by the Social Security Administration of benefits.  There were

3    documents that may have in some way implied, but there weren't

4    necessarily any evidence that the Social Security

5    Administration had, thereby, terminated his benefits.  I think

6    that issue has now become ripe again, and we'd ask the court to

7    change the instruction regarding Instruction Number 18 which

8    only applies to the VA's termination of benefits.  Our original

9    motion in limine asks the court to consider keeping that

10   information out as to the social security and the VA, and then

11   the way evidence came out, it didn't -- it wasn't an issue, but

12   the -- in -- twice I think in closing argument, the government

13   has stated that the Social Security Administration also

14   terminated his benefits.  And so we'd ask for a revision of

15   that to -- Instruction Number 18 to include that they are not

16   to interpret the Social Security Administration benefits as

17   well.

18           THE COURT:  I'm not sure I recall hearing that.  Did

19   you argue that social security had also terminated his

20   benefits, or is it in evidence through the documents?

21           MR. HUSCHKA:  It's in evidence through the documents,

22   Your Honor.  I mean, we didn't argue it other than the context

23   of the documents where he's requesting reconsideration or for

24   an ALJ, and that I think the context of that is that they were

25   terminated, and he is trying to reactivate them or restart the

1    benefits.

2         THE COURT:  All right.  So you're proposing you want

3    me to instruct them about this now before your closing

4    argument, Miss Ramsey?

5         MS. RAMSEY:  One moment, Your Honor, I'm sorry.

6         (Whereupon defense counsel conferred off the record.)

7         MS. RAMSEY:  Your Honor, I think for the record,

8    actually, we would ask for a mistrial at this point.  I think

9    court ruled in limine that that -- the information was not to

10   necessarily come out.  We have gotten to the point where,

11   although the records, and I think the Government's Exhibits

12   possibly 302 and 309 raise the issue, that there may have been

13   some disability proceedings going on with Social Security

14   Administration.  There was, in fact, no evidence during trial

15   that the Social Security Administration had terminated his

16   benefits.  That didn't come up until Mr. Huschka mentioned it I

17   think twice during closing argument, so we would ask for a

18   mistrial based on the violation of the limine.

19        MR. HUSCHKA:  Your Honor, I think this discussion at

20   the limine conference and the limiting instruction itself that

21   the court initially asked the parties to draft contemplated

22   this specific issue, and these specific documents were -- were

23   discussed, and ultimately, came into evidence without

24   objection, and the defense -- I believe the instruction that

25   the court ultimately went with here was proposed by the

1    defense, and at one point had social security in it, but then

2    was provided to us, and they chose to take it out, but I don't

3    think there's a violation of the court's limine ruling.  We

4    specifically talked that the reason for the limiting

5    instruction was because these types of documents may well be

6    admitted, and the context of them necessarily implicates the

7    fact that the benefits were terminated.  If it were not, there

8    would have been no reason for the limiting instruction at all.

9         MS. RAMSEY:  And Your Honor, that's not necessarily

10   true, because during the limine conference, we had not heard

11   any evidence, and during the trial, there was no evidence by

12   any particular witness -- now, we will address the documents in

13   a minute -- that Mr. Hay had applied for, and then the VA --

14   I'm sorry, Social Security Administration had terminated his

15   benefits.  When I reviewed the government evidence and

16   documents, there was no indication that any -- that social

17   security had terminated his benefits necessarily.  There was a

18   motion for -- I think the documents or a review for

19   reconsideration by a judge, but that doesn't mean it's been

20   terminated.  That could have been on the basis of an initial

21   application, but what we have now is that the government has

22   disclosed to the jury that another administrative decision and

23   agency has terminated Mr. Hay's benefits, along with an

24   investigation by the OIG.  So that's why it wasn't necessarily

25   objected to at that time.

1       THE COURT:  All right.  Let me be clear in the

2  government's closing argument.  Did you say that social

3  security had terminated benefits?  If you did, I don't recall

4  hearing that, but did you say that?

5       MR. HUSCHKA:  I believe I did, in explaining the

6  context for the documents that they were seeing on the screen.

7       THE COURT:  All right.  My limine ruling was -- and it

8  was, you all brought up VA and social security, and said no --

9  I said that the ruling was not that there was a termination.

10  It was that the basis for the termination could not be

11  disclosed.  So I allowed evidence.  I mean, what I ruled was, I

12  would allow the evidence that these have been terminated, but

13  you know, with the limiting instruction, but not the basis for

14  that.  So if there are any documents in evidence that discuss

15  either the VA's reasons or the social security's reasons for

16  termination, we need to pull those out, and they shouldn't go

17  back to the jury.  I do not think that this is a violation of

18  the limine ruling in the sense of the government hasn't argued

19  this is why the social security terminated his benefits, but I

20  do think it's appropriate to expand the instructions, because

21  the instruction should include social security, if in fact,

22  there's something in evidence that is a termination document.

23  I don't think it's grounds for a mistrial.  Again, it doesn't

24  violate the -- the -- the purpose and the reason for the limine

25  instruction, and the only problem I think is the Instruction

1    Number 18 is not inclusive enough, because it should include

2    social security as well.  So what I think I'll do is when the

3    jury comes back, before your argument, I'm going to re-read

4    Instruction Number 18, only say VA and social security, and

5    then we're going to have to -- in the electronic version of the

6    instructions that goes back with the jury, we're going to need

7    to modify 18.  We'll collect their paper copies and have to

8    swap out that page before they have those back at the end.  So

9    I'll deny the motion for mistrial, cure the problem with the

10   Social Security Administration, in terms of modifying

11   Instruction Number 18, and giving it to the jury again as soon

12   as they come back here, and then I'm still concerned about, are

13   there any documents, social security documents or otherwise,

14   that discuss the reasons for the termination?

15           MR. HUSCHKA:  If we could have just a moment, maybe

16   during the break to take a look at the documents, Your Honor.

17           THE COURT:  Okay.  Because if so, those need to be

18   redacted, or at least not go back to the jury until I've had a

19   chance to review them, or somebody's had a -- all of us have

20   had a chance to review them.  Okay.  All right.  We'll be in

21   recess for another 10 minutes or so.

22       (Whereupon court took a recess.  Proceedings then continued

23   as follows:)

24           THE COURT:  Let me make a record on this.  My -- we've

25   gone back.  As you know, we handled the first part of the

1   instructions on an informal basis, you with my law clerk

2   Miss Merklen.  So the defendant originally proposed -- proposed

3   this particular instruction about the termination, and included

4   both the VA and Social Security Administration.  That was in

5   the defendant's original proposed instructions.  The government

6   didn't have that.  Then we got a follow-up e-mail from the

7   defendant saying disregard, here is our modified, and the

8   modified one that the defendant submitted was just VA, not

9   social security.  So I just want you to understand, this wasn't

10  the -- this wasn't the court driving this bus on this

11  particular one.  My understanding was everyone agreed that it

12  was just going to be VA.  Nonetheless, I've changed Instruction

13  Number 18 to say VA and social security, and I'm going -- we're

14  going to replace that in the jury's instructions, and I'm just

15  going to alert them that it's been modified to include that

16  they're not to rely or to consider any reasons concerning the

17  social security's decision to terminate either.  So that's how

18  we'll handle that.  Did you have something, Mr. Magariel?

19          MR. MAGARIEL:  I don't, except I would like to make

20  sure that this displays the way I intend, if Bonnie would be

21  kind enough to flip to the desk, please.

22          MS. WIEST:  Sure.  I was just working on that.  I'm

23  sorry, think I did it wrong.  There we go.

24          MR. MAGARIEL:  Not the ELMO, sorry.

25          MS. WIEST:  Not that one?

1          MR. MAGARIEL:  Whatever the HDMI here is.

2          THE COURT:  And we're going to take a break as soon as

3     you finish, because we have a juror that needs to take a break

4     in an hour, so we're going to take another break.  Then we'll

5     come back with your final words, and the final instructions,

6     just so you know.  I don't -- okay.  We good?

7          MR. MAGARIEL:  Yes.  Thank you, Judge.

8          THE COURT:  All right.  Let's bring the jury in.  I am

9     going to alert them that we have taken their instructions back

10     away to modify Instruction Number 18, and then I'll call on

11     you, Mr. Magariel.

12          (Jury entered courtroom.)

13          THE COURT:  All right.  Be seated.  You'll notice that

14     we've taken your jury instructions back, but we will return

15     them.  We needed to make a modification to Instruction Number

16     18, so we're doing that, and we'll make sure you have them back

17     when I read the final instructions right before you deliberate.

18     Instruction Number 18 is being modified to include both the

19     social security and the Department of Veterans Affairs, and how

20     you are to consider or not consider their decisions to

21     terminate Mr. Hay's benefits.  So in other words, neither the

22     fact that either one of these agencies previously terminated

23     Mr. Hay's benefits nor its reasons for doing so have any

24     bearing on the issue of his guilt, and you're not to consider

25     the fact that they previously decided to terminate his

1    benefits, either the VA or social security, or otherwise rely

2    on their decisions as evidence of his guilt.  That's the way it

3    will -- will read.  All right.  Mr. Magariel.

4         MR. MAGARIEL:  Ladies and gentlemen, we told you in

5    opening that this case was about a misunderstood disorder, and

6    now, you've seen the extent in which both government agents who

7    investigated this case and the prosecutors who are prosecuting

8    this case fail to understand FND, functional neurological

9    disorder, that was previously known as conversion disorder.

10   How do we know that all of these government agents failed to

11   understand how this disability works?  The entire theory

12   presented to you in opening and now in closing that there's two

13   different Bruce Hay's assumes that someone with this disorder

14   doesn't present differently at different times based on

15   stressors, triggers, etcetera.  Just ignores that.

16   Government's own expert, Doctor Becker, said it's inconsistent.

17   It presents one way one day, and if you're subject to

18   stressors, potentially, another way another day.  But the

19   government keeps pounding this complete misunderstanding as

20   their theory.  Because he could, for example, as you've seen

21   even in closing, move a desk from one truck to the other, he

22   doesn't have this disorder.  That's not how it works.

23   Government's own expert explained that to you, and you heard

24   that through Doctor O'Neal.  It's characterized by an

25   inconsistent representation in symptoms.  Both experts told you

1    that.  That's the hallmark of the disease.  So all of these

2    videos that show Mr. Hay -- for example, one you just watched,

3    Mr. Hay walking in to meet with Doctor McWoods, he has a cane,

4    he's sort of walking back and forth, is different than how he

5    looks going to other appointments.  His gait at the Quik Trip

6    which you watched during this trial, which I think Agent

7    Carmack describes similarly as sort of walking back and forth,

8    that's how someone with FND presents.  It's not evidence that

9    they were pretending on one day and not on another.  That's the

10   disability.  And so the flaw in this entire case, and we told

11   you this in opening, is that the government doesn't understand

12   how it works.  And so the whole case flows from that.  The

13   agents assumed from the get-go that because on one day, he

14   says -- or presents as needing a walker, needing a cane, his

15   gait is in a certain way, and then on another day out in the

16   country on the comfort of his own farm, he's able to move a box

17   from the back of a truck to another, or he's able to throw hay

18   in the back of a truck, boom, he doesn't have it.  That's not

19   the disability.  The disability isn't 100 percent of the time,

20   I can't do these things.  It's inconsistent.  The example

21   Doctor O'Neal gave you might be helpful for those unfamiliar, I

22   mean, like I assume maybe all of us were before coming into

23   this trial with this disorder.  If you see someone on one day,

24   and they say, oh, my God, my head is killing me, they're

25   wearing sunglasses inside, all the lights in their office are

1    turned off except for, you know, their computer light, and

2    they're saying, I'm suffering from headaches, it's horrible,

3    and then the next day, you saw them, and they look fine,

4    they're happy, they're smiling, all the lights are on, you

5    wouldn't say ha, ha, you don't have migraines.  It's the same

6    with FND, and all of the flaws in the government's case flow

7    from this fundamental flaw.  It's misunderstood.

8         How did Mr. Hay end up with this unfortunate

9    disability?  Let's talk about him.  Mr. Hay served in the Army

10   Reserve, was called up, went to Iraq, and you heard from a

11   fellow truck driver that he and Mr. Hay -- this was Mr. Acker

12   -- drove heavy equipment trucks, huge trucks, 13 feet by

13   13 feet, that carried large equipment from a position to

14   wherever they were needed.  And you heard from Mr. Acker that

15   these trucks had limited protection against both bullets, a

16   risk that they would have faced, and improvised explosive

17   devices, and that that was a constant risk or concern that they

18   had.  Mr. Acker said something to the extent of, I was sure I

19   was going to die over there, that I wasn't going to come back.

