No. 22-3276

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

BRUCE L. HAY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Kansas
No. 19-cr-20044-JAR

## REPLY BRIEF OF DEFENDANT-APPELLANT BRUCE L. HAY

MELODY BRANDON
  Federal Public Defender

PAIGE A. NICHOLS
Assistant Federal Public Defender
KANSAS FEDERAL PUBLIC
DEFENDER
117 SW 6th Avenue, Suite 200
Topeka, KS 66603
(785) 232-9828
paige_nichols@fd.org

DAVID A. O'NEIL
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave. N.W.
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

BENJAMIN LEB
RACHEL TENNELL
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
bjleb@debevoise.com
rmtennel@debevoise.com

*Counsel for Defendant-Appellant Bruce L. Hay*

## TABLE OF CONTENTS

REPLY ........................................................................................ 1

I.    The District Court Erred By Denying The Motion For
      Judgement Of Acquittal Because The Evidence At Trial Does
      Not Support A Conviction For Stealing Government
      Property. .............................................................................. 1

      A.    This Court Would Not Create A Circuit Split If It
            Overrules The Denial Of Mr. Hay's Motion For
            Judgement Of Acquittal. ......................................... 9

II.   The District Court Erred By Denying The Motion For
      Judgement Of Acquittal Because The Evidence At Trial Was
      Insufficient To Prove Wire Fraud. .................................. 11

III.  The Pole Camera Footage Should Have Been Suppressed. .......... 15

      A.    Mr. Hay Has A Reasonable Expectation Of Privacy In
            The Aggregate Of His Movements Around His Home
            And Its Curtilage. ................................................... 18

      B.    Previous Decisions Of This Court Do Not Require
            Affirmance. ............................................................. 21

      C.    The Good-Faith Exception To The Exclusionary Rule
            Does Not Apply ....................................................... 24

IV.   Mr. Hay Is Entitled To A New Trial Because Of The
      Cumulative Effect Of Various Evidentiary Errors ....................... 26

      CONCLUSION ......................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*California v. Ciraolo*, 476 U.S. 207 (1986) ............................................... 18

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ....... 16, 17, 20, 21, 22

*Cleveland v. United States*, 531 U.S. 12 (2000) ...................................... 6

*Commonwealth v. Mora*, 150 N.E.3d 297 (Mass. 2020) ......................... 17

*Ciminelli v. United States*, 598 U.S. 306 (2023) ...................................... 5

*Corley v. United States*, 556 U.S. 303 (2009) ........................................... 8

*Davis v. United States*, 564 U.S. 229 (2011) ......................................... 25

*Florida v. Jardines*, 569 U.S. 1 (2013) ....................................... 18, 19, 20

*Hibbs v. Winn*, 542 U.S. 88 (2004) ........................................................... 8

*Kyllo v. United States,* 533 U.S. 27 (2001)
........................................................................................ 20, 21, 22

*McNally v. United States*, 483 U.S. 350 (1987) ...................................... 5

*Modoc Lassen Indian Hous. Auth. v. U.S. Dep't of Hous. &*
*Urb. Dev.*, 881 F.3d 1181 (10th Cir. 2017) ....................................... 10

*Morissette v. United States*, 342 U.S. 266 (1952) ........................ 2, 3, 4, 7

*Oliver v. United States*, 466 U.S. 170 (1984) ......................................... 18

*Percoco v. United States*, 598 U.S. 319 (2023) ................................... 6, 7

*Skilling v. United States*, 561 U.S. 358 (2010) ........................................ 7

*United States v. Bass*, 404 U.S. 336 (1971) .............................................. 8

*United States v. Cantu*, 684 F. App'x 703 (10th Cir. 2017) .................. 21

*United States v. Crutchley*, 502 F.2d 1195 (3d Cir. 1974) ...................... 9

*United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004)................. 8, 9

*United States v. Dowl*, 619 F.3d 494 (5th Cir. 2010)................................ 9

*United States v. Games-Perez*, 695 F.3d 1104 (10th Cir. 2012)........................................................................................ 10

*United States v. Herrera*, 444 F.3d 1238 (10th Cir. 2006)..................... 24

*United States v. Herrera-Martinez*, 525 F.3d 60 (1st Cir. 2008)............................................................................................ 9

*United States v. Jackson*, 213 F.3d 1269 (10th Cir. 2000)......... 21, 22, 23

*United States v. Jones*, 565 U.S. 400 (2012).............................. 17, 18, 21

*United States v. Leon*, 468 U.S. 897 (1984)........................................... 24

*United States v. Madden*, 682 F.3d 920 (10th Cir. 2012)...................... 25

*United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994) ............. 12, 15

*United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) ............ 23, 24

*United States v. O'Connor*, 874 F.3d 1147 (10th Cir. 2017) .................... 9

