FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 19, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

BRUCE L. HAY,

     Defendant - Appellant.

-----------------------------------------------------

REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS; FIRST
AMENDMENT COALITION; FREEDOM
OF THE PRESS FOUNDATION; THE
MEDIA INSTITUTE; NATIONAL PRESS
PHOTOGRAPHERS ASSOCIATION;
THE NEWS LEADERS ASSOCIATON;
NEWS/MEDIA ALLIANCE; RADIO
TELEVISION DIGITAL NEWS
ASSOCIATION; SOCIETY OF
ENVIRONMENTAL JOURNALISTS,

     Amici Curiae.

No. 22-3276

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:19-CR-20044-JAR-1)**
_____

Rachel Tennell, Debevoise & Plimpton LLP, New York, New York (Benjamin Leb and
Anagha Sundararajan, Debevoise & Plimpton LLP, New York, New York; David A.
O'Neil, Debevoise & Plimpton LLP, Washington, D.C.; and Melody Brandon, Federal
Public Defender, and Paige A. Nichols, Assistant Federal Public Defender, Kansas

Federal Public Defender's Office, Topeka, Kansas, with her on the briefs) for Defendant-Appellant.

Kevin J. Barber, United States Department of Justice, Criminal Division, Appellate Section, Washington, D.C. (Nicole M. Argentieri, Acting Assistant Attorney General, and Lisa H. Miller, Deputy Assistant Attorney General, United States Department of Justice, Criminal Division, Appellate Section, Washington, D.C.; and Kate E. Brubacher, United States Attorney, District of Kansas, and James A. Brown, Assistant United States Attorney, Appellate Chief, District of Kansas, Topeka, Kansas, with him on the brief) for Plaintiff-Appellee.

Brett Max Kaufman, American Civil Liberties Union Foundation, New York, New York; Sharon Brett, American Civil Liberties Union of Kansas, Overland Park, Kansas; Tim Macdonald, American Civil Liberties Union of Colorado, Denver, Colorado; and Tom McBrien, Electronic Privacy Information Center, Washington, D.C., filed an Amicus Curiae Brief of American Civil Liberties Union, American Civil Liberties Union of Kansas, American Civil Liberties Union of Colorado, Brennan Center for Justice, Center for Democracy & Technology, and Electronic Privacy Information Center in Support of Defendant-Appellant.

Katie Townsend, Counsel of Record for Amici Curiae, and Gabe Rottman, Grayson Clary, and Emily Hockett, Reporters Committee for Freedom of the Press, Washington, D.C., filed an Amicus Curiae Brief of The Reporters Committee for Freedom of the Press and 8 Media Organizations in Support of Defendant-Appellant.

—————————————————————

Before **TYMKOVICH**, **MURPHY**, and **CARSON**, Circuit Judges.

—————————————————————

**TYMKOVICH**, Circuit Judge.

—————————————————————

Does the Fourth Amendment permit the government to surveil a home for months on end without a warrant?  This case requires us to decide.

The Department of Veterans Affairs (VA) offers lifetime benefits to permanently disabled veterans.  A Kansas jury convicted Bruce Hay of ten counts of stealing government property and six counts of wire fraud as part of a scheme to

defraud the VA by exaggerating his disability.  As part of its investigation, VA agents installed a pole camera across the street from his house to film his activities.

Mr. Hay appeals his conviction.  He contends that (1) the evidence presented at trial is insufficient to support a conviction, (2) the VA's installation of a pole camera violated his Fourth Amendment rights, and (3) the district judge wrongfully admitted evidence to the extent that it deprived him of a fair trial.

We affirm the district court.

## I. Background

Bruce Hay is a U.S. Army veteran.  In 2005, while at home in Kansas, he was involved in a serious car accident.  Doctors diagnosed him with "functional neurological disorder," or FND, a psychological disorder that impaired his mobility.  Following this diagnosis, Mr. Hay applied for disability benefits from the VA.  In 2006, the VA determined that Mr. Hay was permanently disabled and therefore entitled to benefits.

