No. 22-3276

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

BRUCE L. HAY
Defendant-Appellant.

---

On Appeal from the United States District Court
for the District of Kansas
Case No. 2:19-cr-20044-JAR
Honorable Julie A. Robinson, District Court Judge

---

## BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 8 MEDIA ORGANIZATIONS IN SUPPORT OF DEFENDANT-APPELLANT

---

Katie Townsend
*Counsel of Record for Amici Curiae*
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
ktownsend@rcfp.org

## DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reports and editors with no parent corporation and no stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Freedom of the Press Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of the organization.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The News Leaders Association has no parent corporation and does not issue any stock.

News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT....................................................................... ii

TABLE OF AUTHORITIES........................................................................v

INTEREST OF AMICI CURIAE ...............................................................1

SOURCE OF AUTHORITY TO FILE .......................................................2

FED. R. APP. P. 29(A)(4)(E) STATEMENT ...........................................2

SUMMARY OF THE ARGUMENT .........................................................3

ARGUMENT .............................................................................................5

    I.   Targeted, persistent camera surveillance threatens First Amendment
        freedoms, including the freedom to gather news. ..........................5

       a.   Confidential in-person contacts between reporters and sources play an
           essential role in newsgathering.................................................6

       b.   Persistent camera surveillance has been misused in infamous past efforts
           to identify reporters' sources. ..................................................8

    II.  The Fourth Amendment requires a warrant before investigators
        engage in targeted, persistent camera surveillance that would chill
        First Amendment rights. ............................................................11

       a.   Fourth Amendment safeguards are of heightened importance where First
           Amendment rights are at risk....................................................11

       b.   Under *Carpenter*, the Fourth Amendment requires a warrant to intrude on
           the associational rights threatened by location surveillance......................14

CONCLUSION .........................................................................................20

CERTIFICATE OF COMPLIANCE ...................................................21

CERTIFICATE OF SERVICE..................................................................22

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021).............................................................................11, 14, 16

*Boyd v. United States*,
  116 U.S. 616 (1886)...........................................................................................19

*Branzburg v. Hayes*,
  408 U.S. 665 (1972)...........................................................................................11

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018)................................................................................passim

*Commonwealth v. Mora*,
  150 N.E.3d 297 (Mass. 2020) .........................................................................13

*Entick v. Carrington*,
  19 How. St. Tr. 1029 (C.P. 1765) ....................................................................12

*Heller v. New York*,
  413 U.S. 483 (1973)...........................................................................................12

*Illinois v. Lidster*,
  540 U.S. 419 (2004)...........................................................................................10

*Katz v. United States*,
  389 U.S. 347 (1967)...........................................................................................15

*Kyllo v. United States*,
  533 U.S. 27 (2001)...............................................................................................5

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ...............................................................................18

*Marcus v. Search Warrants*,
  367 U.S. 717 (1961)..................................................................................4, 12, 19

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958)...........................................................................................14

*NAACP v. Button*,
371 U.S. 415 (1963) ...................................................................................... 3

*New York v. P.J. Video, Inc.*,
475 U.S. 868 (1986) ................................................................................. 12, 13

*Nieves v. Bartlett*,
139 S. Ct. 1715 (2019) ................................................................................ 13

*Roaden v. Kentucky*,
413 U.S. 496 (1973) ..................................................................................... 13

*Stanford v. Texas*,
379 U.S. 476 (1965) .............................................................................. passim

*United States v. Di Re*,
332 U.S. 581 (1948) ....................................................................................... 5

*United States v. Hay*,
601 F. Supp. 3d 943 (D. Kan. 2022) ................................................ 4, 17, 18

*United States v. Jackson*,
213 F.3d 1269 (10th Cir. 2000) ............................................................. 4, 15

*United States v. Jones*,
565 U.S. 400 (2012) ................................................................................. 3, 10

*United States v. Ramsey*,
431 U.S. 606 (1977) ..................................................................................... 13