20   He told you that he and Mr. Hay, while they were over there

21   serving in Iraq, saw huge craters in the ground from prior

22   explosive devices that had all ready exploded, and they never

23   knew when their truck might end up the victim of one of those

24   explosions.  And unfortunately for Mr. Acker and for Mr. Hay,

25   they suffer to this day because of PTSD and the stress from

 1    that.  Mr. Acker, in fact, I think had some difficulty as he

 2    was testifying talking about his experiences in Iraq, and said

 3    it affects me to this day.  They saw death.  They feared for

 4    their own lives.  But for Mr. Hay, it was even worse.  He

 5    returned from war, and within a few months, was in a serious

 6    motor vehicle accident.  This is what the truck looked like

 7    after, I think as you heard in the testimony in this case from

 8    the medical records, the truck that Mr. Hay was riding in, the

 9    back panel was hit by a large dump truck, spun the car around,

10    and ended up running into this rock wall.  And this isn't a

11    little fender bender.  This is a serious accident.  And not

12    only was Mr. Hay in the car, but his two young daughters -- you

13    heard from one of the daughters who was very young at the time,

14    Rebekah -- were injured.  You heard that.  People had to be

15    life-flighted helicopter to Children's Mercy, and again, it's

16    obvious from the pictures, it's obvious from the testimony,

17    this was a serious accident.  So what did Mr. Hay do after he

18    was injured in the accident?  You saw again from the medical

19    records, and I think from his mother-in-law Barbara Brown, that

20    after the accident, gradually, symptoms started coming on.  She

21    told you, Mrs. Brown, his mother-in-law, that she saw him

22    suffer from body shakes, that his muscles would freeze up, and

23    Mr. Hay wanted to know why are these things happening, and so

24    he did what anybody would do.  He visited a doctor.  If not the

25    first, one of the first doctors that he saw was Doctor Harry

1   Wilkins, and you met Doctor Wilkins.  He came in and he
2   testified.  He's currently working in Chicago.  But at the time
3   back in 2005, he was a trauma surgeon at St. Luke's, and he saw
4   Mr. Hay just a few days after that accident as a follow-up, and
5   he explained to you, Doctor Wilkins explained to you what he
6   saw.  He did an interview with Mr. Hay, he did a physical
7   examination of Mr. Hay, and one of the things that he pointed
8   out was the intention tremor, that he does sort of -- some sort
9   of distracting test, I think he said it was a finger to nose
10  test, and -- but he's not really looking for whether you can
11  touch your nose, he's looking for other things, and in this
12  case, a tremor, and he saw that, and his testimony was, he
13  believed that was something that would be difficult to fake.
14  It's not obvious.  He doesn't say to you, I'm looking whether
15  you have a tremor or not.  It's this completely other test, but
16  he's looking for something different.  But that's not the only
17  person Mr. Hay saw.  Mr. Hay saw Doctor Daryl Callahan, Army
18  doctor.  He was at Irwin, the Army hospital on Fort Riley here
19  in Kansas.  Doctor Callahan and Mr. Wilkins, not neuro --
20  neuro -- neurologists, but Doctor Wilkins' a trauma surgeon and
21  Doctor Callahan's a general family practitioner, both testified
22  that they have to have some knowledge of neurology in order to
23  know this is the problem, and I need to send it on to an expert
24  in the field.  And Doctor Callahan said that Mr. Hay needed to
25  see a neurologist, same as what Doctor Wilkins had recommended,

1    and Doctor Callahan specifically, he's an Army doctor, he's on

2    an Army base, he says, you need to go to Washington, DC, you

3    need to go to Walter Reed.  And so that's what Mr. Hay does.

4    And so displayed to you as Government's Exhibit 235 is a

5    portion of Doctor Robert Beck who was at the time a neurology

6    resident, when he came here and you met him during a trial,

7    he's now a board certified neurologist.  At the time, he was

8    under the supervision of a board certified neurologist working

9    as a resident, and he found, or at least believed that

10   conversion disorder was likely.  He found it as a possible

11   diagnosis there in that first paragraph, and what he told Mr.

12   Hay was, he suggested an appointment with a particular

13   psychiatrist, and said, you should follow-up for discussion of

14   conversion disorder in Kansas.  And that's exactly what Mr. Hay

15   did.  He came back to Kansas, and at least initially, he met

16   with a board certified neurologist, and you heard from -- I

17   think all of the neurologists said this, but more than one told

18   you that neurologists are both board certified in neurology and

19   psychiatry, because there's sort of a -- an overlap between

20   those two disciplines, and so they have to be experts in both

21   to be able to practice in that field.  You met Doctor Hedges.

22   She came here.  She testified that when she met with Mr. Hay

23   just two or three months after the accident, she believed that

24   he -- as it says there in her report, which was Government's

25   Exhibit 237, shock at seeing his two-year old daughter injured

 1    during a motor vehicle accident combined with the stress and
 2    anxiety that he suffered in Iraq, she believed that he had
 3    conversion disorder.  And it's no surprise that someone who had
 4    suffered PTSD in Iraq, who was in a tragic, serious automobile
 5    accident, might end up with this type of disorder, and you
 6    heard from the government's expert as well as the defense's
 7    expert, Doctor O'Neal, and other doctors, that a potential
 8    contributor to FND is other co-morbid disorders, PTSD, anxiety,
 9    depression.  So Mr. Hay is, unfortunately for him, perfectly
10    cue'd up to have this unfortunate diagnosis.  But not only is
11    he reviewed by all of these doctors, there's an MEB process,
12    medical examination board, that you have to go through in the
13    Army if you're going to be removed from active service for a
14    medical reason.  You heard from Doctor Lewis, the psychiatrist
15    that testified in the defense's case, as well as Doctor
16    Callahan, that there's a thorough process for the MEB.  I mean,
17    the Army's not kicking somebody out because they said, I
18    stubbed my toe.  They have to go through a number of layers,
19    and then finally, the board can reach out to whatever specific
20    doctors, experts they need.  They review all the records, and
21    then they meet; they make a final determination.  Doctor Lewis
22    told you the deciders are high up ranking Army officials,
23    sometimes retired physicians.  They are the ones who review all
24    these records and make this determination.  You heard from
25    Doctor Callahan about the warm handoff, that once someone is

1    found medically incapable of continuing their service in the

2    Army, they become a veteran, and they move over to the services

3    of the VA.  So was Mr. Hay seen by VA doctors, and did they

4    make similar determinations?  This is a report that you've all

5    ready seen as far as when the MEB convened.  That was in

6    November of 2005, and again, the MEB reported a conversion

7    disorder from Government's Exhibit 201.  When Mr. Hay was

8    handed off from the care of the Army to the care of the VA, he

9    saw Milada Medvedeva.  This is not someone who testified to

10   you, but through records that the government introduced, you

11   can see that, the work that she did on the case.  She is a

12   psychologist for the VA.  She met with Mr. Hay in September of

13   2006, said he also presented with conversion disorder.  In

14   August of 2007, Doctor Sharpnack who also did not testify, but

15   through government admitted exhibits, you can see the work that

16   another VA psychologist did in this case, Government's

17   Exhibit 205.  Doctor Sharpnack, again a psychologist at the VA,

18   found conversion disorder, found even back in 2007 that

19   symptoms worsened as a result of stressors.  And at the bottom

20   of that page, no evidence that Mr. Hay's symptoms are being

21   intentionally produced to assume a sick role, as you heard

22   factitious disorder, and no evidence that his symptoms are

23   being intentionally produced for external incentives, which you

24   also heard during this trial back in 2007.  Doctor Sharpnack,

25   VA psychologist.  So as you've heard from the government and

1  heard through evidence throughout this case, the VA takes in

2  the work that was done through these examinations, and they

3  make a determination.  I want to talk a little bit about what

4  this term of Government's Exhibit 203 means, total occupational

5  and social impairment.  You've seen through a number of VA

6  documents as well as the testimony of Aimee Rogers, the VA

7  representative from Wichita.  You've heard a little bit about

8  the VA's internal processes.  To be clear, total occupational

9  and social impairment does not mean that you are functionally

10  an invalid, that you can do absolutely nothing, that you're

11  completely incapable of working, 100 percent incapable of

12  caring for yourself.  That is not what total occupational and

13  social impairment means.  The VA has its own definition.

14  You've heard some of it through Aimee Rogers, and some of it is

15  in these VA rating decisions where they talk about their own

16  definitions, but I want to be clear in case there's confusion;

17  'cause the word total is in there, it does not mean that you

18  can't do anything, and in fact, the definition that's listed

19  below on total occupational and social impairment that has been

20  highlighted there actually says, intermittent inability to

21  perform the activities of daily life.  You heard a little bit

22  of this through an occupational therapist who testified for the

23  defense, and she talked a little bit about some of the things

24  that they look for in determining intermittent ability to

25  perform activities of daily living.  She testified, for

1   example, if you don't remember to take your pills, if you can't

2   remember to pay your bills, and have memory type of problems,

3   that's a category that they look at to determine if you need

4   the help of a caregiver, and that functions in this definition

5   as well.  So in April of 2013, the VA makes its rating

6   decision, and the government showed you part of this document,

7   I believe, in its closing argument, Government's Exhibit 209,

8   but again, make the point about what decision the VA is making

9   here, this is the entire page as it relates to a finding of the

10  generalized choreiform movement disorder, and as you see there,

11  they have assigned -- the VA, we have assigned a 100 percent

12  evaluation for your generalized choreiform movement disorder

13  based on an average of at least one major seizure per month

14  over the last year, and that's it.  That is the criteria the VA

15  used to come up with a 100 percent.  We talked -- well, I

16  talked to you for a couple minutes about Miss Rogers.  There's

17  other important things that she told you about what the VA is

18  actually looking for here.  There was a discussion on

19  cross-examination about marginal employment, and she said that

20  assisting in a family business or assisting in a workshop does

21  not necessarily constitute substantially gainful employment.

22  They have some special regulations as it relates to I think

23  family farms, the VA does.  And so the fact that a veteran

24  assists in a family business or workshop does not necessarily

25  mean the defendant is not disabled, or render the veteran to

1    consider to be unemployable.  So again, just to be clear, that

2    the definition the VA is looking at isn't that you are

3    fundamentally unable to do everything, and that you're stuck at

4    home using a walker at all times.  That's not the process the

5    VA is looking at here.  And you also heard from Aimee Rogers as

6    far as Aid & Attendance.  And again, you heard this a little

7    bit through the occupational therapist from the VA that there's

8    no requirement that you need constant Aid & Attendance, but you

9    do need to -- need to require regular Aid & Attendance.  So the

10   fact that a veteran could do some functioning, but still needs

11   regular Aid & Attendance doesn't qualify them for consideration

12   for these type of benefits.  So as I understand it, the

13   government's theory is, Mr. Hay is one of the finest actors of

14   our time.  He has tricked a trauma surgeon, Doctor Wilkins, an

15   Army doctor, Doctor Callahan, a neurology resident under the

16   supervision of a board certified neurologist at Walter Reed,

17   Doctor Beck, a board certified neurologist, Doctor Hedges;

18   fooled all of them.  He went before an Army MEB, his papers,

19   documents, supporting, etcetera, and those folks who I think

20   Doctor Lewis said, this is a serious process.  They're not

21   letting people leave the military for no reason; fooled them.