*United States v. Owens*, 782 F.2d 146 (10th Cir. 1986)......................... 24

*United States v. Scales*, 903 F.2d 765 (10th Cir. 1990).......................... 24

*United States v. Turley*, 352 U.S. 407 (1957) ......................................... 1

## Statutes and Rules

18 U.S.C. § 82 ........................................................................................... 3

18 U.S.C. § 87 ........................................................................................... 3

18 U.S.C. § 100 ......................................................................................... 3

18 U.S.C. § 101 ......................................................................................... 3

18 U.S.C. § 641 ......................................................................................... 1

18 U.S.C. § 665 ......................................................................... 7

18 U.S.C. § 666 ......................................................................... 7

18 U.S.C. § 668 ......................................................................... 7

18 U.S.C. § 670 ......................................................................... 7

Fed. R. Evid. 701 ...................................................................... 27

**Other Authorities**

OSAWATOMIE, KAN., ZONING REGULATIONS art. 5.10 (2017) .................... 20

## REPLY

I.    **The District Court Erred By Denying The Motion For Judgement Of Acquittal Because The Evidence At Trial Does Not Support A Conviction For Stealing Government Property.**

The government is incorrect that 18 U.S.C. § 641 covers fraud and false pretenses.  The plain text, history, and statutory construction of Section 641 does not support the government's broad interpretation of that statute.  Section 641 nowhere includes the words "false pretenses" nor "fraud."  It reads:

> [w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, . . . ; or [w]hoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted . . . [s]hall be fined under this title or imprisoned . . . .

18 U.S.C. § 641.  This Court should not read into the law words and concepts that Congress chose to omit.  *United States v. Turley*, 352 U.S. 407, 418 (1957) (explaining that "the principle of lenity which should guide construction of criminal statutes . . . precludes extending the term 'stolen' to include every form of dishonest acquisition.") (citation omitted).  The government's effort to rewrite Section 641

"mudd[ies] the statute's plain meaning." *See* Answering Br. for the United States 10 [hereinafter Gov't Resp.].

As Mr. Hay explained in his opening brief, Congress understood the terms it chose to include in Section 641, and it specifically excluded those terms which the government desires to read in. *See* Br. of Def.- Appellant 23–31 [hereinafter Br.]. The government contends that the Court should draw no conclusions from the fact that Section 641 uses the word "steals" instead of "fraud" or "false pretenses" to describe the actions prohibited under this statute. *See* Gov't Resp. 16 (citing *Morissette v. United States*, 342 U.S. 266 n.28, 272–73, n.33 (1952)). *Morissette vs. United States* refutes that contention. The Court in *Morissette* looked to the 1940 editions of the statutes that, in 1947, Congress condensed into Section 641 in an effort to minimize uncertainty "so that [the statute] will be understandable, not only to the judges and lawyers but to laymen." *See Revision of Titles 18 and 28 of the United States Code: Hearing on H.R. 1600 and H.R. 2055 Before the H. Comm. on the Judiciary Subcomm. No. 1*, 80th Cong. 2 (1947) (Hon. John M. Robison, Chairman, explaining that the Subcommittee hoped the bills would "get these laws in better shape" and "have all the

laws properly classified and properly titled, so that [Congress and courts] can turn to them quickly and easily"); *Morissette*, 342 U.S. at 265–67. Those preexisting 1940 statutes (18 U.S.C. §§ 82, 87, 100, and 101) did not include the words "fraud" nor "false pretenses."[1] Therefore, even the statutes codified into Section 641 did not contain additional verbs beyond "steal," "purloin," "embezzle," or "convert." The history of

---

[1] 18 U.S.C. (1940 ed.) § 82 stated "'[w]hoever shall take and carry away or take for his use, or for the use of another, with intent to steal or purloin . . . any property of the United States . . . shall be punished . . . .'" *Morissette*, 342 U.S. at 266 n.28.

18 U.S.C. (1940 ed.) § 87 stated "'[w]hoever shall steal, embezzle, or knowingly apply to his own use, or unlawfully sell, convey, or dispose of, any ordnance, arms, ammunition, clothing, subsistence, stores, money, or other property of the United States, furnished or to be used for the military or naval service, shall be punished . . . .'" *Id.*

18 U.S.C. (1940 ed.) § 100 stated "[w]hoever shall embezzle, steal, or purloin any money, property, record, voucher, or valuable thing whatever, of the moneys, goods, chattels, records, or property of the United States, shall be" punished. *Id.*

18 U.S.C. (1940 ed.) § 101 stated "[w]hoever shall receive, conceal, or aid in concealing or shall have or retain in his possession with intent to convert to his own use or gain, any money, property, record, voucher or valuable thing whatever, of the moneys, goods, chattels, records, or property of the United States, which has thereto been embezzled, stolen, or purloined by any other person, knowing the same to have been so embezzled, stolen, or purloined, shall be" punished.