Six years later, the VA Inspector General's office received an anonymous tip alleging that Mr. Hay was not, in fact, permanently disabled.  It initiated an investigation into Mr. Hay's disability status.  Mr. Hay lived in Osawatomie, a small town in eastern Kansas.  To investigate Mr. Hay's mobility, officers feigned an operation involving deer poaching on a nearby farm so that they could monitor Mr. Hay from a closer distance.  They also tailed him to medical appointments and other events.  For a more robust record of his daily activities, they installed a pole camera on a school rooftop across the street from Mr. Hay's house.  The camera was remote-

controlled and activated by motion, and it recorded near constant footage of Mr.

Hay's house as visible from across the street.  All told, the camera captured 15 hours

of footage per day for 68 days.

Over the course of a six-year investigation, the VA finally developed enough

evidence to suggest that Mr. Hay was faking his disability and that he was not

entitled to disability benefits.  Subsequently, a grand jury indicted Mr. Hay on ten

counts of stealing government property in violation of 18 U.S.C. § 641 and six counts

of wire fraud in violation of 18 U.S.C. § 1343.  A jury found Mr. Hay guilty of all

counts.

## II.  Analysis

Mr. Hay argues that he was entitled to a judgment of acquittal or a new trial

for three reasons:  (1) the evidence presented at trial was insufficient to support a

conviction for stealing government property or for wire fraud; (2) the district court

admitted pole camera footage that was obtained in violation of the Fourth

Amendment; and (3) the district court admitted other incriminating evidence and

testimony in violation of the Federal Rules of Evidence.

### A.  Sufficiency of the evidence

#### 1.  Stealing government property

Mr. Hay first contends his conviction should be vacated because the

government did not supply sufficient evidence to prove that he stole government

property.  In reviewing motions for a judgment of acquittal, we must consider

whether "viewing the evidence in the light most favorable to the Government, any

rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004).

Mr. Hay was charged with fraudulently taking government property under 18 U.S.C. § 641. That statute makes it a crime to take government property in four different ways. It applies to:

> Whoever [1] embezzles, [2] steals, [3] purloins, or [4] knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof.

18 U.S.C. § 641 (brackets added).

Mr. Hay argues that because his scheme involved fraud and deception, but not theft, the statute does not cover his misconduct. The question, then, is whether "steal[ing]," as used in the statute, encompasses acts of fraud and deception. It does.

The term "'steal' may denote the criminal taking of personal property either by larceny, embezzlement, *or false pretenses*." *United States v. Turley*, 352 U.S. 407, 412 (1957) (citing *Black's Law Dictionary* (4th ed. 1951)) (emphasis added). *See also Steal, Black's Law Dictionary* (3d ed. 1933) (defining "steal" as "the criminal taking of personal property by larceny, embezzlement, or false pretenses."). Accordingly, circuit courts have consistently affirmed convictions under 18 U.S.C. § 641 for submitting fraudulent paperwork to the government in order to obtain money. *See United States v. Ransom*, 642 F.3d 1285, 1289-1290 (10th Cir. 2011) (affirming conviction under

5

18 U.S.C. § 641 for falsification of government timesheets); *United States v. Rivera-Ortiz*, 14 F.4th 91, 101 (1st Cir. 2021) (affirming conviction under 18 U.S.C. § 641 for misrepresenting the defendant's occupation on a social security disability insurance application); *United States v. Oliver*, 238 F.3d 471, 472-473 (3d Cir. 2001) (similar); *and United States v. Dowl*, 619 F.3d 494, 501-502 (5th Cir. 2010) (affirming conviction under 18 U.S.C. § 641 for falsifying loan applications).  Mr. Hay feigned a permanent disability to access government benefits.  That qualifies as "stealing" under 18 U.S.C. § 641.