*United States v. Stevens*,
559 U.S. 460 (2010) ..................................................................................... 19

*Wilkes v. Wood*,
19 How. St. Tr. 1153 (C.P. 1763) ......................................................... 12, 19

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) ...................................................................... 6

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978) ................................................................................. 5, 12

## Constitutional Provisions

U.S. Const. amend. IV ...........................................................................3

## Other Authorities

28 C.F.R. § 50.10 ...............................................................................7

Amy Mitchell et al., Pew Rsch. Ctr., Investigative Journalists and Digital
    Security (2015),
    https://perma.cc/PS6SVZZT ...............................................................7

Brief Amici Curiae of the Reporters Committee for Freedom of the Press
    and 15 Media Organizations,
    *Tuggle v. United States*, 142 S. Ct. 1107 (2022) (No. 21-541) ............................1

Brief Amici Curiae of the Reporters Committee for Freedom of the Press
    and 19 Media Organizations,
    *Carpenter v. United States*, 138 S. Ct. 2206 (2018) (No. 16-402) ......................1

Brief Amici Curiae of the Reporters Committee for Freedom of the Press
    and 8 Media Organizations,
    *United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (Nos. 19-1582,
    19-1625, 19-1583, 19-1626) .................................................................1

Charlie Savage, *CNN Lawyers Gagged in Fight with Justice Dept. over
    Reporter's Email Data*, N.Y. Times (June 9, 2021),
    https://perma.cc/8LKT-3J3V .................................................................7

*Government Surveillance: U.S. Has Long History of Watching White House
    Critics and Journalists*, Newsweek (July 24, 2017),
    https://perma.cc/B76N-3Z6B ...............................................................5

*Historical Marker Installed Outside 'Deep Throat' Garage*,
    ARLnow (Aug. 17, 2011),
    https://perma.cc/Z63R-AYWS.................................................................6

Human Rights Watch, With Liberty to Monitor All: How Large-Scale US
    Surveillance Is Harming Journalism, Law, and American Democracy
    (2014),
    https://perma.cc/KUH6-4MVF .............................................................8

Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C ...........................................................................4, 6

Jennifer R. Henrichsen & Hannah Bloch-Wehba, Reporters Comm. for Freedom of the Press, Electronic Communications Surveillance: What Journalists and Media Organizations Need to Know (2017), https://perma.cc/SW4K-EVAX ...........................................................................6

Karen DeYoung & Walter Pincus, *CIA to Air Decades of Its Dirty Laundry*, Wash. Post (June 22, 2007)*, https://perma.cc/QCY9-M2TC ...............................................................................9

Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181 (2016) .......................................................................17

Mark Feldstein, Poisoning the Press: Richard Nixon, Jack Anderson, and the Rise of Washington's Scandal Culture (2010) ..............................9, 10, 11

Memorandum from Howard J. Osborn, Central Intelligence Agency, "Family Jewels" (May 16, 1973), https://perma.cc/D5TY-AMF7...............................................................................9

*National Reporting: Jack Anderson of* United Features Syndicate, The Pulitzer Prizes (1972), https://perma.cc/B4R6-FP7T ...........................................................................8, 9

*Q&A: Brit Hume Recollects the Days of Being a CIA Target*, Fox News (June 29, 2007), https://perma.cc/T4D6-E6AD ...............................................................................9

Timothy S. Robinson, *CIA Elaborately Tracked Columnist*, Wash. Post (May 4, 1977), https://perma.cc/J4U7-B2B2...........................................................................3, 8

## INTEREST OF AMICI CURIAE

Amici are the Reporters Committee for Freedom of the Press, First Amendment Coalition, Freedom of the Press Foundation, The Media Institute, National Press Photographers Association, The News Leaders Association, News/Media Alliance, Radio Television Digital News Association, and Society of Environmental Journalists.