22   Then he met with Doctor Medvedeva at the VA, a psychologist;

23   tricked her.  Doctor Sharpnack who specifically made a finding

24   that he did not believe he was faking for benefits; tricked

25   him.  Doctor Lewis who you saw testify here, Mr. Hay put on a

1    show, faked him out.  Then he did an EEG with Doctor Giron.  He

2    did a later EEG with Doctor Singh, both VA board certified

3    neurologists.  Mr. Hay tricked all of them, everyone.  That's

4    their theory, he never had this.  And you heard from our expert

5    Mary O'Neal who is -- was recognized in this court, is heavily

6    published, and runs her own clinic on this disorder.  She said

7    she reviewed the work that these other doctors did, and that --

8    believed that the diagnosis was consistent with the type of

9    work she does in looking for FND.  So this is the government's

10   theory.  All of these doctors, none of them raised an alarm

11   bell and said uhhh, I don't know, I think this guy might be

12   trying to pull something here.  Not a one.  And these doctors

13   saw Mr. Hay from 2005 through 2017.  This is 12 years of

14   fooling experts in the field; psychologists, neurologists, and

15   doctors.  That's impressive.  And as the government ignored in

16   its opening, apparently, Mr. Hay fooled everyone around in his

17   life.  Now, the government may argue some of these folks have

18   an incentive to support -- for example, Miss Branson is his

19   daughter.  But you also heard from Alan Acker who lives out of

20   state who is an Army veteran, who he sees Mr. Hay socially from

21   time to time.  I don't know what incentive Mr. Acker has to

22   just lie that Mr. Hay has these seizure-like episodes.  Miss

23   Brown is his mother-in-law, but I don't know what Pastor Doctor

24   Joseph Bell, the former full-time pastor at his church and

25   still working in the Nazarene church, what incentive the pastor

1   has to just falsify that he's seen Bruce Hay, not at a C&P

2   exam, at a church event or a church function, or around

3   Osawatomie have these episodes.  For what reason would they do

4   that?  There isn't any.  So I guess if the government's theory

5   is true, Mr. Hay is not only faking it at benefits exams, but

6   sort of randomly in the public, at church, to just lay the

7   stage for this grand ruse, and he's not only doing it for folks

8   who he has a good relationship with.  He's doing it with Stacy

9   Macom who is his sister, who took the stand and said, we don't

10  get along, I haven't talked to him in two years, but I think he

11  does have a disability.  She admitted that she told Agent Baker

12  the same a year before.  She said she didn't think it was as

13  much as he claimed, and she thought he could work, which is of

14  course, the misunderstanding about how this entire thing works,

15  but she admitted that she had seen -- she mentioned an episode

16  where I think her and her husband had to help Mr. Hay.  She

17  mentioned an episode with fireworks, and then she had a

18  specific memory that she told Agent Baker that her son was

19  blowing up some sort of firework, was putting it in a metal

20  pipe or some sort of metal device, and it was particularly

21  loud, and that Mr. Hay -- she knew Mr. Hay was about to have a

22  reaction.  He did.  He fell down, and reacted to that.  So all

23  of these people have seen Mr. Hay have episodes consistent with

24  what he's reporting to the VA, but I guess under the

25  government's theory, they're all lying for Mr. Hay, or he is

1   such a good actor, that he is not just acting at C&P, but sort

2   of at random locations for these people.  For what reason is

3   unknown.  I guess in case they have to testify at a trial

4   later.  The government relies heavily on video evidence in this

5   case for sure.  You had to watch hours of video probably in

6   this case.  The government even showed you some of that video

7   again in closing argument.  But it relies on the false theory

8   that this case has started from, and continues to this day,

9   that because Mr. Hay could scrap metal, because Mr. Hay could

10  care for his cattle or bale hay or build a fence, that

11  therefore, Mr. Hay could not have this disorder.  But again,

12  that's not how FND works.  You've heard this over and over

13  again.  It's inconsistent.  The fact that he does okay in the

14  country on the comfort of his family farm that he's been

15  working on his entire life, but might not do okay after he's

16  driven in the rain and heavy traffic to go to an examination

17  with a doctor who he knows from experience, dealing with folks

18  like his sister, doesn't believe him.  You heard from Doctor

19  May (ph) that it's common that practitioners don't do a good

20  job explaining the disorder, and that that causes unnecessary

21  stress and tension to the patient, and causes problems with

22  diagnosing and treating the disorder.  And as Doctor O'Neal

23  told you, certain stressors -- I mean, every expert told you

24  stressors can cause the disorder.  What stressors does he have?

25  Standing in front of his house?  Helping on the farm?  And more

1  importantly, the government's entire theory is that he only

2  presents this way -- this is their cute benefit Bruce line --

3  is when he goes for benefits exams, but we know that's not true

4  either.  You heard all of our witnesses who say we've seen him

5  like this at other places, church, and otherwise.  And you've

6  seen Government's Exhibit 5.  This is outside of the Miami

7  County administrative building.  We asked a number of the

8  agents in this case, are there any VA facilities, social

9  security facilities in that building?  And everyone either

10  said, I don't know or I don't believe there's any reason to

11  think there is in that building.  Now, the government now stood

12  up in its closing, and has given you a new idea that maybe he

13  was there renewing a handicapped tag.  You haven't heard any

14  evidence throughout the case that he has a handicapped tag.

15  They haven't shown you evidence that he has a plate.  I guess

16  they see the handicapped tag at the car next to Mr. Hay's truck

17  and came up with that theory.  But there's absolutely no

18  evidence to support it.  This is sheer speculation that is

19  inconsistent with their entire theory that he only appears this

20  way at benefits examinations.  This is not a benefit

21  examination.  There's no question that it's not a benefit

22  examination.  You've also seen pole camera footage.  You heard

23  Case Agent Baker admit that in his notes, when he reviewed the

24  footage, there were multiple times that he saw an impairment.

25  He wrote in the notes the word impairment.  You haven't seen

1    those videos through the case, but the case agent admitted he

2    reviewed the video, and he noted impairment multiple times.

3    You've heard testimony from multiple witnesses that Mr. Hay

4    commonly had this problem more at night than he did during the

5    day.  Camera obviously is less likely to pick that up, and the

6    obvious is, if Mr. Hay is having this type of reaction, he's

7    not going to be going outside and doing things unless he has

8    to.  But in the end, the government evidence is inconsistent.

9    We have this video, and we have the testimony of a number of

10   witnesses that defendant has produced, many of them with

11   absolutely nothing to gain from telling you this under oath

12   that they have seen this multiple times; his pastor, his church

13   friend, his sister who does not like him.  No reason for them

14   to come here, swear under oath to tell the truth, and then make

15   up a story about seeing these episodes with Bruce that are all

16   consistent; folks from Nebraska, the pastor, they all tell you

17   the same thing as far as how Mr. Hay presents when he's having

18   these episodes.

19        Let's talk a little bit about the law as it applies

20   here.  This is Instruction Number 12 that you'll have in your

21   packet back in the jury room.  This relates to the initial

22   counts that the government has alleged here, wire fraud, and

23   the important thing is that the government has to prove to you

24   that Mr. Hay acted with the specific intent to defraud.  An

25   intent to defraud, as you see there in the definitions, means

 1   an intent to deceive or cheat someone.  So the government has

 2   to prove that that's what he did.  The government also has to

 3   prove that he had a scheme, as it says in that top paragraph, a

 4   scheme to obtain money or property by means of false or

 5   fraudulent pretenses, representations, or promises.  In that

 6   same instruction further down, there's a definition of

 7   material.  What material means is that it has to be capable of

 8   influencing the decision that's relevant.  So for example, the

 9   government has made the point during this trial that Mr. Hay

10   has claimed in interviews that he only drinks coffee, but there

11   was that one video at Wes's where he drank water.  It seems

12   unlikely to me, and you know, I'm not a VA representative, that

13   the VA would have terminated Mr. Hay's benefits because he said

14   in an interview, I only drink coffee, but yet he drank water.

15   So the point is, the misrepresentation that the government has

16   to rely on has to be one that could influence the VA into

17   making a decision.  So whether you drink coffee or water,

18   probably not the decision the VA would change their mind on;

19   needs to be more significant than something like that.  As I

20   mentioned, the government also has to prove intent, and this is

21   a little bit of help to determine Mr. Hay's intent.  You have

22   to look at the facts, circumstances shown by the evidence in

23   the case.  In 2007, the VA made a rating decision.  They found

24   Mr. Hay to be 100 percent disabled related to the conversion

25   disorder.  The VA made another rating decision in 2013, and

1    this is Government's Exhibit 209 that's in front of you.  And

2    this lists what the government -- or what the VA used.  It

3    literally says, we considered the following evidence in our

4    decision.  So the statement of claim, this is a government

5    exhibit that Mr. Hay pulled out, got a few short sentences

6    where he says, I have this disability, it continues.  There is

7    the letter that's attached from Doctor McWoods, and that's an

8    exhibit that the government has introduced to you as well and

9    Doctor McWoods testified to.  There was a C&P examination done

10   in March of 2013 that's listed there, and then as it says

11   there, they looked at VA treatment records from December 18 of

12   2007 to April 1 of 2013.  So this is how the VA made its

13   decision to in this case continue Mr. Hay's benefits in April

14   of 2013.  So while the government focused a lot of its

15   attention on things before December of 2007, because this is

16   the rating decision that would have been in place during all of

17   the dates in the indictment, 2017, 2018 dates in which the

18   government alleges wire fraud and theft, I'm going to focus on

19   what Mr. Hay told the VA in that time period, and this is the

20   dates that I'm talking about that are alleged in the

21   indictment.  Counts 1, 2, and 3 allege dates in 2017, Counts 4,

22   5, and 6 allege dates in 2018; this is Instruction Number 2.

23   Same -- well, similar with Counts 7 through 16, they allege

24   dates in 2016, '17 and '18, but all of these are after that VA

25   decision in 2013.  So let's look at what Mr. Hay told the VA

1   during that time period, because that's what the government has

2   to show you was fraud, that he misrepresented to the VA during

3   that time-frame that they used to make that decision, that he

4   misrepresented all the symptoms that they allege in the

5   indictment.  So this is the letter that he wrote to the VA in

6   2012 that's Government's Exhibit 227, and it references the

7   letter from Doctor McWoods.  What did Mr. Hay tell Doctor

8   McWoods?  Doctor McWoods I think testified that what he saw on

9   the video was different than how Mr. Hay presented to him, but

10  what did Mr. Hay tell Doctor McWoods?  He told Doctor McWoods

11  he was cutting his grass, but he felt better the following day.

12  And you heard on cross-examination Doctor McWoods admit that

13  his reports reflected all of the following on these dates, that

14  on June 7th, Mr. Hay reported some problems with cramping when

15  he works in the heat.  Again, Mr. Hay told him he works in the

16  heat.  In October, Doctor McWoods' report reflected

17  intermittent problems with flare-up of the muscle spasms, not

18  constant, intermittent.  In May of 2012, Doctor McWoods

19  reflected that Mr. Hay still has episodes of the spasms; again,

20  not that they're constant.  In July of 2012, Doctor McWoods

21  admitted his notes reflected that Mr. Hay told him he had a few

22  episodes, and then although Doctor McWoods initially said, you

23  know, I tried to get him to see a neurologist, and he wouldn't

24  see a neurologist, he admitted on cross-examination that just

25  shortly after Mr. Hay made all these statements, and in fact,

1  Doctor Giron told you that the referencing doctor that got him

2  to that neurologist was Doctor McWoods, and Mr. Hay visited

3  Doctor Giron as recommended by Doctor McWoods and got an EEG.

4  I think Doctor McWoods said, well, I asked him to do it way

5  before that, but initially, he testified he never did it, which

6  is just not correct.  What did Mr. Hay say in the C&P

7  examinations during the relevant dates of the indictment, 2007,

8  and 2013, and then 2017, he answered what was asked.  Doctor

9  Karr did not warn him, she testified, that if he didn't

10  disclose something, it would be fraud.  And so does what he did

11  support a fraudulent intent?  We're going to walk through a

12  little bit what statements he made later.  Are those consistent

13  with someone who was trying to do a scheme to defraud?  If

14  Mr. Hay is exaggerating, as the government claims, he's made up

15  this whole other character, why would he tell multiple VA

16  personnel that he's getting better in various ways?  Why would

17  you do that?  Wouldn't you just have the consistent, I need a

18  walker?  It wouldn't be, oh, well, sometimes, I need a walker;

19  usually, I need a cane.  Why would it be admitting that you

20  help on the farm?  Why would you do those things?  And

21  remember, the reason that we're talking these dates is in

22  Instruction Number 2, the government says, beginning on a date

23  unknown but no later than January of 2011, and then the

24  specific charges in the indictment are from 2016, '17 and '18,

25  so they're based on the rating decision from 2013.  So what did

1    he say in a rating interview in 2013?  He met with Nurse

2    Practitioner Kiefer (ph), and he told her, or maybe a

3    combination of him and his wife told her, that having an attack

4    is typical, which he had in the exam room, and that sometimes

5    he's normal, normal, and that's in quotes, and sometimes he has

6    these spasms, which is also in quotes.  One's a double, one's

7    not, but they're both in some form of quotes; not sure why one

8    is one way, one way is another.  We didn't hear from that

9    witness, I don't think.  So again, sometimes he's normal,

10   sometimes he has these spasms.  That's what he tells the VA in

11   2013.  You heard a little bit of testimony on this I think from

12   a later C&P examiner, but this is a C&P exam related to seizure

13   disorders or epilepsy, and I believe the other examiner

14   basically said, yeah, this is the form that we use, kind of the

15   most specific one we have.  We don't have one for conversion

16   disorder.  And when asked in the interview, do you have

17   seizures, Mr. Hay says, I don't have seizures, and he said that

18   to another examiner later.  If he's defrauding, if he's the

19   greatest actor of all time, and he's defrauding the VA, why

20   when he's sitting down for an examination for seizure disorder

21   would he say, I don't have seizures?  That's what he did

22   multiple times, but the decision was made on the 13th -- or

23   2013.  What did Mr. Hay tell that C&P examiner?  He said -- or

24   what did he tell various C&P examiners?  He said that he helped

25   on the family farm.  We know from various witnesses that he's

1  the only boy out of five sisters.  We know that helping on the

2  family farm was a family undertaking.  We heard from his

3  daughter Rebekah that she had worked on the family farm when

4  she was little.  Scott Jackson kind of said the same, that he

5  had helped out on the farm here and there over the years, and

6  that he knew this was sort of a family affair to take care of

7  the farm, and I think even again, his sister who clearly

8  doesn't like Mr. Hay discussed how she had done work on the

9  farm; she mentioned specifically baling hay, and she herself

10  said this was a family -- family effort.  In 2017, you did hear

11  from Doctor Karr who at the time was at the VA, and you watched

12  the interview, and you can watch that interview again, it's an

13  admitted exhibit, but these are her examination notes, the

14  actual C&P exam from that visit.  Mr. Hay told her he didn't

15  work any paid jobs, and that's true, helping out on the farm is

16  not -- you don't get a W-2.  It's not working 40 hours a week,

17  clock in job.  He helps out on his family farm.  I understand

18  the government wants to get into a dispute he had with his

19  mother, and say this proves he was working.  Those documents

20  say that he basically gets the equivalent of $60,000, but that

21  it goes as a lien on the property, because he's trying to

22  cement his legacy as the only boy following in the shoes of his

23  father, working on the farm.  What does he tell Doctor Karr?