Section 641 alone creates ample doubt that Section 641 historically

covered fraud offenses, contrary to the government's assertion.  *See*

Gov't Resp. 14–16.

Moreover, the Court explained in *Morissette* that "[s]tealing,

larceny, and its variants and equivalents, were among the earliest

offenses known to the law that existed before legislation."  342 U.S. at

260.  Stealing and larceny offenses "are invasions of rights of property

which stir a sense of insecurity in the whole community and arouse

public demand for retribution."  *Id.*[2]  Fraud, in contrast, does not

involve any "invasion" of property and therefore does not rank with the

enumerated acts.  The principle of *Morissette* applies here:  "The spirit

of the doctrine which denies to the federal judiciary power to create

---

[2]    The defendant in *Morissette* salvaged used bomb casings that were
thrown in piles on a large tract of uninhabited and untended land in
a sparsely populated area.  342 U.S. at 247.  Although the defendant
admitted to carrying away and selling the used bomb casings in
broad daylight to sell for a small sum, he thought that the bomb
casings were abandoned and unwanted and "had no intention of
stealing" them.  *Id.* at 248.  The trial court ruled that Morissette's
intent did not matter because he took the used bomb casings without
permission from U.S. government property.  The Court reversed,
noting that although Section 641 covered the type of *actus rea* at
issue (taking and carrying away physical government property),
*mens rea* was still required.

crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute." 342 U.S. at 263.

The Supreme Court's recent holdings in *Ciminelli v. United States* and *Percoco v. United States* reinforce that principle. In *Ciminelli*, the Court addressed the question whether the Second Circuit's "right to control" theory of fraud was a valid basis to convict a defendant under the federal wire fraud statute. *Ciminelli v. United States*, 598 U.S. 306, 308 (2023). Under that theory, a defendant could be found guilty of wire fraud "if he scheme[d] to deprive the victim of 'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" *Id.* at 309 (citation omitted). The Court invalidated this theory, concluding that the wire fraud statute deals with traditional property interests and not the type of intangible interest that the government asked the Court to uphold. *Id.* at 309, 314 ("The right-to-control theory cannot be squared with the text of the federal fraud statutes, which are 'limited in scope to the protection of property rights.'") (*citing McNally v. United States*, 483 U.S. 350, 360 (1987)).

The Court explained that it "ha[s] consistently rejected such federal fraud theories that 'stray from traditional concepts of property.'" *Id.* at 314–15 (citing *Cleveland v. United States*, 531 U.S. 12, 13 (2000)). That lower courts had "for decades" embraced this incorrect theory did not dissuade the Court from prohibiting the expansion of federal criminal law beyond the strict text of the statute. *Id.* at 312–13, 315 (noting that "the right-to-control theory vastly expands federal jurisdiction without statutory authorization . . . [making] almost any deceptive act . . . criminal").

Similarly, in *Percoco*, the Court addressed the question whether and when a private person could be convicted of "honest-services" wire fraud by "depriv[ing] the public of its 'intangible right of honest services'" pursuant to 18 U.S.C. §§ 1343, 1346. *Percoco v. United States*, 598 U.S. 319, 322 (2023). The Court held that the trial judge's interpretation of the test to determine § 1346's applicability to private persons swept too broadly. *Id.* at 322, 328–34. As Justice Gorsuch noted in his concurrence, "the Constitution's promise of due process does not tolerate that kind of uncertainty in our laws—especially when criminal sanctions loom . . . leav[ing] people with no sure way to know

what consequences will attach to their conduct." *Id.* at 333 (Gorsuch, J., concurring) (citation omitted).

Even prior to the decisions in *Ciminelli* and *Percoco*, the Court has moved away from such atextual interpretations of criminal statutes. *See, e.g.*, *Percoco*, 598 U.S. at 328–29 (explaining "'the intangible right of honest services' [in 18 U.S.C. § 1346 wire fraud cases] must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances.") (citing *Skilling v. United States*, 561 U.S. 358, 409 (2010)).

The government states that 18 U.S.C. § 659—another statute adopted at the same time as Section 641—was based on earlier laws that also specifically incorporated "fraud." *See* Gov't Resp. 19–20. That observation, however, provides powerful support for Mr. Hay's position. Congress chose to keep the same language in § 659 today. *Id.* at 20. If Congress desired to add the crime of fraud or false pretenses into Section 641, it knew how to do so. *See, e.g.*, 18 U.S.C. §§ 665, 666(a), 668(b), 670(a); *see also Morissette*, 342 U.S. at 263 (explaining that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably

knows and adopts the . . . ideas that were attached . . . in the body of learning from which it was taken and the meaning its use will convey."). It is a well understood legal principle that Congress does not include superfluous language in the statutes that it creates. *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) ("'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'") (*citing Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). If any form of wrongful taking of property necessarily encompassed "fraud" or "false pretenses," as the government contends, then the specific inclusion of those words in statutes like Section 659 would be superfluous.