Mr. Hay resists this conclusion, arguing that "none of the offenses enumerated in the statute—embezzlement, theft, conversion—extend to offenses that require, as necessary elements, proof of both a material misrepresentation and an intent to deceive." Aplt. Br. at 23.  According to Mr. Hay, the term "steal" refers to a "range of common-law theft offenses that all require the 'wrongful taking' of property without the consent of the owner." *Id.* at 24-25 (citing *United States v. Hill*, 835 F.2d 759, 763 (10th Cir. 1987); *C.R.S. Recovery, Inc. v. Laxton*, 550 Fed. App'x 512, 513 (9th Cir. 2013); *and Steal, Merriam-Webster Dictionary*).  Mr. Hay also distinguishes "stealing" from "fraud," which "requires proof that the defendant obtained property by means of 'false pretenses, representations, or promises' that is 'reasonably calculated to deceive persons of ordinary prudence.'" *Id.* at 25 (citing *United States v. Cochran*, 109 F.3d 660, 664 (10th Cir. 1997); *and Fraud, Black's Law Dictionary* (3d ed. 1933)).

Mr. Hay's definition of "stealing" is overly narrow and unsupported by the text of the statute or by precedent.  As the Supreme Court explained in *Turley*, "steal[ing]" includes the "criminal taking of personal property . . . by . . . false pretenses." *Turley*,

352 U.S. at 412. "[T]he courts interpreting [stolen and steal] have declared that they do not have a necessary common-law meaning coterminous with larceny and exclusive of other theft crimes." *Id*. This reasoning forecloses Mr. Hay's argument.

Mr. Hay points to our decision in *United States v. Hill*, where we held that "while § 641 defines a broad crime against property, it nonetheless circumscribes the means by which that crime can be committed." 835 F.2d 759, 763 (10th Cir. 1987) (internal citation omitted). But *Hill* does not help Mr. Hay because its analysis turns on an intrinsic distinction between *conversion* and *stealing* regarding how possession is obtained: "[o]ne who gains possession of property by wrongfully taking it from another steals. One who comes into possession of property by lawful means, but afterwards wrongfully exercises dominion over that property against the rights of the true owner, commits conversion." *Id.* at 764 (internal citations omitted). Thus, we concluded, "proof that the defendant *converted* property of the government is not proof that he *stole* it. The concepts of stealing and conversion are mutually exclusive." *Id.* (emphasis in original).

Unlike in *Hill*, the government does not argue here that Mr. Hay both came into possession of property in a lawful manner (i.e. conversion) *and also* wrongfully took the property (i.e. stealing). *Id*. Rather, the government argues that Mr. Hay's initial acquisition of government property was wrongful because it was obtained through false pretenses, thereby placing it within *Hill*'s definition of stealing. And as *Turley* made clear, "fraud" and "stealing" are not mutually exclusive—stealing encompasses wrongfully obtaining property through "false pretenses." 352 U.S. at 412.

7

Separately, Mr. Hay argues that the absence of "fraud" in the statutory text implies that Congress did not intend for the statute to forbid stealing by means of fraud. He points to other statutes that forbid both "stealing" and "obtaining by fraud" as evidence that Congress treats these as two separate offenses. *See* 18 U.S.C. §§ 659, 665(a), 666(a)(1)(A), 668(b)(1), and 670(a). He notes that Congress did not place 18 U.S.C. § 641 in the section of the criminal code that criminalizes fraud offenses more generally.

Even if Congress considered "stealing" and "fraud" to be two separate offenses, the statute forbidding "stealing" would still forbid "fraud" wherever a defendant committed "fraud" as a strategy to steal. "Stealing," as explained by the Supreme Court, means the taking of property "by larceny, embezzlement, or false pretenses"—an expansive definition. *Turley*, 352 U.S. at 412 (discussing the definition of "stolen" in the National Motor Vehicle Theft Act, 18 U.S.C. § 2312). And obviously, the *actus reus* of stealing can violate more than one federal criminal statute. For example, one might both steal explosives by wrongfully transporting them away and separately violate 18 U.S.C. § 842(a)(3)(A) (prohibiting possession of explosive materials without a license), or steal an armed vessel and also violate 18 U.S.C. § 964 by delivering it to a belligerent nation, or steal a drone while flying it off in a way that would recklessly interfere with the operation of a manned aircraft in violation of 18 U.S.C. § 39B(a)(2).

Since 18 U.S.C. § 641 prohibits stealing government property by means of fraud or deception, the government presented sufficient evidence to support Mr. Hay's conviction.