As news media organizations, publishers, and organizations dedicated to protecting the First Amendment interests of journalists, amici have a pressing interest in ensuring that warrantless surveillance authorities do not become an "instrument for stifling liberty of expression." *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961). Amici therefore write to highlight past misuses of persistent camera surveillance to intrude on the newsgathering process, as well as to underline the First Amendment interests at stake in the Fourth Amendment question at bar.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiff-Appellee and Defendant-Appellant have consented to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(A)(4)(E) STATEMENT

Amici declares that:

1.  no party's counsel authored the brief in whole or in part;

2.  no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3.  no person, other than amici, its members or its counsel, contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF THE ARGUMENT

The history of the Fourth Amendment "is largely a history of conflict between the Crown and the press," *Stanford v. Texas*, 379 U.S. 476, 482 (1965), and the Constitution's prohibition on "unreasonable searches and seizures," U.S. Const. amend. IV, has functioned since the founding as a vital safeguard for the First Amendment's guarantee of a free press.  If not for its protections, boundless and standardless surveillance would deny the right to gather the news the "breathing space" that it, like other "delicate and vulnerable" First Amendment freedoms, needs "to survive."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Against that backdrop, persistent camera surveillance can pose, and historically has posed, an obvious threat to the integrity of the newsgathering process.  To stake out an "observation nest" near a constitutionally sensitive location—a newspaper office, a home, a church—is an old trick of agencies hoping to identify reporters' sources and dam the flow of newsworthy information to the public.  Timothy S. Robinson, *CIA Elaborately Tracked Columnist*, Wash. Post (May 4, 1977), https://perma.cc/J4U7-B2B2.  But the technology at issue in this case abolishes the limits that once ensured persistent visual monitoring was "difficult and costly"— an exceptional rather than an everyday intrusion. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (quoting *United States v. Jones*, 565 U.S. 400, 429 (2012) (Alito, J., concurring in the judgment)).  The

contemporary pole camera reliably empowers the government to open "an intimate window into a person's life" and associations, *id.* at 2217, including the confidential reporter-source contacts on which so much newsgathering depends.

The district court in this case held that placing a pole camera outside Hay's home for a total of 68 days did not violate a reasonable expectation of privacy because it considered itself bound by this Court's decision in *United States v. Jackson*, 213 F.3d 1269 (10th Cir. 2000), even as it freely granted that "Hay may well be right that the Tenth Circuit should, in light of *Carpenter*, reconsider *Jackson*," *United States v. Hay*, 601 F. Supp. 3d 943, 952 (D. Kan. 2022).  This Court should take this opportunity to do so.

By *Jackson*'s logic, investigators could station a permanent, never-blinking eye with an indefinite memory outside any sensitive location on bare curiosity—on the off-chance, say, of catching the next Neil Sheehan visiting the next Daniel Ellsberg's apartment.  *See* Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C.  That result cannot be reconciled with *Carpenter*, and such an "unrestricted power of search and seizure" would also offer a powerful "instrument for stifling liberty of expression," casting a chilling pall on the reporter-source contacts on which effective journalism often relies.  *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961).  This Court should reject that thin, dangerous construction of the

Fourth Amendment and reaffirm that its requirements apply with "scrupulous exactitude" when First Amendment freedoms are also at stake. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford*, 379 U.S. at 485).

## ARGUMENT

I.    **Targeted, persistent camera surveillance threatens First Amendment freedoms, including the freedom to gather news.**

Experience teaches that a "too permeating police surveillance" will predictably intrude on the newsgathering process—exposing stories pursued, journalistic methods employed, and the identities of sources consulted. *United States v. Di Re*, 332 U.S. 581, 595 (1948). And because in-person meetings play a crucial role in reporter-source relationships, location tracking, in particular, has long been a tool employed by officials hoping to investigate and ultimately chill disclosures to the media. *See Government Surveillance: U.S. Has Long History of Watching White House Critics and Journalists*, Newsweek (July 24, 2017), https://perma.cc/B76N-3Z6B (noting the CIA's track record of "follow[ing] newsmen . . . in order to identify their sources"). But the "more sophisticated systems" of visual surveillance that are now "in use or in development," *Kyllo v. United States*, 533 U.S. 27, 36 (2001), have expanded investigators' field of view dramatically. To conclude that those new tools are entirely unregulated by the Fourth Amendment, available for suspicionless, indefinite deployment outside any sensitive location, threatens the free exercise of First Amendment freedoms.