24  He says, I play around.  I try to stay active, stay active,

25  doing something.  I will go out to the farm and ding around.

1  We own some land, but it's mainly mom's farm.  He says, I watch

2  the cattle, and I've got some chickens.  I think the government

3  argued in closing that watched some cattle literally means that

4  he told the examiner that he stands there and stares at the

5  cattle.  I mean, you know, again, you interpret the evidence as

6  the jury, but as I understand watch the cattle, that's care for

7  the cattle.  Maybe he was telling them he just stands there and

8  stares at cattle all day, but in the context of what he said,

9  he goes out to the farm, tries to stay active, he's admitting

10  that he cares for cattle.  In fact, you saw the interview with

11  Dolly Cherian where he says, you know, we've got cattle for

12  beef purposes.  Yeah, I thought about getting a milk cow, but I

13  don't want to wake up that early and milk the cow, so I don't

14  know if we're going to do that.  So I mean, he's saying he

15  cares for the cattle.  He says that the episodes come up

16  weekly, even little ones, he gets cramps, and that the bigger

17  episodes, the ones that it says down below last for an extended

18  period of time, once a month, maybe twice.  So he is saying, as

19  he said in 2013, sometimes I'm normal, and sometimes I have

20  these episodes.  What else did he tell Doctor Karr?  Again, a

21  summary of what he said.  Try to stay active.  I go out on the

22  farm and ding around.  I care for the cattle.  He admitted that

23  he was active in his shop, and he said that he spends free time

24  caring for his grandson, and you saw a video of that, picking

25  up his grandson, walking from the parking lot across the

1    street, back to his house.  And again, to understand the VA

2    rating system, you have to understand there is not a

3    requirement on this list of complete and utter inability to do

4    any work.  It's not required by the VA.  It does require

5    difficulty in adapting to stressful circumstances, including

6    work or a work-like setting.  That is a criteria, and it's

7    checked in that form that Doctor Karr filled out, and it

8    requires, as did the earlier one that we just discussed,

9    intermittent ability to perform activities of daily living.

10   Intermittent, and that's in Government's Exhibit 210 A, the C&P

11   exam by Doctor Karr.  What did he tell Nurse Practitioner

12   Cherian?  And she did come and testify.  You heard from her.

13   He said in that interview, he can bathe himself, he can dress

14   himself, he can feed himself, he can go shopping, although he

15   complained about not liking it, he can cook for himself, and he

16   said he can drive, although he prefers to let his wife drive

17   further distances.  He told her all of those things in his C&P

18   exam.  So again, if Mr. Hay is a mastermind actor, why is he

19   going into the VA for a C&P exam and saying he can do all of

20   these things?  And we talked about this with Doctor Karr, but

21   he said similar things to Nurse Practitioner Cherian.  He said

22   he helps out on his family farm.  She noticed something on one

23   of his fingers, and said oh, what did you do there to your

24   finger?  And he said he had injured his finger on bale -- or

25   barbed wire.  I asked Nurse Cherian what she assumed that was

1  from, and she said fixing fencing.  He told her he has cows,

2  chickens and two donkeys.  He said he tinkers in his shop.  And

3  then I think she noticed some other injury, and maybe one was

4  his finger, one was his arm, I may be wrong about both being

5  finger, he had some other injury, and he said that he was using

6  electrical tape, and he had I think cut his finger, but maybe

7  something different; two injuries she'd noticed.  As far as the

8  government's claim that he was pretending to be a certain way

9  at the C&P exams, he told Nurse Practitioner Cherian, he had a

10  little quiver that day.  His wife said, do I see something with

11  you, and he said, yeah, I'm kind of having a reaction now.  So

12  he didn't say to her, this is how I am on a daily basis.  He,

13  in fact, said to her, I'm having a little issue this day, a

14  smaller attack or episode.  Again, he told her the same as he

15  told Doctor Karr, it gets bad once or twice a month.  He

16  explained that there are certain signs when things are about to

17  happen, and I think you heard the thing from his daughter

18  Rebekah, and that he mentioned some of these stressors - heavy

19  traffic, overpasses, I think he said in that one, and that

20  fireworks really set him off.  And then you heard the same from

21  folks who knew Mr. Hay just sort of out in Osawatomie.  I think

22  Pastor Bell said that they knew 4th of July, we weren't going

23  to see a lot of Bruce.  He was hiding out in somebody's

24  basement.  About driving, and this is from Nurse Cherian, C&P

25  exam, which is Government's Exhibit 210 B, he said he does

1   drive some; doesn't like driving in Kansas City, but he does

2   short drives.  And that's consistent.  The government points

3   out in the pole camera is he driving almost everyday, and Mr.

4   Hay says, I did short drives.  He doesn't deny that.  He

5   explained to Nurse Cherian that he has spells of being shaky,

6   not that he's always shaky, he has quivers on and off, not

7   always, and described how often they occur.

8         So the investigation in this case begins approximately

9   October 2012, and what he tells the examiners that meet with

10  him, we've just summarized all of them, but again, the key is

11  what he tells Examiner Kiefer (ph) in 2013, sometimes he's

12  normal, sometimes he has these spasms, and he says the same

13  thing in later examinations.  He tries to stay active when he

14  has these episodes, spells, and again, if he has these

15  problems, he should use a walker at every one of these

16  appointments, or it's inconsistent, or it looks like he's

17  getting better, but he says sometimes in long distances, I need

18  a walker, but I mostly just use a cane.

19        Let's talk about the EEG's.  We talked about them

20  briefly, but again, Doctor McWoods said, I told him to get an

21  EEG.  He never got it.  On cross-examination, once confronted

22  with the documents, he admitted Mr. Hay had done so, and now

23  you know from the evidence in this case, he did it at least

24  twice, although other documents I think show he got other

25  EEG's, other admitted documents show he got other EEG's back in

1    2005 and '6, closer in time as part of the initial diagnosis,

2    but as far as later EEG's, 2012, 2017.  During the EEG, with a

3    trained neurologist, Mr. Hay had a spell, during the recording.

4    So the government's theory is that Mr. Hay would risk the whole

5    game that he's been practicing for years by having a spell with

6    the EEG hooked up to him and a trained neurologist looking at

7    him?  That's the government's theory, and he did this twice.

8    With Doctor Singh in 2017, he had a spell during the EEG, side

9    to side head shake, eyes closed.  So Mr. Hay is so brazen about

10   it, he knew a trained neurologist wouldn't think anything of it

11   while he's hooked up to a device to have a spell; he faked it

12   during that EEG, that's government's theory.  Is that what

13   someone would do?  Would someone do that?

14         I want to talk to you a little bit about your lens in

15   the case, and the lens is the presumption of innocence, and

16   this instruction explains that lens to you.  You must continue

17   to presume Mr. Hay is innocent.  It remains even when you go

18   back into the jury room leaving today.  The government has the

19   burden of proving Mr. Hay guilty beyond a reasonable doubt.  If

20   the government doesn't meet their burden, you must, must find

21   him not guilty if the government fails to meet their burden.

22   As you see in that last sentence, and all of this instruction

23   is important, but I want to highlight I think what are the key

24   points here.  If you think there's a real possibility that he

25   is not guilty, Mr. Hay gets, as it says there, the benefit of

1    the doubt, and you should find him not guilty.  And I said

2    should.  It says you must give him the benefit of the doubt and

3    find him not guilty.  Must.

4         We've talked a little bit about the wire fraud and

5    what the government has to prove.  I agree with the

6    government's summary here that you have to find fraud and that

7    he stole the money.  So again, you have to believe that Mr. Hay

8    faked out all these neurologists, all these psychologists, his

9    friends, the pastor, and defrauded the VA at all of these

10   interviews to find him guilty of the theft.  It requires

11   stealing.

12        You heard a little bit from two experts, Doctor

13   Becker, the government expert who was declared as an expert in

14   neurology, but was not declared specifically as an expert in

15   FND.  Doctor Becker specialized in epilepsy, but she said she

16   had to be knowledgeable in FND, because there was some sort of

17   overlap, and she would have to know one or the other in doing

18   her work, but her publishing, her focus was on epilepsy.  She's

19   not published in FND, was not recognized as an expert.  Doctor

20   O'Neal, on the other hand, was found by the court as an expert

21   in both neurology and functional neurological disorder.  That

22   is her focus.  She runs a clinic on that exact disorder from a

23   multi-disciplinary view.  She's published in the field, and the

24   government certainly knows that, because government asked her

25   questions about recent periodicals from major publications on

1    the topic of FND.  Doctor Bell did not know if the Miami County

2    video was related to benefits, and we know it's not.  There's

3    been no evidence it was related to benefits, that the VA had an

4    office there, social security did, etcetera.  Doctor Bell

5    didn't know that Mr. Hay has evidence, because she hadn't heard

6    from all of our witnesses that he had these symptoms in other

7    instances, not C&P examinations, she did not know that.  Her

8    claim was, it can't be FND if you only have the symptoms at

9    this location, it's inconsistent.  She said -- I think she said

10   that's the whole thing about FND, it's inconsistent, but she

11   only has a piece of the pie.  You have a larger picture of when

12   Mr. Hay showed these symptoms, and you know it's not just at

13   C&P exams.  This is a complicated disorder.  It's hard to

14   understand.  And it is naturally that way, because the whole

15   idea is that you're inconsistent, you present inconsistently.

16   Mr. Hay does not have the burden to prove that he has

17   functional neurological disorder.  As you heard from the court

18   at the beginning, and the instructions have told you, we have

19   no burden, we could have sat here quietly and done nothing, put

20   on no case, called no experts.

21        The government has the burden to prove fraud here.

22   That's government's burden.  So I ask that when you go back to

23   the jury room, you not flip that around and say, defendant

24   didn't prove to me that he has this disorder.  That is not a

25   requirement that we have.  The government has the burden to

1    prove fraud in every instance.  And their theory to find fraud

2    is that Mr. Hay fooled all of these neurologists, all of these

3    psychologists, his friends, his pastor, his sister who hates

4    him, he fooled all of these people, all of them.  Unlikely.

5    What did Mr. Hay tell the doctors in the relevant times to the

6    indictment?  He said he goes out on the farm.  He says he

7    tinkers in the shed.  He admitted the injuries on his hands

8    were related to building a fence, etcetera.  Would he go on an

9    EEG and have a fake seizure hooked up to devices in front of a

10   neurologist?  Is that what someone who's intricately planned

11   this scheme, have faked out everyone in their lives, has acted

12   perfectly, is that what someone would do?  They would say, I'm

13   going to risk the whole thing by faking a seizure now in front

14   of this trained board certified neurologist.  Would that person

15   present themselves with different symptoms at all kind of

16   visits?  Would they show up at McWoods looking a certain way

17   and then show up differently at other VA appointments?  Is that

18   what they would do?  Would they look, if not their worst, close

19   to their worst outside the Miami County administrative building

20   for some unknown reason?  Would they admit improvement in

21   interviews with C&P examiners, with determinations of whether

22   they get assistance from a caregiver?  Is that what they would

23   do?  They would say, oh, you know, here's ways I've improved?

24   Is that what they would do if they were trying to scam the VA,

25   and pull a scheme to defraud?

1    This whole case surrounds a misunderstanding of how

2    functional neurological disorder works, a fundamental

3    misunderstanding, that if you say on this day, I have these

4    disabilities, and then you don't have them on the other day,

5    you're a faker.  That's not how it works, and you heard that

6    even from the government's expert.  The inconsistencies are not

7    evidence of guilt.  They're evidence of the disability.  That's

8    what the disability is.  It's inconsistency.  Mr. Hay is not

9    guilty of all of these charges.  Thank you.

10    THE COURT:  All right.  I think we'll take another

11    very brief break.  Why don't we just stay on this floor, and

12    then we'll come back with your 15 minutes or so.  I will read

13    the final instructions, and then we'll send you off to

14    deliberate.  All right.  Bonnie, let's keep them on this floor.

15    (Whereupon court took a recess.  Proceedings then continued

16    as follows:)

17    THE COURT:  We're in recess.  I'm going to stay put,

18    though.

19    (Whereupon court took a recess.  Proceedings then continued

20    as follows:)

21    THE COURT:  Mr. Huschka.

22    MR. HUSCHKA:  Thank you, Your Honor.  Ladies and

23    gentlemen, Mr. Magariel is right about the burden of proof.  We

24    have the burden of proof to prove beyond a reasonable doubt.