Lastly, the government argues that we cannot rely on the rule of lenity absent a "grievous" ambiguity in the statute. Gov't Resp. 21. But the government does not explain what makes an ambiguity "grievous." Such an ambiguity exists "when ordinary means of discerning statutory meaning leave the issue in 'equipoise.'" *United States v. DeGasso*, 369 F.3d 1139, 1149 (10th Cir. 2004) (citation omitted); *accord United States v. Bass*, 404 U.S. 336, 347–48 (1971) (lenity applies when there is "ambiguity concerning the ambit of criminal statutes" and "when choice

has to be made between two readings"); *United States v. O'Connor*, 874 F.3d 1147, 1157 (10th Cir. 2017) (lenity applied after finding "two reasonable interpretations" of the definition at issue). Even if the government's atextual reading of the statute is reasonable, so is our textual reading. At most, the issue is in equipoise and this Court may properly invoke lenity "as a tie-breaker." *DeGasso*, 369 F.3d at 1149.

### A. This Court Would Not Create A Circuit Split If It Overrules The Denial Of Mr. Hay's Motion For Judgement Of Acquittal.

The government contends that three other circuits have concluded that § 641 "extends to obtaining government property by fraud or false pretenses." Gov't Resp. 17–18. But this question was neither raised nor decided in the cases the government cites. In *United States v. Dowl*, the Fifth Circuit rejected the defendant's argument that she could not be convicted under § 641 absent proof that she intended to permanently deprive the government of the property at issue. 619 F.3d 494, 500–02 (5th Cir. 2010). In *United States v. Herrera-Martinez*, the First Circuit rejected the defendant's arguments that § 641 contains asportation and actual-loss elements, and that a residential lease is not a thing of value. 525 F.3d 60, 63–65 (1st Cir. 2008). In *United States v. Crutchley*, the

Third Circuit rejected the defendant's argument that § 641 requires proof that the defendant knew the property belonged to the United States. 502 F.2d 1195, 1201 (3d Cir. 1974). While these decisions affirmed § 641 convictions that arose from fraud-like circumstances, they did not decide the specific question presented here. Courts do not decide questions that "merely lurk in the record, neither brought to the attention of the court nor ruled upon." *Modoc Lassen Indian Hous. Auth. v. U.S. Dep't of Hous. & Urb. Dev.*, 881 F.3d 1181, 1191 (10th Cir. 2017). This Court would thus not create a circuit split by adopting Mr. Hay's interpretation of § 641. And even if it would, the failure of other courts to apply a criminal statute according to its correct terms does not justify this Court doing the same. "[I]t surely cannot be that someone must go to *prison* just so [this Court] can avoid treating him better than those other circuits have incorrectly allowed to be put away." *United States v. Games-Perez*, 695 F.3d 1104, 1123 (10th Cir. 2012) (Gorsuch, J., joined by Holmes, J., dissenting from denial of *reh'g en banc*).

II.  **The District Court Erred By Denying The Motion For Judgement Of Acquittal Because The Evidence At Trial Was Insufficient To Prove Wire Fraud.**

Mr. Hay is a disabled, Iraq war veteran with conversion disorder, Co-morbid Post Traumatic Stress Disorder ("PTSD"), depression, and anxiety.  R3.943–45; R3.1223.  He was diagnosed with conversion disorder approximately 12 times from 2005 through 2017, as the government's expert acknowledged.  R3.896–98.  Mr. Hay's doctors' diagnoses incorporated objective observations of Mr. Hay medical tests, such as EEGs and MRIs.  *See, e.g.*, R3.898–901, R3.964; Exs. 201, 202, 203, 204, 206, 209, 215, 208-B, 210-A, 210-B, 821, 822.  The government conceded in its response that in surveillance of Mr. Hay, agents noted "a few instances of observable impairment" in his physical capabilities.  Gov't Resp. 6.  Further, the government relies on the same witness' testimony who also said that she "did not observe any deficits in any other circumstances . . . when the defendant may not have known that the camera was on."  R3.850.  That observation demonstrates a key feature of conversion disorder—it is inconsistent.  Conversion disorder is diagnosed in light of the "variability and discrepancy," R3.1222; and neurological symptoms, such as tremor and weakness, R3.1208; that

present without evidence of epileptic seizures on an EEG.  R3.1221–22.

Although the jury concluded that Mr. Hay was guilty of wire fraud, the

evidence at trial was insufficient to show that Mr. Hay made false

statements to the government, and this Court should reverse the lower

court's denial of his motion for a judgement of acquittal.