### 2. Wire fraud

The jury also found Mr. Hay guilty of six counts of wire fraud under 18 U.S.C. § 1343. He contends that the government presented insufficient evidence to show he intended to commit fraud.

The federal wire fraud statute applies to

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343. Any falsehood must be material to the scheme, *Neder v. United States*, 527 U.S. 1, 24 (1999), and the defendant must have intended to defraud. *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994).

At trial, the government presented evidence that Mr. Hay committed wire fraud by lying to the VA about the extent of his injuries to obtain benefits. While Mr. Hay does not dispute the statements alleged by the government, he argues that they were insufficient to establish materiality or intent.

We disagree. A reasonable factfinder could conclude that Mr. Hay's statements were material to the VA's decision to assign him disability benefits. "A false statement is material when it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (internal quotation

marks omitted).  VA officials testified multiple times that the agency considered Mr.
Hay's description of his disability when determining his disability status.  *See, e.g.,*
R. Vol. III at 325, 360, 398, and 412.  Viewing this evidence in the light most
favorable to the government, *see Delgado-Uribe*, 363 F.3d at 1077, a reasonable trier
of fact could conclude that Mr. Hay's statements to the government were material.

Mr. Hay argues that the government has not met its burden of showing
materiality since his "doctors also had access to his full medical records, including
reports and test results" and it was "Mr. Hay's doctors, not Mr. Hay himself, [who]
diagnosed him with FND based on the evidence before them, and there is no evidence
that this diagnosis was based solely on Mr. Hay's self-reporting his symptoms."
Aplt. Br. at 36-37.  This argument misapprehends the standard for materiality.  The
government did not bear the burden of proving that Mr. Hay's false statements were
decisive to the VA's disability determination, only that they were "capable of
influencing" that decision.  *Williams*, 934 F.3d at 1128.  Any negligence on the part
of Mr. Hay's doctors in this determination is entirely consistent with the materiality
of Mr. Hay's misstatements.

A reasonable factfinder could also conclude that the discrepancy between
Mr. Hay's statements to the VA and his actual physical condition demonstrated an
intent to defraud.  The jury heard considerable evidence from agents and medical
professionals that Mr. Hay systematically exaggerated his symptoms to obtain
benefits.  As one VA agent testified, Mr. Hay exhibited extreme mobility difficulties
when at his benefits exams.  He could only move with assistance from his wife and

climbed stairs one step at a time, with both feet on each stair.  After his exam, when he believed that he was out of the VA's sight, Mr. Hay drove over to a pawn shop, walked in without assistance of his cane or his wife, and walked out carrying a toolbox.  As neurologist Dr. Danielle Baker put it, "there is a marked discrepancy in what both Mr. Hay and his wife have documented on forms and also demonstrated in evaluations, compensation benefit evaluations versus what was seen with actual every day daily functioning when surveillance was taken."  R. Vol. III at 850. Viewing this evidence in the light most favorable to the government, a reasonable trier of fact could conclude that Mr. Hay intended to defraud the government.  *See Delgado-Uribe*, 363 F.3d at 1077.

Mr. Hay also contends that the government has not carried its burden of showing intent, since he "was upfront with his doctors about his disabilities" and told his doctors that his "episodes only happened once or twice a week."  Aplt. Br. at 37. These points, accepted as true, do not warrant reversal.  The government proved fraud at trial by showing that the chasm between the symptoms that Mr. Hay reported to the VA and the mobility he exhibited out of sight was so great as to be misleading. Even if Mr. Hay acknowledged some aptitude for physical activity to his doctors, it does not follow that the government's exaggeration theory was unsupported by the evidence overall.  That Mr. Hay admitted some ability to perform physical tasks is fully consistent with the jury's conclusion that he exaggerated his physical condition.

\*    \*    \*

11

In sum, the evidence at trial was sufficient to support the convictions for theft of government property and wire fraud.

### B. Fourth Amendment

Mr. Hay next argues that the district court should have suppressed evidence obtained from camera surveillance of his home under the Fourth Amendment. He contends that constant video surveillance of his home over several months constitutes an unreasonable search under emerging Supreme Court case law.