### a. Confidential in-person contacts between reporters and sources play an essential role in newsgathering.

"[J]ournalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). That some of the most consequential reporting about the functioning of government has depended on such sources is familiar enough that a plaque commemorates the "anonymous secure location"—a parking garage—where Bob Woodward would meet Mark Felt during the *Washington Post*'s investigation of the Watergate scandal. *Historical Marker Installed Outside 'Deep Throat' Garage*, ARLnow (Aug. 17, 2011), https://perma.cc/Z63R-AYWS. The reporting of the landmark Pentagon Papers disclosures likewise involved repeated confidential meetings between the *New York Times*'s Neil Sheehan and his source, Daniel Ellsberg, at each other's homes. *See* Scott, *supra*. The value of the reporting that would be lost if journalists could not credibly guard the confidentiality of those contacts cannot be overstated.

While in-person meetings have always played a role in reporter-source relationships, those interactions have taken on special importance in a climate of pervasive electronic surveillance. *See generally* Jennifer R. Henrichsen & Hannah Bloch-Wehba, Reporters Comm. for Freedom of the Press, Electronic Communications Surveillance: What Journalists and Media Organizations Need to Know (2017), https://perma.cc/SW4K-EVAX. In recent leak investigations, the

government has offered a vivid reminder that the electronic trail left by journalists'
interactions with their sources is only ever a routine, secret court order away from
exposure to investigators.  *See, e.g.*, Charlie Savage, *CNN Lawyers Gagged in
Fight with Justice Dept. over Reporter's Email Data*, N.Y. Times (June 9, 2021),
https://perma.cc/8LKT-3J3V.[1]  When any stray digital breadcrumb could put a
source's identity at risk, in-person meetings provide a crucial safety valve.

As a result, as a 2015 report from the Pew Research Center documented,
"[w]hen it comes to the specific actions journalists may or may not take to protect
their sources, the most common technique by far . . . is to meet them in person."
Amy Mitchell et al., Pew Rsch. Ctr., Investigative Journalists and Digital Security
at 8–9 (2015), https://perma.cc/PS6SVZZT.  And a 2014 study conducted by
Human Rights Watch likewise found that growing awareness of the scope of
government monitoring has led journalists "to adopt elaborate steps to protect
sources and information," up to and including "abandoning all online
communication and trying exclusively to meet sources in person."  Human Rights

---

[1]     Exactly because of the important First Amendment interests at stake in
reporter-source confidentiality, the Department of Justice recently adopted
regulations prohibiting the use of "compulsory legal process for the purpose of
obtaining information from or records of members of the news media acting within
the scope of newsgathering," with limited exceptions.  28 C.F.R. § 50.10(a)(2).
While the regulations mark an important shift in the Department's approach, they
lack the lasting force of a federal statute and provide, of course, no protection
against investigations conducted by the instruments of state governments.

Watch, With Liberty to Monitor All: How Large-Scale US Surveillance Is

Harming Journalism, Law, and American Democracy at 4 (2014),

https://perma.cc/KUH6-4MVF.  As one reporter put it, "[m]aybe we need to get

back to going to sources' houses."  *Id*. at 35.  This case asks whether that safe

harbor, too, will inevitably be eroded by ever more expansive surveillance.