25    We embrace that burden, and we've met that burden here.  The

1    good thing about reasonable doubt is that when you all come

2    into this courtroom, you do not check your common sense at the

3    door.  Judge Robinson has instructed you that you can and you

4    should use your common sense in evaluating the evidence in this

5    case.  It is the beauty of our jury system.  You all have your

6    own work experiences, your own life experiences, and your own

7    street smarts, and you know when someone is trying to pull one

8    over on you, and if you're confused over the defendant's

9    selective quotations of some of the half truths and some of the

10   omissions that he gave to C&P examiners throughout this

11   process, you should be.  It's confusing, because it's meant to

12   distract you from all of the lies.  And I want to be clear,

13   this is not a medical trial.  This is not a medical who done

14   it.  This is a fraud trial.  And the defendant wants you to

15   focus on doctors who saw and heard exactly what defendant

16   wanted them to hear back in 2005.  They didn't have the videos

17   that you have.  They didn't have the photos that you have.

18   They didn't hear the testimony that you've heard in this case.

19   And defendant wants to cabin off time periods, because the

20   entirety of this fraud, what you've heard, the grand jury

21   alleged by a date unknown, but least by 2011, well, you've now

22   heard the evidence, and you know that this was a fraud from the

23   get-go.  You know that he lied to the medical evaluation board

24   about being unable to drive while he was out working

25   construction.  You didn't hear Mr. Magariel mention once the

1   construction of Paul Kalmar's house, because it is absolutely

2   devastating for defendant.  You didn't hear him talk about the

3   walker, because that is also devastating for defendant.  If the

4   defendant is going in to the VA to tell the truth, if he's

5   being straight with them, hey, you know, sometimes I have good

6   days, if he walked in there like he walks into the pawn shop,

7   today is a good day, but I also have some bad days.  That's not

8   what he did.  He put the walker in the car because he's

9   anticipating benefits.  He's not anticipating triggers, he's

10   not anticipating stress.  He's anticipating a benefits

11   examination.  And the defendant talked about how it comes and

12   goes, this comes and goes when he wants it to.  It does come

13   and go, so the inconsistency doesn't tell you anything.  It's

14   the consistency of when it comes and goes that tells you

15   everything, and Doctor Becker told you that's not how FND

16   works.  You don't pull the walker out, need it to walk into the

17   social security building, and then be totally fine when you

18   walk out, and you put it back.  And then you're fine at Sam's

19   Club, and you're fine when you get home later that day when you

20   took the same long drive that you took there.  You remember the

21   dental exams where defendant drove up to the same facility.  He

22   didn't load the walker up that time.  He sat in the lobby and

23   watched TV for 30 minutes, completely relaxed, 'cause he wasn't

24   anticipating a benefits examination.  And you heard Mr.

25   Magariel suggest that defendant may have been entitled to

1    something.  Well, he stole that opportunity from the VA.  He

2    took the opportunity from the VA to determine what rating he

3    may have had, had he told the truth.  Maybe it was 0 percent,

4    maybe it was 10 percent, maybe it was 30 percent, maybe it was

5    50 percent, we don't know, and he wants to come in here after

6    the fact, and try to say that he was entitled to something.

7    Well, he took that opportunity from the VA, and he had a

8    chance, he did it in 2006, he did it in 2007, and he did it

9    again in 2013, he did it again in 2017.

10        Now, the government has to prove the material

11   misrepresentation in this case.  That's singular.  All have to

12   agree on one misrepresentation.  There are too many to count in

13   this case.  There are out and out lies, there are half truths

14   and there are many omissions.  You have to agree on one.

15        You know, you all, by serving on this jury, have

16   played a part now in our judicial process.  It's a process that

17   provides for this trial, provides for the defendant's defense

18   and his lawyers, provides for Judge Robinson who presided over

19   the trial and assured a fair process.  Our system does all of

20   those things, but our system does one more thing.  It provides

21   for accountability, and when you break the law, the law

22   requires accountability.  And the defendant did that when he

23   lied to the VA about the extent of his disabilities.  Maybe he

24   had something.  It sure wasn't what he told the VA.

25        When you all have a chance to analyze this evidence,

1    we would ask you to return the only verdict that is supported

2    by the evidence, and that's that the defendant -- defendant is

3    guilty of all of the counts charged in the indictment.  Thank

4    you.

5          THE COURT:  All right.  We will resume with the

6    reading of the rest of the instructions starting with

7    Instruction Number 34.

8          (Court read final instructions.)

9          THE COURT:  All right.  Counsel, approach the bench

10   please.

11         (Proceedings held at the bench, outside the hearing of open

12   court.)

13         THE COURT:  Any objection to the reading of the

14   instructions?

15         MR. HUSCHKA:  No, Your Honor.

16         MR. MAGARIEL:  No, Your Honor.

17         THE COURT:  Okay.

18         (Proceedings continued in open court.)

19         THE COURT:  All right.  Will the bailiffs come

20   forward?  Raise your right hand.

21         (Bailiffs sworn.)

22         THE BAILIFFS:  I do.

23         THE COURT:  All right.  So we are going to send you

24   all back to the jury room.  You're going to each have your copy

25   of the instructions.  The exhibits that have been admitted,

1   that includes the videos, everything, are accessible on an

2   electronic system that Bonnie and the bailiffs are going to

3   show you.  What we would ask, go back, pick your foreperson,

4   and then let us know right away what your schedule is.  You're

5   kind of on your own schedule now, so if you want to leave right

6   away, this evening, tell us that, because we're going to follow

7   the same schedule, and that holds true if the deliberations go

8   into tomorrow, we just want to know when you're arriving, when

9   you're going to take a lunch break so that we will always be

10  available if you have a verdict or question.  That's the reason

11  we want to follow your schedule and have prior notice of it.

12  If you'd like to stay late tonight, that as perfectly fine,

13  just tell us what your intentions are so that we'll know what

14  to do, and I'll make sure the lawyers aren't more than five

15  minutes away, so we can come back together if we need to.  The

16  jury system will get going.  It's all ready ready.  Oh, and the

17  alternates.  Who are -- let's see, Juror 15 and Juror 14.  It's

18  these three, right?  That's right, we're down to two.  So Juror

19  14 and Juror 15, you're the alternates.  So some judges have

20  the alternates stay in the courthouse.  I don't do that.  So

21  we're going to let you go home, but you are still under the

22  admonition to not discuss this case.  The way it works is if

23  one of the jurors got CoVid, or got sick or something, and

24  couldn't continue with the deliberations for some reason, we

25  would excuse -- well, sometimes, if someone gets sick, we just

1  shut down deliberations until the person's better, but

2  sometimes, it would require excusing that person, and calling

3  upon one of the alternates.  So that's why you need to stay

4  isolated and unprotected from communication.  If for some

5  reason, we were to lose a juror, we had to excuse a juror and

6  call one of you alternates back, the deliberations would begin

7  back to square one, because all 12 jurors have to deliberate.

8  So it's not like you'd come in and just sort of hook into where

9  everybody else is at.  I would specifically instruct the jury

10  to start all over again, because every single one of the 12 has

11  a voice, and is important in the deliberative process.  That

12  doesn't usually happen.  You'll get a call from us if you don't

13  need to come back.  You'll get a call from us if you do need to

14  come back.  So just wanted to caution you.  We do want to thank

15  you for your service.  I think we have something to give to you

16  before you leave, Mr. Walsh and Miss Carver, and probably we

17  won't have to see you again.  Do they have to call the

18  code-a-phone, though?  How does that work?

19          MS. WIEST:  Oh, gosh.  Let me ask real quick.

20          THE COURT:  Okay.  We'll let you know.  So we'll send

21  the rest of you back.  Do you need to go back and get your

22  things from the jury room?  Did you leave anything in the jury

23  room?  You did not.  All right.  You're free to go.  We would

24  ask you to leave your notes here, however.  Okay.  And the rest

25  of you just will stand by until we hear from you about what

1    your plans are this evening and tomorrow, if need be as well.

2    So all right?  We'll be in recess.

3         (Whereupon court took a recess.  Proceedings then continued

4    as follows:)

5         THE COURT:  All right.  So you all are ready to go

6    home for the evening, and understand you plan to be back at

7    8:30 tomorrow.  And so Bonnie will meet you, and you'll go

8    directly into the jury room.  You won't have to come back in

9    here.  So just remind you of the overnight admonition you just

10   heard an hour ago.  The deliberations have to stop when you're

11   not all together.  So don't be deliberating with yourself,

12   anyone else when you're out of the courtroom, courthouse, and

13   don't communicate or take in any information about any of these

14   issues, and have a pleasant evening, safe travels, and 8:30

15   tomorrow, be back in the jury room.  We'll be waiting to hear

16   from you.  Thank you.

17        (Whereupon, jury left.)

18        THE COURT:  All right.  So you all just be available

19   no more than five minutes away starting at 8:30 tomorrow, and I

20   don't know that they told us their lunch schedule.  When we

21   find that out, we'll relay that to you also.  All right.  Have

22   a good evening.  We'll be in recess.

23        (Whereupon, court recessed proceedings.)

24

25

1

2

3                         C E R T I F I C A T E

4

5

6        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

7    the regularly appointed, qualified and acting official reporter

8    of the United States District Court for the District of Kansas,

9    do hereby certify that as such official reporter, I was present

10   at and reported in machine shorthand the above and foregoing

11   proceedings.

12       I further certify that the foregoing transcript, consisting

13   of Day 8 - Jury Trial - Pages 1026-1178 - is a full, true, and

14   correct reproduction of my shorthand notes as reflected by this

15   transcript.

16       SIGNED February 10, 2023.

17

18                         S/_____

19                         Nancy Moroney Wiss, CSR, CM, FCRR

20

21

22

23

24

25

```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2
   UNITED STATES OF AMERICA,         Docket No. 19-20044-JAR
3
     Plaintiff,                      Kansas City, Kansas
4                                    Date: 8/11/2022
       v.
5
   BRUCE L HAY,
6
     Defendant.
7  ...................
```

```
8                           TRANSCRIPT OF
                         DAY 9 - JURY TRIAL
9            BEFORE THE HONORABLE JULIE A ROBINSON,
               UNITED STATES SENIOR DISTRICT JUDGE.
10
   APPEARANCES:
11
   For the Plaintiff:      Christopher Oakley & Ryan Huschka
12                         Asst US Attorneys
                           360 US Courthouse
13                         500 State Avenue
                           Kansas City, KS  66101
14
   For the Defendant:      Che Ramsey & David Magariel
15                         Asst Federal Public Defenders
                           201 US Courthouse
16                         500 State Avenue
                           Kansas City, KS  66101
17
   Court Reporter:         Nancy Moroney Wiss, CSR, RMR, FCRR
18                         Official Court Reporter
                           558 US Courthouse
19                         500 State Avenue
                           Kansas City, KS  66101
20
   Proceedings recorded by machine shorthand, transcript
21 produced by computer-aided transcription.

22

23

24

25
```

1       THE COURT:  Jury has announced that they have a

2  verdict, so we'll wait for them to come down.  All right.  So

3  Mr. Dalton, I understand that you all have reached a verdict?

4       JUROR SEVEN:  Yes.

5       THE COURT:  All right.  You can pass the verdict form

6  to Miss Wiest, and I will publish it by reading.  All right.

7  In the case of United States of America versus Bruce L Hay,

8  19-20044 -- you can be seated if you'd like -- we, the jury,

9  duly impaneled and sworn, upon our oaths, make the following

10  unanimous finding.  Count 1.  On the offense of wire fraud

11  charged in Count 1, we find defendant Mr. Bruce Hay guilty.  On

12  the offense of wire fraud charged in Count 2, we find the

13  defendant Mr. Bruce Hay guilty.  On the offense of wire fraud

14  charged in Count 3, we find the defendant Mr. Bruce Hay guilty.

15  On the offense of wire fraud charged in Count 4, we find the

16  defendant Mr. Bruce Hay guilty.  On the offense of wire fraud

17  charged in Count 5, we find the defendant Mr. Bruce Hay guilty.

18  On the offense of wire fraud charged in Count 6, we find the

19  defendant Mr. Bruce Hay guilty.  On the offense of theft of

20  government funds charged in Count 7, we find the defendant

21  Mr. Bruce Hay guilty.  On the offense of theft of government

22  funds charged in Count 8, we find the defendant Mr. Bruce Hay

23  guilty.  On the offense of theft of government funds charged in

24  Count 9, we find the defendant Mr. Bruce Hay guilty.  On the

25  offense of theft of government funds charged in Count 10, we

1    find the defendant Mr. Bruce Hay guilty.  On the offense of

2    theft of government funds charged in Count 11, we find the

3    defendant Mr. Bruce Hay guilty.  On the offense of theft of

4    government funds charged in Count 12, we find the defendant

5    Mr. Bruce Hay guilty.  On the offense of theft of government

6    funds charged in Count 13, we find the defendant Mr. Bruce Hay

7    guilty.  On the offense of theft of government funds charged in

8    Count 14, we find the defendant Mr. Bruce Hay guilty.  On the

9    offense of theft of government funds charged in Count 15, we

10   find the defendant Mr. Bruce Hay guilty.  On the offense of

11   theft of government funds charged in Count 16, we find the

12   defendant Mr. Bruce Hay guilty.  Signed and dated by the

13   foreperson today.  I will poll you individually to make sure

14   that this individually was your verdict as well.  Juror One,

15   was this and is this your verdict?