Moreover, Mr. Hay's C&P exam noted that the "involuntary

movements in his body . . . continued to persist and progress at different

stressful situations."  R3.851.  The government relied in part on footage

that showed Mr. Hay attending doctor appointments and social security

administration appointments, events that are in and of themselves

stressful and could have caused Mr. Hay to exhibit more visible

symptoms of conversion disorder than times where he was observed on

his farm engaging in conduct that is more familiar.

This Court has reversed convictions of mail fraud because of

evidence similar to Mr. Hay's.  In *United States v. Migliaccio*, this Court

held that when two doctors were convicted of mail fraud for allegedly

submitting false claims to the Civilian Health and Medical Program of

the Uniformed Services ("CHAMPUS") for surgeries they performed,

the evidence was insufficient to show that the doctors made false

statements. 34 F.3d 1517, 1523 (10th Cir. 1994). The two doctors performed surgeries on patients who wished to reverse their fertility sterilization but also had a disease for which they sought treatment. *Id.* at 1522. CHAMPUS would pay out claims on some procedures but would not pay claims for reversal of fertility sterilizations. *Id.* This Court concluded that the evidence was insufficient to show that the doctors made false claims because CHAMPUS required physicians to report each medical procedure performed when submitting a claim, even if some procedures were not covered under CHAMPUS. *Id.* The two defendant-doctors submitted claims for procedures where their patients "had substantial symptoms of disease in addition to a desire to restore fertility." *Id.* at 1523. The court concluded that the patients had sought treatment for legitimate pelvic problems in addition to fertility treatment, and it was CHAMPUS's duty to evaluate the claims. *Id.* ("CHAMPUS has the duty to evaluate claims and determine amounts of coverage and exclusions; its failure to perform these duties adequately does not convert an otherwise valid claim into a false representation."). *Id.*

Similarly, Mr. Hay did not make false statements to the VA or his medical providers.  Mr. Hay informed his doctors and the VA that he did not experience uniform symptoms from his disability at all times— that he had "bigger episodes once or so a month" and "smaller episodes several times a week that might cause cramping or other smaller problems for him."  R3.624–25.  In fact, Mr. Hay's smaller cramping episodes would not be evident through video surveillance footage, and would have been the symptoms he experienced more frequently.  As the defense expert explained, Mr. Hay "consistently had the same issues.  However, they were variable.  Sometimes they'd be present, sometimes they weren't.  But he was complaining about the same things over the decade of time he was treated."  R3.1224.  The government's own exhibit includes daily, and sometimes minute-to-minute, summaries of the pole camera footage showing that Mr. Hay used or carried a cane most of the time when he is home.  Gov't Ex. 101.  Mr. Hay would have no reason to carry or use a cane when he was walking between his driveway and his porch—unaware that he was being monitored by the government—if he were feigning his disorder.  Mr. Hay did not know when he would experience symptoms of his conversion disorder, and

therefore he carried his cane in case he suddenly needed it.  *See* Gov.
Ex. 101.  The government's evidence showing Mr. Hay performing more
laborious tasks does not mean that Mr. Hay made false statements
about his disability.  Mr. Hay's presentation on the video footage of
inconsistent stiff movements and tremors illustrated the "hallmark of"
conversion disorder.  R3.1228–29.

Mr. Hay could not have successfully tricked a dozen, highly-
credentialed doctors into diagnosing him with the same disorder over
the span of 12 years.  To the extent those doctors were incorrect, it "does
not convert an otherwise valid claim into a false representation."
*Migliaccio*, 34 F.3d at 1523.  Mr. Hay is entitled to a judgment of
acquittal as a matter of law.

## III.  The Pole Camera Footage Should Have Been Suppressed.

For nearly ten weeks, the government trained a camera on Mr.
Hay's home and its curtilage, capturing a detailed record of his home
and family life.  Br. 44.  The camera recorded "about 15 hours a day for
68 total days."  R3.567.  It was motion-activated and could zoom, pan,
and tilt to ensure that it obtained clear footage of Mr. Hay, his family,
and visitors to his home.  Br. 39–40; R1.99.  While the camera generally

could not see inside Mr. Hay's home, R1.124, it captured glimpses of the interior through Mr. Hay's front door on multiple occasions. Br. 44 (citing Ex. 100-CC; Ex. 100-P). With the aid of this modern surveillance technology, the government was able to document Mr. Hay's daily activities in a way that no citizen would reasonably expect a nosy neighbor or law enforcement officer using traditional surveillance techniques possibly could. Br. 45–46 (noting that law enforcement installed the pole camera because an investigating agent "did not have any luck" surveilling Mr. Hay with traditional methods).

The privacy implications of this type of warrantless surveillance are underscored by its purpose in this case. The government supplemented its targeted investigation and collected more than 1,000 hours of footage of Mr. Hay's home to mine it for patterns suggesting Mr. Hay did not suffer from a chronic illness. Br. 4, 8–11. The warrantless collection of this "detailed, encyclopedic, and effortlessly compiled" information "impinges on expectations of privacy" precisely because it allows the government to discern sensitive information at its leisure. *Carpenter v. United States*, 138 S. Ct. 2206, 2215–16 (2018) (citation omitted).