As part of its investigation, the VA installed a pole-mounted camera across the street from Mr. Hay's house. The camera was motion-activated and remote-controlled, and it produced footage of the front of Mr. Hay's property. The camera could only view Mr. Hay's property as visible from the street.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 585 U.S. 296, 304 (2018). Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Grant*, 556 U.S. 332, 338 (2009).

"For much of our history, Fourth Amendment search doctrine was tied to common-law trespass and focused on whether the Government obtains information by physically intruding on a constitutionally protected area." *Carpenter*, 585 U.S. at 304. In the 1960s and 1970s, however, the Supreme Court expanded the Fourth Amendment's sphere of protection to situations where an individual "seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). This "reasonableness" inquiry is the touchstone of modern Fourth Amendment analysis.

For decades, the Supreme Court has held that individuals do not have a reasonable expectation of privacy in activity that occurs in public view. "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). For instance, the Fourth Amendment does not require a warrant to view property from the air, if "[a]ny member of the public flying in this airspace who glanced down could have seen everything that the[] officers observed." *Id.* at 213-214; *see also Dow Chemical Co. v. United States*, 476 U.S. 227, 238-239 (1986) (holding that aerial view of an industrial plant did not violate the Fourth Amendment, even if "human vision is enhanced somewhat").

But the Supreme Court has required police obtain a warrant to view activities that are beyond public view and perceptible only through equipment outside of

13

general commercial circulation.  In *Kyllo v. United States*, the government surveilled a house using a thermal imaging camera.  533 U.S. 27, 34 (2001).  In deeming this to be a search, the Court explained that when "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant."  *Id.* at 40; *see also id.* at 39 (thermal vision "might disclose, for example, at what hour each night the lady of the house takes her daily sauna and bath—a detail that many would consider 'intimate'").  The Supreme Court's guideposts are clear: viewing of private settings, visible only with technology that is not in general public use, is considered a search; viewing settings that are in public view, or visible via generally available technology, does not constitute a search.

We have already concluded that the use of a pole camera does not constitute a search if the camera can only capture activity in public view.  In *United States v. Jackson*, we held that "[t]he use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment." 213 F.3d 1269, 1280 (10th Cir. 2000) (citing *Dow Chem. Co.*, 476 U.S. at 239 *and Ciraolo*, 476 U.S. at 213).  We reasoned that "activity a person knowingly exposes to the public is not a subject of Fourth Amendment protection" and that the pole cameras at issue in that case "were incapable of viewing inside the houses, and were capable of observing only what any passerby would easily have been able to observe."  *Id.* at 1281.  Although *Jackson* predates *Kyllo*, it is entirely consistent with

the holding in *Kyllo* since videographic equipment is in general commercial circulation and available to the public at large.

The facts of this case are not meaningfully different from those in *Jackson*. Both cases involve the extensive use of cameras surreptitiously filming the front of the house. While Mr. Hay noted at oral argument that the pole camera incidentally captured activity in his house, that activity occurred at night in front of the window and was therefore visible to any passerby. Since the pole camera could not capture footage of any activity that was not in public view, it did not violate the Fourth Amendment.

To counter this, Mr. Hay argues that *Jackson* has been abrogated by the Supreme Court's *Carpenter* decision. He contends that while *limited* video surveillance might not violate the Constitution, the government's months-long, potentially *limitless* surveillance crosses the line. In *Carpenter*, the Supreme Court considered whether the government conducts a search when it accesses historical cell-site location information. There, the government subpoenaed cell phone data from the suspect's wireless provider to track the suspect's movement before, during, and after a crime. The Court found this to be a search covered by the Fourth Amendment. It explained that whenever a cell phone connects to a cell site, "it generates a time-stamped record known as cell-site location information," the precision of which "depends on the size of the geographic area covered by the cell site." *Carpenter*, 585 U.S. at 301. Since many people carry their cell phones with them wherever they go, cell-site location information "chronicle[s] a person's past

15

movements through the record of his cell phone signals." *Id.* at 309.  The Court

found this unreasonable since "[w]hoever the suspect turns out to be, he has

effectively been tailed every moment of every day for five years, and the police

may—in the Government's view—call upon the results of that surveillance without

regard to the constraints of the Fourth Amendment." *Id.* at 312.