> **b.  Persistent camera surveillance has been misused in infamous past
> efforts to identify reporters' sources.**

In light of the crucial role that confidential, in-person meetings with sources

play in the newsgathering process, it should be no surprise that crude variations on

the surveillance at issue here have figured in past, now-infamous leak

investigations.  When a journalist's only option is "to go to their [source's] door,"

With Liberty to Monitor All, *supra*, at 35, officials hoping to out that source—

disrupting the flow of newsworthy information to the public—will work to ensure

that door has a camera pointed at it.

Perhaps the best-known example is the Nixon administration's relentless

monitoring of columnist Jack Anderson, who in 1972 was "spied on by the CIA in

a three-month, unsuccessful agency attempt to determine the sources of his news

stories."  Robinson, *supra*.  Anderson and his staff were, in the eyes of the White

House, too well-informed about United States policy towards India and Pakistan,

as reflected in reporting that earned Anderson a Pulitzer Prize.  *See National

Reporting: Jack Anderson of* United Features Syndicate, The Pulitzer Prizes

(1972), https://perma.cc/B4R6-FP7T.  The Central Intelligence Agency therefore launched an extensive illegal effort to identify his sources.  And in addition to trailing Anderson to and from his home, his church, and his meetings, the agency "rented a room high up in the Statler Hilton Hotel, across the street from Anderson's office, to watch and photograph the comings and goings of the newsman and his informants."  Mark Feldstein, *Poisoning the Press: Richard Nixon, Jack Anderson, and the Rise of Washington's Scandal Culture* 207 (2010).

Though the government's surveillance of Anderson was an extreme case, it is, unfortunately, not an isolated one.  Other reporters on Anderson's staff—including a young Brit Hume, now senior political analyst for FOX News Channel—were likewise targeted for around-the-clock visual surveillance.  *See Q&A: Brit Hume Recollects the Days of Being a CIA Target*, Fox News (June 29, 2007), https://perma.cc/T4D6-E6AD.  And the *Washington Post*'s Michael Getler earned the same invasive treatment—a CIA nest established "where observation could be maintained of the building housing his office"—after he published a report on the movements of Soviet submarines.  Memorandum from Howard J. Osborn, Central Intelligence Agency, "Family Jewels" at 27 (May 16, 1973), https://perma.cc/D5TY-AMF7; *see* Karen DeYoung & Walter Pincus, *CIA to Air Decades of Its Dirty Laundry*, Wash. Post (June 22, 2007)*,* https://perma.cc/QCY9-M2TC.

As egregious an assault on press freedom as this Watergate-era surveillance of journalists was, though, the traditional "practical" checks on visual surveillance constrained the government's ability to achieve its unconstitutional goals. *Jones*, 565 U.S. at 429 (Alito, J., concurring in the judgment). For one, because it took "a team of sixteen undercover officers" to keep a consistent eye on Anderson, the operation was labor-intensive and conspicuous; Anderson caught on, taking steps to preserve the confidentiality of his sources while exposing the operation to public ridicule. Feldstein, *supra*, at 206, 211. The effort was bounded, too, by the limits of the agents' memory and perception. Though the CIA watchers in fact captured a photo of one of Anderson's reporters meeting with a key source, they failed to recognize what they had managed to record. *See id.* at 212.

Today the same surveillance could be accomplished with a pole camera, dissolving those practical checks on abusive monitoring. Unlike a crowd of investigators in dark suits, a pole camera is cheap and discreet, evading the constraint that "limited police resources and community hostility" impose on obtrusive law enforcement tactics. *Illinois v. Lidster*, 540 U.S. 419, 426 (2004). And "[u]nlike the nosy neighbor who keeps an eye on comings and goings," cameras like these "are ever alert, and their memory is nearly infallible." *Carpenter*, 138 S. Ct. at 2219. The result is that the kind of sustained visual surveillance that once required the personal approval of high officials and the

outlay of significant resources, *see* Feldstein, *supra*, at 212, has come within the reach of any petty authority hoping to indulge a curiosity.