16              JUROR ONE:  Yes.

17              THE COURT:  Juror Two?

18              JUROR TWO:  Yes.

19              THE COURT:  Juror Three?

20              JUROR THREE:  Yes.

21              THE COURT:  Juror Four?

22              JUROR FOUR:  Yes.

23              THE COURT:  Juror Five?

24              JUROR FIVE:  Yes.

25              THE COURT:  Juror Six?

1     JUROR SIX:  Yes.

2     THE COURT:  Juror Seven?

3     JUROR SEVEN:  Yes.

4     THE COURT:  Juror Eight?

5     JUROR EIGHT:  Yes.

6     THE COURT:  Juror Nine?

7     JUROR NINE:  Yes.

8     THE COURT:  Juror Ten?

9     JUROR TEN:  Yes.

10    THE COURT:  Juror Twelve?

11    JUROR TWELVE:  Yes.

12    THE COURT:  And Juror Thirteen?

13    JUROR THIRTEEN:  Yes.

14    THE COURT:  All right.  All right.  So a few things

15 I'll tell you.  I'd like to join you very briefly in the jury

16 room.  We have something to share with you before you leave the

17 building.  This does complete your jury service, so you do not

18 need to call the code-a-phone.  On behalf of the parties, I'd

19 like to thank you for your jury service.  You've been with us

20 almost two weeks, and we appreciate your time, understanding

21 that you had other things to do, other obligations and duties

22 in life, and so on behalf of the parties, I thank you.

23    We have a local rule in this district that prohibits

24 the lawyers or parties from contacting you directly to ask you

25 questions about this case or -- or anything related to this

1  case.  If they're going to do that, they first have to get my

2  permission.  So unless you hear from one of the court personnel

3  telling you that I've given them permission to contact you,

4  know that they don't have that permission.  Now, you are free

5  to contact them.  You're free to talk to them and answer their

6  questions.  That's up to you.  Just know that they have to get

7  the court's permission before they can initiate contact with

8  you.  So you are released from your admonition.  You're now

9  free to talk about this case, and I will join you within a

10  matter of minutes.  I know you probably have other things you

11  need to do this morning and today, but I'll join you in just a

12  matter of minutes up at the sixth floor jury room.  So we'll be

13  up there shortly.  Thank you.  We'll recess the jury.  And then

14  for the parties, I'll set this case for sentencing on

15  October 27th at 9:00 AM.  Any sentencing memorandum will be due

16  on October 13th, any responsive memorandum will be due on

17  October 20th, and any post-trial, post-verdict motions should

18  be filed in accordance with the Rules of Criminal Procedure.

19  All right, we'll be in recess.  Conditions of release will

20  remain the same pending sentencing.  All right.  We'll be in

21  recess.

22      (Whereupon, court recessed proceedings.)

23

24

25

1

2

3

4                           C E R T I F I C A T E

5

6

7       I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

8    the regularly appointed, qualified and acting official reporter

9    of the United States District Court for the District of Kansas,

10   do hereby certify that as such official reporter, I was present

11   at and reported in machine shorthand the above and foregoing

12   proceedings.

13       I further certify that the foregoing transcript, consisting

14   of Day 9 - Jury Trial - Pages 1179-1184 - is a full, true, and

15   correct reproduction of my shorthand notes as reflected by this

16   transcript.

17       SIGNED February 10, 2023.

18

19                        S/_____

20                        Nancy Moroney Wiss, CSR, CM, FCRR

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

UNITED STATES OF AMERICA,          )
3                                  )
          Plaintiff,               )
4                                  ) Case No. 19-20044-JAR
   vs.                             ) Circuit No. 22-3276
5                                  )
   BRUCE L. HAY,                   )
6                                  ) Kansas City, Kansas
          Defendant.               ) Date:  December 13, 2022
7    ...........................

8                    TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE JULIE A. ROBINSON
9          SENIOR UNITED STATES DISTRICT COURT JUDGE

10

                      A P P E A R A N C E S
11

   FOR THE PLAINTIFF:
12

           Mr. Christopher Oakley
13         OFFICE OF THE UNITED STATES ATTORNEY
           500 State Avenue
14         Kansas City, Kansas 66101

15   FOR THE DEFENDANT:

16         Ms. Chekasha Ramsey
           OFFICE OF THE FEDERAL PUBLIC DEFENDER
17         500 State Avenue
           Suite 201
18         Kansas City, Kansas 66101

19

20

21

22

23

24  _____
              Proceedings recorded by machine shorthand,
25    transcript produced by computer-aided transcription.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
                    (913) 907-1434                  2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.1337

1              P R O C E E D I N G S

2        THE COURT:  We're here in United States versus Bruce Hay.

3   The case number is 19-20044.  Your appearances, please.

4             MR. OAKLEY:  May it please the Court, the United

5   States appears by Chris Oakley.

6             MS. RAMSEY:  Good morning, Your Honor.  Che Ramsey on

7   behalf of Bruce Hay who appears in person with counsel.

8             THE COURT:  All right.  We are here for sentencing

9   this morning.  I have received a sentencing memorandum filed by

10  Mr. Hay.  I've received the government's responsive memorandum.

11  Mr. Hay's sentencing memorandum has a number of attachments,

12  including letters from family and friends, which I have

13  reviewed.

14            The presentence report, the government has no

15  objections.  The defendant states that he generally objects to

16  the facts contained in the presentence report because it fails

17  to include any evidence that was presented by the defense at

18  the trial.  He asked that the court rely on the trial testimony

19  in this case.  I do not think this is an objection I

20  necessarily need to rule upon.  I am considering all of the

21  testimony presented during the trial.

22            Obviously in ruling on the motion for judgment, I

23  viewed the evidence in the light most favorable to the

24  government, which I'm required to do under the law in

25  determining whether a reasonable jury could reach a guilty

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.1338

1   verdict, and I found that they could.

2          But obviously in deciding the appropriate sentence for

3   Mr. Hay, I rely on all of the evidence and all of the things

4   that have been offered in the presentence report as well as

5   what's been offered in the sentencing memorandum.  By statute

6   I'm required to consider all relevant information.

7          All right.  So are there -- is there any evidence

8   that's going to be presented by Mr. Hay or by the government at

9   today's hearing?

10          MS. RAMSEY:  No, Your Honor.

11          MR. OAKLEY:  No, Your Honor.

12          THE COURT:  All right.  So at this point do you -- are

13   you ready to make argument about an appropriate sentence and we

14   can go forward?  Is that what you all anticipate doing?

15          MS. RAMSEY:  Yes, Your Honor.

16          THE COURT:  All right.  I'll hear from you,

17   Ms. Ramsey.

18          MS. RAMSEY:  Thank you, Your Honor.

19          Your Honor, I don't intend to repeat what's filed in a

20   sentencing memorandum, but I do ask the court to consider

21   Mr. Hay's diagnosis of PTSD in conjunction with the testimony

22   that the court heard which was presented by the defense.

23          The court heard from Mr. Hay -- multiple community

24   members: Mr. Hay's pastor, his daughter, his mother-in-law, and

25   his friends in the community, and what they all informed the

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434
2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.1339

1  court was is that Mr. Hay suffers from an illness which we

2  maintain is conversion disorder, but with the comorbid disorder

3  of PTSD, and those symptoms are debilitating when they occur.

4       Much of the symptoms are aggravated by issues that he

5  has with the PTSD which the court heard testimony about as a

6  reaction to his service in the Army.  We asked the court to

7  consider that as part of his history and characteristics in

8  considering what sentence is appropriate in this case.

9       We also ask the court to consider the timeframe from

10  which this case was first filed until reaching today and

11  Mr. Hay's behavior during that timeframe.  He has been

12  law-abiding.  He has taken care of his family.  He has a

13  courtroom full of support from his family and friends and from

14  his church.

15       I will add the one thing we did not put in our

16  sentencing memorandum which is recent is that Mr. Hay

17  unfortunately has had hip surgery since the trial ended.  He

18  had hip surgery on his right hip, and that's why you see him

19  seated today with the walker and the ice on his hip.

20       He does have follow-up appointments for that I believe

21  on December 21st, and we ask the court to consider whether or

22  not particularly he would get adequate care for that.  I don't

23  have the details of what follow-up is required right now, but

24  whether or not follow-up adequate care would be provided by

25  BOP.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                 USA v. Bruce L. Hay
                                 ROA - Volume 3, p.1340

1          So in large part what's based in our sentencing

2    memorandum, the testimony the court has heard, the fact of

3    Mr. Hay's service to his country, we do ask and believe that

4    the information included in the sentencing memorandum supports

5    a downward variance in this case and we do ask for probation so

6    he can remain in the community.  And that is all I have.

7          THE COURT:  Thank you.

8          Mr. Oakley.

9          MR. OAKLEY:  Your Honor, likewise I won't repeat

10   everything that was stated in the sentencing memo, but this is

11   a serious crime that occurred over more than a decade.  This is

12   not a situation where the defendant was facing hard times and

13   chose to commit a crime on an isolated incident or two isolated

14   incidents.  But this is something he chose to do for more than

15   15 years.

16         Related to the PTSD based on the testimony at trial,

17   it's likely that he suffers some sort of PTSD.  Based on the

18   testimony of, you know, his reaction to fireworks, I think that

19   is probably true.  The problem is the defendant has lied for so

20   long about his conditions, it's hard to tell.

21         The fact of the matter is just certainly during the

22   Fourth of July he may have had effects, he may have had effects

23   when fireworks are going off, but I think the testimony and the

24   evidence at trial was for most of the year, for most of the

25   defendant's life he's not been affected.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.1341

1       He was able to work.  He did work.  He worked a very

2   hard job going out and collecting scrap metal, lifting heavy

3   items.  He was a farmer.  He was a hay farmer.  He was able to

4   do these things.  So certainly he likely has PTSD, but it

5   hasn't affected him to the extent that he claims, and while

6   certainly a factor, it's not a factor that would rise to the

7   level for a variance to probation.

8       We think that a guideline sentence is appropriate

9   given the length of the time that the defendant committed this

10   offense, given the defendant's conduct up to trial.  In the

11   sentencing memo we talk about how the defendant presented

12   himself, and the court pointed out at the limine conference

13   that it was very visible.  Well, at trial we presented evidence

14   from the day before when he's selling scrap metal, and there

15   was no visible shake; he was able to sell more than a thousand

16   pounds worth of scrap metal.  Because of the defendant's lies

17   and deceptions it's really hard to tell what his true maladies

18   are.

19       What is obvious and what the jury found is he doesn't

20   have conversion disorder, doesn't have it to the extent he

21   claimed, that he claimed he was unable to drive, unable to work

22   because he did those things.

23       We talk about the 3553(a) factors in the memo, and all

24   of them support a sentence of imprisonment.  We ask the court

25   to impose the low end of the guideline range.  We think it's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.1342

1   appropriate.  We think that it follows through with the factors

2   of a sentence that's appropriate, but not greater than

3   necessary, given the nature and circumstances of this offense,

4   given the deterrent value that a sentence of imprisonment would

5   hopefully go to the larger community, to somebody that would

6   learn about this type of offense, and so we ask that you impose

7   the low end.

8           THE COURT:  All right.  Before I proceed -- and the

9   way I'll proceed is by announcing a tentative sentence, and

10  I'll hear any further objections, requests, and the like from

11  the parties.

12          But before I proceed any further, Mr. Hay, you have

13  the right to address me directly on your own behalf.  Is there

14  anything you'd like to say at this time?

15          THE DEFENDANT:  Yes, Your Honor.  This is somewhat

16  lengthy.

17          THE COURT:  If you're going to read something, I just

18  ask you to not read too quickly so the court reporter can make

19  sure she can take down every word.

20          THE DEFENDANT:  I appear in this courtroom with a

21  heavy heart.  I stated from the beginning that if you chose to

22  hang me, you'd be hanging an innocent man.

23          From the beginning the prosecutor lied to the court

24  about the offering of the plea deal, and the court dismissed me

25  even though I have a copy.  Why would I have a copy if they

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.1343

1    didn't offer it?

2          The court then advised the jurors not to seek

3    understanding of what they were making judgment on.  The

4    prosecution used cherry-picked videos of my defense -- the

5    prosecution used cherry-picked videos.  But my defense chose

6    not to use my videos as they could say they were staged even

7    though they were from years past.

8          The prosecution used people publicly known to hate me,

9    but the defense chose not to use witnesses to refute them.  The

10   defense told me early on that they did not have a defense, that

11   it was the prosecution's job to make me look like social trash

12   regardless of the facts.  So tell me where is the true justice

13   in that?

14         The entire court case was prosecuted on two issues:

15   The statement I do not drive and the time and manner that I

16   used my cane or walker.  On the statement I do not drive, no

17   one ever asked what the question was.  The question is, do you

18   drive while having an episode?  As for the cane and walker, I

19   use them as needed for my safety, not at the discretion of the

20   VA.

21         To set the court's understanding straight on the

22   issues, neither one has any bearing on the guidelines and

23   qualifying requirements for my ratings in Book C of Title 38

24   Part Four of the federal regulations for the VA.  If anyone had

25   read the book, they would have known this.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.1344

1          As for my physical disposition here today, I present

2     myself as living proof that the prosecutor lied and corrupted

3     the legal system.  He repeatedly told the jury that my cane was

4     just a prop.  At no time did anyone ask what my medical state

5     was.  The defense was made aware of my need for surgery and did

6     not defend me against these lies.