Courts have also long recognized the centrality of the home and its curtilage as a site of "core" Fourth Amendment protection, Br. 40–42, and have rightly distinguished between the fact that an individual might "lack an expectation of privacy in some discrete actions they undertake in unshielded areas around their homes" and the notion that the same individual would expect "that every such action will be observed and perfectly preserved for the future." Br. 45–46 (quoting *Commonwealth v. Mora*, 150 N.E.3d 297, 306 (Mass. 2020)). In *United States v. Jones* and *Carpenter v. United States*, the Supreme Court similarly recognized that long-term or intrusive surveillance may impinge on reasonable expectations of privacy where short-term surveillance does not. *See Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring); *Carpenter*, 138 S. Ct. 2206, 2217. For these reasons, the District Court erred in admitting the surveillance footage here and any related testimony. Because of the central role that this footage played in the government's case-in-chief, Mr. Hay was prejudiced by its introduction and is entitled to a new trial.

A.    **Mr. Hay Has A Reasonable Expectation Of Privacy In The Aggregate Of His Movements Around His Home And Its Curtilage.**

Rather than engage with the issues raised by the prolonged and targeted surveillance of Mr. Hay's home and its curtilage, the government downplays the weeks of continuous video monitoring that it conducted as being merely "intermittent."  Gov't Resp. 28.  The government also ignores intervening precedent by arguing that Mr. Hay lacked a reasonable expectation of privacy in his home and its curtilage. Gov't Resp. 28–36.  In fact, Mr. Hay was subjected to ongoing surveillance that captured the aggregate of his movements around his home and its curtilage over more than two months.  Br. 44.  While the government argues that Mr. Hay lacked even a subjective expectation of privacy in his movements around the front of his property because he failed to "take steps to shield [it] from view," Gov't Resp. 30, this argument fails to grapple with the Supreme Court's holdings in *Jones* and *Carpenter*.  Br. 46–50.  And it ignores the fact that individuals have not been required to take affirmative steps for Fourth Amendment protections to extend to the "area intimately linked to [one's] home . . . where privacy expectations are most heightened."  *California*

*v. Ciraolo*, 476 U.S. 207, 213 (1986); *see* Br. 41–42, 45 n.4.  Mr. Hay had

a reasonable expectation of privacy in the aggregate of his movements

around this sensitive area, which stands at the "very core" of the Fourth

Amendment.  *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation

omitted).

An individual's reasonable expectation of privacy in the aggregate

of their movements around their home and its curtilage does not depend

on any steps they take to conceal it from passersby.  Br. 45 n.4, 46.  The

area around the home is treated "as 'part of the home itself for Fourth

Amendment purposes.'"  *Jardines*, 569 U.S. at 6 (quoting *Oliver v.*

*United States*, 466 U.S. 170, 180 (1984)).  "The front porch is the classic

exemplar of an area adjacent to the home and 'to which the activity of

home life extends.'"  *Id.* at 7 (quoting *Oliver*, 466 U.S. at 182 n.12).  The

government does not dispute either that Mr. Hay's front porch, his yard,

and his driveway were part of the curtilage of his home or that such

areas are constitutionally protected from intrusion regardless of the

steps one takes to shield them from view.  *See* Br. 40–42; *Jardines*, 569

U.S. at 6–7 (explaining that one's right "to retreat into his own home"

stands at the "very core" of the Fourth Amendment and "would be

19

significantly diminished if the police could . . . observe his repose from just outside the front window"). The Supreme Court has held that individuals need not take extraordinary measures to protect themselves from intrusive surveillance of their homes or aggregate movements over time. *See* Br. of Amer. Civ. Liberties Union et al. as Amici Curiae Supp. Def.-Appellant 22 (citing *Kyllo v. United States*, 533 U.S. 27, 29–40 (2001); *Carpenter*, 138 S. Ct. at 2220) [hereinafter ACLU Br.].

The government's argument is particularly weak in light of the specific facts of this case. Mr. Hay was prohibited from taking the steps the government suggests would have shielded his property from view and establish a reasonable expectation of privacy. Gov't Resp. 30. Local ordinances forbid Mr. Hay from building a fence taller than four feet. Br. 45 n.4 (citing OSAWATOMIE, KAN., ZONING REGULATIONS art. 5.10 (2017)). While the government argues that this ordinance reflects the attitude that "the front of the home [is] less private than other areas," Gov't Resp. 45, local zoning rules cannot abrogate the Fourth Amendment. *See Jardines*, 569 U.S. at 6 (noting that the Fourth Amendment's protection over curtilage has "ancient and durable roots").