The *Carpenter* court distinguished the case from *United States v. Knotts*,

where it found that planting a transmitter in a suspect's car to aid in tracking the

vehicle did not constitute a search.  460 U.S. 276, 282 (1983).  There, the Court

explained that "[a] person travelling in an automobile on public thoroughfares has no

reasonable expectation of privacy in his movements from one place to another." *Id.*

at 281.  Although the officers "relied not only on visual surveillance, but on the use

of the beeper to signal the presence of [the] automobile to the police receiver,"

"nothing in the Fourth Amendment prohibited the police from augmenting the

sensory faculties bestowed upon them at birth" with the beeper. *Id.* at 282.  The

*Carpenter* court found that *Knotts* was not controlling on the question of cell site

location information, since that opinion had acknowledged that "different

constitutional principles may be applicable if twenty-four hour surveillance of any

citizen of this country were possible." *Carpenter*, 585 U.S. at 306-307 (citing

*Knotts*, 460 U.S. at 283-284) (internal quotation marks and brackets omitted).  It

further noted that in a more recent case on vehicle tracking, "[a] majority of this

Court has already recognized that individuals have a reasonable expectation of

privacy in the whole of their physical movements." *Id.* at 310 (citing *United States v.*

*Jones*, 565 U.S. 400, 430 (2018) (Alito, J. concurring); and *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)).

The *Carpenter* court distinguished "pursu[ing] a suspect for a brief stretch," which fell within a societal expectation of privacy, from "secretly monitor[ing] and catalogu[ing] every single movement of an individual's car for a very long period," which fell outside of it.  *Id.* (citing *Jones*, 565 U.S. at 429-430 (Alito, J., concurring)).  It reasoned that "[a]llowing government access to cell-site records contravenes that expectation" because "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts." *Id.* at 311.  This in turn "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"  *Id.* citing (*Jones*, 565 U.S. at 415 (Sotomayor, J. concurring)).  Further, unlike tracking devices in cars, "police need not even know in advance whether they want to follow a particular individual, or when," since cell site location data allows the Government to "travel back in time to retrace a person's whereabouts, subject only to the retention policies of the wireless carriers."  *Id.* at 312.  The *Carpenter* court concluded that accessing cell site location information "invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements" and therefore constituted a search.  *Id.* at 313.

Mr. Hay contends that he has a similar reasonable expectation of privacy in the whole of his physical movements coming and going from his home, plus a heightened

expectation of privacy in the exterior to his home. According to Mr. Hay, the recording of his house for an extended period of time (68 days in this case) catalogs his habits, patterns, and visitors in a way that ordinary physical surveillance could not duplicate. As he puts it, "the footage obtained painted an intimate portrait of Mr. Hay's personal life," including "when he entered and exited his home; who visited him and his family," and "what Mr. Hay did on his own front porch." Aplt. Br. at 44. He acknowledges that this activity took place in public but argues that "[w]hile people subjectively lack an expectation of privacy in some discrete actions they undertake in unshielded areas around their homes, they do not expect that every such action will be observed and perfectly preserved for the future." *Id.* at 45 (citing *Commonwealth v. Mora*, 150 N.E.3d 297, 306 (Mass. 2020)).

This argument is precluded by *Jackson*. That the surveillance took place over an extended period of time does not change the basic logic of the opinion—camera surveillance of a home visible to passersby does not constitute a search. Nor does *Carpenter* change the equation. The Supreme Court expressly noted that its decision was "a narrow one:" "[w]e do not express a view on matters not before us: real-time CSLI or 'tower dumps' . . . or call into question conventional surveillance techniques and tools, *such as security cameras*." *Carpenter*, 585 U.S. at 316 (emphasis added). Our holding in *Jackson* that pole cameras trained on a house do not violate the Fourth Amendment remains binding law, and *Carpenter*, without more, does not disturb it. In so holding, we are not alone. No circuit court has concluded that extended video surveillance of a house is a search under *Carpenter*. *See United States v. Dennis*,