## II. The Fourth Amendment requires a warrant before investigators engage in targeted, persistent camera surveillance that would chill First Amendment rights.

If the threat of constant, limitless camera surveillance hangs over each home and newspaper office, the destruction of any secure setting for anonymous association will have a grievous effect on reporters' relationships with confidential sources. And "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). As Supreme Court precedent makes clear, that threat to the interests the First and Fourth Amendments both safeguard requires strict adherence to the warrant requirement when the government conducts surveillance that would chill the exercise of First Amendment rights.

### a. Fourth Amendment safeguards are of heightened importance where First Amendment rights are at risk.

From the outset, the protections of the First and Fourth Amendments have been closely intertwined. Just as "Founding-era Americans understood the freedom of the press to include the right of printers and publishers not to be compelled to disclose the authors of anonymous works," *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2390 (2021) (Thomas, J., concurring) (citation and internal quotation marks omitted), the prohibition on unreasonable searches

11

was widely understood as a response to abusive English practices targeting the publishers of dissident publications, *see Stanford*, 379 U.S. at 482. As the Supreme Court has often observed, two of the landmark cases that informed the Fourth Amendment's adoption—*Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765), and *Wilkes v. Wood*, 19 How. St. Tr. 1153 (C.P. 1763)—were press cases. And whether a particular case involves the institutional press or not, Lord Camden's insight that a "discretionary power given to messengers to search wherever their suspicions may chance to fall" is "totally subversive of the liberty of the subject" continues to inform interpretation of the Fourth Amendment today. *Marcus*, 367 U.S. at 728–729 (quoting *Wilkes*, 19 How. St. Tr. at 1167).

The Supreme Court has insisted, in that light, that the Fourth Amendment's requirements be enforced with an eye toward protecting First Amendment interests. *See Zurcher*, 436 U.S. at 564. In some settings, those interests demand a searching application of the Fourth Amendment's usual standards, because "[t]he necessity for a prior judicial determination of probable cause will protect against gross abuses," *New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 (1986) (quoting *Heller v. New York*, 413 U.S. 483, 492–93 (1973)), and "the preconditions for a warrant" will deny officers discretion to "rummage at large" or "deter normal editorial and publication decisions," *Zurcher*, 436 U.S. at 565–66. On other footings, because "the First Amendment operates independently of the Fourth and

12

provides different protections," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1731 (2019)

(Gorsuch, J., concurring in part and dissenting in part), the Court has underlined

that search regimes implicating distinctive First Amendment interests may require

stricter safeguards than the Fourth Amendment, alone, would provide.

In *United States v. Ramsey*, 431 U.S. 606 (1977), for instance, having

concluded that the Fourth Amendment permits warrantless searches of mail at the

border, the Supreme Court reserved the separate question of whether such searches

would "impermissibly chill[] the exercise of free speech" if not for a statutory

reasonable-suspicion requirement and a ban on reading any correspondence

contained therein, *id.* at 624.  To similar effect, the Court has held that other

warrant exceptions—the "'exigency' exception," for instance—must yield to First

Amendment interests where, say, forgoing a warrant before seizing books or films

"would effectively constitute a 'prior restraint.'"  *P.J. Video*, 475 U.S. at 873

(citing *Roaden v. Kentucky*, 413 U.S. 496 (1973)).  Across diverse contexts, then,

the First and Fourth Amendments work together to ensure warrantless search

regimes do not abridge the freedoms of speech and the press.