7          I had total hip replacement surgery on the 8th of

8     December and will have follow-up appointments for these -- this

9     surgery, and as I heal up, I'll need to schedule surgeries for

10    the other hip, both knees, and both shoulders, and my spine.

11    All of these stem from the 2005 accident and other military

12    activities.

13         The neuropathy in my arms and legs and the conversion

14    disorder overlay on these medical issues very directly.  The

15    only crime committed was the VA's fraudulent denial of medical

16    ratings that they have been aware of for several years followed

17    by the medical issues that became acknowledgeable with the

18    signing of the burn pit act.

19         The VA's heavy-handed charges of fraud against me to

20    cover up their overwhelming fraudulent activity against me is

21    appalling.  The VA has even scrubbed my file to remove some

22    wartime line of duty injuries from my file.  Who gave the VA

23    the authority to dismiss me like that?

24         As we have seen, the court has ran its course bringing

25    us here today, Your Honor.  You have a complicated decision to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.1345

1   make.  I have always carried a high moral compass.  I have

2   served God, country, and family, and there are those who I am

3   so connected to such as my grandson Milo that any separation

4   would be psychologically and sociologically a death sentence

5   for him as he already has ADHD.  My wife and daughters will

6   also have psychological and social meltdowns too.

7          As the court can see, as course as I am, I still

8   remain a strong bond with my church family and friends, and

9   undoubtedly, the outcome of today will steer their views of our

10  country and the court system.

11         As far as my country, I have always been an advocate

12  for the military, and with my strong moral compass I will

13  always maintain a high level of respect for these areas of my

14  life.

15         I ask the court to subscribe to the most lenient

16  options possible and set the surrender date as far out as

17  possible as I can take care of my medical issues that I am

18  allowed to if I must be confined.  Thank you, Your Honor.

19         THE COURT:  Thank you, Mr. Hay.

20         So to the total offense level in this case is 21.  The

21  criminal history category is one.  For custody on Count 1

22  through 6 the maximum term of custody is 20 years.  On Counts 7

23  through 16 the maximum by statute is ten years.  The guideline

24  range is 37 to 46 months.

25         The court's tentative sentence on Counts 1 through 16

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.1346

1   is 37 months to run concurrently for a controlling sentence of

2   37 months followed by three years of supervised release on each

3   count to run concurrently for a controlling term of supervised

4   release of three years.

5           Three years is the maximum term of supervised release

6   under the statute or guidelines for all of these counts of

7   conviction.

8           Under the guidelines Mr. Hay is not eligible for

9   probation, but of course the guidelines are not mandatory.

10  Under the statute the court for each of these counts of

11  conviction could impose between 1 to 5 years of probation.

12  Given the court's tentative sentence of a custodial term of

13  sentence, the sentence will not include probation.

14          I do not intend to impose a fine.  The maximum fine by

15  statute is $250,000 for each of the 16 counts while the

16  guidelines recommend between 15,000 and 150,000.

17          Per statute and guidelines the sentence must include

18  an order of restitution, and in this case the amount of

19  restitution is $537,915.87.

20          Also mandatorily under the statute and guidelines the

21  sentence must include a $100 assessment for the Crime Victims

22  Fund, which is a total of $1,600.

23          The superseding indictment included a forfeiture

24  allegation, but there has not been a preliminary order of

25  forfeiture filed, so I did not know what the government's

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                          2:19-cr-20044-JAR
                                                        USA v. Bruce L. Hay
                                                        ROA - Volume 3, p.1347

1   intentions were with respect to forfeiture.

2          MR. OAKLEY:  We do not intend to include or seek a

3   forfeiture judgment, Your Honor.

4          THE COURT:  Okay.  The court is required pursuant to

5   18 U.S.C. Section 3553(a) to impose a sentence that is

6   sufficient, but not greater than necessary, to comply with the

7   purposes of sentencing identified that statute.

8          In determining the particular sentence to be imposed,

9   the court has considered the sentencing guidelines because they

10  promote uniformity in sentencing and assist the court in

11  determining an appropriate sentence by weighing the basic

12  nature of the offense as well as aggravating and mitigating

13  factors.  The court has considered the evidence presented at

14  trial, the sentencing memoranda, the statements of the parties,

15  and the presentence investigation report.

16         After reviewing the presentence report, the court

17  finds that the guideline range of 37 to 46 months is correctly

18  calculated based on a total offense level 21 and criminal

19  history Category 1.

20         This offense involves Mr. Hay falsely claiming

21  disability benefits from the Veterans Administration.  He did

22  this over a prolonged period of time.  He did it in a shady

23  fashion which I'll describe in a little more detail, and as a

24  consequence the loss to the VA is over $500,000.

25         There was substantial evidence that Mr. Hay

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.1348

1    specifically, intentionally, knowingly, and willfully defrauded

2    the VA.  The VA did not defraud the VA.  Mr. Hay defrauded the

3    VA and the United States of America beginning in 2005, though

4    the indictment doesn't begin in 2005, but the jury heard

5    evidence and I witnessed that evidence beginning in 2005 when

6    Mr. Hay had that car accident, suffered a head injury, no one

7    disputed apparently that there were medical issues that arose

8    from that, and he first started seeking disability benefits

9    from the VA even in 2005-2006 timeframe.  He was lying to the

10   VA about the extent of his impairment and lying to the VA about

11   the extent of his medical issues.  That doesn't mean he didn't

12   have medical issues, but he was lying about the extent of them.

13        So we saw photographs of Mr. Hay actively engaged in

14   building a two-story house, 3100 square feet, maybe bigger.

15   Big house.  He's up on a scaffolding, he's on ladders, he's

16   with another man hoisting heavy windows to place them in the

17   framing on the second story.  He's down in a ditch that he was

18   involved in digging for the main water line.  He was engaged in

19   very heavy construction activity and labor even when he first

20   applied for VA disability benefits.

21        Mr. Hay served in wartime.  He served in the reserves.

22   He was -- he received medals.  I give honor to that and I give

23   homage to that because I think military service is a high

24   calling and it's sacrificial service, and I have respect for

25   anyone that serves in the Army, particularly in wartime.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.1349

1        But for that military service, I would be imposing a

2   much higher sentence frankly.  I would be imposing a longer

3   sentence because of the nature, extent, and frankly outrageous

4   nature of the fraud Mr. Hay, with the help of his wife who also

5   committed fraud, that they engaged for this prolonged period of

6   time and got over a half million dollars of benefits to which

7   he was not entitled.

8        He was entitled to benefits.  He had PTSD, if he had

9   other medical issues -- and in fact the evidence was that

10  Mr. Hay got other service-connected disability ratings for

11  other things not at 100 percent, and that's why I suppose he's

12  still getting a check from the VA every month, I think of about

13  $500.  But at the height of this fraud he was getting over

14  $4,000 a month, and that's because he lied to the VA and

15  claimed that his conversion disorder, if in fact he had

16  conversion disorder, was impairing him to such an extent that

17  he could not work, was impairing him to such an extent he was

18  entitled to an extra check for his wife as his aid and

19  attendance because allegedly he couldn't go to the toilet by

20  himself.  He couldn't feed himself all the time.  He couldn't

21  dress himself sometimes.

22       And none of that was true.  None of it was true.  You

23  can't not toilet yourself periodically and not dress yourself

24  periodically but get up every day and haul scrap you've

25  collected at curbside and go out and work on your family farm

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.1350

1    and bale hay and stand up on moving hay trucks and throwing hay

2    bales down and feed cattle and do all of the things that he

3    claimed that he did when he filed a mechanic's lien so he could

4    get a lot of money out of his family farm that he said he had

5    been working on as the only farm manager for many, many, many

6    years.  You can't -- those things are inconsistent.

7            So he started out in 2005 claiming to be disabled from

8    conversion disorder, PTSD, and some other things, but then it

9    escalated.  He wasn't satisfied with that.  Next he had to

10   later down the line go to permanent and total disability.  And

11   of course the significance of that was to get the VA off his

12   back where he wouldn't have to go get those C&P examinations

13   periodically, and the VA gave it to him.

14           But he wasn't satisfied with that either.  He had to

15   get aid and attendance so his wife could get a check as if he

16   was totally infirm, which he was not.

17           So this was a huge fraud perpetrated on the

18   government, a huge fraud, and this is a system where when a

19   veteran goes in and says that they have something going on --

20   and particularly conversion disorder, there's no diagnostic

21   test; the way they diagnose this is apparently through

22   exclusion, and it's largely based on what the veteran is

23   telling them is going on, what he tells them and what he shows

24   them.

25           And what Mr. Hay consistently told them and showed

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.1351

1    them when he went to these doctor appointments, he went in for

2    his compensation and pension exams, was that he was impaired

3    and he needed a walker or at least a cane and he had episodic

4    shaking and involuntary motor movements and he couldn't drive

5    or he couldn't drive much, and he kept saying it was episodic

6    and he couldn't tell when it was going on, et cetera, et

7    cetera.  And they trusted that and they believed that because

8    that's the way the system works.

9         I suppose they believe that someone that will go to

10   Afghanistan or Iran or Vietnam, or wherever they go put their

11   life on the line, is so honorable that they won't come back

12   from that military service and act dishonorably.  This system

13   is based on trust, that veterans are honorable and that they're

14   not going to defraud the system that is in place to help them.

15   And probably that's the way it most of the time works until

16   somebody like Mr. Hay comes along who engaged in honorable

17   military service and then comes home and acts dishonorably,

18   defrauding the very systems in place to help people like him

19   who probably did come back from wartime with PTSD or other

20   problems, who, you know, are entitled to go to school on the GI

21   Bill even if they don't have a disability.

22        That program has been in place for, what, 80 years,

23   post-World War II, GI bill; you don't have been to disabled.

24   Mr. Hay took advantage of that, and that's not part of the

25   fraud, but I'll never forget that he told one of his examiners

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                  USA v. Bruce L. Hay
                                                  ROA - Volume 3, p.1352

1   that he got this bachelor's degree in management from I think

2   it was Mid-America Nazarene, and in his words it was a bunch of

3   bullshit.  So can taxpayers spent money for him to get a

4   college degree and he referred to it as bullshit.  And frankly

5   I think that's the way Mr. Hay looked at all of this; it was a

6   bunch of BS, that he could game and get as much as he could

7   possibly bleed out of the system.

8          He had no regard and no respect for this system, and I

9   think it was evident today, Mr. Hay, when you read your

10  statement to me you still have no regard and no respect for

11  this system because in your mind, you know, they owe you more.

12  It's never going to be enough.  They owe you more.  They're the

13  bad guys.  Because you served, you're entitled to anything you

14  want.  That's the way you presented for the last 15 years.

15  That's the way you present today.

16         And I take all of that into consideration in

17  determining that this is a case where there should be a

18  guideline sentence imposed.  This is a Heartland case.  In

19  fact, this is a case where I could certainly justify giving a

20  longer sentence than I'm going to impose, but because of these

21  3553(a) factors, I am giving significant weight to the fact

22  that Mr. Hay is a war veteran.

23         I have to consider in determining the appropriate

24  sentence the following:  I have to consider what would be a

25  sentence that is sufficient, but not greater than necessary, to

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.1353

1    reflect the seriousness of the offense.  I'm not going to

2    repeat myself.  I've just told you how serious I think this is.

3              I have to give a sentence that will promote respect

4    for the law.  Mr. Hay has no respect for the law, none

5    whatsoever.  It's evident in the way that he treated the VA,

6    and not just the VA, he got Social Security disability

7    benefits.  And there was a point when he was getting VA

8    disability and Social Security disability, and to be clear, I'm

9    not saying -- I am not finding that he was not entitled to any

10   disability benefits.  I'm just saying that he defrauded the

11   system in going after full benefits, 100 percent disability

12   when he clearly was not 100 percent disabled.

13             But there was a point when he was getting VA; he was

14   getting Social Security.  Meanwhile he gets unemployment

15   compensation benefits.  He applies for unemployment

16   compensation benefits, which means you have to attest that you

17   are ready, willing, and able to work, and then of course, you

18   know, he's getting farm subsidies and representing that he's

19   the only farm laborer.  That's another government entity.  And

20   then of course, you know, he's got the mechanic's lien on the

21   family farm, so he's trying to get his cake and eat it too.

22             He's getting benefits based on him working, and he's

23   getting benefits based on his inability to work.  No respect

24   for the law.

25             I have to impose a sentence that will provide just

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.1354

1    punishment for the offense, and as I've said, I think just

2    punishment in a case like this is one that's within the

3    guideline range.

4          I have to impose a sentence that will afford adequate

5    deterrence to criminal conduct.  I am not at all convinced

6    right now that Mr. Hay is specifically deterred from proceeding

7    to engage in other fraudulent activity based on his nature and

8    his characteristics, but when I think about general deterrence,

9    that's important too, and I'll remember the neighbors of the

10   family farm that both testified, the married couple, both

11   veterans, both came back into the community, got benefits, went

12   to work, which is what Mr. Hay should have done.