The government also ignores that the existing features of Mr. Hay's home that might have concealed parts of it from occasional passersby could not protect it from the prolonged surveillance at issue here. As in the instances where the pole camera allowed the government to peer into Mr. Hay's home, prolonged video surveillance generally allows the government to see into homes whenever window shades are not drawn or the gates of tall fences are open. This is one reason why even where short-term monitoring might honor societal expectations of privacy, long-term government surveillance impinges on them. Br. at 48–50 (citing *Jones*, 565 U.S. at 415, 430; *Carpenter*, 138 S. Ct. at 2217, 2219).

## B.  Previous Decisions Of This Court Do Not Require Affirmance.

There is no merit to the government's contention that *United States v. Jackson* requires a decision in its favor.[3]  *See* Gov't Resp. 32–44 (citing 213 F.3d 1269 (10th Cir. 2000)).  This argument rests on three

---

[3]  The government concedes that *United States v. Cantu*, which primarily involved pole camera surveillance of public and commercial spaces that receive less Fourth Amendment protection than the home and its curtilage is inapplicable to the facts here.  Br. 53 (citing *Cantu*, 684 F. App'x 703 (10th Cir. 2017)).

fatal flaws. *First*, the government states that "*Jackson* follows from Supreme Court precedent" in *Kyllo v. United States*. Gov't Resp. 33–35 (citing 533 U.S. 27 (2001)). But *Kyllo* was decided *after Jackson* and stands for the proposition that analysis of the Fourth Amendment must seek to "assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo*, 533 U.S. at 34.

While the government goes on to assert that *Jackson* "faithfully applied" the precedents discussed in *Kyllo*, *Kyllo* expressly rejected the notion that the federal courts should mechanically apply past Fourth Amendment precedent without considering intervening technological development. *Kyllo*, 533 U.S. at 34–36. *Jackson* relied on the formal similarity between the "use of video equipment and cameras" and surveillance of "activity visible to the naked eye," 213 F.3d at 1280–81; *Kyllo*, in contrast, instructed federal courts to consider the functional difference between technology-assisted methods and their predecessors. 533 U.S. at 35. Accordingly, *Kyllo* did not dictate *Jackson*—rather, *Kyllo* undermined it.

*Second*, the government ignores the technological changes in visual surveillance in the decades since *Jackson*. Gov't Resp. 33, 36–38. The government asserts that the pole camera here falls into the exception laid out in *Carpenter* because it is an example of a "conventional surveillance technique[]." *Carpenter*, 138 S. Ct. 2206, 2220. The government does not acknowledge, however, that the pole cameras at issue in *Jackson* did not have the same capabilities as the one at issue here. Br. 52–53. The key difference between the pole cameras in *Jackson* and those here is that the cameras in *Jackson* used "video tape" and were incapable of the kind of long-term video monitoring leveled against Mr. Hay. *Jackson*, 213 F.3d 1269, 1280. Accordingly, it is no surprise that *Jackson* did not address the kind of long-term surveillance at issue that this case presents. The pole camera here was also motion-activated so that it would automatically capture Mr. Hay's movements around his home and its curtilage during the period it was in use. R1.99. The surveillance here was thus more invasive and different in kind from that in *Jackson*. Separately, the *Carpenter* Court stated that the prime example of a conventional surveillance technique is a security camera, which is itself a far cry

23

from the pole cameras at issue in either case. *See* ACLU Br. 13 n.6. The facts of *Jackson* are thus easily distinguishable.

*Third*, the government argues that the more than two months of continuous surveillance here was not "detailed and comprehensive" within the meaning of *Carpenter* in part because it was limited to a single location. Gov't Resp. 38–43. This argument ignores the fact that the single location at issue—surveilled for almost ten weeks—was Mr. Hay's home and its curtilage. Br. 48–49 (citing *United States v. Moore-Bush*, 36 F.4th 320, 336 (1st Cir. 2022), *cert. denied sub nom. Moore v. United States*, 143 S. Ct. 2494 (2023)). Prolonged surveillance of the home not only creates a visual record of intimate moments from a suspect's family life, it shows "revealing patterns of movements and visits over time" to the ones revealed by the location tracking in *Carpenter*. Br. 49.

## C.    The Good-Faith Exception To The Exclusionary Rule Does Not Apply.

The good-faith exception "applies only narrowly outside the context of a warrant." *United States v. Herrera*, 444 F.3d 1238, 1251 (10th Cir. 2006). The relevant inquiry is "whether a reasonably well trained officer would have known that the search was illegal." *Id.* at

1253 (citing *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)).

Generally, an illegal, warrantless search or seizure will not be protected

under the good-faith exception. *See United States v. Scales*, 903 F.2d

765, 767–68 (10th Cir. 1990) (declining to apply the exception to a

warrantless seizure of a suitcase); *United States v. Owens*, 782 F.2d

146, 151–53 (10th Cir. 1986) (declining to apply the exception to a

warrantless search of a hotel room).