18

41 F.4th 732, 740-741 (5th Cir. 2022) (finding no Fourth Amendment violation in the installation of cameras directed at front and back of defendant's house); *United States v. Tuggle*, 4 F.4th 505, 523-524 (7th Cir. 2021) (finding no Fourth Amendment violation in government's prolonged, round-the clock use of cameras capturing the exterior of defendant's home); *and United States v. Trice*, 966 F.3d 506, 518-520 (6th Cir. 2020) (finding no Fourth Amendment violation in installation of camera across the hallway from entrance of defendant's apartment); *cf. Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 341-342 (4th Cir. 2021) (*en banc*) (finding a Fourth Amendment violation in use of planes to record movements across an entire city).  An en banc First Circuit deadlocked on the question, with an even number of judges reaching opposite conclusions.  *See United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (*en banc*).

Regardless, Mr. Hay's privacy interests fall outside *Carpenter*'s rationale. *Carpenter* acknowledged that individuals have a privacy interest in "the whole of their physical movements."  *Carpenter*, 585 U.S. at 310.  The pole camera across the street from Mr. Hay came nowhere close to capturing "the whole of his physical movements."  It could only capture his movements at a single location, outside his house.  As soon as he left his house, the government could no longer track him by this means.  And the *Carpenter* majority was particularly concerned by retrospective police searches of previously unidentified individuals—i.e. where the government would "travel back in time to retrace a person's whereabouts, subject only to the retention policies of the wireless carriers."  *Id.* at 312.  In this case, the government

did not delve into a preexisting data set on Mr. Hay's whereabouts. It set up the camera while Mr. Hay was already under investigation as a prospective, not retrospective, investigative measure. The surveillance here merely enhances what law enforcement could always do—monitor a suspect's movement in public view.

Mr. Hay attempts to divine a new privacy interest by merging the one articulated in *Carpenter* (a retrospective "all encompassing record of the holder's whereabouts," 585 U.S. at 311), with the one identified in *Kyllo* and *Ciraolo* (privacy connected to one's home). 533 U.S. at 31, 476 U.S. at 213; *see also Lange v. California*, 141 S. Ct. 2011, 2018 (2021) ("[W]hen it comes to the Fourth Amendment, the home is first among equals." (citing *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).

But the Supreme Court's recognition of privacy interests in the home does not "require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Ciraolo*, 476 U.S. at 213. The government executes a search when it "uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion," *Kyllo*, 533 U.S. at 40, but "[n]ow more than ever, cameras are ubiquitous, found in the hands and pockets of virtually all Americans, on the doorbells and entrances of homes, and on the walls and ceilings of businesses." *Tuggle*, 4 F.4th at 516. Mr. Hay retains some privacy interests in the whole of his physical movements and in the interior of his home, but the pole camera at issue did not infringe upon either of those interests.

The Supreme Court has defined a "search" under the Fourth Amendment not by a fixed point, but by "[w]hen an individual seeks to preserve something as private and his expectation of privacy is one that society is prepared to recognize as reasonable." *Carpenter*, 585 U.S. at 304 (citing *Smith*, 442 U.S. at 740) (internal quotation marks omitted). "Current Fourth Amendment jurisprudence admits of a precarious circularity: Cutting-edge technologies will eventually and inevitably permeate society. In turn, society's expectations of privacy will change as citizens increasingly rely on and expect these new technologies." *Tuggle*, 4 F.4th at 527 (upholding use of pole camera).

Few technologies have expanded more rapidly than the ubiquitous camera, which is worn by police officers, built into cellphones that the *Carpenter* court called "almost a feature of human anatomy," and strapped to front doors. *United States v. Moore-Bush*, 36 F.4th at 372 (Lynch, J., concurring) (citing *Carpenter*, 585 U.S. at 311). Cutting edge drone technology enables police to conduct discreet aerial investigations, *see State v. Stevens*, 210 N.E.3d 1154, 1157 (Ohio App. 2023), while satellite images of homes are free and readily available to citizens and law enforcement alike. *See In re Murphy*, No. 771 Sept. Term 2022, 2023 WL 2999975, at *6 (Md. App. 2023). Artificial intelligence software accelerates facial identification and pattern recognition to a previously unimaginable degree. As video cameras proliferate throughout society, regrettably, the reasonable expectation of privacy from filming is diminished.