When the government points a camera at a newspaper office rather than an

alley, or "a place of worship" rather than "an interstate highway," *Commonwealth

v. Mora*, 150 N.E.3d 297, 308 (Mass. 2020) (citation omitted), its use squarely

implicates those overlapping First and Fourth Amendment protections for "privacy

in one's associations," *Ams. for Prosperity*, 141 S. Ct. at 2382 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).  Like reading a traveler's letters or seizing a seller's books, surveillance of the home in particular—as opposed to an arbitrary stretch of road—is the sort of search power systematically likely to burden the exercise of First Amendment rights.  And that much remains true whether in a given case the camera captures Sheehan visiting Ellsberg or a homeowner washing his car.  In either case, the rule governing that surveillance must be framed with the "scrupulous exactitude" the Supreme Court requires where the government's discretion could, if left unregulated, be abused in the future to tread on First Amendment interests.  *Stanford*, 379 U.S. at 485.

###### b.  Under *Carpenter*, the Fourth Amendment requires a warrant to intrude on the associational rights threatened by location surveillance.

The Supreme Court's precedents concerning location-tracking in particular provide the appropriate approach to the analysis, and they reflect the acute attention to First Amendment interests that persistent camera surveillance implicates.  The Supreme Court affirmed in *Carpenter* that confidential associations remain entitled to Fourth Amendment protection—and the shelter of the warrant requirement—when reflected in an individual's "particular movements."  138 S. Ct. at 2217.  After all, "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere.  To the

contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'" *Carpenter*, 138 S. Ct. at 2217 (quoting *Katz v. United States*, 389 U.S. 347, 351–52 (1967)). In particular, under *Carpenter*, the government intrudes on a reasonable expectation of privacy when it gathers information that "provides an intimate window" into an individual's "associations," *id.* at 2217 (citation omitted); information that individuals leave behind or expose without meaningful voluntary choice, *see id.* at 2220; and which new technology allows the government to gather with ease where, historically, comparable analogue surveillance would have been "difficult and costly and therefore rarely undertaken," *id.* at 2217 (citation omitted).

This Court's previous decision in *Jackson*, which rejected the proposition that any degree of pole camera surveillance can intrude on a reasonable expectation of privacy, was reached without the benefit of that guidance and cannot be reconciled with it. *Jackson*'s analysis was brief and categorical. It held that, because the pole camera in that case recorded "only what any passerby" would have been able to see and did not record happenings inside the home, Jackson lacked a reasonable expectation of privacy in his comings and goings. *Jackson*, 213 F.3d at 1281. It did not include in its analysis any consideration of the length of time that the pole camera was capable of recording as compared to the practical constraints on traditional modes of visual surveillance, *see Carpenter*, 138 S. Ct. at

15

2219; it did not weigh the contrast between the storage capacity of the camera and the limited memory of a "nosy neighbor," *id.*; it did not ask whether the "retrospective quality of the" footage "gives police access to a category of information otherwise unknowable," *id.* at 2218; and, perhaps most importantly, it failed to address whether such a camera reliably "provides an intimate window" into an individual's "associations," *id.* at 2217 (citation omitted).  In each of these respects, *Jackson* has been overtaken by *Carpenter* and must be reconsidered.

Under the now-governing test, the recording of nearly ten weeks of footage of Hay's private residence from a surreptitiously installed pole camera plainly violated his reasonable expectation of privacy.  For one, persistent and targeted surveillance of the home will predictably expose a range of confidential associations, including reporter-source contacts.  And to authorize targeted, constant surveillance of an individual's front door is to stake out an act—entering and exiting the home—as involuntary as owning a cell phone.  A person must go out into the world not only to fulfill basic needs, but also to reap the benefits that participation in public life may bring.  As the Supreme Court emphasized recently, the Constitution defends privacy in association in the first place to promote "[e]ffective advocacy of both public and private points of view."  *Ams. for Prosperity*, 141 S. Ct. at 2382 (citation omitted).  A reporter cannot gather the news exclusively from the comfort of a living room.  And the Crown, for that

matter, rummaged through John Wilkes' home for the paper he planned to go out and distribute, not a diary he planned to keep to himself. *See* Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1199 & n.82 (2016). The right to confidential association would be of little use—to journalists or anyone else—if it protected only those who never leave home or accept visitors.