13         And so when you think about people in the community,

14   veterans or even not who are aware because they saw Mr. Hay in

15   other context in the community aware that he got $500,000-plus

16   in VA disability benefits yet was acting in the community the

17   way he's acting, there's some real strong compelling reasons

18   for me to impose a prison sentence to generally deter others

19   from engaging in this kind of fraudulent conduct and to

20   essentially steal money from a system that was designed to help

21   people that are entitled to our help.

22         Finally, protect the public from further crimes of the

23   defendant.  I have absolutely no confidence that Mr. Hay given

24   the opportunity wouldn't continue to engage in fraud of some

25   sort at this point in life.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.1355

1        The term of supervised release in addition to the

2   imprisonment sentence will allow the defendant the opportunity

3   to receive correctional treatment in an effective manner and

4   assist with community reintegration.

5        The court intends to order a special assessment of

6   $100 per count, for a total of $1,600, to the Crime Victims

7   Fund.

8        The court does not intend to impose a fine as

9   imposition of such would hinder Mr. Hay's ability to pay

10  restitution.

11       The superseding indictment includes a forfeiture

12  allegation.  The government has indicated they do not intend to

13  proceed with that.

14       The court makes the following restitution findings

15  based on a preponderance of the evidence and the presentence

16  report:  Restitution totalling $537,915.87 is owed to the

17  Veterans Administration.  Pursuant to the provisions of 18

18  U.S.C. Section 3663(a) and 3664, the court is required to order

19  restitution in the full amount of the victim's losses as

20  determined by the court and without consideration of the

21  economic circumstances of the defendant.  The court intends to

22  waive interest on restitution.

23       The court intends to impose the mandatory and special

24  conditions of supervision set forth in Part D of the

25  presentence report.  There is a financial condition that

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.1356

1    restricts new credit charges or accounts and requires providing

2    release of information forms to the U.S. Probation Office to

3    access financial information.  This is necessary to ensure that

4    restitution is paid to the victim and to protect the public

5    from further crimes of the defendant.

6         Mr. Hay has a documented mental health history, so a

7    special condition requiring mental health treatment will allow

8    him to receive counselling to address mental health issues and

9    provide him with needed medical care.

10        Finally, the nature of the offense and Mr. Hay's

11   complete and utter failure to take responsibility for his

12   actions warrant participation in a cognitive behavioral program

13   which may include moral reconation therapy.  This program will

14   assist in changing Mr. Hay's thinking patterns and will address

15   protection of the public from further crimes of the defendant

16   as well as provide the defendant with needed correctional

17   treatment.

18        I'll make one more observation in response to

19   something that Mr. Hay said.  He said that this case boiled

20   down to whether he needed to use a cane or walker and whether

21   he could never drive, and those are referencing VA rating

22   criteria, which obviously he's quite familiar with.  No, the

23   case didn't just boil down to those things.  It boiled down to

24   all kinds of other representations that Mr. Hay and his wife

25   made to the VA and these examining doctors and examiners about

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.1357

1    what he could and couldn't do.

2            And I will tell you there was a lot of circumstantial

3    evidence here, but the jury also saw with their own eyes, and,

4    granted, these cameras weren't on 24 hours a day, but they were

5    on for periods of time in front of Mr. Hay's house, so the jury

6    got to see how he behaved in front of his house and in the

7    driveway when he didn't think eyes were on him.  They got to

8    see how he behaved at Sam's Club.  They even got to see how he

9    behaved in the doctor's office parking lot where, in my view,

10   he put on a quite a performance coming and going, but when he

11   sees coins on the ground, he doesn't hesitate to stoop and pick

12   them up.

13           But there was lots of kind of circumstantial evidence

14   from which one could infer that it was performance art in large

15   part.  And one thing that I recall is we heard again and again

16   from Mr. Hay, things his wife said as well, that, you know,

17   this isn't 24/7; these are episodes.  And I think the medical

18   professional said that too.  Conversion disorder is a

19   neurological disorder.  It presents seizure-like activity or

20   involuntary movements, episodic.  It's not all the time, which,

21   okay, may mean you can drive, may mean you can do certain

22   things at certain times.

23           But we also heard both from the medical professionals

24   and out of Mr. Hay's mouth and his wife's mouth that these came

25   on without warning.  That's the way conversion disorder works.

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                            USA v. Bruce L. Hay
                                            ROA - Volume 3, p.1358

1    And I'll never forget seeing Mr. Hay walk out of his house and

2    carry Milo, I assume it was.  It was an infant in an infant

3    carrier, carry that baby to his truck, put that baby in the

4    truck in the infant carrier, and Mrs. Hay is right behind him.

5    And I'm thinking why in the world if you've got episodic,

6    unplanned seizure, whatever you want to call it, movements

7    would you trust yourself to carry an infant and put the infant

8    in the infant carrier to the car and lock it in when Mrs. Hay

9    was freely available to do that?

10           I don't think, Mr. Hay, you recognize how damaging

11   those videos were and how just common sense people could look

12   at those and say there are things he's doing that there's no

13   way he would do if what you say what was happening in your life

14   was really happening.  And that would include such things as

15   hauling a couple thousand pounds of scrap in a truck to another

16   town or another county, however far that might be, by yourself

17   on sometimes almost a daily basis.

18           I mean we could go on and on and on.  The evidence

19   here was very strong and it was very compelling, and the jury's

20   verdict was warranted, and Mr. Hay has not accepted

21   responsibility for any of this.

22           Mr. Hay is on bond.  He has complied with the

23   conditions of release, so voluntary surrender is appropriate.

24           Are there objections by the government to the sentence

25   as tentatively announced?

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-20044-JAR
                                        USA v. Bruce L. Hay
                                        ROA - Volume 3, p.1359

1          MR. OAKLEY:  No, Your Honor.

2          THE COURT:  Are there objections by the defendant to

3   the sentence as tentatively announced?

4          MS. RAMSEY:  No, Your Honor.

5          THE COURT:  One other observation I'll make, Mr. Hay,

6   and that is in your statement you were complaining about your

7   representation.  You received incredibly effective

8   representation.  Given the evidence and given what could be

9   worked with, you had two lawyers, two of the best lawyers in

10  the state.  I've often said if I were indicted in federal

11  court, I would want the Federal Public Defenders Office

12  representing me because this is all they do.  They're highly

13  qualified.  They all have excellent educations and many, many

14  years of experience.  And despite this extremely strong and

15  compelling evidence, I think they gave you the very best

16  defense they possibly could have given you.  You received

17  highly effective assistance of counsel, but when you're guilty,

18  you're guilty.

19          All right.  The court determines that the

20  presentence -- Ms. Ramsey, are there any requests for

21  designation?  My intention was to recommend placement at

22  Springfield Federal Medical Center because Mr. Hay does have

23  medical issues.  That's a hospital, one of two or three in the

24  federal system.  And that's not saying he'll go there.  They're

25  going to assess him and figure it out for themselves, and maybe

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                          2:19-cr-20044-JAR
USA v. Bruce L. Hay
ROA - Volume 3, p.1360

1    they'll think he belongs there or maybe they'll think he

2    doesn't.  But that will be my recommendation, and they do honor

3    that if they can.  If that's not what he wants or if you have a

4    different recommendation, that's fine.

5              MS. RAMSEY:  May I have one moment?

6              THE COURT:  Sure.

7              MS. RAMSEY:  Yes, Your Honor, we would agree with that

8    recommendation.

9              THE COURT:  All right.  The court determines that the

10   presentence investigation report as corrected or modified by

11   the court and the previously stated findings are accurate and

12   orders those findings incorporated in the following sentence:

13             Pursuant to the Sentencing Reform Act of 1984 it is

14   the judgment of the court that the Defendant Bruce Hay is

15   hereby sentenced to the custody of the Bureau of Prisons for a

16   term of 37 months on each of Counts 1 through 16 to run

17   concurrently.  The court will recommend he be designated to

18   Springfield Federal Medical Center so that his medical issues

19   can be addressed while he's incarcerated.

20             This term of imprisonment shall be followed by three

21   years of supervised release on each of Counts 1 through 16 to

22   run concurrently.

23             Within 72 hours of release from the custody of the

24   Bureau of Prisons Mr. Hay shall report to the U.S. Probation

25   Office in the district in which he is released.  While on

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                              2:19-cr-20044-JAR
                                           USA v. Bruce L. Hay
                                           ROA - Volume 3, p.1361

1    supervised release, he shall comply with the mandatory and

2    standard conditions adopted by this court and the special

3    conditions of supervision set forth in Part D of the

4    presentence report.

5            It is ordered Mr. Hay shall pay the United States a

6    special assessment of $100 for each count, totalling $1,600, to

7    the Crime Victims Fund.  Pursuant to 18 U.S.C. Section 3013

8    payment of the assessment is due immediately and may be

9    satisfied while in Bureau of Prisons custody.  Imposition of a

10   fine is waived.

11           Pursuant to 18 U.S.C. Section 3663(a) Mr. Hay is

12   ordered to pay restitution in the amount of $537,915.87 to the

13   victims previously identified by the court.  Payments shall be

14   made to the Clerk U.S. District Court, U.S. Courthouse, Room

15   204, 401 North Market, Wichita, Kansas, 67202.  The restitution

16   is due immediately and shall be satisfied in payments of not

17   less than 10 percent of the funds deposited each month in the

18   defendant's inmate trust fund account and monthly installments

19   of not less than 5 percent of his monthly gross household

20   income over the three years of supervised release to commence

21   30 days after his release from imprisonment.  Interest on

22   restitution is waived.  The court orders --

23           Both the government and defendant are advised of their

24   respective rights to appeal this sentence and conviction.  An

25   appeal taken from this sentence is subject to 18 U.S.C. Section

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                      2:19-cr-20044-JAR
                                                    USA v. Bruce L. Hay
                                                    ROA - Volume 3, p.1362

1    3742.  Mr. Hay is advised that it is your right to appeal the

2    conviction and sentence.  You must timely file a notice of

3    appeal here in the district court so you don't lose your right

4    of appeal.

5          Rule 4(b) of the Federal Rules of Appellate Procedure

6    gives you 14 days after the entry of judgment to file a notice

7    of appeal.  If you request, the clerk of the court shall

8    immediately prepare and file a notice of appeal on your behalf.

9    If you're unable to pay the cost of an appeal, you have the

10   right to apply for leave to appeal in forma pauperis.

11         Voluntary surrender is granted, so Mr. Hay will report

12   to the facility designated by the Bureau of Prisons when he's

13   notified by the U.S. Marshals.  Today before you leave the

14   building, you need to check in with the Marshal Service to get

15   more information about that.  I'm not going to delay the report

16   date.  I don't know what they're running, 30, 45 days out, at

17   least 30 days out usually.  So you'll be home for Christmas at

18   least, but you'll need to report when they tell you to report.

19         One final thought, Mr. Hay, because a lot of times

20   when people are convicted of fraud offenses and they've never

21   been in trouble before, and you're in that category obviously,

22   they have this idea that they're not like people in prison;

23   they're better than people in prison.  They look down on people

24   in prison because they have families and they're good parents

25   and they're -- they're good grandparents and they go to church

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                   2:19-cr-20044-JAR
                                                 USA v. Bruce L. Hay
                                                 ROA - Volume 3, p.1363

1    and, you know, all of those things.  And I want you to know

2    you're going to find lots of people in prison just like you

3    that go to church, that have great relationships with their

4    family, and perhaps have never been in trouble before, but

5    they've done something bad enough that they're in prison now

6    just like you.  You're no better than anybody else in prison,

7    and hopefully that's one of the things you figure out in your

8    journey from the very beginning.

9          You're going to find people that have done some pretty

10   awful things, there's no question about that, but you're also

11   going to find other people that have done bad things just like

12   you and made poor judgments just like you and are working their

13   best to put it behind them and come back out in the community

14   and do all the right things, and I hope that's what will happen

15   for you.  So I wish you the best.

16         All right.  We'll be in recess.

17      (The proceedings were adjourned at 10:53 a.m.)

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                    2:19-cr-20044-JAR
                                  USA v. Bruce L. Hay
                                  ROA - Volume 3, p.1364

1                    C E R T I F I C A T E

2       I, Danielle R. Murray, a Certified Court Reporter and the

3   regularly appointed, qualified, and acting official reporter of

4   the United States District Court for the District of Kansas, do

5   hereby certify that the foregoing is a true and correct

6   transcript from the stenographically reported proceedings in

7   the above-entitled matter.

8       SIGNED 9th of February, 2023

9
                        /s/Danielle R. Murray
10                      DANIELLE R. MURRAY, RMR, CRR
                        United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANIELLE R. MURRAY, RMR, CRR

U.S. District Court, 500 State Avenue, Kansas City, Kansas 66101
(913) 907-1434                                    2:19-cr-20044-JAR
                                                   USA v. Bruce L. Hay
                                                   ROA - Volume 3, p.1365