Here, the government relies on its purported "objectively

reasonable reliance on binding appellate precedent." *Davis v. United

States*, 564 U.S. 229, 239 (2011) (applying the good-faith exception

where "officers' conduct was in strict compliance with then-binding

Circuit law"); *United States v. Madden*, 682 F.3d 920, 926–27 (10th Cir.

2012) (same). While the government claims that, like in *Davis*, the use

of a pole camera here "was authorized by binding precedent in *Jackson*"

and "remained binding even by Hay's lights" until after the surveillance

at issue concluded, Gov't Resp. 48–49, that argument misrepresents

Hay's position on the merits. Br. 42–43. Contrary to the government's

argument that *Jackson* was at best undermined by the Supreme Court's

2018 decision in *Carpenter v. United States*, Mr. Hay has consistently

argued that *Jackson* has always been distinguishable from the facts

here and was inconsistent with the subsequent decisions in *Kyllo* and

later *Jones*. *Id. Davis* therefore does not apply.

The government's good-faith argument rises or falls on the merits

of this case. If this Court holds that the long-term surveillance here is

distinguishable from the video tape recordings at issue in *Jackson*, then

it should also hold that *Jackson* did not constitute "binding appellate

precedent" within the meaning of *Davis*. The surveillance at issue here

occurred in the context of a well-resourced, multi-year federal

investigation into Mr. Hay's disability. Br. 8–11. A reasonable law

enforcement officer, aware of the novel issues here and the changing

Fourth Amendment landscape, would have pursued the many

opportunities that the government had to seek a warrant in this case.

The government's failure to do so does not merit application of the good-

faith exception to the exclusionary rule.

## IV. Mr. Hay Is Entitled To A New Trial Because Of The Cumulative Effect Of Various Evidentiary Errors.

In his opening briefing, Mr. Hay argued that the District Court

abused its discretion in making a number of evidentiary rulings,

including permitting law enforcement officers to narrate the video

footage introduced at trial, admitting the hearsay medical records into evidence, and allowing unduly prejudicial evidence from more than two years after Mr. Hay was charged to be presented to the jury.  Br. 55–64. The government's response is merely to assert that these rulings comported with the relevant Federal Rules of Evidence.  Gov't Resp. 49– 57.  For example, Mr. Hay argued that permitting law enforcement narration of the video footage presented at his trial was improper lay witness opinion testimony in violation of Federal Rule of Evidence 701. *See* Br. 59–61; Fed. R. Evid. 701(b) (requiring that lay witness opinion testimony be "helpful to clearly understanding the witness' testimony or to determining a fact in issue").  The government does not explain how this testimony qualified under Rule 701(b).  Gov't Resp. 51–53.  As such, this Court should hold that admitting this testimony was error. The government's response to Mr. Hay's other arguments similarly gainsays the contentions in his opening brief.  Gov't Resp. 53–57. Accordingly, Mr. Hay asks this Court to hold that the District Court erred in admitting this evidence and reverse the judgment below.

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed.

This Court should remand with instructions for the District Court to

enter judgment of acquittal or, in the alternative, order a new trial.


Dated: September 21, 2023

Respectfully submitted,

*/s/ David A. O'Neil*

MELODY BRANDON
   Federal Public Defender

PAIGE A. NICHOLS
Assistant Federal Public
Defender
KANSAS FEDERAL PUBLIC
DEFENDER
117 SW 6th Avenue, Suite 200
Topeka, KS 66603
(785) 232-9828
paige_nichols@fd.org

DAVID A. O'NEIL
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave. N.W.
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

BENJAMIN LEB
RACHEL TENNELL
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
bjleb@debevoise.com
rmtennel@debevoise.com

*Counsel for Defendant-Appellant Bruce L. Hay*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of Rule 32(a)(5) and (7)(B) of the Federal Rules of Appellate Procedure because it contains approximately 5,659 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century font.

Date: September 21, 2023

*/s/ Benjamin Leb*
Benjamin Leb
Debevoise & Plimpton LLP

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2023, the foregoing Reply Brief of Defendant-Appellant Bruce L. Hay was filed with the Clerk of the United States Court of Appeals for the Tenth Circuit via the Court's electronic filing system and served on all counsel of record via CM/ECF.

In addition, I hereby certify that 7 hard copies of the foregoing brief, will be submitted to FedEx for delivery within five business days to the Clerk of the Court at the address below in compliance with 10th Cir. Rule 31.5:

> Tenth Circuit Court of Appeals
> 1823 Stout Street
> Denver, Colorado 80257

Date: September 21, 2023

*/s/ Benjamin Leb*
Benjamin Leb
Debevoise & Plimpton LLP