In conclusion, Mr. Hay had no reasonable expectation of privacy in a view of the front of his house.  The district court did not err in denying suppression of that footage.

### C. Evidentiary rulings

Finally, Mr. Hay argues that he is entitled to a new trial because of three erroneous evidentiary rulings by the district court.  "We review a trial court's evidentiary decisions for abuse of discretion.  However, we subject to de novo review a trial court's legal conclusions about the Federal Rules of Evidence." *United States v. Cherry*, 217 F.3d 811, 814 (10th Cir. 2000).

*First*, Mr. Hay argues that the district court erred in permitting the VA agents to narrate the contents of video footage.  He argues that this testimony bolstered the impact of the footage by allowing non-expert opinion testimony outside the agent's expertise.  Federal Rule of Evidence 701(b), only permits lay testimony when it is:

> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  Mr. Hay argues that the agents' testimony did not satisfy the second condition, because "their impressions of the footage itself were inappropriate."  Aplt. Br. at 60.

But Rule 701 does not prohibit lay testimony of impressions if those impressions are helpful to determining a fact in issue.  Fed. R. Evid. 701(b).  The district court did not abuse its discretion in concluding that the VA agents'

impressions of what was occurring in the video, informed by their deep familiarity with the footage, would help the jury determine a fact in issue.

*Second*, Mr. Hay argues that the district court erred by permitting the government to introduce his VA exam records, which included the doctors' assessment of his entitlement to disability benefits. According to Mr. Hay, these were out-of-court statements offered for their truth and therefore excludable under Fed. R. Evid. 801. The district court admitted these records under Fed. R. Evid. 803(4)'s exception for "medical diagnosis or treatment."[1] Mr. Hay contends that the exception does not apply, because a medical assessment for the purpose of determining disability is not a "diagnosis."

We disagree. The dictionary definition of "diagnosis" means "the discovery of a patient's illness or the determination of the nature of his disease from a study of his symptoms," or "[t]he art or act of recognizing the presence of disease from its symptoms, and deciding as to its character, also the decision reached, for determination of type or condition through case or specimen study or conclusion arrived at through critical perception or scrutiny." *Diagnosis, Black's Law Dictionary* (4th rev. ed. 1968). Nothing in that definition suggests that making a disability determination for a given ailment precludes being "diagnosed" with that

---

[1] Rule 803(4) provides that "[a] statement that: (A) is made for — and is reasonably pertinent to — medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause" is an exception to the rule against hearsay evidence.

ailment. Indeed, it seems to require as much. Rule 803(4) authorizes admission of the VA records.

*Third*, Mr. Hay argues that the district court erred in admitting evidence from after the charging period. The indictment charged Mr. Hay with committing theft and fraud between 2011 and 2018. The district court, however, also admitted evidence of Mr. Hay's behavior from after that period—a mechanic's lien stating that he had worked as a farm manager from 1985 to 2020, and a video from 2021. Mr. Hay contends that this evidence was unduly prejudicial in violation of Fed. R. Evid. 403.

Rule 403 permits a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Assessing the probative value of the proffered evidence, and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403." *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)) (brackets omitted). "This is particularly true with respect to Rule 403 since it requires an on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant." *Id.* (internal quotation marks omitted). Accordingly, a "trial court has broad discretion to determine

whether prejudice inherent in otherwise relevant evidence outweighs its probative value." *United States v. Poole*, 929 F.2d 1476, 1482 (10th Cir. 1991).

The district court acted within its discretion in admitting evidence post-dating the charging period. The VA allotted benefits to Mr. Hay because it determined that he was "permanently disabled," so any evidence that Mr. Hay was able to perform physical labor after that determination—whether or not it was within the charged period—was probative as to whether he had defrauded the VA.

## III.  Conclusion

We affirm the district court's denial of a judgment of acquittal and admission of the contested evidence.