Finally, there can be no serious dispute that the surveillance at issue would be practically impossible without the aid of developments in pole camera technology. Yet the district court nevertheless characterized the long-term pole camera surveillance here as a type of "conventional surveillance technique[]"— akin to the use of a "security camera[]"— that *Carpenter* did not "call into question." *Hay*, 601 F. Supp. 3d at 951 (quoting *Carpenter*, 138 S. Ct. at 2220). The analogy fails. Traditional security cameras can only coincidentally capture the associational activities that were the touchstone of *Carpenter*'s Fourth Amendment analysis—they can only serendipitously catch a reporter and a source meeting in a park, for instance. *See Carpenter*, 138 S. Ct. at 2220 (grouping security cameras with "other business records that *might incidentally* reveal location information" (emphasis added)). Here, of course, there was nothing incidental about what the camera captured. Law enforcement surveilled Hay in a targeted, pervasive fashion, recording and storing every coming and going from his private residence for nearly ten weeks. That constant, systematic, technology-assisted stake-out

17

opens just the sort of "intimate window into a person's life" for which *Carpenter* requires a warrant. *Id.* at 2217.

Similarly, it is hard to understand how the district court could conclude that the surveillance of Hay's home was permissible because it captured less than "the whole of [Hay's] physicals movements." *Hay*, 601 F. Supp. 3d at 952–53 (citation and internal quotation marks omitted). True enough, the interactions and movements captured here were "part of [a] much larger whole." *Id.* But the same could have been said of the collection of less than four weeks of GPS monitoring in *Jones*, which could only track the movement of the defendant's car, or the 127 days of cell-site location information in *Carpenter*, which were not granular enough to "reveal where Carpenter lives and works." *Carpenter*, 138 S. Ct. at 2232 (Alito, J., dissenting); *see Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 342 (4th Cir. 2021) (en banc) ("The datasets in *Jones* and *Carpenter* had gaps in their coverage, too."). But in each case, the Supreme Court asked not what the degree of monitoring the government opted for *happened* to reveal, but what unregulated use of the technology would let the government *systematically* reveal.

And rightly so. The Fourth Amendment forbids the accumulation of "arbitrary power" in the first instance; the Constitution is not reassured by the suggestion that arbitrary power was used responsibly in a particular case.

*Carpenter*, 138 S. Ct. at 2214 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)); *cf. United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*.").  The district court could reach the result it did only by losing sight of the founding insight that connects the First and Fourth Amendments—that "discretionary power given to messengers to search wherever their suspicions may chance to fall" is "totally subversive of the liberty of the subject." *Marcus*, 367 U.S. at 728–29 (quoting *Wilkes*, 19 How. St. Tr. at 1167).  Under such a regime of arbitrary monitoring, the freedoms of speech and the press could not survive.

\* \* \*

The technology at issue in this case poses an untenable threat to confidential association, and with it the freedom to gather the news.  The press could not, under constant official scrutiny, provide the vigorous check on government that the Constitution recognizes and protects.  A probable-cause warrant, and nothing short of it, is necessary to protect the rights enshrined in the First Amendment from persistent, pervasive, and targeted government surveillance.  "No less a standard could be faithful to First Amendment freedoms." *Stanford*, 379 U.S. at 485.

19

## CONCLUSION

For the foregoing reasons, amici curiae respectfully urge the Court to reverse the denial of Defendant-Appellant's motion to suppress.

Dated: May 10, 2023

Respectfully submitted,

*/s/ Katie Townsend*
*Counsel of Record for Amici Curiae*
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App.

P. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains 4,032 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman font.


Dated: May 10, 2023                    */s/ Katie Townsend*
                                       Katie Townsend
                                       *Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2023, I caused the foregoing brief of amici curiae to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

Dated: May 10, 2023

*/s/ Katie Townsend*
Katie Townsend
*Counsel of Record for Amici Curiae*